CLOSED,APPEAL,COMPLEX,PROTO,SEVER

# U.S. District Court
# DISTRICT OF KANSAS (Wichita)
# CRIMINAL DOCKET FOR CASE #: <u>6:12–cr–10089–MLB</u> All Defendants

Case title: USA v. Najera et al

Date Filed: 04/16/2012
Date Terminated: 03/25/2014

Assigned to: District Judge Monti
L. Belot

### Defendant (1)

**Jason Najera**
*TERMINATED: 04/30/2013*
*also known as*
Ene
*TERMINATED: 04/30/2013*
*also known as*
Norte
*TERMINATED: 04/30/2013*

represented by **Jason Najera**
701 SE Stone Road
ElDorado, KS 67042
Email:
PRO SE
*Bar Status:*

**David H. Moses**
Case, Moses, Zimmerman & Martin, PA – Wichita
200 W. Douglas, Suite 900
Wichita, KS 67202
316–303–0100
Fax: 316–265–8263
Email: dmoses@cmzwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*
*Bar Status: Active*

### Pending Counts

18:1959(a)(5) – Violent crimes in
aid of racketeering: attempted
murder; 18:2 – Aiding and
abetting (SEALED
INDICTMENT 04/16/2012)
(26)

### Disposition

120 Months Imprisonment; 3 Years Supervised
Release; $100 Assessment; Fine is Waived;
$16,242.10 Restitution

### Highest Offense Level (Opening)

Felony

### Terminated Counts

18:1962(d) – Conspiracy to
commit racketeering activities
(SEALED INDICTMENT

### Disposition

Dismissed

04/16/2012)
(1)

18:1959(a)(3) – Violent crimes in
aid of racketeering: assault with a
dangerous weapon; 18:2 – Aiding
and abetting (SEALED
INDICTMENT 04/16/2012)
(27)

Dismissed

18:922(g)(1) and 18:924(a)(2) –
Felon in possession of ammunition
(SEALED INDICTMENT
04/16/2012)
(33–34)

Dismissed

**Highest Offense Level
(Terminated)**

Felony

**Complaints**                                   **Disposition**

None

---

Assigned to: District Judge Monti
L. Belot

Appeals court case number:
14–3006 10CCA

**Defendant (2)**

**Pedro Garcia**                    represented by   **John V. Wachtel**
*TERMINATED: 01/07/2014*                            Klenda Austerman, LLC – Wichita
*also known as*                                     1600 Epic Center
Peter Garcia                                        301 N. Main
*TERMINATED: 01/07/2014*                            Wichita, KS 67202–4816
*also known as*                                     316–267–0331
Pistol Pete                                         Fax: 316–267–0333
*TERMINATED: 01/07/2014*                            Email: jvwachtel@klendalaw.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Designation: CJA Appointment*
                                                    *Bar Status: Active*

                                                    **Charles M. Rogers**
                                                    Wyrsch Hobbs Mirakian, PC
                                                    1000 Walnut–Ste. 1600
                                                    Kansas City, MO 64106
                                                    816–221–0080
                                                    Fax: 816–221–3280
                                                    Email: acquit@whmlaw.net

2

*TERMINATED: 09/25/2012*
*Designation: CJA Appointment*
*Bar Status: WDMO Active*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1962(d) – Conspiracy to commit racketeering activities (SEALED INDICTMENT 04/16/2012) (1) | 240 months imprisonment, said term to run concurrently with Counts 2, 3, 4 and 8; 3 years supervised release, said term to run concurrently with Counts 2–7, 8 and 9; $900.00 Assessment ($100/Count) |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to murder (SEALED INDICTMENT 04/16/2012) (2) | 120 months imprisonment, said term to run concurrently with Counts 1, 3, 5, 7 and 8; 3 years supervised release, said term to run concurrently with Counts 1, 3–7, 8 and 9; $900.00 Assessment ($100/Count) |
| 18:1959(a)(1) – Violent crimes in aid of racketeering: murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (3) | Life imprisonment; 3 years supervised release, said term to run concurrently with Counts 1–2, 4–7, 8 and 9; $900.00 Assessment ($100/Count) |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (4) | 120 months imprisonment, said term to run concurrently with Counts 1, 3, 5, 7 and 8; 3 years supervised release, said term to run concurrently with Counts 1–3, 5–7, 8 and 9; $900.00 Assessment ($100/Count) |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (5) | 240 months imprisonment, said term to run concurrently with Counts 2, 3, 4 and 8; 3 years supervised release, said term to run concurrently with Counts 1–4, 6–8 and 9; $900.00 Assessment ($100/Count) |
| 18:924(c)(1)(A) – Possess/discharge a firearm in furtherance of a crime of violence; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (6) | 25 years imprisonment, said term to run consecutively to all other Counts; 3 years supervised release, said term to run concurrently with Counts 1–5, 7, 8 and 9; $900.00 Assessment ($100/Count) |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: Assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (7) | 240 months imprisonment, said term to run concurrently with Counts 2, 3, 4 and 8; 3 years supervised release, said term to run concurrently with Counts 1–6, 8 and 9; $900.00 Assessment ($100/Count) |
| 18:1959(a)(6) – Violent crimes in aid of racketeering: conspiracy to commit assault with a dangerous | 36 months imprisonment, said term to run concurrently with Counts 1, 2, 3, 4, 5, 7 and 8; 1 year supervised release, said term to run |

| | |
|---|---|
| weapon (SEALED INDICTMENT 04/16/2012) (8) | concurrently with all other Counts; $900.00 Assessment ($100/Count) |
| 18:924(c)(1)(A) – Possess and brandish a firearm in furtherance of a crime of violence; aggravated robbery; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (9) | 7 years imprisonment, said term to run consecutively to all other Counts; 3 years supervised release, said term to run concurrently with Counts 1–7 and 8; $900.00 Assessment ($100/Count) |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: District Judge Monti L. Belot

Appeals court case numbers: 13–3140 10CCA, 14–3039 10CCA

**Defendant (3)**

| | | |
|---|---|---|
| **Gonzalo Ramirez** *TERMINATED: 01/09/2014* *also known as* Gonzo *TERMINATED: 01/09/2014* | represented by | **Joel Mandelman** Office of Federal Public Defender – Wichita 850 Epic Center 301 North Main Street Wichita, KS 67202 316–269–6445 Fax: 316–269–6175 Email: joel_mandelman@fd.org *ATTORNEY TO BE NOTICED* *Designation: Public Defender or Community Defender Appointment* *Bar Status: Active* |
| | | **Kirk C. Redmond** Office of Federal Public Defender – KCK |

4

500 State Avenue, Suite 201
Kansas City, KS 66101–2400
913–551–6712
Fax: 913–551–6562
Email: kirk_redmond@fd.org
*TERMINATED: 09/12/2012*
*Designation: Public Defender or Community
Defender Appointment*
*Bar Status: Active*

**Melody J. Evans**
Office of Federal Public Defender – Topeka
117 SW 6th Avenue, Suite 200
Topeka, KS 66603
785–232–9828
Fax: 785–232–9886
Email: Melody_Evans@fd.org
*TERMINATED: 09/12/2012*
*Designation: Public Defender or Community
Defender Appointment*
*Bar Status: Active*

**Timothy J. Henry**
Office of Federal Public Defender – Wichita
850 Epic Center
301 North Main Street
Wichita, KS 67202
316–269–6445
Fax: 316–269–6175
Email: Tim_Henry@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community
Defender Appointment*
*Bar Status: Active*

| **Pending Counts** | **Disposition** |
| --- | --- |
| | Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00 |
| 18:1962(d) – Conspiracy to commit racketeering activities (SEALED INDICTMENT 04/16/2012) (1) | |

| | |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to murder (SEALED INDICTMENT 04/16/2012) (2) | Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00 |
| 18:1959(a)(1) – Violent crimes in aid of racketeering: murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (3) | Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00 |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (4) | Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00 |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (5) | Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run |

concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

18:924(c)(1)(A) – Possess/discharge a firearm in furtherance of a crime of violence; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (6)

Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

18:1959(a)(3) – Violent crimes in aid of racketeering: Assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (7)

Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

18:1959(a)(6) – Violent crimes in aid of racketeering: conspiracy to commit assault with a dangerous weapon (SEALED INDICTMENT 04/16/2012) (8)

Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts

1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

18:924(c)(1)(A) – Possess and brandish a firearm in furtherance of a crime of violence; aggravated robbery; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012)
(9)

Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012)
(10)

Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012)
(11)

Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a

Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11

dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012)
(12)

– 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

18:924(c)(1)(A) – Possess and discharge a firearm in furtherance of a crime of violence; aggravated assault; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012)
(13)

Imprisonment: Life plus 57 years to be served consecutively (count 3 – life; counts 2,4,10 and 11 – 120 months, each count to run concurrently with counts 1,3,5,7,8 and 12; counts 1,5,7 and 12: 240 months, each count, to run concurrently with counts 2,3,4,8,10 and 11; count 8; 36 months to run concurrently with counts 1–5,7,8,10,11 & 12; Count 9 – 7 years to run consecutively to all other counts; Count 6 25 years to run consecutively to all other counts and count 13 – 25 years to run consecutively to all other counts); Supervised release: 3 years total (3 years on each of counts 1–7, 9–13 to run concurrently and 1 year on count 8, to run concurrently with all other counts); Assessment: $1,300.00

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

Assigned to: District Judge Monti L. Belot

**Defendant (4)**

**Russell Worthey**
*TERMINATED: 01/28/2014*
*also known as*
Blanco
*TERMINATED: 01/28/2014*

represented by **James R. Pratt**
Pratt Law L.L.C.
445 N. Waco
Wichita, KS 67202
316–262–2600
Fax: 316–262–2606
Email: jim@jamesrprattlaw.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*
*Bar Status: Active*

**Pending Counts**

18:1962(d) Racketeering – narcotics
(INFORMATION 5/3/13)
(1s)

18:924(c)(1)(A) –
Possession/Discharging a firearm in
furtherance of a crime of violence;
18:2 – Aiding and abetting (FIRST
SUPERSEDING INFORMATION
05/13/2013)
(2ss)

**Highest Offense Level (Opening)**

Felony

**Disposition**

120 Months Imprisonment (Count 1: time served,
Count 2: 120 months, to run consecutively to
count 1); 3 Years Supervised Release (Counts 1 &
2: 3 years each count, to run concurrent); $200
Assessment; Fine is Waived

120 Months Imprisonment (Count 1: time served,
Count 2: 120 months, to run consecutively to
count 1); 3 Years Supervised Release (Counts 1 &
2: 3 years each count, to run concurrent); $200
Assessment; Fine is Waived

**Terminated Counts**

18:1962(d) – Racketeering –
Narcotics (FIRST SUPERSEDING
INFORMATION 05/13/2013)
(1ss)

18:1959(a)(5) – Violent crimes in
aid of racketeering: conspiracy to
murder (SEALED INDICTMENT
04/16/2012)
(2)

18:924(c)(1)(A) Possess/Discharge
a Firearm in Furtherance of a Crime
of Violence; 18:2 Aiding and
abetting (INFORMATION 5/3/13)
(2s)

18:1959(a)(1) – Violent crimes in
aid of racketeering: murder; 18:2 –
Aiding and abetting (SEALED
INDICTMENT 04/16/2012)

**Disposition**

Dismissed

Dismissed

Dismissed

Dismissed

(3)

| | |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (4) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (5) | Dismissed |
| 18:924(c)(1)(A) – Possess/discharge a firearm in furtherance of a crime of violence; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (6) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: District Judge Monti L. Belot

**Defendant (5)**

| | | |
|---|---|---|
| **Anthony Wright** *TERMINATED: 02/12/2014* *also known as* Huesos *TERMINATED: 02/12/2014* | represented by | **Jay F. Fowler** Foulston Siefkin LLP – Wichita 1551 N Waterfront Parkway – Ste. 100 Wichita, KS 67206–4466 316–291–9541 Fax: 316–267–6345 Email: jfowler@foulston.com *ATTORNEY TO BE NOTICED* *Designation: CJA Appointment* *Bar Status: Active* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1962(d) – Conspiracy to commit racketeering activities (SEALED INDICTMENT | 108 Months Imprisonment (Count 1: time served; Count 6: 108 months, term to run consecutively to count 1); 3 Years Supervised Release (counts 1 & |

04/16/2012)
(1)

6: 3 years, each count, terms to run concurrently); $200 Assessment; Fine is Waived

18:924(c)(1)(A) –
Possess/discharge a firearm in furtherance of a crime of violence; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012)
(6)

108 Months Imprisonment (Count 1: time served; Count 6: 108 months, term to run consecutively to count 1); 3 Years Supervised Release (counts 1 & 6: 3 years, each count, terms to run concurrently); $200 Assessment; Fine is Waived

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to murder (SEALED INDICTMENT 04/16/2012) (2) | Dismissed |
| 18:1959(a)(1) – Violent crimes in aid of racketeering: murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (3) | Dismissed |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (4) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (5) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: District Judge Monti L. Belot

## Defendant (6)

| | |
|---|---|
| **Joshua Flores** | represented by **Carl Fredrick A. Maughan** |
| *TERMINATED: 09/11/2013* | Maughan Law Group, LC |
| *also known as* | 200 W Douglas, Suite 350 |
| Big Knox | |
| *TERMINATED: 09/11/2013* | Wichita, KS 67202 |
| | 316–264–2023 |
| | Fax: 316–264–1919 |
| | Email: carl@mlglc.com |
| | *LEAD ATTORNEY* |
| | *ATTORNEY TO BE NOTICED* |
| | *Designation: CJA Appointment* |
| | *Bar Status: Active* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:924(c)(1)(A) – Possess and brandish a firearm in furtherance of a crime of violence; aggravated robbery; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (9) | 84 Months Imprisonment; 3 Years Supervised Release; $100 Assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1959(a)(3) – Violent crimes in aid of racketeering: Assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (7) | Dismissed |
| 18:1959(a)(6) – Violent crimes in aid of racketeering: conspiracy to commit assault with a dangerous weapon (SEALED INDICTMENT 04/16/2012) (8) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|

None

Assigned to: District Judge Monti
L. Belot

**Defendant (7)**

| | |
|---|---|
| **Jesus Flores** | represented by **Roger L. Falk** |
| *TERMINATED: 01/07/2014* | Law Office of Roger L. Falk, P.A. |
| *also known as* | 301 West Central Avenue |
| Tito | Wichita, KS 67202 |
| *TERMINATED: 01/07/2014* | 316–265–5115 |
| | Fax: 316–265–5183 |
| | Email: roger_falk@sbcglobal.net |
| | *LEAD ATTORNEY* |
| | *ATTORNEY TO BE NOTICED* |
| | *Designation: CJA Appointment* |
| | *Bar Status: Active* |

**Pending Counts**                                 **Disposition**

18:1959(a)(3) – Violent crimes in
aid of racketeering: Assault with a
dangerous weapon; 18:2 – Aiding          Time served; 3 years supervised release; $200.00
and abetting (SEALED                     Assessment
INDICTMENT 04/16/2012)
(7)

18:1959(a)(6) – Violent crimes in
aid of racketeering: conspiracy to
commit assault with a dangerous          Time served; 1 year supervised release, to run
weapon (SEALED INDICTMENT                concurrently with Count 7; $200.00 Assessment
04/16/2012)
(8)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                              **Disposition**

18:924(c)(1)(A) – Possess and
brandish a firearm in furtherance
of a crime of violence; aggravated
robbery; 18:2 – Aiding and               Dismissed
abetting (SEALED
INDICTMENT 04/16/2012)
(9)

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|

None

---

Assigned to: District Judge
Monti L. Belot

### Defendant (8)

| | | |
|---|---|---|
| **Angel Cerda** | represented by | **Paul S. McCausland** |
| *TERMINATED: 09/05/2013* | | Young, Bogle, McCausland, Wells & Blanchard, PA |
| *also known as* | | One Main Place |
| Shrek | | 100 North Main Street, Suite 1001 |
| *TERMINATED: 09/05/2013* | | |
| | | Wichita, KS 67202–1322 |
| | | 316–265–7841 |
| | | Fax: 316–265–3956 |
| | | Email: p.mccausland@youngboglelaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | *Bar Status: Active* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (11) | 78 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived; $14,926.52 Restitution |

**Highest Offense Level
(Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012) (10) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) | Dismissed |

(12)

18:924(c)(1)(A) – Possess and
discharge a firearm in
furtherance of a crime of
violence; aggravated assault;
18:2 – Aiding and abetting
(SEALED INDICTMENT
04/16/2012)
(13)

Dismissed

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

Assigned to: District Judge Monti
L. Belot

**Defendant (9)**

| | | |
| --- | --- | --- |
| **Juan Torres** | represented by | **Michael J. Shultz** |
| *TERMINATED: 03/25/2014* | | Shultz Law Office, P.A. |
| *also known as* | | 445 North Waco |
| Bugsy | | Wichita, KS 67202 |
| *TERMINATED: 03/25/2014* | | 316–269–2284 |
| | | Fax: 316–269–2011 |
| | | Email: michael@shultzlaw.net |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | *Bar Status: Active* |

**Pending Counts**                                    **Disposition**

18:1959(a)(5) – Violent crimes in
aid of racketeering: attempted
murder; 18:2 – Aiding and
abetting (SEALED INDICTMENT
04/16/2012)
(11)

12 Months and 1 Day Imprisonment; 2 Years
Supervised Release; $100 Assessment; Fine is
Waived; $14,926.52 in Restitution

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                 **Disposition**

| | |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012) (10) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (12) | Dismissed |
| 18:924(c)(1)(A) – Possess and discharge a firearm in furtherance of a crime of violence; aggravated assault; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (13) | Dismissed |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: District Judge Monti L. Belot

**Defendant (10)**

| | | |
|---|---|---|
| **Alfredo Beltran–Ruiz**<br>*TERMINATED: 02/26/2014*<br>*also known as*<br>Deuce–Deuce<br>*TERMINATED: 02/26/2014* | represented by | **David M. Rapp**<br>Hinkle Law Firm LLC – Epic Center<br>301 North Main Street, Suite #2000<br>Wichita, KS 67202<br>316–660–6214<br>Fax: 316–264–1518<br>Email: drapp@hinklaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment*<br>*Bar Status: Active*<br><br>**Jessica M. Burtin**<br>Hinkle Law Firm LLC – Wichita<br>8621 E. 21st Street North, Suite 200<br>Wichita, KS 67206–2991<br>316–267–2000 x 3142<br>Fax: 316–631–1742 |

Email: jshannon@hinklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Status: Active*

**John B. Sullivan**
PSUSBSID–NOMAIL
316–262–5852
Fax: 316–265–5678
Email:
 *TERMINATED: 02/01/2013*
*Designation: CJA Appointment*
*Bar Status: Suspend*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (16) | 67 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012) (15) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (17) | Dismissed |
| 18:924(c)(1)(A) – Possess and discharge a firearm in furtherance of a crime of violence; aggravated assault; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (18) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

Assigned to: District Judge Monti L. Belot

**Defendant (11)**

| **Donte Barnes** | represented by | **Jeff L. Griffith** |
| --- | --- | --- |
| *TERMINATED: 01/07/2014* | | Griffith & Griffith |
| *also known as* | | PO Box 184 |
| Snipes | | 111 S. Baltimore |
| *TERMINATED: 01/07/2014* | | |
| *also known as* | | Derby, KS 67037 |
| Snipe | | 316–788–1551 |
| *TERMINATED: 01/07/2014* | | Fax: 316–788–2371 |
| *also known as* | | Email: jlgriffithlaw@aol.com |
| Sniper | | *LEAD ATTORNEY* |
| *TERMINATED: 01/07/2014* | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | *Bar Status: Active* |

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (16) | 32 months imprisonment; 3 years supervised release; $100.00 Assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012) (15) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (17) | Dismissed |

18:924(c)(1)(A) – Possess and
discharge a firearm in furtherance
of a crime of violence; aggravated
assault; 18:2 – Aiding and abetting
(SEALED INDICTMENT
04/16/2012)
(18)

Dismissed

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

Assigned to: District Judge Monti
L. Belot

**Defendant (12)**

| | | |
| --- | --- | --- |
| **Jesus Sanchez** | represented by | **Mark T. Schoenhofer** |
| *TERMINATED: 01/15/2014* | | Law Office of Mark Schoenhofer |
| *also known as* | | 1631 E. 1st |
| Drac | | Wichita, KS 67214 |
| *TERMINATED: 01/15/2014* | | 316–262–5400 |
| *also known as* | | Fax: 316–262–1787 |
| Dracula | | Email: <u>mydefensefirst@yahoo.com</u> |
| *TERMINATED: 01/15/2014* | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | *Bar Status: Active* |

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1962(d) – Conspiracy to commit racketeering activities (SEALED INDICTMENT 04/16/2012) (1) | 120 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived |

**Highest Offense Level
(Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012) | Dismissed |

(19)

| | |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (20) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (21) | Dismissed |
| 18:924(c)(1)(A) – Possess and discharge a firearm in furtherance of a crime of violence; aggravated assault; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (22) | Dismissed |
| 18:1959(a)(6) – Violent crimes in aid of racketeering: conspiracy to commit assault with a dangerous weapon (SEALED INDICTMENT 04/16/2012) (28) | Dismissed |
| 18:922(g)(5) and 18:924(a)(2) – Illegal alien in possession of a firearm (SEALED INDICTMENT 04/16/2012) (35) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: District Judge Monti L. Belot

**Defendant (13)**

| | | |
|---|---|---|
| **Enrique Gobin**<br>*TERMINATED: 09/05/2013*<br>*also known as* | represented by | **Benjamin Anthony Reed**<br>Seigfreid Bingham PC<br>911 Main Street, Suite 2800 |

Ricky
*TERMINATED: 09/05/2013*
*also known as*
Sonny Boy
*TERMINATED: 09/05/2013*

Kansas City, MO 64105
816–421–4460
Email: breed@seigfreidbingham.com
*TERMINATED: 11/15/2012*
*Designation: CJA Appointment*
*Bar Status: Active*

**Edward L. Robinson**
Joseph, Hollander & Craft, LLC – Wichita
500 N. Market Street
Wichita, KS 67214–3514
316–262–9393
Fax: 316–262–9006
Email: erobinson@josephhollander.com
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*
*Bar Status: Active*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (20) | 120 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012) (19) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (21) | Dismissed |
| 18:924(c)(1)(A) – Possess and discharge a firearm in furtherance of a crime of violence; aggravated assault; 18:2 – Aiding | Dismissed |

and abetting (SEALED
INDICTMENT 04/16/2012)
(22)

## Highest Offense Level
## (Terminated)

Felony

| Complaints | Disposition |
| --- | --- |
| None | |

Assigned to: District Judge Monti
L. Belot

## Defendant (14)

| | | |
| --- | --- | --- |
| **Alfonso Banda–Hernandez** | represented by | **Michael D. Hepperly** |
| *TERMINATED: 10/01/2013* | | Michael D. Hepperly Law Office, Chtd |
| *also known as* | | 310 W. Central – Ste. 119 |
| Fonso | | Wichita, KS 67202 |
| *TERMINATED: 10/01/2013* | | 316–267–5330 |
| | | Fax: 316–267–6589 |
| | | Email: mhepperly@aol.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | *Bar Status: Active* |

| Pending Counts | Disposition |
| --- | --- |
| 18:1959(a)(6) – Violent Crimes in Aid of Racketeering, Conspiracy to Commit an Assault with a Dangerous Weapon (INFORMATION 07/12/2013) (1s) | 72 Months Imprisonment (36 months each count, to run consecutively); 1 Year Supervised Release; $200 Assessment; Fine is Waived |
| 18:1959(a)(6) – Violent Crimes in Aid of Racketeering, Conspiracy to Commit an Assault with a Dangerous Weapon (INFORMATION 07/12/2013) (2s) | 72 Months Imprisonment (36 months each count, to run consecutively); 1 Year Supervised Release; $200 Assessment; Fine is Waived |

## Highest Offense Level (Opening)

Felony

| Terminated Counts | Disposition |
| --- | --- |

| | |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012) (19) | Dismissed |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (20) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (21) | Dismissed |
| 18:924(c)(1)(A) – Possess and discharge a firearm in furtherance of a crime of violence; aggravated assault; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (22) | Dismissed |

### Highest Offense Level (Terminated)

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: District Judge Monti L. Belot

### Defendant (15)

| | | |
|---|---|---|
| **Andrew Gusman** *TERMINATED: 11/19/2013* *also known as* Beaver *TERMINATED: 11/19/2013* | represented by | **Eric A. Hartenstein** 200 W. Douglas , Suite #600 Wichita, KS 67202 316–262–8911 Fax: 316–262–5754 Email: erichartenstein@att.net *ATTORNEY TO BE NOTICED* *Designation: CJA Appointment* *Bar Status: Active* |

| **Pending Counts** | **Disposition** |
|---|---|

| | |
|---|---|
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (21) | 21 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: conspiracy to commit murder (SEALED INDICTMENT 04/16/2012) (19) | Dismissed |
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (20) | Dismissed |
| 18:924(c)(1)(A) – Possess and discharge a firearm in furtherance of a crime of violence; aggravated assault; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (22) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: District Judge Monti L. Belot

**Defendant (16)**

| | | |
|---|---|---|
| **Eusebio Sierra–Medrano** *TERMINATED: 12/11/2013* *also known as* TC *TERMINATED: 12/11/2013* | represented by | **Mark L. Bennett , Jr.** Bennett and Hendrix, LLC 5605 S.W. Barrington Ct. South, Suite 201 Topeka, KS 66614 785–271–0800 |

Fax: 785−271−0803
Email: mark@mlbjrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*
*Bar Status: Active*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1962(d) – Conspiracy to commit racketeering activities (SEALED INDICTMENT 04/16/2012) (1) | 120 months imprisonment, to be served consecutive to State of Kansas, Ford County District Court case 10−358 sentence; 3 years supervised release; Assessment: $100.00 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (14) | Dismissed |
| 18:922(g)(1) and 18:924(a)(2) – Felon in possession of a firearm (SEALED INDICTMENT 04/16/2012) (36−37) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: District Judge Monti L. Belot

**Defendant (17)**

**Jayson Vargas**                        represented by   **Mark A. Sevart**
*TERMINATED: 03/24/2014*
*also known as*                                          PO Box 781602
Wee Wee

26

*TERMINATED: 03/24/2014*

Wichita, KS 67278
316−686−1519
Fax: 316−788−7437
Email: markchrissevart@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*
*Bar Status: Active*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:922(j) Possession of a stolen firearm (SUPERSEDING INFORMATION) (1s) | 120 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1962(d) – Conspiracy to commit racketeering activities (SEALED INDICTMENT 04/16/2012) (1) | Dismissed |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (23) | Dismissed |
| 18:1959(a)(6) – Violent crimes in aid of racketeering: conspiracy to commit assault with a dangerous weapon (SEALED INDICTMENT 04/16/2012) (24) | Dismissed |
| 18:924(c)(1)(A) – Possess and brandish a firearm in furtherance of a crime of violence; aggravated robbery; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (25) | Dismissed |
| 18:922(g)(1) and 18:924(a)(2) – Felon in possession of a firearm (SEALED INDICTMENT | Dismissed |

04/16/2012)
(29)

**Highest Offense Level**
**(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: District Judge Monti L.
Belot

**Defendant (18)**

| | | |
|---|---|---|
| **Adam Flores** | represented by | **Sean C. McEnulty** |
| *TERMINATED: 01/03/2014* | | McEnulty Law Firm |
| *also known as* | | 151 Whittier St., Suite #1000 |
| Little Lazy | | Wichita, KS 67207 |
| *TERMINATED: 01/03/2014* | | 316–263–0142 |
| | | Fax: 316–681–4499 |
| | | Email: s@mcenultylawfirm.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | *Bar Status: Active* |

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Opening)**

None

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (23) | Dismissed without prejudice |
| 18:1959(a)(6) – Violent crimes in aid of racketeering: conspiracy to commit assault with a dangerous weapon (SEALED INDICTMENT 04/16/2012) (24) | Dismissed without prejudice |
| 18:924(c)(1)(A) – Possess and brandish a firearm in furtherance of a crime of | Dismissed without prejudice |

violence; aggravated robbery; 18:2 –
Aiding and abetting (SEALED
INDICTMENT 04/16/2012)
(25)

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

Assigned to: District Judge Monti
L. Belot

**Defendant (19)**

| | | |
| --- | --- | --- |
| **Fabian Neave** | represented by | **Gregory D. Bell** |
| *TERMINATED: 12/03/2013* | | Forker Suter LLC |
| *also known as* | | 129 West 2nd Ave, Suite 200 |
| Puppet | | PO Box 1868 |
| *TERMINATED: 12/03/2013* | | |
| | | Hutchinson, KS 67504−1868 |
| | | 620−663−7131 |
| | | Fax: 620−669−0714 |
| | | Email: gbell@forkersuter.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | *Bar Status: Active* |

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1962(d) – Conspiracy to commit racketeering activities (SEALED INDICTMENT 04/16/2012) (1) | Deft sentenced to 60 months imprisonment; 3 years supervised release; Assessment: $100; Restitution: $16,242.10 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (27) | Dismissed |

| | |
|---|---|
| 18:1959(a)(6) – Violent crimes in aid of racketeering: conspiracy to commit assault with a dangerous weapon (SEALED INDICTMENT 04/16/2012) (28) | Dismissed |
| 18:922(g)(1) and 18:924(a)(2) – Felon in possession of a firearm (SEALED INDICTMENT 04/16/2012) (30) | Dismissed |
| 21:841(a)(1) – Possession with intent to distribute methamphetamine, a controlled substance; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (31) | Dismissed |
| 18:924(c)(1)(A) – Possess a firearm in furtherance of a drug trafficking crime: possession with the intent to distribute methamphetamine (SEALED INDICTMENT 04/16/2012) (32) | Dismissed |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: District Judge Monti
L. Belot

**Defendant (20)**

| | | |
|---|---|---|
| **Jesus Torres**<br>*TERMINATED: 09/05/2013*<br>*also known as*<br>Rabbit<br>*TERMINATED: 09/05/2013* | represented by | **Christopher S. O'Hara**<br>O'Hara & O'Hara<br>1223 E. First<br>Wichita, KS 67214<br>316–263–5601<br>Fax: 316–263–7205<br>Email: ohara@oharaohara.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |

*Bar Status: Active*

**Charles A. O'Hara**
O'Hara & O'Hara
1223 E. First
Wichita, KS 67214
316–263–5601
Fax: 316–263–7205
Email: ohara@oharaohara.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Status: Active*

**Pending Counts**

18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (27)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

None

**Highest Offense Level (Terminated)**

None

**Complaints**

None

**Disposition**

36 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived; $16,242.10 in Restitution

**Disposition**

**Disposition**

Assigned to: District Judge Monti L. Belot

**Defendant (21)**

**Jose Neave**
*TERMINATED: 07/09/2013*
*also known as*
Caiyo
*TERMINATED: 07/09/2013*

represented by **Kevin W. Loeffler**
Law Office of Kevin Loeffler
111 E. 7th
PO Box #1175
Newton, KS 67114
316–283–7490
Fax: 316–283–8833
Email: kloeffler@lawyer.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*
*Bar Status: Active*

| Pending Counts | Disposition |
|---|---|
| 18:1959(a)(5) – Violent crimes in aid of racketeering: attempted murder; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (26) | AMENDED JUDGMENT – 78 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived; $16,242.10 Restitution; ORIGINAL JUDGMENT –78 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived; $16,424.10 Restitution |

**Highest Offense Level (Opening)**

Felony

| Terminated Counts | Disposition |
|---|---|
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (27) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| Complaints | Disposition |
|---|---|
| None | |

---

Assigned to: District Judge Monti L. Belot

**Defendant (22)**

| | | |
|---|---|---|
| **Hernan Quezada** | represented by | **Derek S. Casey** |
| *TERMINATED: 09/11/2013* | | Triplett, Woolf & Garretson, LLC – Wichita |
| *also known as* | | 2959 North Rock Road, Suite 300 |
| Cheese | | Wichita, KS 67226 |
| *TERMINATED: 09/11/2013* | | 316–630–8100 |
| *also known as* | | Fax: 316–630–8101 |
| Cartoon | | Email: dscasey@twgfirm.com |
| *TERMINATED: 09/11/2013* | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |

*Bar Status: Active*

| Pending Counts | Disposition |
| --- | --- |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) (38) | 33 Months Imprisonment; 3 Years Supervised Release; $100 Assessment; Fine is Waived |

**Highest Offense Level (Opening)**

Felony

| Terminated Counts | Disposition |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| Complaints | Disposition |
| --- | --- |
| None | |

---

Assigned to: District Judge Monti L. Belot

**Defendant (23)**

| | | |
| --- | --- | --- |
| **Humberto Jorge Ortiz** *TERMINATED: 01/28/2013* *also known as* Beto *TERMINATED: 01/28/2013* | represented by | **Molly M. Gordon** Depew Gillen Rathbun & McInteer, LC 8301 East 21st Street North, Suite 450 Wichita, KS 67206–2936 316–262–4000 x 104 Fax: 316–265–3819 Email: molly@depewgillen.com *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* *Designation: CJA Appointment* *Bar Status: Active* |

| Pending Counts | Disposition |
| --- | --- |
| 18:1959(a)(3) – Violent crimes in aid of racketeering: assault with a dangerous weapon; 18:2 – Aiding and abetting (SEALED INDICTMENT 04/16/2012) | 46 Months Imprisonment; 2 Years Supervised Release; $100 Assessment; Fine is waived; $16,242.10 Restitution |

(27)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                    **Disposition**

None

**Highest Offense Level
(Terminated)**

None

**Complaints**                                           **Disposition**

None

---

**Plaintiff**

**USA**                              represented by   **Aaron L. Smith**
Office of United States Attorney –
Wichita
301 North Main Street, Suite #1200
Wichita, KS 67202–4812
316–269–6561
Fax: 316–269–6484
Email: aaron.smith3@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Lanny D. Welch**
Office of United States Attorney –
Wichita
301 North Main Street, Suite #1200
Wichita, KS 67202–4812
316–269–6481
Fax: 316–269–6484
Email: lanny.welch@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/25/2013 | 572 | 53 | TRANSCRIPT of Motion Hearing regarding Juan Torres held 2–4–2013 as to Jason Najera, Pedro Garcia, Gonzalo Ramirez, Russell Worthey, Anthony |

Wright, Joshua Flores, Jesus Flores, Angel Cerda, Juan Torres, Alfredo Beltran–Ruiz, Donte Barnes, Jesus Sanchez, Enrique Gobin, Alfonso Banda–Hernandez, Andrew Gusman, Eusebio Sierra–Medrano, Jayson Vargas, Adam Flores, Fabian Neave, Jesus Torres, Jose Neave, Hernan Quezada, Humberto Jorge Ortiz before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Michael Shultz.

**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/24/2013. (Schwemmer, Cindy) (Entered: 03/25/2013)

| 03/25/2013 | 573 | 76 | TRANSCRIPT of Hearing on James Motion (Morning session) held 2–13–2013 as to Jason Najera, Pedro Garcia, Gonzalo Ramirez, Russell Worthey, Anthony Wright, Joshua Flores, Jesus Flores, Angel Cerda, Juan Torres, Alfredo Beltran–Ruiz, Donte Barnes, Jesus Sanchez, Enrique Gobin, Alfonso Banda–Hernandez, Andrew Gusman, Eusebio Sierra–Medrano, Jayson Vargas, Adam Flores, Fabian Neave, Jesus Torres, Jose Neave, Hernan Quezada, Humberto Jorge Ortiz before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Michael Shultz.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/24/2013. (Schwemmer, Cindy) (Entered: 03/25/2013) |
| 03/25/2013 | 574 | 191 | TRANSCRIPT of Hearing on James Motion (Afternoon Session) held 2–13–2013 as to Jason Najera, Pedro Garcia, Gonzalo Ramirez, Russell Worthey, Anthony Wright, Joshua Flores, Jesus Flores, Angel Cerda, Juan Torres, Alfredo Beltran–Ruiz, Donte Barnes, Jesus Sanchez, Enrique Gobin, |

| | | | |
|---|---|---|---|
| | | | Alfonso Banda–Hernandez, Andrew Gusman, Eusebio Sierra–Medrano, Jayson Vargas, Adam Flores, Fabian Neave, Jesus Torres, Jose Neave, Hernan Quezada, Humberto Jorge Ortiz before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Michael Shultz.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/24/2013. (Schwemmer, Cindy) (Entered: 03/25/2013) |
| 04/24/2013 | 604 | 265 | TRANSCRIPT of Hearing on Daubert Motion held 4/16/2013 as to Pedro Garcia, Gonzalo Ramirez, Angel Cerda, Juan Torres before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: ALL counsel of Record.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 7/23/2013. (Schwemmer, Cindy) (Entered: 04/24/2013) |
| 04/24/2013 | 605 | 463 | TRANSCRIPT of Hearing on Daubert Motion held 4/17/2013 as to Alfredo Beltran–Ruiz, Donte Barnes, Jesus Sanchez, Enrique Gobin, Alfonso Banda–Hernandez, Andrew Gusman before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: ALL counsel of Record.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is** |

| | | | |
|---|---|---|---|
| | | | **located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 7/23/2013. (Schwemmer, Cindy) (Entered: 04/24/2013) |
| 04/24/2013 | <u>606</u> | 584 | TRANSCRIPT of Hearing on Daubert Motion held 4/18/2013 as to Joshua Flores, Eusebio Sierra–Medrano, Jayson Vargas, Adam Flores, Fabian Neave, Jesus Torres before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: ALL counsel of Record.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 7/23/2013. (Schwemmer, Cindy) (Entered: 04/24/2013) |
| 06/18/2013 | <u>678</u> | 670 | TRANSCRIPT of Hearing on Motion to Suppress held 3–25–2013 as to Gonzalo Ramirez before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Lanny Welch, Aaron Smith (US Attorney's Office).<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 9/16/2013. (Schwemmer, Cindy) (Entered: 06/18/2013) |
| 07/22/2013 | <u>720</u> | 688 | |

| | | | |
|---|---|---|---|
| | | | TRANSCRIPT of Plea of Guilty of Anthony Wright held 4–22–2013 before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel. **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/21/2013. (Schwemmer, Cindy) (Entered: 07/22/2013) |
| 07/22/2013 | 721 | 710 | TRANSCRIPT of Plea of Guilty by Russell Worthey held 5–6–2013 before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel. **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/21/2013. (Schwemmer, Cindy) (Entered: 07/22/2013) |
| 07/22/2013 | 722 | 732 | TRANSCRIPT of Continued Plea of Guilty of Russell Worthey held 5–13–2013 before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel. **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |

| | | | |
|---|---|---|---|
| | | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/21/2013. (Schwemmer, Cindy) (Entered: 07/22/2013) |
| 11/13/2013 | 843 | 752 | TRANSCRIPT of Plea of Guilty held 10–30–2013 as to Jesus Sanchez before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Mark Schoenhofer.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 2/11/2014. (Schwemmer, Cindy) (Entered: 11/13/2013) |
| 03/18/2014 | 982 | 780 | TRANSCRIPT of Trial, Excerpt of Closing Arguments, held October 16, 2013, as to Pedro Garcia before Judge Monti L. Belot, Court Reporter Jo Wilkinson, 316–315–4334, jo_wilkinson@ksd.uscourts.gov. Transcript purchased by: Mr. John V. Wachtel.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/16/2014. (jw) (Entered: 03/18/2014) |
| 03/19/2014 | 983 | 862 | TRANSCRIPT of Motion Hearing held 3–4–2013 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers** |

| | | | |
|---|---|---|---|
| | | | **from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 984 | 874 | TRANSCRIPT of Motion Hearing held 9–12–2013 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 985 | 919 | TRANSCRIPT of MASTER INDEX for Jury Trial held 10–2–2013 through 10–17–2013 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 986 | 929 | |

| | | | |
|---|---|---|---|
| | | | TRANSCRIPT of Jury Trial held 10–2–2013 & 10–3–2013 Pgs 1–243 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | <u>987</u> | 1172 | TRANSCRIPT of Jury Trial held 10–4–2013 AM Pg 244–353 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel;Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | <u>988</u> | 1282 | TRANSCRIPT of Jury Trial held 10–4–2013 PM pg 354–459 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel;Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth** |

| | | | |
|---|---|---|---|
| | | | **below.**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 989 | 1388 | TRANSCRIPT of Jury Trial held 10–8–2013 AM pg 460–584 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel;Joel Mandelman/Tim Henry.

**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 990 | 1513 | TRANSCRIPT of Jury Trial held 10–8–2013 PM pg 585–764 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.

**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 991 | 1693 | TRANSCRIPT of Jury Trial held 10–9–2013 AM pg 765–875 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry. |

| | | | |
|---|---|---|---|
| | | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | <u>992</u> | 1804 | TRANSCRIPT of Jury Trial held 10–9–2013 PM pg 876–1023 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel;Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | <u>993</u> | 1952 | TRANSCRIPT of Jury Trial held 10–10–2013 AM pg 1024–1165 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of |

| | | | |
|---|---|---|---|
| | | | Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 994 | 2094 | TRANSCRIPT of Jury Trial held 10–10–2013 PM pg 1166–1283 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 995 | 2212 | TRANSCRIPT of Jury Trial held 10–11–2013 AM pg 1284–1394 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 996 | 2323 | TRANSCRIPT of Jury Trial held 10–11–2013 PM pg 1395–1519 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy** |

| | | | |
|---|---|---|---|
| | | | **carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 997 | 2448 | TRANSCRIPT of Jury Trial held 10–15–2013 AM pg 1520–1653 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 998 | 2582 | TRANSCRIPT of Jury Trial held 10–15–2013 PM pg 1654–1724 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 999 | 2653 | TRANSCRIPT of Jury Trial held 10–16–2013 & 10–17–2013 pg 1725–1880 (end) as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. |

|  |  |  | Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |
| 03/19/2014 | 1000 | 2809 | TRANSCRIPT of Sentencing held 1–6–2014 as to Pedro Garcia before Judge Belot, Court Reporter Cindy Schwemmer, 316–315–4354, cindy_schwemmer@ksd.uscourts.gov. Transcript purchased by: Val Wachtel; Joel Mandelman/Tim Henry.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/17/2014. (Schwemmer, Cindy) (Entered: 03/19/2014) |

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,              )
                                       )
                           Plaintiff,) District Court
                                       ) Case No. 12-10089-09
vs.                                    )
                                       )
JUAN TORRES,                           )
                                       )
                           Defendant,)
                                       )
_____

**TRANSCRIPT OF MOTION HEARING**

On the 4th day of February, 2013, came on to be heard Motion to Dismiss in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.

APPEARANCES

The Plaintiff appeared by and through Mr. Aaron Smith and Mr. Lanny Welch;

The Defendant appeared by and through Mr. Michael Shultz.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

**I N D E X**

**FEBRUARY 4, 2013:**

**WITNESS**

**AARON SMITH**

Direct Examination by Mr. Welch:        5
Cross Examination by Mr. Shultz:        12
Argument:                               20
Certificate of Certified Shorthand Reporter: 23

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 3:25 p.m. February 4, 2013, the following proceedings were held.)

THE COURT:  United States against Juan Torres. Case number 12-10089.  Lanny Welch and Aaron Smith appear for the Government.

Are you Juan Torres?

DEFENDANT:  Yes, sir.

THE COURT:  All right.  The Defendant appears with Michael Shultz.  We have another motion to dismiss. By another, I mean that I've already had one of these today.  To dismiss on the basis that the -- well, it's not quite the same.  The allegation is that the Defendant was a juvenile on October 4, 2008, and that he wasn't prosecuted in a timely fashion; and that if he had been prosecuted in a timely fashion, he could have been prosecuted as a juvenile.  Is that right, Mr. Shultz?  Is that basically your argument?

MR. SHULTZ:  Yes, Your Honor.

THE COURT:  I'm trying to figure out what are the facts here.  Is there any dispute about the fact that -- about his date of birth?

MR. WELCH:  There is not, Your Honor.

THE COURT:  So we just need oral argument here or are we going to put on evidence or what?

MR. SHULTZ:  Your Honor, I think largely oral argument.  My reference to the *United States vs. Hoo* case in my motion, the District Court in that case held an evidentiary hearing to ensure that there was a factual basis for the Government's delay.  That was also a RICO enterprise type investigation.  And I think some evidence would be valuable to be heard and I think that is evidence that's probably only in the possession of the Government.

THE COURT:  What's your position about that, Mr. Welch?

MR. WELCH:  Your Honor, we believe the burden at this hearing remains with the Defendant, but I'm not opposed -- we did plan to put on some evidence addressing the appropriate standard for this motion that there was no prejudice to the Defendant and there was no design by the Government to cause harassment to the Defendant or to gain a tactical advantage.  We do have some evidence --

THE COURT:  All right.  Well, I'll let you start and -- on a hearing like this, it really doesn't make any difference who goes first or who goes last. I'll hear all the evidence and then I'll decide.

MR. WELCH:  Thank you, Judge.  United States would call Aaron Smith.

**AARON SMITH**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Would you state your name, sir.

A   Aaron Smith.

Q   How are you employed?

A   With the United States Attorney's Office as an Assistant United States Attorney.

Q   At some point in the past, Mr. Smith, have you been involved as one of the prosecutors assigned to the investigation of the Nortenos street gang in Dodge City, Kansas?

A   Yes, I have.

Q   Do you know when the federal investigation into activities of that gang, when it was initiated?

A   There were some, I guess I would say, straggling or separate cases which weren't part of the Dodge City Nortenos investigation; and an idea of investigating the Nortenos gang in Dodge City didn't really even become a possibility until summer of 2010.

Q   And at some point -- we'll talk about this more later at some point -- there was an Indictment returned

which focused on the activity of the Nortenos street gang; is that correct?

A    That's correct.  April of 2012.

Q    And the Defendant is charged in Counts 10 through 13 of that Indictment; is that correct?

A    Yes.

Q    The events which led to the charges filed against the Defendant, I want to just briefly touch on those events.  Specifically, what occurred, what crimes took place, on October 4, 2008, that the Defendant is charged with?

A    It would have been what was to be characterized in state court as a drive-by shooting where the Defendant and other co-conspirators or gang members were involved in an altercation with rival gang members in Dodge City, Kansas.  It began earlier in the evening when the Defendant and his gang member friends had essentially a verbal altercation with a rival Surenos gang member and persons associated with that rival.  Later in the evening, it appears the Defendant, along with his gang member friends, left, gathered weapons, returned to the scene.  And Abel Hernandez is the Surenos, the rival gang member, I'm referring to, returned to the home of Abel Hernandez.  Shots were fired into the home of Abel Hernandez and Abel Hernandez and his mother were both

struck and wounded by gunshots.  In a nutshell, that's the drive-by shooting that occurred in October of 2008.

Q   And both the verbal altercation and then the subsequent drive-by shooting occurred at the same residence in Dodge City; is that correct?

A   Correct.

Q   And that address is 1110 4th Avenue in Dodge City?

A   4th Avenue, that's correct.

Q   Subsequent to the actual shooting -- I'm sorry -- you testified Abel Hernandez and his mother were struck by gunfire when the shots were fired; is that correct?

A   They were.

Q   Subsequent to events which occurred on the 4th of October, 2008, did the Dodge City Police Department receive information from an informant about who participated in those crimes?

A   They did.  Subsequent to October of 2008, sometime after the summer of 2010, there was some investigative leads, essentially, that lead Dodge City to identify other potential witnesses.  Those potential witnesses -- or that confidential informant was not contacted then by Dodge City Police Department until January of 2011.

Q   And through discussions with that informant, was the Dodge City Police Department able to identify the Nortenos street gang members who participated in the

events which occurred on October 4, 2008?

A   They were.  Before January of 2011, Dodge City Police Department couldn't identify the Nortenos that were involved in the October, 2008, incident in which the Defendant is charged.

Q   All right.  Then in January of 2011, you said the informant provided this information.  Is that correct?

A   That's correct.

Q   And was that informant placed in a federal grand jury to discuss their information that they had provided to the Dodge City Police Department?

A   Yes.  That informant testified in a federal grand jury March 30th of 2011.

Q   Now, in addition to Counts 10 through 13, which, again, the Defendant is charged in, there are other violent crimes or VICAR events charged in the Indictment; is that correct?

A   Yes, there are.

Q   Did those events occur both before the Defendant's events -- the counts charged against the Defendant in October, 2008, occur both before and afterward?

A   One of the VICAR events occurred before.  It was in July of 2008.  But the remainder of the VICAR, the violent crimes, occurred after October, 2008.

Q   And were other civilian witnesses -- by civilian

witnesses, I mean non-law enforcement witnesses, placed into grand jury to assist in the investigation of this RICO VICAR case?

A    They were.  And after, after March 30th of 2011, as I counted it, there were at least 16 other civilian witnesses that testified in the grand jury, all on different violent crimes than the October, 2008, violent crime.

Q    So after March 30, 2011, there was a total of 16 additional civilian witnesses placed in the grand jury?

A    That's correct.

Q    Those witnesses didn't testify necessarily about Counts 10 through 13, but they provided information about the larger conspiracy investigation?

A    And, yes, and other counts.

Q    Now, did the police department also gain information that in the events which occurred on October 4, 2008, there was another juvenile in addition to this Defendant that was -- had some involvement in that crime?

A    Yes.  Their investigation revealed that there would have been another juvenile involved in the October 4, 2008, shooting.

Q    What is his name?

A    His name is Eric Sanchez.

Q    And Eric Sanchez was not charged in the Indictment,

was he?

A    He was not charged.

Q    And why was he not charged in the Indictment?

A    That's probably twofold.  Number one, it appears that his role was -- he had a lesser involvement in the shooting than the Defendant and the other two co-defendants in that crime itself.  He also was a juvenile and remained a juvenile at the time of the Indictment and so indicting him mechanically would have caused difficulties as far as proceeding with the Indictment.

Q    Now, prior to the Indictment being presented to a federal grand jury, was it necessary to obtain approval of the Indictment from the Department of Justice?

A    It was.

Q    And do you know when that approval was received?

A    Final approval from the Department of Justice wasn't received until April of 2012, just probably days before its presentment to the grand jury.

Q    When was the Indictment actually presented to the grand jury?

A    April 16, 2012.

Q    Prior to the presentment of the Indictment in April, on April 16, 2012 -- and I should have asked you this -- you have been involved in this investigation since

approximately when?

A    I was -- I was aware that there was a possibility that an investigation would start in the summer of 2010. In reality, the actual investigation didn't begin until a few months prior to that January, 2011, date when this confidential informant was interviewed.

Q    And your involvement would have been --

A    After summer of 2010.

Q    Since you have been involved, either assigned formally or informally to this investigation, do you recall any discussions that took place that were designed to come up with a way of gaining a tactical advantage over this Defendant by delaying the Indictment?

A    There were no discussions about that.

Q    Do you recall any discussions concerning delaying the Indictment to harass this Defendant?

A    There were no discussions about that.

Q    Was there any attempt on your part, the investigator's part, or anyone else, either state or federal investigators, or any other prosecutor, to delay the Indictment based on this Defendant's age and his date of birth?

A    No.  His age was never taken into consideration.

Q    And any delays that did occur in the presentation of

the Indictment to the grand jury, did they have anything to do with the Defendant's date of birth and when he would or would not turn 21?

A    No.

MR. WELCH:  No further questions, Your Honor.

THE COURT:  Mr. Shultz.

MR. SHULTZ:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. SHULTZ:

Q    The other juvenile, Eric Sanchez, who was considered in part of that, he was not charged you said in part because he had a lesser role.  That was according to the confidential informant?

A    Yes.

Q    And what brought -- I mean, that confidential informant, I assume, came forward or -- came forward in the summer of 2010.  Is that what caused --

A    No.  Actually, we only learned that the confidential informant even existed in the summer of 2010; and then the confidential informant had to be found, contacted and interviewed; and that didn't occur until January, 2011.

Q    Okay.  How did you learn of the confidential informant's existence if he did not come forward?

A    The confidential informant -- another confidential

informant.

Q   Okay.  You said a part of the reason, too, why Eric Sanchez was not charged was because he was and remained a juvenile after the time of the Indictment.  I think you said indicting him mechanically -- I don't know if there's any significance to that phrase -- would have been difficult.  Is that fair or --

A   Well, it would have caused us to be on a different time line, charging Eric Sanchez, at least by my reading of the Juvenile Justice Act, because it would have put us in the position, for instance, of having a preliminary hearing or some other hearing such as that which would have put Eric Sanchez in a completely different position from a prosecution standpoint as 23 other defendants.  And, honestly, it could have really accelerated things on a different time line than 23 other people.

Q   It would have accelerated his time line relative to other people?

A   That was my interpretation of the Juvenile Justice Act.

Q   So did you discuss those considerations with investigators, others, as you were considering when and who to charge?

A   Honestly, we never even considered that until we

were in the process with the Department of Justice.

Q   And that -- when did that begin, the process with the Department of Justice?

A   February of 2012.

Q   So about two months before final approval was sought?

A   Correct.

Q   And so the age of Eric Sanchez wasn't considered until that point?

A   Correct.

Q   And was the age of Juan Torres considered at all?

A   Other than just knowing how old he was, no.

Q   What was -- what's the cause for the distinction? Why was one juvenile's age considered and the other not?

A   Well, they were both considered insofar as knowing how old they were and then how that affected our ability to indict.  In Eric Sanchez' case, it precluded us from indicting; and then in Juan Torres case, it allowed us to indict.

Q   And when in February did you start that process with the Department of Justice?

A   I don't know the date.  I would -- the only reason why I know it was February is because of looking at my e-mails to the Department of Justice.

Q   You testified that 16 other witnesses testified

after the confidential informant on March 30 of 2011.

A    16 civilians, yes.

Q    16 civilians, I apologize.  Were there any other civilian witnesses that testified about this crime after that date?

A    That's a difficult distinction because at some point we started asking questions about the enterprise in general, so they would begin to incorporate the Defendant's activities on a basis of his role in the enterprise or his identification with the enterprise. So those questions were asked of some of the 16 civilian witnesses.  Now, I do not recall if there were any specific questions in relation to October 4, 2008, exactly.  I would say that the bulk of any information that would have happened with those 16 civilian witnesses would have been enterprise related or other violent crime related.

Q    Other than October 4, 2008?

A    Correct.

Q    So the bulk of your -- the grand jury's knowledge about October 4, 2008, came on or before March 30, 2011?

A    The bulk of the direct testimony about what would have occurred on that date, correct.

Q    Okay.

A    About events directly occurring on October 4th, yes.

Q   Okay.  After, let's say, after December, 2011, was there any additional evidence or direct testimony about October 4, 2008, presented to or considered by the grand jury?

A   After December of 2011?

Q   Yeah.

A   Nothing about -- well, I don't recall there being any testimony that would have related to October 4th, 2008.  Any testimony that I can recall would have been enterprise or association related.

Q   When -- you indicated that there were -- there were crimes alleged both -- to have occurred both before October 4, 2008, and October 4, 2008?

A   Yes.

Q   What's the latest crime charged in the Indictment?

A   February 5th, 2012, Count 38, was charged.  And Count 38 is a VICAR, violent crime.

Q   And that's -- that arose out of an altercation?

A   Yes.  February 5th, 2012.

Q   So that would have happened after the beginning of the grand jury?

A   Yes, it actually did.

Q   So the -- just to kind of -- my understanding is that the first time Mr. Torres, you became aware of Mr. Torres, would have been when a confidential

informant came forward, appeared, whatever, in January of 2011?

A    Correct.

Q    And the -- really, the only substantive time that there was grand jury testimony by a civilian presented about Mr. Torres would have been March 30, 2011, or before?

A    Well, it would have been March 30, 2011.

Q    March 30, 2011?

A    Just that date.

Q    Okay.  And I guess you're aware that the Juvenile Delinquency Act includes protections, procedural protections above and beyond what an adult defendant would typically receive?

A    I guess I'm aware it has procedural differences.  I didn't -- I'm aware that there are procedural differences.  I guess it depends on what you mean by protection.

Q    Well, to proceed against a juvenile in the United States District Court, the Attorney General has to certify a number of things?

A    Yes.

Q    Correct?

A    Yes.

Q    And one I believe that was cited in your brief was

the offense charged is a crime of violence that is a felony and that there is a substantial federal interest in the case?

A   Yes.

Q   And that on a motion to transfer a juvenile prosecution in United States District Court to adult prosecution, the Court is required to consider a number of things in the interest of justice that they don't have to necessarily consider for an adult.  Is that fair?

A   Yes.  But can I qualify that answer in relation to this case?

Q   Sure.

A   Yes.  But as I interpreted the Juvenile Delinquency Act in relation to Juan Torres, the way I read it is that his certification would have been automatic, an automatic certification to adult prosecution based upon the nature of the offenses he was charged with.  So the District Court had considerations to make; but because of the underlying offense, that certification would have occurred.

Q   Do you know where you're drawing that from?

A   The statute.

Q   Okay.

      MR. SHULTZ:  That's all the questions I have.

Thank you.

THE COURT:  Anything further of Mr. Smith?

MR. WELCH:  No, Your Honor.

THE COURT:  Any further witnesses for the Government?

MR. WELCH:  No, Your Honor.

THE COURT:  Mr. Shultz?

MR. SHULTZ:  No, Your Honor.  No witnesses.

THE COURT:  For the record, Mr. Torres, you can testify here today.  It's entirely up to you.  If you don't testify, I won't hold it against you in any way.  But I do want you to know at any hearing you have a right to testify and you have a right to call witnesses.  You need to talk with Mr. Shultz about that and then decide what you want to do and tell me.

(Off-the-record discussion between Mr. Shultz and Defendant Juan Torres.)

DEFENDANT:  Not today, Your Honor.

THE COURT:  Thank you very much.  That's your choice; correct?

DEFENDANT:  Correct.

THE COURT:  Now, there are a lot of people here in the courtroom with you.  I assume that you don't want to call any of them?

DEFENDANT:  No.  They're just --

MR. SHULTZ:  Were you asking me or Mr. Torres, Your Honor?

THE COURT:  Either one of you.

MR. SHULTZ:  I don't think we intend to. Although let me -- may I confer one more minute.

(Off-the-record discussion between Mr. Shultz and Defendant Juan Torres.)

MR. SHULTZ:  The only other issue that I think we could potentially ask about was his date of birth, which was February 22, 1991.  That's not necessarily in the record, but I believe the Government will stipulate.

MR. WELCH:  We'll stipulate to that, Your Honor.

THE COURT:  All right.  Thank you very much. Do either of you want to make any argument or shall I just decide this on the basis of the written materials?

MR. WELCH:  The latter would be fine with the Government, Judge.

MR. SHULTZ:  Just brief argument, Your Honor. I would argue that the case that's cited by the Government certainly do put forward the two-prong test that they talk about.  I would argue that this is sort of a different standard.  The only case I've found with

this particular issue is the *Hoo* case, which I cited, so I think this maybe is a different way to evaluate it. But I think even under the, the two-prong test, there's actual prejudice in the sense of that there are protections in the Juvenile Delinquency Act that were not -- that were avoided because of the timing of the Indictment. All of the information about Mr. Torres' alleged involvement in the October 4, 2008, crimes would have been known to the Government roughly a year prior to the Indictment, and that the application of that, had that case been prosecuted in a speedy manner, Your Honor, would have triggered protections that I don't think any of us can necessarily predict how they would have come in, but I think that another hearing, a certification by the Attorney General. As I read the Juvenile Delinquency Act differently, maybe incorrectly, that to transfer to an adult prosecution, there has to be a consideration of a number of factors that are not necessarily automatic. I could be reading that incorrectly; but I believe that there was prejudice just merely by the loss of those procedural protections and that even if it was not a scheme to harass Mr. Torres, there were tactical considerations and tactical advantages gained by the Government. And I think Eric Sanchez' non-prosecution gives evidence that these age

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 68

considerations and the complications of the Juvenile Delinquency Act were considered on the decision on when to issue the Indictment.

THE COURT:  But shouldn't I consider the nature of the case in its entirety and not break it out into whether a separate charge just on the basis of the drive-by could have been brought earlier as to this Defendant?

MR. SHULTZ:  Yeah, I mean, I think that's a fair consideration, Your Honor, that it's more than this charge.  I would argue that the nature of this charge -- I think there's a, in my view, a connection, a federal interest, that maybe isn't as substantial as the Government sees it and that grouping all those things together because of the rubric of the investigation is not necessarily the same as a substantial federal interest under the Juvenile Delinquency Act.

THE COURT:  Well, I've never had this come up before and I'll take a look at it.  All right.  Thank you very much.

MR. SHULTZ:  Thank you, Your Honor.

MR. WELCH:  Thank you.

DEFENDANT:  Thank you, Your Honor.

(Adjourned at 3:52 p.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 11th day of March, 2013.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer

United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS


UNITED STATES OF AMERICA,          )
                                   )
                      Plaintiff,)  District Court
                                   )  Case No. 12-10089
vs.                                )
                                   )
JASON NAJERA, et al,               )
                                   )
                      Defendants,)
                                   )
_____


### TRANSCRIPT OF MOTION HEARING


On the 13th day of February, 2013, came on to be heard **Hearing on James Motion** in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.


**APPEARANCES**

The **Plaintiff** appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;

Defendant **Pedro Garcia** appeared in person and by and through Mr. Val Wachtel;

Defendant **Gonzalo Ramirez** appeared in person and by and through Mr. Joel Mandelman and Mr. Tim Henry;

Defendant **Joshua Flores** appeared in person and by and through Mr. Carl Maughan;

Defendant **Donte Barnes** appeared in person and by and through Mr. Jeff Griffith;

Defendant **Enrique Gobin** appeared in person and by and through Mr. Ed Robinson;

Defendant **Alfonso Banda-Hernandez** appeared in person and by and through Mr. Mike Hepperly;

Defendant **Andrew Gusman** appeared in person and by and through Mr. Eric Hartenstein.

**I N D E X**

**FEBRUARY 13, 2013:**

**WITNESS**

**SHANE WEBB**
Direct Examination by Mr. Welch:          4
Cross Examination by Mr. Wachtel:        20
Cross Examination by Mr. Mandelman:      25
Cross Examination by Mr. Maughan:        32
Continued Direct Exam by Mr. Welch:      42
Cross Examination by Mr. Wachtel:        50
Cross Examination by Mr. Mandelman:      55

**J.L. BICE**
Direct Examination by Mr. Smith:         60
Cross Examination by Mr. Griffith:       76
Continued Direct Exam by Mr. Smith:      81
Cross Examination by Mr. Hepperly:       92
Cross Examination by Mr. Hartenstein:    99
Cross Examination by Mr. Robinson:      105

Certificate of Certified Shorthand Reporter: 115

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 9:10 a.m. February 13, 2013, the following proceedings were held.)

THE COURT: This is United States against Jason Najera and others. Case number 12-10089. Lanny Welch and Aaron Smith are here for the Government. We all know this is being divided into two separate James hearings, so let's have the appearances for the Defendants who are here for the first hearing. We can start with Carl.

MR. MAUGHN: Thank you, Your Honor. Carl Maughan appears on behalf of Joshua Flores, who is present in person.

MR. HARTENSTEIN: Andrew Gusman appears in person and with counsel Eric Hartenstein.

MR. WACHTEL: Pedro Garcia appears in person, Your Honor, and by counsel Val Wachtel.

MR. HEPPERLY: Alfonso Banda-Hernandez appears in person and by and through Mike Hepperly.

MR. GRIFFITH: Jeff Griffith on behalf of Donte Barnes, who appears personally.

THE COURT: Joel.

MR. MANDELMAN: Joel Mandelman and Tim Henry for Gonzalo Ramirez, who appears in person.

MR. ROBINSON: Ed Robinson for Enrique Gobin,

who's present in person.

THE COURT:  Anyone else?  Call your first witness.

MR. WELCH:  Your Honor, as the Court is aware, we attached the chart in the filing on Monday.  We have an updated version of that which I have marked as Government Exhibit 1.  We've given a copy to all defense counsel.  May I approach, Your Honor?

THE COURT:  Yes, you may, sir.  Thank you.

MR. WELCH:  Your Honor, our plan this morning is to address statements 1a through 4c.  We go in chronological order in terms of when the crimes occurred.  We start with statements 2a, b and c, Your Honor.  At this time, we would call Shane Webb.

MR. MANDELMAN:  Your Honor, I need to interrupt.  I'd ask that the witnesses be separated.

THE COURT:  What.

MR. MANDELMAN:  The Government has all their witnesses here --

THE COURT:  No.  This is a James hearing.

MR. MANDELMAN:  Okay.

THE COURT:  No reason for that here.

**SHANE WEBB**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as

follows on:

## **DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you state your name please.

A   Shane Webb.

Q   And, Mr. Webb, how are you currently employed?

A   By the Kansas Bureau of Investigation.

Q   How long have you been with the KBI?

A   About a week and a half.

Q   Okay.  Prior to your employment as an agent with the Kansas Bureau of Investigation, how were you employed?

A   With the Dodge City Police Department.

Q   How long did you work for the Dodge City Police Department?

A   Since January 3rd of 2005.

Q   And you left from the Dodge City Police Department into the KBI; is that correct?

A   That is correct.

Q   When you left the Dodge City Police Department, what was your rank?

A   I was a detective.

Q   And what type, generally speaking, what type of work did you do for the Dodge City Police Department at the time that you left?

A   Mainly narcotics and gang crimes.

Q   While working with the Dodge City Police Department, were you familiar with various events and crimes committed by gangs in Dodge City, Kansas?

A   Yes, I was.

Q   And was one of the gangs that you worked on and had familiarity with the Nortenos street gang in Dodge City, Kansas?

A   Yes.

Q   I'd like to focus your attention on events -- right now -- events which occurred in June of 2009 if I could.

A   Yes.

Q   Are you familiar with a robbery which occurred on June 8, 2009, at 1005, or 1-0-0-5, Avenue E in Dodge City, Kansas?

A   Yes, I am.

Q   Could you tell the Court just generally speaking what happened during that crime?  What occurred?

A   In the evening of June 8, 2009, approximately four to six individuals went into 1005 Avenue E, Dodge City, Ford County, Kansas, where they committed an armed robbery of the victims of that residence.

Q   And how many -- approximately how many people lived at 1005 Avenue E on June 8, 2009?

A   I'd say approximately five.  I think there was two males, females and some children.

Q   And the -- the ethnicity of the people who lived at that house, are you aware where they were from?

A   Yes.

Q   Where were they from?

A   From Guatemala.

Q   Was there some significance to the fact that Guatemalans were the victims of this crime?  Had you seen that -- has the Dodge City Police Department seen similar crimes like that in the past?

A   Yes, we had.

Q   Did the victims report to the police department that the robbers were armed with firearms?

A   Yes, they did.

Q   And I think you testified that they reported four to six men came into their home and robbed them; correct?

A   That is correct.

Q   During the robbery, was money taken from the victims at the residence?

A   Yes, sir.  Yes, there were.

Q   As part of your investigation into this home invasion robbery, have you and other members of the Dodge City Police Department interviewed witnesses who provided information about that crime?

A   Yes, we have.

Q   Are you aware of the men who committed the robbery

on June 8, 2009, at 1005 Avenue E in Dodge City?

A   Yes, I am.

Q   Who committed the robbery?

            MR. WACHTEL:  Objection.  Foundation.

            THE COURT:  Sustained.

BY MR. WELCH:

Q   Your investigation included interviews of witnesses; is that correct?

A   That is correct.

Q   Did some of the witnesses provide information who were actually present during the crime itself?

A   Yes.

Q   And did you receive information from people who were -- had information immediately following the crime that provided that information to the Dodge City Police Department?

A   Yes.

Q   And those -- the people who either were present during the crime itself or immediately following the crime, did they identify who was present or who committed the robbery?

A   Yes.

Q   And who did they tell you had committed the robbery?

A   It was Jesus Flores.  It was Joshua Flores.  It was Pedro Garcia and Gonzalo Ramirez.

Q   All right.  Now, you've identified the four men.  Do you see three of those men in the courtroom today?

A   Yes, I do.

Q   All right.  Would you please point to -- starting with Pedro Garcia, point to him and describe what he is wearing today?

A   Pedro Garcia is in blue with the white undershirt sitting next to Mr. Wachtel.

Q   He is in the front row of the jury box seated third from the left; is that correct?

A   That is correct.

Q   Okay.  Do you see Gonzalo Ramirez in the courtroom?

A   Yes, I do.

Q   Where is he seated?

A   He's in the back row.  He's the only individual in red.

Q   All right.  Is he far left in the second row?

A   That is correct.

Q   All right.  And then Joshua Flores, do you see him in the courtroom today?

A   Yes, I do.

Q   Where is he seated and what is he wearing?

A   He's in the front row.  He has a green-colored top on, white undershirt, sitting on the front row to the far right.

Q    Okay.  Thank you.

MR. WELCH:  Your Honor, I'd ask that the record reflect Pedro Garcia, Gonzalo Ramirez and Joshua Flores have been identified by the witness.

THE COURT:  It will.

BY MR. WELCH:

Q    Detective Webb, do you know, was this crime reported by the victims to the Dodge City Police Department?

A    Yes, it was.

Q    And did police officers respond to the scene?

A    Yes, they did.

Q    And do we know approximately when the crime occurred on June 8, 2009?

A    It was in the evening; but I don't have the exact time.

Q    Okay.  And from the investigation that you and others have conducted, are you aware of the roles that the four men -- the one who's not present who committed the robbery you said is Jesus Flores; is that correct?

A    That's correct.

Q    Are you aware of the roles that were played by the four men in deciding to do the robbery to begin with and then when the actual robbery occurred, what each of the men did?

A    Yes.

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 80

Q   Now, at some point in the evening of June 8, 2009, do you have information that one of -- one or more, Pedro Garcia, Gonzalo Ramirez, Joshua Flores or Jesus Flores, discussed committing a robbery?

A   I don't know if it was described as they were going to go commit a robbery.  They were going to go look for a house.

Q   Was a statement made that they all understood meaning going to look for a house --

MR. WACHTEL:  Objection, Your Honor.  Calls for a conclusion.

THE COURT:  Yes, I think so.  I don't know how he would know what they were thinking.

MR. WELCH:  I can do it another way, Your Honor.

BY MR. WELCH:

Q   Has your investigation revealed that at some point a statement was made that said something to the effect of let's go look for a house?

A   Yes.

Q   And do you know who made that statement?

A   It was either Pedro Garcia or Gonzalo Ramirez.

Q   In response to that statement "let's go look for a house", what did these four men do?

A   They went to look for a house.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Okay.  And has a witness provided information to you about what exactly occurred?  How they went to look for a house?

A   Yes.

Q   When the statement was made, where were these four men located?

A   They were at 1302 Avenue D in Dodge City, Kansas.

Q   Is that a residence that belonged to one of these men?

A   Yes.

Q   Which one?

A   Pedro Garcia.

Q   So at Pedro Garcia's, this statement "let's go look for a house" -- which, Your Honor, is identified as Statement 2a in the Government filing -- when this statement is made at Pedro Garcia's house, you said it was made by either Pedro Garcia or Gonzalo Ramirez; is that correct?

A   That is correct.

Q   And in response to that statement, the four men left Pedro Garcia's house; is that correct?

A   That is correct.

Q   What did they do?

A   They then walked south through the alleyway approximately three blocks until they got behind the

address of 1005 Avenue E.

Q    And the location of Pedro Garcia's house to the victim house, 1005 Avenue E, is approximately how far apart?

A    Three blocks.  I can't give you an exact distance.

Q    Both, obviously, are located in Dodge City, Kansas; correct?

A    Yes, sir.

Q    All right.  At some point was a house selected to commit a robbery at?

A    Yes.

Q    How do you know that?

A    Through the person that gave us information stated that Gonzalo Ramirez went up to a back window of that house, began looking in the window, and said let's kick this in.

Q    And looked in the window of the house at 1005 Avenue E in Dodge City?

A    That is correct.

Q    And you said Gonzalo Ramirez, who you previously identified as being in the far left in the second row of the jury box, said "let's do this house" or "let's kick this house"?

A    That's correct.

            MR. WELCH:  Your Honor, that statement is

identified as 2b in our chart.

BY MR. WELCH:

Q   And in response to that statement, what happened?

A   The four individuals went around to the front of the house and proceeded to rob the victims inside the residence.

Q   Did they gain entrance through the front door of the house?

A   Yes, they did.

Q   And once they were inside the house, did each of the four men participate in the robbery?

A   Yes, they did.

Q   What did -- what happened to the victims inside the house?

A   I'm sorry.

Q   When the four men went inside the house, what happened?

A   Jesus Flores stood at the front door as a lookout. Josh Flores, Pete, or Pedro Garcia, took off through the residence after a female.  And Gonzalo Ramirez took a male by the name of Isidro Raleas-Velasquez into a room where he was able to obtain some money.

Q   Prior to Gonzalo Ramirez taking that victim into a room and getting money, did he physically assault that victim?

A    Yes.

Q    How did he do that?

A    By taking the bottom of a pistol and hitting him on top of the head.

Q    And after the robbery was completed and the robbery was reported to the police department, did that victim, did he receive medical attention?

A    Yes, he did.

Q    Do you know if all four of the men were armed with firearms during the robbery?

A    According to a person who gave information, they were.

Q    And then after the robbery was complete -- well, let me ask you this.  During the robbery while the four men were in the house, did they get money?

A    Yes, they did.

Q    After they got money, what did they do?

A    They then exited the residence.

Q    And where did they go?

A    They ran back north through the alleyway back to Pedro Garcia's residence at 1302 Avenue D.

Q    And all four men fled at the same time and fled back to Pedro Garcia's house?

A    That's correct.

Q    And after the robbery and after they arrived back at

Pedro Garcia's house, was money divided amongst the four robbers?

A   Yes.

Q   And how do you know that?

A   Through a person that was there.

Q   And did all four of the men receive proceeds from the robbery?

A   I was told that three of 'em did.  They were not for sure about Josh Flores, if he got any money or how much it would have been.

Q   After Pedro Garcia, Gonzalo Ramirez, Josh Flores and Jesus Flores went to Pedro Garcia's house and money was divided, did the four robbers then go separate ways?

A   Yes, they did.

Q   And who -- do you know what Pedro Garcia and Gonzalo Ramirez did after dividing the money and after committing the robbery?

A   Yes.

Q   What did they do?

A   During this time, two other individuals arrived at Pedro Garcia's residence.  Pedro Garcia or Gonzalo Ramirez stated "let's go look for scraps".

Q   Okay.  Joshua Flores and Jesus Flores, did they go in a separate direction -- did they depart from Pedro Garcia and Gonzalo Ramirez after the home invasion

robbery?

A   Yes.  I believe at the time they stated that they were in a different room in the residence at the time when Pedro Garcia and Gonzalo Ramirez left the residence.

Q   Okay.  So at some point, then, after the four robbers got back to the house, they divide the money, Pedro Garcia and Gonzalo Ramirez went one direction and Josh Flores and Jesus Flores went a different direction; is that correct?

A   That is correct.

Q   And did -- Pedro Garcia and Gonzalo Ramirez, did they leave the house again?

A   Yes, they did.

Q   Did they leave with other people?

A   Yes, they did.

Q   Who did they leave with?

A   Anthony Wright and Russell Worthey.

Q   And did they leave -- how?  In a vehicle or on foot or do you know?

A   They left in Anthony Wright's significant other's vehicle.

Q   All right.  And while Pedro Garcia, Gonzalo Ramirez, Anthony Wright and Russell Worthey were now in this vehicle -- do you know what type of vehicle it was?

A   It was a small gold in color I want to say Mazda, but that might not be right.  It was a small passenger car.

Q   It was a small you think Mazda.  When the four of them left in the Mazda, was a statement made concerning how they should leave Dodge City?  What direction they should go?

A   Yes, sir.

Q   What was the statement that was made?

A   Statement was made to go east because there was a lot of cops in the area.

Q   And who made that statement?

A   Pedro Garcia.

Q   And Pedro Garcia would know there was a lot of cops in the area because the home invasion robbery had just occurred; is that correct?

A   That is correct.

Q   And did he advise that they should avoid the area of town where the robbery had just occurred?

A   Yes.

Q   And the statement was made to whom?

A   Made to Anthony Wright and Russell Worthey.

Q   Do you know who -- I'm sorry --

A   As well as Gonzalo Ramirez.

Q   Do you know who was driving the car at that time?

A    Yes.

Q    Who was driving?

A    Anthony Wright.

Q    Turning back to the robbery for just a minute. Detective -- I'm sorry -- Agent Webb, each of the four members of the robbery participated in the robbery itself; is that correct?

A    That is correct.

Q    And did each of the four have a role that they performed or a part of the crime that they performed during the commission of the crime?

A    Yes.

Q    And the proceeds of the crime itself were divided at least among three of the four and possibly all four received some proceeds of the robbery; is that correct?

        MR. MAUGHN:  Objection to possibly all four. That wasn't the testimony.

        MR. WELCH:  We'll just say three, Your Honor.

        THE COURT:  I think it's repetitious.

        MR. WELCH:  Okay.  I'll move on, Judge.  Thank you.  If I could just have just a moment, Judge.

                (Off-the-record.)

        MR. WELCH:  Your Honor, I have no further questions about statements 2a, 2b and 2c.

        THE COURT:  Well, didn't you also cover 1a?

MR. WELCH:  We did, but I'll get into that in a minute, Judge, if I could.

THE COURT:  All right.  2a, 2b and 2c are all involved.  Garcia, Ramirez and the two Flores.  So whoever represents Pedro Garcia can start.  Mr. Wachtel.

MR. WACHTEL:  Thank you, Your Honor.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q   Agent Webb, my name is Val Wachtel.  I represent Pedro Garcia.

A   Yes, sir.

Q   If I ask you a question that you don't understand, would you tell me that you don't understand it?

A   Yes, sir.

Q   Thanks.  I've listened to your testimony, and, to me, you described -- have you described statements made to you by the victims of the robbery?

A   No, sir.

Q   Have you described statements made to you by one or more confidential informants?

A   Yes, sir.

Q   Is there any way that you -- without identifying the confidential informant, is there any way that you can help me understand which of the statements that we've talked about regarding the robbery were made by which

informant?  A -- Informant A and Informant B.  Can you do that?

A    Sure.  Where would you like to start?

Q    I'd like to start with, let's see -- well, first one you covered was 2a.  That is the "let's go look for a house" statement.

A    So you want to start with Informant A?

Q    I don't know.  Is that Informant A?

A    We can start there if that's how you'd like to start.

Q    Well, I'd like to start in the chronological order of which informant told you what.  Let's make this Informant A.  Okay?

A    Okay.

Q    All right.  How long after this incident did Informant A give you this information?

A    It was after they were indicted.

Q    Let's go to 2b, which is "let's kick this house".  Who gave you that information?  Which informant?

A    It would be the same as the first one.

Q    Same one.  Now, someone described to you what went on inside the house; right?

A    That is correct.

Q    Okay.  Was that a confidential informant as well?

A    Same person.

Q   Same person.  And when you said the people ran --
after the robbery, people ran back to Pedro Garcia's
house, described that person as the person who gave you
information, is that Informant A?

A   It could be A, B and C in this deal.  There was
three different persons that gave us information.

Q   So A, B and C gave you that information about people
running back --

A   That's correct.

Q   -- to the house?  1a was "let's go look for some
scraps".  You testified to that?

A   Okay.  Are you calling this Informant A or 1-A?  I
don't want to be confused.

Q   The same guy who told you about statement 2a.

        THE COURT:  Can we stop for a minute.

        MR. WACHTEL:  Yes, sir.

        THE COURT:  Do you have a copy of this chart?

A   Yes, sir.

        THE COURT:  Okay.  It makes sense for you to
follow the statement number if that's consistent with
the way you want to question the witness.  Because
you've got statement a, Informant A, et cetera.  I think
the record needs to be clear.

BY MR. WACHTEL:

Q   Was the statement at 1a, "let's go get some scraps",

made to you by an informant other than the one that you had been describing as Informant A?

A  Yes.

Q  And how long after this robbery occurred did that informant tell you about this?

A  I want to say it would have been in the year 2010.

Q  After the Indictment?

A  Before.

Q  Before.  But that informant, whoever he or she was, could not tell you who made that statement?  Do I understand that correctly?

A  Knew it was either Gonzalo Ramirez or Pedro Garcia. They both were sitting on the couch together and stated that I heard it come from one of the two but he did not know which one.

Q  I know the statements that you were discussing here weren't recorded, but were your confidential informants recorded when they were interviewed by you or other members of the police department?  Or any law enforcement officer?

A  Some of the interviews would be recorded.  Some of them will not be.

Q  Is there a reason why they all would not have been?

A  Yes.  Some of them were through -- I don't want to mess up the terms -- but I guess through proffers, that

happened up here.

Q   I think we all know what that means.  Thank you. But those proffers weren't recorded?

A   No, sir.

Q   You also testified that you were aware of the roles played by each defendant in the robbery.  Did I understand that?

A   Yes.

Q   Did that information come to you from someone who was a victim of this crime?

A   No.

Q   Did that information come to you from one of the confidential informants that we've talked about so far, A and B?

A   Yes.  It was the first person.

Q   The first person?

A   That you labeled as A.

Q   I apologize.  We just labeled him A because that's where we started.

A   That's fine.

Q   You testified the four men walked down the alley to the house that was robbed?

A   That is correct.

Q   That information was given to you by a confidential informant?

A    That is correct.  It would be person A as you referred to them.

Q    Person A?

A    Yes, sir.

       MR. WACHTEL:  I don't have any further questions.  Thank you very much.

       THE COURT:  Thank you.  I think you're next, Mr. Mandleman.

                    **CROSS EXAMINATION**

BY MR. MANDELMAN:

Q    Just, again, so I'm clear.  The person who talked to you about statement 2a didn't talk to you about that statement until sometime in 2012 after he was indicted in this case?

A    That's correct.

Q    And that person was a participant in this robbery?

A    That is correct.

Q    Was that person under the influence of alcohol at the time of the robbery?

A    I don't recall if he was under the influence of anything.  I'm not saying he was or he wasn't.  I don't know at this time.

Q    Drugs?  You're just not sure?

A    I'm just not sure at this time.

Q    And, again, I'm just a little bit confused.  That's

the same person who was responsible for the statement in 2b?

A    That is correct.

Q    And as far as which -- I note there's two statements there.  There "let's do this house" or "let's kick this one".  That's the -- there's only one of those statements was made.  That person just wasn't certain as to what was said?

A    That is correct.

Q    And you just attribute that to the fact that this happened so long ago?  What?

A    I can't say why he didn't know what was said one way or the other.

Q    With respect to 2a, where was the person in relationship to where the statement was made if they weren't able to identify the speaker?

A    They were just in a group.  I can't tell you exactly what their positioning was.  I don't know.

Q    Were they in the same room?

A    Yes.

Q    They knew -- the person knew both Mr. Garcia and Mr. Ramirez?

A    Yes.

Q    But nonetheless wasn't able to identify who made the statement?

A    That's correct.

Q    The person was present at the robbery?  This same person?

A    Yes.

Q    And participated in the robbery?

A    Yes, sir.

Q    Did this person tell you how many other people participated in the robbery?

A    Besides himself, there was three others.

Q    Have you been able to figure out how come the victims of the robbery identified six people as coming to their house?

A    No, I haven't.

Q    You know who those other two people were?

A    No.

Q    And where was this person -- this person was the lookout?  I'm not clear.  Where was this person when the robbery was taking place?

A    That's correct.

Q    Was the person, at the time of the robbery back in 2009, cooperating with the Dodge City Police Department in another case?

A    Not to my knowledge.

Q    Person had been arrested and charged with selling methamphetamine in January, 2009?

A    I know he had been arrested at one point.

Q    And subsequently got out --

MR. WELCH:  I'm going to object, Your Honor. This line of questioning is not relevant to the hearing today.

THE COURT:  Sustained.

MR. MANDELMAN:  Just for the record, it's our position that if this person was a cooperating witness in another case against our client, it's relevant to whether or not he was a co-conspirator in this case if he was an agent of the Government.

THE COURT:  I sustained the objection.

MR. MANDELMAN:  Thank you, Judge.

BY MR. MANDELMAN:

Q    1a, different -- this is a different -- this is that third person?

A    Yes.  That's correct.  May be the -- I don't know. I'm kind of lost in our letters now.  But it wasn't the first person that was involved in the home invasion if that's what you're asking.

Q    Yeah.  Again, wasn't able to -- wasn't able to identify whether it was Mr. Garcia or Mr. Ramirez who made this statement?

A    Which statement are we talking about?

Q    1a.

A    That is correct.

Q    Where was this person when the statement was made in relationship to my client Mr. Garcia?

A    The basement of Pedro Garcia's residence, small room.  They were -- Pedro Garcia and Gonzalo Ramirez were setting on the couch.  He was in close proximity to that couch.

Q    Is this similar scenario to the other situation but a different person?

A    That's correct.

Q    Was this person under the influence of drugs or alcohol?

A    Couldn't tell you, sir.

Q    When were you made aware of this statement?  Was this after the Indictment or was this in 2010?

A    I believe this was in 2010.

Q    After this person had been arrested on some other charges?

A    That is correct.

Q    For selling methamphetamine?

MR. WELCH:  Same objection, Your Honor.

THE COURT:  Sustained.

BY MR. MANDELMAN:

Q    And this would have happened after, after the robbery?  This "let's go get some scraps"?  I'm just

trying to figure out the chronology here.

A    After the home invasion occurred, that's correct.

Q    Your testimony was that the two, Josh Flores and Jesus Flores, stayed behind at Pedro Garcia's house while my client Mr. Garcia left Mr. Garcia's house?

A    That's correct.

Q    Was there any explanation for how come those folks stayed at Mr. Garcia's house?

A    No.

Q    Are they welcome at Mr. Garcia's house?

        MR. WELCH:  Objection.  It's not relevant, Your Honor.

        THE COURT:  Sustained.

BY MR. MANDELMAN:

Q    And this person told you that Wright picked up Garcia and my client in this, in this girlfriend's gold vehicle?

A    I don't necessarily know he said he picked them up. They left in that vehicle.

Q    All right.  What's the source of this information?

A    I don't know how we're lettering it any more; but it would be another informant in this case.

Q    Different person?

A    It would be the same informant that issued statement 1a.

MR. MANDELMAN:  Your Honor, just one second. I'd like to consult with Mr. Henry just for a second.

THE COURT:  Thank you.

(Off-the-record.)

MR. MANDELMAN:  If I may.  Just a couple quick questions on follow-up.

BY MR. MANDELMAN:

Q   Did these informants give you consistent statements as to what happened?

MR. WELCH:  About what, Your Honor?  Define what we're talking about.

Q   Yes.  As far as the chronology, the way the robbery took place.

A   Yes.

Q   And have they given multiple statements about this? Has Informant A talked to you more than once about the way this happened?

A   Yes.

Q   And are those multiple statements recorded?

A   I believe one would be.  There was also a grand jury testimony.  And there would also be -- I believe that there was also another meeting, but it would not be recorded, the last one.

MR. MANDELMAN:  That's all right now.  Thanks.

THE COURT:  Mr. Maughan, I think you're up

now.

MR. MAUGHN:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. MAUGHAN:

Q   Good morning, Agent.  Just so that I'm kind of clear.  When statement 2a was made, who else was living in Mr. -- was that made in Mr. Garcia's house?

A   It was either in his house or by the door going out to the backyard.  They could have been either in that area, backyard, or right inside the basement, small basement.

Q   Okay.  Didn't you testify that Mr. Garcia and Mr. Ramirez were sitting on a couch when 2a was made?

A   That was when 1a was made.

Q   Okay.  But 2a, you're not sure whether they were inside the house or in the doorway to the backyard?

A   Somewhere in that area, yes, sir.

Q   And you, from the information you have, you don't know whether that statement was made by Pedro Garcia or Mr. Ramirez.  Is that true?

A   That's true.

Q   Okay. Do you know where your source was standing in relation to those two at the time?

A   No, sir.

Q   Who else was living in that house at the time of

this statement?

A    I don't know.

Q    Okay.  Do you know if anyone else lived there?

A    I would imagine Pedro Garcia's mother.  She's always lived at that residence.  But I don't know who else would have been there.

Q    Did Mr. Garcia live exclusively downstairs in the basement or was his room upstairs or --

A    His bedroom was in the basement.

Q    So statement 1a, was that made upstairs or downstairs?

A    Downstairs.

Q    Downstairs.  And that's the statement that was made while the two potential declarants were sitting on the couch?

A    That is correct.

Q    And you know that 2a was made at least downstairs but you're not sure exactly where in that vicinity?

A    That is correct.

Q    The victims of this robbery, the people who lived in the house, identified four to six people coming into the house; is that right?

A    That is correct.

Q    And have you inquired of your source as to why he says four and the victims say six?

A    No.  He stated there was four of them.

Q    Have you -- do you know of any reason why your source might be protecting two other people who may have been involved?

A    No, sir.

Q    Did your source tell you whether or not the people who were involved in this disguised their appearance in any way?  Did they wear masks or anything like that?

A    Yes.

Q    Have you followed up or anyone that you know of involved in this investigation followed up with the victims to do a line-up of any sort?

A    I do not know about a line-up.

Q    Have you followed up with the victims to see if they can identify the people your source identified?

A    Not to my knowledge.

Q    And I think you answered this but I just want to clarify it.  Your source is somebody who claims to have actually been involved in the robbery?

A    That is correct.

Q    And your source is one of the people who actually got money from the robbery?

A    That is correct.

Q    And was -- did that individual tell you this information, did he come to you or was he arrested

and -- already?

A   It was after the Indictment so I don't know how that's all arranged.

Q   So it was after the person had been charged with the crime of the robbery; is that right?

A   Yes, sir.

Q   And he was facing potential prosecution?

A   Yes, sir.

Q   You testified that you don't know whether that person who made statements -- and let me just clarify because we kind of went back and forth on the numbers. 1a is made by the same person -- you were told about statement 1a by the same source as told you about 2a; is that correct?

A   No.

Q   Okay.  The person who told you about statement 2a, was that the same person who told you about 2b and 2c?

A   No.

Q   Same as 2b though?

A   2a and 2b are the same person.  2c and 1a are the same person.

Q   Okay.  Was the person who told you about 1a and 2c, was that person involved in the robbery?

        MR. WELCH:  I'm going to object to questions from this counsel about 1a.  That question is not being

offered -- that statement is not being offered against Joshua Flores.

THE COURT:  I was kind of wondering why we're doing this exercise; but I figured you knew what you were doing.  Let's move on here.  We don't have a whole lot of time here, Mr. Maughan.  This is a very discrete hearing.  We're not here before a jury trying to confuse them.

MR. MAUGHN:  And, Your Honor, and that's why I'm trying to clarify because some of the testimony was a little confusing so I'm trying to nail it down.

BY MR. MAUGHN:

Q   So just to be clear, 1a is not relevant to Joshua Flores?

A   That is correct.

Q   Do you know whether Joshua Flores was present when 2a was made?

A   I do not know.

Q   Do you know whether Joshua Flores was present when 2b was made?

A   Yes, he would have been.

Q   Okay.  Do you have any information as to whether or not Joshua Flores heard that statement?

A   No.

Q   Do you have any information as to whether Joshua

Flores understood what the declarant meant when he said "let's do this house" or "let's kick this one"?

A    It would just call for my personal opinion if I think he knew or not.

Q    But besides your personal opinion?

A    I don't know.

Q    Now, 2c, was this statement made while Pedro Garcia and Mr. Ramirez were already in the vehicle leaving?

A    That is correct.

Q    So Joshua Flores was not present at the time that that statement was made?

A    That is correct.

Q    And nor was Jesus Flores?

A    That is correct.

Q    And Joshua Flores never received any benefit from that statement because he, he wasn't avoiding the police with the other people in the car?

MR. WELCH:  Objection, Your Honor.  That's not consistent with the Tenth Circuit law on co-conspiracy and how it's applied to co-conspirators so I object to that question.

THE COURT:  Well, if he wasn't present, that's -- what's your point here, Mr. Maughan?  What point are you trying to make here?

MR. MAUGHN:  Well, Your Honor, in order for

the statements to be used as co-conspirator statements, you first need to show the statements were made within the conspiracy.  And in order for the conspiracy to exist, that the parties need to have mutual benefit. And I'm just trying to determine --

THE COURT:  Is your position that your client had withdrawn from the conspiracy at that point in time?

MR. MAUGHN:  Or that this was a different conspiracy because this was after these two -- the people in the vehicle were off to do something else that they've been charged with as a conspiracy and after the alleged robbery had been terminated.

THE COURT:  Well, the statement wasn't made -- according to this witness, your client was not present when the statement in the car was made.

MR. MAUGHN:  Correct.

THE COURT:  Now where do you want to go with this?

MR. MAUGHN:  That's good enough, Judge.

THE COURT:  All right.

BY MR. MAUGHN:

Q   Do you have any evidence that the four people that your source says was involved in the robbery had agreed to do this before they went to do the robbery?

MR. WELCH:  Objection.  Irrelevant, Your

Honor.

THE COURT:  Sustained.  No -- overruled.  The four -- your question is that the four people involved in the robbery had agreed to do it beforehand?

MR. MAUGHN:  Correct.

THE COURT:  What do you mean by beforehand?

MR. MAUGHN:  Well, had they planned it before they -- was it a spontaneous event that occurred at the time or --

THE COURT:  I think that's a legitimate question.

A   All I know is the first informant said that Peter Garcia, Gonzalo Ramirez said "let's go look for a house" and the four of them took off and walked down the alleyway.

BY MR. MAUGHAN:

Q   But you don't know whether Joshua Flores was present when that statement was made?

A   I don't know about when the statement was made, no, sir.

Q   And just to be clear, so your evidence is that you don't know whether or not they had agreed upon doing the robbery before they left Mr. Garcia's house?

A   Before they left Mr. Garcia's house, that's correct.

Q   And just so I can kind of visualize this -- and I

think your testimony was that all four people went into the house; is that correct?

A    That is correct.

Q    But one of them stayed by the front door; is that right?

A    That is correct.

Q    And that was Jesus Flores?  Is that what you testified?

A    That is correct.

Q    Now, you don't have any direct knowledge as to whether Joshua Flores benefited from this robbery?

MR. WELCH:  Objection.  Irrelevant, Your Honor.

THE COURT:  The objection is overruled.

A    I do not know if he benefited from it or not.

BY MR. MAUGHN:

Q    But you know the other three divided up the money?

A    That's correct.  That's what I was told.

Q    Your testimony was that you're not sure whether or not -- you have no information whether your confidential informant who provided statements 2a and 2b was under the influence of any alcohol or drugs at the time that he perceived these events; is that right?

A    That's correct.

Q    You do know that your confidential informant is a

habitual user of narcotics. True?

A   I don't know that.

Q   You do know he's a user --

MR. WELCH:  I'm going to object.  Same objection I made with Mr. Mandleman, Your Honor.  I don't think it's relevant.

THE COURT:  I'll let him answer.

A   The only thing that I know about that person -- I don't know if he's a user or a dealer.  I do not know.

BY MR. MAUGHN:

Q   But he's one of the two?

A   That is correct.

Actually, I guess, just so I can correct myself.  I do know that he has dealt in narcotics; however, I just don't know about his level of use.

Q   You don't know about his level of use but you know that he has used?

A   I just don't remember him telling me if he has.

MR. MAUGHN:  Thank you.  No further questions.

THE COURT:  Thank you.  Any redirect?

MR. WELCH:  No, sir.

THE COURT:  All right.  Now we're going to move to statements --

MR. WELCH:  1a, 1b and 1c, Your Honor.

THE COURT:  Go ahead, sir.

MR. WELCH: Thank you.

**CONTINUED DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, you are the same Shane Webb who just testified this morning; correct?

A   Yes.

Q   Following the home invasion robbery that you just testified about, are you familiar with a murder which occurred in Dodge City, Kansas, on June 8, 2009?

A   Yes, I am.

Q   And would you tell the Court, generally speaking, what happened in connection with that homicide? What occurred from the investigation conducted by the Dodge City Police Department?

A   On the evening after the homicide on June 8, 2009 --

Q   Let me stop you. You said after the homicide. You mean --

A   Excuse me. After the home invasion.

Q   All right. Go ahead.

A   Four individuals went to 201 East McCarter, Dodge City, Ford County, Kansas, to lot number 24 where a group of individuals were setting outside consuming alcohol. During -- when those four persons approached, they began yelling out different gang slurs and two persons were shot, one of those being Israel Peralta,

who is deceased.  The other one being Mariano Sorano --
I believe I'm saying his last name right -- and he was
struck I believe twice, two different bullets.  The four
individuals that committed this then fled the scene
after that occurred.

Q    And in addition to Israel Peralta who was struck by
gunfire and died, and Mariano Sorano who was struck by
gunfire and survived, there were at least two other
victims that were not struck by gunfire who were located
in the same area; is that correct?

A    That's correct.  As well as I believe a house that
was occupied.

Q    But the other two men were victims of the crime as
well; is that right?

A    Yes, sir.

Q    Now, and you said this murder occurred after the
home invasion; is that correct?

A    That is correct.

Q    Do you know how long after the home invasion the
murder would have taken place?

A    It was within the hour.  I don't know the exact
time.

Q    And the area of town, you said 201 E McCarter in
Dodge City.  What part of town is that located in?

A    It's on the south side of Dodge City.

Q   And is this area of Dodge City considered to be territory belonging to a certain gang in Dodge City?

A   It's more likely to be lived in by Surenos gang members.

Q   And Surenos gang members are rivals to what gang in Dodge City?

A   Nortenos.

Q   Have you received information from witnesses that were present before and during the murder itself?

A   Yes.

Q   That provided information about how the murder took place?

A   Yes.

Q   Now, starting with -- you've already testified about a statement 1a a little bit, but let's go into that a little bit more.  1a is "let's go get some scraps". Where was that statement made?

A   In the basement of Pedro Garcia's residence.

Q   And do you have information as to who was present when that statement was made?

A   Yes.

Q   Who was present?

A   Pedro Garcia, Gonzalo Ramirez, Anthony Wright, Russell Worthey would have been in the proximity.  I don't know exactly where he was at at that time.  Jesus

Flores and Joshua Flores would have been in a bedroom

downstairs away from that conversation.

Q    The four men that you've just told us about that

were either in the basement or in close proximity to the

basement, Pedro Garcia, Gonzalo Ramirez, Anthony Wright

and Russell Worthey, did they all associate with the

same gang?

A    They all associated with Nortenos in some way or

another.

Q    And the statement that was made that's identified as

1a, "let's go get some scraps", who's your understanding

said that or made that statement?

A    That was either Peter Garcia, Pedro Garcia, and

Gonzalo Ramirez.

Q    Are you familiar with the term scraps?  Have you

heard that before?

A    Yes, I have.

Q    What does scraps mean in the context of gang

activity?

A    It's a derogatory term used against a Sureno gang

member.

Q    And it would be used by a Norteno making fun of or

you said derogatory term toward the rival gang, the

Surenos?

A    That is correct.

Q   So do you understand that the term -- the statement "let's go get some scraps", what does that mean to you as an investigator into these type of cases?

A   They're either gonna go and hit up some scraps, get in a fight with them, confront them in some way.

Q   And in response to that statement "let's go get some scraps", what happened?

A   The four individuals drove to the south part of Dodge City at 201 E McCarter, lot 24.

Q   And do you know when the four men left in the car -- which you've identified as possibly a Mazda earlier; is that right?

A   That's correct.

Q   The driver was who?

A   Anthony Wright.

Q   And was Russell Worthey in the car?

A   Yes, he was.

Q   Do you know where he was located?

A   He was in the front seat passenger.

Q   And was Pedro Garcia in the car?

A   Yes, he was.

Q   Where was he located?

A   He was located behind Anthony Wright, so on the driver's side of the vehicle in the rear seat.

Q   And where was Gonzalo Ramirez located?

A   He was in the back seat on the passenger side of the vehicle.

Q   Do you know if one or more of the men in the vehicle were armed with firearms?

A   Yes.

Q   How many and who?

A   Peter Garcia and Gonzalo Ramirez.

Q   They had firearms?

A   That's correct.

Q   And that was reported to you by people present at the time?

A   That is correct.

Q   And how -- when the statement was made "let's go get some scraps", how was it decided where they would go to look for --

MR. WACHTEL:  Objection.  Foundation, Your Honor.

MR. WELCH:  I'm trying to get there, Judge.

THE COURT:  Overruled.

BY MR. WELCH:

Q   When the statement was made as to where they were gonna go find some scraps, how was that decided upon?

A   Russell Worthey stated that he had basically had a confrontation where he threw up gang signs to some other individuals earlier in the day.  Russell Worthey is the

one that stated "I know where some are".  And they went to the south part of town.

Q   And had Russell Worthey in fact had an altercation or confrontation with people he believed to be rival gang members in that area of 201 East McCarter earlier that day?

A   That is correct.

Q   So when either Pedro Garcia or Gonzalo Ramirez said "let's go get some scraps", Russell Worthey had the idea where he knew there may be some scraps to find; is that right?

A   That is correct.

Q   And is that where they went in the vehicle?

A   Yes.

Q   Do you have information, Agent Webb, as to who fired the weapons that resulted in the death of Israel Peralta and being struck by gunfire by Mariano Sorano?  Who was firing the guns?

A   Gonzalo Ramirez and Pedro Garcia.

Q   And after the shots -- do you know how many shots were fired approximately?

A   I believe over ten.  Ten or over.

Q   Multiple rounds?

A   Yes.

Q   That's based on the number of shell casings found at

the scene; is that correct?

A    That is correct.

Q    After the shots were fired, Israel Peralta is struck and Mariano Sorano is struck by gunfire, what did these four men, the four attackers, what did they do?

A    They fled in the gold-colored Mazda.

Q    And where did they go?

A    Back to Pedro Garcia's residence.

Q    In the vehicle on the way, after the murder has occurred and they're driving back to Pedro Garcia's residence, you said, I want to focus your attention on the statement 1b.  Was a statement made by Gonzalo Ramirez to Pedro Garcia about the shooting itself?

A    That is correct.

Q    What was said by Gonzalo Ramirez to Pedro Garcia?

A    Was told that Gonzalo Ramirez was kind of laughing at the time, told Pedro Garcia "you really got that one".

Q    And then also in the vehicle in between 201 East McCarter and returning to Pedro Garcia's house, did Pedro Garcia make a statement to Russell White -- Russell -- I'm sorry -- Anthony Wright and/or Russell Worthey about what had just occurred?

A    He told them that they all had kids.  They took it as don't say anything, they were gonna -- they feared

that if they said anything about this, that was a threat towards their family.

Q   The statement made by Gonzalo Ramirez to Pedro Garcia about "you really got that one", that's identified as statement 1b; correct?

A   That is correct.

Q   Then the statement made by Pedro Garcia to Anthony Wright and Russell Worthey to remember that they have kids is identified as statement 1c; correct?

A   That is correct.

MR. WELCH:  If I could have just a moment, Your Honor.

THE COURT:  Sure.

(Off-the-record.)

MR. WELCH:  Your Honor, I have no further questions about statements 1a, 1b and 1c.

THE COURT:  Mr. Wachtel.

MR. WACHTEL:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   I was going to go in reverse order but I changed my mind.  I actually want to talk with you again about statement 1a, which is let's go find -- "let's go get some scraps"?

A   Yes, sir.

Q   Is it your testimony that whoever told you about that statement does not remember who made it?

A   That is correct.  Knows it was one of two persons.

Q   So either my client or Mr. Ramirez but he doesn't know which one?

A   Yes, sir, that's correct.

Q   And didn't know which one the last time you talked to him; right?

A   Do what?

Q   Did not know which one the last time you talked to him?

A   That's correct.

Q   Okay.  Thanks.  You then testified -- jumping around a little bit -- that Russell Worthey said he knew -- he knew where in a trailer park that they could go find some scraps.  Right?

A   That's correct.

Q   Paraphrased.  Right?

A   That is correct.

Q   Is it a confidential informant who told you of that statement?

A   It would be the same as -- same person as 1a.  Both 1b and 1c are the same as 1a.  Just -- not to get ahead of you, but just to -- so you know.

Q   Okay.  Thanks.  Can you tell me when the

confidential informant or informants told you about this statement about Russell knowing where to go to find some scraps?

A    Found out about this through grand jury testimony.

Q    So you were aware of this before the -- the witness, whoever he or she was, went to the grand jury; right?

A    That's correct.

Q    When did you learn that?

A    When did I -- I'm sorry.

Q    When did you learn about that statement?  At the grand jury or prior to that?

A    I believe these are all grand jury statements.

Q    I understand.  When did you learn about 'em?

A    I didn't review that video, but I have interviewed this person before he went to grand jury.  But I'm not for sure if those statements were made in that interview; but I know they came out of the grand jury testimony.

Q    So you don't remember whether or not those statements were made to you at all; right?

A    That's correct.  It is possible.

Q    It's possible but you don't recall?

A    That's correct.

Q    Thank you.  You testified that Gonzalo Ramirez and Pedro Garcia were doing the shooting; right?

A   According to this person, yes.

Q   According to -- according to Informant 1-A; right?

A   I think you labeled him as B earlier.

Q   But in any event, the same, the same informant?

A   That is correct.

Q   Okay.  Did you conduct the actual investigation at the scene?

A   No, I did not.

Q   Were you the detective in charge?

A   No, I was not.

Q   Have you read the police reports?

A   Some of them, yes.

Q   But in any event, in statement 1b Mr. Ramirez says, quote, you really got that one.  Right?

A   That is correct.

Q   And evidently according to 1 -- let me rephrase. You then talked about statement 1c in which Mr. Garcia allegedly told Wright and Worthey, "remember, you have kids".  Right?

A   That's correct.

Q   Now, how did you learn that Mr. Wright and Mr. Worthey took that to be a threat?  If in fact they did.

A   Because of their statements to me.

Q   Because of the statements that Wright and Worthey

made to you?

A    That's correct.

Q    During the investigation prior to the grand jury?

A    One of 'em was before the grand jury statement.  The other one was after in a proffer.

Q    Which one was before?

A    Anthony Wright.

Q    And when after the grand jury testimony did Mr. Worthey confirm that he took this to be a threat?

A    It would have been after they were indicted.

Q    The statement "remember, you have kids", with regard to the, to the commission of the shooting, right, when was that statement made?

A    After.

Q    After the shooting.  Was it made in the car as people were leaving?

A    At some point it was made in the car.  I can't tell you exactly where.

Q    Was it made -- can you tell me whether it was prior to -- well, let me rephrase that.  Do you know where everybody went after the shooting?

A    They went to Pedro Garcia's house.

Q    Was it made before -- was it made at Pedro's house? If you know.

A    It was made before they got to Pedro Garcia's house.

From the time they left the scene in the vehicle, sometime between there and Pedro Garcia's house.

MR. WACHTEL:  I don't have any further questions.  Thank you.  Wait -- I do.  No, I don't.

THE COURT:  Mr. Mandleman.

**CROSS EXAMINATION**

BY MR. MENDELMAN:

Q   Was anybody at the scene or any of the victims able to identify my client?

A   Not that I know of.

Q   So the first time my client was identified in this homicide was when Mr. Wright talked to you in 2010?

A   That's correct.  I don't know the exact date; but I believe it was 2010.

Q   And is that statement recorded?

A   Yes.

Q   And then Mr. Wright testified again before the grand jury?

A   Yes.

Q   Have you spoken with him subsequently?

A   Yes, I have.

Q   When's the last time you talked to him?

A   I do not recall.

Q   In 2012?

A   Yes, sir.

Q   And was that statement recorded?

A   I don't believe so.  And I'm just trying to think --
I'm getting people confused in my head.  But I know I
talked to him in 2012.  It would not have been a
recorded statement.

Q   Any reason why it wasn't recorded?

A   It's a proffer.  I don't know.

COURT REPORTER MS. SCHWEMMER:  I'm sorry.  You
said what?

A   It's a proffer.  One of those proffers.

BY MR. MANDELMAN:

Q   And 1b, that was Mr. Wright or Mr. Worthey who heard
my client say that?

A   That's correct.

Q   It was Mr. Wright?

A   That is correct.

Q   And the first time you were told about this was --
you first got this in 2010, that 1b?  Or it's one of
those interviews?

A   Not that statement.

Q   Okay.

A   That's the first time I talked to him was in 2010.

Q   But he didn't tell you that in 2010?

A   I don't know if he did or not.

Q   Okay.  At some point in time between 2010 and --

A    This was grand jury -- statement that he made in grand jury.

Q    Was Wright under the influence of alcohol at the time?

A    During grand jury?

Q    No.  At the time of the incident?

A    I do not know.

Q    Okay.  You didn't -- you didn't ask him?

A    If I did, I, I just don't know.  I don't recall at this time.

Q    So you don't know drugs or what he was doing that night, the night of this homicide, alleged homicide?

A    That's correct.  I didn't -- I don't know if he was under the influence.  I'm not saying he was.  I'm definitely not saying he wasn't.

Q    Okay.  And the only people who would have been present were -- there was only four people -- it was in that vehicle and there was only four people in that vehicle?

A    Yes, sir.

Q    Was Mr. Worthey able to corroborate that statement was made by my client?

A    I don't know at this time.  I know those statements came from Anthony Wright and that's --

Q    You're not sure if Worthey could corroborate it?

A   That's correct.  I haven't reviewed those reports.

Q   Did you ask him?

A   Sir, I don't know.

Q   What did Wright say he was doing during the homicide?

A   Took off running.

Q   How'd they end up reassembling in the car?

A   They all ran back to the car eventually.

Q   Four guys abandoned the car, went out and shot some people and then got back in the car?

A   Yes.

Q   Did they go off together?

A   What do you mean?

         MR. WELCH:  I'm going to object, Your Honor. I'm not sure how this is relevant to the co-conspiracy issue.

         THE COURT:  If they went off in the car and there were four in the car, they were together.  This has been covered about six times.

BY MR. MANDELMAN:

Q   Did Mr. Wright say he saw my client do the shooting?

A   I know that he recalled seeing both Pedro Garcia and Gonzalo Ramirez with firearms.  They pulled them out, he heard a gang term stated, he heard shots start to go off, he then turned and ran.

Q   Did he identify the weapons?

A   Yes, he did.

Q   What kind?

A   I don't know at this point.

Q   But it's in the interview?

A   That's correct.  Or in the grand jury statement.

Q   Now, are you aware of whether Wright cooperated against my client in a prior drug case?

MR. WELCH:  Objection.  Irrelevant, Your Honor.

THE COURT:  Sustained.

MR. MANDELMAN:  Just like to confer with my client for one second, Your Honor.

(Off-the-record.)

MR. MANDELMAN:  Okay.  Thank you, Judge. That's all.

THE COURT:  Thank you, Mr. Mandleman.

MR. WELCH:  Nothing further, Your Honor.

THE COURT:  We're going to take about a 10 minute recess.  And I'd like to see Mr. Fowler.

(Recess.)

MR. GRIFFITH:  I'm over here, Your Honor. With your permission, I've asked the marshal and counsel while my portion is going on, I'm going to sit at counsel table so I can spread out.  If that's all right.

THE COURT:  That's all right.  I was just looking for you.

MR. GRIFFITH:  I'm pretty hard to find sometimes.

THE COURT:  I think everybody is here.  Yes, Mr. Welch, go ahead.

MR. SMITH:  Your Honor, the United States would call Detective J.L. Bice.

THE COURT:  And for the record, we're talking about statements 3 and 3a?

MR. SMITH:  3a.

### J.L. BICE

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

### DIRECT EXAMINATION

BY MR. SMITH:

Q   Detective, would you please tell us your name.

A   J.L. Bice.

Q   And what is it you do for a living?

A   I'm a detective for the Dodge City Police Department.

Q   How long have you worked with Dodge City?

A   A little over four and a half years.

Q   And how long have you been in law enforcement?

A    Approximately 13 total.

Q    13 total years?

A    Yes, sir.

Q    And are you familiar with the event which would be a shooting that occurred at 1705 Avenue D on March 15 of 2011?

A    Yes, I am.

Q    Did you investigate that crime?

A    I assisted in that, yes.

Q    And we're referencing, for the Court, statements 3 and 3a; is that correct?

A    That's correct.

Q    And have you made yourself aware of those statements in conjunction with your investigation?

A    Yes, I have.

Q    Now, what are your duties at the Dodge City Police Department?

A    Primarily narcotics investigations and violent gang crimes.

Q    And so are you familiar with the Norteno gang that has been discussed and testified about today?

A    Yes, I am.

Q    And are you familiar with a person identified as an Alfredo Beltran-Ruiz?

A    Yes, I am.

Q   That person is not present; is that correct?

A   That's correct.

Q   And are you familiar with Donte Barnes?

A   Yes, I am.

Q   Is Donte Barnes present in the courtroom today?

A   Yes, he is.

Q   And he's seated where?

A   It would be the back row, third person to the right, dressed in orange top and orange T-shirt.

Q   Third person moving right; is that correct?

A   Correct.

MR. SMITH:   Thank you.   Your Honor, the record should reflect Donte Barnes has been identified.

THE COURT:   It will.

BY MR. SMITH:

Q   Can you briefly summarize what it was that occurred at 1705 Avenue D on March 15 of 2011?

A   Yes.   The resident, person that lived at that residence on that evening, reported that a vehicle had pulled up in front of his residence, an individual had thrown some gang signs which were Norteno related. After that had happened, he addressed his wife to take the children to another room of the house and he got on the floor.   He felt that something was fixing to happen. And shortly after that, he went out to his vehicle, came

around the block looking for the car that had pulled up front.

Q   Okay.  Let me stop so we can move a little bit -- a little more incrementally.  This resident you're referring to, he lived at 1705 Avenue D?

A   That's correct.

Q   In Dodge City, Kansas?

A   That's correct.

Q   His name is what?

A   His name is Reyes Delira Padilla.

Q   Was he associated with a gang?

A   Yes.  He is a documented Sureno.

Q   And he told you that he recognized these signs as somehow being Norteno gang related; is that correct?

A   That's correct.  It would have been a -- basically a sign identifying this person as a Norteno, which is disrespectful to the Sureno.

Q   This house, 1705 Avenue D, what part of Dodge City, Kansas, is that in?

A   It's basically on the east side of Dodge.  It's generally referred to as the east side or --

THE COURT:  I'm having trouble hearing you.

Q   (By Mr. Smith)  I believe we missed it.  It's generally referred to as?

A   The east side or alphabet city.

Q I take it that's because the streets are the name --
the letters of the alphabet?

A Yes, they're alphabetically --

Q Is it typical for a Sureno to live in that area?

A Not very.

Q Now, you testified Delira-Padilla saw a vehicle that
was parked out front; is that correct?

A That's correct.

Q How did he describe that vehicle?

A I believe it was a red or maroon Lincoln.

Q Lincoln?

A Correct.

Q And then you testified that he left his house and
got into his vehicle; is that right?

A That's correct.

Q What did Delira-Padilla do at that point?

A He drove -- his vehicle was parked behind his house.
He drove around to where the Lincoln was parked. At
that point, that Lincoln was gone. He started to search
for it and seen it parked again around the corner.

Q So this neighborhood, is it common for this
neighborhood to have alleyways behind each of the
residences?

A Yes, it is.

Q So when the vehicle -- when Delira-Padilla's vehicle

was parked behind his house, it's parked in or on the alleyway; is that correct?

A    That's correct.  I think it was actually parked in his back yard.

Q    And those alleys allow transit of vehicles easily? That's what they're designed for; is that right?

A    That's correct.

Q    After Delira-Padilla found that maroon Lincoln parked around the corner, did he do anything?

A    Yes.  He was looking -- he didn't -- he looked to see if anybody was in it.  There was nobody in it. About that time, he heard what he believed to be a gunshot.  He actually thought the gunshots were directed towards him.  And he did what he referred to as marked the vehicle.  He rammed his vehicle into the Lincoln.

Q    He rammed his vehicle into the Lincoln?

A    That's correct.

Q    And he referred to it as marking it?

A    That's correct.

Q    Where did he go next?

A    He -- as I said, he thought he was being shot at so he kind of fled the area.  And then kind of drove around towards the house again, his own house.  At that time he looked to see if the Lincoln was still there.  It was not.  So during this time he called his brother-in-law

and told him basically what had happened.  And he continued to search for the Lincoln at that time.

Q   Was he driving when he was searching for the Lincoln?

A   That's correct.

Q   Now, at some point does he identify another vehicle or something else unusual at his residence?

A   Actually it was like two or three house from his residence; but, yes, he did.

Q   What does he see?

A   He seen what he described as being a tan Lincoln parked at a house directly on the corner about three -- I'm sorry -- about three houses north of his house.

Q   What was significant about seeing the tan Lincoln?

A   He seen two individuals, a driver and passenger.  He seen the passenger getting out.  At that time he just thought that that passenger was going up to the house.

Q   Is Delira-Padilla still in his vehicle or is he at his residence?

A   He was still in his vehicle at that time.

Q   So the -- he sees what he believes is a person approaching the house; is that correct?

A   Correct.

Q   Out of the tan Lincoln?

A   Correct.

Q    Something unusual happen at that point?

A    Yes.  He returned back to his house.  His brother-in-law had arrived by that time.  So he drove his vehicle back to his backyard, backed in so he could leave again hastily if he needed to.  Him and his brother-in-law started looking for damage to the house in reference to the gunshots that he had heard earlier. They were on the south side of his house.  They started walking towards the east towards the front of the house when he observed a -- an individual approximately a house and a half in the front yard north of them.  When he seen this person, he heard gunshots and then seen muzzle flash.  Him and his brother-in-law, he described, tried to hit the ground.  And about the same time, he observed this same tan Lincoln drive south through the alley behind his house as this was going on.

Q    Okay.  So he described this person standing approximately a house and a half north; is that correct?

A    I believe that's correct.

Q    So that his location, then, would be in between the house where the tan Lincoln had been parked at; is that right?

A    That's correct.

Q    And the individuals exited that tan Lincoln?

A    That's correct.

Q   Delira-Padilla describes hearing gunshots and also seeing the muzzle flashes?

A   That's correct.

Q   Are the muzzle flashes from the area of the person which he observed the house and a half away?

A   That's the way he described it, yes.

Q   He and his brother-in-law hit the ground.  And then at what point is it that he sees that tan Lincoln again?

A   The way he described, it was almost -- it was kind of going on at the same time.  It was just shortly after the -- I mean, just immediately after the gunshots.

Q   And the tan Lincoln speeds away down the alleyway which would -- is the alleyway that he drove his vehicle down before?

A   That's correct.

Q   And he -- and Delira-Padilla, that's the he I'm referring to, observes that tan Lincoln go down that alleyway?

A   That's correct.

Q   Had law enforcement been called at this point?

A   Yes.  Law enforcement actually had been called as a result of the first gun fire that he, he had heard while he was -- I believe he had actually told his wife maybe even to call law enforcement.  I don't recall exactly. But law enforcement had been called by that time.

Q   What happens to the tan Lincoln?

A   Sergeant Meridian of the Dodge City Police Department arrived in that area and observed a vehicle which matched that description approximately a block away.

Q   Would that be a block away from Delira-Padilla's home?

A   That's correct.

Q   Was the vehicle stopped?

A   Yes, he did stop it.

Q   Was there an occupant in the vehicle?

A   Yes, there was.

Q   And that occupant was whom?

A   It was Donte Barnes.

Q   And was Donte Barnes arrested?

A   Yes, he was.

Q   At some point was Alfredo Beltran-Ruiz also arrested?

A   Yes, he was.

Q   Now, when he was arrested, was that in conjunction or was that as a result of this investigation, the March 15 shooting?

A   I believe his actual arrest at that time was a result of a probation violation, if I remember correctly.

Q   But he was in custody?

A   That's correct.

Q   And was that by the Dodge City Police Department?

A   Ford County Sheriff's Office actually.

Q   Ford County Sheriff's Office?

A   Yes.

Q   In your investigation, did you discover that Alfredo Beltran-Ruiz was visited several times while he was in custody?

A   Yes.

Q   And during one of those visitations, did he have contact with a woman identified as a Laura Rodriguez?

A   Yes, sir.

Q   Do you know who Laura Rodriguez is?

A   Yes, I do.

Q   And does Laura Rodriguez have any relationship to any of the defendants in the courtroom today?

A   Yes, she does.

Q   And what's that?

A   She would be the mother of Enrique Gobin.

Q   Is Laura Rodriguez -- or do you know Laura Rodriguez to associate with any of the other co-defendants in this case?

A   Yes, sir.

Q   And what is that association?

A   She's befriended a lot of them.  A lot of them are friends of Enrique.  Not only that, but they're also other siblings that are gang affiliated gang members.

Q   And would she also be related to several of the co-defendants?

A   Yes, sir.

Q   Is it unusual for Laura Rodriguez, in your experience, to visit or have contact with incarcerated individuals associated with the Norteno gang?

A   No, sir.

Q   And were you able to observe the video recording when Laura Rodriguez had contact with Alfredo Beltran-Ruiz?

A   Yes, sir, I was.

Q   And to clarify, this contact would have occurred after March 15 of 2011; is that right?

A   Yes, sir.

Q   When Alfredo Beltran-Ruiz was in custody on a probation violation?

A   I believe that's correct, yes.

Q   During that contact, what conversation or what statements were made between Laura Rodriguez and Alfredo Beltran-Ruiz?

A   Laura basically just came to -- and it's a video visitation.  She came to the booth.  She picked up a

phone.  She said:  What did you do, where is it.
Alfredo Beltran-Ruiz stated that go -- go tell 'em to go
to Beto's house.  Then described it's on Elm and Avenue
K.  Just said Avenue K.  He said it's two houses from
the corner.  There's a white garage.  And it's under the
mower, under the lawnmower.

Q   Okay.  The it, at this point, the it is never
identified?

A   That's correct.

Q   Now, a reference is made to an individual identified
as Beto; is that correct?

A   That's correct.

Q   Do you know who that person is?

A   Yes, I do.

Q   And who is it?

A   That's Humberto Ortiz.

Q   At the time that this statement was made, were you
aware of where Humberto Ortiz was living?

A   Yes, I was.

Q   And after this statement, this conversation between
Alfredo Beltran-Ruiz and Laura Rodriguez, did law
enforcement go to the location described?

A   Yes.  Immediately after I watched the video
visitation, I went directly to that area.

Q   Were you familiar with the area?

A   Yes.

Q   You knew where you were headed by the description?

A   Yes, sir.

Q   And was there a white shed or garage?

A   Yes, sir.

Q   Was there a lawnmower?

A   Yes, sir.

Q   Was there anything by or under the lawnmower?

A   A .22 caliber revolver.

Q   And that was under the lawnmower?

A   Yes, sir.

Q   And it was recovered?

A   Yes, sir.

Q   And held as evidence in this case?

A   Yes, sir.

Q   Back at the scene.  So on March 15, 2011, were any shell casings recovered from the scene?

A   Not that I'm aware of, no.

Q   Moving on then to statement 3a.  Beltran-Ruiz is in custody on the probation violation; is that correct?

A   That is correct.

Q   And he is visited by another individual with a first name of Destiny; is that right?

A   That's correct.

Q   At the time, did you know what the relationship

between Destiny and Beltran-Ruiz was?

A   It appeared by the conversation it was some sort of an intimate relationship.

Q   Was that on March 25, 2011?

A   That's correct.

Q   When the visitation occurred?

A   That's correct.

Q   And was that video recorded?

A   Yes, it was.

Q   Were you able to view the video?

A   Yes, I did.

Q   Was there a conversation between Beltran-Ruiz and Destiny that referenced Donte Barnes?

A   Yes.

Q   And I believe that in Government Exhibit 1 we've actually included each of the attributed statements to Beltran and to Destiny to give context to the statements.

And Detective Bice, why don't you just go ahead and read what it was or what those statements were that were in that video recording?

A   Okay.  I believe you're referring to the statements made in 3a?

Q   That is correct.

A   Beltran stated:  What time Snipes have court on the

7th. Destiny replies: What time's what. Beltran states: What time does home boy got court on the 7th. Destiny stated: Fuck if I know. His lady called, like, oh, my God, he has court. And I'm like, all right. Beltran states: For real. Call her and be like, oh, my God. Destiny states: Not -- when he got locked up, she called me crying and was like why isn't Alfredo locked up, I thought they were together. Beltran stated: Yeah, we were, but I know how to run.

Q   And, again, you observed the video recording of this conversation; is that correct?

A   I'm sorry.

Q   You observed the video recording of this conversation?

A   That's correct.

Q   In the first statement by Beltran there's a reference to someone known as Snipes; is that right?

A   That's correct.

Q   Do you recognize that name?

A   Yes. It's what we refer to as a street gang moniker, and that moniker is for Donte Barnes.

Q   Has Donte Barnes been identified as Snipes or some version of that before by the Dodge City Police Department?

A   Yes, he has.

Q   And you're familiar with that identification?

A   Yes, I am.

Q   And Donte Barnes, has he identified himself to Dodge City specifically as Snipes or some version of that gang name?

A   I believe that is documented on his gang sheets through different contacts by different officers, correct.

Q   Now, did you ever look and see, did Donte Barnes have court on the 7th?

A   I don't recall.

MR. SMITH:  Nothing further.

THE COURT:  Mr. Griffith.

MR. GRIFFITH:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. GRIFFITH:

Q   Just a couple of questions about the drive-by.  What time was the shooting, do you understand it was started?

A   I don't recall the exact time but I know it was after dark.

Q   Okay.  Can you just narrow it to an hour?  Get as close as you can.  I'm not going to hold you to it.

A   I want to say about 1, but I'm not a hundred percent sure.

Q   As you said, after dark.  Even clear out in Dodge

City, it gets dark by 10, doesn't it?

A   Yes, sir.

Q   And in your experience in your work at Dodge City, do these various different gangs tend to know each other, know who their members are, recognize their members?

A   Yes, sir.  A lot of 'em are local members of different gangs and possibly had gone to school together at different times.

Q   I'm assuming, since it doesn't appear anywhere in the reports, that Mr. Padilla was unable to identify anybody that was involved in this drive-by shooting; correct?

A   That's correct.  I think at one point during the traffic stop, he actually approached Sgt. Meridian and stated something to the effect that that's the guy or that's the -- he may have used a different name.  I don't recall.

Q   Now, with regard to statement number 1, the synopsis indicates that, on Government Exhibit 1, indicates that Mr. Beltran told Ms. Rodriguez to go get something under a lawnmower.  That's really kind of a -- an opinion of whoever created number 1; correct?  I mean, Mr. Beltran didn't say go get anything, did he?

A   He -- actually, what he said, I believe, was "tell

him to go get it".

Q   Tell him to go get it?

A   I believe that's correct.

Q   Okay.  Is it -- do you have the transcript of the statement in front of you?

A   I do not, not in front of me.

Q   Is it possible that what he said was tell him it is somewhere?

A   That's possible.

Q   As opposed to go get it?

A   That's possible.

Q   There is a difference between those two?

A   Yes.

Q   Okay.  And so, as I understand it, Ms. Rodriguez is the first -- first person to mention anything about it was Ms. Rodriguez; correct?

A   That's correct.

Q   So we all understand, that wasn't the first thing out of her mouth and that wasn't the first thing out of his mouth.  There had been some conversation, some chit-chat, between them for a period of time prior to that statement, was there not?

A   I don't recall that, no.

Q   Okay.  So Ms. Rodriguez says "where is it?"  That's your recollection?

A    I believe so.  I believe the first thing she said was like what, what did you do; and then, where is it. But it was almost like one sentence.

Q    Right.  He didn't really have an answer to what did you do, did he?  He being Mr. Beltran.

A    Correct.

Q    And Mr. Beltran then says tell him it's and then described this Beto's place or directions to Beto's place and the lawnmower; correct?

A    Yes, sir.

Q    And so I'm clear, this occurred, this conversation occurred when?  Do you recall?

A    I believe this conversation was on March 20th, if I recall, March 20, 2011.

Q    Do you know how long Mr. Beltran had been in custody at that point in time?

A    I do not.

Q    Clearly, he was in custody because it was a visitation?

A    That's correct.  And it would have been between the 15th and the 20th, so within that five-day period.

Q    And Mr. Barnes had been in custody since the night of the drive-by, which was the 15th, or shortly after midnight, maybe, on the 16th?

A    Yes, sir.

Q    In relation to when the conversation took place, when did you watch the video?

A    I watched the video, I believe, on March 23rd.

Q    And so that would have been three days later?

A    Yes, sir.

Q    Was anybody, that you're aware of, monitoring the conversation between Ms. Rodriguez and Mr. Beltran at the time it was occurring?

A    No, sir, not that I'm aware of.

Q    So no one would have observed Ms. Rodriguez after she -- after the conversation, what happened after the conversation?

A    Yes, sir, as far as I know.

Q    No one?

A    Correct.

Q    Now, clearly, in -- with regard to conversation number 3a, this appears to be some discussion between a significant other, or I guess you called it a romantic interest, this Destiny and Mr. Beltran, about something that a significant other of Mr. Barnes asked Destiny. Correct?

A    Yes, sir.

Q    And some discussion ensued about whether -- when and whether or not Mr. Barnes had to be in court?  Snipes had to be in court?

A   Yes, sir.

Q   And then the last statement by Mr. Beltran was a statement responding to Destiny's statement that whoever this significant other was thought that they were together.  Barnes says, "yeah, we were, but I know how to run"?

A   Yes, sir.

MR. GRIFFITH:  Thank you.  That's all I have, Your Honor.

THE COURT:  Anything further?

MR. SMITH:  No, Your Honor.

THE COURT:  All right.  Next witness, please.

**CONTINUED DIRECT EXAMINATION**

BY MR. SMITH:

Q   Detective Bice, why don't you tell us your name again.

A   J.L. Bice.

Q   You've previously testified and been sworn in this case; is that correct?

A   Yes, I have.

Q   And for the Court's reference, we are now going to be referencing what's been identified as statements number 4a, 4b and 4c.

Detective, are you familiar with the investigation in relation to a shooting that involved a man named

George Gonzalez on March 30 of 2011?

A   Yes, sir, I am.

Q   And in that investigation, have you determined essentially, in summary, what occurred on that date?

A   Yes, sir.

Q   And tell us in summary, who is George Gonzalez?

A   George Gonzalez is a documented Sureno gang member in Dodge City, Kansas.

Q   Did he hold any position of distinction?

A   He had been in the gang for quite sometime so he possibly could have -- would hold a position of authority.

Q   Now, on March 30, 2011, in your investigation, did you determine that George Gonzalez was contacted by several of the defendants that are present in the courtroom today?

A   Yes, sir.

Q   And who did you determine that George Gonzalez had contact with?

A   He had contact with Jesus Sanchez, Enrique Gobin, Alfonso Banda-Hernandez, Andrew Gusman, Yesenia Rios.

Q   Is Andrew Gusman present?

A   Yes, he is.

Q   Would you please identify him for the record?

A   He would be in the front row, fifth person from

the -- from left to right, wearing orange.

Q   Wearing orange.  Thank you.  And is Enrique Gobin present?

A   Yes, sir, he is.

Q   And where is he seated please?

A   Front row also, first chair, starting with the left.

Q   And is Alfonso Banda-Hernandez present?

A   Yes, sir.

Q   And where is he seated, please?

A   Rear row, second person from the last from left to right, wearing blue.

Q   Okay.  Second person from the left -- the last person, second one from the left; is that correct?

A   Yes.  He would be the sixth person, sixth person.

Q   Okay.  Now, Jesus Sanchez is not present; is that correct?

A   That's correct.

        MR. SMITH:  Your Honor, the record should reflect the witness has identified the Defendants.

        THE COURT:  It will.

BY MR. SMITH:

Q   You've identified George Gonzalez as a Sureno gang member; is that correct?

A   That's correct.

Q   Are you aware that the three Defendants present that

you've identified are associated with another gang?

A   Yes, that's correct.

Q   And what gang are they associated with?

A   They're associated with Nortenos.

Q   What occurred on March 30, 2011, that began this contact between these individuals?

A   On that day Mr. Gonzalez was in a vehicle that was getting fuel at a Love's Convenience Store on east Wyatt Earp in Dodge City, Ford County, Kansas.  While they were getting gas in their vehicle, they were approached by the defendants that I mentioned, and some gang slurs and gang hand signals were exchanged.

Q   Between Mr. Gonzalez and the Defendants?

A   That's correct.

Q   The gang slurs and gang signs, I assume, were signs and slurs that associated each group with their individual gang; is that correct?

A   That's correct.

Q   So this included words that were exchanged?  The slurs?

A   Yes, that's correct.

Q   Was George Gonzalez able to identify what vehicles all of the individuals were in?

A   Yes, he was.  His -- he actually reported one of the vehicles as being a green Plymouth passenger car.  And

stated that at the encounter at Love's Convenience Store that they were all in this vehicle at that time. He later, however, described that vehicle along with a grape or dark gray either Chevy Blazer or Ford Bronco that was involved as well.

Q  But the encounter at the east Love's in Dodge City, Kansas, they were all in one vehicle; is that correct?

A  That's correct.

Q  And that would be five individuals; is that right?

A  That's correct.

Q  That was concurrent with the slurs and the gang signs?

A  That's correct.

Q  What is it that happens that causes the second vehicle to become involved?

A  The individuals in the green Plymouth had drove to a location that I believe is Mr. Banda-Hernandez' residence and dropped him and Andrew Gusman off at his house where they picked up his vehicle, which is a dark-colored Chevy Blazer.

Q  You said Blazer or Bronco; is that correct?

A  It's a Chevy Blazer I believe.

Q  Chevy Blazer. Okay. Where is George Gonzalez at this point?

A  He had left. He had left Love's so he -- he was

just gone.  I believe he was on his way to his girlfriend's house.

Q   Was George Gonzalez in a vehicle?

A   Yes, he was.

Q   Was he driving?

A   No, he was not.

Q   And you state you believe he was going to his girlfriend's house; is that right?

A   That's correct.  I believe he actually said that they were running some errands and stuff; but eventually he went to his girlfriend's house, yes.

Q   How is George Gonzalez then recontacted by the five individuals that you've named?

A   Gonzalez reported that he had seen the two vehicles, the one that he had seen prior, the green passenger car, I believe he said was a Plymouth, but then he also said that he seen the, the Blazer or the Bronco.  He knew who that driver of that vehicle was to be one of the same individuals that he had seen at Love's.

Q   During the investigation, did he identify the driver of the gray vehicle by name?

A   Yes, he did.

Q   And that was whom?

A   Alfonso Banda-Hernandez.

Q   Did he recognize or was he able to identify any of

the other five individuals?

A   I believe he knew who Enrique Gobin was because he lived across the street from his mother's house.

Q   From Enrique Gobin's mother's house or from George Gonzalez?

A   His mother.  Yes.  George Gonzalez' mother lived across the street from Enrique Gobin's residence, who was his mother's house.

Q   I see.  Now, after George Gonzalez is then recontacted, he is still a passenger in the vehicle; is that correct?

A   That's correct.

Q   What occurs?

A   The vehicles that he described began following, following him around town.  Him and the driver -- there was a discussion about trying to lose these vehicles. He felt at that time that there was something going on because they were following him and they are opposing, opposing gangs.  He stated that the driver of his vehicle tried to speed up and they felt that at least at one time that they thought that they'd lost 'em.  He also described the green Plymouth at one time pulling over and letting the Blazer pass it to get up close to 'em.  So basically following them.

Q   At some point does George Gonzalez exit the vehicle?

A    Yes, he does.

Q    How does that occur?

A    They drove up to the alley, I believe -- I believe it's in between 6th Avenue and 7th Avenue, and they pulled up into the alley and he got out and began walking towards his girlfriend's house.

Q    Would that have been the rear of his girlfriend's house?

A    That's correct.

Q    And you stated he exited the vehicle and walked towards that house; is that right?

A    That's my understanding, yes.

Q    Does he see either of the two pursuit vehicles as he gets out of the vehicle heading towards his girlfriend's house?

A    Yes, he does.

Q    Which vehicle?  Or -- does he see both or does he see one?

A    I believe he just described at that time the Plymouth.

Q    So he sees the Plymouth.  Does anything unusual occur?

A    Yes.  Shots were fired.

Q    Was George Gonzalez able to identify from where the shots came?

A    I believe he described an individual in the passenger side rear seat as the shooter.

Q    At some point was another witness identified and interviewed about how or whom took the shots at George Gonzalez?

A    Yes, sir.

Q    And who was that?

A    Yesenia Rios.

Q    And I believe that's Y-E-S-E-N-I-A for the spelling of the first name.

And who does Yesenia Rios identify as being responsible for shooting at George Gonzalez?

A    Jesus Sanchez.

Q    Does Yesenia Rios identify who else is in the green Plymouth with her?

A    Yes, she did.

Q    And who was that?

A    Enrique Gobin.

Q    Was Enrique Gobin a passenger or driver?

A    He was the driver.

Q    Does Yesenia Rios identify who was in the gray Blazer?

A    Yes, she did.

Q    And who was in the gray Blazer?

A    Alfonso Banda-Hernandez and Andrew Gusman.

Q   Now, then moving specifically to the statements contained in Government Exhibit 1. Statement 4a is a statement that's attributed to Jesus Sanchez; is that correct?

A   That's correct.

Q   And what is the statement contained in 4a?

A   He told Banda-Hernandez to come where they were or where they are.

Q   Do you know when that occurred in the context of this shooting?

A   I believe it was just prior to the shooting.

Q   Now, Banda-Hernandez is in a different vehicle; is that right?

A   That's correct. It's my understanding this statement was made by cell phone.

Q   By cell phone?

A   Correct.

Q   And that's Jesus Sanchez telling Banda-Hernandez to "come where they are"?

A   Correct.

Q   Statement 4b then occurs at what point in relation to the shooting?

A   That would have been after the shooting.

Q   And statement 4c?

A   That would have been after the shooting as well.

Q   And taking this in chronological order, your understanding, 4c or 4b, which statement occurs first?

A   4c would have actually occurred before 4b.

Q   And what statement is contained in statement 4c?

A   Basically Jesus Sanchez, again, via cell phone, told Banda-Hernandez to "get out of the area because it will be hot".

Q   And is this before or after the shots are actually fired at George Gonzalez?

A   After the shots had been fired.

Q   Then you state then the third statement would actually be 4b; is that correct?

A   Yes, sir.

Q   And that is the statement, again, attributed to Jesus Sanchez; is that right?

A   Yes, sir.

Q   And Jesus Sanchez says what and to whom?

A   He says basically while a group of them are standing together at a house, tells Banda-Hernandez and Gusman that he shot at Gonzalez or at his car.

Q   So I take it by the context of statement 4b, is it your understanding at some point that Jesus Sanchez, Alfonso Banda-Hernandez, Andrew Gusman and Enrique Gobin then meet at a later point?

A   That's correct.

Q   And after they meet after the shooting occurs, is that when statement 4b would occur to your understanding?

A   That's correct.

MR. SMITH:  Nothing further.

THE COURT:  Mr. Reed, I think you're first -- or somebody's first here.  Who wants to be first?

MR. HEPPERLY:  I'll go.

THE COURT:  Mike, you want to be first?

MR. HEPPERLY:  Sure.

**CROSS EXAMINATION**

BY MR. HEPPERLY:

Q   Is it Detective Bice?

A   Yes.

Q   Detective Bice, my name is Mike Hepperly, and I represent Alfonso Banda-Hernandez.

A   Yes, sir.

Q   I'll refer to him as Mr. Hernandez.

A   Okay.

Q   Is that all right?

A   Yes, sir.

Q   And I'll refer to Mr. Sanchez as Mr. Sanchez.  Is that all right?

A   Yes, sir.

Q   Let's talk about these three statements.  Now, my

understanding is that a Ms. Ruiz -- is that how you pronounce her name?

A   Rios.

Q   Rios.  R-I-O-S?

A   Yes, sir.

Q   Is she the person who made these statement -- or who heard these statements?

A   Yes, sir.

Q   So let's look at 4a.

A   Okay.

Q   When Mr. Sanchez made the statement -- you have Exhibit 1-A in front of you; is that correct?

A   Yes, sir.

Q   Was the statement "come where they are" -- that's in quotes?

A   Yes, sir.

Q   So that would be the exact statement that was made?

A   I believe that's what she stated.  I believe that was due to grand jury testimony.

Q   Okay.  So it's not the whole "tell Banda-Hernandez to come where they are"?  It's only "come where they are".  Correct?

A   I believe she testified that, that Jesus Sanchez was talking to Alfonso Banda-Hernandez on the phone.

Q   Where was she in relationship to Mr. Sanchez?

A    She would have been in the seat directly in front of him.

Q    Do you know whether or not the cell phone was on speaker phone?

A    No, sir, I do not.

Q    Do you know whether or not there was a statement that Mr. Hernandez was on the other end of the cell phone call?

A    No, sir.

Q    Now, can you tell me whether or not the vehicle was running at the time that Mr. Sanchez made this statement?

A    I believe it was.

Q    In other words, was the vehicle moving?

A    I believe it was.

Q    Okay.  And do you know how fast?

A    No, sir.

Q    Do you know whether or not the windows were up or the windows were down when this statement was made?

A    No, sir.

Q    Do you know whether or not the radio was on?

A    No, sir.

Q    When did she make the statement to law enforcement? Do you recall?

A    I believe that particular statement come from grand

jury.  She did tell me, though, during a prior interview, that there was a phone conversation between them; but I don't recall whether she gave me that particular statement at that time or not.

Q   Do you know whether or not she was under the influence of alcohol during the time that she allegedly heard this statement?

A   I believe that is correct, yes.

Q   Do you know whether or not she was under the influence of alcohol when she made the statement or interview to you?

A   I actually interviewed her twice.  The first time, yes.  The second time, I do not believe she was.

Q   Yes, she was under the influence of alcohol?

A   The first interview, yes.

Q   Did she make the statement in the first interview to you or the second interview?

A   Like I said, again, I don't know specifically that statement, if she made that during the interview.  I do recall her during the second interview telling me, though, that there had been a phone call from Jesus Sanchez to Alfonso Hernandez.  I think the statement comes from grand jury testimony.

Q   Okay.  Did she know the relationships of where the cars were when she heard this statement?  In other

words, where was her car in relationship to the other vehicle, the Blazer/Bronco?

A   I don't recall her telling me that she knew the relationship between the two at that time.

Q   Did she know whether or not they were in sight of each other?

A   I don't recall exactly during the phone call whether they were in sight of each other or not.  I know they were at times.  She told me that.

Q   During the phone call?

A   Yes, I don't know.

Q   Okay.  And this may have been answered -- you may have answered this when the prosecution asked you but I don't recall the answer.  Was this statement made before or after the gunshots were fired?

A   That was before the gunshots were fired.

Q   When did she tell you that?

A   I believe in both the interview and also the grand jury, I believe.

Q   Let's look -- and going in chronological order, let's go to 4c because that's the second statement.  Is that correct?

A   Yes, sir.

Q   And was this statement made after the gunshots or before the gunshots?

A   That statement would have been afterwards.

Q   And is the person who's hearing the statement Ms. Ruiz again?  Is it the same person?

A   Yes.  Ms. Rios.

Q   Rios.  I'm sorry, I mispronounced her name.

A   Yes, sir, that's correct.

Q   Is the statement, because it's in quotes, "it will be getting hot" is that the statement that she heard?

A   Actually I believe that statement was told to -- actually by Mr. Banda-Hernandez, I believe.

Q   Excuse me.  I want to make sure that I understand this.

A   Yes, sir.

Q   Are you saying that he made that statement to Mr. Sanchez?

A   No, sir.  Mr. Sanchez made that statement to Mr. Hernandez and I believe Mr. Hernandez disclosed that during one of his interviews.

Q   Okay.  But my question is --

A   Yes, sir.

Q   -- did she -- was the statement by Mr. Sanchez on March 30th of 2011, "it will be getting hot", was that the full statement?

A   I believe that's correct, yes.

Q   Okay.  So was her testimony either in the grand jury

or in the interview with you that she was in the vehicle when this statement was made?  In her vehicle, the green Plymouth.

A   I believe -- trying not to be confusing here.  I believe this actual statement was told to us by Mr. Hernandez.

Q   Okay.  My -- it appears to me that evidently Mr. Sanchez said that -- Mr. Sanchez made this statement.  Is that correct?

A   Yes, sir.

Q   In 4c?

A   That is correct.

Q   And who is the individual you said that made this statement?

A   I believe that was in an interview to Detective Webb by Mr. Hernandez.

Q   So Ms. Rios was not the person who made that statement?

A   I believe that's correct.

Q   She was not the person who heard that statement?

A   I believe that is correct.

Q   Okay.  So she's not involved in that; correct?

A   I believe that's correct.

Q   All right.  Let's go to 4b.  Do you see that statement?  Tells Banda-Hernandez and Gusman he shot at

victim's car?

A   Yes, sir.

Q   Who made -- who heard that statement?

A   I believe, again, that was also Mr. Hernandez.

Q   Okay.

MR. HEPPERLY:  If I may have just a moment to talk to my client, Your Honor.

THE COURT:  Yes, you may, sir.

(Off-the-record.)

MR. HEPPERLY:  I have no further questions, Your Honor.  Thank you.

THE COURT:  Thank you very much.  Who wants to go next?  All right.  Mr. Hartenstein.

### CROSS EXAMINATION

BY MR. HARTENSTEIN:

Q   Good morning, Detective Bice.

A   Morning, sir.

Q   My name is Eric Hartenstein.  I represent Andrew Gusman.

A   Yes, sir.

Q   You described how when Mr. George Gonzalez was in an altercation at this Love's Family Store, how he was in a car with two other people.  Who were those people?

A   I don't recall the names.  It was a male friend and a girlfriend of that person.

Q   A male friend and a girlfriend?

A   Yes, sir.

Q   And were these people interviewed?

A   Yes, sir.

Q   And are there reports or transcripts of their interviews?

A   I believe there are, yes, sir.

Q   So you don't know their names right off the bat?

A   That's correct.

Q   And these are the people that were in the car with Mr. Gonzalez?

A   That's correct.

Q   And with regard to the statements that Ms. Yesenia Rios made.  How many times did you interview her?

A   Twice.

Q   Was she interviewed again by someone else?

A   Not that I recall.  She did appear in grand jury.

Q   And were her statements between the interviews consistent?

A   Between my two interviews?

Q   Yes.

A   No, sir.

Q   Did she tell -- what did she tell you the first time she was interviewed?

        MR. SMITH:  Objection to relevance as to the

admission of co-conspirator statements.

MR. HARTENSTEIN: Goes to the credibility of the alleged co-conspirator.

THE COURT: Is Rios a co-conspirator? One of the known but unindicted co-conspirators?

MR. SMITH: She, she could be described as that. I think we would describe her as a witness.

THE COURT: Well, for purposes of this hearing, I think it's relevant.

A   No.  Her statements were not the same.

BY MR. HARTENSTEIN:

Q   Now, you interviewed her on the day of the -- of the incident, which was March 31; is that correct?

A   I don't recall the exact date; but it would have been relatively close to that date, yes, sir.

Q   And did you interview her on April 4th?

A   It would have been several days afterwards, yes, sir.

Q   And then did you interview her again on April 28th?

A   I don't recall the third interview.  I spoke to her several times.  I don't recall how many of those were actual interviews; but there were -- her and I had several conversations, I guess you could say.

Q   Is it safe to say that her statements were not consistent between the interviews you had with her?

A    Yes, sir.  Specifically the first one, yes.

Q    As to Mr. Gusman, what part did you believe that Mr. Gusman played in this conspiracy to shoot at George Gonzalez?

MR. SMITH:  Objection.  Speculation.

THE COURT:  Well, I think you need to lay some foundation.  Unless you just want his opinion.  If you're just asking his opinion --

BY MR. HARTENSTEIN:

Q    I'm asking your opinion.  What do you believe Andrew agreed to do in furtherance of this conspiracy?

A    During any time of activity like these when you have several gang members, there's sometimes some general rules or standard rules when they see an opposing rival that they confront this individual by either slurs, signs, anything of that nature.  So after the fact at some point, he was, he was involved in a second vehicle, involved chasing Mr. Gusman, which is a foreseeable act when it comes to gang crime, and following him which eventually evolved to the shooting.

Q    He wasn't driving that vehicle, was he?

A    No, sir, that's correct.

Q    So he was a passenger in that vehicle?

A    Yes, sir.

Q    There's some -- do you have some dispute as to

whether -- when the second vehicle came on the scene in the statements that were offered?

A    I don't recall a dispute.  I just remember that the phone call had been placed by Mr. Sanchez to have that second vehicle come to wherever their location was.

Q    At the Love's store, were there differing statements as to how many vehicles were there?

A    No, sir.  I mean, I -- I don't understand what you're asking.

Q    Did Mr. -- okay.  I'll withdraw that.

So who are the unidentified but known co-conspirators in this particular conspiracy?

MR. SMITH:  Objection.  Your Honor has entered a ruling on that.

THE COURT:  I think it's up to the Government to comply with the order that I made the other day.

MR. HARTENSTEIN:  Thank you, Your Honor.

BY MR. HARTENSTEIN:

Q    On statement 4b, I believe you just stated that Mr. Banda-Hernandez had reported to you that he and Gusman heard Mr. Sanchez say that he shot at the car. Where were they when they heard that statement?

A    I believe that was at another gang member's house where they eventually met up with after the shooting.

Q    Is there any indication that Mr. Gusman knew this

shooting was gonna happen before it did?

MR. SMITH:  Objection; speculation.

THE COURT:  No.  Overruled.  If he knows.

A    I'm sorry.  Could you ask the question again.

BY MR. HARTENSTEIN:

Q    Do you have any statements or any -- any statements offered by witnesses or victims indicating that Mr. Gusman would have known that this shooting was going to occur prior to it happening?

A    No, sir.

Q    Is there any indication that Mr. Gusman ever possessed a gun?

A    No, sir.

Q    How long have you known Mr. Gusman?

A    Oh, probably two, maybe three years.  At least known of him.

Q    How is it that Mr. Gusman is only identified in 4b but not in 4a and 4c as hearing this statement?

A    I'm sorry.  I don't understand your question.

Q    Mr. Gusman is identified as being -- as hearing the statement that Mr. Sanchez made in 4b, but he's not identified in 4a or 4c.  Is it your belief that Mr. Banda-Hernandez and Mr. Gusman were together throughout the course of this?

A    Is that my belief?

Q   Yes.

A   Yes, sir.

Q   How is it Banda-Hernandez heard it and Mr. Gusman did not?

A   Which statement, sir?

Q   4a or 4c.

A   Mr. Gusman would not have been in the vehicle during the statement that was made which was the -- it was actually a Dodge Stratus but Mr. Gonzalez described it as a Plymouth.  So Mr. Gusman would not have been in that vehicle when that statement was made.

            THE COURT:  4c?  Which statement?

A   4a, Your Honor.

            THE COURT:  4a.

A   Yes, sir.

BY MR. HARTENSTEIN:

Q   But Mr. Banda-Hernandez was in the vehicle?  In the Stratus?

A   No, sir.  He would have been on the phone with Jesus Sanchez.

        MR. HARTENSTEIN:  Nothing further, Your Honor.

        THE COURT:  Thank you, sir.

    Now, Mr. Robinson.

                      **CROSS EXAMINATION**

BY MR. ROBINSON:

Q    Good morning, Detective.

A    Good morning.

Q    Since I'm going last, I'm going to try not to recover a lot of the same ground; but forgive me if I do a little bit.

A    Not a problem.

Q    I'm going to ask you about the statements 4a, 4b and 4c which you have a summary in front of you.  Correct?

A    Yes, sir.

Q    Your source for statement 4a is Yesenia Rios; correct?

A    That's correct.

Q    You said at the time Ms. Rios allegedly heard this statement being made she had recently consumed some alcohol; correct?

A    Yes, on that date, yes.

Q    And you spoke with her several times after she allegedly heard this statement; correct?

A    Yes, sir.

Q    Another one of those times she was intoxicated; correct?

A    The only time that I recall her admitting or -- to drinking or intoxicated was the very first interview that I did.

Q    And how long after she allegedly heard these

statements did you conduct your first interview with her?

A   It would have been several -- several hours later. Three, maybe, hours later.  I don't recall exactly.  But it would have been a couple hours afterwards.

Q   What were the circumstances of that meeting in terms of how is it that the two of you arrived at the same location and had this conversation?

A   What had happened was after receiving some of the information that we received from Mr. Gonzalez, some of our patrol -- patrol officers started looking for the possible suspect vehicles.  One of those we automatically recognized as possibly being Mr. Hernandez'.  The other one did not ring any bells with any officers.  So they started going to some of the gang members' houses; and they observed the Dodge Stratus which was very similar to what Mr. Gonzalez had described.  And at that house is where Yesenia was staying at the time and that was also her car.

Q   So the first conversation you had with Ms. Rios occurred at that house?

A   No, sir.  After they had been in contact with her, they asked her to come to the police department to speak to us.  And that's where I talked to her was at the police department.

Q   You say that she was asked to come to the police department, i.e., she was not placed in custody?

A   Yes, sir, that's correct.

Q   So she came of her own volition to the police station and talked with you?

A   Yes, sir, that's correct.

Q   And did she tell you that she was intoxicated at the time or is that something you otherwise observed?

A   Both, yes.

Q   And during this first conversation you learned that she allegedly had heard this statement "come where they are".  Correct?

A   No, sir, not during that one.

Q   Okay.  So you, you didn't learn this alleged statement during that conversation?

A   Correct.

Q   You learned it during a subsequent conversation?

A   I believe this actual statement came from grand jury testimony.

Q   I understand; but I'm talking about the meetings that you had with her before the grand jury testimony --

A   Uh-huh.

Q   -- did you hear Ms. Rios say that she heard this alleged statement in any of your meetings with her before her grand jury testimony?

A    I don't recall her making that specific statement during my interviews.

Q    Okay.  How many interviews do you recall you had with her before she had her grand jury testimony?

A    Like I say, we had a couple, two or three conversations, maybe four.  She come to the police station.  I might have just stepped out to the lobby to talk to her.  But actual interviews, two or three.

Q    So you spoke with her probably four times at least before her grand jury testimony?

A    Possibly, yes.

Q    And she never said during any of those four statements that she heard this alleged statement?

A    I don't recall her telling me that statement during the interview, sir.

Q    And you recall that the statements she made to you during those four meetings were not entirely consistent; correct?

A    That's correct.  At least one, the first one, and the last one, yes.

Q    So just so I'm clear.  There's no other source for this alleged statement besides Ms. Rios?

A    That's correct.

Q    At any of the meetings that you had with Ms. Rios before her grand jury testimony, was she ever in

custody?

A   No, sir.

Q   Had she ever been charged with a crime?

A   Not that I'm aware of.

Q   Has she ever been told that she was a suspect in this case?

A   I don't know if she ever was actually told that or not.  She may have been told at some point or another that she could possibly be a suspect in the case.

Q   I'd like to go to statement 4c since we're kind of going in chronological order.

A   Okay.

Q   Your source for this statement is Mr. Banda-Hernandez; correct?

A   I believe that's correct.

Q   Are there any other sources for this statement besides Mr. Banda-Hernandez?

A   I do recall that I believe Ms. Rios told us that there was another phone call to Mr. Banda-Hernandez after that basically confirming that they were wanting to leave that area and go somewhere else.  I don't remember if she actually heard it or said that statement; but she did confirm that there was another conversation between the two after the shooting.

Q   I'm just trying to make sure I'm clear because I

understood you saying earlier that Ms. Rios was not a source for the statement in 4c.

A    I believe that's correct.

Q    So which one is it?

A    She heard a conversation between Mr. Sanchez and Mr. Banda-Hernandez basically describing that they wanted to leave the area quickly; however, I believe the actual source of that particular statement was made by Mr. Hernandez.

Q    So the source of the statement was Mr. Banda-Hernandez but you claim that Ms. Rios heard it as well?

THE COURT:  No.

MR. ROBINSON:  I'm confused.

THE COURT:  That's not what he's saying.

BY MR. ROBINSON:

Q    I'm not trying to lead you astray.  I'm just confused.

A    Mr. Banda-Hernandez is the one that made that statement to Mr. Webb -- or, I'm sorry -- Detective Webb, during the interview.  Ms. Rios stated that there was a conversation after the shooting that they had on the phone regarding getting out of the area where the shooting occurred.

Q    Were you present at any interviews with Mr. Banda-Hernandez that you're relying on for this statement?

A     No, sir.

Q     So you don't personally know the circumstances of that meeting that Mr. Banda-did Hernandez had with law enforcement authorities where he made this alleged statement?

A     Just through reports.

Q     Would the same be true for the statement 4b then?

A     Yes, that's correct.

Q     You said that your understanding of the circumstances of these events were that Mr. Gobin was driving the green vehicle and Mr. Sanchez was in the back seat on the passenger side; correct?

A     That's correct, yes, sir.

Q     And your understanding is that the shots that were allegedly fired out of that vehicle came from the passenger side in the back; correct?

A     Yes, sir.

Q     Do you have any reason to believe that Mr. Gobin knew that when they drove past Mr. Gonzalez that Mr. Sanchez was going to allegedly fire shots?

A     I don't recall getting any statements to that, no.

          MR. ROBINSON:  I think that's all I have, sir.

          THE COURT:  Anything further?

          MR. SMITH:  Nothing further.

          THE COURT:  All right.

MR. SMITH:  This witness can step down.

THE COURT:  Now, are we through for this morning?

MR. WELCH:  Yes, Your Honor.

THE COURT:  All right.  And, Rachael, are we reconvening at 1 or 1:30?

LAW CLERK MS. SILVA:  It was 1:00.

(Off-the-record discussion between the Court and Law Clerk Ms. Silva.)

MR. GRIFFITH:  I didn't catch that.  Is our argument in writing?

THE COURT:  It would be much easier.  It doesn't have to be lengthy.  If you have a point to make or authority to site, it's easier for me if it's in writing.

MR. GRIFFITH:  May I ask a question, Your Honor?  There's a hearing, obviously, this afternoon on the statements that are not the statements here this morning.

THE COURT:  Correct.

MR. GRIFFITH:  Do you anticipate that you would take into consideration evidence that is presented this afternoon if it applies in any way to statements that are offered that we've discussed this morning?

THE COURT:  I don't know of any way to know whether I would or not, Jeff, but you can stick around.

MR. GRIFFITH:  I plan on it.  I just was curious.  Thank you.  Val said I could come back.  I appreciate that.

THE COURT:  Well, I always look to Val for authority on who can appear in my courtroom.

MR. WACHTEL:  It's not very safe advice, Your Honor.

THE COURT:  All right.

(Adjourned at 11:45 a.m.)

C E R T I F I C A T E


I, Cindy L. Schwemmer, United States Court

Reporter in and for the District of Kansas, do hereby

certify:

That the above and foregoing proceedings were

taken by me at said time and place in stenotype;

That thereafter said proceedings were

transcribed under my direction and supervision by means

of computer-aided transcription, and that the above

and foregoing constitutes a full, true and correct

transcript of said proceedings;

That I am a disinterested person to the said

action.

IN WITNESS WHEREOF, I hereto set my electronic

signature on this the 19th day of March, 2013.




                          s/ Cindy L. Schwemmer

                          Cindy L. Schwemmer

                          United States Court Reporter

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 185

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS


UNITED STATES OF AMERICA,                )
                                         )
                             Plaintiff,) District Court
                                         ) Case No. 12-10089
vs.                                      )
                                         )
JASON NAJERA, et al,                     )
                                         )
                            Defendants,)
                                         )
_____


**TRANSCRIPT OF CONTINUED HEARING ON MOTION**


     On the 13th day of February, 2013, came on to be heard **Continued Hearing on James Motion** in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.


**APPEARANCES**
     The **Plaintiff** appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;
     Defendant **Jason Najera** appeared in person and by and through Mr. David Moses;
     Defendant **Jayson Vargas** appeared in person and by and through Mr. Mark Sevart;
     Defendant **Adam Flores** appeared in person and by and through Mr. Sean McEnulty;
     Defendant **Fabian Neave** appeared in person and by and through Mr. Greg Bell;
     Defendant **Jose Neave** appeared in person and by and through Mr. Kevin Loeffler;

Appellate Case: 14-3006    Document: 23-2    Date Filed: 04/01/2014    Page: 186

<u>**I N D E X**</u>

**FEBRUARY 13, 2013:**

**WITNESS**

**JAMES NAU**
Direct Examination by Mr. Welch:          4
Cross Examination by Mr. Sevart:         15
Cross Examination by Mr. McEnulty:       23

**J.L. BICE**
Direct Examination by Mr. Welch:         31
Cross Examination by Mr. Moses:          38
Cross Examination by Mr. Sevart:         40

**SHANE WEBB**
Direct Examination by Mr. Welch:         43
Cross Examination by Mr. Moses:          52
Cross Examination by Mr. Loeffler:       59
Cross Examination by Mr. Bell:           60
Redirect Examination by Mr. Welch:       61
Recross Examination by Mr. Moses:        65

Certificate of Certified Shorthand Reporter: 74

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 1:40 p.m. February

13, 2013, the following

proceedings were held.)

THE COURT:  Okay.  We'll start the second part of the James hearing.  Let's have the appearances of the defendants and counsel, please.

MR. BELL:  Fabian Neave appears in person and with counsel Greg Bell.

MR. McENULTY:  Your Honor, Adam Flores appears in person, by and through Sean McEnulty.

THE COURT:  All right.

MR. SEVART:  May it please the Court. Defendant Jayson Vargas appears in person represented by myself, Mark Sevart, as court appointed counsel.

MR. LOEFFLER:  May it please the Court.  Jose Neave appears in person and with counsel Kevin Loeffler.

MR. MOSES:  Afternoon, Your Honor.  David Moses on behalf of Jason Najera, who's present in the courtroom.  My apologies for the miscommunication.

THE COURT:  Not necessary.  All right.  Go ahead, Mr. Welch.

MR. WELCH:  Thank you, Your Honor.  United States calls James Nau, spelled N-A-U.

THE COURT:  Which statements are we covering

at this point?

MR. WELCH:  5a and 5b, Your Honor.

**JAMES NAU**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you please state your name.

A   James Nau.

Q   Mr. Nau, how are you currently employed?

A   I'm an agent with the Kansas Department of Revenue, the Alcohol Beverage Control Division.

Q   How long have you been employed with ABC?

A   Since about the end of September, 2012.

Q   Prior to your employment as an agent with the Kansas Department of Revenue, where were you employed?

A   The Dodge City Police Department.

Q   How long were you with the Dodge City Police Department?

A   From February 13, 2006, until September 21st, 2012.

Q   During the time that you worked as a Dodge City, Kansas, police officer, were you involved in the investigation of gang crimes?  Specifically, gang crimes committed by the Norteno street gang in Dodge City?

A   Yes, I was.

Q   And, sir, are you familiar with the events which occurred surrounding a home invasion robbery which occurred April 30 of 2011 in Dodge City?

A   Yes.

Q   Can you tell the Court initially from your understanding what happened?  What did the victims report happened to them?

A   I was actually working the night that that particular call came out.  It was reported that two people kicked in a door, held these -- the victims at gunpoint and robbed them from their money and then fled from the area.

Q   The two men who kicked in the door, as you put it, were they -- were their faces covered?

A   Yes.  They reported wearing dark clothing, both with ski masks and then bandanas covering their face as well.

Q   And the address where the victims resided and where the robbery occurred was 609 East Spruce in Dodge City, Kansas; correct?

A   That is correct.

Q   And the occupants of the home, or the victims in this case, were Guatemalan immigrants; correct?

A   That is correct.

Q   Had you had experience prior to April 30, 2011, of

Guatemalan immigrants being victimized as victims of robbery by Norteno gang members?

A    That is correct.

Q    Did the victims of the robbery -- do you remember their names?

A    Couple of 'em.  I believe one was Jose -- and I don't know if I'm going to get the last name right -- Santaella.  And Santos Gutierrez.

Q    Those are the two victims in the house; correct?

A    Correct.

Q    Did they report whether money was taken from them during the robbery?

A    I didn't learn until after the initial fact later on that money was taken.  During the time, the communication with their -- the Spanish dialect they speak, we only had one officer who is able to speak for them.  So we were told to go look for alleged suspects, for people in the area, so that's what I was doing.

Q    I understand.  But as you sit here today, you know money was taken during the robbery?

A    Correct.

Q    Okay.  After the robbery occurred -- do you remember approximately what time the robbery would have happened?

A    If I remember right, it was -- I want to say late night, early morning.  I want to say like around 3 a.m.

Q   After the robbery was reported by the two victims and the Dodge City Police Department responded to the call from the victims, you said an investigation was conducted; correct?

A   Correct.

Q   And at some point did Dodge City police officers speak with a witness who provided information about who had committed this robbery?

A   Yes.

Q   And did the witness indicate who he or she had received the information from as to who had committed the robbery?

MR. SEVART:  Your Honor, I'm going to at this time renew my objections I filed in my motion, number 440.  I filed a Motion to Suppress these statements with respect to my client.  The Government's response, as I understood it, was that they were not planning on introducing any statements of my client.  Obviously, that seems to be different now.

MR. WELCH:  Your Honor, Mr. --

THE COURT:  I don't remember your motion because it hasn't been set for hearing.

MR. SEVART:  That's correct, Your Honor.  I believe the reason why it wasn't set for hearing was that the Government's reply was simply they weren't

planning on using statements against my client.  I think they might have misinterpreted the motion, from talking with them this morning -- or earlier this afternoon. But the motion I filed to suppress basically covered unreliable hearsay as well as confrontational issues because I think they're trying to allege these statements were made to a confidential informant.

THE COURT:  Well, go ahead.  What do you say, Mr. Welch?

MR. WELCH:  Your Honor, I can't dispute anything Mr. Sevart is saying.  I don't have any memory of what our response was.  I would ask the Court to allow to us proceed today with the James hearing.  If in fact we need to take up the -- Mr. Sevart's motion and we responded incorrectly, then I apologize.  I'd ask the Court to set that for a separate hearing down the road.

THE COURT:  I think so.  Let's -- you know, there's no jury here.  If it later turns out that this is somehow inadmissible, I can disregard it.

MR. SEVART:  Okay.  That would be fine.

THE COURT:  But your objection is noted.  And after things are over, I'd allow defense counsel to submit any briefs that they want with respect to the James hearing.  If that's part of your concern then --

MR. SEVART:  Okay.  Your Honor, as far as

direction to -- would you want me to refile the motion or to renotice it for hearing or --

THE COURT:  No.  All I can say is -- and you said it, it's Docket 440 or something like that.

MR. SEVART:  Yes.

THE COURT:  And you were here the other day when we were setting timetables in this and we haven't had the motion to suppress yet in your case. Eventually, if need be, it will be heard; and if it relates to this, then I'll take it up.  Thank you, Mark.

MR. SEVART:  Okay.  Thank you, Your Honor.

MR. WELCH:  Your Honor, I should have said for purposes of this hearing this statement is not being offered against Jayson Vargas because he is the declarant.  They're only being offered against Adam Flores.

THE COURT:  Okay.

MR. WELCH:  Your Honor, we will proceed, with the Court's permission.

BY MR. WELCH:

Q   All right.  Mr. Nau, I think what I asked you was have you or other members of the Dodge City Police Department gained information as to who committed the robbery at 609 East Spruce on April 30, 2011?

A   Yes.

Q   And the information came from a person who provided that information to the Dodge City Police Department obviously; correct?

A   Correct.

Q   And did that person indicate who they had spoken to about the robbery?

A   Yes.

Q   Who had they spoken to?

A   To Jayson Vargas.

Q   And when did the person get information from Jayson Vargas as to who had committed the robbery?

A   To my knowledge, right after it had been committed.

Q   All right.  So the very night or early morning of the robbery is when this person gained that information; is that correct?

A   Correct.

Q   All right.  What was told to this person concerning -- who told this person about the robbery? Jayson Vargas?

A   Yes.

Q   What did Jayson Vargas say about the robbery?

A   He had stated that we, which at that point, learning through the interview, we was him and Adam Flores, had done something and that the cops were hot in this area and they would let them know further, later on, of what

took place.

Q   Okay.  The information provided to this witness came from Jayson Vargas you said; correct?

A   Yes.

Q   And Jayson Vargas told this person that he and Adam Flores had committed a robbery; is that correct?

A   Correct.

Q   Okay.  All right.  Did Jayson Vargas ask this person to do anything in connection with the robbery?

A   After it was committed, he had told them that they needed to get a new pair of shoes, dispose of these old ones, because the door that he had kicked in, there may be a footprint on that door and these shoes needed to be removed and new ones needed to be bought.

Q   So your testimony is Jayson Vargas told this person -- provided shoes to this person and instructed the person to get rid of the shoes?

A   Correct.

Q   Because the shoes were used during the commission of the robbery?

A   Correct.

Q   And Jayson Vargas was concerned that evidence from the shoes --

          MR. McENULTY:  Objection, Your Honor.  Leading.

MR. WELCH:  I'll rephrase, Your Honor.

BY MR. WELCH:

Q    Why did Jayson Vargas want the shoes to be destroyed?

A    He feared that the police would be able to link him -- link the shoes back to the home invasion robbery based on there could be residue from the door on his shoes or the shoe print may be left on that door.

Q    And that statement concerning the destruction of the shoes is identified as statement 5a; correct?

A    That is correct.

Q    In addition to providing the shoes to the witness, did Mr. Vargas provide anything else to the witness in relation to the robbery?

A    Money to buy -- to buy new shoes.

Q    And do you know Jayson Vargas?

A    Yes, I do.

Q    Do you see him in the courtroom today?

A    Yes, I do.

Q    Could you please point to him and describe what he is wearing?

A    He's on the back row in the blue with white undershirt, glasses.

Q    And do you also know Adam Flores?

A    Yes, I do.

Q   Do you see him in the courtroom?

A   Yes, I do.

Q   Again, point to him and describe what he is wearing.

A   He's on the first row, same thing, wearing blue, and white undershirt and shaved head.

MR. WELCH:  I'd ask the record reflect the witness has identified both Jayson Vargas and Adam Flores, Your Honor.

THE COURT:  It will.

BY MR. WELCH:

Q   After the events which occurred immediately following the robbery involving the shoes and giving money to purchase new shoes, did the witness provide information to the police department about the location of the robbery?

A   Yes.

Q   How did that happen?  What did he or she say?

A   They had stated that they were with Jayson Vargas while he passed this place and he had pointed out that this was the place that he and Adam Flores had kicked the door in.  Got into specifics that this was the actual place where during the -- during the tame of the home invasion robbery, one of the Guatemalans tried to go out the window to escape; and he had stated to this informant that this was the place that the Guatemalan

tried to climb out the window when they kicked the door

in and robbed their money from them.

Q    All right.  The night of or the morning of the

robbery itself, had Jayson Vargas identified who had

done the robbery with him to the witness?

A    Yes.

Q    And that was Adam Flores?

A    That is correct.

Q    And then subsequent to the robbery, the day of the

robbery, the second statement about walking with Jayson

Vargas and the house had been pointed out, do you know

when that statement took place?

A    I don't know exactly when that statement took place.

Q    But during that statement, did Jayson Vargas mention

Adam Flores by name again?

A    Yes.

Q    And is that statement identified as 5b?

A    Yes, that is correct.

        MR. WELCH:  Your Honor, I have no further

questions about 5a or 5b.

        THE COURT:  Mark, do you want to go first?  I

don't care.

        MR. SEVART:  That would be fine, Your Honor.

        MR. WELCH:  Your Honor, our contention would

be it's not being used against Jayson Vargas so only Mr.

McEnulty has standing to object to this statement.

THE COURT:  Well, your objection is noted. But if Mark wants to ask some questions, he may without waiving his objection.  I just -- I want everybody to have an opportunity at this hearing so that we don't have to repeat anything later on.  That's all I'm trying to accomplish here.

MR. SEVART:  Your Honor, the cross-examination that I would have for this witness I think would probably be more relevant to my motion that I filed for --

THE COURT:  Suppression motion.

MR. SEVART:  Uh-huh.

THE COURT:  But you've had your opportunity and I'll hear whatever -- if it comes to it, I'll hear these things at the suppression hearing.

MR. SEVART:  Okay.

THE COURT:  But you're welcome to question him today about the statements.  That's what we're here for.

MR. SEVART:  Okay.  Thank you, Your Honor.

#### CROSS EXAMINATION

BY MR. SEVART:

Q   Detective, the first question I guess I'd have for you has to do with the layers of hearsay testimony that we have here today.  Obviously, you were not inside of

any home where a Guatemalan would have been robbed; correct?

A   Correct.

Q   So you have no personal independent knowledge of any alleged crime involving Guatemalans and robbery; correct?

A   Other than what was reported.

Q   Okay.  So -- and that means what people told you?

A   Correct.

Q   Okay.  Now, you testified earlier that there were a number of Guatemalan offenses -- or victims; is that correct?

A   Correct.

Q   Do you know how many robberies there were in this time frame, you know, give or take a few months, involving Guatemalans?

A   I don't know a number, no.

Q   Would it be more than a dozen?

A   I honestly couldn't answer that.  I didn't work every single robbery there was so I don't know.

Q   Okay.  Obviously, this witness that you referred to in your testimony was not present during any sort of robbery; correct?

A   To my knowledge, no.

Q   Okay.  And is it your position that this witness is

a confidential informant?

A   Yeah.

Q   So at this point in time, you're not willing to reveal who this person is?

A   Correct.

Q   As far as this person, are you willing to disclose to us whether this person has any sort of a criminal background?

A   I don't know the extent of their background.

Q   Okay.  So we don't have any method of securing what, if any, reliability there is of this confidential informant; correct?

A   Correct.

Q   We don't have any ability to test whether -- whether what they're telling you is true or make believe or half truths; correct?

A   The only thing I think we can go on is, I mean, it was pretty much described the same way the victims described it.

Q   Okay.  Which could lead one to believe that the confidential informant was involved in the robbery; correct?

A   Can lead one to believe that.

Q   And was trying to pin the robbery then on, say, Jayson Vargas; correct?

A    Possible.

Q    Okay.  Now, did this confidential informant talk to you or did this confidential informant talk to Detective Corey?

A    Talked to Detective Corey.

Q    Okay.  Is Detective Corey present here today?

A    No, he's not.

Q    Okay.  So the witness, the confidential informant, did not talk to you directly; right?

A    That is correct.

Q    Okay.  At best then, what we have is a confidential informant who we don't know what their credibility is talking to a different detective who then maybe made a report or did something that came to your attention and that's really what you're testifying off of.  Is that accurate?

A    That is very accurate, yes.

Q    Okay.  Did you even hear the information from Detective Corey or did you hear it from somebody else or from a report that allegedly was written by Detective Corey?

A    It was from a report that was written by Detective Corey.

Q    And is Detective Corey even available at all any more or has he moved on to bigger and better things?

A    He -- he is in another state working.

Q    Okay.  The next area I want to talk to you about just for a moment is the nature of this conversation as you understand it from your review of Detective Corey's report.  Okay?

A    Okay.

Q    As I -- and if you need to review Detective Corey's report, I have that here.  But as I understand Detective Corey's report -- and correct me if I'm wrong -- this was supposed to be some sort of a kind of like a date with this confidential informant; correct?

A    What do you mean?

Q    Well, that, that supposedly my client and this confidential informant were walking down the street holding hands or something to that effect.  Is that --

A    That sounds about right, yes.

Q    Okay.  And than apparently, according to this confidential informant, my client was bragging about some event; correct?

A    Correct.

Q    And so the -- assuming for the moment that the conversation in fact happened, it really was more of a conversation in an effort or with an intent of, of impressing this lady; correct?

          MR. WELCH:  To which I'll object.  Calls for

speculation, Your Honor.

THE COURT:  Sustained.

MR. SEVART:  Your Honor, I think --

MR. WELCH:  Also not relevant.

MR. SEVART:  I think the intent of the statement is intended to impress a lady versus --

THE COURT:  But this witness doesn't know what he is intending to do, your client was intending to do.

MR. SEVART:  Well, I think it goes to the issue, Your Honor, of whether this was trying to further gang activity or further a relationship with a woman. And --

THE COURT:  I don't think that -- I mean, that may be an argument that could be made to a jury, but -- after hearing the statement was made, but I don't believe that this witness can say what was in your client's mind or what he intended.  Unless he told her, you know, hey, I want to impress you and I'm going to tell you about how we went and kicked in the door here at this house and robbed it.

MR. SEVART:  Well, let me ask a few more questions, Your Honor.  I appreciate the latitude here.

BY MR. SEVART:

Q   Because there's apparently a couple of different events that Detective Corey is talking about in his

report, isn't there?

A    That is correct.

Q    One of 'em was this walking down the street holding hands and apparently trying to impress this lady with that some offense occurred at this address; right?

MR. WELCH:  Object to the form of the question, Judge.

THE COURT:  Sustained.  Let's move on from impressing people here.

BY MR. SEVART:

Q    Well, it's clear from Detective Corey's report, isn't it, that when he was telling this lady, or allegedly telling this lady or this witness about some crime that may or may not have happened at this residence, didn't have anything to do with furthering gang activity, did it?

A    Not to my knowledge.

Q    And it didn't have anything to do with trying to promote any interest that a gang would have; correct?

MR. WELCH:  I'm going to object.  No foundation.  Calls for speculation by this witness.

THE COURT:  I agree.  Let's, let's move on from what your client intended by these supposed statements.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

BY MR. SEVART:

Q    There certainly were no additional crimes then committed immediately after suggesting that this house had been robbed; correct?

A    What do you mean?

Q    Well, nobody went and robbed the house again; correct?

A    Not to my knowledge.

Q    Nobody went over to the house then to see if they could scare the Guatemalans away from calling the police; correct?

        MR. WELCH:  I'm going to object as being irrelevant.  I have no idea what this has to do with the issues at stand.

        THE COURT:  Sustained.

BY MR. SEVART:

Q    Now, with respect to the tennis shoe event.  Do you have any idea when that conversation was alleged to have occurred?

A    From what I understand with the report was the morning when they got -- when he had gotten back.

Q    Okay.  And as far as the tennis shoes, are those in evidence somewhere?

A    To my knowledge, yes.  I can't say yes or no because I don't know.  I didn't collect 'em.

Q   Do you know if they've been tested for any sort of fingerprints?

MR. WELCH:  Objection, Your Honor.  It doesn't matter.

THE COURT:  That's not what we're here for. This is not what we're here for, Mr. Sevart.

MR. SEVART:  I understand, Your Honor.

THE COURT:  Then if you understand, let's move on to something we're here for because I don't have all day to take up matters that don't -- are not relevant to a James hearing.

MR. SEVART:  I appreciate that, Your Honor.  I think it may be relevant to my motion and I can come back with that at another tame.

THE COURT:  Then we'll take it up at the time of your motion when we don't have 50 people sitting here in the courtroom.

MR. SEVART:  I appreciate that, Your Honor. I'll defer, then, additional questions to that time.

THE COURT:  Thank you.  Mr. McEnulty.

MR. McENULTY:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. McENULTY:

Q   Good afternoon, sir.  I represent Adam Flores.  If you could repeat again the dates of your employment with

the Ford County Sheriff's Office.  Is that your previous employer?

A    Dodge City Police Department.

Q    Dodge City.  And what are those dates of employment?

A    I started February 13, 2006, and my last day there was September 21st, 2012.

Q    You've testified this morning -- this afternoon, in regard to some statements made against Jayson Vargas and Adam Flores.  Is that correct?

A    That is correct.

Q    Do you have any personal knowledge of these statements?

A    No, I don't.  As far as them being directed to me?

Q    Yes.

A    No.

Q    What form of information are you reading these off of?  Where is this information derived from that you now have?

A    The information I received was from police reports. The, the report Detective Corey had done.

Q    All right.  Have you spoken to Detective Corey specifically about his report that you're apparently referring to?

A    No, I have not.

Q    All right.  Is there any other report except for

Detective Corey's that you have information that you're using from today?

A   I've read about all the police reports that were involved in that particular case.

Q   All right.  I mean specifically about this incidence of this confidential witness making this statement.  Do you have any other source of information besides Detective Corey's report?

A   Just grand jury transcript.

Q   All right.  Now, you did not interview the confidential witness?

A   That is correct, no, I did not.

Q   All right.  Why haven't you interviewed the confidential witness?

MR. WELCH:  Objection.  Irrelevant.  Doesn't matter.

THE COURT:  Sustained.

BY MR. McENULTY:

Q   Is the interview with the confidential witness to your knowledge on any type of video or audio cassette?

A   To my knowledge, it is on a DVD.

Q   All right.  Have you personally seen that DVD?

A   No.  We were not able to view it.  It was with the ATF office.

Q   With the ATF office?

A   Yes.

Q   All right.  Do you have any other information that the ATF office may have other reports in regard to these statements?

A   I don't know.

Q   But you did not -- you think -- or you know that the video or audio cassette of this conversation with the confidential informant is present?  You think or you know?

A   When I went to go view it from our evidence room, they told me ATF office had it.  That's where it was checked out to.

Q   Did you attempt to obtain it?

A   No, because I'm not from here.  I'm three hours away from here.  So at the time I went to go check this out was when I was supposed to be up here yesterday so wasn't going to do me any good to try to obtain it when I wasn't going to get in until late last night.  So I pulled Detective Corey's narrative which he done from that interview.

Q   All right.  So Detective Corey, you never spoke to him?

A   No.

Q   You've never seen the video or audio tape?

A   No.

Q   And the only information you have that you're testifying from this afternoon is this one report?

        MR. WELCH:  Objection.  That's not what he said.  He also said he reviewed a grand jury transcript of this witness.

BY MR. McENULTY:

Q   And the review of the grand jury transcript?

A   That's correct.

        THE COURT:  My understanding of his testimony is that he has reviewed reports, Corey's and others, and the grand jury testimony.  If that's not correct then the witness can enlighten us.

A   That is correct.

        THE COURT:  All right.  There you have it.

        MR. McENULTY:  Judge, if I may make a clarification.  He has reviewed others --

        THE COURT:  That's what he testified to.

BY MR. McENULTY:

Q   What other reports have you reviewed?

A   There was two reports by Officer Leslie Fisher, who is Leslie Lehman now, that she interviewed the victims that night and at later dates.  Also the initial report by the lead officer on that case, Officer Addison.

Q   All right.  Do you have any knowledge if Fisher or Addison are still with the Dodge City Police Department

or Ford County sheriff, whatever capacity they were in at the time they wrote the reports?

A    Yes.  Leslie Fisher, who is Leslie Lehman, is still there; and Officer Addison had retired in December.

Q    Leslie Fisher Lehman you say?

A    Yes.  Lehman now.  She's --

Q    So you have no information about the conviction history of the confidential informant; is that correct?

A    That's correct.

Q    Were you on duty, sir, on April 30th of 2011?

A    Without looking at a calendar -- was that the same night as this?

Q    Yes, same night as this.

A    Yes, I was.

Q    All right.  Did you happen to have the occasion to either view this scene or arrive at the scene of 609 North Spruce in Dodge City, Kansas?

A    I arrived at it and was there shortly.

Q    All right.  Now, the alleged victims were citizens of the United States; is that correct?

A    To my knowledge, I think they're illegal.

Q    All right.  Did you attempt to interview them?

A    No.

Q    Did you have knowledge if they have the ability to speak in English?

A    I don't know how much English they can speak.

Q    All right.  Have you reviewed any report that the alleged victims gave to any law enforcement authority?

A    Yes.

MR. WELCH:  I'm going to object to the line of questioning now as being irrelevant to the issues at hand, Judge.

THE COURT:  This is not a discovery deposition, Mr. McEnulty.

MR. McENULTY:  Thank you, Your Honor.  I'll withdraw that question.

BY MR. McENULTY:

Q    These statements of the confidential informant, sir, do you have any idea what location -- where they were given to Detective Corey?

A    I'm assuming they were in the interview room.  I don't know.

Q    But you do not know?

A    I do not know.

Q    Do you know if anyone else was present during the time that these statements were provided to Detective Corey?

A    It doesn't state in the report anybody else was present, so I'm assuming there was nobody else.

Q    You don't have any idea about whether the

confidential informant was under the influence of alcohol when these statements were provided?

A   I have no idea, no.

Q   You don't have any idea about her behavior at all, do you?

A   No, I don't.

Q   Do you have any information in regard to why Detective Corey approached this confidential informant?

A   I have no idea.

Q   You don't have any idea if the informant was providing any form of substantial assistance in regard to alleviating some crime that the confidential witness may have been charged or being charged with?

A   I have no idea, no.

Q   Have you had personal contact with Adam Flores in the past?

A   Yes, I have.

Q   All right.  Have you had occasion to ask him about these statements?

A   No.

Q   Matter of fact, did you interview him or Jayson Vargas at all about these statements?

A   No.

Q   And why did you not?

MR. WELCH:  Object, Your Honor.  Irrelevant.

THE COURT: What's the relevance of whether he did when he says -- when he says he didn't interview them?

MR. McENULTY: Judge -- thank you.

THE COURT: Thank you. Anything further?

MR. WELCH: No, sir.

THE COURT: Thank you, Mr. Nau. You may resume your seat. Now we have statement 6 and 7?

MR. WELCH: This would just be statement 6, Your Honor.

THE COURT: All right.

MR. WELCH: United States calls J.L. Bice.

THE COURT: Still under oath, Mr. Bice.

**J.L. BICE**

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, you are the same J.L. Bice who testified this morning; correct?

A   Yes, sir.

Q   And you are still employed by the Dodge City Police Department; correct?

A   Yes, sir.

Q   Do you have information about an attempted shooting which occurred on August 20, 2011, with a victim by the name of Kendra Owens?

A   Yes, sir.

Q   Can you tell the Court what happened in relation to that attempted shooting?

A   It's my understanding that on that date Ms. Owens, along with an individual by the name of Jose Luna, were driving in a vehicle.  While they were doing so, they observed Jayson Vargas in another vehicle following them.  There was a small chase, kind of -- he pulled up beside 'em, pointed a gun at 'em and made some threats to them.

Q   Prior to August 20, 2011, had Kendra Owens had a relationship of some type with Jayson Vargas?

A   Yes, sir.

Q   And as of August 20, 2011, that relationship no longer existed; correct?

A   That's correct.

Q   But on August 20, 2011, was Kendra Owens at that time in a relationship with Jose Luna?

A   That's correct.

Q   And is Jose Luna the person you said that she was in a vehicle with?

A   That's correct.

Q    During the commission of this crime?

A    Yes, sir.

Q    Now, prior to Kendra Owens seeing Jayson Vargas, did she have some contact with him in some form or fashion immediately before the attempted shooting?

A    Yes, sir.  I believe she reported that she had had some contact with him by texting on a cell phone.

Q    Did she have an understanding that Jayson Vargas was mad at her for dating Jose Luna and not dating him?

A    Yes, sir, that's correct.

Q    When she saw Jayson Vargas in a car, was she in fear that Jayson Vargas may try to harm her or Jose Luna?

A    Yes, sir.  Especially after he had drove up to them and pointed the firearm at them.

Q    You said when Ms. Owens saw the weapon raised at her she was in a vehicle with Jose Luna; correct?

A    Yes, sir.

Q    And Jayson Vargas was in a separate vehicle?

A    Yes, sir.

Q    And there was a car chase that occurred in Dodge City, Kansas?

A    Yes, sir, between the two of them, yes.

Q    All right.  And was Jayson Vargas arrested following that car chase?

A    Yes, sir.

Q   Now -- and was a firearm found in his possession?

A   It was found in the car that he was driving.

Q   And did Kendra Owens provide information to law enforcement after Jayson Vargas was arrested about seeing the firearm pointed by Jayson Vargas at her and Jose Luna?

A   Yes, sir.

Q   Was Jayson Vargas arrested for that offense?

A   I don't recall exactly if that's what he was arrested for but I believe that's correct.

Q   All right.  At some point after this took place, he was in Ford County jail; is that correct?

A   Yes, sir.  He was taken into custody.

Q   And at some point in time was Jayson Vargas in the Ford County jail with Jason Najera?

A   Yes, sir, that's my understanding.

Q   Have you been provided information about a threat that was communicated to Kendra Owens that came from Jason Najera in relation to this crime?

A   Yes, sir, I was.

Q   What was that threat?

        MR. MOSES:  Objection.  Lack of foundation, Your Honor.  Hearsay.

        THE COURT:  Lay some foundation.

        MR. WELCH:  Yes, sir.

BY MR. WELCH:

Q   At the time that -- where was Jose Luna when he -- well, who did Jason Najera make the threat to?

MR. MOSES:  Objection.  Assumes a fact not in evidence.

THE COURT:  The objection is overruled.

BY MR. WELCH:

Q   Who did Jason Najera make the statement to which contained the threat?

MR. MOSES:  Objection.  Lack of foundation, Your Honor.

THE COURT:  Overruled.

A   To Jose Luna.

BY MR. WELCH:

Q   And where was Jose Luna when the statement was made?

A   He was also incarcerated in Ford County Detention Center.

Q   And what was the nature of the threat?

A   Basically the threat was for Jose Luna to relay to Kendra Owens not to testify against Jayson Vargas or bad things may happen to her, or something to that effect.

Q   At the time that this statement was made which -- do you know whether or not Jose Luna passed along that statement to Kendra Owens as he was instructed?

A   I believe that's correct, yes.

Q   At the time the statement was made by Jason Najera

to Jose Luna, was Jason Najera and Jayson Vargas, were

they members of the same gang?

        MR. MOSES:  Objection.  Assumes facts not in

evidence and lack of foundation.

        MR. SEVART:  I'd join in that objection, Your

Honor.

        THE COURT:  Sustained.  Lay some foundation.

        MR. WELCH:  Yes, sir.

BY MR. WELCH:

Q   Do you know Jayson Vargas, sir?

A   Yes, I know who he is.

Q   Do you know Jayson Vargas to be -- Jayson Vargas

documented to be a member of a gang?

A   Yes.

Q   What gang?

A   LCC.

Q   That stands for what?

A   Los Carnales Chingones.

Q   Is that affiliated with the Nortenos?

A   Yes.

        MR. SEVART:  Objection, Your Honor.  Calls for

speculation, lack of evidence, foundation.

        THE COURT:  Overruled.

BY MR. WELCH:

Q   Are you familiar with Jason Najera?

A   Yes, I am.

Q   Do you know, is he documented to be a member of a gang?

MR. MOSES:  Objection.  Lack of foundation; assumes facts not in evidence and speculation.

THE COURT:  Overruled.

BY MR. WELCH:

Q   Same question, sir.

A   Yes, he is.

Q   And what gang is he documented to be a member of?

A   He's a documented member of DV, which stands for Diablos Viejos.

Q   Is DV, Diablos Viejos, associated with the Nortenos?

A   Yes, sir.

Q   And do you see Jason Najera in the courtroom today?

A   Yes, sir, I do.

Q   Would you please point to him and describe what he is wearing?

A   Sitting directly to my left wearing a blue -- blue jersey and shaved head.

Q   All right.  And were you present when Officer Nau identified Jayson Vargas?

A   Yes, I was.

Q   And do you agree that is the Jayson Vargas you know?

A   Yes, sir.

MR. WELCH:  Your Honor, I'd ask the record reflect both Jayson Vargas and Jason Najera have been identified by this witness.

THE COURT:  It will.

MR. WELCH:  Your Honor, I have no further questions regarding statement 6.

THE COURT:  Mr. Moses.

MR. MOSES:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. MOSES:

Q   Is it Detective Bice or Vice?

A   Bice.

Q   With a B?

A   Yes.

Q   Thank you.  Detective, how did you learn about the threat?

A   Through grand jury testimony.

Q   Is this something you've read?

A   Yes, sir.

Q   Did you have any direct contact with any individual who relayed that information to you?

A   No, sir.

Q   Can you tell me who the individual was that

testified at the grand jury that relayed this

information at the grand jury?

         MR. WELCH:  To which I'll object at this time,

Your Honor.  I don't think it's relevant for purposes of

this hearing.

         THE COURT:  Overruled.  Who is it?

A    Kendra Owens.

         THE COURT:  Surprise surprise.

         MR. MOSES:  It's always nice to know, though,

Your Honor.

BY MR. MOSES:

Q    Did you have any personal contact with Kendra Owens

regarding this statement?

A    No, sir.

Q    Did you make any steps to confirm the accuracy of

the information that was provided by Kendra Owens at the

grand jury regarding this statement?

A    I'm not understanding exactly what your --

Q    Did you investigate the information to make sure it

was accurate?

A    No.  That's all I had at that time was what she

stated in the statement.

Q    So you didn't talk to Mr. Luna about it?

A    Correct.

Q    And you didn't talk to Mr. Najera about it?

A    That's correct.

Q    And you didn't talk to Mr. Vargas about it?

A    That's correct.

Q    Do you recall from reading the grand jury testimony when Ms. Owens claims that this statement was made?

A    No, sir.  I don't recall if she gave a specific date or time when that was made.

Q    So it's fair to say we don't know, presuming the statement was made, whether the statement was made in 2011 or whether it was made in 2012?

A    All I can tell you was it had to have been made after they were both incarcerated together at the same time.

Q    Other than the grand jury testimony, has this statement that is related or attributed to Ms. Owens been reduced to writing in another report?

A    Not that I'm aware of.

Q    Do you know whether Ms. Owens was afforded any promises or guarantees in exchange for her grand jury testimony?

A    I'm not aware of any.

            MR. MOSES:  Thank you.

                    **CROSS EXAMINATION**

BY MR. SEVART:

Q    Detective, with respect to the alleged statement, do

you know what exact words were supposedly used?

A   I don't know the exact words.

Q   Okay.  Do you know the context in which these statements were allegedly made as far as where?

A   I can give you Ms. Vargas' (sic) at least opinion of that.  She took that as a threat.

Q   Let me break this down just a little bit.  I think it's already been established that you don't have any personal knowledge of any of this; correct?

A   Yes, sir.

Q   It's all based off of what you read out of her testimony at a grand jury?

A   That's correct.

Q   Okay.  And you don't know of any other reports or anything?  All you're able to tell us is what's in the grand jury transcript; correct?

A   Regarding this statement, that's correct.

Q   Okay.  Did she testify at the grand jury where in the world this statement was to have been made?

A   As far as where her location was at?  I'm sorry.

Q   Yes.  Where, where was she when this supposedly happened?

A   I don't recall.

Q   You were asked earlier about when, and you don't really have any information on that either; correct?

A    Correct.  I just know it was after they were both incarcerated at the same time.

Q    You don't know for sure whether they were really ever incarcerated together either; correct?

A    No, I do believe that is correct.

Q    Okay.  Do you have records or anything that can support that?

A    There should be records available, yes.

Q    Okay.  Does Ford County jail also keep people separated just as several of the other facilities do with respect to people that they think might be related somehow?

A    They do have some criteria.  I can't really testify as to exactly what all of their criteria is; but they do house people in different pods and so on, so forth.

Q    Her testimony never said that Jayson did anything; correct?

A    That's correct.  As far as I'm aware.

        MR. WELCH:  Your Honor, there's two Jasons so we need to identify which Jason we're talking about here.

        THE COURT:  Vargas?

BY MR. SEVART:

Q    She didn't say Jayson Vargas did anything; correct?

A    Yes, sir, that's correct.

MR. SEVART:  I don't have any further questions, Your Honor.

THE COURT:  Thank you.

MR. WELCH:  Nothing further, Your Honor.

THE COURT:  All right.  Now are we moving to 7?

MR. WELCH:  Yes, sir.

THE COURT:  All right.

MR. WELCH:  United States calls Shane Webb.

THE COURT:  You're still under oath, Mr. Webb.

A    Yes, Your Honor.

### SHANE WEBB

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

### DIRECT EXAMINATION

BY MR. WELCH:

Q    Sir, would you tell us your name again.

A    Shane Webb.

Q    Sir, while you were employed with the Dodge City Police Department, did you assist in or did you at some point participate in the investigation of stabbings which occurred on August 27, 2011?

A    Yes, I did.

Q    Now, on that date -- did those occur in Dodge City,

Kansas?

A    Yes, they did.

Q    On that date, was Carlos Ramirez and Gabriel Rivera both stabbed during an attack?

A    Yes, they were.

Q    And can you tell the Court just briefly what happened in relation to that crime?

A    Two individuals approached Mr. Rivera and Mr. Ramirez at the residence at 703 9th Avenue in Dodge City, Ford County, Kansas.  There was some kind of a verbal altercation.  Witnesses stated during that verbal altercation one of the first two males made a phone call and shortly thereafter an SUV arrived and three more individuals got out of that SUV.  It then lead into a physical conflict where Mr. Ramirez and Mr. Rivera were stabbed.

Q    Prior to the altercation, there were people gathered at 703 -- excuse me, 703 9th Avenue for a party; is that right?

A    That is correct.

Q    And at some point they were approached initially by two men you said; is that right?

A    That is correct.

Q    The victims, or the partygoers, did they indicate to police after the fact that they believed there was some

type of gang motive involved in this attack?

A   I believe they relayed that.

Q   And that was based on statements made by --
initially by the two men who arrived; is that right?

A   That is correct.

Q   Do you recall, generally speaking, what the nature
of those statements were made by the two people towards
the partygoers or towards the victims?

A   I don't recall.

Q   That's fine.  At some point in time have other
members of the Dodge City Police Department interviewed
witnesses who provided information about what lead up to
this crime?

A   Yes, we have.

Q   Prior to -- do you know who the two men who
initially arrived at the party and where the altercation
began, do you know the identity of those two men?

A   Yes.  What I've been told through witnesses or
persons involved.

Q   And who were the two men who initially arrived at
that location?

        MR. MOSES:  Objection as to hearsay and
foundation, Your Honor.

        THE COURT:  Overruled.

BY MR. WELCH:

Q   Who were the two men who initially arrived?

A   Jesus Torres and Jason Najera.

Q   And prior to the arrival by Jason Najera and Jesus Torres at 703 9th Avenue, do you know where they had been?

A   Yes.

Q   Where had they been?

A   In the 800 block of 9th Avenue at Humberto Ortiz' residence.

Q   And Humberto Ortiz is -- do you know him to be a documented gang member?

A   Yes.

Q   What gang did he belong to?

A   LCC.

Q   And LCC is affiliated with Norteno; is that correct?

A   Yes.

Q   Jason Najera and Jesus Torres, do you know them to be documented gang members?

MR. MOSES:  Objection.  Same as before, Your Honor.

THE COURT:  Well, I'd be interested to know how he knows they're gang members.

MR. WELCH:  My question was are they documented.  And I should specify by the Dodge City

Police Department.  I think he can testify to that, Your Honor.

MR. MOSES:  Now I object as -- well, there's probably a foundation for that, but I object as hearsay and speculative.  And I'll throw in lack of foundation for the record.

THE COURT:  For purposes of this hearing, I think I'll just let his testimony stand.

BY MR. WELCH:

Q   Do you know, Mr. Webb, whether the Dodge City Police Department has documented Jason Najera and Jesus Torres as being members of a gang?

A   Yes, they have.

Q   What gang are they documented to be members of?

A   DV or Diablos Viejos.

Q   That is a gang affiliated with the Nortenos; correct?

A   That is correct.

Q   All right.  Now, have witnesses provided information about the conversation or conversations which took place at Humberto Ortiz' residence prior to Jason Najera and Jesus Torres going and confronting the partygoers?

A   Yes.

Q   What happened?  What was the nature of that conversation?

A    Mr. Torres arrived at Humberto Ortiz' house --

Q    Your talking about Jesus Torres; correct?

A    Jesus Torres.  I'm sorry.  What did I say?

Q    That's fine.  Go ahead.

A    Arrived at Humberto Ortiz' house.  Jesus Torres house is at 619 9th Avenue.  And so the 700 block starts, he's got the corner house, it starts just past that.  So two houses north of his residence is where these partygoers were at.  When he arrived at Mr. Ortiz' house, he stated that he did not want scraps, which is the derogatory term for -- Nortenos refer to Surenos as, by his mom's house.

Q    Now, the scraps that he referred to was who?  What people did he believe to be scraps or members of a rival gang?

        MR. MOSES:  Objection.  Calls for speculation.

        MR. WELCH:  I can clarify, Your Honor.

        THE COURT:  Yes.

BY MR. WELCH:

Q    Were people who were present at the house who overheard the conversation reported the conversation to law enforcement?

A    At 703?

Q    I'm sorry.  Humberto Ortiz' house.  You testified there was a conversation initiated by Jesus Torres;

correct?

A   That's correct.

Q   Jesus Torres expressed concern that there were scraps close to his mother's house; correct?

A   That is correct.

Q   And were you provided information as to why Jesus Torres believed the people at 703 9th Avenue were members of a rival gang?

A   Yes.  I don't remember how, but I know one of 'em used to be associated with one of the Sureno gangs.

Q   One of the people at the party at 703 9th Avenue at some point in time had in fact been a member of the Sureno gang?

A   That is correct.

Q   And Jesus Torres expressed displeasure about these Surenos, which he referred to as scraps, being close to his mother's house; correct?

A   That is correct.

Q   All right.  What did Jesus Torres say he wanted to do in response to these people, these scraps, being close to his mother's house?

A   He wanted to go back down there and confront them. I know that.  I don't remember any other statements other than he wanted to go confront them about that.

Q   And did he ask others to help him do that?

A    Yes, he did.

Q    And did others help him do that?

         MR. MOSES:  Objection.  Calls for speculation.
He already said he doesn't remember what was said.

BY MR. WELCH:

Q    Well, were you provided information by people at
Humberto Ortiz' house as to what, if any, response Jesus
Torres got to -- received to his request?

A    Yes.

Q    What did those people tell you?

A    That Jason Najera left the residence with him as
well as another individual by the name of Jose Luna.
They then walked south on 9th Avenue towards 703 9th.

Q    All right.  Now, the statement by Jesus --

         THE COURT:  Who walked?  Luna and who?

A    Jesus Torres.  And Jason Najera.

         THE COURT:  All right.  They walk over to 703?

A    Yes, sir.

         THE COURT:  All right.

BY MR. WELCH:

Q    Statement made by Jesus Torres while at Humberto
Ortiz' house about being upset that scraps were living
near his mother's house, that is identified in statement
7; is that correct?

A    That is correct.  Can I correct one thing?  Just so

Your Honor understands.

Q   Sure.

A   Those three individuals walked towards 703; however, only two of them actually approached the residence and went in the yard.  Jose Luna took off southbound and went to Jesus Torres' residence.  So he never actually made it onto the property of 703 9th.

Q   You began your testimony by indicating that the victims at the party saw two men arrive at the party; is that correct?

A   That is correct.

Q   I think I may have asked you this.  If I have, I apologize, Your Honor.  But the party -- the victims, did they provide information to law enforcement that after the two men arrived initially, other men arrived after the two men arrived at their house?

A   That is correct.

Q   All right.  And at the Humberto Ortiz house, did people provide information to law enforcement that after Jason Najera and Jesus Torres and Jose Luna left the house, others from the house came -- or left and went to 703 9th Avenue also?

A   That is correct.

Q   All right.  So that information corroborated what was reported by the victims at the party?

A    That is correct.

MR. WELCH:  Your Honor, I have no further questions concerning statement 7.

THE COURT:  Mr. Moses, do you want to start?

MR. MOSES:  That's fine, Your Honor.

**CROSS EXAMINATION**

BY MR. MOSES:

Q    Agent -- is it Webb?

A    Yes, sir.

Q    Okay.  Congratulations on your new job, by the way.

A    Thank you.

Q    Did I understand your testimony earlier correct that you don't remember what Jesus Torres said while inside the house, the Ortiz house?

A    No.  I know what he said when he was inside the house.  I'm sorry if I misspoke on that.

Q    At one point I heard you say I don't remember.

A    Not about that.

Q    Okay.  Do you remember Torres ever referring to the Nortenos by name during these comments inside the Ortiz house?

A    Referring to the Nortenos by name?

Q    Yes.

A    I don't know what you mean by that.

Q    Well, the synopsis that's been provided to us as

part of Exhibit A says that Torres says he doesn't like, and then puts scraps in quotes, living near his mother's residence and wants Nortenos to go with him to confront them.  He didn't use the word Nortenos, did he?

A   No.  I didn't type it.

Q   There were friends of his that were at the house and he asked for their assistance and that's what they went and did.  Is that what he relayed to you?

A   I didn't talk to him.

Q   Okay.  Have you ever talked to Jesus Torres?

A   Yes, I have.

Q   And did you talk to him before or after the Indictment in this case?

A   I didn't talk to him about anything relating to this case.

Q   Okay.  That wasn't my question.  Did you talk to him before or after the Indictment in this case?

A   I'm sorry.  Way before.

Q   Okay.

A   Yeah.

Q   And so you have not spoken with him since the Indictment?

A   That is correct.

Q   Who relayed the information to you that is contained in the synopsis of statement number 7 which is part of

Exhibit A?

A    It was Christy Sanchez in that grand jury.

Q    Refresh my memory who Christy Sanchez is?

A    Christy --

Q    Did you say Christy Sanchez?

A    Yes, sir.

Q    And refresh my memory who Christy Sanchez is?

A    She was somebody who was at Humberto Ortiz' house on that night.

Q    And was she a significant other or a partner of anybody else that was at the house, at the Ortiz house?

A    Not to my knowledge.

Q    Did you review any reports that refer to statements by Christy Sanchez about what happened at the Ortiz house that evening?

A    Did I review any reports?

Q    Yes.

A    Part of the grand jury testimony that she gave.

Q    Other than the grand jury testimony, did you review anything else that relates statements to her?

A    She, she spoke to me on this case.  But I think if you're asking have I spoke to her about anything else in this case, she provided information.  I was not initially involved in this case.  She provided information to me with her attorney at the Dodge City

Police Department. I don't know the circumstances around that. But she came to Dodge City Police Department. I was asked to interview her with her attorney present in regards to this crime. At which time I did. I then relayed information to the investigators that worked on that case. They then had her come up and go through grand jury. If that clarifies it.

Q   At the time that the attorney brought her in, was she a suspect in the investigation -- in the investigation of this stabbing and fight?

A   I can't tell you one way or the other. I don't know what she was in custody for. I just know she was in custody.

Q   Okay. Do you know if she was provided any type of a bargain or substantial assistance or assistance or promise or guarantee in exchange for her cooperation?

A   Sir, I don't know the details about that.

Q   Do you know whether she was under the influence of any alcohol or drugs at the time that she purportedly overheard these statements at the Ortiz house on that day?

A   I can't say if she was or wasn't. But it's probable.

Q   I don't think you've been in the courtroom all day.

I think you left for a while.  But you're familiar with the overall case; is that correct?

A   Yes, sir.

Q   And in the statements that were discussed and the counts that were discussed this morning, there was continual reference to Guatemalans as the victims.  Do you recall that?

A   Yes, sir.

Q   The two individuals that are alleged to be the victims in the counts that are related to statement number 7, they were not Guatemalans; is that also correct?

A   Yes.  Statement number 7, they were not Guatemalans. They were Hispanic.

Q   So this case is separate and distinct from the other cases in that this is the only one that involves Mexicans as victims rather than Guatemalans as victims. Is that a fair statement?

A   No.

Q   What other counts involve Mexicans --

        MR. WELCH:  I'll object, Your Honor.  It doesn't matter the ethnicty or the country of origin of the victims.

        MR. MOSES:  It goes to the nature of the conspiracy, Your Honor.

THE COURT:  If he knows.

A    Alex Peralta was Hispanic.  Mariano Sorano was Hispanic.  And forgive me if I forget people in these cases, but -- I would literally have to set and go through the Indictment in each one so I knew who the victims were; but there is other victims other than Guatemalans in this Indictment.  I hope that answers --

Q    I believe you said there was other victims other than Guatemalans in this Indictment.  Is that what you said?

A    Yes, sir.

Q    Okay.  And if I understand your testimony correctly, you have had direct contact with Christy Sanchez?

A    Yes, I have.

Q    And that was one time?

A    Yes, it was.

Q    The statement that she provided you when her attorney brought her in compared to the grand jury testimony, have you compared those two to see if there's inconsistencies?

A    No, I have not.

Q    Would it surprise you if you found inconsistencies?

A    Would it surprise me?  No.  I mean -- from the time that she would have talked to me to the time of the grand jury, I mean, it's possible that things are going

to be inconsistent with what she said.  I can't tell you, sir.

Q   At any time did she share with you, or in the alternative when you reviewed her grand jury testimony, was my client Mr. Najera identified as being in the room during those conversations by Mr. Torres?

A   She describes Jason Najera and Jesus Torres talking to each other when the statement's made.  That's when Jason Najera decides to leave the residence with Jesus Torres and Jose Luna and walks out down the street.

Q   Did she say where in the house they were located?

A   No, sir.

Q   Did she say what they were doing?

A   No, sir.

Q   Did she say whether either of them appeared to her to be under the influence of alcohol or drugs?

A   I believe she said that, if I remember correctly, Jesus Torres, she thought that -- I think she said he was under the influence of alcohol, or at least she thought that he was.

Q   And she does not know where they went after they left the house?

A   Yes, she watched them walk down the street.

Q   She didn't see where they went, though, did she?

A   Yes, she did.

Q    She watched all the way?

A    Yes.

Q    Is 703 visible from the Ortiz house?

A    Yes.  It's one block away.

Q    Did she describe what she saw at the 703 location?

A    Yes.

Q    Okay.

MR. MOSES:  Thank you.

THE COURT:  Does anyone else want to question the witness?

MR. LOEFFLER:  Just a couple questions, Your Honor.

THE COURT:  Mr. Loeffler.

**CROSS EXAMINATION**

BY MR. LOEFFLER:

Q    Officer, was my client, Mr. Neave, was he present when the statements were made?

A    He was at the residence.  She included his name as the persons at the residence.  I can't tell you what his -- how far away he was from the person that made the statements.  I don't know that information.

Q    You don't know if he was in the same room or heard these statements being made at all, do you?

A    That's correct.

MR. LOEFFLER:  Thank you.  I don't have any

more questions.

THE COURT:  Any further --

MR. BELL:  Yes, sir.

THE COURT:  Yes, Mr. Bell.

**CROSS EXAMINATION**

BY MR. BELL:

Q   Agent Webb, we met a little while ago.  I'm Greg Bell.  I represent Fabian Neave.  I have very few questions for you.

I want to take you back to the conversation that occurred at the Ortiz house; and I have the same questions as prior counsel with regard to Fabian Neave. During your testimony here this afternoon with regard to specifically statement number 7, you have not thus far mentioned Fabian Neave's name.  True?

A   That is correct.

Q   As you sit here today, you don't have any knowledge or information that he personally heard any statements made, specifically statement 7, made on the day in question.  True?

MR. WELCH:  To which I'll object as being irrelevant, Your Honor, whether he heard the statement or not.

THE COURT:  Whether -- who is he?

MR. BELL:  Whether Fabian Neave heard any

statements made by Mr. Torres at Humberto Ortiz' home.

THE COURT:  He can answer if he knows.  Or has information that Fabian heard the statement.

MR. BELL:  That's my question.

A   I do not know.

Q   You don't know where he was in the home at the time any statements were made with regard to going down to this party.  True?

A   Not when any statements were made.  When statement number 7 was made, I do not know where Fabian Neave was.

MR. BELL:  Okay.  Thank you very much.

MR. WELCH:  Your Honor, I do have brief follow up.

THE COURT:  Yes, sir.

### REDIRECT EXAMINATION

BY MR. WELCH:

Q   Mr. Moses asked you questions about a Christy Sanchez and her knowledge as to where Jesus Torres and Jason Najera went after the statement was made.  Did Christy Sanchez tell you whether or not she observed the altercation?

A   Yes, she did.

Q   And how did she see what happened at the residence where the party was taking place?

A   She rode in a vehicle down to the residence.  She

stayed inside the vehicle where she observed the

altercation take place outside the vehicle.

Q   And which vehicle did she ride in?

A   Mr. Jose Neave's.

Q   Was Jose Neave in the vehicle that went from

Humberto Ortiz' house to the party?

A   Yes.

Q   And who else was in the vehicle with Christy Sanchez

and Jose Neave?

A   Fabian Neave and Humberto Ortiz.

Q   And did Christy Sanchez tell you what, if anything,

Jose Neave, Fabian Neave and Humberto Ortiz did when

they arrived in a vehicle at the party?

A   Yes.  She said they exited the vehicle and ended up

getting into the altercation.

Q   All right.  And when Christy Sanchez, Jose Neave,

Fabian Neave and Humberto Ortiz arrived in the vehicle,

were Jason Najera and Jesus Torres already at the house

where the party was taking place?

A   Yes.

Q   You testified earlier one of the two men -- the

victims told law enforcement that one of the two men

made a phone call and shortly after the phone call was

made, other, presumably Nortenos, arrived at the scene.

Correct?

A    That is correct.

Q    Did Christy Sanchez corroborate that in fact a vehicle containing additional gang members did arrive at that scene?

          MR. MOSES:  Objection as to the form.

          THE COURT:  What?  That it's leading?

          MR. MOSES:  Yes, that would work, Your Honor. He referred to the gang members and I don't believe Mr -- Agent Webb has ever talked about that.

          MR. WELCH:  I can rephrase the question, Your Honor.

          THE COURT:  Yes, please do.

BY MR. WELCH:

Q    Agent Webb, what information did Christy Sanchez provide you as to who was at the party, at the house, when she and the other three men arrived in the vehicle? People who had already been at Humberto Ortiz' house?

A    So you want to know everybody that was at the house to begin with?

Q    Yes.

A    All right.  Jason Najera, Jesus Torres, Fabian Neave, Humberto Ortiz, Jose Neave.  And I believe she said two females but she didn't know who they were.

Q    Jose Luna?

A    And Jose Luna, I'm sorry.

Q   I think you said Humberto Ortiz, but he was there as well; correct?

A   Yes.

Q   All right.  At some point you testified that Jason Najera -- who initially left the house?  Who initially left Humberto Ortiz' house to go to confront the party?

A   Jesus Torres, Jason Najera and Jose Luna.

Q   And the others who were remaining behind at Humberto Ortiz' house, what did they do?

A   According to Christy Sanchez, they went out into the front yard of Humberto Ortiz' house near the street so they could watch down the street and watch these individuals walking towards 703.

Q   At some point in time did the people in the vehicle that arrived at the house later participate in the altercation and the fight?

A   Yes.

Q   And that information was provided to you by Christy Sanchez; correct?

A   Yes.

Q   And anyone else?

A   Yes.

Q   Who?

A   Humberto Ortiz.

            MR. WELCH:  No further questions, Your Honor.

MR. MOSES: Just briefly, Your Honor.

## RECROSS EXAMINATION

BY MR. MOSES:

Q   Did Christy Sanchez tell you how many people were at the party when she first observed the individuals at the party?

A   At 703 --

Q   Yes.

A   No.

Q   Did she ever tell you there was more people at the party than there was initially coming from Ortiz' house?

A   I don't think we talked about numbers, sir.

Q   So you -- did she tell you how it started?  At the party?  How the fight started at the party?

A   She wasn't there.

Q   So all she knows is what she saw after she arrived with the other individuals?

A   That's correct.

MR. MOSES:  Thank you.

MR. LOEFFLER:  No more questions, Your Honor.

THE COURT:  Thank you, again.  Do we have any further evidence --

MR. WELCH:  We do not, Your Honor.

THE COURT:  -- today about this hearing?

MR. WELCH:  No, sir.

THE COURT: All right. I'll make some rulings at the appropriate time.

MR. SEVART: Your Honor, if I may, just to clarify, since I was not here this morning. My client was not either. As I understand it, the other statements that the Government has in their exhibit number 1, other than the three that they talked about today, are not going to be used against my client. Is that correct?

MR. WELCH: Which -- tell me what you're talking about, Mark?

MR. SEVART: 5a, 5b and 6 are the only statements being used against -- that you're attempting to use against Jayson Vargas? None of those other statements you're going to be using against him. Is that correct?

MR. WELCH: We will not be using 1a through 4c against your client. And we will not be using 7 against your client.

MR. SEVART: So that leaves 5a, 5b and 6 as the only -- I just wanted the record with respect to my client to be clear that they're not going to be using those other statements against my client.

MR. WELCH: Your Honor, Mr. Vargas is charged in Count 1 in the RICO conspiracy. So to the extent his

statements apply to the enterprise, the RICO conspiracy, yes, we will be using those against --

MR. SEVART:  Well, we object to that, Your Honor.

THE COURT:  Well, you should have been here this morning.

MR. SEVART:  Well, I --

THE COURT:  Look, if it becomes a problem, then we can -- you're saying that -- which ones?  1a, 1b or 1c will be used against Mr. Vargas?

MR. WELCH:  Your Honor, Jayson Vargas is charged as one of the RICO conspirators.  Because of that, it's conceivable that in order to establish the enterprise, some of these other statements will be used to establish the enterprise; and it may have some impact on Mr. Vargas because he is charged in the RICO conspiracy.

THE COURT:  But my question is:  Which ones are you talking about?

MR. WELCH:  I don't -- Your Honor, I don't have any specific statements that I know we're going to offer against Jayson Vargas.

THE COURT:  Well, if you know that you're going to offer certain statements against Jayson Vargas, I want you to tell Mark.

MR. WELCH:  I will do that.

THE COURT:  Then, if we need to, we can have a very small hearing about it.

MR. SEVART:  Thank you, Your Honor.

THE COURT:  All right.  Now, I assume that none of the Defendants want to testify here today or call witnesses?

MR. MOSES:  Mr. Najera does not.  But I do have one question for the Court.  Since this is a public record, this Exhibit A-1, am I allowed to give that to my client?  Under your previous order -- I would presume I can.

THE COURT:  Any objection?  He's been sitting there looking at it.

MR. WELCH:  No, Your Honor.

THE COURT:  I don't see any reason why he can't have it.

MR. MOSES:  Thank you, Your Honor.

THE COURT:  All right.  Anything else?  I assume no one else wants to testify.  And if any of the defense counsel want to submit letter briefs with respect to the issues we're talking about here, not any other issues, just the James hearing issues, please do so as soon as possible.  By the end of next week.  And hopefully that will help me get out a ruling about this.

All right.  Everybody's excused except Mr. Moses and Mr. Smith and I want to talk with them.

MR. MOSES:  Do you want my client here?

THE COURT:  I don't want him to go anywhere.  But I don't think he's going anywhere anyway, but I just -- I want to talk to the two of you up here at the bench.  He can come up if he wants.

MR. MOSES:  No.  I think he's fine where he is.

(The following colloquy was had at the bench between the Court, Mr. Moses and Mr. Smith.)

THE COURT:  I think this should be on the record.  If Mr. Najera wants to plead guilty, that's fine.  But I want to be sure that that's what he wants to do.  That's why I had him come back for this.  And if he wants to plead guilty today and not have the suppression hearing, I want him to be prepared to say he understands that he had a right to a suppression hearing.  Because he isn't going to get one later on.  Because he's already changed his mind once.

MR. MOSES:  I understand.  And one of the delays -- he caught me by surprise today so I have not been over the Petition with him and that's what I was -- that's what my assistant brought over was the Petition.

I really am not prepared to do -- even though Aaron and Lanny want the plea today, and I understand why, I have not gone over the Petition with him.

THE COURT:  I don't want the man to plead guilty until he is absolutely ready to come in and go through the whole thing and say this is it and I'm not going to change my mind later on.  We get those things all the time where, you know, he gets in here and starts thinking about it and then he's rushed into a plea, et cetera, et cetera.

So what do you want to do about the Motion to Suppress?  Do you want to take that up today?

MR. MOSES:  Well, I don't think, out of fairness to Aaron, I don't think it's fair to -- I think they had already made plans not to do the Motion to Suppress.  You already sent your people back, didn't you?  Are they still here?

MR. SMITH:  No, I have them here.  That's the problem is we had to bring in a bunch of witnesses.  But we would not go through with the plea if we have a Motion to Suppress.  I mean, that's -- that's part of the -- if he's ready to accept responsibility, then he's ready --

THE COURT:  Well, this is always a problem.  And it's really you guys' problem as much as it is mine,

you know.  But the main thing is that if he wants to plead guilty, he's got to understand, because I'm going to question him about it, that the Motion to Suppress is out the window and he can't come back later on and claim -- I don't know if you want to make a record with him in here or not --

MR. MOSES:  If it helps you any, in our discussions this afternoon before he made his final decision, the Government said they would withdraw the offer if he went forward with his Motion to Suppress.

THE COURT:  I can't understand why he would do that, but that's your choice.

MR. MOSES:  That's what the Government -- and I laid it out to him and that he had that choice.  But I would prefer that I have enough time to go over the Petition with him.  I understand Aaron brought the witnesses in.  They're going to be --

THE COURT:  How many witnesses are we talking about?

MR. MOSES:  Aren't they going to be back?

MR. SMITH:  One, two, three, four -- four witnesses.

MR. MOSES:  I think having heard the James hearing was helpful.  Which was one of my requests of Lanny and Aaron.  But I respect their decision.  And

when they're going to pull a deal off the table, I respect that. I don't agree with it, but I respect it.

THE COURT: Well, I don't get involved in that.

MR. MOSES: I think it was beneficial to hear the evidence.

THE COURT: I'm just saying that -- I've said what I've said. I don't get involved in your discussion -- except that I'm going to make the record perfectly clear -- you guys know this -- about making sure his plea, if he pleads guilty, is a good plea.

MR. MOSES: We were hoping we were going to have this thing --

THE COURT: He's right there.

MR. MOSES: Well, I'm going to need to go over the Petition with him. I mean, I can do that now. But I just don't want him to feel rushed at this point. Out of fairness, he hasn't really been rushed because he had this on the table for about -- well, you know, two weeks now --

MR. SMITH: Or more.

MR. MOSES: Whenever it was we talked to you, which was a week or two ago.

THE COURT: I don't know. I don't want to talk to him. It's not for me to talk to him. But he's

here and it's only 3:00.  And I've got another matter in here -- and I've said my piece.  I just want to make sure if he pleads guilty that this time it sticks.  Okay.

              (Adjourned at 3:00 p.m.)

C E R T I F I C A T E


I, Cindy L. Schwemmer, United States Court

Reporter in and for the District of Kansas, do hereby

certify:

That the above and foregoing proceedings were

taken by me at said time and place in stenotype;

That thereafter said proceedings were

transcribed under my direction and supervision by means

of computer-aided transcription, and that the above

and foregoing constitutes a full, true and correct

transcript of said proceedings;

That I am a disinterested person to the said

action.

IN WITNESS WHEREOF, I hereto set my electronic

signature on this the 20th day of March, 2013.



                              s/ Cindy L. Schwemmer

                              Cindy L. Schwemmer, RPR, FCRR

                              United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,               )
                                        )
                            Plaintiff,) District Court
                                        ) Case No. 12-10089
vs.                                     )
                                        )
JASON NAJERA, et al,                    )
                                        )
                            Defendants,)
                                        )
_____

**TRANSCRIPT OF DAUBERT MOTION HEARING**

     On the 16th day of April, 2013, came on to be heard **Hearing on Daubert Motion** in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.

**APPEARANCES**
     The **Plaintiff** appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;
     Defendant **Pedro Garcia** appeared in person and by and through Mr. Val Wachtel;
     Defendant **Gonzalo Ramirez** appeared in person and by and through Mr. Joel Mandelman;
     Defendant **Juan Torres** appeared in person and by and through Mr. Michael Shultz;
     Defendant **Angel Cerda** appeared in person and by and through Mr. Paul McCausland.

Appellate Case: 14-3006    Document: 23-2    Date Filed: 04/01/2014    Page: 260

# I N D E X

**APRIL 16, 2013:**

**WITNESS**

**SHANE WEBB**
Direct Examination by Mr. Welch:          3
Cross Examination by Mr. Wachtel:         83
Cross Examination by Mr. Mandelman:      120
Cross Examination by Mr. Shultz:         126

**JAMES NAU**
Direct Examination by Mr. Smith:         133
Cross Examination by Mr. Wachtel:        172
Cross Examination by Mr. Mandelman:      182
Cross Examination by Mr. McCausland:     189
Cross Examination by Mr. Shultz:         191

Certificate of Certified Shorthand Reporter: 198

| EXHIBITS | I | O | A |
|---|---|---|---|
| Gov't | | | |
| 1 | 82 | 82 | 82 |
| 2 | 26 | 26 | 26 |
| 3 | 27 | 30 | 30 |
| 4 | 53 | 53 | 53 |
| 5 & 6 | 55 | | |
| 7 | 58 | | |
| 8 | 60 | | |
| 9 | 60 | | |
| 10 | 62 | | |
| 11 | 64 | | |
| 12 thru 17 | 66 | 66 | 66 |
| 18 thru 31 | 68 | 68 | 68 |
| 32 thru 36 | 73 | 73 | 73 |
| 37 thru 39 | 78 | 78 | 78 |
| 40 | 68 | 68 | 68 |
| | | | |
| **Deft** | | | |
| A | 84 | 86 | 86 |
| B | 184 | 188 | 188 |

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 9:05 a.m. April 16, 2013, the following proceedings were held.)

THE COURT:  This is the U.S. vs. Najera and others.  Case number 12-10089.  Lanny Welch and Aaron Smith are here for the Government.

This is the first of three Daubert hearings and the Defendants who are here today, I believe, are Pedro Garcia, is that correct?

MR. WACHTEL:  That is correct, Your Honor.

THE COURT:  All right.  And Gonzalo Ramirez.

MR. MANDELMAN:  Yes, Your Honor.

THE COURT:  Juan Torres.

MR. SHULTZ:  Yes, Your Honor.

THE COURT:  Angel Cerda.

MR. McCAUSLAND:  Yes, Your Honor.

THE COURT:  And I think Hernan Quezada announced he was not going to be here.  Is that right?

MR. SMITH:  That's correct.

THE COURT:  All right.  Well, we'll put on the Government's witness, or witnesses, and then I'll allow the defense counsel who are here to decide who wants to be first.  And I bet it will be Val since he filed the motion.

MR. WACHTEL:  I suspect that it will be Val

also, Your Honor.  Thank you.

THE COURT:  Well, I don't care, but I thought maybe that would be the case.

MR. WACHTEL:  Forewarned is forearmed, Your Honor.

THE COURT:  All right.  Okay.  Call your first witness, Mr. Welch.

MR. WELCH:  Your Honor, United States calls Shane Webb.

Your Honor, for the hearing today, and Wednesday and Thursday, the Government has assembled an exhibit notebook.  We've given copies of the notebook to defense counsel.  Your Honor has one.  I gave one to your clerk. The original I'm putting on the witness stand now.

THE COURT:  Thank you.  I appreciate it and I'm sure they do, too.

MR. WELCH:  Your Honor, in the interest of time, if you would prefer I not do this, I certainly won't, but I thought I'd go ahead and have -- I don't intend to go through each exhibit; but collectively have the witness identify the exhibits and introduce them now to make it a little easier.

**SHANE WEBB**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as

follows on:

## **DIRECT EXAMINATION**

BY MR. WELCH:

Q   State your name, first.

A   Shane Webb.

Q   Mr. Webb, I've just handed you a black notebook. Have you seen that before?

A   No, I have not.

Q   Well --

A   I've seen copies of it, yes.

Q   Look at it real quickly and make sure you've seen that before or you've seen an identical version before.

            (Witness complies with request.)

A   Yes, I've seen a copy of this.

Q   The first three exhibits are all documents; is that correct?

A   That is correct.

Q   And then Exhibits 4 through 40 are photographs?

A   That is correct.

Q   Have you seen the three documents prior to today?

A   Yes, I have.

Q   Do you recognize them?

A   Yes, I do.

Q   Do you know what they are?

A   Yes.

Q   And photographs 4 through 40, have you seen those prior to today?

A   Yes, I have.

Q   And can you identify those?

A   Yes.

MR. WELCH:  Your Honor, for the purposes of this hearing, we would offer Exhibits 1 through 40.

THE COURT:  Any objection gentlemen?

MR. WACHTEL:  Your Honor, unless he identifies the photographs, I object to that.

MR. WELCH:  We'll do it the old fashioned way, Judge.  That's fine.

THE COURT:  Okay.

BY MR. WELCH:

Q   Sir, would you please tell us what law enforcement agency you work for currently?

A   Currently employed by the Kansas Bureau of Investigation.

Q   How long have you been employed by the KBI?

A   Since February 3rd of this year.

Q   And what are your general duties with the KBI?

A   I'll be assigned to the southwest Kansas drug task force.  Mainly primarily will be narcotics purchases, sales, narcotics violations.

Q   Prior to your employment as a KBI agent, were you

employed with another law enforcement agency?

A   Yes, I was.

Q   Which one?

A   The Dodge City Police Department.

Q   When did you begin your employment with the Dodge City Police Department?

A   On January 3rd of 2005.

Q   And your employment began January, 2005, and continued through when?

A   Through February 2nd of this year.

Q   So you were continuously employed with law enforcement first with the Dodge City Police Department and then with the KBI; is that correct?

A   That is correct.

Q   Prior to your employment with the Dodge City Police Department in 2005, were you employed by a different law enforcement agency?

A   No, I was not.

Q   All right.  Now, when you became a Dodge City police officer, did you receive training before you became a commissioned law enforcement officer?

A   Yes, I did.

Q   What training did you receive?

A   I attended the basic training for law enforcement at the Kansas Law Enforcement Training Center in Yoder,

Kansas.  I believe it was approximately 560 hours.

Q   All right.  And did you successfully complete that training?

A   Yes, I did.

Q   And did you become a commissioned law enforcement officer at that point?

A   Yes, sir.

Q   With the Dodge City Police Department?

A   Yes, sir.

Q   What was your rank at that time?

A   I was a patrol officer.

Q   And how long were you a patrol officer with the Dodge City Police Department?

A   Just a little over two and a half years.

Q   And generally speaking, what were your duties as a patrol officer in Dodge City, Kansas?

A   When I started on patrol, taking beat calls, depending on whatever call would come out, also traffic enforcement.  I did that for a short period of time before getting moved on to a unit at the time called the street crime unit.  I was still uniformed officer but I worked on the street crime unit which mainly primarily dealt with -- it was a proactive unit to deal with both gangs and street level narcotics sales and usage.

Q   Your time assigned to the street crime unit -- known

as SCU; is that right?

A   That's correct.

Q   What periods of time were you assigned to the SCU?

A   From the end of '06 -- excuse me -- the end of '05, beginning of '06, until July of 2007.

Q   And I think you said this already, but the focus of the SCU was gang enforcement, gang investigations and what else?

A   Narcotics violations.

Q   And how many members of the SCU were there?

A   At the time, there was four.

Q   When did your assignment to the SCU end?

A   In July of 2007.

Q   And what did you -- what was your assignment at that point?

A   I moved back to the detective bureau.

Q   Were you promoted to detective?

A   Yes, I was.

Q   And what were your duties as a detective with the Dodge City Police Department?

A   They were the same.  I was working the -- lack of a better term -- the back end of a lot of the gang investigation cases, as well as we were working narcotics such as purchases or working dealers, those kind of cases.

Q   And you were a detective with the Dodge City Police Department from '07 through when?

A   Through February 2nd of this year.

Q   When you took the job with the KBI?

A   That is correct.

Q   All right.  Now, just a second ago you referred to your work as a detective working the back end of gang investigations, so that implies to me that as a patrol officer, you were working the front end of gang investigation.  Is that a fair statement?

A   That is correct.

Q   Explain to the Court what you mean by working the front end of a gang investigation.  What did that entail?

A   That would be the initial calls coming out, whether it be criminal damages, any type of shootings, would be the initial persons to respond.  We would either work those crime scenes on our own, or if it was something we could not work, we would then contact the detective bureau at the time.  When I -- then flipped that when I went back to the detective bureau.  I still had guys on the streets that were working those kind of crimes, if they needed assistance, I was usually the one they'd contact as far as the gang cases would go or if they thought there was some kind of gang nexus.

Q   All right.  Now, you said on the front end when you were a patrol officer working gang cases you were working criminal damage to property.  What is that? What type of crimes would that involve?

A   Anything from vehicles getting windows broken out to different kinds of graffiti tagging on people's property.

Q   What do you mean by tagging?

A   Graffiti, spray paint, identifying what gangs are in what neighborhoods, or, in essence, them claiming what turf is their's by putting up different kinds of graffiti.  Or who the other gang was having disagreements with at the time such as either other sets of other gangs, rival gangs, or other persons in rival gangs that they would be having any problems with.  They would tag it, be there their street monikers, which is a nickname that several gang members have one way or the other, and they would be crossing those individuals out. Just identifying a lot of stuff through graffiti.

Q   Okay.  We'll explain crossing out, those terms, a little bit later; but when you're talking about tagging, are you generally speaking of spray painting property, houses, cars, et cetera, or is it something else that you're talking about?

A   That's correct.  Just like you explained it.

Q   Okay.  You also talked about you investigated, in addition to criminal damage to property crimes, gang related crimes, you also investigated as a patrol officer, shootings; is that right?

A   Yes, sir.

Q   What type of shootings would you be involved with investigating as a patrol officer with SCU?

A   Either shootings at occupied or unoccupied dwellings.  Shooting at vehicles.  Shootings at persons, you know, that may be in different areas of the city.

Q   All right.  And shootings at either occupied or unoccupied dwellings, were you able to determine that at least in some cases those were gang motivated?

A   Yes.

Q   And how did you do that?  Why was -- how were you able to do that and as a result of that were you and the other members of the SCU assigned to the investigation?

A   Most of the time when we would hear an address come out, first of all, if the shooting was at certain addresses, we had our -- we had information and we knew where most of our different gang members and different gang members and different sets lived at.  We were familiar with a lot of addresses.  So when you hear those addresses come out, that might be the first indication.  Secondly, when we would get there, the

persons that we were dealing with, whether we knew through previous contacts that they were affiliated with one gang set or another. And, obviously, from talking to them if they had been hanging out with persons of a certain set and thought that that was the reason that they were targeted.

Q When you say set, what do you mean by set?

A Sets are different -- sets are different groups of a larger national gang and they'll form different smaller sets and they'll call theirselves different names. They all link back to some type of a national organization type deal.

Q Okay. Now, talking, then, about the back end, as you referred to it, as a detective with the Dodge City Police Department, you also worked gang related crimes; is that correct?

A Yes, sir.

Q How, if at all, was your role different as a detective working those cases as compared to a patrol officer working those cases?

A Usually we had a lot more time, to begin with. We had more time --

Q As a detective?

A That is correct. We had more time to work the scenes, to later follow up during daytime hours. That's

another thing, when I was on the SCU, our primary times that we would work would be 5 in the evening until 5 in the morning or 6 in the evening until 6 in the morning. Sometimes it's hard to get ahold of witnesses or even victims late at night like that.  So we had more of the opportunity to contact those individuals during the daytime hours.  Our, I guess you could say, the level of experience with other detectives in working more serious person felony crimes on the state level, we had more access to those types of persons when I was working back in the detective bureau.

Q   All right.  When you were a detective the the Dodge City Police Department working gang investigations, how many detectives were there like you doing that work?

A   Gang investigations?

Q   Yes.

A   Primarily me.

Q   Okay.  And that was true from '07 through when?

A   Through -- well, actually, Detective Bice came on in 2008 and we worked a lot of those crimes together.  But there was a good year, year and a half, in there where it was primarily me, I guess.  And then once Detective Bice came to the Dodge City Police Department, he then -- I don't know if he was assigned to or if he just jumped in and helped out with the -- primarily with

these crimes.

Q   So for approximately a year and a half you were the gang detective, essentially, for the Dodge City Police Department; is that correct?

A   Yes, sir.

Q   When Detective Bice was hired by the department, he joined you as the second gang detective in the detective bureau; is that correct?

A   Yes, sir.

Q   And at the time that you left the Dodge City Police Department, was it still just the two of you, Detective Bice and yourself, as the gang detectives?

A   Yes, sir.

Q   All right.  Now let's go back a little bit and talk about your training.

Generally speaking, not just gang-related training, but you talked about the hours that you passed to become a commissioned law enforcement officer.  From '05 until you became a KBI agent, did you receive other training to be a law enforcement officer?

A   Yes, I did.

Q   How many hours per year did you receive?

A   We had to keep up with the mandatory 40 hours per year.  I had well over the 40 hours required by the State of Kansas to stay certified as a law enforcement

officer.

Q   And did you receive training that was specific to or focused on gangs and gang investigations?

A   Yes, I did.

Q   Do you have an estimate how many hours you would have received?

A   Approximately 200, right around 200 hours.

Q   That's from '07 until you became a KBI agent?

A   Yes, sir.

Q   Was that training received in Kansas and outside of Kansas?

A   Yes, it was.

Q   And were there times where you actually provided training on gangs and gang investigations to community groups or law enforcement agencies?

A   Yes, I have.

Q   How many times would you have done that?

A   Several times.  I'd say 10 to 15 times.

Q   In the past, Agent Webb -- excuse me -- have you been a member of any associations, gang investigators associations?

A   Yes.  I was a member of the Kansas Gang Investigators Association from their inaugural year, which I believe was in 2006, through 2008 or 2009, and then one year in between there, 2009 and 2013, one of

those years in there, I don't recall which year.

Q   And did you receive training through that association?

A   Yes, I did.

Q   And did you provide training to members of that association?

A   Not to that association, no.

Q   All right.  Have you also either received or given training on Hispanic gangs?

A   Yes, I have.

Q   Now, either as a patrol officer or as a gang detective, have you had direct contact with gang members in Dodge City, Kansas?

A   Yes, I have.

Q   Would that be on a regular basis?

A   Yes, sir.

Q   What type of contact would you have with gang members in Dodge City?

A   You talking about as far as working cases or --

Q   Anything.

A   Okay.  Since I became a detective?

Q   Let's start with patrol officer.

A   Okay.  On several different occasions, I've had contact, due to our priorities, with the street crime unit in Dodge.  We started off not only working the

gangs, there was DEA out of Garden City put together a group called -- it was a task force. I believe it was called Go Soldiers Task Force. It was primarily between the -- some members of the -- started off with Liberal Police Department, Dodge City Police Department, Garden City Police Department, officers of Holcomb, Kansas, which is right next to Garden City, Finney County Sheriff's Department, the Ford County Sheriff's Department and the Seward County Sheriff's Department. This task force, when they put it together, was to, at the time, go back and forth between Dodge City and Garden City because of the nexus and the ties between the gang members of those two cities. We basically would work every other weekend on either a Friday or Saturday night in the different communities. So we -- basically, they had a memorandum of understanding between those agencies to work back and forth in their cities. During that time, I was able to not only contact members in Dodge City, but members from all over southwest Kansas that were involved in different gang activity through that task force. That task force then, I believe because of budgetary reasons and other concerns -- or not other concerns -- but because of budgetary reasons and whatever reason, Garden City and Finney County at one point pulled out of that. We then

took that same concept and brought that to Dodge City using that task force. And also one thing I didn't mention, we also used probation, parole, court services, all those different, for lack of a better term, probationary services, to assist us. We also assisted them on any kind of home visits they would like to do either on gang members or even persons that were not gang members that they would -- they wanted to do home visits. Those were the things that we would do on those occasions. Obviously, through my work at the Dodge City Police Department, on numerous occasions I've talked to gang members in our community even on situations that weren't criminal in nature, but such things as walking through the mall, just doing a walk-through basically, contacting individuals; going to a youth center that we have in Dodge City called The Alley, that's a place that we would frequent on the weekends and talk to younger teenage persons, persons that we were able to identify as maybe those that were starting to sway towards gangs due to clothing or who they were hanging out with. If we would observe those individuals, we would then not only talk to them, we would try to go talk to their parents and let them know what we were observing such as clothing or who they were associating with. A lot of times, through talk with those parents, they would then

show us a lot of things in their bedroom that they didn't understand, how those items were starting to show up more frequently in their rooms. They didn't really understand what they were. We could then explain different gang associated items to them. So we tried to be proactive to keep the younger youth out of it and from joining gangs. And then also, you know, we had to perform enforcement actions against those individuals that were committing different crimes associated with a gang.

Q   By enforcement actions, you mean you've arrested gang members as well; is that right?

A   That is correct.

Q   All right. Now, in addition to the gang members and their families that you were talking to, did you also talk to rival gang members?

A   Yes, sir.

Q   And did you receive information about gangs from -- about one gang from members of a rival gang?

A   Yes, sir.

Q   Did you also talk with victims of gang crime?

A   Yes, I did.

Q   Did you receive information about the operation of gangs and the types of crimes that they committed from the victims of those crimes?

A    I'm sorry.  Can you restate that.

Q    Certainly.  In dealing with victims of gang crime, did you receive information from the victims as to why they were victims of gang crime?

A    Yes.  Why they thought they were targeted?

Q    Exactly.

A    Yes.

Q    Okay.  And you also mentioned that you worked with probation and parole officers about gang members and their activities?

A    Yes, sir.

Q    Have there been times in the past, Agent Webb, that other law enforcement agencies either in southwest Kansas or anywhere else came to you as an expert on Dodge City gang and gang members?

A    Yes.

Q    How often would you receive contact from other agencies or other people outside of Dodge City seeking help from you about a Dodge City gang issue?

A    I can't -- sometimes weekly.  If just depended. Most of the time, any time a gang member from Dodge City would go to prison, we would be contacted by the prisons; whether that person would admit in prison that they were a gang member, which most of them do because they don't want to get placed in a situation where

they're in the wrong prison setting and mixed in with rival gang members for their own safety reasons.  We would be contacted by, obviously, Garden City, Great Bend, Liberal police departments when either they were dealing with individuals from Dodge City that they believed had gang ties or if -- and we would do the same.  If we had any individuals that we were able to identify from different sets from the different cities in southwest Kansas, we would then in return get ahold of different officers that we knew to be working gangs in that community, letting them know that they were mobile to our communities and back and forth and who they were hanging out with.  Just more for intelligence reasons.

Q   Okay.  And when you were a patrol officer assigned to SCU, if there was reason to believe an incident or crime was gang related, did Dodge City police policy require that the SCU officers were involved in that investigation?

A   Yes.

Q   Same question when you were a detective with the detective bureau.  If there was reason to believe that an incident or a crime was gang related, was it understood by policy that you or later Detective Bice were to be involved in those investigations?

A   At some point through the investigation. You know, that would be different. If, if these crimes occurred in the evening or if Detective Bice and I were unavailable for some reason, those detectives would still work that crime. At some point we may become involved and it might be as little as, you know, who's hanging out with this individual or any kind of questions that they would have that we might have answers to in reference to the gang aspect of a case.

Q   All right. Generally speaking, either as patrol officer or later as a detective, if there was a gang incident in Dodge City, within your department, were you one of the people that was viewed by your fellow officers as an expert in gang and gang activity in Dodge City, Kansas?

A   Yes, sir.

Q   You've already talked about the SCU. That was a formalized unit put together by the police department in part to combat gang activity; is that correct?

A   To my understanding. It was formed in 2002, before I arrived at the police department.

Q   All right. So it existed prior to your becoming a Dodge City police officer?

A   Yes, sir.

Q   All right. But from '05 until '07 when you were a

patrol officer assigned -- were you assigned to SCU the entire time?

A    From the end of 2005, beginning of 2006, right in that area, until July of 2007.

Q    Was one of the functions of the SCU while you worked with the SCU to combat gang activity and gang crime?

A    Yes.

Q    In addition to the SCU from '05 until you became a KBI agent, are you aware of other programs or initiatives that were put together by the Dodge City Police Department to counteract gang activity?

A    Yes, I am.

Q    What were they?

A    The first chief that I had at the police department retired, I believe, in 2010.  At that time, another chief came from, I believe, Washington.  When he arrived at the police department, he changed the street crime unit to -- I think it's Public Oriented Policing, I believe is what he called it.  And he called that, basically, that unit, he renamed it that.  I was not involved with that unit at that time other than talking to him.  I wasn't actually on that unit.  But I do know that he changed that unit at the time.  He also changed programs that were going through the schools from the DARE program, which was mainly for children to resist

drug influences, to a program that was called the GRAT program, and it was more gang resistance training for youth going through the schools in Dodge City.

Q   Did at any time during your employment with the Dodge City Police Department, did the department have policies in place concerning criteria to be used to identify and document gang members?

A   Yes.

Q   Would you please look in the black notebook and look at Exhibit 2.  Do you recognize what Exhibit 2 is?

A   Yes.  This is our -- the Dodge City Police Department policy on both documenting gangs as well as -- it looks like it's been -- it was updated at one point to include a state statute that came out in 2006 for what the state defined as a gang member also, different criteria to put into affidavits or different bonds on persons -- on gang members that were involved in person felonies.

Q   At some point in time the State of Kansas enacted laws governing of the how to identify gang members.  Is that what you're saying?

A   Yes, sir.

Q   You said the Dodge City police policy was amended to in corporate Kansas law?

A   Yes, sir.

Q   And is that part of what's contained in Exhibit 2?

A   Yes, sir.

Q   The policies that are there in front of you as Exhibit 2, were those policies that you were -- that you worked with as either a patrol officer or a gang detective?

A   Yes, sir.

MR. WELCH:  Your Honor, we would offer Exhibit 2.

THE COURT:  Any objection to 2?

MR. WACHTEL:  No objection, Judge.

MR. McCAUSLAND:  No objection.

MR. MANDELMAN:  No.

MR. SHULTZ:  No objection.

THE COURT:  2 is received.

BY MR. WELCH:

Q   From your experience, was the criteria that's stated in the policy, was it followed by you and other Dodge City police officers?

A   Yes.  And, in fact, the criteria for identifying gang members was already in place before that state law came out and the Dodge City Police Department was already compliant with that before it even came out.

Q   Okay.  And was there a -- there had been in use for a period of time what's referred to as a gang sheet.

Are you familiar with a gang sheet?

A    Yes.  I believe those started being used in 2002.

Q    Again, they predated your employment as a police officer; is that right?

A    Yes, sir.

Q    But from the time you began working with the Dodge City Police Department, you used gang sheets; is that right?

A    Yes.  And if I can make a correction.  The forms on the computer that we were able to use, I believe that form was created in 2002.  I know there was gang sheets created further back, even into the '90s.  Some of those were handwritten.  Some of them were different kinds of forms.  But the -- the form that we use today was, I believe, created in 2002.

Q    All right.  And would you look at Exhibit 3.

A    Yes, sir.

Q    What is Exhibit 3?

A    This is a gang verification criteria form that we like to have filled out by every officer that has any contact with gang members.  It doesn't always happen.  But this is our, our form that we use at the Dodge City Police Department, or that I used, I guess.

Q    All right.  So if a police officer came in contact with a gang member, he or she was supposed to fill out a

gang sheet?

A    That is correct.

Q    Sometimes that happened; sometimes it didn't is what you're saying?

A    That is correct.

Q    All right.  If a gang sheet was completed -- well, let me ask you this, were there times when you yourself completed gang sheets?

A    Yes, sir.

Q    Was there a time when gang sheets were being completed and submitted persuant to the policy that you were supposed to see every gang sheet that was generated by anyone within the department?

A    Yes.  And actually, when other officers -- this data base, to access it and to put information in, there's only certain people that are allowed to put information into that data base.  Those are the gang officers at the time -- just call 'em gang officers -- through the defendant SCU or the POP unit, different officers in those units have -- what do I want to say -- read/write permission, basically, in the program to put information in.  So if a patrol officer was to do a gang sheet, it would probably be a handwritten one they would then give to a gang officer.  That gang officer would then input that information into the system.  But there's only

certain people that had permission to write that information into there. I'm sorry I probably didn't even answer your question.

Q  That's fine. So, generally, a patrol officer who was not a gang officer would hand write out the form?

A  That is correct.

Q  And give it to a gang officer and then it was input via computer into the system?

A  Yes, sir.

Q  Okay. After the form was completed, was there a point in time where you saw every gang sheet that was input into the system?

A  Yes, sir.

Q  What period of time was that true?

A  Probably would have been from somewhere 2008, 2009 area until 2011 possibly, it was about a two year period in there. And you can tell all the gang sheets that came in, whenever I was responsible for looking at them, they'll have my initials on the bottom. Then they are also initialed off by a training lieutenant or -- excuse me -- I believe she was a patrol lieutenant. She might be a training lieutenant now. She also observes all those gang sheets to make sure that any criteria, any boxes that are checked in this gang criteria, that's explained out in the comment section on how and why they

marked different sections on the gang criteria.  Then, of course, it was also my duty and her duty to then look at the back of the form.  And on the back of the form, it says a CFS number, and that's a basically a case number or a CAD number that's generated through Ford County communications so that people -- it's kind of a checks and balances system so that gang sheets just couldn't be made up, that there would be a, basically, a call through Ford County communications and officers either checked out with this gang member or whatever the call might be, whatever the crime might be, that case number would be on the back and that's how that gang sheet is created so they couldn't just be made up.

MR. WELCH:  Your Honor, if I haven't already, I would offer Exhibit 3.

MR. WACHTEL:  No objection for this hearing, Judge.

MR. McCAUSLAND:  No objection.

MR. MANDELMAN:  No objection.

MR. SHULTZ:  No objection.

THE COURT:  3 is received.

BY MR. WELCH:

Q   Agent Webb, were there occasions when there was no criminal activity involved that a police officer would generate a gang sheet?

A    I'm sorry.  Say that one more time.

Q    Certainly.  Would there be times where there was no criminal activity involved or suspected where a gang sheet would be generated?

A    Yes, sir.

Q    And then, likewise, there was times where there was criminal activity suspected or known to have occurred that a gang sheet was generated?

A    Yes.

Q    Generally speaking, what was the purpose of completing and using the gang sheets?

A    Okay.  There was a couple different reasons.  One is, obviously, for intelligence within the police department.  Whenever gang crimes are committed, to be able to go back to those different gang sheets to either find out vehicle information, which can be contained on the back of those; persons that different gang members are hanging out with or associating with at different times over the years.  It can have address locations. It can have -- so it can have those sort of deals for just intelligence purposes for the ability to assist in solving different crimes.

The second part of that is once these gang sheets are completed -- I know in 1996 both Diablos Viejos and Los Carnales Chingones were -- a form was filled out

through NCIC.  Through NCIC, these gang sheets are then given to records.  Once we sign off on 'em, initial on 'em that everything is on these sheets that need to be on there, they then go to a records personnel independent from the officers so that she can then look at the criteria.  If there's enough criteria met on those gang sheets, she then will enter that person through NCIC.  Which NCIC basically is -- the reason they're entered in there is more of an officer safety concern so that when a gang member is stopped, no matter where within the United States, and that person's driver's license is ran, if they have been entered as a gang member somewhere through NCIC -- and there's a big criteria they have to go through to actually get a gang set entered into NCIC to begin with.  But once that person has been identified underneath that gang set by law enforcement agencies and it's sent off to NCIC, then they will give the officer a warning.  Kind of like a stolen vehicle when somebody runs a tag, they can tell you if it's stolen or not.  It's the same thing.  If a driver's license is ran, they can tell you if that person has been documented as a gang member.  And through NCIC they're actually called -- it's a signal 120, which just means that -- that's what you'll hear on the radio.  It means NCIC has that person documented

through their system -- or not documented, but entered into their system as a gang member.

Q   What is NCIC?

A   National -- it's ran by the FBI.

Q   Okay.  National data base criminal information?

A   Yes, sir.

Q   And was the Dodge City Police Department the only law enforcement agency that inputs gang information into NCIC?

A   No.

Q   That happens all over the country?

A   That is correct.  And I know some, you know, some agencies do -- some agencies actually, depending on the size of the agency, may have their own internal thing like that and they don't go through all the requirements of NCIC to actually to first get the set identified with NCIC and then to start entering members in there.  They might do their own local type deal.  Like Wichita, for instance, is one of those agencies.

Q   In addition to inputting this information in NCIC, which the Dodge City Police Department did, did the Dodge City Police Department maintain a separate file or system of documented gang members?

A   Yes.

Q   All right.  How did you -- what did you do to --

what's meant by documenting a gang member?  What did you do?  What criteria did you use to enter someone into your records as a gang member?

A   We went off the basic criteria sheet that everybody can see.  Basically, there's different -- if the person admits gang affiliation, under state statute, and what the police department was already using, that person can be entered as a gang member.  Other than that, they have to meet three of the criteria below on that gang verification sheet to be entered as a gang member.  Once that's sent to records, there's then what they call hard copy.  Hard copy, that's kept so that nothing can be changed in the computer after that.  I mean, if that was to happen, or a sheet was to get deleted out of the electronic file, there would be a hard copy of that in each person's individual file.  Is that what you're asking?

Q   Yeah.  So an admission by the gang member themselves alone could have them documented as a gang member; is that correct?

A   Yes, sir.

Q   If there was no admission, then they had to meet at least three of the criteria listed on the gang sheet and state statute before they could be documented as a gang member by the Dodge City Police Department?

A   Yes, sir.

Q   Is that correct?  Okay.  All right.  And just generally speaking, if a police officer stopped a vehicle for speeding in Dodge City and recognized or suspected that the driver and the front seat passenger are both members of a gang, would they or were they supposed to fill out a gang sheet?

A   Yes, sir.

Q   In addition to writing the speeding ticket, they were supposed to fill out a gang sheet?

A   Yes, sir.

Q   Did you see gang sheets like that that were generated by other officers?

A   Yes.

Q   And what type of information was supposed to be contained on the gang sheet from like a routine traffic stop?  If there's two gang members in the vehicle?

A   Once again, just back to the verification criteria. A lot of officers will just have this in their head, you know, whether they're going to admit affiliation, if they see any physical gang tattoos.  If they happen to get a chance, you know, if they say, you know, the set they're still kicking with, or if one gang member replies to another by a nickname, they'll document that as a gang moniker.  All the way down to, you know, if

somebody standing, you know, aside, says, hey, that's a group of gang members, and it's from a trusted source.

Q   Okay.  An informant saying so and so is a gang member, that by itself would not get you documented as a gang member; is that correct?

A   No.

Q   After a gang member was documented by the Dodge City Police Department, was it possible to be undocumented or no longer be listed as a gang member?

A   Yes.

Q   How did that occur?  How did that happen?

A   That would occur from five years after the date that they were entered as a gang member.  Those are more NCIC rules and that's what our department would follow. Obviously, a lot of people wouldn't know if they were documented gang members on a traffic stop because once they drop off through NCIC after that five years and no contact, no gang contact where they're no longer admitting, no longer hanging out with gang members, not wearing the clothing, not going by their street moniker, all those different things together, when they're no longer doing that after five years, NCIC, every month, sends out a list of members that are -- persons that are going to be coming out of NCIC.  You would then -- and, once again, when I was looking at all the gang sheets,

Case 6:12-cr-10089-MLB Document 604 Filed 04/24/13 Page 37 of 198
Appellate Case: 14-3006 Document: 23-2 Date Filed: 04/01/2014 Page: 295

37

during that same period of time I was getting these sheets from NCIC. I'd get them from records personnel, the lady that would actually enter in the different persons into NCIC. I would then go through that list. Sometimes, it would be persons that we just no longer have contact with or persons that have -- that still live in our community just moved on from the gang life. Those persons would come out. If those -- some of these persons that were to be coming out were in prison, we would then contact the prisons if they hadn't heard from them due to lengthy incarcerations, if these persons are still having different -- committing different kinds of crimes within the Kansas Department of Corrections or the Federal Bureau of Prisons, we could then -- usually they would give us enough that we could re -- put them back into NCIC because of different crimes and stuff that they're committing and that they're telling us about.

Q   Were there occasions while you worked at the Dodge City Police Department that gang members who had been documented in NCIC were taken out of the system because they had not shown any new activity in, it appeared, in over five years?

A   Yes.

Q   That did happen?

A   Yes, sir.

Q   Now, I want to ask you some questions, general questions, about your experiences with gangs in general in Dodge City, Kansas.  All right.  Let me ask you first, from your experience, the gangs that you dealt with in Dodge City, was there generally a structure to the gangs that you worked with?

A   Generally there's a structure.  It's fluid at times.

Q   Does that structure usually involve a leadership, one or more members who are considered leaders of the gang?

A   Yes, sir.

Q   And then below the leaders are, generally speaking, what?

A   Generally speaking, once you have your leaders, or what they might refer to as OG's or older gangsters, you might then have what a lot of our Hispanic gangs refer to as street soldiers or just soldiers, guys that are willing to fight or do whatever to hold up the reputation of a gang.  And then your third tier of that is what we consider to be peewees, which are your younger kids.  A lot of times, they're still in -- coming out of middle school or in high school.  And that's kind of your three levels of structure.

Q   And, generally speaking, how does one in Dodge City,

at least, how does one become a member of a gang?

A   Generally speaking, you get jumped in.

Q   What does that mean?

A   That means you're, for whatever time period they deem necessary, you're going to get beat in by however many individuals they deem necessary at the time to basically physically beat you up for a certain period of time.

Q   And is that, the jumping in or being beat in, is that generally the preferred method or the method most often used by gangs in Dodge City, Kansas?

A   Yes.

Q   Other than -- are there ways other than being beat in or jumped in to be a member or join a gang?

A   Yes.

Q   What would those be?

A   A term by being blessed in, and that would be if you got older family members that are in the gang, they're down for the gang, if you've hung around those guys most of your young life, they might just bless you into the gang.  They know you're going to be down for the sets. There's also ways that, you know, I've learned through training, that people get into gangs and that could be to go out and do missions, crimes, what they consider missions.  For females, they could get beat in.  They

can also get what they refer to as sexed in.  And that would be by different members of the gang having sex with them.  Usually it's a lower thought of a female getting into the gang than them getting beat in or jumped in.

Q   All right.  And members would be persons who went through one of these ways to be admitted into the gang; is that correct?

A   Yes, sir.

Q   Is there also a term associates, people who aren't officially members but are associated with a gang?

A   Yes.

Q   What would an associate be?

A   I guess the best way to describe that would be just somebody that hangs around with these guys a lot.  Just consider 'em hang-arounds.  They might be the person that's got a vehicle to drive these guys around.  We can associate them that way.  They're not claiming gang affiliation or anything like that, they just associate with some of the members of the gangs.  That would be what an associate is.

Q   All right.  Couple times you used the term down with the set.  What does that mean being down with the set?

A   It just means they'll be up for doing whatever with the gang.  Whether it be committing crimes or getting in

fights with rival gang members. That's just a term, to be down for their set.

Q All right. In Dodge City, from your experience, have you come across or investigated cases where members were given direction or orders by leadership of the gang to do certain crimes or activities on -- to benefit the gang?

A Yes. It's not -- it's not something that's well talked about. It's hard to get somebody to tell you that so-and-so okayed what they did or -- because then it implicates other people in the sets into that crime. So, I have learned that they do talk to the older gang members for advice, whether to do things or not.

Q Let me ask you this way. Are there, from your experience, are there either formal or informal rules of understanding or the ways that gang members are supposed to conduct themselves?

A Yes.

Q All right. What type of rules, generally speaking now, for the gangs in Dodge City, what type of things are expected of gang members to do to be considered part of the -- or down with the set?

A Okay. If they're out in public and they get confronted by another gang member in some way, if they get hit up --

Q   A rival gang member?

A   A rival gang member.  They get gang signs thrown up at 'em.  If they don't represent their gang, if they don't do something, whether it be throwing hand signs back, getting into a verbal altercation or physical altercation, that can get you violated within your gang. A violation will consist of, once again, some type of a physical beating for whatever length of time.  Another way might be is if you're supposed to attend meetings with the gangs and you're either late our don't show up, you can get violated.  There's several of 'em.  That's just the ones that come to my head.

Q   Do you know from interviews or investigations that you participated in, of gang members being violated for not following the rules?

A   Yes.

Q   Does that include both for failing to confront a rival gang member and for failing to attend meetings or attend meetings on time?

A   Yes.

Q   You've heard of people being violated for all those reasons?

A   Yes.

Q   In Dodge City, Kansas?

A   Yes, sir.

Q   You made reference to sets of gangs.  What, in Dodge City, what would be a set?

A   For our Sureno gangs, it would be 18th Street and MCB, Master Criminal Boys; and for our Norteno set it would be Diablos Viejos and a set that associates very closely with them is Los Chingones Carnales.

Q   In Dodge City, the two primary gangs you dealt with as a law enforcement officer were Norteno and Sureno?

A   Yes, sir.

Q   And there are sets that affiliate -- that consider themselves Surenos and there are sets that consider themselves Nortenos; is that correct?

A   That is correct.

Q   Surenos are rivals to the Nortenos; is that correct?

A   Yes, sir.

Q   So if a Norteno is out at a convenience store and sees, happens to run into a Sureno, there's an expectation on both parts to confront each other by other gang members?

A   Yes, sir.

Q   Are there, in addition to rival sets, are there allied sets in Dodge City?

A   Yes, sir.

Q   What would those be?

A   18th Street and MCB would be allies.  LCC and DV

Case 6:12-cr-10089-MLB   Document 604   Filed 04/24/13   Page 44 of 198
Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 302

44

would be allies.

Q   18 Street and MCB on the Surenos side and LCC and DV on the Nortenos side; is that correct?

A   Yes, sir.

Q   Are there certain colors -- I'm speaking generally now -- certain colors the gangs adopt that they wear or will display routinely?

A   Yes.  When it comes to Hispanic gangs, Surenos will mainly be in blues or blacks, but the primary color is blue; and then for your Norteno gangs, they might be in reds and blacks but their primary color is red.

Q   And are there hand signals that are used by gangs in Dodge City?

A   Yes, sir.

Q   And other type of symbols that, again, generally speaking now, that are used by Surenos and Nortenos?

A   Yes.

Q   How about tattoos?

A   Yes.

Q   And hair styles?

A   Yes.

Q   And then graffiti, or what you've referred to as tagging, is that done by both sets of Surenos and Nortenos?

A   Yes, sir.

Q   Now let me get a little more specific about gangs in Dodge City. You made reference to LCC, which you said was Los Carnales Chingones; is that correct?

A   Yes.

Q   DV, which is Diablos Viejos; correct?

A   Yes.

Q   Those are two gangs that are allied with each other --

A   Yes, sir.

Q   -- in Dodge City? Do you know when DV was first entered into NCIC as a gang in Dodge City by the Dodge City Police Department?

A   In 1996.

Q   And then the same question for LCC, when was it first entered into NCIC as a gang known to operate in Dodge City, Kansas?

A   The same year, 1996.

Q   At some point in time, Agent Webb, have you -- did you help prepare an expert summary about gangs in Dodge City, Kansas?

A   Yes, I did.

Q   And as part of that expert summary, did you provide a number of -- the active number of LCC gang members in Dodge City at a particular time?

A   Yes, I did.

Q   What date did you use?

A   I believe July 1st of 2012 is when we put that --
got those -- obtained those numbers from the Dodge City
Police Department.

Q   And so as of July, 2012, how many documented LLC
gang members were there in Dodge City, Kansas?

A   I believe there were 67.  And that documentation
would be persons that were documented within the
previous five years, had not fallen out of NCIC, that we
currently had documented.

Q   So they're still considered active gang members?

A   Yes, sir.

Q   And then the same question for DV.  As of July,
2012, what number of DV active gang members were there
documented by the Dodge City Police Department?

A   217.

Q   I think you've answered this question, but let me
ask it just a little different way.  From 2008 until you
left to join the KBI, which gangs did you work with or
against the most?  Which were the most active gangs in
Dodge City?

A   Coming out of 2008, the focus shifted to DV and LCC
as at the time they were committing the most crimes and
the violent shootings and stuff like that.

Q   Were there, let's say, 2009, '10, '11, '12, were

there areas of Dodge City that the gangs considered belonged to them?

A   Yes.  That's been since, from persons I've talked to at the police department, from the early 2000s, and that would be the east side of Dodge City, which would be Avenues A through Avenue P.  On the south would be Wyatt Earp.  On the north would be Comanche Street.  People refer to that as the east side or to alphabet city.

Q   And that area was considered what, which gang's territory?

A   Nortenos.

Q   And the Sureno territory, did they have one, too?

A   Mainly it was south Dodge or west Dodge, just depending.

Q   And how would the Nortenos, for example, how would they make it known to the Surenos that east side and north side of town was considered their territory?

A   Mainly by graffiti.  And, obviously, being at different residences, wearing different colors within that neighborhood, where they put their self out so the public, persons driving by down the street, could see that, see them.

Q   Were there occasions that a Sureno gang member moved into what was considered Norteno territory?

A   Yes.

Q   And was there -- have you seen occasions where retaliation or it was made known to the Sureno that they didn't belong in that part of town?

A   I've seen it twice that Surenos have tried moving over into the east side of Dodge and both times their houses have been shot up; and one occasion, I mean, that house has been shot up multiple times.

Q   All right.  In addition to shooting at both occupied and unoccupied dwellings, what type of criminal activity did both the Nortenos and Surenos, what type of criminal activity were you generally investigating during that time period committed by those gangs?

A   Everything, sir.  I mean, from, from the criminal damages all the way up to homicides.

Q   In the summary that you helped prepare, did you make a list of crimes that were committed?

A   Yes, I did.

Q   Why don't you just review that.  You don't need to read every one; but give us an overview of the type of criminal activity that you had documented committed by gangs in Dodge City?

A   Do you want me to read them all?

Q   Go ahead.

A   Burglaries, thefts, criminal damages, criminal trespass, robberies, assault, batteries, battery LEO or

batteries on law enforcement, disorderly conducts, the tagging, graffiti, home invasions, intimidation of witnesses or victims, criminal threats, possession of firearms, criminal use of weapons, discharge of firearms mainly in the form of drive-bys, alcohol violations, drug trafficking, use, distribution, obstruction of legal process and, of course, our homicides.

Q   All right.  Was there a point in time, Agent Webb, that you and Detective Bice were given a specific assignment related to the Norteno street gang?

A   Yes, we were.

Q   What was that assignment and who gave it to you?

A   It was in 2010.  At the time it was by at the time acting Chief Ball, John Ball, and by Lt. Craig Melliker, who was a lieutenant over the detective bureau.

Q   Craig Melliker is now the Chief of Police in Dodge City; correct?

A   Yes.

Q   What assignment did you and Detective Bice receive related to the Nortenos?

A   Originally it was to try to work a proactive case against them by use of informants to purchase narcotics, to get informants to try to solve older crimes that had been committed that we didn't have leads or anything on.

Q   And were those primarily violent crimes?

A   Yes, sir.

Q   And was the reason you and Detective Bice were assigned to that investigation primarily because you two were considered the experts within the department on gangs in Dodge City?

A   Yes, sir.

Q   And at that time the Nortenos were the most active gang, meaning the most responsible for more criminal activity than other gangs within the city?

A   That is correct.  And just as a side note, obviously, Officer James Nau was very well versed in what was going on on the streets.  Just so happened that Detective Bice and I were able to move to a separate office to try to keep things I guess controlled for what we were doing in the investigation so we didn't have a bunch of people going a bunch of different ways and we weren't able to keep everything centrally located I guess.

Q   All right.  During that time Officer Nau was a patrol officer; is that correct?

A   Yes, sir.

Q   And he was having direct contact on the streets with gang members as well?

A   Yes, sir.

Q   Like you had when you were a patrol officer?

A   Yes, sir.

Q   All right.  You've already testified within the Nortenos or the gangs that consider themselves affiliated with Nortenos are the DV and LCC in Dodge City.  Let me ask you about both those gangs in Dodge City.  Have you seen a structure within those gangs in Dodge City?

A   Yes.

Q   Would the structure that you testified to earlier about gangs in general apply to both DV and LCC in Dodge City?

A   Yes.

Q   And in addition to leadership within both those gangs, were there members within the gang?

A   Yes.

Q   And I think you also made reference to peewees or the lower level generally younger junior high age kids.  Did you see that both within the DV and LCC in Dodge City?

A   More DV.  I don't really recall LCC having much in the form of peewees.  LCC, their numbers are smaller and a lot of their members are incarcerated so they don't have as large of a group as DV does.

Q   All right.  And in order to be admitted as a member of either DV or LCC, you testified earlier about being

beat in is generally the accepted practice in Dodge

City.  Was that true for both DV and LCC?

A    Yes.

Q    And have you heard of gang members, DV and LCC gang

members, being violated for violating the code or the

rules of the gang?

A    Yes.

Q    Generally speaking, did DV and LCC gang members in

Dodge City employ monikers, the use of street names?

A    Yes.

Q    When you would investigate gang activity, were there

times where the only name that someone was known by a

gang member was known by was their moniker?

A    Yes.

Q    Their real name was not known by a witness or a

victim?

A    Yes.

Q    You've also testified, Detective Webb, about the

practice of tagging and the purpose primarily of tagging

is to identify the areas of town that belong to a gang

or considered belonged to them.  Would you look at

Exhibits 4 through 11.  And when you're done with that,

tell me.

A    Yes, I'm finished.

Q    Have you seen those photographs before?

A   Yes, I have.

Q   And are these photographs contained within the Dodge City Police Department records as photographs maintained by you as a gang -- when you were with the PD as a gang detective?

A   Yes.  Some of these are actual criminal cases and criminal damage.  Those photos might be underneath that case number.

Q   But do you recognize each of these photographs as photographs maintained by the Dodge City Police Department?

A   Yes, sir.

Q   And do you believe that each of these are a fair representation of the types of tagging or graffiti that you would see routinely done by gangs in Dodge City?

A   Yes, sir.

Q   Do you believe Exhibits 4 through 11 will help the Court understand what's meant by tagging?

A   Yes.

        MR. WELCH:  Your Honor, we would offer Exhibits 4 through 11.

        THE COURT:  Any objection?

        MR. WACHTEL:  No objection.

        MR. McCAUSLAND:  No objection.

        MR. MANDELMAN:  No objection.

MR. SHULTZ:  No objection.

THE COURT:  Hearing no objection, 4 through 11 are received.

BY MR. WELCH:

Q    Starting with Exhibit 4, Agent Webb, can you please first of all decipher for us what is spray painted on what appears to be a garage door?

A    Yes.  Over on the left part of the photo it says "Nortenos por vida", so Norteno for life.  You'll notice the "S" on Nortenos is backwards and crossed out.  That is a -- just to show disrespect to Sureno gang members.  The "for life", you can see the "I", it's supposed to -- appears to be representing like crosshairs on a scope.  And at the bottom underneath that, it's got a backwards S and it says "scrapas", and notice the S's are backwards and the scrapas is crossed out.  Scraps is a derogatory term for a Sureno gang member such as table scraps or something of that nature.  The 14 in the middle is for the 14th letter of the alphabet for the letter N, which will -- it's for Nortenos or Nuestra Familia.  Mainly in our groups in Dodge City it's going to be for Nortenos.  Again, to the right side, "Diablos", you notice the S is backwards with the S crossed out.  Again on the "I" what appears to be crosshairs.  And it says "Diablos Viejos" and "Diablito"

and you'll notice the one dot and the four dots, again, for the representation of 14.

Q   All right.  The one dot would be to the left in our photograph of the "Diablito"; is that right?

A   Correct.

Q   The four dots, which appear to be kind of a diamond shape, are to the right of that same word; correct?

A   Yes.  And it's also common to see that same thing in tattooing.

Q   Okay.  Turning then to Exhibits 5 and 6 are essentially one exhibit because this is graffiti spray painted along a huge portion of a fence; is that correct?

A   Yes.  It's a fence down in south Dodge by one of the salvage yards.

Q   All right.  Would you explain, starting with 5, explain what's meant by -- decipher for us what is meant by this graffiti?

A   Sure.  You can see originally this is going to be tagged up by a Sureno gang member.  So it will be in blue in the back.  And appears that 915 is, I believe, out of El Paso.  You have the Texas symbol, which would be the T-X.  They might be claiming the east side or wherever they're from.  So you'll see behind the E and the S to begin -- that are red now, you can see the blue

spray paint was behind that.  LCC, obviously, claims the east side of Dodge City.  They'll use the E-S a lot. The 1233 is for the 12th letter of the alphabet, which would be L, then the third letter will be C and the third letter will be C again, so that's for LCC.  You'll notice the 3's are crossed out for disrespect to Sureno gang members since they'll use the number 13 a lot, which will represent the letter M for La Eme.  They're underneath the banner of -- Sureno gangs are underneath the banner of La Eme.  And then you can see the red crossing out "Sur" kind of in the upper right portion of the photograph.

Q   Originally you said this would have been spray painted by a Sureno gang member.  That's why the blue parent is on the fence.

A   That is correct.

Q   The red was painted over the blue; correct?

A   That is correct.

Q   And that's in part to show disrespect to the Sureno gang?

A   That is correct.

Q   Now, in addition, in the original blue spray paint towards the right where it says Sur, S-U-R, 13.

A   Uh-huh.

Q   There's a one dot and three dots to the right.  That

appears similar to what we've seen on Exhibit 4 where there was one dot and four dots. Here we see one dot and three dots. Does that have some significance?

A    Yes. It's the same thing. Norteno gang members will do just like Surenos, they'll put one dot and three dots, which is for the number 13. Not to be confused if there's only three dots alone, which we see a lot in tattooing, that might mean "mi vida loca", my crazy life, which is kind of a synonymous tattoo for persons affiliated with gangs or gang members just because of the lifestyle. But with the one dot and three dots it's obviously for the number 13 for Sureno gang members.

Q    All right. Turning to Exhibit 6, which, again, is part of the same spray paint. The number in blue 915 appears again but we can tell it's a different 915 because this one has -- it looks different than the 915 on the Exhibit 5. But again decipher for us quickly what's meant by what's painted on that portion of the fence?

A    Sure. You got 1233 again, which is the LCC with the 3s with X's through 'em. You also have S-S, which means south -- which is they're referring to southsiders or south side. You'll notice a line through it with an arrow going down. There again, crossing out whichever set, it's probably L-F-L, it could either be a street

moniker or set. It's probably a set. They're crossing out LFL, so it's probably south side LFL out of whatever city that is, I'm not familiar with them, but they're crossing that out. Crossing out Surenos. The 915 area code, which area codes are rather synonymous in gang members activities, they'll tattoo area codes on them, shows a location that they're from. So for Dodge, for instance, you'll see a lot of 620 either tattoos or might be in their graffiti. If they're going -- if they're tagging up some other place outside of their main location, they might tag up 620. It will let other gangs members in that area know that somebody from, obviously, western Kansas has been there and tagged up 620. It would be just the opposite here in Wichita, for instance, they might use 316. If they came out to Dodge, they would tag up 316 so that's what the area codes are.

Q   620 is the area code for Dodge City, Kansas; correct?

A   Yes, sir.

Q   Okay. Turning then to Exhibit 7. This appears to be a trash dumpster. And in black sharpie or black marker there's various symbols and numbers and words. What's meant by what's written there?

A   "DV" is obviously the Diablos Viejos. You'll see

then "S-K" next to it, referring to scrap killers, and notice the "S" is crossed out.  Up towards the top part where the bar is coming down there's a 1 and 4 up there. Then you'll have an upside down 13 and upside down 18 for showing disrespect to both MCB and 18th Street. "W-O-B" can mean different things.  Usually in this instance it will probably mean "weed over", derogatory name for a female.  That's what W-O-B will be.  And than you'll see the one dot, four dots, again that are in the diamond shapes on the outside of the X4 which would be for 14.  There's also a XIV which are Roman numerals for 14.  And then N-A, would be for north in Spanish.

Q   N-A, you mean the letter N in Spanish?

A   Yes.

Q   This is graffiti that took place in Dodge City, Kansas?

A   Yes, sir.

Q   I should have asked you, each one of these photographs were various graffiti that occurred somewhere in the city of Dodge City; correct?

A   That is correct.

Q   Okay.

A   And not all these -- I know some of these have got dates and times on them.  But that would be due to cameras -- I mean, the dates look way off, like 2002.

It's just from replacing batteries so frequently and they're not setting the dates and times back on their cameras.

Q So the time and dates on these photographs is not necessarily accurate is what you're saying?

A That is correct.

Q Turning then to Exhibit 8. Do you recognize that.

A Yes.

Q What is that?

A That's a huelga bird. The huelga bird is actually a symbol for the United Farm Workers Association out of northern California. When the Nuestra Familia was created as a prison gang in California, they used this symbol as a symbol for their gang. You'll then see a lot of Nortenos street gangs then use this symbol also both through tattooing and through graffiti.

Q All right. So the huelga bird would be associated with, especially in red -- well, the huelga bird of any kind would be associated with the Nortenos in Dodge City; correct?

A That's correct.

Q The fact it's in red is further evidence it's Norteno; correct?

A Yes, sir.

Q And then Exhibit 9.

A   To the left, "DV", obviously, for Diablos Viejos and then -- I'd have to look for a while at that next word. I don't know what they put on the end of it.  Diablos -- it might be Diablos -- might be throwing a moniker up there.  I can't really tell.  You'll again see 18th Street crossed out.  Obviously, it's telling them to die.  Over to the side, of course, then you'll see the big 1-4 for 14.  Then to the right you'll see 1-8-7, I believe over 18th Street.  At this time they were problem having a lot of problems with 18th Street.  187 is the California penal code for homicide or murder, so you'll see 187 used throughout the nation for gangs that associated from the west coast such as Hispanic gangs or even Bloods and Crip gangs, they'll use the number 187 coming from the west coast.  Our gangs will use it. They'll put 187, sometimes they'll put it over a gang moniker of a rival in a different gang.  Sometimes they'll put it over the whole gang number.  It's even been put up over officers names in Dodge City.

Q   187, what does that mean?  Is that a direct threat toward either the gang or gang member?  Is that why that number is used?

A   Yes, sir.

Q   All right.  Go ahead.

A   And then down in the right corner, it obviously says

"fuck" and then it's got a 13 crossed out for crossing out the Surenos.

Q    Then Exhibit 10, what is this?

A    Exhibit 10 was -- I took this photograph.  This is taken off the search warrant at Patrick Long's residence who's an LCC gang member.  The main deal in the middle is kind of a roll call.  You'll see a lot of different names like "gimpy", that's a street moniker.  "El Pat", obviously, is for Pat Long.  There's a ton of stuff in there.  It says, of course, the "east", kind of looking over towards the left hand side where the big "L" starts in the middle there, so it's going to say "east", then "LCC" in the red.  "Fuck scrapas", derogatory name for scraps.  You'll see the Roman numerals on the left side that will say 1233.  "Cisco" is just another street moniker.  "Browny" is a street moniker.  "Smiley" is a street moniker.  It's just kind of a gang roll call. You'll notice on the right hand side, directly underneath -- well, just a little ways down from where it says "Cisco" on the top, it will say -- it says "fuck Desi", that's referring to Desi Garcia who was the founder of LCC who has since left these guys and resides out in a different state and so therefore they're upset because he left, so they're displaying that.  Then, I guess, going back up top to the left, "carnales", you'll

notice the "S" is crossed out.  "East side gang".  "Asta la muerte", something about death.  Then you'll see "death before dishonor".  The "S" again crossed out.  1233.  It's -- this is common LCC gang graffiti.

Q   Right in the middle in between the two "C" there appears to be a crown with a number 5?

A   That is correct.

Q   What does that mean?

A   LCC uses a crown.  Lots of gangs, different sets across the nation will use different symbols for their sets.  LCC uses a crown.  Each point -- they'll use a five-pointed crown.  They'll also use a five-pointed star.  The different points of the crown could mean for ES LCC, so east side LCC could be one of the reasons.  Different gang members think different things of what their symbols mean.  So -- they'll also use a five point star with the different points meaning that east side LCC with a five pointed star.

Q   Based on your training and experience, Agent Webb, is it safe to say that everything on this poster, what appears to be a poster, has meaning?

A   Yes.

Q   And it's all connected to gang activity or identifies gang members.  Is that a fair statement?

A   Yes, sir.

Q    Then turning to Exhibit 11.  Sureno gangs also employ tagging within Dodge City; is that correct?

A    Yes, sir.

Q    What's the meaning of this, what appears to be on the side of building or house?

A    The first word is "Sur", just for south or south side.  The "13" is, again, for the allegiance to La Eme for the 13th letter of the alphabet, the letter M.  And then they'll have "N-K", which is Norteno killer.  Then they'll have the N crossed out, which is the way it is in this photo.

Q    And is the N backwards on purpose?

A    Yes.  Disrespect.

Q    Further disrespect to Nortenos?

A    Yes, sir.

Q    All right.  Now, you testified earlier that the DV and LCC employ the color red and we saw that with the spray painting.  They're always -- if it was done by DV or LCC it was in red paint.  Same for blue with the MCB or 18th Street, we just saw "SUR 13".  In addition to using red paint, do Nortenos use the color red in other ways?

A    Yes.

Q    How so?

A    Anywhere from clothing, tattoos, red bandannas.

They'll wear red belts. They'll wear belt buckles with the numbers 14 -- as far as Nortenos go, they'll wear belt buckles with the numbers 14 or N. Surenos will do just the opposite. They'll wear blue belts with belt buckles with number 13 or S for south side. Or they might -- 18th Streeters sometimes will wear on their belt buckle, it will have an 8 ball on there and just referring back to 18th Street.

Q   All right. Would you like at Exhibits 12 through 17 and after you've done that, tell me that you're ready.

A   12 through what, sir?

Q   17.

A   Yes, I've looked at them.

Q   Are these also photographs maintained by the Dodge City Police Department?

A   Yes.

Q   And do they each have gang significance?

A   Yes, they do.

Q   And have you seen those photographs before?

A   Yes.

Q   And do you think those photographs will help the Court better understand your testimony?

A   What's that?

Q   Do you think these photographs would help the Court better understand your testimony?

A   Yes, sir.

MR. WELCH:  We would offer Exhibits 12 through 17, Your Honor.

THE COURT:  Any objection?

MR. WACHTEL:  No objection.

MR. McCAUSLAND:  No objection.

THE COURT:  It's received.

BY MR. WELCH"

Q   Starting with Exhibit 12, what was the purpose of taking this photograph by the officer who took it?

A   Obviously, it's to show the bandanas, looks like the focal point of the photo.  Our Nortenos will carry red bandanas.  They will either let them hang out of their pockets or if they want to be more discreet sometimes they'll tuck them into their pocket.  But usually the red clothing will give it away.  Obviously, this person has got on a red shirt.  Some type of red on their shoes and the red bandana hanging out of the back pocket. This would be to show affiliation with either LCC or DV or Norteno sets.

Q   Turning to 13.  What was the purpose of taking that photograph?

A   Purpose of this would be, obviously, for the red undershirt.  Looks like the person had a black shirt on over the red undershirt.  Red boxers.  And then you'll

see the N on the belt buckle. Looks like a black belt but the belt buckle is the significance there, it's got the letter N.

Q   And then Exhibit 14?

A   Again, a bandana hanging out of a back pocket.

Q   Exhibit 15?

A   Red boxers, red belt. Red -- or belt buckle with the N in it. They'll wear those cloth belts. You can tell by the belt buckle, it's just cut out, and you can see the cloth usually behind the belt buckle itself and the color will show through so you can read it.

Q   Exhibit 16?

A   Just all the red. The red flannels are -- red flannel shirts are worn a lot by DV and LCC. Any kind of red clothing, red ball caps, things of that nature.

Q   Okay. And Exhibit 17?

A   Red clothing again. If you look at the hat, it's actually a Red Sox hat. That's -- Cincinnati Reds, Red Sox, those major sporting teams, that kind of apparel will be worn by gang members, Nebraska Cornhuskers, not only for the letter N for Nebraska but the red clothing.

THE COURT: All right. Let's take a recess. About 15 minutes, please.

(Recess.)

THE COURT: Yes, sir.

BY MR. WELCH:

Q    Agent Webb, earlier in your testimony you stated that tattoos are frequently used by gang members in Dodge City to identify themselves as gang members.  Is that a fair statement?

A    That is correct.  Identify theirselves to others as gang members.

Q    Okay.  Would you look at Exhibits 18 through 31. And Exhibit 40.  18 through 31 and Exhibit 40.  And tell me when you've done that.

A    Okay.

Q    Are each of those exhibits photos maintained by the Dodge City Police Department?

A    Yes, sir.

Q    Are they maintained to document gang tattoos of in this case Nortenos in Dodge City?

A    Yes.  And they're just personal identifiers for that person.

Q    And do you believe Exhibits 18 through 31 and 40 would help the Court better understand your testimony?

A    Yes.

        MR. WELCH:  We would offer Exhibits 18 through 31 and 40, Your Honor.

        MR. WACHTEL:  No objection for this hearing.

        MR. McCAUSLAND:  No objection.

MR. SHULTZ:  No objection.

THE COURT:  They're received.

BY MR. WELCH:

Q    We can go through this a little quicker I think, Agent Webb.  Exhibit 18, what is meant by that tattoo? What is that?

A    Obviously, it says Norteno on top.  Viejos down below.  Diablos is probably going to be on another arm. And then the huelga bird that we've described.

Q    You see these tattoos on a person in Dodge City, what do you -- what conclusion would you draw?

A    He's a DV Norteno gang member.

Q    Turning then to 19.  Do you see tattoos on the face of this exhibit?

A    Yes.

Q    What tattoo do you see and what's the significance of the tattoo?

A    The one-four, like I explained earlier, for the 14th letter of the alphabet, the letter N for Norteno, north.

Q    Exhibit 20, again, the number 14?

A    Same thing.  It's on the back of a neck.  Just so it sticks out of the shirt so he can be identified.

Q    And, again, the number 14 in Exhibit 21?

A    Same thing, 14.

Q    Same meaning.  And on 22, the word "Norte", what

would that mean to you?

A   North.  He's a northsider.

Q   Exhibit 23.

A   It would be the four dots on the left hand -- I mean, excuse me -- on the left wrist.  Usually it will coincide with the right wrist having one dot so it would be for the number 14.

Q   This person also has on a red jersey.  You said sports teams that employ the color red are frequently used by Nortenos to identify themselves as a member of the gang?

A   That is correct.  And usually the numbers are also. The number of the jersey is usually the number 14.  And just for the opposite, you know, like 18th Streeters, Peyton Manning used to be big when he played for the Colts.  He had the number 18.  Southsiders wear a lot of stuff with the number 13 so --

Q   So four dots on left wrist, you would expect there to be one dot on this person's right wrist?

A   That's correct.

Q   And I know this one is difficult to see, but in Exhibit 24, is there a tattoo or tattoos on the forehead that are significant to you?

A   Yes.

Q   What are they and where are they?

A   It's on the eyebrows.  When he shaves his eyebrows, it says "Norteno" and then "catorce".  Catorce is for the number 14 in Spanish.  So just saying he's a Norteno and catorce is for the number 14.

Q   And you have seen those tattoos personally?

A   Yes.

Q   Exhibit 25, what is the significance, if any, of the red star?

A   I talked about the points of the star.  It can also -- points can also mean north or norte, N-O-R-T-E, for the five points.  Obviously, the star is red, he's going to be a northsider.

Q   Exhibit 26.

A   Again, the "N" for Norteno.  You can see the huelga bird, the "XIV".  And it looks like there's something else possibly written in there or it might be a cover up tattoo.  I can't really tell.

Q   The "N", the "XIV" and the huelga bird are each independent identifiers for a Norteno gang member?

A   Yes, sir.

Q   Then Exhibit 27, the what appears to be a tattoo on the upper right cheek of this subject.  What meaning does that have to you?

A   He would be a Norteno.  He's also got the red clothing on, the red rosary.

Q   Exhibit 28.  Are there tattoos on the face of this subject?

A   Yes.  He's got one dot by his right eye, four dots by his left eye, for the number 14.

Q   Then Exhibit 29?

A   "X" is for the ten and then the "4", so instead of XIV, he put X4, so it's for 14.

Q   Exhibit 30?

A   The five point star under the ear that we spoke about.

Q   And Exhibit 31?

A   The crown that we spoke about.  You'll see it in graffiti as well as tattoos.

Q   And you said that generally is associated with LCC?

A   That's correct.

Q   And then turning to Exhibit 40.  Appears to be several tattoos on the face of this subject, but are there tattoos that have gang significance to you?

A   Yes.  The "X" and the 4 "on the forehead; as well as it says "foco loco" for Ford County crazy, basically. Loco is a Spanish word for crazy.  And I believe it's got "DV" on the right cheek.  And I can't really tell about the left cheek.

Q   Earlier you also testified gangs employ hand signals to identify themselves as members of certain gangs and

also to threaten rival gang members. Is that a fair statement?

A   Yes. It's a -- and also it's a form of nonverbal communication, I guess, if there's a lot of distance between you and that person, you know, you could throw up hand signs at 'em and they can get your message from across a room.

Q   And have you seen hand signals used by Nortenos in Dodge City, Kansas?

A   Yes, sir.

Q   Would you look at Exhibits 32 through 36 and tell me if you've seen those before, those photographs before?

A   Yes. I've seen all these photographs before.

Q   Okay. And are these photographs maintained by the Dodge City Police Department?

A   Yes, they are.

Q   And do they reflect various gang hand signals used by Norteno gang members?

A   Yes, they are.

MR. WELCH: Your Honor, we would offer 32 through 36.

THE COURT: Any objection?

MR. WACHTEL: No objection for this hearing.

MR. McCAUSLAND: No objection.

MR. SHULTZ: No objection.

THE COURT:  They're received.

BY MR. WELCH:

Q   All right.  Exhibit 32, what is the significance of the hand signal that's being displayed?

A   Throwing up the number 14.  He's got 1 with his right hand and 4 with his left hand.

Q   And also wearing a red T-shirt?

A   Yes, sir.

Q   And Exhibit 33.  Now, we can do this quickly, but let's go through each one of these people in the photograph.  They all are displaying a hand signal or some type of display; is that right?

A   Yes, sir.

Q   And upper left hand corner standing, there is a gentleman with the number 1 and 4; is that right?

A   That's correct.

Q   Okay.  Next to him, going to the right, what is this person displaying and does it have any meaning to you?

A   He's displaying the letter "N" with, you can see his fingers, and then he's got his red bandana draped over it.

Q   Next to his left, our right, there is another hand signal.  What does that mean to you?

A   Individual is displaying the five-pointed star.

Q   And then at the end, standing, there's another 1-4;

is that right?

A   Yes, sir.

Q   In the front, kneeling, to the far left, is another 1-4 hand signal; correct?

A   Yes.  And he also has his arms crossed.  He's starting -- first three guys are forming X-I-V with their arms and so he's the X.

Q   With his fingers he's displaying 1-4, but he also has his arms crossed to display X?

A   That's correct.

Q   All right.  The one in the middle who has the 14, what appears to be a red sweatshirt of some type --

A   He's just got his arms up around his neck area, his chest area, to form an "I".

Q   All right.  And then kneeling to the far right, what is he doing?

A   He's displaying a "V".  So the first three guys are X-I-V for the number 14.

Q   And at the top are the words "Diablos Viejos" and then below that "gueneracion nortenos".  Do you know the meaning of that?

A   Just the "Diablos Viejos", obviously, they're using the money signs.  You'll see that a lot when something is typed, they'll use the money sign, kind of showing the "S" is crossed out, once again, to disrespect Sureno

gang members.  Just saying their generation is Nortenos.

Q   Turning to 34.  What is the -- what is this hand signal and what does it mean?

A   Throwing up D-V.

Q   And then Exhibit 35.  In the middle there are two males, appear to be -- have their hands together.  Can you tell what -- does that have any significance in terms of gang activity?

A   Yes.  You can't really see the bottom parts of their hand, but what they're doing is they're putting up a five-pointed star together.  Their hands interlocked is making a five-pointed star.  Their pinkies would be coming down on the bottom to make the other two points that you can't see.

Q   The one in the mimddle with the white jersey, you said frequently they employ the number 14, which he does have a 14 jersey on; is that correct?

A   That is correct.

Q   And then others have either a red baseball cap or red flannel shirt.  Now, in Dodge City, have you come across times where DV and LCC are allied with one another?  They hang out together?  They associate with one another?

A   That is correct.

Q   And is this an example of where you have DV gang

members associated with LCC gang members?

A   Yes.  And there's also, you can tell on the left, looks like a female.  I don't know what she's doing, but the hand sign right there is throwing up an "E" for east side is what the -- it would be the second hand from the left making an E.

Q   Okay.  And then Exhibit 36, which appears to be a picture of several people together, each, or most of which, have some type of hand signal.  Do the hand signals that you can see, do most if not all those have some type of gang significance to you?

A   Yes.  Everything in this photo is some type of Norteno hand signal.  As well as the clothing and everything else.

Q   And the gentleman in the black shirt in the middle, is that an "N" that he's displaying?

A   Yes, it is.

Q   And there's several that have the 1 and the 4 that you've testified about earlier in other pictures; is that correct?

A   That's correct.

Q   Okay.  And you also said on occasion hairstyles can be unique to gang members; is that correct?

A   That's correct.

Q   Would you look at 37, 38 and 39 and tell me if those

are photographs that are maintained by the Dodge City Police Department?

A    Yes, they are.

Q    And do they each display a hairstyle that is common to Norteno gang members?

A    Yes.

MR. WELCH:  Your Honor, we would offer 37, 38 and 39.

MR. WACHTEL:  No objection.

MR. McCAUSLAND:  No objection.

MR. SHULTZ:  No objection.

THE COURT:  They're received.

BY MR. WELCH:

Q    37.  In addition to -- there appears to be a pony tail.  Is that something that is associated with Nortenos in Dodge City?

A    More where the hair is being grown out at.  That's a -- what they -- they are calling a Mongolian braid. We started seeing this, I think it was somewhere around '08 or '09, somewhere in that area.  They started growing out this Mongolian top notch right at the back top part of their head and they'll let it grow rather long.  I've been told by officers that were able to talk to some of these guys that were growing it was that it's because they were going to go to war so -- against

rivals.

Q   In addition to the hairstyle, this subject has the four dots on his left upper cheek or chin -- I mean, check, yeah.  Do you see that?

A   Yes.

Q   And then there's a tattoo under his left ear.  Do you know what that is?

A   Yes.  The number 14.

Q   And then Exhibit 38?

A   Again, the Mongolian top notch.

Q   And then 39?

A   He had -- same thing, just it was just growing down and he had it braided and it's coming around the front.

And our Surenos will do just the opposite.  They usually have what they call a rat tail and it will be at the very bottom of the hair line and they'll let just a small bit of their hair grow rather long and they can braid it, bring it around the front.  But it's totally different.  It's not on the top of their head.  It's growing out the bottom of their head.  It's just another identifying symbol.

Q   Earlier, Agent Webb, you testified about the type of criminal activity committed by Norteno gang members in Dodge City.  Did those crimes frequently or oftentimes use firearms?

A    Yes, they did.

Q    That include drive-by shootings, attempted murders and murders?

A    Yes.  And robberies.

Q    And robberies.  Was there, from your experience, was there ways to effect your status within the gang? Either improve your status or decrease your status within the gang?

A    The, I guess you could say, the more violent you are, the more people within the gang are scared and intimidated by you and the higher status that you're going to get within the gang.

Q    So committing violent crimes in Dodge City could benefit you within the gang?

A    Yes, sir.

Q    And if you are frequently violated or you're not following the rules, could that decrease your status within the gang?

A    Yes, sir.

Q    Or refusal to confront a rival gang member could effect your status within the gang?

A    Yes, sir.

Q    And are you also familiar with home invasions that victimize Guatemalan immigrants in Dodge City?

A    Yes, I am.

Q    Have those type of crimes occurred several times in Dodge City, Kansas?

A    Yes.

Q    From your working, either directly investigating those crimes or work with other officers that are investigating those crimes, have you formed an opinion as to which group or groups are primarily responsible for those type of home invasions of Guatemalan immigrants?

A    Yes.  It's mainly our Norteno sets.  And the reason being is, primarily, we have a large population of Guatemalan residents that live on the east side of Dodge City.  That is the primary territory where they are targeted at is going to be within that east side of Dodge City.  And we have also not only put together several cases, but we've actually caught Nortenos in the act of committing these robberies before.

Q    And I asked you this in a different way, but just to make sure we make the record clear.  Attacking rival gang members could improve -- or let me ask you -- could that improve your status within the gang?

A    Yes.

Q    And the commission of robberies like the Guatemalan home invasions, could that improve your status within the gang?

A   I don't -- I guess I don't really know how much they talk about the different missions like that that they'll do within the sets.  That might be more for monetary gain to those individuals that are doing that.

Q   Could that be considered a mission --

A   Yes.

Q   Okay.  And then I'd ask you to look at Exhibit 1. Are you familiar with that?

A   Yes, I am.

Q   Did you help create that document?

A   Yes.  Detective Bice, Officer Nau and I sat down and prepared this document.

Q   Did you create a general summary of your experience with the gangs in Dodge City, the colors they use, the symbols they use, et cetera, and is that contained within this summary?

A   Yes, it is.

Q   And you testified you were one of the authors of this document; correct?

A   Yes, I am.

        MR. WELCH:  Your Honor, we would offer Exhibit 1.

        MR. WACHTEL:  No objection for this hearing.

        MR. McCAUSLAND:  No objection.

        MR. SHULTZ:  No objection.

THE COURT:  1 is received.

MR. WELCH:  Your Honor, I have no further questions of Agent Webb.

THE COURT:  Mr. Wachtel.

MR. WACHTEL:  Thank you, Judge.

#### **CROSS EXAMINATION**

BY MR. WACHTEL:

Q   It's Agent now, isn't it?  It's not detective?

A   Yes, sir.

Q   We've met before?

A   Yes, sir.

Q   I was going to start at the beginning, but I think I'll start at the end of your testimony if that's okay.

A   Sure.

Q   You remember being asked some questions just a moment ago about crimes against Guatemalans --

A   Yes.

Q   -- in Dodge City?  And I think with regard to these crimes, it was your expert opinion that these were crimes more for money than status.  Right?

A   Yes.

Q   And then in that same answer you used the word mission.  Remember?

A   Yes, sir.

Q   What does mission mean in the context you used it in

your answer to the Guatemalan home invasions?

A   Missions can be different things such as an older member sending out younger members to go and tag up fences to see if they do that mission, if they complete that.  It could be any, any crime.  I mean, it could be going out and just to go look for rival gang members to get in fights with them, to do whatever.  Those can all be considered missions.

Q   Is it missions that increase your status in the gang?

A   It can be.

Q   Can be but is not necessarily.  Is that what you're telling me?

A   That's correct.  It doesn't necessarily have to be missions that increase your status; but I don't think that it hurts their status in any way.

Q   But in any event, it is your opinion that the crimes against Guatemalan residents are for money; right?

A   Primarily, yes.

Q   I want to hand you what's been marked as Defense Exhibit A.  Judge, I have a copy and I've given a copy to the Government.

Let me tell you what this is.  It is the United States' disclosure of anticipated expert witnesses.  It was filed in this case as Document 297.  And you were

identified in here as an expert witness. If you'll turn to Page 3. As I read this, under "gang testimony", the Defendants are being told what the Government's expert witnesses are going to talk about.

Now, I understand from speaking with Mr. Welch that you've actually read this lately.

A   I skimmed through it at the beginning of this hearing is the first time I seen it.

Q   Well, if you want to read this over the noon hour and have me call you then, that's fine.

A   It doesn't matter. Is there something I need to know that's within it. I didn't prepare this document.

Q   I understand this document contains your opinion. Do you need to know that?

A   This contains my opinion?

Q   What you're gonna testify to.

A   Okay.

Q   Because the question I'm going to ask you, all right, is with regard to all the information starting under "gang testimony" on Page 3, right, going through Page 4 and most of the way through Page 5. I'm gonna ask you how much of this is your opinion and how much is not.

A   Okay.

Q   Can you answer that question without spending more

time reading this exhibit?

A   I can tell you what my opinions are on this, yes.

Q   Okay.

MR. WACHTEL:  Then I move the admission of Exhibit -- I move the admission of Exhibit 1, Your Honor.

THE COURT:  I thought it was Exhibit A.

MR. WACHTEL:  I'm sorry.  Exhibit A.

MR. WELCH:  I have no objection, Your Honor, but with one -- I want to make sure it's clear -- and apparently Mr. Wachtel didn't know that this morning. This summary, which is admitted as Exhibit 1 that Mr. Webb has testified he helped create, was attached to this when it was filed, so I think you need to take both those together.  But I have no objection to the admission of this exhibit.

THE COURT:  A is received.

BY MR. WACHTEL:

Q   All right.  Let's start with Exhibit A if we can.

A   Yes, sir.

Q   With regard to the contents of Exhibit A, I need to know how much of that is your opinion that you're gonna testify to.  What is it?

A   I think Exhibit 1 is what I prepared.  I did not prepare Exhibit A.

Q   Well, I -- excuse me -- I'm sure you did not.

A   If you have any questions about any of the statements that are in it, I mean, I can talk to you about it.

Q   Yeah.  My question is:  How much of this are you going to talk about at the trial if you know?

A   I don't know.

THE COURT:  Well, I think, in fairness, you ought to let him read it --

MR. WACHTEL:  Yes, Your Honor.  I'd be more than happy to.

THE COURT:  -- since he didn't prepare it.  I assume the Government prepared it.  We can take the time for him to read it.

MR. WACHTEL:  Or I can call him this afternoon, Judge.  Doesn't matter to me.

THE COURT:  Well, it shouldn't take too long to read three pages.

(Off-the-record.)

A   Okay.  I'm familiar with it.

BY MR. WACHTEL:

Q   Let's approach it paragraph by paragraph if we may.

A   Sure.

Q   The very first paragraph underneath "gang testimony", it sounds to me you've testified to the

contents of this paragraph here today, have you not?

A    Yes, sir.

Q    Do you know whether you will testify to the contents of this paragraph at the trial of this case?

A    Sir, I don't know what I'm going to be asked at trial.

Q    Second paragraph, next -- first full paragraph, next page --

A    Yes, sir.

Q    -- sounds like what you testified today, too, with the exception of the case citation?

A    Yes, sir.

Q    Do you know whether or not you will testify to this information at trial?

A    Once again, I don't know what I'll be asked.

Q    The next paragraph down, commencing "the witnesses", sounds to me like you've testified to the contents of this paragraph today, too.  Also.  Have you not?

A    Yes, sir.  I believe I testified to every one of these paragraphs --

Q    Let's make sure.

A    Okay.

Q    Next paragraph, you've read it.  Sounds to me like --

A    Third paragraph on the fourth page, sir?

Q   "The witness may testify about how and why gang members respond to insults or threats".  Do you see that one?

A   Yes, sir.

Q   And you testified to the contents of that paragraph here today?

A   Yes, sir.

Q   "The witness may testify that gangs have an interest in and a need for establishing a reputation".  That's the paragraph at the bottom of the page?

A   Yes, sir.

Q   And you've testified to that today, too; right?

A   Some parts of it, yes, sir.

Q   What parts have you not testified to?

A   I don't know that we talked a lot about that they needed to establish a reputation for power over intimidating witnesses or victims.

Q   Come to think of it, I don't remember you testifying to that either; but you could, couldn't you?

A   Yes, sir.

Q   Anything else in that paragraph?

A   No, sir.

Q   Thank you.  And then the first full paragraph on the top of Page 5, you've certainly testified to that information today?

Appellate Case: 14-3006  Document: 23-2  Date Filed: 04/01/2014  Page: 348

90

A    Yes, sir.

Q    And the last paragraph above "tools of trade".
You've testified to that here today; right?

A    Yes.  We talked about the area of the city that they
live in.  I don't know how in detail we went into this
but --

Q    The area of the city that the Guatemalans live in?

A    Yes, sir.  Or the area of the city that these crimes
are perpetrated on them more frequently than other parts
of the city I guess.

Q    Are you able, however, as an expert, able to testify
as to the contents of this last paragraph?

A    Yes, sir.

Q    Okay.

A    Last paragraph on Page 5?

Q    Yes.  The one that ends at "tools of trade"?

A    Yes, sir.

Q    I don't have any more questions regarding that
exhibit.

A    Yes, sir.

Q    But do I have a question or two regarding Government
Exhibit 1.

A    Okay.

Q    Now, my understanding is that this is a document
that was prepared by you and James -- is it Nau, N-A-U?

United States District Court, Wichita, Kansas

348

A    James Nau.  Detective Bice.  That's correct.

Q    And Detective Bice.  And this is a joint work among the three of you?

A    That is correct.  And this -- this was actually taken -- we didn't start from scratch on this.  This document -- not the total part of this document existed, but parts of this document existed and we added to it or took out what we did not believe was adequate for this document.

Q    Is there any way to tell from reading this document what it was you all took out?

A    No, sir.

Q    Is there any way that I can tell from reading this document what you all added?

A    I think in this document we took out -- or maybe we put it in and then took it back out -- was who -- we got into more detail than I think what the document -- what we set out to make the document.  I think when we prepared our first draft of this, it had a lot more detail in it than I think that was required, I guess, of this document.  We wanted this to be for a general person that didn't really know much about the gangs in Dodge to be able to pick this up, to look at it, and to have some understanding after they read it and to kind of have some general knowledge about it.

Q   As an expert in gangs, are you capable of testifying with regard to this document in full?

A   Yes, sir.

Q   So I don't need Detective Nau to do that; right? Because you can?  Right?

A   That's correct.

Q   Because this is your opinion?

A   This is all of our opinions, yes, put into one that we agree with each other, yes, sir.

Q   And Detective Bice, we don't need him to testify to this either because it's a joint agreement; right?

A   That's correct.  I mean, they can testify to it.  I don't know what you're asking though.

Q   Of course they can.  But this is your opinion and you can testify to it; right?

A   This is the three of ours opinion and, yes, I can testify to it.

Q   Okay.  Thank you.  I have one more question about this document.

A   Yes, sir.

Q   While I'm looking for it, let me ask you what it is about the huelga bird that is -- why it is associated with Diablos Viejos or the LCCs or even the Nortenos?

A   That is -- this is gonna get into a long drawn out explanation.  In the 1960s when La Eme was controlling

the California prison systems --

Q   I'm sorry.  When who was involved?

A   La Eme, the Mexican mafia that we spoke about earlier.  When everybody went to prison, as far as Hispanics, at one point they were trying to combine all Hispanics that were going to prison in California under one gang set.  An incident happened in the late '60s with some individuals in a prison in California that divided -- divided that group from the southern Hispanics and the northern Hispanics.  The northern Hispanics, most of them, when they went to jail or they went to prison, were from the northern part of the state.  A lot of those guys worked in fields such as farming and agriculture.  They took that symbol from the United Farmworkers Association and brought it in as a symbol of their gang, the Nuestra Familia --

Q   Excuse me -- go ahead.

A   No --

Q   Go ahead.

A   All I was saying is, under that, you then have different sets that claim allegiance, you know, in a way, to the Nuestra Familia, more as symbolize, not so much that they talk to 'em on a day-to-day basis or anything like that, not claiming that, but they'll use that as a symbol for their gang.  If that makes any

sense.

Q    Through your study of gangs --

A    Yes, sir.

Q    -- you're certainly aware that the huelga bird is not just a bird, it's an eagle; right?

A    I'm not very familiar with what the huelga bird is other than as far as the gang.  I mean, I didn't look up and find out what kind of species it is or anything.

Q    You certainly know that its original -- outside of Mexico -- its original association was with the farmworkers union run by Caesar Chavez?

A    I'm not familiar with any of that.  I can only tell you where --

Q    So if it could symbolize something other than gang membership, you are not aware of that?

A    That's correct.

Q    Okay.  Thank you.

A    I'm not saying it could or couldn't, so --

Q    You're just saying you don't know?

A    Exactly.  I'm just saying that I know that's a symbol they commonly use.

Q    I just have a couple of questions about your training.

A    Yes, sir.

Q    I'm looking at your CV --

A    Yes, sir.

Q    Do you happen to have a copy?

A    Yes, I do.

Q    I'm looking at the one that I received on or about September 21st of 2012.

A    I don't know when you received it exactly.  I mean, I turned it in ahead of that, but --

Q    Have you, since September 21st, 2012, have you changed your resume?

A    No, I have not.  I need to.  And I also noticed some errors in it on dates but --

Q    Well, you tell us in that that you went to the academy, KLETC?

A    Yes, sir.

Q    And you received gang training there -- on my document it's at the top of the second page.

A    Yes, sir.

Q    Can you tell me what kind of gang training?  Do you remember what kind of gang training?

A    I do remember part of it.  The instructor used to work here at the Wichita Police Department where she worked some gangs here in Wichita.  She kind of gave us a broad overview of different gangs, west coast, Chicago based, New York based, Hispanic, black, different types of ethnic culture gangs.  It was just a broad overview

of gangs.

Q   And the course didn't last very long?

A   Sir, I don't remember exactly how much time was spent on it.

Q   Well, let's be more recent.  Because you have a section called "gang training"?

A   Yes, sir.  Is this where I received the training or was giving it?  I received it.  Okay.

Q   Just so we're on the same page.  It's this here?

A   Yes, sir.

Q   I just have some questions about what things are. You see the one labeled "how to work street gangs"?  You got four hours of credit?

A   That's correct.

Q   What does that mean?

A   That's what they labeled the class name as.  It was basically just how to work investigations, how to, if I remember right, you know, how to --

Q   How to investigate street gangs, is that it?

A   Exactly.  How to treat people, stuff like that, on the streets.

Q   Is that -- how to treat people?  Did you say that?

A   Exactly.  How to talk to people, how to talk to gang members to, you know, get them to cooperate with you. Certain things like that along -- going down the roads

of the investigation.

Q   Do you speak Spanish?

A   A little bit.  Enough to try to stay safe on a car stop.

Q   If you'll go down to the one, two, third entry up from the bottom.

A   Yes, sir.

Q   "MOCIC, risk gang entry data".  What does that mean?

A   That was a course put on by MOCIC, which is a midwest -- man, I don't even know the term of it. There's four, there's four of these.  It's -- they're federal entities that break up the nation into four different -- man, I don't even know how to explain this -- in different bureaus, basically.  MOCIC, obviously, gives -- they give funding to law enforcement for different things.  They also have equipment that you can check out from them.  The MOCIC, the risk gang entry, was to be able to link up some of the federal system -- it's kind of like an NCIC based deal except you can put more data into it and it's for being able to link up the agencies throughout the United States with more information and to be able to put you in contact with those investigators that run somebody's name.  I hope that all makes sense.

Q   Okay.  I also see that you attended at least three,

that I can see, Midwest Enforcement Conference on Gangs and Drugs?

A That's correct. And the first one, the date is wrong. That was in 2006 was the inaugural year. Somehow it's got '07 on there.

Q I type, too, but not very well.

A I'm sorry.

Q In any event, what is that? What do those things consist of?

A They'll be broken up into different segments, usually, of different -- it can be different instructors or different teaching points. On that one was Al Valdez, who I guess is pretty much known through the nation as an expert out of California on Latino gangs. I remember he talked quite a bit at that conference. I don't know if I have the exact hours of what all training took place at that conference, but he was the primary presenter.

Q Okay. And would this, the kind of training that you receive at these things every year, would that change or was it constantly the same?

A It was changing.

Q And did I understand you correctly when you said you were a presenter at one of these?

A Yes. Not at -- not at KGIA, the Kansas Gang

Investigators Association, but the Sedgwick County -- let me get back to it.  It's in here.

Q   Is it?

A   Yes, sir.  Wichita Crime Commission Conference on Gangs and Narcotics.

Q   Wichita Crime Commission?

A   That's correct.  It's here in Wichita every summer.

Q   Do you recall what topic you presented?

A   Yes.  My topic was to -- the three years that I spoke at that, was to talk about southwest Kansas gangs, any kind of -- and, granted, very quickly, because the time restraints on that.  Was to talk about -- I also talked about Garden City and Liberal.  After talking to their officers that are kind of in the same places I was within their department, about any kind of trends they're seeing, any kind of movement of our gangs between our cities.  It's basically where law enforcement from all around the State of Kansas can go and get a quick update, basically, on what's happening in western Kansas.

Q   And then you, obviously, you've become an expert, if you will, in gangs from your work in the field; right?

A   That and my training, yes, sir.

Q   I would just adding that on --

A   Yeah, I got ya.

Q   Do you research -- do you do research about the gangs?

A   Yes.  Actually, I'm currently reading one of Al Valdez' books.  I mean, at different points, you know, if we see something in graffiti that we don't know what it is, not only will we research it on the internet, but we might, you know, reach out to other partners --

Q   So part of your continuing education in bettering yourself, right, is using the internet.  True?

A   Correct.

Q   And talking with -- talking, I guess through e-mail or something like that, with other people of like experience?

A   Probably more through phone calls unless we need to e-mail a photo such as graffiti or something to somebody.  Also talking to other, you know, just gang officers, you know, either from Wichita or wherever. The prison systems.  We utilize, you know, a wide variety of persons to try to get information from.

Q   With regard to gangs, is there one gang or two that you are more focused in your study and training on than the others?

A   Mainly Hispanic gangs.

Q   Hispanic gangs.  So would you consider yourself an expert on, say, the 19th Street Roadblock Neighborhood

Crips?

A    No.  Crips and Bloods, I'm familiar with the general concept of 'em, where they come from.  Same way with Chicago based gangs.  Same way with some of the east coast based gangs.  I'm familiar with some of their symbols, some of their colors, some of the things that different things mean; but I'm more focused, because we don't ever see those in southwest Kansas, I'm more focused on Hispanic gangs.

Q    Okay.  Well, let's talk about the three gangs that you've been talking about here mostly.  The Nortenos, the DVs and the LCCs; right?

A    Yes, sir.

Q    And you told us about a list you have or have maintained about the members, the active members of the LCCs.  Remember testifying about that?

A    Yes.

Q    Some 67 people?

A    There's a list maintained by the police department. I don't maintain that list.

Q    I apologize.

A    No, that's okay.  I just don't want to --

Q    No, no.  I apologize.  I misspoke.  Then there's also a similar list, right, regarding DVs?  And it's got two hundred plus names on it?  Or at least the one you

Q   were talking about did; right?

A   That's correct.

Q   Is there a list about the Nortenos?

A   Is there a list about the Nortenos?

Q   A similar list regarding the Nortenos?

A   That list -- if I can explain that list that records keeps.  I know out to the side it's got different gangs that are entered that they have sent off for NCIC validations for.  I do not know if there actually has a Nortenos set.  And the reason they might have that and the reason they might just have a Sureno set in there and not MCB 18th Street would be for any persons that move in through Dodge City that stay for a time that don't actually claim a specific set, they might put them under the broader name of Norteno or the broader name of Sureno.  But I don't know for sure about that.

Q   Well, let me ask my question another way.

A   Okay.

Q   Is there a Norteno gang in Dodge City?

A   Just sub sets, yes, there is.

Q   There is no Norteno gang.  There are what you consider to be sub sets; right?

A   We consider them Nortenos.  We just actually call them by their sub set and not by Nortenos.

Q   Tell me the difference between the Nortenos and any

sub set thereof?  Or can you do that?

A   Okay.  Just restate that.

Q   Yeah.  Sure.  If you consider the DVs or, in your expert opinion, DVs or the LCCs to be sub sets of the Nortenos, what's the difference between the -- between the DVs and the Nortenos?

A   Just -- I don't know how to explain it other than they're sub sets.  I mean, it's a group of guys that got together, they called their gang a certain set name and people either want to be under that set name or they want to be under another set name.  It's all under the same umbrella.

Q   Is it just a bunch of guys picking a name and wearing red and putting silly tattoos on them?  Is that what the sub set is?

A   I don't know if I'd describe it like you just did; but it -- the same general principal.  It's not a bunch of silly guys.  I mean, these guys --

Q   Do you know whether or not the Nortenos have any leadership control over the DVs?

A   I know persons within those sets have different leadership controls.  I don't know if anybody, you know, when you're referring to Nortenos, I mean, the best way to probably refer that to would be the Nuestra Familia out of California; but I don't think there's no direct

ties to that.  They're just a set underneath that umbrella.

Q   Okay.

A   They use their symbolisms.  They --

Q   It's my recollection, Nortenos, that's a gang that began in prison; right?

A   The Nuestra Familia did.  Nortenos are more what they consider their street gangs.

Q   Well, okay.  So you have difficulty explaining what a sub set is; right?  It's not an easy question to answer?

A   Well, I don't necessarily have a problem explaining it.  It's just -- it's groups of individuals that believe in what that national gang believes in, wants to use their symbols and such and they create a smaller set of theirselves.

Q   Do the Nortenos have a written constitution?

A   Yes, they do.

Q   Do the DVs?

A   I know they use the written constitution from the Nuestra Familia, which is the 14 bonds.

Q   What's that based on?

A   It's 14 bonds that they wrote as their, basically, their prison rules within the gang.

Q   No, no.  Where did you come by this knowledge?

A   I know that kites have been found in Ford County jail.  A kite is a small piece of paper that's handed between inmates and that.  I know that we have one of those that was obtained by the Ford County Sheriff's Department and given to the Dodge City Police Department.  I know that that is general knowledge that is passed on to all members that come into the jail setting anyway.

Q   That's -- the kites you're talking about is something that's handed -- passed on between one inmate and another?

A   That is correct.

Q   Okay.  But -- and the basis for your knowledge that the Nortenos -- excuse me -- that the DVs who aren't in jail follow the -- follow a constitution, that's based on what?

A   Just be their education on the streets by other gang members.

Q   Your education on the street by other gang members?

A   Not mine.  Their education on the street from other gang members.

Q   But how did you come by that knowledge is what I'm trying to find out.

A   How did I come by what knowledge?

Q   The knowledge that the DVs on the street use what

I'm going to call, mistakenly, the Nortenos constitution?

A    I don't understand how you're asking me this question.

Q    Well, and I apologize.  It ain't easy for me either. But you've told me that the DVs don't necessarily have their own constitution, they use somebody else's.  Isn't that what you told me?

A    They're under the -- but I've told you this.  I mean, I don't know if we're getting off the -- they're underneath the umbrella of Nortenos.  They will follow their rules, the Nuestra Familia's rules.  The street gangs are Nortenos.  They'll have different sub sets underneath Nortenos.  So, though they believe in the Norteno and the Nuestra Familia's ways, they're just sets.  It's just a different name for them being Norteno gang members is their actual street set.

Q    Without me trying to phrase that what you just told me, how did you learn that?

A    From -- it was from the time that I got out and started working in the police department, from gang officers that were there at the time that explained how these sets were working on the streets; through all my training; through debriefing individuals; through talking to gang members; through everything we went

through earlier, talking to victims, witnesses, parents.

Q   Would I be correct then in saying that you certainly learned some of this in your investigation of crimes?

A   Yes, sir.

Q   And you learned that from what? Witnesses? From snitches? From whom? Both?

A   Defense attorneys are the only ones I hear 'em call 'em snitches besides different defendants. But, I mean, through informants, definitely. Through rival gang members. Through every way imaginable.

Q   Then snitch was a bad word. Confidential informant would be a better word; right?

A   However you want to call them, sir.

Q   Okay. And, in fact, a lot of the things that your expert opinion is based on in this case and that your expertise is based on, are, in fact, interviews done with gang members with an eye towards prosecution of gang members. Right?

A   No.

Q   No? Let me ask you the question another way. You've given us your opinion. If you took out of the -- if you set aside, in reaching an opinion, everything that you've learned by interviewing witnesses for prosecution, if you could set that aside, would your opinion be the same?

A    On what?

Q    The opinion you're gonna testify to.  What we've talked about on Exhibit A and Exhibit 1.

A    I could -- I think I understand what you're saying.  And I might not understand what you're saying, but I'll try.  I think what you're saying is if I took out the individual sets out --

Q    No.  You don't understand and it's my fault.

A    Okay.

Q    I thought we established that some of the things that you have learned and that you rely on about -- let's just talk about the DVs.  Okay?

A    Yes, sir.

Q    You learned from interviewing people that have been arrested; right?

A    Yes.

Q    You learned it from talking to confidential informants; right?

A    Yes.

Q    You learned it from even talking to the Surenos; right?

A    Yes.

Q    And much of that talking had to do with prosecution of crimes; right?

A    Some of it.

Q   Some of it did.  If you took --

A   The prosecution fades away, would I still --

Q   I'm sorry.  If you took what you've learned when you were investigating to prosecute a crime, right, what was told to you by these people, would your opinion change in any way?  Your opinions change in any way?

A   I'm sure they would on some small parts about where we're able to get into more detail when somebody is debriefing, whether they're working out a deal through prosecution, whether they try to give 100% of everything we ask, as opposed to when we talk to somebody on the streets, they'll answer certain things but won't answer everything.  I'm trying to --

Q   No.  I now understand what we're talking about.  Okay.  In other words, your opinion might change a little bit, but the core --

A   Might not have all the details to form my opinions on certain things.  I still might come to the same conclusion, but it might -- without some of those details.

Q   You might come to a different --

A   I might come to the same conclusion --

Q   Without the details?

A   Correct.

Q   If I were to ask you where you learned a certain

thing about the Nortenos, would you be able to recall whether you learned that in your research, whether you learned that in your training or whether you learned that by talking to a confidential informant in a prosecution?

A   It depends what you're going to ask.  I mean, I might be able to.  A lot of it's just a combination of everything, so it's hard to set here and say I'd remember a date and time and who told me and all of that.

Q   Well, you talked about gang sheets and documenting gang members.

A   Yes, sir.

Q   And at some point in time, and for you in Dodge City, you sort of became in charge of documenting gang members; right?  It had to pass through you?

A   I was one of the persons that once a gang sheet was formed, it went through me to make sure that -- and my primary role on that was to make sure whatever boxes those officers checked, that they described it out in the comment section to make sure that they justify why they were checking that.  And also to make sure the case numbers were attached; that the person was identified correctly on the back as far as their personal descriptors and such.

Q But you didn't quibble with the officer's opinion that the person was a gang member. Is that what you're telling me?

A Right. I, I didn't exactly. The only time that I'd ever talk to an officer on it is if he checked a box and he didn't describe below why he was checking that box, for instance, you know, I would go to him and ask him either do you need to take this off or was there more information that you left out of this. It was just a checks and balances system.

Q In Dodge City, are women categorized -- bad choice of words -- on gang sheets as being like DVs or Nortenos?

A Are you asking can there be female gang members?

Q Yeah.

A Yes, sir.

Q Have you ever -- to the best of your knowledge and belief, has Dodge City ever made a mistake and categorized somebody as a gang member when they weren't?

A Well, that depends what you mean by categorize them as a gang member. Was a sheet ever done on 'em that they might be associated --

Q Let's do it that way. Has a gang sheet ever been created on somebody as being a DV or a Norteno or an LCC that was incorrect?

A   The only thing I can answer about that is that I know the gang sheets are done, the comments are written on them by officers, those go into the deal.  So I don't have no personal knowledge of anybody being, quote, unquote, entered as a gang member that was not factual.

Q   So just so that I'm clear, people who make the decision in Dodge City as to who gets a gang sheet and who doesn't are the officers that made the contact?

A   That's correct.  But also, don't forget the person that actually enters them in NCIC and puts them on that gang document as being gang members is a separate entity which would be within the records department that looks over that stuff.

Q   Well, what kind of decisions does that person make other than to enter it into the machine?

A   They're the person that's trained in NCIC and have to follow those NCIC guidelines that are within the state statute before they get put in.  It's not just an officer putting somebody in.

Q   And you don't know what those guidelines are?

A   I understand that it's the same as the state statute.  Whether they admit, or three or more of the subsequent verifications to be entered into NCIC.

Q   Is there any information that's contained on the, the what I'm going to call the original gang sheet, the

one that's created in the field, the one that the officers generally hand-write; right?

A   Yes, sir.

Q   Okay.  Because that's your form?

A   Sometimes it's notes.  Sometimes it's just scribbled on a piece of paper.

Q   Whatever it is that they wrote --

A   Yes, sir.

Q   -- upon which they would rely to make somebody a gang member, if that's put on the gang sheet when it gets typed --

A   Yes, sir.

Q   -- where do you put it?

A   It's given to records -- the records department.

Q   No.  No.  Where would I look on that gang sheet to find the notes of the officer?

A   That's going to be in the comments section; but it's going to be typed.  It's not going to be their original notes if that's what you're asking.

Q   Okay.  You said -- I tried to write it down as specifically as I could.  You were talking about gangs and you were talking about your experience with gangs in general and I think you said gangs have structure but it is fluid.  You remember saying that?

A   Yes, sir.

Q   Can you tell me what that means?

A   I mean by the structure such as leadership. Obviously, gang members commit a lot of crimes, they're in and out of jail.  As those members go into jail, it might be somebody else that will step up in a leadership role.  That's what I was referring to by the fluid nature of the leadership.

Q   Okay.  It's the fluid nature of the leadership, not the structure?

A   Well, even the structure itself.  I mean, you're going to have different members going in and out of jail.  You know, gangs at different times because of who may be incarcerated, may be weaker on the streets.  I don't know how to keep explaining that.

Q   Well, I thought we were talking about, I guess, leadership.  Is that fluid also?

A   Yes, sir.

Q   Rules of the gang are fluid also?

A   I mainly know of, you know, only certain rules and those are pretty much followed so --

Q   By all gangs everywhere?

A   No, sir.  Just by the different sets.

Q   Just by the DVs?

A   Individual rules I know about these individual sets. I don't know if the Latin Kings in Chicago are going to

for the same rules.  I don't know that.

Q    You told us about some general rules?

A    Yes, sir.

Q    I think you were able to name two.  That a gangster must represent his gang?

A    That's correct.

Q    Or her gang I reckon.  And they must attend meetings?

A    That's correct.

Q    Are there any other rules that the DVs or the LCCs have that you haven't told us about?

A    There's different rules.  I know if you're a DV, I know that methamphetamine use was a no-no for a while. I know you're not supposed to go after another gang member's female companion.  That can get you violated. At one point they were asked to bring dues.  Those people that didn't bring dues to meetings could get violated.

Q    Anything else that you can recall here today?

A    Those are right off the top of my head what I can think of.

Q    You also testified about when the DVs were entered into the NCIC for the first time.  At least from Dodge.

A    Yes, sir.

Q    And that I think you said was 1996?

A    That's correct.

Q    Are there DVs in Kansas any place other than Dodge?

A    Yes.  Mainly they will move from Dodge in some form or another.  That set is in Dodge, but different kids that get placed into placement, maybe out of home, they might get to a different community and jump in different kids into what they think is Diablos Viejos in different cities.  And then also we have members that move, you know, if that member might move to Pratt, they can be identified to Pratt as a Diablos Viejos from Dodge City but he is now living in our community.

Q    So if you have a Diablos Viejos gang in my home town, Junction City where we've got everything, that would not necessarily be the same DVs that exist in Dodge?

A    It's possible.

Q    Isn't it likely?

A    Well, I say that because unless, you know, a couple of our guys move to Junction City and you're, in your example, and they move to Junction City and set up bases, you know, and they start recruiting people into their gang and there's still a lot of contact between Dodge and that, I mean, I would consider that it's no different than McDonald's moving to a different community.  You've got different McDonald's but they're

doing the same thing.

Q   The only difference being McDonald's is a more successful franchise; right?

A   Way more successful, sir.

Q   You also testified about a specific assignment that you received related to the Nortenos from what I guess is now the chief of police?

A   Yes, sir.

Q   As I understood it, first, that assignment was to work proactively against them, which is what you said?

A   Against the Norteno gangs in Dodge, yes, sir.

Q   Okay.  Was there a second assignment?

A   Yes.  That kind of -- well, it turned into more, as we began getting information about crimes that were not solved, it kind of went away from that proactive aspect of it and went into trying to solve some of the older crimes.  If that makes --

Q   Sort of cold case stuff?

A   Yes, sir.  That would be a good term.

Q   The one thing I don't see in your -- in the reports that I've read, Exhibit A and Exhibit 1, is an opinion by you as to whether or not the crimes that my client, Mr. Garcia, was involved in, were ordered by the DVs. Do you have an opinion on that?

MR. WELCH:  I'm going to object.  It's

irrelevant, Your Honor, why it's not in there.

THE COURT:  He can answer whether he has an opinion.

A    Okay.  If you could -- just make sure I'm on the same page.  Ask me again.  I'm sorry.

BY MR. WACHTEL:

Q    Sure.  I represent Pedro Garcia.

A    Yes, sir, I understand that.

Q    Pedro Garcia is charged with homicide and home invasion?

A    Yes.

Q    Do you have an opinion based on your, on your expertise, your work and your knowledge, as to whether or not that homicide was ordered by whoever it is that's running the DVs?

A    I don't know that anybody ordered it.  I do not have an opinion on that.

Q    But if asked about it, you'd call that a mission, though; right?

A    I would definitely say it was gang related.

Q    And would you definitely say it was to increase Mr. Garcia's position within the DVs?

A    I don't think that he really needed his position increased within DVs.  I mean, Peter is one of the older guys.  I think a lot of people looked up to him.  I

don't know that this crime itself would give him more status or less status.  I'm sure that it would give him more status if everybody knew about it; but I don't think that was the case that everybody knew about it so -- Peter still had a lot of clout, I guess, within DV.

Q   So whatever clout Pedro had would not have been increased by this crime if he committed it because ain't that many people knew about it; right?

A   Correct.  But it could be.  I mean, it could be increased; but, you're absolutely right, not a lot of people knew about that so -- but to those people that knew about it, I'm sure that increased his reputation with them.

Q   Okay.  And would the same be true of the home invasion against the Guatemalan fellow?  Would your opinion be the same as to that?  It wasn't ordered --

A   Well, that's correct, I'll agree with that.  And, you know, I don't know how much more status that would get them more than that was a monetary thing.  But it does give them some status just because other members of that gang would know these guys are kind of crazy, they're out there, they'll do stuff like that, which intimidates them, so that then within the gang mind set gives them more status or more reputation, a better

reputation.

Q   If they know about it?

A   That's correct.

        MR. WACHTEL:  Thank you very much, Agent.  I don't have any further questions.

        THE COURT:  Who's next?

        MR. MANDELMAN:  I'll go ahead, Your Honor.

        THE COURT:  How much do you have?

        MR. MANDELMAN:  I think maybe 15 minutes.  I think I could -- unless the Court wants me to --

        THE COURT:  No, I'd like to go ahead.  If you think you only have 15 minutes, we'll go ahead.

### CROSS EXAMINATION

BY MR. MANDELMAN:

Q   I'm going to show you a list.

A   Yes, sir.

Q   Can you just go ahead and identify that?

        MR. WELCH:  Joel, may I see it.

                (Off-the-record.)

BY MR. MANDELMAN:

Q   Can you go ahead and identify that.

A   This is a printout of an Excel -- I think it's Excel -- it's a spreadsheet that's created and maintained by records.  Obviously, the list is larger than this because all gangs are in this; but it appears

they separated out DV and LCC.

Q   And who's the author of the list?

A   It would be records personnel at the Dodge City Police Department.

Q   Is it you?

A   No.

Q   Do you know who it is?

A   I can tell you one person that's involved in it would be Kelly Melliker.  She's a -- works in records in Dodge City Police Department and probably her supervisor -- I don't know, I'm just guessing at this. But I know that Kelly has something to do with entry of gang members.

Q   Okay.  What's the significance of being on that list?

A   It's just an investigative tool.  It's got aliases so you can search for aliases.  Names, dates of birth. The gang itself.

Q   Are those gang members?

A   These ones in here?  She's identified -- I mean, obviously, in this sheet, I believe these guys are all identified somehow in her list.  I haven't had contact with -- I mean, some of those people I don't know, if that's what you're asking me.

Q   That's what I'm asking --

A    This is maintained by records Dodge City Police Department.  That's about all I can tell you about this.

Q    Have you ever seen it before?

A    Yes.

Q    So how did someone end up on that list?

A    Records at Dodge City Police Department.  This is -- how you get put on this list, it would be through the gang verification criteria being turned into records. Whenever they substantiate enough for, I guess, for you to be a gang member, they'll put you on -- it's just an Excel spreadsheet -- they'll put that person on this list so that they can keep track of who's in and out, I guess.  I don't know how else to tell you.

Q    I mean, do you verify before someone got onto that list?

A    For a short period of time, if, if they met enough of that criteria where I initialed off on that sheet. And the only thing I was verifying was is what the officer was putting on that sheet that he explained in the comments section what boxes he was checking up above.  That then gets turned into records.  I don't have no call or say-so about who goes on this list, sir.

Q    So who would have made that decision?

         THE COURT:  What's the relevance of this, Mr. Mandleman?  He doesn't know.  This is a Daubert

hearing, not a discovery deposition in a civil case.  He says -- he told you one name.  If you -- he doesn't know the other answers.  Come on, let's move through this.

BY MR. MANDELMAN:

Q   Is the connection between the local Nortenos and the California prison gang?

A   I don't know of no direct connection.  I know of some direct ties to California through different gang members, but nothing to the prison gang.

Q   The photos that you testified about today, do you know who took those?

A   Not all of 'em.  I know a couple of them, I've taken.

Q   Do you know when they were taken?

MR. WELCH:  I'm going to object as not being relevant, Your Honor.

THE COURT:  Sustained.

BY MR. MANDELMAN:

Q   You testified that you were -- at one point, you were a member of the Kansas Gang Investigators Association?

A   Yes, sir.

Q   And then why did your membership lapse?

A   You have to pay dues every year to be in it.  They provide the best -- well, besides the training, they

provide, basically, forums that are not being -- cannot be viewed by the public.  It's only persons involved in that organization.  And it's basically forums so you can either talk to other investigators from whoever is involved in KGIA.  And this kind of goes back to what I would do, picking up the phone and calling certain people.  They provide forums on there so you can actually get on the computer to interact and ask about different symbolism, stuff like that.  I never used it.

Q   But it was access to other -- it was an easy way to talk to other people who were doing the same kind of work?

A   Absolutely.

Q   Okay.

A   Without having to go through --

Q   And who, who, who runs the organization?

A   They have different people voted onto the board every year; and I haven't been in the last few years, so I can't tell you.

Q   The fact that the DVs and LCCs got entered into some NCIC data base in '96, where did that come from?

A   How did we get those dates?

Q   Yeah.

A   Okay.  I know that that is maintained in records.  I know that the date of entry was on a form that they,

obviously, had been submitted to NCIC in 1996 on those -- the exact specific dates that I put into that document, which is Exhibit 1, I believe.

Q   And then you left the department in February?

A   Yes, sir.

Q   And how come?

A   To advance my career, sir.

MR. MANDELMAN:  That's all I have.  Thanks.

THE COURT:  We'll take a noon recess. Approximately one hour.  Are the marshals going to need more than that?

DEPUTY U.S. MARSHAL:  I don't believe so, Judge.

THE COURT:  Come get me when you're ready.

DEPUTY U.S. MARSHAL:  Yes, sir.

MR. McCAUSLAND:  Your Honor, if it makes any difference, I am not going to ask any questions of this witness so --

THE COURT:  Oh, it does make a difference.

MR. McCAUSLAND:  -- he can be released as far as I'm concerned.

MR. SHULTZ:  Your Honor, I had probably two or three minutes of questions.

THE COURT:  Well, let's good ahead and then we won't have to take a noon recess.

**CROSS EXAMINATION**

BY MR. SHULTZ:

Q   Good afternoon, Agent.  On Exhibit 1 -- and I may be just a little bit unclear -- the history you've put in there about Nortenos were established by second generation Hispanics or Chicanos in California prisons, where did that history come from?  Where did you learn that?

A   A lot of that comes from Al Valdez who is primarily from southern California who's the expert in gangs out there.  Through different publications he's put out and through our trainings where we've learned those publications, or through him talking to us.  That was our general knowledge that when you picked up this form, you kind of know where it was formed and where it started.

Q   So Al Valdez is the go-to guy?

A   One of 'em.

Q   Who are the others?

A   Around the nation?

Q   Sure.  Or that you've been trained -- that forms part of the basis for your training?

A   Gentleman by the name of Jerry Stanzic (ph).  I believe he's from Wisconsin.  Went through a training in Denver where he put that on.  Also Lou Savelli, who

started the NYPD gang unit.  I've been through a couple trainings with him.  He knew a lot about Hispanic gangs that have migrated from the west coast to east coast.  This is pretty -- I don't want to say generic -- but this is pretty much what's stated at different trainings.  This is how this, this started, this is where it came from, so -- I've been taught this by several different people and it's all substantially the same.

Q   Okay.  Now, Al Valdez and the person from Wisconsin and -- I already lost the names so --

A   Savelli --

Q   Are these all law enforcement?

A   I actually think some of them are retired now; but at one time, they were law enforcement, yes, sir.

Q   Is any of the training that you received either at the KLETC or your continuing education, been provided by non-law enforcement personnel as regards to Hispanic gangs?

A   I don't know.  Not that I know of.  Most of it's all -- some -- I know a lot of it's through an organization called MCTC, which is Midwest Counter Drug Training Center out of Iowa.  They have different instructors come through there that I've had in different -- that they then -- either you go to training

up there or they can put out training different places. But I think that most all of 'em are law enforcement at the time or retired from law enforcement.  There might have been persons that came in here and there that were not law enforcement but still had something to do with it, whether it be persons involved in the corrections field that would talk about tattoos or something like that.

Q   Do you recall ever having like a sociologist or an academic, somebody who studies gangs from a disinterested perspective?

A   That would probably -- I'd have to go back to college a little bit on that, probably, when I did some of that.

Q   I want to ask about the time line.  As I understand it, before 2005, you were not in law enforcement?

A   That's correct.

Q   And 2005 to July of 2007, you were in the street crimes unit?

A   Yes, sir.

Q   And part of that was investigation of gangs but part of it was just street crime?

A   Narcotics, sales and stuff.

Q   And I guess --

A   Majority of it was gangs, though.

Q   Majority was gangs?

A   Yes, sir.

Q   Okay.  And then since 2007 of July, July, 2007, you've been exclusively gangs?

A   Not exclusively.

Q   What would you say the percentage is roughly?

A   Well, over the last couple years, it's been primarily gangs because of this case; but I also was assigned to the southwest Kansas drug task force for the KBI.  I would also, in other parts of western Kansas, do hand-to-hand purchases of narcotics in an undercover capacity as well as, you know, other cases like that. But I worked -- I'd say 50/50 during that time, between narcotics cases, and sometimes those involved gang members of different communities or whatever.  But I don't know how to explain that any better.

Q   I'm going to ask what's kind of an obvious question; but some crimes are just committed with no gang affiliation, tie, relationship at all; correct?

A   Yes, sir.

Q   Gang members sometimes commit crimes that are unrelated to gangs?

A   Yeah.  Like driving while suspended and stuff like that?  Yes, sir.

Q   Yeah.  Have you ever testified as an expert for a

defendant in a gang related case?

A   No, sir.  I've never testified as an expert in court.  In Ford County, because of prosecutors, defense attorneys, as well as the judges, they know that I have a pretty good grasp on everything.  I have been able to give my opinions in court.  But I've never went through any kind of certification as an expert witness in this.

Q   So you've never gone through a hearing like this before?

A   Yes, sir, that's right, I have not.

Q   And I want to ask you last about the gang sheets. You said that five years after the last contact, somebody just kind of drops off that sheet?

A   Yeah.  That, that person, their names would come up on that list, we'll contact prisons to find out if they're in prison or not.  If they're not, then an officer will fill out, whoever is responsible for doing that at the time, will fill out a sheet that basically says no contact in the last five years, remove them from NCIC.  And that is to help records purpose to remove them so it's told to them by an officer and they're not just pulling people out or putting people in.

Q   And that just is the basis of your knowledge of their gang membership.  It may -- membership -- it doesn't necessarily reflect the -- well, let me start

over because I could see that was going bad.

Somebody can have a contact on January 1st, 2010, for instance, then January 2nd decide I am no longer a gang member. For your purposes, though, they're still considered a gang member for five years?

A   For NCIC purposes, they're considered a gang member for five years.

MR. SHULTZ:  That's all the questions I have. Thank you.

THE COURT:  All right.  Who's the next witness?

MR. SMITH:  Your Honor, the next witness would be Officer James Nau, who would present testimony similar.

THE COURT:  All right.  Do you anticipate -- how long do you think his testimony will be?

MR. SMITH:  I would anticipate, since we've had most of the testimony already, if we could just focus on the training and experience of James Nau and ask if his opinions comported with Officer Webb's, it would be at least half of the time --

THE COURT:  All right.

MR. SMITH:  -- of Officer Webb's.

THE COURT:  We'll take a recess until approximately 1:00.  And then we'll take up Mr. Nau and

then does the Government have any more witnesses?

MR. SMITH:  No, Your Honor.

THE COURT:  All right.  We'll easily be able to take care of Mr. Nau in the afternoon.

A   Your Honor, Mr. Wachtel had --

THE COURT:  I don't know what he intended to do with it.  He didn't identify it so just put it up there on the witness stand.

A   Yes, sir.

(Noon recess.)

(Beginning at 1:05 p.m. April

16, 2013, the following

proceedings continued.)

THE COURT:  Please call Officer Nau.

MR. SMITH:  United States would call Officer

Nau.

**JAMES NAU**

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as

follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q    Will you please tell us your name.

A    James Nau.

Q    And what is it you do for a living?

A    I'm an agent for the Kansas Department of Revenue,

the Alcohol Beverage Control division.

Q    When did you start that?

A    September 24th, 2012.

Q    And before going to the ABC, if I can refer to it as

ABC, where did you work?

A    Dodge City Police Department.

Q    How long had you been with the Dodge City Police

Department?

A    I started February 13th, 2006, until I left

September 21st, 2012.

Q   Were you in law enforcement before that?

A   For three months before that, I worked at the Ford County Detention Center, Ford County jail as a detention officer for three months.

Q   And did you receive any training to become a Ford County detention deputy and then did you receive any other training to become a police officer with the City of Dodge City?

A   Just to become a detention deputy, I was just hired on and took care of inmates, no training, per se, to that.  When I got hired on in February, I went to Kansas Law Enforcement Training Center in Yoder, Kansas, in March of 2006, when I graduated in June of 2006.

Q   So you completed the training at KLETC?

A   Yes.

Q   Successfully?

A   Yes.

Q   And you were present when questions were asked of Agent Webb; is that correct?

A   That is correct.

Q   So I may refer back to some of the questions asked by either the United States or by defense counsel, and if you're not -- if you don't remember the question, let me know.

A    Okay.

Q    During your training at KLETC, did you receive some training that involved investigation or identification of gangs or gang members?

A    Just briefly, not -- about the same as Agent Webb did.

Q    All right.  Now, once you started with the Dodge City Police Department, what was your first role or your first job?

A    When I first started, I was hired on as patrol officer, which I was assigned to a beat, you know, took a variety of numerous calls.  And I did that until about July of 2007 when I was assigned at that point to the street crime unit.

Q    And is that the street crime unit that's been referred to as the SCU?

A    Yes.

Q    And you said July of 2007; is that correct?

A    That's when I got onto it, yes.

Q    And what were the -- what was the focus of that SCU unit?

A    Primarily gang enforcement.  That was mostly gang crimes.  Also worked street level narcotics.

Q    Before you left the Dodge City Police Department, did your rank or did your role change in any way?

A    Not -- well, kind of but not really.  I stayed still on patrol.  I was on street crime unit from July, 2007, until about August, 2010, when a new chief that came in, who changed our name, kind of our role.  We were then changed to the Problem Oriented Policing unit.  On that particular unit I was assigned to gang investigation and gang crimes.  I did that until January of 2012, when I was sent to Portland, Oregon, for ten days of training to be an instructor on what they -- before, they had the DARE program.  Then switched over to the GREAT program, which was Gang Resistence Education And Training.

Q    Hold on just a second.  Say GREAT again.

A    GREAT is Gang Resistance Education and Training.

Q    Okay.

A    That program was taught in middle schools, in fifth grade elementary school levels, and it was just -- it was a program designed to kind of keep kids focused, stay away from gangs, some different ways to do that if you're encountered by people trying to recruit you and things of that nature.

Q    And you were trained to be an instructor for that program; is that correct?

A    That is correct.

Q    You were certified to be an instructor; is that correct?

A   That is correct.

Q   And did you then instruct for the GREAT program?

A   Yes, I did.

Q   Now, other than your training at the Kansas Law Enforcement Training Center, did you conduct or attend any other training specific to gangs since becoming a Dodge City police officer?

A   Yes, I did.

Q   And that training, is that contained within the resume or C.V. that has been disclosed in Document 297; is that correct?

A   That is correct.

Q   Were you a member of any other organizations or any law enforcement organizations that focused on gang activity or gang crime?

A   I was a member of the Kansas Gang Investigators Association.

Q   You mentioned Problem Oriented Policing unit. Essentially, is that what we refer to as the POPs unit?

A   That's correct.

Q   And the POPs unit is referenced in the summary that was also created by you and Officer Webb -- I'm sorry -- Agent Webb and Detective Bice; is that correct?

A   That's correct.

Q   Which, again, is Document 297?

A    That is correct.

Q    What was the difference in the focus from the SCU versus the POPs unit?

A    On SCU we were -- during this time, we were out on the streets more often than the POP unit. What we would do on the POP unit was investigate the stuff that the street officers had. To me, it was -- the way I looked at it, the way our role was, we were nighttime detectives when the detectives were gone. We were basically those people who, for my instance, I worked the gang crime, so anything that was gang related that the street officers took, they could bring back to me; or if it was day shift that had gang related calls or incidents they worked, they would pass it on to me. If it was a burglary where an alleged gang member was a suspect, then it would be handed to me for me to basically do the foot work and try to figure it out.

Q    That was your role within the POPs unit --

A    Correct.

Q    -- is gang related crimes; is that correct?

A    That's correct.

Q    How many other members of the POPs unit were there?

A    There was four of us total.

Q    And so the other members of the POP unit, did they have other focuses or expertise other than gang related

crimes?

A   Yes.

Q   In addition to being involved with the POPs unit, were you involved in any other investigative task forces that were more regional in nature?

A   I was part of the -- what we -- Detective -- or Agent Webb was part of it before me.  At one point it was the Go Soldiers Task Force and then they kind of -- it kind of from budgeting issues and stuff fell through with it.  I don't remember the exact year, I think it was 2008 or '09, the SCU unit reproposed for a task force similar to that to be focused in Dodge City which we applied for and got grant money to fund that.

Q   Were you a member of that task force?

A   Yes.

Q   What was your role within that task force?

A   I was just a regular member at the time; and I think it was about 2010 when I was assigned the leader of that task force where I would set up our deployment dates when we were going to work the task force.  I would compile a target list of gang members with outstanding warrants.  I would get with our probation officers who would also partake in this task force and get a list of current gang members that they had that they wanted to do home visits on.  And that's what we focused our task

force on.

Q   Did that task force focus on areas other than just Dodge City?

A   That task force in particular was just in Dodge.

Q   All right.  Was there any point where you again worked -- you mentioned that you worked on the same task force that Agent Webb was involved in; is that correct?

A   That was the same general principle of the task force.  I would attend monthly meetings in Garden City with Garden City PD, which was basically just a gang intelligence sharing meeting where they would let us know what's going on in their city, we could let them know what's going on in our city, what we're hearing about their people and vice versa.

Q   And you attended those monthly?

A   That's correct.

Q   Other than the gang specific training that you've attended, have you also given training that's associated with gang identification or gang investigation?

A   Yes, I have.

Q   And what sorts of trainings have you conducted?

A   I've given basically to schools, people in the community, parents of children in schools, gang identification, just general gang awareness, how to identify things that might be gang related.  If parents

suspected their kid might be in a gang, it was common for them to come to us and ask us to come and look at their, you know, son or daughter's bedroom to see if there was something gang nature in there.  As that started happening more often, we worked -- the Dodge City middle school approached us and wanted us to do basically gang meetings with children there who, what they called, were getting gang referrals as showing gang behavior.  If a student was to get a referral, it was during that time we set up this program where it was mandatory for the parents to attend this meeting with us and school officials.  And what we would do is separate children from the parents and basically give a gang one-on-one to mom and dad on this is what gangs are, this is how to recognize them, you know, these are things to look for.

Q   We'll just focus specifically on the differences between your role and, for instance, Agent Webb or Detective Bice.  You mentioned on the POPs unit you essentially performed a function similar to what would be a night detective; is that right?

A   That is correct.

Q   So I take it you were taking referrals directly from your on-the-street officers in Dodge City; is that correct?

A    That is correct.

Q    Would you also become aware of information or get referrals from, for instance, Ford County Sheriff's Office?

A    Yes.

Q    Was it common for Dodge City police and Ford County sheriff to work the same cases?

A    Yes.

Q    To have the same targets of investigation; is that correct?

A    That is correct.

Q    Now, the difference then -- or, you tell me the difference between your role and, for instance, Agent Webb's role, in the day-to-day identification and investigation of gangs in Dodge City, Kansas?

A    As he was assigned to a detective, he was getting, as he called it, working the back end of the case.  My day-to-day role is I was usually out there with them, with the gang members, talking to them, stopping them on car stops.  If we saw 'em doing a walk through the mall or WalMart or whatever store we were at, we would interact with 'em, talk to 'em.  Basically, it was to try to see what was going on.  So I was having contact almost daily as I worked.

Q    And was that contact with those that have been

identified as Norteno gang members and Sureno gang members?

A    That's correct.

Q    Are there other gangs that are active or have been identified in Dodge City?

A    Yes.

Q    Did you also have contact with those individuals?

A    Yes.

Q    And you said that was on almost a daily basis?

A    Yes.

Q    Would you then, after you gathered, I assume we would call it, information on the front end of the investigation, would that then information be passed on to detectives such as Agent Webb and Detective Bice, to work cooperatively on the case from there on out?

A    Yes.

Q    On a day-to-day basis, if you're working on the POPs unit, you're out on the street, what was your specific role throughout the day?

A    Just depending on what I had.  If I had cases to investigate, I would, you know, work those cases by trying to talk to a witness or suspects or potential suspects.  If we weren't doing that then we were just watching gang houses.  We would get information on where gang parties were taking place.  We would do

surveillance watching those places.  So a lot of the work when I wasn't doing desk work or paperwork was out doing surveillance work.

Q    What about your day-to-day role if you're on the street and another Dodge City Police Department officer conducts a traffic stop or starts some sort of other investigation, how would you become involved?

A    Kind of like Agent Webb described in his testimony where we knew most of these addresses.  We knew -- I knew a lot of the vehicles, so if I knew a gang member's car was getting stopped by one of our street officers, I would start working my way that way to help them out with it because I knew most of the vehicles.  I was able to keep a memory of most of the tag numbers, so when they ran 'em for a traffic stop, I knew who they were going to be dealing with.  If the vehicle happened to be -- the tag happened to be entered in NCIC as a gang car, our dispatch would let us know that so I would work my way to that car stop to assist on it in basically any way they needed me to.  A lot of it was just to get information, who was in the vehicle, how many people.  Some of these -- some of the new guys we have on our department aren't up to speed with all of our gang members we had prior and new ones that are hanging out, so it was something for me to at least help them know

who these people are as well, other than dispatch telling them it's a gang member.

Q   So other than just being an investigator, you were also a reference to other Dodge City Police Department officers; is that correct?

A   That is correct.

Q   Now, in your roles as the SCU and also the POPs, did you have the opportunity to interview gang members or suspected gang members about their roles and their activities in the gang?

A   Yes.

Q   You mentioned you had almost daily contact with gang members.  How often would those sorts of interviews take place?

A   It just depends on -- most of the time, if it was just, you know, a consensual contact on the street or somewhere, they usually weren't a long interview; but I've had gang members approach me before when they seen me and tell me they wanted to come in and talk about their getting out of the gang life and want to tell me about, you know, not only their gang, but other gangs in Dodge.  So, we would set up times to do that.  It wasn't every day that they would tell me everything about 'em or conduct what I would call an in-depth interview, but most of the time.

Q   And in your role with the Dodge City Police Department did you have the opportunity to interview families of gang members?

A   During -- it depends on what it was.  I mean, we would have family members who would come to us wanting to know if their child was involved, you know, with that.  We would have to talk with them to see what they're noticing to make them suspect that, so there was times where I would talk with family members on that basis also and to the crime part of it.

Q   Did you gather information and intelligence from those interviews?

A   Yes.

Q   Did you feel it was important to also know who was related to who and does that effect in any way gang membership or gang status?

A   Yes.

Q   And how does that come into play?

A   If -- it's kind of hard to describe.  If certain people -- as Agent Webb described, there's different ways to get into a gang or to acquire gang membership.  One would be, something that we see some, is being what we call blessed in or because your family or older brother or somebody in your family who's held a position or been in that gang for quite sometime, if you

associated yourself with that, you were basically accepted into that gang because of your older sibling or relative to that nature.

Q   And let's -- I guess let's just talk about DV and LCC specifically in this case.  Do you find there's a lot of interrelatedness in the membership of DV and LCC?

A   Yes.

Q   So is it important for you to know who is actually blood relatives when it comes to identification of gang activity?

A   Yes.

Q   Even -- or, if there are individuals that aren't identified as gang members, have you found in your experience they've been associated with gang members or associated with gang crimes or locations of gang crimes?

A   Yes.

Q   Have you had the opportunity to interview, I assume, victims of some crimes that were found to be gang related?

A   Yes.

Q   And did you gain relevant information about the operation of the gang or operation of other gangs in Dodge City from those interviews?

A   Yes.

Q   And have you had the opportunity to interview

informants and did you gain similar information from those informants?

A    Yes.

Q    Other than just the consensual interviews or meetings that you said that you had set up, have you had an opportunity to effect arrests of people identified as gang members?

A    Yes.  As we were on the POP unit, any suspect that was a gang member, whether it be an arrest warrant or probation violation or anything to that nature, usually a beat officer would go to court services or community corrections to arrest, you know, whoever's got a warrant there.  If it was a gang member person, it was assigned to me on the POP unit.

Q    Okay.

A    So it was taken away from the beat officer and assigned to me.

Q    So even if another officer was out on the scene of an arrest, if it was found out that it was a gang member, you would be called in; is that correct?

A    Yeah, it was assigned to me at that point; and basically it was to try to debrief or interview or get information from this gang member about crimes or anything gang related.

Q    Is that based upon your specific role or your

training and experience or your expertise in gangs in Dodge City, Kansas?

A   About all of it.

Q   Now, are you familiar with what's been generically referred to as gang sheets?

A   Yes.

Q   You've seen them before?

A   Yes.

Q   Have you filled them out?

A   Yes, I have.

Q   Matter of fact, have you reviewed the gang sheets that are relevant to this case?

A   Yes.

Q   Did you fill out any of those gang sheets?

A   Yes, I did.

Q   Other than just filling out those gang sheets, did you have any other role in the maintenance of those gang sheets?

A   Yes.

Q   And what was that role?

A   After, at one point, as Agent Webb stated, they were passed on to him for approval before he could submit them to our records for entry purposes.  After Detective Webb, they were then assigned to Detective Bice where the same protocol was you fill them out, they go to him

for approval.  They were removed from him and then assigned to me when I was on POP unit and then I had to go through -- I was in charge of basically entering those sheets into our data base, approving those sheets and then sending them on to our records department.

Q   Approval of those sheets means what?

A   Basically, like Agent Webb stated, it's a checks and balance.  If they have a box, depending on what box was checked, an explanation of why that box was checked had to be done in the comment section so I had to make sure that was all equal.  As well as pertinent information like on a traffic stop, if it was a vehicle, we tried to get the vehicle information put on the back of the gang sheet so we could, you know, document or if, you know, such and such gang member was involved in a crime with a vehicle, we could look back at different vehicles to see maybe some leads that way.

Q   And, again, that gang sheet -- and you have the black notebook in front of you, has previously been identified as Exhibit 3.  Have you had an opportunity to look at that prior to this hearing?

A   I have a copy that I've seen this morning.

Q   And are you familiar with Exhibit 3?

A   Yes.

Q   Is that what we've referred to -- or at least the

front page, generically, as a gang sheet?

A    Yes.

Q    And you mentioned that you then were responsible for passing that on to records.  And why was that?

A    Records was who -- and Kelly Melliker was in charge of basically putting our gang data base together.  I don't know who she had assistance from.  But once it was passed on from me and approved, I would make two copies of it, approve them, and then send a copy to records and one copy would go into our hard files of that particular person.  Records at that point would go through their guidelines to enter them in NCIC.

Q    And have you become familiar with the process of entering that information into NCIC?

A    I haven't become familiar with the process of how to do it; but I've seen the guidelines and know what the guidelines are for them to be entered.

Q    Okay.  You're familiar with the NCIC guidelines?

A    Yes.

Q    And that's the NCIC guidelines for essentially an identification of a person as a gang member; is that correct?

A    That is correct.

Q    And as a matter of fact, have you seen Exhibit 2, which is the Dodge City Police Department policies in

regards to gang investigations?

A   Yes.

Q   And are you familiar with those policies?

A   Yes.

Q   Do you understand that there is a difference between the identification of an individual for NCIC purposes as a gang member versus Dodge City Police Department?

A   Yes.

Q   What do you understand the difference to be?

A   To be entered in NCIC, the most common one is if they admit gang affiliation or membership.  If they don't, then NCIC requires two other categories from our gang sheet.  The same thing similar with Dodge City is if they admit, then they're a documented gang member. If they don't fully admit gang affiliation, then it's three following or three other categories on that sheet that would document them.

Q   So Dodge City Police Department requires additional information than what NCIC requires?

A   Correct.

Q   And, for instance, if you can look at Government Exhibit 3 please, you mentioned a self-admission or admission of gang affiliation qualifies as being classified as a gang member; is that correct?

A   That's correct.

Q   If that did not occur -- and you mentioned Dodge City Police Department required three additional categories; is that right?

A   That's correct.

Q   Is that simply three additional checkmarks here on this piece of paper?

A   No.  It's one from each -- if you look at the sheet, your first top box is self-admission, which we'll call category one.  Your second category would be association.  Your third category would be other criteria.  For the three, if they didn't admit, for the three spots to be checked, it had to be one from each category.  So it would have to be one from, for instance, if they had just a gang tattoo, that would be a checkmark in a self-admission.  If they associated with known gang members, that would be another checkmark in the second category of association.  And then something in your third one would come from your third category.

Q   If an individual just had three boxes checked under other criteria, that would not qualify?

A   Correct.

Q   It had to be one from each of the three categories?

A   That is correct.

Q   And, again, NCIC only requires two other than if

there was no self-admission; is that correct?

A    That is correct.

Q    Are you familiar with the process of removing an individual from NCIC or removing them from the rolls as a gang member?

A    Yes.

Q    When did that occur?

A    When I was in charge of putting these, approving these gang sheets, monthly I would get a list from our records, from Kelly Melliker from records, that would basically show a long list of people who were coming up for what we would call purge out of our system, which would be removing them from NCIC or our system.  At that point I was to go look up each one of their names to see when the last contact with them was.  And if it had been five years, then they were removed, which I would make out a sheet, a blank sheet with all their information on it, saying remove from NCIC.  I would put on the list that she provided me, remove, take out, whatever, and initial it and provide a copy of that sheet with that list and give it back.  Which at that point she would remove them.

Q    So under your watch, people were removed?

A    Yes.

Q    And there was a question about some people being

identified or have people been identified incorrectly as

gang members.  In your experience and training, has that

occurred?

A    Yes.

Q    What were the circumstances of that?

A    The one particular one that I know of, the time that

they were entered, I wasn't on street crime unit yet.  I

was still on patrol.  But we worked -- we helped street

crime unit on a gang party at a gang residence.  One

female individual there was on probation who was

consuming alcohol and some other illegal activities.

She had -- during this time, she had used her sister's

name who had no gang involvement, no gang affiliation,

and they documented her sister's name as she gave it as

a gang member.  Probably a year or two had went by from

that date, she was stopped on a traffic stop.  One of

our street officers had stopped her, asked her about

gang membership because she came back as a gang member,

which she stated she had no affiliation with it and no,

you know, no membership or anything to that nature.  So

all the information was brought back to me.  I retraced

all the steps on that and found out that the name she

used was her sister wasn't her real name and she did it

basically so she wouldn't, when they ran her, she would

show up with no wants or warrants or on probation.  At

that time, I had her removed.  I typed out a letter, passed it on to our records, which they sent it to NCIC and she was then removed.

Q   Okay.  So that's one instance that you know of which was an incorrect identification?

A   Yes.

Q   Now, characterize for me what you would consider the difference between gang membership and just gang association?

A   Gang membership, to me, if -- and a lot of these boys that I've dealt with or people I've dealt with on the street would tell me I'm a gang member or I'm down with this set or I'm gonna be this set.  The association part comes in where they're not committing the crimes for the gang, they're not doing anything really for the gang other than just hanging out with them a lot or they're always seen with them.  We kind of, at one point, had an unwritten rule that if we saw them on more than three different occasions with the same people or with gang members then we did a gang sheet and instead of putting gang, you know, DV or LCC or MCB or 18th Street, we would also attach associate to the end of that.

Q   So you would identify them as an associate but not a gang member?

A   Correct.

Q   Okay.  Now, you mentioned you had contact with a lot of these individuals and you would have direct admissions; is that correct?

A   That is correct.

Q   Is that because of your role, essentially, being proactive and being on the streets?

A   Yes.

Q   So in that role, you have had contact with many individuals identified as gang members in Dodge City; is that correct?

A   That is correct.

Q   And not all, I assume, but how many or what percentage of those individuals would make direct statements to you about their involvement in gangs?

A   Most everyone that I dealt with, if they were a, you know, in my words, a full-fledged gang member and I asked them about their gang membership, they admitted. The ones we listed as associates would say they haven't been jumped in yet but, you know, they hang around them all the time or they're always with them or this is -- if they -- if they wouldn't admit affiliation, we kind of tried to figure out if it was just by coincidence or if it was just because they had been childhood friends all their life, what their association was.  So we would

ask 'em what they thought about the rival gangs and at that point we would get the derogatory terms about rival gang members, or they didn't like the color blue because that would be a rival; or if they were south side gang members, associates, we would ask them about the color red, which they would tell us, you know, they don't like that color because it's a rival gang. But they weren't full-fledged, in our words, full-fledged gang members yet. They weren't doing the crimes. They were just, you know, in the car with them or they would, you know, maybe wear blue clothing or wear a blue belt or something of that nature. To me, that was how we -- how I figured out our associates from our people who were openly admitting.

Q So other than just those admissions, they provided other intelligence to you specifically; is that right?

A Correct.

Q Did you also seek, in your contacts, to identify tattoos or colors or meanings of those things?

A Yes.

Q I take it you did successfully gather that information from your contacts; is that correct?

A That is correct.

Q Now, what was the goal of gathering that information? Was it informational or was it

investigative?

A   To me, it was informational.  If I -- I didn't go out dealing with gang members and thinking I knew everything about their gang.  If I didn't know something, I asked.  Even if it was, to me, a stupid question, I would ask so I had the basic answer so I didn't assume something and it would be different.

Q   Now, what about photographing gang members.  Did you do that?

A   Yes.

Q   Did you find it, through your daily or almost daily contacts, that gang members generally consented to being photographed or even posed for photographs?

A   Yes, most did.

Q   So that was common?

A   Yes.

Q   And was that for informational or investigative purposes from your standpoint?

A   A lot of it was -- well, it could be for both.  When I was in charge of approving these gang sheets, I was also in charge of updating our gang files on our computer, which consist of photos of new tattoos or updated facial shots.  So if we needed to use their photo in an investigative standpoint later, we had something current versus -- for one instance, we did a

gang update, we had one kid who was entered when he was 13 years old and at this time he would have been 19 and the only photo we have of him was when he was 13 years old.  So in six years, he's definitely changed.  So if we were to use his photo in a photo line-up where he could be a suspect of a crime, he's not gonna be picked out from six years ago from what he looks like today.  So my job was, if we got photos from gang members, was to update, basically, their photo file as well.  And that was for information and investigation.

Q   Now, just speaking generally about gangs and gang activity in Dodge City, Kansas.  Through your training and experience and through your training in the classroom, let's say, are you able to form an opinion as to what the structure, leadership and the roles of members, associates, peewees, are for gangs in Dodge City, Kansas?

A   Yes.

Q   Are you familiar with the information that, for instance, Agent Webb testified to today?

A   Yes.

Q   And do you agree with the information that he related?

A   Yes.

Q   Is there anything that you feel you should add?

A   Well, there was one point, I think it was around 2008, 2009, we had a constant problem on Friday and Saturday nights at our local mall where it turned into a gang hang out.  At one point, the mall adopted a rule, basically, if you weren't there for shopping purposes or the movies or some other thing the mall provided, then basically, you were kicked out of the mall for that night.  If it continually happened, you were banned eventually.  Most of this we were dealing with was in, our terms, quote, unquote, peewee gang members, who, some of the older kids in that gang were telling us, that they bring these kids basically every weekend to see who's gonna basically be, quote, unquote, down with their gang.  If they continually showed up then they felt this was somebody that they could see as jumping in later, because if they continually showed up to hang out with 'em, they're always gonna hang out with 'em, versus some who would come once, not come for a month, come again or never come back.

Q   So that's a specific instance of recruiting or testing peewees that you were familiar with?

A   That is correct.

Q   Now, are you familiar generally with the gangs' rules of conduct, their expectations?

A   Yes.

Q   The behaviors that they're responsible for conducting?

A   Yes.

Q   And do you have anything to add in addition to Agent Webb's testimony?

A   No.

Q   You're familiar with certain gang sets having alliances with each other?

A   Yes.

Q   And rivalries with each other?

A   Yes.

Q   And you have gone through all of the exhibits that are contained, Government Exhibits 1 through 40; is that correct?

A   That is correct.

Q   Was there anything in Government Exhibits 1 through 40 that you felt that you needed to add?

A   No.

Q   Do you feel in your training and experience you're familiar with the symbology that is associated with each individual gang in Dodge City, Kansas?

A   Yes.

Q   The colors, clothing, the hand signals?

A   Yes.

Q   And did you agree with the testimony of Agent Webb

in relation to all of the symbology in what I just referred to?

A    Yes, I do.

Q    You heard Agent Webb testify about certain areas of town that may be related to certain gang sets in Dodge City, Kansas; is that correct?

A    That is correct.

Q    Would you agree with his testimony?

A    Yes.

Q    Is there anything that you felt that you needed to add or any additional information since you were you were the man on the street, essentially, in Dodge City?

A    No.

Q    And what gang sets would you consider to have been the most active in Dodge City in the past five years?

A    The four primary that we had active in the past five years was MCB, 18th Street, which were our two Sureno gangs, and then DV and LCC, our Norteno gangs.

Q    Now, are you familiar with the type of criminal activity that each of those gangs is usually associated with?

A    Yes.

Q    Are you familiar with the targets, the victims of most of those crimes?

A    Yes.

Q   Any weapons that may be used by each of those gangs?

A   Yes.

Q   And would you agree with Agent Webb's testimony about each of those individual aspects?

A   Yes.

Q   Is there anything that you feel that you would need to add to his testimony?

A   No.

Q   And, again, Agent Webb testified to the specific meanings or symbology in, for instance, the graffiti that was shown in government exhibits; is that correct?

A   That is correct.

Q   And did you review those exhibits yourself?

A   Yes, I did.

Q   Do you agree with the symbology and the meaning of each of those individual symbols in those photographs?

A   Yes.

Q   And did you also hear the testimony about tattoos?

A   Yes.

Q   And do you agree with the symbology represented by each of the individual tattoos that Agent Webb testified to?

A   Yes.

Q   As well as the clothing, do you agree with his testimony in regards to clothing?

A    Yes, I do.

Q    And hairstyles?

A    Yes, I do.

Q    Is hairstyle something that you would see commonly or is it common now?

A    It wasn't for a while.  We started to notice, as he referred to it, as a Mongolian braid or Mongolian patch. My partner at the time and I were trying to figure out what the symbolism for that was; and after talking to some DV gang members, it was basically a Mongolian war patch.  And I didn't get a whole lot of chance at that time to retrace the structure of the Mongolian era, but we were told that when Mongolia people went to war, they would shave their head that way.  So that's why it was called, basically, a Mongolian war patch, which had then began to be worn out into a long braid from the top of the head.  I dealt with some southside gang members at a gang fight one night where we were able to speak with them and they had what they called the rat tail.  And so I asked -- to me, it was a stupid question -- why they grew it at the bottom and not the top.  And they said because the top would represent north; the bottom would represent south.  So our southsiders would wear it at the bottom; northsiders would wear it at the top.  That was something we started seeing for quite a while and as

years went on, I mean, few people would do it, people would start to grow it out longer.

Q  And, Agent, you are also familiar with Government Exhibit 1; is that correct?

A  Yes.

Q  And did you participate with Detective Bice and Agent Webb in the creation of that document?

A  Yes, I did.

Q  Do you agree with the contents of that document?

A  Yes, I do.

Q  Is there anything that you feel that was left out or should be clarified or needs to be added to that document?

A  No.

MR. SMITH:  Nothing further.

THE COURT:  I have a question.  Agent Webb didn't testify about this and I was wondering if Mr. Nau could testify about the translation of slang terms and nicknames, language and writing that is specific to the Nortenos and its subsets.  That's on Page 4 of Exhibit A.

MR. SMITH:  I'll go through that, Your Honor.

BY MR. SMITH:

Q  Agent Nau, are you familiar with certain language, certain words, certain nicknames or phrases that would

be used by gangs in Dodge City, Kansas?

A    Yes.

Q    Are there certain phrases, names, words that are unique to, for instance, south side gangs versus north side gangs?

A    Yes.

Q    Are there certain derogatory terms that are inherent to south side gangs versus north side gangs?

A    Yes.

Q    So, for instance, do south side gangs have a particular derogatory term that they would use when they're addressing or describing a northsider or a Norteno?

A    Yes.

Q    And what would some of those words be?

A    Some of those would be -- when I was first learning all this stuff, the most common one would be a "buster". They would be known as a "buster"; versus a southsider would be known as a "scrap".  I did an interview once with a north side gang member who referred to southsiders as "screezys".  And I didn't know what that was.  He basically told me it was a derogatory put down for them.

Q    A screezy?

A    A screezy.

Q    And a buster would be a name a Sureno would call a Norteno; is that correct?

A    Yes.

Q    Is that something you found was common in your contacts with Surenos and Norteno gang members?

A    Yes.

Q    The use of the word "scraps", is that something you have found to be common?

A    Yes.  They would refer, even during a consensual talk with them, as I stated before, if we asked them about the color blue, they would put it down or say they didn't like it for whatever reason; or, you know, you would ask 'em what they thought about -- if it was a northsider we were talking to, what do you think about MCB or 18th Street and they would call 'em a scrap or they don't like scraps, something to that nature.  And same way with our Sureno gang members.

Q    Have you noticed certain styles of writing or certain ways of writing certain words that you would identify with either a Sureno or a Norteno gang?

A    Usually our Surenos or south side gang would -- anything with the number 4 or the N would either be X'd out or written backwards to show disrespect to the northsiders.  The same thing for a northsider, if they would write anything with an S or 3 or 8, it would be

X'd out, written backwards, upside down, had arrows running through it. And that was just to show the disrespect to the southsiders.

Q   Have we seen particular examples of that, for instance, in the photographs that have the graffiti on them?

A   Yes.

THE COURT: So the record reflects that I was awake when I heard that testimony, that's not really what I was looking for here. Unless -- I'm again looking at Page 4. Nicknames, is that the same as a buster and a scrap? Language, have we already heard about this? What language --

MR. SMITH: No. Just his testimony just now.

THE COURT: But I heard that from Agent Webb. Is there something about language that is different than what Agent Webb testified about?

Q   Agent Nau, are you familiar with any other instances of language or use of language that would be unique to the Surenos or Nortenos gangs other than the derogatory terms?

A   No.

THE COURT: So that's what we're talking about? What I thought we were talking about was that apparently every defendant, allegedly, has a nickname.

Is that -- I thought that's what we were talking about in this expert testimony summary.

BY MR. SMITH:

Q   Okay.  Now, Agent, in your day-to-day experience and your identification and contacts with persons identified or associated with gangs, have you learned that they or most of them would have nicknames or street names?

A   Yes.

Q   For instance, the individuals that are indicted in this case, did you become familiar with nicknames or street names of each of those individuals?

A   Yes.

Q   And of individuals not indicted in this case in Surenos, are you familiar with nicknames or street names or monikers of those individuals as well?

A   Yes.

Q   In your contacts with these individuals, no one specifically, but generally, would those individuals, those gang members, identify themselves by their gang names or monikers?

A   Yes.

Q   And would you find instances of, for instance, victims or rival gang members referring to a rival by their street name or moniker?

A   Yeah.  Sometimes that's all they knew 'em as.

Q   Okay.  Is it -- well, my next question then, is it more common for your identified gang members to be referred to by their real given name or by their street name?

A   More common by their street name.  There's even times on the POP unit where we couldn't, you know, remember a southsider's name, we knew his street name. So, I mean, even with our officers, we knew who street names are pretty regularly.

THE COURT:  Well, here again, I understand that.  A lot of people have nicknames that aren't gang members.  I assume.  But is there anything about the specific names that are on Exhibit A that somehow identify them as a member of a gang as just opposed to having a name, a nickname?  That's what I'm looking for.

BY MR. SMITH:

Q   Does a street name or a nickname necessarily have to be gang related?

A   Not necessarily.

Q   Are there some nicknames or street names that in some way represent or associated with gang or gang membership?

A   Yes.

Q   Can you think of one instance?

A   You want me to give a specific person?

Q   Please.

A   Jason Najera's nickname was Norte or Ene.

Q   And Ene represents the letter N; is that correct?

A   The letter N, that's correct.

Q   And Norte represents north; is that correct?

A   Correct.

Q   And is Jason Najera a Norteno street gang member?

A   Yes.

Q   At least as identified by the Dodge City Police
Department?

A   Yes.

MR. SMITH:  Nothing further.

THE COURT:  Okay.

Well, let's see, Mr. Wachtel, you represent Pistol
Pete, according to the --

MR. WACHTEL:  Indeed --

THE COURT:  -- Exhibit A.  So maybe you can
ask him about that.  You don't have to but --

MR. WACHTEL:  Actually, Your Honor, I actually
thought I might start by asking some of those questions.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   I'm Val Wachtel.  I think I met you earlier today.

A   We had the James hearing.  I met you there, too.

Q   I was looking at Exhibit 3.  It's the gang sheet;

right?

A   Yes, sir.

Q   And I was looking at the category self-admission. Right?

A   Okay.

Q   And I notice the box that says "subject uses gang related moniker".  Who decides that a street name or a moniker or a nickname, call it what you will, is gang related?

A   That depends on if they're hanging around gang members or with gang members or if that's what they're known as to their gang or their gang members.

Q   How do you figure that out?

A   By asking them.  Or by asking other people.

Q   So you asked -- well, perhaps, you asked Mr. Garcia why his nickname was Pistol Pete; right?

A   I've never done it but --

Q   Who did?

A   -- somebody may.  Somebody must have at some point or somebody else in a gang had said that's what his name is.

Q   And you have -- I mean, is it your opinion that Mr. Garcia's street name is Pistol Pete?

A   That's what -- if I was to pull up his gang sheets and see, that would be the basis I would form that he

goes by Pistol Pete if that was what they used as his gang name or his street name.

Q   But that doesn't have a -- that has nothing to do with Norteno; right?

A   Correct.

Q   And doesn't have an N in it?

A   Correct.

Q   So street names are not necessarily gang related; right?

A   Not necessarily.

Q   And I don't remember the other street names that are in the caption of this case.  Do you know how many of those street names, those monikers, are gang related and how many aren't?

A   Not without looking.  I mean, I can see, as I gave the example on Jason, was one example.

Q   I'm trying to find the list --

A   I can see about two.

Q   What's the other one?

        THE COURT:  Here.  Do you want --

A   Would be TC on Eusebio Medrano.

Q   Sir?

A   TC.  Right here.

Q   Okay.  Look over your shoulder.

A   This one right here.

Q   Eusebio Sierra-Medrano is known as TC?

A   The only reason why I would form an opinion of that being gang related is because that would be Tulare County, California, where his gang set originates from, his California gang set.  So I would base an opinion on just that alone, that being a, quote, unquote, gang related street name.

Q   Otherwise, the only criteria we have, despite your expertise for gang membership nicknames, is if -- is if my client, who somehow or other got this nickname, was found in the company of some known DV; right?  And somehow he was called by his nickname, then that would become a gang related nickname simply because it was said in the presence of another person; right?

A   Correct.  That box would be checked.

Q   Well, that doesn't have anything to do at all with expertise, does it?  That's just what's gonna happen?

A   Yes.

Q   Is that right?

A   Yeah.

        MR. WACHTEL:  Your Honor, I can give this back to you.  I don't have any more questions in this regard.  Thank you.

BY MR. WACHTEL:

Q   Is there a real life actual Norteno gang in Dodge

City?

A    What do you mean by real life actual?  Like just a gang called Norteno, period?

Q    Yeah.  Is there a Norteno gang in Dodge City?

A    It's just like Agent Webb described.  DV and LCC are gonna fall under that Norteno umbrella as being a Norteno gang.

Q    I'm just having a little trouble finding my exhibit. If you can bear with me.

A    Okay.

Q    I think I can do this without it.  Would you turn in the notebook that you have to the Exhibit 1.

A    Okay.

Q    My understanding is that Exhibit 1 was created jointly by you, Detective Bice and Detective Webb?

A    That is correct.

Q    It's your joint work?

A    Yes.

Q    Is there anything -- and Detective Webb acknowledges that and he says that this is his opinion.  Is this your opinion also?

A    It was all three of ours opinion.  We all collectively put this together, thought of things.  This was what our opinion was.  It was the same as Webb's opinion and Detective Bice's or we wouldn't have put it

together.

Q   Okay.  So do you know which part of this is your opinion and they bought into it?

A   No, I couldn't tell you, I don't know.

Q   And which part -- could you tell me which part is not?

A   I couldn't tell you.  I can just tell you this was a joint effort between all three of us.  What we saw was good and what we formed an opinion on that was good, we laid in here.  If we saw that it needed to be removed, then we formed that opinion all collectively to remove that out.  It wasn't that me and Detective Bice thought it was good and Detective Webb thought it was bad so he removed it.  It was something that was all together.

Q   Can you take a look at what you had in your hand before as Exhibit A.

A   Yes.

Q   I'm just going to go through it a piece at a time.  All right?

A   Okay.

Q   Start at Page 3 at the bottom with "gang testimony"?

A   Okay.

Q   Just the very last paragraph commencing on this page.  By the way, have you had a chance to look --

            THE COURT:  Let's make sure he's had an

opportunity to read it.

Q   I was about to ask him, Judge.  Have you had an opportunity to read that today or yesterday before you walked in?

A   I have this morning.

Q   This morning?

A   Yes.

Q   Thank you.  Is this your opinion, what's contained in this paragraph?

A   It's just gonna be just like Agent Webb said.  Some of this is gonna be and some of it's -- without going through every single thing on what you have questions on, what's my opinion and what's not --

Q   Well, you heard Agent Webb because you were here this morning, say, yeah, this is his opinion and he could testify to that.  Did you hear that?

A   Yes.

Q   Is this your opinion and can you testify to it?

A   Yes.

Q   Would the same be true of the first paragraph on Page 4:  The witnesses may testify concerning the primary purpose of the Nortenos, et cetera, et cetera, et cetera?

A   I mean, it's the same thing.  I mean, the Nortenos and its sub sets, DV and LCC, are gonna be classified

into the Nortenos.

Q   And you heard Detective Webb say, yeah, he agrees with this and he can testify to this; right?

A   Yes.

Q   So could you; right?

A   Yes.

Q   And you agree with this?

A   Yes.

Q   And the next paragraph:  The witness may testify that gang members carry or possess firearms for protection, et cetera.  He said he agrees with that and he could testify to that as an expert.  How about you, do you agree?

A   Yes.

Q   And you could testify as an expert?

A   Yes.

Q   The witness may testify about how and why gang members respond to insults, threats, et cetera.  Right? Detective Webb says he agrees with that and as an expert, he could testify to it.  And you would say the same thing; right?

A   Yes, sir, that's correct.

Q   And the same would be true for the very next paragraph which talks about gangs having an interest in and a need for establishing a reputation for being

tough, et cetera, et cetera?

A    That is correct.

Q    So both you and Detective Webb are in agreement as to that and both of you could testify about it; right?

A    Correct.

Q    And on the next page, Page 5.  The witness will testify -- witnesses will testify concerning -- that conduct constituting violations in the gang include not hanging out with, and so on and so forth.  Right?

A    Right.

Q    You agree with this?  Detective Webb agrees with this --

A    Yes.

Q    -- and you could testify about this -- what's contained in this paragraph?

A    Yes.

Q    And the same is true about the last paragraph: There is a significant population of Guatemalan immigrants living in Dodge City?

A    Yes.

Q    And it goes on from there.  And you could, as an expert, could testify to that and so could Detective Webb?

A    That is correct.

Q    And as I understood the Government's examination of

you, there's nothing that you have to add to any of this stuff?

A    Correct.

Q    Except, perhaps, this something about the gangs taking their peewees out to the mall.  Right?

A    Correct.

Q    Do you know if Detective Webb is aware of that?

A    I don't know.  We probably have told him at some point or he heard it through the grapevine.  Because when we -- when me and my partner worked that specific weekends, or that time period, we were spending two and three hours on Friday and Saturday night at the mall, so it was taking our time off the street up there, so I'm sure he's heard about it.

Q    And this is not expert opinion.  This is just fact based.  That's something you did and something you investigated; right?

A    Correct.

          MR. SMITH:  Objection.  He is asking for a legal conclusion of the witness.

          THE COURT:  No, he's not.  And Val has hit on something that strikes me here, too.  I realize what we're doing here, to some extent, is legitimate *Daubert* testimony.  Maybe.  But there's also straight Rule 701 testimony here that really doesn't require expertise to

testify about. Maybe a little expertise that if you're hanging around the mall, you can identify a gang member and a peewee. But -- I only say this so that we could perhaps move this through a little more quickly tomorrow for some of the people who are here, some of the lawyers who are here but are not having the opportunity to question the witnesses here today.

MR. WACHTEL: Your Honor, I don't have any further questions. Thank you very much.

THE COURT: All right.

MR. WACHTEL: Thank you, Detective.

THE COURT: Yes, Mr. Mandelman.

MR. MANDELMAN: Thank you, Judge.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   I don't have that much -- I don't have that much for you --

THE COURT: I've got all afternoon if you want to ask all those questions.

Q   You investigated some of the underlying crimes that are a part of this, part of this Indictment?

A   Some of them.

Q   You expect to be a fact -- you're gonna be a fact witness in this case?

A   I don't know what I'm going to be.

Q   Okay.

A   I don't know what I'm going to all testify to, I don't know.

Q   But you did investigate some of the underlying offenses that are charged in the Indictment?

A   I was at some of them.  I don't know how much investigation I put into each one; but I was initially at most of them, yes.

Q   Okay.  And you made reference that some member -- you referred to some gang members as associates?

A   Yes.

Q   Is there a list of that?

A   The same list I think that you showed Agent Webb earlier today with the spread sheet, there's a whole -- for every gang, some of 'em have associate next to it the same way as they do the gang name.  So there would be your gang members and then some would just say associate only.  So it's kind of the same list.

THE COURT:  It's your list.

Q   I'm -- I'm wondering is, is there another list that includes the associates or does that list include both?

A   It includes both.  It, it doesn't have -- I mean, you can, if you did a search on it, wanted to get the associates only, you could search for all associates and it would bring up just like your spread sheet does, it

would bring up associates only.  But in the spread sheet itself, it's got every gang, every person, that's a member or associate.  So it's got them all together.

Q   Just to clarify -- just -- I'm just gonna approach real quickly.  This is that same list?

THE COURT:  Why don't you, Joel, why don't you mark that for the record.  If you're going to identify something and -- I'm not sure how relevant it is, but I'm not -- I don't want to have you referring to something that -- is it Exhibit B, Defendant's Exhibit B?

MR. MANDELMAN:  Yes, Judge, that's what I've done.

THE COURT:  All right.

BY MR. MANDELMAN:

A   And this is, I mean, the same thing.  If you had the whole entire data base or spread sheet, if you will, it will have, where it says gang, DV, it will also have associate next to it as well.

Q   Just -- does this list include both associates and full-fledged members?

A   Yes.

Q   It just doesn't -- the list we've been provided by the Government doesn't distinguish -- it doesn't include that label?

A   Right.  What I'm looking at there was they probably did a search of just DV gang members itself.  Which at that point, you can separate them out.  You can do a search that way and distinguish and separate them out that way so you can get the number of, like, on that one, it's got DV and LCC.  It doesn't have associates with that.  So you can separate them out through that spread sheet that way.  That's what that looks like they did there.  That's, to me, what I'm looking at is gang members.

Q   How many of these folks are associates?

A   What folks?

Q   The people that are on the list.

A   I would have to look.  I don't have the list to show what associates are in there.

Q   So who made the decision about how to characterize an individual member?

A   What do you mean?

Q   When -- somebody had to decide that they were not -- that they were just an associate.

A   By filling out that gang sheet.  If they admitted or those criteria were met.

Q   They didn't meet enough of the criteria?

A   An associate, that's correct.  If they would have met the criteria, they would be a gang member.

Q   The number that you've provided to us, 176 gang members, or whatever, 220 gang members, that includes both associates and regular members?

A   I didn't provide you any number --

Q   Okay.

A   -- on anything.

THE COURT:  There's some numbers in Exhibit 1.

MR. MANDELMAN:  Okay.  If you want to refer to Exhibit 1.

A   For DV, it shows current documented number of members of DV is 218.  That would be members is how I'm reading it.

BY MR. MANDELMAN:

Q   It's your understanding those would be -- those -- that doesn't include associates?

A   That would be my understanding.

Q   Your earlier testimony, though, was that when I showed you this list, this included both.

A   I didn't say that list did.  The whole data base spread sheet itself includes all associates and members. I didn't say that one did.  That's the same list that, as Agent Webb stated, came from Kelly Melliker in records and whoever else helps her.  That whole spread sheet list she has of gangs has gang members and associates on it.

Q   Let me ask it a different way.  Who made the final call as to whether someone was an associate or a gang member?

MR. SMITH:  Objection to relevance; cumulative; and asked and answered to the continued line of questioning.

MR. MANDELMAN:  The concern here is that there's no way to distinguish between the folks that they're describing as gang members and the folks they're saying hung out.

THE COURT:  The objection is overruled; but see if you can get an answer.  He may not be able to do it.  I think he's trying to tell you that he didn't do it and there's somebody back at the Dodge City Police Department who, looking at the sheets, Exhibit 3, was able to put this spread sheet together.  Is that what you're saying?

A   That is correct.

THE COURT:  But he didn't do it.

MR. MANDELMAN:  Okay.

THE COURT:  So he doesn't know.

BY MR. MANDELMAN:

Q   Is that correct?

A   That is correct.

MR. MANDELMAN:  I'm going to introduce Exhibit

B.

THE COURT:  Yeah, I think you should.

MR. MANDELMAN:  Okay.

THE COURT:  Exhibit B is received for whatever it's worth.

MR. MANDELMAN:  Thanks, Judge.

THE COURT:  Let me see if I recognize anybody's name on here.  Well -- look at these nicknames.  I'd hate to be somebody named "Squirrel", I'll tell you that.  Or "Beaver".  Oh, my goodness.  Go ahead.

BY MR. MANDELMAN:

Q   Gonzo is not -- that's not a gang nickname?

A   That's not a gang nickname.  That's his nickname.

Q   Right.  Right.  You know he's been called Gonzo since he was a little boy?  You don't know?

A   I don't know.  I have not known him since he was a little boy so I have no idea.

Q   But it's not your testimony that's gang related?

A   Correct.

Q   Have you ever testified as an expert in a criminal case?

A   No.

Q   Why did you leave the Dodge City Police Department?

A   To advance my career.

MR. MANDELMAN:  That's all I have.  Thank thank.  Thank you.

THE COURT:  Yes, Mr. McCausland.

MR. McCAUSLAND:  Just a couple.  Can I do it from right here?

THE COURT:  Yes, you may.

MR. McCAUSLAND:  Can everybody hear me?

## CROSS EXAMINATION

BY MR. McCAUSLAND:

Q   Do you speak Spanish?

A   Not fluently.

Q   All right.  Were you involved in figuring out what Los Carnales Chingones means?

A   I was not involved, no.

Q   Where did that information come from?  Do you know where it came from?

A   The partner I had at the time, after getting more deeply involved with this, Francisco Hara, was fluent in Spanish, and that's what he told us it translated to. We also had information prior to -- that information was also basically given as I started and was getting, I guess, knowledgeable in the gang stuff.

Q   All right.  So some of what's in Exhibit 1 is information that was there before you started that you have just accepted and relied upon?

A   I mean, it was handed to us saying this is what this is and it's been confirmed through other people, so, yeah.

Q   But you haven't confirmed each and everything in Exhibit 1?

A   I don't know what you're meaning as confirmed each and every thing.

Q   The accuracy of the information.  Have you confirmed every bit of information in Exhibit 1?

A   What -- I mean, what information are you --

Q   Well, I don't know.  Where it talks here on the first page about under Diablos Viejos about Nortenos established by second generation Hispanics or Chicanos in California prisons to protect from other race gangs and the Mexican mafia --

A   That was from training from, as Agent Webb stated, from Al Valdez.  I've attended the same kind of trainings he has.

Q   All right.  But are there things in here that you didn't receive in training or personally verify?

A   Most of this stuff was, like I said, it was a corroboration of everybody on this is what Agent Webb knew as he came in and learned through training, this is the same thing I've learned through training so, I mean, it was verified in some way.

Q   All right.  It was one of the three of you?  In other words, Agent Webb, Detective Bice or yourself?

A   Yes.

Q   All right.  Thank you.  Same thing on Diablos Viejos.  Do you know how they determined that means "old devils"?

A   That's -- I don't speak Spanish so I don't know.  My partner is fluent in it, stated that was the same thing that it meant so, that's what we knew it prior to that as well, so, again, that was another confirmation from my partner.

Q   All right.  The name Shrek, which is identified on the Indictment as the nickname of Angel Cerda, Shrek is a big green guy in animated movies; right?

A   That's correct.

Q   Anything about that that has to do with any gang that you're aware of?

A   No.  Other than being his street name, that's it.

Q   All right.  Thank you.  That's all.

          THE COURT:  Yes, Mr. Shultz.

          MR. SHULTZ:  Thank you, Your Honor.  I just have a few questions as well.

                    **CROSS EXAMINATION**

BY MR. SHULTZ:

Q   Good afternoon, Agent.  I guess we'll start with

sort of the same thing, with Bugsy after Juan Torres.
Is that a gang name or is that just a nickname as far as
you know?

A    That's his, his street name.  That's what he's known
as.

Q    You don't have any reason to believe that it's the
same as for Jason Najera as Norte?  In and of itself,
there is nothing about that name that is gang related?

A    Right.  You're correct.

Q    I may have just missed this.  You're now with ABC at
the Kansas Department of Revenue?

A    Yes.

Q    Anything about your current job that requires or
enhances your gang expertise in any way?

A    Nothing that requires it; but I've asked them if I
could still attend training when it comes available to
keep you with it, which they've approved that so --

Q    You're not, as part of that job, actively
investigating gangs any more?

A    Not unless they're underage drinkers or selling it
illegally.

Q    And just to clarify, the example you gave about the
mall, did you specify which gangs you talked to, which
gang told you, hey, we're bringing our peewees to test
them out?

A    No.  But it was DV.

Q    Okay.  When you -- the three of you were putting together Exhibit 1, did you ever have disagreements about what should or shouldn't be in?

A    Not necessarily disagreements as much as, you know, do we put this, and it was kind of yes or no.  I mean, it wasn't two of us said yes, one said no and they removed it or we added it.  It was, I mean, it was, basically, it was unanimous whether we were going to put it or not.

Q    Was it unanimous immediately?

A    In like -- I don't recall on each and every thing but --

Q    Is it fair to say -- well, let me start over.  Would you agree that gang -- that there's not a one-size-fits-all model that can be applied to all gangs?

A    As far as what do you mean?

Q    Just if somebody says all gangs are the same.  Is that a reliable principle?

A    I would say no.

Q    Okay.  All gangs in Kansas are the same.  Is that a reliable principle?

A    To say they're all the same, no; but do they have some of the same structure and basic guidelines and

rules, probably so.  But not that they're all the same.

Q   Okay.  So similar -- similarities maybe?

A   There's some similarities.  There's gonna be some things, obviously, that are different.  That's gonna be with everybody.

Q   Okay.  But the structure, membership, et cetera, shouldn't -- isn't identical?

A   It's not identical; but some of it's gonna model, you know, one gang may model this one or this gang may do it just a hair different.  Do you see what I mean?

Q   Yeah.  If somebody holds themselves out as an expert and says gang structures are all identical, is that a credible expert?

A   Going to depend on how their gangs are.  If it's just gangs in general, I don't know how every single gang does things compared to our Dodge City gangs.  I haven't been to Texas or LA and investigated or got the whole background or interviewed on the Bloods or Crips or the Northsiders there or the Southsiders there to figure out if ours are doing the exact same thing those are.  So --

Q   The four sets listed in Exhibit 1, are there other sets or gangs outside of those in Dodge City?

A   Yes.

Q   Okay.  And there are differences in the structure,

membership, among all the gangs in Dodge City --

A    There's gonna be, yes.

Q    That's fair?

MR. SHULTZ:  Okay.  That's all the questions I have.

THE COURT:  I hesitate to ask about redirect.

MR. SMITH:  Nothing further.

THE COURT:  Thank you.  All right.  We're through for today.  We'll reconvene tomorrow morning at 9:00 and --

MR. MANDELMAN:  Your Honor, if I could just address the Court just real briefly.

THE COURT:  Yeah.

MR. MANDELMAN:  I had filed this previous motion about gang -- the gang -- the gang sheets and trying to suppress some of the information that was on the gang sheets.  And I -- if I may just move or suggest that we deal with some of that through if the Government were to file a specific 404(b) notice because we haven't really dealt today with the underlying source of material about individual admissions.  We have information and just the position we're all in is I've got information going back to 2000, so 13 years old, that involves interaction with the police that I don't know if the Government is going to try to introduce

that.  And I suggest that we have a specific 404(b) motion about prior incidents that aren't the ones -- that aren't the crimes that are charged here that we deal out to just sort of narrow the issues here.

THE COURT:  Well, I hear you saying two things.  One, if the Government intends to offer true 404(b) evidence against any defendant, the Government is going to have to notify; but as far as gang sheets are concerned, I don't believe, at least the way I understand what a gang sheet is now, that that in -- that a gang sheet in and of itself is 404(b) evidence.

MR. MANDELMAN:  Well, uhm --

THE COURT:  Being listed on a sheet is not evidence of a crime.  I wouldn't think.  What's the Government's position on this?

MR. WELCH:  Your Honor, I think we can make this quick.  The actual sheets we don't expect to offer as evidence at a trial.  There may be the incident itself may be offered as evidence --

THE COURT:  As individual --

MR. WELCH:  Yes.

THE COURT:  -- not as a group --

MR. WELCH:  Correct.

THE COURT:  -- against everybody.  Does that answer your question?

MR. MANDELMAN: Well, to the extent that this is a RICO case and one of the elements of the crime is going to be membership in this enterprise. The Government's going to use this 2000 admission to a police officer that I've not had the opportunity to challenge. I mean, I'm asking that those specific incidents that they do intend to use be noticed. Otherwise, we've got no -- we're going to be objecting at trial --

THE COURT: I think he just said they don't intend to offer the gang sheets --

MR. MANDELMAN: Well, he said they intend to introduce the incident --

MR. WELCH: Maybe. There's a 404(b) deadline the Court has already imposed, which we will comply with, and you'll know then what we're going to offer and what we're not.

MR. MANDELMAN: Okay.

THE COURT: Sounds good to me.

MR. MANDELMAN: Okay. Thank you.

(Adjourned at 2:25 p.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 19th day of April, 2013.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS


UNITED STATES OF AMERICA,            )
                                     )
                         Plaintiff,) District Court
                                     ) Case No. 12-10089
vs.                                  )
                                     )
JASON NAJERA, et al,                 )
                                     )
                         Defendants,)
                                     )
_____


### TRANSCRIPT OF DAUBERT MOTION HEARING


On the 17th day of April, 2013, came on to be heard **Hearing on Daubert Motion** in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.


**APPEARANCES**

The **Plaintiff** appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;

Defendant **Alfredo Beltran-Ruiz** appeared in person and by and through Mr. David Rapp;

Defendant **Donte Barnes** appeared in person and by and through Mr. Jeff Griffith;

Defendant **Jesus Sanchez** appeared in person and by and through Mr. Mark Schoenhofer;

Defendant **Enrique Gobin** appeared in person and by and through Mr. Ed Robinson;

Defendant **Alfonso Banda-Hernandez** appeared in person and by and through Mr. Mike Hepperly;

Defendant **Andrew Gusman** appeared in person and by and through Mr. Eric Hartenstein.

## I N D E X

**APRIL 17, 2013:**

**WITNESS**

**SHANE WEBB**
Direct Examination by Mr. Welch:          4
Cross Examination by Mr. Rapp:           55
Cross Examination by Mr. Robinson:       60
Cross Examination by Mr. Schoenhofer:    63
Cross Examination by Mr. Hartenstein:    70
Cross Examination by Mr. Hepperly:       77

**JAMES NAU**
Direct Examination by Mr. Smith:         84
Cross Examination by Mr. Schoenhofer:   108
Cross Examination by Mr. Robinson:      112
Cross Examination by Mr. Hartenstein:   117


Certificate of Certified Shorthand Reporter: 121

| EXHIBITS | I | O | A |
|---|---|---|---|
| **Gov't** | | | |
| 1 thru 40 | 17 | 17 | 18 |
| 2 | 16 | | |
| 4 thru 11 | 34 | | |
| 5 & 6 | 36 | | |
| 7 | 37 | | |
| 8 | 39 | | |
| 10 | 39 | | |
| 11 | 40 | | |
| 12 | 41 | | |
| 13 | 41 | | |
| 14 | 41 | | |
| 15 | 41 | | |
| 16 & 17 | 42 | | |
| 18 thru 31 | 42 | | |
| 32 & 33 | 46 | | |
| 34 & 35 | 48 | | |
| 36 | 49 | | |
| 37 | 51 | | |
| 38 & 39 | 52 | | |
| 40 | 42 | | |

(Beginning at 9:10 a.m. April 17, 2013, the following proceedings were held.)

THE COURT:  Good morning everyone.  This is day two of the *Daubert* hearing in case number 12-10089.  We've had some cancellations in this matter so I think I'd better note the appearances.  Lanny Welch and Aaron Smith, of course, for the Government.  Alfredo Beltran-Ruiz.

MR. RAPP:  Is here, Your Honor, with his lawyer Dave Rapp.

THE COURT:  All right.  Good morning.  Donte Barnes.

MR. GRIFFITH:  He's present, Your Honor.  Good morning.  Jeff Griffith with him.

THE COURT:  All right.  Jesus Sanchez.

MR. SCHOENHOFER:  He appears in person, Your Honor, and with counsel Mark Schoenhofer.

THE COURT:  All right.  Enrique Gobin.

MR. ROBINSON:  Mr. Gobin is here in person and with counsel Ed Robinson.

THE COURT:  Alfonso Banda-Hernandez.

MR. HEPPERLY:  He is in person and by and through Mike Hepperly.

THE COURT:  And Andrew Gusman.

MR. HARTENSTEIN:  Present, Your Honor, with counsel Eric Hartenstein.

THE COURT:  All right.  Thank you, Gentlemen, all.

MR. WELCH:  We're ready, Your Honor.

THE COURT:  So am I.

MR. WELCH:  We would call Shane Webb, Your Honor.

THE COURT:  Mr. Webb, you're still under oath, sir.

A   Yes, sir.

**SHANE WEBB**

Having been **previously** duly sworn to tell the truth, the whole truth and nothing but the truth, **testified further** as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you state your name.

A   Shane Webb.

Q   Mr. Webb, how are you currently employed?

A   By the Kansas Bureau of Investigation.

Q   How long have you been employed by the KBI?

A   Since February 3rd of this year.

Q   Prior to your employment with the KBI, were you employed by another law enforcement agency?

A    Yes, I was.

Q    Which agency?

A    The Dodge City Police Department.

Q    When did you begin your employment with the Dodge City Police Department?

A    On January 3rd of 2005.

Q    Prior to being employed by the Dodge City Police Department, did work for another law enforcement agency?

A    No, I did not.

Q    When you joined the Dodge City Police Department in 2005, what was your rank?

A    I was a patrol officer.

Q    And prior to becoming commissioned an as officer, did you attend the Kansas Law Enforcement Training Center?

A    Yes, I did.

Q    And how many hours of training did you receive there?

A    I believe it was 560.

Q    And did you successfully complete that training?

A    Yes, I did.

Q    When you began your employment at the Dodge City Police Department, you said you were a patrolman; is that correct?

A    That is correct.

Q   What were your general duties when you started?

A   General duties was to take street calls; any calls to 911.   Also to work traffic enforcement.

Q   And at some point in time did your -- while you were a patrol officer, did your duties include gang enforcement and gang investigation?

A   Towards the end of 2005, beginning of 2006, I was placed on the street crime unit, which its primary function was to work gangs and street level narcotics sales and use.

Q   All right.  And the street crime unit was known as the SCU; is that correct?

A   That is correct.

Q   The SCU existed prior to your employment by the police department?

A   Yes, it did.

Q   And while -- when you were assigned to the SCU -- I'm sorry -- you said that was in '05 or 2006?

A   Right at the end of '05, beginning of 2006.

Q   When you began your assignment with the SCU, your role included investigation of gang crimes; is that correct?

A   Yes, sir.

Q   Generally speaking, what did the SCU do?

A   We would respond to all calls involving gangs, gang

activity.  We would back officers up on traffic stops where they would stop known gang members.  We would work any type of a -- anything the officers deemed was some type of gang related activity, whether it be as serious as a shooting in an occupied dwelling, anything like that.  Any criminal damages, graffiti, any kind of gang graffiti that would be tagged up or spray painted onto buildings referencing tagging, we would work those, document that kind of stuff.

Q   When you say tagging, you're talking about spray painting on property, cars or buildings?

A   That is correct.

Q   At some point in time did your role or your -- let me say, your rank with the police department change?

A   Yes, it did.

Q   When and what did it change to?

A   It was in July of 2007.  I then became a detective with the Dodge City Police Department.

Q   How did your duties change when you became a detective?

A   Primarily I still was working gang crimes in the detective bureau, just wasn't working the initial call unless we were requested to come out on different scenes to work those scenes.

Q   When you were with -- when you were a patrol officer

with the SCU, how many SCU gang officers were there?

A    Most of the time, there was four of us.

Q    When you were promoted to detective and you were working gang crimes as a detective, how many gang detectives were there?

A    It was pretty much just me until Detective J.L. Bice came on the police department, I believe in 2008.

Q    All right.  Can you briefly tell us how your duties changed in relation to gang investigation when you were a patrol officer as compared to when you were a gang detective?

A    Sure.  When I was -- when I worked on the SCU, you know, our primary function was talk to a lot of these guys on the streets through different kinds of contacts, whether it be criminal in nature --

Q    When you say these guys, who are you talking about?

A    I'm talking about gang members.

Q    Okay.  Go ahead.

A    Between -- whether it was criminal in nature or if it was just a consensual contact at a different business or restaurant, wherever it my be.  We would also work -- just because for lack of better terms -- we worked the front end of the crimes that would be happening on the streets.  When I went to the detective bureau, we had a lot more time to work these crimes, I'd say, on the back

end or to work older cases through whatever means, whether it be informants or getting new information on these cases.

Q   And --

A   I hope I explained that well enough.

Q   There was a period of time when you became a detective in 2007 that you were the only gang detective with the police department?

A   Yes.

Q   And that changed when Detective Bice was hired in 2008; is that correct?

A   That is correct.

Q   When you were with the SCU, were there times that non-SCU patrol officers with the police department would call you in because you had the gang expertise?

A   Yes.

Q   Give us an example of when that would happen?

A   For instance, if they would either have something that was gang related where they thought certain persons were involved in it, or they might need to know monikers, nicknames, or just at all different times. When they thought something was gang related, they would most definitely usually contact us.

Q   Was that true, then, when you became a detective?

A   Yes.

Q   While you were with the Dodge City Police Department, did you receive training that was gang related training?

A   Yes, I did.

Q   What type of gang training did you receive as either a patrol officer or a gang detective?

A   Have constantly went through gang trainings from the time we started at the academy.  They had basic gang training.  Through my field training, officer time with the Dodge City Police Department, we also went through some gang training.  Then, shortly after, became a member of the Kansas Gang Investigators Association.  I was a member of that for three years.  I've constantly went through different gang trainings throughout my career.

Q   In addition to receiving gang training while you were with the Dodge City Police Department, did you provide or give training, gang related training, to other groups and law enforcement agencies?

A   Yes, I did.

Q   What type of training did you provide?

A   Different trainings to different persons or entities or groups within the community that would ask for some type of gang training to know what -- either they start seeing different graffiti around town, wanted to know

Case 6:12-cr-10089-MLB   Document 605   Filed 04/24/13   Page 11 of 121
Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 467

11

what it meant, wanted to know what kind of gang problem we had; and for the last few years, I've also given training on southwest Kansas gangs at the Wichita Crime Commission Conference on Gangs and Narcotics.

Q   While you were with the police department, Agent Webb, did you have interaction with other law enforcement agencies either in Ford County or elsewhere in Kansas or in other states where agencies were contacting you as an expert on gangs in Dodge City, Kansas?

A   Yes.

Q   What type of agencies or what type of work did you do?

A   Pretty much all the cities in southwest Kansas including Garden, Liberal, Great Bend, as well as their respective Sheriff's Departments out there would contact us due to the frequency of gang members moving in between those cities, being in the presence of gang members in other communities.  They would call us any time they would see that.  We would also do the same. If we were able to talk to or identify any of their members from their cities, we would then get in contact with them.  I was also contacted by Kansas Department of Corrections quite frequently when we would either have members going into prison, they would be asking about

their relationship with gangs, or when -- and the same when they were coming back out on the streets, they would usually give us a call, let us know what, if anything's, happened during their incarceration that was gang related and also advise us that, you know, this person is getting ready to get released.

Q   When you were with the police department, Agent Webb, did you have direct contact with gang members in Dodge City, Kansas?

A   Yes, I did.

Q   Did you interview various gang members?

A   Yes, I have.

Q   Did you have contact with victims of gang crime in Dodge City?

A   Yes, I have.

Q   Did you have contact with families of gang members in Dodge City?

A   Yes.

Q   And did you have -- did you receive information from confidential informants that was strictly gang related or gang related information?

A   Yes, I have.

Q   Now, when you talked with parents of gang members, what was the purpose, generally, of that contact or that interaction?

A   Usually when we talk to parents is when we would first identify different persons as possibly starting to get involved in gang activity, we would try to contact parents.  We would go to houses, speak to them.  Most of the time, they didn't have a clue as to what their child was starting to do.  Oftentimes, they would have different symbols and clothing items and stuff like that in their rooms that the parents wanted us to look at because they didn't know what it meant.  But we would contact them any time we were able to identify a person that might be possibly just in the beginning stages of hanging out with different gang members.

Q   When you would either talk with gang members themselves or victims of gang crime, were you occasionally provided street names or monikers for the gang members involved in various crimes or incidents?

A   Yes, we were.

Q   Were there times that the only identification that could be provided was the street name because the person didn't know the person's real name?

A   That is correct.

Q   From your experience, have you found that gang members in Dodge City generally had a street name or a moniker?

A   Yes.

Q   During your employment with the police department, did you become involved in the investigation of gang crime?

A   Yes.

Q   What type of gang crime did you help investigate?

A   Are you talking about this case or --

Q   No.  Just generally during your tenure with the Dodge City Police Department.

A   In general, I worked everything from traffic violations, criminal damages, narcotics use and sales, robberies, home invasions, burglaries, homicide, just the whole -- just about everything.

Q   Within the police department, were you recognized as one of the gang experts in Dodge City?

A   Yes.

Q   And by other police departments regionally or state-wide, were you recognized as one of the experts on gangs in Dodge City, Kansas?

A   Yes.

Q   You've talked about the SCU a little bit.  Was that a program enacted by the police department to counteract gang activity or gang crime?

A   It was created before I was there.  I know that was part of their role, so I'm sure that's what the department was looking at whenever they formed that

unit.

Q   And when you were a member of the SCU, was that one of their priorities?

A   Yes.

Q   Were there other initiatives while you were employed at the police department that were directed at gang crime and gang activity?

A   Yes.  In 2006 the drug enforcement agency out of Garden City, Kansas, with cooperation with the Garden City Police Department, Finney County Sheriff's Department, as well as the Dodge City Police Department, Ford County Sheriff's Department, Holcomb Police Department and some other smaller agencies, created Go Soldiers Task Force, which was a task force that was designed to go back and forth between Dodge City and Garden City on I think it was every other weekend, basically, we would go to one community or the other, work through the evenings on either Friday or Saturday nights.  Also persons that would come out and be part of that task force would be probation, corrections, court services, any type of those probationary service type persons would come out and we would either do bar checks, home visits on persons that they had on corrections that were gang members that they've been wanting to do home visits on, we would do those.  There

was also times when we would do home visits on persons that they were still wanting to do home visits on but were not -- were not gang related. We would still assist them in those type of calls.

Q   Were there members of the Dodge City Police Department that did not have the level of interaction with gang members or gang crime that you had?

A   Yes.

Q   While you were at the department, were there policies in place that were meant to assist you in determining how to classify or document gang members?

A   Yes.

Q   Would you look at the black notebook that I think you have in front of you and look at Exhibit 2 and tell us if you can identify that?

A   Yes, I can.

Q   What is that?

A   This is the policy from the Dodge City Police Department on gangs, gang documentation, as well as the Street Crime Unit.

Q   And were those -- were those policies in place when you were employed by the police department?

A   Yes, they were.

Q   And were those the policies that you followed?

A   Yes.

MR. WELCH:  I'm going to try this again, Your Honor.

Q  The entirety of that notebook are Exhibits 1 through 40.  1, 2 and 3 are documents and then 4 through 40 are photographs.  You recall looking at those yesterday?

A  Yes, sir.

Q  Did you identify each of those yesterday?

A  Yes, I did.

Q  And can you testify that 1, 2 and 3 are either documents that you prepared or documents that you recognize as being policies of the department or a gang sheet?

A  Yes.

Q  And then you recognize 4 through 40 as photographs that are maintained by the Dodge City Police Department; is that correct?

A  Yes.

MR. WELCH:  We would offer 1 through 40 at this time, Your Honor.

THE COURT:  Any objection?

MR. GRIFFITH:  Do they have to be readmitted, Your Honor.  They were admitted yesterday.

THE COURT:  Well, but because we're doing this in three separate hearings, I suspect that -- well, it's only reasonable for me to allow any objections --

MR. GRIFFITH:  No objection, Your Honor.

THE COURT:  -- to any of the exhibits, but --

MR. HEPPERLY:  I have no objection, Your Honor.

MR. RAPP:  No objections, Your Honor.

MR. HARTENSTEIN:  No objection, Your Honor.

MR. ROBINSON:  Same.

THE COURT:  Mark.

MR. SCHOENHOFER:  No objections, Your Honor.

THE COURT:  All right.  Exhibits 1 through 40 are received.

MR. WELCH:  Thank you, Your Honor.

BY MR. WELCH:

Q   Exhibit 2, Agent Webb, you said are policies that were created by Dodge City Police Department focusing on gangs; is that correct?

A   Yes, sir.

Q   And did, to your knowledge, the Dodge City Police Department model their criteria used in documenting gang members on anything else?

A   Their criteria was already a model whenever I started.  I know in 2006 State of Kansas actually finally came out with a law identifying what gang members were for the State of Kansas.  I know that the policies and procedures in the gang verification

criteria that they had in place already fit within those parameters.

Q   So the policies that were in place comported with the state law which was later enacted is what you're saying?

A   That is correct.

Q   All right.  So what, in order to document a gang member in Dodge City, Kansas, what did you do?  What steps did you go through?

A   The person would be contacted either by -- any officer, any law enforcement officer in Dodge City.  If they had different reasons to document them, whether that person would be admitting gang membership, using gang monikers, being in association with other known gang members.  If they had other sources that would tell them this person is a gang member.  There's different -- all the criteria listed out on the gang criteria or verification criteria, any of that information could be filled out on there.

Q   When a Dodge City police officer, not just you, but any police officer came into contact with a gang member, what were they supposed to do with information they gathered during that stop?

A   Like I said, any information about any kind of the gang contact, I guess I could say, on the back side of

the sheet and what the officers would collect would be any personal identifiers, hang outs, driver's license, anything, any cars they were in, any persons they were hanging out with, any residences they were hanging out at, all that stuff could be documented on one of these sheets.

Q   All right.  And the sheet you're making reference to, do you see an example of one as Exhibit 3?

A   That is correct.

Q   And do you know -- have you personally filled out those gang sheets in the past?

A   Yes, I have.

Q   And have you seen gang sheets filled out by other police officers?

A   Yes, I have.

Q   Was there a point in time that every gang sheet that was generated within the department had to go through you?

A   Yes.

Q   What period of time was that in place where you saw every gang sheet generated?

A   I believe it was somewhere around 2009 to approximately 2010, '11, somewhere in there.

Q   Now, at some point, then, were persons in Dodge City documented as gang members by the police department?

A   Yes.

Q   And that was done in part by -- well, utilizing the criteria that's on the gang sheet?

A   That is correct.

Q   And then yesterday we talked about entering that information into NCIC.

A   Yes.

Q   Is that right?  What is done -- why are gang members entered into NCIC, the national data base?

A   The national data base is more for officer safety purposes.  If persons meet certain criteria off the gang verification criteria, I believe either if they admit gang membership, that can get them entered, or if they meet three or more of the criteria underneath that line, they can be entered into NCIC.  NCIC, once a person is entered into NCIC, they're in there for five years. They can come back out after five years if no gang contact has been made with them.  That is for any officer that stops that person anywhere in the contiguous United States and run their driver's license, run their name or date of birth, NCIC will let them know basically who they're dealing with for an officer safety purpose.

Q   So to make sure we're clear.  At the police department there were a list of gang members maintained

by the police department correct?

A   Maintained by the records department, that's correct.

Q   And then at some point, generally, those identified gang members would be entered into NCIC by the police department as well as a national data base; correct?

A   That's correct.  That's by the records department also.

Q   Was it possible that once you became a documented gang member you could be undocumented and no longer considered a gang member by the police department?

A   Yes.

Q   Did you see occasions where that happened?

A   Yes.

Q   You talked earlier about this five year period of time.  How was that decided upon as an appropriate period of time to use?

A   Those are NCIC rules.  I don't know how they came up with that time period.

Q   Okay.  All right.  But you -- did you deal with verifying -- how would you get notified that it's been five years since last contact?

A   Each month NCIC puts out a list of those agencies that have members documented within their computer system.  NCIC will then send some type of a sheet that

says these members are getting ready to -- their five years is basically up.  We would then either look and see if they were incarcerated in a prison setting.  If so, we would then contact that prison to find out if we had enough information we could obtain from them to either keep them entered in NCIC or if no contact was made or if the person legitimately just quit doing any of this stuff, being a gang member, and was now no longer associating with, not committing any crimes with, those persons, a sheet would then be filled out saying no gang contact, remove from NCIC.  That would then be relayed to the records department for their records so that they could then take that person out.

Q   All right.  Agent Webb, I want to ask you now some questions generally about gangs in Dodge City.  Not any particular gang, but just generally speaking now.  From your experience, the gangs that you encountered and worked with and against in Dodge City, did they generally have a structure?

A   Yes, they did.

Q   And within the structure, was there usually a hierarchy, a leadership and other positions within the gang?

A   Yes.

Q   Can you tell us, generally speaking, what that was?

A   You're hierarchy basically goes with what they consider OGs or older gansters.  They also refer to these persons as shot callers.  That's your -- your hierarchy.  Then below that would be more of what we consider a street soldier or soldiers sometimes how they're referred to, which is going to be persons that will commit a lot of crimes for the gang.  Usually that's your persons that are also involved in narcotics use and sales.  Below that is your -- what we consider peewees.  Most of these are end of middle school to high school age individuals and they're usually responsible for most of the graffiti and tagging.

Q   And, again, generally speaking, within gangs in Dodge City, how did one become a member of a gang?  What did you have to do?

A   Get jumped in.  Get beat in.  Be a certain amount of time that a certain number of members would be determined by the group that was going to put that person in the gang would then physically beat them up for a certain period of time, whatever they deemed.

Q   Was that the only way to become a member?

A   No.

Q   How else could you become a member?

A   Persons come also be blessed in.  And I say that -- it's basically if you have older siblings that are in

the gang, they know that you're down for the gang, that you would do whatever for the gang, they might not necessarily have to beat you into the gang.  You could be basically blessed into the gang.  I know of other ways through my trainings that I've heard persons get in.  They could be -- commit crimes to get into the gang against, usually, rival gang members.  There's also ways for females to get in the gang.

Q   And once you became a member, again, just talking about gangs in general in Dodge City, once you became a member, were their rules of conduct that you were expected to operate within?

A   Yes.

Q   Generally speaking, what would those rules be?

A   Some of the rules that I know as far as the gangs in Dodge, they'd have different rules about drug use, certain kinds of drugs to use them or not.  Meetings, you were required to attend meetings.  If not, you could get violated.  Violations would usually include a physical beating if you got a violation.  If you were late to meetings.  At one point if you didn't bring funds to the meeting.  If you were messing with other gang members' girlfriends, that could get you a violation.  There's several different things that could get you violations.

Q    And gangs in Dodge City, do they usually have a rival gang?

A    That is correct.

Q    Are there rules that are expected of gang members in relation to how they're supposed to interact with rivals that they encounter?

A    Yes.  If they're hit up by another gang member of a rival gang, if there are either gang signs are thrown at them or something's said, or if they don't -- if they don't act on those type of things, they could get violated.  It makes the gang look weak.

Q    If they back down to a threat, that can be a violation?

A    Yes.

Q    Are there generally common symbols and terminology and hand signals, colors, that are used by gangs in Dodge City?

A    Yes.

Q    You've already identified Exhibit 1.  Is this a document that you helped create?

A    Yes, it is.

Q    Within that document, did you -- let me ask you this.  Within Dodge City, were there gangs and are there gangs that have adopted certain colors as their color?

A    Yes, they have.

Q   Okay.  Are there gangs in Dodge City that adopt blue as their color?

A   Yes.

Q   Which gangs are those?

A   18th Street and Master Criminal Boys.

Q   And are there gangs that have adopted red as their color?

A   Yes.

Q   What gangs are those?

A   DV, Diablos Viejos, and Los Carnales Chingones.

Q   Known as LCC?

A   That's correct.

Q   Within that document, that summary that you put together, did you identify the number of DV gang members at a certain period of time in Dodge City?

A   Yes.

Q   What date did you use and what was the number of DV gang members?

A   This was as of July 1st, 2012, and I think I said 217 yesterday, but it's 218.

Q   And then LCC, did you give a number for that same date?

A   Yes.

Q   What was that?

A   There were 67.

Q   And these are active members; correct?

A   Active within the five years previous from July 1st, 2012.

Q   Okay.  There's also sometimes used the term associate, associate gang member.  What is an associate as compared to a member?

A   An associate is just somebody that there was not enough criteria met for that person to be entered as a gang member, but it's still, for intelligence purposes, something that we wanted to document within the police department, whether it be a person that gives gang members rides around town or is just hanging out with these individuals.  There was still information that we want to document somehow so that we knew who that person was and who they were hanging out with.

Q   Over the past five years, Agent Webb, which gangs in Dodge City were the most active?  And by active I mean committing most of the criminal activity that was investigated by the police department.

A   At the end of 2008, it was probably MCB; but from 2008 on, it's been DV and LCC.

Q   And MCB you said has adopted the color blue; correct?

A   That is correct.

Q   And do they consider themselves affiliated with a

Sureno or would they call themselves a Sureno gang or --

A    Yes, they would.

Q    And then the DV and LCC, sometimes there were Nortenos attached to them; is that correct?

A    Yes.  More DV than LCC.

Q    What is -- what do you mean by that?  There's a DV gang and an LCC gang which are separate gangs; is that correct?

A    They're separate sets, yes.

Q    Separate sets.  Okay.  And what is their connection to or relation to Nortenos, what is that?

A    Ask me that one more time because I don't want to mess this up.

Q    Sure.  You identified the DV, Diablos Viejos, in Dodge as being a red gang; correct?

A    Yes.

Q    And LCC is another red gang, separate set, but they are -- are they allied with each other?

A    Yes.  They're allied with one another.

Q    Do they interact with each other?

A    Yes, they do.

Q    Do you see DV and LCC gang members together?

A    Yes.  They also commit crimes together.

Q    Okay.  I was just going to ask, have you seen DV and LCC gang members commit criminal activity together?

A    Yes, they do.

Q    Where does the word Norteno or the name Norteno, how does that apply to Dv and LLC.

A    The word Norteno comes out of California.  In California there's basically a dividing line by Bakersfield, California.  Supposed to be, if you went to the California penal system and you were born south of that line of Bakersfield, kind of cutting across the state, you would go to prison as a Sureno gang member. If you were from north of that line, you would go there as a Norteno gang member.  Basically just means you're northerners allied with the Nuestra Familia, which is a prison gang in California.  It's just kind of an umbrella for their gangs that wear red and have some of the beliefs that the Nuestra Familia has.  They'll call them northerns or Nortenos.  Same is true for the southerners except for they claim allegiance to the Mexican mafia, La Eme.

Q    So within Dodge City, DV and LCC gangs members generally consider themselves under the umbrella of Nortenos?

A    That is correct.

Q    Okay.  And then the same for MCB and 18th Street would consider themselves Sureno?

A    That is correct.

Q   And in Dodge City, were there areas of town that were considered either DV or LCC territory or MCB/18th Street territory?

A   Yes.

Q   What would those areas be?

A   The 18th Street and MCB would usually either live in south Dodge or in the west part of Dodge.  And by the west, I'm referring to basically Central Avenue, which kind of divides our city, to the west there.  And our DV and LCC would mainly be from the east side of Dodge City which would be the lettered streets A through P, and it would be Wyatt Earp on the south to Comanche on the north.  It's one square mile.  And people would refer to that as the east side or to alphabet city.

Q   You testified earlier that at one point in time you were involved with more investigations around 2008 of MCB or 18th Street gang; is that right?

A   That is correct.

Q   At some point that changed to DV and LCC?

A   That is correct.

Q   In response to that -- what the police department was seeing, were you yourself given a specific assignment related to gang investigation?

A   Yes, I was.

Q   When was that assignment made and what was it?

A   It was in 2010.  I was instructed by my lieutenant that's now chief, Craig Melliker, and the previous chief, John Ball, to start an investigation into DV and LCC.

Q   And that was based in part on the level of activity, criminal activity, that you were seeing by those two gangs?

A   That is correct.

Q   What type of activity were you seeing?  What type of crimes were being committed?

A   All of 'em that I discussed earlier.  Just the gamut of everything, pretty much.

Q   Okay.  Did you see violent crime committed by those gangs?

A   Yes.

Q   What type of violent crime did you see?

A   Everything from batteries to homicides.

Q   And were some of those crimes directed at rival gang members?

A   Yes, they were.

Q   Now, within the DV and LCC gangs in Dodge City, did you see -- earlier you testified gangs generally have a structure.  Did you see a structure with both DV and LCC?

A   Yes.

Q   Would the structure that you described earlier about the hierarchy you described, would that apply as well to DV and LCC?

A   Yes.

Q   And becoming a member of DV and LCC, would that be true -- the description you gave of being generally beat in was the most common method, was that true for DV and LCC in Dodge City?

A   Yes.

Q   And you know that based on what?

A   Basically, interviews and debriefs with either gang members that are currently or former gang members.

Q   And was it possible within DV and LCC to be violated?

A   Yes.

Q   Have you heard of gang members being violated for committing transgressions that you described earlier, not going to meetings, coming in late, not confronting rival gang members when they were supposed to?  Have you heard of those violations occurring in Dodge City?

A   Yes.

Q   And the DV and LCC gang members, did they always have a moniker or generally have a moniker?

A   Generally, they do.

Q   Did you have occasions where you're dealing with

either victims of crime or trying to investigate an offense where the persons involved, either the victims or codefendants, only knew perpetrators by their street name?

A   Yes.

Q   In the DV and LCC, do they have rival gangs?

A   Yes, they do.

Q   Who are their rivals?

A   MCB and 18th Street or any gang that's going to affiliate underneath the Sureno banner.

Q   And what ways do gangs notify other gangs or people in general what part of town they consider to be theirs?

A   Through graffiti.

Q   Would you look at Exhibits 4 through 11 and tell us, are these examples of graffiti that were found, tagging, that was done in Dodge City documented by the police department?

A   Yes, it is.

Q   That's true for all 4 through 11?

A   Yes.

Q   I won't spend time on each one, but let's start with 4 and briefly describe what this means to you.  How you were able to decipher the meaning of the spray paint on what appears to be a garage door?

A   Okay.  Starting on the left, obviously, the top word

is "Norteno". It's got a backwards S that's crossed out. That's to show disrespect to any Sureno gang member. Says "Nortenos por vida", so Nortenos for life. Notice the I, it appears it's got an X through it, like it's a sight glass through a, like, rifle hairs. It's got down at the bottom, it's got, "scrappas" and the S is backwards, it's crossed out, just, again, showing disrespect to Sureno gang members. The number 14 is synonymous with Norteno gang members as the 14th letter in the alphabet is the letter N so they'll use 14 a lot both in graffiti and tattoos. To the right is the gang set, which is "Diablos Viejos". You'll notice the S's are backwards, showing disrespect to the Sureno gang members. Same thing again with the I's. "El Diablito", that could be the person's street moniker that tagged this up. You'll notice the one dot and the four dots for the 14.

Q   One dot and four dots appear on either side of the Diablito?

A   That's correct.

Q   We presume that would have been done by a Diablos Viejo?

A   Yes.

Q   Why would we assume a DV would have done this?

A   If you're from another set, you would tag up your

set name.  They obviously tagged up Diablos Viejos so it's most generally going to be from Diablos Viejos.  Also, just one other thing.  When we were going through these photos, I told them yesterday, some of these dates are not right on them.  Whenever they're changing out batteries in cameras, I don't think the dates always got set back on them right.

Q   But whoever put this on the garage door, joined, Diablos Viejos and Norteno wrote both of them on the garage door, obviously; correct?

A   That is correct.

Q   And then the "scrapas" on the bottom left, you said that's a derogatory term toward who?

A   A Sureno gang member.

Q   All right.  5 and 6, let's just touch on 5 real quickly.  That appears to be a fence where initially blue paint was spray painted on and then red paint was spray painted over it; is that correct?

A   That's correct.

Q   What, generally, was the meaning of the blue paint?  Who would have done that and how do you identify who would have done that?

A   Blue paint, obvious,ly was put up by a Sureno gang member.  The 915 would be an area code that that gang member would be from.  Right underneath it says "E-P",

that would be for -- 915 area code is an area code, I'm assuming, for ElPaso, Texas. And you can see the Texas up there. They also claim east side -- probably in ElPaso they're going to claim east side, so they put up E-S which is now underneath the red paint. They put up "SUR". That would be for a southern gang member. The number 13, which is the number that they use is for the letter M, which is the 13th letter in the alphabet to show representation or respect to La Eme. And they'll use the one dot and the three dots. During this, an LCC gang member has came back and tagged back over it. Crossed out the 915 and the ElPaso, put an arrow down showing disrespect. Over the Texas part, they put LCC. Over the east side part, they then tagged up with red over the blue. Because LCC claims the east side of Dodge City, so it's common for them to put east side on stuff. The numbers 1233 at the bottom will be for the 12th letter of the alphabet, L, and the two 3's are from C, so LCC. And then you can notice that the 3s got X's through them to disrespect the number 13 or the 3's that the Sureno gang members will often tag up.

Q   Turn to 7 if you would. This appears --

A   To 7.

Q   Number 7. We're going to skip 6.

A   Sure.

Q   This appears to be a trash dumpster which has sharpie on it or black marker graffiti.  Can you decipher what's meant by this graffiti?

A   Off to the -- just starting on the left of the writing.  "DV" would be for Diablos Viejos.  Then it says "SK" and the S has got a line through it to disrespect, obviously, the Sureno gang members.  SK is generally tagged up by LCC and DV for them being scrap killers is what that means.

Q   That's what "SK" stands for is scrap killer?

A   That is correct.

Q   Okay.

A   The 1 and 4 just underneath the top where the top part of the graffiti starts for the number 14.  The number 13 and number 18s are upside down so -- and they got a line, X's through 'em and a line going down showing disrespect.  There's also "WOB".  It's usually a derogatory term towards women.  It's weed over -- a derogatory name for a woman and that could mean -- that possibly is what that means.  We've seen tagging like that.  Then down below you'll have X 4 for the 14.  Or the Roman numerals XIV, which is Roman numerals for 14.  "NA" for the letter N.  Just, again, representing north or northerners.  And then the one diamond off on the left and four diamonds off to the right, again, the

number 14.

Q    The E-N-E is Spanish for the letter N; is that correct?

A    That's correct.

Q    Which you associate with Norteno; is that right?

A    Yes, sir.

Q    Exhibit 8 is what?

A    This is a huelga bird.  Norteno gang members, this is a symbol that they will commonly use, or persons underneath that umbrella of the Neuestra Familia.  This is a symbol that the prison gang took from United Farm Workers Association in northern California as a symbol that they use, just in taggings and tattoos, it's just, again, showing allegiance back to Nuestra Familia.

Q    And the fact that it's painted in red is further confirmation that it's a Norteno tagging?

A    That is correct.

Q    Let's skip 9 and go to 10.  Can you tell us what this is?

A    This is a picture I took in Pat Long's house during a search warrant.  This is kind of a roll call for -- I say roll call.  Roll call is just some type of a piece of graffiti where different members will put their gang monikers up on 'em and we call them roll calls.  This is LCC -- you can kind of see "LCC" in red in the

background.  All the other names, the "el Gimpy", that's just going to be a street moniker for Gimpy.  "Cisco" is another street moniker.  I don't know where exactly you want me to go through all of this.  Obviously, it's -- the Roman numerals of 1233 for LCC.

Q   That's fine.  In the middle in between the two C's there's a crown that has the number 5.  What does that mean?

A   That's correct.  LCC will use a five-pointed star, as well as DV; and the LCC also uses five-pointed crown.  I'm told that each point means something different.  And with the five-point crown, it could possibly mean ES LCC, so east side LCC.

Q   Okay.  And then Exhibit 11.  DV and LCC aren't the only gangs that tag in Dodge City; is that correct?

A   That's correct.

Q   11 is an example of what?

A   This is a Sureno gang member that would have tagged this up.  The "SUR" is for Sureno.  13 is the number that they're just representing that they respect La Eme.  Then they put up "NK" with the N backwards and crossed out and that just is for disrespect to Nortenos but also saying they're Norteno killers.

Q   Just like you saw earlier "SK" for scrap killer.  This is "N" for Norteno killer; is that correct?

A    That's correct.

Q    Now, in addition to the tagging that we've seen examples of, are there also ways that they use the colors that they've adopted?

A    Yes.

Q    Is one way clothing that they wear?

A    Yes.

Q    Okay.  Let's look at Exhibits 12 through 17.  We won't look at each one of these, but starting with 12. Why would a police officer have taken a picture of this clothing?

A    For the red shirt and the red bandana hanging out of the back pocket, as well as the red on the tennis shoes. This would be common colors for LCC or DV.

Q    And the way that this person has the bandana hanging from their pocket, is that common?  Have you seen that --

A    Yes, I have.

Q    -- frequently?  Then Exhibit 13, what is that?

A    Just showing, obviously, the red undershirt, the red boxers.  The biggest thing in this is going to be the belt, though.  It's got an "N" on the belt, which is representing Norteno.

Q    14, we see the bandana hanging from the pocket again like we saw in 12.  And then 15, another belt with the

letter N on the belt buckle?

A    That is correct.

Q    And then 16 and 17.  Why would pictures be taken of these two people and maintained by the Dodge City Police Department?

A    Again, red clothing.  The red flannel jackets are popular with persons in LCC and DV.  Just the opposite would be the same with Surenos, they'll wear a lot of blue flannels.  In Exhibit 17, of course, the red clothing.  Also the sports cap was one of the bigger parts of this.  That's for the Boston Red Sox.  They'll wear a lot of sports memorabilia that is either associated with red in color, the number 14, or team names with the name of "red" in 'em, like Cincinnati Reds is also another popular hat.  You'll see a lot of Norteno gang members, whether DV or LCC, that will have the letter C usually in red.

Q    Okay.  And then the use of the letter "N", DV, LCC, huelga birds, do you also see that used in tattoos?

A    Yes, I do.

Q    Starting with 18 through 31 and then 40, are these pictures of tattoos taken by the police department and maintained within your custody?

A    Within the -- yeah, the Dodge City Police Department's?

Q   Yes.

A   Yes.

Q   18, what is meant by these three tattoos we can see?

A   Again, it says "Norteno".  It's got the huelga bird that we talked about earlier.  And, obviously, this would be a Diablos Viejos gang member.  He's got Viejos down below.  And you notice the line.  This is in cursive, but that line going through the S could be just showing some type of disrespect or it might just be because of the cursive write.

Q   And would you presume that elsewhere on this person's body the word Diablos appears?

A   Yes.  Probably going to be on the other arm.

Q   And then Exhibit 19.  On the face of this person appears the number 1 and 4.  What is meant by that?

A   That's correct.  Again, it's the 14th letter of the alphabet for the letter N for Norteno.

Q   Again, the number 14 on the back of a neck?

A   That's correct.

Q   14 on both arms.  1 and 4 -- 1 on the right arm, 4 on the left arm; correct?

A   That's correct.

Q   Okay.  And then "Norte" on Exhibit 22.  What's meant by that?

A   Just a north side gang member.

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 500

Q   Okay.  Exhibit 23.  What is significant in this photograph?

A   Again, it shows some red sports clothing.  You'll notice the four dots on the left wrist.  Most generally there will be one dot on the other wrist.  So they put them together for 14.

Q   Okay.  Exhibit 24.  What is significant about this photograph?

A   In this one, this individual has "Norteno" over the right eyebrow and "catorce" over the left eyebrow.

Q   And then a red star in 25.  What -- why is that significant?

A   The red star can mean several different things to these gang members.  It's, obviously, it's filled in with red.  The five-point star could be the north star. If you count each one of the points, there's five points.  N-O-R-T-E is what they'll say the points mean. LCC will use it just a little bit different, they'll say it's ES LCC, east side LCC.

Q   Exhibit 26, focusing on the right arm.  What is significant about these tattoos?

A   The letter "N" representing the Norteno.  As well as "XIV" for the number 14.  As well as a huelga bird. Looks like there's some writing behind it.  I can't really tell off this photo, but it might be some type of

a cover up tattoo where they're covering something else up. I don't know.

Q   Then Exhibit 27, there appears on the right cheek to be a tattoo. What is significant about that?

A   That's correct. There's a -- the letter "N" for Norteno. I believe he's also got one dot and four dots by his eyes.

Q   And wearing red as well?

A   That's correct. Also has a red rosary, which is common with Norteno gang members.

Q   Exhibit 28. Are there tattoos here that are significant?

A   Yes. The one dot by the right eye and four dots by the left eye, again, just for the number 14.

Q   Okay. Then 29, "X" and "V" -- X standing for ten, Roman numeral ten; correct?

A   That is correct. Then four. So, again, 14.

Q   And then number 30. The star, does that mean anything to you?

A   Yes. Just like we just described the star, just putting it on some part of their body.

Q   You said both the star and five-point crown are used for basically the same meaning; is that right?

A   That's correct.

Q   Okay. Now, in addition to tattoos -- I'm sorry --

let's skip to 40 real quick.  Look at 40 and tell me if there are tattoos that are significant for a gang investigator in this photograph?

A    Yes.  The "X" and "4" on the forehead for the number 14.  There's also, I believe, "DV" on the right cheek -- or maybe it's on the left, one of those two is "DV".  And then it's just saying -- the "FOCO loco" is just Ford County crazy.

Q    All right.  Then in addition to the tattoos which are used, are there also hand signals that are employed by DV, LCC, to identify themselves as belonging to those gangs?

A    Yes.

Q    All right.  Starting with Exhibit 32.  Do you see a common hand signal or hand gesture used by DV or LCC?

A    Yes.

Q    What do you see?

A    The 1 and the 4.

Q    For 14?

A    Yes, sir.

Q    Okay.  Exhibit 33.  Each of the people, the seven people in this photograph, are doing something different.  Are each of them showing something, though, that is connected to or related to DV or LCC?

A    Yes.

Q   Starting in the upper left hand corner, the first one standing, what is he showing and what does that mean to you?

A   He's throwing up a 1-4 for the number 14.

Q   Just go along, if you would, and describe --

A   Sure.  The next person has a bandana draped over his hands and he is making the letter "N" for showing he's a northsider or allegiance to Norteno.  The five-pointed star is used both by DV and LCC and we talked about the five points of that star.  Again, the number 1 and 4, which will be the person in the back on the far right.

Coming down to the front row to the bottom left.  Person is throwing up a 1 and 4.  He's also got his arms crossed forming an "X".  This is -- these three individuals down on the bottom row are actually making "XIV".  The middle person has got his arms up together making the "I" and the last person on the right is making the "V".

Q   And the number 14 is on the shirt of the person in the front middle; correct?

A   Yes.  I don't know if that was computer generated on there by them or if that's actually on the shirt.

Q   But in addition to the hand signals, there's words that appear below -- excuse me -- above.  "Diablos Viejos" with dollar signs in the S's.  What is meant by

that?

A    Whenever these individuals will type on computers, any time they use an "S", they'll usually use the money sign so it looks like they're crossing out the S's. Sometimes they'll use other letters to not use S's I guess is the best way to say that. Then they also put in "gueneracion nortenos" just saying this generation is Norteno.

Q    Okay. Exhibit 34, this hand signal, what does it mean?

A    "DV".

Q    For Diablos Viejos?

A    That is correct.

Q    And Exhibit 35. There are several hand signals here. What do they mean to you?

A    The -- not the first hand signal on the right, I don't really know what she's doing. But the second hand --

Q    You mean on the left?

A    Excuse me -- on the left. I'm sorry.

Q    Go ahead.

A    On the -- the second hand signal on the left is throwing up basically an "E" for east side. So it would be more LCC gang member. Then the hand signal that's in the middle, you can see the top part of a five-pointed

star.  You can't see the fingers below.  They're basically making a handshake together throwing up a five-pointed star.  The person in the middle has a number 14 San Francisco 49ers jersey.  And then, again, there's red flannel.

Q   And in this particular photograph, is this an example of DV and LCC gang members associating together?  Are both gangs represented in this photograph?

A   Yes.

Q   And then Exhibit 36.  What is this and what does it mean to you?

A   This is a -- I don't know what would be the best way to put it -- a trophy shot.  It's just a large gathering of Norteno gang members that are -- individually, different people are throwing up different hand signs that mean different things.  Mainly, it's all Norteno related.

Q   Okay.  We won't talk about all of them, but right in the middle there's what appears to be a male in a black shirt.  What is he -- what signal or sign is he throwing?

A   He's putting up the "N", letter N.

Q   And to his right, our left, is a male in a red checkered jacket.  What's he showing?

A   The 1 and 4.

Q   Okay.  In addition to the hand signals -- if a hand signal is displayed to a rival gang member, what is meant by that?

A   It's showing them basically who they're down with, who they are in a gang with.  Showing either their set or they're showing the overall allegiance with either being a Norteno or overall affiliation with being a Sureno.  So they'll throw those signs back and forth.

Q   So if a DV happens to run into an MCB in Dodge City, Kansas, and the DV shows 1-4 to the MCB, what is supposed to happen?  Or what could happen?  What communication is happening there?

A   It's a nonverbal communication.  I mean, that person can either throw back their gang signs or you could have a physical altercation because that person, so that he doesn't get violated within his gang, is probably going to start some kind of physical confrontation.

Q   Okay.  I was just going to ask you if an MCB initiates and throws their 1-3 back, or initiates it and throws a 1-3 to a DV or LCC, and the DV or LCC gang member does nothing, just walks away, what would that do or what could that do to the gang, the DV or LCC, gang member within their gang?

A   Obviously, it is going to make that person look weak within the gang.  If other members know about it or

other members find out about it, that person is probably going to get violated within their own gang.

Q   All right.  In addition to the hand signals that you've shown photographs of, are there also particular hairstyles that are sometimes used by the gangs in Dodge City?

A   Yes.

Q   Looking at 37, 38 and 39, is this a hairstyle that you have seen employed by DV and LCC gang members?

A   Yes.

Q   What is it?  How do you describe it?

A   Like just -- it's a Mongolian top notch is what they call it.  It would be up towards the top part of the head.  Not on top, but towards the back and top.  It will just be a large patch of hair that they'll start growing out.  I've been told by Officer Nau when he was on the streets that he found out it meant that they were getting ready to go to war.

Q   All right.  In 37, in addition to the top knot that you've talked about, there's also on the left cheek of this person, the four dot tattoo.  Do you see that?

A   That is correct.

Q   And is there another tattoo that's visible in this photograph that identifies this person as belonging to DV or LCC?

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 508

A   Underneath the ear, he's got a 1-4.  That won't necessarily distinguish him being related to DV or LCC, but underneath the Norteno banner, that he believes in some of those beliefs.

Q   Okay.  All right.  Then Exhibit 38, again, you see the pony tail or top knot; is that right?

A   That is correct.  And the letter "N" on the back of the neck.

Q   Okay.  And then Exhibit 39?

A   That's actually a top notch.  It's just it's braided and coming around the front and got a little red rubber band on it.

Q   So even the color of the rubber band is significant as well; is that right?

A   Sure.

Q   Okay.  Have you had experience with hairstyles that are unique to the Surenos?

A   Yes.

Q   What would that be?

A   Most commonly they'll wear what's considered a rat tail.  It will grow out of the -- right above their hair line just on the neck, they'll grow a small patch of hair and let it get rather long.  They just call it a rat tail.  It's usually -- I don't know how better to describe it than that.

Q   Do you, from your training and experience with gangs in Dodge City, do you know ways that -- well, is it possible to change your status within the gang, either up or down?

A   Yes, it is.

Q   How would -- what would you need to do or what would be expected of you to increase your status within the gang?

A   Commit crimes that will make the gang look more fearsome to rival gangs, whether that be getting into fights with rival gangs, whether it be shooting at them, whether it be -- anything that you can do to, to put fear into other persons, they believe gains them respect within their gang.

Q   If you commit violent crime that isn't necessarily directed at rival gang members, could that also increase your status within the gang?

A   Yes, it could.

Q   Why?   Why would that be significant to the gang members?

A   Just because other persons in the gang know that you're -- you're down for the gang, you would do whatever.   You don't have no fear.   Things like that earn you respect and more status within your gang.

Q   Does going to prison, can that effect your status

within the gang?

A   Yes.

Q   How so?

A   Several different things, whether it's a crime that you committed against a rival gang member.  Also, they, obviously, gang members don't like persons who cooperate with law enforcement.  So if you didn't cooperate, you went to prison, it was -- your crime was against a rival gang member, you're going to go into prison with some sort of status.  As long as you follow different rules that they have in prison as far as the gangs go, it's still attending meetings in prisons and stuff like that, when you get back out, your status is going to be increased because you did time for the gang.

Q   Have you had experience with Dodge City gangs of gangs members who committed violent crime that have enjoyed greater status within a gang because of those type of crimes they've committed?

A   Yes.

Q   How could your status decrease or how could you get in trouble within the gang?

A   Obviously, some of the violations we talked about earlier as well as I'd say the big one is cooperating with law enforcement.

Q   Exhibit 1 you've touched on earlier, Agent Webb, but

that is a document that you assisted in creating; is that correct?

A   That's correct.  Officer Nau at the time and Detective Bice and I prepared this document so that somebody that didn't know anything about the gangs in Dodge City would be able to pick up this document and in a short read kind of get the general idea of what gangs we have and some of the functions of them.

MR. WELCH:  Your Honor, I have no further questions of Agent Webb.

THE COURT:  Let's take a recess. Approximately 15 minutes and then we'll start the cross-examination.

(Recess.)

THE COURT:  Who would like to start?  Anyone?

MR. RAPP:  I'll start, Your Honor.  I only have a couple questions.  Should I do it from here or go --

THE COURT:  If you only have a couple of questions, gentlemen, you can question from the jury box.  That's fine with me.

**CROSS EXAMINATION**

BY MR. RAPP:

Q   I'll make sure I talk loud.  Agent, if I talk loud, I'm not yelling at you.  Okay?

A    I can hear you.

Q    Because I don't want you to come over here and --

all right.  Just a couple questions.

You talked about all contacts with gang members being documented.  Correct?

A    We would like all contacts to be documented. Sometimes those contacts are not documented for whatever reason.  If the officer was to get busy and not get it done.  But we do try to -- we did when I was there, we tried to document most all contacts with gang members where there was enough criteria or any criteria that would fit on the gang criteria verification form.

Q    All right.  And we understand that maybe not every officer complied with the policy all the time; but as a general rule, an officer who came into contact with a gang member was supposed to fill out a gang sheet. Correct?

A    Yes, sir.

Q    Now, if an officer found out information about a gang related crime, would they also fill out a gang sheet on that?

A    Sometimes.  If it went through court, I mean, if it was -- if it was -- if a gang sheet wasn't done on that initial date when whatever it was happened and it was later found out who was involved or if that case ended

up going through a criminal prosecution, at the end of that case, if people were prosecuted in it and it was proven through the case that it was some sort of gang related crime, those gang sheets could then be done at a later time, I guess is the best way to put that.

Q   Okay.  But anyway, the effort would be made, again, because of the NCIC reporting and so on, to demonstrate that a crime was gang related.  Is that correct?

A   Not so much for NCIC reporting.  I guess we're kind of getting two things confused there.  The gang verification criteria forms are just more for the police department's intelligence.  That then goes to records. Record is the one that then enters those into NCIC.  So it doesn't always have to be criminal in nature.  It could be just from a consensual contact at the mall or at WalMart or something like that, a gang verification criteria form could be filled out.

Q   If the Dodge City Police Department found out that a particular crime was allegedly a gang related crime, from a third party, a potential informant, would that be documented on a gang sheet?

A   No.

Q   All right.  Would every contact, again, as a general rule, involving my client, Alfredo Beltran-Ruiz, be reflected on a gang sheet?

A    Not every contact, no.

Q    As a general rule, would that be a safe statement?

A    They would like to have every contact documented but I can't say that happened, sir.

Q    But as a general rule, you would expect it to; correct?

A    I just can't say that that happened on every time. We would like every time an officer contacts a gang member to do a gang verification sheet; but it just doesn't always happen.  So I can't say that as a general rule that it always should happen.  I mean, I can't say that.

Q    All right.  If information was received from a third party, a non-gang member, about a gang member and a gang related crime, would that be reflected on a gang sheet?

A    The only time -- it's possible that, you know, a third party, an informant or something, could give information and it's possible that a gang sheet would be done.  I don't know of any instances.  But I know that there is criteria on there that basically says from a, a trusted source, or something to that effect, on the gang verification criteria, a sheet could be generated. Whether that officer that gets that information does it or not, I can't answer that.

Q    So we couldn't, for instance, look at

Mr. Beltran-Ruiz' collection of gang sheets and determine whether or not that was or wasn't in fact all the information the Dodge City Police Department had about his gang activity, alleged gang activity; correct?

A    Right.  That might not be everything that every individual officer might know, you know.  There could have been contacts that were not documented.

Q    Are those gang sheets maintained?  In other words, does the Dodge City Police Department keep all of those gang sheets once they're prepared and submitted?

A    Once they're submitted, they go to records personnel at the Dodge City Police Department.  I know that they then keep a what they call hard copy.  Just basically a printed out copy in an individual's -- basically, in a folder for an individual so that nothing could be changed in the computer system where those documents are put into, nothing could be added to that gang folder that hasn't been -- went through the approved channels within the department and nothing can be taken out.  So it's kept separate of the officers in the department.  It's something that has to be -- to get into NCIC, has to be approved by, I believe it's Kelly Melliker with the police department, maybe some other persons in records.  It's totally independent of the -- of what the officers do with that information.  That's more just for

an intelligence gathering for officers.  Records department then goes on and either will put people in NCIC or not.

Q   All right.  But would the records department have a folder or would the department in another location have a folder with all of the gang sheets related to, for instance, Mr. Beltran-Ruiz?

A   Yes.

MR. RAPP:  Thank you.

THE COURT:  Mr. Robinson, do you want to go next?

MR. ROBINSON:  Yeah.  I have just a few questions.

**CROSS EXAMINATION**

BY MR. ROBINSON:

Q   Sir, you said that sometime in 2009 until sometime in 2010 or '11 all the gang sheets went through you?

A   Yes, sir.

Q   Can you explain a little bit more about how that process went of you being the conduit or whatever, for lack of a better term, for these gang sheets?

A   I was part of the chain in that.  Basically what would happen is as soon as -- after an officer would submit a gang sheet and it was typed into the system, if you can look at the form, basically on the side where

the boxes are, like, say, the subject admits gang affiliation. My responsibility in checking these gang sheets was to make sure in the comments section that they listed out why they were -- or how the person identified his gang affiliation. Any of these boxes that were checked, my role was to make sure that they described it in the comments section of why they were checking those boxes. Once that was done, I initialed off and it then went to a lieutenant and the lieutenant then reviewed it before it went to records.

Q   When you were in this capacity in 2009 and 2011, were you also in charge of kind of making sure that people created a gang verification sheet if they had some contact that would -- that would merit filling out that kind of a document?

A   No, sir. I was not a supervisor within that department.

Q   Was there anyone in a supervisory capacity for that during that time?

A   I know that there was sergeants over at the time either the Street Crime Unit or when it changed to the Proactive Oriented Policing, I believe is what it was, the POP unit, there was a sergeant that was over those units on the respective shifts so they would have supervision. But that wasn't my responsibility.

Q    You said that there have been occasions when someone has been removed from this gang list that the police department maintains?

A    Yes.

Q    How many times do you know of that that's actually happened?

A    I can think of a few because I've had to -- at one point when NCIC was sending out the paperwork saying, hey, it's been five years, you need to look at this individual, if you have had no more contact, we need a reason to take them out.  So that's when we fill out the sheets that say basically no contact, remove from gang member from NCIC.  I've done several of those sheets.  A specific number, I couldn't tell you.  But the person that's responsible for reviewing that every -- that document that comes out every month, those people that are coming out every five years, that person is responsible for either finding out where they are if they're incarcerated, if there's anything they can document.  If not, those persons come off the list.

Q    Was there someone in charge of reviewing that list during these times to make sure that if someone was no longer considered in a gang that they would actually get removed?

A    Yes.

Q   Who was that?

A   I was part of that for a while.  It rotated to different people.  I know before I was doing it, I know there was a detective that was in the bureau that was doing it before 2009.  I know after I did it, Detective Bice did it.  I believe after that, it went on to either a sergeant or possibly to Officer Nau.

Q   You said that based on your experience and training, these alleged gangs have meetings periodically?

A   Yes, sir.

Q   Have you ever attended any of these meetings?

A   No, I have not.

MR. ROBINSON:  I don't have any other questions.

THE COURT:  All right.  Who's next please. Mark.

MR. SCHOENHOFER:  I've got a few, Your Honor.

**CROSS EXAMINATION**

BY MR. SCHOENHOFER:

Q   Agent, regarding your technical or specialized knowledge regarding gangs, would you consider yourself to be a gang expert just on Dodge City or southwest Kansas gangs?

A   I know, obviously, more about Dodge City and my knowledge gets smaller as it goes out from Dodge City.

I do know quite a bit about southwest Kansas gangs in general, as I've talked about those for the last few years.  And that's mainly, not only from working in southwest Kansas when I was assigned with the KBI drug traffic force, we would go out and we would work all of southwest Kansas.  I know a lot about those gangs.  But my primary focus is I know, you know, more about the Dodge City gangs than I do about others.  I do understand, obviously, some of the west coast gangs, whether it be the African American gangs or the Chicago based gangs.  I understand some things with those; but I'm not real familiar with them.

Q   You stated that the Nortenos and the Surenos are gangs that really come from California, originated out there in the prison system.  Am I correct?

A   That's where the beliefs, yes, originated, that's correct.

Q   Okay.  Have you studied or trained with any of the experts out in California regarding those two gangs?

A   I've been through some training with Al Valdez.

Q   What kind of training?

A   On two different occasions.  He's provided training on Hispanic gangs out of the LA, California, area, as he's -- I think he's recognized throughout the United States as pretty much the expert on LA based, west coast

based gangs.  I've been through -- also read a book that he put out.  It's about a 500-page book and I believe it's called -- I can't remember -- but I know Al Valdez -- it's a fourth edition and Al Valdez wrote it. It's his fourth book he wrote.  I've read that book. Also I've been through other trainings with other, you know, experts from around the nation, east coast gangs, Chicago gangs, stuff like that.

Q   Regarding the two gangs, or the two large gangs, the north side and south side in Dodge City that you've testimony about, and I know that they can break off into sets or different gangs, but regarding those two, how many training events have you attended?

A   Regarding those two?

Q   Yes.

A   That would be more just what I've learned from other officers when I first came on the department of what has been passed down, what I learned from other gang unit officers when I got on, or the street crime unit.  I don't know if there was any formalized training when I came on to that more than it was on-the-job training per se.

Q   Is it fair to say that your expertise in these two gangs are basically from just experience on the street then?

A    A majority of it, yes.

Q    Okay.  And if I understand correctly, going back over your testimony, you first started out as a patrolman; correct?

A    That's correct.

Q    That was 991 calls and traffic enforcement I think is how you described it?

A    Yes, sir.

Q    And then it was in 2005 late, or early 2006, that you became a gang street level drug enforcement officer; is that correct?

A    That's correct.  It happened rather quickly.  Part of that reason was is I was originally from Dodge.  I knew a lot of these persons that were involved in the gangs.  So shortly after I kind of got out on my own, per se, you know, when I got out of training and stuff like that, after I started with the police department, I was working night shift, I knew who a lot of these individuals were.  When we lost a few officers off the street crime unit at the time that went to work for a different city, I think the department thought it was a natural fit that I just go on since I knew so many of the individuals.

Q    When did these gangs become gangs in Dodge City?

A    As far as when they first started documenting them

as gangs, I know was the -- as far as NCIC went, was in 1996 on both DV and LCC.  Different time frames in 1996. So that's, you know, any information that would have probably been attained by the police department before that would have just been intelligence; but I know that's when the department identified them as.

Q   About '96 then?

A   Yes, sir.

Q   Would those have been started by guys from California?

A   The --

Q   The gangs themselves in Dodge City.  Obviously, if you're going to be affiliated with a gang, you have to have some type of authority to start one in Dodge City, wouldn't you?

A   I don't think you'd need some kind of authority.  I mean, it would be more of what your beliefs are going to be whenever you're starting a gang.  Obviously, they had some ideology that came from California at some point because we know that that's where the Norteno/Sureno umbrellas come from with the prison gangs.

Q   You testified that in order for it to be an active gang that there has to be a hierarchy; is that correct?

A   Doesn't have to be a hierarchy.

Q   Doesn't have to be.  So it could have started

without an OG then; correct?

A    That's correct.

Q    It just had people who wanted to affiliate themselves with this gang because of its ideals.  Is that how it works?

A    You could say that.

Q    I'm not gonna say that.  I'm looking for your testimony.  I'm sorry.

A    Well, just like you put it.  I mean, that could happen.  It's possible.

Q    Well, is that what happened?

A    I don't know what happened.  I wasn't involved.  I wasn't a gang member in 1996.  I can't tell you.

Q    Well, I understand that, but you're here to testify as this *Daubert* hearing as an expert.  Am I correct?

A    Yes, but not about the creation of the gang.  I was not there when this gang was created.

Q    Certainly you should know a little bit about the history, though; correct?

A    I do know a little bit about the history, yes, sir.

Q    Do you know how it started in Dodge City?

A    I know some of the people that were involved in it; but I don't know exactly how it started.

Q    Okay.  Do you know who the OGs are today?

A    Yes.

Q   So in the northsiders, there are how many OGs?

A   Do you want -- are we going to sit and go through all the names?  Is that what you want?

Q   Do you know how many?

A   I couldn't tell you numbers.  I could tell you different persons that I know are either looked up to by other members in the gang through debriefs and certain events that they have stated that, you know, he's their shot caller or an OG, you know, he's been down for the set for a long time.

Q   Okay.  And you know the same with the south side then, too; is that correct?

A   Yes, sir.

Q   Okay.

A   In Dodge City.

Q   That's what I'm asking about.

A   Yes, sir.

Q   And you would agree that a person as an expert, a person who is on the documented gang membership list who commits a crime doesn't necessarily commit the crime for the gang?  He could be committing a crime; correct?

A   Can they commit crimes other than for the gang just for their own benefit?

Q   Sure.

A   They could, yes.

MR. SCHOENHOFER:  I have no further questions.

THE COURT:  Mr. Hartenstein.

**CROSS EXAMINATION**

BY MR. HARTENSTEIN:

Q   Just to follow up a little bit on some of Mr. Schoenhofer's questions.  When was the last time you went to a formal gang training?

A   Last time would have been this last summer.  Would have been in June here in Wichita, Kansas.

Q   And it was here in Wichita.  And what topics were covered in that training?

A   If I can refer to my C.V. I might have it.  If not, I might have to -- might be something I'd have to get to you down the road.  I don't remember the exact topics. I know it's, it's based around gangs and narcotics.

Q   Did you talk about your Dodge City gangs specifically or just gangs in general?

A   I actually presented an hour block to that training to the rest of the persons in it on southwest Kansas gangs, including Dodge City, Garden City and Liberal.

Q   You talked about the meetings and that you knew that there were meetings; but, of course, you'd never been to one.  Do you know where they are?  Where they're held?

A   Different members' -- different residences.  I mean, I've known some places where they were held through

talking to other individuals that were there, through debriefs. If that makes any sense.

Q So have you kept a record of those places where meetings are being held?

A I know there's some type of documentation on those interviews with different persons about where they're having meetings at over certain time periods.

Q And would that documentation show who attended those meetings as well?

A I think part of it might say some of the members that they could remember that were there during certain meetings.

Q So you would have some sort of additional data base that would show that there were meetings held and certain people attended those meetings?

A No, sir, not yet, because that information came through this investigation and persons that are cooperating.

Q But it's available; is that correct?

A At some point I think it should be, yes, sir.

Q Okay. You said that there were -- you said -- and this is from the notebook they handed out. There are 218 DV gang members as of last summer in Dodge City. How many of those are currently on the streets or you know where they are?

A    I couldn't tell you.  I just know where certain individuals are being housed at.

Q    How many -- back to these meetings.  How many people typically attend one of these meetings?  Certainly not 200?

A    No, sir.  I never heard of the entire -- every member that we have attending a meeting.

Q    They don't have a big convention that you know of?

A    Not that I know of.

Q    Mr. Schoenhofer asked you about the old gangsters or original gansters.  And, of course, you mentioned the shot callers, the foot soldiers and the peewees.  And you indicated that you do know who, at least with regard to the Norteno sets, who were the OGs and you have a list of those names?

A    Not -- I don't know if it would be so much of a list, but it's going to be documented in a lot of different gang sheets.  With different persons on the street saying who was shot callers; and, obviously, some of that comes through debriefs with this case and people saying who was calling shots or making decisions for the gang.  So, no, not all of that is documented where you would have access at this time to it.

Q    Are you using OGs and shot caller interchangeably?  Are they more or less the same people?

A   They can be, yes, sir.

Q   And with regard to the foot soldiers, are they also identified as foot soldiers somewhere?

A   No.  It's just a generic term for different roles of those persons within the gang.

Q   So if you're not a shot caller, then are you necessarily a foot soldier or a peewee?

A   That's correct.

Q   And as far as the peewees goes, where's the cut off?  Where do you quit being a peewee?

A   I -- I would assume probably whenever they fully get jumped into the gang.

Q   Mr. Schoenhofer asked you about the northern California or the Norteno gangs as being the connection and the basis for these Dodge City organizations, as you call 'em.  Do you have any connection -- current connection between any of these California gangs and this group of individuals in Dodge City?

A   Just through different members that would have came from California that still have ties out there.  But I don't have no personal knowledge of any of our gangs contacting Neustra Familia, who's a prison gang in California.  I don't have any knowledge of any direct ties as far as that.  They just believe in the ideologies of being a Norteno gang member and underneath

that umbrella.

Q   So there are Norteno gang members in Dodge City that came from California?

A   Yes.

Q   And they were gang members when they came here from California?

A   Yes.

Q   And you have those names available?

A   Yes.  You have them, I believe.

Q   Are they identified as such?

A   I believe so.  One of 'em is in this Indictment.

Q   You mentioned -- I don't remember whether it was today or yesterday 'cause I sat in yesterday morning -- that the Surenos quit being a factor around 2008 or they weren't garnering your attention after 2008.  Why is that?

A   Due to a federal prosecution that targeted a couple of those members, as well as their immigration status on several of the members.  They were here with no status and they committed felony crimes and immigration customs deported a large number of those individuals.

Q   But your notebook shows there's still 237 of 'em as of last summer.  So how many of those -- were there like a bunch more prior to that?

A   As far as that goes, you know, if it's still within

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

the five years whenever that document is created, so, if they were documented after 2007, they're still going to be on that list until that five year mark comes up until they send that paperwork from NCIC for whoever the officer is at the time that's working on that stuff to look and see if that individual has had any contacts or if he is in prison.  Obviously, if he's deported, then that's the time when they'll pull those individuals out of NCIC.

Q   So these numbers would actually be -- the numbers from June 1st of last year, of '12, would actually be a five year look-back?

A   It would contain information from the previous five years.

Q   Anybody who was a gang member over the course of those last five years would still be on that list?

A   Within those sets, that's correct.

Q   Prior to your training here in Wichita last summer, what was the last training you had before that?

A   I've given trainings since then, just so you know -- and are you specifically talking about gang training?

Q   Specifically talking about gang training and formalized gang training that you either attended or, like you said, presented at?

A   Okay.  Would have been in -- I did the same thing in

2010, 2011, at the Midwest Law Enforcement Conference on Gangs and Drugs which was here in Wichita. Both times I attended their courses other than the session that I spoke at. I've been through the Kansas Gang Investigators Conference three different years. Most of those are approximately 24-hour trainings. Been through Latino Crime Culture in Communities classes which teach on gangs. Been through conspiracy gang investigations. All in all, I've had a little over 200 hours specifically on gangs since 2005, since I started the end of 2005, beginning of '06.

Q   And one more question. I'm sorry I'm jumping around here. You talked about the specific structures of these gangs with the shot callers and foot soldiers and whatever. Have you and your department produced some sort of an organizational chart that shows who the individuals are and what their part is in this organization?

A   No.

Q   And if I were -- my client is Mr. Gusman back there. Could you tell me who Mr. Gusman would answer to? Who would be his lieutenant or superior?

A   I know certain persons that Mr. Gusman would -- he also associated a lot with LCC and Humberto Ortiz. He would get a lot of information from him. I know he hung

out a lot with Alfredo Beltran --

Q   That wasn't my question.  My question was who does he answer to.  I mean, you're saying people are directing these missions --

A   I'm not specifically saying all these missions are directed.  Sometimes the individuals themselves could go to carry out a mission that they thought would either benefit the gang or benefit theirselves.  So it's not everything he does in life he has to call and ask for permission.

Q   So many things may not be gang related at all?

A   Depends on what you're talking about.

Q   Is that correct?

A   Well, that totally depends on what you're talking about.

Q   Well, if he were to get in a fight, would it necessarily be gang related?

A   Doesn't have to be.  Depends on what the situation is and who he's fighting.

        MR. HARTENSTEIN:  Okay.  Nothing further, Your Honor.

        MR. GRIFFITH:  I don't have any questions, Your Honor.

        MR. HEPPERLY:  I just have a couple questions, Your Honor.

THE COURT:  Yes, Mike.

**CROSS EXAMINATION**

BY MR. HEPPERLY:

Q   Officer, nice to meet you today.

A   Sir.

Q   We were provided with gang verification criteria.
Are you familiar with that?

A   Yes, sir.

Q   Who created that particular form?

A   I do not know.

Q   Was that in place when you were working for the
Dodge City Police Department?

A   Yes, sir.  I believe it was created around 2002,
that form.  And the computer based version that you can
get to within the police department, I believe was
around 2002.

Q   Have you made any changes to that since 2002?

A   Have I?

Q   Yes.

A   No.

Q   Did you end up being the lead officer on gang
related activity in Dodge City?

A   On certain cases, yes.  Certain cases, no.

Q   Who were the other officers who would have been
that?

A    Detective Bice. Officer James Nau. Different times when the street crime unit was going, it could have been Officer Hornback, Officer McClure, Officer Herrara, Officer Sharp, Officer Cramer. At different times when different persons would come through that street crime unit, or the POP unit, you know, if it wasn't a crime that warranted calling out the detective bureau, those officers, those gang officers, would work that case themselves.

Q    Okay. So different officers can have different contacts with alleged gang members, just depending on what the particular incident was; correct?

A    Yes, sir.

Q    So it wouldn't necessarily be a gang related incident that the officers may be in contact with these individuals?

A    It's possible, I don't know.

Q    So, for example, if you had a traffic ticket. Some individual had a traffic ticket and was stopped by a patrolman or a police officer, he could then use a gang verification criteria? In other words, he stopped a particular individual on a certain day at a certain time, and if they had, say, some monikers or, let's say, for example, they had tattoos on them --

A    Yes.

Q   -- would that officer then have a gang verification criteria on that particular traffic stop?

A   He could complete one, yes.

Q   Okay.  So for someone having a speeding ticket, they could have one of these gang verification criteria written; correct?

A   That is correct.

Q   And at the bottom, it has a place where it has for comments?

A   Yes.

Q   Who would write those comments?

A   The officer would provide those comments. Sometimes -- this form itself, there's only certain people that have read/write access to be able to read and write, to be able to type onto that form.

Q   Okay.

A   Sometimes the officers will provide a handwritten type card stating, you know, on this day I documented this person, this is why.  And the person that has read/ write access into it, which is usually a gang officer, would sit down and then type that in, show it to the officer, make sure it was all true and correct to their knowledge, before it got submitted on.

Q   So would there be notes taken between the gang officer and the particular officer who made the stop?

A   No.

Q   So there would be nothing written down between the officer who made the stop and the gang coordinator in the police department who then wrote these comments?

A   I guess I'm kind of getting confused on this.

Q   Yeah.  That was probably not a very good question.  My understanding of what you had stated is that a police officer can make a stop and then they would have handwritten notes of that stop.

A   That's correct.  It would be a little -- they provide little cards.  Sometimes officers would use 'em.  That would get turned over.  That would then get put into a typed submission.

Q   Somebody else would type it?

A   That is correct.

Q   And who is that person?

A   It depends on -- if you look at the gang criteria form, on the front would be the officer that -- if I can get to it -- would be -- on the front would be the officer that submitted it, so submitted that he had this information.  On the back would be where usually the officer -- yes, on the back would be where the officer would put down his name if he was actually doing that for somebody else and putting it into the system.

Q   So that officer, for example, who was typing it,

would put their initials or sign it; correct?

A   They would usually type their name on the back part where it says submitted by.

Q   All right.  Then the person who was actually making the comments, which would be the police officer who made the stop, would he sign this document?

A   No, he would not; but his name would be on the front.

Q   Okay.  A typewritten name would be on the front?

A   That is correct.

Q   So my question to you then is:  Where are those notes that the officer would have taken at the stop?

A   I don't know what's done with those notes, sir.

Q   Okay.  Are any of these gang verification certificates, do any of them have any further documentation other than what's on the front page?  Most of these that I see only have a front page.  Are there any that are more than one page in length?

A   They should just be a front and a back.

Q   Okay.

A   Do you have that?

Q   I do not have that.  I have a second page but --

A   It looks just like Exhibit 3 that we've been going over.

Q   Okay.  So they would have a second page or a back

page?

A   A back side of it, yes, sir.

Q   And who would prepare that subject identification record, which I think is the back page; is that correct?

A   That's correct.  That would be off the initial officer that made the contact.  It could be typed in, though, by a gang officer on the back side of that page.

Q   Is there any signature of that officer who made the initial stop on that page?

A   There's no signatures on these.  The only thing you might find on these would be initials down in the right hand corner.  That's going to be the person who has -- like when I spoke that I would see each of these gang sheets for that year and a half period, whatever that time frame was, I would initial -- once all the boxes were checked and the comments lined up with whatever boxes were checked, I would initial it and this would go past me and that way they knew that I seen that gang sheet.  And then it would go on to a lieutenant.  So that's going to be the only type of anything written with any type of identifying signature or initials.

Q   Okay.  So the officer's name wasn't on here who made the stop, that's all I'm asking.

A   Oh, no.  His name will be on there; but it's not going to be signed.

Q   Signed, name or initials?

A   That's correct.

MR. HEPPERLY:  Okay.  I have no further questions.  Thank you.

THE COURT:  Well, anything further --

MR. WELCH:  No, Your Honor.

THE COURT:  Gentlemen?

MR. HEPPERLY:  No, sir.

MR. GRIFFITH:  No, sir.

THE COURT:  All right.  Then I think we're ready for Officer Nau.

MR. SMITH:  We would call Officer Nau, Agent Nau.

THE COURT:  And, of course, you're still under oath, Agent Nau.

A   Yes, sir.

**JAMES NAU**

Having been **previously** duly sworn to tell the truth, the whole truth and nothing but the truth, **testified further** as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Tell us your name please.

A   James Nau.

Q   And what is it you do for a living?

A    I'm an agent with the Kansas Department of Revenue, the Alcohol Beverage Control division.

Q    When did you start that job?

A    September 24th of 2012.

Q    And what did you do before that?

A    I was a police officer for the City of Dodge City.

Q    Were you in law enforcement prior to being a police officer?

A    For three months as a detention officer at the Ford County jail.

Q    And when did you start with the Dodge City Police Department?

A    February 13th, 2006.

Q    And what was your role?

A    Patrol officer.

Q    Is that the role that you had during your entire tenure with the Dodge City Police Department?

A    I did different assignments as a patrol officer; but I didn't go detective or anything from there, stayed on the street.

Q    When you first went to -- or prior to going to the Dodge City Police Department, did you attend the Kansas Law Enforcement Training Center?

A    Yeah.  Right after I was hired.

Q    Did you graduate from that training center?

A    Yes, I did.

Q    Successfully complete all training?

A    Yes.

Q    And since that time, have you also attended any other specialized training since your hiring at Dodge City Police Department?

A    Yes, I have.

Q    Did that specialized training include training in the identification or investigation of street gangs?

A    Yes, it did.

Q    And did you successfully complete all of that training?

A    Yes.

Q    Have you completed or submitted a resume or a C.V. for the review of the Court in this case?

A    Yes, I have.

Q    And you have a copy of that in front of you I believe?

A    Yes, I do.

Q    And to your knowledge, that has been filed with the Court; is that correct?

A    Yes.

Q    There also has been reference, Agent Nau, to what has been identified as Government Exhibit 1.  Are you familiar with that exhibit?

A    Yes.

Q    And did you, in conjunction with two other individuals, prepare or create that exhibit?

A    Yes, I did.

Q    And do you agree with the contents of that exhibit?

A    Yes.

Q    Does that exhibit contain your opinions about the contents and the gangs that are represented in that exhibit?

A    It contains our opinions collectively between myself and Agent Webb and Detective Bice, yes.

Q    Are there any opinions in there that you disagree with?

A    No.

Q    You mentioned that you stayed on the street with the Dodge City Police Department; is that correct?

A    That's correct.

Q    But your roles changed; is that right?

A    That is correct.

Q    When did that first occur?

A    July, 2007, is when I was assigned to the Street Crime Unit; and I was on that unit until, I think it was about August, 2010.

Q    Generically, just tell us really what was the Street Crime Unit?

A   We worked and investigated gang crimes and worked street level narcotics.

Q   What was your specific role with the Street Crime Unit?

A   That exactly.  Enforce traffic stops on gang members; arrest warrants; did surveillance on gang houses and drug houses pertaining to gang members; and just worked, you know, street level narcotics through confidential informants.

Q   How many officers were on the Street Crime Unit when you were a member of the Street Crime Unit?

A   There was four of us.

Q   Did -- between the four of you, did you have individual specialized roles?

A   That was basically what we were assigned to do. There was -- we were partnered up two per shift so one would work one night shift, the other group would work the other night shift on weekends.

Q   Now, after the Street Crime Unit, did you have any other specialized roles?

A   After the Street Crime Unit, we had a new chief came in who changed our name, kind of our -- the way we did things.  And we changed to the Problem Oriented Policing unit, which at that point we basically, how I called it, we worked primarily weekend nights.  We worked a 14-hour

shift, Thursday, Friday, Saturday night.  We were what I called our night detectives on gang crimes.

Q   Okay.  So then how specifically would you say that how you operated was different from the Street Crime Unit to the POP unit, the problem -- what was it?  problem Oriented Policing?

A   Problem Oriented Policing unit.  The Problem Oriented Policing unit was, there was still four of us on it.  Each one of us had something specialized that we did or investigated primarily.  I was assigned on that unit as gangs again.  Any gang related call that would come out or any gang member on probation through corrections or court services or anything of that nature that was in violation of their probation that would be arrested, instead of it being assigned to a beat officer, that was assigned to me to go arrest that gang member basically was for identification purposes, to gather information on new tattoos, to see if they wanted to talk about any gang crimes, their gang.  Basically was to debrief.  So any gang related call that came out -- we still did that on the Street Crime Unit, but not as often.  The Problem Oriented Policing unit, that's anything gang related, anything gang involved, it was sent to us.

Q   So in your experience when you were on the POP unit,

for instance, if a beat officer that was just running a beat, a traffic beat, encountered anything they felt was gang related, would you be contacted?

A    Yes.

Q    Did you respond to each of those individual calls?

A    As long as I wasn't busy, yes.  If I wasn't able to, one of our other officers -- we still had three officers on that unit, although they might not have been specifically specialized in gang training or the gang investigation part, they would -- if I was tied up on something else, they would respond to it for me and gather information.

Q    So in your experience, then, a beat officer who was not on the POP unit, would they, would they complete an investigation if it was gang related or would they pass that on?

A    They would usually pass that on.

Q    In your experience, the beat officers or other officers, just line officers on the Dodge City Police Department, did they have the level of training and experience that you had in investigating or contacting gang members?

A    No.

Q    Did they have the knowledge as far as identification of specific individuals that were associated with gangs?

A    No.

Q    Did they in fact even have the knowledge of the identification of the gang sets or the names of the gangs themselves?

A    No, they did not.

Q    Can you give me an example of that?

A    I've had several officers, whether it be at the mall or going through WalMart or seeing a carload of gang members, just knowing based on what color they are, what gang they're associated with, whether it be red gang or blue gang, not knowing the gang name, not knowing Norteno, Sureno, just knowing red and blue.

Q    But that is specialized knowledge that you have; is that correct?

A    Correct.

Q    And is it generally recognized in the Dodge City Police Department, from your experience, that you are the person or were the person on the street with that specialized knowledge?

A    Yes.

Q    In your role with the Street Crimes Unit or the POP unit, how often did you have direct contact with individuals that were associated with or members of street gangs in Dodge City?

A    Mostly every day that I worked.

Q   All right.  Would that necessarily involve an arrest?

A   No, not necessarily.

Q   It could involve consensual contacts?

A   Yeah.  It could be as simple as walking through the mall, seeing them walking through WalMart, just chatting briefly.  A car stop where not even a ticket was issued.

Q   How often do you feel that you had consensual contacts, non-arrest oriented contacts with gang members or associates?

A   I couldn't give you an -- even an approximate number; but I've had a lot of contact just even outside of work when I'm not working where I'm approached at, you know, a grocery store or somewhere where they've came up and spoke to me.  So I can't give you a number exactly.  I've had a lot of contact.  Probably more contact where they haven't been arrested versus where they have been arrested.

Q   And in your role with the Street Crimes Unit or the POPs unit, did you also have opportunity to interview, for instance, families of gang members?

A   Yes.

Q   And did you have opportunity to interview victims of alleged gang crimes?

A   Yes.

Q   And opportunity to interview informants,
confidential or otherwise?

A   Yes.

Q   And from your contacts with each of those different
groups of individuals, did you gain information or
knowledge or intelligence that aided you or advanced
your knowledge of street gangs in Dodge City, Kansas?

A   Yes.

Q   Have you also given presentations or trainings
related to street gangs?

A   Yes, I have.

Q   What was the nature of those trainings?

A   Most of those trainings were for at one point when I
first got on the Street Crime Unit, we were approached
from the middle school as they were starting to see more
gang signs and problems in the middle school age kids.
At that point, the school started a policy where if you
were a student and displayed gang behavior, you would
get from a teacher a gang referral which sent you to the
principal's office.  They compiled a list and then they
contacted us, wanted help with this.  Basically it was
to -- it was to give parents information on how to
recognize this behavior because they may not know it or
just started seeing it at home.  So this was something
for them -- for us to kind of open their eyes, let them

know what's going on, this is things to look for. When we first started that, we were doing that weekly every Monday at the middle school for almost the whole school year. As we started doing that, it started to basically wind down. Within the last year we were doing about twice to three times a year. But most of the training I've given was identification, to our police department, was more identification and updates on our current gang members.

Q   And so you've given that training, that self same training to the Dodge City Police Department?

A   I've given it to Dodge City Police Department. I've given it to Geary County Sheriff's Department. I've given it to other law enforcement agencies in our area just so they have a knowledge of between, you know, where all -- some of these cities and towns are neighboring to Dodge so people wanted to know, you know, a little bit about what was going on with gangs as they may, you know, drift into their area.

Q   And did you hear Detective -- Agent Webb testify about some regional task forces that could be gang focused?

A   I'm sorry.

Q   Did you hear Agent Webb testify that there were in existence some regional task forces that were gang

focused?

A    Yes.

Q    Were you a member of any of those regional task forces?

A    I wasn't at the time.  I was aware of it as I worked there because they would have their task force in Dodge City at times.  When I came on in 2007, from it jumping from city to city, it stayed basically right in Dodge so we weren't going to other cities.  I did -- I have worked other cities before with their gang unit such as Garden City on big events, and vice versa, they've came to Dodge City and helped us out, kind of in exchange for us helping them.  So any time there was a big event where, I guess you could say, the gang members were going to congregate or show up more, they would ask us to come over; and same thing with us, we would have them come over for some big event as well.

Q    Now, you talked about the number of consensual encounters or that you had a number of consensual encounters with gang members or associates; is that correct?

A    That's correct.

Q    Have you been involved in the arrest and investigation of gang related crimes?

A    Yes.

Q   In conjunction with those arrests, have you had the opportunity to interview victims, witnesses and alleged -- the alleged perpetrators?

A   Yes.

Q   And from those contacts, have you gained specialized knowledge or experience in the activities of gangs in Dodge City, Kansas?

A   Yes, I have.

Q   Are you familiar with the documents that have been presented, which would be Exhibit 2 and Exhibit 3?

A   Yes.

Q   Exhibit 2 is the Dodge City Police Department policies on gang investigations; is that correct?

A   Yes.

Q   Now, in there there is a differentiation between what would be documentation for Dodge City and also documentation for NCIC; is that correct?

A   That is correct.

Q   Now, in some capacity, were you also involved in the entering of information into NCIC or reviewing that information?

A   After it went from Detective Webb, it went from him to Detective Bice shortly and then it was transferred to me where I did the same thing, approved the gang sheets that were coming through from officers.  They would turn

them into a box or my mailbox or -- after I got on the Problem Oriented Policing unit, we had -- I had a just kind of a folder on the door where they would place those sheets so I could get them each time I came into work as I only worked Thursday and Friday and Saturday nights.  So from Sunday through Wednesday I wasn't there to fill out sheets so they would have a place where they could put them and that way I would get them when I came back.  There was, at one point during my time on the POP unit, where if I wasn't getting gang sheets, I was in charge of going to look through what kind of calls they had while we were gone to see if anything was gang related and to see why there wasn't a gang sheet done.

Q   So there were instances where a gang sheet would not be completed; is that correct?

A   Correct.

Q   And retroactively, if you found something to be gang related, would you then create a gang sheet?

A   If I could get enough information off of -- based on a report that an officer wrote on a gang member where they described, you know, the clothing or tattoos or things that were said, I would create a gang sheet just off that alone myself.

Q   Were there instances when you retroactively reviewed a case and were not able to complete a gang sheet?

A    Yes.

Q    And I asked specifically about NCIC.  Are you familiar with the process in entering or registering someone as a gang member with NCIC?

A    Yes.

Q    What are the criteria for that registration?

A    The criteria after it goes -- the gang sheet goes to me for approval, it goes on to our records, as Agent Webb had stated.  From there they have a certain criteria for entry purposes of NCIC.  And the first one is if they admit gang affiliation that will get them entered into NCIC immediately.  If they don't have gang affiliation, then it's two or more criteria after that.

Q    Now, are you familiar with Dodge City Police Department's criteria for entering someone as a gang member?

A    Yes.

Q    Is it different than NCIC?

A    Yes.

Q    How is it different?

A    The difference is -- the same thing, if they admit, they'll be documented as a gang member.  If they don't admit, then off the gang verification criteria sheet, there's three kind of categories, and one box from each category has to be checked for a total of three other

criteria if they don't self-admit.

Q   So NCIC, without an admission, requires two criteria to be found; is that correct?

A   Correct.

Q   Yet Dodge City Police Department, if there is no self-admission, requires three additional criteria?

A   Correct.

Q   And those three criteria, I believe you mentioned, need to be from each of the three separate categories that are represented on Government Exhibit 3; is that correct?

A   That is correct.

Q   Now, are you familiar generally with the structure, the characteristics and the different identifications of gangs in Dodge City, Kansas?

A   Yes.

Q   And, again, you were present for Agent Webb's testimony this morning; is that correct?

A   That is correct.

Q   And I assume you were present for Agent Webb's testimony yesterday; is that correct?

A   That is correct.

Q   Is there anything about his testimony yesterday or today that you would disagree with or have a different opinion on the general characteristics of gangs in Dodge

City, Kansas?

A    No.

Q    There were some questions about the origins of gangs or Norteno or Sureno gangs coming from California.  Did you hear these questions?

A    Yes.

Q    And the associations with either being a Norteno or a Sureno, did you hear those questions?

A    Yes.

Q    In your estimation or opinion, what does it mean to be associated with or under the umbrella of either a Norteno or a Sureno?  Or are those phrases relevant?

A    Basically, as Agent Webb described, our gangs, DV and LCC, kind of fall under the umbrella of Norteno. Our blue gangs are Sureno gangs, if you will.  MCB and 18th Street will follow under that umbrella of Surenos. And basically it's, as they stated, it's from the prison system.  And going into the prison system, you don't go in as DV or you don't go in as MCB.  You're going in claiming basically affiliation with either Norteno or Sureno.  Based on the color your gang is and the beliefs you have with that.

Q    So I don't want to simplify this, but is it then color --

            THE COURT:  Please do simplify it.

BY MR. SMITH:

Q -- is it color-oriented? Red/blue, versus, for instance, the north side of California, south side of California?

A Yes.

Q So in Dodge City, Kansas, you have what gangs that associate with the color red?

A DV and LCC.

Q And in Dodge City, Kansas, you have what gangs that associate with the color blue?

A MCB and 18th Street.

Q And is that whether they would claim the phrase Norteno or claim the phrase Sureno?

A That's correct.

Q If a DV member, for instance, were to be incarcerated in Ford County Detention Facility -- and you worked there; is that correct?

A That's correct.

Q If they were to be incarcerated in the Ford County Detention Facility, would they ask to be or consent to be or want to be placed with individuals that would wear blue?

A No.

Q And when I say individuals that would wear blue, I mean gang members associated with the color blue?

A    Correct. No, they would not want to be with them.

Q    If an LCC gang member were arrested, incarcerated and placed in the Ford County Detention Facility, would they want to be housed with gang members associated with the color blue?

A    No.

Q    Would they specifically or could they specifically ask to be housed somewhere else?

A    Yes.

Q    And in your training and experience, where would they ask to be housed or who would they ask to be housed with?

A    They're usually housed with the other red gangs.

Q    And would that also apply to DV gang members?

A    That is correct.

Q    What about MCB gang members, what would their request be, in your training and experience?

A    They would request to be -- the way it's set up in new jail now, they would request to be, I think it's in the south pod, with the blue gang members.

Q    And 18 Street?

A    Would request to be placed with blue gang members.

Q    Now, 18 Street and MCB are separate gangs sets; is that correct?

A    That's correct.

Q   And DV and LCC, are they separate gang sets?

A   Yes.

Q   Yet in a prison setting, if I'm summarizing correctly, DV, LCC, would ask to be housed together, MCB and 18th Street would ask to be housed together?

A   That is correct.

Q   In your training and experience, are there individuals that have come from other areas of the country, entered Dodge City, and associated themselves with either red gangs or blue gangs?

A   Yes, there is.

Q   So, for instance, are there individuals that are members of sets that we haven't heard of from other cities in Kansas that have come to Dodge City and associated themselves with a red gang, a Norteno gang?

A   Yes.

Q   And are you aware of specific individuals like that?

A   Yes.

Q   Do those individuals, when they come from other cities in Kansas, necessarily claim, for instance, DV or LCC?

A   They don't necessarily claim it or -- I guess -- it's hard to describe how they would do it.  They don't necessarily claim it but they associate and affiliate themselves with that.

Q   Okay.  And the sets, their sets from their original home town, were those sets associated with either the color red or a Norteno gang?

A   Yes.  If they came from another town from a red gang or a red-colored gang, they're going to associate themselves or affiliate themselves with our red gangs we have in our city.

Q   And if an individual who in another city was associated with a red gang or a Norteno set, and they came to Dodge City, would they -- or would they be welcome to associate with a blue gang or one associated with a Sureno?

A   No.

Q   Have you seen any instances of that occur in Dodge City, Kansas?

A   No, I have not.

Q   And, similarly, for individuals who were blue or Sureno associated in other cities than Dodge City, other than Dodge City, coming to Dodge City, would they then associate with blue or Sureno gangs?

A   Yes, they would.

Q   Now, Officer, you have seen the other exhibits that have been identified as Exhibits 4 through 40; is that correct?

A   That is correct.

Q   And, again, you heard the testimony of Agent Webb;
is that right --

A   Yes.

Q   -- in regards to 4 through 40?

A   Yes.

Q   Is there anything about his testimony or any
opinions that you have different than those opinions
espoused by Agent Webb?

A   No.

Q   Is there anything that you would add to those
opinions?

A   No.

Q   Is your interpretation of the representation of
colors the same as Agent Webb?

A   Yes.

Q   His representation of who -- what sets would be
allies and what sets would be rivals, is that the same?

A   Yes.

Q   And your opinion as to the different clothing,
colors, hand signals, symbolisms, numbers and tattoos,
would that be the same as Agent Webb?

A   Yes.

Q   Is your interpretation of the symbolism and
symbology and numbers represented in the graffiti the
same as Agent Webb?

A   Yes.

Q   And the description of the hairstyles, is that the same?

A   Yes.

Q   Now, Agent Webb actually referenced your name in the description of the hairstyles.  What is your understanding of the difference in the hairstyles that was discussed earlier?

A   The difference in the hairstyles, from what I gathered from information interviewing gang members, was the north side gang members, or DV or LCC gang members, would wear what they called the top notch or Mongolian braid, which was the patch on the top of the head where they would let it grow out and braid it down.  That was different from our southsiders as our southsiders grew it at the bottom.  And the difference there was the northsiders grew it at the top for the north.  The southsiders grew it at the bottom for the south.

Q   Did you actually conduct interviews in an attempt to interpret the representation of those hairstyles?

A   Yes.

Q   And you did that personally?

A   Yes, I did.

Q   And, again, on the C.V. or resume that you've submitted and filed with the Court, does that contain a

list of your specialized gang investigation training?

A   Yes.

Q   Does it also contain a listing of the gang training that you yourself have conducted or given to other groups or individuals?

A   Yes.

Q   Was there a program that was also known as the GREAT program?

A   Yes, there was.

Q   What is the GREAT program?

A   The GREAT program is a program -- GREAT stands for Gang Resistance Education And Training.  At the time before that, they had the DARE program and had moved different direction from the DARE program basically to -- it was taught in middle school and fifth grade elementary classes.  It was to give kids kind of a help and guidance to keep away from gangs and direct their, I guess, their attention or their focus that they thought they might stray down that path to keep them away from that.

Q   How were you involved in the GREAT program?

A   I was certified -- actually I was sent to Portland, Oregon, for ten days to be a certified instructor of that program.

Q   Did you conduct those trainings?

A    Yes, I did.

Q    Did you become certified to be the instructor?

A    Yes, I did.

MR. SMITH:  Nothing further.

THE COURT:  Mr. Rapp.

MR. RAPP:  No questions, Your Honor.

THE COURT:  Mr. Schoenhofer.

MR. SCHOENHOFER:  Just a few, Judge.

**CROSS EXAMINATION**

BY MR. SCHOENHOFER:

Q    Agent, on these consensual encounters that you spoke of earlier, these were with individuals that you have either recognized as gang members or somehow documented as gang members; is that correct?

A    Yes.

Q    How many of those individuals were either disciplined or their status was changed for talking to you and offering you information about their gang?

A    I'm not -- I don't know.

Q    Do you know of any?

A    Nobody has told me anything.  I don't know.

Q    You said you agreed with the testimony offered by Agent Webb previously; is that correct?

A    Yes.

Q    And you heard him testify that individuals could

have their status changed either up or down; correct?

A   Correct.

Q   And the down would be for some violation of gang code; is that correct?

A   Correct.

Q   And one of the gang codes that would violate you would be if you snitched out or offered information on the gang; correct?

A   I don't know about necessarily on the gang; but if you snitched out or gave information pertaining to a crime.

Q   Well, would offering information about the gang itself be a violation?

A   It possibly could be.

Q   And do you know of any incident from those people that came and talked to you and offered you information consensually that they were violated?

A   I don't know of anything specific.  I've never heard of anything, no.

Q   Okay.  What is your definition of a gang, street gang?

A   Definition that I was -- that I -- I came from a small town, so before I became a cop, I heard of gangs, I had no idea what anything was.  As I got into law enforcement and learned more about it, the definition of

a gang is, how I learned, three or more people, basically, with a common identifier or symbols who collectively go out and commit crimes.

Q   Is that still the definition that is offered to these people that you give talks about gangs to?

A   That's a short version.  I mean, it's in our policy here, definition of a gang, and I can read it, the whole thing to you, but --

Q   You do have a policy with a definition?

A   Yeah.  I'm pretty sure this policy had a definition of it.

Q   That's not been included in this government exhibit, has it, or the various exhibits?

A   I think that the definition is in here.

THE COURT:  Apparently there's a state statute.

MR. SCHOENHOFER:  Right.

THE COURT:  Were you aware of that?

MR. SCHOENHOFER:  I am.

THE COURT:  I mean now?

MR. SCHOENHOFER:  I was aware of it, yes.  It kind of surprised me a few months ago.

BY MR. SCHOENHOFER:

Q   Exhibit 2 is the definition you're referring to.  Do you have that in front of you?

A   I have Exhibit 2, yes.

Q   Okay.  In considering whether an individual is a member of a known gang in Dodge City, do you look for not only the criteria that you identified as to, you know, whether they're wearing colors, whether they throw up gang signs, gang membership, admitted gang membership, do you look to see whether they take orders from individuals in the gang?

A   I don't look to see if they take orders.  I've asked on interviews I've done if they take orders and they're reluctant to talk about that.

Q   So have you had any gang member that has been charged in this Indictment that has come to you and said I take orders from someone?

A   Not in this Indictment, no.

Q   Have you learned from any individual indicted in this case that there is somebody who gives such orders?

A   I personally have not, no.

Q   Is it your testimony that there is somebody in Dodge City that's part of the north side gang that gives orders?

A   It could be -- I can tell you that I've heard people and specific people that have said these are the people that are giving orders; but what orders they've given or to any of these people, I couldn't tell you.

Q   Would you agree that if the north side is a valid gang, that there must be a hierarchy?

A   Not that there -- I mean, they've got some structure.

Q   There has to be structure?

A   I don't know if there has to be; but there is.  I mean, they have -- I mean, every gang has got some kind of a hierarchy or structure.  In some form or some fashion.

        MR. SCHOENHOFER:  Your Honor, I have no further questions.

        THE COURT:  Thank you.  Mr. Robinson.

### CROSS EXAMINATION

BY MR. ROBINSON:

Q   Good morning, sir.

A   Good morning.

Q   You said you grew up in a small town?

A   Yes.

Q   I did, too.

    You started as a police officer in February, 2006?

A   That is correct.

Q   Did you have any specialized training or experience in these alleged street gangs before February, 2006?

A   No, I did not.

Q   Is it fair to say that you gained most of your

experience that would qualify you as an expert in this case based on your work and classes that you attended?

A   Yes.

Q   You have taught classes about street gangs as well; is that correct?

A   That's correct.

Q   And you've taught these classes based on the knowledge and experience you have; correct?

A   That's correct.

Q   And when you taught these classes, you were holding yourself out as someone that had a specialized level of knowledge in this area?

A   That is correct.

Q   Okay.  Now, I notice that in your C.V. you started in the Street Crime Unit in July, 2007?

A   Yes.

Q   And you taught your first class as a gang expert in 2007?

A   That was when we first started those meetings that I talked about at the schools.

Q   Okay.  So --

A   During that time, I had a partner who was on that unit prior to me getting on there and so that was kind of a thing collectively from his information and what I've learned that we put together.

Q    Who was your partner at that time?

A    My partner at that time was Officer Bob Stein (ph).

Q    Okay.  So I just want to make sure that I understand how you're holding yourself out based on your C.V.  Is it your testimony that by the time you started giving classes, you were qualified to hold yourself out as an expert in street gangs?

A    Not by the time I gave my first class, no.

Q    Okay.  So we should not infer, based on the fact that you've necessarily taught classes, that at that time you were an expert in street gangs?

A    Not in 2007.

Q    Thank you.  And your testimony is that the Nortenos constitutes a street gang; is that right?

A    I've not stated they constitute a street gang --

Q    But is that your opinion?

A    As far as what do you mean?

Q    Well, we're here for a hearing on qualifying you as an expert.  And, as I understand, you have submitted a summary report which I believe is Exhibit 1 in that notebook in front of you?

A    Uh-huh.

Q    This is a summary of your opinions; correct?

A    Right.

Q    And so it's your opinion that the DVs and LCC is a

street gang; correct?

A   Correct.

Q   And -- but part of what you're basing that on is the policy of the Dodge City Police Department, which is Exhibit 2; correct?

A   Correct.

Q   And part of that policy is that if you have three or more people together acting in a criminal capacity, that makes them a gang; correct?

A   That is correct.

Q   Now, your training and experience tells you that there's more than three members in these what you call street gangs?

A   Yes, there's more than three members.

Q   Okay.  Now, you would agree with me that if three people are dressed alike and happen to commit a crime together, that doesn't necessarily make them a gang; right?

A   Correct.  They have to have other identifying marks or symbols.

Q   Right.  And you would agree that -- well, you've answered my question in that regard.  Thank you.

Would you agree that, based on your experience and training, that there is a continuum of whether a person associates -- associates with gang members or alleged

gang members versus if that person is actually a member of this alleged gang?

A   So what you're asking me, are their associates that aren't, I guess, basically, classified as a full-fledged gang member?

Q   Well, what we have is a summary of your opinions. I'm just trying to understand what your opinions are based on your qualifications.  For example, I have been sitting next to Enrique Gobin all morning.  You're not here to say that because I've been sitting next to him all morning that I'm in a gang with him; correct?

A   Correct.

Q   There's a continuum of contact that you have to have with someone before you would consider them to be gang members together; correct?

A   Correct.

Q   You're saying, based on your experience and training, you have the ability to make those differentiations?

A   Yes.

Q   During the time that you were in the Problem Oriented Policing unit, do you know if the Dodge City Police Department kept an accurate number of the people it considered in the DV or LCC gangs?

A   During that time?

Q    Yeah.

A    I was in it until I left, and January is when I took over the GREAT instructor position.  So from January, 2012, they pulled the numbers, I think it was in July, so, I mean, that's going to be an accurate description in that five-year range because I was only on that Problem Oriented Policing unit for two.

Q    So you agree that at any given time you're looking at a five-year look-back as was talked about before today; correct?

A    Correct.

MR. ROBINSON:  That's all I have, sir.  Thank you.

THE COURT:  Thank you, Mr. Robinson. Mr. Griffith?

MR. GRIFFITH:  I don't have any questions. Thank you, Your Honor.

THE COURT:  Mr. Hepperly?

MR. HEPPERLY:  No questions, Your Honor.

THE COURT:  Mr. Hartenstein?

MR. HARTENSTEIN:  Just a couple, Your Honor.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. HARTENSTEIN:

Q    Agent, I'm sorry, I must not have been paying

attention. When did you leave the Dodge City Police Department?

A September 21st, 2012.

Q And at that time you were with the Problem Oriented Policing group or unit?

A I was part of it. January, 2012, is when I took over that GREAT instructor position; and then once school year was over, we basically went back to the POP unit during the summertime.

Q And you said there were four officers in that unit?

A Yes.

Q What were their names?

A Leslie Lima (ph) was one of them. Chris Olson, who was a school resource officer, was part of it. And Deena Ward.

Q So are Leslie and Deena women?

A Yes.

Q And Chris is a man?

A Yes.

Q And you said -- I believe I heard you say -- that you worked Thursday, Friday and Saturday nights?

A That was -- during this time from January '12 until I left, during the summertime only. During the school year, those officers were in the schools teaching -- or, basically, school resource officers and I was teaching

GREAT at middle school and elementary school.

Q   So am I correct to understand that during the school year, there was no Problem Oriented Policing going on at night and over the weekend?

A   No.

Q   I am correct?

A   You're correct, there was not.

Q   Okay.  Back to these gang sheets you talked about. You said something I hadn't heard earlier.  If you or some other officer on the street was to initiate a gang sheet, I believe you testified it would first go to Agent Webb, or then Officer Webb or Detective Webb, and then it would go to Detective Bice and then it would come to you.  Is that what you said?

A   Well, I think that's how you understood it.  What it did, at one point Detective Webb was the guy who approved those.  Then at some point, Detective Webb (sic) took over that approval, so they didn't go to Detective Webb any more.  Then there was a point in there after Detective Bice, they came to me, so they came to me at all times after that.  It went from one person to the next so --

Q   So this wasn't --

A   -- not in that fashion of an officer gave it to Webb and then it went to Bice and then to me.  There were

certain times each one of us were in charge of approving those sheets.

Q   And when you were in charge of approving a sheet, did you have the authority or the ability to edit that sheet before it was submitted?

A   I was the one who -- the people who submitted those in on our computer data base, as Agent Webb had said earlier, were the only people with authority to change or save anything in there.  Those sheets were typed up how they were given to us.

Q   So the sheets were typed up the way they were presented by the officer on the beat or on the street?

A   Correct.

         MR. HARTENSTEIN:  Nothing further, Your Honor.

         MR. SMITH:  Nothing further.

         THE COURT:  Thank you.  All right, Gentlemen. Thank you very much.

                    (Adjourned at 11:45 a.m.)

C E R T I F I C A T E


I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 22nd day of April, 2013.


                              s/ Cindy L. Schwemmer
                              Cindy L. Schwemmer, RPR, FCRR
                              United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,                )
                                         )
                              Plaintiff,) District Court
                                         ) Case No. 12-10089
vs.                                      )
                                         )
JASON NAJERA, et al,                     )
                                         )
                             Defendants,)
                                         )
_____

## TRANSCRIPT OF DAUBERT MOTION HEARING

On the 18th day of April, 2013, came on to be heard **Hearing on Daubert Motion** in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.

**APPEARANCES**

The **Plaintiff** appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;

Defendant **Eusebio Sierra-Medrano** appeared in person and by and through Mr. Mark Bennett;

Defendant **Jayson Vargas** appeared in person and by and through Mr. Mark Sevart;

Defendant **Adam Flores** appeared in person and by and through Mr. Sean McEnulty;

Defendant **Fabian Neave** appeared in person and by and through Mr. Greg Bell;

Defendant **Jesus Torres** appeared in person and by and through Mr. Chris O'Hara;

Defendant **Joshua Flores** appeared in person and by and through Mr. Carl Maughan.

Appellate Case: 14-3006    Document: 23-2    Date Filed: 04/01/2014    Page: 579

**I N D E X**

**APRIL 18, 2013:**

**WITNESS**

**SHANE WEBB**

Direct Examination by Mr. Welch:          4
Cross Examination by Mr. Sevart:         47
Cross Examination by Mr. Maughan:        55
Cross Examination by Mr. O'Hara:         58

**JAMES NAU**

Direct Examination by Mr. Smith:         61
Cross Examination by Mr. Sevart:         76
Cross Examination by Mr. Maughan:        80


Certificate of Certified Shorthand Reporter:  86

| EXHIBITS | I | O | A |
|---|---|---|---|
| Gov't | | | |
| 1 | 14 | 15 | 15 |
| 2 & 3 | 14 | 15 | 15 |
| 4 thru 40 | 15 | 15 | 15 |
| 1 | 46 | | |
| 3 | 16 | | |
| 4 | 30 | | |
| 5 | 31 | | |
| 7 | 33 | | |
| 8 | 33 | | |
| 10 | 34 | | |
| 11 | 35 | | |
| 12 thru 17 | 36 | | |
| 18 thru 31 | 37 | | |
| 32 thru 36 | 40 | | |
| 40 | 37 | | |

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 580

(Beginning at 9:10 a.m. April 18, 2013, the following proceedings were held.)

THE COURT:  Good morning.  This is day three of the *Daubert* hearing in case number 12-10089.  Government counsel appear as before.  Let me call these names and make sure they're here and counsel can enter their appearance.  Eusebio Sierra-Medrano

MR. BENNETT:  Your Honor, Mr. Sierra-Medrano appears in person and with his attorney Mark Bennett.

THE COURT:  Good morning, Mr. Bennett.

MR. BENNETT:  Good morning, Your Honor

THE COURT:  Jayson Vargas.

MR. SEVART:  May it please the Court.  Mr. Vargas is present, Your Honor, represented by myself, Mark Sevart, as court appointed counsel.

THE COURT:  Adam Flores.

MR. McENULTY:  Defendant Adam Flores appears in person and by and through counsel Sean McEnulty.

THE COURT:  I recognize Mr. Flores.  Fabian Neave.

MR. ROBINSON:  May it please the Court.  Fabian Neave appears in person and with counsel Greg Bell.

THE COURT:  Thank you.  Jesus Torres.

MR. O'HARA:  Chris O'Hara appears on behalf of Defendant Jesus Torres who is also present, Your Honor.

THE COURT:  Thank you.  And, finally, Joshua Flores.

MR. MAUGHN:  Thank you, Your Honor. Mr. Joshua Flores appears in person and with counsel Carl Maughan.

THE COURT:  Thank you very much.  Well, you know, the drill.

MR. WELCH:  Your Honor, United States calls Shane Webb.

THE COURT:  Still under oath, Mr. Webb.

A    Yes, sir.

**SHANE WEBB**

Having been **previously** duly sworn to tell the truth, the whole truth and nothing but the truth, **testified further** as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you state your name.

A   Shane Webb.

Q   And how are you currently employed, Mr. Webb?

A   By the Kansas Bureau of Investigation.

Q   How long have you been with the KBI?

A   Since February 3rd of this year.

Q   Prior to your employment with the KBI, were you employed by another law enforcement agency?

A   Yes, I was.

Q   Which one?

A   The Dodge City Police Department.

Q   When did your employment with the Dodge City Police Department begin?

A   On January 3rd of 2005.

Q   And when did it end?

A   On February 2nd of this year.

Q   Prior to your employment with the Dodge City Police Department, where you employed by any other law enforcement agency?

A   No, I was not.

Q   Before becoming -- or, at the time you became a commissioned law enforcement officer in Dodge City, did you go through training?

A   Yes, I did.

Q   What training did you go through?

A   I attended the Kansas Law Enforcement Training Center where I received 560 hours of basic law enforcement training.  I also went through field training program at the Dodge City Police Department.

Q   And did you successfully complete all of that training?

A   Yes, I did.

Q   And when you started with the police department, what was your rank?

A   I was a patrol officer.

Q   And what were your duties?

A   To take 911 calls, as well as work traffic enforcement, those type of calls.

Q   Was there a point in time, Agent Webb, that your duties with the Dodge City Police Department began to focus on gang crimes and gang enforcement?

A   Yes.  At the end of 2005, beginning of 2006, I was assigned to the, at the time, the Street Crime Unit.

Q   What was the Street Crime Unit, known as the SCU?

A   The Street Crime Unit was to be -- mainly work -- focus on gang enforcement as well as street level narcotics use and sales.

Q   All right.  And this would have been the end of 2005 into 2006?

A   End of 2005, beginning of 2006.

Q   And you were still a patrol officer with the police department?

A   Yes.

Q   How many members of the SCU were there at that time?

A   There was four.

Q   And were all four of you police officers?

A   Yes.

Q   And all four had the same assignment relating to gang enforcement and street level drug enforcement?

A   Yes.

Q   What type of interaction during that time as a patrol officer at SCU did you have with gangs in Dodge City, Kansas?

A   We would work all the -- any call that would come out that would be gang related; or if officers, through a different investigation, if they found out it was gang involved, they would contact us.  We also did a lot of what I consider proactive stuff.  If we would notice juveniles hanging out with known members of these gangs, we would try to contact their families, parents, to talk to them about the likelihood of who they were hanging out with and where that might be leading them down the road of gang membership.

Q   All right.  Were there times that other police officers that were not members of the SCU would come into contact with someone they believed was a gang member or there was an incident they believed was gang related that they called you and asked you to come in and take over?

A   Yes.

Q   That was part of your job; is that right?

A   Yes, sir.

Q   And while you were with the SCU, did you have one-on-one contact with gang members in Dodge City?

A   Yes, I did.

Q   Did you have contact with family members of gang members in Dodge City?

A   Yes.

Q   Did you have contact with victims of gang crime in Dodge City?

A   Yes.

Q   And did you have contact with people who provided information, either confidential informants or other people, who provided information about gang activity in Dodge City, Kansas?

A   Yes, I did.

Q   All right.  At some point in time did your rank within the department change?

A   Yes.

Q   What was it and when did that happen?

A   In July, 2007, I promoted to the detective bureau.

Q   And what did you do within the detective bureau at the Dodge City Police Department?

A   When I started, I was primarily -- I would work gang related crimes.  I was just able to work them in a different capacity, more during the daylight hours

instead of the nighttimes when most calls would be coming out.  I was able to have more time to contact victims, witnesses, during daytime hours; as opposed to when I was working on the streets with the Street Crime Unit, it was more in the evenings when I would be working.

Q   All right.  So when you were a detective within the detective bureau at the police department, did you still have an assignment to focus your attention on gang crime and gang activity?

A   I don't know how much of an assignment it was.  It was just the lieutenant at the time knew that I was coming off the Street Crime Unit and that was his focus on what cases that he would assign me.

Q   Okay.  So you spent a great deal of your time continuing your work on gang activity in Dodge City?

A   Yes, sir.

Q   Now, in an earlier hearing I think you described your work at the SCU as working more of the front end of the gang investigation and the -- your work with the detective bureau is working the back end of the gang investigations.  Can you briefly describe again what you meant by that?

A   Yes.  When I was referring to the front end, it would be the initial call, responding to the scenes or

whatever it may be. When I was in the detective bureau, it was more I would be contacted after scenes had either been secured, or whatever the call may be. Just had a lot more time to work on these cases than having to run from call to call when I was on the streets.

Q At any point in time when you were at the Dodge City Police Department, either as a patrol officer or detective, did you have gang training?

A Yes, I did.

Q What type of training did you receive and how much did you receive?

A I received a little over 200 hours of gang training, or right around 200 hours. That came from several different persons. Most of the gang trainings I went to, I tried to focus on Hispanic gangs as that's what we had in Dodge City primarily. I've been through gang trainings with several different well known, I guess, persons who -- I'm trying to say -- experts in different gangs.

Q All right. And were there times when you provided training, gang training, to either community groups or other law enforcement officials or officers?

A Yes.

Q Where did you do that and what type of training did you provide?

A    I provided training over the years to officers coming onto the Dodge City Police Department.  It's been brief, but basically saying what gangs were in Dodge City.  Also identifying different members to them.  I've also provided gang training here in Wichita at the Sedgwick County Crime Commission, their yearly conference on gangs and narcotics.

Q    When you were a detective at the police department, did your contact with gang members continue?

A    Yes.

Q    And did you continue to have contact with family members of gangs, gang members in Dodge City?

A    Yes.

Q    When you met with family members related to gang activity, what were you primarily talking to them about?  Describe that interaction.

A    It could be on several different levels.  It could be either that we were just identifying that their child might be starting to hang out with different gang members and it might be becoming a problem for this child; all the way up to if they were victims of crimes or their children were suspects of crimes.

Q    All right.  Within the department, were you viewed by other officers and your supervisors as an expert on Dodge City gangs?

A    Yes.

Q    And have you been recognized by other law enforcement agencies in the area, in southwest Kansas, as an expert on gangs and gang members in Dodge City, Kansas?

MR. SEVART:  Your Honor, I'm going to object as calling for speculation and hearsay, lack of foundation.

THE COURT:  Overruled.

BY MR. WELCH:

Q    The question, Agent Webb, was have you been recognized by other law enforcement agencies anywhere in Kansas as an expert on Dodge City gangs and gang members?

A    Yes.

Q    What type of interaction and association have you had with other law enforcement agencies related to gangs in Dodge City or southwest Kansas?

A    Are you asking who exactly has contacted me?

Q    Which agencies and what did you do with them?

A    Worked closely with the Seward County Sheriff's Department, Liberal Police Department, Finney County Sheriff's Department, Garden City Police Department, Great Bend Sheriff's Department which would be Barton County, with members of the Kansas Department of

Corrections, as well as the gang units here in Wichita, Kansas.

Q   And what type of work would you do with each of those agencies or why would they call you for information?

A   We would contact each other any time that we had one of our members, whether -- one of their members would be in Dodge City that we knew was and we were able to identify was from a gang from a different locale which was usually in southwest Kansas, we would make sure we contact officers, let them know that they were in Dodge or that they were traveling, who they were with; and they would do vice versa.  And also if any of these persons were involved in crimes in our communities, we'd make sure to try to get in contact with the departments where these individuals were from.

Q   Were there times where there was a formal operations with other law enforcement agencies in the area focusing on gang activity?

A   Yes.

Q   What was it and when was it?

A   That occurred in approximately 2006.  Drug Enforcement Agency out of Garden City, Kansas, created a Go Soldiers Task Force.  It was officers from the Dodge City Police Department, Ford County Sheriff's

Department, the Garden City Police Department, the Finney County Sheriff's Department, Holcomb Police Department, some other local smaller agencies around the area; as well as probation, corrections, court services, juvenile corrections.  We would meet every other week in a different community.  It was back and forth between Dodge and Garden City.  I believe in 2007, Garden City stepped out of that program.  We then took that and just modeled that and used that just in Dodge City.  The name was changed of what the task force was but it was still the same general principles and still officers from local communities around Dodge City would come in and take part in that task force.

Q   All right.  Agent Webb, do you have a black notebook in front of you?

A   Yes, I do.

Q   Contained within that notebook are exhibits marked 1 through 40.  Are you familiar with each of those 40 exhibits?

A   Yes, I am.

Q   And Exhibit 1 is a document that you helped create; is that correct?

A   Yes, sir.

Q   And Exhibits 2 and 3 are documents that were utilized by the Dodge City Police Department when you

were employed by that department; correct?

A   That is correct.

Q   And Exhibits 4 through 40 are photographs maintained by the Dodge City Police Department?

A   That is correct.

Q   And you've seen each of those photographs prior to today?

A   Yes, sir.

MR. WELCH:  Your Honor, we would offer Exhibits 1 through 40.

THE COURT:  Does anyone have any objections to 1 through 40?  They've been received at both hearings so far.

MR. SEVART:  Your Honor, just for the record, I would object on foundation and relevance.

THE COURT:  I'm glad it's just for the record. Anybody else?  All right.

MR. WELCH:  Thank you, Your Honor.

BY MR. WELCH:

Q   Agent Webb, while you were employed with the police department, were there times where the police department would document people as being gang members in Dodge City, Kansas?

A   Yes, they would.

Q   What was the general process by which that was done?

How would you do that?

A    Officers would, once contacting a gang member, whether it be a patrol officer or member of the Street Crime Unit or the units that changed into -- changed names, they would fill out a gang verification criteria form.  That form was more for intelligence within the police department; however, that form was given to the records department which would then enter these individuals into NCIC if they met the certain amount of criteria.

Q    All right.  And the gang verification criteria form, is an example of that form identified as Government Exhibit 3 in the notebook?

A    Yes, sir.

Q    And these have been referred to also as gang sheets. Have you personally used these gang sheets?  Meaning, have you filled out gang sheets in the past?

A    Yes, I have.

Q    Was that Dodge City Police Department policy when you had contact with a gang member, you were supposed to fill out a gang sheet?

A    Yes, sir.

Q    All right.  In the past when you filled out a gang sheet, tell us why you would do that and how it's done?

A    If I would -- if I would contact persons who had

gang involvement or if we were just initially documenting them, if we had reason to start asking them questions along the lines of gang membership, if they would admit gang membership, that would be one of the criterias. If that criteria was met on the gang sheet, that person could be entered into NCIC as a gang member. If that criteria wasn't met, then it would need three or more of the following criterias: Whether the individuals has gang related tattoos; uses gang moniker; involving gang crimes against rival gang members; if they're identified by rival gang members or sources in the community or confidential informants. Any of those boxes can be checked. Once these boxes are checked on the gang verification criteria, in the comments section, that officer or myself, whoever was filling that gang sheet out on that person, would then put comments. The comments would relate back to each one of the boxes that were checked to make sure you explained why that box was checked. On the back side of the form was personal descriptors; as well as there's a place for CFS, which is just a case number that's generated through Ford County Communications to show that person was actually out with that person or that there was a call within Ford County Communications that the officer had contact with that person.

Q   Okay.  Contact with a gang member, would that always be -- would that always result from an arrest?

A   No, sir.

Q   So this can be just a general consensual contact on the street?

A   Yes, sir.

Q   Sometimes it was as a result of an arrest as well; is that correct?

A   Yes, sir.

Q   All right.  In addition to filling these sheets out yourself when you were either a patrol officer or detective, was there a point in time when all of the gang sheets that were completed by anyone within the department went through your hands and were reviewed by you?

A   Yes.

Q   When did that happen and why did that happen?

A   That time frame was the end of 2009 through 2011. The purpose of when I was getting the gang sheets, everybody that would submit a gang sheet, that would then come to me and the purpose was just so that any boxes that they marked that I'd make sure they filled something out in the comments section of why they were marking the boxes; made sure that it had a case number on the back if it was a person contact; and just make

sure that the form was completed correctly. I'd then initial it off and hand it to a lieutenant at the Dodge City Police Department who would then review it. Once he or she felt that it was complete, did not kick it back to the officer, it would then go to records.

Q   And during that time period when you were looking at all of the gang sheets, you were a detective; is that right?

A   Yes, sir.

Q   To make sure I understand then, in order to be documented by the Dodge City Police Department as a gang member, if a gang member admitted that he or she was a member of a gang, that could get you documented; correct?

A   Yes, sir.

Q   If there was not a self-admission then three of the boxes had to apply in the officer's opinion before Dodge City Police Department would document them as a gang member; is that correct?

A   That is correct. And that's following Kansas state law.

Q   Okay. All right. And I was just going to ask you. The policies which are identified as Exhibit 2, were those policies in place when you worked at the police department?

A   Yes, they were.

Q   Were those policies followed?

A   To the best that we could.  It states, you know, that every contact with a gang member should be documented.  That didn't always happen; but most generally we would like to have it happened.

Q   But the criteria utilized to identify someone or document someone as a gang member, was that followed?

A   Yes.

Q   That's the same criteria which appears on the gang sheets identified as Exhibit 3; correct?

A   Yes.

Q   And both the gang sheet and the Dodge City police policy followed state law; is that right?

A   That is correct.

Q   Earlier you made reference to entering someone as a gang member in NCIC.  That's different than being documented as a gang member by the police department; is that correct?

A   Yes.

Q   How is it different?

A   When they get documented as a gang member by the police department, that's more for intelligence within the police department.  Once these gang verification criteria forms go to records personnel, those personnel

will then look at the completed gang sheet.  If there's enough criteria on it, then they would then have -- they can then enter these persons into NCIC, which is -- so that if an officer was to stop any of these individuals, their personal descriptors are ran through NCIC.  NCIC can then forward back a message saying this person is a gang member.  And it's more for officer safety purposes. NCIC is completely controlled by the records department.

Q   All right.  While you were at the police department, did the department maintain a list of documented gang members?

A   Yes, they did.

Q   Dodge City gang members?

A   Yes.  Records department did.

Q   Okay.  And as part of the NCIC process, some of those documented gang members would have been entered into NCIC, the national data base, as gang members; is that correct?

A   Yes, sir.

Q   The gangs themselves are entered into NCIC or can be; is that correct?

A   The sets, yes.

Q   Thank you.  Okay.  Now, once someone was documented as a gang member by the Dodge City Police Department or entered into NCIC, was it possible to be undocumented or

no longer listed as a gang member?

A   Yes.

Q   How did that happen?

A   Every -- I was in charge of this for that period of time between 2009 and 2011.  Every month, NCIC will send a document to the police department.  It will have individuals' names on it where it's been five years since they've been documented.  Those persons are going to come out of NCIC unless we have reason to re-document them.  Sometimes it can be because that individual has been in prison.  If that is the case, then we contact those prisons to find out if there's enough information we could obtain from that other law enforcement agency to either keep them entered; or if they just generally did not have no more gang contact, or if they truly had left the gang, might still be living in the community, just left that stuff alone, after those five years, another gang verification criteria form would be filled out and it would basically tell records that there's been no contact and to remove them from NCIC.

Q   Have you seen occasions where people were in fact taken off the list and no longer listed as a gang member by the police department?

A   Yes.

Q   And they were taken out of NCIC and no longer listed

in the national data base as a gang member?

A   Yes.

Q   And you were part of that process on occasion; is that correct?

A   Yes, sir.

Q   Now, speaking -- my questions now are just gangs in general in Dodge City.  I have a few questions for you about that.  From your experience when you were with the department, did you find that most of the gangs in Dodge City had some form of structure?

A   Yes.

Q   How would you describe the structure that you found from working with and working against the gangs in Dodge City?

A   The structure would be at the top of our gangs would either have what they would consider shot callers or OG's.  They're older gangsters.  Most of the time those were older persons within the gang.  Underneath that level would be more of a what we considered to be street soldiers or persons that would do crimes for the gang. And then your younger persons in the gang would be what we considered peewees.  Most of these would be middle school to high school age individuals that would be responsible for mainly criminal damages like tagging and fights at the school.

Q   In the past two days you've made reference to gang members and gang associates.  What's the difference between a gang member and a gang associate?

A   Gang members are persons that have had enough -- met enough of the criteria to be documented.  Gang associates might not have met enough of that criteria but it was somebody that we wanted to do document for intelligence purposes within the police department in case they were involved in any type of crimes with these persons.  Just for intelligence reasons.

Q   And in Dodge City, from your work with gangs, did you learn how -- the most common method by which someone became a member of a gang?  What did they have to do to gain membership in a gang in Dodge City?

A   Most commonly they would be what they consider beat in or jumped in into the gang.  It would be for whatever time at that time they deemed necessary for that person to be beat in and by however many individuals that were either available or they deemed necessary to jump that person in.

Q   All right.  So people who were already members of the gang would beat the person who is wanting to be admitted into the gang for a period of time?

A   Yes, sir.

Q   Was that the only way to be admitted as a gang

member in Dodge City gangs?

A    No.  But the other ones, I've just learned.  I don't have any -- I want to say -- I don't have any knowledge of them getting in other ways but I don't have, other than through my training, I know there's other ways to get into gangs.  One that I've heard most frequently, though, would be the jump-in process.

Q    Okay.  The jump-in process was told to you by gang members in Dodge City?

A    Yes, sir.

Q    In Dodge, was it -- did the gangs generally have a rival gang?

A    Yes.

Q    And did they generally, the gangs, have rules that the members were expected to abide by?

A    Yes.

Q    What were some of the rules that gang members were expected to adhere to?

A    Not to be cowardly when on the streets to rival gang members, whether that person was throwing gang signs at them or not.  You know, any kind of verbal threats back and forth, they weren't to bow down from those threats.  That would make the gang look weak.  They were not -- at some point there was different rules over narcotics use.  Certain kinds of narcotics not to use.  It could be not

to mess with other gang members' girlfriends; not to be late to meetings. At one point it was to bring dues to meetings. If you didn't do that, you could get violated. There were several different things.

Q   And how did you gain this information?

A   Through debriefs.

Q   Of?

A   Of gang members theirselves.

Q   Now, if someone didn't adhere to these rules, for example, if a rival gang member was encountered somewhere in Dodge City and a threat was made, either hand signal or verbal threat was made, and the person turned away and didn't do anything, what would -- what could the result of that be?

A   It would probably be a physical beating, what they call a violation.

Q   And do you know for a fact that violations did occur within the gangs?

A   Yes.

Q   And the result, the punishment, was a beating?

A   Yes.

Q   And in addition to not standing up for your gang against rival gang members, how else could you get violated?

A   Cooperating with law enforcement.

Q    And not attending meetings or being late --

A    Not attending, yes, sir.

Q    Did you hear of cases where people were violated for some of those transgressions?

A    Yes, sir.

Q    In Dodge, did the gangs commonly use the same color, adopt the same color to use as representing their gang?

A    Yes.

Q    And you've already made reference to hand signals. Is that a common thing done by gangs in Dodge City?

A    Yes.

Q    Are tattoos commonly used to represent association or membership within a gang?

A    Yes.

Q    Are there ways -- let me ask you this.  In Dodge City, were there parts of town that were considered or claimed to be the property of certain gangs or their territory?

A    Yes.

Q    What gangs did you most often deal with from 2008 until you became a KBI agent.  Within Dodge, what are the gangs you spent most of your time working against?

A    It would be, like I said in the other hearings, at the end of 2008 it would have been more MCB and 18th Street.  In 2009 on, it was mainly DV and LCC.

Q   And MCB stands for what?

A   Master Criminal Boys.

Q   And 18th Street is reference to what?

A   It's a street name out in, I believe, in Orange County, California.

Q   All right.  Then you also made reference to DV. What does DV stand for?

A   Diablos Viejos.

Q   And LLC stands for what?

A   Los Carnales Chingones.

Q   Now, the MCBs and 18th Street are different sets; correct?

A   That is correct.

Q   But they ally with each other in Dodge City?

A   Yes.

MR. SEVART:  Objection, Your Honor.  That's leading and without foundation.

THE COURT:  I think it will be a lot better if you recognize that the rules of evidence do not apply at this hearing.  Is there some reason why you're continuing to object?  We've gone through two days of hearings with no objections so far from eight or ten other lawyers.  What are you trying to do?

MR. SEVART:  Your Honor, I'm trying to have the record establish the witness's testimony and that it

be the witness's testimony, not --

THE COURT:  That's not the purpose of this hearing.  And the rules of evidence don't apply.  You're aware of that, aren't you, Mr. Sevart?

MR. SEVART:  Your Honor, I'm aware that the rules with respect to hearsay and -- are -- and I understand the burden of proof is also relaxed; but I do believe that objections are appropriate in a hearing. If the Court --

THE COURT:  What do you think this hearing is for, Mr. Sevart?

MR. SEVART:  It's to determine --

THE COURT:  -- this is a discovery hearing. What it has been for the past two days.  Has absolutely nothing to do with the *Daubert* case.  It's a discovery hearing and that's what it's turned out to be so that the Defendants and their lawyers can get more information from these two witnesses.  Now, I won't -- you can make your objections for the record, I suppose, but you are wasting my time and the time of everyone else in this courtroom to do it.

MR. SEVART:  Well, Your Honor, I apologize for wasting anyone's time.  I'm just trying to protect my client with respect to the testimony that's coming in.

THE COURT:  Then protect him with an

understanding of the proper rules.  Understand?

MR. SEVART:  Yes, Your Honor.

THE COURT:  You're an experienced lawyer in this court.  I'm not going to put up with frivolous objections.  Let's go.

BY MR. WELCH:

Q   Agent Webb, I think we left off with the DV and LCC. Did they ally with each other within Dodge City?

A   Yes, they did.

Q   Were there parts of town that they considered to be their territory?

A   Yes, sir.

Q   Can you describe what those areas were?

A   It would have been mainly from Avenue A to Avenue P, which would be on the east side of Dodge City, and from Wyatt Earp on the south to Comanche Street on the north. It would be a one square mile section.  And they refer to that as the east side or alphabet city.

Q   What was a method by which gangs would identify areas of town as belonging to them?

A   Using tagging, graffiti.

Q   Would you look at Exhibits 4 through 11.  We won't cover each one of these, but let's start with 4, and can you tell us is this an example of what you've referred to as tagging?

A   Yes, it is.

Q   Tagging in this case is the use of spray paint on what appears to be a garage door; is that correct?

A   Yes, sir.

Q   All right.  Just quickly, if you can, tell us, the "Nortenos" on the upper left and "14" in the middle, the "Diablos Viejos", what does that mean to you?

A   That a Diablos Viejos Norteno gang member would have tagged this up.  You can tell the S's are backwards showing disrespect to Surenos.  You'll see the reference of one dot, four dots, for 14.  14 is the 14th letter of the alphabet for Nortenos, showing allegiance to Nuestra Familia.  And down at the bottom you can also see "scrapas".  The S's are backwards and it's crossed out as showing disrespect to --

Q   Scrapas is a word used by DV and LCC?

A   Yes, sir.

Q   Why is it used?

A   Just to be derogatory towards Surenos, saying that they're table scraps or that sort of derogatory term.

Q   And MCB and 18th Street would be considered Surenos; is that correct?

A   Yes, sir.

Q   Okay.  Exhibit 5, I want to just touch on this quickly because it appears there's blue paint on this

fence to start with and then red paint covering the blue paint.  Is that right?

A  Yes, sir.

Q  What does that mean to you?

A  The blue paint would have been on there first.  It would have been somebody from the 915 area code is what they're referencing, which would probably be ElPaso, Texas.  You can tell an LCC gang member has came back over, crossed out 915 and the ElPaso, put an X over it and line going down, showing disrespect.  Over the "Texas" they put "LCC".  Obviously, this person was claiming east side of ElPaso, Texas.  You could tell in red it's then covered back up with east side or the "E-S" for east side.  Also see claims the east side of Dodge, that's what they're tagging up there.  The number "1233".  Twelfth letter of the alphabet is L, third letter is C.  So 1233, any time you see it, it's associated with LCC for 1233.  You can see where they cross out the "S-U-R" which would just be what a Sureno gang member would commonly tag up.

Q  Okay.  In Dodge City, are there gangs that have adopted the color red as being their color?

A  Yes.

Q  What gangs were they?

A  LCC and DV.

Q   And which gangs used blue as their color?

A   18th Street and MCB.

Q   All right.  We can skip Exhibit 6.  Go to 7, if you would.  Appears to be a trash dumpster with some black marker on it.  What does this mean, the markings on the side of the dumpster?  What does that mean to you?

A   This would have been a DV gang member that tagged this up.  You can see "DV" off to the side.  Then has "SK" with a line through the S, again, showing disrespect to Surenos.  SK is commonly, when they tag that up or wear it on a tattoo, it means scrap killer. 1 and 4, of course, is 14, 14th letter of the alphabet. You'll see 13, which would be for the 13th letter of the alphabet for the letter M.  Surenos will use the number 13 to show allegiance to La Eme or the Mexican mafia or their beliefs.  You can see the 13 upside down as well as 18, for a reference to 18th Street.  They're crossing them out showing disrespect.  The "WOB" can mean weed over, a derogatory name for a female or -- I'm assuming that's what they're tagging up there.  You'll see the "X-4" for 14.  "XIV" is Roman numerals for the number 14.  You'll see the one diamond, four diamonds, again, for 14.  You'll see "Ene", which is for the letter N in Spanish, which is reference to Nortenos.

Q   Exhibit 8, what does this mean to you as a gang

investigator in Dodge City?

A    The huelga bird is commonly found with gangs that -- I believe in the Norteno beliefs, the huelga bird is a symbol that was taken from the United Farmworkers Association in northern California and it was adopted by the Nuestra Familia, which is a prison gang in California.  Most Norteno -- underneath that umbrella, Nortenos, their gang members will use the huelga bird in both taggings, graffiti, as well as tattoos on their body and other drawings.

Q    Okay.  The fact that it's painted in red is significant as well; is that correct?

A    Yes, sir.

Q    Okay.  Skip to Exhibit 10 and just briefly tell us what this sign means to you, why a photograph was taken of this sign.

A    I took this photograph.  This was at Patrick Long's house, who was a known LCC gang member.  The main white part, you can see in red it's stating "LCC".  A lot of this other deal on there would be what we consider roll call or individuals within that gang tagging up their street moniker onto the, the deal itself.  You can see "1233", "LCC", as well as just the street monikers. And -- I don't know what else you want me to explain about it.

Q   That's fine.  Now, as pertaining to DV and LCC in Dodge City, the testimony you provided earlier about structure of gangs within Dodge City, would that be consistent -- the structure you described, would that be consistent for both DV and LCC?

A   Yes.

Q   There's a hierarchy, leadership, foot soldiers and peewees or someone at the lowest level?

A   Not so many peewees for LCC.  They just don't have a lot of younger members like that.

Q   Okay.  And then the Nortenos or DV/LCC sets are not the only gangs in Dodge City that tag; is that right?

A   That is correct.

Q   Exhibit 11 is what?

A   This would a Soreno gang member in Dodge, this would be a common tagging for them.  "SUR" just means they're a southsider.  The number "13", again, for the letter N, showing allegiance to La Eme.  You'll notice the "N" is actually backwards, crossed out.  That's showing disrespect to Nortenos and it's also claiming they're a Norteno killer.

Q   You've also testified that the color red is employed by DV and LCC to represent -- to identify themselves as members of either DV or LCC; is that correct?

A   Yes, sir.

Q    Do they use the color red in their clothing?

A    Yes, they do.

Q    All right.  Looking at Exhibits 12 through 17, we won't touch on each one of these, but starting with 12, why would a photograph be taken of this person wearing these clothes?

A    You can tell the shirt's red.  Got a red bandana hanging out of their pocket.  The shoes are red and black.  This would be common colors for a Norteno gang member in Dodge.

Q    Red bandana hanging out of the pocket, was that a common method of identifying one's self as a DV or LCC?

A    Yes, sir.

Q    And 13, what's the significance of this photograph?

A    The red shirt undershirt, the red boxers, as well as the N on the belt buckle.

Q    N standing for what?

A    Nortenos.

Q    Skip 14.  15 is another example of a belt bucket with the letter N; is that correct?  And red boxer shorts?

A    Yes, sir.

Q    And red belt.  Okay.  Then 16 and 17, why would photographs be taken of these two people?

A    In Exhibit 16, the red hat.  The red flannel, which

is common for LCC and DV members to be wearing.  Just anything with the color red.

Q   And same question for 17.

A   Obviously, the red on the clothing, as well as the sports memorabilia, baseball cap.  You'll see a lot of Red Sox hats, Cincinnati Reds hats, Nebraska Cornhuskers, because it will have the N on it and it will be red.  You'll see that type of clothing.

Q   Okay.  In addition to the red clothing, you testified gang members utilized tattoos to identify themselves or associate with gangs.  Is that true in Dodge City?

A   Yes, sir.

Q   All right.  Looking at Exhibits 18 through 31 and then 40, again, we won't cover each one of these, but starting with 18, what is significant about these tattoos?

A   Starting with 18, obviously, this person is claiming they're a Norteno.  You again see the huelga bird we talked about earlier.  And then the word "Viejos".  Most likely on the person's other arm, they might have Diablos and Viejos on this arm.  It might just be because of the cursive writing, but it appears they're crossing out the S also in Viejos.

Q   Sometimes are tattoos placed on the face to identify

one's self as being a member of a gang?

A    Yes, sir.

Q    Is 19 an example of that?

A    Yes, it is.

Q    What is significant with this photograph?

A    Just the "1-4" representing they're a Norteno, the 14th letter of the alphabet for the letter N.

Q    Exhibit 20 is another example of being tattooed on the body; correct?

A    Yes, sir.

Q    Same for 21?

A    Yes, sir.

Q    And then 22, what is the significance of "Norte" on the chest?

A    It's claiming he's a north side gang member.

Q    All right.  And 23, what is significant about this photograph?

A    Beside the clothing, you'll see the four dots on the left wrist.  Most commonly there's going to be one dot on the right wrist and just when they put their wrist together, it makes a 14.

Q    And then Exhibit 24?

A    This was tattooed on this individual's eyebrows.  It says "Norteno" on the right eyebrow on the left it says "catorce", which is the number 14 in Spanish.

Q   Do you see examples of the red gangs using a star or five point crown as tattoos or in other symbols?

A   Yes.  DV and LCC will both use the five-pointed star.  LCC more uses a five-pointed crown.

Q   And 25 is -- what does this mean to you?

A   This would be either a DV or LCC gang member.  The five points of the star is supposed to be the nautical star, the north star.  The five points can either mean ESLCC for east side LCC or Norte, N-O-R-T-E.  Obviously, star being colored in red is also another indication.

Q   Okay.  We can skip 26 and 27.  28, there are small tattoos on the face that are significant to you; is that correct?

A   Yes.  The one dot by the right eye and the four dots by the left eye.

Q   Again signifying the number 14?

A   The number 14, yes, sir.

Q   Exhibit 29, again, Roman numeral 10 on the right wrist and 4 on the left wrist?

A   Yes, sir.

Q   Means what?

A   Just for the number 14, again, for Norteno.

Q   And Exhibit 30, what is significant about this?

A   Just another star tattoo.

Q   And 31?

A   This would be a crown tattoo commonly worn by an LCC gang member.

Q   And Exhibit 40, if you would skip to that.  There's facial tattoos.  What, if any, are significant to you?

A   The "X-4" for the 14.  On one of the checks it says "DV" and then the "FOCO loco", just Ford County crazy, which is the county that Dodge is seated.

Q   Now, earlier you testified, Agent Webb, that gangs employ hand signs or hand signals for different reasons, one of which would be to identify themselves as a member of a gang and also to threaten other gangs, rival gang members; is that correct?

A   That's correct.  It will be for -- a form of nonverbal communication if the person is not close enough for them to talk to.  Across a room or across a street.  Or they could flash a gang sign that that person could see, that would tell them who they're -- either -- what their set is or who they're -- what gang they're in.

Q   Are you familiar with the common hand signals employed by DV and LCC to identify themselves as members of those sets?

A   Yes, I am.

Q   Is Exhibit 32 through -- I should say are Exhibits 32 through 36 examples of hand signals used?

A   Yes, they are.

Q   All right.  32, what is this person displaying?

A   Again, just throwing up the 1 and 4 for 14.

Q   Quickly, if you could, what is significant with 33? Each person in this photograph is displaying something different; is that right?

A   Yes, they are.  The person in the back row, top left, throwing up the 14 for the letter N.  The next person has got the red bandana draped over his hands and he is making the letter N.  That's the hand signal he is making.  Third person from the left in the back row is making the five-pointed star.  The last person in the back row, again, is throwing up the 1-4.  The three individuals in the front row, the guy on the left is throwing up 1-4 but his arms are also crossed in an X. The middle guy has got his arms up in front of his chest to his chin.  And then the last guy is making a V.  So they're making XIV for the Roman numeral 14 on the front row.  I don't believe that 14 on the -- was on his shirt there in the middle.  It looks like this was taken off of a -- some -- it's been digitally altered by -- put it on Facebook or something.  Also, whenever they -- they will type and put any kind of typing, most of the time they'll use a money sign because it looks like they're crossing out the X.  So you can see that here where they

put up "Diablos Viejos" and they're using the money sign.

Q   Hang on.  Crossing out the S why?

A   To show disrespect to Surenos.

Q   Okay.  All right.  And then Exhibit 34, what is this hand sign?

A   DV.

Q   For what?

A   Diablos Viejos.

Q   All right.  And Exhibit 35, are there hand signals here that are significant to you as a gang officer?

A   Yes, there are.

Q   What are they?

A   Second hand signal from the left is putting up east side.  He is making the letter E.  The individuals in the middle that are shaking hands, they're forming a five-pointed star.  You can't see the bottom of their fingers in this picture but that is the five-pointed star.  You see the individual in the San Francisco jersey with the number 14 on the jersey.  And, again, you see the red plaid shirts.

Q   And in this photograph are there members of both DV and LCC sets in Dodge City?

A   Yes.

Q   This shows association of -- that they hang out

together on occasion?

A   Yes, sir.

Q   We'll skip 36.  In addition to the colors and the hand signs and tattoos, are gang -- do gangs in Dodge City sometimes use hairstyles that are unique to their sets?

A   Yes, they do.

Q   Is that true of DV and LCC?

A   Mainly DV.

Q   Okay.  What would that be?

A   They wear kind of a top -- what they call top notch.  It's a Mongolian braid.  So the hair will grow out -- towards the top of their head, they'll let a circle of hair grow out.  They call it the Mongolian braid.  I was told at the time when they started growing these by Officer Nau at the time that the -- they were growing out this hairstyle because they were getting ready to go to war with their rival gang members.

Q   And 37, is that a hairstyle, an example of this Mongolian top notch?

A   Yes, it is.

Q   In addition to the hairstyle, there's a tattoo on the left cheek and then below the left ear.  What do those mean to you?

A   Left cheek's got "4".  His right cheek will probably

have 1.  For the number 14.  14 underneath the left ear just, again, signifying he's a Norteno gang member.

Q   Okay.  And we can skip -- 38 and 39 are just other examples of the top knot; is that correct?

A   Yes, sir.

Q   You've already testified to this to some degree, but are there terms that are used by DV and LCC sets, derogatory terms used for rival gang members in Dodge City?

A   Yes.

Q   What would those include?

A   They'll call their rivals "scraps" or "screezys", anything with the letter S where they can be derogatory towards them.

Q   And do Surenos also employ derogatory terms towards Noretnos?

A   Yes, they do.

Q   What would those be?

A   They'll call DV "dirties".  They'll call LCC "la caca", which is just for feces.  They'll call 'em "busters" as in sodbusters or they're not really gang members.  Those are derogatory terms Surenos use towards Nortenos.

Q   You talked earlier about hierarchy within the gang. Is it possible within Dodge City gangs to change your

status within the gang?  Either go up or down?

A    Yes.

Q    What would ways be of increasing or improving your status within the gang amongst other gang members?

A    Committing crimes for the gang.  Committing crimes where people would look at you as knowing that you're an individual that's down for the gang, that -- the crazier you are, the more respect you kind of get within your gang.

Q    When you say down with the gang or down for the gang, what are you meaning by that?

A    Just that you would do anything for the gang.  And also, you know, if you were to get caught doing any of that, if you don't cooperate with law enforcement, you go and spend prison time and come back out, that obviously boosts up yourself within the gang.

Q    Then how would you -- you said it's possible to decrease your status as well.  What would you do or have to do to --

A    By a lot of those things we talked about earlier by getting violations; and not only violations, but if you do cooperate with law enforcement, that would be a bad thing.

Q    If you're confronted by a rival gang member and you don't stand up for your gang?

A   Yes, sir.

Q   Now, Exhibit 1, Agent Webb, did you help create that document?

A   Yes, I did.

Q   And within that document did you identify the number of DV gang members in Dodge City on a certain date?

A   Yes, I did.

Q   What was the date and what was the number?

A   These numbers were given by the records department, Dodge City Police Department.  As of July 1st of 2012, there was 218 Diablos Viejos documented gang members. And that would have went back from the July 1st, 2012, that would go back five years, so that's persons that they had entered into NCIC.

Q   Did you likewise provide a number of LCC gang members in Dodge City?

A   Yes, I did.

Q   What was the number and what was the date?

A   It was the same date.  And it was -- their number was 67.

MR. WELCH:  Your Honor, I have no further questions of Agent Webb.

THE COURT:  We'll take about a 15 minute recess and we'll start the cross-examination.

(Recess.)

THE COURT:  I think I'll let Mr. Bennett go first.

MR. BENNETT:  Judge, I have no questions. Thank you.

THE COURT:  That's why I let you go first.

MR. BENNETT:  Should have saved the good for the last.

THE COURT:  Maybe -- who wants to ask questions?  I assume Mr. Sevart would like to ask some questions.

MR. SEVART:  If I may, Your Honor.

THE COURT:  And I will not permit the Government to object to any of your questions either.

MR. SEVART:  I'll try not to ask anything that's objectionable, Your Honor.  Thank you.  And I also will try to move quickly.

THE COURT:  That's fine.

MR. SEVART:  Appreciate it.

**CROSS EXAMINATION**

BY MR. SEVART:

Q   Sir, I have a couple of quick questions with respect to some of the information you testified to that's in the book.

A   Yes, sir.

Q   There where it says number of gang members, is that

the number of gang sheets that were filed?

A   No, sir.

Q   Okay.  That would be actual individuals?

A   That is correct.

Q   With different names and that sort of thing?

A   Yes, sir.

Q   Okay.  Also, what population, what is the population of the particular community?

A   I think our last census -- I can't tell you for sure.  I know the last census before this last one was 28,000.  I think we're over 30,000 now.

Q   And do you know what percentage is Hispanic?

A   No, sir.

Q   Okay.  With respect to the photographs, are those photographs that were obtained by law enforcement or are those photographs that were, you know, staged or set up by law enforcement as examples?

A   These were all obtained either by law enforcement or -- I think the one photo that's got the six individuals in it, I think that was obtained by a juvenile service corrections officer with juvenile services.  But the rest of them I think, you know, could be taken off of KDOC websites or wherever; but some of these were taken by officers.

Q   But they're not photos that you went out and got

some people and said, here, pose like this, we're going
to take a picture as an example of something?

A    No, sir.

Q    Okay.  With respect to your qualifications --

A    Yes, sir.

Q    -- have you ever studied any psychology?

A    I think I had a psychology and sociology class in
college; but, no, I'm not -- my continuing education
doesn't include sociology or psychology or anything.

Q    Okay.  Do you have a college degree?

A    Yes, sir.

Q    And what is that in?

A    Criminal justice.

Q    But you don't have a minor in psychology or
sociology?

A    No, sir.

Q    No education in like anthropology or society
formations or anything of that sort?

A    No, sir.

Q    No family studies or human behavior classes?

A    Not to my knowledge.

Q    Okay.  Haven't taken any courses on, you know,
languages or art history or anything dealing with
tattoos or drawings or any of that sort of stuff?

A    Yes, I've had classes.  You want to start breaking

these down word by word?  You're throwing a bunch of stuff in together.  Might be easier.

Q   Okay.  We can certainly do that.  With respect to language, have you taken Spanish classes or --

A   I've taken intermediate Spanish.  Also, being in Dodge City, we have a high population that speak Spanish so I can learn from other officers or I've learned some on the streets.

Q   Do you consider yourself fluent in Spanish?

A   No, sir.

Q   With respect to art, have you studied any art classes?

A   Are you talking about paintings?

Q   Well, tattoos, primarily, in this particular instance.

A   I have had classes on tattoos, mainly with gang tattoos.

Q   And where were those classes at?

A   The class that I can remember was here in Wichita, Kansas.  It was put on by -- I believe it was a person that was with the California Department of Corrections or it might have been the Washington Department of Corrections.  He went through, I believe it was, a four, an eight hour class on tattooing and symbols and what tattoos mean.

Q   And so that was a law enforcement class?

A   Yes, sir.

Q   Never a college course on art or art history?

A   Not that I recall. Not that I recall as far as tattooing goes.

Q   Okay. Would you agree that really your testimony in this particular case would be more like common sense type of observations?

A   No, sir.

Q   Okay. As far as the experience, I guess, that you have, has that always been from a law enforcement standpoint?

A   Besides my college, as well as growing up in Dodge City around most of these individuals.

Q   Have you ever been a member of a game?

A   A game or gang? No.

Q   A gang, you've never been a member of a gang?

A   No.

Q   Ever gone undercover to go into a gang?

A   Not to go into a gang, no.

Q   The perspective that you have is from a law enforcement perspective; correct?

A   Not only from a law enforcement perspective, also from growing up in Dodge City from being around this. Even my years previous to being in law enforcement, I

was still a member of the community seeing a lot of these things.

Q   Okay.

THE COURT:  How old are you now?

A   What's that?

THE COURT:  How old are you now?

A   36 years old, sir.

THE COURT:  Thank you.

Q   Have you ever been a witness for the defense?

A   Have I ever been called by a defense -- yes.  I mean, I've been called by defense -- been subpoenaed by defense attorneys.  I don't understand what you mean.

Q   Have you ever been called to testify as a defense expert on gangs?

A   No, sir.

Q   Have you ever been consulted by defense as a gang expert?

A   At times I've been able to give my opinions in the District Court in Ford County.  I've never been through a type of a hearing like this to be certified as an expert.  It's just been through certain defense attorneys, as well as prosecutors, as well as the judge at the time, have allowed me to give opinions on different things that they needed to be brought up to speed on.

Q    Okay.  So break that down a little bit.  You've never been qualified by a court as an expert; correct?

A    That is correct, sir.

Q    And you've never testified as an expert in federal court; correct?

A    That is correct, sir.

Q    Your seminars that you have presented have all been law enforcement sponsored seminars; correct?

A    I don't know if the Wichita Crime Commission is -- I don't know what their role for being an organization is.

Q    You've never presented as an expert at any, like, criminal defense association or anything of that sort; correct?

A    Not for the defense association.  I've done other talks, you know, to the Chamber of Commerce, different groups like Lion's Club.  Even area mental health where I've spoke to parents where their children or youth are getting involved in these things.  I've also spoke to families of juvenile persons that are placed on juvenile corrections.

Q    Okay.

A    That probably is not all of it.  I've spoke to a lot of different groups.

Q    You testified some about hierarchy and the difference between like a member and an associate.  You

recall that?

A   Yes, sir.

Q   And those are classifications that you as law enforcement make; correct?

A   That's correct.  Under state law for the State of Kansas of what they define a gang member as.

Q   But not what a gang might classify somebody; correct?

A   You're saying what would a gang member say?  He's just an associate, not a member of us.  Is that what you're asking?

Q   What I'm asking is these labels that you are utilizing and testifying to are labels that are created by law enforcement and maybe also the Kansas statute on gangs?

A   This is more labels that -- I just know they're labels that we use within the police department as this person is either an associate or -- if they don't meet enough criteria to be a full-fledged documented gang member.

Q   Right.  And those are labels that law enforcement has created, not the gang groups?

A   I -- yeah, the groups have not.

Q   Okay.

A   Not to the best of my knowledge.

MR. SEVART:  Thank you.  No further questions.

THE COURT:  Thank you, Mr. Sevart.  Who's next?  Mr. Maughan.

MR. MAUGHN:  Very briefly, Your Honor.

### CROSS EXAMINATION

BY MR. MAUGHAN:

Q   Good morning, Agent.  The training that you had, you said you were trained by other people who are experts in gangs?

A   Yes, sir.

Q   Now, were those people experts in gangs in other areas of the country?

A   Yes, they were.

Q   Did you ever receive any training from somebody who was an expert in the gangs that exist in southwest Kansas?

A   Not the gangs that live in southwest Kansas; but the umbrella that these gangs fall under.

Q   So the -- for want of a better word -- the national or international branch gang.  Is that true?

A   Just where these gangs originated from, which would be out of the west coast.

Q   Okay.  So -- and then you use that information of in general experts on Nortenos gangs to extrapolate information about the people in southwest Kansas?

A     Plus my experiences on the street.

Q     Sure.  Okay.  Now, gangs in different areas of the country do act in different ways; correct?

A     Yes.

Q     Different sub sets of an umbrella gang will act in different ways?

A     Yes.

Q     And the training you received was from experts who didn't know anything about the sub sets in southwest Kansas?

A     To the best of my knowledge, yes.  I did attend one gang training with an individual that did know about gangs in southwest Kansas.

Q     And who was that?

A     Tim McClure.

Q     And is he from the Dodge City Police Department or is he from somewhere --

A     He was from the Ford County Sheriff's Department.

Q     And is he a contemporary of yours?  Kind of equal rank or is he -- I know you come from different agencies but --

A     Yes, sir.  He's an investigator for the Ford County Sheriff's Department.  I now work for the Kansas Bureau of Investigation, so I guess he's an investigator if that's what you're asking.

Q    Well -- and what I'm trying to get at is is his level of experience greater than yours or less than yours?

A    That's -- I couldn't tell you.

Q    Okay.  Thank you.  Are you aware of any academic studies on gangs in Dodge City or southwest Kansas?

A    No, I'm not aware of any.

Q    And so your proposed expertise are based solely on your experience and the experience of your fellow officers.  Is that true?

A    Yes.  As well as talking to members of the community or -- everything we covered in this hearing.

Q    Your proposed expertise is not based on any academic study or academic papers written on gangs?

A    No, that's not necessarily true because now you broadened that back out.

Q    All right.  Let me -- I asked two different questions.  Let me ask the first question.  Your expertise in -- the proposed expertise in the gangs in southwest Kansas are based upon -- not based upon any academic studies that you know of regarding these individuals?

A    Well, I mean, yes, obviously, under the umbrella gangs; but not specifically the southwest Kansas gang.  Just the gangs that they are under the umbrella of which

would be Nortenos or the Surenos.  I mean, those I'm very familiar with.

Q   And the umbrella gangs don't necessarily -- the sub sets in southwest Kansas don't necessarily act in a uniform way to all of the other sets in an umbrella gang?

A   That's possible.

MR. MAUGHN:  Thank you.  No further questions, Judge.  Thank you.

THE COURT:  Thank you, Mr. Maughan.  Who's next?  Well, I guess you're up, Chris, if you want to ask some questions.

MR. O'HARA:  I've just got a couple, Your Honor.

THE COURT:  All right.

#### CROSS EXAMINATION

BY MR. O'HARA:

Q   In regards to I guess the list regarding the documentation.  You testified that after five years that one could be removed from this list?

A   Yes, sir.

Q   Now, is that automatically removed or is that something that is -- you said you oversaw the list.  Is that something where you would look at it and decide whether to remove someone?

A   No.  It would be a short period of time -- and the reason that NCIC would send that is in case it was an oversight by the records department or the department itself that there was actually documentation within that time frame that had not been sent off to them to keep that person in.  If we notice there was no documentation within the police department in those five years and the person was not incarcerated, you know, still doing any of this, where we could have enough from an outside agency to keep that person in, then that person would be removed.

Q   You would actually do the removing from the list then itself?

A   No, sir.  I would send a letter back to records, which would be the same sheet, the gang verification criteria.  It would have the individual's name on the top and it would say remove from NCIC, there's no gang contact.  Records would then go through their paper copies also and they would then -- once -- basically, this was just from the street saying, hey, we don't have no information, records would then look, say, we don't have no information.  Records personnel would then take them out.  Officers of the police department have nothing to do with them being put into NCIC or taken out of NCIC.  It's just more of an investigative tool that

goes through records.

Q   You also testified about the difference between a gang associate and a gang member.  And you said, I believe, that an associate doesn't meet all the criteria on your criteria sheet that you've testified regarding?

A   That is correct.

Q   Okay.  Now, that then wouldn't -- a gang associate, then, wouldn't be considered actually a documented gang member?

A   That's correct.

Q   And then the other question I had was you testified about what it takes to get into a gang.

A   Yes, sir.

Q   Are you aware of what it takes to get out of a gang?

A   Yes.  Pretty much the same thing.  It will be some type of a beating, and it's called a beat out and they would, you know, physically assault that person until they decide enough is enough and that person could be out of the gang.

Q   Are you aware of anything that would happen, then, if that individual had tattoos or anything on them?

A   I don't know about that, sir.

Q   Is that the only way you're aware of getting out of a gang?

A   That's the only way that I'm aware of besides

obviously, you know, dying or becoming deceased.

MR. O'HARA:  I have nothing further.

THE COURT:  Thank you.  I think we're concluded with Agent Webb.  And now come forward Agent Nau.

MR. SMITH:  Yes, Your Honor, we would call Agent Nau.

THE COURT:  You're still under oath, too.

**JAMES NAU**

Having been **previously** duly sworn to tell the truth, the whole truth and nothing but the truth, testified **further** as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q    Tell us your name please.

A    James Nau.

Q    What is it you do for a living?

A    I'm an agent for the Kansas Department of Revenue, the Alcohol Beverage Control Division.

Q    When did you begin there?

A    September 24th, 2012.

Q    Before that, were you employed in law enforcement?

A    Yes, I was.

Q    And where were you employed?

A    At the Dodge City Police Department.

Q   In what capacity?

A   As a patrol officer.

Q   When did you begin at the Dodge City Police Department?

A   February 13, 2006.

Q   And your rank with the Dodge City Police Department, was that always as a patrol officer?

A   For the most part it was patrol officer where I was then tasked different assignments but still in patrol.

Q   You began as a patrol officer; is that correct?

A   That's correct.

Q   Did you go through the Kansas Law Enforcement Training Center?

A   Yes, I did.

Q   Did you successfully complete that training?

A   Yes, I did.

Q   And then as working as a patrol officer, you've mentioned that you had other specific assignments or tasks; is that correct?

A   That is correct.

Q   And what tasks were those or assignments?

A   I was assigned to the Street Crime Unit in July of 2007, which lasted until August, 2010.  From that date it was -- the Street Crime Unit was changed and some of our focus, the way we did things, was changed as well.

Q   What was your focus when you worked with the Street Crime Unit?

A   It was to investigate gang crimes and work street level narcotics.

Q   Now, when you were focused in working those particular crimes with the Street Crime Unit, how did that differ from how the other patrol officers were working during that time period?

A   We were on different shifts.  There was four of us, two officers per night shift.  Basically, we didn't take calls.  We investigated or watched, did surveillance on gang houses, on drug houses.  Any time any other officers would do a traffic stop on a gang car or investigate a gang related, possibly a gang related crime, they would call for our assistance over to either help with it.  As we were on it, our supervisors, I don't know how the other ones were doing it, on our shift, or on the Street Crime Unit, but we were basically referred to as a source of information on gangs.  So if a beat officer on the Street Crime Unit when we were on that, if they had a gang related crime, they would work the crime, basically, they would call us over for information pertaining to that particular crime or suspects or witnesses.

Q   So the other officers then referenced you to aid in

investigating those crimes?

A    That is correct.

Q    Could that be something that would be specifically gang related like a violent crime or would that include anything down to a traffic stop or traffic infraction?

A    That would include anything down to a traffic stop. They would call for assistance either to, A, get information; or, some of these officers didn't know who these people were or what gang they belonged to so they would look at us to help 'em out.

Q    And you mentioned then that unit changed in about 2010; is that correct?

A    Yes, that is correct.

Q    How did that unit change?

A    We had a new chief come in and he changed it from the Street Crime Unit to the Problem Oriented Policing unit, also known as the POP unit.  And from there -- there was still four of us assigned to this unit.  All four people had different expertise in different things. And we worked weekend nights.  We worked Thursday, Friday, Saturday, night shift, 14-hour shift.  And basically I was assigned to gang investigations on that unit.  So anything that was gang related was assigned to me while I worked on those nights.

Q    So out of the four people on the POP unit, you

essentially were the gang investigator; is that correct?

A   That is correct.

Q   Now, how do you feel that your specific investigative role changed from going from SCU to the POP unit?

A   Anything that was -- as I stated, anything that was gang related, other than just being on the SCU unit when we were basically a source of information pertaining to gang information.  Going to the POP unit now we started to -- to me, we were night detectives.  We worked those gang crimes.  If it was a gang related crime, we took that whole crime over or that whole scene over.

Q   Now, Agent, you've also created a C.V. and submitted it to the Court?

A   Yes.

Q   And does that C.V. contain not only your training and experience, but specific trainings that you've attended focused on gang crimes; is that correct?

A   That is correct.

Q   And does it also contain examples of specific instances in which that you have given training; is that right?

A   That is correct.

Q   Now, there is mention of a program that is referred to by the acronym GREAT, G-R-E-A-T.  Can you explain to

us what that is?

A    Yeah.  GREAT took place of what the DARE program used to be.  GREAT stands for Gang Resistance Education And Training.  It's basically a program developed for middle school and fifth grade elementary level students and it gives them kind of ideas and ways to deal with things that are, I guess, difficult in life.  It gives them opportunities, shows them other ways to deal with things so they don't lead into gang membership.

Q    Did you receive any training to become an instructor for the GREAT program?

A    Yes.  I was sent to Portland, Oregon, for ten days for a 60-hour course based on being an instructor for the GREAT program.

Q    And were you certified to be an instructor?

A    Yes, I was.

Q    And you then conducted that program.  And was that in Dodge City, Kansas?

A    Yes.  That was at Dodge City middle schools and also at -- right now it's Comanche Middle School.  Before that, it was fifth grade elementary school.

Q    Other than giving trainings or education related to the GREAT program, have you also given other trainings related to gang investigations?

A    Yes, I have.

Q   And those are contained within your C.V. is that correct?

A   That is correct.

Q   Along with trainings that you've attended; is that right?

A   That is correct.

Q   In your role with the SCU and with the POP unit, did you have opportunities to have direct contact with gang members in Dodge City, Kansas?

A   Yes.  Mostly every day that I worked, I had contact some way or another.

Q   And so would that involve investigations or arrests?

A   Yes.

Q   Would it involve also consensual encounters?

A   Yes, it would.

Q   And did you gain information or intelligence from each of those encounters with gang members?

A   Yes, I have.

Q   And would that include during the consensual encounters?

A   Yes.

Q   Did you also have an opportunity to interview families of gang members?

A   Yes.

Q   And victims of suspected gang crimes?

A    Yes.

Q    And informants in relation to gang activity?

A    Yes.

Q    And did you gain information and intelligence in each of those contacts?

A    Yes.

Q    And have you had the opportunity to arrest gang members in Dodge City, Kansas?

A    Yes, I have.

Q    In your role with the SCU and with the POP unit, have you been considered by other officers or even your supervisors in Dodge City to be an expert in Dodge City gangs?

A    Yes.

Q    Now, Agent, you've been present for the testimony of Agent Webb the last three days; is that correct?

A    That is correct.

Q    How was your role when you were with the Dodge City Police Department different than Agent Webb's role when he was with the Dodge City Police Department?

A    As he stated, he was on the Street Crime Unit for a while, then was promoted to detective.  From when I got on in 2007, until I left in 2012, I stayed on the street.  One part in there from January, 2012, until I left in September, from January until the end of school

year, I was in the schools teaching during the week. During the summertime is when we came back to that Thursday, Friday, Saturday night 14-hour shifts so I was back working the streets again.  He was, like he stated, he would catch the, as a detective part, the back end of the cases working them that way.  When I was working during the summertimes and on the POP unit, we were taking the case from the start to the finish.  So I was always on the street my entire time there.

Q   You began with the front end of the investigation?

A   Correct.

Q   For lack of a better term.

A   That is correct.

Q   And as you've stated, you had almost daily contact with gang members in Dodge City, Kansas?

A   That is correct.

Q   Does that include gang members that have associated themselves as either Surenos and those also that associated themselves as Nortenos?

A   Yes, that is correct.

Q   And using those generic terms, Sureno versus Norteno, do you agree each of those two generic terms associate themselves with certain colors?

A   Yes.

Q   And the Surenos associates themselves with what?

A    Blue.

Q    And the Norteno with what?

A    Red.

Q    Before being a police officer with the Dodge City Police Department, did you have another law enforcement role?

A    Yes.  For three months prior to that, I was a detention officer at the Ford County jail.

Q    And I'm going to ask you some questions specifically about detention and you can draw on your experience from being a detention officer and also being a police officer with Dodge City.  As gang members were arrested, did they make certain requests of the Ford County jail as to what their placements would be?

A    Yes.  Depending on what color or gang they affiliated themselves with or represented themselves with, they wanted to be in that area versus being with a rival.  And the same thing goes for the detention staff purposes.  They would ask if they were gang related for the fact we didn't get rival gang members mixed you and have a big fight.

Q    Okay.  So, for instance, if a Sureno gang member, an 18th Streeter, was arrested, he would make what request of Ford County?

A    He would request to be either with 18th Street gang

members or MCB, Sureno gang members.

Q    And if an LCC gang member or DV gang member were arrested, they would make what request of Ford County?

A    They would request to be with each other in the red gang area.

Q    And in your training and experience, if an LCC gang member were placed, for instance, with a MCB in the MCB area of the jail, what would occur?

A    There would be some sort of physical altercation or big fight.

Q    Now, Agent, you've seen Government Exhibits 1, 2 and 3; is that correct?

A    Yes, that is correct.

Q    Are you familiar with Government Exhibit 1?

A    Yes.

Q    And did you help in creating Government Exhibit 1?

A    Yes, I did.

Q    Does Government Exhibit 1 contain your opinions as to the operation or identification of gangs in Dodge City, Kansas?

A    Yes, it does.

Q    Are there any opinions related in Government Exhibit 1 that you would disagree with?

A    No.

Q    And are you familiar with Government Exhibits 2 and

3?

A    Yes.

Q    Government Exhibit 2 is the policies and procedures
of the Dodge City Police Department; is that correct?

A    Yes, that is correct.

Q    And Government Exhibit 3 is what we can generically
refer to as a gang sheet; is that correct?

A    Yes, that is correct.

Q    And did you have contact with gang sheets or the
creation of gang sheets?

A    Yes.  I filled out gang sheets when I've had gang
contacts.  There was also at one point in time as
Officer -- or Agent Webb had stated, where he -- those
gang sheets were submitted to him for approval.
After -- I don't know why they were switched -- but he
got busy and then they were directed to Detective Bice
for his approval.  And then at one point in time when I
was on the POP unit, they were all -- all gang sheets
were to go through me for approval.

Q    And did you do so?

A    Yes.

Q    And they were forwarded on then to records; is that
correct?

A    That is correct.

Q    And are you familiar with the process of then the

records department taking those and entering the information into NCIC?

A   I don't know how they directly enter it; but I know kind of what NCIC requires for them to be entered.

Q   And some of those policies and procedures are in Government Exhibit 2; is that correct?

A   Yes, that is correct.

Q   Is there a difference in the classification required by NCIC and that required by the Dodge City Police Department?

A   Yes.

Q   And what is the difference?

A   The difference between NCIC and Dodge City Police Department classification is if they admit gang affiliation, that's automatic entry for NCIC purposes as well as being a documented gang member for the police department.  If they don't admit affiliation, NCIC requires only two other criteria be documented or checked or marked on that gang sheet.  The Dodge City Police Department required three, but it had to be one area from each of the three categories on the gang sheet.

Q   The gang sheet actually has categories contained on the front page of that gang sheet; is that right?

A   That is correct.

Q   So when you say that three other boxes need to be checked, it was actually one from each of the three categories; is that correct?

A   That is correct.

Q   Or one or more from each of the three categories?

A   Correct.

Q   Agent, you've heard Agent Webb testify about common gang characteristics and behaviors in Dodge City, Kansas, all gangs in Dodge City, Kansas.  Is that correct?

A   That is correct.

Q   Is there any opinion that you disagreed with with Agent Webb or anything that you feel that you should add to his testimony?

A   No.

Q   And you've also heard him testify specifically about gangs in Dodge City, Kansas, specifically red gangs in Dodge City, Kansas.  Is that correct?

A   That is correct.

Q   Did you agree with his opinions that he has testified about in the last three days?

A   Yes, I do.

Q   And did you agree with the representations or interpretations that Agent Webb made of, for instance, the symbolism the LCC and DV would use?

A   Yes, I agree.

Q   Have you personally seen that symbolism?

A   Yes.

Q   And received training on that symbolism?

A   Yes, I have.

Q   Have you also received information directly from gang members as to that symbolism?

A   Yes.

Q   Would you agree to the testimony of Agent Webb about the colors used to identify LCC or DV?

A   Yes, I would.

Q   And would you agree with Agent Webb about the proposed leadership or structures or rules of behavior and expectations of those gangs?

A   Yes, I would.

Q   And when I asked you about the interpretation of symbolism, would that include not only, for instance, graffiti and writing, but tattoos or hand signals or hairstyles?

A   Yes.

        MR. SMITH:  Nothing further, Your Honor.

        THE COURT:  Mr. Bennett.

        MR. BENNETT:  No questions, Your Honor.

        THE COURT:  Thank you, sir.  Anyone else?

Yes, Mr. Sevart.

MR. SEVART:  Thank you.

**CROSS EXAMINATION**

BY MR. SEVART:

Q   Sir, to begin with, would the opinions that you would be giving in this case then be the exact same opinions as Officer or Detective Webb would be giving?

A   Yes.

Q   And there's no different opinions, then, between the two of you?

A   No.

Q   Sir, have you ever been certified by a court as a gang expert?

A   No, I have not.

Q   Have you ever testified in state court as a gang expert?

A   I've not testified.  I've been the same thing as Agent Webb.  I've been asked to give my opinion on things.  I've also been asked to come over and establish gang membership on a defendant and vice versa.

Q   In state court?

A   In state court.  I've also had defense counsel call me over to show that their person was no longer a 1gang member as the examples were given on taking them out of NCIC.

Q   And have you ever testified in federal court other

than this case?

A   No, I have not.

Q   Have you -- do you have a college education?

A   Yes, I do.

Q   And what is your degree in?

A   Biology.

Q   And when you indicated earlier that you were teaching in the schools, were you teaching biology at school?

A   No.  I was teaching the GREAT program.

Q   Okay.  How often did you teach the GREAT program?

A   It was every week.  It just depended -- the first time I got into it as the main instructor, I had to teach middle school and then fifth grade, so I would go teach four classes in the morning at the middle school and then go teach anywhere from one to three after that. I was in the school almost every day until school was over from January until May.

Q   Different schools or the same school or --

A   The middle school and -- I mean, there was a middle school and elementary, but I had different classes every day.  There was sometimes five and six fifth grade classes and five and six middle school classes.  So if I taught these three or four middle school classes this day, the next day I would teach the other three or four.

So every day was different.

Q   Okay.  And with respect to the GREAT program then, this presentation that you were giving to the students, did you use a powerpoint presentation?

A   Yes.

Q   And did you use materials, then, that were provided to you from the seminar that you attended?

A   Yes.

Q   Okay.  So really what you're doing is you're taking their powerpoint and their material and giving it to students at various ages; is that correct?

A   That is correct.

Q   Okay.  And it's that group that did all of the research or the studies for the material that you're providing; correct?

A   That is correct.

Q   In studying biology, did you ever take any anthropology classes?

A   No, I did not.

Q   Any human behavior classes?

A   No.

Q   Any psychology classes?

A   I have taken a psychology class.

Q   With just the entry level psychology?

A   Yes, sir.

Q   Don't have a minor or any other degree in that?

A   No, sir.

Q   How about sociology?

A   I took a sociology class and that was one of those gen ed courses.

Q   Okay.  Just introductory?

A   Yes, sir.

Q   Again, no minor or advanced degree?

A   No, sir.

Q   How about as far as art or art history?

A   I did take an art history class when I was in Fort Hays State University.

Q   And did you study symbolisms or any of that in that class?

A   Some, but not a lot.

Q   Certainly would not consider yourself an expert in that area?

A   No, I would not.

Q   How about any family studies or anything?

A   No.

Q   Did you consider yourself fluent in Spanish?

A   No, I do not.

Q   Would you agree that essentially 100% of your employment has been affiliated with the prosecution side of the criminal justice system?

A    Yes.

Q    Have you ever been a gang member?

A    No, sir.

Q    Even on an undercover status?  Never gone undercover?

A    No, sir.

MR. SEVART:  No further questions, Your Honor.

THE COURT:  Anyone else have any questions? Yes, Mr. Maughan.

**CROSS EXAMINATION**

BY MR. MAUGHN:

Q    Agent, I was just curious, how did you define a gang related crime?

A    Anything that -- the way it was assigned to us when we were on different areas, especially the POP unit, if it was involving gang members, it was assigned to us, to our department, that was a gang related crime.  Whether it was rival or not, if it involved gang members, it was determined a gang related crime for us.

Q    So even if it was just common shoplifting case, if it was done by a gang member, it was gang related and you were --

A    Correct.

Q    Was that gang related activity then used to put on the gang sheet for that individual?

A    That crime specifically, no.  Just depending on that certain individual.  If they had the colors or if the tattoos were visible or if they made statements about the gang, that was put on the sheet.  The crime would be referenced back to the case number but the crime itself wouldn't be specific.

Q    But it isn't one of the criteria for the gang sheet that a person commits gang related crimes?

A    That is one of the criteria is that, that box is specifically -- and that's why they had myself and Agent Webb and Detective Bice at one point approve those. That box, if it was checked, had to establish what gang related crime it was and that it was specific to rival gangs.

Q    All right.  So the definition of gang related for the purpose of the gang sheet is different from gang related to the purpose of assigning it to the POP team?

A    That is correct.

Q    Thank you.  Agent, have you ever authored any papers in law enforcement journals regarding gangs in southwestern Kansas?

A    Have I ever what?  I'm sorry.

Q    Authored, written any papers.

A    No.

Q    Okay.  Are you aware of any articles within law

enforcement journals of any sort relating to gangs in southwest Kansas?

A   Not any articles, I'm not aware of.

Q   Your training in the GREAT program was done, did you say, in Washington state; is that right?

A   It was done in Portland, Oregon.

Q   I'm sorry.  I knew it was the northwest up there.

A   It's close.

Q   And that's a national program; true?

A   That is correct.

Q   It was not specific to any specific type of gang?

A   That is correct.

Q   It included information about Bloods and Crips?

A   It really didn't pertain a lot of information about gangs itself, period.  It was basically how to get -- there was studies done by all these different agencies who put this together and it was basically studies done to see what was effective to give children a different direction.

Q   Okay.  So it was really unrelated to gangs in particular.  It was more of a mentoring program for young children to make better choices?

A   Correct.

Q   Okay.  The training you've had regarding gangs and gang activity, has any of that been specifically related

to gangs in southwest Kansas?

A   There's things that I've learned just like Agent Webb, from, you know, a little bit that I learned in the jail the three months I was there, to being on the Street Crime Unit.  That's where I got a lot of my information.  Also sharing information with Detective Webb and learning things from him.

Q   I'm asking about the formal training you've had about gangs and --

A   Like the conferences I've went through?

Q   Correct.

A   There's nothing been specific to southwest Kansas. It's going to be just like -- I went through almost the exact same things he has, so it's going to fall under that umbrella of the Nortenos and Surenos.

Q   And, again, would you also agree that different sub sets across the country of the Nortenos will act differently and have different rules and regulations and things like that?

A   That's possible, yes, I would agree.

Q   Would you also agree that the behaviors and the rules and signs and symbols of a gang evolve over time?

A   What do you mean?

Q   Well, for example, Agent Webb was testifying about some of the rules that would result in a violation of

some sort.  Is it true that that changes over time and that what may have been a rule that resulted in a violation five years ago, maybe today, different personnel in the gang, they don't really enforce that any more?

A    It's very possible, yes.

Q    And including the manner in which they wear clothes and things evolves over time.  Is that true?

A    That is correct.

Q    So what may have been true five years ago may not necessarily be reliable information today?

A    It just depends on what it is.

MR. MAUGHN:  Thank you, sir.  No further questions, Judge.

THE COURT:  Anything further from anyone?

MR. SMITH:  Nothing further.

THE COURT:  Thank you.  All right.  I think we've concluded -- I do want to say -- I listened to Mr. Sevart's questions.  16 defense counsel have had an opportunity to question those two witnesses and their answers and their testimony is not identical.  If your point that you're trying to make is that they are totally identical, the record will not bear that out. And that's simply because different lawyers ask different questions.  A lot of their testimony is

similar, as they've testified, and as you've heard; but I don't think you were here for the other two days and so the record for those other two days should be consulted, I would recommend, to everybody.  Because other people have other areas of inquiry.

(Off-the-record.)

THE COURT:  Cindy will send every counsel in this case a pdf copy of the whole three days of testimony early next week.  And you'll get an e-mail today requesting you to make any input you have into the *Daubert* aspects of this by April 30.  So then I can make a ruling about this.  All right.  Any questions?  Okay.

(Adjourned at 10:58 a.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 23rd day of April, 2013.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

Appellate Case: 14-3006 Document: 23-2 Date Filed: 04/01/2014 Page: 664

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS


UNITED STATES OF AMERICA,                )
                                         )
                              Plaintiff,) District Court
                                         ) Case No. 12-10089-03
vs.                                      ) Circuit Court
                                         ) Case No. 13-3140
GONZALO RAMIREZ,                         )
                                         )
                              Defendant,)
                                         )
_____


## TRANSCRIPT OF HEARING ON MOTION TO SUPPRESS

     On the 25th day of March, 2013, came on to be heard Motion to Suppress in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.


APPEARANCES

     The Plaintiff appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;

     The Defendant appeared by and through Mr. Tim Henry and Mr. Joel Mandelman.


Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 2:50 p.m. March 25, 2013, the following proceedings were held.)

THE COURT:  This is United States against Gonzalo Ramirez.  Case number 12-10089.  Lanny Welch and Aaron Smith appear for the Government.  The Defendant appears with Joel Mandleman and Tim Henry.  And half the Wichita bar is also here, which I assume you all are just basically here as observers?

All right.  Now, let me make sure what we're going to do today.  We're going to hear the Motion to Suppress, which is Docket 541, which applies only to Mr. Ramirez.  There are other motions in my notebook here that some of you other counsel have joined in primarily relating to the gang sheets and tattoos.  I take it we're not going to hear that today?

MR. MANDELMAN:  I'm not -- I didn't think so, Your Honor.  It wasn't scheduled on the docket.

THE COURT:  All right.  While you're here, if you don't mind, I'll give you my thoughts on that motion because at some point in time we'll have to deal with that.  Evidently, according to the motion, this Defendant and some of your respective defendants have made some statements about their membership in gangs which you all seek to suppress.  For this Defendant, one

of the contentions is that he wasn't given his Miranda warning. There's some other contentions. But I think when this motion is heard, these motions are heard, I'll be interested to know how the Government intends to deal with them. In other words, let's say Mr. Ramirez -- because he's here, we can talk about him -- and he supposedly made some statements as far back as September 29, 2000, about having a wooden club for self defense in a rival gang area, et cetera. What I'm going to need to know, among other things, with respect to these statements, is the circumstances under which they were taken. In other words, because it doesn't say here, if he was in the police station where a Miranda warning might arguably apply, then that's one thing. If some police officer came up to him at a gas station and was questioning him, that's another thing. So we're going to have to know about that with respect to all these people that the Government's claiming made these statements. Now, we're talking about tattoos. Are these tattoos -- I'm asking this kind of rhetorically. If they're tattoos that anybody can see without taking a shirt off or something like that, then that's one thing. If they are tattoos that you can't see, then that's another matter. So we're going to have to consider that. And, finally, I suppose, regardless of what the

foundation for any of this is, we won't be able to deal with it entirely until we have the *Daubert* hearings on the experts, because I assume the experts, one of the things they're going to try to put into evidence is their opinion about what it means to have a tattoo or something like that.  So how are we going to do this, Mr. Smith?  Are we going to have a separate hearing on the -- to lay a foundation for these so-called admissions by these defendants about their gang affiliation and whether they have tattoos?  Or how does the Government look at this in terms of handling it?

MR. SMITH:  Your Honor, I do think that after the *Daubert* hearings are conducted that will probably give the Court and the litigants more direction as to what specific information that those experts relied upon.  In general, of course, we're asking them to state their opinion and contained within those gang sheets is the basis for some of those opinions.  Now, I agree, if there are specific, for instance, a statement as Your Honor mentioned or a specific tattoo that would be covered, if those experts identify those specific statements and or tattoos, we could then give notification to the litigants and Your Honor that those are very specific instances or pieces of evidence that we intended to admit; and, if necessary, then have a

hearing on the admission of those very specific pieces

of evidence.  But that's going beyond the general -- the

expert opinion that we would explore if --

THE COURT:  Right.  But you would agree if

it's going to be specific as to Angel Cerda, for

example, or anybody else, that we would have to have

that hearing in advance of the *Daubert* hearings to make

sure that it's evidence that an expert can in fact

consider?  It wouldn't make much sense to have it

afterwards, would it?

MR. SMITH:  Well, I guess I wouldn't entirely

agree with that because I feel that the gang sheets, I

think as I mentioned in my response, would come under

the business records exception and the experts could

have read, observed, digested, the contents of those

gang sheets in arriving at their expert opinion.

THE COURT:  Well, I'm not going to make a

ruling on that today; but I assume most of the defense

counsel wouldn't agree with that.

MR. MANDELMAN:  They're law enforcement

reports so we're not going to say they're admissible

under the business records exception.

THE COURT:  What?

MR. MANDELMAN:  We believe that those gang

sheets are law enforcement reports.  Some of them are

very much like police reports where they quote the defendant.  We're not going to agree that they're admissible under the business records exception.

THE COURT:  Yeah, that's -- I think Joel is right about that.  Now, whether he's right -- ultimately right, is another matter, but --

MR. SMITH:  And I wasn't arguing admissibility.  But Your Honor mentioned whether the expert could rely upon them or --

THE COURT:  Well, I know that experts can rely on information that is not otherwise admissible; but I'm always a little nervous about that.  You know what I mean?  Maybe some of the people out in Denver haven't read that.  Just a word to the wise here.  And if it applies specifically to a defendant, I think that it would make sense for a lot of other reasons to find out about the circumstances under which the gang sheet, whatever information is on the gang sheet, was created. I'm not making any rulings.  I'm just trying to think ahead.

MR. SMITH:  Your Honor, my concern would be then with the *Daubert* hearing scheduled around April 16, I believe when we provided the underlying material for each of these gang sheets, it would have -- it was a full box full of underlying materials.

THE COURT: But you've only identified a few things in your, in your response. You haven't identified a whole box full of stuff.

MR. SMITH: Right. Okay. Then I'll ask for clarification. Would this apply just to Gonzalo Ramirez and the defendants for whom have joined his objection and would it then apply to just those gang sheets which those attorneys have identified in their objections?

THE COURT: Well, at this point I would think that would be the case because we had an agreement early on that if you joined, that was one thing. If you didn't join then you couldn't take advantage of the hearing and any ruling. I know Mark Bennett isn't here today and isn't on the phone; but we'll convey that to him separately because he did join in what we have here today. I'm just trying to make sure that we don't have any glitches in this case, any evidentiary glitches. And I, frankly, maybe, maybe I don't have it in my file here, Aaron, but I don't think that I've ever seen a gang sheet.

MR. SMITH: Your Honor, I think some of them were attached to some of Defendants' motions. They provided examples --

THE COURT: Well, be that as it may, I'm not going to say any more about it; but you can tell where

I'm headed here.

All right.  So let's go back to where we're at here today, which is the Motion to Suppress.  Now, ordinarily in a matter like this where there's a -- in this case, two warrants, the defendant has the burden of going forward.  But I see all these officers here today.  I assume that's who they are.  They look like officers.

MR. SMITH:  Yes, Your Honor.  And Mr. Mandleman asked me --

THE COURT:  I assume Mr. Mandleman or somebody has subpoenaed all of them in here.

MR. MANDELMAN:  Your Honor, we talked whether Mr. Thompson, the guy who prepared -- and I called Aaron last week just to make sure that the officer who prepared the warrants was gonna be here in case something came up.  That was the extent of the conversation as far as the witnesses.

THE COURT:  What are they doing here?  Just to see what happens?

MR. SMITH:  No, I brought them here anticipating that Mr. Mandleman would want them.

MR. MANDELMAN:  Okay.  Well, I appreciate it. I -- I'm happy to question Mr. Thompson.  Though, just so the Court's clear, I'm not actually contesting whether the, whether the warrant had probable cause.

There's three -- 13 items were seized. I'm contesting the admissibility of three of those items.

THE COURT: The telephone.

MR. MANDELMAN: The telephone. A gun that was found in the closet. And then some ammunition. The rest of it is not the subject, you know, is not the subject of the motion. So the --

THE COURT: Well, the way I read this was that there are two warrants and the original warrant was applied for, from, and gotten from a judge and I have the application and what-not. So the question that you're raising with respect to the first warrant is whether it covers the telephone.

MR. MANDELMAN: The scope, exactly, yes.

THE COURT: Because, it was the telephone that lead to the second warrant which is the ammunition -- or at least the gun. Because they have a picture of your client holding the firearm. So they went back to the judge and got another warrant. Isn't that the way the facts are --

MR. MANDELMAN: Uhm, the sequence is they actually got all the stuff. The second warrant was just -- they got -- they downloaded the photos which I think they had already seen. So the first warrant, the first warrant, just so I make this clear, the first

warrant they did seize the gun, the ammunition and the phone.  They also seized some drug paraphernalia and some drugs, which is not the subject of the motion.  But they seized all three things based on the first warrant.  And it's our contention -- really, four points.  That that first warrant didn't authorize the seizure of the phone.  It wasn't --

THE COURT:  I understand that.

MR. MANDELMAN:  It wasn't included in there.  And then in the alternative, even if it did, it didn't allow them to search the actual data on the phone without obtaining a second warrant.  They did obtain a second warrant but they didn't obtain that second warrant until after they already looked on the contents of the phone.  And the basis for that second warrant is, Judge, you know, we looked at the phone, it's got stuff we like, give us a warrant.  The sequence -- the chronology there is backwards.  Even if that second warrant is good, it's our position that it's over broad.  It just suggests give us everything on the phone.

THE COURT:  Well, if I was to rule without evidence, because, ordinarily, on these warrant cases, if I was to rule as a matter of law that the warrant was not sufficient to justify the seizure and investigation of the telephone, then that would end it, wouldn't it?

MR. MANDELMAN:  Yes, Your Honor.

THE COURT:  All right.  That's where I'm headed, because I do not understand the Government's position that this original application for the first warrant covered a telephone.  And I don't think that you've addressed that in your response.  So I'll let you do that, Mr. Welch.

MR. WELCH:  Your Honor, the affidavit submitted in support of the application of the search warrant -- Your Honor, you have both search warrants, I believe, don't you?

THE COURT:  I have Attachment 1, which is the affidavit and application for -- by Brian Montgomery.

MR. WELCH:  That is the first search warrant.

THE COURT:  That's the first one.

MR. WELCH:  Yes, sir.

THE COURT:  Okay.

MR. WELCH:  All right.  Your Honor, that search warrant, of course, laid out in the Affidavit, which was attached, the history of the drug investigation that the KBI had undertaken in association with the Dodge City Police Department, during which they made several undercover purchases from the Defendant in various locations in Dodge City.  The third purchase, I believe, was they made contact with the Defendant at his

residence and the drug buy took place.  The first two I don't believe occurred at the Defendant's residence; but the third one did.  After they made the three buys of methamphetamine through the Defendant -- and at least two of the buys, if not all three, involved the Defendant making contact or the agents making contact with the Defendant via telephone.  So they knew that the Defendant had made -- had used the telephone to facilitate these drug deals prior to applying for the search warrant.  When they applied for the search warrant -- and Your Honor has the search warrant in front of you right now.  You can see, obviously, what they asked to search for, and there are a number of items that they requested authority to search for from the Defendant's house, which is the 1409 Avenue H in Dodge City, Kansas.

THE COURT:  Right.

MR. WELCH:  Again, that's where the third buy took place or where the Defendant met with them to exchange the drugs and the money in the third buy. There was probable cause in this warrant for a multitude of items, we believe.  Obviously, drug evidence could be searched for in the residence.  Drug paraphernalia, drug records, drug lists.  Those are all contained in the application and the search warrant itself.

THE COURT:  He's not making any complaint about that.

MR. WELCH:  I'm getting there Judge, I promise.  And there also was electronic -- they received permission to search for written, recorded and electronic data.  Format including telephone records, records of sales or purchases or prospective sales or purchases of controlled substances.  Your Honor, there are additional language that I did put in my response which allowed for names, addresses, telephone or pager numbers of suppliers or purchasers of controlled substances.

THE COURT:  Right.  I'm reading that.

MR. WELCH:  All of that, Your Honor, would be evidence that could be found on a telephone.  All of that is evidence that could be found in the residence; and it's not unlikely that the agents were going to find a telephone used by the Defendant as part of these drug buys in the house, which is what they did.  When they saw the telephone in the house, it's my understanding, they seized it from the Defendant's bedroom on a dresser, is my understanding.  The telephone records and other records could be contained not only just in the house but on the phone as well.  Especially telephone and pager numbers when they knew that the Defendant had

used that telephone as part of the drug deals.  It's logical to assume that records of phone calls that they had made with the Defendant were gonna be found on the telephone, which later were found on the telephone.  But, Your Honor, in the -- the Defendant cited the *Carey* decision that said that -- that was the case where the agents investigated -- were investigating a drug case, found the computer and searched the computer and went ahead and searched the computer files which appeared to be child porn related.  And the Tenth Circuit said they should have stopped and got a second search warrant.  Which is exactly what these investigators did.  When they found the phone, which, again, they had -- they knew before they went into the house with the search warrant they likely were going to find a phone because they've been dealing with the Defendant on the telephone.  And, yes, they did look at the phone and found some photographs.  They stopped at some point, Your Honor, and proceeded -- went back to the same judge and got a second warrant, just as the Tenth Circuit told us in *Carey* you're supposed to do.  And --

THE COURT:  I don't think *Carey* said that.  I don't think that -- the problem that I have, Lanny, and you know what it is, is that it wasn't that they found the phone.  If they'd walked into the house and seen the

phone sitting on the desk, then since they didn't ask to -- didn't ask to search for a phone in the warrant application, at that point they could have gone back to the judge and said, say, we found a phone in there and we think that in the phone, based on our experience, there's probably a lot of information in there that would relate to what this case is about and we want permission to open the phone and look at the contents. They didn't do that.

MR. WELCH:  Your Honor, they did not do it just as you said.  That is true.  But I don't think they had to, given what was contained in the first search warrant.  Given the plain view doctrine, which I cited in my response.  They could have been -- they had reason to be in that location, meaning in the telephone, given the records that they asked for in the first search warrant, Your Honor.  What they were given authority to search for in the first search warrant could have -- some of those things could have been found in that phone and therefore they had lawful authority to be in the phone and at some point stop and got a second search warrant when they realized there were things in the phone that deviated from the first warrant.  Which is what they should have done.  Now, they could have done it different, Judge, I'm not arguing with that; but the

way they did it was not illegal and not unlawful, according to Supreme Court, in my humble opinion, they had authority to be where they were in the execution of that -- of the first search warrant which lead to the discovery of the telephone, Judge.  And the gun and the ammunition that were found in the house as well.

THE COURT:  Well, I disagree with you.  I usually don't make these findings from the bench; and, if necessary, I'll write a short opinion, but I do not believe that the application for the warrant or the warrant was sufficient to cover the contents of the phone.  And they didn't do it right and the motion is sustained.

MR. WELCH:  Your Honor, for the record, can we call a witness just to make the record more complete, given the Court's decision?

THE COURT:  Give me a proffer about what the witness is going to say.  I have a very busy afternoon.

MR. WELCH:  I understand you do, Judge.  We would probably call, with the Court's permission, call two witnesses:  Mr. Montgomery, who was the affiant for the search warrant; and Mr. Thompson, who was the affiant for the second search warrant.  To tell you about, briefly, about the investigation and then the execution of both search warrants.

THE COURT:  That would be a waste of my time. The motion is sustained.  Anything further?

MR. MANDELMAN:  No, Your Honor.

THE COURT:  All right.

MR. HENRY:  Thank you.

THE COURT:  I'll do a very short, basically, a minute order, sustaining it for the reasons that I said here in open court.

(Adjourned at 3:14 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

C E R T I F I C A T E


I, Cindy L. Schwemmer, United States Court

Reporter in and for the District of Kansas, do hereby

certify:

That the above and foregoing proceedings were

taken by me at said time and place in stenotype;

That thereafter said proceedings were

transcribed under my direction and supervision by means

of computer-aided transcription, and that the above

and foregoing constitutes a full, true and correct

transcript of said proceedings;

That I am a disinterested person to the said

action.

IN WITNESS WHEREOF, I hereto set my electronic

signature on this the 18th day of June, 2013.


s/ Cindy L. Schwemmer

Cindy L. Schwemmer

United States Court Reporter

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,          )
                                   )
                        Plaintiff,) District Court
                                   ) Case No. 12-10089
vs.                                )
                                   )
ANTHONY WRIGHT,                    )
                                   )
                        Defendant,)
                                   )
_____

**TRANSCRIPT OF PLEA OF GUILTY**

On the 22nd day of April, 2013, came on to be heard Plea of Guilty in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.

APPEARANCES

The Plaintiff appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;

The Defendant appeared by and through Mr. Jay Fowler.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 11:45 a.m. April 22, 2013, the following proceedings were held.)

THE COURT:  This is United States against Anthony Wright.  Case number 12-10089.  Lanny Welch and Aaron Smith appear for the Government.  Are you Anthony Wright?

DEFENDANT:  Yes, sir.

THE COURT:  All right.  The Defendant is here with Jay Fowler.  Please swear the Defendant.

(Defendant sworn to enter a plea of guilty.)

THE COURT:  Please be seated, Mr. Wright.  You are 27.  You have a GED.  Have you had any alcohol to drink in the last 24 hours?

DEFENDANT:  No.

THE COURT:  Have you taken any drugs, legal or illegal?

DEFENDANT:  No.

THE COURT:  Have you ever had any mental problems?

DEFENDANT:  No.

THE COURT:  Have you had sufficient time to discuss your case with Mr. Fowler?

DEFENDANT:  Yes.

THE COURT:  Are you satisfied with the way he's handling your case?

DEFENDANT:  Yes.

THE COURT:  Now, today I'm going to explain some things to you relating to the charge and relating to your guilty plea.  I'm going to ask you some questions.  And if there's any point in time today where you don't understand something that I say or, more important, you don't understand the consequences of the answers that you have to give in order for me to accept your plea, I want you to tell Mr. Fowler or tell me.  Will you do that?

DEFENDANT:  Yes.

THE COURT:  If you don't tell him or tell me that you don't understand something, he and I will assume that you do understand.  Now, according to the Plea Agreement, you're here to plead guilty to Count 1 and Count 6 of the Indictment.  Have you gone over Count 1 with Mr. Fowler?

DEFENDANT:  Yes.

THE COURT:  Do you understand it?

DEFENDANT:  Yes.

THE COURT:  Do you have any questions about it?

DEFENDANT:  No.

THE COURT: Mr. Fowler, based on your conversations with the Defendant, do you believe that he understands Count 1?

MR. FOWLER: Yes, sir.

THE COURT: Do you think it's necessary for me to read it to him?

MR. FOWLER: No.

THE COURT: All right. Then Count 6 is a shorter count, I believe. Count 6 charges that on or about June 8, 2009, in Kansas, that you and Pedro Garcia, Gonzalo Ramirez and Russell Worthey knowingly possessed firearms and discharged firearms in furtherance of a crime of violence for which they may be prosecuted in a federal court. Do you understand that charge?

DEFENDANT: Yes.

THE COURT: Now I'm going to cover each one of them separately with you; but the first charge is a so-called RICO charge, and, in particular, a conspiracy. Do you know what a conspiracy is?

DEFENDANT: Yes.

THE COURT: What is it?

DEFENDANT: Whenever you're not the one that did it; but you're there or have something to do with it.

THE COURT:  Well, that's more like aiding and abetting.  A conspiracy is an agreement between two or more people to violate the law.  That's what a conspiracy is.  Aiding and abetting is a little different.  Aiding and abetting means that you are helping someone else commit a crime knowing that the crime is being committed; but you don't have to have an agreement.  Very similar.  But the element of agreement is what's important.  Okay?  All right.  So, in Count 1, that's a conspiracy.  In count 6 you're charged with aiding and abetting.  Okay?

You've got to answer out loud.

DEFENDANT:  Yes.

THE COURT:  All right.  Now, there are elements of these offenses; and the elements of Count 1, which is 18 U.S. Code Section 1962(d), are set forth in *U.S. v Harris*, and I'm going to read from that opinion.  That's a Tenth Circuit case.  The Government has to -- by that I mean what the Government would have to prove to a jury beyond a reasonable doubt in the event of a trial.  First, that a conspiracy or agreement as set forth in the Indictment, Count 1, existed between two or more persons to participate in the affairs of an enterprise that effected interstate commerce through a pattern of racketeering activity.  You know what

interstate commerce is? That's something that moves --

conduct between two or more states. Okay?

DEFENDANT: Okay.

THE COURT: All right. Second, that you deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose. That's the second element. And the third element is that you agreed with someone, not necessarily a defendant, that -- let me start over again. The Defendant, you, agreed that someone, but not necessarily you, would commit at least two of the racketeering acts detailed in the Indictment.

You understand that's the third element?

DEFENDANT: Yes.

THE COURT: Now, Mr. Smith, so that the record's clear here, because the racketeering statute contains many, many, many different types of conduct. What are the two racketeering acts that the Government says this Defendant engaged in?

MR. SMITH: Your Honor, he was engaged in murder, which is one of the underlying elements of racketeering; and is also charged substantively in the VCAR counts. And the Defendant has also admitted that he trafficked in methamphetamine. He along with other members of the conspiracy.

THE COURT:  All right.  You agree that there's evidence of that, Mr. Fowler?

MR. FOWLER:  Your Honor, there is one point of contention in the fact that he's agreeing that he participated in a RICO conspiracy and that the -- that he engaged in the sale of methamphetamine and other kinds of violent acts.  He has not specifically agreed that he participated in the murder as part of a preplanned event on his part.  And that's the point of clarification that we asked some language like that be removed in the Plea Agreement and it was.  So he's agreeing that he participated in a gang-related criminal enterprise that had the acts necessary for a guilty plea under the RICO statute.  We also agree that he participated as an aider and abettor in the event that -- of the murder which was referenced in the Indictment.  He is just is not agreeing that he conspired to do the murder in advance of the murder. That's the limitation on our agreement.

THE COURT:  And I believe that would be sufficient for the two predicate acts.

MR. FOWLER:  Yes.  We understand the predicate acts are there and the course of conduct over time.  We just don't agree necessarily that it involved a preplanning of the murder.

THE COURT: All right. Do you agree with what Mr. Fowler just said, sir?

DEFENDANT: Yes.

THE COURT: All right. So now we've covered the elements of Count 1. And you understand -- and I'm looking at the Plea Agreement now that you entered into -- that the maximum sentence upon conviction of Count 1 is 20 years in prison, a large fine, supervised release. I'll explain supervised release in a moment.

So let's now turn to Count 6. Count 6 is a little more straightforward. The elements of that offense are that on or about the date alleged in Kansas that you knowingly possessed and discharged firearms in furtherance of this crime of murder. And my understanding from what Mr. Fowler said, that you aided and abetted in this shooting. And you agree to that? But you did not plan the shooting?

DEFENDANT: Yes.

THE COURT: Would that be a correct statement?

DEFENDANT: That's correct.

THE COURT: But you understand that aiding and abetting is -- carries the same consequences as the actual underlying act, which, here, is shooting someone with a firearm?

DEFENDANT: Yes.

THE COURT: All right. Now, the penalty for that is a mandatory minimum sentence of ten years; a maximum sentence of life. Now, mandatory minimum means just what it says: You have to serve at least ten years. It may be more than ten years. And life, of course, in the federal system, is life because you never get out. There's no parole in the federal system. All right?

The matter of a fine, in all probability, I'm sure Mr. Fowler is appointed in this case, I don't know what your resources are, but a fine is not very likely. But supervised release, if you're released following a prison sentence, is something that you'll have to serve. When a person is on supervised release, they have to comply with the conditions that the court puts on them and they're supervised by a probation officer to make sure they comply with those conditions. A lot of the conditions are pretty obvious. You can't commit any crimes. You can't use illegal drugs. You can't possess any firearms or dangerous weapons. You can't be, in your case, you can't be a member of a gang or associate with gang members. Those are things that they'll cover with you when you're interviewed by the probation office. Do you have any questions about supervised release?

DEFENDANT:  No, sir.

THE COURT:  All right.  Now, the Plea Agreement, have you had an opportunity to go over the Plea Agreement and discuss it with Mr. Fowler?

DEFENDANT:  Yes.

THE COURT:  Do you understand it?

DEFENDANT:  Yes.

THE COURT:  Do you have any questions about it?

DEFENDANT:  No.

THE COURT:  I pretty much covered Paragraph 1. Paragraph 2 is very important because it sets forth the facts, which, if true, justify my decision to accept your plea.  Have you gone over Paragraph 2 and discussed it with Mr. Fowler?

DEFENDANT:  Yes.

THE COURT:  And does Paragraph 2 accurately state what happened and what you did?

DEFENDANT:  Yes.

THE COURT:  Now let's go to Paragraph 3, Paragraph 4, 5, 6, 7, 8, 9 and 10.  All of these paragraphs taken together basically talk about how your sentence is going to be determined.  If I accept your plea here today, you'll be later interviewed by one of our probation officers.  Mr. Fowler can be present with

you when you're interviewed.  A lot of information will be obtained from you:  Your background, your education, your medical condition, many, many other things.  A report will be prepared; and it will be given initially to you and Mr. Fowler and he'll go over the report with you.  And if there's anything in the report that needs to be corrected, he works with probation to get that done.  Then I get the report.  Now, there's certain things that are going to be in that report that I'm going to pay close attention to.  The first thing I'm going to look at is the sentence under the so-called sentencing guidelines.  Keeping this in mind, that you're pleading guilty to a crime that, regardless of the guideline sentence, can't be less than ten years. It can be more and probably will be more; but it can't be less.  I can't tell you what the guideline sentence is -- the guideline range would be in this case.  You understand that?

DEFENDANT:  Yes.

THE COURT:  I really don't know anything about you at all.  Now, there are some things, though, that will apply.  One is talked about in Paragraph 4.  That's relevant conduct.  I haven't gone through this Indictment.  How many other counts is he charged with?

MR. SMITH:  All of the counts that he would be

charged with would be the underlying act that he's pleading to in Count 1 that involves the homicide.  So his behavior is encompassed in Count 1.

THE COURT:  Well, there any -- are there any counts other than Counts 1 and 6?

MR. SMITH:  Yes.  2, 3, 4 and 5.

THE COURT:  Okay.  Well, relevant conduct is a feature of the sentencing guidelines that allows a defendant to be held responsible in the guideline calculation for criminal conduct that he committed but he didn't plead guilty to or get convicted of by a jury. And the effect of relevant conduct is that it raises the guideline range.  You understand that?

DEFENDANT:  Yes.

THE COURT:  How much, I don't know.  But that's what happens.  Seems unfair, but the Supreme Court of the United States says it's okay.  So relevant conduct can apply.  I just don't know exactly how.

In Paragraph 5, the Government is agreeing to make some recommendations for you.  It's agreeing to recommend a low end of the guideline sentence, keeping in mind that it can't go below ten years.  If you're truthful with the probation office, I'll give you credit for acceptance of responsibility and that lowers the guideline range; but I don't know how much.

Paragraph 6, you're making some agreements basically about being truthful; and that's important because Paragraph 7 talks about substantial assistance. You have at this point provided substantial assistance to the Government according to Paragraph 7. What has he done? Just generally?

MR. SMITH: Debriefed several times with the United States.

THE COURT: All right. And are you agreeing that you will file -- yes, the Government will file a substantial assistance motion on his behalf?

MR. SMITH: Correct.

THE COURT: All right. Now, here's -- that's important for one real important reason and that is that if I grant the motion -- the Government's agreeing that it will file a motion. I don't have to grant the motion; but if I do, that eliminates the mandatory minimum sentence and I can sentence you basically to any sentence that I want that I think is appropriate and justified by the law. I'm not bound by a mandatory minimum. Are you following me?

DEFENDANT: Yes.

THE COURT: Now, I'm not obligated to grant a substantial assistance motion. I will tell you that almost always I do grant the motion. Now, the

Government usually, when it files the motion, says something in the motion about what you've done, first of all; and, second, recommends a specific sentence.  I may grant the motion; but I don't always go along with the recommended sentence that the Government puts in the motion.  You understand that?

DEFENDANT:  Yes.

THE COURT:  All right.  Now, if for some reason I would not grant the motion, then you won't get that credit that you would otherwise be entitled to; and most importantly, you'd still be facing the ten year mandatory minimum sentence.  You understand that?

DEFENDANT:  Yes.

THE COURT:  All right.  Now -- and that's basically what Paragraph 8 says, that sentencing is up to me.  Now, I know that you have talked with Mr. Fowler about what sentence you might receive in this case, haven't you?

DEFENDANT:  Yes.

THE COURT:  You understand that his job is to advise you about things like sentencing, but that he cannot promise you a sentence?

DEFENDANT:  Yes.

THE COURT:  And has not promised you a sentence; correct?

DEFENDANT: That's correct.

THE COURT: All right. Paragraph 9 talks about information that you provided. I don't know what information you've provided; but the Government is agreeing that they will not use any of that information to bring additional charges against you unless, of course, they find out that you've been lying to them. But if you have been lying to them, they won't file a substantial assistance motion. You understand that that?

DEFENDANT: Yes.

THE COURT: All right. And Paragraph 10 says that if you're unhappy with your sentence when you receive it, you can't withdraw your plea and ask for a trial. Okay?

DEFENDANT: Okay.

THE COURT: Now, what ought to be pretty obvious at this point is that I don't make up my mind about sentencing until the day of sentencing. I look carefully at the presentence report; but I don't make up my mind on the basis of the report alone. I'll want to hear anything that the Government has to say with respect to a sentence, anything that you might want to say, anything Mr. Fowler might want to say. So the bottom line here is I have no idea what your sentence is

going to be in this case.  You understand that?

DEFENDANT:  Yes.

THE COURT:  Now, Paragraph 12, waiver of appeal.  The only part of this that I'll go over with you is basically that you're agreeing that if I give you a sentence that is within the guideline range, whatever that is, turns out to be, you will not appeal that to the next higher court in Denver.  And you won't appeal your conviction.  You understand?

DEFENDANT:  Yes.

THE COURT:  Okay.  Any questions about that part of the plea agreement?

DEFENDANT:  No, sir.

THE COURT:  And I don't think there's anything else that really needs to be discussed except the last paragraph which says that basically that you're pleading guilty because you are guilty and not for any other reason and that it's your decision to plead guilty, it's not Mr. Fowler's or anyone else's.  Is that true?

DEFENDANT:  Yes.

THE COURT:  All right.  Do you have any questions about the Plea Agreement, Mr. Wright?

DEFENDANT:  No, sir.

THE COURT:  The other document is called a Petition.  Have you gone over that document and

discussed it with Mr. Fowler?

DEFENDANT:  Yes.

THE COURT:  Do you understand it?

DEFENDANT:  Yes.

THE COURT:  Do you have any questions about it?

DEFENDANT:  No.

THE COURT:  Do you understand that one of the things you're doing in that Petition is admitting that you committed the crimes charged in Count 1 and Count 6?

DEFENDANT:  Yes.

THE COURT:  Okay.  Now, the last thing we need to cover are your rights in connection with a trial and your rights that you give up by pleading guilty.  You do not have to plead guilty in this case.  You can, if you wish, have a trial to a jury.  It would be a trial to a jury of twelve people; and depending -- okay?

DEFENDANT:  Yeah.

THE COURT:  And depending on the number of defendants in the case, at least probably two alternate jurors and maybe more, but certainly twelve.  When we get juries here in federal court, we don't know who the jurors are going to be until the day of trial.  The computer selects them, basically; and they're summoned in and I don't know who they're going to be and the

lawyers don't.  So we go through a process of selection. You can participate in that with Mr. Fowler's assistance.  Questions are asked of the potential jurors to learn something about them, where they live, what they do for a living, you know, various other -- lots of different things that are covered.  The purpose of the questioning process is to obtain people as jurors who can agree to be fair and impartial to both sides.  And if a juror answers a question that indicates for some reason that he or she can't be fair and impartial, I'll excuse that person for cause.  Then, depending on the number of defendants in the case -- you can excuse jurors for pretty much any reason you want.  If you were the only defendant sitting in the case, you could excuse up to ten and the Government up to six.  If there's more than one defendant in the case, that number changes. But we can assume that you'll be permitted to excuse some jurors with so-called peremptory challenges.  At the end of that process, there are twelve people plus alternates who will hear and decide the case.  And once they're sworn in as jurors, the trial starts.  And at a trial, you have important rights.  You have, first of all, the right to counsel.  You have the right to be presumed innocent, and that means that I tell the jurors that the charges against you are not evidence of any

kind, that you are presumed to be innocent of the charges until such time, if ever, that the Government, by its evidence, can convince all twelve of the jurors beyond a reasonable doubt of your guilt. The Government, of course, calls its witnesses. Mr. Fowler has an opportunity to cross-examine any witness called by the Government. When there are more than one -- when a defendant is charged multiple times, in more than one count, like you are in this Indictment, I tell the jury that they must consider the evidence as to each charge separately. In other words, it's not an all-or-nothing thing. You can be found guilty of some, not guilty of others, for example. If there's more than one defendant who's sitting and going through the trial, I tell the jurors basically the same thing, that they have to consider the evidence as to each defendant individually. The jury sometimes could find a defendant guilty and another defendant not guilty.

You have a right to testify at a trial; but you don't have to. And you have a right to call witnesses; but you don't have to. If you choose not to testify or call witnesses, I tell the jury that that can't be held against you in any way. They can't go back to the jury room and say, well, Mr. Wright didn't testify so he must be guilty, he didn't tell his side of the story. Now,

if you do want to testify, of course, that's your decision, but Mr. Fowler would counsel with you about that.  And finally, if you're convicted by a jury, you can appeal your conviction and your sentence.  Now, do you understand those rights?

DEFENDANT:  Yes, sir.

THE COURT:  Now, this is what's important.  By pleading guilty here today, you're giving up basically all of those rights except, of course, your right to counsel.  You're giving up your right to be presumed innocent.  You're giving up your right to make the Government, if it can, prove your guilt to a jury beyond a reasonable doubt.  You're giving up your right to remain silent because you've told me that Paragraph 2 of the Plea Agreement and in the Petition is accurate.  And then, as I explained to you, you're giving up your right to appeal your conviction and your sentence if you're sentenced within the guidelines, whatever those are.  Do you understand the rights you're giving up?

DEFENDANT:  Yes.

THE COURT:  All right, sir.  Now, Mr. Wright, do you have any questions at all about what we've covered here today.

DEFENDANT:  No, sir.

THE COURT:  Then I will ask you:  How do you

plead to Count 1, guilty or not guilty?

DEFENDANT:  Guilty.

THE COURT:  How do you plead to Count 6, guilty or not guilty?

DEFENDANT:  Guilty.

THE COURT:  Mr. Fowler, any reasons why I shouldn't accept these pleas?

MR. FOWLER:  No, sir.

THE COURT:  I find that his pleas have been made freely, voluntarily, and because he is guilty as charged; not out of ignorance, fear, inadvertence or coercion; and with a full understanding of their consequences.  I further find that he has admitted the essential elements of the crimes charged and is mentally competent.

Pursuant to Rule 11, advisory guideline 6(b)1.1 and *U.S. vs. Byrum*, I'll accept the plea but will defer my decision to accept or reject the Plea Agreement until I've seen the presentence report.

The Defendant is remanded.  Sentence is July 8 at 10:00.  If there's nothing further, we're in recess on this matter.

(Adjourned at 12:15 p.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 22nd day of July, 2013.


s/Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,            )
                                     )
                          Plaintiff,) District Court
                                     ) Case No. 12-10089
vs.                                  )
                                     )
RUSSELL WORTHEY,                     )
                                     )
                          Defendant,)
                                     )
_____

## TRANSCRIPT OF PLEA OF GUILTY

On the 6th day of May, 2013, came on to be heard Plea of Guilty in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.

APPEARANCES

The Plaintiff appeared by and through Mr. Aaron Smith;

The Defendant appeared by and through Mr. Jim Pratt.

(Beginning at 2:10 p.m. May 6

2013, the following proceedings

were held.)

THE COURT:  Count 1 charges, if I'm reading this correctly, a violation of 18 U.S.C. Section 1962(d).  Correct?

MR. SMITH:  Correct.

THE COURT:  And it charges extensively about the existence of an enterprise, et cetera.

MR. SMITH:  Yes.

THE COURT:  And *U.S. v Tracy Harris* holds that an enterprise is not an element of Section 1962(d).

MR. SMITH:  Well, what we -- what I did is I still included the enterprise language because in the sense of the greater indictment, the 38-count indictment, that enterprise language was included because it's also relevant to define the VCAR counts. So it was just my choice.  I didn't want to pluck information out of Count 1 of the Indictment and essentially miss something when I started extracting information.  I think that it's also relevant because -- and Your Honor mentioned this at a hearing last week -- that part of the elements of this crime is that he would have agreed that he or one of the other co-conspirators

would have committed an act in furtherance of the racketeering conspiracy. And so this introductory language defining the enterprise I do think is helpful and relevant.

THE COURT: Well, according to the *Harris* case, there are only two elements, three elements. First, a conspiracy or agreement is detailed in the Indictment existing between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity. Second, the defendant deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose. Third, the defendant agreed that someone, not necessarily the defendant, would commit at least two of the racketeering acts alleged in the Indictment.

Those are the elements according to the Tenth Circuit.

MR. SMITH: I agree. And I think we have that all covered in the factual basis and I think that we have enterprise and purposes of the enterprise covered and the role of the defendant; and then the factual basis will allow the defendant to define his individual role and agreements.

THE COURT: What do you say -- knowing what

the elements are of 1962(d), what do you say about that, Mr. Pratt?

MR. PRATT:  Your Honor, I agree with Mr. Smith.  I think the elements are adequately covered in the Plea Agreement and the factual basis.  I do understand that the enterprise may not necessarily be an element; but I think reading through the information, I do think that the elements of the crimes that Mr. Worthey will be pleading to are adequately covered. I mean, if the Court disagrees --

THE COURT:  I don't disagree necessarily or agree.  I just want to be sure, since these are both very serious offenses and carry very serious penalties, that we are all on the same page with respect to this now and not later on when somebody comes in and says, well, I didn't understand what I was pleading to or something to that effect.

MR. PRATT:  Your Honor, that concern may be a question better addressed to Mr. Worthey.  I have gone over this matter with him several times.  We have been negotiating this plea agreement -- I believe actually this agreement is version five.  And I believe he does understand.  But if there's any question, I would ask him to let us know.

THE COURT:  I'm going to ask him; but I think

I have to ask the lawyers first of all.

MR. PRATT:  I understand, Your Honor.

THE COURT:  All right.  Swear Mr. Worthey, please.

(Defendant sworn to enter a plea of guilty.)

THE COURT:  Please be seated, Mr. Worthey. This says that you're 24; you have a GED.  Have you had any alcohol to drink in the last 24 hours?

DEFENDANT:  No.

THE COURT:  Have you taken any drugs, legal or illegal?

DEFENDANT:  No, Your Honor.

THE COURT:  As far as you're concerned, have you ever been hospitalized or treated for any sort of a mental illness?

DEFENDANT:  No, Your Honor.

THE COURT:  Evidently your mother has told someone that you were treated at some point in time for some sort of a mental problem.

DEFENDANT:  Yeah.  Your Honor, she told me when I was younger that I used to go to an area mental health and that I guess they had diagnosed me with the early signs of schizophrenia and post-traumatic stress.

THE COURT:  Well, Mr. Pratt, do you have any

information to indicate that he's been treated?  The Petition says I was informed by my mother that I had been diagnosed with depression, PTSD from childhood abuse, and early signs of schizophrenia; however, I have seen no formal documentation.

MR. PRATT:  That's correct, Your Honor.  That is basically what Mr. Worthey told me, that that's what his mother told him.  I wanted to put it in the Petition.  I have seen, other than probably normal depression caused by his situation and being away from his family, I have seen no signs of anything like that. And he has never indicated to me that it was a problem or an issue and I certainly would have asked if I had noticed any problem.

THE COURT:  Well, Mr. Worthey, the whole point of putting that inquiry into the Petition is that you have to have sufficient mental ability and mental clarity to cooperate and communicate with Mr. Pratt, with me; but mainly that you have to be able to make the decisions that you are gonna be called upon to make in connection with this plea.  And if you have any concern that because of some sort of a mental situation that you might not be able to do those things, then you need to tell me because I don't want you to do something that you don't feel mentally capable of doing.  How do you

feel?

DEFENDANT:  Your Honor, I feel that I'm capable.  I mean, I understand what everybody's telling me.

THE COURT:  Do you have any recollection of any treatment that Mr. Pratt could get ahold of some doctor or institution to determine whether you'd actually had treatment for this?

DEFENDANT:  Yeah.  As I told him, I was going to area mental health.

THE COURT:  But where is that area --

DEFENDANT:  It's in Dodge City.

THE COURT:  And when do you think you were going?

DEFENDANT:  I was around like 12 so --

THE COURT:  A long time ago.

DEFENDANT:  Yeah, a long time ago.

THE COURT:  Well, I'm going to leave it up to Mr. Pratt and you.  If you want Mr. Pratt to try to get those records before we go any further, that's fine with me.

DEFENDANT:  I mean, they've already talked to me about the competency thing; and, I mean, I'm competent.  I mean, I know everything that they're telling me.  I know everything that they explained to me

in the Plea Agreement and --

THE COURT:  All right.  It's your choice.  I'm not here to force anything on you.  But, here's the point.  Today, we're going to cover things today that won't be covered again.  If I accept your plea today, I'll see you again down the road a couple of months when I sentence you; but at that point in time, I won't be going over the matters today that we'll discuss here today.  It may be that Mr. Pratt or the probation office would want to look into those records in connection with a sentencing; but as far as going back over what we talk about today, I won't do that.  Are you comfortable in going ahead today, I take it?

(Off-the-record discussion

between Mr. Pratt and Defendant

Mr. Worthey.)

MR. PRATT:  Your Honor, after speaking with my client, he has indicated, and I asked him to do so for the Court himself, that he does not think that those records would have any effect on what's going on today.  I would also like to tell the Court a little bit of background during this negotiation process.  One of the reasons why -- when I first saw these issues, I believe he told that to pretrial services as well, and I had filed a motion for an exam and apparently I had used the

wrong statute or something and it kind of turned into a mess. But it was the schizophrenia that worried me and I, in explaining the situation, the pretrial situation, to Mr. Worthey, he told me that he didn't see it, that this was just information he received from his mother. I have dealt with incompetent clients before. I did not see anything that would indicate to me that Mr. Worthey's mental capacities were any way effected. In fact, during the negotiations of this, he did his own legal research and would come to me with ideas and questions and things like that. So as far as competency issues, I certainly do not think there is one. As far as Mr. Worthey understanding what's going on, I believe he does because we in fact have kind of argued about the charges and what could be done and would should be done. Is it possible that if there were these issues, they could be relevant at sentencing? Perhaps. I don't think they're relevant now.

THE COURT: All right. Well, I think we've cleared the air on this and we'll go ahead, Mr. Worthey. Now, I take it, based on what Mr. Pratt said anyway, that you've had sufficient time to discuss this case with him?

DEFENDANT: Yes, Your Honor.

THE COURT: And are you satisfied with the way

he's handling your case?

DEFENDANT:  I am.

THE COURT:  All right.  Now, what the Government has done, according to Mr. Smith, is basically reduced the charges that were in the Indictment originally to a two-count Information.  Have you gone over the Information and discussed it with Mr. Pratt?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand it?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions about it?

DEFENDANT:  Not at this time, Your Honor.

THE COURT:  Now, I'm prepared, if you want me to, to read the Information to you.  I'm satisfied that -- it sounds to me like you've been over it before; but would you like for me to read it to you?

DEFENDANT:  That wouldn't be necessary, Your Honor.

THE COURT:  All right.  So that you clearly understand, however, an Information is a charge filed by the U.S. Attorney.  It's not an Indictment.  You've already been indicted.  But now you're proceeding on this information.  You do not have to do that.  You may,

if you wish -- sounds like it wouldn't be necessary -- but you may, if you wish, ask to have these charges presented separately to a grand jury to see if the grand jury would return an Indictment.  You understand that right?

MR. PRATT:  Your Honor, if I could just --

(Off-the-record discussion between Mr. Pratt and Defendant Mr. Worthey.)

DEFENDANT:  We can go forward, Your Honor.

THE COURT:  Well, I appreciate that, but you understand that you can have this -- I don't know -- is it the same charge, these same two charges that were in the Indictment?

MR. SMITH:  Yes, they're the exact same.  The only difference is that originally this Defendant wasn't in Count 1.  Now he will be in Count 1; but the second charge, he was originally indicted with.

THE COURT:  All right.  So you could, if you want, have these two charges taken before a grand jury to see if you would be indicted.  You understand that?

DEFENDANT:  I understand.

THE COURT:  And you can also give that right up and proceed on the Information, which is what I assume you want to do.

DEFENDANT:  Yes, Your Honor.

THE COURT:  But it's your choice.  It's not Mr. Pratt's choice.  You understand that?

DEFENDANT:  Yes.

THE COURT:  All right.  Has he signed the consent?

MR. PRATT:  I don't have a consent, Your Honor.

THE COURT:  We've got one.

MR. PRATT:  May I approach, Your Honor.

THE COURT:  Yes, sir.  I'll approve the waiver and we'll proceed.  Now, let's go over the Plea Agreement.  Have you, I take it, I'm sure you have, gone over this Plea Agreement and discussed it with Mr. Pratt?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand it?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions about it?

DEFENDANT:  Not at this time, Your Honor.

THE COURT:  What I'm going to do is cover most of it with you.  There's some paragraphs in here which I don't really think are necessary to cover; but if you have any questions at all about what I say today about

the Plea Agreement or the Petition or anything else, I want you to tell me or tell Mr. Pratt.  Because if you don't tell us that you don't understand something, he and I will assume you do understand.  Fair enough?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Let's go over Paragraph 1 of the Plea Agreement.  You're agreeing to plead guilty to Count 1 of the Information and Count 2 of the Information.  And you understand that there's a maximum penalty on Count 1 of 20 years in prison, a large fine; and on Count 2, there is a mandatory minimum sentence of 10 years and a maximum sentence of life. You understand those two penalties?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, in the federal system, a person serves their entire sentence basically.  There's no parole in the federal system.  So whatever sentence you would receive in this case, you would serve all of the sentence.  You understand that?

DEFENDANT:  Is that like -- there's good time, isn't there?

THE COURT:  Well, there's some good time; but the reason I don't get into that any more with defendants is because that's something that is awarded by the Bureau of Prisons.  I don't have any control over

that.  And if you don't earn it and they, you know, if the Bureau of Prisons doesn't think you earned that, then you don't get it.  And I don't want people leaving here thinking that they're going to get good time credit from me or as a result of pleading guilty because they may not get it.  You understand that?

DEFENDANT:  Yes.

THE COURT:  All right.  Now, a mandatory minimum sentence means a mandatory minimum of 10 years.  It can be greater than that and we'll go into that in a minute.  And a life sentence means a life sentence.  It means you don't ever get out.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  I doubt that fines will be imposed, but it's possible; but certainly supervised release will be imposed if you're sentenced to a term of years less than life.  And when you get out, you will be supervised for a period of time by a U.S. Probation Officer.  And during that period of supervision, whatever it is, it can be up to three years, you can't commit any other crimes and you can't associate with gangs and there are many other conditions of supervision; but the point of supervision is this, that if you violate the terms of supervision, you can be brought back to court and the Government -- all the

Government has to prove is that it's more likely true than not true that you violated supervised release. And if that proof is there, then I can -- or a judge -- can send you back to the penitentiary to serve more time in this case without a trial. You understand?

DEFENDANT: Yes, Your Honor.

THE COURT: All right. Now, Paragraph 2 is really the most important paragraph of the Plea Agreement. And it's a long paragraph. Have you gone over Paragraph 2 and discussed it with Mr. Pratt?

DEFENDANT: Yes, Your Honor.

THE COURT: Does Paragraph 2 accurately state what happened and what you did?

(Off-the-record discussion between Mr. Pratt and Defendant Mr. Worthey.)

MR. PRATT: Your Honor, my client wanted me to just bring to the Court's attention in the fifth paragraph of the factual basis it indicates on June 8th, 2009, the Defendant, along with codefendants Pedro Garcia, Gonzalo Ramirez and Anthony Wright, were at Pedro Garcia's home in Dodge City. Garcia and Ramirez suggested at some point that the four Nortenos go look for Serranos gang members. My client indicates that he was not -- while he was present at the house, he was not

present when that statement was made.  Or he did not hear that statement being made.  I don't know if it effects the -- I mean, this is something I've discussed with him before and I did not believe it effected the factual basis or the elements of that offense because that is something that was brought out by another witness and it's just an overall indication of what occurred that night.  But he did want me to bring that to the Court's attention.

THE COURT:  Well, I think the thing to do then is to interlineate that he did not hear that statement. Any objection to that, Mr. Smith?

MR. SMITH:  No, Your Honor.

MR. PRATT:  Your Honor, I would also like to point out, Anthony Wright was here, I believe, a week or two ago, basically entering this same plea and. Mr. Worthey is in the same position as Mr. Wright.  He is not stipulating that he participated in the murder. He's also not stipulating that he conspired in regard to that homicide or that he discharged or even possessed the firearm.  These charges are based on the aiding and abetting theory.

THE COURT:  I'm going to cover that with him. I recognize that.

MR. PRATT:  Okay.

THE COURT: After reading through the factual statement. Now, having made that addition that you didn't hear that statement, do these facts accurately state what happened and what you did?

DEFENDANT: Yes, Your Honor, the rest of the facts are correct.

THE COURT: All right. Now I want to cover -- I've already covered, while you were in the courtroom but I didn't address you specifically, the elements of these two offenses. The Government in case this matter went to trial would have to prove certain elements to the jury beyond a reasonable doubt. And the elements of Count 1 are set out in a very recent Tenth Circuit case called *United States vs. Harris*, which is published at 695 Fed. 3rd 1125. And the elements are as follows: First, a conspiracy or agreement as detailed here in the information existed between two or more persons to participate in affairs of an enterprise that effected interstate commerce through a pattern of racketeering activity. Second, that you, the Defendant, deliberately joined or became a member of the conspiracy or agreement with the knowledge of its purpose. And, third, that you agreed with someone, not necessarily that you, the defendant, would commit at least two of the racketeering acts detailed in the Information. Those are the

elements.  Do you understand them?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Because that's why I asked you if you wanted me to read the Information to you because it details in substantial language the enterprise, the purposes of the enterprise, the role of the defendants, and various other matters.  And I take it you understand that, in view of the elements that I just told you.  Do you have any questions about it?

DEFENDANT:  No, Your Honor.

THE COURT:  Now, Count 2 is the count regarding possession and discharge of firearms.  And the elements of that offense are that, first, that you committed the crime, in this case it would be a murder, which is a crime of violence, obviously; that you used or carried a firearm during -- third, during and in relation to that crime.  And during and in relation to means that the firearm played an integral part in the underlying crime.  And knowingly uses a firearm means that the firearm is readily accessible and is actively employed during and in relation to the crime; and -- well, that covers that.

Now, what Mr. Pratt is saying is that you are not charged with actually killing this person or shooting this person.  You're charged also with 18 U.S. Code

Section 2.  That's right at the end of Count 2.  And that is the aiding and abetting statute.  And when someone is charged with aiding and abetting a crime, I also instruct the jury on aiding and abetting, which basically means that the Government has to prove beyond a reasonable doubt that you knew a crime was being committed; that you participated in the crime with the intention of seeing to it that the crime succeeded.  The best analogy is a bank robbery.  If two people go to rob a bank, one person drives the get-away car and the other person goes into the bank and robs it.  If the driver of the get-away car knows that a bank robbery is going to occur and wants it to succeed, then the driver of the get-away car is just as guilty of bank robbery as the person who actually goes in to rob the bank.  You understand that?

DEFENDANT:  Yes.

THE COURT:  All right.  So the Government does not have to prove for Count 2 that you actually shot this individual or even used a gun.  They have to prove that somebody else did, obviously, and that you aided and abetted.  You understand?

DEFENDANT:  Yes.

THE COURT:  All right.  Now, I've covered, I think, the elements of these two offenses.  Do you have

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 723

any questions at all about those elements?

DEFENDANT:  I have a question.  Could I ask my lawyer please?

THE COURT:  Yes.  Go ahead.

(Off-the-record discussion between Mr. Pratt and Defendant Mr. Worthey.)

MR. PRATT:  Your Honor, I would ask that we continue this hearing.  Give me about a week to meet with my client and discuss some of these issues.  He has some questions that I don't think I can answer in the time that this hearing would allow.

THE COURT:  That's fine.  I don't want him to proceed to a conclusion if he has questions.  But are they things that I ought to discuss with him today so that we don't have to go -- have a continuance next week?

MR. PRATT:  Your Honor, this is something that I need to discuss with him.  I don't think the Court would be in a position to be able to discuss and answer these questions.

THE COURT:  That's fine.

MR. PRATT:  Your Honor, I want to make sure that he completely understands.

THE COURT:  I want him to as well.  So we'll

continue this until, what, next Tuesday?

LAW CLERK MS. SILVA:  Yes.  Probably would be best.  Next Tuesday at 10:00.

THE COURT:  10:00 next Tuesday, Mr. Pratt.

MR. PRATT:  That is the 14th.  Yes, Your Honor.

THE COURT:  All right.  Thank you very much.

MR. PRATT:  Thank you.

DEFENDANT:  Thank you, Your Honor.

MR. SMITH:  Thank you.

THE COURT:  Yes, sir.

(Adjourned at 2:45 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

C E R T I F I C A T E


I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 22nd day of July, 2013.


s/ Cindy L. Schwemmer

Cindy L. Schwemmer

United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,                )
                                         )
                               Plaintiff,) District Court
                                         ) Case No. 12-10089
vs.                                      )
                                         )
RUSSELL WORTHEY,                         )
                                         )
                               Defendant,)
                                         )
_____

**TRANSCRIPT OF COMPLETION OF PLEA OF GUILTY**

     On the 13th day of May, 2013, came on to be heard Completion of Plea of Guilty in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.

APPEARANCES

     The Plaintiff appeared by and through Mr. Aaron Smith;

     The Defendant appeared by and through Mr. James Pratt.

(Beginning at 10:50 a.m. May 13, 2013, the following proceedings were held.)

THE COURT: All right. Let's reconvene the Russell Worthey case. This is United States against Russell Worthey. Case number 12-10089. We were here last week, I believe, and at that time we proceeded for a while on a Superseding Information and questions arose; and as a result of the questions, the matter was continued until today. Now, since that time, the Government has filed a First Superseding Information. Count 1 is the same. Correct, Counsel?

MR. SMITH: It is.

THE COURT: Mr. Pratt?

MR. PRATT: That is correct, Your Honor.

THE COURT: Count 2 is very similar to the charge in the Information. Again, it charges possession and discharge of a firearm in furtherance of a crime of violence. But the Amended Information, instead of using the state crime of murder in the first degree, now charges aggravated assault in violation of Kansas law, but the underlying federal statute, 18 U.S. Code Section 1959, remains the same. Are we okay? Everybody on board here with where we are at this point?

MR. SMITH:  Yes, Your Honor.

MR. PRATT:  Yes, Your Honor.

THE COURT:  So let me ask, first of all, Mr. Worthey, is it necessary for me to read the amended Count 2 to you?

DEFENDANT:  No, Your Honor.

THE COURT:  Thank you.  Now, we need an Amended Plea Agreement and an Amended Petition, I would think, in order to move forward.

MR. SMITH:  I believe Mr. Pratt has a new Plea Agreement and new Petition.

MR. PRATT:  Yes, Your Honor, and I believe that I forwarded the amended -- or the new plea agreement to you last week.  The only changes in the Plea Agreement, Your Honor, because the Count 2 doesn't really change it, was we typed in the interlineation the Court made at the hearing, the last hearing, and that was that the Defendant did not hear the statements made by Defendants Garcia or Ramirez; and we took out the second to last sentence in Paragraph 3 which referenced that the Government would not ask for a sentence above --

MR. SMITH:  Your Honor, I have an extra copy of the Plea Agreement if I could bring it to you.

THE COURT:  Well, I have the Plea Agreement, I

believe.  It says on or about June 8, 2009, in Dodge City, Kansas, Russell Worthey acted in aiding or abetting the murder of Israel Peralta.  Co-defendants of the Defendant shot Peralta with handguns resulting in his death.  The Defendant was involved in the murders as an act of a pattern of racketeering activity.

MR. SMITH:  Yes.  That paragraph didn't change.  The one that Mr. Pratt's referring to, Your Honor, is the fifth paragraph of the factual basis.  And that would be after the second sentence that reads: Garcia or Ramirez suggested at some point that the four Nortenos go back to get Soreno gang members.  If you recall, Your Honor, at the last hearing, we interlineated a sentence this reads:  The Defendant did not hear the statement made.

THE COURT:  And that's in the -- now in the written that I have --

MR. SMITH:  Yes.

MR. PRATT:  Yes.

THE COURT:  So now I know that I have the correct Plea Agreement.

MR. SMITH:  Okay.

THE COURT:  Now, I'm wondering if it would be even necessary to have an Amended Petition.  The Petition --

MR. PRATT: Your Honor, I did not change the Petition at all. I had one sent here because I left mine at the office. I was stuck in state court until --

THE COURT: Well, my point is I don't think there's anything in the Petition that goes into -- in the original Petition that goes into those facts.

MR. PRATT: No, Your Honor.

THE COURT: So I can use that original Petition.

MR. PRATT: Absolutely, Your Honor.

THE COURT: Use the Amended Plea Agreement. I don't think there's any reason to change the waiver. That's already been made.

MR. PRATT: I agree.

THE COURT: So, Mr. Worthey, again -- and you're still under oath in this proceeding -- if you don't understand something that I say here today or if you have any additional questions, I want you to tell me or tell Mr. Pratt because, truly, in view of what has occurred now, I think we're able to proceed with the plea. Do you agree?

DEFENDANT: Yes, Your Honor.

THE COURT: Now, the first superseding information hasn't been filed jet.

MR. SMITH: It's at the clerk's office, Your

Honor.  It just must not have been sent over yet.

THE COURT:  Okay.  Let's do this.  I don't remember how far we got.  We covered -- I think last week we fully covered Count 1.

MR. PRATT:  That's correct, Your Honor.  It was Count 2 that --

THE COURT:  And Count 2 was the problem.  And now we know that the only change is to delete murder and put in aggravated assault.

MR. PRATT:  That's correct.

THE COURT:  Correct?

MR. PRATT:  Yes, Your Honor.

THE COURT:  So we're now on the Plea Agreement.  The maximum penalties are the same and I think I've covered those.  Correct?

MR. PRATT:  Correct, Your Honor.

THE COURT:  Now, with the changes in the factual information, Mr. Worthey, does the new, so to speak, factual statement in Paragraph 2 accurately state what happened and what you did?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And I think that brings us up to where we were last week and we can continue on.  I'm going to cover Paragraph 3, 4, 5, 6, 7, 8, 9 and 10 together because they all relate to

sentencing. After today, you'll be interviewed by one of our probation officers. Mr. Pratt can be with you when your interviewed. You'll be questioned about a lot of matters that he's quite familiar with and that relate not just to the case, but to your background and education and health and other things. A report will be prepared and that report initially will be provided to you and Mr. Pratt. He will go over the report with you. And if there's anything in the report that needs to be corrected or changed, he'll work with the probation office to get that done. And then the report is given to me. Now, I read it, and I consider it, but I don't make up my mind about a sentence on the basis of a report. I really never make up my mind about a sentence until the day of sentencing. That's because of a couple of things. One, there may be additional information that's brought to my attention by the Government or you at the time of sentencing. You may wish to address me or have other witnesses address me about an appropriate sentence. There's the matter about substantial assistance which usually doesn't come to my attention until at least right before sentencing. So, the bottom line here is that, while I'm sure that Mr. Pratt has discussed with you what sentence you might receive or maybe hope to receive, he can't promise you any

particular sentence and has not promised you a sentence. Is that true?

DEFENDANT:  That is true, Your Honor.

THE COURT:  Okay.  Now, there are some things in the Plea Agreement that will potentially impact your sentence.  Paragraph 3 talks about the sentencing guidelines.  I always give respectful consideration to the guidelines, but I don't know what the guidelines are in this case and, with the exception of the 5(k) provisions which I'll get to in a minute, you are facing here a mandatory 10-year sentence up to life because of Count 2.  And the guidelines may be more or may be less; but the sentence can't be less than 10 years unless -- and we'll get into this -- the 5(k) motion is granted. You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  But I do pay attention to the guidelines.  I don't have to follow them any more, but I do have to follow a mandatory minimum sentence.  There's no exception to that except what we're going to discuss. The Government is agreeing to make some recommendations in Paragraph 5.  I will give you credit for acceptance of responsibility if you're truthful with the probation officer.  That effects a guideline sentence only.

There's this matter in Paragraph 4 of relevant

conduct. I don't have that Indictment up here but basically what this says is that if you're charged in any other counts of the Indictment, even though you're not pleading to them or haven't been found guilty by a jury, the conduct in those charges can be considered for purposes of a guideline calculation. You understand that? And relevant conduct generally raises the guidelines. How much, I don't know. But that's something that's in the presentence report. On the other hand, acceptance of responsibility credit lowers the guideline sentence. But how much, I don't know, because I don't know what the guidelines are.

In Paragraph 6 you're agreeing to provide truthful information which, of course, is a condition for the substantial assistance credit that is mentioned in Paragraph 7. The Government is agreeing in Paragraph 5 to file a substantial assistance motion on your behalf. And in Paragraph 7 acknowledges that you have provided substantial assistance. The importance of a substantial assistance motion is that if I grant the motion, since the Government has already agreed to file it, I'm no longer required to impose a mandatory minimum sentence. But I will tell you, and I think you need to know this, I do not automatically any more grant substantial assistance motions. I'm becoming concerned about

substantial assistance motions and the lawyers know about the reasons why.  Even though the Government makes the substantial assistance motion, you'll be required to serve the mandatory minimum sentence, and perhaps more. If I do grant the motion, you'll no longer be subject to the mandatory minimum sentence; but that doesn't mean that you will get a sentence less than 10 years because I don't know what the guidelines are in this matter and they may be pretty significant.  But, basically, if I grant the substantial assistance motion, then I can sentence you basically to any sentence that I want to from time-served to life.  Do you agree with that, Mr. Pratt?

MR. PRATT:  Yes, Your Honor, I do.

THE COURT:  Now, to some extent, of course, if I grant the motion, your sentence is dependent upon the substantial assistance that you did provide.  Which I don't know at this point what it is.  But if I grant the motion but don't give you -- well, let me back up and say that frequently the Government recommends in the motion itself what the Government believes the sentence should be.  Sometimes I go along with that; sometimes I don't go along with it.  But if I don't go along with it, as far as I know from the present law in the Tenth Circuit, that is not an issue that can be appealed.  You

can't say, well, the judge didn't go along with the

government's recommended sentence. That can't be

appealed. I do not believe that if I fail to grant the

motion that that is an appealable issue either. I'm not

absolutely sure of that; but I think it still is not

appealable. I'm not telling you that I will grant the

motion and I'm not telling you I won't. I'm just

telling you that it is not an automatic thing just

because it's in the Plea Agreement. Okay?

DEFENDANT: Yes.

THE COURT: So we go on now to Paragraph 8,

which you've already figured out. 9, which provides for

information that you provide. And 10, and basically

that says, together, that since I don't know what

sentence you're going to receive in this case, it's

going to be up to me to impose the sentence. And if

it's different than what you hoped for, you can't

withdraw your plea and have a trial. Do you understand

that?

DEFENDANT: Yes, Your Honor.

THE COURT: Now, Paragraph 12, the only part

of this paragraph that I think is worthwhile to discuss

with you is the matter of appeal. And to some extent,

this doesn't -- this has to be -- language in this

paragraph has to be considered in light of what I think

the law is with respect to a Section 5 motion, which I've already told you.  If you were to come in here and plead guilty without a Plea Agreement or if you were to be convicted by a jury of these crimes, you could appeal your conviction and your sentence to the next higher court in Denver.  By this paragraph, you are agreeing that you won't do that.  And the paragraph says:  "The Defendant knowingly waives any right to appeal a sentence which is imposed within the guideline range determined appropriate by the Court."  Now, that's really not accurate because if I don't grant the 5(k) motion then you're subject to the mandatory minimum sentence regardless of what the guideline range is.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  And the rest of the Plea Agreement I don't think I'll cover except for the last paragraph that simply says that you're pleading guilty because you are in fact guilty and not for any other reason and it's your decision to plead guilty, it's not Mr. Pratt's.  Is that true?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Now, with everything that we've said here last week and today, do you have any questions about the Plea Agreement?

DEFENDANT:  No, Your Honor.

THE COURT:  Now, there's a document called a Petition.  Have you gone over the Petition and discussed it with Mr. Pratt?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand it?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions about it?

DEFENDANT:  No, Your Honor.

THE COURT:  Do you understand that one of the things you're doing in that Petition is admitting under oath that you committed the violations set forth in Counts 1 and 2 of the First Superseding Information?

DEFENDANT:  Yes, Your Honor.

THE COURT:  You know, I'm looking at this waiver and I think that under the circumstances, unless counsel object, I'm going to interlineate the following: Being advised of the nature of the charges, the proposed -- and I'm going to add First Superseding Information, and of my rights, hereby waive in open court on May 6 and 13, 2013.  Any objection?

MR. PRATT:  No objection, Your Honor.

THE COURT:  All right.  Now, the last thing we're going to cover today --

MR. PRATT:  Your Honor, excuse me.  My client has a question.

THE COURT:  Yes, sir.

(Off-the-record discussion between Mr. Pratt and Defendant Mr. Worthey.)

MR. PRATT:  Thank you, Your Honor.

THE COURT:  Everything okay?

MR. PRATT:  It was just a question about the waiver.  He wasn't sure what you had done.  I explained it to him.

THE COURT:  I'll be glad -- Mr. Pratt, here here, come get it and he can see it.  Just kind of updated it, Mr. Worthey.  That's all I did.

MR. PRATT:  Thank you.

THE COURT:  That's all right.  Mr. Worthey.

DEFENDANT:  Yes.

THE COURT:  All right.  Now, you are certainly entitled to have a trial in this case to a jury.  I'm sure you know that by this time.  It would be a trial not only on Count 1 and 2 of the Superseding Information, but it would probably, in all likelihood, be a trial on the charges contained in the Indictment, the original Indictment.  And I've forgotten how many charges there are with respect to you, but let's assume

for purposes of discussion that you're the only defendant on trial.  I know you've got a lot of co-defendants, but for purposes of discussion, you're the only defendant.  We would bring in probably somewhere in the neighborhood of 30 potential jurors. We don't know until the day of trial who they are going to be.  So we question the jurors, and by we I mean me and the lawyers, about their background, their knowledge of the case, whether they know any of the witnesses.  In a case like this, there would probably be some questions about gangs and lots of other -- I mean, this would -- there would be pretty significant jury questioning in this case.  But what we're looking for in any case is jurors who can agree to be fair and impartial to both sides, to listen to the evidence, not make up their mind about the case until they've heard all the evidence and then consider only the evidence and the applicable law in reaching a verdict.  There are two kinds of challenges that can be made to a juror.  The first is a challenge for cause, and that means that if the juror says something that indicates he or she can't be fair and impartial.  For example, if a juror -- none of the jurors that would appear in this case are going to come from Dodge City, but if a juror indicated that he knew a witness or knew something about this, then probably that

juror could be excused for cause.  And then in a one defendant case, you could excuse up to ten and the Government up to six of the potential jurors for pretty much any reason you want.  That leaves twelve people plus one alternate who will be sworn as the jury, maybe two alternates, but certainly twelve people, who will be sworn as the jury.  And it will be the jury, not me, who will hear the evidence and decide the case.

Once the jury is picked and sworn, then the trial begins.  At a trial, you have many important rights. You have the right to counsel.  You have the right to be presumed innocent.  Which means that I tell the jurors that the charges against you are not evidence of any kind and they are required to presume that you are innocent of the charges until such time, if ever, that the Government by its evidence can convince all twelve of the jurors beyond a reasonable doubt of your guilt. When a defendant is charged with more than one count like you are here, I also instruct the jury that they must give separate consideration to the evidence as to each count.  It's not an all-or-nothing sort of verdict. If there are more than one defendant, which there might be, I also instruct the jury that they must give separate consideration to the evidence against each defendant.  Of course, counsel has the opportunity to

cross-examine any witness called by the Government.  The jury's verdict, whether it be guilty or not guilty, has to be unanimous and has to be unanimous as to each count.

No defendant is required to testify or call witnesses at his trial.  Which is not to say that you can't.  If you feel after discussing matters with Mr. Pratt that you should call witnesses or testify yourself, or both, you may do that.  But if you don't, I instruct the jury that that can't be held against you in any way.  And finally, as I think I've already told you, if you're convicted by a jury, you can appeal both your conviction and your sentence.  Do you understand your rights?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, by pleading guilty, you're giving up every one of those rights except your right to a lawyer.  You're giving up your right to be presumed innocent.  You're giving up your right to make the Government, if it can, prove your guilt to a unanimous jury beyond a reasonable doubt on the charges.  You're giving up your right to remain silent because you've told me that Paragraph 2 of the Plea Agreement is accurate.  And finally, as I've explained to you today, you basically are giving up your right to appeal.  Do

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 743

you have any questions about the rights that you're giving up?

DEFENDANT:  No, Your Honor.

THE COURT:  Then I will ask you, sir:  How do you plead to Count 1, guilty or not guilty?

DEFENDANT:  Guilty.

THE COURT:  How do you plead to Count 2, guilty or not guilty?

DEFENDANT:  Guilty.

THE COURT:  Mr. Pratt, any reason why I shouldn't accept his pleas?

MR. PRATT:  No, Your Honor.

THE COURT:  I find that the Defendant's pleas have been made freely, voluntarily and because he is guilty as charged; not out of ignorance, fear, inadvertence or coercion; and with a full understanding of their consequences.  I further find he has admitted the essential elements of the crimes charged and is mentally competent.  Pursuant to Rule 11, Advisory Guideline 6(b)1.1 and *U.S. vs. Byrum*, I'll accept his pleas but will defer my decision to accept or reject the Plea Agreement until I've seen the presentence report.

Defendant is remanded.  Sentencing is July 29 at 10:15.  And if there's nothing further, this matter is concluded for today.

Appellate Case: 14-3006    Document: 23-2    Date Filed: 04/01/2014    Page: 744

DEFENDANT:  Thank you for your time, Your Honor.

THE COURT:  Thank you, Mr. Worthy.

(Adjourned at 11:17 a.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 22nd day of July, 2013.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,           )
                                    )
                         Plaintiff,) District Court
                                    ) Case No. 12-10089-12
vs.                                 )
                                    )
JESUS SANCHEZ,                      )
                                    )
                         Defendant,)
                                    )
_____

**TRANSCRIPT OF PLEA OF GUILTY**

On the 30th day of October, 2013, came on to be heard Plea of Guilty in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.

APPEARANCES

The Plaintiff appeared by and through Mr. Aaron Smith;

The Defendant appeared by and through Mr. Mark Schoenhofer.

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 747

2

(Beginning at 10:00 a.m. October 30, 2013, the following proceedings were held.)

THE COURT:  This is United States against Jesus Sanchez.  Case Number 12-10089.  Aaron Smith is here for the Government.

You are Jesus Sanchez?

DEFENDANT:  Yes, Your Honor.

THE COURT:  I recognize you from all the pictures of you that were shown in the recent trial.  All right.  Mark Schoenhofer is here with Mr. Sanchez.  Swear the defendant.

(Defendant sworn to enter a plea of guilty.)

THE COURT:  Please be seated.  The Petition says that you're 23.  You have a 10th grade education.  Have you had any alcohol to drink in the last 24 hours?

DEFENDANT:  No, Your Honor.

THE COURT:  Have you taken any drugs, legal or illegal?

DEFENDANT:  No, Your Honor.

THE COURT:  Have you ever had any mental problems?

DEFENDANT:  No, Your Honor.

THE COURT:  Have you had sufficient time to

discuss your case with Mr. Schoenhofer?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Are you satisfied with the way he's handling your case?

DEFENDANT:  Yes, Your Honor.

THE COURT:  I'm sure he's told you what will happen here today.  I'm going to explain -- go through the charge to which you're going to plead guilty.  Then we will go over the Plea Agreement and the Petition. And then I will advise you of your rights in connection with a trial; and most important, really, the rights you're going to give up by pleading guilty.  If you have any questions about what I say or, most important, any questions about the consequences of your answers, I want you to tell me or tell Mr. Schoenhofer.  Will you do that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  If you don't tell us that you don't understand something, he and I will assume you do understand.

Now, you're going to plead guilty today to Count 1 of an Indictment.  And I assume, you tell me if this isn't the case, that you've gone over the Indictment, and particularly Count 1, with Mr. Schoenhofer.

DEFENDANT:  Yes, Your Honor.

THE COURT: Let me -- I'm going to summarize it. It charges you and many other individuals as follows: That you were leaders, members and associates of the Nortenos, a criminal organization whose members and associates engaged in various criminal acts out in Dodge City. The allegation is that the Nortenos constituted an enterprise, which is a term defined in federal law, and which in the language of the Indictment, constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise which -- and that the enterprise engaged in and its activities effected interstate or foreign commerce. And then it goes on to talk about the fact that the Nortenos was a street gang; that it had sets called the Diablos Viejos and Los Carnales Chingones; its purpose, among other things, were murder, robbery, distribution of narcotics, preserving and protecting the power, territory and profits of the enterprise through violence, promoting and enhancing the enterprise and the reputation of its members and keeping victims in fear of the enterprise. And then it goes on to talk about the roles, how the members of the Nortenos identified themselves by wearing red and then making hand signals and having tattoos. And then it gets to the means and

methods of the enterprise, getting back to use of murder, robbery and assault effecting interstate commerce.  And then, finally, it gets down to the racketeering conspiracy; and that's the charge -- the specific federal charge set forth in Count 1.  You and various other people participated in a conspiracy to distribute controlled substances, distribute and possess with intent to distribute controlled substances, murder, robbery; and that it was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.  Do you understand what your charged with?

DEFENDANT:  Yes, Your Honor.

THE COURT:  I assume you know what a conspiracy is, don't you?

DEFENDANT:  Yes, Your Honor.

THE COURT:  What do you think a conspiracy is?  I'll tell you what it is.  There's a really long definition that I would read to a jury, but it's basically an agreement between two or more people to violate the law.  That's what a conspiracy is.  It's an agreement.  That's it.

Now, if the case would go to trial, I would give instructions on what the Government would have to prove

beyond a reasonable doubt in order to convict you or any defendant charged with a violation of Count 1.  And actually, I'm looking at the instructions that I've already given in the previous trial and looking at your Plea Agreement.  This is a long recitation of facts. Let me ask Mr. Smith, so that I don't have to go through this in agonizing detail, what is it specifically that Mr. Sanchez did among all these various acts?

MR. SMITH:  Your Honor, on or about March 30, 2011, in Dodge City, Kansas, the Defendant participated with three other codefendants, Enrique Gobin, Andrew Gusman and Alfonso Banda-Hernandez, in a shooting which is charged substantively later in the Indictment.  That was at George Gonzalez, a Sureno gang member.  That shooting is charged as a VICAR attempted murder, VICAR assault, deadly weapon.

Mr. Sanchez, I believe, through the testimony of witnesses, would be identified as the person shooting at George Gonzalez.

Also, in 2008, on or about July 2nd, 2008, Mr. Sanchez participated with Fabian Neave and Jose Ochoa, Jr -- although Jose Ochoa, Jr. is not indicted in this case.  Fabian Neave is indicted.  That crime is charged substantively later in the Indictment.  That was a robbery of an individual known as Bryant Licon.

Fabian Neave testified about this robbery also during the trial previously.  During that robbery, a knife was held at Bryant Licon.  Money was taken from Bryant Licon.  There was actually a second -- a girl, that was present with Bryant Licon, although she is not named in the Indictment.  No property was taken from her however.

Mr. Sanchez is charged substantively in another count, which is an alien in possession of a firearm; but that wouldn't constitute a predicate act for purposes of Count 1, and we are agreeing to dismiss that count.

THE COURT:  All right.  So, this is what I would say to a jury, that Count 1 alleges that beginning on or about 2008 and continuing until 2012, within the District of Kansas and elsewhere, that you and others violated 18 U.S. Code, Section 13 -- excuse me, 1962(d) by conspiring with each other.  The conspirators being persons associated with the Nortenos, an enterprise, whose activities effected interstate and foreign commerce, to conduct and participate directly and indirectly in the conduct of the affairs of that enterprise through a pattern of racketeering activity consisting of multiple acts under the following provisions of federal and state law.  And I would charge based on the Government's statement here, attempted murder and robbery and aggravated assault.  I believe

those would be the three crimes based on the Government's statement that would be appropriate.  Do you agree with that, Mr. Smith?

MR. SMITH:  Yes, Your Honor.

THE COURT:  How about you, Mr. Schoenhofer, are those the three?

MR. SCHOENHOFER:  I would agree, Your Honor.

THE COURT:  All right.  And then I would also instruct the jury that as a further part of the conspiracy, each defendant agreed that a conspiracy would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.  And, Mr. Smith, would you read into the record so that Mr. Sanchez can understand, what the Government's evidence would be with respect to the conspiracy with regard to the racketeering acts.

MR. SMITH:  Yes, Your Honor.  The Government proffers that it would present that the act involving murder, the attempted murder that occurred on March 30, 2011, qualifies as a predicate racketeering act and that the robbery committed on that same date qualifies -- I'm sorry -- on July 2nd, 2008, qualifies as a predicate racketeering act.

Further, the Government would produce at trial, as it has in the trial previously, other acts of robbery,

shootings, violence and drug trafficking that were committed by other members of the conspiracy, though not directly attributable to the Defendant, attributable to his codefendants, during the period of time of the conspiracy from 2008 through 2012.

THE COURT:  What would be your evidence of the agreement?

MR. SMITH:  Your Honor, our evidence of the agreement as is instructed by the Court can consist of the commission of the predicate acts themselves, the commission with other members of the conspiracy, indicating an agreement.  The Defendant is also charged with separate conspiracies in each of those acts so the conspiratorial agreement must be necessary or must be proven in each one of those predicate acts.  There also would be evidence, 404(b), or enterprise evidence presented, as we've noticed to the Court, of the Defendant's participation in other acts that could qualify as other predicate offenses; and, therefore, also indicative, if not direct evidence, at least circumstantial evidence, of an agreement by the commission of those acts.

THE COURT:  Mr. Schoenhofer, are you satisfied based on your review of the evidence and the statements of Mr. Smith that the Government could put on a case

sufficient to meet its burden under Count 1?

MR. SCHOENHOFER:  Yes, Your Honor.  And this is something that I discussed with my client in our last interview that I believe that the evidence is sufficient and the risk high enough that a plea of guilty to this plea agreement is in his best interest; and my client and I came to an agreement that there is enough evidence.

THE COURT:  Do you agree with that, Mr. Sanchez?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Do you have any questions about Count 1 and what the Government would be required to prove and what the Government thinks it would be required -- thinks it could prove?

DEFENDANT:  No, Your Honor.

THE COURT:  All right.  I do want to say this to you, and I'll say this to anybody, there are some defendants left who haven't entered pleas; and I don't know what they're going to do.  I know you're aware of the outcome of the trial.  Correct?

DEFENDANT:  Yes, Your Honor.

THE COURT:  You know that I would not allow the Government to put on evidence at your trial of the conviction of these other two defendants?  In other

words, you would be tried -- the jury would not know that there had been a trial on similar charges and that other people had been convicted.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  That's not part of the proof that I would allow the Government to produce.  Everybody's entitled to a trial on its own merits.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Now, having said that, let's go on to the Plea Agreement.  Have you had an opportunity to go over the Plea Agreement and discuss it with Mr. Schoenhofer?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand it?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions about it?

DEFENDANT:  No, Your Honor.

THE COURT:  I'll cover most of it with you.  Not every paragraph.  Some of these paragraphs just won't require discussion here today.

Paragraph 1 says that you'll plead guilty and that you understand the maximum sentence is 20 years in prison, a large fine -- a fine is probably not very

likely in your case, but it's a possibility.  Up to three years supervised release.  And a special assessment.

Supervised release means that when you're released from the penitentiary, under whatever sentence you actually receive, you'll be supervised by a U.S. probation officer for a period up to three years. During that period of time, you can't commit any crimes, you can't use illegal drugs, you can't be a gang member, you can't associate with gang members, you can't have firearms.  There are a lot of other conditions that will be explained to you by the probation office and then again by me at the time of sentencing.  But the thing about supervised release is that if you violate supervised release, you can be brought back to court before a judge, not before a jury.  And if the evidence is sufficient to convince the judge that it's more likely true than not true that you violated supervised release, then the judge can send you back to the penitentiary to serve more time in this case.  And the evidence that the Government would be required to produce is not proof beyond a reasonable doubt.  It's a much lower standard.  You understand?

DEFENDANT:  Yes, Your Honor.

THE COURT:  And then I don't know what

sentence you're going to receive in this case.  I'm going to talk to you about that in a minute; but in the federal system, there's no parole.  So whatever sentence you receive, you have to serve all of it.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Paragraph 2 sets forth the facts which, if true, justify my decision to accept your plea.  Have you carefully gone over Paragraph 2 and discussed it with Mr. Schoenhofer?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Does Paragraph 2 accurately state what happened and what you did?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, let's talk about Paragraphs 3, 4, 5, 6, 7 -- and I noted Paragraph 13, deportation consequences, what's his status here in the United States?

MR. SCHOENHOFER:  He came over -- I guess he had a work permit, a visa, for a period of time that expired.  So he is not here presently with authority of the United States.

THE COURT:  All right.  Well, here's what's going to happen.  If I accept your plea today, you'll be interviewed by a probation officer.  Mr. Schoenhofer can

be present with you when you're interviewed.  The probation office covers an awful lot of territory in the interview; and then a written report is prepared that initially is given to you and to Mr. Schoenhofer.  He goes over the report with you; and if there's anything in the report that needs to be corrected, he works with the probation office to get that done.  Now, I get the report after that and I read it.  And I pay close attention to what it says.  But I don't make up my mind about a sentence until the day of sentencing.  That's because sometimes, fairly frequently, I get additional information between the time the report is prepared and the day of sentencing that bears on the sentence.  You're, of course, made aware of that, any additional information.  And then on the day of sentencing, frequently, the lawyers have something to say about an appropriate sentence; and you may want to say something about a sentence.  So, while I pay attention to the report, I don't come out on the bench on the day of sentencing deciding what sentence you're going to receive.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Now, I consider, of course, the sentencing guidelines -- and that brings me to Paragraph 4 of the Plea Agreement -- actually

Paragraphs 3 and 4, which talk about -- Paragraph 4 talks about relevant conduct. Relevant conduct is a guideline concept that allows the sentencing guideline factor, the calculation, to be increased by conduct that you haven't plead guilty to or been convicted of by a jury. And it probably in this case will consist of the counts in the Indictment to which the charge -- that charges you with crimes but you're not pleading guilty to. The effect is to raise the guideline sentence somewhat. How much, I don't know. You understand that?

DEFENDANT: Yes, Your Honor.

THE COURT: It seems unfair, I will say that, that you can be held responsible for a sentence for conduct that you weren't charged with, or that you were charged with but you didn't plead guilty to. But the Supreme Court of the United States says that can be done.

Now, Paragraph 5 talks about the Government's agreements. And I'm looking particularly at sub paragraph (b), which says the Government will recommend the guideline range provide a sentence recommendation that is no less than 120 months, regardless of the guideline range. Both parties agree to this recommendation. I'm not sure what you're saying here.

MR. SMITH: We're agreeing to make a

sentencing recommendation no less than 120 months, Your

Honor.

THE COURT:  Regardless of the guideline range?

MR. SMITH:  Yes.

THE COURT:  What you're saying is if the

guideline range is less than 120 months, you want me to

vary upward.

MR. SMITH:  Yes.  That is the agreement.  And,

Your Honor, Mr. Schoenhofer and I have both conferred

with probation about this; and we're fairly confident of

what the guideline range will be and it actually will

encompass 120 months, but --

THE COURT:  It would what?

MR. SMITH:  It will encompass 120 months in

the guideline range; but this is just back-up language.

THE COURT:  Here's the thing, Mr. Sanchez,

whatever the Government is agreeing to do and you're

going along with, the sentence is still up to me.  All

right?  I don't know what your sentence is going to be.

Apparently Mr. Schoenhofer and Mr. Smith have gone up to

see a probation officer and they've come up with a

possible guideline sentence; but nobody's told me about

it.  I haven't met with anybody about it.  So I don't

know what your sentence is going to be in this case.

But, what you're agreeing to here, if I'm reading this

correctly, is at least 120 months, ten years.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Any questions about that?

DEFENDANT:  No, Your Honor.

THE COURT:  All right.  Of course, if you're truthful with the probation office, I'll give you credit for acceptance of responsibility.  That lowers the guideline range.  But in light of the previous paragraph, I guess it really doesn't make any difference if the guideline range turns out to be lower than 120 months, at least the parties are going to ask me to impose at least a 120-month sentence.  Am I saying that right?

MR. SMITH:  Yes, Your Honor.

THE COURT:  Mr. Schoenhofer?

MR. SCHOENHOFER:  Yes, Your Honor.  So that the Court is sort of illumed on what was going on here.  Originally the recommendations of the Government in plea negotiations that we had was going to be recommending a, I believe, 150 months or something of that nature.  That was problematic in plea negotiations.  We wanted to come to an agreement that we all understood that the Government was going to be asking for no less than 120 months; and then we agreed that that's in fact the

lowest number that they would agree to, nothing less. That's how this language resulted.

THE COURT:  Okay.  Well, as long as you understand, Mr. Sanchez, that in the end, I'll decide the sentence, whatever the agreement is between you and the Government, because I'm not part of the government. Okay.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, Paragraph D says that the Government is not going to call you as a witness. That's up to the Government.  I don't get involved in who testifies and who doesn't testify.

And Paragraph 6, I've already said two or three times, I decide the sentence; but, Paragraph 7 says that when you come in here on the day of sentencing, whenever that is, that if you don't like your sentence, you can't ask to withdraw your plea and have a trial.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And then Paragraph 13 talks about deportation consequences.  I don't have anything to do with whether, ultimately, you can remain in the United States or get deported.  The only -- what will happen is when you're released from the penitentiary, if there's a detainer on file from the

immigration people, you'll be surrendered to the immigration authorities and some immigration judge, not me, will decide whether you're permitted to remain in the United States.  You understand that?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Paragraph 9 talks about waiver of appeal.  I'm a little concerned about the language in this because it says by entering into this agreement, Defendant knowingly waives any right to appeal a sentence imposed which is within the guideline range determined appropriate.  What if the guideline range is less than ten years?

MR. SMITH:  Well, by this provision, I don't think he would be prohibited from appealing; but I think we're confident in our position.

THE COURT:  I agree.  This is this standard language in these plea agreements, Mr. Sanchez, that generally applies; but since -- and generally, not always, I follow the sentencing guidelines and sentence a defendant within the guideline range.  That means, then, if there's a paragraph like this in the plea agreement, you're giving up any right to appeal your conviction and your sentence.  Here, I suppose, it's theoretically possible that if your guideline range is less than 120 months and I give you a sentence of 120

months or more, you would be permitted to appeal your conviction and your sentence. Is my thinking on this correct?

MR. SMITH: I would agree with that.

THE COURT: Mr. Schoenhofer?

MR. SCHOENHOFER: I do, Your Honor.

THE COURT: That's not to say that the appeal would do you any good. It's just to say that you could appeal. If your guideline range is 120 months or greater, then you can't appeal. Do you agree with that counsel?

MR. SMITH: I do.

MR. SCHOENHOFER: I agree, Your Honor.

THE COURT: All right. You understand what we just said, Mr. Sanchez?

DEFENDANT: Yes, Your Honor.

THE COURT: All right, sir. Now, the only other paragraph I think that I want to mention is the last paragraph, which basically says that you're pleading guilty because you are in fact guilty and not for any other reason; and that it's your decision to plead guilty, it's not Mr. Schoenhofer's or anyone else's. Is that true?

DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Now, do you have any

questions at all about the plea agreement?

DEFENDANT:  No, Your Honor.

THE COURT:  The other document is called a Petition.  Have you gone over the Petition and discussed it with Mr. Schoenhofer?

DEFENDANT:  Yes, Your Honor.

MR. SCHOENHOFER:  Your Honor, may I -- if I may, paragraph 14, no other agreements.  My client and I both agree there is nothing -- there are no other agreements.  We -- the United States are the only parties to the agreement.  This is the only written agreement, formal agreement, that exists between the parties.  I do want to put -- because my client would like me to put this on the record -- that one of the considerations in his mind in entering this plea agreement, although not a part of the formal agreement, is he was wanting to make sure that once he had been prosecuted here, or that he entered into this plea, was found guilty and sentenced in this, that there was no risk that Ford County would be coming around charging him.  Now, again, we understand there's no formal agreement to that.  But it was refreshing -- certainly, in his mind, it was important that in fact the United States Attorney's Office contacted local law enforcement back in western Kansas and they said, yeah, we have no

intentions of doing that, we don't intend. I wanted to put that on the record that that was a factor in his mind and that was, in his mind, important in entering into plea negotiations in this case. Once again, my client and I both recognize that that is not a formal agreement because they're not a party to this.

THE COURT: You understand what he just said?

DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Ford County is a division of the State of Kansas and they're not here today and won't be; but, realistically, if you receive a ten-year sentence, I can't imagine that Ford County would proceed against you. All we're saying here is that that's the understanding, but it's not part of the agreement. Okay?

DEFENDANT: Yes, Your Honor.

THE COURT: All right. Now, getting back to the petition. Do you understand the petition?

DEFENDANT: Yes, Your Honor.

THE COURT: Do you have any questions about it?

DEFENDANT: No, Your Honor.

THE COURT: Do you understand that one of the things you're doing in the Petition is admitting under oath that you committed the offense charged in Count 1?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Now, the last thing I want to talk to you about is your right to a trial.  You certainly have a right to a trial in this case and it would be a trial to a jury.  Rachael, what's he scheduled for?  Would he have been scheduled in January?

LAW CLERK MS. SILVA:  January 7.

THE COURT:  There was a -- we have scheduled a trial for three of you in January.  You and who else?

LAW CLERK MS. SILVA:  Alfredo Beltran-Ruiz and Jason Vargas.

THE COURT:  And Vargas.

MR. SMITH:  And Alfredo --

THE COURT:  So three people.  And assuming that you went to trial with those other two individuals, we would call in, oh, I don't know, maybe 40 or 50 potential jurors because of the number of defendants and the number of challenges that could be made and the length of the trial.  That's what we had in the trial that we had a month ago.  We don't know who they are until they get here, so the lawyers and I question the potential jurors.  What we want are people who can agree to be fair and impartial to both sides.  And so the jurors are questioned about lots of things.  And then, following the questioning process, you can ask to have

any potential juror excused for cause who, for some reason, you believe and I believe can't be fair and impartial.  And then, in addition, depending on the number of defendants, and if there were three defendants, I would probably allow each defendant six peremptory challenges.  A peremptory challenge is a challenge for pretty much any reason you want.  And the process then allows the Government and the Defendants to pick the twelve people and probably in this case two alternate jurors who will hear and decide the case.  Once that process is over with, then the trial starts.

At a trial, you have the right to counsel; you have the right to be presumed innocent.  And that means that I tell the jury at the very beginning of the case -- I tell 'em what the charges are, obviously, they need to know why they're here -- but I tell them that the charges are not evidence of any kind and that they must presume that you are innocent of those charges until such time, if ever, that the Government, by its evidence, can satisfy all twelve jurors beyond a reasonable doubt of your guilt.

Now, when a defendant is tried with other defendants, I also instruct the jurors that they must give separate consideration to the evidence as to each individual juror.  It's not a -- each individual

defendant.  It's not a guilt by association sort of situation.  And when the defendant is charged in more than one count, I give a similar instruction that the jurors must give consideration to the evidence as to each separate count.  Of course, Mr. Schoenhofer would have the right to cross-examine any witness called by the Government.  The jury's verdict, whatever it is, has to be unanimous as to each defendant and each count. It's all separate.

You would not be required to testify or call witnesses at the trial; and if you didn't, I would instruct the jury that your silence cannot be considered in any way against you.  You can call witnesses if you wish and you can testify if you wish.  That's a choice you would be entitled to make.

And, of course, if you're convicted by a jury, you can appeal both your conviction and your sentence.

Now, do you understand those rights?

DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Now, by pleading guilty, you're basically giving up all those rights.  You're not giving up your right to have a lawyer, of course.  But you're giving up your right to be presumed innocent. You're giving up your right to make the Government, if it can, prove your guilt to a jury beyond a reasonable

doubt.  You're giving up your right to remain silent because of Paragraph 2 of the plea agreement and what was said here today in court.  And with this kind of narrow exception that we've talked about, you're giving up your right to appeal.  Do you have any questions about the rights you're giving up?

DEFENDANT:  No, Your Honor.

THE COURT:  All right, sir.  Then I will ask you:  How do you plead to Count 1, guilty or not guilty?

DEFENDANT:  Guilty.

THE COURT:  Mr. Schoenhofer, is there any reason why I should not accept Mr. Sanchez' plea?

MR. SCHOENHOFER:  I know of no reason, Your Honor.

THE COURT:  I find that he made his plea freely, voluntarily and because he is guilty as charged; not out of ignorance, fear, inadvertence or coercion; and with a full understanding of it's consequences.  I further find that he has admitted the essential elements of the crime charged and is mentally competent.  Pursuant to Rule 11, advisory guideline 6(b)1.1 and U.S. vs. Byrum, I'm accepting his plea but will defer my decision to accept or reject the plea agreement until I've seen the presentence report.

Defendant is remanded.  Sentencing is January 13 at

10:00.  Thank you very much.  We're in recess.

MR. SCHOENHOFER:  Thank you, Your Honor.

MR. SMITH:  Thank you.

(Adjourned at 10:37 a.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 30th day of October, 2013.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,    )
                                 ) District Court
                Plaintiff,       ) Case No.
vs.                              ) 12-10089-02
                                 )
PEDRO GARCIA and GONZALO          ) Circuit Court
RAMIREZ,                         ) Case No.
                                 ) 14-3006
                Defendants.      )


TRANSCRIPT OF JURY TRIAL
EXCERPT OF CLOSING ARGUMENTS


       On the 16th day of October, 2013, came on to be
heard proceedings in the above-entitled and numbered
cause before the HONORABLE MONTI L. BELOT, Judge of the
United States District Court for the District of Kansas,
sitting in Wichita, commencing at 3:12 p.m.  Proceedings
recorded by machine shorthand.  Transcript produced by
computer-aided transcription.


APPEARANCES:


The plaintiff appeared by and through:
        Mr. Lanny D. Welch
        Mr. Aaron Smith
        United States Attorney's Office
        1200 Epic Center
        301 North Main
        Wichita, Kansas  67202


The defendant Garcia appeared by and through:
        Mr. John V. Wachtel
        Klenda Austerman, LLC
        1600 Epic Center
        301 North Main
        Wichita,  Kansas 67202-4816


The defendant Ramirez appeared by and through:
        Mr. Timothy J. Henry
        Mr. Joel Mandelman
        Federal Public Defender's Office
        850 Epic Center
        301 North Main
        Wichita, Kansas  67202-1508

I N D E X

CLOSING ARGUMENTS                                      PAGE

        By Mr. Smith (cont'd)                        3

        By Mr. Wachtel                               8

        By Mr. Henry                                27

        By Mr. Mandelman                            55

        By Mr. Welch                                58




REPORTER'S CERTIFICATE                               82

**JOHANNA L. WILKINSON, CSR, CRR, RMR**
*U.S. District Court, 401 N. Market, Wichita, KS  67202*
(316) 315-4334

(Closing arguments continued as follows:)

THE COURT:  All right.  Now, you've used 70 minutes.

MR. SMITH:  Thank you.

So, ladies and gentlemen, moving forward then -- well, I believe I've gotten off on my slides just a bit. Moving forward.  Cooperation, the cooperators, there were individuals who cooperated in this case.  They testified.  You have a list of who those persons are.  Evaluate their testimony critically.  I expect you to, as I expect you to evaluate all of the witnesses' testimony critically.  But remember -- and there are instructions to this effect -- they have admitted their crimes in court.  They have admitted other crimes, numerous other crimes that they've admitted, where they've been involved in, despite the fact that they needn't have done that.

They subjected themselves to sitting on this stand and testifying in front of you and being cross-examined.  They have subjected themselves to retaliation of a gang we already know was violent and vindictive.  They are still subject to prosecution.  They may not lie.  If they lie, their plea agreements can be voided.  Read the plea agreements, if you would, because they are in evidence, as are the cache of our letters referenced with Joe Galindo, because he is still subject to prosecution.  They have placed their fates in this judge's hands.

Now, did some of the witnesses travel to testify? Did Joe Galindo, was he given money to get out of town to hide from the Nortenos? Yes. But take that into consideration and consider if it is reasonable and reasonable in light of their testimony.

What would the defendants have you to believe -- I suspect some of these arguments may be coming -- Anthony Wright and Russell Worthey conspired to frame Pedro and Gonzo. To what end? And why? They somehow decided to recruit Joe Galindo and have Joe Galindo give similar information as to what occurred that evening. In telling their story, however, they couldn't agree on who it was that threw gang signs down at the trailer park and couldn't even agree what day it was that that occurred. They chose to tell their stories years apart, despite hatching this plan to frame Pedro and Gonzo. Well, it didn't happen, ladies and gentlemen.

What else would they have you believe? "Joe, he knew about the phrase 'norte.' He said 'puro norte'; he didn't say 'norte puro,' but he knew. He knows someone was shot in the back climbing a fence." Well, how did he know that, ladies and gentlemen? He was told. He knows the gun jammed. You know the gun jammed. Joe Rodriguez knows the gun jammed. Pedro Garcia said the gun jammed. You have a spent shell casing -- or an unspent shell casing saying that the gun jammed and Joe knew that there were two guns at the scene, a revolver,

and I semi-automatic, a MAC-11, which also is consistent with Russell and Anthony's testimony.

So are there differences in Joe's testimony?  Yes, there are.  Joe had the guns reversed.  Why?  Because he knew one of the guns jammed, so logically assumed that it was the semi-automatic.  He thought Gonzo's gun jammed.  He said "norte puro" instead of "puro norte."  Well, Joe wasn't there.  Anthony and Russell were there.  Those small details Joe may have wrong.  Does he have the substance of the story correct?

What else would they have you believe?  Isidro, he's testified that he thinks it was six people that robbed him.  And what I suspect an argument would be, well, if it's six people, it's Tito, it's Josh, and four completely unknown people, four more, you know, two -- you know, two more than what was really there or could have been there.  And those four unknown people certainly didn't include Pedro and Gonzo, but Tito Flores, even though he's not a gang member, he put himself at the scene of the robbery and put a gun in his own hand.  He implicates two cousins, Knox and Gonzo, while protecting Russell and Anthony?  Because the argument will be made that Russell and Anthony were at the robbery.

Now, Russell and Anthony admit to a murder, come in and plead to a murder, subject themselves to the sentence that they're facing but aren't going to own up to a robbery?  Tito Flores put the gun in his own hand but he didn't when he

testified.  He didn't put the guns in the hands of any of his other co-conspirators.  Now, Isidro said he was beaten over the head with a gun.  Joe Galindo just happened to take Pedro and Gonzo to Tito and Josh Flores, to reunite later on that evening.  Just happened to be the four guys implicated in that robbery.  And why would Tito protect Anthony and Russell but throw his cousins under the bus?

How is it that this diverse group of people at different times get the substance of what occurred on June 8th, 2009; correct?  What are other things the defendants would have you believe despite the evidence of firearms, ammunition, drug-trafficking, stealing money from Guatemalans, receiving meth through the mail, forcing witnesses to flee the country, victims fleeing the state, wiring money to California for -- I'm sorry, wiring money to California for payment of drugs and others that you will remember, despite all of that there is an interstate commerce.  What would they have you believe, despite the evidence of multiple racketeering acts, there is a pattern of racketeering activity, it just happened to be that there was a whole lot of it, completely unrelated, despite the evidence of common symbols, names, colors, tattoos, enemies, and criminal activities, there isn't an enterprise, it's just a street gang that really is not organized.

What will they have you believe?  Despite the fact that all of the symbology is Norteno, despite the fact that the

Diablos Viejos identified themselves at Norteno, despite the fact that the enterprise is charged in the indictment, which you have as Diablos Viejos and Nortenos in Dodge City, Kansas, that is the indictment that you have in your instruction, somehow it's all trumped by the sanction from California, and, therefore, it's not an enterprise?

But the defense expert testified they're a gang and they identify themselves as Nortenos.  Somehow there isn't an enterprise.

California, Neustra Familia, Neustra Raza are not indicted in this case.  The victims don't care about California.  The gang members don't care about California.  The enterprise, the Nortenos, existed in Dodge City, Kansas.  And I say "enterprise" here for a very specific reason.  I do not say Norteno.  I do not say Diablos Viejos or LCC.

Was it an enterprise?  That is what you must answer, not whether they called themselves Nortenos, whether they called themselves the Beetles, Spanky and the Little Rascals, or Me and You and a Dog Named Boo.  It's not what they called themselves, but were they an enterprise.

Now, in this case it is convenient for you because they all decided to dress the same, tattoo themselves the same, call themselves Norteno, tattoo 14 all over their body, X4 all over their body, one four all over their body, throw up graffiti identifying themselves as Norteno.

Case 6:12-cr-10089-MLB   Document 982   Filed 03/18/14   Page 8 of 82
Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 781

8

They will ask you, please, ignore the enterprise. Come on, it's just a little bit of interstate commerce.  Hey, this is just a violent street gang; it's not the Norteno enterprise that the federal government should be focused on. Well, I think there's a priest in Dodge City that would disagree.  As their expert testified, he hadn't seen a lot of violent crime in the last couple years.

And even if it was a criminal enterprise, Pedro and Gonzo just happened to not be involved at all in all of those substantive counts that they're charged in.  So in the end, because there is an enterprise, because they are the Nortenos, because he is a member and he is a member (indicating throughout), what is this case about?  This case, in the end, is about fear, intimidation, anger, shooting, and murder.  It is about spilling the red blood of the residents of Dodge City, Kansas, for one purpose, "puro norte."

Thank you.

THE COURT:  Thank you, Mr. Smith.

Mr. Wachtel, you may proceed.

MR. WACHTEL:  Thank you, Your Honor.

CLOSING ARGUMENT

MR. WACHTEL:  Usually I know when I stand up to make closing argument exactly what I'm going to say. Ordinarily I start with the instructions, all of them, and talk with you about the instructions and what it is that they mean.

You had your own instructions on -- every one of you had your own set of instructions. There's a reason why you have them. The reason that you have them is so that you can do your duty in this case.

Being a juror's not easy business. It's not supposed to be. And you have instructions so that each and every one of you can understand the law as well as the people who write jury instructions can write it down. Why do each and every one of you have to know what the law is? You have to know what it is, at least in this case, so that you can do your duty.

I can't tell you what you have to do. I can't tell you how to make a decision. But I can tell you what I think you won't do. And first I'll tell you why I think it and then I'll tell you what it is. You swore, under oath, you told us that whatever the law is, I can follow it, whatever the law is I can follow it. And the law is what's written in those instructions.

Now, so I think what you're going to do to discharge your duty as Americans is that you're not going to say, juror whatever number, you read the conspiracy instructions, and you come tell the rest of us what that means. I don't think there's one person in this jury box who would treat their duty to this court and to the parties and to these defendants that cavalierly.

The judge suggested to you that you read these instructions.  I would further suggest to you that in order to discharge your duty you've got to look at every piece of evidence that came in in this case.  Each one of you has to look.  To the extent that there are plea agreements, there are written documents that are exhibits in this case, you have to look at 'em.  If you don't look at 'em, you're giving yourself a handicap in your understanding.

I am going to talk with you a little bit about the instructions, not all of those, just a few.  Before I do that, no, I was talking about this not being hard -- not being easy, that being a juror is hard.  And one of the reasons that being a juror is hard is that sometimes that law we swore to abide by is something that we're not gonna like, we're not gonna like what the law is.  But as jurors, sworn to follow the instruction and follow the law, you have to follow the law even if you hate it, even if you hate it.

Were the various crimes admitted in Dodge City, Kansas, street crimes?  Yes, they were.  Every murder, every murder in the world, is a street crime.  Every robbery in the world is a street crime.  But not every murder is prosecuted by the United States of America and not every home robbery is prosecuted by the United States of America.

To get -- to be here, for y'all to be here, there is something that the Government must prove to you before -- I

don't mean to infer -- imply that these crimes in Dodge City did not -- that people weren't hurt, that people did not die, that damage was not done.  I don't mean to imply that.  But you've got to look at the instructions.  And I suggest to you that one of the instructions you ought to look at early on in this case is Instruction No. 11.  And I'm not going to read it all to you 'cause I don't have to 'cause I know you're going to read it.  But there is something in Instruction 11, which is about interstate commerce, that you need to read and understand.  One, it talks to you about interstate commerce, but then it says the important thing, and it is in instruction 11's final paragraph.  It says, "The evidence need not show any particular degree of an effect on interstate commerce."  It goes on.  "The Government is not required to prove a significant or substantial effect on interstate commerce or foreign commerce.  Rather, a minimal effect is sufficient."

And those words are critical.  All you have heard evidence in this case of things moving in interstate commerce. These guns, we were told -- none of which, by the way, are involved in the crimes allegedly committed by my client -- but we are told that these -- thank you, thank you for warning me -- we are told that these guns moved in interstate commerce, and I'm sure they did.  But the question that you don't have, what you do not have before you, is anybody telling you what effect, if any, it had?  I can't tell you 'cause there's no

evidence about it.  And you are stuck with, and I am stuck with, and this court is stuck with the evidence that came from that witness stand.

Now, there's another instruction that probably you should think about along with this instruction, and it is towards the back.  I'm not going to try to find it and slow myself down because it takes too much time.  But basically you are told in the instructions -- and you will find it -- that although you can use that good sense which is common to all Americans and which you all share, you cannot guess someone into guilty, into being guilty.  You cannot.  You swore you would not.  You told us in voir dire that you would not guess.

To find -- for you to find any impact, minimal or less, and certainly less than special, you have to have evidence that gives you some idea of what that is.  And you don't have any evidence, not one witness, not one word, not one murmur.  It will -- I think, based on the evidence in this case, you cannot find that there was any effect on interstate commerce, and you're not gonna like that, but -- some people won't like that.  I'm sorry, let me rephrase.  Some people won't like that because they will say, but this crime occurred, this crime in Dodge City happened, this crime in Dodge City happened.  These crimes in Dodge City happened.  But -- but if you can't find that impact on interstate commerce, then your job is done.

Those crimes would be prosecuted by somebody else, someplace else, most likely in Dodge City, Kansas, where they happened.  So there's a danger in not reading all of these instructions to the letter.  And while I'm on the subject of instructions, let's talk about -- where'd it go, where'd it go?  Oh, here it is.

Let's talk about Instruction 10.  I think that's a two-page instruction.  And the part that I find interesting is on the second page.  If you want to find it easy, it's in the first full paragraph on that page.  And the key language is this:  "It is not necessary that the enterprise have any particular formal structure.  But it must have significant -- sufficient organization that its members functioned and operated in a coordinated manner in order to carry out the purpose or purposes of the enterprise."  (As read.)

Now, you are the judges of the facts, and nobody can take that from you.  You sat there for days.  We've had you sit here for days and listen to people talk to you from this witness stand.  I direct your attention to everybody who said they were DV or LCC or who used Norteno as their name.  None of those.  Do you think any of those people was capable of doing anything in an organized manner?  If you don't find that that's how it operated, that's how the gang operated, then your job is done; you vote not guilty on Count 1 and that takes care of everything else.  So as you're considering what went on here,

you need to think about that.

The instructions talk to you about different kinds of evidence, and there is always an instruction about circumstantial evidence, and you will find that at Instruction 52. And it's short, so I'm going to read it to you. "There are two types of evidence from which a jury may properly find a defendant guilty of crime. One is direct evidence, such as the testimony of an eyewitness. The other is circumstantial evidence, the proof of a chain of circumstances pointing to the commission of the offense."

Interesting language. Tough to maybe get your head wrapped completely around all the time, so let me give you the example that is used most often by lawyers in discussing instructions. Here it is. You live out in the country. You come home at night. It's dark, it's cold, but there's no snow on the ground. You go to bed. You get up the next morning. You look out into your backyard, north 40 or whatever it is, and you see a foot of new-fallen snow. You also see a log that's been in your backyard for years and you know it's hollow, and you see rabbit tracks that lead up to that log.

Now, that is pretty good circumstantial evidence -- in fact, it's real good circumstantial evidence -- that the rabbit's in the log. And that's the kind of circumstantial evidence that you can rely on.

Now, there's another kind that isn't that

trustworthy, isn't nearly that trustworthy.  And I've never been able to describe it, but my grandmother did, and she said a cat can have kittens in the oven but that don't make 'em biscuits, and that's the bad circumstantial evidence.  It will lead you in the wrong direction if you let it.

Two more instructions, then we're done.  We spent a lot of time in voir dire talking with you about cooperating witnesses.  We spent a lot of time in this case reading aloud and discussing with witnesses what kind of deals they were getting from the Government for their testimony.  And I know that that was probably not fun to sit through.  But there's an instruction that tells you why we did that, and it tells you what to do with what you've learned here, and it is Instruction 61.  That instruction says this:  "The testimony of a witness who provides evidence against a defendant for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness."

Now, what this means, put in simpler language, if you get something of value in exchange for your testimony, then the jury is entitled to really look at you closely in determining whether or not you sat on that witness stand and told the truth.  It is difficult to -- for me to imagine a greater reason to lie to this jury than freedom.  It is extremely difficult for me to imagine a greater reason to lie

from that witness stand than a shorter sentence.  And, in fact, there were at least two people that we talked to, two cooperators that we talked to, and we asked them, is freedom important to you?  And they said, yes, it was.  And I asked one of them if it was more important than money.  And you will all -- you will remember the answer to that, which was yeah, it's more important than money.

Those witnesses, who are offered something of value, have an offer to be paid for what they say.  Now, they don't -- and there's a downside to it; right?  They could be prosecuted if the Government thinks they lied, if the Government that thinks they lied.  They can't be prosecuted if you don't believe them 'cause that's not part of the deal.  They can't be prosecuted if the judge doesn't believe them because that's not part of the deal.  All they have to do is say what makes this table satisfied.

Now, Mr. Smith talked to you about, gee willikers, why is all of this testimony from these cooperating witnesses so close in terms of what they say happened.  We've got, what, in this room?  Two lawyers, two clients, two lawyers, a policemen, me, the judge, other policemen here.  There are other -- but there are other people charged in this case than just the people you've heard from here today, over the past two weeks, and there are a heck of a lot more policemen involved in this case than you see in this courtroom, and there are myriad

ways for information that exists in the discovery -- and discovery is the information that we are provided by the Government, that tells us what in blue blazes they think happened -- there are myriad ways for that discovery to find it into the hands of witnesses who are really willing to cooperate and who are not even charged in this case.

Who possibly could I be talking about?  Joe Galindo.  Now, Joe is an interesting guy because he comes -- of all the cooperators that you've heard testify to you, Joe Galindo is the one that comes in here without plea bargain.  No plea bargain for Joe.  Of course, he does not need one, because in exchange for his truthful testimony he is not going to be charged with crime number one.  No matter what he did, if he mentioned it or talked about it in his interview with the authorities, they're not going to charge him with anything.  And he admitted to you that he is a dangerous man, a dangerous man.  He has a series of batteries and crimes of that sort which are -- cause serious harm.  But Joe is on the streets.  He walked in here in civilian clothes.  Not very many other cooperators did, but Joe's on the streets.  And, obviously, Joe is an honorable man.

So that brings me to the inevitable place where I have to talk with you about people's plea agreements.  I have to remind you of this.  I know you remember -- and I promise not to take a long time -- but let's talk about Anthony Wright.

First cooperating witness that you heard.  He's got a plea agreement from the Government that says -- basically it says this.  It says that he's going to -- I'm sorry, I'm trying to get to the Government's agreements.  Forgive me.  The Government is not going to file any additional charges against him that arise out of his being a Diablos Viejos.  The Government's going to recommend a sentence at the low end of the guideline range.  We've told you, you learned in the testimony, that we have guidelines and the guidelines says if your criminal history is this and your severity level of the crime is on the scale here, where those two things meet that's what the guideline-recommended sentence is.

They're also going to agree to give -- to recommend a two-level reduction for acceptance of responsibility in severity level of the crime, and another one-point reduction for doing that in a timely fashion.  And that is good.  And I will tell you that that language appears in countless, countless plea agreements.  What's important about his plea agreement is in paragraph seven.  And it says Substantial Assistance, and it talks about what the Government's going to do if they're satisfied with the way he behaved.

They say in this particular agreement that they recognize that substantial assistance has already been provided to them and that they are going to -- if they're satisfied with

him -- file a motion, 5K1 motion, to ask this court to reduce his sentence, even if the sentence has a mandatory minimum time.  They can't promise what Judge Belot will do, but at least they can promise to -- well, let me rephrase that, 'cause it ain't a promise; it's a -- it's a carrot dangling out here somewhere.  It says we, the Government, are the only people who can file this motion.  You can't, Mr. Worthey.  Your lawyer can't, Mr. Worthey.  And the judge can't do it for you.  So if you don't jump -- if you don't come when we whistle, you may not get this motion filed on your behalf.

Okay, let's talk about the next person that showed up.  Was I talking about Worthey?  I probably was.  Let's talk about Anthony Wright.  And he's got basically the same deal with regard to the Government agreements.  With regard to the -- I got these two boys confused.  Anthony's the one that they recognized and that has given the substantial assistance already, but the rest of it is just what I told you.

Russell Worthey, if you go to paragraph 5 of the Government's agreements, you're going to find pretty much what's contained in Anthony Wright's agreements, with them not filing additional charges.  They promise -- they agreed to file a motion based -- a 5K1 departure motion.  That's paragraph (b), 5(b).  When you read that exhibit, they recommend the two-level reduction and the one-level reduction, and in his case they recommend they say they're not going to are request

that the court depart upwards in this guy's sentence, if he doesn't ask the court to depart downward.

If you get to paragraph 7, they talk about substantial assistance, and they say in this one he has yet to provide substantial assistance. So he's got the same problem that his cousin has. He's got to convince the Government that he's telling the truth. He doesn't have to convince you. And I can understand why you would not be. He doesn't have to convince the judge. He doesn't have to convince anybody but the Government.

I'll try to move faster. Jesus Torres, the guy with the plea agreement, basically the same as the ones we talked with you about in the past. However, his agreement, he's allowed to argue for a departure or variance in his sentence, while the Government recommends simply a guideline sentence for him, and he -- Government, agrees to allow -- to allow -- it's not written very well. I will read it. "[T]o allow, pursuant to a request by the defendant, an order of court for the defendant to be granted credit for time served on the underlying state criminal action."

Now, I don't remember, as I stand before you good people today, what his sentence was, but he's been -- told you he's been in custody since this case was filed. And while he is getting credit for the time served in this case -- in this case, in terms of a federal sentence -- he's also going to get

credit for time served on a sentence that is imposed upon him by the state of Kansas.

MR. WELCH: Your Honor, I'm sorry to interrupt, but I think counsel just made reference to Jesus Torres?

MR. WACHTEL: I think that's who I talked about.

THE COURT: Mr. Welch?

MR. WELCH: Jesus Torres was not a witness in this case, Judge.

MR. WACHTEL: I apologize, Your Honor, if I got my Rabbits confused, and I apologize to you, ladies and gentlemen. I am sorry.

So let's talk about Exhibit 376, Juan Torres. Juan's got the same basic agreements that the other people have. Indeed, he's got something maybe even better. He's got this: the State of Kansas, though not a party to this agreement, has agreed not to file any additional charges against him, nor prosecute any crimes arising out of the facts forming the basis for the Government's behalf, and further agrees to dismiss any indictments pending. So if you cooperate from the Government, you get a "get out of jail free" pass, at least from the State of Kansas.

Is that something of value in exchange for your testimony? You bet that is. You bet that is. Is that a strong inducement to sing the song -- to sing the lyrics that the Government gives you? That it is. Is that good reason not

to trust one word that came out of his mouth?  You bet it is.

Lastly I'm going to talk to you about is Fabian Neave, a person who has told you that his lawyer didn't give you any of the discovery, that he attended -- that although he had had the testimony of the experts from the *James* hearing or the *Daubert* hearing -- *Daubert* hearing you have a hearing to find out whether these folks are the experts they claim to be, like Agent Webb, but in exchange for his cooperation he gets deals also.  The same deals you've heard about, right?  Yet he gets -- in subparagraph (b) he gets the same deal from the State of Kansas.  Though not a party to this agreement, the State of Kansas has agreed not to file any other charges against him.  So whatever he did when he was whatever kind of gangster in Dodge City, Kansas, that he professes to be, the State of Kansas is not going to prosecute him for anything.  And, ladies and gentlemen, those are sufficient reasons for almost anybody to lie.

Now, at this point in time I will talk to you about the evidence itself.  I think what's important for you to remember in this case is what there isn't on that table.  We had -- in Dodge City we had a home invasion in which two men were severely injured.  The -- one of the people who got injured in that home invasion says there were six people, six people, who burst into that home.  Now, cooperators with regard to that says no, no, it's only four, just three guys and me,

that's all it was.  I don't know why that person would minimize who was involved, and I don't have any obligation to prove to you why he did.  But I submit to you that the most believable witness with regard to those facts is the home -- is the person who was living in that house that suffered through that crime.

Now, surely if my client was involved in these crimes there would be someone, someone who could pick his picture out of a lineup.  Nobody did that here.  Surely, in spending that much time in a house, his fingerprints would be somewhere.  No evidence he wore gloves if he was there.  Where's the fingerprint evidence?  There is none.  And from that you may sensibly assume that his fingerprints weren't found there, because if they were you'd have heard it.  DNA, I don't know how much DNA might get deposited in a scene like that, but nobody looked, and there's no DNA evidence here.

The gun that Mr. Garcia allegedly had when that crime was committed -- we've got guns.  We've got lots of guns. We got pistols.  We've got shotgun.  We've got a rifle.  You don't have one gun in that crime to look at, not one.

It's even more apparent that somebody is not telling you the truth when we get to the trailer park crimes. The testimony in this case was, from the victims of the crime, that the shooter was 6 feet tall.  I'm 5-11.  I agree that there are almost -- there's almost nothing in life that you can prove with absolute certainty except you can prove how tall

Pedro Garcia is. And we did that, because we had Mr. Garcia stand up when a witness was here talking to him. And it is readily apparent that Mr. Garcia is nowhere nearly as tall as I am, nowhere nearly.

Now, the Government would have you believe that Russell Worthey and Anthony Wright are really, really good witnesses, but, gosh, they can't remember a lot of stuff. They can't remember what they were wearing. I would think that the day that you were around somebody who is shot to death would be a pretty important day in your life, and you would be able to recall an awful lot about that.

They don't remember what Mr. Garcia was wearing, who they swear to you was there. They don't remember what Mr. Ramirez was wearing, who they swear to you was there. And, oh, by the way, we also know how tall Mr. Ramirez is 'cause he stood up also, and he's shorter than Pedro Garcia, shorter.

Now, Anthony Wright was picked out of a lineup. Anthony Wright was the passenger in that car with the Mongolian hair that somebody said they saw. And that's how he got caught. I think his testimony is completely untrustworthy. And what is missing from that crime scene, now we know, because we saw it ad nauseam, that there were empty shell casings there -- I don't remember the number of the exhibit, but I reckon you all do -- laying all around that place where the shooting occurred. Are there fingerprints on those shell

casings?  We don't know.  We'll never know, because they weren't tested.

Were there fingerprints of my client found anyplace in that vicinity?  None have been offered to you, so the Government doesn't have them.

The guns that were used, you don't have those to look at.  The gun that a witness says she saw Mr. Worthey put beside the console of his car, that gun's not here.

It -- I'm not going to use up my hour, and I don't know how much I've used up, but I'm --

THE COURT:  I will tell you, since you asked.

MR. WACHTEL:  Thank you, Your Honor.

THE COURT:  In three more minutes you will have used 35 minutes.

MR. WACHTEL:  I will try to exhaust 35 minutes. Thank you, Judge.

I -- I -- let me stop stuttering and start again. I think what the evidence -- the important fact about the evidence in this case is what it does not prove, what it does not prove.  It does not prove that those honyocks out in Dodge City who fancy had themselves gangsters had an impact on interstate commerce.  And there's no evidence in this case that tells you that they did or what that impact might be.

We know from the instructions that interstate commerce is huge, this huge thing.  I can't begin to describe

how big interstate and foreign commerce is in this country.  I can tell you that it dwarfs Dodge City, and if it dwarfs Dodge City it dwarfs the Diablos Viejos.  So I think you're going to find, when you sit down and talk to each other, I think you're going to find that there's a critical piece of evidence missing here, and if they don't prove to all of your satisfaction, beyond a reasonable doubt, that there was an impact on interstate or foreign commerce, your job is done.  You vote didn't prove it, not guilty.  Now, they don't have a place for didn't prove it, but when you vote not guilty, that's what you are saying.

With regard to -- if somehow you find your way past Count 1, you're then faced with the other acts that my client is alleged to have committed.  I don't think there is sufficient evidence in this case for you to find him guilty of any of those.  This case is important for what ain't there, not what is.

Why did Anthony Wright decide to save himself?  I do not know.  Why did Joe Galindo decide to save himself from the State of Kansas?  I do not know, and you will never know either.

Last thing.  You're gonna go back in the jury room and, according to the instructions, you're going to pick a foreperson.  When I started in this business it was a foreman, but it has changed now and that's a good thing.  And a foreman

probably can guide you through the process.  But nobody in this jury -- nobody, not the foreperson in this jury -- is obligated to check your brains at the door to that jury room.  You are not required, because the foreman may disagree with you, to give up something that -- to take a position other than what is consistent with what you think they have proved.  The foreperson of a jury is not your boss, whoever that person becomes is not your boss.

Now, the judge told you that the foreperson, if you have a question, you can get it to the judge, it goes through the foreperson.  The foreperson cannot refuse to put your question to this court, cannot refuse.  And don't allow yourself to be browbeaten out of what you think you know from the evidence in this case.  I'm not worried about that from you.  We spent hours talking to you.  You are good people and a good jury, and I thank you for just listening to me.  Thank you very much.

THE COURT:  Thank you, Mr. Wachtel.

CLOSING ARGUMENT

MR. HENRY:  If it please the Court, counsel, Gonzalo.  Ladies and gentlemen of the jury, the Government started out by saying that there are two parts of this case: there's the visceral part -- they showed you a dead body of Israel Peralto, that they wanted you to take back to the jury room -- and then there's the analytical part.  Well, ladies and

gentlemen, Instruction No. 66 says that you're to perform your duty without bias as to any party or person; the law does not permit jurors to be governed by sympathy, prejudice, public opinion.  The promise you made when you took your oath, keep constantly in mind that it would be a violation of your sworn duty to base a verdict on anything but the evidence and the law applicable to this case.

Now, I think there are two parts of this case. And I don't want to in any way minimize somebody who's died, somebody who's been beaten or injured.  But this is a cold case from 2008, 2009, that should have stayed in the state court system.  But the Government chose to bring it into federal court.  And so this is a little bit different.

They cite to certain Kansas laws, but the bottom line is is that for this to be in this court, it has to jump through a lot more hoops; it has to jump through the issue about the interstate commerce; it has to jump through the issue of the enterprise.  There are a number of things that are different from just whether or not Israel Peralta died on June 8th of 2009, or whether or not there was a drive-by on October 4th of 2008, or whether there -- on June 8th of 2009 -- whether there was a home invasion.

Ladies and gentlemen, crimes occurred.  That's the first half of this case.  That's the case that the Government presented, you know, without a flaw.  They proved up crimes

occurred.

The other half of the case, though, is they didn't prove up who did it. They want you to keep looking at that screen. I mean, the judge read for an hour and a half the instructions in this case, and for the next hour we saw the same instructions up on the screen. They want you to be focused on that screen, rather than what happened in that witness box. Their entire case on who actually did this is based upon seven criminals. Four of 'em came in in jumpsuits, three in green, one in orange, and then there were three: Juan Torres, who was out on bond awaiting sentencing; Joe Galindo, who's absolutely scot-free without any charges; and Marriet Gonzalez, who's never been charged. Those are the seven witnesses that are pointing the finger at Gonzalo Ramirez and Pedro Garcia.

Now, Instruction No. 4, and this is -- and I'm going to hit some of these instructions, and I apologize because I know you've already -- you've seen 'em now two or three times, but a separate crime is charged against each defendant, this is No. 4, in each count of the indictment, and you must separately consider the evidence against each defendant on each count and return a separate verdict for each defendant.

So you have to treat Gonzalo different from Pedro and it still is under your oath, and because -- when you're

sworn as jurors, ladies and gentlemen, and this is something that I think it's maybe difficult to grasp, but -- and this isn't like you're out having coffee with a friend on the weekend.  I mean, this is a sworn duty that U.S. citizens give to our country.  One judge used to say the only service better than jury service is service to your country in the military.  And this is important business.

You heard -- and I'm not going to go through everything, but with respect to the -- the Government kept pointing out, well, you know, all these witnesses, this is really -- the judge is going to decide your fate.  We had nothing to do with it.  We didn't offer you anything.  Anthony Wright and Russell Worthey got a huge benefit.  They got their deal.  They sold their testimony to the Government when the Government chose to drop Count 3.  Count 3, ladies and gentlemen, is a mandatory life without parole.  You don't get out of prison.  There is no parole in the federal system.

Count 3 was dropped before they decided to enter into their deal.  They knew that they were going to get that mandatory life case off.  That's how serious this case is.  And they sold their testimony, Anthony Wright and Russell Worthey.  You saw 'em.  You saw all the other people that came in, whether they were in jumpsuits or not, pointing the finger.

Now, let's ask ourselves, why should we find Gonzalo Ramirez not guilty?  Russell Worthey and Anthony Wright

are pointing the finger at them.  We have those two witnesses saying that Pedro Garcia and Gonzalo Ramirez were in the back seat of that car, even though the windows were tinted, couldn't see in there.  We have their version versus Ricardo Sanchez and April Solis.  They don't have a dog in this fight, ladies and gentlemen.  They don't have a dog in this fight.  And Ricardo Sanchez, remember his testimony?  I mean, he's a 6-foot individual, very tall witness, that came in to this case.  He was looking on his surveillance cameras and said every four of those individuals that got out of that car that he saw were all his size, approximately 6 foot.

And we even had Gonzalo stand up while he was in the witness stand and said he ain't 6 foot.  I mean, he's a head shorter than me, at least.  So we're talking about somebody who physically doesn't match the description of the four assailants there or three assailants or five assailants, however many assailants, because, frankly, the witnesses that were there, Mariano Sorano or Robert Arco, who testified didn't get a good look, they just turned and ran.  So we have somebody who doesn't have a dog in this fight, who objectively is giving you evidence of who actually did it, and it physically is impossible to match my client's stature.

Then we have April Solis.  April Solis says that she sees -- and this is kind of a -- I mean, this was kind of a nail-biter.  She ends up -- she's in -- she's baby-sitting for

her friend.  Fortunately, the four children are sleeping in the back bedroom, away from where the road's at.

Could we have No. 100 pulled up?

And, remember, she's in the bedroom that's on the street.  She is in the area that is the middle road, where the gold Mazda, Anthony Wright's wife's car, had been parked, and she hears the shots.  She mutes her TV.  Remember, she's in that room where the window's actually knocked out, and she's right above her trailer hitch.  And she hears a car rolling down the road, stopping close to where her trailer's at.  And, remember, there is a lamppost, a streetlight right next to her trailer, and that car is rolling closer and closer to her, where this window is wide open.  I mean, this is pretty harrowing.

And she hears footsteps coming towards her trailer.  And she looks out, and she sees Anthony Wright driving.  Remember what she said, she goes, well, a pale individual with a 5:00 o'clock shadow.  That describes Anthony Wright to a T when he testified here.  But, anyway, and then she also said that the passenger in the front seat gets in and stuffs a gun in the console area.  She doesn't see the passenger; she can only see the console area.

We heard Detective Francis today testify about what could be seen.  He went out there to make sure she could get that good view, and sure enough, she could.  Because

remember what she said, that car drove slowly past that hitch and almost hit that hitch. That's right outside her window where she's looking at.

And why is this important? Ladies and gentlemen, Russell Worthey says I didn't have a gun. In fact, once the shots started flying, he runs the opposite direction, all the way down here and is picked up at the end of the road. Now, how can he be picked up at the end of the road, ladies and gentlemen, when April Solis is in this area here, seeing Russell Worthey get back in the car and stuff the gun in there? Russell Worthey, Anthony Wright, they're all lying, they're all lying. April Solis doesn't have a dog in this fight, and Russell Worthey wasn't picked up at the end of the road. He was in that car, and he had a gun in his hand, a revolver. He says he sees Gonzalo Ramirez with a revolver. It's Russell Worthey with a revolver. He admits that he's in the front passenger seat. Anthony Wright admits that he's the driver. He tells Russell -- or he says, he testifies, that Russell Worthey was right there next to me in the front seat. Those are the only two people seen, ladies and gentlemen. They knew they were looking at life, and so what do they do? They sell their testimony. They sell their testimony.

Now, we heard from Mr. Smith say that -- I mean, after 60 minutes of going back over the instructions -- we have this compressed time where he says -- talks about what the

testimony was, talks about the evidence.

Ladies and gentlemen, the Government may try to assume that Mr. Garcia and Mr. Ramirez were guilty. The bottom line is is that that's not your job. You have to have evidence, ladies and gentlemen. And why is there a reasonable doubt? Well, they have Joe Galindo. Joe Galindo -- and Mr. Smith said Joe Galindo, he knows all these things, he's not perfect, but, you know, he knows what's going on, and so it must have happened.

Well, ladies and gentlemen, Mr. Wachtel talked about this a little bit, you know, Fabian Neave, a puppet who testified near the end of the trial, he testified, he said, well, my attorney hasn't shown me anything, I don't have any discovery. Well, I think that's kind of hard to believe, especially when you're looking at a ten-to-life count, that you don't know anything about your own case. But he says that, oh, I have access to Pedro Garcia's transcripts from earlier hearings. Well, and then you have somebody like Juan Torres, Juan Torres, he doesn't turn state's evidence until July 1st, 2013, this summer. He's been sitting with his discovery for the last year and a half, when the indictment comes down in 2012, in April. He's had a year and a half with his discovery.

Everybody knows what this case is about. Juan Torres decides to check it in. He decides, hey, I got -- or check out of this case, I got to get whatever deal I can. And,

boy, did he get one. He got one all right. He gets -- he gets the state charges dismissed; he gets the Government to essentially give him *Kastigar* protection. There's a letter, it's a *Kastigar* letter for Mr. Galindo, but that same language is in paragraph nine of all these plea agreements. He is getting essentially not to be charged with anything stemming from the indictment, which is a four-year conspiracy. So there's a wide swath of no further charges going to be brought against you, and you get this *Kastigar* protection which says, hey, whatever you tell us in the debrief we can't use against you.

So we have somebody like Joe Galindo, who walks in there and, again, you know, there -- they put a lot of emphasis on Joe Galindo. Joe Galindo is -- I mean, he admits to you that he participated in an aggravated robbery, aggravated battery, aggravated kidnapping, and passed a lie detector, and got essentially the case dismissed. That's when he left town. He comes back four years later, but he's -- I mean, if somebody can pass a lie detector test, ladies and gentlemen, they can go ahead and lie with the best of 'em. And that's what he did, because his story is absolutely not consistent with Tito Jesus Flores, and it's not consistent with Russell Worthey and Anthony Wright.

Joe Galindo says that he ends up getting called that night -- somehow he gets called that night. This is after

the home invasion, after then, the murder -- supposedly after a home invasion that's not enough, you got to go out and commit a murder, and then Russell Worthey and Anthony Wright says, well, we dropped them off at each of their homes, Pedro Garcia's, Gonzalo Ramirez's homes, and then I went and dropped off Russell Worthey down by Wyatt Earp or whatever the name of that street is, and then Anthony Wright went home.  Okay, and that's Anthony Wright and Russell Worthey's version.  Joe Galindo says that he gets a call from my client and says you got to pick me up, this is -- this is Norte, this is, whatever, it's part of the gang thing, you got to come and get me, okay?  Now, why would they then come pick him up and drive him back to the house that Anthony Wright just dropped him off at?  And why would somebody who supposedly is involved in a murder is going to be walking the public streets late at night, out there for law enforcement to find?

He said -- Joe Galindo said that he picked up Pedro Garcia and Gonzalo Ramirez on the street.  Now, ladies and gentlemen, 1302 Avenue D and 1409 Avenue H, the former is Mr. Garcia's residence, the latter is Mr. Gonzalez' residence, five blocks apart.  You don't need to call a ride if you're out walking the streets.  You can get there in time before anybody's going to come pick you up.  Where did this thing come from?  He says that he goes and picks him up, drives him back to Gonzalo Ramirez's house where Anthony Wright just dropped

him off. And he says, oh, and by the way, Pedro Garcia confessed to the murder in the backyard. No one else hears this except Joe Galindo.

And what's interesting is Joe Galindo said after that they went over to Tito's apartment for the rest of the night and Tito was talking about the home invasion. Well, Tito testified. Tito is Jesus Flores. I keep getting them mixed up sometimes, if I say Juan Torres or Jesus Flores or -- anyway, but Juan Torres is -- excuse me, Jesus Flores is Tito. He testified. He said after the home invasion, remember, he said that I only remember one person at Garcia's house, and I know who Russell Worthey is and I know who Anthony Wright is, and it wasn't either of them that came up when the four of us went up into the backyard of Garcia's house. He said one person was there, not two, like Anthony Wright and Russell Worthey said. And then what does he say? That was the last he saw 'em that night.

If Joe Galindo drives Gonzalo Ramirez and Pedro Garcia back to Tito's apartment that night, Tito would have said that they came over that night afterwards. Tito didn't say that. He didn't say the last time he saw 'em was at the back of Pedro Garcia's house. So what we've got is we've got Joe Galindo's testimony conflicting with Tito's testimony, and Tito's testimony conflicting with Anthony Wright and Russell Worthey's testimony.

And, ladies and gentlemen, it's one thing to have some inconsistencies, given the length of time that this cold case has been sitting, but to have three major witnesses in the case essentially give three different versions of what happened on the night of the murder, they're lying, they are lying.  And there's a reason why we have cross-examination and why we have juries, because they can see these people, look 'em in the eye, these meth-addled criminals who got unbelievable deals.  They made out like bandits because they are bandits.  And if you look at those deals that they got, they got state charges dismissed, no more federal charges, they get a walk over the four-year period of the conspiracy.  They even get a motion for a reduction in sentence if they have been good-enough witnesses to satisfy the Government to file that motion.

And ultimately, yeah, the judge is going to make the decision on sentencing on those that are sentenced, but Joe Galindo, he's -- he ends up getting off scot-free.  He even got paid by the ATF.  He was getting paid subsistence.  He was getting paid because he butt-dialed somebody, and he gets to move out of the state.  And he's the one who's probably the biggest liar in here, and a professional liar, because he can pass polygraphs.

Again, I can't emphasize enough, Worthey and Wright's testimony conflicts with Jesus Flores' testimony, who's Tito, and both of those conflict with what Joe Galindo

said, on the night of most of the charges in this case, and, again, it conflicts with what we know from people who were not involved, had any interest in this case, and that's April Solis and Ricardo Sanchez.  It just conflicts.  Gonzalo Ramirez wasn't there, ladies and gentlemen.

Now, we have evidence from even Mr. Worthey admitted that, yeah, you know, I got into a fight with Gonzalo Ramirez around Christmastime, sometime earlier.  You know, that might show some bias on his part.  It might be that there was this divide that was in the DV organization or group or whatever you want to call it.  The bottom line is is that the -- we had three people, at least, testify about it.  We said Joe Galindo said that there was this -- you know, there were certain part of the group that thought that maybe I had snitched when I left town and got those charges dropped when he says he passed that polygraph.

We've got Anthony Wright, who said that there were two meetings that he was a party to, and the first one was with Jason Najera, who just lost his brother, Big Benji, to a drug overdose.  And the rule was going to be put down that no one was going to be able to use.  That didn't sit too well with a lot of people, especially with a lot of meth addicts that we saw come into this courtroom in this courtroom the last couple weeks.  What ended up happening is -- and Anthony Wright admitted this -- that the second meeting he went to is at TC's

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 813

trailer.  TC is somebody that's fairly high up.  He was Eusebio Sierra-Medrano, is TC.  And, of course, what did he say about that meeting?  Oh, they just kicked it, they just -- it was like a party, they ended up using.  TC was a big drug dealer, okay?  So the bottom line is is that there is a divide.  We don't know if it's what Anthony Wright says.  Russell Worthey says it was kind of the young versus the old, but we know that there is a schism, and there is likely a reason why people are coming in and sitting in that witness stand, throwing Gonzalo Ramirez under the bus.

And you have to decide.  Just because the Government brings people in that have that kind of criminal record, have been essentially given the farm to testify here, doesn't mean that they're testifying to the truth.  It doesn't mean that they're testifying to the truth.  You have to decide their credibility.  That's what these instructions say.  Just because the Government puts it on, I mean, you know, we all want to think that the Government is right and does the right thing and everything like this, but, frankly, from my perspective, I know better.

The bottom line is that they don't have a monopoly on the truth.  They ended up getting their version through a bunch of people because they put a fire sale out there, and they got a whole lot of ants to their picnic.  They got a whole lot of people who said, oh, well here's the time when I can go

ahead and get rid of all this stuff.  I mean, I'm looking at mandatory life without parole; I'm going to come to that table and I'm going to go ahead and give 'em what they want.  And that's what happened.  That's what happened on a lot of these witnesses.

Now, Marriet Gonzalez, she was, I'll admit, somewhat all over the place, but she was in a tight spot.  She had been protecting her good friend, Teresa Tinoco.  This is about the drive-by on October the 4th, 2008.  But ladies and gentlemen, she has consistently said -- even though she was protecting her friend, she consistently said early on that Cerda was driving that night in Gonzalo's car and that Savage was there, not, you know -- in my opinion, the evidence shows that there were five people in that car.  She said initially that it was her, Jesus Flores, who testified, that was on the drive-by, and then she said Savage was there, Cerda, his older brother, and said Gonzo, Gonzalo.  So we've got five people in what she's saying.  But then all of a sudden Teresa Tinoco comes in.  She was protecting Teresa Tinoco.  And so all of a sudden we've got a sixth player in this thing.  Now, why is Cerda driving and not Gonzalo?  It's Gonzalo's car.  Gonzalo's not driving because he's not in the car.

Do you remember what Santiago Hernandez says?  Remember, Abel Hernandez is the one who ended up getting shot in the leg at that drive-by.  Santiago Hernandez, who was

working that day, gets back in right after the incident with the beer bottles being thrown, asked about why is all the glass out there on the street.  And the Government asked about how, you know, well, what did the people around you say?  And in cross-examination I asked the same question.  And Santiago Hernandez, Abel Hernandez' brother, says they said that it was Gonzalo's little brother, Eric, that was in the car that night. Well, the car speeds off, supposedly goes to Gonzalo Ramirez's mother's house, somebody goes in, gets a gun, and comes back and shoots up the place.  Okay.

Now, again, why is there Marriet Gonzalez saying that Cerda's the driver?  If Cerda's the driver it's because Gonzalo's not in the car.  His younger brother may be, but it's not Gonzalo.  And why do we want to not believe Jesus Torres -- I'm sorry, Juan Torres.  I'm sorry, Juan Torres is the person who's admitted to being in the drive-by.  He was in the back seat.  And, remember, he's the one who comes up, in just this summer, after everything is kind of, you know, out there in the open, then he decides to cut his deal and debrief on July 1st of 2013.  And he says that, no, it was Marriet Gonzalez and Teresa Tinoco in the car, and they were in the back seat with me.

Well, ladies and gentlemen, we heard today that Jose Louis Alvarez Lopez -- I think it's Jose, but it's Mr. Alvarez Lopez testified here today that two males got out

of the back seat of that car, two males.  Not Juan Torres and one of those two girls that he says was back there with him. It was another male back there, another male as in Savage.

The person, Cerda's driving, Angel Cerda, who's the older brother of Savage, Savage is in the back seat, and those two males get out and have this confrontation with the individuals at that house at the drive-by.  So we've got Juan Torres.  And, remember, Juan Torres says that I don't know how I got to the kick-back that night at Cerda's barn, I don't know what car I went into and all that.  He had been drinking even earlier in the day, and then, of course, at the kick-back they're drinking more, all the way up until when the drive-by supposedly happens late at night.  We're talking about 11:00, 12:00 o'clock, and they're drinking before the game's even over at Dodge City.  So how are we supposed to believe what Juan Torres says when he's been drinking all day?  He's not going to get his memory back by having about another six or eight beers that night.  He's already way past four sheets to the wind and five sheets to the wind.

The bottom line is he doesn't know what went on that day.  He's in the back seat of the car.  He's the one who's got all the bravado coming out, wanting to fight these people at this place, with another male in the back seat.  But it's not Teresa Tinoco and Marriet Gonzalez in the back seat, because a second male comes out of that back seat.

So Juan Torres' testimony isn't -- and that's the, you know, it is -- that's the testimony that supposedly makes Marriet Gonzalez change her testimony, because she has to be consistent. She doesn't want to get charged. She's got that little baby. She doesn't want to get charged. And, yeah, she looked awkward on the stand, I'll grant you that. She had to essentially eat lying to that grand jury that Teresa Tinoco wasn't in that car. But everything else she was awkward on is because they were trying to make her change her story with regards to Savage and who was in that car that night. Remember, she only had one beer. She got to the kick-back and, because she was kind of floating between different boyfriends and different gangs, you know, she was kind of a -- kind of sometimes she said she was kind of persona non grata. Bottom line is she was there because of her friend Marriet Gonzalez -- excuse me, Teresa Tinoco, I'm sorry. But, anyway, bottom line is is that Santiago Hernandez, one of the -- the brother of the victim in the case, says that the people at the party that night back at that house says that it was Gonzalo Ramirez's younger brother that was in the car. And, again, according to Mr. Torres and to even Marriet Gonzalez, no one changed seats. They went over to Gonzalo Ramirez's mother's house, and then came back. And then the place gets shot up. She says the three men got out of the vehicle and the two girls stayed in the car. Juan Torres doesn't want to associate himself with

the shooting, so he says only Gonzalo Ramirez got out of the car and did the shooting.

And, again, ladies and gentlemen, all these people are highly suspect. We're talking about people who are drug-addicted. We've got somebody like Fabian Neave, I think it was, who said that the -- it maybe either -- it may be Mr. Flores, Tito, but it was either Tito or Puppet, Fabian Neave, who said that I was drinking, you know, 30-packs of beer and occasionally smoking meth back in 2008, but when 2011 came along I was drinking a bottle of Crown and doing meth daily. Ladies and gentlemen, people who do meth don't have any memory about what's going on. They are living high their entire life.

MR. WELCH: Your Honor, I'm going to object. There's no evidence of this in this case.

THE COURT: I'm sorry?

MR. WELCH: There's no evidence of what Mr. Henry just said about the effects of methamphetamine on people and meth-addled people. There's no evidence of that in this case, Judge.

THE COURT: Well, let's move on, please.

MR. HENRY: Your Honor, I'm sorry. I apologize. And I will.

These individuals that were in the witness stand admitted to selling and using meth. And when it comes to this case, the state case being brought into federal court, remember

that we have requirements regarding the enterprise.  The enterprise runs throughout this case, and there has to be a common purpose.  And, remember, the testimony, when it comes to drug transactions.  It was all for their own personal profit.  They never put anything back into the gang.  We know the gang is not part of the national organization gang.  That's why this thing is so suspect on the interstate commerce side of things.  This isn't part of the national Norteno, the Nuestra Familia, the Nuestra Raza.  And the Nortenos that are part of this hierarchical, that have a rank, they have banks.  The bottom line is we just have a bunch of wannabes who have adopted the symbols that they are a street gang in Dodge City.

Now, the Government wants to say that this enterprise is met just by that.  I would dispute that, ladies and gentlemen.  And also the enterprise has to have the common purpose, the common goal.  All the drug transactions that have been testified to by Worthey, Wright, Neave, Flores, all of it, they put the money back in their pocket, they bought clothing, they bought beer, whatever, but they didn't pay the gang.  We only had two months, supposedly, of a ledger that says a certain amount of dues were collected, and then they got seized by the raid by the police.

We don't have any evidence that anything went outside of Dodge City.  And what's interesting about this -- and this is why when it comes to the drug-selling, whether

it's, you know -- I forget if it was Neave or Flores that said that -- I think it was Neave who said that his team, the people that sold underneath him, one of them was I think Cutty (phonetic).  Cutty's not even a gang member.  These people sell to anyone they can make money.  They're in the profit business maybe, but the bottom line it's all for their pocket.  It's not for a common purpose.  It's not for the gang.  It's not for the enterprise.  And that's important because enterprise runs throughout every count of this indictment.  And that has to be met before you even get -- remember, the Court read this and the Government brought it out that really only element five is really important.  You've thrown -- I mean, the instructions say that you have to decide whether or not all the elements have been met by beyond a reasonable doubt.  You don't get to skip over one through four and number six and just look at one element.  All elements have to be met by this high standard of beyond a reasonable doubt.

And the bottom line is is that when it comes to drug -- when it comes to robbery, what happens in the home invasion?  And this is what's kind of interesting.  Anthony Wright and Russell Worthey used the term "home invasion," but yet Mr. Neave says no, it's called a kick-in or a kick door.  He says that's what the DVs call it.  Now, why would Russell Worthey and Anthony Wright use the term "home invasion" when the DVs don't even use that term?  It's because their testimony

has been so coached that they're using the same language that the agents or the Government wants them to use when they get in the witness stand. They're not even using the language of the DVs. They're using the Government's language. They have been coached, and they can be coached. The bottom line is that doesn't mean you have to buy it, doesn't mean that it's the truth.

Again, we have people that are convicted felons. You have an instruction on that. We have an instruction on people that use drugs, on using great care and caution about whether or not to decide whether or not those people are credible. We have one right after the other, reasons why you should not believe them. And that's the only evidence on the second half of this case, not that a crime didn't occur, is who did it. And that's what we're here for, ladies and gentlemen.

We're not disputing that Mr. Peralto died. We're not disputing that a home invasion occurred. We're not disputing that a drive-by occurred. The bottom line is the question who did it and why are these two people being thrown under a bus.

And after all these years that go by and all these people see the writing on the wall, they're either looking at life or whatever, and they decide, I got to cut my losses, I'm going to go ahead and cut a deal. And they're called here because their testimony somewhat, somewhat, matches what the

Government wants from the witness stand. But, again, Tito, Jesus Flores, and Joe Galindo and Russell Worthey and Anthony Wright, they give three different versions on some very important events on the night of June 8th of 2009, very important differences in their testimony. And I would submit that neither of them can be believed about who actually was with them. Who actually was with 'em, unlike Mr. Smith who said that I was going to go ahead and say that Russell Worthey and Anthony Wright were involved in the home invasion, I'm not saying that. Bottom line is that six people went in there. We don't know who it was because the one who was injured the most said that they all had masks. Bottom line is is that one -- two people supposedly have entered deals and one testified, but that's it. Bottom line is that we don't know who these other people are.

They want to put it on Gonzalo Ramirez and Pedro Garcia and, again, it just doesn't match up. Anthony Wright and Russell Worthey's testimony of what happened in the back of Pedro Garcia's house is different from what Joe Galindo says, it's different from what Tito says, and what happened later that night is just not matching up.

With respect to the instructions, ladies and gentlemen, I know Mr. Mandelman of our office is going to also discuss this a little bit, but the -- you -- there are some things that are fairly important. And when it comes to, for

example, the conspiracy counts, the instruction says -- and this is just part of the instruction, and you're going to have the whole things back there with you, but "On the other hand, proof is not sufficient if it merely shows that a defendant knew about the existence of a conspiracy or was associated with members of the conspiracy.  Rather, the evidence must show Garcia and/or Ramirez knowingly joined the charged conspiracies, or any of them, with the intent to advance their purposes."

How many people are in the DVs there in Dodge City?  You know, they charged 23, I guess, whatever, but the bottom line is that there is a lot more.  It doesn't mean that Gonzalo Ramirez and Pedro Garcia are the ones that were involved.  If they don't have knowledge, if they're not even a part of this, and I would submit that the evidence that the Government has, pointing the finger about who did this, is absolutely -- at least establishes reasonable doubt and, frankly, I would say that you shouldn't even be considering any of it, given its quality.  But there are issues here that have to be fleshed out.

The bottom line is these instructions are extremely complicated.  I'm not going to want to go through it. The judge put it in what was, I believe, the proper order, even if the Government is trying to tell you to follow some other formula.  But the bottom line is is that we've got principals

that have been ingrained in our constitution and have been used for the last well over 200 years:  presumption of innocence, beyond a reasonable doubt.

There's an instruction here with regards to the use of the plea agreements.  You cannot use the individual plea agreements as evidence against Gonzalo Ramirez or Pedro Garcia. The plea agreements can only be used as far as the issue of credibility goes with those witnesses.  That's what that's for. So you don't get to use the Government's factual basis that they created and is pretty much repetitious throughout a lot of these plea agreements.  That's not evidence against Gonzalo Ramirez or Pedro Garcia in this case.  The deals that they struck, that's evidence to decide whether or not you think that they are credible people, whether or not they came in here and told you the truth.

And what's interesting about this, ladies and gentlemen, is that, except for Marriet Gonzalez, who never was actually charged, everyone else, the six males who testified, all had been under federal indictment before they decided to sell their story.  Joe Galindo, he's under the witness-tampering thing before he ends up cutting a deal, getting out on bond and working for the ATF doing -- buying drugs until he has to get out of town.

Everyone else comes much later on.  They know the score.  These people aren't dumb.  They've got criminal

records.  They know how to play the system.  And, in fact, Fabian Neave even says, when he's talking to Lieutenant Francis -- Brooks-Francis, that he's a hustler.  I mean, these people is what the Government's backing their horse on, and the bottom line is is that -- is that it is not -- does not meet the standard of beyond a reasonable doubt.

THE COURT:  You wanted to be told when you've used 40 minutes.

MR. HENRY:  Have I?

THE COURT:  Almost.

MR. HENRY:  Okay.  Thank you, Judge.

THE COURT:  You've got one minute.  Well, it's 40.

MR. HENRY:  That's just the warning; right?  I can go beyond that; right?

THE COURT:  You can go up to the time I gave you, if you want.

MR. HENRY:  Thank you.

Ladies and gentlemen, Mr. Neave, who again was selling meth and possessing a gun while he was on bond for those few months that he was out of custody, he said that TC somehow -- and, again, the -- the drug transactions are all for personal profit, so they aren't part of the enterprise 'cause it's not going back to the enterprise, it's not going back to the gang, there's not this common purpose.  But what's kind of interesting about that, he says, one time I remember going to

Wal-Mart where TC either wired or sent a money order out to his relative in California.  Now, there'd be a record of that.  As tough and as bad as the evidence is on interstate commerce, the Government would have been all over that, to corroborate Neave's -- Fabian Neave's testimony regarding that ever happening.

They're using it as an example of interstate commerce.  Where's the proof?  Where is that proof?  That's a record that's going to be out there.  It's going to be with a bank.  It's going to be with Wal-Mart.  The bottom line is that they didn't bring it in as evidence, and it's because it's not there.  Neave made it up, just like everyone else that got on that stand and wore a green jumpsuit or an orange jumpsuit or should be wearing an orange jumpsuit or a green jumpsuit.  The bottom line is that's the type of evidence they have.  They don't have anything on interstate commerce.

They bring in guns that aren't even part of the Counts 1 through 13 that you're here to decide.  These guns don't even apply to these counts.  And they have an ATF person say that they were transported in interstate commerce at some time in the past when they got made.  They were made in Massachusetts or Georgia or China, and they had to essentially cross -- travel in interstate commerce.  Traveling in interstate commerce is not the same as having an effect on interstate commerce.  When something comes to rest in Kansas,

they have to establish something more to get over that hump. This is a federal case because they chose to bring it here. They have to meet the standards by beyond a reasonable doubt as to every one of these elements, and they can't do it.

Ladies and gentlemen, I'm going to pass the baton to my colleague, but at the end of this case I'm asking you to return a verdict of not guilty on behalf of Gonzalo Ramirez. Thank you.

THE COURT: Okay. Now I think we'll take about ten minutes. I don't know if you want to, but I do. So we'll take about ten minutes, and when you come back the lawyers will finish their argument. I'm going to tell 'em how much time they have.

(The jury left the courtroom, after which the following proceedings were had.)

THE COURT: You all can sit down. All right. Mr. Mandelman has 39 minutes if he wants to use it.

MR. MANDELMAN: I think, honestly, Your Honor, I don't expect -- I'm probably just going to talk for 10 or 15 minutes.

THE COURT: Well, I'm just telling you what you have.

MR. MANDELMAN: I appreciate it.

THE COURT: I'm not telling you to use it. And I'm telling Lanny the same thing. He's got 30 minutes. But

you all are -- need to keep an eye on this jury, because I think they're worn out.  All right.  We'll be back very shortly.

(A recess was taken from 4:45 to 4:53 p.m.)

THE COURT:  Okay, Mr. Mandelman, you're up.

MR. MANDELMAN:  Thanks, Judge.

CLOSING ARGUMENT

MR. MANDELMAN:  May it please the Court, counsel, Mr. Ramirez, Mr. Garcia, ladies and gentlemen.

Hi.  I'm not going -- I'm not going to take as much long -- as much time as Mr. Smith or Mr. Wachtel or Mr. Henry, but just got to really sorta quick -- I got a one-slide PowerPoint.  Go ahead and -- there we go.  There we go.  Okay.  Thank you.

And the Government's used an organized crime statute here, but this is not an organized crime case.  And you got the definition of enterprise.  There's a longer definition that you're going to have with you in the packet:  Common purpose, ongoing organization, personnel who function as a continuing unit and -- wow, it's flashing -- continue in an essentially unchanged form during substantially the entire period charged in the indictment.  The indictment starts in 2008, and it extends until April 16th of 2012.  What we've heard about is a few meetings in 2008 that a few people showed up to, a party at TC's that the Government's treated like it

was some sort of peace conference.  I mean, this group never got off the ground.  It never had that kind of organization. It never had the sort of structure, never had the leadership. We've seen tattoos, we've seen graffiti, we've seen alcohol, and that doesn't make an enterprise.

This group never had the sort of structure.  The collection of however much money they got in that safe doesn't make an enterprise.  Virtually any group of people could be prosecuted in federal court based on the Government's theory here.  And this definition is rigorous and it requires a little more structure than what we've seen here.  These guys were entrepreneurs, they were hustlers, they were independent contractors, but what they weren't was an enterprise.

I want to direct you to one other instruction, and that's Instruction No. 13, a pattern of racketeering activity. And Mr. Smith has suggested that basically any sort of crime could constitute a pattern of racketeering activity.  And the definition, again, a series of disconnected acts does not constitute a pattern, and a series of disconnected crimes does not constitute a pattern of racketeering activity.

Different people, different offenses, different times, different circumstances.  There was nothing at all in common with these.  You heard about a straight-up robbery, where the guys divided up money themselves.  You heard about a homicide.  You heard about a drive-by shooting that took place

nine months earlier, with totally different people. There was no organization at all. And there is no pattern in this case. There was individual crimes committed by individual participants. And I want to end by talking about those participants, and I'm not going to repeat everything that Mr. Wachtel and Mr. Henry have said, but this was pretty much a fire sale.

Mr. Henry called it a fire sale. We got seven snitches here, and this is just a straight-up snitch case. You got the paid snitch. You got Neave. He's the jailhouse snitch, right. He comes forward in June 'cause the store's open, you know, the store's open. You got the last-minute snitch. You got Jesus Torres's plea agreement. It's signed October 7th, 2013. This case never got cooked. It never got cooked. You had Neal Tierney testifying about firearms he examined during the trial. You heard Agent Gravatt say, yeah, we've been investigating crimes in Dodge City for years. His buddy, his colleague Neal Tierney, said Friday afternoon he's still looking at firearms that neither of these defendants have ever seen before, no connection to the case.

The Government decided, listen, we're in trouble here, let's throw in some guns. You get to see an SKS that they found in Eusebio Sierra-Medrano's house in July of 2010. Nothing to do with this case. This was seven snitches, guys who cut deals because they've learned how to manipulate the

system, they were facing enormous prison sentences, and this was a way home. This case is nothing but seven snitches.

Nobody talked until they were implicated. They knew who to implicate, and that's what happened here. This is not a federal case. And these gentlemen are not involved in these offenses.

I appreciate your time, your attention. We've listened to evidence for seven days. You've listened to all of us talk. You guys are smart. I'm going to sit down, and I'm going to let Mr. Welch talk to you. But, again, I appreciate your time and your attention here.

THE COURT: Thank you, Mr. Mandelman.

Mr. Welch.

CLOSING ARGUMENT

MR. WELCH: Ladies and gentlemen, I know it's been a long day, and I will keep that in mind and I will keep this as brief as possible, but there are things we have to respond to. The first is attorneys love the word "snitches." We heard that a lot, they're snitches, they are criminals. When we selected you as a jury, we told you you're going to hear from cooperators. These people are not the kind of guys you want as youth pastors at your church. We told you what they were. They're gang members. In Dodge City, Kansas, they've committed crimes, they've sold drugs, they've done robberies, they've done everything we've talked about in this case. And they're

also DV gang members with Gonzalo Ramirez and Pedro Garcia.

Sometimes you have to use one to explain one, to know one.  You and I don't know anything about how gangs operate.  They do.  And the cooperators do.  And they told you. They came in here and they told you what they did.  They told you how the gang operated.  They told you what these symbols meant.  They told you what red means.  They told you everything about how the gang operated.  And they told you that these two were also members of DV.

Now, in the end those people will be sentenced to federal prison by him.  The only person who will decide what -- how much time they get in prison is Judge Belot.  And we've heard from Mr. Henry that we coached these people to say the right thing or say how -- say things how we wanted to say it. I can't remember exactly how Mr. Henry said it.  Well, if we coached them, we did a really bad job, because at the same time Mr. Henry told you they're so inconsistent, they don't say the same thing.  Remember, he said this and he said that, and he said this and he said that.  They don't match up.

Well, if we coached 'em, don't you think we'd get it all together?  Or if they, on their own got together and said, you know what, here's what we're going to do, Anthony, Russell, let's get together and let's come up with a story. Well, if they're going to do that, they're going to make a story that matches.  And theirs don't match exactly.  But as to

the important parts of what happened at the murder, they do match. And as Mr. Smith said earlier, they do match with Ricardo Sanchez and April Solis. Now, Ricardo Sanchez is a good, hard-working man, and he was telling us what he remembers, but he was watching this on closed-circuit TV post. When he said they were all 6 feet tall, 6 feet tall. But, he told you he had no color, and it's not -- you know, you decide for yourself if you're going to really see the height of these guys when you see them for a matter of a few seconds, which is what he told us you would have seen. In the end, ladies and gentlemen, you decide the credibility of the witnesses. Did we coach them? Did we tell 'em what to say? You get to decide that. We didn't, but you can decide if I'm not telling you the truth or not. But in the end, you compare their stories and you decide if they're telling the truth.

Now, let me talk about Joe Galindo real quick. We heard a lot about Joe Galindo, the professional liar I think is what Mr. Henry called him. Now, Joe Galindo, again, was a gang member. Joe Galindo was best friends with these two men. Eleven days after the murder, Joe Galindo was stopped in a car with Pedro Garcia and Gonzalo Ramirez. Remember, there was testimony from Officer Nau about the gang sheet that he generated when he stopped Joe Galindo, Pedro Garcia and Gonzalo Ramirez in a car together, where Pedro Garcia and Gonzalo Ramirez admitted to being DV, and they're with Joe Galindo that

day.

Anthony Wright, when we're talking about Joe Galindo, Anthony Wright did not testify that he dropped these two guys off at their houses after the murder.  That's not what Anthony Wright said.  He said he dropped 'em off downtown at Dodge City.  And Joe Galindo said he picked them up walking in that area, and then they went to Gonzalo Ramirez's backyard.  And then Mr. Henry said something about, and nobody was there to hear.  Well, that's because Pedro Garcia and Gonzalo Ramirez and Joe Galindo were the only three people in the backyard that heard what happened.

Ladies and gentlemen, you also heard a lot from all three defense counsel about this being a state case, this is a state case, why is this even here?  Well, this is Kansas.  Dodge City is in Kansas, and when a street gang behaves the way this gang behaved and committed a pattern of activity like this gang did, those are federal crimes, appropriately charged in federal court.  Dodge City is in Kansas, and federal crimes that occur in Dodge City, they're going to be prosecuted here.  That's why this case is here.  And when they tell you this is state crime, should stay there, this is why Congress enacted this law, is because when we have this type of enterprise that is committing these type of crimes, it needs to be addressed in federal court.  That's why we're here.  And it's an appropriate prosecution.

Ladies and gentlemen, just now Mr. Mandelman talked to us about enterprise. And one thing he left off. He had these same three elements that Judge Belot has told us about. We have to prove these three things for an enterprise: a common purpose, an ongoing organization, formal or informal. Mr. Mandelman didn't have that part on, formal or informal. He was talking about this, you have to have all this organization. No, you don't. It can be formal or informal. And third, we have to prove that it functioned as a continuing unit over a period of time.

Ladies and gentlemen, here's what we showed you in this case. There is a load of criminal activity, which I'm going to get to here a little bit later, but murders, robberies, assaults, aggravated assaults, and drug dealing, which I'm going to talk a little bit more about here in a minute, engaged in by the members of this enterprise over a significant period of time.

In addition, we talked to you about the criminal activity to enrich themselves. We've heard many, many questions on cross-examination, and we heard it again here in closing argument, now, we didn't prove any money went to the enterprise. Ladies and gentlemen, look at those instructions. We don't have to prove that a dime went to the enterprise. That's not the law. They can say it all they want, and they can tell you and imply to you that that's what we have to

prove.  We don't have to prove that.  We have to prove that it acted as an enterprise to benefit themselves, but they don't have to benefit the gang.  We don't have to prove anything goes to the gang.

What we've proved is that they acted, one, with common purposes to enrich themselves and enrich each other. They did that by many ways, but one of the most common ways was drug dealing, that they made money for themselves, which is a violation of this law.  They made money, drug money, for each other.  Fabian Neave talked about many levels of dealers.  He bought from David Ochoa, who's DV.  He got his meth and he passed it on to Armando Maestas and others, who were also DV. They make money for themselves, and that's sufficient.  All this talk about no bank and -- that's hogwash.  We don't have to prove that, folks, and you don't have to find that.

Lastly we have to show -- what we showed as far as common purpose was intimidation of rivals and the public.  And we showed that to you over and over again.  That was their common purpose.  For example, I know you got a lot of pictures and you're tired of looking at these pictures, and there's a point in time you wonder what in the world, another picture of tagging or hand signals or tattoos.  The reason we did that, folks, is to show you the breadth of this activity, how long this enterprise has been active, how many different ways they distribute themselves or exhibit themselves.

And also when we had these witnesses who said they're DV and testified, they have to be able to corroborate that they know what these symbols mean, and what the DV means, 14, Norteno, Norte, etc. That's why we told you so much. But we heard tagging was a way to intimidate rivals to we're in your part of town or stay out of town. We also heard tats are a way of identifying yourself as a member of the DV. We also heard a display of the red clothing and also the hand signals, that is all part of the enterprise and identifying themselves as DV or Norteno and also to intimidate rivals as to what they are and stay away.

As to the organization, we showed you the following things that this enterprise, the DV, did. They had -- in order to be a member you have to be jumped in. You also had rules of conduct once you did become a member, which included attend meetings. We know meetings happened, ladies and gentlemen. You heard that from multiple witnesses, not just Juan Torres, not just Fabian Neave, not just from Russell Worthey. You heard it from many witnesses. They did have meetings.

There was an organization that was structured. There were payments made. We have the evidence of April and May, but remember Juan Torres said he testified that they purchased a gun using gang money, and we know it wasn't the $440 that was seized because they couldn't have used the money

to buy the Glocks, so they were collecting other money to buy in that case a Glock firearm.  Fabian Neave also testified that they were collecting money to buy drugs, guns, and put money on other gang members' books who are in prison.  That is to benefit the enterprise.  That is a crime committed by this gang in Dodge City, Kansas.

We also -- the rules, you heard from multiple witnesses, obviously don't cooperate with law enforcement, don't mess with girlfriends, and confront rivals when you meet rivals.  And if you violate any of those rules you are, in fact, violating it.  And you heard from multiple witnesses that violations did occur.  Beatings occurred if you broke these rules.  They had their own justice system, ladies and gentlemen.  As crude and odd as it seems to us, that's what they did.  That's how they operated.  That is organization.  That is common purpose.

And we also heard evidence if you violate -- if your transgression's bad enough you can be jumped out again, gang members.  At least one example were Juan Worthey, the brother of Russell Worthey, was jumped out because he cooperated with law enforcement.

As to the continuing unit, ladies and gentlemen, we showed you the following:  that from 2008 to 2012 the number of members remained constant.  Now, there was testimony that this gang began in the early 90s, and Agent Webb said that it

began in the '90s, and when he left to join the KBI it was still going, unfortunately.  But from 2008 to 2012 the numbers of members of DV remained fairly constant.  And also during that same time period the people -- the defendants who testified, the codefendants who testified, admitted that they were DV during that time period and also identified these two defendants as members during that same time period.

Now, we've heard a lot about interstate and foreign commerce.  First of all, Mr. Wachtel talked to us about -- he said I can't even begin to explain to you how difficult this is and how broad it is.  You know what, we don't need to rely on Mr. Wachtel to explain it to us because Judge Belot already has.

In the instruction Judge Belot told us that "interstate or foreign commerce may include the movement of money, goods, services or persons from one state to another . . . or between the United States and another country."  That's what interstate commerce is, and to affect that means that you have items, let's see, persons -- Judge Belot also told us, it can be -- yeah, money, goods, services or persons moving from one state to another or from the United States to a foreign country or the other way around.  That's what we have to prove, that there was some movement across state lines.  Now, they also -- they implied just now well we had all these guns just to try it make it look like,

you know, guns, so we'll get you excited about guns.  That's not our purpose, ladies and gentlemen.  We have to prove interstate commerce to you.  And the guns is one part of that.

Agent Tierney testified that each of these guns were not made in Kansas.  This gun was used to shoot at a rival gang member George Gonzalez.  This gun was found in the possession of Eusebio Sierra-Medrano, the man that Tim Henry described in his closing as a big drug dealer as part of the Nortenos.  And that's about the only thing Mr. Henry said I agree with.  Eusebio Sierra-Medrano TC was a drug dealer and was a DV.  This is his gun, and it wasn't made in Kansas.  This is the gun that Fabian Neave admitted he had when he was arrested for drug dealing.  That's not made in Kansas.  This rifle was also found in Eusebio Sierra-Medrano's possession, TC, not made in Kansas.

Now, this is an SKS.  Remember, Juan Torres said Gonzalo Ramirez used an SKS when he shot at the house on Fourth Avenue.  We know this is not the gun that was used, because it was tested, so that means there was another SKS semi-automatic assault rifle that belonged to this gang, because they're made in China.  This shotgun was found at the house on Fourth Avenue with the gang ledger, and the other -- the scales and the other items that you heard testimony about.

Now, this is a Mossberg shotgun.  Agent Tierney examined it and it's not made in Kansas.  We also heard when

Pedro Garcia was convicted in 2009, November I believe 2009, he was arrested with a shotgun, threatening a rival gang member, that was also a Mossberg shotgun.  And you will see in his plea agreement, which is Government Exhibit 4, that he admitted that he possessed a Mossberg shotgun.  We know it can't be this one because this one was seized in 2008.  In 2009 Pedro Garcia had another, a different Mossberg shotgun, which was not made in Kansas, in his plea agreement he admitted he had one and that he affected interstate commerce by possessing it because he was a felon.

MR. HENRY:  That's an improper use of the plea agreement according to the instructions, Your Honor.

MR. WELCH:  You can --

THE COURT:  This is argument.  Let's go ahead, please.

MR. WELCH:  Thank you, Judge.

You can look at the plea agreement and consider that there was yet another Mossberg shotgun not made in Kansas that affected interstate commerce in the case.

And I don't remember, frankly, if it was Mr. Mandelman or Mr. Henry, one of them said, and we don't have the guns that were used in the murder.  Folks, I would love to have the guns that were used in the murder, but we know what happened to the MAC-11.  We know what happened to that gun.  Pedro Garcia told Fabian Neave that he gave it to the

girlfriend and held it for Flores and Pratt. We traced that lead in Pratt and found T.J. Quint, who testified to you that I got a gun from Anjelica Flores in 2010, the same gun that Joe Rodriguez testified he sold to Gonzalo Ramirez about two or three months prior to the murder.

We don't have that MAC-11. Wish we did, but we don't. But what we do have, ladies and gentlemen, from the murder is shell casings. Now, some of you probably looked at that, when Neal Tierney was testifying, why did we need to look at every one of them, seems like a little detail maybe we didn't need. Well, ladies and gentlemen, in this case Mr. Tierney testified to you that each one of these shell casings he examined are not made in Kansas. And why is that important? For two reasons it's important. Number one, it affects interstate commerce that this ammunition crossed state lines. Number two, one of these shell casings housed the bullet that shot Mariano Sorano. One of these bullets likely housed the bullet that killed Israel Peralto. That is direct evidence these two men were connected to the murder that shell casings that they used to kill Israel Peralto and shoot Mariano Sorano affected interstate commerce, because the bullets they used caused the murder and caused the striking of Mariano Sorano.

Now, along the same line, ladies and gentlemen, we also have the shell casings from Fourth Avenue in 2008, 20

shell casings made in Russia.  And again at the time we introduced that testimony you're probably wondering, again, every shell casing, really?  The reason we do that, ladies and gentlemen, is because those are made in Russia.  They had to affect foreign commerce when they were transported from Russia to Kansas.  And, again, these shell casings, one of these shell casings hit Rumalda Hipolito and one of them hit her son Abel Hernandez.  Those are direct evidence of effect on interstate commerce in this case by Gonzalo Ramirez because the ammunition they used crossed state lines.  That's additional evidence or information you can consider as to the effect on interstate commerce.

In addition to the ammunition, in addition to the firearms, ladies and gentlemen, we also have -- or I showed you the shotgun found in the gang house in 2008, Pedro Garcia's prior conviction for the Mossberg shotgun.  We also have testimony about three Glock handguns.  Now, to be fair, it could be one Glock handgun.  We don't know.  There's one, two or three.  And here's what I mean by that.  We had testimony from Anthony Wright that Pedro Garcia had a Glock handgun.  He knows that because he saw it in Mr. Garcia's house.  We also heard testimony from Joe Galindo that he used a Glock handgun in an assault, a drive-by shooting, of a rival Sureno.  And we also heard testimony from Juan Torres that the gang used gang money to purchase a Glock handgun.  Glock handguns are not made

in Kansas.  And, again, I don't know if there's one gun or three guns, it doesn't matter.  There's an effect on interstate commerce by the gang using these three guns.  The MAC-11 I've talked about already.  Jesus Flores said he'd seen Pedro Garcia with the MAC-11.  And then we already talked about, Mr. Smith and myself, we both talked about the testimony concerning the gun going from Joe Rodriguez to Gonzalo Ramirez, and to Anjelica Flores and then to T.J. Quint.

We also had testimony from Mr. -- from Fabian Neave that this is Jose Ochoa, Jr., known as Taz.  This is the man that he threatened to leave Dodge City so he would not testify in the case against himself and Jesus Sanchez, known as Drac.  That is movement from Dodge City, Kansas, in this case to Mexico across state lines, which affects interstate commerce, ladies and gentlemen.

We also have testimony from Joe Galindo, that he sold drugs with Eusebio Sierra-Medrano, and on one occasion he paid money to California, wired money to California, as did TC, payment for drugs that had been received by TC in Dodge City, Kansas.

We also had testimony that TC was a source, TC's family, was a source of methamphetamine for Pedro Garcia, methamphetamine that Pedro Garcia -- excuse me, yeah, that Pedro Garcia received in the mail in bubble wrapped packages from Eusebio Sierra-Medrano's family.  That is movement from

drugs to California to Kansas through the interstate commerce.

We also had evidence from Joe Galindo, who testified that he participated in an assault of Surenos in Dodge City, Kansas, with DV gang members from Texas. They came to Dodge City, they participated in the assault, and then one or two of the DV gang members from Texas actually got jumped in that night after the assault on the Surenos. The travel from Texas to Dodge City is further example of an effect on interstate commerce. Mr. Smith talked earlier about this is Isidro Raleas-Velasquez, of course. He testified that he lost $800 during the robbery, money that he would have wired to his family, just a portion of which he would have wired to his family down in Guatemala, which he was unable to. That's an effect on interstate commerce, money that he would have wired, that he wasn't able to wire because it was stolen from him.

Ladies and gentlemen, we also have evidence from Mariano Sorano and Roberto Arco that they left Dodge City, went first to Nebraska, and then to Atlanta, Georgia. And the reason they left was because they felt if they stayed in Dodge City they would be killed. This was the direct result of the enterprise's effect on interstate commerce, which is what we have to prove, that the enterprise affected interstate commerce, not that they did, but the enterprise's effect on interstate commerce resulted in these two men leaving Dodge City because they felt if they didn't they would be killed.

Now, as to the enterprise racketeering activity, very quickly, these are the crimes that we showed you.  And this is evidence of the enterprise and the continuing ongoing organization of the -- and the continuity of the enterprise.  First of all, Mr. Neave testified about the robbery he committed with Jesus Sanchez and, again, Taz, who he had leave town.  That was in July of 2008.  October of 2008, of course, is the shooting that occurred on Fourth Avenue.  April 28, 2009, there was testimony from Mr. Galindo that he and Jesus Sanchez committed the shooting at Jose Alvadrez-Barava (phonetic), known as Toro, who was a rival Sureno gang member.  The motive in this case was to intimidate rivals, Surenos, which Mr. Galindo testified about.  We also had the distribution by Mr. Gonzalo Ramirez.  And this is a racketeering act, ladies and gentlemen.  We don't have to prove that Gonzalo Ramirez sold guns for the enterprise; it's enough that he sold drugs for himself, to enrich himself.

We also have the murder on June 8, we have the robbery on June 8 of 2009.  We also have another distribution in June of 2019 by Gonzalo Ramirez, again in November 2009 by Gonzalo Ramirez.  This is the assault by Pedro Garcia and Antonio Flores in November of 2009 where another Mossberg shotgun was used to intimidate rival gang members -- excuse me, to intimidate people not to testify against DV gang members in Dodge City, Kansas.

Then we also have the robbery which Joe Galindo admitted he did with a man named Trey Edwards, a fellow DV, that was a robbery of Guatemalans.  Remember, Galindo testified about punching Guatemalans, as did Trey Edwards, during the robbery.  Then we also have an assault with a dangerous weapon by -- this is when Joe Galindo and Eusebio Sierra-Medrano were at East Love and the -- Eusebio Sierra-Medrano ended up stabbing a rival gang member known by the gang name of Frosty.

We also presented evidence of the shooting of George Gonzalez, a rival gang member, in March of 2011, and then distribution of methamphetamine by multiple DVs, some of which testified here in court that they were distributing methamphetamine as DV gang members, and that they distributed it with others, including Pedro Garcia, Gonzalo Ramirez, Anthony Wright, Fabian Neave, Juan Torres, Joe Galindo, Eusebio Sierra-Medrano, Lupe Amaro, Humberto Ortiz, Jose Luna, Jesus Torres, Armando Maestas, Carlos Maestas, David Ochoa.  On this list, Humberto Ortiz, there's testimony he's LCC.  Everyone else, the testimony was, the rest were DV gang members, and they were distributing methamphetamine from the period 2008 to 2011.  Now, Pedro Garcia and Gonzalo Ramirez were not distributing in 2010 and 2011, 'cause they'd already gone to prison, but these others testified that they were continuing distributing methamphetamine during that time period.

If you put it altogether, ladies and gentlemen --

and there's other crimes that we presented testimony on but, frankly, I couldn't get it on one screen -- this shows a pattern of activity by this organization.  This shows a continuing continuity of the organization.  It also shows the common purpose of the organization.

MR. HENRY:  Your Honor, I'm going to object to this because there have been a number of things that he has mentioned that have not been brought into evidence by this court or have been ruled on by the court.

MR. WELCH:  I don't -- with all due respect, Judge, I don't believe that's true.

THE COURT:  Well, all I know is that I've told the jury what argument is and it will be up to the jury to decide whether things that are being talked about in argument that are not evidence.  This case -- it's now 5:30 at night.  This case has gone on for two and a half weeks.  We've had 40 or 50 witnesses, and we're not -- I'm not in a position now to start parsing out whether a specific person or someone else mentioned in argument was or was not talked about during the evidence. But having said that, you have five minutes.

MR. WELCH:  Thank you, Your Honor.

Ladies and gentlemen, Rumalda Hipolito and her son Abel Hernandez were shot in June 2008 because Gonzalo Ramirez and the people with him that night, specifically Juan Torres and Angel Cerda, believed that those people lived at a Sureno

house.  There was testimony they believed Abel Hernandez was a Sureno.  The motive for that crime was gang-related.  The motive for that crime involved -- remember, Gonzalo Ramirez was the driver of the vehicle, and beer bottles were being thrown at his car.  If Gonzalo Ramirez didn't respond to that, he would have run the risk of losing face with his rival gang -- excuse me, with his fellow gang members.  If he doesn't respond to that, ladies and gentlemen, he could risk his position within DV.  So in response to that, he goes and gets a gun and fires into the house, striking Rumalda Hipolito and Abel Hernandez.  Ladies and gentlemen, that is direct evidence of the crimes being committed -- the violent crimes being committed to maintain or increase their position within the gang, which we have to prove to you, ladies and gentlemen.

The same is true for the murder which occurred on June 8, 2009.  You heard testimony that the reason they went to south Dodge City and to that trailer park was to look for scraps.  That was their motivation when they went there.  And they went there with firearms, and they went there -- there was no provocation by the four men at that location.  This wasn't a robbery.  The only thing said, as these guys came around the corner, was "puro norte" or something to identify themselves as Norteno.  That was a gang-motivated crime as well.  And the result -- unfortunately, the result of these crimes was, in addition to the murder, of course, and the assault of these

Appellate Case: 14-3006  Document: 23-2  Date Filed: 04/01/2014  Page: 850

people, was it worked.  Because we heard from Juan Torres that after he watched Gonzalo Ramirez commit this shooting, he was scared of Gonzalo Ramirez and he feared Gonzalo Ramirez, and he gained greater respect in his eyes because of the shooting.

And we heard lots of testimony that that's the type of thing that gains you respect within DV, was shootings, and especially shootings at rival gang members.  In addition, it worked on June 8, 2009, when these two men participated in the murder of Israel Peralto, because we heard from Anthony Wright and Russell Worthey that they then saw what happened and they gained greater respect for these two men because of the shooting.  And the first thing Pedro Garcia and Gonzalo Ramirez did after the murder was they go to Joe Galindo and they tell him, "A scrap died tonight."  Pedro Garcia said that, not Gonzalo Ramirez, "A scrap died tonight and I shot him in the back."  And that's exactly where Israel Peralto was shot.  Now, either Joe Galindo did the murder himself or he talked to the man who did, because that's a detail that only a murderer would know.

Ladies and gentlemen, these were gang-motivated crimes.  These men acted to further maintain or further their positions in DV, and we've proven to you that it's an enterprise and it was an ongoing, the continuity, the long list of gang activity and gang crimes committed by these defendants in Dodge City, Kansas.  This is a federal case.  We ask you to

return a verdicts of guilty as to each count charged against these two defendants, because the evidence has proved they're guilty and this case is being prosecuted exactly where it should be.  Ladies and gentlemen, thank you very much.

THE COURT:  Do either the Government or either of the defendants have any additional requested instructions or any additional objections to the instructions given?

MR. WELCH:  The Government does not, Your Honor.

MR. WACHTEL:  Not additional.

MR. MANDELMAN:  No, thank you, Your Honor.

THE COURT:  All right.  Well, it's been a long day.  It's 5:30.  But I think it's important for you all to hear the arguments altogether.  And if you thought the arguments were too long, you're blaming that on me, because I'm the one who says how long they have to argue.  So get mad at me if you want; don't get mad at the lawyers.  They're doing their job.

Now, I'm going to excuse you.  This case is ready for you at this point.

Yes, sir?

JUROR ███████:  Sorry, Judge, but I'm a little unclear.  The alternates, are they excused after tonight or do we --

THE COURT:  No, I was just about ready to tell you that, Mr. ███████.

JUROR                  :  Oh, okay.

THE COURT:  I want all of you to come back tomorrow.  It may be, and probably will be, that the 12 regular jurors will be here and ready to deliberate, but if something should happen overnight and somebody is not -- somebody's in a car accident or something like that, then one of the alternates will have to take over.  So you may not be here very long tomorrow, but I do want you to return.

Now, of course, the admonition goes back into effect.  And your first decision before you leave tonight is you decide what time you want to come back tomorrow.  I would suggest 9:00, but if you want to come in earlier or a little bit later, then that's fine.  And when you all get here, all right, if all 12 of the regular jurors are here, then I want you to tell Mr. Lahey or Ms. Silva or Robert, and I will then excuse the two alternates.

Now, just a couple of last instructions, 'cause I won't see you tomorrow morning, in all probability.  You are in charge of your deliberations.  You are to take how much ever time you need to reach your verdicts.  We don't put time limits on jury deliberations, but there is, with respect to the admonition, I do not want you deliberating unless all 12 of you are in the jury room.  The reason for that is that you're entitled to each other's opinions about the case, and some people are going to be going out to the rest room or wherever,

Appellate Case: 14-3006 Document: 23-2 Date Filed: 04/01/2014 Page: 853

and if they're gone, then they're not contributing and they don't hear what the other people have to say.

Now, tomorrow we'll bring the evidence in to you so you will have it in the jury room. And with that, thank you very much. You're excused. I'll see you all tomorrow morning, or I may not see you, but I'll see you sometime tomorrow.

(The jury left the courtroom, after which the following proceedings were had.)

THE COURT: What do you all want to do about all of this evidence that's up here?

MR. WELCH: Your Honor, we'll certainly take the guns with us tonight. If you want us to take everything, we'll take everything and bring it back tomorrow. Whatever you want to do.

MR. HENRY: Your Honor, if the court's locked up, it could just stay here and then go back to the jury room when they've all convened. I was going to ask, do we need to be here for the excusing of the two alternates?

THE COURT: Not unless I call you.

MR. HENRY: Okay.

THE COURT: The courtroom will be locked. Of course, someone will come in and clean it, but I'm not worried about that. But I do think the guns should be taken back by the Government. The rest of it's just paper, pictures, and stuff like that. All right.

Now, one last thing. You've seen the modification that I did to the verdict forms. Any problem with that modification?

MR. WELCH: Not from the Government.

MR. WACHTEL: I don't have a problem.

MR. MANDELMAN: I mean, it was our view that the Government wasn't entitled to second-degree instruction, so just insofar as that.

THE COURT: Yeah, but --

MR. HENRY: That's reserved.

THE COURT: In the end you may want to know whether it's first or second degree. I'm not saying that you will, but you will. You'll know if your client's found guilty on Count 3, and I'm certainly not suggesting that he will be.

MR. MANDELMAN: Sure, sure. Thanks, Judge.

THE COURT: Thank you very much. I'll see you all tomorrow.

MR. WACHTEL: Yeah, I'll get my cell phone number over to your office tomorrow, Judge.

THE COURT: Okay.

(Whereupon, the proceedings were adjourned at 5:32 p.m.)

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 18th day of March, 2014.


 s/ Johanna L. Wilkinson
Johanna L. Wilkinson, CSR, CRR, RMR
United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS


UNITED STATES OF AMERICA,           )
                                    )
                         Plaintiff,) District Court
                                    ) Case No. 12-10089
vs.                                 )          -02
                                    ) Circuit Court
PEDRO GARCIA                        ) Case Nos. 14-3006
                         Defendant,)          14-3039
                                    )
_____


**TRANSCRIPT OF MOTION HEARING**


        On the 4th day of March, 2013, came on to be heard
Motion to Suppress in the above-entitled and numbered
cause before the HONORABLE MONTI L. BELOT, Judge of the
United States District Court for the District of Kansas,
Sitting in Wichita.


APPEARANCES

        The Plaintiff appeared by and through Mr. Lanny
Welch and Mr. Aaron Smith;

        The Defendant Garcia appeared by and through Mr.
Val Wachtel;

(Beginning at 2:50 p.m. March 4, 2013, the following proceedings were held.)

THE COURT:  This is United States against Pedro Garcia.  Case number 12-10089.  Lanny Welch and Aaron Smith are here for the Government and Mr. Garcia is here with Val Wachtel.

Mr. Garcia has filed a Motion to Suppress. Government has responded.  And when I reviewed this yesterday getting ready for today, all I saw in here was there was a warrant search.  Now, I've got the warrant, application for the warrant, and what appears to be a transcript of somebody's testimony before Judge Hampton, state judge out in Dodge.  I take it, Mr. Wachtel, you don't disagree that there was a warrant?

MR. WACHTEL:  No, Your Honor.  I don't disagree with that at all.

THE COURT:  So you've got the burden here.

MR. WACHTEL:  Well, actually, I reckon I do. So by way of -- I'll make an opening statement if you'd like.

THE COURT:  I will because you know, ordinarily, it's pretty difficult to overcome a search warrant.  I'll listen to anything you have to say or any evidence that you might offer.

MR. WACHTEL:  Your Honor, I understand that it's a difficult burden to overcome.  Might inform the Court that what prompted this to be filed was what was received in discovery from the Government, which was its testimony of a Dodge City police officer who testified to get this warrant rather than executing an affidavit.  That particular testimony, you have a complete transcript of it, Judge, today.  I think they gave that to you.

THE COURT:  Well, I think I do.

MR. WACHTEL:  What we had was this, Your Honor, which is completely blacked out on a number of pages.  We don't know whether there's probable cause or not.  We think perhaps there is not.

THE COURT:  Well, mine doesn't have any blacked out pages.

MR. WACHTEL:  No, Your Honor.  I have a copy that does if you would care to take a look at it.

THE COURT:  No, I'll accept your -- but you know I have an unredacted transcript, apparently, of everything that the officer said before Judge Hampton.

MR. WACHTEL:  I reckon you do, Your Honor.  I got mine at 2:00 and have not completely read it.

THE COURT:  Well, why don't we each take -- let's take a little recess and we'll each read it.

Okay.  Because I didn't get mine until -- I didn't even get mine until five minutes ago.

MR. WACHTEL:  I think that's a good idea, Judge.

THE COURT:  All right.  We'll do that.

(Recess.)

THE COURT:  Okay.  I have read the transcript of the testimony before Judge Hampton on October 18, 2010, which apparently -- not apparently -- based on which he authorized the search warrant of 1302 Avenue D in Dodge City, which is the basis of the Defendant's Motion to Suppress.  Mr. Wachtel, I will listen to any argument that you have with respect to the adequacy of that testimony.

MR. WACHTEL:  That would be fine, Your Honor. Before we start, the Government has indicated it's willingness to stipulate that commencing on or about June 8 of 2009 --

MR. WELCH:  No, Val --

MR. WACHTEL:  November -- I'm sorry -- November 8 or 9th, 2009, my client was in federal custody on a federal crime and remained in federal custody and then before he was brought back here today, he was still in federal custody.

MR. SMITH:  Your Honor, if I could just make

some small corrections.  He was taken into custody in November of 2009.  I believe he made his federal first appearance in February of 2010; but he was in custody, as far as we know, from November 2009 forward.

THE COURT:  All right.

MR. WACHTEL:  I'm prepared to make argument to the Court.  This case -- my issue with regard to this search warrant is not so much that there was -- that there wasn't sufficient testimony provided, but that that testimony and the issuing of the warrant was stale. The crime -- this warrant appears to be based on the home invasion crime that we heard about when we were here on the James hearing.  That happened in --

THE COURT:  June 8, 2009.

MR. WACHTEL:  I'm sorry.  I picked up the wrong --

THE COURT:  Right?

MR. WACHTEL:  Yes, that is right, Your Honor. June 8, 2009.

THE COURT:  Okay.  Now, your client was not in custody at that time?

MR. WACHTEL:  No, sir, he was not.

THE COURT:  Okay.

MR. WACHTEL:  He was in custody when the warrant was applied for and when it was executed.

THE COURT:  Yeah, that's what the judge noted.

MR. WACHTEL:  Yes.  And he had been for sometime.

THE COURT:  Okay.

MR. WACHTEL:  And my whole issue is, Your Honor, that this warrant is stale.  You figure that out by looking at what it was they wanted to file and that is really set out more specifically in the first page of Exhibit 1 which commences the following particularly described items are contraband or evidence or fruits or instrumentalities of said crimes.  And then it lists, any gang attire, including but not limited to red bandanas, and items with Norteno gang association, whatever that means.  Photos, drawings, gang roll calls, et cetera, any documents, photographs, mail, bills or other personal or business items indicating the identity of the persons residing in the location.

So what they were looking for, in addition to the identity of people residing at the location, were evidence of gang membership of my client.

THE COURT:  Right.  I --

MR. WACHTEL:  Excuse me, Your Honor, I'm sorry.

THE COURT:  I gathered that.  Because this -- your client lived -- this is, as I understand it, is

your client's parents' house but he lived there.

MR. WACHTEL:  He lived in the basement and his brother Roque, R-O-Q-U-E, lived upstairs along with the rest of the family.  But my point is this.  You can look all you want at the -- at the testimony given to get the search warrant and you'll find almost nothing about gangs.  There's no testimony about Pedro Garcia being in the same gang or even a related gang to whatever gang Gonzalo Ramirez might have been in.  The same is true about Mr. Galindo who's mentioned in that.  The same is true about Mr. Worthey, Mr. Wright, the Florez brothers.  There's no mention that these people were necessarily in the same gang or that they were all in any gang.  So if you're looking for probable cause that gang related information might have been in Mr. Garcia's residence, they haven't provided any.  So I think it fails at least in that regard.  Also I think it's stale, given when it was -- when the application was made with respect to when the alleged crime occurred.

THE COURT:  Approximately two years and four months later.

MR. WACHTEL:  Approximately that.

THE COURT:  Okay.  Well, I haven't looked at the law lately on what a stale --

MR. WACHTEL:  Your Honor, I didn't provide

that to you because I wasn't sure. I'd be happy to provide you with the law on staleness. I can tell you this. It's not terribly helpful because it seems to be determined on a case-by-case basis. And there's a lot of talk in those opinions about ongoing crimes, whatever that means.

THE COURT: Well, maybe that would be the best thing would be, if that's your argument, you can present a -- I'm hesitating here because I'm looking at your motion. There's no authority in your motion about staleness.

MR. WACHTEL: No, Your Honor, there's not.

THE COURT: So you can supplement your motion with any authority that you want to make in support of your motion now that we've all had the basis of the entire testimony. The Government can respond to it. And I'll make a ruling.

MR. WACHTEL: And when would you want that submitted, Your Honor?

THE COURT: Whenever you have time, Val, now that you're still representing Mr. Huato --

MR. WACHTEL: I understand that I am doing that, Judge.

THE COURT: How much time do you need?

MR. WACHTEL: I think a week, ten days.

THE COURT:  There's nothing happening in this case that would -- that I could think of that would cause me a problem with that period of time.

MR. WACHTEL:  If it's all right with the Government, then it's all right with me.

THE COURT:  Let's fix a date though.  Today is the 4th.  Can you submit whatever you need to submit by the 15th?

MR. WACHTEL:  Yes.

THE COURT:  Friday the 15th.  Lanny, how much time would you like to respond?

MR. WELCH:  Two weeks, Your Honor, if we could have it.

THE COURT:  All right.  The Government respond by the 29th.  Oh, that's Good Friday.

MR. WELCH:  I do my best, Judge.

THE COURT:  Then I'll take it under advisement and I'll get you out a ruling.

MR. WACHTEL:  Thank you.

THE COURT:  I guess -- I don't want to shortcut this if it's not warranted, but what is it that was found in the search that the Government would want to introduce?

MR. WELCH:  Your Honor, there was gang graffiti on the walls in the basement of this house that

we believe we would want to offer as evidence and that knowledge was gained during the execution of the search warrant. As far as --

THE COURT: Is that -- let's look at the items on the return. Is that number 11? Wood clipboard with gang graffiti written in red ink.

MR. WACHTEL: I looked at those pictures today, Your Honor, and I suspect that's what that is.

MR. WELCH: Your Honor, it may be; but it's my understanding actually on the walls of the residence there was gang graffiti which was not -- could not physically be taken as part of the search warrant.

THE COURT: Did they take a picture of it?

MR. WELCH: I'm sure they did, Judge.

THE COURT: Well, in your response, please describe out of the, either the return or whatever, the pictures that were taken, the items that the Government believes it would like to submit at trial and that will help me anyway.

MR. WELCH: We will, Judge.

THE COURT: There's some in here that, unless St. Ramone, who I've never heard of, is the patron saint of the Nortenos or something like that, then, what the heck. All right?

MR. WELCH: Yes, sir.

THE COURT:  Thank you.

MR. WACHTEL:  Thank you, Judge.

(Adjourned at 3:28 p.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 4th day of February, 2014.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS


UNITED STATES OF AMERICA,          )
                                   )
                        Plaintiff,) District Court
                                   ) Case No. 12-10089
vs.                                )          -02,03
                                   ) Circuit Court
PEDRO GARCIA &                     ) Case Nos. 14-3006
GONZALO RAMIREZ, et al             )          14-3039
                      Defendants,)
                                   )
_____


**TRANSCRIPT OF MOTION HEARING AND STATUS CONFERENCE**

On the 12th day of September, 2013, came on to be heard Motion and Status Conference in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.


APPEARANCES

The Plaintiff appeared by and through Mr. Lanny Welch;

The Defendant Garcia appeared by and through Mr. Val Wachtel;
The Defendant Ramirez appeared by and through Mr. Joel Mandelman and Mr. Tim Henry;
The Defendant Jason Vargas appeared by and through Mr. Mark Sevart.

(Beginning at 1:30 p.m.

September 12, 2013, the

following proceedings were

held.)

THE COURT:  This is United States against Jason Najera and others.  12-10089.  Lanny Welch is here for the Government.  Why don't we have the Defendants' appearances.

MR. WACHTEL:  Pedro Garcia in person and by Val Wachtel, Your Honor.

MR. MANDELMAN:  Joel Mandleman and Tim Henry for Gonzalo Ramirez, who is here in person.

MR. SEVART:  May it please the Court.  Jason Vargas appears in person and represented by myself, Mark Sevart.

THE COURT:  Thank you.  What I want to do today is kind of get us ready for the trial so that you all have plenty of time to prepare and we'll have plenty of time to prepare.  And this is kind of an informal session.  I'll give you my thoughts on some things and then if you all have anything that concerns you and, of course, I know there's some pending motions and I'll get those ruled on, obviously.  If you feel you need to make any oral argument on any of them, I have them up here and I'll listen to anything you have to say.  We'll

start the trial on the 2nd, as you know.  Right now we have, I think, 60 jurors who have been summoned in who have not sought to be excused.  I think you've all seen the letter that I sent out to the prospective jurors; and while I don't think I'm required to do this, I've made available to you copies of the responses from prospective jurors asking to be excused.  And you're welcome to go through those.  I haven't made a decision on them yet.  You're welcome to go through them here in the courtroom.  I don't want you taking them out of the courthouse.  If you feel that there are any in there that you don't think should be excused, you can make a note of it and give it to Rachael and I'll take a look at it.  But right now, with three defendants, I believe with the 60 that we have coming in and with -- probably since everything about this case is Dodge City and we don't have any jurors coming from Dodge City, I would think that 60 would be enough.

The rule says that all -- that the defendants together get ten peremptory challenges; but I can increase that, and I will increase it.  I'm going to give each Defendant four peremptory challenges and the Government gets six.  So what we have is twelve and six. The Defendants can exercise those individually or together, however they want to get together and do it.

I will let the lawyers question the prospective jurors in a case like this.  But I like to do a lot of it myself because I think it goes quicker.  So what I'd like for you to do is, by next Friday, which will be the -- no, that's too soon.  I don't need them that quickly.  By the 27th, which is two weeks from tomorrow, would you please just submit any proposed voir dire questions that you want me to ask and exchange those and I'll look them over.  But, you know, I'd like to be able to get a jury fairly quickly and I know you would, too.

Once we get the jury, I'm not going to -- I always hesitate about this, about letting the lawyers make opening statements and not putting any time limits on; but this is a serious case and two of the Defendants particularly are charged with very serious offenses and facing a lot of time if they're convicted, so I won't put any time limits on the opening statements, assuming that any of the Defendants want to make opening statements at the beginning of the trial and that's, of course, up to the Defendant.

Do you, Lanny, do you anticipate that the Government is going to have a bunch of exhibits that it will use during the trial?

MR. WELCH:  During opening statement?

THE COURT:  Well, yes, during opening

statement.

MR. WELCH:  Yes to both, Judge.  Obviously, a smaller number for the opening statement; but as far as the number of exhibits for trial, I would guess because there's a lot of photographs, Judge, I would guess 300 total exhibits, somewhere in that neighborhood.

THE COURT:  If you're planning on using exhibits during opening statement, please let the defense counsel know what you're going to use so that if there's some objection to them I can take that up and you all can file something rather informally objecting to any particular exhibit.

Are we going to need any special technology for any of this?

MR. WELCH:  Judge, the elmo; and then Deb has to be here running our equipment for us, so I think between the two, we should be good.

THE COURT:  All right.  Is the arrangement that we've got here for counsel table acceptable to you all?

MR. WACHTEL:  It is to us, Your Honor.

MR. SEVART:  It is, Your Honor.

MR. MANDELMAN:  Yes, Judge.

THE COURT:  All right.  During the trial we'll move the podium over to that position between the

government table and kind of the edge of the jury box because in past cases I've had complaints -- not complaints -- but comments from the jurors that if it's there, they can't see the defendants and defense counsel.

You know that we'll -- my intent is to have the case go from Tuesday through Fridays so that we can keep Monday for our usual criminal day.  And I think that's probably enough, four days a week for the jury is probably enough in a case like this.

Now, we've lost this one Defendant.  Lanny, what do you think in terms of how long the case might take at this point?

MR. WELCH:  Judge, my best guest as far as the Government's case, I think we're still looking at probably, trial days, I would say ten to twelve trial days.

THE COURT:  Okay.  That's kind of what -- do you all have any thoughts about it?  Val?

MR. WACHTEL:  I don't know, Your Honor.  May I remain seated, Your Honor?  Is that okay?

THE COURT:  Yes.  There's no reason for you all to be getting up unless you want exercise.

MR. WACHTEL:  No, sir.  I had enough of that in the last week and few days.  I think they're about

right.  I cannot project exactly how many witnesses we might call.  I expect one and that won't take a heck of a long time.

THE COURT:  Joel, what do you think?

MR. MANDELMAN:  I think that's about right.  I do think some of these witnesses could individually take a long -- some of these individual Government witnesses might take a while; but I think that number is probably about right.

THE COURT:  Okay.  Mark?

MR. SEVART:  I would agree.

THE COURT:  Okay.  In that letter that you all have seen, I told them three to four weeks and so they won't be surprised or shocked if it's three to four weeks.  And, you know, you all have tried so many cases in here before me, you know, I mean, my rules are that I want to fill up the trial days as much as possible.  I think that if we quit at 2:00 in the afternoon, you know, the jurors may -- and have to extend it out, the jurors may wonder what the heck's going on.  But I'll be reasonable about that.  Obviously, if we run out of witnesses, we run out of witnesses and I tell the jury that it's my fault, and it is my fault probably.  And they seem to be able to deal with that.

I've not tried a RICO case before but I know Lanny

has and Val has at least.  Mark, were you in on that one upstairs?

MR. SEVART:  Your Honor, I was not in the trial.  I was involved but from a different standpoint.

THE COURT:  Tim, were you in that upstairs?

MR. HENRY:  No, Your Honor.

THE COURT:  Well, it would be very helpful to me if by the 27th you all could get in any proposed instructions.  I don't mean the whole set, you know that, because you know what my standard instructions are.  But in a RICO case, or any case like this where there are a lot of counts, I've got to tell the jurors what the case is about and I hesitate to read the Indictment to them.  I'm going to have to summarize it somehow.  And requested instructions may be helpful in terms of summarizing the case and letting the jury know what it's about.  And it will certainly be helpful to us in getting instructions prepared for the end of the case.

Those are just my general thoughts about it. Lanny -- we'll start with Lanny and then we'll go down the row here.  Have you got any concerns that you think need to be raised at this point?

MR. WELCH:  Judge, I don't.  I was not involved in the RICO trial upstairs.  I was certainly

familiar with it; but just to clear the record, I was not actually one of the people that tried that case.

I did want to put just two things on the record real quickly, Judge.  We -- if there's any reciprocal discovery, we would ask for it.  We haven't received any but I don't think we've asked for any.  So, for the record, we would ask for it.

THE COURT:  You'll get it.

MR. WELCH:  We've also filed notice of alibi and we've received a response from Mr. Sevart.  We did not receive anything from Mr. Mandleman or Mr. Wachtel.  Which, that's fine.  Just wanted to make sure that's --

THE COURT:  Well, you know, if you ask for it, the rule says the defendants have to do it.  They know the rules.  If they don't do it, then they better not get up and say they have an alibi.

MR. WELCH:  The last thing, Judge.  I don't have any argument on the motions.  I'm confident in our responses.  But I did just -- I think to clarify two issues, if I can, Judge.

THE COURT:  Yeah.

MR. WELCH:  I gave these photographs to defense counsel already.  Regarding our disclosure, we don't intend to offer everything in that disclosure that we initially disclosed.  What I have -- is if I can

approach, Judge.

THE COURT:  Yes.

MR. WELCH:  I modified the initial disclosure to just these three Defendants and then the highlighted events are the ones that we would intend to go forward with.  So if it's not highlighted, we don't intend to offer evidence on that.

The photographs, Judge, if you're ready for that. Briefly, there's the issue about the gang tattoos.  The tattoos that we would intend to offer would be only those that are what we consider visible tattoos. Gonzalo Ramirez I know has a tattoo on his chest, which is Nuestra Familia.  We would not offer that because that's not a tattoo that's generally visible to the public.  But, these tattoos, photographs we have, would be the ones we would intend to offer, Judge, as to these three Defendants because we believe they showed gang membership and also they're visible to the public.  Now, the second photograph, this photograph I'm holding up, Judge, I know it's difficult to see, but Pedro Garcia has some very small tattoos on his forehead which are X and 4 which we believe shows his membership in the Nortenos.

THE COURT:  Okay.

MR. WELCH:  With regard to Gonzalo Ramirez,

Mr. Mandleman, I thought, raised a concern.  There are a couple two or three photographs which had his client in handcuffs.  We are more than willing to take new photographs in which he is not in handcuffs and substitute those for these photographs.  The point, of course, is just to show the tattoos.  We're not trying to show that he was in jail or in custody at the time the photographs were taken.  But, in particular, the X and the IV photographs where his left hand, left wrist, is handcuffed; and then the N-E-N-E 14 in the webbing of his left hand, Judge, there's obviously handcuffs visible in that photograph.  We would be willing to substitute a new photograph for those if the Court desires us to do so.

THE COURT:  What about the one here that doesn't show him in handcuffs but shows the handcuffs on the bench?

MR. WELCH:  Same thing, Judge.  We would be more than happy to take a picture of just the tattoos in a different setting so there's no handcuffs.

THE COURT:  What's your take on that, Joel?

MR. MANDELMAN:  Uhm, well, the the law here is a little -- is a little bit cloudy.  There's no Supreme Court case or no Tenth Circuit case about the tattoos. The Government did cite some cases whether or not these

violate his right against self incrimination. I cited in Document 542, uhm, *United States vs. Greer*, a Second Circuit case, where they did find a Fifth Amendment concern, but nonetheless admitted the tattoos. Uhm, and I've also just suggested under 403 that the Court, could exclude 'em. If the Court's inclined to allow these to be introduced, I think we should figure out some way to do it so it doesn't show that he's in custody.

THE COURT: Let me cut through this. I think and I can do it pretty quickly. I'll make a written ruling on the tattoos; but my impression from reading your submissions is that the Government's correct, but if -- and I think you can at least make an assumption for purposes of the photographs, that accepting the Government's offer to have the pictures retaken, if you don't -- if your client -- and I think really it's up to the client. If the client doesn't want the picture, to submit to having the pictures retaken, then your client is probably going to have pictures shown to the jury in handcuffs. I mean, I suspect that after a couple of weeks, the jury is going to conclude that these men are in custody anyway. I mean, jurors aren't stupid. And the Defendants aren't stupid either. But that will be the ruling on that. And I'll look through the individual pictures; but, you know, to me, it's kind of

obvious when people have tattoos -- at least I saw in the paper yesterday that Ms. Kansas has tattoos --

MR. WELCH:  Well --

THE COURT:  I don't think she's going to be a witness, is she?

MR. WELCH:  I would love to have her, Judge, but I don't think --

THE COURT:  But when people have tattoos, to some extent they're for the purpose of showing the public, you know, something, whatever it is.  And I'm not against tattoos.  One of my children has a tattoo, so -- but that's my ruling on that.

Now let's talk about Exhibit 3.  Any handcuffs in Exhibit 3?

MR. WELCH:  Judge, there's not; but, if you look at the second one, anyone who's been in a jail will recognize the door as probably a jail door.  So we will make the same offer there as well with Mr. Vargas to take new pictures so that the jail door is not visible in the background.

THE COURT:  I didn't see a jail door.

MR. WELCH:  This one here.  That door.  Again, if you've been in county jail, you'd recognize that's probably a holding cell.

THE COURT:  That's fine.  But these aren't the

same pictures that we were looking at during the motion hearings.  What about all those?

MR. WELCH:  Well, we intend to offer the evidence of -- enterprise evidence of Nortenos with tattoos and the significance of the numbers, the dots, et cetera.  These are just tattoos of the Defendants going to trial, Judge.

THE COURT:  All right.  Now, explain this to me.  The other -- the highlighted portions are what?

MR. WELCH:  We filed our disclosures several weeks ago of prior incidents or convictions that we intend to offer either as racketeering acts, Judge --

THE COURT:  In that Docket 161 or whatever it is -- 633?

MR. WELCH:  Yes.  What you have, Judge --

THE COURT:  So if I compare --

MR. WELCH:  Yes.  What I did was extract these three Defendants out of 633 just to make it a little easier.  Maybe I didn't make it any easier.

THE COURT:  No, it makes it easier.

MR. WELCH:  These are just these three Defendants, Judge.  These are the identical disclosures we made in 633; but what I've done here is -- and I said, I think, at the time we filed 633 that we probably wouldn't offer all of that, but just as a precautionary

measure, we've looked through these a little closer and if it's not highlighted then we don't intend to offer it.

THE COURT:  Okay.  All defense counsel square on what we're dealing with here?

MR. WACHTEL:  I understand what the Government is doing, Your Honor, and thank them very much, and we'll just rely on our submissions with regard to this.

THE COURT:  All right.  Joel's.

MR. MANDELMAN:  Uhm, just real briefly because I have also kind of addressed this in writing.  On the first RICO predicate, the drug sales, these were three transactions:  Two $50 transactions of methamphetamine and one that was about $400 to a confidential informant. It's not clear to me that this had anything to do with participation in the Nortenos.  I've asked in a separate motion about who the confidential informant was; but, uhm, it's clear my client was convicted of it, he plead guilty, but it still needs to be related to this case. So I've asked, A, for identity of the confidential informant; and then, uhm, again, I'm just asking the Court to exclude it.  And I made sort of similar arguments about under 401, 403 and 404(b) on these other enterprise incidents.

MR. WELCH:  Briefly, Judge.  Those deals were

Appellate Case: 14-3006  Document: 23-2  Date Filed: 04/01/2014  Page: 883

actually to an undercover KBI agent.  There was an informant involved in the case; but the deal, the buys, were with an undercover KBI agent.

THE COURT:  Will that person be a witness?

MR. WELCH:  He can be, Judge.  I can certainly bring him.  And, again, drug dealing is clearly a racketeering act under 1961.

THE COURT:  Is there a problem that it was -- these were misdemeanor quantities?

MR. WELCH:  They're not misdemeanor quantities in state court.

THE COURT:  I thought Joel said they were.

MR. WELCH:  These are felony convictions in state court, Judge.

MR. MANDELMAN:  I didn't say anything about what kind of -- I think it was $50 -- there were two $50 sales and one --

THE COURT:  I assumed that was misdemeanor then.

MR. MANDELMAN:  Okay.  But, uhm, we think the importance of the confidential informant shows that he was the guy who actually set it up.  I understand what Mr. Welch is saying about proof of, you know, the actual sale, he has the agent.  But we're saying in order to show this has some nexus to the gang, we want to show

who actually arranged the deal.

THE COURT:  Well, I can't make the Government disclose the confidential informant, I don't think, but --

MR. MANDELMAN:  The agent surely knows --

MR. HENRY:  -- and did the agent know, or did the CI know, or was the CI working with the agent or was this undercover KBI agent, you know -- I mean, I'm assuming when you call 'em a confidential informant that he is working with the agent, but that doesn't necessarily need to be the case.  An agent can go in undercover and try to make a buy if he knows somebody is going to be a middleman or whatever; but the -- but I do think if the CI is somehow related to the Nortenos, then I think it is relevant.  And if a person is not related to the Nortenos then that also is relevant because it's just a -- outside the enterprise that the Government keeps alleging, you know.  I mean, drug dealing happens whether you're in a gang or not.  It happens on the street a lot.  If people know that you're holding, they have a lot of people that will come up and buy.  So the bottom line is just because there's a drug case doesn't mean that it's somehow related to this enterprise.  So I think that there should be disclosure more completely than what's been given.

THE COURT:  Well, first of all, they're not offering that as enterprise evidence.  They're offering it as a RICO predicate.  Is this -- I want to make sure I understand.  Is this a conviction or is this --

MR. WELCH:  It is a conviction, Judge.

MR. MANDELMAN:  Yes.

THE COURT:  All right.  Well, I'll think about it, but -- isn't the law still that you don't have to disclose confidential informants?  That I can't make the Government disclose confidential informants?  I haven't looked at that for a long time.

MR. WELCH:  That is the general rule, Judge. The informant was involved to some degree; but the actual buy was the undercover agent.  But, yes, the general rule is you don't have to disclose the identity of the informant.

MR. MANDELMAN:  I guess our position would be that this is exculpatory because, as Tim stated, I mean, this shows that wasn't part of the enterprise.  I understand, I think, the Court's distinction between a RICO predicate here and an enterprise, evidence is --

THE COURT:  It's not my distinction, Joel. It's the Government's distinction.  Do you see how it's listed?

MR. MANDELMAN:  But the, the way the

statute -- I do, Your Honor. The way the statute is gonna, uhm, define the RICO predicates is it has to be like it's part of the affairs of the enterprise, so it -- it kind of doubles back.

THE COURT: Yeah, I understand your point; but, you know, these are the kind of things which I appreciate you all taking up early so that we don't have to spend a lot of time on them at trial; but I don't have enough information to make some kind of a definitive ruling saying the Government can't offer that evidence.

MR. HENRY: Your Honor, I guess maybe the -- one of the issues that I look at this is that without giving up a name, maybe they can tell us whether or not -- and, again, I'm always a bit suspect, given the list of people that the Wichita Police Department has on their gang list --

THE COURT: This is Dodge City.

MR. HENRY: I know. But if they operate the same way, pretty much everyone is -- if they've said hi to somebody in that town, they're on the list. But the bottom line is is that is this person a part of the Nortenos, the Sorenos, or if they're unrelated. The bottom line is is that I think that without having to give up the actual identity of the individual, they

should give up information about the individual that will, you know, allow us to be able to, I think not only have that disclosure, but be able to cross-examine the witness and find out if there was any relationship to an enterprise. Because it is -- I just can't imagine -- a RICO predicate, you're essentially saying that this, that this prior is one of the parts of the enterprise. And if the person is outside of the gang circles or the environment out there in Dodge City, then I think that's highly relevant and may not even qualify as a predicate and we should be able to argue that to the jury.

THE COURT: Okay. I don't know. I can't rule on that right now. I've made some notes about it; but I think it's one of these things where -- I hate to put more work on you because I know you're busy -- but if you believe that I can order the Government to disclose the name of the confidential informant, then you can present me with some authority that says that I can. I think I can under certain circumstances. I just cannot remember the law that pertains to ordering disclosure of a confidential informant. On the other hand, it may be that Lanny will be willing to do it. So I don't know. And that would solve all the problems.

MR. MANDELMAN: Thank you, Judge. I'll speak with Mr. Welch and maybe -- and, otherwise, I'll file

something in writing even if it's just short.

THE COURT:  Okay.

MR. WELCH:  One more thing, Judge, I should have clarified regarding this.  As to Jason Vargas, his is just a one-page document.  The last two entries which are listed under enterprise evidence, Judge, number 7 and number 8, dated 10-16-10 and 10-30-10, those are both gang sheets, contact with Dodge City police officers.  The Defendant was arrested both dates.  One's for a PV, that was the second one, he was arrested on a PV violation.  I think the first one, I think he was driving while suspended.  And I believe -- and if I'm wrong, I'll come back and file something in writing -- but I think his admissions were made without Miranda warnings being given to him, so those admissions we are not going to offer, Judge.

THE COURT:  So you're not going to offer 7 and 8?

MR. WELCH:  We're not going to offer the admissions he made to the officers those days; but the reason it's still highlighted is we believe the contact with the police, who he was with that day, tattoos that they noted, that they made note of, the color red that he was wearing I believe on both days, all of that would be relevant.  None of that is protected by Miranda and

Miranda warning.  But his admission that he was LCC, in an abundance of caution, we're not going to offer that because it was given without Miranda.

THE COURT:  All right.  That solves that problem, doesn't it, Mark?

MR. SEVART:  Well, partly.  Your Honor, there's a couple things, if I may.  First of all, back up a little bit with respect to the tattoos.  I think the Government should be able to lay the foundation for these pictures without ever having to mention that's a jail door or this was in the jail.  If they've got the person who took the photograph says I took this photograph and it was on this date and it's a fair and accurate depiction of what I took --

THE COURT:  Do you want the first one shown with him in an orange jumpsuit that everybody today, you know, that hasn't been living, you know, under a rock, knows that people in orange jumpsuits are in custody.  I don't care.

MR. SEVART:  It seems to me that they could crop that.  This one tattoo on the neck, all that is is rest in peace and my client's father's name, so I don't see how that hurts us.  It may even help us, but --

THE COURT:  The Government apparently thinks it's relevant.

MR. WELCH: Judge, I put that there so we would know we're talking about Jason Vargas. We don't intend to offer this exact photograph. The two that are relevant on the tattoo are -- the tattoos are on his arms, Judge.

THE COURT: That takes care of that, Mark.

MR. SEVART: With respect to the predicates, I do want to add a little bit, if I may, and I'll be real brief, but I just want to go through these briefly with the ones that they've highlighted.

My client, first of all, with the distribution of methamphetamines, he has never been charged nor convicted of any methamphetamine charge or dealing; and he's not charged with distribution of methamphetamine as a separate count in the Indictment before the Court. And it would seem to me that -- and if I continue on, he's not charged with shooting into any occupied vehicle in this case. And so it would seem to me that any talk about my client and drug dealing or any talk about my client and shooting at houses or cars would be completely irrelevant and highly prejudicial and does not go to offer any sort of common plan or scheme or motive or intent or be of any value other than to smear my client in front of the jury.

THE COURT: Is the law that it has to be a

conviction?

MR. SEVART:  Well, the quick answer is no. But it does need to be some reliable -- I mean, there's the first basic weight is left with the discretion of the Court as to whether it's of a reliable nature.  The second thing that we have is is that it has to be of a common plan or scheme to the offense that my client is charged with; and he's not charged with any sort of distribution of drugs or any sort of assault on a vehicle or assault on a house.  My client is charged basically with possession of a firearm, felony possession of a firearm, and then that event that they're saying that my client confessed to his girlfriend about some Guatemalans that were robbed --

THE COURT:  Well, but, here again --

MR. SEVART:  There's no common scheme --

THE COURT:  -- I'll -- this is basically a gang case and the RICO aspect of it is, in my understanding, relates to what his involvement in gang related activity is, not that he has to be convicted of anything.

MR. SEVART:  Well, but there still has to be that tie-in, you know, under 404(b).  That means there still has to be some motive, opportunity, intent that makes it relevant.

THE COURT:  I don't think so; but if you want to provide me with some authority that says that 404(b) is the key to getting in RICO evidence, then I'll read it.  But I don't think it is.

MR. SEVART:  I would argue it would be a little different if my client was charged with a drug offense or if he was charged with shooting at a house; but he's not charged with those things.  If they've got -- if they've got some conviction where he robs some Guatemalans, we may have a whole different argument to be making here.  But these are --

THE COURT:  Well, everybody seems to think that the Government's case is going to be more or less all of the Defendants who plead guilty who are now going to come in and testify against these three gentlemen, and if somebody's in the car and they say that Jason Vargas was in the car and I'm a member of the Nortenos and he's a member of the Nortenos and we were shooting at somebody's house, I don't think a conviction is necessary, is there?

MR. SEVART:  Well, I think that all of that is just character evidence or that -- it's not being offered to show a common plan or scheme of what my client is charged with.  Its only value to a jury is to bad-mouth my client and to make him look bad.

THE COURT:  Well, I don't mean to be flippant here, but that's always -- all the Government's evidence in a criminal case is to make the defendant look bad.

MR. SEVART:  But their motive has to be to show evidence of guilt; not guilt by association; not character to commit crime, therefore he committed this crime.

THE COURT:  I think that -- I don't mean to cut you off -- but I think this is where it will be very helpful for all counsel and me to know -- to see the instructions and to review the RICO cases.  I haven't done this for today; but my impression is that we would all benefit from knowing exactly what comes in under RICO.  I've already done some work on this and issued some prior orders.  And I don't think that your position is correct; but if I'm wrong, you can make an argument about it.

MR. SEVART:  Well, I know there's -- I'll read it again.  I know there's the Tenth Circuit opinion that came down from the prior case that's pretty lengthy and has a lot of insight, I think, for it --

THE COURT:  Actually there are two.

MR. SEVART:  Is there?  Okay.  I know of the one.  I'll look for the other one as well.

The last thing -- and it's just additional

information for Your Honor -- and that is that the 8-1103 case was a trial in state district court and the 10-2506 was my client had entered a plea of guilty. With respect to the case that he plead guilty to, I don't believe that there was any warning or any acknowledgment made at the time of the plea or the sentencing that that evidence could later be used against him in a RICO case or that there was any finding that that was a gang related event. And same with the jury trial. I don't believe there was any evidence offered that was a gang case. And, of course, in state court, the prosecutor -- if they even want to talk about gangs or call it a gang case, they have to have a hearing before the judge to get permission to basically designate it as a gang case so that gang evidence can come in. And how they do that is basically say there's no explanation for what happened other than that it's gang-related. And --

THE COURT: That's Kansas law?

MR. WACHTEL: Unfortunately, Your Honor, I had it run down my throat this morning.

THE COURT: I don't know what Kansas law is on it; but I'd be very surprised if there's any law that says that in 2006 that a defendant in state court has to be warned that in 2012 the Government is going to charge

him in a RICO case.

MR. SEVART:  My analogy is kind of like a domestic violence case.  There is a battery and there is a domestic violence battery.  In order for it to be a domestic violence battery, it has to be classified as such.  There is a robbery and there's a gang robbery; and in order for it to be a gang robbery, it would need some classification or some indication that it is gang related.  And I would bet you that in the state case that the -- that if it was gang related, the Government would have filed a motion to be able to bring in gang evidence.

THE COURT:  When you say the Government, you're saying the state?

MR. SEVART:  The state attorney, yes, the District Attorney running that case would have had some sort of motion brought to be able to introduce gang evidence.  And the Kansas case law requires them to be able to demonstrate that it is gang evidence, or that it is a gang case; and they do that by showing there's no other explanation for it.

THE COURT:  Well, here again, this is something that's new to me.  So if there's some law out there that says that you have to give notice to -- six years in advance to a defendant in a state case that the

government may file a RICO case six years down the road against him, I'll listen to it.  But I'd be surprised.

MR. SEVART:  Yeah, I don't believe there's a statute that says that, Your Honor.  I think it basically just goes to the two points, one of 'em being that in the proffer that has been produced, there seems to be some assumption that these are gang events.  And I am proffering that the assumption should be just the opposite, that they are not gang related events, because if they were gang related events, there would have been some evidence in that state case that it was a gang case.

THE COURT:  Well, let me rephrase that then. If there's some case law in the federal system that says that a state conviction can't be introduced in a RICO case unless in the state case there was some designation.  Apparently Kansas has this, I don't know if all states do, that the crime was a gang related crime.  I'll pay attention to that.  I'll pay attention to anything you file because I don't want to make an error.  But I can't imagine that would be true.  But if it is, it is.

MR. WELCH:  If I can respond just real quick, Judge.  As to the racketeering act, the Defendant Jason Vargas is charged in Count 1, the RICO conspiracy, as

are these other two Defendants.

THE COURT:  I know.

MR. WELCH:  Distribution of methamphetamine is a racketeering act.  And we expect to have one or more cooperators who will testify that they dealt drugs with Jason Vargas.  That's what's going to happen here.  The other two, the '03 and '06, aren't convictions.  The victims of both those crimes were Sorenos.  He was with other LCC gang members when he shot into -- well, '06, he, Jason Vargas, shot at Sorenos while Morales was the driver of the car and he was shooting outside the car.  And the victims in the '03 conviction were also Sorenos.  Clearly, they were gang motivated crimes.  We'll have evidence of that.

THE COURT:  Well, by the time we start to trial, I'll be more knowledgeable about the kind of evidence that is admissible in these sorts of cases; and, like I say, if there's case law that supports Mark's position, I know he'll make me aware of it.  I just don't know now.  Okay?

Now, like I say, I'll get out a ruling on the motions that you've filed that remain to be ruled on.  Do any of you want to make any further argument?  Joel's made argument on his.  I'll listen to anything that anybody else wants to say.

MR. MANDELMAN:  Just a couple quick technical things, as far as the, uhm, voir dire questions.  Uhm, if there's stuff we want to ask that we don't necessarily want the Court to ask, we don't -- you don't want it or -- you don't want --

THE COURT:  No.  Usually what happens in these things, the defense is concerned in a case like this about maybe drug use by jurors.  They don't want -- Joel Mandelman doesn't want to get up and confront the jurors, you know, have you used illegal drugs; but he wants me to ask that question.  And that's what I'm talking about.  You can ask them anything you want.  Well -- maybe not anything.  But I'm not going to interfere with your questioning.  I just want to make sure that we don't extend it and extend it and extend it.

MR. MANDELMAN:  And then, uhm, it will be all right to supplement the jury instructions because, for both strategic reasons and because of potential things that might come up --

THE COURT:  Obviously.  Things come up at the trial.  To me -- you all are very experienced lawyers; but, to me, it helps to get ready for the trial if you know generally what the instructions are likely to be in a case like this.  I mean, you know what my instruction

on reasonable -- proof beyond a reasonable doubt is and what-not.  But on the elements, principally, it helps you prepare for trial if you know what that is.  It helps me, too.

MR. MANDELMAN:  And then the other thing is in Document 691 I just asked for some additional discovery. Some of those issues have been resolved.

THE COURT:  What are you looking for now?

MR. MANDELMAN:  Uhm, we have a dispute about this list of the Nortenos.  This came up in the Daubert hearing.  We've got a data base, Excel spreed sheet that's got, like, 200 names on it.  Uhm, but I want a list that's got whether they are actually associates or real members and when they were added to the data base. And then if anyone's been removed from the data base. And, basically, I want to be able to challenge the accuracy of this list.  I mean, we think this list, uhm, came out of nowhere basically.  My guy doesn't know most of the people on that list.

THE COURT:  I don't know.  I didn't remember the list was introduced --

MR. MANDELMAN:  I introduced it at the Daubert hearing.

MR. WELCH:  We've already given a list of the Nortenos, Judge.  That's why Joel has this list he is

looking at.  We didn't need to give that list; but we did.  I don't know that there's any other list out there.  I think Joel wanted a list of Sorenos also.  I don't know what that has to do with our case, frankly, and I don't know if we've given a list of Sorenos and -- I don't believe we have.  We did give a list of the Nortenos.

THE COURT:  Well, I don't know, Joel.  I mean, I think you can certainly cross-examine about how do you know that so and so is a Norteno.  I'm not sure if the number is particularly relevant whether there were 100 or 50 or 200.  I don't know.  I think if the Government has given you a list -- what is it you want me to do?  Divide it between peewees and all of that kind of stuff?

MR. MANDELMAN:  There was testimony at the hearing that there's a more detailed, uhm, more detailed data base.  I mean, that same data base; but there's some extra columns that describes whether they're a full fledged member or an associate and then if anybody's been removed and when they were added to the list.  I mean, part of the idea here about the enterprise is that this thing has some continuity to it, that it actually is an association in fact.  To the extent that list is not accurate and they've just picked people out of the phone book, I mean, we ought to be able to challenge

that.  And if the Dodge City Police Department has information about that -- and that was the testimony at the hearing, Kelly Mellecker keeps a longer list.  The two experts who testified didn't know.  They referred me to somebody else.  I mean -- I could try to issue a subpoena; but this is in the possession of the Dodge City Police Department.

MR. WELCH:  I may be wrong.  I think what we're talking about is the NCIC entry that was done by Kelly Mellecker, so it's not a list kept by the Dodge City Police Department.  It's information input into the national computer system that this person has been documented.

THE COURT:  I have a very vague recollection of this list.

MR. WELCH:  I think that's the list we're talking about, Judge; but we'll look and see if there's a different list.  If it's NCIC, that's not maintained by the Dodge City Police Department.  If there's another list that the Dodge City Police Department maintains, I'll check on that.  I don't know the answer to that.

THE COURT:  That's probably the best you can hope for at this point.  I mean, this isn't like the rotary club that has a list of the --

MR. MANDELMAN:  Who's paying their dues.

THE COURT:  -- who's paying their dues.

MR. WACHTEL:  But there may be such a list, Your Honor, and I can't shed a whole lot of light on this, but I remember seeing a list that lists my client's sister Patri (ph) as a Norteno.  The only woman Norteno I've ever heard of in this case.  So there is some kind of list she managed to get on and I don't know whose got that.

MR. WELCH:  That's -- I think that's the list we turned over.

MR. WACHTEL:  That is what I think that is, yes.

MR. WELCH:  I think you have that.

THE COURT:  I don't know.  Can't -- I thought I heard evidence that women can be -- have some status.

MR. WACHTEL:  Right.  They're more than likely to be an associate, Your Honor, rather than a member, that are -- are a woman's auxiliary of the Nortenos, perhaps, but we're not -- we've heard nothing about that.

THE COURT:  I don't mean to laugh, but this is -- I would never do it at the trial.

MR. WACHTEL:  Of course not, Judge.

THE COURT:  I can't clearly remember but I remember there were the peewees and they were the people

that wanted to be -- they were wanna-be Nortenos.  And I do remember something about women that had some status.

MR. WACHTEL:  But if Joel is correct, Your Honor, if there is a list that has just more than that, then --

MR. MANDELMAN:  Yeah.

MR. WACHTEL:  -- that would tell us was she -- I'm just picking on Patri because that's my client's sister -- was she a member or was she an associate or was she -- perhaps had the misfortune to have a brother, not my client, who was a member.

THE COURT:  I don't know.

MR. WACHTEL:  I don't know either, Judge.

THE COURT:  I think these are the kind of things -- you all work together well -- that you need to talk with Lanny and Aaron about and if there are lists out there -- the bottom line to me is this.  If the witnesses, those two officers, whatever their names were, I don't remember, are going to come in and talk about lists, then those lists have to be produced.  That's about as much as I can tell you at this point in time.

MR. MANDELMAN:  Kind of on the sort of same vein, I'd also asked for -- some of these witnesses had previously cooperated with the state, like in other

prosecutions, that I wanted that information. And the theory being that these witnesses are professional cooperators, they're biased toward the state. They've gotten in trouble before, they've gone to the government and they've agreed to testify against defendants in a criminal trial. I want to know if the guys who they're going to use here have previously cooperated in other cases, have an independent relationship with the government.

THE COURT: That's an interesting point. Clearly, if they have convictions, you're going to know that. I suppose you'll know if they have arrests; but arrests may not be admissible. Do you know? I've never run across this before.

MR. WELCH: No, Judge. Any benefit that was given to them in this case by the federal government will be disclosed.

THE COURT: Are you aware of any case law, Joel, that says if they've cooperated previously with the state in some other case that that is something that is discoverable? Or -- maybe the Government doesn't even know it.

MR. MANDELMAN: I think for the key witnesses, they have an obligation to find out. They're the proponents of these witnesses. We believe it's

exculpatory or it's *Giglio* certainly.  It shows this ongoing relationship with the government.  So we're asking sort of under the due process clause that they have an obligation to inquire about, you know, these six or seven guys who are -- who they're using in this case.

THE COURT:  I don't know the answer to that and I think it's one of these things where if you can find some authority that says that that's something that the Government is required to turn over, then you can send it to me and send it to Lanny and he can respond and I'll make a ruling.  But I've never encountered that before.

Now, my general feeling is this.  You all know this.  The Government has certain obligations in these types of cases that Lanny, in particular, is very well acquainted with and they are aware of what can happen if they don't comply with those obligations.  And I'm sure that they don't want any unfortunate consequences in this case or any other case because they've failed to comply.  So if that's something that they're required to reveal to the Defendants, I certainly expect them to do it; but if there's some question about it, whether that's a requirement, then I'll take a look at it.  I don't know, Joel.  I've never had that happen.  That's never come up before.

MR. MANDELMAN:  Well, we also have the situation here where one of these witnesses who's cooperating, his wife apparently is cooperating in a Dodge City murder case and -- not the federal case. She's cooperating in a Dodge City murder case.  And I want to know if Dodge City -- the Government's not -- federal government is not doing anything about that.  I want to know if Dodge City said we'll -- we'll either talk to the federal government or -- if they discuss this case in state court.  So if she is getting some benefit based on her husband's cooperation or if they've made any representations to her.

THE COURT:  I don't know.  That's pretty tenuous.

MR. WELCH:  The federal government has made no promises to the cooperating witness or his wife relating to her cooperation in the state case.  We've had no discussions with the wife.  In fact, we had maybe a ten second discussion with the federal witness about that so he understands, there's no promises, your wife's cooperation has nothing to do with your case, you understand that, right, and he said he understood that.

MR. MANDELMAN:  I -- I -- I believe that to be the case; but I don't know what the state prosecutors have said about if they're going to help her because

he's helping in this case.

THE COURT:  Well, but this is a federal case and I just, like I say, that's so tenuous that I can't imagine.  I suppose that you can call the prosecutor out there -- I realize you probably don't want to do it -- and call out there and say, you know, is there some deal going on out there.  But it would be speculation to allow that type of questioning or make the Government disclose it any more than Lanny already has.

MR. MANDELMAN:  Well, we may seek to inquire about it from the witness.

THE COURT:  Well, you can try but --

MR. MANDELMAN:  We'll see what we can find out, Your Honor.

THE COURT:  I think, you know, the way I look at these things is the defendant is entitled to make all the inquiries he wants from people; but whether evidence like that or questions that relate to that would be relevant at the time of trial, I don't know.

Okay.  Anything else that you all are concerned about?

MR. WELCH:  Judge, the final thing is as far as these jurors, anyone you want to excuse is fine.  We have no objection.

THE COURT:  Well, I just wanted you to know.

I don't want it to come up later that I've excused somebody that should be here.  But I just don't want you to take these things back to your office and spread them around.  You can look through them.  Most of 'em -- I haven't studied them, but most of them seem to me to be legitimate reasons that they want off and there's 60 that don't.

MR. HENRY:  I paged through them, Your Honor, and, obviously, the one that works in Dave Rapp's office, you know, since he's representing one of the defendants in this case, I think that's -- that's kind of one of the automatics.  As far as the health issues go, I certainly understand that.  There are a lot of those in there.  As far as the job, you know, issues go, we had this recently this summer with somebody from Boeing, or Spirit.  There was one that I noticed in there of, you know, having ten-hour shifts and working the second shift and I don't, you know, if teachers and people at Boeing stop showing up for jury trials, we're going to be doing a lot of bench trials, Your Honor, because there aren't going to be anybody that's going to be sitting over there.

THE COURT:  No.  You know, I don't use this method except in cases where -- you know, the trials we've been having lately aren't very long.  But if we're

going to have a three to four week trial, I think it's better to try to get this out front rather than have people get up here in the jury box and go on and on and on about how -- so look through the list and if you think there's somebody on there that their reason isn't valid, let me know.  I may or may not excuse them.  But we've got 60 that are willing to be here.  I can't imagine that we would have all that many challenges for cause based on employment or other conflicts.  Okay.  Or at least I hope when they get here --

MR. HENRY:  But if the case goes three weeks, there may be some coming from the jury box when we are questioning them.  Or did they already know that it's going to be --

THE COURT:  Well, didn't you see the letter? It's on the other side --

MR. MANDELMAN:  That may have just came to me. I don't know.  It's my fault if I didn't --

THE COURT:  Have you seen the letter?

MR. MANDELMAN:  There was just, like, a letter just indicating that it was expected to go three or four weeks --

MR. HENRY:  Okay.  So everyone -- the 60 that have responded positively know the length.  Okay.  Thank you, Your Honor.

THE COURT:  No, I tell 'em that it's going to take three to four weeks, four days a week.  I don't tell them what case it is.  I don't give them any information about the case, per se.

Okay?  Yeah, Mark.

MR. SEVART:  Your Honor, the only thing that I -- it's a little difficult to tell what sort of -- whether any of these folks are minorities or not minorities --

THE COURT:  I don't ask them that.

MR. SEVART:  There's a list of some names that might -- it appears that they may be younger Hispanic people.  If there are other young Hispanics on the jury panel, then it may not make a difference; but I hate to waive --

THE COURT:  Well, you see, I don't know who the others are; but you're not waiving anything.  If it's Ramos, who theoretically could be Hispanic, but he has a good reason for not being here -- anyway, you look through it and if you've got a concern, I'll consider it.  But I don't ask them to provide that kind of information.  I don't tell them that the defendants are Hispanic, for crying out loud.  That would not be a valid reason to seek to be excused from a jury anyway. I can tell 'em that Tim Henry was one of the defense

counsel, that might be a valid reason.

MR. WACHTEL:  Don't use my name, Judge.

MR. HENRY:  You don't want to poison them this early.

THE COURT:  No, seriously, the fun's going to be over when I walk out of here.  Won't be any more frivolous comments.

Now, I address this to the three Defendants.  I don't care whether you go to trial or you plead guilty. I don't want to know any discussions that have been going on, if any, about pleas.  It makes no difference to me one way or the other.  But I wish that to the extent possible, for purposes of planning, if there are going to be pleas in this case, that you let Rachael know so that I can do the pleas before we start the trial.  Okay?  That's the only thing I ask.  I'm not sure how we could fit that in, but we probably would change the reporting time for the jurors or something so that they won't have to sit down in the jury room waiting for something to happen.  Nobody wants that. Anything else?

MR. WELCH:  No, sir.

MR. SEVART:  No, Your Honor.  Thank you.

MR. WACHTEL:  No, Your Honor.  Thank you.

(Adjourned at 2:32 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 912

45

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 31st day of January, 2014.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS


UNITED STATES OF AMERICA,          )
                                   )
                        Plaintiff,) District Court
                                   ) Case No. 12-10089-02
vs.                                )      & 12-10090-03
                                   ) Circuit Court
PEDRO GARCIA,                      ) Case Nos. 14-3006
and GONZALO RAMIREZ,               )      &  14-3039
                        Defendants,)
                                   )
_____


### INDEX to WITNESSES AND EXHIBITS IN JURY TRIAL


On the 2nd day of October, 2013, came on to be heard **Jury Trial** in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.


**APPEARANCES**

The **Plaintiff** appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;
Defendant **Pedro Garcia** appeared in person and by and through Mr. Val Wachtel;
Defendant **Gonzalo Ramirez** appeared in person and by and through Mr. Joel Mandelman and Mr. Tim Henry.

**I N D E X**

** This Volume is **INDEX ONLY** for Jury Trial Witnesses and Exhibits **

**OCTOBER 2, 2013:**
Motion Prior to Voir Dire                          4
Voir Dire – NOT Transcribed in Deft Garcia's appeal

**OCTOBER 3, 2013:**
Preliminary Instructions to Jury                   20
Opening Statements – NOT Transcribed in Deft Garcia's appeal

**WITNESS**

**Shane Webb**
Direct by Mr. Welch                               36
Cross by Mr. Wachtel                             144
Cross by Mr. Mandelman                           176

**Traci Rankin**
Direct by Mr. Smith                              182
Cross by Mr. Mandelman:                          193

**Craig Mellecker**
Direct by Mr. Welch                              195
Cross by Mr. Wachtel                             221
Cross by Mr. Mandelman                           223

**Michael Robbins**
Direct by Mr. Welch                              226
Cross by Mr. Wachtel                             241
Cross by Mr. Mandelman                           241

**OCTOBER 4, 2013:**

**Mariano Lorenzo-Sorano – Interpreter – LuAnn Rivera**
Direct by Mr. Welch                              244
Cross by Mr. Wachtel                             262
Cross by Mr. Mandelman                           267
Redirect by Mr. Welch                            268

**Roberto Cruz-Arco – Interpreter – LuAnn Rivera**
Direct by Mr. Welch                              270
Cross by Mr. Wachtel                             289
Cross by Mr. Mandelman                           291

**April Ortiz-Mendoza**
Direct by Mr. Smith                             294
Cross by Mr. Wachtel                            326
Cross by Mr. Mandelman                          328

**Ricardo Sanchez – Interpreter – LuAnn Rivera**
Direct by Mr. Smith                             330
Cross by Mr. Wachtel                            344
Cross by Mr. Mandelman                          349

**Anthony Wright**
Direct by Mr. Smith                             354
Cross by Mr. Wachtel                            433

**OCTOBER 8, 2013:**

**Anthony Wright (Cont'd)**
Continued Cross by Mr. Wachtel                  460
Cross by Mr. Mandelman                          483
Redirect by Mr. Smith                           509
Recross by Mr. Wachtel                          514

**Shane Webb (Recalled)**
Direct by Mr. Welch                             517
Cross by Mr. Mandelman                          522

**Bamidele Adeagbo**
Direct by Mr. Smith                             523

**Russell Worthey**
Direct by Mr. Welch                             539
Cross by Mr. Wachtel                            628
Cross by Mr. Mandelman                          667
Redirect by Mr. Welch                           679

**Joe Galindo**
Direct by Mr. Smith                             683
Cross by Mr. Wachtel                            745

**OCTOBER 9, 2013:**
Colloquy between Court and Counsel              765

**Joe Galindo (Cont'd)**
Continued Cross by Mr. Wachtel                  769
Cross by Mr. Mandelman                          776
Redirect by Mr. Smith                           784
Recross by Mr. Wachtel                          791

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

**Frank Herrera**
Direct by Mr. Welch                               793
Cross by Mr. Mandelman                            806

**Isidro Raleas-Velasquez**
Direct by Mr. Smith                               808
Cross by Mr. Wachtel                              816
Cross by Mr. Mandelman                            818

**Alonzo Diego**
Direct by Mr. Welch                               819
Cross by Mr. Wachtel                              828
Cross by Mr. Mandelman                            829

**Isidro Raleas-Velasquez (Recalled)**
Direct by Mr. Smith                               830

**Jesus Flores**
Direct by Mr. Welch                               832
Cross by Mr. Wachtel                              880
Cross by Mr. Mandelman                            913
Redirect by Mr. Welch                             924

**Jeff Mooradian**
Direct by Mr. Smith                               925
Cross by Mr. Henry                                941

**Shane Webb (Recalled)**
Direct by Mr. Welch                               945
Cross by Mr. Henry                                976
Redirect by Mr. Welch                             983
Recross by Mr. Henry                              983

**Leslie Lima**
Direct by Mr. Smith                               984
Cross by Mr. Henry                                993

**Brady Schulte**
Direct by Mr. Smith                               994
Cross by Mr. Henry                               1000

**James Nau**
Direct by Mr. Welch                              1004
Cross by Mr. Henry                               1018

OCTOBER 10, 2013:

**Alberto Hernandez**
Direct by Mr. Welch                          1024
Cross by Mr. Henry                           1052
Redirect by Mr. Welch                        1067

**Santiago Hernandez**
Direct by Mr. Smith                          1068
Cross by Mr. Henry                           1080

**Rumalda Hipolito**
Direct by Mr. Welch                          1085
Cross by Mr. Henry                           1098

**Marriet Gonzalez**
Direct by Mr. Smith                          1101
Cross by Mr. Henry                           1141

**Juan Torres**
Direct by Mr. Welch                          1172
Cross by Mr. Henry                           1238
Cross by Mr. Wachtel                         1266
Redirect by Mr. Welch                        1280

OCTOBER 11, 2013:

**Neal Tierney**
Direct by Mr. Smith                          1284
Cross by Mr. Wachtel                         1324
Cross by Mr. Mandelman                       1327
Redirect by Mr. Smith                        1328

**Fabian Neave**
Direct by Mr. Smith                          1345
Cross by Mr. Wachtel                         1407
Cross by Mr. Mandelman                       1433
Redirect by Mr. Smith                        1445

**James Thompson**
Direct by Mr. Welch                          1448
Cross by Mr. Wachtel                         1464
Cross by Mr. Mandelman                       1465
Redirect by Mr. Welch                        1466

**Dallas Hornback**
Direct by Mr. Welch                          1467
Cross by Mr. Wachtel                         1475
Cross by Mr. Mandelman                       1475

**Kendra Owens**
Direct by Mr. Welch                          1476
Cross by Mr. Wachtel                         1488
Cross by Mr. Mandelman                       1490

**Neal Tierney (Recalled)**
Direct by Mr. Smith                          1491

**Craig Mellecker (Recalled)**
Direct by Mr. Welch                          1504

**Colleen Brooks-Francis**
Direct by Mr. Smith                          1508
Cross by Mr. Wachtel                         1512

**OCTOBER 15, 2013:**

**Joe Rodriguez**
Direct by Mr. Welch                          1528
Cross by Mr. Wachtel                         1534

**Timothy Quint**
Direct by Mr. Smith                          1536

**Michael Huffines**
Direct by Mr. Smith                          1542
Cross by Mr. Mandelman                       1546

**Steven Gravatt**
Direct by Mr. Smith                          1547
Cross by Mr. Wachtel                         1564
Cross by Mr. Mandelman                       1566
Redirect by Mr. Smith                        1567

**James Nau (Recalled)**
Direct by Mr. Smith                          1568
Cross by Mr. Wachtel                         1590
Cross by Mr. Henry                           1603

**Shane Webb (Recalled)**
Direct by Mr. Welch                          1606
Cross by Mr. Wachtel                         1654
Cross by Mr. Mandelman                       1660
Redirect by Mr. Welch                        1663

**Motions**                                  1665

**Lisa Taylor-Austin**
Direct by Mr. Wachtel                    1671
Cross by Mr. Mandelman                    1697
Cross by Mr. Smith                        1698
Redirect by Mr. Wachtel                   1718
Recross by Mr. Smith                      1720

**OCTOBER 16, 2013:**

Argument on Instructions                  1725

**Jose Louis Alvarez-Lopez**
Direct by Mr. Henry                       1786
Cross by Mr. Welch                        1794
Redirect by Mr. Henry                     1800

**J.L. Bice (Recalled)**
Direct by Mr. Henry                       1801
Cross by Mr. Welch                        1802
Redirect by Mr. Henry                     1802

**Drew Francis**
Direct by Mr. Mandelman                   1803
Cross by Mr. Welch                        1807
Redirect by Mr. Mandelman                 1807

Instructions to Jury                      1810

Closing Argument by Mr. Smith             1815

NOTE:  Remainder of Closing Argument taken by Ms. Johanna
Wilkinson - FILED in SEPARATE FILE

**OCTOBER 17, 2013:**

Questions by Jury                         1856
Verdict                                   1872

Certificate of Certified Shorthand Reporter  1880

| EXHIBIT | I | O | A | EXHIBIT | I | O | A |
|---|---|---|---|---|---|---|---|
| **Government** | | | | | | | |
| **1** | 517 | Demonstrative | | **83** | 92 | 92 | 95 |
| **2** | 1705 | | | | | | |
| **3** | 1652 | 1652 | 1652 | **85** | 113 | 114 | 116 |
| **4** | 1452 | 1452 | 1452 | **86** | 130 | 131 | 131 |
| **5** | 1507 | 1508 | 1508 | **87** | 113 | 114 | 116 |
| **6** | 46 | 47 | 48 | **88** | 318 | 319 | 319 |
| | | | | **89** | 318 | 319 | 319 |
| | | | | **90** | 323 | 325 | |
| **9–14** | 73 | 74 | 74 | **91** | 1396 | 1398 | 1399 |
| | | | | **91** withdrawn | | | 1809 |
| **16** | 73 | 74 | 74 | | | | |
| **17–22** | 64 | 74 | 75 | **93** | 1454 | 1455 | 1455 |
| **23–32** | 113 | 114 | 116 | **94** | 1451 | 1451 | 1451 |
| | | | | **95** | 1456 | 1457 | 1462 |
| **34** | 113 | 114 | 116 | **96** | 1463 | 1463 | 1463 |
| **36** | 113 | 114 | 116 | **98** | 728 | 728 | 728 |
| **37–38** | 92 | 92 | 95 | **99** | 728 | 728 | 728 |
| **39** | 113 | 114 | 116 | **100–102** | 186 | 190 | 190 |
| **40** | 92 | 92 | 95 | **103** | 201 | 202 | 202 |
| **41–42** | 130 | 131 | 131 | **104–110** | 206 | 206 | 207 |
| **43** | 113 | 114 | 116 | **111–118** | 206 | 206 | 207 |
| **44`** | 64 | 74 | 75 | **119–120** | 232 | 239 | 239 |
| **45** | 72 | 72 | 72 | **121–123** | 211 | 212 | 212 |
| | | | | **124** | 237 | 239 | 239 |
| | | | | **125–131** | 214 | 215 | 215 |
| **48** | 92 | 92 | 95 | **132** | 235 | 239 | 239 |
| **49** | 1405 | 1407 | 1407 | **133–137** | 217 | 218 | 218 |
| **50** | 1575 | 1576 | 1576 | **138** | 282 | 282 | 282 |
| **51** | 1578 | 1578 | 1578 | **140–145** | 253 | 254 | 254 |
| | | | | **146** | 247 | 247 | 247 |
| **53** | 1187 | 1188 | 1191 | **147–151** | 532 | 532 | 537 |
| | | | | **153** | 530 | 530 | N/A |
| **58** | 521 | 522 | 522 | **154** | 412 | 414 | 415 |
| **59** | 837 | 837 | 837 | **155** | 427 | 429 | 429 |
| | | | | **156** | 399 | 400 | 400 |
| **61** | 1636 | 1637 | 1637 | **157** | 399 | 859 | 859 |
| | | | | **158** | 626 | 629 | 629 |
| **63** | 1637 | 1638 | 1638 | **159** | 565 | | |
| | | | | **159–A** | 566 | 566 | 566 |
| **68** | 1206 | 1206 | 1206 | **159–B** | 1452 | 1452 | 1452 |
| **69** | 113 | 114 | 116 | **159–C** | 1452 | 1452 | 1453 |
| **77–78** | 1641 | 1642 | 1642 | **162** | 1404 | 1404 | 1404 |
| | | | | **163** | 1628 | 1628 | 1629 |
| **80** | 92 | 92 | 95 | **164** | 1629 | 1631 | 1631 |
| **81** | 113 | 114 | 116 | **165** | 1630 | 1631 | 1631 |
| **82** | 92 | 92 | 95 | **166** | 1537 | 1538 | 1538 |

| EXHIBITS | I | O | A | EXHIBITS | I | O | A |
|---|---|---|---|---|---|---|---|
| Government – Continued | | | | | | | |
| 167–168 | 1642 | 1643 | 1643 | 380 | 740 | 740 | 740 |
| 169–170 | 1639 | | | 381 | 713 | 713 | 713 |
| 200–201 | 796 | 796 | 796 | 384 | 707 | 707 | 707 |
| 202 | 825 | 826 | 826 | 385 | 596 | 597 | 597 |
| 203 | 811 | 811 | 812 | 386 | 1363 | 1364 | 1364 |
| 204 | 812 | 812 | 812 | 387 | 596 | 597 | 597 |
| 205 | 803 | 803 | 803 | | | | |
| 206 | 814 | 814 | 814 | 389 | 521 | 522 | 522 |
| 207 | 800 | 800 | 800 | | | | |
| 208 | 814 | 814 | 814 | 400 | 543 | 543 | 543 |
| | | | | 401 | 1193 | 1194 | 1194 |
| 210 | 804 | 805 | 805 | 402 | 680 | 680 | 680 |
| | | | | 403 | 1383 | 1383 | 1383 |
| 212 | 873 | 880 | 880 | 404 | 712 | 713 | 713 |
| | | | | 411 | 717 | 717 | 717 |
| 300–303 | 929 | 929 | 929 | 412 | 1106 | 1106 | 1106 |
| 304–305 | 949 | 950 | 950 | 413 | 521 | 522 | 522 |
| 306–325 | 952 | 952 | 952 | 414 | 1144 | 1144 | 1144 |
| 326 | 952 | 952 | 952 | | | | |
| | | | & 992 | 417 | 1362 | 1362 | 1362 |
| 327–329 | 956 | 956 | 956 | 418 | 1111 | 1111 | 1111 |
| 330–336 | 957 | 958 | 958 | | | | |
| 337–344 | 961 | 962 | 962 | | | | |
| 345–347 | 964 | 965 | 965 | | | | |
| 348–352 | 966 | 966 | 966 | | | | |
| 353 | 969 | 969 | 969 | | | | |
| 354–355 | 970 | 971 | 971 | | | | |
| 357 | 970 | 971 | 971 | | | | |
| 358–359 | 969 | 969 | 969 | | | | |
| 360–363 | 970 | 971 | 971 | | | | |
| 364 | 934 | 934 | 934 | | | | |
| 365–367 | 1050 | 1050 | 1050 | | | | |
| 368 | 935 | 935 | 935 | | | | |
| 368–369 | 1094 | 1094 | 1094 | | | | |
| 370–371 | 1015 | 1015 | 1015 | | | | |
| 372–373 | 1016 | 1016 | 1016 | | | | |
| 374 | 936 | 937 | 937 | | | | |
| 375 | 974 | 974 | 974 | | | | |
| 375–A thru 375–E | 974 | 974 | 974 | | | | |
| 376 | 1234 | 1235 | 1235 | | | | |

Appellate Case: 14-3006    Document: 23-2    Date Filed: 04/01/2014    Page: 922

**EXHIBITS      I      O      A**
**Defendant Ramirez**

| | I | O | A |
|---|---|---|---|
| **R-A** | 488 | 488 | 488 |
| **R-B** | 488 | 488 | 488 |
| **R-C** | 488 | 488 | 488 |
| **R-CC** | 1166 | | |
| **R-D** | 488 | 488 | 508 |
| **R-DD** | 1167 | | |
| **R-E** | 488 | 488 | 489 |
| **R-EE** | 1808 | 1808 | N/A |
| **R-F** | 488 | 488 | 489 |
| **R-FF** | 1001 | | |
| **R-G** | 495 | 495 | 496 |
| **R-GG** | 1053 | | |
| **R-H** | 504 | | |
| **R-HH** | 1790 | | |
| **R-I** | 675 | 675 | |
| **R-II** | 1061 | | |
| **R-J** | 675 | 675 | 676 |
| **R-JJ** | 1080 | | |
| **R-K** | 675 | 675 | 676 |
| **R-L-1** | 782 | 782 | 783 |
| **R-N-1** | 781 | 781 | 781 |
| **R-N-2** | 777 | 778 | 778 |
| **R-O** | 1437 | 1437 | 1437 |
| **R-P** | 1437 | 1437 | 1437 |
| **R-Q** | 1447 | 1447 | 1447 |
| **R-R** | 1401 | 1443 | N/A |
| **R-W** | 914 | 914 | 914 |
| **R-X** | 914 | 914 | 914 |
| **R-Z** | 1243 | | |

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA,            )
                                     )
                          Plaintiff,) District Court
                                     ) Case No. 12-10089-02
vs.                                  )          12-10089-03
                                     ) Circuit Court
PEDRO GARCIA,                        ) Case Nos. 14-3006
and GONZALO RAMIREZ,                 )          14-3039
                          Defendants,)
                                     )
_____

### TRANSCRIPT OF JURY TRIAL

On the 2nd day of October, 2013, came on to be heard **Jury Trial** in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.

**APPEARANCES**

The **Plaintiff** appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;
Defendant **Pedro Garcia** appeared in person and by and through Mr. Val Wachtel;
Defendant **Gonzalo Ramirez** appeared in person and by and through Mr. Joel Mandelman and Mr. Tim Henry.

# I N D E X

** See **Separate INDEX Volume** for specific page numbers for individual Witnesses and Exhibits **

**OCTOBER 2, 2013:**
Motion Prior to Voir Dire                    4
Voir Dire - NOT Transcribed in Deft Garcia's appeal

**OCTOBER 3, 2013:**
Preliminary Instructions to Jury            20
Opening Statements - NOT Transcribed in Deft Garcia's appeal

**WITNESS**

Shane Webb                                  36
Traci Rankin                               182
Craig Mellecker                            195
Michael Robbins                            226

**OCTOBER 4, 2013:**

Mariano Lorenzo-Sorano                     244
Roberto Cruz-Arca                          270
April Ortiz-Mendoza                        294
Ricardo Sanchez                            330
Anthony Wright                             354

**OCTOBER 8, 2013:**

Anthony Wright (Cont'd)                    460
Shane Webb (Recalled)                      517
Bamidele Adeagbo                           523
Russell Worthey                            539
Joe Galindo                                683

**OCTOBER 9, 2013:**

Joe Galindo (Cont'd)                       769
Frank Herrera                              793
Isidro Raleas-Velasquez                    808
Alonzo Diego                               819
Isidro Raleas-Velasquez (Recalled)         830
Jesus Flores                               832
Jeff Mooradian                             925
Shane Webb (Recalled)                      945
Leslie Lima                                984
Brady Schulte                              994
James Nau                                 1004

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

**OCTOBER 10, 2013:**

| | |
|---|---|
| Alberto Hernandez | 1024 |
| Santiago Hernandez | 1068 |
| Rumalda Hipolito | 1085 |
| Marriet Gonzalez | 1101 |
| Juan Torres | 1172 |

**OCTOBER 11, 2013:**

| | |
|---|---|
| Neal Tierney | 1284 |
| Fabian Neave | 1345 |
| James Thompson | 1448 |
| Dallas Hornback | 1467 |
| Kendra Owens | 1476 |
| Neal Tierney (Recalled) | 1491 |
| Craig Mellecker (Recalled) | 1504 |
| Colleen Brooks-Francis | 1508 |

**OCTOBER 15, 2013:**

| | |
|---|---|
| Joe Rodriguez | 1528 |
| Timothy Quint | 1536 |
| Michael Huffines | 1542 |
| Steve Gravatt | 1547 |
| James Nau (Recalled) | 1568 |
| Shane Webb (Recalled) | 1606 |
| Lisa Taylor-Austin | 1671 |

**OCTOBER 16, 2013:**

| | |
|---|---|
| Jose Louis Alvarez-Lopez | 1786 |
| J.L. Bice | 1801 |
| Drew Francis | 1803 |

**OCTOBER 16, 2013:**

| | |
|---|---|
| Argument on Instructions | 1725 |
| Instructions to Jury | 1810 |
| Closing Argument - Mr. Smith | 1815 |

**OCTOBER 17, 2013:**

| | |
|---|---|
| Questions by Jury | 1856 |
| Verdict | 1872 |

Certificate of Certified Shorthand Reporter  1880

(Beginning at 9:00 a.m. October 2, 2013, the following proceedings were held.)

THE COURT:  This is United States against Pedro Garcia and Gonzalo Ramirez.  Case number 12-10089. Lanny Welch, Aaron Smith appear for the Government.  Mr. Garcia is here with Val Wachtel; and Mr. Ramirez is here with Tim Henry and Joel Mandelman.  The jury isn't here yet and I will take up, briefly, the motions that have been filed in the last couple of days.

The first is the Government's Motion in Limine with respect to Officer Lima.  Anybody want to argue that? I've read it.  I understand it.

MR. SMITH:  Your Honor, I think our argument is summarized in the in limine motion.  We just feel that that particular question is not appropriate for Officer Lima when she would take the stand.

THE COURT:  Anybody disagree?

MR. MANDELMAN:  I'm sorry, I don't even -- what is the --

THE COURT:  Officer Lima was apparently involved in some sort of an affair with a fellow officer.

MR. SMITH:  That was filed under seal.  Have you received that?

MR. WACHTEL: No. I received the file under seal but -- I didn't think I could open that and --

MR. MANDELMAN: It didn't -- actually, I think our names -- it was Garcia, Vargas and Najera were listed on the --

THE COURT: Well, anyway, here's the deal. It says in response to potential *Giglio* information sent by the Government, the Dodge City Police Department notified Government prosecutors that in or around 2011, the Ford County Sheriff's Office was investigating misconduct by one of its deputies. During the investigation, Officer Lima was interviewed. The investigators asked Officer Lima if she was having a relationship with another deputy. Officer Lima told the investigators she was not. In fact, she had a brief relationship with a second deputy. Officer Lima is no longer married. The investigation was closed. The Dodge City Police Department was informed that Officer Lima initially denied the relationship and the human resources for Dodge City determined that no discipline was warranted.

Anybody want to say something about that?

MR. WACHTEL: I am disinterested in it, Your Honor, and would not use it anyway.

THE COURT: Thank you.

MR. MANDELMAN:  Your Honor, it goes to her character and reputation for truthfulness.

THE COURT:  Well, I know, maybe if we were in divorce court, it might; but, thankfully, we're not, Mr. Mandelman.

MR. MANDELMAN:  We just -- we just -- we ask to be permitted to --

THE COURT:  I'm going to rule in your favor on one of 'em so you don't have to feel like you're being shut out here.  I'm going to mark this one granted.

The next one is the disclosure of another predicate act.  I don't want to hear any evidence on this one.  This is granted.  The Government's known about this since -- at least since the Indictment was returned in July and there's no reason for that not to have been disclosed earlier.

And, good Lord, folks, if we don't have enough predicate acts in this case to confuse the jury beyond all possible confusion, then -- that one, Docket 795, the objection was sustained.

Now, the one that really does concern me a little bit because I sense here we've got two ships maybe passing in the night and I'm not sure exactly what's going on, is the one about the confidential informant.  Apparently, the confidential informant was involved in a

drug transaction with Ramirez and the confidential informant was an undercover KBI agent. Is that right? Am I thinking straight here?

MR. WELCH: Judge, there's an undercover KBI agent and a confidential informant.

THE COURT: All right. Well, what's the basis for requiring the Government to disclose the confidential informant in this case?

MR. MANDELMAN: Sure. Thanks, Judge. Uhm, two principal issues. We think, uhm, that my client may have been set up by another gang member.

THE COURT: Probably was if it's a drug deal. That's the way they work.

MR. MANDELMAN: But set up by a fellow -- what the Government is going to be describing as a Norteno, someone within this so-called enterprise. We think if he was set up by someone within the enterprise, it would take it out of the -- it wouldn't be a predicate RICO act. It wouldn't be in furtherance of any conspiracy if he was set up by someone who was within the conspiracy.

THE COURT: Have you cited any authority? That seems to be a rather vague proposition.

MR. MANDELMAN: Well, the 1962(d) is if there's an agreement between some folks for a common purpose to participate, uhm, in the affairs of the

enterprise, in a pattern of racketeering activity.  If someone set him up --

THE COURT:  What do you mean by setting him up?

MR. MANDELMAN:  A Norteno who got arrested cooperated with law enforcement.

THE COURT:  They turned him and he cooperated.

MR. MANDELMAN:  And they said sell to Mr. Ramirez.  And he participated in that transaction not knowing that he was set up by a fellow gang member. There was snitching inside the gang.

THE COURT:  But you're assuming that's what occurred.

MR. MANDELMAN:  Well, I mean, I think either that or -- yes, I mean, that's what we think happened. But even if that didn't happen and this was just totally outside the gang, uhm, racketeering act, it's a huge list, drug dealing, assaults, it's endless.  If a defendant in a RICO case got prosecuted for a domestic violence assault, that could be a racketeering act but it wouldn't be part of a RICO conspiracy case.  We think this is either within the -- he was set up or it's so far removed from the RICO case that it doesn't come in in that way.

THE COURT:  How's this evidence going to come

in if at all?

MR. WELCH:  Your Honor, we expect to introduce the fact that he was convicted in 2009 of drug dealing to a KBI undercover agent.

THE COURT:  So the conviction --

MR. WELCH:  Yes, sir.

THE COURT:  -- not the underlying -- well, all right.  If he was convicted, then they're just going to use the conviction and not going to let the defense undermine the conviction at this point.  All they're offering is the conviction.  They're not offering the circumstances of the -- leading to the conviction.

MR. MANDELMAN:  I mean, we think in a way that's --

THE COURT:  If the KBI agent was going to be in here testifying about a drug deal that didn't result in a conviction, I might be inclined to agree with you; but if all they're offering is the fact of the conviction, then I don't see that there's any basis to start retrying that.

MR. MANDELMAN:  Well, there's no dispute -- he was convicted in state court.  I mean, that conviction is, you know, it's a matter -- we're not disputing that --

THE COURT:  Isn't that a predicate act?

MR. MANDELMAN: Well, it's not sufficient just to be convicted. It has to somehow be part of this RICO conspiracy. They're going to get up here in closing and argue, Your Honor, they're going to -- Ladies and Gentlemen, this gentleman engaged in drug trafficking. Well, we need to be able --

THE COURT: No, he was convicted of engaging in drug trafficking. Isn't that the difference, Joel?

MR. MANDELMAN: He was. But we need to be able to rebut that that particular conviction was outside of the 1962(d) conspiracy.

THE COURT: Well, I don't follow what you're saying. I just -- I don't see that -- you know, you've got these general --

MR. HENRY: Your Honor --

THE COURT: Yes, Tim.

MR. HENRY: They're gonna use it as the predicate act to show that this -- I mean, they're going to take the conviction and argue it that this is a, first of all, it shows the interstate commerce nexus; but to do that, they've got to essentially make the argument that it's for this common purpose underlying the enterprise. And the bottom line is is that, as Joel's pointed out, there are two out of three possible scenarios here that are clearly something that would

be -- we would be able to argue is outside the common purpose and should not be used by the jury or to make this connection, which certainly I think the Government's going to use.

THE COURT: Well, I still don't understand why you need the identity of the confidential informant.

MR. HENRY: Well -- and as I argued a week or so ago, even if we don't need the actual identity of the individual, we need to be able to know from the Government -- and the Court can take this, maybe, under seal in chambers -- to determine from the Government who the person was within the Norteno gang, whether LCC or DV, or whether or not it's somebody that's entirely outside of the gang culture and was an act that was absolutely independent of any kind of an enterprise or racketeering act. And so --

THE COURT: If Lanny stood up now and said I won't tell you the identity of the confidential informant but I'll tell you that he was a member of the Nortenos, you still wouldn't be satisfied.

MR. HENRY: I think we would be able at least to be able to argue to the jury and counter the Government's argument that they're trying to say that this is an underlying predicate. We would be able to say how can that be? This is the rules of the road that

the Court's giving the jury as far as what a RICO conspiracy is, and it doesn't mesh.

MR. MANDELMAN:  We think it could be excluded all together, the evidence of this conviction.  It's simply going to be prejudicial in this case if we can't cross-examine this CI to find out how she got introduced to Mr. Ramirez.

THE COURT:  I want to concude this and get this case started.  Are you saying that the law says that when the Government offers the evidence of a conviction in a RICO case that the Defendant is entitled to go behind the conviction and get involved in who was involved in the transaction and all of the facts leading up to the conviction?

MR. MANDELMAN:  I mean, if it's relevant in the particular case.  I understand why --

THE COURT:  No.  I'm saying have you got any authority for your position?

MR. MANDELMAN:  Well, the elements of the offense require them to prove certain things about the conspiracy.

THE COURT:  No.  I'm saying do you have any authority for your position that under these circumstances when there has been a conviction, that the defense is entitled to go behind the conviction and

start getting involved in the circumstances that led to the conviction?

MR. MANDELMAN:  Well, I just rely on the authority about confidential informants that I cited in the previous -- thanks, Judge.

THE COURT:  Let me do this, Joel.  I don't want you guys having to work until midnight.  But you understand where I'm coming from here.  They say it's a conviction.  It is a conviction.  You don't argue about that.

MR. MANDELMAN:  No dispute.

THE COURT:  If you've got some authority that says that under these circumstances you can look behind the circumstances of the conviction and argue that this was not a predicate act because the individual involved was not a Norteno, then I'll certainly listen to that; but based on what you're telling me right now, the motion for disclosure of the informant is overruled.

Now, I have before me some documents here that apparently the Government wants to use in opening statement.  Are you objecting to those or are these just up here for --

MR. WACHTEL:  Well, Your Honor, at first I thought that I would not; but I do object to some of them.  I took the liberty of numbering them.  I know

they're not numbered on yours.  But on behalf of Mr. Garcia, I object to the --

THE COURT:  Which one, Val?  You've got to help me out here.

MR. WACHTEL:  I'm trying to, Judge.  I misnumbered.  I think it's number 7.  The young man with the --

THE COURT:  Show me the picture.

MR. WACHTEL:  Yes, sir.  This one right here. I numbered it as 4 but I think it might actually be 7. It's this photograph here.

THE COURT:  Yeah, I remember that one.

MR. WACHTEL:  It makes it easier then because the one that I object to comes right after that fellow in the plaid shirt.  The photograph of the, quote, rag, that the guy's got in his pocket, which we don't see who that person is.

THE COURT:  I remember these from the hearing. The picture of the young man, good looking young guy, wearing a red hoodie and a ball cap is being shown to the jury -- presumably will be shown during opening statement and presumably would be shown for what purpose?

MR. WELCH:  The color red, Your Honor.  The different factors, the way they identify themselves as

Diablos Viejos.

THE COURT:  This person is not a Defendant?

MR. WELCH:  He is.  He's plead guilty.  He is going to testify, Judge.

THE COURT:  But, I mean, he's not -- this isn't, obviously, these two men.

MR. WELCH:  I purposely did not put pictures of these Defendants except to identify there's two pictures -- actually three pictures, I think, of these Defendants.

THE COURT:  This fella with the plaid shirt, who is he?

MR. WACHTEL:  Have no idea, Judge.

MR. WELCH:  David Ochoa, Your Honor.  He is going to testify as well.

THE COURT:  We've got the red do-rag.

MR. WELCH:  Just to show the color red, Your Honor.

MR. WACHTEL:  So there isn't going to be any foundation to get it into the case at all so why should the jury see this and then be told they need to disregard it.

THE COURT:  I assume because -- I've heard testimony at the *Daubert* hearings that red handkerchiefs are indicative of membership in the Nortenos.

MR. WACHTEL:  Yeah, I heard that same testimony, too, Judge; but that was then and we are here now, and I think that if they're gonna show something to this jury, they're gonna have to get it in or we're gonna have to tell the jury that what they showed them in their opening statement, they cannot consider.

THE COURT:  Well, you know I'm telling the jury that the opening statements are not evidence.  But I assume there will be testimony about red handkerchiefs.

MR. WELCH:  There will, Judge.  Also in that picture he is wearing a red shirt as well, in addition to the handkerchief.

THE COURT:  Another one, Val.

MR. WACHTEL:  I would make the same argument to the picture of the belt buckle with the red N on it, Your Honor.

THE COURT:  That's probably Nebraska.

MR. WACHTEL:  I don't know why anybody would have that bad a taste but it probably is.

THE COURT:  I agree.

MR. WACHTEL:  The next one is the number 14 on the back of some unidentified person's neck plus a date on that.

THE COURT:  I know what that is, though.

MR. WACHTEL:  Also the red N on the cap of the young man sitting in the car.  Same objection to the 14.

THE COURT:  14 is a big deal to these fellas.

MR. WACHTEL:  Well, it is.  But where is this 14?  And I don't know whether they're going to introduce it or not and I oppose letting the jury see it --

THE COURT:  All right.  Let me say this so we can get through this.  My ruling was and remains that the Government, during its opening statement, I expect them to use as exhibits things that it reasonably expects to be admitted.  Okay?  If for some reason or another one of these exhibits is not admitted either because they overlook it -- and you have to keep track of that --

MR. WACHTEL:  I'll keep track.

THE COURT:  -- or because I would later sustain an objection to it for some reason, then I'll remind the jury that this was shown in opening statement, it wasn't offered in evidence or admitted in evidence and they are not to consider it.  Is that acceptable?

MR. WACHTEL:  It is to me, Judge.  I'll keep track of these.

THE COURT:  Okay.  Is that all right with you, Joel?

MR. MANDELMAN: Yeah. I do join in his objection and I'm concerned -- I believe that some of these photos are not going to be able to be authenticated as to time, place, and who's in them.

THE COURT: But you guys are going to need to keep track of those so that you can remind me later on. All right.

MR. MANDELMAN: There's some very prejudicial photographs of people flashing signs and having tattoos that, I mean, if they can't get them in, I think we're going to have problems. I'm going to have some more objections later on if they can't get them in.

THE COURT: Well, but we don't know that.

MR. MANDELMAN: I agree. I don't know if they can lay a foundation for them or not.

THE COURT: Do you all have any objection to the Kansas map?

MR. MANDELMAN: Nope.

THE COURT: All right. I'm not going to tell -- I try to tell the jurors a little bit about the case. I'm not going to go into a great deal of detail about what the case is about. I think it will go over their heads and will be a waste of their time. I'll try to be as brief as possible about it.

We're going to pick twelve jurors, two alternates.

You all get six -- each Defendant gets six peremptories and the Government gets six.  And we should, unless something is really different about this case, be able to get a jury here hopefully this morning or early afternoon and get started with the evidence.

Do you all know at this point in time if you want to make opening statements or do you want to reserve them?

MR. WACHTEL:  Your Honor, I must in all candor say that I have not yet decided.  First time in my life I've been thinking about reserving; but I haven't made up my mind.

THE COURT:  Well, then you'll have to let me know.

MR. WACHTEL:  Yes, sir.

MR. MANDELMAN:  And I will probably address the jury.

THE COURT:  All right.  Okay.  Anything else that you can think of?

MR. WELCH:  Not by the Government, Judge.

MR. WACHTEL:  Nothing, Your Honor.

THE COURT:  Joel, you got anything?

MR. MANDELMAN:  No.  Oh, one sort of preliminary thing.  I was just wondering if the Court would object to just introducing Tim and I not by saying

we're public defenders.  I know Mr. Garcia is represented by private counsel and I just don't want to get into why he's got court appointed counsel.

THE COURT:  I've been introducing you guys as the federal public defenders all the time I've been up here because I'm proud of you.

MR. MANDELMAN:  Me, too.  But, I don't know, I would just ask the Court to consider just introducing us just as attorneys here in Wichita.

THE COURT:  Well, I'll think about it.  You'll probably be identified.  Anything else?

MR. MANDELMAN:  Thank you, Judge.

THE COURT:  We'll get the jury up here and get going.

(Recess.)

(Whereupon, Voir Dire was held on October 2, 2013, beginning at 9:40 a.m. to 12:15 p.m. and 1:20 p.m. to 4:55 p.m.)

(Voir Dire NOT transcribed.)

(Beginning at 9:10 a.m. October 3, 2013, the following proceedings continued.)

THE COURT:  Good morning.  Like I told you last night, I'm going to give you some preliminary

instructions about your duties as jurors. These are not the written instructions you'll get at the end of the case. I don't want to frighten you; but those are, in this case, those are going to be quite long and I'll -- there's no point in giving them to you now. In part -- I know what some of them are going to be. Some of them are very standard. You've already heard me give a couple of them, the beyond a reasonable doubt and part of the credibility instruction and those are given in every case; but the elements of the offense charged and things like that, to some extent depend on the evidence that's offered and, of course, we haven't heard any evidence.

These instructions really just kind of outline the legal requirements for what the jury has to do during the trial. They're pretty self-evident.

It's going to be your job to determine as judges of the facts what the evidence is in the case; and you and you alone are the judges of the facts. My job is to interpret the law, give you the law as it applies and do various other things during the trial. But in the end, you're going to have to go back to the jury room and discuss the evidence that is introduced and admitted and decide, applying the legal standards, what the evidence has been and what you believe and what you don't believe

and how much of it you believe and then ultimately attempt to reach verdicts.

Nothing that I say or do during the trial is intended to indicate to you what I think the verdict should be. I may make some comments during the case, for example, in ruling on objections and things like that, that you may want want to know why I overrule an objection or if I sustain an objection. Sometimes I think jurors get the idea that I'm kind of trying to telegraph to them what I think their verdict ought to be and that's not the case at all. That's a different part of my job. But nothing that I ever say during the case is intended to indicate to you how I think you ought to resolve it.

The evidence is going to consist primarily of the testimony of witnesses. The Government has placed on my bench here this morning an exhibit notebook and, obviously, there are going to be quite a few exhibits in the case. Some of these may be admitted; some may not be. Kind of depends on what goes on during the trial. There are things, though, that are not evidence and this is important to remember. The statements and the arguments and the questions by the lawyers are not evidence. Now, either Mr. Welch or Mr. Smith is going to get up here in ten minutes or so and make the

Government's opening statement and that's a very important part of the case because it a road map or outline, if you will, of what the Government believes its evidence will show; but it's not evidence because it's not made under oath and you must not consider that as evidence.  Similarly, if Defendants' counsel choose to make opening statements, which is an option on their part, they don't have to, but if they do, what they say is not evidence.  It's simply what they think their evidence might show if they choose to offer evidence.  Similarly, closing arguments are not evidence.

Now, objections.  I don't watch all these TV shows about the law.  I see enough of that here.  But sometimes I have seen some, particularly -- I like the old Law and Order, the original Law and Order.  I thought that was pretty good.  But that's morphed into kind of what I don't care much for.  But I always thought that the way it was portrayed was that objections were some sort of attempt by a lawyer to hide evidence from the jury; and that's not the case at all.  That's really not the case.  Evidence comes in under what's called the Federal Rules of Evidence.  In other words, they're standard rules that apply to the admission of evidence.  One rule, for example, about admission of hearsay.  Some hearsay is admissible; some

isn't.  And I'm supposed to know those rules.  But sometimes -- and this case has never been tried before and the lawyers have a better idea, to some extent, of what the evidence is going to be.  And if the lawyers feel that evidence is being offered or may be offered that is not admissible under the rules of evidence, their job is to make an objection.  That's the only way they have of letting me know that they are concerned about that.  So, they stand and say, Your Honor, objection, or sometimes they'll state the objection. They know me pretty well and they know that I don't allow them to make arguments about the objection like they do on TV where everybody knows what their argument is.  Sometimes I'll allow that and sometimes I won't in front of the jury.  But that's the point of an objection.  Most of the time I will simply rule on it without any further discussion; but sometimes I don't understand the objection.  I don't understand why they're making an objection.  And so I'll have them come up at the bench; and if it's really confusing to me, I'll send you out to the jury room while I discuss it with them.  But that's the way I deal with it.  Here's the way you deal with it.  If I overrule an objection, you may consider the question for its purpose. Remember, a question is not evidence but it's still

something you need to hear and consider. And then the witness may answer. Whatever the answer is, you may consider it. If I sustain the objection, that means that the response of the witness is not something you should consider. Now, sometimes, the way things go in court, things are going pretty fast and what-not, Mrs. Schwemmer doesn't tell the lawyers to slow down, and the answer comes in before I sustain the objection. And if that happens, then you're not to consider the answer. Sometimes I make a mistake in terms of admission of evidence because I realize later that I shouldn't have admitted the evidence and then I instruct you to disregard it. That doesn't happen very often; but if I say disregard it, that's what I mean. And the practical effect of that is that when you go into the jury room to discuss the case, you don't discuss evidence that I told you to disregard.

Anything that you may see or hear outside the courtroom is not evidence. Now, we're very lucky in my little courtroom here and the way the jury room you now know is configured so that you're probably not going to be out much in the main area of the courthouse where you might hear or see something. And, frankly, in this case, I don't think you'd hear or see anything anyway. You may see, when you come in in the morning or leave at

night, you may see one of the lawyers out there. They know the rule is that they can't talk to you. That's just the rule about lawyers during trial, can't talk to the jury. They're not rude. If you haven't figured it out already, these are really nice guys and -- but, they know during the trial that they can't talk to jurors. And as a practical matter, I can't either. Sometimes, I mean, I'll talk to you in court on the record; but I'm not going to come back with a cup of coffee in the morning and sit down and talk with you because that's just not appropriate.

Now, there's two kinds of evidence. There's direct evidence and there's circumstantial evidence. And I know you've heard those terms, particularly circumstantial evidence. Every TV show, books, movies, they talk about circumstantial evidence as if it's some kind of secondary non-important evidence. It's just as important as direct evidence. Direct evidence is eye witness testimony. I saw this and I saw this. That's direct evidence. Circumstantial evidence is kind of indirect evidence, proof of a chain of facts from which the jury can infer the existence of a fact. And the lawyers don't get up and say, now, Ladies and Gentlemen, I'm going -- this witness is going to give direct evidence. The way the case flows generally is that you

hear the evidence, and the only time that somebody may make a point of direct and circumstantial evidence is during closing argument, which is entirely appropriate, but the lawyers know that they're going to get an instruction from me -- or you're going to get an instruction from me that says there's no difference between direct and circumstantial evidence as far as the law is concerned.  It may make a difference to you in terms of the weight of the evidence or something else; but circumstantial evidence isn't some kind of less important evidence.

I've read you part of the credibility instruction which is -- there are more credibility instructions. I've told you about another one in terms of the credibility of someone who's been convicted of a crime. And I think there are a couple of others that you'll hear at the end of the case.  But basically, that's your job, you know, you're to determine the facts in the case.  You've got to decide what evidence you credit and what you don't.  Now, it's rare in a case when we talk about credibility and who to believe and who not to believe that you have someone that it's so obvious, they admit on the witness stand that they're lying.  Some witnesses do that and you must consider that if that happens.  But generally weighing credibility simply

means to determine how much of any witness's testimony to believe and then you have to weigh all of the evidence to reach your final decision.

You know this is a criminal case.  We've gone over this and I'm not going to pay much more attention to it. These Defendants are presumed innocent.  There are a lot of crimes charged in this case.  They're presumed innocent of all of them.  And that presumption stays with them throughout the trial.  It never shifts to these Defendants to prove their innocence.  We hear that kind of thing on TV and movies, I'm going to prove my innocence.  Defendants don't have to prove anything to you.  That presumption stays with them until such time, if ever, that the Government by its evidence convinces all twelve of the jurors beyond a reasonable doubt.  And this is important.  These Defendants -- I've touched on this yesterday -- in some of the charges they're charged together but then in other charges one is not charged at all and the other is charged.  And to the extent they're charged together, they're entitled to separate consideration of the evidence as to the charges.  This will become more apparent to you when you get the instructions and the verdict.  But you have to ultimately give separate consideration to the evidence as to each Defendant and as to each charge.

Obviously, the Government bears the burden of proof beyond a reasonable doubt.  I've read that instruction to you and I won't read that again.

Now, this is going to be a fairly long case and when we take a recess, break for the evening, I generally say remember and heed the admonition.  And this is the admonition.  I'm not going to repeat it every time.  This is what I mean by it.

During the trial you are not to discuss the case or permit anyone to discuss it with you.  Now, that means a couple of things.  Number one, it means that when you go home and your spouse wants to talk with you or your neighbor or what-not about the trial, you have to tell them that you can't talk about the case, the judge says you can't talk about the case.  The reason for that is, there's certainly a possibility if you start discussing the case, number one, you may get information that is not evidence that could effect your thinking.  And, number two, and maybe more likely, once you start discussing the case, you start making up your mind about the case before the case is over.  And that brings me to the second one and that is that you can't discuss it among yourselves.  There's going to be times when you're -- some or all of you are in the jury room together and, you know, the natural thing is to say,

well, what did you think of that witness.  Well, the problem with that is you may not have heard all the witness's testimony, number one; but number two, frequently, it's not uncommon in a case for a later witness to change your mind about the evidence.  But if you start discussing it among yourselves, you start making up your mind about it before the end of the case.

I don't want you to do any research about the case. I alluded to that yesterday.  In the old days that usually meant that people, if we had a particularly curious juror, would go to the library or something and get out the old newspapers or something like that.  But now days all you have to do is get on the darn internet and you can find anything.  And please don't do that. And here again, whatever you need to know about this case is going to happen right here in the courtroom; and if you start getting on the internet, looking up things that you have a question about and that the lawyers and the evidence isn't answering, that's not evidence.  It's not appropriate for your consideration.

You can bring cell phones.  I don't know whether Rachael or my secretary Sue has told the marshals that you can bring cell phones into the building.  She says she has.  You, obviously, can't have them here in the courtroom.  I don't even know really how to handle all

of this about communications, tweeting and -- I don't do that. I can barely send a text message. But you're not to do that during the case. You're not to use your cell phones to send messages out to people about what's going on.

Now, I'll let you take notes. And I don't, you know, I don't encourage note-taking and I don't discourage it. This is a longer case and it may be that note-taking will help you. But Mrs. Schwemmer, as I told you, her job here is to take down everything that is said. Not for you. And here's why. I think some jurors think, well, gosh, you know -- and I've had this happen -- you'll be in there deliberating and you can't remember what a witness said so you'll want to have the record read back. Sometimes I allow that. But frequently it presents a problem because if I have Mrs. Schwemmer read back the testimony of one witness, then there may be other testimony that would have been contrary to that or complimentary to that, and you'll have to have that read back in order to balance the two. So, while I don't absolutely prohibit read-backs of testimony, I encourage you to listen carefully to the evidence, take notes if you wish; but remember, in the jury room, your notes are not evidence and it's your memories that control. The reason that there are twelve

of you in the jury room is because the law rather assumes that twelve of you can remember the evidence that is important for you to reach your verdict. I'm not telling you you can remember everything. You can't. But you should be able to remember the evidence that will make up your verdict.

Now, you'll recall that I told you yesterday -- and I want you to keep this always in mind -- that in the event of convictions, and I'm certainly not suggesting that there will be or should be, but in the event of convictions, regardless of who it is, I impose the sentence. That's my job. And so you must not allow or worry about that or speculate about that, what will happen to any person who might ultimately be sentenced.

Now, here's another point. Sometimes jurors want to ask questions. I may ask a question or two during the trial if I don't understand something. And I know there are times when the jurors won't understand what's going on or they won't understand the import of a question and an answer. But, especially in criminal cases, I think it's inappropriate. Some judges allow it; but I don't allow it, particularly in a criminal case. For this reason: It's disruptive. If a juror would have a question of a witness who's testifying or who has testified, you'd have to go to the jury room,

write out the question, give it to me.  Then I would show the question to the lawyers.  The lawyers would have an opportunity to object to the question or whatever.  If I thought the question was appropriate, then I'd bring you back in and I would ask the question.  In other words, I'd read it.  I wouldn't ask it, I'd read it to the witness.  The witness would, hopefully, answer; and, hopefully, that would be it.  Now, if that answer didn't satisfy the jurors, or a juror, then we would have to start the whole process over again.  And my expectation has been that, while you may have legitimate questions in your mind during the trial that you would like to ask, that you will find that in the end your question will either be answered by other evidence or you'll realize that your question wasn't necessary -- the answer wasn't necessary for you to reach your verdict.

It seems rather comfortable in here this morning. Are you all comfortable?  I'm hopeful that we won't have any major weather changes that effect the temperature. But you might want to bring sweaters or jackets in case it might get cold.  They were going to turn the air conditioning off as a result of this whatever they're calling it; but we persuaded them not to do that.

So, all right.  Now, you know that we'll take at

least one recess in the morning and at least one recess in the afternoon; but if any of you need a recess, just raise your hand and say, Judge, can we have a recess and I'll take one.

Any of you have any questions at this point?  All right.

JUROR # 100574000 01-0045:  I have one.  If we can't hear the answer --

THE COURT:  If you can't hear, you should say -- you raise your hand and say we can't hear. That's a very good point.  I generally can hear; but sometimes I will tell a witness to speak up or Cindy will tell a witness to speak up.  She has that authority from me, too.  So if you all can't hear, please indicate that and we will make sure that you can.

All right.  That having been done, we'll now have the Government's opening statement.  Mr. Welch.

(Opening Statements by Mr. Welch and Mr. Wachtel NOT Transcribed.)

(Recess.)

(Beginning at 10:45 a.m. October 3, 2013, the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT: All right. Before we bring out the jury, any person in the courtroom who is expected to be called as a witness in this case will have to leave the courtroom until after he or she has testified, with the exception of the case agents. So if any of you back there are expected to be called as witnesses -- who did you think was going to be -- should be excluded, Joel?

MR. MANDELMAN: Your Honor, I just wasn't sure who was in the courtroom.

THE COURT: Well, doesn't look to me like anybody who's in the courtroom is going to be a witness. Lanny, any of these people besides the case agents?

MR. WELCH: No, sir.

THE COURT: All right. Now, that rule, if people start coming in who may be witnesses, you're going to have to let me know. All right? Okay. Bring the jury out please.

(Jury enters the courtroom.)

Please be seated. Mr. Mandelman, do you want to make an opening statement?

MR. MANDELMAN: Yes.

THE COURT: All right, sir. You may proceed.

(Opening Statement by Mr.

Mandelman NOT Transcribed.)

THE COURT: Thank you, Mr. Mandelman. Call

your first witness.

MR. WELCH:  Your Honor, United States calls Shane Webb.

**SHANE WEBB**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you state your name.

A   Shane Webb.

Q   Mr. Webb, how are you employed?

A   I'm employed by the Kansas Bureau of Investigation.

Q   How long have you been employed by the KBI?

A   Since February 3rd of this year.

Q   And currently with the KBI are you assigned to a particular part of the State of Kansas?

A   Yes, I am.

Q   Where are you assigned?

A   To the southwest 19 counties of the state.

Q   And where is your office located?

A   My regional office is located out of Great Bend, Kansas.

Q   And where do you live?

A   In Dodge City.

Q   What are your current duties with the KBI?

A   My current duties are to -- mainly involves narcotics, whether that be using confidential informants to purchase narcotics or to do them in undercover roles. I also purchase narcotics myself.

Q   Prior to your employment with the KBI, were you employed by another law enforcement agency?

A   Yes, I was.

Q   Which agency is that?

A   The Dodge City Police Department.

Q   How long were you with the Dodge City Police Department?

A   From January 3rd of 2005 until February 2nd of this year.

Q   And prior to your employment with the Dodge City Police Department, were you employed by another law enforcement agency?

A   No, sir.

Q   Where are you from originally, sir?

A   Originally.  Most of my life, I've lived in Dodge City.

Q   Okay.  So you grew up in Dodge City, Kansas, and joined the Dodge City Police Department; is that right?

A   That is correct.

Q   And, again, I'm sorry, what year did you join the

police department? What year did you join the police department?

A In 2005.

Q When you joined the police department, did you receive training?

A Yes, I did.

Q What type of training did you receive?

A The basic training for law enforcement would be going to the Kansas Law Enforcement Training Center. It's located in Yoder, Kansas. That's a 14-week program or 560 training hours. After that training is completed, I then went to -- back to Dodge City Police Department where we conducted -- in what's considered their field training program where you're put with a senior officer. That's just over 400 hours. Those are my initial trainings to become law enforcement.

Q When you were initially commissioned as a law enforcement officer, a police officer in Dodge City, what was your rank?

A I was a police officer.

Q And what were your duties?

A To work patrol, to take 911 calls, to enforce traffic regulations, those -- things of that nature.

Q As your tenure with the police department went along, did your duties change?

A    Yes, they did.

Q    How so?

A    At the end of 2005 or beginning of 2006 I was placed on a unit called the Street Crime Unit.  The Street Crime Unit's main focus was on gangs and street level narcotics dealers.

Q    And when were you made part of the Street Crime Unit?

A    It would have been right at the end of 2005, beginning of 2006.

Q    And your duties you said initially as a police officer were to respond to 911 calls, conduct some investigations, street investigations.  How did your duties change when you joined the Street Crime Unit?

A    Our main focus was on gang activity as well as narcotics sales.

Q    And you said your main focus was gang activity.  As an officer within the -- was it known as the SCU the Street Crime Unit?

A    That's right.

Q    As an officer assigned to the SCU, day-to-day, what did you do?

A    Any time officers within the city would either stop persons that were suspected gang members, we would go to their traffic stops to visit with those individuals.  We

would go to any type of gang hangouts.  We would patrol gang neighborhoods.  We would also respond to any initial calls that would come out that would possibly be gang involved, whether that -- whatever that may be.

Q   Prior to your assignment to the Street Crime Unit in 2005, did the Street Crime Unit already exist?

A   Yes, it did.

Q   And why was the SCU formed by the police department in the first place?  If you know.

A   I don't know.

Q   When you were assigned to the SCU, your focus was primarily on gang investigations; is that correct?

A   Correct.  And street level narcotics sales.

Q   In your assignment within the Street Crime Unit starting in 2005, did you have direct contact with gang members in Dodge City, Kansas?

A   Yes, I did.

Q   And describe for the jury, if you would, what nature of contact you would have with gang members?

A   You mean -- can you rephrase that?

Q   Well, did you interview gang members?

A   Yes, sir.

Q   Did you interview gang members' families?

A   Yes.

Q   Did you interview victims of gang crime?

A   Yes.

Q   Did you conduct investigations of gang criminal activity?

A   Yes, I did.

Q   For the purpose of prosecution of crime?

A   Yes, sir.

Q   Did you make arrest of gang members?

A   Yes, I did.

Q   In addition to yourself, were there other members of the Street Crime Unit?

A   Yes, sir.

Q   How many?

A   There was a total of four officers that would be assigned to the Street Crime Unit.  Two of 'em would work, basically, weekday nights.  Two of us would work weekend nights.

Q   Within the Dodge City Police Department, were there people, starting in 2005 when you were with the Street Crime Unit, were there people identified as gang experts on the police department?

A   I don't know if I would call them gang experts; but we had officers that worked gangs.

Q   And were you one of those officers?

A   Yes.

Q   How long were you a member of the Street Crime Unit?

A   Until basically July of 2007.  During that -- July 2007, I was then promoted back to the detective bureau.

Q   And how did your job duties change, if at all?

A   They did change.  When I went back to the detective bureau, I would still assist in crime on the street.  If those officers would get called to crime scenes that they couldn't work themselves then they would contact and if they were gang-related, I would be the one that would be contacted.  I was the primary person in that role for gang crimes from July of 2007 until the end of 2008 when Detective Bice joined the department.

Q   Okay.  You said when Detective Bice joined the department.  Then how did that effect your role as a detective with the Dodge City Police Department?

A   Not only did he become -- begin assisting me in those crimes, but he also began working some of those crime without my help.

Q   Detective Bice is in the courtroom today; is that right?

A   Yes, sir.

Q   At some point in time while employed with the Dodge City Police Department, Mr. Webb, were other programs enacted by the police department to combat gang activity and gang crime?

A   Yes.

Q   What were those?

A   In two thousand -- I believe it was 2010 or 2011, we had what we called in the school system the DARE program, which was to educate children on resisting drug influences.  That program was changed to the GREAT program, which was more revolved around gang resistance and ways to keep children out of gangs.

Q   Now, at one point was there a unit called the POPs unit?

A   That is correct.

Q   What was that?

A   It was Proactive -- Public Oriented Policing.  In 2010 or 2011 when the GREAT program changed, or when the DARE program changed to the GREAT program, they then took the officers from the Street Crime Unit, which I wasn't part of any more, and changed that to the proactive or Public Oriented Policing program.  And their job duties changed some.

Q   All right.  So beginning in 2005, one of your primary focuses within the police department was crime gang activity in Dodge City, Kansas; correct?

A   The end of 2005, beginning of 2006.

Q   And this continued until when?

A   My focus on working gang investigation?

Q   Yes.

A   Would have -- all the way up until February 2nd of this year when I left the Dodge City Police Department.

Q   To join the KBI?

A   Yes, sir.

Q   In addition to working gang activity within Dodge City, Kansas, did you also work with other regional law enforcement agencies on gang activity in southwest Kansas?

A   Yes, sir.

Q   Which departments and what did you do?  What type of work did you do with them?

A   We had a task force we would put together between Dodge City, Garden City.  We had officers that would help us from Liberal, Kansas; Holcomb, Kansas; Haskell County; Finney County; Ford County; Dodge City Police Department.  We would travel back and forth -- and also corrections, probation officers, when persons are convicted of crimes, put on probation or corrections. We would have those persons in that line of work come out on this task force and we would -- started off, we went between Garden City and Dodge City pretty much every other weekend so that we could combat gang crime in those communities.  It since has changed to where just Dodge City is doing it locally.  They're still using parole, probation, corrections, as well as the

Ford County Sheriff's Office.  There's still members from smaller departments and counties around Ford County that come in to assist those officers on the weekends that do those task force duties.

Q    While you were with the police department, Mr. Webb, was there a process by which the police department would identify gang members and document people as being members of gangs in Dodge City?

A    Yes, sir.

Q    How did you do that?

A    There is a -- there's criteria sheets, we call 'em gang sheets.  Whenever officers would have any contact with any persons that they suspected to be gang members, they would then either take handwritten notes or they would contact a gang officer to come over and speak to those individuals.  That information was then -- was logged and stored within the Dodge City Police Department.

Q    And the criteria that was used by the police department and assembled on what you refer to as a gang sheet, that criteria came from where?

A    I don't know where the criteria originally came from.  I know in 2006 the State of Kansas basically put out their definition of what a gang member was.  I know within that definition, the things that were being asked

on the gang sheets fell within the state laws in Kansas.

Q   So the criteria used by the Dodge City Police Department was in line with the definition used by the State of Kansas?

MR. WACHTEL:  Objection; leading and suggestive.

THE COURT:  Pardon me.

MR. WACHTEL:  Leading and suggestive, Your Honor.

THE COURT:  Let's see if we cannot lead the witness please.

MR. WELCH:  Yes, Your Honor.

BY MR. WELCH:

Q   The criteria that was used on the gang form --

MR. WELCH:  Let me do this, Your Honor.  May I approach the witness?

THE COURT:  Yes.  I think that would be the easiest way.

BY MR. WELCH:

Q   Let me show you what's been marked as Government Exhibit 6, which is I think a two-sided document, Mr. Webb.  Would you look at both sides and tell me if you've seen that document before?

A   Yes, I have.

Q   And what is that?

A   This is a form that is our gang verification criteria.  This is actually a form that's on the computer.  All the boxes and lines can be filled in on the computer and then it stores a digital copy, basically.

Q   What's on the back of the form?

A   On the back of it, it will have the personal identifiers of the person that was spoken to; their address; their height, weight; driver's license; social security numbers; any persons that they were associating with you can place there on the back; any vehicles that they were stopped in.  So that these are all searchable fields in case we ever needed to go back to search any of these items for whatever the purpose may be.

Q   And the document that you have in front of you marked as Exhibit 6, is that a true and accurate copy of a gang verification criteria form that was used by the Dodge City Police Department when you were employed with the department?

A   Yes.

        MR. WELCH:  Your Honor, we would offer Exhibit 6.

        MR. WACHTEL:  If I could just see it, Your Honor, please.

        THE COURT:  Well, look, we're not going to go

through this trial wanting -- with counsel, whether it's the government or defense counsel, wanting to see every document. I've got the exhibits. I assume you all have copies of the exhibits. Correct?

MR. WACHTEL: Yes, sir. That's a two-sided exhibit. Mine is not. I just wanted to make sure that it had two sides on it.

THE COURT: All right. That's fine. I understand. But I expect counsel to be familiar with the exhibits that are offered and not have to approach every time an exhibit is offered unless there's some real reason to do it. It just delays the proceeding unnecessarily. Any objection to 6?

MR. WACHTEL: No.

MR. MANDELMAN: No, Your Honor.

THE COURT: 6 is received.

MR. WELCH: All right. May we display the exhibit.

BY MR. WELCH:

Q   The top portion of the criteria form, on Page 1 there's a box marked self-admission. Can you explain what that means and what that pertains to?

A   Self-admission would be if the individual would claim a specific set, that he was a member of a certain set. We would take that as a gang admission.

Q    And then below that there are four boxes which say what?

A    The three blocks below would be suspect -- or, excuse me, subject admits gang affiliation, subject has gang related tattoos.  We would then mark the boxes if we had examples of those tattoos, if they'd been photographed on the individual.  Subject writes gang graffiti.  Whether we have writings that may have been taken somehow either from school or possibly from their residences; or if we've seen they've tagged up graffiti on walls by using spray paint, that could be marked.  And also if we had an example of that, we would include that into their gang file.  And if the subject uses a gang-related moniker or a nickname.

Q    All right.  Let's go through these one by one.  Now, the first box says subject admits gang affiliation.  Did you personally have occasion where gang members admitted to you as a police officer they were associated with a gang in Dodge City?

A    Yes, sir.

Q    Does that occur on a fairly regular basis?

A    I can't say on what kind of basis; but it did occur.

Q    And was there a point in time where every gang sheet or gang verification criteria sheet that was completed by a police officer in Dodge City you reviewed?

A    That is correct.

Q    When did you do that?

A    That would be from 2009 until probably -- I want to say the end of 2010, 2011, right in there.  There's probably a year, year and a half, maybe a little bit longer, a little bit shorter, where every gang sheet that was produced within the department would come across my desk.

Q    And do you recall seeing other gang criteria sheets that were filled out by other officers where people had admitted gang association or gang affiliation?

A    Yes, sir.

Q    We don't need to go through each of these, but the second box says subject has gang related tattoos.  Can you just explain the process, how you would document tattoos?  Why that was important?

A    Tattoos, obviously, do not usually change much unless somebody has them removed or covers them up with another tattoo.  They were a way of -- a personal identifier for us; but also there are distinct tattoos that go with certain sets of gangs.  So we would try to document those to coincide with what set they were claiming.

Q    And then the last box there says subject uses a gang-related moniker.  What does that mean?

A   It's a nickname that they may have been given by the gang.  Sometimes it's nicknames that they may have had since birth; but most people on the streets will know them by that nickname and not necessarily their true name.

Q   All right.  Now, the next section below, the association section, what does that mean and why is that on the form?

A   The association section.  Again, it's just if officers observed this or -- they could then start marking these boxes.  If they associated with known gang members, that means if they were -- whether it be walking through a store together or if it would be on a traffic stop or it would be in some type of a crime that occurred with other members.  The next one is self-explanatory.  Included in the group photographs with other known gang members.  If we would ever get those photographs, we could then mark that box.

Q   Were there occasions where you obtained photographs of gang members?

A   Yes, sir.

Q   And then the last box under the association section is what?

A   Subject involved in criminal gang incidents.

Q   What does that mean?

A   That could be from anything -- any kind of crimes that they may be committing together that we had information they were involved in.

Q   All right.  And, briefly, let's touch on the other criteria section.  What information is contained there and why was that important?

A   The judicial findings of gang membership.  That has not happened very often, to my knowledge, in Dodge City.  But it was there if it happened to be within court, and the judge would have different criteria that they would meet under the -- as gang enhancements.  If there was a gang crime, the judge could do a gang enhancement on the sentencing.  That's what that box was for.

Next one would be subjects or victims who are targets of a crime or members of a rival gang.  It could be anything from batteries to criminal damages against that person's property all the way up to the numerous crimes.

Subjects use hand signs or gang language in content and contacts which clearly indicate gang affiliation.  If a -- different persons will throw different hand signs which will coincide with the sets they are claiming towards rival gang members; or if they are throwing gang signs to each other in photographs, we could check that box.

Subject name appears on a gang document, hit list or gang-related graffiti; through any kind of ledgers or what we consider roll calls; if persons will tag up their street moniker on walls or on notebooks through the school.  Those kind of items, you would be able to check that box.

The next one would be subject wears colors, gang clothing, gang paraphernalia in such a way that indicates gang affiliation.  Our gangs in Dodge City were color-oriented.  If they were wearing certain colors, they would coincide with the set they belonged to.  The officer could then check that box.

Subject identified as a gang member by another law enforcement agency.  This could happen either through other community -- through other law enforcement agencies in other communities in southwest Kansas.  They would then contact us and say, hey, I had contact with this individual, he admitted being in a certain gang out of your city.  Or if they admitted in Kansas Department of Corrections or in the Federal Bureau of Prisons and we were made aware of that, we could do a gang sheet and identify that on there.

Subject identified as a gang member by a reliable informant.  Kind of speaks for itself.  If a person would provide us information that the department or that

officer, they had credibility with, and they were reliable, they could mark that box.

Subject identifies gang member by another gang. This happened quite often.  Rival gang members or victims of different crimes would identify who that person may be.  The officer could then check that box.

Then, subject identified as gang member by public source.  I think this one is close to being the same as being the reliable informant.  It's a public source.

Then there's a comments section and any boxes that were checked on these sheets, and especially whenever I was checking the sheets, the officer would have to explain out why he checked what boxes.  So if the -- in the comments section, say, if the subject admitted gang affiliation, the officer would then put in his notes what the person said as to how they would admit that gang affiliation.  That would go with any of the boxes. So during the time when I was checking these sheets, my only job on checking these sheets was to make sure that any boxes that were checked, that the officer would describe in the comments section why they were checking those boxes.

Q   All right.  Mr. Webb, were there occasions where you personally completed one of these sheets based on contact that you had had?

A   Yes, sir.

Q   And then in addition to you personally filling out these sheets, you had occasion to review the contact sheets done by or completed by other officers; is that correct?

A   Yes, sir.

Q   That was one of your functions within the police department?

A   Yes, sir.

Q   In addition then, or as a result of the gang identification sheet and contact with gang members in Dodge City, did the Dodge City Police Department maintain a list or roster of gang members?

A   The Dodge City records department did.

Q   Did you help assemble that list for a period of time?

A   Not -- no, I did not help assemble it.

Q   Did you have access to that?

A   I had access to review material that they would enter.

Q   All right.  Focus in on a period between 2008 and 2012, you were employed by the Dodge City Police Department; is that correct?

A   Yes, sir.

Q   During that five-year period were there gangs that

were particularly active in Dodge City?  Meaning that you focused a lot of your -- police department focused a lot of their time and attention on based on criminal activity and other activity they were performing?

A    Yes.

Q    Which gangs would that be?

A    We had basically four sets.  Two of the sets fall underneath the umbrella of Nortenos.  Two of the sets fall under the umbrella of being Surenos.  Which are Hispanic gangs.

Q    Let's start with Nortenos.  Tell us, first of all, what does Norteno mean?

A    Norteno means north, Spanish word for north.

Q    You said there were two sets that fell within the Norteno name; is that right?

A    That's correct.

Q    What sets were they?

A    DV or Diablos Viejos, and the Los Carnales Chingones, which were affiliated very closely with the Diablos Viejos or DVs.

Q    All right.  Now, starting with DV, the Diablos Viejos, what does Diablos Viejos mean?

A    It means Old Devil in Spanish is what I've been told.

Q    And then the LCC, the Los Carnales Chingones, what

does that mean in Spanish?

A    It means The Bad Ass Brothers.

Q    And within, you said DV and LCC -- well, what relationship, if any, did DV and LCC have with each other?

A    They had a pretty strong relationship.  They would, obviously, hang out together a lot.  They would commit crimes together.  I don't know where you want me to go with this.

Q    That's fine.  You said earlier in your testimony that the gangs in Dodge City adopted colors.  Is that right?

A    Yes, sir.

Q    What color did the Nortenos, DV and LCC adopt?

A    The color red.

Q    Let's then turn it Surenos.  What does Sureno mean?

A    Sureno means south or southerner in Spanish.

Q    And you said there were two sets that identified themselves beneath the Sureno umbrella in Dodge City; is that right?

A    That's correct.

Q    What were those sets?

A    It was Master Criminal Boys, or MCB, and 18th Streeters.

Q    And what color did those sub sets of Surenos adopt?

A    Mainly blue.

Q    And what was the relationship between -- or the interaction between Nortenos and Surenos in Dodge City during 2008, 2012, and before?

A    It was -- they would have orders, you know, to -- or it would be what was taught of them to hit up or to get in confrontations with their rivals.  It could be crimes, whether that be to damage property, to get in a fight with them, to verbally confront them, all the way up to shooting at them or committing homicide.

Q    Let me -- I probably asked a poor question.  And you gave us a good answer, but let me ask you this.  Starting with Norteno.  Let me -- starting with Diablos Viejos, the DV.  All right.  Did they have rivals in Dodge City?

A    Yes, they did.

Q    Who were their rival gangs?

A    It would be Master Criminal Boys and 18 Streeters.

Q    And you said Nortenos, DV and LCC, were under the Norteno umbrella; correct?

A    Yes, sir.

Q    And DV and LCC were allied with one another?

A    Yes.

Q    So who were the rivals to LCC?

A    It would also be Master Criminal Boys and 18th

Streeters.

Q   And it goes without saying then -- what was the relationship the Surenos had with DV and LCC?  Did they also consider those gangs their rivals?

A   That is correct.

Q   Do you know, Detective -- excuse me, Agent Webb, when the Diablos Viejos gang began in Dodge City?

A   It would have been in the early '90s, around 1992.

Q   And do you know how it began in Dodge City?

A   I went to school with some of the founders of Diablos Viejos.

Q   And who were they and how do you know they were the founders of DV?

A   I know this because of persons that we constantly debrief or talking to gang members.  One of those was Travis Martinez.  His street name was Huevos.  He was in the same class as I was.  I don't know -- if he graduated, he would have graduated in 1995.

        MR. MANDELMAN:  Object, Your Honor.  This is testimonial hearsay.

        THE COURT:  Now let's -- let me talk to you a minute about this.  One of the things that I've already done in this case is I have heard the testimony of this witness, or at least some of the testimony of this witness, because the rules provide that certain people

can be qualified as expert witnesses, and that is, witnesses who are entitled to give opinions that will be of assistance to the jury, provide information to the jury which they might not otherwise know but nevertheless would be helpful to them.  The rules require that expert witnesses' opinions be given to the opposing side in the case well in advance of the trial and if there's any objection or concern about the admissibility of those opinions, that can be brought to the attention of the judge in advance of a trial for a ruling.  And that happened in this case and I have made a ruling in this case with respect to this witness's testimony.  The lawyers are aware of the ruling.  It's in writing.  I'm not -- you will not get it.  But I have ruled, among other things, that this witness can give expert testimony.  And one of the aspects of expert testimony is that testimony which otherwise might not be admissible under the rules, and one of those rules is hearsay, can be given, assuming the other qualifications are present.  And I've made that ruling.  So, while counsel can get up if they wish and make objections to the testimony as it comes in, they know that I've already ruled about that and they can make objections for the record.  Now, that doesn't mean that this witness or any other witness can testify to anything

that he or she wants to.  There are parameters that the lawyers are aware of that are in my written ruling and I expect this witness and any other witness to -- his testimony to be within those parameters.  And, finally, the fact that a witness is called an expert under the rules, and Rule 702 of the Rules of Evidence talks about experts, so that's the rule, doesn't mean that that witness is entitled to more credibility or less credibility than any other witness.  You'll get an instruction at the end of the case that says that you are to judge the testimony of a, quote, expert, end quote, the same way that you will judge the credibility of any other witness.  You'll get another instruction about that.  But that's basically why I'm going to allow this witness to testify about things that otherwise, if he had not previously been designated as an expert, would not be admissible.  All right.

MR. MANDELMAN:  Your Honor, I don't want to interrupt again.  I want to renew my objection in full, and this is beyond the scope of his report, testifying based on his personal history from growing up in Dodge City.

THE COURT:  I don't know whether it is or it isn't.  I expect the Government to offer testimony that's consistent with his report and consistent with

the testimony that he gave here several months ago.  And I'm not going to sit here and nitpick his report or read the transcript of his prior testimony to try to figure out if there's one sentence that's uttered in my court today in front of this jury that might not have been uttered at the hours and hours and hours of testimony that I heard previously from these witnesses.  Now, is that clear to everybody?

MR. WACHTEL:  Yes, it is, Your Honor.  May I just ask so that we don't delay -- I don't delay the proceedings, for a standing objection to anything that the officer says that is basically *Crawford* hearsay.

THE COURT:  My concern about that, Mr. Wachtel, is I don't have any problem with that, but apparently the Court of Appeals has problems with that.  So, without casting any aspersions on defense counsel who are doing their job here, I think that they'll have to make a decision with respect to whether to make contemporaneous objections.  They'll probably be overruled, and they know that; but on the other hand, it's very possible that they may make objections which are not covered in my previous ruling and would be appropriate.  So, does that make everything clear to everybody?  I hope so.  All right.

MR. WELCH:  Thank you, Judge.

BY MR. WELCH:

Q   I think we left off, Agent Webb, with how Diablos Viejos, DV, got started in Dodge City.  And you said in the early '90s; is that right?

A   Right.

Q   You have information as to who started it.  We don't need all the names; but the people who began DV in Dodge City, was the police department aware of who they were?

A   I believe so.

Q   And did you know some of those people?

A   Yes, sir.

Q   And when you began your employment with the Dodge City Police Department in 2004, DV was already established in Dodge City; is that correct?

A   I started beginning of 2005; and, yes, they were already established.

Q   I beg your pardon.  Thank you.  And when you left to join the KBI in 2012, was DV still established in Dodge City, Kansas?

A   Yes, sir.

Q   Now, earlier when we saw the gang criteria sheet, one of the items that was on that form, ways that officers and gang members identify who's a gang member, was by the color or the clothes that they wear; is that right?

A   Yes, sir.

MR. WELCH:  Your Honor, may I approach again?

THE COURT:  Sir.

BY MR. WELCH:

Q   Sir, I'm going to hand you photographs which have been marked 17, 18, 19, 20, 21, 22 and 44.  Starting with 17, would you please look at those and tell us if you've seen those before?

A   Yes, I have.  These photos are maintained by the Dodge City Police Department.

Q   Have you seen those photographs prior to today?

A   Yes, I have.

Q   And do you believe those photographs will assist the jury in better understanding your testimony concerning gang clothing and gang colors?

A   Yes, sir.

MR. WELCH:  Your Honor, we would offer those exhibits at this time.

MR. MANDELMAN:  Objection.  They're people in red clothes; but they haven't been authenticated as to when they were taken and who they were.  I mean, I agree they're people in red clothes; but they still have to have something to do with this case.

MR. WACHTEL:  Join in that objection, Your Honor.

THE COURT: The objection is overruled. You may cross-examine the witness with respect to those matters; but at the present time, I'm going to receive Exhibits 17 to 22 and 44.

Q  Starting with Exhibit 17, Agent Webb, can you tell us why that is a photograph maintained by the Dodge City Police Department?

A  Because of the -- this was actually taken of an individual by the name of Humberto Ortiz, street name is Beto; and whenever they encountered him on this occasion, they took photographs of the clothing he had on as well as the red bandana hanging out of his back pocket and also the shoe colors, being the red and the black. Those are all indicators as far as the color of clothing. So they want to photograph that to coincide with the gang sheets.

Q  Humberto Ortiz was a documented gang member in Dodge City?

A  Yes, sir.

Q  Which set did he belong to?

A  Los Carnales Chingones, LCC.

Q  LCC?

A  Yes, sir.

Q  All right. Turning then to 18. What is 18 and why is that significant?

A   This is the same individual.  Again, it was another contact where he would have a red bandana hanging out of his pocket.

Q   Now, have you as a police officer in Dodge City seen other gang members displaying a bandana or handkerchief in this fashion?

A   Yes, I have.

Q   And did you also see other Sureno gang members doing the same?

A   Yes, I have.

Q   The color of the bandana for the Sureno gang member would be what?

A   It would be blue.

Q   Turning then to 19.  What is the significance of 19 and why is that maintained by the Dodge City Police Department?

A   This is a picture of Pedro Garcia.  Obviously, the red undershirt, the red boxers, as well as the N on the belt buckle which would signify for Norteno.

Q   And do you see Pedro Garcia in the courtroom today?

A   Yes.

Q   Would you please point to him and describe what he is wearing?

A   Yes.  He's wearing a tan shirt, black pants, sitting right next to Mr. Wachtel.

MR. WELCH:  Your Honor, we would ask the record reflect the witness has identified Defendant Pedro Garcia.

THE COURT:  It will.

BY MR. WELCH:

Q   The N belt buckle, did you see that on a fairly regular basis in Dodge City?

A   Yes, sir.

Q   And have you -- well, let me ask you this:  Was Pedro Garcia a documented gang member in Dodge City?

A   Yes, he was.

Q   Which set was he documented as being a member of?

A   The Diablos Viejos, DV.

Q   Even though he was a documented DV or Diablos Viejos, he has the N belt buckle; is that right?

A   That's correct.

Q   Is that -- did you have Norteno -- or, DV gang members, Diablos Viejos gang members, that identified themselves as both DV and Norteno?

A   Yes.

Q   Was that common?

A   Yes.

Q   Turning then to 20.  Why was this picture maintained by the Dodge City Police Department?

A   This photo was within Russell Worthey's gang file,

who went by Blanco as his street name. Obviously, you see the red belt with the cut-out in the belt buckle so you could see the letter N, which is a lot like a Nebraska Cornhusker N would be on the side of this.

Q   The N signifies what?

A   A Norteno.

Q   Russell Worthey, was he a documented gang member?

A   Yes, he was.

Q   What set was he documented belonging to?

A   The Diablos Viejos.

Q   Okay.  And even though he is a DV gang member, he is showing the letter N, which signified to you as a gang expert, what?

A   He's claiming allegiance to the La Nuestra Familia, or the Norteno prison gangs in California.

MR. MANDELMAN:  Your Honor, I, I need to object again.  I apologize.  If we could approach for a second.  I don't want to slow this down; but I don't want to make --

THE COURT:  Yes, you can come up.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

MR. MANDELMAN:  There was, at the *Daubert*, there was no testimony at the *Daubert* hearing identifying specific people as members of the gang. That's all coming out as hearsay.  He testified at the *Daubert* hearing he was testifying about background, colors, significance of graffiti.  Now he's identifying specific people as members of the gang.  That needs to come from people who know, not from a police officer.

MR. WELCH:  Judge, we had a long discussion at the *Daubert* hearing about the gang sheet, which they have, and all those people are on the gang sheet that says gang members.

THE COURT:  I think you can cross-examine him about that.

MR. MANDELMAN:  Okay.  Just note my objection to this testimony.

MR. WACHTEL:  Just to protect myself and my client, I object on the same grounds that he did.

MR. MANDELMAN:  Sixth Amendment.

MR. WACHTEL:  Sixth Amendment, for prohibited hearsay.

MR. MANDELMAN:  It's also improper expert testimony under 702.  That's my objection.

THE COURT:  I understand your objection; but the objection is overruled.

MR. MANDELMAN:  Thanks, Judge.

THE COURT:  This is something you fellas know. I'm not in a position to sit up here and view several, what, hundred pages, several hundred pages of testimony from the *Daubert* hearing and the reports and get into whether a certain discrete piece of testimony was or was not received.  I've said this before and I'm not going to say it again.  It's up to counsel to stay within the confines of my ruling; but specific -- and these are things that -- I don't remember specifically if he identified individuals, but he did identify these forms. These were -- whatever he said about the photographs, I don't know.  Now, with that having been said, I remember Judge Rogers saying that the N on the Nebraska hat will be identified as standing for knowledge.

MR. WACHTEL:  Wise, wise words.

(Thereupon, the following proceedings continued in the hearing of the jury.).

MR. WELCH:  Your Honor, if we could turn to 21 if we could.

BY MR. WELCH:

Q   Agent Webb, do you know who this is?

A   Yes, I do.

Q   Who is that?

A    This is Adam Flores.

Q    Was Adam Flores documented as a gang member in Dodge City?

A    Yes.  He was an LCC gang member.

Q    And why would this photograph be maintained by the Dodge City -- or taken, first of all, and maintained by the Dodge City Police Department?

A    Once again, back to the gang clothing, wearing the red hat.  Also, red flannels were very popular to Nortenos as well as the blue flannels would be very popular to our Sureno gang members.

Q    Turning to 22.  Is this a photograph maintained by the Dodge City Police Department?

A    Yes, it is.  This is Juan Torres.  At one time he went by Little Rabbit; and his street name now is Bugzy. The picture here was taken, obviously, because some of the red clothing.  You can see the cap is a Boston Red Sox cap.  That is a popular sporting team that our Nortenos would wear.  As well as, like, the Cincinnati Reds and Nebraska Cornhuskers, anything with red, with symbolism of the N, or anything that would lead back to some type of red within the name, they would wear those types of sports items.

Q    And then turn to 44.

A    This is David Ochoa.  Went by Little David.  There's

a Nebraska Cornhusker stocking cap, which is very common that we would see in Dodge City with our Nortenos.

Q   Why was that a popular choice?

A   The -- because of the letter N.  Obviously, we're close to Nebraska so you can get a lot of Nebraska sporting goods clothing here.  It was very common.

Q   And what color does Nebraska Cornhuskers, what are the colors of the university?

A   Primarily, you know, red, white, black shirts; but most of their colors are going to be red with the letter N somewhere on it.

Q   Do you also have 45?

A   No, sir.

Q   I'll hand you what's been marked Exhibit 45 and ask you to take a minute and look at that.  What is that?

A   This is a photograph of David Ochoa, Little David.

Q   And why was that picture maintained by the department?

A   Because of the clothing.  He had a red colored flannel shirt on.

MR. WELCH:  We would offer 45, Judge.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  45 is received.

BY MR. WELCH:

Q   If you would display 45.  You testified, Agent Webb, this is David Ochoa.  That's the same person who was previously wearing the Nebraska stocking cap; is that right?

A   Yes, that is correct.

Q   You also testified, though, about red flannel.  Why would red flannel shirts be significant to you as a gang officer in Dodge City, Kansas?

A   They were just so available.  I don't know.  They just -- several members would, would have flannel shirts from whatever source.

Q   Well, did you commonly see Norteno, DV, LCC gang members wearing red flannel in Dodge City?

A   It was very common.

Q   Earlier, Agent Webb, you made reference to tagging. In fact, on the gang criteria form, tagging was one of the boxes that could being checked.  Did you have personal experience with observing gang members either in the process of tagging areas of town or the results of tagging in Dodge City, Kansas?

A   Yes, both.

Q   Let me hand you what have been marked as Exhibits 9, 10, 11, 12, 13, 14 and 16 and ask you if you would take a minute and see if you recognize those.

A   Yes, I do recognize those as photographs that were kept by the Dodge City Police Department.

Q   Do you believe those photographs would aid the jury in better understanding what tagging means and why you as a Dodge City police officer considered that significant?

A   Yes.

MR. WELCH:  Your Honor, we would offer those exhibits at this time.

MR. WACHTEL:  Object to absence of foundation.

MR. MANDELMAN:  Same objection.  Unless we know when they were taken, where it was taken and who was responsible for it, it's of no significance at all in this case.  It's so irrelevant.

THE COURT:  The objections are overruled. They're received.  You may cross-examine.  Do you want to voir dire the witness now or do you want to wait until cross-examination?

MR. WACHTEL:  I'll wait, Your Honor, if that's all right with the Court.

THE COURT:  That's all right with me.

MR. MANDELMAN:  Well, I could just pick one of 'em.  I don't care.  I'll ask him.

THE COURT:  Okay.  Pick one and --

MR. MANDELMAN:  Exhibit 9.  Do you know when

this -- do you know when this photo was taken?

A    Yes, I took it.

MR. MANDELMAN:  You took it.  And when did you take it?

A    I believe this was the end of 2006.  I don't know the exact date; but there is a case number because this was a criminal case that I had filed.

MR. MANDELMAN:  The end of 2006?

A    Yes, sir.

MR. MANDELMAN:  Okay.  And do you know who was responsible for it?

A    Yes.

MR. MANDELMAN:  Okay.  Who was responsible for it?

A    Juan Torres.

MR. MANDELMAN:  Okay.  And you know where it -- where it was?

A    Yes.  It was at the VFW park in Dodge City.

MR. MANDELMAN:  Okay.  Can you -- were you the photographer of the remaining exhibits?

A    I was not on number 10.  I was of 11 and 12.  I was not of 13.  I don't know if I took 14; but I've seen this tag up on the wall.  I know where this was at. I've seen it; but I don't know if I photographed it. And same way with 16.  I don't know if I photographed

it; but I know where this was.  I've seen it in person where it was tagged at.

MR. MANDELMAN:  So what about 10?  Who took 10?

A    I do not know, sir.

MR. MANDELMAN:  It's got this date here, 2002. This is not a 2002 case.  This case is from 2008 to 2012.

MR. WELCH:  Objection; argumentative, Judge.

THE COURT:  Correct.  Sustained.

MR. MANDELMAN:  Was this taken six years before the beginning of the charges in this case?

A    I do not know, sir.

MR. MANDELMAN:  Do you know who would?

A    Once we look in the computer system, we could tell what the date was.  The thing about having the dates on the photographs, as I've explained before in some of these hearings, is not always are these dates correct due to the fact of whenever you take batteries out of cameras and replace batteries, if the officers wouldn't reset the actual date on the camera, that would not be a correct date.

MR. MANDELMAN:  So you, you don't know when it was taken?

A    No, sir.

MR. MANDELMAN:  Do you know when 14 was taken?

A    14 would have -- it would have been in 2008 or 2009.

MR. MANDELMAN:  Even though the date here -- this is a problem -- it's your testimony that this is a problem with the camera battery.

A    No, it's not a problem with the camera battery. They still had to replace AA batteries in the cameras; and whenever they replace those batteries, if they would not set the date on the camera, it would go back to a default.  So I couldn't tell you exactly what date this was taken.  But I know where this was spray painted up. I remember seeing it.  And I know it was taken down shortly after I seen it.

MR. MANDELMAN:  What about 16?

A    That's the same.  I don't know exactly when this picture was taken and I'm not for sure if I took it or not.  But this was at the corner of Division and 13th -- or, excuse me, 12th Avenue.  It was on the side of the house right there.  I've seen it.  This gang graffiti would not have been up for any long period of time as it's city code to get it taken down.

MR. MANDELMAN:  I think I skipped 13.

A    Yes.  I do not know when this photograph was taken. And I did not take this one for sure.  And I never seen it other than in the photographs that were maintained by

the police department.

MR. MANDELMAN:  So, I mean, at a minimum, I'm objecting to 10 and 13.  I don't think there's any foundation for those photographs.  We don't know exactly when 14 was taken.  If he took 16 and he knows about it, that's fine.

THE COURT:  Ladies and Gentlemen, let me, again, try to let you know how things work here in these matters.  When an exhibit is offered, the witness has to be able to identify it somehow, obviously, whether it's a photograph or something in writing like Exhibit 6.  But with respect to photographs, there's no requirement in the law that says that a photograph to be admissible has to be taken by the witness.  The underlying requirement is that the witness can identify the photograph.  So, here again, ultimately, the jurors have to determine the weight of the evidence and whether or not the photograph -- the witness can say that the photograph depicts what it is and what he's aware of.  And I let defense counsel question those matters to make sure, if defense counsel is concerned, to make sure that the witness can identify the photographs individually.  And I've done that with respect to Mr. Mandelman.  But I'm satisfied that this witness can identify these sufficiently for legal purposes.  And you can certainly

consider, if you wish, at the appropriate time, the fact that he didn't take one of the pictures or more of the pictures in terms of the weight of the testimony. But in terms of the admissibility of the testimony, with respect to these photographs, the objection is overruled and they are received.

Let me stop just for a second here. It's 12:00. Do you want to stop here and take the noon recess? Do you want to go on for -- I assume he's going to be here for quite a while.

MR. WELCH: I would expect he will be, Judge.

THE COURT: Would you like to take the noon recess now, Ladies and Gentlemen, for about an hour and then -- or would you like to go on for a little while.

(Off-the-record.)

THE COURT: I see nodding heads. I think probably they want to take their lunch recess. So we will take the noon recess, Ladies and Gentlemen, until about 1:00. Please remember and heed the admonition. You're excused.

(Noon recess.)

(Beginning at 1:05 p.m. October 3, 2013, the following proceedings continued.)

THE COURT: Before we get started, Ladies and

Gentlemen, this is Robert Moody.  Well known to the lawyers here.  Until two years ago, he was a member of my staff as my courtroom deputy; and he sat there for many years.  He's now starting his third year at Washburn law school; and as soon as he graduates from Washburn law school, he is going to be a member of one of the larger more prestigious firms here in Wichita.  Everybody here is proud of Robert, let me tell ya.  So, he's here as my intern, or extern, as I guess they call them up at the law school, mainly on Fridays.  But he's here today also.  So you may see him from time to time.  All right.

MR. WELCH:  Thank you, Judge.

BY MR. WELCH:

Q   Agent Webb, before we broke for lunch we had just started -- I just handed you a series of photographs starting with Exhibit 9.  Can we display 9 please.  Agent Webb, do you recognize what Exhibit 9 is?

A   Yes, I do.

Q   What is that?

A   This is the wall of a restroom that's in one of our parks in Dodge City called VFW park.  On the wall -- I caught an individual by the name of Juan Torres placing graffiti, or tagging, on the side of this restroom in this park.

Q You've used the word tagging in your previous testimony. What is tagging? What does that mean?

A Just basically graffiti, gang slangs, whether it be on paper or on walls using either markers, pens or spray paint.

Q And this particular example of tagging signifies what? What does this mean?

A It's Roman numerals XIV for the number 14, which would be the 14th letter of the alphabet for the letter N for Norteno or Nuestra Familia.

Q And the color of the spray paint, is that significant to you as a gang investigator?

A Yes. It's the color red which would also coincide with Nortenos.

Q You said you caught Juan Torres as he was doing this tagging; is that right?

A That's correct.

Q And Juan Torres is documented -- what set does he belong to in Dodge City?

A The Diablos Viejos.

Q When you see 14, Agent Webb, what does that signify to you in Dodge City? What does that mean? Especially a red 14?

A That they're going to be claiming this as territory within where their gang operates.

Q   And when you say they, which gang are you talking about?

A   The Nortenos.

Q   Or commonly known as what in Dodge City?

A   Diablos Viejos.

Q   All right.  Turn then to Exhibit 10 if we could. First of all, what type of structure is tagged here? What building is that?  Do you know?

A   This was actually a garage that faces Ash Street. It's right next to -- it would be 9th and Ash.  It would be on the south side of the road.  This is a garage that's been tagged up, a garage door.

Q   All right.  Starting at the left, if you could, the upper left, can you first read for the jury what is written on or spray painted on the garage door?

A   Yes.  It says Nortenos.  And you'll also see the S is backwards or it will be crossed out.  That's to show disrespect to Surenos.  They'll cross out the letter S and placing it backwards.  And it says "por vida" which would be for life.  It's also common whenever they use and "I" they'll put, like, a rifle scope in the circle part of the "I" which they've done here.  And then it will say "scrapas" on the bottom, which is a derogatory term for a Sureno gang member.  They'll call them scrapas, such as table scraps is how individuals have

identified it to me.  So it's just basically being derogatory towards them.  You'll see the "S"s are backwards and you'll see it crossed out.

Q   All right.  And in the middle is a number; correct?

A   Yes.  Large number 14.  Once again, for the 14th letter of the alphabet for the letter N.

Q   All right.  And then to the right, starting with the upper right, what is that word?  And read going down if you would.

A   Yes.  It says "Diablos Viejos", and "El Diablito", diablito.

Q   You've testified before, of course, Diablos Viejos means what?

A   DV, the actual set.

Q   And then the El Diablito, what does that signify to you?

A   I believe diablito is little devil is what that would be in Spanish.  Then you'll see the one dot and four dots, again, with the number 14.

Q   The one dot would be to the left of diablito and the four dots to the right?

A   That's correct.  It's probably a gang moniker.

Q   So the El Diablito you said is a gang moniker in your opinion; is that right?

A   That is my opinion.

Q   All right.  So what does that mean in terms of --
the gang moniker appearing on the door with the other
graffiti, what did that mean to you?

A   Probably whoever was using the street name El
Diablito is probably the one who placed this up there.

Q   Do you know who El Diablito is or was?

A   No.

Q   Now, the one dot on the left, four dots on the
right, that signifies what?

A   The number 14.

Q   Okay.  All right.  Turning then to Exhibit 11.  What
is that?

A   This was gang graffiti that I photographed on
Minneola Road, which would be in the south part of Dodge
City.  This is actually a fence that surrounds one of
our salvage yards.  What has happened in this photograph
is at some point a Sureno gang member from area code
915, which you can see crossed out.  915 area code would
be for El Paso, Texas.  This person has tagged up the
fence.  You can see the 915.  The the E-P is probably
referring to El Paso since that's where the area code is
out of.  Texas.  Also east side, so they might be
claiming the east side of, maybe, El Paso for instance.
You'll see where it says "sur 13".  They'll use the one
dot and three dots.  They're doing that for the 13th

letter of the alphabet for the letter M, and that is showing allegiance with the Mexican mafia. And L-F-L is probably going to be their gang set. I'm not sure what that exactly stands for, but LFL is probably going to be their gang set. And a member of Los Carnales Chingones has came back and they've tagged over this. You can see them crossing out the 915. And they put an arrow down. LCC, I've spoken about. LCC will also claim the east side of Dodge City, so they'll tag up east side. That's the reason why they just cover it up with red paint and put E-S. And then the numbers 1-2-3-3 is the 12th letter of the alphabet is for L, the third letter for C, the third letter for C. So LCC will tag up a lot of 1233s.

Q Earlier you testified that this particular graffiti or this tagging is located -- or was located in south Dodge City; is that correct?

A That's correct.

Q Were there places, areas of Dodge City, that were claimed by each gang?

A More our Nortenos would claim an area; but our Surenos had neighborhoods they've lived in more frequently.

Q The DV, for example, what area of Dodge City would they usually claim is their territory?

A    It would also be on the east side of Dodge City.  It would be from Central Avenue, or Avenue A, through Avenue P.  It would be from Wyatt Earp on the south to Comanche Street on the north.  It would be basically one square mile.  And they refer to that as the east side or alphabet city because of the alphabet-lettered streets.

Q    So A Avenue, B Avenue, C Avenue, et cetera?

A    Yes, sir.

Q    You said this is in the south part of town and it appears that the blue tagging occurred first.  What part of town would the Sureno, the MCB or 18th Street gang claim is theirs?

A    Mainly the south part of town or the west part of town.

Q    All right.  And LCC, did they have a particular part of town they claimed?

A    Yes.  It would be the same as DV did, which would be the same streets that I just explained on the east side of Dodge City.

Q    Now, the fact that LCC gang members had come in and painted over the existing blue spray paint, what did that mean?  What does that signify?

A    It's showing disrespect and also showing that they're in the area, basically showing that they were here also, and it's showing disrespect to these other

gang members.

Q   Turning then to 12.  Is this the same fence?

A   Yes, it is.

Q   Just a different portion of the fence showing additional graffiti; is that correct?

A   Yes.

Q   Okay.  Just quickly, if you could, decipher this for us starting with the 1233 in the upper left?

A   Once again, 1233 for the LCC.  Crossing out the 915 area code.  Crossing out the two S's, putting the down arrows.  Crossing out "L F L" which would most likely have been their gang set.  Crossing out Surenos and crossing out the number 13.

Q   All right.  You testified to this, but 13 appeared in the other photograph as well.  13 is a number of significance to the Surenos; is that right?

A   That is correct.

Q   And why is that?

A   It's -- they're claiming -- the Surenos will claim allegiance to the Mexican Mafia, which is a prison gang in California.  Nortenos will claim allegiance to Nuestra Familia, which is a prison gang in California, which, Nuestra Familia, you'll get your northerners, and your La Eme, you'll get your southerners.  So those will be the street gangs that claim allegiance to those two

prison gangs.

Q   And La Eme is the letter M in Spanish; is that correct?

A   That's correct.

Q   Now, the 1233 -- before we leave this picture, there's X's in the lower portions of both 3's.  Does that have any significance?  Do you see this routinely?

A   Mainly we would see it in the I's; but I did see it here.

Q   And these are -- you said earlier for the I's, what did that mean?

A   Most of the time within the I's they would draw basically crosshairs for, like, a scope of a rifle.

Q   Turning to 13.  This one is a little difficult to see, Agent Webb; but, first of all, what type of structure or item is that that was tagged?

A   This is a trash dumpster in one of the alleys.  I don't know where this is at exactly.

Q   But it's in Dodge City, Kansas?

A   Yes.

Q   And what tagging is on this dumpster that was significant to you as an investigator?

A   Just to the left -- actually, they just pulled the picture up a little bigger -- to the left of the S-K there's letters D-V, which would coincide with the

Diablos Viejos gang member placing this up there.  The letters SK would be for scrap killer.  I've explained the derogatory term of scraps that they will call them. Again, they'll cross out the S for the Sureno gang members to show disrespect.  The upside down 13's and 18's, again, crossed out.  Down there on the bottom part you'll have the one dot and four dots off to the right in the diamond shapes.  X 4 for the number 14.  XIV for the 14.  And Ene for the letter N in Spanish.

Q   Okay.  Now, the upside down 13, the number 13 is significant why?

A   Why is it?  They're just showing disrespect to Sureno gang members.

Q   They do that by having the number upside down; correct?

A   That is one way.

Q   Why is the number 18 depicted as well?

A   The same thing.  We have a Sureno gang called the 18th Streeters.  And they, again, will do the same thing with number 18.  They'll either cross them out, write them upside down, do different things like that.

Q   Below -- we've seen examples of this earlier, but the one dot to the left and four dots to the right signifies what?

A   The number 14.

Q   And then an X and a 4 signifies what to you?

A   The number 14.

Q   X meaning what?

A   Ten.

Q   Roman Numeral ten?

A   That's correct.

Q   Then the E-N-E which appears to the right.  You said that was for the letter N?

A   Yes, that's correct.

Q   Which means what?

A   Ene means N in Spanish.

Q   N stands for?

A   The Nortenos or Nuestra Familia.

Q   All right.  On this graffiti we have DV identifying both DV and Ene.  In your experience, DV and N go together in Dodge City; is that correct?

A   That's correct.

Q   Meaning Nortenos and DV are the same?

A   That's correct.

Q   Turning then to Exhibit 14.  What is that?

A   This picture was taken on the back of one of our motel conference centers.  It was the Silver Spur Center at the time.  On this wall there is depicted a bird called the Huelga bird.  The Huelga bird is a symbol that was originally used by the United Farmworkers

Association out of California.  It is an actual bird. But they've used that as their symbol for their organization.  When Nuestra Familia, the prison gang, began, they also started using this symbol.  Our street gangs will also use this symbol through tattoos and through graffiti to show allegiance and pay homage to them.

Q   The fact that this graffiti was placed, you said, on a motel in Dodge City.  Where this hotel is located, is that area considered DV territory?

A   Not necessarily.  This was at 14th and Spruce, just to the east of 14th and Spruce.  But it's still showing tagging up, showing they're in the area.

Q   Exhibit 16.  DV and LCC weren't the only gangs that tagged in Dodge City; is that correct?

A   That's correct.

Q   What is Exhibit 16 an example of?

A   This was at 12th and Division.  It would be the first house there.  This is actually facing the VFW Park that I explained earlier where the XIV was tagged up. This would be a Sureno gang member, be using the color blue.  Sur for south or for southerner.  The number 13 for the 13th letter of the alphabet.  And then they'll place up N-K for Norteno killer and they'll usually cross out N.

Q   The fact that the N is backwards, is that by accident or by design?

A   They'll place letters backwards.

Q   To show disrespect to rivals; is that right?

A   Yes, sir.

Q   Let me hand you, Agent Webb, Exhibits 37, 38, 40, 48, 80, 82 and 83.  If you would take a minute and please look at those.

A   Yes, sir.

Q   All right.  Have you seen those photographs before?

A   Yes, I have.

Q   And are those photographs maintained as exhibits or part of the gang file by the Dodge City Police Department?

A   Yes, they are.

Q   Do you believe that those photographs would assist the jury in understanding your testimony about gang activity in Dodge City?

A   Yes.

        MR. WELCH:  Your Honor, we would offer those exhibits at this time.

        MR. MANDELMAN:  Your Honor, again, I object until there's a foundation and until the relevance is demonstrated.

        THE COURT:  Lay a foundation, please.

BY MR. WELCH:

Q    All right.  These photographs of -- don't describe each photograph; but, generally speaking, these are photographs of what type of activity?

A    Individuals throwing up -- I say throwing up -- making hand signs that would be their gang signs.

Q    And are hand signs or hand signals a common way that DV gang members in Dodge City would identify themselves as members of the gang?

A    Yes.  Both theirselves and to rivals.

Q    Have you seen yourself, as a police officer in Dodge City, these hand signals displayed for you?

A    Yes.

Q    And have you had experience where these hand signs were given by DV gang members as warnings or threats to rival gang members?

A    I'm sorry.  Ask that one --

Q    As part of your investigation, have you heard where these types of hand signals were given as warnings or threats to rival gang members?

A    Yes.

Q    Are you familiar with the term hit up?

A    Yes.

Q    What does hit up mean?

A    They'll hit each other up with gang signs.  Form of

nonverbal communication.  So if they're across a room, across a park, across the mall, they can throw gang signs at each other to -- to identify who the other person might be banging with if they actually are gang banging.  Or it could be a threat to a rival gangster that they're throwing signs and this is who I am, and they'll show that to each other.

Q   And, Agent Webb, are each one of these exhibits, each one of these photographs, an example of hand signals that you have either seen as an investigator in Dodge City or as a gang investigator learned these are common forms of expression and identification by DV and LCC gang members?

A   Yes, they are.

MR. WELCH:  We would offer those exhibits, Judge.

THE COURT:  Any objection?

MR. MANDELMAN:  Well, my question still is when they were taken and where.

THE COURT:  That goes to the weight.  You may -- if you want to voir dire him again, fine.  If not, you can question him in your cross-examination.

MR. MANDELMAN:  Well, just note my objection.

THE COURT:  37, 38, 40, 48, 80, 82 and 83 are received.

BY MR. WELCH:

Q Starting with 37, Agent Webb. What is portrayed in Exhibit 37.

A This is a photograph that the Dodge City Police Department received from a juvenile corrections officer. This photograph was -- has obviously been altered to place words and numbers that I do not believe was actually on their clothing at the time or was actually a sign in the picture but they have taken a computer, basically, and placed this on there. It says Diablos Viejos. One way that they will write as far as computers go, if they don't actually change the S's, they leave them out, possibly put, like, Z's or they'll use the money sign which is indicating that they're crossing out the X -- excuse me -- the S. So here it says "Diablos Viejos" and it says "gueneracion nortenos". The person in the top back lefthand side is throwing up the 1-4. The person directly next to him that has the bandana draped over his hands, the red bandana, he is making the letter N with his fingers for Norteno. The third person from the left in the back row is making a five-pointed star. Each point of that star they say means N-O-R-T-E for Norte. They also refer to that as the nautical star, The North Star. The last person in the back row on the righthand side is also

putting up the 1-4.  In the front row to the left side, that individual is placing up 1-4 with his hand but he's also got his arms crossed.  The middle person will place his arms together and be making the I basically.  This is -- they're making the Roman numeral XIV.  And then the person on the bottom righthand side is making the V.  So the front row is making XIV for the number 14.

Q   All right.  So this exhibit makes reference to both Diablos Viejos and Nortenos generation; is that correct?

A   That's correct.

Q   And these are gang members in Dodge City, Kansas; is that correct?

A   I believe they would be if they're making pictures like this.

Q   All right.  And Diablos Viejos is centered in Dodge City; correct?

A   Yes, sir.

Q   All right.  Turn to 38 if you would.  What is this an example of?

A   This person is Alfredo Beltran-Ruiz, goes by Deuce-Deuce.  He is throwing up the sign DV.  He is making a D with his right hand and a V with his left hand.

Q   For what?  What does DV stand for?

A   For Diablos Viejos.

Q   And then what's the next one you have?  40?

A   Yes.

Q   Okay.  What is the significance of Exhibit 40?

A   This photo was taken by persons that have spoken to us about this.  This was taken actually here in Wichita, Kansas, at a skating rink during a rap concert.  This would be just a group photograph with numerous gang members throwing numerous different gang signs.

Q   Even though this photograph was taken in Wichita, Kansas, do you recognize some or most of the members, the people depicted in the photograph?

A   Yes.  I can identify most of them.

Q   And how do you know these people?

A   Because they're gang members in Dodge City.

Q   And which gang do they belong to?

A   Diablos Viejos.

Q   And do you see examples of hand signals being displayed by one or more of the people in this photograph?

A   Yes.

Q   We don't need to go through each one; but let's start with the gentleman the second to the left in the red and black plaid shirt.  Do you see what -- in the front row.  Do you see what he is throwing up?

A   Yes.

Q    What is that?

A    He's placing the number 14.

Q    And then next to him, the gentleman in the black shirt, what is he displaying?

A    The letter N for Norteno.

Q    And then the far right there's a female with a red shirt and a red belt.  What is she throwing up?

A    Obviously, she's making the X.  She's also, with her fingers, making the number 14.

Q    And there are other examples of hand signals but we won't go through each one; but you see additional hand signals that are common for DV/Norteno gang members in Dodge City?

A    Yes.

Q    What is the next exhibit you have, Agent Webb?

A    Number 48.

Q    What is depicted in Exhibit 48?

A    Exhibit 48 is a photograph that I would have taken in late 2005.  This was three individuals.  One on the left is Russell Worthey.  The one in the middle Alondo Morrow.  One on the right is Lorenzo Gobin.  And they're making XIV, the Roman Numeral XIV, for the number 14.

Q    All right.  And there's, obviously, a police car in the background; is that right?

A    That is correct.

Q   All right.  On occasion would you have, like this, gang members identify hand signals and other practices and customs of the gang to you -- for you?

A   That is correct.

Q   Now, in addition to the XIV standing for 14, do you also notice the color of clothing that at least -- all three of these people have at least one item of red clothing or red belt on; is that correct?

A   That is correct.

Q   All right.  And these three -- you've identified who they are, but are they documented as members of a gang in Dodge City, Kansas?

A   Yes.  These are all Diablos Viejos gang members.

Q   And, again, they are displaying the number 14 which represents Norteno; correct?

A   That is correct.

Q   The next photograph you have?

A   Number 80.

Q   80?

A   Yes.

Q   I'm going to need your help on this one.  I think I showed this one in my opening statement.  I think I said this was a DV and I'm wrong.  What is that actually a signal of?

A   He's placing the N for Norteno.  And on his left

hand he has a five point star.  His right hand -- it's upside down in this photograph -- but if he would hold his hand down the other way, it says DV on his right hand right in the web of his hand.

Q   Who is that?

A   Armando Maestas.

Q   Is he documented as belonging to a gang in Dodge City?

A   Yes.  He is documented as a Diablos Viejos.

Q   In addition to the hand signal, the N he is making, and the tattoos you've identified on both hands, there's writing on the sweatshirt.  Do you see that?

A   Yes, I do.

Q   What does that say?

A   It says Diablos Viejos.

Q   And the color of the sweatshirt, is that significant to you?

A   Yes.  It's red.

Q   And do you have another photograph?

A   Number 82.

Q   All right.  Why is this a picture that's been maintained by the Dodge City Police Department?

A   This is a photograph that was removed off a cellular telephone as part of a search warrant.  That's why it's maintained.

Q   Okay.  Do you see people depicted in the photograph that are documented gang members in Dodge City, Kansas?

A   Yes, I do.

Q   Who are they?

A   Starting on the left is Josh Flores.  The female kneeling right there is Erica Neato.  Next to her is Jayson Vargas, Wee Wee, with LCC.  The person with the 14 jersey on is Juan Torres, Bugzy, that we've spoken about.  The other male individual in the front with the sunglasses on is Donte Barnes.  His street name is Snipes.  And I'm not for sure who the female sitting in the back in the yellow is.

Q   Let me go through these real quickly again.  The far left, you said this gentleman with the red baseball cap, his name is what?

A   Josh Flores.

Q   Do you know Josh Flores to be involved in gang -- criminal activity with -- well, let me ask you this.  Back up.  What gang is Josh Flores documented to belong to?

A   LCC.

Q   And you said the female to his left is Erica Neato.  Are their female DV or LCC gang members in Dodge City?

A   Not gang members but more girlfriends or hang-arounds.

Q    The gang members in this photograph, would they be the males?  The men?

A    That's correct.

Q    All right.  So Erica Neato is next to Josh Flores. The man next to her, we can just see his face, you identify as who?

A    Jayson Vargas.

Q    Is he documented by the Dodge City Police Department to be a member of a gang?

A    LCC.

Q    And then you said the gentleman to his left in the what appears to be a San Francisco 49ers 14 jersey is -- first of all, who is that?

A    That is Juan Torres.

Q    And does he have a street name or gang name?

A    Bugzy.

Q    All right.  I should have asked you, Jayson Vargas, you said his gang name was Wee Wee?

A    That's correct.

Q    Josh Flores, did he have a gang name?

A    Yes, Big Knox.

Q    Now, Bugzy, or Juan Torres, I think you previously identified him as belonging to the DV gang; is that correct?

A    That is correct.

Q   Okay.  Then the man to his left with the sunglasses on, who is that?

A   That is Donte Barnes and he goes by Snipes.

Q   And is he documented to be a member of a gang in Dodge City?

A   Yes.  He's a Diablos Viejos.

Q   All right.  So in this picture, as far as the documented gang members, we have two LCC, Josh Flores, and Jayson Vargas; is that right?

A   That's correct.

Q   And two DV, Juan Torres and Donte Barnes; is that correct?

A   That's correct.

Q   Is it surprising to you as a gang investigator in Dodge City to see DV and LCC gang members associating with each other?

A   No.

Q   And did you see examples of DV and LCC gang members committing criminal activity together?

A   Yes.

Q   And in addition to these four men documented as gang members, do you see evidence of their gang affiliation in the photograph?

A   Yes.  Josh Flores, the individual on the left, if you look at his hand, he's making the letter E for east

side.  LCC will claim.  And then Jayson Vargas and Donte Barnes, they're making a five-pointed star in the middle of the photograph.  It's kind of hard to see the bottoms of the fingers.  But it's for The North Star, for the nautical star.

Q   All right.  The five-point star, you said earlier DV claimed the five-point star because the five points stand for N-O-R-T-E, Norte, meaning north; correct?

A   That's correct.

Q   Does LCC also utilize the five-point star as a symbol of their gang?

A   Yes, they will.  The five points will mean E-S-L-C-C, so east side LCC.

Q   The fact that Juan Torres is wearing a number 14 jersey, is that a coincidence in your opinion?

A   No, it's not a coincidence.

Q   Why not?

A   The number 14 in sports wear for the gang would be for the letter N.  San Francisco is also in the northern part of California where a lot of these gangs originate out of.

Q   Okay.  If we can turn to 83.  All right.  Now, in 83 we see three of the same men in the last photograph; is that right?

A   That is correct.

Q   Starting on the left, that is who?

A   That is Donte Barnes.

Q   And in the middle is who?

A   Jayson Vargas.

Q   And on the right?

A   Josh Flores.

Q   And, again, Donte Barnes is DV; correct?

A   That is correct.

Q   And Jayson Vargas and Josh Flores are LCC; correct?

A   That is correct.

Q   Now, again, do you see evidence other than the red clothing that they're each wearing, evidence of gang affiliation by what they're doing in the photograph?

A   Yes, I do.

Q   Starting with Donte Barnes on the far left, what do you see him doing?

A   That's a hand sign where if you use one hand, you can throw up DV.  So he's making a D and then the back of his finger is making the V.

To the middle where Jayson Vargas is, he's -- that hand sign is actually LCC.  The thumb and the index finger is making the L and the other two fingers are making the C-C.

And then Josh Flores is making the letter E for the east side for east side LCC.

Q  Earlier, Agent Webb, you testified that you've had experience based on your training and investigations that you've conducted, DV and LCC gang members committing criminal activity together in Dodge City; correct?

A  Yes, sir.

Q  Let's focus on DV if we can.  What type of criminal activity was commonly committed by DV gang members in Dodge City?

A  Anything from traffic violations to obstruction of official duty, batteries, assaults, battery on law enforcement, robberies, home invasions, aggravated assault, assaults, shooting at occupied dwelling, shooting at unoccupied dwellings.  All the way up to homicide.

Q  You made reference -- you said both robbery and home invasion.  What is a home invasion?

A  Referring to home invasion would be where people are at home, knock on the door, and the next thing you know you have several gang members inside your residence stealing your money, your valuables.  People -- persons getting, you know, physically attacked during it.

Q  All right.  Now, the victims of this criminal activity perpetrated by DV gang members, who was it usually?  Or did it vary?

A    A large -- it mainly was our Guatemalan population.

Q    And that would be in reference to the robbery, home invasion robberies; is that right?

A    That is correct.

Q    And I'm going to come back to that in a second.  In more broader terms, shootings and attempted -- you said -- you talked about shooting into occupied and unoccupied dwellings.  Was there a general pattern?  And, if not, tell us, to who the victims were for those crimes?

A    Most generally the victims of those nature of crimes and the batteries or the shooting at dwellings in occupied or unoccupied dwellings would be rival gang members.

Q    And you said that would be -- in addition to those, that criminal activity, have you had experience with DV gang members dealing narcotics and drugs?

A    Yes.

Q    And have you personally investigated DV gang members involved in drug trafficking in Dodge City?

A    I've been involved in those investigations, yes.

Q    What type of drugs are you aware that DV gang members sold, trafficked, in Dodge City?

A    Methamphetamine, cocaine, marijuana.

Q    Now, did you have experience with -- you've

testified to this a little bit already -- but DV and LCC gang members on occasion would commit crimes together; is that right?

A   Yes.

Q   Now, if I were to ask you what type of criminal activity LCC gang members were involved in, would you essentially give us the same list you did for the DV gang members?

A   Yes.

Q   Going back to the home invasion robberies.  Were Guatemalan immigrants frequently -- you said they were frequently the target of those type of crimes; is that right?

A   Yes.

Q   And within the Dodge City Police Department did you have experience with or form an opinion as to who commonly -- which groups of people commonly committed that crime, home invasion robberies of Guatemalans?

A   Yes.

Q   Who was that?

A   It would have been DV and LCC.

        MR. WACHTEL:  Objection; foundation.

        THE COURT:  Lay some foundation.  Probably be helpful.

BY MR. WELCH:

Q   Do you have experience, Agent Webb, with multiple home invasion robberies of Guatemalans in Dodge City, Kansas?

A   Yes.

Q   Have investigations been conducted of some of those home invasion robberies of Guatemalans?

A   I'm sorry.

Q   Have investigations, criminal investigations, been conducted of those home invasion robberies where Guatemalans were the victim?

A   Yes.

Q   Have you or other police officers determined -- solved those crimes and determined those to be committed by DV gang members in Dodge City, Kansas?

A   Yes.

Q   Was that -- talking about that crime, home invasion robbery now, the number of robberies that you saw like that, did you see other gangs perpetrating that type of crime on a regular basis?

A   No.

Q   Where did the Guatemalans generally live?  Or do -- where do they generally live in Dodge City, Kansas?

A   On the east side of Dodge City.

Q   And that part of town is considered to belong or is

occupied by which gang?

A   DV and LCC.

MR. WELCH:  I would ask the question again, Your Honor.  I don't know if Mr. Wachtel has an objection now or not.

MR. WACHTEL:  I'm sorry.  Did he ask a question again, Judge?

MR. WELCH:  The question objected to was do you have an opinion as to -- I believe the question was do you have an opinion as to which gang commonly commits home invasion robbery of Guatemalans as victims.

THE COURT:  You may answer.

A   Yes, I have an opinion of that.

BY MR. WELCH:

Q   And what is that opinion?

A   DV and LCC.

Q   Do you have examples of those type of home invasion robberies being committed by DV and LCC gang members together?

A   Yes.

Q   And do you have examples of those home invasion robberies being perpetrated by DV gang members by themselves?

A   Yes.

Q   Just DV gang members.  Okay.  And are those home

invasion robberies -- have there been examples of --
well, let me strike that.

In Dodge City, Kansas, is there a significant
population of Guatemalan immigrants?

A   Yes.

Q   And how are they employed?  If you know.

A   Most are employed at the beef packing plants.

Q   And are a portion of those immigrants legally in the
United States?

A   A portion of them are -- I imagine a portion of them
are; but a large portion of them are not here legally.

Q   All right.  Do you know, based on your
investigations you've participated in and the police
department has investigated, whether the portion of
these Guatemalan immigrants utilize bank accounts?

A   Most of them do not.

Q   Why not?

A   They do not trust the banking system in Guatemala;
so, therefore, they'll keep the money in their houses or
on their persons.

Q   And do you know why Guatemalans are frequently used
as victims by DV and LCC gang members to rob?

A   Yes.

Q   Why is that?

A   For that reason, that they mainly keep the money on

their persons or in their houses.  And also, our Guatemalan population generally will live several families inside one dwelling.

Q   And is there anything about the stature of Guatemalans that, according to DV gang members, make them an attractive target?

A   Yes.  I've been told that they are small.  They're also scared about their immigration status and they don't -- they're afraid if they call law enforcement that they will be deported.

MR. WACHTEL:  Your Honor, I would object to hearsay and denial of Sixth Amendment confrontation rights.

THE COURT:  Oh, that objection is overruled. The answer will stand.

BY MR. WELCH:

Q   And do you have experience, Agent Webb, where Guatemalan immigrants have been the victims of these robberies and lost sizable amounts of money, currency?

A   Yes.

Q   Do you know, sir --

MR. WACHTEL:  Your Honor, I would make the same objection to that answer also.

MR. MANDELMAN:  I would just join in the objection.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

THE COURT: Well, the objections are overruled for the reasons already given and already set forth in my written order. This man is qualified as an expert witness and his opinions are admissible subject, of course, to your cross-examination, and to, ultimately, to the consideration of the jury in terms of weight and credibility. But go ahead and make your objections for the record if you need to.

BY MR. WELCH:

Q   Sir, let me hand you photographs that have been identified or marked as 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 36, 39, 85, 87, 43, 69, 81.

Starting with Exhibit 23, take a minute and look at each one of those.

A   Okay, sir.

Q   Before I get to those photographs, let me ask you one more question concerning the areas of town that are claimed by the gang. The east part of town you said was considered DV territory; is that correct?

A   That's correct.

Q   Do you have -- have you worked investigations where Sureno, rival gangs, members, moved into that portion of town and there was a reaction to that -- them locating themselves in what's considered DV territory?

A   Yes. I know of two different families that have

moved over to the east side of Dodge that no longer live there.

Q   Why not?

A   Their houses were shot up.

Q   All right.  Turning, then, to Exhibit 23 -- let me ask you a question regarding all of these photographs together.  Are these photographs maintained by the Dodge City Police Department?

A   Yes, they are.

Q   Are these photographs that you have seen before?

A   Yes, I have.

Q   And do you believe these photographs would assist the jury in better understanding your testimony concerning gang identification?

A   Yes.

Q   And generally speaking, these are photographs of what?  What type of activity?

A   Most of these are all tattoos.

MR. WELCH:  Your Honor, we would offer these exhibits at this time.

THE COURT:  Any objection?

MR. WACHTEL:  No, Your Honor.

MR. MANDELMAN:  I continue to object.  I, I understand they're maintained by the Dodge City Police Department; but other than that, we still don't know

when they were taken or who they are of or how they relate to this case.

THE COURT:  Do you want to voir dire him now regarding the exhibits or do you want to just cross-examine him at the appropriate time?

MR. MANDELMAN:  Uhm, well, if he can establish -- again, I just don't -- I don't know.  If he can establish when -- if he knows when they were -- they may be admissible if he can establish when they were taken or --

THE COURT:  It's not necessary.  That's one thing that you can question him about.  But -- if he can identify them, it doesn't really make any difference when they were taken.  But if you wish to question him about them now, I'll permit it.

MR. MANDELMAN:  I would.

THE COURT:  Kind of like you being able to identify a picture of your grandmother.  You may not have taken it and you may not be sure when it was taken or even who took it; but if you can say it's your grandmother, it's admissible.

MR. MANDELMAN:  Sure.  I don't know if he has -- if he has that much information.  Let me just go ahead on 23.  Who is this?

A    This is the arm of Jason Najera.

MR. MANDELMAN:  Do you know when it was taken? This one has got a date.  Is that right?  Or is this just a date that got put on it?

A  I can't tell you the date on most of these, sir.

MR. MANDELMAN:  Okay.  Did you -- all right. Were you the photographer on any of these?

A  Exhibit 28, I was.  I was there when 29 was taken but I'm not for sure if I took it or not.  32.  I was there when -- if I didn't take it, I was there when number 69, Exhibit 69, was taken.  I was there when 81 was taken also.

MR. MANDELMAN:  Do you know who all those people are?

A  Yes, sir.

MR. MANDELMAN:  Okay.  I'll just cross him then, Your Honor.  Thank you.

THE COURT:  Now or later?

MR. MANDELMAN:  No.  I'll just wait until it's my turn.

THE COURT:  All right, sir.  They're received then.

MR. WELCH:  Thank you, Judge.

BY MR. WELCH:

Q  Turning then to 23.  You've already told us, Mr. Webb, that this was -- this is the arm of Jason Najera;

is that right?

A    That is correct.

Q    Who is Jason Najera?

A    Jason Najera is one of the older guys in the gang. Consider him an OG within the gang.  His street name is Ene or Norte.  They call him both of those.

Q    You made reference to Jason Najera as being an OG. What does that mean?

A    Older gangster.  Somebody that has a lot of input within the gang that people will take problems to.

Q    And you told us his gang -- Jason Najera's gang moniker is Norte; is that right?

A    That's correct.

Q    Earlier you identified Pedro Garcia for us in the courtroom.  One of these photographs was of him.  Do you know, did he gave a gang name?

A    Yes.

Q    What is it?

A    Peter Garcia is Pistol Pete.

Q    And do you know Gonzalo Ramirez?

A    Yes.

Q    Do you see him in the courtroom as well?

A    Yes, I do.

Q    And would you please point to him and describe what he is wearing?

A   Sitting just to the right of Mr. Mendelman wearing the white shirt.  Has glasses on.

MR. WELCH:  Ask the record to reflect the witness has identified Gonzalo Ramirez, Your Honor.

THE COURT:  It will.

BY MR. WELCH:

Q   Are you familiar with whether or not Gonzalo Ramirez had a gang name also?

A   I know he had a nickname.  I know that other gang members knew him by that, but it might have been from earlier in his life.

Q   What was that name?

A   They would call him Gonzo.

Q   Now, do you know whether Pedro Garcia and Gonzalo Ramirez also were considered people that had status within the DV gang?

A   Yes.

Q   How do you know that?

A   By talking to other gang members.

MR. MANDELMAN:  Judge, Your Honor, again, I would just object under Sixth Amendment, 702.  This is way beyond any testimony we've heard before.

MR. WACHTEL:  We join in the first part of that objection, Your Honor.

THE COURT:  The objection is overruled.

BY MR. WELCH:

Q   My question for you, Agent Webb, was do you know Pedro Garcia and Gonzalo Ramirez to be people, gang members, that were considered to have status within the DV gang?

A   Yes.

Q   You started to answer how you know that. Tell us how you know that.

A   Through debriefing other gang members that have cooperated with us.

Q   All right. You referred to Jason Najera as one of the OG, older gang members, that had a lot of respect. Do you have an opinion as to whether Pedro Garcia and Gonzalo Ramirez would also be considered OG or gang members that had a great deal of respect within DV?

A   Yes, they would. They would all be pretty much on the same level.

Q   If I didn't ask you, Jason Najera is a documented gang member in Dodge City; correct?

A   Yes.

Q   Which gang?

A   Diablos Viejos.

Q   Turning, then, to the actual exhibit. There appears to be three tattoos that are visible in this photograph. Starting at the top, what is that?

A   The word Norteno for northerner, north; as well as the Huelga bird that we discussed earlier in the graffiti pictures; and then viejos.  Oftentimes when we see viejos on one arm or one leg, the other arm or leg would have diablos.  So put them together, it would be Diablos Viejos.

Q   Is this photograph another example of DV and Norteno being synonymous with one another?

A   Yes.

Q   Why do you say that?

A   Diablos Viejos are underneath the umbrella that claim allegiance to Nortenos or Nuestra Familia, which their street gangs are Nortenos.

Q   And the Huelga bird also is synonymous with both in Dodge City; is that correct?  The Huelga bird tattoo we see in the middle, is that synonymous with both DV and Norteno?

A   That's correct.

Q   Turning, then, to Exhibit 24.  First of all, do you know who that is?

A   It's Hernan Quezada.

Q   Is Hernan Quezada a documented gang member in Dodge City?

A   Yes, sir.

Q   What gang is he documented to belong to?

A   Diablos Viejos.

Q   There are two tattoos of significance in this photograph.  Do you see them?

A   Yes, I do.

Q   Where are they?

A   One on his right check; one on his left cheek.  It's for the number 14.

Q   So the 1 is on the left, our left; and 4 on our right.  Correct?

A   That is correct.

Q   And I know I've asked this before but I need to ask this with each photograph.  14 signifies what?

A   For the letter N, the 14th letter of the alphabet, for Norteno.

Q   And even though 14 represents Norteno, this is a DV gang member in Dodge City; correct?

A   Yes, sir.

Q   So 14 also represents DV; is that correct?  In Dodge City?

A   That's correct.

Q   All right.  Turning to 25.  What is that?

A   This is Jason Najera, the first photograph we showed in this series.  This is the back of his neck.  He has the number 14 tattooed on the back of his neck.

Q   And then 26.

A    This is Jason Najera's chest and it says Norte.

Q    All right.  You told us earlier his gang name was Norte; is that right?

A    That's correct.

Q    27.

A    This is Russell Worthey.  You see on his right arm he's got the number 1.  On the left arm he's got the number 4.  For the 14th letter of the alphabet for the letter N for Norteno.

Q    And I think you told us before, but Russell Worthey is a documented gang member; is that right?

A    That is correct.  His street name is Blanco.

Q    What gang is he documented to belong to?

A    Diablos Viejos.

Q    Turning then to 28.  Who is that, first of all?

A    This is Enrique Gobin.

Q    And is Enrique Gobin a documented gang member in Dodge City?

A    Yes, he is.  And his street moniker is Sonny Boy.

Q    In addition to the red jersey that he is wearing, is there anything else about this photograph that would identify Enrique Gobin as a DV gang member?

A    He has the four dots on his left wrist.  His right wrist there is one dot.

Q    We can't see the right wrist in this photograph;

correct?

A   That's correct.

Q   But am I correctly pointing to the location of the four dots on his left wrist?

A   Yes.

Q   And then 29.  Who is that?

A   This is Erik Sanchez.

Q   And is he a documented gang member in Dodge City?

A   Yes, he is.

Q   Which gang?

A   He's Diablos Viejos.  And his street name is Savage.

Q   And is there -- this is somewhat subtle; but there is a tattoo that is identifying him as a DV gang member?

A   Yes.  By his right eye there's one dot and by his left eye there's four dots for the number 14.

Q   Same pattern, the four dots we saw with Enrique Gobin, but this is much smaller; is that right?

A   That's right.

Q   Different location?  The four dots to our right; is that correct?

A   That is correct.

Q   The one dot to our left?

A   That is correct.

Q   30.  First of all, do you know who that is?

A   Yes, I do.

Q   Who is that?

A   It's Fabian Neave.

Q   Is Fabian Neave a documented gang member in Dodge City?

A   Yes, he is.  He is a Diablos Viejos.  And his street name is Puppet.

Q   All right.  And this photograph focuses on his right shoulder and right arm.  Starting at the top, what do you see that identifies him as a DV gang member?

A   The letter N for Norteno.  And then you'll see the Huelga bird.  And directly above the Huelga bird is XIV, again, for the 14th letter of the alphabet, the letter N for Norteno.

Q   And then 31, do you know who this is?

A   Yes, I do.

Q   Who is that?

A   This is Jesus Sanchez.

Q   Go ahead.

A   I'm sorry.

Q   Jesus Sanchez, is he a documented gang member?

A   Yes, he is.

Q   Which gang is he documented to belong to?

A   Diablos Viejos.

Q   I know this is difficult to see, but are there tattoos on Mr. Sanchez which identify him as Diablos

Viejos?

A   Yes.

Q   Where are they and what are they?

A   They're in his eyebrows.  If you shaved his eyebrows, over his right eye says Norteno.  Over his left eye says catorce for the number 14 in Spanish for, again, referring back to the 14th letter of the alphabet for the letter N for Norteno.

Q   Turning then to 32.  Who is that and what is significant about this photograph?

A   This is Wayson Tabor.  He is a documented Diablos Viejos gang member.  And the letter N by his right eye, again, for the 14th letter of the alphabet.

Q   In addition to the tattoos of the letter N, the color of his clothing is significant; is that right?

A   That is correct.

Q   Turning then to 34.  Who is this and is he a document gang member?

A   This is Oscar Bustillos; and, yes, he is a documented gang member of Diablos Viejos.  And he has a tattoo of the nautical star for the North Star under his left ear.

Q   And what's the next photograph you have?

A   Exhibit 36.

Q   36 is -- this is not a tattoo photograph; is that

right?

A    That is correct.

Q    What is this?

A    This is Benjamin Martinez.  Street name is Little Benji.  He's a documented Diablos Viejos gang member. And he's throwing up the one four.

Q    And wearing the red shirt; correct?

A    Yes, sir.

Q    At least in this photograph.  What's the next photograph you have, sir?

A    I have Exhibit 39.

Q    Do you know who's depicted in this photograph?

A    Yes.  This is Benjamin Martinez' back.  So the person that was in the previous photo, this is him without his shirt.

Q    And there are, I guess, technically, three tattoos of significance.  The top script tattoo on the back of the neck, what did that say?

A    Says "diablito".

Q    Does that identify -- well, first of all, you've already told us he's a DV gang member; correct?

A    Yes.

Q    The diablito, does that identify him as being a DV gang member?

A    Referring to "little devil", yes.

Q   The lower left, the number 14 and the dots, what does that signify?

A   Yes.  Again, for the 14th letter of the alphabet for the letter N for Norteno; and there's also the one dot and four dots on each side, or the number 14.

Q   To the right?

A   XIV, the Roman numerals for the number 14.

Q   What's the next photograph you have?

A   Exhibit 85.

Q   Who is that?

A   This is Wayson Tabor, the individual that had the N by his right eye.  This is his left hand.  This is his knuckles.  XIV for the number 14 and then DV for Diablos Viejos.

Q   And the next photograph you have?

A   Exhibit 87.

Q   Do you know who this is?

A   This is Erik Sanchez.  Goes by Savage.

Q   All right.  And this is his back; is that right?

A   That is correct.

Q   Starting on the left, if you would, can you tell us the significance of that tattoo and then work your way to the right?

A   Yes.  The 620 is the area code in Dodge City.  The Norte across top of his back, again, showing homage to

Nortenos.  Number 14, we discussed, the 14th letter of the alphabet.  Then on the back of his right arm will be the letter N for Norteno.

Q   Do you have another photograph, sir?

A   Yes.  I have Exhibit 40 -- I have several.

Q   What's the next one?

A   Exhibit 43.

Q   Who is that?

A   This is Alfredo Beltran-Ruiz, Deuce-Deuce.

Q   We have seen Alfredo Beltran-Ruiz in an earlier photograph; is that right?

A   Yes.

Q   He was throwing the DV and had red pants on; is that right?

A   That is correct.

Q   Okay.  So he is the same person identified -- you've already identified as a DV gang member in Dodge City; correct?

A   Yes.

Q   What about this photograph identifies him as a gang member, DV gang member in Dodge City?

A   The XIV on his forehead; and on his left cheek he has DV tattooed.

Q   And the next photograph.  What number is next?

A   Exhibit 69.

Q   Who is that?

A   This is again Alfredo Beltran-Ruiz.  This is his arms.

Q   And start off on our left, if you would, work to the right, and tell us the significance of those tattoos?

A   Yes.  You can see D on his right arm and V on his left arm for DV.  And if you look at his wrist, he'll have the X on his right wrist and he'll have four dots on his left wrist, again, for the number 14.

Q   So DV on the top; 14 on the bottom.  Is that right?

A   That's correct, sir.

Q   And next photograph you have?

A   Exhibit 81.

Q   Who is that?

A   Enrique Gobin.

Q   We earlier saw Mr. Gobin also with the Arkansas jersey on; is that correct?

A   That's correct.  These photos were taken at the same time.

Q   Earlier we saw the four dots on his wrist; is that right?

A   That is correct.

Q   All right.  What is depicted in the photograph that identifies him as a DV gang member?

A   The Diablos and then the Viejos.  It also appears he

has used Z's instead of the S at the end of Diablos and at the end of Viejos.

Q   Instead of using S, to disrespect Surenos; is that right?

A   Yes, sir.

Q   Do you have another photograph?

A   That is all, sir.

Q   I'm going to hand you three more photographs marked Exhibits 41, 42 and 86.  Starting with 41, would you please take a minute and look at those and tell us if you recognize them.

A   Yes, I do.

Q   Are these photographs maintained by the Dodge City Police Department?

A   The last two are.  I'm not so sure the first one isn't Kansas Department of Corrections; but I know it's accessible to the public.

Q   Are these photographs you've seen before today?

A   Yes.

Q   Do you believe these photographs will assist the jury in understanding your testimony concerning this facet of gang identification?

A   Yes.

        MR. WELCH:  Your Honor, we would offer all three exhibits.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  I'm just trying to get to 86, Your Honor.  I'm sorry.  And I don't have any objections either.

BY MR. WELCH:

Q   Starting with the first exhibit --

THE COURT:  Any objection, Mr. Mandelman?

MR. WACHTEL:  No.  I'm sorry, Your Honor.  I thought I said I do not object.

THE COURT:  I know.  I thought I asked --

MR. MANDELMAN:  I did, too, Your Honor.

THE COURT:  Okay.  They're received.

BY MR. WELCH:

Q   All right.  The first exhibit, Agent Webb, what number again?

A   41.

Q   41.  Do you know who this is?

A   Yes, I do.

Q   Who is that?

A   This is Eusebio Sierra-Medrano.

Q   Does he have a gang name?

A   Yes.  He goes by TC for Tulare County, California.

Q   Mr. Sierro-Medrano, also known as TC, is he a documented gang member in Dodge City?

A   Yes, he is.

Q   He has not lived in Dodge City his entire life, has he?

A   No.

Q   All right.  Prior to living in Dodge City, he lived where?

A   I'm assuming California.

Q   Do you know if he had any special status in the DV gang --

MR. MANDELMAN:  Judge, I just object.  If the witness doesn't know --

THE COURT:  I think that objection is well taken.  He says assuming California.  If you can lay a foundation; otherwise, it's sustained and the jury is directed to disregard his assumption.

BY MR. WELCH:

Q   Do you know where Eusebio Sierra-Medrano lived prior to Dodge City?

A   No.  I just know he had his family in California.

Q   We'll move on.  Have you had experience with Eusebio Sierra-Medrano in Dodge City, Kansas?

A   Yes, I have.

Q   Is he documented as belonging to the gang in Dodge City, Kansas?

A   Yes.

Q   Which gang?

A    The Diablos Viejos.

Q    All right.  And in this photograph, let's start with the tattoos if we can.  Do you see tattoos that identify him as belonging to Norteno or DV in Dodge City?

A    Yes.  The four dots on the left cheek; the one-four behind his left ear.

Q    And then there's a hairstyle that we have not seen yet.  Have you seen that before?

A    Yes.

Q    What is that?

A    It's the mongolian hairstyle.

Q    And have you seen that worn by some DV gang members in the past?

A    Yes.

Q    The next photograph is 42; is that right?

A    Yes.

Q    42.  Do you know who that is?

A    Yes.  This is Russell Worthey.

Q    All right.  And let's start with the hairstyle.  Do you recognize what that is?

A    Yes.

Q    What is this?

A    It's, again, the mongolian hairstyle.

Q    You've previously -- we've seen pictures of Russell Worthey; but I'll ask again, he is a documented DV in

Dodge City; correct?

A    Yes.

Q    And on the back of his neck, what do you see?   The tattoo?   Do you see it?

A    The letter N for Norteno.

Q    And then the last one is 86?

A    Yes.

Q    Let me ask you first, who is in this photograph?

A    This is Jesus Torres; Rabbit.

Q    And you recognize the hairstyle?

A    Yes, I do.

Q    And did all the DV gang members wear the mongolian hairstyle?

A    No.

Q    But did other gang members in Dodge City -- other meaning LCC or Sureno gang members -- did they wear the mongolian hairstyle?

A    No.

Q    Below the hairstyle, did you see a tattoo on the back of the neck?

A    Yes.

Q    What is it and what does it signify?

A    Signifies he is a Diablos Viejos gang member.   He has Diablos on there.

Q    Is Jesus Torres a documented gang member in Dodge

City?

A   Yes, he is.

Q   Which gang is he documented as belonging to?

A   Diablos Viejos.

Q   Agent Webb, let me ask you -- let's focus on DV gang membership for now if we can.  Are you familiar, sir, with the manner in which a person who wanted to be a DV gang member, how they went about becoming a DV gang member?

A   Yes.

Q   What was the process they had to go through before they could become a member of the DV?

A   Most times they would be friends or they would definitely hang out with the gang, whether that be going to parties or whether they went to school together.  They would be associated somehow.  To actually get into the gang, you would be -- most generally, you would be what they call jumped in, so you would be beaten in by however many individuals that they deemed necessary for however long they deemed necessary to show that you had heart.

Q   Now, the jumping in, after someone was jumped in, were you officially a member of DV?

A   Yes.

Q   Was there a period of time, based on your

investigations, that there was a certain number of seconds that you had to endure the beating before you were officially jumped in?

A  I've heard several different numbers of seconds over the years; but usually it refers back to the number 14. However, sometimes it's not 14 seconds.  They could count a lot slower and it could turn into a longer period of time.  But everything is usually generalized around the number 14.

Q  And in order to officially be a member, was it necessary to be jumped in?

A  No.

Q  What other way could you become a member without being jumped in?

A  Another way I've heard is being blessed in.  So if you have family members that may be in a gang, they're in good standing with the gang, you've hung out with the gang because of your family, siblings, they can be what they call blessed in where the gang will just accept them in as a blessing in.  I know through my training and experience it could be crime-ordered missions or do a crime to get in.  Females can either be jumped in or sexed in.

Q  Let's stick with DV gang members in Dodge City if we can.

How many -- in addition to -- have you had experience, learned through your investigation, that DV gang members were in fact jumped in, beaten into the gang in Dodge City?

A    Yes.

Q    And have you talked to DV gang members who they say themselves that's how they got into the gang is they were beaten into the gang or jumped in?

A    Yes.

          MR. WACHTEL:  Objection; hearsay and Sixth Amendment violation.

          MR. MANDELMAN:  I'll just join.

          THE COURT:  I heard you say hearsay.  What else did you say?

          MR. WACHTEL:  I'm sorry, Your Honor.  I said denies me the right of confrontation.

          THE COURT:  The objection is overruled.

BY MR. WELCH:

Q    All right.  The question was, Agent Webb, have you had DV gang members tell you that they were jumped in, that's how they became members of the DV gang?

A    Yes.

Q    After one became a member of DV, were there rules that you were expected to follow?

A    Yes.

Q   What were those rules?

A   There's probably more than I can list today; but you were to -- at any point that you were confronted by a rival gang member, you were to confront that person back, whatever way that may be, whether it be verbal altercations, physical altercations.  You were to attend meetings.  They would have meetings on certain days, on Sundays usually, different times.  You were to attend the meetings.  For a period of time you were to bring money to meetings.  There was a period of time in there where they were not to be using methamphetamines, not to mess with other gang members' girlfriends.  Things of that nature.

Q   How about cooperating with law enforcement?

A   Yes.  You're not supposed to do that.

Q   Even if you are a victim of a rival gang member, for example, the Sureno attacked you and you were harmed in that attack, are you expected not to cooperate with law enforcement in solving the crime where you were the victim?

A   Absolutely.

Q   So if you did cooperate with law enforcement where you were the victim, were you considered a snitch?

A   Yes.

Q   And have you heard of examples -- well, if you did

not follow those rules, what could happen?

A   You could be jumped out of the gang.

Q   And are you familiar with the term violation or violated?

A   Yes.

Q   Let's talk about violation.  What were violations?

A   Violations is much -- best way to explain it would be much like being jumped into the gang.  If you got violated, they could put however many guys on you for whatever period of time and they're basically going to beat you up.  That's called a violation.  There's several ways you can get violations, up to when they're finally, you know, if you created a serious enough violation in their eyes, they will jump you out of the gang.

Q   So you could be violated but still be a member of the gang; is that right?

A   Yes.

Q   You said if it was a severe violation or there were a number of violations you may be jumped out of the gang; is that right?

A   Yes.

Q   What does that mean?

A   To be jumped out?

Q   Yes.

A    You'll no longer be part of them.  I don't know how to say it any better than that.

Q    Was that also a beating?

A    Yes.

Q    Being jumped out involved being beaten?

A    Yes.

Q    And a violation involved being beaten; correct?

A    Yes.

Q    Do you know from your work as a gang investigator in Dodge City whether violations were actually meted out or conducted on any gang member in Dodge City?

A    I've been told that.

Q    Do you know what was determined to be a violation that resulted in beatings or the justice was meted out of a beating for a violation?  What had been done by the gang member that resulted in being violated?

A    I have been told about several.

Q    Give us an example.

A    One, for instance, an example would be being late to meetings.  They would put a violation on you.  You would get your violation, get beat up by however many guys for however long.  Up to where if you cooperated with law enforcement, being beat out again.

Q    Do you know of examples where people did not respond to rival gang members in a way they believed they should

have and they were violated for not responding to Surenos?

A   I don't have an example in my head right now, so not that I know of.

Q   Do you know of examples where DV gang members were actually jumped out of the gang for a violation?

A   Yes.

Q   Do you know what the violation was that resulted in that person being kicked out of the gang essentially?

A   Yes.  Cooperating with law enforcement because they were shot at.

Q   Because they were a victim of the crime?

A   That is correct.

Q   When you first began as a gang investigator in Dodge City, the rules and the structure you've just described, the rules that you were expected to follow, the manner in which you became a DV gang member, the clothing, the tattoos, hand signals, was all of that in place when you became a Dodge City gang investigator?

A   Yes.

Q   When you left and joined the KBI was that structure still in place, there were still rules to follow, tattoos, clothings, structure in place to be a part of the DV gang?

A   Yes.

Q   Have police officers as part of searches actually obtained ledgers or rosters of DV gang members and proof that there was meetings being held by the DV?

A   Yes.

Q   First of all, what did you recover and where did you recover it?

A   Recovery of one of these documents was -- I believe it was in 2008.  The address was 910 4th Avenue in Dodge City, Ford County, Kansas.  This was -- 910 1/2, excuse me.  This was a basement apartment.  This was a search warrant conducted by the police department.  In the southwest bedroom of that apartment, there was a small safe.  Inside that safe were documents.  At the time the investigator found them, he thought they were drug ledgers; but, in fact, it was payments for attending meetings, and this money was supposed to be disbursed out for different things for the gang.

Q   And you know this was a gang roster and those -- this was a ledger of monies being paid for meetings attended, you know that how?

A   From two -- debriefing of two different individuals that described that.

MR. WACHTEL:  Same objection, Your Honor, with regard to hearsay and denied the right of confrontation.

MR. MANDELMAN:  Your Honor, he is talking

about a document that's not in evidence.

THE COURT:  Doesn't have to be --

MR. MANDELMAN:  I object --

THE COURT:  They're not offering it into evidence.  The objection is overruled.

Once again, Ladies and Gentlemen, rules are somewhat relaxed with respect to people who have expertise in an area and they can give testimony about things that are not necessarily admissible in evidence. The rule says that.  So I don't blame counsel for making their objections for the record; but at this point in time, I haven't heard anything that would -- any testimony that would not be admissible under the rules. So you may go ahead.

BY MR. WELCH:

Q   Earlier, Agent Webb, you testified about Jason Najera, Pedro Garcia and Gonzalo Ramirez enjoying higher status within the DV gang.  Do you recall that?

A   Yes.

Q   What type of activity would one perform to gain higher status or become someone who's looked up to by other DV gang members?

A   Commit crimes.  Do things for the gang will get you more status within the gang.

Q   And was there any particular type of crime that was

viewed as more valuable or more important than other criminal activity?

A   Obviously, going after rival gang members in some way, whether it be through physical altercations or shooting at rival gang members.

MR. WELCH:  Your Honor, I have no further questions of Agent Webb.

THE COURT:  Would you all like to take a recess before we start cross-examination?  I see heads nodding.  We'll take about 15 minutes.  Remember and heed the admonition.

(Recess.)

THE COURT:  Yes, sir.

MR. WACHTEL:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   We have met before, haven't we?

A   Yes, sir.

Q   I'm Pedro Garcia's lawyer.  My name is Val Wachtel. How are you doing so far this afternoon?

A   Just fine.

Q   Well, I want to ask you some questions; and one of the things I put before you is Exhibit 6 which you testified about?

A   Yes, sir.

Q    Exhibit 6 is not displayed but it's the gang --

thank you.  It's the gang verification criteria?

A    Yes, sir.

Q    And this is a document that was -- it's a form

document that was prepared by your agency or by some

other agency?  If you know.

A    I don't know.

Q    Do you know what guidance was used to prepare this

form to put in the information that is signified by all

these little boxes?  Do you know who did that?

A    No, sir.

Q    Do you know where the information came from?

A    On this?  No, sir.

Q    Let's look at the back of it, please.  As I

understand your testimony about the back, the back is

also supposed to be filled out; right --

A    That is correct.

Q    -- when a person creates the sheet?

A    That is correct.

Q    And that should be filled out by the person who did

the creating; right?  For example, there's a block here

that says hangouts; right?  Do you see it?  About

halfway down on the righthand side.  It says hangouts?

A    Yes.

Q    If that is -- if that's not filled out on one of

these gang sheets, is that gang sheet incorrect?

A   No.

Q   Who would fill out hangouts if they were gonna be on this sheet?

A   If they were gonna be on this sheet itself, a gang officer would have had to enter in the information on this gang sheet.  Sometimes on the back of these -- when a person would search these in the data base, so, if they searched for an individual, on the back sometimes gang officer would leave like hangouts and associates the same on gang sheets.  So if they only searched and they got the first gang sheet, which is the most recent, they could flip to the back and the hangouts and the associates and stuff might be right there on that gang sheet.

Q   But let me ask you this question.  If I get a gang sheet from your agency, or your former agency, and the front part has been completed, the part with all the little boxes has been completed, and the back part is blank.  All right.  Does that satisfy whatever standards Dodge City police had for the creation of the gang sheet?

A   Well, unless it was printed out on one side of the paper, there might be a second page.  I guess I don't understand what you're asking.

Q   If I had a gang sheet, all right, that is similar to the one you have --

A   Yes, sir.

Q   -- and it's been completed.  Front has been completed; but the back hasn't been completed.  We have everything we can see here about the back except there's nothing in it.  All right.  Is that gang -- has that gang sheet been correctly completed based on your rules and policies?  I'm sorry.  When I say yours, I know you're not there any more.  Based on Dodge City rules and policy?

A   As far as the back side goes, if they don't have all this information, I mean, I couldn't tell you.  Would it pass?  Would it go to be passed on to records?  Yes, it may be passed on to records; but what they do to the from there, I couldn't tell you.

Q   Would you consider it reliable if the front portion was filled out and the back portion was blank?

A   Well, it depends, because on the back when it's asking for, like, their address now and like a CFS number, sex, race, date of birth, the only time these would be filled out -- there might not be so much information on the back, be more like photographs or if somebody called and the officer didn't actually check out with the person.  Because when the officer checks

out with a person or did a gang sheet, they most generally will check out through Ford County communications. Ford County communications would then give a case number that would be placed on the back of these gang sheets and then that would be like a checks and balances to show the officer actually did check out this and they weren't just doing a gang sheet on an individual that they didn't have contact with.

Q   So each contact would generate its own case number?

A   Not necessarily. Because there could be several persons involved in one incident. It might have the same CFS number. But there would also be times where if officers would obtain photographs and that might be the only thing that they're going to fill in on the gang sheet and they put a name up top and filled out, you know, subject was included in the photograph or something of that nature, they might not fill everything out on the back.

Q   So whether the back is completely filled out or not, it has no impact on its use by your department?

Let me rephrase it. Its reliance on -- your department's relying on it.

A   I can't answer that. I don't know.

Q   Would you rely on an incomplete gang sheet in, in developing an opinion as a gang expert?

A   It depends what the information contained within the gang sheet was.

Q   All right.  So let's talk about the first page.  The first side --

A   Yes, sir.

Q   Self-admission is the first section.  I mean after name; right?  And date and gang.  Self-admission is the first general criteria; right?

A   Yes.

Q   And one of them is self-admit.  Subject admits gang affiliation?

A   Yes.

Q   When a subject admits their gang affiliation, that's done with what?  An interview with law enforcement?

A   Most generally.  It could be a traffic stop.  It could be a consensual encounter at a store.  It could be numerous ways.

Q   But, but to get in here as self-admission, right, it's got to be admitted to a law enforcement officer?  Right or wrong?

A   That is correct.

Q   And subject has gang related tattoos.  Does the person tell you they have gang related tattoos or do you look?

A   Both.

Q   Both.  Subject writes gang graffiti.  Now, in terms of self-admission, how would one know that unless you caught the person in the act of graffiti writing?  Do you just ask, hey, do you -- do you do gang graffiti? Is that how you figure this one out?

A   Most of the time it could be from different items found inside their residence if you're doing a search warrant.  There's several, I mean, if it's on notebooks that teachers might take at school and say, hey, this has been taken from this student.  There's a lot of different ways for gang graffiti, I guess, to be marked.

Q   Well, from -- let me see if I can go at it another way.  I think you told us in your direct testimony that you worked for a time with an organization there in Dodge City which was designed to help kids not become gangsters; right?

A   No.

Q   No.  Why did I misunderstand that?

A   That's when the unit changed over to the proactive -- or, excuse me -- Public Oriented Policing. They then changed those programs within that unit.  I was already off the street crime unit.  But that's what that unit changed into.

Q   But let's say hypothetically that somebody calls up, says, hey, I think my kid -- I think my 13 year-old kid

is involved with gangs --

A    Okay.

Q    And would the person then try to help and say what gang?  Would they want to know that?

A    If we ever had parents that would contact the police department, there would be different ways we could do that.  I mean, we would probably most generally go to their residence because most of the time the parents would be having questions about the clothing or different items they're finding within the residence.

Q    So would you -- would you create the beginnings of a gang sheet about that admission to you by a parent that their child may be involved with a gang?

A    It could go down to a reliable source.  I could see them placing that in there.

Q    Okay.  And would just the completion of that one, this one box, right, would that then generate a gang sheet in your system on a kid?

A    In the Dodge City Police Department?

Q    Yes.

A    That could.  It could happen, yes, sir.

Q    So if that is so, then if you were seen in the company of a known gang member, one would check the box subject associates with known gang members; right?

A    Correct.

Q   That's what you do.  And that would be enough to generate a gang sheet; right?

A   A gang sheet.  It wouldn't necessarily document it was a gang member; but would generate a gang sheet.

Q   It would generate a gang sheet?

A   Yes, sir.

Q   And despite the fact that the -- the known gang member might be just, what, a relative?  Just a relative of the person?

A   I'm sorry.  Ask that question --

Q   Yeah, sure.  We're generating a gang sheet on X. We're gonna do that because X associates with known gang members.

A   Uh-huh.

Q   All right.  What if the known gang member is X's older brother?  Does that generate a gang sheet?  Does that count?

A   It could generate a gang sheet; but that would be more for just internal stuff within the police department.  It could be brought back and used in investigations if you want to know who might be hanging out with who.  It's just intelligence.  It's not actually documenting them as a gang member.  It's not enough criteria on this sheet.

Q   You've got to have three for that; right?

A   Well, to my understanding, if the subject admits gang affiliation or if they have three of the boxes below, that will meet what they consider NCIC guidelines.

Q   Well, thank you very much for helping me understand that.

I think I put two other exhibits in front of you before you sat down.  Right?

A   Yes, sir.

Q   Just looking at them in the order that you got them. What's the first one that we looked at?

A   Exhibit 19.

Q   Exhibit 19.  And my recollection from your earlier testimony is that Exhibit 19 is Pedro Garcia?

A   That is correct.

Q   How do you know that?

A   In this gang folder, the photo that is directly before it is a picture of him in all of his clothing. The photographs are numbered sequentially and it's the following photograph.

Q   Same clothing?

A   Yes.  Except his shirt is down and it looks like he's wearing all black.

Q   If that shirt was down, it would look like he wasn't in this picture; right?

A    That's possible.

Q    Well, in any event, you did not take this photograph; right?

A    I do not believe I took this.

Q    Do you know who took it?

A    I'm not sure.

Q    I suppose when it was taken doesn't matter, but at the time that -- what I'm trying to get to is how it is you know that this photograph, other than where it existed in a photo album, is of Mr. Garcia?

A    That's it.

Q    That's it.  Okay.  Well, let's talk about, then, the next exhibit, which is 20.  Have you got that one?

A    Yes, sir.

Q    I think 20 is the one that shows Russell Worthey, of all people, with a red belt that has the letter N on the buckle; right?

A    Yes, sir.

Q    Now, I was listening to you when you talked about that and I remember you mentioned -- it was kind of unfamiliar to me -- and I think you called it nostra (ph) familia.  Are those the words you used?

A    Yes, sir.

Q    I'm -- could you have meant to use nuestra familia, which means our family?

A    I'm sorry. I thought however you were pronouncing

it -- so -- nostra familia, nuestra, however you would

like to explain it. I'm talking about the same thing.

Q    I'll spell it. N-U-E-S-T-R-A?

A    I believe it's a Spanish word.

Q    Yeah. N-U-E-S-T-R-A; right?

A    I believe so.

Q    All right. What does it mean? What does that term

mean?

A    The nuestra familia?

Q    Yes, sir.

A    Is just like you said, it's our family. It was a

prison gang that was formed to protect theirselves

against Sureno gang members or members of La Eme in the

California penal system.

Q    What relationship, if any, does Nuestra Familia have

to the Nortenos? If you know?

A    They will claim allegiance to the Nuestra Familia.

Q    What does that mean?

A    I'm sorry, I don't understand what you're asking.

Q    They pledge allegiance to. What does that mean to

you in the language of your business?

A    They will wear their colors. They will learn their

rules. Those sorts of things.

Q    Does claiming allegiance mean you're an admitted

card-carrying member of whatever entity it is you're claiming allegiance with?

A   I'm sorry.  Can you ask that again.

Q   I'm sorry.  That was -- does it mean -- if I claim allegiance to Nuestra Familia, does it mean I'm a member?

A   Not necessarily.

Q   To become a member, I've got to do something other than just say I'm a member; right?

A   I'm not really familiar with how to get into Nuestra Familia.

Q   Well, how familiar are you with the Nortenos?  For example, if I claim allegiance to the Nortenos, does that make me one?

A   If you're claiming it and you're committing crimes, then I would believe you, sir.

Q   But would the Nortenos believe me?  Would I be a Norteno under the Norteno scale of measurement?

A   I don't know if some of the guys would accept you; but me being law enforcement and you were telling me that's what you are, I take it for face value and that's what it is.

Q   Well, I guess what I'm really trying to get to with you and doing a really, really bad job and I apologize, is that is it your testimony here today that the

little -- that the street gang in Dodge City that commits street crimes called the Diablos Viejos, that those people are Nortenos?  Is that your expert opinion?

MR. WELCH:  I'm going to object.  Misstates the evidence, Your Honor.  Street crime -- there's been a lot more testimony than just street crime committed by this gang.

MR. WACHTEL:  I'll rephrase, Your Honor.

BY MR. WACHTEL:

Q   Based on your training and experience, all right, are the Diablos Viejos Nortenos?

A   Yes.

Q   You used oftentimes that the, the phrase the Diablos Viejos operated under the umbrella of the Nortenos.

A   Umbrella, banner, however you would like to describe that.

Q   I'm trying to use your words.  You said under the umbrella?

A   I've described it both ways, yes, sir.

Q   What does that mean?

A   It means that they are going to believe in what other -- the Nuestra Familia, that they want to believe in the Norteno beliefs.  They want to wear red clothing. They want to learn their rules.  And therefore when they go on to prison or wherever that they can carry that

with them.

Q   Well, are you familiar -- do you know whether or not the Nortenos have a written constitution?

A   The Nortenos?  The Nuestra Familia does.  The Nortenos -- I have seen this constitution.  I know that they pass it around amongst theirselves.

Q   Do you know whether a Norteno is required by its entity to live up to that constitution?

A   In prison, I would imagine.

Q   So the Nortenos are, what, just a prison gang?  Is that what you're telling me?

A   No, that's what you stated.

Q   Okay.  Are the Nortenos simply a prison gang?

A   No.

Q   Is the Nuestra Familia simply a prison gang?

A   Primarily they are a prison gang.

Q   But not --

A   I'm sure the members get out of prison and then they're back on the street so I can't just say they're solely in prison.

Q   Well, I guess what I'm trying to figure out, and I apologize for doing such a lousy job, is that what is it in your opinion as the gang expert that makes somebody who says I'm a DV, Norteno, an actual member of the Nortenos?  That's what I want -- that's what I'm trying

to get to.

A    Each individual person is going to be different.
Are you saying if somebody tells me they're a gang
member, what am I supposed to take from that?

Q    I guess I'm wondering what the difference is between
an actual Norteno and a Norteno wanna-be?

A    I don't know that there is a difference, sir.

Q    Okay.  Well, do you know the contents of the Nuestra
Familia's constitution?

A    Do I know all the -- no.  The 14 bonds?  I can't
recite them for you if that's what you're asking.

Q    But you did say that the Dodge City Nortenos -- I'm
sorry -- Dodge City Diablos Viejos have some rules;
right?

A    That's correct.

Q    Are they written down?

A    Other than the ones that we find in the jail which
are the 14 bonds linking them back to California, any of
the other rules, I have not seen written down.

Q    Have you ever seen -- have you ever seen Mr. Garcia
in the possession of those rules?

A    No.

Q    I'll just leave those with you because they may have
some questions.

A    Sure.

Q   Now I'm going to hand you Exhibits 11 and 14.  I have some questions.

A   Yes, sir.

Q   When you were talking with Mr. Welch about the Norteno graffiti -- right?

A   Yes.

Q   You remember that?  And you said that Nortenos have -- when they use S's, they will write them backward; right?

A   Sometimes.

Q   And put X's through them?

A   Sometimes.

Q   What's -- what is it that dictates when you do it, when you write it backwards?

A   Just different times when they want to be derogatory towards them.

Q   Would, in your opinion, would crossing out or writing over a Sureno graffiti be a derogatory act?

A   Yes.

Q   Well, let's look at Exhibit 11, which I think you told us the blue writing was, in your opinion, Sureno graffiti.  Not Sureno -- some local Dodge City gang; right?

A   No, I did not say local Dodge City.  This was the one we explained from Texas.  Got the 915 area code.

Are we looking at the same photograph, sir?

Q   I'm looking at Exhibit 11.

A   That's the one you handed me.  That's what I --

THE COURT:  I think if it's in evidence, I think it would be helpful if it was displayed to the jury.

Q   Well, I won't try to rephrase your testimony or change it at all.  But the blue writing is, in your opinion, Norteno graffiti; right?

A   No, sir.  The blue writing is Sureno graffiti.  It's possibly from an individual from El Paso, Texas.

Q   You are absolutely right.  That's exactly what you said.  But what I don't understand is that -- you see the red letters?

A   Yes, I do.

Q   Do you see the red E-S?

A   Yes, I do.

Q   How come the S isn't backwards?

A   Because LCC claims the east side of Dodge City so therefore they won't turn their S's backwards.

Q   Based on your knowledge and experience, do Norteno gangs always use as part of their graffiti the area code of the part of the country in which they live?

A   Not always.  I can't say that.

Q   Well, is it -- I'm sorry.  That's okay.  I'll

withdraw that almost question.

I'm going to hand you Exhibit 48.  I think you had described Exhibit 48 as three DVs who you could name giving us gang signs; right?

A   Yes, sir.

Q   Is this picture posed?

A   They wanted to pose in front of the police car.

Q   How do you know that?

A   Because I was there.

Q   Okay.  How did you -- how did that -- I'm sorry -- how did that even come about?  Do you remember?

A   I don't remember exactly how.  I mean, I know we talked to 'em.  They thought it would be cool to throw up their gang signs in front of a police car.  We thought it would be cool to have that picture so whenever they say they're not gang members, we could show it.

Q   Thank you.  I'm just trying to go back and forth between pictures.  Okay.  Exhibit 40.  You testified about Exhibit 40, too.

A   Yes, sir.

Q   Which I understand was taken in Wichita, Kansas?

A   Yes, sir.  That's where I've been told.

Q   At some kind of party?  Some kind of a party?

A   I heard it was a rap concert.

Q   Okay.  In any event, it wasn't taken in Dodge City; right?

A   Not to my knowledge.

Q   Where is Pedro Garcia in this photograph?

A   He's not in this photograph.  When this photo was taken, he wasn't around.

Q   Okay.  In fact, of all the photographs we've seen today, but for the one that shows Mr. Garcia's stomach and belt buckle, he's not in any of these, is he?

A   Not to my knowledge, no.  He hasn't been in none of these photographs the Government has produced to me yet besides the one where he's lifting up his shirt.

Q   Right.

A   Yes, sir.

Q   The front row of Exhibit 40 on the far lefthand side --

A   Yes.

Q   -- there is a young lady who appears, I guess, to be making gang signs?

A   On the righthand side?

Q   Left, lefthand side of the photograph.  Okay. Righthand side.  I was -- it's the young lady with the no sleeves and the red belt.  Do you see her?

A   Yes.

Q   She's throwing up gang signs, is she?

A    Yes, she is.

Q    Who is she?

A    Kendra Owens.

Q    Were you -- when the Nortenos were being investigated by the Dodge City police, did you have an occasion to be involved in an interview with Kendra Owens?  If you don't remember, that's all right.

A    I don't remember.  I know Detective Shane Corey interviewed her but --

Q    Let me show you also 37.

A    Yes, sir.

Q    What -- I'm sorry.  Do you know who these folks are that are photographed in 37?

A    No, I do not.

Q    Okay.  Not any of them; right?

A    Not that I can tell.

Q    Let's take the person on the back row, righthand side, dressed in the black shirt.

A    Yes, sir.

Q    Looks like he is putting up four fingers; right?  On his left hand?

A    That's correct.

Q    And giving somebody the finger with his right.  Is that what that looks like to you?

A    That is correct.

Q   Is using your -- your middle finger to throw up a gang sign of your own gang, is that not disrespectful?

A   Apparently he didn't think so.

Q   Yeah, well, he may not be a gang expert.  What do you think?

A   I don't have no opinion on that.  He's throwing up the one-four.  That's what's important to me.  I don't know if he would consider it disrespectful.  I've never heard anybody say that if somebody throws up our gang sign and they use their middle finger that that will be disrespectful to the gang.  So, I've never heard that and I can't answer that.

Q   Have you ever heard of a Diablos Viejos gang in the United States that was under the umbrella of the Sureno?

A   Yes, I have.

Q   Where does that gang -- where is that gang located?

A   Somewhere in California.

Q   We have looked at a whole bunch of exhibits, 23 -- long lengthy run of them.  I'm going to try to get them one at a time for you.  Okay?

A   That's fine.

Q   At least I'm going to try.  Exhibit 23?

A   Yes, sir.

Q   Which is a picture of a person with three tattoos on his left arm.

A   I believe it's on his right, the back of his right arm.

Q   Is that the back of someone's arm?  I'm sorry.  The back of his right arm?

A   Yes, sir.

Q   Works for me.  Top tattoo says north?

A   Correct.

Q   Bottom says Viejos?

A   Yes.

Q   And the middle is what we've been calling the huelga bird, which is really an eagle; right?

A   You told me that, yes.

Q   Well, it's -- if it's an eagle, it has meaning, and you know what its meaning is outside the gang world?

A   Talking about as far as the United States of America or are you talking about the huelga bird.

Q   Let's talk about the United States first.

A   Okay.

Q   Do you know what its symbolism is other than gang stuff in the United States?

A   Freedom.

Q   No -- but have you ever heard of Cesar Chavez?

A   From you.

Q   Do you know who Cesar Chavez was?

A   What you told me was he is part of the United Farm

Workers Association.

Q   He was the United Farm Workers Association.  But in arriving at opinions as to whether or not certain kinds of tattoos are gang related, don't you think it would be important to know about the importance of the huelga bird to Hispanic Americans?

A   This tattoo in relationship to the way you just described it did not matter to me.  In going back and looking at the history of this, the reason that these guys are putting it on their bodies with the words Norteno and other stuff is to symbolize the huelga bird that the Nuestra Familia uses in their prison settings.

Q   You also said something else about this photograph.  This is Jason Najera; right?

A   Yes, sir.

Q   And maybe I took bad notes, and that's possible -- is there an E someplace on this that is important?  You mentioned something about ene when you talked about this?

A   About this photograph?

Q   Yes, I thought so.

A   Exhibit 23?

Q   Right.

A   I don't know if I did or not.  Are you talking about possibly his street name?

Q    Possibly, yeah.

A    Okay.

Q    What's the importance?

A    He goes by Norte or Ene, meaning northerner.

Q    Okay.  So Ene could stand for Norte; right?  First letter in north?

A    That's correct.

Q    Or Norteno; right?

A    That's correct.

Q    Or for that matter, something else?

A    That's correct.

Q    Okay.  Thanks.  Appreciate that.  I think I've got three more pictures.  Yep.  I've got Exhibit 41, 42 and 80.  Have you got them?

A    Yes, sir.

Q    Let's just start with 41.

A    Yes, sir.

Q    41 you told us was who?

A    Eusebio Sierra-Medrano.

Q    And you said Mr. Medrano had a mongolian haircut?

A    Well, the mongolian braid coming out the top of the hair.  I think the true Mongols would actually have a shaved head with just a notch.

Q    Right.  But this is a braid and it's known as a mongolian; right?

A   That's what I've been told.

Q   Who told you that?

A   Officers of the Street Crime Unit, after I got off it, these hairstyles started coming in and I was briefed by the guys that were working the streets and what they were hearing off the streets.

Q   Let's also look just for fun at 42.

A   Yes, sir.

Q   To me, 42 is harder to see.  Does that braid start at roughly the same part on 42's head as 41 does?

A   Roughly, yes.

Q   We can't see the front of 42's head, but based on your experience, that hair would be not bald like mine but shaved short, cut short?

A   No, not necessarily.  If you're talking about a true mongolian haircut, I think they would shave their heads around it and just have the top part of their hair coming out.

Q   You're talking about a true mongolian haircut based on Nortenos -- excuse me -- on Diablos Viejos?

A   Just talking about the actual Mongols from whatever --

Q   Well, are you familiar with where it is that the Diablos Viejos who adopt this hairstyle, where it is that starts?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    I'm sorry.

Q    Yes.  There are people -- there are Diablos Viejos in Dodge City who wear the mongolian; right?

A    That's correct.

Q    When those people have that haircut, does the braid start at the same place in their head?

A    No.

Q    It does not?

A    Oftentimes, no.  I don't think everybody can take a tape measure and center up their hair.

Q    You know, I probably was just being silly by asking that -- but they don't start, like, on the front of their head; right?

A    The biggest thing when it comes to the hair would be the braid.  Most of the time it will come off the top of the head and be a braid coming off the top of their head.  Most of our Surenos will do just the opposite and they'll have rattails, what they call rattails.  They'll come out of the bottom of their hair and be braided. They can come off pretty much anywhere from the top of their head.

Q    Okay.  In any event, that is, I think, native to Dodge City?  Diablos Viejos?

A    Yeah.  As far as I know, yes, sir.

Q    And based on your training, experience and

investigation, are you aware of Nortenos or Nuestra Familia members who wear that haircut?

A I'm not familiar with them.

Q Have you ever even heard about that before you saw it on these kids from Dodge City?

A I haven't. And I didn't research that either, so, I couldn't tell you.

Q In your direct testimony you said that you had heard that getting jumped in lasted for 14 seconds, depending upon who was counting; right?

A I've heard it being different amounts of time; but most generally from -- I'll say this, probably more often than not, I'm told that the 14 is synonymous with their jump-in's; but it could be them counting and it taking a lot longer than that one second.

Q Is that something that you heard in the investigation of this case?

A I heard a lot in this case. I'm sure I probably knew this before this case came around; but I can't tell you specifically exactly when I first heard that, sir.

Q Well, you said there were DVs who told you -- there was at least one DV who told you that he was jumped in. Did you learn that in the investigation of this case?

A Are you talking --

Q You said there was a DV who told you he was jumped

in.  I asked you did you learn that in the investigation
of this case.

A   I've heard about people being jumped in before this
case, if that's what you're asking.  I have heard about
people during this case being jumped in.  I also heard
that before this case.

Q   But did you learn that in your investigation of the
Diablos Viejos?

A   Well, at some point or another, if they're Diablos
Viejos gang members and I was dealing with them in a
criminal nature in an investigation; but I don't know.
I can't tell you, sir, if it was this investigation or
not.

Q   When you learned that -- you told us that one of the
rules is that the Diablos Viejos don't cooperate with
the police.  Remember telling us that?

A   Yes, sir.

Q   Did you learn that in your investigation of this
case?

A   No, I knew that before.

Q   Did you learn that in the investigation of the
Diablos Viejos generally?

A   Yes.  It would be investigations that happened
before this case if that's what you're asking.

Q   You told us you have learned that Diablos Viejos

that wanted to leave the gang or did not want to leave the gang were sometimes jumped out.  Do you remember talking about that?

A   Yes, sir.

Q   Did you learn that in the investigation of this case?

A   I learned it before.

Q   You said you had been told of violations.  Would I be correct in saying that you were told of violations in the investigation of this case and before you started investigating this case?

A   It would be fair to say both.

Q   You learned a person can suffer a violation for being late to a meeting; right?

A   That's correct.

Q   Same answer?  You learned it both prior to and in the investigation of this case?

A   I -- that -- I'm pretty sure on that specific thing that I'm thinking about, that would have been during this case that I would have learned about the violations for being late to meetings.

Q   I think I'm almost finished.  Just have a drink and bear with me.

      Oh, yeah, yeah, yeah.  You are not a federal law enforcement officer; right?

A    No, sir.

Q    You were a police officer?

A    Yes.

Q    In Dodge City?

A    That is correct.

Q    And is that where you were a police officer -- I'm setting aside the KBI.  Is that where you always were a police officer or were you a police officer somewhere else before this?

A    No, sir.  I started my career at the Dodge City Police Department and I left it for the KBI this year.

Q    Right.  And you're in the KBI?

A    Yes, sir.

Q    Kansas Bureau of Investigation?

A    Yes, sir.

Q    And the Kansas Bureau of Investigation investigates what?  State crimes?  Violations of state law?

A    Also violations of federal law.

Q    I'm sorry -- what's your primary mission?

A    My primary mission right now is to work narcotics cases.

Q    Right.

A    But sometimes those, because of the weights of those cases, because of the weights of the narcotics, those will be federal cases, so we also utilize the federal

system.

Q   Yeah.  I kind of understand how that works but let me ask it a different way.  As a KBI agent, are you supposed to be familiar with Kansas criminal law?

A   Yes.

Q   In all my days I've never heard of the Kansas crime of home invasion.  Have you?

A   I would say that's more of a term that I did pick up through this investigation.

Q   Right.  Because if we're talking --

A   They call it aggravated robberies on the state side if that's what you're wanting to get at.

Q   That's exactly what we call it; right?

A   Yes, sir.

Q   How come you don't call a spade a spade here?

MR. WELCH:  Objection; irrelevant and argumentative.

THE COURT:  Sustained.

BY MR. WACHTEL:

Q   Do you know why it is, if you do, that in the context of this case law enforcement refers to aggravated burglaries as home invasions?  If you know.

MR. WELCH:  Again, Your Honor, I'm going to object as being irrelevant.

THE COURT:  What's the relevance of it?

MR. WACHTEL:  Well, Your Honor, I think the relevance of it is in terms of it being used here to inflame the passions of the jury.

THE COURT:  Overruled.  It will be up to the jury to decide whether their passions are inflamed by the use of home invasion as opposed to aggravated robbery or aggravated burglary.

MR. WACHTEL:  I'm sorry.  Thanks.  You may want to hold on to those exhibits.

A   I have it, sir.

THE COURT:  Mr. Mandelman.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Have you ever testified as an expert witness before in federal court?

A   No, I have not.

Q   Have you ever testified as a witness in any capacity in federal court?

A   Yes.

Q   Go ahead.

A   Yes, I have.

Q   Go ahead.  In what sort of case?

A   Before this case?

Q   Yes.

A   I've testified in front of a grand jury on indicting

Sureno gang members.  Those never went to a trial.  But since then, this would be my -- I'd say my second opportunity to testify but it's second case type deal.

Q   Have you ever testified as an expert in state court?

A   I've given my opinions but never been through a hearing like we went through with the Daubert hearing like you guys have.

Q   You were just permitted to give your opinion without being determined whether or not you are in fact an expert?

A   Basically what's happened in those hearings is, obviously, the judges in Ford County, I've been around them for several years now.  The defense attorneys thought it might help them in part of their case as well as the prosecutors have allowed me to give opinions, that's correct.

Q   How were you employed before you were working for the Dodge City Police Department?

A   I ran the bowling center in Dodge City.

Q   Gonzo, that's -- that's what his mom calls him?

A   I don't know.  I've never asked her if that's what she calls him.  I've spoke to her before but I don't know if she referred to him -- right off the top of my head -- as Gonzo or not.

Q   But it's not your testimony that's a gang name?

A   That name -- he is known to persons within the gang as Gonzo.  That name could be given to him as a family nickname but that has stuck with him.  That's what numerous gang members know him as and don't actually know his full name.

Q   Okay.  Pretty much everyone who knows him calls him Gonzo?

A   I don't know.

Q   You mentioned everything from traffic violations to murder.  How is a traffic violation a gang crime?

A   That depends.  If you flee and elude law enforcement so that you can get into a neighborhood where all the doors can be open and your fellow gang members get to flee from the car, those would be traffic violations.

Q   But there's plenty of crimes that might be committed by a gang member that aren't gang crimes?

A   Can you ask that differently.  I don't understand what you're asking.

Q   Speeding, burglary.  You can pretty much do anything regardless of your affiliation and it would not necessarily be a gang crime?

A   Depends.  That is correct.  If it's not gang motivated or there's not numerous gang members committing the crime within the same time, it's possible.

Q   The state of Kansas has a definition of a gang?

A   That's correct.

Q   And that's the definition, at least in part, you use to identify both whether or not an entity is a gang; is that correct?

A   I'm not the person that does that so I couldn't tell you.

Q   And that statute also has some criteria which are mirrored, I think, in Government Exhibit 6, three criteria?  That sort of tracks a state statute?

A   That's correct.  I know part of the gang sheet meets in with the state statute that was created.

Q   Now, that Kansas definition doesn't have any connection to interstate commerce, does it?

MR. WELCH:  Objection; irrelevant, Your Honor.

THE COURT:  If he knows, he can answer.

A   I don't know.

MR. MANDELMAN:  Request permission to approach the witness.

BY MR. MANDELMAN:

Q   And have you ever -- have you ever -- just take a second and see if you can identify what that is.  And I'm just talking about the very top part.

A   Yes.

Q   And that provides a definition of a criminal street

gang that's from the Kansas statutes?

A    It looks like this was, yes, updated -- was this updated in 2012?  This year?

Q    This is the most recent version.

A    Okay.

Q    And that definition, in your brief review, does not have any connection to interstate commerce, does it?

MR. WELCH:  To which, again, I object as being irrelevant, Your Honor.

THE COURT:  Well, are you intending to offer that into evidence?

MR. MANDELMAN:  I think the Court can take judicial notice of the statute.  It's state law.  But if he answers -- I mean, I don't --

THE COURT:  Are you asking him do the words interstate commerce appear in the definition?

MR. MANDELMAN:  Well, he's described that at some point in 1996 the Dodge City Police Department characterized the Diablos Viejos as a gang.  I want to know if that gang meant that that has any sort of connection to interstate commerce.

THE COURT:  Well, why don't you ask him that.

MR. MANDELMAN:  Okay.

A    Can you repeat your question.

BY MR. MANDELMAN:

Q   Sure.  The fact that the Dodge City Police Department categorized that the Diablos Viejos as a gang from, I think you testified back in the mid '90s, that characterization didn't have any -- that determination didn't have any -- wasn't based on a gang's effect on interstate commerce?

A   I do not know.

MR. MANDELMAN:  That's all I have.  Thank you.

THE COURT:  Redirect, please.

MR. WELCH:  No questions, Judge.

THE COURT:  Thank you, Officer Webb.  Next witness.

MR. WELCH:  Your Honor, may we approach on a quick matter?

THE COURT:  Sure.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

MR. WELCH:  Judge, I'm sorry to waste time. Shane Webb will testify I believe two more times about other parts of the investigation.  Should he be sequestered?

MR. MANDELMAN:  I think so.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

MR. WELCH:  He's not a case agent.

THE COURT:  He's not?

MR. WELCH:  He's not a case agent, Judge.

THE COURT:  I think he should be.

MR. WELCH:  Okay.  Wanted to make sure.  Thank you.

(Thereupon, the following

proceedings continued in the

hearing of the jury.)

MR. SMITH:  United States calls Lt. Traci Rankin.

**TRACI RANKIN**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Lieutenant, will you please tell us your name.

A   Traci Rankin.

Q   What is it you do for a living?

A   Police officer.

Q   And with whom?

A   Dodge City Police Department.

Q   How long have you been with the Dodge City Police Department?

A    Almost 17 years.

Q    You hold the rank of lieutenant; is that correct?

A    Yes, sir.

Q    What duties have you had with Dodge City in 17 years?

A    I've been a patrol officer; a detective; detective sergeant; patrol lieutenant; school resource officer. I've been a lieutenant, which I'm currently in training in professional standards.

Q    And do you remember what your duties were back in 2009?

A    I was a patrol lieutenant.

Q    What does a patrol lieutenant do?

A    In charge of the patrol division.  We have four separate shifts and management of the officers and supervisors and their patrol duties.

Q    In Dodge City, was there any particular town that you were responsible for?

A    Just the jurisdiction of Dodge City.

Q    Dodge City --

        THE COURT:  Would you pull that microphone up a little closer, please.

A    Yes, sir.  Sorry.

        THE COURT:  Thank you.

BY MR. SMITH:

Q    What shift were you responsible for in June of 2009?

A    I worked 8 to 5 normally, Monday through Friday in the office.

Q    Now, are there any provisions -- I suppose being a lieutenant -- for being on call or being responsible for responding to significant events?

A    Yes.  If the officers had to call out additional help during the day, I would get called; and I would take a patrol car home every night.

Q    I see.  So do you recall, were you working or did you have occasion to work on June 8 of 2009?

A    I was at home when I got a call.  I was off duty but I had a patrol car at home that evening.

Q    And you received a call?

A    Yes, I did.

Q    What was the call in regards to?

A    I had the on-duty supervisor called and told me he was at a current crime scene and just received a call of a shooting in south Dodge City and said that he was going to have to call in additional help.  At that time I told him I would go out to the scene to assist.

Q    So I take it you got your uniform on; is that right?

A    No.  Actually, I just put on the first clothes I had and went out the door because the location was only a

few blocks from my house.

Q   Okay.  And so you're familiar with the area?

A   Very.

Q   Do you recall what area or what address it was that you responded to?

A   The area was 201 McCarter.  It's a trailer park.  It's got approximately 70, 75 trailers in it.

Q   Have you been to that trailer park before?

A   Many times.

Q   You mentioned it was close to your home; is that right?

A   Yes, sir.

Q   Driven around it in the day?  Driven around it in the night?

A   Correct.

Q   Okay.  201 East McArtor, is that in the city limits of Dodge City?

A   Yes, sir.

Q   So you responded there.  Do you recall what time it was that you responded?

A   I got the call about 11:30 p.m.  And it just took me a few minutes to get there.

Q   And the call that you were responding for was shots fired or was it anything else?

A   Just that there had been a shooting at the trailer

park.  I have a police radio at home.  As soon as I got

the call, I turned it on and I could tell by the radio

traffic that they were responding to a subject that was

shot in the leg.

Q   Shot in the leg?

A   Correct.

      MR. SMITH:  May I approach, Your Honor?

      THE COURT:  Sir.

BY MR. SMITH:

Q   I've placed three exhibits in front of you marked

Exhibit 100, 101 and 102.  Do you see those exhibits?

A   Yes, sir.

Q   Let's look at Exhibit 100 first.  Do you recognize

what is depicted in Exhibit 100?

A   Yeah.  It's an aerial view of the trailer park.

Q   This is the trailer park at 201 East McArtor?

A   Yes, sir.

Q   And the same trailer park that you responded to on

June 8 of 2009; is that correct?

A   Yes, sir.

Q   Do you recognize that as being an accurate depiction

of the trailer park?

A   Yes, sir.

Q   And an accurate depiction of the trailer park as it

was in 2009?

A   As far as I can remember, yes.

Q   Okay.  Now, if we look at Exhibit 100, can you essentially see where your vehicle responded to and the area of any crime scene that you responded to?

A   Yes, sir.

MR. SMITH:  Your Honor, I'd move to admit Exhibit 100.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  I don't have any objection.

THE COURT:  100 is received.

MR. SMITH:  May we publish please?

THE COURT:  Yes.

BY MR. SMITH:

Q   Now, Exhibit 100 is now on the monitor for you to observe and for the jury to observe; is that correct?

A   Yes.

Q   We see several streets.  In fact, those streets are named in Exhibit 100.  Can you please point those out and tell the jury what the names of the streets are that we're referring to.

A   The top street is McArtor street.  It is the one that we typically enter off into in the trailer park. Minnola Road is the far right street and that's farthest to the east.  Agnes is the south street that borders the trailer park.  And then Rath Avenue is the west side of

the trailer park.

Q   And we have the picture displayed right here; is that correct?  As far as orientation north to south; is that right?

A   Yes, sir.

Q   When you responded to the scene on June 8, 2009, where did you initially drive to?

A   I came into the area on McArtor street and I entered the trailer park on the far west road.  I got out of my car and started to approach the house but our communications advised on the radio that there was a possible code blue subject in front of trailer 41, which would have been a separate road.

Q   When you refer to the far west road, you're referring to the road internal to the trailer park and not Rath Avenue; is that correct?

A   Correct.

Q   So you were driving down that internal road of 201 East McArtor in the trailer park; is that right?

A   Yes, sir.

Q   Now, you received a call for code blue.  What does that mean?

A   A subject not breathing.

Q   Subject not breathing.  And that was in front of a specific lot; is that correct?

A    I was directed to lot 41.

Q    And then what did you do?

A    I turned around and got back onto McArtor street, went down the middle row of the trailer park and parked in front of trailer number 41.

Q    Okay.  Now, you can actually use your finger or use a pen if you would like and touch that screen so that you can mark for the jury where you responded to.  So -- let's wait -- and when you drove to the area of lot 41, go ahead and put a mark on that screen and tell us where you responded?

A    It was in this direct area right in here.

(Witness indicates on screen.)

Q    Okay.  You drove your patrol vehicle to that area?

A    Yes, sir.

Q    And did what then?

A    I got out.  There was people standing out in front of trailer 41 and I asked where the subject was and they pointed to the back of the trailer.  So I started to walk into this area in between the two trailers.

Q    Okay.  When you walked into -- so you're actually walking to the east; is that correct?

A    Yes, sir.

Q    And in between trailers.  When you walked into that area, do you see anything that's unusual?

A   I found a Hispanic male laying on the ground.

Q   All right.  You have in front of you what's been marked as Exhibits 101 and 102; is that correct?

A   Yes, sir.

Q   Do you recognize what's depicted in 101 and 102?

A   It's -- 101 is a picture of the subject I found laying on the ground; and 102 is accurate that evening of the backyard where he was living.

Q   102 is actually more of a picture of the person and the area; is that correct?

A   Correct.

Q   And do both of those pictures accurately represent what you saw on that evening?

A   Yes, sir.

        MR. SMITH:  Your Honor, move to admit Exhibits 101 and 102.

        MR. WACHTEL:  No objection, Your Honor.

        MR. MANDELMAN:  I don't object, Your Honor.

        THE COURT:  101 and 102 are received.

        MR. SMITH:  Thank you.

BY MR. SMITH:

Q   Let's look at 102 first.  You mentioned that 102 would be the Hispanic male that you found -- the person and then the area that he was found in; is that correct?

A   Yes, sir.

Q   What is it that we see in this photograph?

A   The trailers back up against each other.  He is laying towards the back between trailers next to a shed.

Q   Okay.  That building on the left top, the white building, is the shed I take it?

A   Yes, sir.

Q   And then the purple and white structure is a trailer; is that correct?

A   Correct.

Q   And, again, this is the Hispanic male that you saw on that evening; is that right?

A   Yes, sir.

Q   And let's look at Exhibit 101.  Is this a close-up photo of that same person?

A   Yes, it is.

Q   Is this how the person was when you found him on June 8, 2009?

A   It was, except the shirt.  We cut the shirt open to try to look for wounds.  When I first approached and saw him, his shirt was pulled down.

Q   Okay.  Let's talk about when you first approached this individual.  What did you see when you first approached him?

A   When I first approached, I noticed his eyes were half open and his mouth was open full of blood and he

didn't appear to be breathing.

Q   Okay.  Did you attempt to determine if he was alive?

A   Yes.  I checked the radial pulse on his arm and the carotid pulse on his neck and didn't see any.  I could tell by the pooling blood in his mouth he didn't have any respiration.

Q   At that point could you see any wounds?

A   Other than the blood in his mouth, no.

Q   Did you make a determination -- did you determine -- attempt to determine if he had any wounds?

A   Yes.  There was an officer that was with me, Officer Jeff Sharp.  I asked him to cut the shirt up the middle, make sure we didn't go through any evidence.  And we didn't see anything on his chest except for what appeared to be a bullet laying just below the skin right above the right nipple.

Q   And, in fact, can you see that in this photograph?

A   Yes.

Q   Can you point that out?

A   It would be right here.  (Witness indicating.)

Q   Okay.  Thank you.  Then did you do anything further to determine essentially why he died?

A   Yes.  We log-rolled him onto his right side.  About the thoracic area, the middle area of his back, there was a bullet wound that appeared right in the middle

area of his spine.

Q Had you seen bullet wounds before in your experience as a law enforcement officer?

A Yes, sir.

Q This appeared to be consistent with a bullet wound; is that correct?

A Yes, sir.

Q What you saw on his chest, the impression above his right nipple, did that appear to be the subject of a bullet wound that he had sustained?

A Yes, sir.

MR. SMITH: Nothing further. Thank you.

THE COURT: Yes, sir.

MR. WACHTEL: Just a moment, Your Honor.

(Off-the-record.)

MR. WACHTEL: I guess I don't have any questions at this time.

THE COURT: Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q I'm sorry, I want to make sure that I have -- is it Lt. Rankin; is that correct?

A Yes, sir.

Q You prepared a report in this case?

A Yes, sir.

Q   Were you able to speak with any witnesses as part of the investigation?

A   I spoke briefly with -- after the crime scene was turned over to detectives, I spoke to a Ricardo Sanchez-Sanchez.

Q   And was Mr. Sanchez able to provide a description of the suspects?

A   He gave a clothing description and approximate height.

Q   And what did he say?

        MR. SMITH:  Objection; hearsay.

        THE COURT:  Sustained.

        MR. MANDELMAN:  Your Honor, it goes to the -- impugn the police investigation in this case.  They had information that was -- it's not coming in for its truth.

        THE COURT:  Then what's the purpose?

        MR. MANDELMAN:  It's to challenge the police investigation in the case.

        THE COURT:  But not for -- not for purposes of truthfulness?

        MR. MANDELMAN:  That's correct.  It's not that the victim -- it's not that the suspect said that they looked a particular way.  It's that the police knew they had a contrary description.

THE COURT:  Well, let's put it this way then. It exceeds the scope of the direct examination.

MR. MANDELMAN:  Well, would you like me to call this -- I don't want to bring this witness back --

THE COURT:  I don't care what you do.  It exceeds the scope of direct and we're not going to get into something right now that exceeds the scope of direct examination.  All she did in this case was identify these three photographs.

MR. MANDELMAN:  I'm trying to save the Government money from having to bring someone back.

THE COURT:  Well, you can call Congress in Washington and explain that to 'em; but that's my ruling and it stands.

MR. MANDELMAN:  Okay.  I'll see you later, Ms. Rankin.

MR. SMITH:  Nothing further.

THE COURT:  Next witness.

MR. WELCH:  Your Honor, United States calls Craig Mellecker.

## CRAIG MELLECKER

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

## DIRECT EXAMINATION

BY MR. WELCH:

Q Sir, would you tell us your name.

A Craig Mellecker.

Q How are you employed?

A I'm a police officer for the City of Dodge City.

Q How long have you been employed by the Dodge City Police Department?

A A little over 29 years.

Q What is your current rank with the Dodge City Police Department?

A I'm the Chief of Police.

Q When you started 29 years ago, did you say, were you a patrol officer?

A Started in animal control for a little over a year. Then switched over to the patrol division.

Q I want to focus your attention for the testimony today on the date of June 8, 2009, if I can, sir. On June 8, 2009, what was your rank?

A I was the detective lieutenant in charge of the detective bureau.

Q And I should have asked you this, Dodge City, Kansas, is located in Ford County, Kansas; is that correct?

A That's correct.

Q And when did you become Chief of Police?

A   2011.

Q   But on June 8, 2009, you were a lieutenant with the police department; correct?

A   That's correct.

Q   Do you recall being called out to a crime scene late either June 8, 2009, or early June 9, 2009?

A   Yes, I do.

Q   What call did you receive?

A   I was notified that we had a shooting at the Countryside Mobile Home Park, which is 201 East McArtor in Dodge City.  We had one person that was shot and being transported to the hospital.  And when I was en route, I was told that we had a second victim that was deceased behind one of the mobile homes.

Q   Do you recall approximately what time you arrived at the location of the trailer park?

A   I believe it was just around midnight.

Q   And when you arrived, can you just, generally speaking, describe the scene.  Were other police officers already there?

A   Yes.  There were other Dodge City police officers there.  I recall one or two deputies with the Ford County Sheriff's Department were there.  They were setting up, basically, the crime scene.  We had a citizen police axillary person there keeping track,

basically, doing a crime log, crime scene log,

documenting who goes into the crime scene.

Q   Do you recall, Chief Mellecker, approximately what

time you arrived at the crime scene?

A   It was around midnight.

Q   When you arrived, did you make contact with Lt.

Traci Rankin?

A   Yes, I did.

Q   And what did you learn from her when you arrived?

A   She took me to the area where Israel Peralta's body

was behind trailer 23-A.

Q   Sir, I think you have in front of you three

exhibits.  Let's start with 101 actually.  I would ask

you, have you seen Exhibit 101 prior to today?

A   Yes, I have.

Q   And this exhibit has already been admitted so

does -- can you see it on your screen, Mr. Mellecker?

A   Yes.

Q   Do you recognize this person depicted in the

photograph?

A   Yes, I do.

Q   Who is that?

A   That is Israel Peralta.

Q   When you arrived at the trailer park that night,

early morning, was Mr. Peralta already deceased?

A   Yes.

Q   You also said you had heard en route to the crime scene location that there was another person who had been shot and was being transported to the hospital; is that right?

A   That is correct.

Q   Do you recall the name of that individual?

A   I do not recall it at this time.

Q   Did you ever have any contact with that person?

A   No.

Q   What did you do after you arrived at the crime scene?  What did you do, again, as a lieutenant with the police department on this occasion?

A   Started organizing the detectives of what they were going to do.  I'd also had the -- our County Coroner, Dr. Moffitt, notified and requested that he respond to the scene.

Q   And did that happen?

A   Yes, he did.

Q   And was Mr. Peralta pronounced dead at the scene?

A   Yes, he was.

Q   Can you look at 102.  I think you have that in front of you as well.  I want to ask you just a couple questions about that exhibit.  Do you recognize what that is, sir?

A    Yes, I do.

Q    What is that?

A    That's a picture of where Mr. Peralta was lying behind 23-A.

Q    The one difference that is noticeable in this photograph as compared to 101 is on Mr. Peralta's hands there appears to be some brown objects.  Do you know what those are?

A    Yes.  Those are paper grocery sacks or bags.  The Coroner, after he looked at Mr. Peralta, asked me to bag his hands before the body was moved.

Q    And was that done?

A    Yes, it was.

Q    All right.  And 101 -- could you display 101?

A    Excuse me.

Q    I was asking for an exhibit to be displayed.

     101, I presume, then, 101, that photograph was taken prior to 102; is that right?

A    That's correct.

Q    And do you know who took both photograph 101 and 102?

A    I did.

Q    Did you take additional photographs that evening or that morning?

A    I didn't hear you.

Q   Did you take additional photographs that morning,
June 9, 2009, as the investigation continued?

A   Yes, I did.

Q   You said, Chief, earlier that part of your duties
that night was to organize other police officers and
detectives who were on-scene working this crime; is that
right?

A   That's correct.

Q   Did you personally, then, document evidence that was
located at the scene?

A   Detective Robbins was documenting and collecting the
evidence.  My primary function helping out my detectives
was taking the photographs of the evidence.

Q   I'm going to ask you to look at Government Exhibit
103.  Let me ask you, are you familiar with that
document?

A   Yes, I am.

Q   What is that?

A   It's a crime scene diagram that was completed by
Detective Robbins.

Q   Now, this diagram, you've seen it before today?

A   Yes, I have.

Q   And can you, based on being at the scene June 8 and
June 9, 2009, can you tell us whether a portion of the
crime scene that's depicted is accurately depicted in

Exhibit 103?

A   Yes.  It's accurate.

MR. WELCH:  Your Honor, we would offer 103.

MR. WACHTEL:  No objection, Your Honor.

MR. MANDELMAN:  I don't object.

THE COURT:  103 is received.

BY MR. WELCH:

Q   Sir, do you see on the screen a portion of the diagram marked and admitted now as Exhibit 103?

A   Yes.

Q   In the diagram do you see the location of Israel Peralta's body as it was discovered by law enforcement June 8, June 9, 2009?

A   Yes, I do.

Q   Where is it located?

A   At the rear of lot 23-A.

Q   Where I placed a yellow arrow, is that the body of Israel Peralta?

A   Yes.

Q   In addition, you said there is the one rectangle at the top of the diagram marked 22-A; is that right?

A   That's correct.

Q   And then the rectangle below is marked 23-B; is that correct?

A   That's correct.

Q    What was 23-A? What type of structure was that?

A    That's a mobile home.

Q    And what type of structure was 23-B?

A    Another mobile home.

Q    All right. Now, to the right would be Mr. Peralta's body to the north of trailer 23-B; is that correct?

A    That's correct.

Q    All right. So to the east there appears to be a red vehicle; is that right?

A    That's correct.

Q    And behind that or to the east of that red vehicle there are numerous numbered squares or rectangles. Do you know what those represent?

A    Those are evidence markers that represent shell casings or other evidence that was found in that area.

Q    And did you assist in photographing shell casings and other evidence that was recovered that night, early morning?

A    Yes, I did.

Q    And then there's also to the mid left portion, which would be to the west and then south of Mr. Peralta's body, a small, again, rectangular yellowish numbered item. Do you know what that was?

A    Yes, I do. That's another evidence marker.

Q    And was an item of evidence secured in that

location?

A    Yes.

Q    And then the blue vehicle which would be directly south of unit 23-B, do you recall photographing that vehicle that night, early morning?

A    Yes, I do.

Q    And do you remember what type of vehicle that was?

A    It was a VW Jetta.

Q    And then the vehicle to the south of the VW Jetta, red in color, did you take photographs of that vehicle also?

A    Yes, I did.

Q    Do you recall why you took photographs -- let's start with the blue VW Jetta, why you took photographs of that car?

A    It had bullet holes, basically, on the trunk lid and then on the passenger side rear door and quarter panel areas.

Q    And do you recall why you took the photographs of the red vehicle to the south of the blue VW Jetta?

A    There was the passenger side front tire was flat and appeared to have a bullet impact or bullet hole in it.

Q    And the rectangular object to the south of 23-B just to the west of the red vehicle, the one marked 24, what type of structure is that?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    That's another mobile home.

Q    And do you recall taking photographs of the mobile home marked number 24 as part of this investigation?

A    Yes, I did.

Q    Why did you do that?

A    It had a bullet hole that entered on the -- over by the front door on the east side of the home and exited out the back side of the mobile home.

Q    All right.  Do you recall -- I realize you're not the one that actually collected the evidence, but do you recall if bullet evidence was collected from the blue VW Jetta?

A    Yes.  We collected both fragments and a partial slug.

Q    Do you recall if a bullet fragment or bullet was recovered from the red vehicle to the south of the VW Jetta?

A    Yes.  We recovered a bullet slug from the front tire.

Q    And you testified, Chief Mellecker, that a bullet passed through the structure, the mobile home marked 24 here.  Was a bullet recovered from that home?

A    No.

Q    Do you know why not?

A    The exit was high on the west side of the mobile

home, high off the ground, and we did not find a

projectile anywhere in the backyard.

Q   Did it appear to you that that bullet had passed all

the way through the structure?

A   Yes, it did.

Q   Sir, I'm going to ask you to look at a series of

photographs which are marked 104, 105, 106, 107, 108,

109, 110, 111, 112, 113, 114, 115, 116, 117 and 118.

Would you please take a minute and look at those and

tell me if you recognize what they are.

A   These are pictures that I had taken on June 8 at

this crime scene.

Q   And are those pictures you took as part of the

investigation that was conducted?

A   Excuse me.

Q   Are these pictures that you took as part of the

investigation?

A   Yes.

Q   And you said you took these pictures yourself;

correct?

A   Yes, I did.

      MR. WELCH:  Your Honor we would offer 104

through 118.

      MR. WACHTEL:  No objection.

      MR. MANDELMAN:  I don't have an objection.

THE COURT:  They're received.

BY MR. WELCH:

Q   Starting with 104, Chief, if you would.  Can you tell us what is depicted in that photograph?

A   This is on the south side of 23-B.  You can see the tail end or the rear of the blue Jetta.

Q   The blue Jetta is in that location; is that correct?

A   That's correct.

Q   You said this is to the south of 23-B.  Where is 23-B in this photograph?

A   23-B would be the mobile home on the right side of the blue Jetta.

Q   Did I just place an arrow on 23-B?

A   Yes.

Q   Can we return to 103 for a second.  Just to make sure we're all on the same page, Chief.  The blue VW Jetta we just saw in the prior picture is that vehicle there; is that right?

A   That's correct.

Q   And the light blue trailer is that structure in that location; correct?

A   That's correct.

Q   Okay.  104 again, please.  Thank you.  Do you know, Chief Mellecker, where the victims of the shooting, where they were located at the time the shooting began?

A   They were at the rear or around the rear of the VW Jetta.

Q   In that general area depicted in this photograph?

A   Yes.

Q   Okay.  105 please.  And what is this, sir?

A   This is a picture of the front of 23-B.

Q   All right.  And this photograph essentially has moved a little bit to the northeast from the last photograph; is that correct?

A   Yes.

Q   All right.  So do you see the VW Jetta in this photograph?

A   You can see about half of it.

Q   In that location?

A   Yes.

Q   And then 23-B is there; is that right?

A   That's correct.

Q   Okay.  106.  What is depicted in this photograph?

A   This is the area in front of 23-B.  And you can also see to the right of it part of 23-A.

Q   All right.  So 23-B, again, is the light blue trailer; correct?

A   That's correct.

Q   23-B is the pinkish-colored trailer?

A   23-A is the pinkish one.

Q   I'm sorry.  23-B is the light blue; 23-A is the pinkish color?

A   That's correct.

Q   Thank you.

Chief, 23-B, again, the light blue trailer is here and 23-A which you corrected me is the pinkish trailer in that location; correct?

A   That's correct.

Q   All right.  And that last photograph we could just see the markers that were placed on the ground.  Do you recall that?

A   Yes.

Q   All right.  106, please.  And what was the purpose of placing -- it appears in this photograph we can see one, two, three, four, five, six, seven, eight yellow markers on the ground?

A   Those markers indicate areas where evidence was located.

Q   All right.  107.  What is that, sir?

A   That is the front of 23-A.

Q   And, again, 23-A being that location; correct?

A   That's correct.

Q   And the yellow markers on the ground, do you see more -- some of the same that were in the last photograph and possibly additional markers that were

placed on the ground?

A    That's correct.

Q    Now, what follows, sir, is a series of photographs of shell casings.  Is that what you have in front of you?

A    That's correct.

Q    All right.  And this one is marked with the number 1; is that right?

A    That's correct.

Q    Okay.  Why was that done?

A    It's just a numbering sequence that we use.  We start at a certain point -- we try to start at one end and move to the other.  This was probably the first shell casing that was found.

Q    And then 109.  Again, what is that?

A    Evidence marker 2 with a spent shell casing.

Q    110.  What is that?

A    Evidence marker 3 with a spent shell casing.

Q    112 -- 11.  What is that?

A    That is evidence marker 4 showing a spent shell case.

Q    Now, 112, what is that?

A    Evidence marker 5 with a spent shell casing.

Q    113, what is that?

A    Evidence marker 6 with -- showing a spent shell

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

casing.

Q   114 is what?

A   Evidence marker 7 with a spent shell casing.

Q   Next photograph, 116, what is that?

A   Evidence marker 8 with a spent shell casing.

Q   117 is what?

A   Evidence marker 9 with a spent shell casing.

Q   And then 118 is what?

A   Evidence marker 10 with a spent shell casing.

Q   Go ahead, 119 -- 118?

A   Yeah, 118 is evidence marker 11 with a live round of ammunition.

Q   Do you know if -- do you know the number of spent shell casings that were photographed by you?

A   I believe it was ten spent shell casings and one live round of ammunition.

Q   And were the ten spent shell casings and the one live bullet recovered as evidence?

A   Yes, they were.

Q   And who did that?

A   Detective Robbins.

Q   Sir, I'd ask you to look at Exhibits 121, 122 and 123.  And again ask you if you recognize those photographs?

A   Yes, I do.

Q    What are they?

A    They're photographs that I had taken at the crime scene.  121 is basically the southwest part of the yard at 23-B.

Q    Okay.  Let me ask you first, all three of these photographs were taken by you; is that right?

A    That's correct.

Q    And were they taken for the purpose of documenting where evidence was located and recovered?

A    That's correct.

MR. WELCH:  Your Honor, we would offer 121, 122 and 123.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  I don't object.

THE COURT:  They're received.

BY MR. WELCH:

Q    121 please.  Thank you.  Chief Mellecker, what is depicted in Exhibit 121?

A    It's the southwest corner, basically, of the yard at 23-B.

Q    Can we display 103 again, please.  Do you see the portion of the photograph, the area depicted within Exhibit 121, do you see it depicted on Exhibit 103?

A    Yes, I do.

Q    Can you -- you can actually touch the screen as

well, Chief, and show us where that picture is --

A    Back in that area.  (Witness indicating.)

Q    All right.  122, what is 122?

A    It's a closer up picture of the southwest area of the backyard at 23-B.

Q    Go back to 121 if you would.  Thank you.  Now, the electrical boxes that we saw closer up in 122, do you see those depicted in the middle of photograph 121?

A    Yes, I do.

Q    All right.  122 again.  Thank you.  Now, what was the purpose of taking this photograph, Chief Mellecker?

A    Right below the electrical boxes you can see an evidence marker number 13.  That's the area that we found a spent projectile.

Q    And 123, please.  And what is 123?

A    It's evidence marker 13 along with the spent projectile.

Q    And that is the same 13 marker and spent bullet that was -- you testified about in 122; correct?

A    That's correct.

Q    All right.  So the marker we see at the bottom, middle bottom, the yellow marker 13, 123 is a close-up of that marker?

A    That's correct.

Q    And could you show 104 again.  Thank you.  Do you

Q   see depicted on Exhibit 104 yellow marker 13?

A   Yes, I do.

Q   Where is that?

A   It's in that southwest corner of the yard of 23-B.

Q   All right.  So that location is a spent bullet, a bullet that had been fired; correct?

A   Yes.

Q   And over here we saw a series of photographs which include ten spent shell casings, the casing from a fired bullet; correct?

A   Yes.

Q   And then one live round.  All of those ten shell casings and one live round are found in that general area; is that correct?

A   That's correct.

Q   I'm now handing you, sir, Exhibits 125, 126, 127, 128, 129, 130 and 131.  Starting with 125, can you tell us if you recognize those photographs?

A   Yes.  These are, again, photographs that I had taken at this crime scene.

Q   And do those photographs depict portions of the crime scene where evidence was recovered -- located and recovered?

A   That's correct.

MR. WELCH:  Your Honor, we would offer 125

through 131.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  We don't object.

THE COURT:  They're received.

BY MR. WELCH:

Q   125 please.  Thank you.  What is depicted in Exhibit 125, sir?

A   This is the blue VW Jetta that was parked beside 23-B.

Q   And, again, not to be redundant, but could you show 104 again.  Thank you.  You previously testified that that blue vehicle is the blue VW Jetta; is that correct?

A   That's correct.

Q   The same car depicted in Exhibit 125?

A   That's correct.

Q   125 again, please.  Thank you.  What was the purpose of taking this and other photographs of the blue VW Jetta?

A   To document the crime scene and also to show the vehicle's location.

Q   All right.  126.  Why did you take this picture identified as Government Exhibit 126?

A   It shows a measurement tool that we use when we photograph bullet holes.

Q   And the measuring tool is black and white; is that

right?

A    Yes.

Q    All right.  And directly above that ruler -- is it okay -- I'll call it a ruler -- is a hole in the vehicle; is that correct?

A    That's correct.

Q    And did you identify that as a bullet hole and that's why you marked it as evidence?

A    Yes.  It appeared to be a bullet hole and that's why we documented it.

Q    All right.  127.  First of all, is this the same vehicle depicted in 126?

A    Yes, it is.

Q    All right.  And why did you take this photograph?

A    We found what appeared to be another bullet hole on the passenger side right below the rear door and, again, we put a measurement tool, a ruler, right below it.

Q    128 please.  Thank you.  What is depicted in Exhibit 128?

A    This is another what appears to be bullet hole on the trunk lid of the blue Jetta.

Q    And 129.  What is depicted in this photograph?

A    This is the rear seat.  Rear seats are folded down. And it's got two evidence markers indicating bullet fragments.

Q   Do you recall, Chief Mellecker, when you arrived at the scene, was the hatch or the trunk of the VW Jetta latched?  Was it closed?

A   The trunk was closed when I arrived.

Q   In order to -- there appears to be a 15 and 16 evidence marker placed in the vehicle.  What's the significance of 15 and 16?

A   Those are bullet fragments.

Q   What is depicted in Exhibit 130?

A   Evidence marker 15 just to the left of it; and to the right of it are two what appear to be fragments from a bullet.

Q   And then 131.  What is 131?

A   It's evidence marker 16 with a bullet fragment.

Q   And were Exhibits 15 and 16, the actual bullet fragments, seized as evidence?

A   Yes.

Q   Chief Mellecker, if you could look at Exhibit 133, 134 and 135 and 136 and again tell us if you recognize what those are.

A   Yes.  These are pictures that I had taken of the red Cavalier.

Q   And Government Exhibit 104, I don't think I had you identify it.  Just referred to it as the red car south of the VW Jetta.  But do you see the red Chevy Cavalier

vehicle identified or depicted in Exhibit 103?

A    Yes, I do.  It's in front of the porch area of number 24.

Q    It's located -- where I marked the yellow arrow, is that the Chevy Cavalier?

A    Yes, it is.

Q    Exhibits 133 through 137 you said are photographs you took; is that right, Chief?

A    Yes, they are.

Q    And did you, again, take those photographs to document the crime scene and evidence that was located and seized?

A    Yes, I did.

            MR. WELCH:  We would offer 133 through 137, Judge.

            MR. WACHTEL:  No objection.

            MR. MANDELMAN:  I don't object either, Your Honor.

            THE COURT:  They're received.

BY MR. WELCH:

Q    Thank you.  And, Chief Mellecker, what is depicted in Exhibit 133?

A    This is the passenger side of the red Cavalier.

Q    And why did -- go ahead.  I'm sorry.

A    With an evidence marker of number 14 up by the

passenger side front tire.

Q   Why was an evidence marker placed in the right front tire -- near the right front tire in this picture?

A   We believed that we had a bullet lodged in that tire.

Q   134 please.  What is this?

A   It's a close-up of the front tire with the evidence marker number 14 on the red Cavalier.

Q   135, what is that?

A   That is a chalk outline or circle around the bullet hole in the tire that came off of the red Cavalier.

Q   136.  Do you know what's depicted in Exhibit 136?

A   Yes.  That's the bullet removed from the tire.

Q   And how do you know that a bullet was retrieved from the tire of the red Chevy Cavalier?

A   Several days later I took that tire down to our city shop and had one of our mechanics at the city shop, Matt Nau, use their special equipment to remove the rim and pop the tire off of the rim, basically; and when he did that, I could remove the bullet from the tire.

Q   After the bullet was recovered from the tire, what did you do with it?

A   I turned it over to Detective Robbins who was the evidence collector.

Q   And do you know whether that was turned in as

evidence as part of this investigation?

A   Yes, it was.

Q   Chief Mellecker, based on the evidence that was recovered from the scene that night and early morning, were you able to determine the direction of the bullet fire, the general direction of the bullet fire as it appeared from the evidence you recovered and structures or vehicles that were -- sustained gun fire?

A   Yes.

Q   All right.  Can you generally show us the direction where the bullets traveled that you recovered and bullet holes that you located in structures or vehicles?

A   Well, it appeared that the bullets were -- the firearm was fired from up in this area up here in front of 23-B and they were directed basically to the southwest.  (Witness indicating.)

Q   And based on your testimony, you found multiple bullet holes in the VW Jetta; correct?

A   That's correct.

Q   Found a bullet hole in the tire of the red Chevy Cavalier; correct?

A   That's correct.

Q   You found a bullet hole through the residence located at unit 24 in the trailer park; correct?

A   That's correct.

Q    And you found one live round in that general location which was marked -- we saw on the photograph marked as Exhibit 13; correct?

A    That was evidence marker 13 was a spent projectile.

Q    I'm sorry.  If I didn't say it, that's what I meant to say.  You found a spent bullet marked 13 in that location; is that correct?

A    That's correct.

Q    And then there was also the one live round found in that location up to the northeast; is that correct?

A    That's correct.

Q    In amongst the ten shell casings that we saw photographs of seized as evidence; correct?

A    That's correct.

        MR. WELCH:  I have no further questions of Chief Mellecker, Your Honor.

        THE COURT:  Do you have any questions?

        MR. WACHTEL:  Just briefly, Your Honor, yes.

        THE COURT:  All right.

                    **CROSS EXAMINATION**

BY MR. WACHTEL:

Q    Chief, my name is Val Wachtel.  What were your responsibilities at that crime scene that night?

A    To organize the detectives that were investigating it; make assignments of what they were going to do at

the crime scene; and then if we need help, to assist them with anything I could do to help them in working the crime scene.

Q   And in addition to all of that, you took all these pictures that we've been seeing; right?

A   That's correct.

Q   And being in charge of the officers that were there that evening, did you expect them to then -- if you assigned them something to do or if they had something on their own, would you have expected them to report back to you that evening?

A   I gave assignments out to my detectives, yes.  And through the -- through that working of that crime scene, if they had any questions, they would come and ask me or report back to me, yes.

Q   Would Lt. Rankin -- there was a Lt. Rankin that was there?

A   Yes.  She was the patrol bureau commander at that time.

Q   Did you also give instructions to her as to what to do?

A   I don't recall if I gave any instructions to her or not.

Q   Do you recall her reporting back to you that evening while you were still at the crime scene?

A    I don't recall.

Q    If she had, would you have made a note of it?

A    I may have if she did.

Q    Did you bring your notes with you?

A    Yes.

Q    Because if you'd like to check to see, that's fine with me.

(Witness complies with request.)

A    I don't have any mention that she reported back to me.

Q    And if she had, it would have been your practice to make a note of that; right?

A    I would like to say that would be my practice.  I don't recall her reporting back to me though.

Q    Now that you're Chief, would you like to be able to say that would be the practice of your detectives?

A    Yes.

MR. WACHTEL:  I don't have any further questions.  Thank you very much.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q    Did you interview the same Ricardo Sanchez-Sanchez that Lt. Rankin did?

A    Yes, I spoke to a Ricardo Sanchez.

Q   Did you know if that was --

MR. WELCH:  Your Honor, I'll make the same objection.  Beyond the scope of direct and irrelevant.

THE COURT:  Sustained.

MR. MANDELMAN:  I make -- I make the same response.  This -- after Lt. Rankin interviewed this man, the Chief interviewed this man.  He gave a description that's inconsistent with the height of the --

THE COURT:  You're to ignore Mr. Mandelman's comments.  It's totally improper.  This man came here to testify about photographs.  That's all he testified about.  That's all you can cover on cross-examination.  You know that.

MR. MANDELMAN:  I have nothing further.

THE COURT:  All right.  We'll take a recess until about 4:30, Ladies and Gentlemen.  Remember and heed the admonition.

(Jury excused for recess.)

MR. WELCH:  Your Honor, I have one --

THE COURT:  Yes, sir.

MR. WELCH:  Judge, it's entirely my fault. I'm requesting if we could -- we went a little faster with Mr. Mellecker than I thought we would.  We're not ready for our next witness.  Can we stop for the day and

take up first thing in the morning?

THE COURT:  Who is it?

MR. WELCH:  It's Mike Robbins, Judge.  He's here, but I don't have the exhibit that I need to give him.  And that's my fault, Judge.  I promise I'll be ready --

THE COURT:  You can't question him without an exhibit?

MR. WELCH:  I can question him about other things.  It's just an exhibit that I need for him that I don't have right now, Judge.

THE COURT:  But what about the other things?

MR. WELCH:  I can.  I can cover some other things.

THE COURT:  We'll continue.  You know, I don't know how many witnesses you listed.  When you -- yesterday; but it sounded like about 20 or 30.  And we're not moving very fast and so I'm not going to waste time by quitting at 4:20.  Question him about what you can and then get the exhibit tomorrow.

MR. WELCH:  We will.  Thank you, Your Honor.

(Recess.)

THE COURT:  Next witness, please.

MR. WELCH:  Your Honor, United States calls Michael Robbins.

**MICHAEL ROBBINS**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you tell us your name.

A   Michael Robbins.

Q   Mr. Robbins, who do you work for?

A   I work for the Dodge City Police Department.

Q   How long have you been so employed?

A   Since April of 2003.

Q   What is your current rank with the Dodge City Police Department?

A   I am a detective.

Q   How long have you been a detective?

A   I've been a detective since February of 2009.

Q   Detective Robbins, for our purposes today I'd like to focus your attention on the date of June 8, 2009, and ask were you working with the police department on that day?

A   Yes.

Q   Were you called in to assist in a homicide investigation that day?

A   Yes, I was.

Q   Where was the homicide?  Where did it take place?

A   I do not recall the exact address.  I remember it
was in a trailer park on the south side of town.

Q   South side of Dodge City, Kansas?

A   Yes.

Q   Did you respond to that location at some point on
June 8, 2009?

A   Yes, I did.

Q   Do you recall approximately what time you arrived at
the location?

A   It was in between midnight and 12:30.

Q   So actually into June 9, 2009?

A   That's correct.

Q   And the next morning?

A   Yes.

Q   When you arrived, Detective Robbins, what were you
assigned to do?

A   I was assigned to evidence collection and
diagramming the scene.

Q   And did you do that?

A   Yes, I did.

Q   Let me first ask you to look at what has been
admitted as Government Exhibit 103.  Do you know what
that is?

A   Yes, I do.

Q   What is that?

A   This is a computerized diagram that I had completed of the crime scene.

Q   And you prepared that yourself; is that right?

A   Yes, I did.

Q   Can we display 103.  You already did.  Thank you. What was the purpose of creating this diagram, Detective Robbins?

A   To show the location of pieces of evidence as well as where the -- in relation to where the body was found and also the vehicles and the motor homes or the mobile homes.

Q   We've had testimony earlier that the body of the man that was found at that location was a man by the name of Israel Peralta.  Is that your understanding?

A   That's my understanding, yes.

Q   Now, did you depict the location of Mr. Peralta as he was found by police officers that night/early morning?

A   Yes, I did.

Q   You can actually touch the screen, I think, of your monitor and show us the location of Mr. Peralta's body?

A   Right there.  (Witness indicating.)

Q   Thank you.  In addition -- well, actually, before I move on.  I think you have in front of you -- yes,

Exhibit 101.  Do you know what that is?

A    That would be the body of a gentleman that was identified as Israel Peralta.

Q    Did you see Mr. Peralta's body when you arrived?

A    Yes, I did.

Q    Did you attempt to -- did you have any direct contact with the body of Israel Peralta or were other officers taking care of that portion of the investigation?

A    Other officers took care of that portion.

Q    All right.  Exhibit 103 depicts, in addition to the body of Israel Peralta, depicts toward the east, or to the right on the diagram, several numbered, yellow numbered, rectangular numbers, next to a red vehicle. Do you see those?

A    Yes, I do.

Q    What are those?

A    Those are -- well, ten of them are spent shell casings and one of them is an unspent round.

Q    All right.  And did you identify or did you locate spent shell casings and a live round in that location at 201 East McArtor, June 8, June 9, 2009?

A    Yes, I did.

Q    I'm going to ask you to look at a series of photographs which have been admitted marked 106, 107 and

then -- yeah, 107, and then 108 through 118.  Take a minute to just look at those and tell us if you know what those are.

Have you seen those before, sir?

A   Yes, I have.

Q   Starting, then, with 106 and 107.  Display 106 please.  Thank you.  What is depicted in this photograph?

A   This is the blue trailer there and it's lot 23-B at 201 East McArtor.  The numbered placards that are down on the ground shows the location of different items of evidence that have been found and photographed by then Lt. Craig Mellecker.

Q   Then 107, what is depicted in that photograph?

A   This is lot 23-A.  The vehicle that you had described as the red vehicle is actually a maroon vehicle.  And that is also visible there, as well as other pieces of evidence.

Q   Okay.  The yellow markers or placards on the ground, those are placed there for what reason?

A   Those are placed there to identify the location where the items were found to keep them in an order so we know how to collect them and keep them separate from each other.  And that's where the evidence was actually found and I went through and collected all of that.

Q   Okay. And then 108 through 118. Do you know what is depicted -- we don't need to look at each one of those, but what's depicted in that series of 108 to 118?

A   108 through 117 are empty -- through, yeah, 117, are empty shell casings that I collected that are numbered 1 through 10; and then on 118, which is item number 11, that is an unspent round that was also collected at the scene.

Q   Can we display 108. 108 is -- we won't go through each one of those, Detective Robbins, but 108 is what?

A   This is a spent shell casing. On the bottom it is stamped 9 millimeter Luger.

Q   And then 117 is what?

A   This is also a 9 millimeter Luger spent shell casing.

Q   And then the numbers in between are eight additional shell casings that you seized that night or early morning; is that correct?

A   Yes. And they're all stamped with 9 millimeter Luger on the bottom.

Q   And then 118. 118 is what?

A   This is an unspent shell casing. This one is also stamped with 9 millimeter Luger on the bottom of the shell.

Q   This is a live bullet; is that right?

A    That is correct.

Q    I'm going to ask you to look at Exhibit 119 and 120. Starting with 119, do you know what that is?

A    This is a manila envelope that appears to be evidence.  I can't really tell.

Q    Go ahead and cut open 119.

                    (Witness complies with request.)

Q    And you just, for the record, removed the contents of 119; is that correct?

A    That is correct.

Q    And inside Exhibit 119, what did you locate?

A    I found several small packages that bear the case number, as well as the information that's normally on each one.  It bears my name as well as my number, which is 173, and my initials.  And each one of these is the shell casings, the empty shell casings.

Q    All right.  So how many of the little envelopes did you find inside Exhibit 119?

A    There are ten.

Q    And you recovered ten spent shell casings as part of the investigation you conducted; is that correct?

A    Yes, I did.

Q    And then would you now look at Exhibit 120 and tell us -- if you need to open that, go ahead.  Otherwise, tell us, if you know, what that is.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Witness complies with request.)

A    This would be item number 11, the 9 millimeter Luger round that was unfired.

Q    Okay.  Display 118, please.  Sir, the live round that you have in your hand right now, is that the same live bullet that's depicted in Exhibit 118 marked in the photograph as item number 11?

A    It should be.  Without opening it, I would not be able to tell.

Q    Go ahead and open it.  Let's make sure.

(Witness complies with request.)

A    Yes, it appears to be the same round that I found that night.

Q    Okay.  In addition, Detective Robbins, to the ten shell casings that were photographed and seized as evidence and the one 9 millimeter Luger live round which is now on the screen, you also recovered other bullet evidence as part of your role in this investigation; is that right?

A    Yes, I did.

Q    Let me first ask you to look at photographs 128, 130 and 131.  Before I do that, let me ask -- could you display 106.  Exhibit 106.  I know this is being redundant, Detective Robbins, but would you look at the screen and tell us, the placards, the yellow markers, on

the ground, did these depict the locations where you found spent shell casings or one live round?

A   Yes, they do.

Q   Okay.   Then return to the other exhibit.   The three exhibits I just gave you 128, 130 and 131.   Do you recognize those, sir?

A   Yes, I do.

Q   What where those?

A   This is, Exhibit number 128 is a bullet hole in a blue VW that was on the scene.   It is just to the south of lot 23-B.   One of the rounds apparently struck the vehicle.   And then in item number 130 and 131, these were bullet fragments that were recovered out of the trunk of that vehicle.

Q   The photograph that's --   the photograph that's depicted on the screen right now, the VW, the blue VW Jetta, would be that vehicle in that location; is that correct?

A   It's hard to tell from -- because there was a -- there's a white Oldsmobile that's directly alongside of it further back.

Q   That's fine.   That's okay.   Let's then stick with Exhibit 128.   And what is 128?

A   This goes the back side of the VW Jetta.   And you can see the trunk plate there and then below you can see

the license plate number.

Q   Okay.  130.  What is Exhibit 130?

A   When we opened the trunk, we found bullet fragments. This is part of the metal casing that surrounds the actual lead of the bullet.  It was stripped off when it entered into the vehicle.

Q   Okay.  131.  What is 131?

A   This is also a larger portion of the jacketing from a round in the back of the vehicle.

Q   Sir, I'm going to hand you what's been marked as Government Exhibit 132.  And if you need to open that envelope, please do so.  Can you tell us what that item is?

A   This is item number 16 as shown in the picture here.

Q   Depicted in 131?

A   Yes.

Q   Okay.  And do you know where the item that hold in your hand now, do you know where it came from?

A   Well, I know it came from the back of the seat, the back seat where -- to explain.  It appeared as if the round came through the back of the trunk and then lodged in the back of the seat.

Q   Can you display 128.  Your investigation, you believe 128 shows a bullet hole in the trunk of the VW Jetta; correct?

A    Yes.

Q    And just inside the trunk area of the vehicle, you found the item you now hold in your hand; correct?

A    Just inside the trunk was where we found the fragments that were item number 15, which I believe came off of this.  This was on the -- right on the back seat.

Q    This is item 16 depicted in Exhibit 131; correct?

A    Yes.

Q    And you believe these are bullet fragments or portions of a bullet that were fired into this vehicle; correct?

A    Yes, I do.

Q    You can place that back.

                    (Witness complies with request.)

Q    Thank you.  In addition to locating bullet or bullet fragments in the VW Jetta, did you locate a bullet or bullet fragment lying on the ground?

A    Yes, I did.

Q    Sir, I'm going to ask you to look at first Exhibit 122 and then 123.  What is 122?

A    122 shows a photograph of electrical meters and some fence and a shed, the very far back of lot 23-B.  And that was on the ground right here.  You can see where there's a placard marked number 13 and that's where a spent round was found on the ground.

Q   Okay.  And did -- well, actually, Chief Mellecker,
Lt. Mellecker, take a picture of the spent round and is
that depicted in Exhibit 123?

A   Yes, he did.

Q   Sir, I'm going to hand you what's been marked as
Exhibit 124.  Again, if you need to open that to
identify it, please do so.

(Witness complies with request.)

Q   What is that?

A   This is a spent round.  This is the spent round that
we found lying at the back of the lot.

Q   Are you certain that what you hold in your left hand
now -- or in your hand now, is what's depicted in --
item 13 depicted in the photograph currently on the
screen?

A   Yes.

Q   And do you want to place that back.

(Witness complies with request.)

Q   Thank you.  Detective Robbins, let me have you look
at Exhibit 134 and 136.  And, again, do you know what
those are?

A   This is a flat tire that was on a red Chevy
Cavalier.  This was on the -- this was parked in front
of the third trailer house.  If I can refer to my notes,
I can tell you the lot number.

Q   That's fine.  Thank you.

A   In front of lot 24.  The tire was flat and there was what we believed to be a bullet hole found in the tire. We did collect the tire -- we collected the round as item 14, but we had to collect the whole tire and take it to the city shop to have the tire removed to actually collect the round out of it.

Q   Do you know, Detective Robbins, if a round was in fact collected from inside this tire?

A   Yes, it was.

Q   Let me ask you to look at Exhibit 137.  And, again, open the contents, and after you've had a chance to examine it, tell us what that is.

                    (Witness complies with request.)

Q   Do you recognize that, sir?

A   Yes, I do.

Q   What is that?

A   This was the expended round that was found inside of the tire which is item number 14 here.

Q   Any question in your mind that's the same fired bullet that was found inside the tire?

A   No.

Q   The same fired bullet that is depicted in Exhibit 136?

A   Yes, it is.

Q   Do you see that on your screen?  136?

A   Yes, I do.

Q   Okay.

MR. WELCH:  Your Honor, at this time United States would offer Exhibits 120, 124, 137, 132 and 119.

MR. WACHTEL:  No objection, Your Honor.

MR. MANDELMAN:  We don't object.

THE COURT:  They're all received.  Thank you.

BY MR. WELCH:

Q   Finally, Detective Robbins -- would you display Exhibit 100.  There's been testimony earlier, Detective Robbins, that Exhibit 100 is an aerial view of the trailer park which was the subject of this crime investigation.  Do you recognize that, sir?

A   Yes, I do.

Q   Now, what has been magnified for our purposes now, I'd ask you to look at what's on your screen now and compare it to the diagram that you prepared which is entered as Exhibit 103, and my question is is the area in the -- on the aerial which is now on the screen, does it roughly match the diagram that you prepared showing the location of Mr. Peralta's body, the shell casings that were found, the VW Jetta, the red Chevy Cavalier and the bullet evidence that was recovered by you that evening and early morning?

A   Yes, it does.

Q   On this aerial exhibit, where is, for example, can you place a dot on the screen in the approximate location of where the VW, blue VW Jetta would be on this aerial?

A   It would be right in there -- no -- that didn't take.  It's --

Q   Okay.  A little to the north?

A   Yes.

Q   Now, this area -- I've asked Ms. Hesston to make this larger.  We can take off that yellow.  Thank you.

On this portion of the aerial do you see the approximate location of Mr. Peralta's body, where it was found that night, early morning?

A   Yes, I do.

Q   Can you place an arrow or mark on the screen?

A   It's --  (Witness indicating.)

Q   Okay.  That location.  Okay.  Then 103.

So for our purposes, if we're looking at the aerial, the body, of course, you've already identified is in that location; correct?

A   Yes.

Q   On your diagram?

A   Yes.

MR. WELCH:  Your Honor, I have no further

questions of Detective Robbins.

THE COURT:  Are you planning on calling him tomorrow?

MR. WELCH:  No, sir.  Cross-examination.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   Other than collecting evidence, shell casings, spent bullets, did you do anything else in your investigation while you were there?

A   That night?  No, I did not.

Q   Would that include -- that night, did you find out who the owner of the VW Jetta was?

A   I believe all of the tags were ran, yes.  I did not personally collect it; but all of the license plates were ran that night.

MR. WACHTEL:  Thank you.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Were the -- was this evidence submitted to the Kansas Bureau of Investigation lab?

A   Yes, it was.

Q   And was it tested for fingerprints?

A   No, it was not.

Q   Why not?

A   Well, because fingerprints -- when you fire a round through a gun, there's a lot of heat and gasses that are expelled and those tend to burn off the oils that are in fingerprints, so it is highly unlikely that you would find a fingerprint on a fired round.

Q   Well, you also found an unspent round?

A   Yes, I did.

Q   Was that round tested?

A   If I can refer to my notes, I can --

Q   Please.

A   No, it was not.

Q   And your reason?

A   It was only sent -- excuse me -- yes, it was.  It was sent to the KBI laboratory for fingerprinting and extraction mark comparison to all the other 9 millimeter shell casings that were sent.  So it was.

Q   Those all -- they were all tested?

A   That one was tested.

Q   The -- right, the --

A   That one.

Q   The unspent round?

A   Right.  For fingerprints.

Q   Are you aware of the results of that test?

A   No, I do not have them right here with me, no.

MR. MANDELMAN:  Thank you.

THE COURT:  Anything further?

MR. WELCH:  No, sir.

THE COURT:  Thank you.  You're excused.

A    Thank you.

THE COURT:  All right, Ladies and Gentlemen. We'll take our evening recess.  Remember and heed the admonition.  I'll see you tomorrow morning at 9:00. You're excused.

(Jury excused for evening recess.)

THE COURT:  Anything before we break?

MR. WELCH:  No, sir.

MR. WACHTEL:  No, Your Honor.

THE COURT:  All right.  I'll see you tomorrow.

(Recessed for the evening at 4:57 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 9:05 a.m. October 4, 2013, the following proceedings continued.)

THE COURT:  Next witness, please.

MR. WELCH:  Your Honor, United States calls Mariano Sorano.

(NOTE:  Answers are spoken by Interpreter Ms. LuAnn Rivera, unless otherwise noted.)

THE COURT:  And, Ladies and Gentlemen, this is LuAnn Rivera, who is our interpreter.

**MARIANO SORANO**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you state your name again for the record.

A   (Witness)  Mariano Lorenzo Sorano.

Q   And where do you currently live?

A   (Witness)  In Atlanta, Georgia.

Q   How long have you lived in Atlanta, Georgia?

A   For nine years.

Q   I want to direct your attention to the date of June 8, 2009, and ask you if you were in Dodge City, Kansas,

on June 8, 2009?

A    (Witness.)  Yes.

INTERPRETER:  Yes.

Q   As of June 8, 2009, how long had you been in Dodge City, Kansas?

A    (Witness.)  One day.

INTERPRETER:  One day.

Q   And why had you traveled to Dodge City, Kansas?

A   To work in a meat packing factory.

Q   And where did you come from?  Where were you before you went to Dodge City in June of 2009?

A   From Atlanta, a cousin brought me.

Q   Why was it you thought you could get a job in Dodge City, Kansas?

A   Because he had come from Atlanta and things were going well for him.

Q   And who is he?  Is this your cousin, your friend?

A   His name is Dalbalio (ph).  He's a cousin.

Q   Did you have -- in addition to the cousin that was going to help you get a job, did you have other family in Dodge City, Kansas?

A   Mateo's mother.

Q   And who is Mateo?

A   Roberto.

Q   Roberto is related to you how?

A   Cousin, yes.

Q   Do you have any other family in Dodge City?

A   No others.

Q   Now, on the night of June 8, 2009, do you recall being at a trailer park?

A   Yes.

Q   Sir, I'm going to hand you two photographs.

A   Yes.

Q   One has been admitted as Exhibit 125; the second as 104.

A   Yes.

Q   Can we display 125, please.

    Mr. Sorano, do you recognize the vehicle in that picture?

A   Yes.

Q   And why is it that you have seen that car before? How do you know you've seen that car before?

A   It was there that night with them.

Q   And who -- were you standing near that car at some point the night of June 8, 2009?

A   Yes.

Q   Were other people with you standing around that car?

A   Yes.  Three people.

Q   So there's you and three other people?

A   Yes.

Q   Did you know the three other people that were standing with you?

A   That one day I had met Mateo.  I didn't know the other two.

Q   Let me ask you to look at Government Exhibit 146. Do you recognize the person in that photograph?

A   Yes.  Roberto.

Q   And Roberto is your cousin; correct?

A   Yes.

MR. WELCH:  Your Honor, we would offer Exhibit 146.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  I don't object.

THE COURT:  146 is received.

BY MR. WELCH:

Q   This was -- Roberto was one of the two cousins that you had that lived in Dodge City, Kansas; correct?

A   Yes.

Q   If we can go back to 125.  And Roberto was with you standing around this car and you said two other men?

A   Yes.

Q   Had you met the two other men before that day?

A   No.  I met them that day.

Q   And were they friends of Roberto, your cousin?

A   Yes.

Q   All right.  So do you know -- do you remember the names of those two other men that were standing with you?

A   Lito and Tino.

Q   And do you know whether or not Lito and Tino were related to one another?

A   Brothers.

Q   Now, you have the four of you standing around this car.  What are you doing?

A   Drinking beer.

Q   And do you recall about what time of night it was when the four of you were standing around this car?

A   10:30 to 11.

Q   At some point while the four of you were standing or sitting around this car -- well, let me ask you this. Let me show you Exhibit 103.  And there was testimony yesterday that this blue car is the blue Jetta you've already identified.  Can you tell us where you -- approximately where you were standing before you were attacked?

A   Can I show it on there?

Q   You can touch on the screen, yes.

                    (Witness complies with request.)

Q   You just placed on the screen a yellow mark approximately a little bit south of the blue Jetta; is

that correct?

A   It's a little bit more over here I think.

Q   And your cousin Roberto, do you recall where he was located?

A   Yes.

Q   Where was he located?

A   Where I put my first one.

Q   And then the two brothers -- the two brothers, do you recall where they were?

A   Yes.  One was sitting on the car.

And then another one was next to Roberto here.

COURT REPORTER MS. SCHWEMMER:  Next to where?

INTERPRETER MS. RIVERA:  Roberto.

Q   At some point while the four of you are gathered around this car, were you assaulted?  Were you attacked by people?

A   Yes.

Q   What happened?

A   They came out and they were firing guns, shots.
(Witness indicating.)

Q   Now, you made a motion -- for the record, you made a circling motion.  Can you tell us what direction, looking at this diagram, what direction these men, or these people came from?

A   From here.  (Witness indicating.)

Q   How did you find out that you were being attacked?

A   I saw, like, a reflection from behind.

Q   Did you hear anything?

A   Gun fire.  That's all.

Q   And when did you realize that it was gun fire?

A   Because it was hitting on the ground and the car and I got hit in the leg.

Q   When you heard -- you realized that you were being shot at, what did you do?

A   Ran.

Q   Did you see the people, the men who were attacking you?

A   No.

Q   Could you tell how many there were?  How many men there were attacking you?

A   From three to four.

Q   And were you able to see the clothing they were wearing or were you able to see their faces?

A   No.  It was too fast.

Q   You've already told us that you heard gunshots.

A   Yes.

Q   Do you recall how many gunshots you heard?

A   No, but there were a lot.

Q   Based on the number of gunshots you heard, Mr. Sorano, could you tell how many guns these people

had?

A    No.

Q    When you say multiple gunshots -- and if you can't tell us, that's fine -- but do you think there were more than ten shots?  Less than ten shots?  Or do you know?

A    I would say eight or ten.

Q    All right.  When you realized that you were being fired upon, you said you ran; correct?

A    Yes.

Q    What direction did you run?

A    This way.  (Witness indicating.)

Q    And while you are running, were you able to see what Roberto was doing?

A    They ran this way.  Or maybe this way.  I'm not sure.  (Witness indicating.)

Q    Just now you said -- when I asked you what direction Roberto ran, you said they ran this direction.  Who is they?

A    His brother and him.  Tino.

Q    One of the brothers and Roberto?

A    Yes.

Q    And you referred to Tino as one brother and Lito as the other brother; is that correct?

A    Yes.

Q    And then Roberto is your cousin; correct?

A    Yes.

Q    So Roberto and Tino ran the same direction?

A    Yes.

Q    And could you tell which direction Lito, the man who was sitting on the trunk of the car, did you see where he ran?

A    No.

Q    I've already had you look at 104.  I'm also going to ask you to look at 105.  And you did this on the diagram but let me have you do this on the photograph as well.

                    (Off-the-record.)

Q    On this photograph, Mr. Sorano, do you see the location where you, Roberto, and the two brothers were located just prior to the attack?

A    Yes.

Q    Just place a dot again on the screen where you were located?

A    I was here.  Roberto was here.  Tino was here.  And his brother here.  (Witness indicating.)

Q    And what direction on this photograph did the men come from who attacked you?

A    From here.

Q    And after you realized that you were being shot at, what direction did you run in this photograph?

A    This way.  (Witness indicating.)

Q   That night, Mr. Sorano, did you have any guns with you?

A   No.

Q   Had you met -- how many people had you met since you had come to Dodge City?

A   My cousin, Dalbalio, and those two only.

Q   And had you had the chance yet to apply for a job?

A   No.  I was going to apply on Monday.

Q   Since you had been in Dodge City, had you had problems with or had you had trouble with anyone?

A   No.

Q   Do you recall ever meeting this man located in this seat?

A   No.

Q   Do you recall ever meeting this man in the blue shirt?

A   No.

Q   Do you recall ever having any problems with either this man or this man while you were in Dodge City or any other time in your life?

A   No.

Q   Mr. Sorano, I'll ask you to look at Exhibit 140.  Do you recognize who that is?

A   Yes.

Q   Who is that?

A    Me.

Q    And Exhibit 141, do you recognize who that is?

A    Yes.

Q    Who is that?

A    Me.

Q    And do you recognize 142, what that is?

A    Yes.

Q    What is that?

A    My right leg.

Q    Let's go ahead and look at 143, 144, 145.

A    Yes.

Q    Do you recognize all those photographs also?

A    Yes.

Q    And are all of these photographs of you shortly after the attack or the clothing you were wearing that night?

A    Yes.

MR. WELCH:  Your Honor, we would offer 140, 141, 142, 143, 144 and 145.

MR. WACHTEL:  No objection, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  They're all received.

BY MR. WELCH:

Q    Can you display 140.  Mr. Sorano, you've identified this as a picture of yourself; correct?

A    Yes.

Q    And where are you when this photograph is taken?

A    In the hospital.

Q    In Dodge City, Kansas?

A    Yes.

Q    Is this shortly after the attack?

A    That night.

Q    And then 141?

A    The same night.

Q    And the injury above your right ear, did that occur that night?

A    Yes.

Q    And then 142.  You said this was a picture of your leg; is that right?

A    Yes.

Q    Now, Mr. Sorano, this is your right leg?

A    Yes.

Q    And approximately what part of your leg is depicted in this photograph?

A    The right one.

Q    Is it above the knee or below the knee?

A    Below the knee.

Q    When did you realize that you had been shot in the leg?

A    I had taken two steps.

Q   Did you feel pain?

A   Something like cold.

Q   Were you able to run, though, despite the fact you had been shot in the leg?

A   Yes, a little bit.

Q   143 through 146 -- excuse me -- 145, were the clothing you were wearing that night; is that correct?

A   Yes.

Q   Can we display -- is that the shirt you were wearing, sir?

A   Yes.

Q   And the pants?

A   Yes.

Q   And the next photograph.  And the belt?

A   Yes.

Q   Now, all -- the shirt and pants you were wearing and belt were blue in color; correct?

A   Yes.

Q   And your belt buckle has a 13 on it; correct?

A   Yes.

Q   Were you at that time or any time a member of a gang, Mr. Sorano?

A   No.

Q   You don't deny that you were wearing blue clothing that night; correct?

A   I don't deny that.

Q   And -- do you know, Mr. Sorano, if, in addition to yourself being shot in the right leg, if any of the other men who were with you were shot that night also?

A   Just the one they killed.

Q   Handing you what's been admitted as Government Exhibit 101.  Do you recognize the man in that photograph?

A   Yes.

Q   And who is that?

A   Lito.

Q   Is this the man who was seated on the trunk of the car at the time that the attack began?

A   Yes.

Q   And you've already told us when you realized you were receiving gun fire, you ran?

A   Yes.

Q   Did you see what direction this man ran?

A   Almost the same direction I took off running.

Q   Mr. Sorano, if you would refer again back to the diagram.  You've already told us that -- can you indicate the direction you ran, if you would.

A   We ran this way.  But from there, I don't know where he went.

Q   You and the man in the photograph ran together?

A   Yes.

Q   And at some point you lost contact with him; correct?

A   We separated.

Q   Where did you -- where did you run to?

A   Straight ahead.

Q   And at some point did you meet up again with your cousin Roberto?

A   Yes.  More ahead.

Q   At what location?  Do you recall?

A   It was far from there.  I was running and they found me.

Q   And did you see Tino again that night?

A   Yes.

Q   Where did you see him?

A   With Roberto.

Q   So the three of you ended up at the same location after the shooting?

A   Yes.

Q   And after the shooting you knew where Roberto was and where Tino was but you didn't see Lito again; is that correct?

A   I didn't see him again.

Q   Do you recall police officers arriving after the shooting?

A    They came to where we were hiding in the trailer. We called them.

Q    Okay.  And after you called them, the police arrived and talked to you?

A    Yes.  And they told us that he had died there.

Q    And the photographs of you in the hospital were taken by police officers; is that correct?

A    Yes.

Q    And you were cooperative with the police and you told them what you remembered happening?

A    Yes.

Q    Do you know if the police officers talked with your cousin Roberto and also with Tino?

A    I think they did.

Q    Now, I realize you had just met Lito that night or the day before; but to your knowledge, had Lito had trouble with anybody in Dodge City?

A    I really don't know.

Q    All right.  And how about Tino, do you know whether he had any trouble with anyone in Dodge City?

A    Neither, I don't know.

Q    Did you know the men who attacked you, sir?

A    No.

Q    Do you know, as you sit here today, why they attacked you?

A   No.

Q   To your knowledge, had you done anything to anyone in Dodge City that would have annoyed or irritated or upset anyone?

A   No, nothing.

Q   Did you know of anyone in Dodge City who was angry with you or any of the men who were gathered with you that night?

A   No.  No.

Q   After you realized that gunshots were being fired at you and you were struck in the leg, did you think you were going to be killed that night?

A   Yes.

Q   Did you believe that your friends could be killed that night as well?

A   Yes.

Q   After the shooting, how long did you stay in Dodge City, Kansas?

A   Two weeks.  Two.

Q   And why did you stay for two weeks?

A   I was scared.  I was scared.  I thought they were going to kill me.

Q   Was there a period of time that you had to allow your leg to recover?

A   Yes.

Q   You were not able to travel immediately; is that correct?

A   No.

Q   After you were able to travel and you could get up and move, what did you do?  Where did you go?

A   My uncle from Omaha, Nebraska, picked me up and I went back to Atlanta.

Q   All right.  So initially you went to Nebraska?

A   Yes.

Q   And then back to Atlanta, Georgia; correct?

A   Yes.

Q   Did you ever have the opportunity to apply for a job in Dodge City, Kansas?

A   No.

Q   And did you leave Dodge City, Kansas, because of what happened to you the night of June 8, 2009?

A   Yes.

Q   Were you afraid, Mr. Sorano, that if you stayed in Dodge City, Kansas, you were going to be killed?

A   Yes.

MR. WELCH:  No further questions for Mr. Sorano.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Mr. Sorano, my name is Val Wachtel.  I represent Mr. Garcia.

A   Yes.

Q   If I ask you a question that you don't understand, will you tell me, please, that you did not understand it?

A   Yes.

Q   And if I speak softly and you can't hear me, would you tell me that you can't hear me?

A   Yes.

Q   You were shown some exhibits, pictures, by the Government, by Mr. Welch.  Would you take a look at Exhibit 145.  It should be still up there.

A   Yes.

Q   145 is what?  A blue belt?

A   What?

Q   Exhibit 145 is a picture of a belt; correct?

A   Yes.

Q   What color is the belt?

A   Blue.

Q   And you were wearing that that night?

A   Yes.

Q   Also a blue shirt?

A   Yes.

Q   And blue pants?

A   Yes.

Q   Do you have any tattoos?

A   Yes.

Q   I saw one -- do you have one on your left hand?

A   The night that this happened, I didn't have any.

Q   You did not have any tattoos when this happened?

A   No, none.

Q   Do you know that the color blue is associated with the Sureno gang?

A   Yes.

Q   And did you know that the number 13 was associated with the Sureno gang?

A   Yes.

Q   Are you a Sureno?

A   No.

Q   So just because you wear a belt buckle that says 13, that doesn't mean that you are a Sureno; right?

A   My brother was a gang member in Mexico.

     They picked him up in Nebraska and deported him to Mexico.

Q   But you're not a gang member?

A   No.

Q   Despite the fact that you wear 13 -- a belt buckle that has a 13 on it?

A   No.

Q   Do you remember being interviewed by a police officer at the hospital the night you were shot?

A   I don't think so.

    I remember that they interviewed me at my cousin's trailer.

    I was kind of confused that night.

Q   I can imagine that that is so.  Do you remember telling a police officer that you got a good look at the shooter?

A   No, I didn't say that.

Q   You did not?

A   No.

Q   Did you remember saying that the shooter was not wearing a disguise of any kind?

A   What?

Q   Do you remember telling the police that the shooter was not wearing a disguise of any kind?

A   I told him I could not identify him.

Q   Did you tell the police officer that you got a good look at the shooter's face?

A   No.

Q   Did you tell the police officer when you were interviewed on the 9th that you had forgotten what the shooter looked like?

A   No.

Q   Do you remember how -- I'm sorry -- let me back up.
Do you remember how many people you saw coming to where
you were with guns?

A   Three or four.

Q   Do you remember being twice interviewed by law
enforcement?

A   Yes.  Once at the trailer and then once at their
office when they took pictures.

Q   Were those pictures that were shown to you today?

A   No, not those.  Not these.

Q   Do you remember who it was that talked to you at the
police office?

A   It was a fat guy.

Q   I'm sorry, sir.

A   It was a fat guy.

Q   Gordo?

A   (Witness.)  Gordo.

        INTERPRETER MS. RIVERA:  Fat guy.

Q   Thank you.  Do you remember telling the fat guy that
you remembered the shooter being built like Tino?

A   No, I didn't say that.

Q   You didn't say that?

A   No.

Q   Help me understand, though, how is Tino built?

A   He comes up to about here on me.  (Witness

indicating.)

Q   How tall are you?

A   I don't know.

Q   Would you say that the shooter was less than six feet tall?

A   I didn't see him.

Q   Okay.  But Tino is less than six feet tall?

A   How much -- how tall am I?

Q   I don't know; but I will tell you how tall I am. I'm five feet eleven inches.

A   I really don't know.

Q   Last time I'm going to ask you.  Is Tino shorter than I am?

A   Yes.

Q   A head shorter?

A   Yes.

Q   Were you shown photographs at the police station -- bad question.  Let me withdraw that.

    The police showed you mugshots; right?

A   Of gang members at my trailer.

Q   That was at your trailer?

A   Yes.

Q   Did you see anybody in those photographs that you recognized?

A   I saw a lot of 'em; but I didn't recognize anyone.

Q   So you didn't identify any of the people in those photographs as having been involved in the attack on you?

A   None.

Q   Do you remember telling the fat guy that you saw four or five people that night?

A   I remember there being three or four.

Q   Three or four.  Do you remember telling the fat law enforcement officer that you thought the person who shot at you was bald?

INTERPRETER MS. RIVERA:  Was what?

Q   Bald.

A   No, I didn't say that.

MR. WACHTEL:  If I could have just a moment, Your Honor.

(Off-the-record.)

MR. WACHTEL:  Thank you very much, sir.  I don't have any further questions.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Hi.  Joel Mandelman.  I represent Gonzalo Ramirez. And I just have a couple questions for you.  I want to thank for you coming out here.  You came here from Atlanta?

A   Yes.

Q   The Government paid for you to come out here?

A   No.

Q   You just came out here on your own?

A   Yes.

Q   Do you still have family here?

A   No.

Q   How'd you get out here?

A   In an airplane.

Q   Okay.  Just, yeah, like I said, just a couple questions.  How much had you had to drink that night?

A   One beer.  I was going for the second one.

Q   You, you told Detective George you maybe had two or three beers?

A   No.  I said one and I was going for the second one.

Q   Okay.

MR. MANDELMAN:  That's all I have.  Thank you for coming.

THE COURT:  Yes, sir.

MR. WELCH:  Just to clear up one thing, Your Honor.

**REDIRECT EXAMINATION**

BY MR. WELCH:

Q   Mr. Sorano, you flew on an airplane here; correct?

A   Yes.

Q   And you did not have to pay for that plane ticket, did you?

A   No.

Q   And as a witness, you were flown here by the United States; correct?

A   Yes.

MR. WELCH:  No further questions, Your Honor.

THE COURT:  Yes, sir.

MR. WACHTEL:  I don't have any questions regarding that, Judge.

MR. MANDELMAN:  No.  I appreciate him coming out here.

THE COURT:  Okay.  Thank you, sir.  You're excused.  Next witness.

MR. WACHTEL:  Your Honor, before he leaves, can we approach the bench, please.

THE COURT:  I suppose.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

MR. WACHTEL:  At some point I intend to call Officer Gurrera (ph) and Detective George to impeach this witness.  Will the Government agree that he is

available -- the witness is available so I don't have

hearsay problems.

MR. WELCH:  We're fine.

MR. WACHTEL:  Thank you, Judge.

(Thereupon, the following

proceedings continued in the

hearing of the jury.)

MR. WELCH:  Your Honor, United States calls

Roberto Cruz-Arco.

(NOTE:  Answers are spoken by

Interpreter Ms. LuAnn Rivera,

unless otherwise noted

**ROBERTO CRUZ-ARCO**

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as

follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you tell us your name.

A   (Witness.)  Roberto Cruz-Arco.

Q   And where do you live?

A   (Witness.)  In Atlanta.

INTERPRETER MS. RIVERA:  In Atlanta.

Q   Atlanta, Georgia?

A   (Witness.)  Yeah.

INTERPRETER MS. RIVERA:  Yeah.

Q   How long have you lived in Atlanta, Georgia?

A   About five years.

Q   Prior to living in Atlanta, Georgia, where did you live?

A   I was living there.

Q   Okay.  But before you lived in Atlanta, Georgia, where did you live?

A   In Mexico.

Q   Was there a period of time, sir, that you lived in Dodge City, Kansas?

A   I don't understand.

Q   Have you lived in Dodge City, Kansas, in the past?

A   Yes.

Q   In 2009, were you living in Dodge City, Kansas?

A   Yes.

Q   And I want to ask you about events that took place on June 8, 2009.  Do you recall that day, sir?

A   Yes.

Q   As of June 8, 2009, how long had you lived in Dodge City?

A   About three years.

Q   And who did you live with in Dodge City?

A   With my mom and my brother.  And my aunt.

Q   And where in Dodge City did you live?

A   On McArtor.

Q   Sir, I'm going to ask you to look at an exhibit admitted as Exhibit 100.  There's been testimony that this is a trailer park just south of McArtor Street in Dodge City, Kansas.  Do you recall that trailer park?

A   Yes.

Q   When you lived in Dodge City, Kansas, did you live in that trailer park or somewhere else?

A   Inside this park.  (Witness indicating.)

Q   You pointed just now a little bit above McArtor Street.  There was testimony yesterday, sir, that McArtor Street is located on the north of this diagram. Do you see that?

A   Yes.

Q   And was your trailer that you lived in north of McArtor?  North of McArtor or south of McArtor?

A   To the north of McArtor.

Q   And in that trailer, you lived with your mother, your brother and your aunt?

A   Yes.

Q   As of June 8, 2009, did you know a man by the name of Faustino or Tino Peralta?

A   Yes, I've known him since Mexico.

Q   And you are from Mexico originally?

A   Yes.

Q   And Faustino Peralta was also from Mexico; correct?

A   Yes.

Q   And did you know his brother Israel Peralta?

A   Yes.

Q   How long had you known Israel Peralta?

A   Oh, I was little.  I'd say since ten years old.

Q   And do you recall when you lived in Dodge City in June of 2009, how old were you?

A   Me?  About 20.

Q   And you were 20 years old in June of 2009 and you had known both Faustino Peralta and Israel Peralta for many years before that; is that correct?

A   Yes.

Q   And, sir, let me ask you to look at Exhibit 105. And can you tell us if you recognize the picture -- the trailer depicted in that photograph?

A   Yes.

Q   How do you know that trailer, sir?

A   It's Faustino's trailer.

Q   And as of June 8, 2009, was Faustino Peralta living in that blue trailer?

A   Yes.

Q   And do you know where Israel Peralta was living?

A   He lived there together with Faustino.

Q   So Faustino and his brother Israel Peralta both

lived in this light blue trailer; correct?

A   Yes.

Q   And you can barely see off to the left in this photograph a blue Volkswagen Jetta.  Do you see that car?

A   Yes.

Q   Do you know who that car belonged to?

A   Faustino's.

Q   Do you know in June of 2009, was Faustino Peralta, was he working?  Was he employed?

A   Yes.

Q   Do you know what he did?

A   He was working at a dairy.

Q   And Israel Peralta, do you know what he did -- was he employed?

A   Yes.  He was working with his brother at a taco place.

Q   And how long -- you said you had been in Dodge City about three years as of June, 2009; correct?

A   Yes.

Q   And how long had Faustino Peralta been living in Dodge City?

A   I don't remember.

Q   How about Israel Peralta, had he been in Dodge City very long?

A   No, he hadn't been there long.

Q   Do you know if Israel Peralta had family back in Mexico?  A wife?

A   Yes.

Q   Do you know if he had children?

A   Yes.  He had one child.

Q   And do you know if Israel Peralta was trying to work in the United States to make money for his family?

MR. WACHTEL:  Objection; relevance, Your Honor.

THE COURT:  Sustained.

BY MR. WELCH:

Q   Mr. Arco, let's focus on June 8, 2009.  This photograph that you have in front of you on the screen, do you recognize this area as an area that you and other men were gathered late in the evening of June 8, 2009?

A   Yes.

Q   Who were the men -- you were out near this trailer June 8, 2009, in the evening; correct?

A   Yes.

Q   And other men were with you?

A   Yes.

Q   Who were those men?

A   Faustino, Israel, Mariano and me.

Q   We've talked quite a bit about Faustino and Israel.

Let me ask about Mariano. Who is Mariano?

A   My cousin.

Q   And Mariano was -- had he lived in Dodge City very long?

A   No. He had been there like two days.

Q   Where had he come from?

A   From Atlanta.

Q   Do you know why he had come to Dodge City?

A   Yes. To look for a job.

Q   And you said Mariano was your cousin; correct?

A   Yes.

Q   And was he staying with you while he was in Dodge City?

A   He was staying with my uncle.

Q   And do you know why Mariano had come to Dodge City?

INTERPRETER MS. RIVERA:  I'm sorry.

Q   Do you know why Mariano had come to Dodge City?

A   Because there was no work in Atlanta so he came to look for a job.

Q   Now, you said at some point in the evening of June 8, 2009, you, Mariano, Faustino and Israel are gathered out near this trailer; is that right?

A   Yes.

Q   What were you doing?

A   They were drinking beer.

Q   And let me ask you to look at Exhibit 125.  Do you know what that is, sir?

A   Yes.

Q   What is that?

A   A car.

Q   And do you know whose car that is?

A   Faustino's.

Q   You said that some of the men gathered with you were drinking beer.  And we see beer on the trunk of this car; correct?

A   Yes.

Q   Were you drinking beer?

A   No.

Q   Were the other three men drinking beer?

A   Yes.

Q   In addition to drinking beer, what were the four of you doing?

A   Nothing.  We were just there talking.

Q   That day, or any time while you had been in Dodge City, had you had any trouble with anyone?

A   No.

Q   And that day, as far as you know -- I know Israel had not been in Dodge City very long, but do you know whether Israel had had trouble with anyone?

A   No.

Q   Do you know if Faustino had had trouble with anyone?

A   No.

Q   And I know Mariano had only been there for a day or two; but to your knowledge, had Mariano had trouble with anyone in Dodge City, Kansas?

A   No.

Q   At some point that night, were you attacked?

A   Yes.

Q   What happened?

A   They came and started shooting there.

Q   Let me ask you, sir, to look at Exhibit 103.  There was testimony earlier, Mr. Arco, this blue car in the middle of that diagram is the VW Jetta.  Do you agree that's accurate?

A   Yes.

Q   And can you tell us -- you can actually touch the screen and it will leave a mark.  Can you show us on the screen where you were located when this attack began?

                    (Witness complies with request.)

Q   You've placed a yellow mark just to the south of the Volkswagen Jetta; correct?

A   Yes.

Q   And do you recall where Israel was right before the attack started?

                    (Witness indicating.)

Q   You've placed a mark on the trunk of the Volkswagen Jetta; correct?

A   Yes.

Q   And do you recall where Faustino was located?

(Witness indicates.)

Q   And then, lastly, do you recall where Mariano was located?

(Witness indicates.)

Q   When the attack began, Mr. Arco, what direction were you facing?

A   This way.  (Witness indicates.)

Q   The direction that the blue car is pointed, is that the direction you were facing?

A   Yes.

Q   So on this diagram, it would be to the west?

A   Uh-huh.  Yes.

Q   Now, when you realized you were being attacked, where did these men who attacked you, where did they come from?

A   They came out from here.

Q   Did you see these men?

A   No.

Q   Did you see how many men there were?

A   Just, like, reflection.  Four or five.

Q   Did you hear gunfire?

A    Yes.

Q    When you first heard the noises, did you realize it was gunfire?

A    Yes.  Well, the kids, there were throwing fireworks and so we thought they were fireworks.

Q    So when you initially heard these noises, you thought they were firecrackers or fireworks?

A    Yes.

Q    At some point did you realize they were not firecrackers?

         INTERPRETER:  No.  Well, they were hitting close and, like, blowing the sand up.

Q    Okay.  When you realized that stuff was being kicked up around you, what did you do?

A    I ran.

Q    And did you believe you were being shot at?

A    Yes.

Q    What direction did you run?

              (Witness indicates.)

Q    The mark on the screen appears to be to the south, southwest.  Is that the direction you ran?

A    Yes.

Q    And did you see -- well, did the other men with you, did they run also?

A    Yes.

Q   Let's start with Mariano.  Did you see which direction he ran?

A   Mariano?

Q   Yes.

(Witness indicates.)

Q   And then Faustino, did you see which direction he ran?

A   Yes.

Q   Which direction did he go?

(Witness indicates.)

Q   Did he go approximately the same direction you went? You ran?

A   Yes.

Q   Then Israel, did you see the direction he ran?

A   Yes.

Q   Which direction did Israel run?

(Witness indicates.)

Q   Mr. Arco, after you realized you were being shot at and you are running, did you ever turn around to look at the people who were attacking you?

A   No.

Q   Did you see the direction the men went who were shooting at you?  What they were doing?

A   No.

Q   Do you recall seeing their faces and whether or not

they had their faces covered or not?

MR. WACHTEL:  Objection.  The question is multiple parts.

A    No.

BY MR. WELCH:

Q    Let me ask, did you see the faces of the men attacking you?

A    No.

Q    Could you see if their faces were covered with anything?

A    No.

Q    You didn't see whether they were or not?

A    No.

Q    Did you see any of your three friends again that night?

A    Yes, but just Mariano.

Q    I'm going to ask you to look at Exhibit 138.  Do you recognize 138, what that is?

A    Yes.

Q    And do you recognize that as the trailer that you went to after the shooting?

A    Yes.

MR. WELCH:  Your Honor, we would offer 138.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  138 is received.

BY MR. WELCH:

Q    Do you remember, Mr. Arco, the location of this trailer in the trailer park?  The approximate location of that trailer?

A    Here.  (Witness indicates.)

Q    Can we display Exhibit 100.  And can you just show us the approximate location of the trailer depicted in Exhibit 138.

                  (Witness indicates.)

Q    And that was not the trailer you lived in; correct?

A    No.

Q    Did you know the people who lived at that trailer?

A    Yes.  Just the kids.

Q    Now, you said you saw a Mariano again after the shooting; correct?

A    Yes.

Q    Where did you see him again?

A    On that street.

Q    Which street?

A    This where we went into the trailer.

Q    You saw him again at the trailer depicted in 138?

A    Inside, yes.  And outside, too.

Q    And did you see Faustino?

A    And Faustino, too.

Q   So you, Mariano and Faustino all ended up together at that same location; correct?

A   Yes.

Q   Did you see Israel Peralta again after the shooting?

A   No.

Q   Mr. Arco, while you lived in Dodge City, were you affiliated with any gang?

A   No.

Q   To your knowledge, was Faustino affiliated with any gang?

A   No.

Q   And I realize Israel had not been there that long; but to the extent that you know and the period of time he was in Dodge City, to your knowledge was Israel Peralta involved in gang activity?

A   No.

Q   All right.  And Mariano, do you know whether or not he was involved in gang activity?

A   No.

Q   Do you recall Mr. Arco, prior to June 8, 2009, you personally having any trouble with anyone?

A   No.

Q   And do you recall any time having any trouble with this man seated in this chair here?

A   I can't see him.

Q    This man in the grayish-green shirt?

              MR. WACHTEL:   Stand up.

                        (Defendant Mr. Garcia stands.)

A    No.

BY MR. WELCH:

Q    And the man in the blue shirt, do you recall ever having any trouble or even knowing that man before June 8, 2009?

A    No.

Q    As the attack was occurring or immediately after the attack, did you have any idea why you and your friends were being attacked?

A    No.

Q    Let me ask you, sir, to look at Exhibit 101 and tell me if you know who that is?

A    Yes.

Q    Who is that?

A    Israel.

Q    Did you see Israel Peralta again after you and Mariano and Faustino and Israel fled from the Volkswagen Jetta or the area of that trailer?

A    No.

Q    That night, Mr. Arco, did you believe that you were gonna be killed?

A    Yes.  If I hadn't ran, if I had just stood there,

they'd have killed me.

Q   After the shooting took place, how long did you stay in Dodge City, Kansas?

A   About two weeks.

Q   And where did you go after?

A   To Nebraska.

Q   And you live in Atlanta, Georgia, now; correct?

A   Yes.

Q   All right.  And when did you go to Atlanta, Georgia?

A   I don't remember if it was a month or two months later.

Q   Earlier we had testimony from Mariano Sorano that he had gone to Nebraska and then to Atlanta after the shooting.  Did you go with him?

A   Yes.  We went together.

Q   All right.  And did you leave Dodge City, Kansas, because of what happened to you the night of June 8, 2009?

A   Yes.

Q   And did you travel from Nebraska to Georgia, leaving the State of Kansas, because you thought if you stayed in Dodge City, you would be killed?

A   Yes.

Q   Mr. Arco, do you recall at some point after the shooting meeting with police officers?

A    Yes.

Q    And where did you first meet with police officers?

A    At my house.  They knocked at the door.

Q    And did you talk to the police about what had happened at the trailer park?

A    Yes.  They took me to their station, the police station in Dodge City.

Q    Did that happen that night?

A    Yes.

Q    And did you talk to them about the men who attacked you?

A    Yes.

Q    Do you recall telling -- were you able to give a description of the clothing that at least some of those men were wearing?

A    No.

Q    Do you recall whether or not you were able to tell the police that you saw their faces or whether or not their faces --

         INTERPRETER MS. RIVERA:  I'm sorry.

Q    Were you able to tell the police whether you saw the faces of the men who attacked you?

A    No.

Q    Is it possible that you did tell them that and you don't remember today?

A   No.  I don't remember.  I don't remember saying it.

Q   And do you recall whether or not -- let me ask you.
I'm not sure if I asked you this.  When you were being
attacked, Mr. Arco, did you see the men who were
shooting at you?  Did you actually see guns in their
hands?

A   No.

Q   How many shots do you recall hearing?

A   A lot.

Q   Could you tell or did you have an opinion while this
was happening or immediately after it happened whether
or not there was one gun or more than one gun based on
the number of shots you heard?

A   I don't know.

Q   You just recall a large number of shots; is that
correct?

A   Yes.

Q   Were you able to tell the police officers either
that night or later on whether or not you saw guns in
the hands of the men attacking you?

A   No.

        MR. WELCH:  Your Honor, I have no further
questions.

        THE COURT:  Yes, sir.

        MR. WACHTEL:  Thank you.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   Mr. Cruz-Arco, my name is Val Wachtel.  I represent Mr. Pedro Garcia who's sitting there in the off-color shirt.

A   Okay.

Q   And I just have a few questions for you.  If I ask a question that you don't understand, will you please tell us?

A   Okay.

Q   And if I speak so softly that you can't hear me, will you please tell me?

A   Okay.

Q   I notice that you are wearing a black and blue plaid shirt.  Have I got those colors correct?

A   Yes.

Q   Are you familiar with a Hispanic gang known as the Surenos?

A   No.

Q   Are you a member of a gang?

A   No.

Q   And when you lived in Dodge City, were you a member of a gang?

A   No.

Q   Do you have a nickname?

A    Yes.  Mateo.

Q    And when you first spoke to police officers in Dodge City, did you tell them that your name was Mateo?

A    Yes.

Q    Did there come a time during your contact with law enforcement that you told them that your name was Robert -- is it Robert or Roberto, by the way, your first name?

A    Roberto.  Roberto.

Q    Did there come a time when you told police in Dodge City that your name was really Roberto Cruz-Arco?

A    No.

Q    You did not?

A    I didn't understand.  Did I tell them my name?

Q    Let's go back.  When police first interviewed you, did you tell them that you were Mateo?

A    No.

Q    Did you ever tell them that you were Mateo?

A    Yes.  I told them.

Q    Thank you for your time.  I don't have any further questions.  Oh, wait, I'm sorry, one -- two.

     Did police show you pictures of people and ask you to look at them?

A    Yes.

Q    Were you able to identify anyone that you saw in

those pictures?

A   No.

MR. WACHTEL:  Thank you.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Hi.  Thanks for coming.  I'm Joel Mandelman.  I represent Gonzalo Ramirez.  I'm going to just pick up where Mr. Wachtel left off.

You were shown twelve different sets of six photos?

A   The detective had a big folder.

Q   And those set of -- those set of photos included a photo of my client?

A   I don't know.  I don't know him.

Q   You weren't able to identify anybody from that set of photos?

A   No.

Q   You told Detective George there was only one gun involved in this?

A   Me?  I didn't say that.  Not that I remember.

Q   You remember -- you remember having an interview with him?  He was the big guy.

A   I don't remember.

Q   Just a couple other questions.  When were you born?

A   Where?

Q   When?

A   July 20th of 2001.  (sic)

Q   And were you working at the time this happened?

A   I wasn't working.

Q   Do you remember telling Officer Lima that you didn't know your date of birth?

A   Well, that day I didn't remember anything.  I didn't want to remember anything.

Q   You didn't remember the day you were born?

A   No.  I mean, after what happened.

Q   You didn't remember if you were working or going to school or what you were doing?

A   No.

Q   And you told her you weren't a gang member?

A   Yes, that I wasn't.

Q   But that you liked to wear blue, brown and black?

A   I wear all colors.  I wear yellow.  I wear pink. Red.

Q   This is -- I'm talking about at the time of the shooting.

A   What?  I don't understand.

Q   At the time of the shooting, you told her you liked to wear blue, brown and black?

A   I just dress normally, any color.

Q   You remembered what colors you liked to wear but you

didn't remember the date you were born?

A   No.

Q   How much had you had to drink that night?

A   I don't even drink.

MR. MANDELMAN:  That's all I have.

THE COURT:  Anything further?

MR. WELCH:  No, Your Honor.

THE COURT:  All right.  Thank you.  You're excused, sir.  Who's your next witness?

MR. SMITH:  Your Honor, our next witness would be April Solis.

THE COURT:  Who?

MR. SMITH:  April Solis.

THE COURT:  All right.  Well, let's take a recess until about 10:30.

Juror # 100584020 01-0123, are you having trouble seeing?

JUROR # 100584020 01-0123:  Yeah.  That light's shining right up here.

THE COURT:  Let me do this.  Before we leave, I'll have Rachael turn these lights off and see if it bothers the rest of the jurors.

JUROR # 100590490 01-0200:  Your Honor, also, the monitor is blocking our view of the witness's eyes.

THE COURT:  I'll have the monitor turned down.

It flips down.  And I think, hopefully, you'll be able to see.

JUROR # 100590490 01-0200:  Thank you.

THE COURT:  Thank you for letting me know.

(Off-the-record.)

THE COURT:  You know what I'll do, I'll have the people that take care of that come up over the noon hour and see if they might be able to move it someplace. Is that all right?

JUROR # 100590490 01-0200:  That should be better, Your Honor.  Just that little movement helped.

THE COURT:  Okay.  You all keep me advised of these things, will you.  If you can't see.  I mean, when it's not in use, I'll have it turned down; but I was thinking that maybe Matt could move it even a little closer so that it could go completely down except when somebody was using it.

(Off-the-record.)

THE COURT:  Next witness, please.

MR. SMITH:  United States calls April Solis.

**APRIL ORTIZ-MENDOZA**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Good morning, ma'am.  How are you?

A   Good.

Q   Now, I referred to you as April Solis.  Is that correct?

A   Yeah.

Q   And have you been married since you had the name of Solis?

A   Yeah.

Q   What name do you go by now?

A   Ortiz-Mendoza.

Q   Okay.  Thank you.  So I want to talk to you specifically about your life, your time in Dodge City, Kansas.  Okay?

A   Okay.

Q   Now, you're a little bit soft-spoken and you have a microphone in front of you.  Okay?

A   Okay.

Q   If you could lean forward a little bit or you might be able to pull the microphone closer to you.  Does that sound all right?

A   Yeah.

Q   Let's try a little bit louder.  Yes?

A   Yes.

Q   Thank you.  Now, this jury here is going to be the

one that has to hear you, so keep that in mind when you're speaking into the microphone.  Do you understand that?

A   Yes.

Q   You understand that you've taken an oath today to tell the truth; is that correct?

A   Yes.

Q   And if I ask you any questions that you don't understand, please let me know.  Okay?

A   Yeah.

Q   If I start to go too quickly, please let me know and I'll slow down.  Is that all right?

A   Yes.

Q   And you have to answer out loud also.  So if you can answer yes or no or with any other words, then please do that.  Okay?

A   Yes.

Q   No huh-uh or uh-huh because I can't type that down and neither can the court reporter.  Okay?

A   Okay.

Q   Thank you.  So, are you familiar with Dodge City, Kansas?

A   Yes.

Q   How long have you lived -- or, have you lived in Dodge City, Kansas?

A   19 years.

Q   How old are you now?

A   19.

Q   Okay.  Do you recall where you were living in Dodge City in 2009?

A   7004 Avenue B.

Q   And that's Avenue B in Dodge City, Kansas; is that right?

A   Yes.

Q   2009, how old were you?

A   I was 14.

Q   Okay.  Do you recall an area of some trailer parks in Dodge City that was at 201 East McArtor in the south side of Dodge City?

A   Yes.

Q   Had you been to those trailer parks before?

A   Yes.

Q   And do you recall if you were at the trailer parks on June 8 of 2009?

A   Yes.

Q   Do you know why you were at the trailer parks that night?

A   Watching my friends' kids.

Q   Okay.  And, again, how old were you?

A   14.

Q    How many kids were you watching?

A    Four.

Q    And was that at a trailer in 201 East McArtor?

A    Yes.

Q    Okay.  Can we see Government Exhibit 100, please.
Do you see that on the screen in front of you?  Do you
see a picture on the screen?  You can tilt that up if
you need to, if you're able to see it.

A    Yes.

Q    Do you recognize the area that is depicted in
Government Exhibit 100?  Do you recognize the area of
town?

A    Yes.

Q    Is that the trailer park at 201 East McArtor?

A    Yes.

Q    Is that where you were on June 8 of 2009?

A    Yes.

Q    And babysitting; is that correct?

A    Yes.

Q    Do you recall the lot number or address that you
were babysitting at?

A    56-B.

Q    56-B.  Are you able to find where you think 56-B is
on Government Exhibit 100?

A    Yes.

Q   And you can actually touch the screen and put a mark on that spot.

(Witness complies with request.)

Q   Okay.  That's 56-B?

A   Yes.

Q   How many times have you been to 56-B before June 8 of 2009?

A   Several.

Q   Was it all for babysitting?

A   Babysitting, visiting, just friendly visits.

Q   Okay.  The woman that you were helping was a friend of yours?

A   Yes.

Q   And on June 8, 2009, it was four children; is that right?

A   Yes.

Q   Do you know or do you remember what ages the children were at the time?

A   Ranging between 6 to about 2 years old.

Q   Okay.  At some point that evening when you're babysitting, do you recall hearing something unusual?

A   Yes.

Q   Where were the children at the time?

A   They were asleep in the back bedroom.

Q   All four of them?

A   All four of them.

Q   Where were you at the time?

A   In the front bedroom.

Q   Okay.  And when you say front, what direction does that mean?  There's a street near 56-B.  Do you see that street on Government Exhibit 100?

A   Yes.

Q   Would the front bedroom be near the street or towards the trailers?

A   It was right next to the street.

Q   Right next to the street.  Was there a window in that bedroom?

A   Yes.

Q   And tell me -- just describe the bedroom for me?

A   It was just a small bedroom.  There was just a twin size mattress on the floor.  She was kind of in a depressive mood so the room was not very clean.  It was -- the clothing was all stacked up and the bedroom window, the bottom half, there was no window.  It was completely taken out.

Q   Okay.  So -- and you're referring to she and that is the woman that you were helping that night; is that right?

A   Yes.

Q   Was she at the trailer?

301

A   No.

Q   She was gone?

A   Yes.

Q   Okay.  You said the trailer essentially -- or, I'm sorry, the bedroom was messy with clothes stacked up everywhere; is that right?

A   Yes.

Q   That's not the bedroom the children were in?  Only the bedroom you were in?

A   Yes.

Q   Were you laying on the bed or what were you doing?

A   I was laying on the bed watching the TV that was in the living room.  I had the bedroom door open.

Q   Now, what did you hear that you thought was unusual?

A   I thought I heard fireworks and just popping noises.

Q   Why did you feel that was unusual?

A   Because usually around that neighborhood, if you hear fireworks, you hear the children laughing, you hear music playing, you hear just a party going on.

Q   And did you hear any of those other noises?

A   No.  It was completely silent.

Q   Do you recall what time of night it was?

A   It was around I would have to say somewhere between 10 and between 12, somewhere around there.

Q   Was it dark?

A    Yes.

Q    What was the lighting situation around your trailer at 56-B?

A    There was a lamppost; but I cannot remember where it was placed.  But there was a lamppost that was right next to the trailer.

Q    Was that a lamppost for lighting the street or a lamp post --

A    Yes.

Q    -- for the trailer?

A    For the street.

Q    At some point did you determine that the sounds you heard were not fireworks?

A    Yes.

Q    How is it that you determined that?

A    I went to look out the window that was broken to see if I could stick my head out the window to see if farther down they were having a party or something.

Q    Let me stop you here.  Which direction is this window facing?

A    It's facing the street.

Q    Okay.  Towards the street.  Why don't you just draw a line down the street that we're referring to.

(Witness complies with request.)

Q    Okay.  So the window is facing that street which is

in the middle of the trailer park; is that correct?

A    Yes.

Q    Go ahead and put another mark there for 56-B since I erased it.

(Witness complies with request.)

Q    Thank you.  You went to look out the window; is that right?

A    Yes.

Q    And you said you looked down.  What do you mean you looked down?

A    I looked down the street.  (Witness indicates.)

Q    Okay.  You pointed off to your right; is that correct?

A    Yes.

Q    Does that mean that you looked south down that road?

A    Yes.

Q    Why is it that you looked south?

A    Because that's where I could -- that's where I could hear it from.

Q    Okay.  What did you do next?

A    I tried to stick my head out the window; but as I was sticking my head out the window, I heard two random shots.

Q    And you described those as shots?

A    Yeah.

Q   Why did you describe them as shots?

A   Because they were -- I realized then that they were not fireworks.

Q   That's two shots after the first group of noise that you thought were fireworks; is that correct?

A   Yes.

Q   What happened when you heard those shots?

A   I got my head back in the window and I ducked down.

Q   What did you feel at that point?

A   I was scared.  I was nervous.  I wasn't for sure what was going on.

Q   Had you been around gunshots before?

A   Yes.

Q   And is that what made you aware enough to be afraid?

A   Yes.

Q   Could you tell how far away the gunshots were?

A   Just only, like, seven trailers down.

Q   And when you say down, are we still referring to south?

A   South, yes.

Q   Is there something that catches your attention next?

A   I turned -- I'm not sure if I turned off the TV or turned down the TV; but I made it silent in the house and I could hear some -- a group of people, not just one person, but I could hear people running down towards my

trailer.

Q   Okay.  So let's stop here for a second.  You tried to make it silent in the house?

A   Uh-huh.

Q   You turned the TV off or down; is that correct?

A   Uh-huh.

Q   Where were the children?

A   The children were still asleep.

Q   They didn't wake up at all?

A   No.

Q   You mentioned that you heard people, more than one person, running down towards your trailer.  Does that mean that they were running north toward the trailer?

A   Yes.

Q   Okay.  How do you know that it was more than one person?

A   Because the sound of the footsteps.  It's not just one person running.  It sounds like a group of people.

Q   This road here that is in front of 56-B, is that a paved road or is it a gravel road?

A   It's, it's actually mixed.  It was a paved road but it was so broken down that they made it into gravel.

Q   Okay.  At the time, was it gravel?

A   Yes.

Q   What do you hear after you hear a group of people

running north?

A   I could hear a car at the distance coming northbound on the road and I can hear the footsteps.  Because it's gravel, I can hear it slide to a stop.

Q   The footsteps slid to a stop?

A   Yes.

Q   What did you hear from the vehicle after you heard it driving north?

A   I heard it come right into the lot of the trailer between my trailer and the next trailer.

Q   Okay.  I'm going to clear this and I'm going to try to zoom in on this area.  This is on Government Exhibit 100.  Can you point to the 56-B for us again.

                    (Witness complies with request.)

Q   And that's the -- you placed a mark that's a bit smaller than the trailer that's to the south of it; is that correct?

A   Yes.

Q   You heard footsteps running from what direction?

A   Headed this direction.

Q   And you heard a vehicle coming from the same direction; is that correct?

A   Yes.

Q   Then you say you heard the vehicle pull in.  And where do you think or where do you know that that

vehicle pulled in?

A    Right around here.  (Witness indicates.)

Q    Did it pull in between the trailers or did it stay on the road?

A    It kind of pulled off on the side of the road but half of it pulled off to the side of the road and half of it stayed on the road.

Q    Now, this window that you're looking out of in 56-B, the one facing the road, was it centered in the eastern wall or was it more northerly or southerly?

A    No, it was right in the middle of the room.

Q    Right in the middle of the room facing the window; is that correct?

A    Yes.

Q    What did you do next?

A    I tried to slowly peek up to see what was going on. I wasn't for sure if my friend had came home or what was going on.

Q    Do you hear any more footsteps?

A    The footsteps are now walking, just randomly walking around.  And then I can hear doors opening.

Q    What do you hear the car doing?

A    The car is slowly going on the gravel like it had not made a complete stop but it slowly started going and it slowly started coming into the -- to the light that

was at the post.

Q   At what point can you see anything out of the window?

A   When it -- when the car is still moving and it comes so close to hitting the hitch that is on the trailer.

Q   And that's the hitch on the trailer that you were in; is that correct?

A   Yes.

Q   Is that hitch on the road-ward side of that trailer?

A   On the road.

Q   On the road.  How much of the vehicle are you able to see out of that window?

A   The front portion.  The -- all the way up to the driver.

Q   The front half of the vehicle?

A   Yes.

Q   How would you describe the vehicle?

A   Of what I can remember, I can only remember that it was a gray vehicle that had a muffler modification.

Q   I'm sorry.  It had what?

A   Muffler modification.

Q   Did you see that or did you hear?

A   I heard it.

Q   How would you describe that?

A   Just in my words, a rice burner.

Q   Because of the muffler modification?

A   Yes.

Q   It was louder?

A   Yes.

Q   You said a grayish car?

A   Excuse me.

Q   Did you say a gray-colored car?

A   Yes.

Q   Was it two-door or four-door?

A   It was four-door.

Q   And you were able to see that?

A   Yes.

Q   Any idea of the make or model of the vehicle?

A   No.

Q   It was a passenger car -- or was it a passenger car rather than a van or a --

A   Yes.

Q   After you see that vehicle rolling toward the trailer hitch, do you see any people?

A   Yes.

Q   Who do you see and where are they?

A   I can see the driver -- well, half of the driver.

Q   And he's in the vehicle; is that correct?

A   Yes.

Q   And the vehicle is rolling; is that correct?

A    Yes.

Q    What do you see of the driver?

A    I can only see where the light has hit in a certain spot that his arm is on top of the steering wheel and his hand is close to the, the, what I would consider the gear shift.

Q    Okay.  Do you know if the car was a manual transmission or automatic transmission?

A    No, I don't know.

Q    You refer to gear shift as if it were a manual transmission car; is that correct?

A    Just lower down.  I guess just -- (Witness indicates.)

Q    You're describing with your right hand being down towards your waist; is that correct?

A    Yes.

Q    You're making movements as if there were a gear shift in the center console of the vehicle; is that correct?

A    I'm just trying to describe it.  His hand was there.

Q    You saw the hand towards the center console --

A    Yes.

Q    -- of the vehicle; is that correct?

A    Yes.

Q    And you mentioned the light shining down.  Are you

referring to the streetlight?

A    Yes.

Q    Do you know which direction the streetlight is shining from?

A    No, I do not remember.

Q    You see one arm up on the steering wheel; is that correct?

A    Yes.

Q    Do you notice anything else unusual or any details of the arm?

A    Just that it's bare.  There's no tattooing.  It's just a man's hand.

Q    And why do you describe it as a man's hand?

A    It's more muscular.  It's more built.

Q    All right.  Are you able to see the driver's face?

A    No, not completely.

Q    I'm sorry.

A    Not completely.

Q    Are you able to see a portion of the driver's face?

A    Yes.

Q    What portion are you able to see?

A    The lower half of his chin.

Q    And what do you remember about that?

A    That it was shaded, looked like a 5:00 shadow.

Q    Is there any other description of the man that you

remember?

A   Just looked like a pale man.

Q   Okay.  You mentioned that you heard more than one person running up the road at the same time the vehicle was moving; is that correct?

A   Yes.

Q   Were you able to see anyone else in the area besides the driver?

A   The passenger.

Q   When did you see the passenger?

A   Getting into the vehicle.

        MR. WACHTEL:  I'm sorry, ma'am.  I just didn't hear you.  I'm sorry.  Your answer to the question about when you saw the passenger.

A   When -- after he got -- after I heard a door shut, that he was -- when the car was rolling, he was, he was trying to settle into the seat.

BY MR. SMITH:

Q   Okay.  The car was still rolling?

A   Yes.

Q   You heard a car -- a door shut?

A   The -- I heard more than one door shut.

Q   More than one door shut?

A   Yes.  But I, I could see him settling into the passenger seat.

Q   Is this the front passenger seat?

A   Yes.

Q   What portion of that person are you able to see?

A   The lower half of his body, just between the dashboard and his lower. (Witness indicates.)

Q   Would that refer -- when you say dashboard, are you referring to a mid chest area?

A   Yes.

Q   Torso area?

A   Yes.

Q   And you're using hand signals also to, I believe, identify down to the pelvis area?

A   Yes.

Q   All right. Do you remember being able to see clothing for anyone that you saw getting in the vehicle?

A   Not that I can remember.

Q   You mentioned that you heard more than one door shut; is that correct?

A   Yes.

Q   Did you see any of the other people that shut the other doors?

A   No.

Q   Did you see any of the more than one people that were running or on the road?

A   No.

Q   All right.  When you see that passenger get into the front passenger seat of the vehicle, do you notice anything unusual?

A   That he -- to me, it looks like he has a gun in his hand.

Q   Why do you say that?

A   Because I can see the, the top portion of the barrel of the gun.

Q   Okay.  Do you know that it's a barrel of a gun?

A   Uhm, yes.

Q   Do you know what sort of gun it is?

A   No.

Q   Do you know if it's a revolver or a semiautomatic?

A   No.

Q   Do you know what a revolver is?

A   Yes, I know.

Q   Okay.  Describe one for me.

A   It would be a long gun that has a barrel that shoots and turns automatically.

Q   Okay.  And if I say semiautomatic, do you know what that is?

A   Not really.

Q   Okay.  Do you have any idea what color the gun was? What you described as a gun?

A   What I described as the gun?  Only -- I'm -- I can't

really say so because the way the light was hitting it, and also that it was in partial shadows.

Q   Okay.  So the item was in partial shadows; is that correct?

A   Yes.  It's in the shadows but I could still see the figure of it so I -- I would have to say either it was blacker than the shadow or it was black.

Q   I see.

THE COURT:  Are you through using the screen?

MR. SMITH:  Yes.

THE COURT:  Ma'am, would you tip that back down again.

(Witness complies with request.)

THE COURT:  Thank you.

BY MR. SMITH:

Q   Do you see anyone else do anything in the car?

A   The passenger starts to move his arm, moving it this way. (Witness indicates.)  Where I could see the gun and he goes to put it right by the console by the arm of the driver.

Q   Are you able to identify at that point any better what the item is?

A   Just, just that I could still see the lighting, just, just the same as I saw it in his hand.

Q   So that item he puts down in the center console?

A    Yes.

Q    At some point -- the vehicle is still rolling; is that correct?

A    Yes.

Q    At some point are you able to see the rest of the vehicle as it drives?

A    Not that I can remember.

Q    Were you watching or were you -- did you stop looking out the window?

A    I was still watching but I cannot remember.  I, I know I saw the vehicle, the rest of the vehicle, but I cannot remember what it looks like.

Q    Did you see any other passengers in the vehicle?

A    No.

Q    Were you able to look into the back windows of the vehicle?

A    No.  The windows were tinted.

Q    What direction did the car drive?

A    It was northbound.

Q    And what road is on the north side of that trailer park?

A    East McArtor.

Q    You were interviewed about this by law enforcement officers; is that correct?

A    Yes.

Q   Do you recall being interviewed the evening that
this happened?

A   Yes.

Q   Which was June 8 of 2009; is that right?

A   Yes.

Q   About four years ago?

A   Yes.

Q   And do you recall being interviewed also a couple of
days later?

A   Yes.

Q   When you were interviewed on those two days, did you
tell the officers what you've told us as best as you
could remember?

A   Yes.

Q   Is there anything that you've testified to here
today that you feel that you don't remember accurately?

A   No.

Q   Do you recall also writing out a written statement
for law enforcement?

A   Yes.

Q   Did you do that in your own handwriting?

A   Yes.

Q   Did you give it to law enforcement officers?

A   Yes.

Q   And did it briefly tell the story of what you saw

that evening?

A    Yes.

Q    And what you heard that evening?

A    Yes.

Q    Have you been able to review that written statement recently?

A    Yes.

Q    Okay.  Now I want to show you two other exhibits please.  I've placed in front of you what's been marked as Exhibits 88 and 89; is that correct?

A    Yes.

Q    That's Government Exhibit 88 and 89?

A    Yes.

Q    Do you recognize the person that is in Exhibit 88?

A    Yes.

Q    How do you recognize that person?

A    He's my brother.

Q    Do you recognize the person that's exhibited in Government Exhibit 89?

A    The what?

Q    In 89.  Do you recognize the person that's in 89?

A    Yes.

Q    And how do you know that person?

A    That's my brother.

Q    Is it a picture of the same person?

A    Yes.

Q    What's your brother's name?

A    Jose Natanal (ph) Luna, Jr.

MR. SMITH:  Your Honor, I would move to admit Government Exhibit 88 and 89.

MR. WACHTEL:  I don't have any objections.

MR. MANDELMAN:  Me neither.

THE COURT:  They're received.

BY MR. SMITH:

Q    If we can publish Government Exhibit 88 please. While we're getting to that, tell us, Ms. Ortiz, do you know if your brother is a member of a gang?

A    Yes.

Q    And what gang is he a member of?

A    The Nortenos.

Q    And is that in Dodge City, Kansas?

A    Yes.

Q    How long has he been a member of the Nortenos?

A    Since he was 12.

Q    Are you close to your brother?

A    Yes.

Q    Eventually we'll get the picture up here.  How old is your brother?

A    About 23.

MR. MANDELMAN:  Judge, I'm going to object.

I'm not sure what the relevance of this is.  If the Government -- maybe we should approach if there's something we should know about, otherwise, I --

THE COURT:  I don't know why this is objectionable.  She is identifying a picture of her brother who's a gang member.

MR. MANDELMAN:  I don't even know who he is.

THE COURT:  She said what his name was.

MR. MANDELMAN:  I understand that.  But his role in the case.

THE COURT:  The objection is overruled.

BY MR. SMITH:

Q   Okay.  So how many years older is he than you?

A   I would have to say he's about four years older than me.

Q   Four years.  And -- okay.  Now we have Government Exhibit 88 displayed for the jury.  Is this your brother?

A   Yes.

Q   Jose Luna; is that correct?

A   Yes.

Q   Does Jose Luna have a nickname?

A   Yes.

Q   What is that nickname?

A   Narison.

Q   What does Narison mean?

A   Big nose.

Q   Big nose.  Does Jose Luna have tattoos?

A   Yes.

Q   What sort of tattoos does he have?  You can point them out on the display?

                    (Witness indicates.)

A   He has gang-related and faith-related -- just random tattoos.

Q   Let's talk about a tattoo.  Is there a tattoo under his left ear on Government Exhibit 88?

A   N.

Q   Does that mean anything to you?

A   Yes.

Q   And what does it mean?

A   Narison.

Q   Narison.  Is there a tattoo under his left eye?

A   Yes.

Q   What is that tattoo?

A   Four dots.

Q   And does that mean anything to you?

A   Four.

Q   For what?

A   14.

Q   And what does 14 mean?

A    14, XIV, Nortenos.

Q    And what does XIV mean?

A    Huh?

Q    What does XIV mean?

A    14.

Q    Okay.  Why is the number 14 so important?

MR. WACHTEL:  I object to foundation, Your Honor.  It's asking for a -- it appears to be asking for a conclusion.

THE COURT:  Sustained.

BY MR. SMITH:

Q    Is the number 14 important?

MR. WACHTEL:  I object again, Your Honor.

THE COURT:  Sustained.

BY MR. SMITH:

Q    Do you see -- have you ever seen your brother with that hairstyle before?

A    Yes.

Q    How long had he worn that hairstyle?

A    Since -- before he got out of prison last year.

Q    Okay.  Let's look at the next government exhibit please.  This is your brother again; is that correct?

A    Yes.

Q    I want to return briefly to the evening of June 8, 2009.  Do you know how many people were in the vehicle

that drove away, drove north away from your trailer?

A    The front driver, the passenger, and I only heard the door shut -- I'm not for sure how many were in the back.

Q    Do you think that there are people in the back?

A    Yes.

Q    Why?

A    Because I heard the -- I heard more than one door shut.

Q    Okay.

        MR. SMITH:  One moment, Your Honor.

                (Off-the-record.)

        MR. SMITH:  May I approach?

        THE COURT:  You may.

BY MR. SMITH:

Q    I'm showing you what the Government has just marked as Government Exhibit 90.  Do you recognize that?

A    Yes.

Q    Is that the written statement that you gave to law enforcement, I think on June 8, 2009?

A    Yes.

Q    And you've seen that recently; is that correct?

A    Yes.

Q    Is there anything in there that you think is incorrect or has been altered?  That's a photocopy.

A    No.

Q    That appears to be correct?

A    Yes.

Q    I just have a couple of questions.  You see where you placed your name on the top of that document.  You've written your name?

A    Yes.

Q    Is that entire document your handwriting?

A    Yes.

Q    Look at the I's that you have in April Solis.  Do you dot your I's in an unusual way?

A    Yes.

Q    How is that?

A    By putting X's.

Q    Okay.  Did you place your name at the bottom of that document?

A    Yes.

Q    And did you dot your I's in an unusual way at the bottom of that document?

A    With X's.

Q    On the I's?

A    Yes.

Q    Is there also a word in the middle of that statement -- I don't remember, it might be the word --

                MR. WACHTEL:  I now object to asking her about

the contents of the statement unless the Government can admit it.

THE COURT:  You can ask her about the word.

BY MR. SMITH:

Q   Is there a word in the middle of the statement that you dotted the I in an unusual way?

A   Yes.

Q   And how did you do that?

A   With an X.

Q   Again, is that a true and accurate photocopy of the written statement that you gave to law enforcement on June 8, 2009?

A   Yes.

MR. SMITH:  Move to admit Government Exhibit 90.

MR. WACHTEL:  I actually object to that, Your Honor.  The witness is here.  The witness has testified.  The statement adds nothing to the case.

THE COURT:  What would be -- under what rule would that be admissible?

MR. SMITH:  Your Honor, I'm not admitting it for the context or the content of the statement; but for those specific words that I asked about, the I's and the crosses.  And I can redact the rest of the document if necessary.

THE COURT:  That acceptable?

MR. WACHTEL:  Actually, to me, Your Honor, it is not because I tried to think of a rule by which it was admissible and could not either.

THE COURT:  I don't think it's admissible either and he's not offering it for the contents, only apparently to show how she dots her I's.

MR. WACHTEL:  Then I would think that that is not relevant, Your Honor.  She has testified to us how she dots her I's.

THE COURT:  I agree.  Sustained.

MR. SMITH:  Nothing further.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   Ms. Solis, my name is Val Wachtel.  I'm Pedro Garcia's attorney.

Mr. Garcia, could you stand.

(Defendant Mr. Garcia complies with request.)

Q   Are you able to see Mr. Garcia?

A   Yes.

Q   On the night that you saw what you saw that you testified to us about, right, did you see Mr. Garcia that night?

A   I saw no faces.

Q   Right.  You just saw the color of a face; right?
Driver's face?

A   Yes.

Q   Which you described I think here as light-skinned,
white skin?

A   Just pale.

Q   Pale.  More pale than Mr. Garcia?

A   He ducked so I can't really --

Q   I beg your pardon.  Stand up, Mr. Garcia.

(Defendant Mr. Garcia complies

with request.)

A   I would have to say the same.

Q   The same.  There is no question in your mind that
when you saw the passenger -- well, let me rephrase
that.  You described the passenger; right?  What
passenger seat was the passenger in?  The one that you
talked about.  Front seat?  Back seat?

A   The passenger that I saw?

Q   Yes.

A   With the gun?

Q   Yes.

A   Right next to the driver.

Q   Front seat; right?

A   Front seat.

Q   And there's no question in your mind at all, right, that you saw that passenger put a gun, what, between the seat and the console?

A   Yes.

Q   There's also no question in your mind that the driver, right, had a 5:00 shadow?

A   Yes.

Q   Do you know a Natasha Castro?

A   Yes.

Q   Who is Ms. Castro?

A   She is the woman I was babysitting for.

Q   Was she present --

A   No.

Q   -- when you saw what you saw?

A   No.

Q   One last question and I'll be through bothering you. Can you spell your brother's nickname for me?

A   N-A-R-I-S-O-N.

Q   All one word?

A   Yes.

          MR. WACHTEL:  Thank you very much.

          THE COURT:  Yes, sir.

                    **CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Joel Mandelman.  I'm representing Gonzalo Ramirez

and I appreciate you coming out here today.  Just a few questions for you.  You still -- you said you still live in Dodge City?

A   Yes.

Q   And, uhm, how many times did you meet with Mr. Smith prior to your testimony here today?

A   With who?

Q   With Mr. Smith prior to your testimony here today?

A   I'm not sure who you're referring to.

Q   The prosecutor?

A   Oh, uhm, just when I arrived here two days ago and approximately the other day.

Q   How long have you been in Wichita?

A   Three days.

Q   And how many times have you watched the statement that you gave previously to Detective Francis?

A   The written statement?

Q   The video statement.

A   Once.

Q   And it's clear in your mind that there was a gun in the front seat?

A   Yes.

Q   Uhm, and you were shown some line-ups?

A   Yes.

Q   And you weren't able to identify anyone in those

330

line-ups?

A   No.

Q   And those line-ups included a picture of Mr. Ramirez?

A   I do not remember.

MR. MANDELMAN:  I don't have anything further. I appreciate you coming.

THE COURT:  Sir.

MR. SMITH:  Nothing further, Your Honor.

THE COURT:  Thank you, ma'am.  You're excused. Next witness, please.

MR. SMITH:  Thank you.  United States would call Ricardo Sanchez.

(NOTE:  Answers are spoken by Interpreter Ms. LuAnn Rivera, unless otherwise noted.)

**RICARDO SANCHEZ**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Please tell us your name.

A   Ricardo Sanchez.

Q   Mr. Sanchez, I know you're here with the aid of an

interpreter; is that correct?

A   Correct.

Q   Do you speak English?

A   A little bit.

Q   Are you more comfortable having the interpreter here
to help you understand?

A   Yes.

Q   Thank you.  Tell us, Mr. Sanchez, are you familiar
with Dodge City, Kansas?

A   Yes.

Q   Do you currently live there?

A   Yes.

Q   How long have you lived there?

A   Two years -- twelve, twelve years.

Q   Twelve years.  What was it that you did for a living
in Dodge City?

A   I work in a casino.

Q   Now I want to take you back to June of 2009.

A   (Witness.)  Okay.

        INTERPRETER MS. RIVERA:  Okay.

Q   You were still living in Dodge City; is that
correct?

A   (Witness.)  Correct.

        INTERPRETER MS. RIVERA:  Correct.

Q   Do you recall your address at the time?

A (Witness.) Correct.

INTERPRETER MS. RIVERA: Correct.

Q What was the address?

INTERPRETER MS. RIVERA: 201 East McArtor.

Q And do you recall, was that a trailer park?

A (Witness.) Correct.

INTERPRETER MS. RIVERA: Correct.

Q Did you have a lot number?

A Yes. 41.

Q I'm going to show you what's been marked and admitted as Government Exhibit 100. Do you recognize what's depicted in 100? You can pull that screen up if you need to.

A Yes, I recognize it.

Q Is that the area of town that you lived in?

A Yes.

Q Does that photograph contain lot 41?

A Yes, it contains 41.

Q Can you just place a mark -- you can touch the screen -- and show very briefly where lot 41 is.

(Witness complies with request.)

Q You've placed a yellow mark on the screen; is that correct?

A (Witness.) Correct.

INTERPRETER MS. RIVERA: Correct.

Q   It appears that the mark is slightly in between two trailers, was yours the trailer to the north or the south of that?

A   To the north.

Q   Thank you.  Did you live at lot 41 with anyone?

A   I'm sorry.

Q   Did you live at lot 41 with anyone else?

A   Yes, with my brother.

Q   What is your brother's name?

A   (Witness.)  Jose Sanchez.

INTERPRETER:  Jose Sanchez.

Q   At that point, how long had you lived at that address?

A   About four years.

Q   Okay.  Go ahead and push that screen back down for me.  Do you remember the night of June 8, 2009, when a shooting would have occurred near your home?

A   Yes, I remember.

Q   Were you at your home at the time?

A   Yes.

Q   Was Jose there?

A   He was also there.

Q   Was anyone else in the trailer?

A   My sister-in-law.

Q   And do you remember what you were doing earlier that

day?

A   Yes, I remember.

Q   And what were you doing?

A   I was getting my clothes ready because I was leaving for Kansas City the next day.

Q   Was that in the evening of June 8, 2009?

A   It was at night.

Q   Now, do you recall about what time it was that something unusual would have occurred at the address?

A   About 11:00 at night.

Q   Okay.  Does your trailer have a camera attached to it?

A   Correct.

Q   Did you install that camera?

A   I installed it.

Q   And why did you install a camera?

A   Because I had an audio system in my car and it had been broken into and stolen before.

Q   Which direction did that camera point?

A   To the west.

Q   And there is a road that goes directly -- it goes north and south directly to the west of your trailer; is that correct?

A   (Witness.)  Correct.

        INTERPRETER:  Correct.

Q   Did that camera record?

A   It records but I was not recording that moment.

Q   You were not recording at that date or was there a period of time that you were not recording?

A   It had been for about a period of a week when I wasn't recording.

Q   And why was it that you were not recording?

A   Sometimes I just forget to turn it on.

Q   Is the camera a color camera or black and white?

A   It's a color camera; but at night it doesn't distinguish colors.

Q   And how do you know that it doesn't distinguish colors at night?

A   Well, I would have friends come and visit and I would think they would have certain color clothing on but then when they'd come in the door, I'd see it was different.

Q   I see.  Now, at some point that evening did you hear a vehicle driving near your home at lot 41?

A   Yes.

Q   Why do you remember specifically that vehicle driving near your home?

A   It was out of the ordinary because it was very fast and it stopped really quickly.

Q   Was that the first unusual sound that you heard that

evening?

A   Yes.

Q   What did you do after you heard that vehicle stop very quickly?

A   That's when I looked at my screen, the television screen.

Q   What did you see on your television screen?

A   I saw on my television screen the car that had parked in front of the trailer that's in front of mine.

Q   Okay.  Let's zoom in on this area here.  We'll take care of that.  Identify for us again lot 41, your home.

                    (Witness complies with request.)

Q   Okay.  And the road to the west is the direction that your camera was pointed; is that correct?

A   (Witness.)  Correct.

          INTERPRETER:  Correct.

Q   Can you place a mark where you saw the vehicle would have been when you looked at the monitor?

                    (Witness complies with request.)

Q   And you placed a mark on the road north of your home; is that correct?

A   (Witness.)  Correct.

          INTERPRETER:  Correct.

Q   What did you see of the vehicle?  How would you describe it?

A    I saw four men get out of the vehicle.  And then they ran behind my trailer.

Q    Describe the vehicle for me.

A    The vehicle was a small four-door.  Could have been maybe a Honda or a Nissan.

Q    Now, through the camera, were you able to guess at all at the color of the vehicle?

A    (Witness.)  No.

          INTERPRETER:  No.

Q    Do you know if it was light-colored or dark-colored?

A    It was light.

Q    You mentioned that you saw four people get out of the vehicle; is that correct?

A    Correct.

Q    And ran behind your trailer; is that right?

A    Correct.

Q    Show us the path that those persons ran on the monitor, please.

          (Witness complies with request.)

Q    Thank you.  Were you able to describe anything else about those four men that ran or exited that vehicle?

A    Just that one with a gun.  And a bandana on a face on one of them.

Q    Was the person with the bandana and the person with the gun a different person?

A   Can you repeat the question, please.

Q   The person with the bandana on, was that the same person that you saw carrying the gun?

A   I don't remember.

Q   Are you able to describe the gun at all?

A   A short gun.

Q   Is there anything else about the people that ran behind your trailer that you thought was unusual?

A   They were wearing, like, baggy clothes.

Q   Was this all four of them?

A   Yes.

Q   After the individuals ran to the south around your trailer, did anything else unusual happen?

A   That's when -- well, I heard that they ran behind my house.

And then I heard five or six shots.

Q   Can you tell where the shots came from?

A   From the south.

Q   And after hearing those five or six shots, did you hear anything else unusual?

A   Then there was like a moment of silence and then I heard two more.

And then I saw only two of them return to the car.

Q   Were you able to tell where the two people returned from, what direction?

A    They came from the south.  The same place that they had gone before.

Q    Let's mark on the screen again where this car was parked.

(Witness complies with request.)

Q    Did the two people running take the exact same path that you saw them take when they left the vehicle?

A    Correct.

Q    And you saw those two people.  Did you see them go back to the vehicle?

A    Correct.

Q    Did you see them get in the vehicle?

A    (Witness.)  No.

INTERPRETER:  No.

Q    Did you see the vehicle leave?

A    Yes.

Q    Are you watching -- everything that you describe, are you watching that on the camera that's attached to your home?

A    Correct.

Q    Do you know what direction the car drove?

A    North.

Q    And is McArtor Street the street that is bordering the northern part of the trailer park?

A    Correct.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   And you can lower that monitor now.

(Witness complies with request.)

Q   After hearing the shots and the car driving away, did you leave your trailer?

A   No.  When I saw the four men get out and I saw, I saw the gun, I called 911.

And I didn't go out until I saw a sheriff.

Q   So law enforcement was there and then you left your house?

A   I'm sorry.

Q   Law enforcement was there and then you left your house?

A   Correct.

Q   Where did you go once you left your house?

A   To talk to the sheriffs.

Q   After talking to the sheriff, did you walk around your home?

A   Correct.  Someone had advised the sheriff that a person had been injured.

So the sheriff went to go see about that person but then I stayed.

And that's when I got a flashlight and I went back behind my house and I found the person.

Q   And we're going to look at what's been marked and admitted as Government Exhibit 101.  Do you recognize

what's depicted in the photograph in Exhibit 101?

A   Yes.

Q   What is that?

A   The person that I found that night.

Q   That's the same person you saw that was behind your trailer?

A   He was dressed the same way.  I really didn't look at his face.

Q   Let's look at Government Exhibit 102.  Do you recognize the area that is in Government Exhibit 102?

A   Yes.

Q   What is that area?

A   This would be the southern area of my house where I live.

Q   Can we see your house in that picture?

A   Yes.

Q   And go ahead and place a mark on it.

                    (Witness complies with request.)

Q   And you've placed a mark on Government Exhibit 102. Do you see a white building that is directly to the right of the mark that you placed?

A   Yes.

Q   What is that white building?

A   This would be the neighbor's building.  I don't know what's in it.

Q   And we're going to look at Government Exhibit 100 again.  And let's zoom in on the area.  On Government Exhibit 100, can you place a mark in the area that we were just looking at in the photograph?

                    (Witness complies with request.)

Q   And that mark that you've placed on Government Exhibit 100, is that where you found the victim that night?

A   Correct.

Q   Thank you.  And you can push the monitor down again.

    Do you recall being interviewed by police officers or sheriff deputies about this case?

A   (Witness.)  Correct.

        INTERPRETER:  Correct.

Q   Did you give them statements about what you observed?

A   (Witness.)  Correct.

        INTERPRETER:  Correct.

Q   Were you interviewed the night of June 8, 2009?

A   Yes.

Q   And did you go to the police department for an interview later on?

A   The detective came to my work.

Q   And were you interviewed by the detective at your work?

A   At my work, correct.

Q   Did you describe to each of those officers what you had seen that evening?

A   (Witness.)  Correct.

    INTERPRETER:  Correct.

Q   Do you recall giving officers descriptions of the clothing that the four people were wearing?

A   I don't remember.

Q   You don't remember if you told the officers what colors you thought that people were wearing?

A   I never recognized a color.

Q   Is that because of the camera?

A   It was because of the camera.  It was at night so the color wasn't distinguishable.

Q   Did you tell law enforcement officers that the camera distorted colors?

A   Yes, I told them that.

Q   You mentioned that you didn't recognize or you didn't look at the face of the victim; is that correct?

A   (Witness.)  Correct.

    INTERPRETER:  Correct.

Q   Did you know -- do you know if you knew that person even though you didn't look at them that evening?

A   (Witness.)  No.

    INTERPRETER:  No.

Q   When you saw the two individuals running back to the vehicle, did you see a handgun?

A   No, I didn't see.

MR. SMITH:  Thank you.  Nothing further.

THE COURT:  Yes, sir.

## CROSS EXAMINATION

BY MR. WACHTEL:

Q   Mr. Sanchez, I'm Val Wachtel.  I represent Mr. Garcia.  Could you stand up, Mr. Garcia.

(Defendant Mr. Garcia stands momentarily and is seated.)

Q   Mr. Garcia is seated right there.  That is him.  I just have a few questions for you.  If you don't understand a question, will you tell me that you don't understand.

A   All right.

Q   You were first interviewed about what you saw on June 8; right?

A   Correct.

Q   Where did that interview take place?

A   Outside of my house.

Q   Did you -- and you told the officer that you saw four people run from that vehicle; right?

A   Correct.

Q   Did you get -- did you get a pretty good look at

them?

A    Seeing the four men come out of the car, yes.

Q    And do you remember telling -- did you tell the officer how tall you thought they were?

A    I remember telling them.

Q    Remember telling them that they were -- you thought they were six feet tall?

A    I don't remember saying that but I, I know that they were tall.

Q    Tall.  How tall are you?

A    Six.

Q    Okay.  Were they your height or taller than you?

A    About my size.

Q    Do you remember -- were you asked what clothing they were wearing?

A    Yes, correct.

Q    And you were -- although there was some problem with recognizing color because of your camera, you did see what they were wearing; right?

A    Their style of dress, yes.

Q    Were any of the four people wearing short pants?

A    Yes.

Q    How many people?

A    If I remember, I think there were just two.

Q    Were the people in shorts wearing shirts?

A    I think so.

Q    Short-sleeved shirts?

A    I don't remember.

Q    Do you remember whether the shirts were dark color or light color?

A    It was a light color.  Because the camera at night shows colors more like black and white.

Q    Like black and white.  So you wouldn't be able to tell if something was a dark blue or a black; right?

A    Correct.

Q    Did you also tell the officers that one of the people that got out of the car was wearing dark-colored jeans?

A    Yes, I remember.

Q    And those jeans were not short pants?  Those were long trousers; right?

A    Long pants, yes.

Q    And did that person have anything on his face?

A    I don't remember which one, which one had his face covered.

Q    Do you remember the person in the jeans, seeing the person in the jeans carrying a gun?

A    I don't remember.

Q    Eventually, some of those people returned to that car; right?

A   Yes, two.

Q   And were you able to see them get in the car?

A   No.

Q   Do you remember being interviewed by Officer Mettler (ph) on June 10 at the police station?

A   I don't remember.

Q   But you do remember being interviewed -- oh, no, at your place of work.  Right.  You were interviewed a second time at your place of work?

A   At my workplace, yes.

Q   Right.  And you do remember that?  Being interviewed there?

A   Yes, I remember.

Q   Do you remember discussing with whomever it was that interviewed you what the people that you saw get out of that car were wearing?

A   I don't remember.

Q   Do you remember telling the officers that one of the people that you saw wore a white shirt and either blue or black pants?

A   Yes, I remember that.

Q   You remember telling the person in the interview that that person had a gun and was wearing a black bandana?

A   I don't remember.

Q   Do you remember telling -- I'm sorry, withdraw that almost question.

Were you able to tell -- the four people that you saw, were you able to tell -- were you able to see them exit the car, I guess, is what I want to ask you?

A   (Witness.)  No.

INTERPRETER:  No.

Q   Do you remember telling the person that interviewed you that the one with the gun was dark-skinned, chubby, Hispanic male.

A   I don't remember that.

Q   Do you remember telling the person who interviewed you that the one with the gun couldn't run very fast because his pants were baggy?

A   Yes, I remember.

Q   Do you remember telling the person that interviewed you that that person was wearing a white short-sleeved T-shirt and a ball cap?

A   I don't remember.

Q   Were you asked to try to pick the people that you saw out of a photographic line up?

A   Yes, they asked me to, but I couldn't.  I never saw their faces.

Q   You did look at the photographs?

A   The photographs you mean?

Q   Yes.

A   I don't remember.

MR. WACHTEL:   Thank you very much for your time.

THE COURT:   Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Hi, I'm Joel Mandelman.   I represent Gonzalo Ramirez.   We've never met?

A   Exactly.

Q   It's good to meet you.

A   Nice to meet you.

Q   You saw one gun?

A   Just one, yes.

Q   And then you saw the person with the gun return to the car?

A   I don't remember that.

Q   You're a little bit famous here.   We were talking about you yesterday.   You met with Traci Rankin, a woman --

A   Yes.

Q   -- on that night.   Do you remember speaking with her?

A   Yes.

Q   And you told -- you told Lt. Rankin that you thought

the men were six feet tall?

A   Yes.  That they were tall.  I don't remember if I said six feet.

Q   Go ahead, Mr. Ramirez, just stand up.

                    (Defendant Mr. Ramirez stands

                    momentarily and is seated.)

Q   He doesn't look like he's six feet tall?

A   No.

Q   Okay.  Go ahead.  Thanks.  And then you said you saw two people get back into the car?

A   Yes.

Q   And you thought the shooter got back in the car?

A   I don't remember that.

Q   Then you met two days later out at the packing plant with Chief Mellecker?

A   I'm sorry.  Where?

Q   I guess up at Cargill?

A   Yes.

Q   And you were asked again about this incident?

A   Correct.

Q   And he kind of asked you, basically, tell me what happened again?

A   Yes.

Q   And you again said you saw one gun?

A   Correct.

Q    And you thought the shooter got back in the car?

A    I don't remember that.

Q    Again, you thought the men were tall?

A    Yes.

Q    And you've had this camera for a couple years?

A    No.  I had had it about three months.

Q    Chief Mellecker asked you about the camera and at the time you told him you'd had it for about two years?

A    I don't remember that.

Q    And he asked you specifically about whether the camera distorts color?

A    Correct.

Q    And you told him you knew that sometimes it changes the color?

A    Yes.

Q    That's because you've seen friends and then you saw 'em; is that correct?

A    Correct.

Q    So then when you described them as being tall and being -- and wearing a certain kind of clothes, you took that into account when you were talking to the Chief?

A    Can you repeat that question.

Q    You knew about the effect of the camera?

A    Correct.

Q    And you told the Chief you knew about the effect of

the camera?

A   Correct.

Q   How long have you been in town?

A   For twelve years.

Q   I'm just asking how long have you been in Wichita for this case?

A   Two days.

Q   And where are you staying?

A   The Drury Plaza Hotel.

Q   You currently live in Dodge City?

A   Yes.

Q   And the Government's paying your expenses?

A   Yes.

Q   And like we said, we've never met before?

A   Correct.

Q   How many times have you met with the prosecutors in this case?

A   You mean with the detectives?

Q   Well, with either of the lawyers who are handling the case?

A   Two or three times.

Q   Okay.  And we've never met?

A   Exactly.

Q   Okay.  Thank you.  I appreciate you coming down here.

A    Thank you.

THE COURT:  Redirect?

MR. SMITH:  Nothing further.

THE COURT:  All right, sir.  Thank you. You're excused.

We'll take our noon recess until 1:00, Ladies and Gentlemen.  Remember and heed the admonition.


(Noon recess at 11:50 a.m.)


Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 1:10 p.m. October 4, 2013, the following proceedings continued.)

THE COURT:  We are -- I think Robert told you we're going to quit at 3 today.  It's for another reason, but then apparently they're expecting some bad storms.  And for those of you who have to drive a fair distance, I'd rather you get home before, if we have bad storms.  I always believe everything the weather man says, of course.  Next witness, please.

MR. SMITH:  Thank you, Your Honor.  United States will call Anthony Wright.

**ANTHONY WRIGHT**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Good afternoon, Anthony.  My name is Aaron Smith. You have met me before; is that correct?

A   Yes.

Q   Okay.  And you've done a good job so far.  I want to make sure that you speak up while you're testifying here today.  You understand that?

A   Yes.

Q   If you need to pull that microphone closer, please do so.  Also, there is a computer monitor in front of you.  I may use that to show you some photographs.  If I show you photographs, you can pull that -- let's leave it down for now.  Thank you.  If I show you some photographs, then you can pull that up to take a look at it.  Okay?

A   Okay.

Q   And when you're looking at photographs, I may ask you to mark something on the photograph.  You can touch the screen and place a mark on the screen where the photograph would be displayed.  Do you understand that?

A   Yes.

Q   Will you tell us your name, please.

A   Anthony Wright.

Q   And you are currently in custody; is that correct?

A   Yes.

Q   How long have you been in custody?

A   17 months I think.

Q   Are you in custody for -- tell me what you're in custody for?

A   For I got arrested for a RICO act.

Q   A RICO act.  So you were charged with crimes under the RICO act; is that correct?

A   Yes.

Q   And you had an attorney in this case; is that correct?

A   Yes.

Q   And you've consulted with the attorney about the charges that you had; is that right?

A   Yes.

Q   Have you entered a plea in this case?

A   Yes.

Q   And did you do so with the aid of an attorney; is that correct?

A   Yes.

Q   And your attorney's name is Jay Fowler; is that right?

A   Yes.

Q   And you know that Jay is not present today but someone from his office is present to be here while you testify.  You understand that?

A   Yes.

Q   Thank you.  At some point in time did you live in Dodge City, Kansas?

A   Yes.

Q   How long did you live in Dodge City, Kansas?

A   My whole life.

Q   From the time you were born until -- how old are you now?

A    27.

Q    Did you live in any other cities?

A    Yes.

Q    Tell me about that when did you first leave Dodge?

A    I don't know.  I was --

Q    Look up for us.  Thank you.

A    I moved to Oklahoma and I lived in Wyoming.

Q    Okay.  When did you move to Oklahoma?

A    In 2005.

Q    Why did you go to Oklahoma?

A    It was supposed to be a better environment.

Q    In what way?

A    Get away from the drugs and everything.

Q    Were you involved in drug activity?

A    Yes.

Q    And how were you involved in drug activity?

A    I got high.

Q    You got high?

A    Yeah.

Q    So we're talking about before 2005 now; is that right?

A    Yes.

Q    Were you involved in any other way?

A    Before then, no.

Q    You were just getting high.  And what drugs were you

using?

A   Meth.

Q   Methamphetamine?

A   Yes.

Q   You refer to meth by any other name, any other word?

A   Speed.

Q   Have you heard it called dope?

A   Yes.

Q   And if I use the word dope, does that refer to methamphetamine or more than one different type of drug?

A   Well, people use it as more; but, I use it as methamphetamine.

Q   You consider it methamphetamine?  Is that what you said?

A   Yes.

Q   Make sure to keep your head up when you're speaking. Sometimes if you look down, your voice trails off. Okay?

A   Okay.

Q   Thank you.  Now, you went to Oklahoma.  How long were you in Oklahoma?

A   A couple months.

Q   And why did you leave Oklahoma?

A   I went back to Dodge.

Q   How long were you in Dodge at that point?

A   Uhm, I don't remember.

Q   Did you have any more trouble or have any more criminal charges when you were in Dodge City?

A   Yes.

Q   And was that after you had returned from Oklahoma?

A   Yes.

Q   What did you get in trouble for then?

A   Possession of methamphetamine.

Q   Anything else?

A   Later on, I went to prison; and then when I got out of prison, I caught more charges.

Q   Okay.  After you get out of prison -- was that for possession of methamphetamine?

A   Yes.

Q   Did you leave Dodge City to go to any other place?

A   When I got out of prison?

Q   Well, just tell me any other time that you left Dodge City.

A   Well, like through my childhood, I was in foster homes and group homes and stuff.

Q   Tell me the age you were when that began?

A   I don't remember.  13 or 14.

Q   So it was before 2005?

A   Yes.

Q   Before you went to Oklahoma?

A   Yes.

Q   What cities did you go to when you were in foster homes?

A   Syracuse, Kansas; Great Bend; Kansas City.  Them are where I was in foster homes at, group homes.

Q   And when you were in group homes, did you ever run from the group homes?

A   Yes.

Q   When you ran from the group homes, where did you go?

A   I went to Emporia.  Then I went to Wyoming.

Q   And did you ever -- I'm sorry.  At some point did you go to Salina as well?

A   Oh, yeah, I went to Salina group home, too.

Q   So Emporia, Salina, and Wyoming.  Are those all during the period of time that you were running away from group homes?

A   Yes.

Q   Or in foster care?

A   Yes.

Q   Are all of those times before 2005 when you've gone to Oklahoma?

A   Yes.

Q   During the time that you had ran from the foster homes, did you have contact with gangs?

A   Yes.

Q   Where and when did you have contact with those gangs?

A   In 2003 I got -- I became a Norteno.

MR. WACHTEL:  I'm sorry, Your Honor.  I could not understand that.

THE COURT:  Nor could I.

A   I said in 2003 I became a Norteno gang member.

BY MR. SMITH:

Q   Norteno gang member.  Where were you --

A   Watsonville Norteno.

Q   Where were you in 2003 when you became a Norteno?

A   Emporia.

Q   And you used the phrase Watsonville Norteno; is that correct?

A   Yes.

Q   What does that mean?

A   It's a city out of California.

Q   Watsonville is a city in California?

A   The way I understood it, yes.

Q   That's what you understood when you became a gang member?

A   Yes.

Q   But you were not in California.  You were in Emporia, Kansas?

A   Yes.

Q   What did you do to become a member of the Watsonville Nortenos?

A   I got jumped in.

Q   And explain the jumping in process for us?

A   I got beat up for 14 seconds by four people.

Q   Who were the four people that jumped you in?

A   You want their names?

Q   Please.

A   Listo, Andreas, Puppet and then Lonely.

Q   I believe the name Puppet has been mentioned in the context of being in Dodge City, Kansas.  Are you familiar with a Puppet in Dodge City, Kansas?

A   Yes.

Q   Are we referring to the same people?

A   No.

Q   Puppet that you referred to in Emporia is not the Puppet from Dodge City, Kansas?

A   No.

Q   But you do know a Puppet in Dodge City, Kansas?

A   Yes.

Q   The other three people that you mentioned, Listo, Andreas, and Lonely, were they from Dodge City, Kansas?

A   No.

Q   Were they from Emporia?

A   Yes.  One of 'em was from California.

Q   Were they Watsonville Nortenos?

A   Yes.

Q   The same group that you were jumped in?

A   Yes.

Q   You mentioned you were beaten for 14 seconds; is that right?

A   Yes.

Q   Why was it 14 seconds?

A   It's the 14th letter of the alphabet for N for Norteno.

Q   Okay.  And this is 2003; is that correct?

A   Yes.

Q   How long did you stay in Emporia to be a member of the Watsonville Nortenos?

A   I was there for a few weeks and then I went -- I was on the run, so I went to Wyoming.

Q   When you went to Wyoming, were you involved in gang activity?

A   No.

Q   When did you next become involved in gang activity?

A   When I went to prison.

Q   And where did you go to prison?

A   Lansing Correctional Facility.

Q   That's in Kansas; is that correct?

A   Yes.

Q   Why did you go to prison, to Lansing?

A   Possession of methamphetamine.

Q   Is that the possession of methamphetamine you've mentioned already?

A   Yes.

Q   What year was that?

A   In 2005.

Q   And how long were you at Lansing?

A   I got out in 2009, January of 2009.

Q   Let's talk about Watsonville Nortenos.  Are there any particular symbols that the Watsonville Nortenos use to identify themselves?

A   The N.  The 14.

Q   The letter N; is that correct?

A   Yes.

Q   What does that mean?

A   For Nortenos.

Q   And what does the number 14 mean?

A   It's the 14th letter of the alphabet.

Q   Do you have any tattoos, Anthony?

A   Yes.

Q   And do you have any tattoos that would identify you as a member of the Watsonville Nortenos?

A   I got 14 on my hands and N on my head.

Q   And where is the N on your head?

A    On the back of my head.

Q    Go ahead and turn around for the jury.

(Witness complies with request.)

Q    And that N, is that N still symbolizing Norteno?

A    Yes.

Q    When you say 14 on your hands, describe that for us. Or hold your hands up.

(Witness complies with request.)

Q    Okay.  You might need to describe that for us a little bit more.

A    I have an X on one hand and 4 on the other hand.

Q    Which symbolizes the number 14?

A    Yes.

Q    You have -- that's fine.  Thank you.  You have a series of other tattoos; is that correct?

A    Yes.

Q    Are any of your other tattoos what you would consider gang tattoos?

A    I got four dots on my arm.

Q    And where on your arm are the four dots?

A    On my left arm.

Q    Do you recall when you got the tattoo on the back of your head?

A    I got it in prison.

Q    Is that the 2005 to 2009 period?

A    Yes.

Q    Or 2006 to 2009?

A    Yes.

Q    What about the 14 on your hands?

A    In prison, too.

Q    And what about the four dots on your arm?

A    I got that a long time ago.  I don't remember when.

Q    Was it before you went to prison?

A    Yes.

Q    Now, you've noted that you've gone to prison and became essentially reacquainted with gang activity; is that right?

A    Yes.

Q    How does that work when you go into a prison setting?  How does gang activity or gang affiliation work in a prison setting?

A    I don't understand your question.

Q    Okay.  You went to Lansing Correctional Facility; is that correct?

A    Yes.

Q    Essentially, you're greeted by guards at the facility; is that right?

A    Yes.

Q    I assume -- well, you tell me.  Do they try to identify if you have any gang affiliation?

A   Yeah.

Q   And how do they do that?

A   By your tattoos.

Q   Do they have conversations with you?

A   The guards?

Q   Well, or processing, the processing department at Lansing.

A   They ask you.

Q   Okay.  Did you tell them that you were affiliated with any gang?

A   I think I told 'em -- I don't remember.

Q   After you were identified as being affiliated with a gang -- let's use Lansing as the example because that's where you were at.  How does that change your, your status or your housing at the prison?

A   I was in max custody.

Q   Why were you in max custody?

A   For gang violence, they give you a gang point.  Any time you get a write-up, you can't, you can't lose your custody until one year with no trouble.

Q   Does that one gang point occur the moment you get to Lansing?

A   No, it's only if you have gang activity.

Q   Gang activity in the prison or before you got to prison?

A    In the prison.

Q    So at some point in Lansing you had gang activity in the prison?

A    Yes.

Q    What did you do?

A    It was a gang fight.  Put us under investigation.

Q    Okay.  I want to talk about the structure of the gangs in prison at Lansing.  Who were you affiliated with in Lansing?

A    Red Raggers.

        MR. WACHTEL:  I'm sorry, sir.  I could not understand.

A    Red Raggers.

BY MR. SMITH:

Q    Red Raggers?

A    Yes.

Q    Red as in the color red?

A    Yes.

Q    And what does rag mean?

A    What does -- it's a -- it's the color that Nortenos wear.

Q    Is there -- were there other gangs in Lansing that were considered Red Raggers?

A    Yes.

Q    Who else was considered Red Raggers?

A  They have Latin Count, LCC, Azteca.

Q  Let's talk about LCC.  Have you heard of LCC before you went to Lansing?

A  Yes.

Q  Where did you hear about LCC?

A  From Dodge City.

Q  Did you have contact with the LCC gang or gang members when you were in Dodge City?

A  Yes.

Q  Were you familiar with some of the members of LCC?

A  Yes.

Q  What color does LCC identify with?

A  Red.

Q  And in prison, did the Latin Kings and the Aztecas also identify with red?

A  Latin Counts.

Q  Latin Counts.  I'm sorry.  Did they identify with red?

A  Yes.

Q  Were there gangs in Lansing that identified with different colors?

A  Yes.

Q  What gangs were those?

A  They had Sureno gangs and SD.

Q  What is SD?

A    Spanish Disciples.

Q    And what color did the Surenos identify with?

A    Blue.

Q    What color did the SD identify with?

A    Black.

Q    Were the Spanish Disciples affiliated with Surenos or with Red Raggers?

A    With Red Raggers usually.

Q    When you arrived at Lansing, was there a structure to the Red Raggers gangs?  Were there roles that individual members should play?

A    Yeah.

Q    Was there a leader of the gang?

A    No.  There was somebody you go to for advice.

Q    Do you know who that person was?

A    Antonio Flores.

Q    Antonio Flores.  Does Antonio Flores go by a nickname?

A    Lazy.

Q    Where was Antonio Flores from?

A    LCC.

Q    Was it LCC in Dodge City?

A    Yes.

Q    Does Lazy have any other relatives in Dodge City?

A    Yes.

Q   And who are his relatives?

A   Josh Flores and Adam Flores.

Q   Do you know Josh Flores?

A   Yes.

Q   Is he a gang member?

A   Yes.

Q   What gang?

A   LCC.

Q   Does he have a nickname?

A   Big Knox.

Q   Do you know Adam Flores?

A   Yes.

Q   Is he a gang member?

A   Yes.

Q   What gang?

A   LCC.

Q   Does he have a nickname?

A   Yes.

Q   What is it?

A   Little Lazy.

Q   Little Lazy?

A   Yes.

Q   Did Antonio Flores have any other relatives that you know of?

A   His mom.

Q   Any cousins?

A   Yes.

Q   And who were his cousins?

A   I can't say 100% for sure that they are his cousins; but I think Gonzo Ramirez and Wee Wee.

Q   You said Gonzalo Ramirez; is that correct?

A   Yes.

Q   Is Gonzo Ramirez in the courtroom today?

A   Yes.

Q   Where is he sitting?

A   To my left.

Q   To your left.  What is he wearing?

A   A blue shirt.

Q   And is there anyone else in the courtroom today that you recognize from Dodge City, Kansas?

A   Peter Garcia.

Q   Where is he seated and what is he wearing?

A   To my left.  Tan shirt.

Q   A tan shift.

        MR. SMITH:  Your Honor, the record should reflect the witness has identified the Defendants.

        THE COURT:  It will.

BY MR. SMITH:

Q   You mentioned the name Wee Wee; is that correct?

A   Yes.

Q   Do you know the name of Wee Wee?

A   Uhm, I can't think of it.

Q   What gang was Wee Wee a member of?

A   LCC.

Q   Do you know if Gonzalo Ramirez or Gonzo Ramirez was a member of a gang?

A   Yes.

Q   And what gang was he a member of?

A   DV.

Q   What is DV?

A   The Norteno.

Q   What does DV stand for?

A   Diablos Viejos.

Q   Where does the DV gang operate?

A   In Dodge City.

Q   Do you know if Peter Garcia was a member of a gang?

A   Yes.

Q   And what gang was he a member of?

A   DV.

Q   Is that the same DV in Dodge City, Kansas?

A   Yes.

Q   So going back to your time at Lansing, Lazy was someone who you would go to for advice; is that correct?

A   Yes.

Q   Were there other members of the gang, the Red Rag

gang, in Lansing that you felt were in the leadership position?

A   No.

Q   Were there other members of the Red Rag gang that you respected or felt that you needed to -- well, let's stop there.  That you respected?

A   Yes.

Q   And who was that?

A   Puppet, Fabian Neave.  Tony Perez.  Big Knox.

Q   You mentioned the name Puppet as being a Fabian Neave; is that correct?

A   Yes.

Q   Was he a member of a gang?

A   Yes.

Q   What gang?

A   DV.

Q   From Dodge City, Kansas?

A   Yes.

Q   Did you know Puppet before you went to Lansing?

A   Yes.

Q   From Dodge City?

A   Yes.

Q   You also mentioned the name Tony Perez; is that correct?

A   Yes.

Q    Was he a member of a gang?

A    Yes.

Q    What gang?

A    DV.

Q    From Dodge City?

A    Yes.

Q    Did he have a street name?

A    Before they called him Stinky Cheese and then in prison it was Big Tone.

Q    Big Tone?

A    Yeah.

Q    Are you saying before he went to prison they called him that other name?

A    Yes.

Q    Okay.  So you know -- you knew Tony Perez before you went to Lansing?

A    Yes.

Q    Was Tony Perez one of the older members of the gang?

A    Yes.

Q    Did he hold a leadership position in the gang?

A    Not that I know of.

Q    So sticking with the structure and activities in Lansing.  Were there rules that were to be followed when you were in custody in Lansing?

A    Yes.

Q   What were those rules?

A   A mandatory work out.  If you see somebody in trouble, you help 'em.  Don't tell.

Q   Okay.  How did the mandatory work out work?

A   Four times a week, mandatory.

Q   Who was it that enforced that?

A   Different people.

Q   Did you ever have an occasion where you didn't do the mandatory work out?

A   Yes.

Q   What happened when you didn't do the mandatory work out?

A   You get in trouble and they tell you next time do it.

Q   All right.  And you said you were supposed to help someone in trouble; is that right?

A   If there's a fight or something, you got to jump in.

Q   Is that anyone you're supposed to help if they're fighting?

A   Other Red Raggers.

Q   And who do the Red Raggers fight with or did they fight with when you were in Lansing?

A   Sureno gangs, black gangs, SD.

Q   And at one point you stated SD may have been affiliated with Red Raggers; is that right?

A   Yes.

Q   But you would fight with SD?

A   Sometimes, yes.

Q   So if you saw a fellow Red Ragger in trouble, then you were expected to go help; is that correct?

A   Yes.

Q   What other activity -- what other illegal activities did the gang in Lansing conduct?

A   To --

MR. WACHTEL:   Your Honor, I'm sorry.   I object to the testimony about gangs in Lansing as being not relevant to this case which deals with gangs in Dodge City, Kansas.

THE COURT:   Is there some point in this?

MR. SMITH:   Your Honor, the gang in Lansing contains many of the members that are in --

THE COURT:   We've heard that.

MR. SMITH:   -- in Dodge City, Kansas.   And the structure and rules, the respect and the leadership positions will then translate once they are transported out of the jail into the community.

THE COURT:   Well, let's move through it. We've already covered in some detail, I think, and presumably will cover more of the rules and what-not of these gangs.   I don't want to get too repetitive here.

Go ahead.

MR. SMITH:  Thank you, Your Honor.

BY MR. SMITHL

Q   Let's talk specifically about one area then.  What is a violation?

A   When you get beat up by -- when they -- you get in trouble and get beat up.

Q   Did you ever suffer a violation?

A   Yes.

Q   Why were you violated?

A   For -- I was told to violate somebody else and I didn't think they needed a violation, so I got a violation, too.

Q   Okay.  Who made that decision?

A   Lazy.

Q   Were you there when they made the decision to violate you?

A   Yes.

Q   What happened?

A   I got beat up.

Q   By who?

A   By Lazy.

Q   Anyone else?

A   No.

Q   How long did that beating occur?

A    Just a few seconds.

Q    Are violations used outside of prison?

A    Yes.

Q    Have you witnessed any other violations outside of prison?

A    Uhm, yes.

Q    Tell me about those violations.

A    We was in county jail and I seen Little Benji get a violation.  That's one I can think of right now.

Q    Why was Little Benji violated?

A    Somebody said he was tellin'.

Q    What does that mean?  Telling?

A    That he was telling on people.

Q    Okay.  Telling who?

A    The cops.

Q    He was snitching?

A    Yes.

Q    So he was violated?

A    Yes.

Q    You saw him violated?

A    Yes.

Q    And you don't recall any other violations?

A    Not that I can think of.

Q    After you left prison in 2009, did you return to Dodge City?

A    Yes.

Q    Did you affiliate with any gangs in Dodge City?

A    Yes.

Q    And what gang did you affiliate in Dodge City?

A    DV and LCC.

Q    Why did you affiliate with those two gangs?

A    Because I was a Norteno.

Q    Is DV a Norteno gang?

A    Yes.

Q    Is LCC?

A    No.

Q    Why would you affiliate with LCC then?

A    We're -- I have friends that are LLCers.

Q    When you're out on the street in Dodge City, is LCC still a Red Rag gang?

A    Yes.

Q    Are they allies with DV?  Are they friends with DV?

A    Yes.

Q    Did you become a member of DV or LCC?

A    No.

Q    Why is that?

A    Because it would be a hood hopper.

Q    What does that mean?

A    Change sets.

Q    Okay.  So if you change sets, then that would make

you a hood hopper. Is that what you're saying?

A   Yeah.

Q   Did -- so you weren't required to join DV then?

A   No.

Q   But did you consider yourself still a Watsonville Norteno?

A   Yes.

Q   You mentioned that you were jumped in in Emporia. Did you witness anyone be jumped in into gangs in Dodge City?

A   Yeah.

Q   Okay. Tell me who you saw jumped in?

A   Isaac.

Q   And where or when was Isaac jumped in?

A   In the county jail.

Q   Who jumped Isaac in?

A   I don't remember.

Q   Did you see anyone else jumped in?

A   No.

Q   Have you heard the phrase jump out?

A   Yes.

Q   And what does that mean?

A   You get jumped out.

Q   What does to be jumped out mean?

A   I guess to get beat up until you're out of the gang.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Have you seen that occur?

A   No.

Q   Have you heard about that happening?

A   No.

Q   Do you know what someone would need to do to be jumped out of a gang?

A   No.  Get beat up.

Q   Okay.  What sort of violation would someone have to perform to be beaten out of the gang?

A   Tellin'.

Q   And that's telling law enforcement?

A   Yes.

Q   When you use the phrase telling, is that what you mean?

A   Yes.

Q   Is that a rule?  That you're not supposed to tell?

A   Yes.

Q   Is that a rule that was in place when you were in prison in Lansing?

A   Yes.

        MR. WACHTEL:  Object to further questions about Lansing.  They have nothing to do with this particular gang in Dodge City, Kansas.

        THE COURT:  Let's stick with Dodge City from now on.

BY MR. SMITH:

Q   Was it a rule when you were in Dodge City?

A   Yes.

Q   Was it a rule when you were affiliating with DV?

A   Yes.

Q   And LCC?

A   Yes.

Q   What other things would occur to get a violation when you were in Dodge City?

A   If you smoke meth.  There was a rule passed that you can't smoke meth or you're in violation.

Q   When did that rule come into effect?

A   After Big Benji died.

Q   Who's Big Benji?

A   Jason Najera's brother.

Q   So is it Benjamin Najera?

A   I don't know his last name.

Q   Big Benji, Jason Najera's brother?

A   Yes.

Q   He died?

A   Yes.

Q   How did he die?

A   They said it was drugs; but I don't know.

Q   And then you say a rule was passed that you couldn't smoke meth?

A    Yes.

Q    Was this in -- after you were released from prison in 2009?

A    Yes.

Q    Who passed the rule?

A    Jason.

Q    Was Jason in some sort of leadership position?

MR. MANDELMAN:  Judge, objection as to leading.

THE COURT:  I think so.  Let's -- most of your questions are leading questions and I don't think you need to be asking this man leading questions.

So let's see if we can phrase questions in a non-leading way.

BY MR. SMITH:

Q    Why or -- did Jason have authority to pass the rule?

MR. MANDELMAN:  It's still leading --

THE COURT:  No, it isn't.  Look, Ladies and Gentlemen, a leading question is a question that the question itself suggests the answer.  A non-leading question is who, what, when, where, why and how.  That's how you ask non-leading questions.

BY MR. SMITH:

Q    Did Jason have authority to pass the rule?

A    From what I saw, yes.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Did you see people follow the rule?

A   Yes.

Q   Did the rule cause -- did the rule cause any
conflict in the gang?

A   Yes.

Q   Did you see the conflict in the gang?

A   Yes.

Q   What did you see?

A   Somebody else, TC, like, people respected him also
and so a lot of people went with TC because he was able
to still get high and do -- and do what you want.

Q   Do you know TC's name?

A   No.  Like, I know it but I, I don't know.

Q   Okay.  You were out when this rule was passed?

A   Yes.

Q   Which side did you go with?

A   I kicked it with everybody.  I wasn't a member of DV
so I could do what I wanted.

Q   Were you using meth?

A   Yes.

Q   What period of time was this?

A   In 2009.

Q   Around 2009, I think you mentioned after getting out
of Lansing, you caught another case; is that correct?

A   Yes.

Q    What sort of case did you catch?

A    Sales of methamphetamine and criminal possession of a firearm.

Q    Do you remember when that was?

A    No.  In 2009.

Q    What happened after you were arrested for that case?

A    I went to jail and -- on that case, I went to jail. Then I got out on corrections.

Q    Going back to TC.  You mentioned that he was someone that was respected.  Was he respected by you?

A    Yes.

Q    Why was he respected by you?

A    He was somebody who had heart and he -- just more feared.

Q    More feared.  Is that what you said?

A    Yes.

Q    What does it mean to have heart?

A    He'll do whatever it takes.

Q    Explain that more for us.

A    If I need something or need somebody to go with me to do something, he would be one to go with me.

Q    What does it mean?  Something?

A    Like if I'm gonna fight or in that nature.

Q    Were there other members -- I'm talking about from 2009 until you caught the -- you went to jail.  Were

there other members that had that sort of status?

A   Yes.

Q   Who else had that status?

A   Gonzo Ramirez; Pedro Garcia; Antonio Flores; Jason Najera.

          MR. WACHTEL:  Objection, Your Honor.  Lack of foundation for this -- for the answers to that question.

          THE COURT:  You can cross-examine him about it.  Go ahead.  And I'm sure you will.

BY MR. SMITH:

Q   Did you have relatives in Dodge City?

A   Yes.

Q   Did you have cousins in Dodge City?

A   Yes.

Q   Who were your cousins in Dodge City?

A   Juan Worthey and Russell Worthey.

Q   How are you related to them?

A   They're my cousins.

Q   By blood?

A   Yes.

Q   How long have you known them?

A   My whole life.

Q   Was Juan Worthey a member of a gang?

A   Yes.

Q   What member or what gang?

A    DV.

Q    Did he have a street name?

A    Little Wicked.

Q    Was Russell Worthey a member of a gang?

A    Yes.

Q    What gang?

A    DV.

Q    Did he have a street name?

A    Yes, Blanco.

Q    And, Anthony, do you have a street name that you go by?

A    Huesos.

Q    Huesos?

A    Yes.

Q    Did the gangs in Dodge City, DV and LCC, have gang meetings?

A    Yes.

Q    Did you attend gang meetings?

A    A couple times, yes.

Q    What period of time was it that you were attending these gang meetings?

A    In 2009.

Q    Where were the gang meetings?

A    One was at Russell's house; and one was at TC's house.

Q   Let's talk about the meeting at Russell's house. What was discussed at the gang meeting?

A   That's when -- the first time I heard about, uhm, Jason saying no more smoking meth.

MR. WACHTEL:  Objection, Your Honor; hearsay.

THE COURT:  Overruled.

BY MR. SMITH:

Q   That's when you heard Jason talk about not smoking meth?

A   Yes.  That was one of the first times I heard it, about the rule that you can't get high no more or it's a violation.

Q   Who was present at the meeting?

A   A lot of people.  I don't know.

Q   It was at Russell's house.  Was Russell there?

A   Yes.

Q   You were there?

A   Yes.

Q   Jason was there?

A   Yes.

Q   Whom else?

A   TC.  I don't remember.

Q   You mentioned another meeting at TC's trailer; is that right?

A   Yes.

Q   What was discussed at that meeting?

A   I was just getting high.

Q   I'm sorry.  What?

A   We were just getting high and hangin' out.  And just a little kickback.

Q   What's a kickback?

A   Just go hang out.

Q   Is that the same as having a gang meeting?

A   Not really; but we were all just there hangin' out, talkin'.

Q   Did the gangs have any other rules that they were supposed to follow?

A   I don't know.  What I've told you.

Q   Okay.  You've been interviewed by law enforcement before; is that right?

A   Yes.

Q   You were interviewed -- well, this case is about a homicide on June 8 of 2009.  Do you understand that?

A   Yes.

Q   Are you familiar with that event?

A   Yes.

Q   Have you been interviewed by law enforcement in relation to that crime?

A   Yes.

Q   Have you been interviewed by law enforcement more

than once in relation to that crime?

A   Yes.

Q   Do you recall when the first time was that you were interviewed by law enforcement?

A   Kind of.

Q   When?

A   It was in 2009.  I was in the county jail.  It was Shane Webb and they took me to the police station to talk about it.  I think it was in 2009.

Q   Was it soon after June 8 of 2009 when the event occurred?

A   No, it was a while.  No, it was in 2010 because I was already in the new jail.

Q   At some point, did Dodge City change jails?

A   Yes.

Q   And is that why you refer to it as the new jail?

A   Yes.

Q   Okay.  You were interviewed by Shane Webb?

A   Yes.

Q   Did Shane Webb ask you questions about what occurred on June 8, 2009?

A   Yes.

Q   Did you answer those questions?

A   The first time, no.

Q   Did you meet with law enforcement again?

A    Yes.

Q    When did you meet with law enforcement again?

A    I don't remember the dates.

Q    How close was it in relation to the first time you met with Shane Webb?

A    A few months, couple months.

Q    Did you answer questions for Shane Webb about what happened on June 8, 2009, that time?

A    Yes.

Q    Why did you not answer the questions the first time?

A    I was scared.

Q    What were you afraid of?

A    Uhm, of going to jail, my family and everything.

Q    You have a wife; is that correct?

A    Yes.

Q    Do you have any children?

A    Yes.

Q    Is that still true and was it true in 2009?

A    Yes.

Q    So you were interviewed by Shane Webb a second time and you answered questions about what occurred on June 8, 2009; is that correct?

A    Yes.

Q    You've been interviewed by law enforcement -- have you been interviewed by law enforcement since then?

A    Yes.

Q    Do you recall how many times you've been interviewed by law enforcement?

A    No.  Been a few.

Q    And have you testified in front of a grand jury about what occurred on June 8, 2009?

A    Yes.

Q    When you were interviewed by law enforcement, did you have an attorney with you?

A    Yes.

Q    When you were interviewed by Shane Webb the second time, you stated you were in custody; is that right?

A    Yes.

Q    What were you in custody for?

A    The charge that I caught, the possession or the sales of methamphetamine and criminal possession of a firearm.

Q    In relation to your sale of methamphetamine, were you working with anybody in the sale of that methamphetamine?

A    Yes.

Q    Who were you working with?

A    TC and Peter.

Q    What role did TC have?

A    He was getting it.

Q   He was getting the methamphetamine?

A   Yes.

Q   What role did Peter have?

A   I was getting it from him.

Q   And then what did you do with the meth after you got it from Peter?

A   I sold it.

Q   Were those the roles in 2009 and 2010 before you went into custody?

A   Yes.

Q   When you were out of custody and in Dodge City, Kansas, did the Nortenos have rivals?

A   Yes.

Q   Who were the rivals?

A   MCB Surenos.

Q   MCB Surenos?

A   Yes.

Q   When you were out of custody, did did the Surenos affiliate themselves with any certain color?

A   Blue.

Q   Is it the same as it is in Lansing?

A   Yes.

Q   Do you recall the evening of June 8, 2009?

A   Yes.

Q   Were you with anybody on that day?

A   Yes.

Q   Who were you with?

A   Russell Worthey, Peter Garcia and Gonzalo Ramirez.

Q   Let's talk about when you wake up on that day, June 8, 2009.  What did you do?

A   I don't know.  I was with my wife.

Q   After you left your wife, did you -- who did you meet?

A   Russell.

Q   What time was that?

A   Late afternoon.

Q   What did you and Russell do?

A   We were driving around.

Q   Where were you driving around?

A   In the trailer park in south Dodge.

Q   Let's look at Government Exhibit 100 please.  Do you recognize what's depicted in Government Exhibit 100?  You can lift that screen up if it will help you.  Pull the top.

                    (Witness complies with request.)

A   Yes.  It's the trailer park in south Dodge.

Q   Are you familiar with that?

A   Yes.

Q   Why are you familiar with it?

A   I lived there and that's where we was at that day.

Q   June 8, 2009?

A   Yes.

Q   Do you recognize the streets depicted on the photograph?

A   Yes.

Q   Where, about, did you live on -- is it depicted on this photograph?

A   Where I lived it was like where the 5 is on --

Q   Go ahead and use your finger and touch the screen, maybe.  Use your finger and touch the screen.

A   It don't show my trailer on there.

Q   Was it north of the trailer park?

A   It was where the number 5 is.  It was two trailers up.

Q   When you say up, you mean north?

A   Yeah.  North from the third trailer north.

Q   Is there a road depicted on the photograph separating the two trailer parks?

A   McArtor.

Q   McArtor?

A   Yes.

Q   And your trailer was, then, north of McArtor?

A   Yes.

Q   How long had you lived there?

A   Since I got out of prison until around September.

Q   Was that when you got out of prison in 2009?

A   Yes.

Q   Were you familiar with the area?

A   Yes.

Q   Where did Russell live?  I don't need an address. But in relation to this trailer park --

A   Few miles away, I think, two miles away.

Q   Why did you and Russell drive around and drive through this trailer park?

A   I lived over there and we were just drivin' around.

Q   Did you drive around any other places in Dodge?

A   That particular day, no.

Q   When you drove -- do you know what time of day this was?

A   It was late afternoon.

Q   When you drove around the trailer park, did anything unusual happen?

A   Yes.  We drove by a group of people that were outside drinkin', havin' a little party.

Q   Do you remember where those people were sitting when they were having the party?

A   Yes.

Q   Can you point to the screen where you remember they were.

                    (Witness complies with request.)

Q   Is the purple arrow that you've placed on -- let's try it again.

(Witness complies with request.)

Q   Now we have a yellow line; is that right?

A   Yes.

Q   That's where the party was?

A   Yes.

Q   What did you see when you drove by this party?

A   There was a group of people outside.

Q   Was there anything unusual?

A   They were all wearing blue.

Q   What did that mean to you?

A   They were Surenos.

Q   Did anything happen?

A   Then?  No.

Q   Did you throw gang signs?

A   No.

Q   Did you see anyone throw gang signs?

A   I didn't.

Q   Were there any words exchanged with the people that were wearing blue?

A   No.

Q   What did you do next?

A   We drove -- we drove by.  We went around and then we drove around a little bit longer.  Then we ended up

going to Peter's house.

Q   Where was Peter's house?

A   On the east side in Dodge.

Q   Do you recall the address or what street it was?

A   I think D, I think.

Q   Avenue D?

A   Yes.

Q   Had you been to Peter's house before?

A   Yes.

Q   How many times have you been to Peter's house?

A   I don't know.

Q   Can you approximate for me?

A   A lot.  I don't know.

Q   Are you familiar with the house?

A   Yes.

         MR. SMITH:  May I approach, Your Honor?

         THE COURT:  Yes, sir.

Q   I've placed in front of you what's been marked as Government Exhibits 156 and 157.  Do you see those?

A   Yes.

Q   Look at Government Exhibit 156 for me.  Do you recognize what's in Government Exhibit 156?

A   That is the back of Peter's house.

Q   Is that an accurate depiction or how you remember Peter's house?

A   Yes.

MR. SMITH:  Move to admit Government 156.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  I don't object.

THE COURT:  156 is received.

BY MR. SMITH:

Q   What time was it that you went to Peter's house?

A   It was getting late.

Q   What does that mean?

A   Dark outside.

Q   Is it still you and Russell?

A   Yes.

Q   Who's driving?

A   I am.

Q   What type of vehicle are you driving?

A   A gold Mazda.

Q   Was it two-door or four-door?

A   Four-door.

Q   Was it your vehicle?

A   It was my wife's.

Q   What's depicted here in Government Exhibit 156, is that the house that you and Russell went to?

A   Yes.

Q   When you arrived at the house, what did you do?

A   We walked around to the back door.

Q   Is the back door depicted on this picture, 156?

A   Yes.

Q   Can you place a mark on the back door.

                    (Witness complies with request.)

Q   When you walked to the back door, what did you find?

A   Nothing.  We knocked.

Q   Where were you parked?

A   In the front of the house.

Q   What happened when you knocked?

A   Nobody answered.

Q   Was Russell with you?

A   Yes.

Q   What did you do next?

A   We knocked and we waited for a few minutes and then
we was gettin' ready to leave and then we saw people
runnin' through the backyard.

Q   Is that the backyard of Peter's house?

A   Yes.

Q   You have in front of you what's been marked as
Government 157.  Do you see that?

A   Yes.

Q   Do you recognize what that is?

A   An alley.

Q   What alley?

A   Behind Peter's house.

Q   Does it show the backyard?

A   I don't know.  I see the alley.

Q   Okay.  When you saw people running through the backyard, were they -- where were they in relation to that alley?

A   They were coming south.  They came from the south into the backyard through the alley.

MR. SMITH:  Move to admit Government 157.

MR. WACHTEL:  Objection.  Insufficient foundation, Your Honor.  My recollection -- I'm sorry.  My recollection is he said he didn't know whether Peter's house was there -- Pedro's house was there or not.

THE COURT:  That's my recollection.  He said it's an alley so -- where is it in -- ask him where -- if he can recognize that as being somewhere in relationship to --

A   I know the alley goes all the way behind Avenue D up behind them houses.  I don't know if that's the alley directly behind Peter's house or not.

BY MR. SMITH:

Q   So you do not recognize it?

A   No.

Q   Okay.  Thank you.  You stated then you saw people running -- tell me again what you stated about people

running?

A   We were at the door knocking and then we turned around and we see Peter, Gonzo, Tito and Josh Flores running through the backyard to the house.  They had red bandanas on their face, coming through the yard.

Q   From what direction were they running?

A   They came south.

Q   They came south?

A   Well, they came from the south into the backyard up the alley.

Q   Did you recognize Peter?

A   When they got close, yes.

Q   Did you recognize Gonzo?

A   Yes.

Q   Did you recognize Josh Flores?

A   Yes.

Q   And that's the person that you've referred to as Knox; is that right?

A   Yes.

Q   And you stated Tito Flores?

A   Yes.

Q   Had you met Tito Flores?

A   A couple times, yes.

Q   Did Tito Flores have a name that he went by?

A   Tito.

Q   Do you know if Tito Flores was a member of a gang?

A   I know he hung out.  I don't know if he was a member or not.

Q   You described what some of the people were wearing; is that right?

A   Yes.

Q   What were they wearing?

A   Red bandanas.

Q   Where were they wearing the red bandanas?

A   On their face.

Q   Were all four of them wearing red bandanas on their face?

A   I don't remember if they all four had 'em on their face or not.

Q   Was Russell with you still?

A   Yes.

Q   When they ran into the backyard, where did they go?

A   Went into the back door.

Q   The back door that you pointed out on 156?

A   Yes.

Q   And where did you go?

A   I went in with them.

Q   Where did Russell go?

A   He went in with them, too.

Q   Before you get to the back door, is there any

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

conversation being had?

A We just said what's up, shook hands. Then we went in.

Q And when you walk in that back door, where do you go?

A Right there to the living room part.

Q Inside the home?

A Yes.

Q Was there any conversation inside the home?

A Yes.

Q And what was that --

MR. MANDELMAN: Judge, I'd like to approach real briefly. I have an objection.

THE COURT: About what? I've already covered previously all the hearsay statements.

MR. MANDELMAN: Well, I'd just like to -- just be one second. I don't want to --

THE COURT: I'm quitting at 3:00.

MR. MANDELMAN: I know but I don't want to --

THE COURT: All right. Come up.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

MR. MANDELMAN: I just want to renew my objection from the James hearing and violation of hearsay and the Sixth Amendment. I still don't think they've showed any sort of conspiracy here. They need to show that these statements -- that this guy was a member of the conspiracy and that these statements were made in furtherance. Mr. Wright, showing that he just drove around with Mr --

THE COURT: That's what we had the James hearing for.

MR. MANDELMAN: Well, he said he just drove around with Mr. Worthey. I don't think --

THE COURT: We had the James hearing. I've determined these people are members of the conspiracy and that these statement are admissible. That's what we had back in May.

MR. MANDELMAN: I understand. Yeah, I just want to make sure I renew my objection.

THE COURT: Okay. Your objection is renewed and overruled.

MR. WACHTEL: For the same reasons, Your Honor, join in that.

THE COURT: All right.

(Thereupon, the following proceedings continued in the

(hearing of the jury.)

BY MR. SMITH:

Q   Who was in the living room?

A   All of us.

Q   You and the five other people that have been mentioned?

A   Yes.

Q   Was there any conversation in the living room?

A   Yes.  They were splittin' up money.  Said they just did a home invasion.

Q   Do you recall who said that?

A   No.

Q   Did you see the money being split up?

A   Yes.

Q   Did you see any firearms?

A   Yes.

Q   Where did you see the firearms?

A   They had 'em in their hands.

Q   Who's they?

A   Gonzo, Peter, Josh and Tito.

Q   Did you see what sort of firearm Gonzo had?

A   A revolver.

Q   Did you see what sort of firearm Peter had?

A   It was a -- at the time I didn't know what it was, what kind of gun it was.

Q   Did you see it?

A   Yes.

Q   Have you seen it before?

A   No.

Q   Did you see what sort of firearm Knox had?

A   He had a little pistol.

Q   Did you see what sort of firearm Tito had?

A   No.

Q   Did you see that he had a firearm?

A   I think so.  I'm not 100% for sure.

Q   How long did it take to split up the money?

A   A few minutes.

Q   Was there any conversation during the splitting up of the money?

A   Just about they just did a home invasion and they were done and then some -- said something about go look for some Surenos.

        THE COURT:  Said something about what?

A   Let's go look for some Surenos.

BY MR. SMITH:

Q   Who was there when the statement was made let's go look for some Surenos?

A   All of us.

Q   The six of you?

A   Yes.

Q   What happened next?

A   Uhm, me, Russell, Peter and Gonzo, we went and got in my car and left.

Q   Where were Knox and Tito?

A   They left.  I don't know where they went.

Q   So you and Gonzo, Peter and Russell went to your vehicle?

A   Yes.

Q   Is that the vehicle you parked out front?

A   Yes.

Q   Are you in the same vehicle that you were in earlier in the day?

A   Yes.

Q   Where did you get into the vehicle?

A   The driver.

Q   Where did Russell get into the vehicle?

A   The passenger.

Q   Where did Peter get into the vehicle?

A   Behind me.

Q   And where did Gonzo get into the vehicle?

A   Behind Russell.

Q   Did anyone have guns when you left the house to go to the vehicle?

A   Yes.

Q   Who had guns?

A    Peter and Gonzo.

Q    Were they the same firearms that you had seen earlier?

A    Yes.

Q    Did you have a gun?

A    No.

Q    Did you see Russell with a gun?

A    No.

Q    After you got into the vehicle, what happened next?

A    I started driving and Peter directed me out of the east side because he said there were going to be a lot of the cops over there because they just did a home invasion.

Q    Did you get out of the east side?

A    Yes.

Q    When you refer to east side, are you referring to the east side of Dodge City?

A    Yes.

Q    Then what happened?

A    We went to the south side.

Q    Why did you go to the south side?

A    Because there was some Surenos over there.

Q    Who decided to go to the south side?

A    I think I did.

Q    When you said there were Surenos there, what were

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

you referring to?

A    Southsiders, some gang members.

Q    Were you referring to the people that you had seen earlier in the day?

A    Yes.

Q    Did you drive to the same trailer park?

A    Yes.

Q    Is that the trailer park that we have in Government Exhibit 100?

A    Yes.  I think.  I don't remember.  Is that the one you showed me?  Yes.

Q    Is that the trailer park you drove to?

A    Yes.

Q    How long did it take to get there?

A    I don't know.  A few minutes.

Q    Okay.  Go ahead and push that screen down.  We don't need that for a little while.

                    (Witness complies with request.)

Q    Thank you.  What happened when you arrived at the trailer park?  What first happened?

A    We drove by the group that was outside drinking.

Q    Was it the same group from earlier in the day?

A    Yes.

Q    Was it at the same location from earlier in the day?

A    Yes.

Q   Were the four of you seated in the same places?

A   Yes.

Q   Did you see that group still drinking?

A   Yes.

Q   What happened?

A   We drove by and then Peter directed me around --
told me to go -- where to turn and we went around to
another street and pulled up.  Peter directed me where
to park.  Then we got out of the car.  We all got out of
the car.  We went through the trailers.

Q   Now I'm going stop you there.  You've mentioned that
you've been interviewed by law enforcement several
times; is that correct?

A   Yes.

Q   I've handed you what's been marked as Government
154; is that correct?

A   Yes.

Q   Will you take -- open the envelope and remove the
contents of Government Exhibit 154 please.

                    (Witness complies with request.)

Q   One piece of paper.  When you were interviewed by
law enforcement, were you shown a map of the trailer
park?

A   Yes.

Q   Did you make markings on the map of the trailer

park?

A    Yes.

Q    Do you recognize Government Exhibit 154?

A    Yes.

Q    Is that the map of the trailer park that you made markings on?

A    Yes.

MR. SMITH:  Your Honor, I'm going to show this to defense counsel.

(Off-the-record discussion.)

MR. MANDELMAN:  Your Honor, I've never seen this document before.  I don't think it's previously been disclosed to defense counsel.

THE COURT:  What is it?  Is it an aerial photograph?  That's what it says on the list here.

MR. SMITH:  It's an aerial photograph, Your Honor, that has been in physical evidence.  It was turned over on several ECR lists of discovery that counsel has had and counsel has not asked to review the physical evidence in this case.

THE COURT:  Well, I don't know about that.

MR. MANDELMAN:  This is the sort of document that he --

THE COURT:  Is it the same as Exhibit 100?

MR. WACHTEL:  Yes and no, Your Honor.

MR. SMITH:  It is marked upon.

THE COURT:  It's Exhibit 100 that this witness has marked on?

MR. SMITH:  Correct.

THE COURT:  So you've seen Exhibit 100.  So what you say you haven't seen is his markings?

MR. MANDELMAN:  That's right.

THE COURT:  Well, why don't I give you about five minutes and you can look at them.

MR. MANDELMAN:  Okay.  Thank you.

THE COURT:  Val, do you want to look at them, too?

MR. WACHTEL:  No, Your Honor.  I was just standing up to look at the exhibit.

THE COURT:  I see.

MR. WACHTEL:  I could see it.

THE COURT:  We'll take a recess in place while Joel takes a look at the markings.

                    (Off-the-record.)

MR. MANDELMAN:  Thanks, Judge.  I'm fine with it.

THE COURT:  Thank you.

MR. SMITH:  Move to admit Government 154.

MR. WACHTEL:  I don't object, Your Honor.

MR. MANDELMAN:  I don't either.

THE COURT:  154 is received.

BY MR. SMITH:

Q   On Government Exhibit 154, did you make markings as to the path your vehicle took?

A   Yes.

Q   Did you make markings as to the path that you took after seeing the party?

A   Yes.

Q   And where did you go after you saw the party?

A   Went around the trailer park to the next street.

Q   And let's look at Government Exhibit 100.  When you're looking at Government Exhibit 100, do you see the same trailer park depicted in Government 154?

A   Yes.

Q   Where did you drive -- and you can use your finger to make a line -- after you passed the party?

(Witness indicates.)

A   Drove around.

Q   Okay.  So you turned and then began going north through the middle road of the trailer park; is that correct?  That's what you've drawn on this Government Exhibit 100?

A   Yes.

Q   After you started going north --

A   It would be west -- oh, you're talking about --

never mind.

Q   When you turned into the trailer park, what direction were you going?

A   When I went to -- I was going south when I turned into the trailer park.

Q   I see.  And then you turned again; is that right?

A   Yes.

Q   Which direction did you turn?

A   West.

Q   And then you turned again; is that right?

A   Yes.

Q   And which direction did you turn?

A   North.

Q   Then what happened?

A   I drove up a ways and Peter directed me where to park at.

Q   Where was that?

A   It was approximately in this area up here.

                    (Witness indicates.)

Q   Did you park?

A   Yes.

Q   Then what happened?

A   We all got out of the car.

Q   Where did you go?

A   We went through the trailers.

Q   Do you remember where you went through the trailers?

A   Do you want me to draw it?

Q   Please.

(Witness indicates.)

A   Somewhere around in here.  Not 100% for sure, but in that area.

Q   Was there any conversation as you were taking that path through the trailers?

A   Not that I remember.

Q   Were all four of you together?

A   Yes.

Q   Were you walking side-by-side or in a line?

A   Peter and Gonze was in front of us, in front of me and Russell.

Q   Was anyone wearing a bandana?

A   Peter and Gonzo put bandanas on their face.

Q   When did they put the bandanas on their face?

A   When we were going through the trailers.

Q   Did you have a bandana?

A   No.

Q   Did you see Russell with a bandana?

A   No.

Q   Did you see any firearms?

A   Yes.

Q   When did you see the firearms?

A    When we got out of the car.

Q    Who had a firearm?

A    Peter and Gonzo.

Q    What sort of firearm did you see Gonzo with?

A    Revolver.

Q    What sort of firearm did you see Peter with?

A    It was a bigger gun.  I wasn't sure what it was called at the time.  I know what it is now.

Q    How did you learn what it is?

A    From you guys.

Q    Okay.  You didn't know that at the time?

A    No.

Q    And you had not seen that gun before?

A    Just that night.

Q    I see.  After walking through the trailers, where did you go?

A    We went around to the front of the trailer where them guys were partyin' at.  We crossed over a porch.

Q    Let's erase these markings.  And zoom in.  You placed a mark before earlier when you were testifying where you saw the guys having a party; is that correct?

A    Yes.

Q    Can you make that marking again?

(Witness complies with request.)

Q    Now, you stated you went around towards that area;

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

is that right?

A   Yes.

Q   From where did you come?

A   We came from over here, and I'm not sure which trailer we went through.  Then we came around the outside of this trailer.

Q   When you came around the outside of the trailer, were the four of you together?

A   Me and Russell was behind.  We were coming up behind 'em.  We were all -- we were all together, just in kind of a line.

Q   Was there any additional conversation at that point?

A   No.  Just -- we went around and all you heard was puro Norte and shots fired.

Q   When you went around where did you hear --

A   Around the trailer.

Q   The front of the trailer that you've drawn on here?

A   Yes.

Q   Where were you standing when you heard that?

A   It was about the front of that trailer.

Q   Where was Russell?

A   Either beside me or behind me.

Q   And where was Peter?

A   In front of me.

Q   Where was Gonzo?

A    In front of me.

Q    What does puro Norte mean?

A    Pure Norte.  Like this is -- Norte, like the north sign.

Q    How many shots did you hear fired?

A    Numerous.  I don't know.  A lot.

Q    Were there people out -- were there still people out at the party?

A    They took off runnin'.

Q    Did you see how many people were there?

A    No.

Q    Did you see how many people were there when you first arrived at the trailer park that evening?

A    No.  There was a few.  I don't know how many.

Q    Did you see shots being fired?

A    Yes.

Q    And who did you see firing shots?

A    Peter and Gonzo.

Q    How do you know that shots were being fired?

A    Because I could see the guns going off.  I was right there.

Q    What did you do after the guns were fired?

A    Took off runnin'.

Q    Where did you run?  Let's clear this.

A    Back to my car.

Q   Do you recall how you ran back to your car?

A   Through some trailers.  I don't know which way.

Q   Did you see where Russell went?

A   He took off runnin', too.  I don't know what way he ran.

Q   Was he running with you?

A   No.

Q   Did you see Peter or Gonzo?

A   They were behind me.

Q   You don't remember what trailers you ran through. Did you run to that center road where your car was parked?

A   Yes.

Q   What happened when you got to the center road?

A   I got in the driver's seat and Peter and Gonzo got in the back seat.

Q   Did they get in the back seat in the same positions they were in earlier?

A   Yes.

Q   Then what happened?

A   I drove up a little bit and picked Russell up.

Q   Was there any conversation when you got into the vehicle?

A   Yes.  There was a statement that you got that one.

Q   And who said you got that one?

A    Gonzo.

Q    Was this before or after Russell got into the car?

A    I think it was after.

Q    How far do you think you pulled up before Russell came back to the vehicle?

A    Almost to the end of the street.

Q    Did you stop to pick him up?

A    Yes.

Q    Where did you go after you picked up Russell?

A    Went east and then north.

Q    So --

A    East on McArtor and then I went -- I turned -- do you want me to draw it?

Q    We'll zoom out.  Yes.

                    (Witness indicates.)

A    Turned east on McArtor and then went north.

Q    And you have Government Exhibit 154 in front of you; right?  Do you have those same markings on Government 154?

A    Yes.

Q    Is there a reason why you drove that way?

A    At the time, no.  That's just to get away.

Q    And all four of you were in the vehicle?

A    Yes.

Q    Was there any further conversation in the vehicle?

A   When we were going down Minnola, no.  And then Peter told me to go east, turn off about halfway down Minnola Street that takes you east of Dodge to go around.

Q   Okay.  Was there a conversation then?

A   Not at that time.

Q   At some point when you're in the car, is there another conversation?

A   Yes.  We're driving, we're coming back around the outside of Dodge, and there was a comment made about we all have kids.

Q   Who made that comment?

A   Peter.

Q   Who was it directed toward?

A   All of us I think.

Q   What did that mean to you?

A   That you better keep your mouth shut 'cause we all got families.

Q   What were your feelings at this time?

A   Better keep my mouth shut to protect my family.

Q   Where did you go next?

A   We drove to the east side and then we went back to Peter's house and I dropped Peter and Gonzo off in the alley.

Q   Was Russell still with you?

A   Yes.

Q    Then where did you go?

A    Then I went and dropped Russell off.  Then I went back to my mother-in-law's house.

Q    Where did you drop Russell off?

A    On, it's like downtown Dodge, by Wyatt Earp.

Q    You stated you went to your mother-in-law's house?

A    I did after that, yeah.

Q    Did you have a conversation with anyone else, Peter, Gonzo or Russell, after June 8, 2009, about what occurred?

A    No.  One time we was in the county and something was mentioned about it; but we never talked about it.

Q    Who was it mentioned by?

A    Between me and Peter.

Q    And what was -- what did you mention with Peter?

A    I don't really remember.  I just remember it being brought up.

Q    I want to go back now to some of the conversations we had about your drug use involvement.  Were you using drugs on the night of June 8, 2009?

A    No.

Q    Is there any particular reason why you were not using drugs?

A    Because Russell didn't get high so we didn't get high.

Q   Did you see anyone using drugs that night?

A   No.

Q   And you've stated that you sold dope for Peter Garcia; is that correct?

        MR. WACHTEL:  I object, Your Honor.  This is asked and answered and it's repetitive.

        THE COURT:  I'm not sure whether it is or isn't at this point.  Go ahead.  I'll listen.

BY MR. SMITH:

Q   Did you sell drugs for Peter Garcia?

A   Yes.

Q   Did you sell dope for anyone else in the DV or LCC gangs?

A   Lazy.

Q   Who is Antonio Flores?

A   Yes.

Q   Did you know of other DV or LCC -- I want to know if you know of other DV or LCC gang members that sold drugs?

A   Yes.

Q   Who else do you know that sold drugs?

A   Gonzo.

        MR. MANDELMAN:  Judge, I'm going to object on foundation.

        THE COURT:  Sustained.

BY MR. SMITH:

Q   Do you know other gang members that sold drugs?

A   Yes.

Q   How do you know that those other gang members sold drugs?

A   I was with them before when they did it.

Q   Who were you with when another person sold drugs?

A   I was at Peter's house before and Gonzo sold a little sack to some chick when she come over.

Q   And what drug was it?

A   Some methamphetamine.

Q   Were you with anyone else when they sold drugs?

A   Lazy.

Q   And what drug did Lazy sell?

A   Methamphetamine.

Q   Were you with anyone else when they sold drugs?

A   I was with TC.

Q   And what drug was TC involved in?

A   Methamphetamine.

Q   Anthony, let's talk about what you were charged with in this case.  Do you know exactly what it was that you were charged with?

A   I took a plea for --

Q   Well, what did you plead to?

A   RICO act and a crime committed with an automatic

weapon I think.

Q   So it's your understanding you plead to two counts; is that right?

A   Yes.

MR. SMITH:  May I approach?

THE COURT:  Yes, sir.

BY MR. SMITH:

Q   I'm showing you what's been marked as Government Exhibit 155; is that right?

A   Yes.

Q   Do you recognize what Government Exhibit 155 is?

A   Yes.

Q   What is Government Exhibit 155?

A   My plea agreement.

Q   Have you seen that plea agreement before?

A   Yes.

Q   Have you read the entire plea agreement?

A   Yes.

Q   Have you gone over the plea agreement with your attorney?

A   Yes.

Q   Does the plea agreement contain all the terms of your plea?

A   Yes.

Q   And does it contain the counts which you plead

guilty to?

A   Yes.

Q   Does it contain facts that you admitted when you entered the plea?

A   Yes.

Q   And did you agree to those facts?

A   Yes.

Q   When you say RICO act, describe for the jury what it is, your understanding, that you admitted to?

A   Crimes committed by an organization.

Q   And what were those crimes?

A   The gun -- the crime committed with a weapon, and then I'm not sure about the other one.  I don't remember.

Q   Let's talk about June 8, 2009.  Do you know what happened as the result of the shooting on June 8, 2009?

A   Somebody died.

Q   When you plead to the RICO act, was that in relation to that some person dying?

A   Yes.

Q   Did you admit in your plea agreement to dealing drugs?

A   That what?

Q   To dealing drugs.  Did you admit in your plea agreement --

A    Yes.

Q    And you mentioned something with a firearm.  Was that using or possessing a firearm during a crime of violence?

A    Yes.

Q    Were you charged with other counts that you did not plead to?

A    No -- was I charged?

Q    Were you charged?

A    Oh, yes.

Q    With other counts.  What were those counts related to?

A    The murder.

Q    Contained within that plea agreement are paragraphs -- are paragraphs contained within that plea agreement about what's called substantial assistance?

THE COURT:  Are you going to offer the plea agreement?

MR. SMITH:  I will.

THE COURT:  I think you should before you start talking about what's in it.

MR. SMITH:  Your Honor, I'd move to admit Government Exhibit 155.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  We have no objection.

THE COURT: It's received.

BY MR. SMITH:

Q   Are there provisions in the plea agreement about what is called substantial assistance?

A   I don't know what that means.

Q   Okay. You're testifying here today; is that correct?

A   Yes.

Q   After you testify, do you hope to be given consideration for the testimony?

A   Yes.

Q   Is that described in the plea agreement?

A   Yes.

Q   Are your promises about your testimony contained within the plea agreement?

A   Yes.

Q   And is the procedure for you to get substantial assistance in the plea agreement?

A   Yes.

Q   Do you understand who is responsible for sentencing you in this case?

A   Yes.

Q   Who is responsible for sentencing you in this case?

A   The judge.

Q   Did the Government make a recommendation as to your

sentence?

A    Yes.

Q    Does the Government decide what your sentence is?

A    No.

Q    Were there any promises made to you in the plea agreement that you would not go to prison?

A    No.

Q    Specifically, in the plea agreement, does it state that you will go to federal prison?

A    Yes.

Q    Were there any promises made to you outside of that plea agreement for your testimony today?

A    Just that the Government will file a motion.

Q    And when will they file a motion?

A    After my testimony.

Q    Are you guaranteed to have a motion filed?

A    No.

Q    After the motion is filed, who decides what your sentence is?

A    The judge.

Q    When you were in state custody and you spoke to Shane Webb, you were in for a case; is that correct?

A    Yes.

Q    Did the state do anything with any cases that you had after you spoke to Shane Webb?

A    Yes.

Q    What did the state do?

A    They gave me corrections.

Q    What does that mean?

A    Put me on probation.

Q    For those state cases?

A    Yes.

Q    What were the cases that you were put on corrections for?  If you remember?

A    Conspiracy to sell methamphetamine; criminal possession of a firearm; and tampering with an electronic device.

        MR. SMITH:  One moment, Your Honor.

                (Off-the-record.)

BY MR. SMITH:

Q    I want to refer you back to one statement that you heard in the car.  The statement you got that one.  Do you recall that?

A    Yes.

Q    Do you know who Gonzo made that statement to?

A    To Peter.

Q    Was there any response to that statement?

A    Uhm, I think -- I don't remember.

        MR. SMITH:  Thank you.  Your Honor, I'm just going to withdraw that one exhibit.

THE COURT: Mr. Wachtel.

MR. WACHTEL: Are you done?

MR. SMITH: I am done.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q I'm sorry. I'm Val Wachtel. I'm Mr. Garcia's attorney. You sound nervous to me. Do you need any water or anything like that before I start my cross-examination of you?

A No, I'm all right.

Q All right. Good. Well, any event, I represent Mr. Garcia. And if I ask you a question that you don't understand, I want you to tell me that you do not understand. Will you do that?

A Yes.

Q And if you can't -- if I speak too fast and you don't understand that, will you tell me that -- you're going to ask me to ask that question again; right?

A Yes.

Q Okay. Well, I'm interested -- I'm going to try to go through your testimony with you here sort of chronologically the way you gave it. All right?

A Yes.

Q And my understanding is that you spent some time in Lansing prison; right?

A   Yes.

Q   One batch of time or two?  You've been sent there once or twice?

A   Once.

Q   What did you do to get yourself sent there?

A   Possession of methamphetamine.

Q   That methamphetamine that you had, do you remember how much it was you had?

A   It was a pipe.

Q   A pipe?

A   Yes.

Q   Then you possessed whatever methamphetamine that was in that pipe for your own benefit; right?

A   Yes.

Q   Because that was for your use?

A   Yes.

Q   Was that a simple possession charge or was that a possession with intent charge?

A   Simple possession.

Q   In any event, you got yourself sent to Lansing where you did, what, hard time?  Were you in the honor camp?

A   No.

Q   And you said to us, told the jury, that you were associated with, quote, Red Raggers, close quote?

A   Yes.

Q   Actually, I think you said you were affiliated with them; right?

A   Yes.

Q   And you also said that the LCCs were affiliated with the Red Raggers; right?

A   Yes.

Q   And the Aztecas also?

A   Yes.

Q   Right?

A   Yes.

Q   And Red Raggers means what?  People who, who, who have some affiliation with the letter red -- excuse me -- with the color red?  Is that what it means?

A   Yes.

Q   Let me see if I can find what you said.  Now, in addition to LCC and Aztecas who claim a relationship to the letter red, right?

A   Yes.

Q   Were there other gangs in that prison that claim a relationship to the letter red -- to the color red?

A   Yes.

Q   Okay.  Were there Crips --

A   Yes.

Q   -- gang members?  Bloods?

A   Yes.

Q   Do the Crips claim affiliation with the color red?

A   No.

Q   But Bloods do; right?

A   Yes.

Q   And the Bloods -- Bloods is a Hispanic gang far as you know?

A   Black.

Q   Black gang.  So there's more than one -- I'm sorry. That's a bad question.  The Crips could be Red Raggers?

A   No.

Q   They could not.  The Crips could be Nortenos?

A   No.

Q   The Crips come be Nuestra Familia?

A   No.

Q   And I noticed that you -- when you were talking about who was -- who the Red Raggers were, you left out the Diablos Viejos.  Is that because they weren't affiliated with Red Raggers?

A   They were there.

Q   They were there?

A   I mentioned the names of a couple.

Q   A couple of people?

A   Yes.

Q   Okay.  Now, you told us in your direct testimony that you considered yourself to be a Norteno; is that

right?

A    Yes.

Q    But a particular -- but you qualified it with the word Watsonville; right?

A    Yes.

Q    Okay.  And you joined the Watsonville Nortenos in -- the Watsonville -- what is the name of the Watsonville gang that you joined?

A    It's called the Watsonville.  They're from Watsonville, California, or the street Watsonville or something.  They're -- they came here from California. That's all I know.

Q    Excuse me.  In Emporia, are they just called Watsonville?

A    Watson.

Q    Watson.  W-A-T-S-O-N.  Right?

A    Yeah.

Q    The Watson, right.  Did the Watson gang kick money back up to the Nortenos?

A    Did they what?

Q    Did they -- the crimes that they committed -- they committed crimes; right?  The Watson folks in Emporia; right?

A    Yes.

Q    And they committed crimes and they made some money

at it; right?

A   I don't know.  I can't say.

Q   Did you?

A   No, not in Emporia I didn't.

Q   So you would not know whether or not the Watsonville gang in Emporia contributed any money at all to the Norteno gangs that originated in northern California; right?

MR. SMITH:  Objection.  Beyond the scope and irrelevant.

THE COURT:  Overruled.

A   No, I can't say that they did.

BY MR. WACHTEL:

Q   That's because you don't know or because you don't remember?

A   I don't know.

Q   But in any event, by the time you end up back in Dodge City --

A   Yes.

Q   -- you don't join the Diablos Viejos or the LCC?

A   No, I don't.

Q   You may have hung out with folks that were in those gangs; right?

A   Yes.

Q   For example, Mr. Garcia?

A   Yes.

Q   Or Mr. Ramirez?

A   Yes.

Q   Or the Flores family; right?

A   Yes.

Q   But you didn't join?

A   No.

Q   Now, you told us that you got violated while you were in prison; right?

A   Yes.

Q   Was that while you were in Lansing prison?

A   Yes.

Q   Was that while you were in Lansing prison for the drug crime that we've talked about?

A   Yes.

Q   Was Mr. Garcia involved in that violation that happened to you?

A   No.

Q   Can you get out of -- based on gangs that you have experienced, can you get out of a gang without being jumped out?

A   Drop out.

Q   You can drop out; right?

A   If you want, I guess.

Q   Have you ever seen that happen?

A   I've seen people say they're not affiliated no more.

Q   You told us also about this first trip to Lansing that you don't necessarily get put in seg, right, just because you're a gangster?

A   No.

Q   Or just because you claim to be a gangster; right?

A   No.

Q   You've got to do something to get put into administrative segregation?

A   Yes.

Q   Is that also known as the hole?

A   Yes.

Q   Did you go to the hole when you got to Lansing?

A   I did.

Q   You did?

A   Yes.  Not when I first went; but during my time, yes.

Q   How long were you there before you got sent to the hole?

A   I don't know.  A while.

Q   A while?

A   Yes.

Q   What did you do?

A   A fight.

Q   With who?

A    With some Surenos.

Q    You talked in your testimony about Tony Perez.  You remember talking about Tony Perez?

A    Yes.

Q    Was Tony Perez involved in the Red Raggers in Lansing while you were there?

A    Yes.

Q    My recollection is you said that he was not a leader.  Is that what you said?

A    Yeah, he was not.

Q    He was not.  He was just somebody that you went to to ask for advice if you needed advice?

A    Yes.

Q    The Red Raggers in prison didn't have a leader, did they?

A    No.

Q    And they didn't have -- and they didn't give orders to people like you telling you what to do, did they?

A    No.

Q    Oh, yeah.  Now, after you talked about being involved with the Red Raggers, you talked about going back to Dodge.  And actually you said you attended meetings in Dodge in, in 2009?

A    Yes.

Q    Do you remember talking about that?  Meetings with

whom?

A   With home boys.

Q   Home boys?

A   Yes.

Q   Would some of those home boys have been the Diablos Viejos?

A   Yes.

Q   Would some of those home boys have been LCCs?

A   Yes.

Q   Would some of those home boys have been neither?

A   Yes.

Q   Yes?

A   Yeah.

Q   You were neither; right?

A   Yes.

Q   So -- but there were meetings.  Now, you talked about one meeting which you described as being a party. Remember?

A   Yes.

Q   You remember where that meeting took place?

A   At TC's house.

Q   I'm sorry.  I don't remember who TC is.  Do you?

A   I don't know his real name.

Q   If I asked you to tell me who attended that -- I'm talking about the meeting that you described as a party.

If I asked you to tell me who all attended that, could you do it?

A   No.

Q   Well, in all candor, was that, that particular occasion a gang meeting or was it a party?

A   It was probably more of a party.

Q   You said that --

A   Kickback.

Q   A kickback?

A   Yeah.

Q   I'm older than you by a bunch.  To me, kickback means it was a party?

A   Yes.

Q   Yeah.  And there was no gang business of any kind discussed then, was there?

A   There was about -- that's whenever TC and Jason split up and, yeah, there was a little bit.

Q   Well, they split up because they had problems with -- one with the other; right?

A   Yes.

Q   There was an earlier moating -- well, there was another meeting in 2009; right?

A   Well, I'm sure they had a lot of meetings.

Q   Well, I'm only interested in the ones that you attended and that you know something about.  Were there

more than two?

A   Not that I'm aware of, two.

Q   Well, let's talk about the other one that you went to.  Was that before the kickback or after?

A   It was before.

Q   Where did that meeting take place?

A   At Russell's house.

Q   Russell Worthey's house?

A   Yes.

Q   Russell Worthey is related to you somehow; right?

A   Yes.

Q   How so?  How is he related to you?

A   He's my little cousin.

Q   Your cousin?

A   Yes.

Q   And I think you called him your little cousin; right?

A   Yes.

Q   What does that mean?  That he's younger than you?

A   Yes.

Q   But in any event, it was at his house.  Do you remember when in 2009 that took place?

A   No.

Q   Was Mr. Garcia there?

A   I can't say that he was.

Q   Is that because you don't know or because he was not?

A   That's because I don't remember or I don't know.

Q   Okay.  What about the kickback meeting?

A   No, he wasn't there.

Q   You talked about a meth sale which I think involved you and somebody known as TC and Mr. Garcia; right?

A   Yes.

Q   Do you remember when that took place?

A   There was not all three of us together, no, I didn't say that.

Q   Okay.  Well, let's just talk about your involvement with Mr. Garcia in this meth sale; right?

A   Yes.

Q   Remember when that took place?

A   There was numerous times.

Q   Well, how many times were there?

A   A few.

Q   Well, how many times were there ones in which TC was involved?

A   None really with me.

Q   Why did you bring TC's name up at all when you talked about the deal that you and Mr. Garcia did?

A   I know that that's where he got it from and then I would split TC when he sold dope before.

Q   Okay.  All right.  With regard to -- how do you know Mr. Garcia -- on this occasion that you were talking with the prosecutor about, right, how do you know that he got those drugs -- dope is what you call it; right?

A   Yes.

Q   How do you know that he got that dope from TC?  How do you know that?

A   He told me.

Q   TC?

A   No.

Q   Did he tell you that he paid for it?

A   He didn't tell me.

Q   He didn't tell you.  Did he tell you that it was fronted to -- do you know what fronted means?

A   Yes.

Q   Did he tell you that it was fronted to him?

A   No, he didn't.

Q   What does fronted mean to you?

A   When you get something and you pay for it later.

Q   What was your involvement, then, with Mr. Garcia?

A   I'd go get dope from him.

Q   Sir?

A   I would go get dope fronted from him.

Q   You got dope fronted from Mr. Garcia?

A   Yes.

Q   Was that with regard to every dope deal that you did with Mr. Garcia?  Is that how it went down?  He fronted the dope to you?

A   Yeah.

Q   And then what did you do with that?

A   I went and sold it.

Q   I'm not particularly interested in what you sold it for; but when you get the money, right, what did you do with it?

A   I went back and paid Peter.

Q   And you -- did you pay him all the money that you made?

A   Yes.

Q   All --

A   All of it.

Q   So you never made any money for yourself?

A   Oh, I made money for myself; but I paid him all that I owed him.

Q   I understand you're a stand-up guy, you paid him everything you owed him; right?

A   Yes.

Q   And then you took the profits and you used it for yourself; right?

A   Yes.

Q   How much of those profits did you kick back to the

Diablos Viejos?

A    None.

Q    How about the LCC?

A    No.

Q    How about the Watsonvilles?

A    No, none.

Q    Well, how, if at all, did your sale of those drugs from which you profited benefit the Diablos Viejos?  If you know?

A    It didn't that I know of.

Q    Let's then move forward to June -- let's move forward, if we can, to June 8 of 2009.  All right?

THE COURT:  You know, I think -- I assume you're going to ask him a lot of questions.

MR. WACHTEL:  Your Honor, it will take some time.  We can't get done by 3.

THE COURT:  I think this is probably a little early; but we'll break here for the weekend, Ladies and Gentlemen.  Please remember and heed the admonition and I'll see you on Tuesday morning at 9:00.

(Jury excused for the weekend at 2:55 p.m.)

THE COURT:  I think it would be very helpful, at least for Mr. Wachtel and me, because you mentioned it, for the Government to prepare some kind of

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

illustrative exhibit that can be -- that the jury can also use with nicknames, real names, street names, you know.  I guess that Peter is Mr. Garcia.

MR. WACHTEL:  Yes, Your Honor, that is a nickname that he has.

THE COURT:  But, I mean, we're going to have other people come in who have plead guilty and are going to testify and they're going to use different names.  I really think that would be helpful.  You all -- Government knows who these people are.  I don't think that it's prejudicial to the Defendants for the jury to be able to know who's talking about whom.  Any objection to that, Val?

MR. WACHTEL:  No, Your Honor.  I -- once upon a time, I objected to that.  But I've learned it's the only sensible thing that you can do to help the jury and the lawyers.

MR. MANDELMAN:  I don't think it's necessary. I think it might be prejudicial unless -- I mean, the guys who are here can say what they're -- say how they're referred to --

THE COURT:  Well, they can say it, but the problem is there's so many names being thrown around and nicknames and street names that I -- at least I'm having trouble keeping track of it.  Mr. Wachtel is having

trouble keeping track of it. So, it's two to one.

MR. WACHTEL: I'm having trouble. And I have a street name, Judge. It's Val.

MR. SMITH: Your Honor, we'll prepare some sort of poster that has names, street names and photographs.

THE COURT: Well, I don't know whether it needs to be a poster or just something that can be handed out to the jurors. But show it to the defense counsel first so that they know what it is and we're all on the same page. Okay.

MR. MANDELMAN: Judge, I've got just three real brief -- they're related. Just three sort of discovery issues.

THE COURT: Yes.

MR. MANDELMAN: Mr. Wright testified here at the end -- and I think Aaron asked him if he had some agreement with Shane Webb where he got community corrections. I've sort of made this point earlier and I'm going to just renew it for these witnesses that have prior agreements with the state. This is a case where the United States has basically adopted a state prosecution. These guys have long term relationships with folks in Ford County. If they've got prior cooperation agreements, I need them.

THE COURT:  I don't know about prior cooperation agreements.  What do you mean by that?

MR. MANDELMAN:  Well, I think if they've testified for the Government before in any capacity, but certainly, I mean, I'm -- it shows prior relationships with these very same law enforcement officers.  I think any prior cooperation in Ford County.  Now, if someone cut a deal in Florida, maybe that's just beyond.  But a Ford County deal in any capacity, I think we're entitled to.  And especially when a guy comes on the stand here and testifies he got community corrections.  I've got no idea, Judge.

MR. SMITH:  Your Honor, we disclosed in discovery a document here that was prepared by Scott James, the Assistant Ford County Attorney, that has listed not only agreements that they have had, but crimes of dishonesty and false statement for any defendant that has been involved in this case and witnesses.

THE COURT:  How about any witnesses?

MR. SMITH:  And witnesses.  There are witnesses listed in this document.  When I asked Mr. Wright the question about whether he received corrections for any case, I was referring directly to this document.  It reads plea agreement --

THE COURT: Well, I know you did it. And make a copy for Joel so that he has it.

MR. WELCH: He has it, Judge.

MR. MANDELMAN: This is like --

THE COURT: Make another copy for him.

MR. MANDELMAN: This is like one -- this is not the agreement. It just -- it lists the case.

THE COURT: Well, doesn't it say that there was an agreement in the case?

MR. MANDELMAN: Go ahead and produce that. I want that document introduced. Introduce it.

MR. SMITH: No. It says: Agreed to community corrections as opposed to DOC in 09 CR 535 and 10 CR 388. That contains all the information necessary for that defendant to be cross-examined and any bias. We do not have any written document. They have, they have a videotape of the -- of the interview when they were discussing the agreement.

MR. MANDELMAN: In Dodge City you can just --

THE COURT: I don't know. But I agree that they're entitled to it. You know you have to give it to them. I don't know exactly what form it's in. I think probably in state court maybe they don't use formal agreements like we have here. I don't know. Thankfully, I don't have to worry too much about state

court. But I want the defense counsel to have access to whatever information that the Government has and whatever form it's in with respect to any agreements that Government witnesses have made with the people out in Ford County. I mean, my guess is that, you know, they agreed to dismiss some charges in Ford County in favor of the charges here. I don't know. But you all know. And I want the defense counsel to have that. I don't think it means a lot to the jury but they're still entitled to it.

MR. MANDELMAN: Okay. There's one other issue. There's a reference earlier made to a bank ledger kept by Jason Najera. Now, we've been provided basically, I don't know, 17 discs worth of discovery in 38 counts with 23 defendants. I mean, it's -- basically we got like a key to the Library of Congress. I mean, there's tons -- there's tens of thousands of pages of documents.

THE COURT: Okay.

MR. MANDELMAN: I don't know what's on that disc if it doesn't have anything to do with this case or with these -- the Defendants being tried. This is something buried in a Jason Najera folder that's been disclosed. I believe -- if the Government says it's been disclosed, I believe it. But I --

THE COURT:  Okay.

MR. MANDELMAN:  I mean, I don't have the resources to go through every one of those files if they're gonna start introducing some gang stuff that's been on one of these 17 discs that's not disclosed in that document 633 --

THE COURT:  How are they going to get something that Jason Najera kept -- a bank statement of Jason Najera's into evidence?

MR. MANDELMAN:  They may not be able to but there's already been testimony about it.  I didn't even know --

THE COURT:  There was?

MR. MANDELMAN:  -- it existed.

THE COURT:  I must have been asleep during that testimony.

MR. HENRY:  It was Shane Webb's testimony and it was regarding something out of a safe that was found --

MR. MANDELMAN:  In a search warrant.

MR. HENRY:  -- in a search warrant in a separate case a number of years ago but yet it keeps getting referred to as being the rules or something of the Nortenos.

THE COURT:  That's -- you mentioned bank

statement.

MR. MANDELMAN: Well, a ledger. I mean, I'm not trying to mischaracterize it. I don't even know what it is.

THE COURT: Well, I don't ever -- look, I expect you guys to somehow work together in these matters. And if you think that there is such a document, then ask 'em, and I want them to point it out in whatever format so you can find it and look at it. Okay. But they've -- here's the deal. And I don't want to belabor this. They've disclosed all this information to you. And there's been plenty of time in this case to go through a lot of things. And the public defender has an investigator, at least one, who can go through all this stuff, too. So I'm not particularly in favor of these arguments that, well, we've got all kinds of information but we don't know what's there.

MR. MANDELMAN: I can provide -- I mean, really, this is -- we've got 17 at least -- is that how many discs -- I don't know.

MR. SMITH: 29 discs --

THE COURT: But, you know, that's what these cases are about. The Government gives you the information. The Government doesn't have to sit down with you and go through it with you.

MR. MANDELMAN:  Well, some of it -- I don't want to either.  It's nested somewhere.  I mean, I just have no -- I don't have -- we're stuck --

THE COURT:  Well, all --

MR. SMITH:  I will find out where it is and point it out.

THE COURT:  -- I can say at this point is if there's some sort of rules for the DV or the LCC that you're aware of that you can put your finger on that's in this information that's been disclosed, I want you to find it and give it to defense counsel.  Okay?

MR. SMITH:  It was a ledger, Your Honor.

THE COURT:  A ledger.  Whatever it is.  Okay.  Anything else?

MR. MANDELMAN:  Well, there is one other thing.

THE COURT:  You've got three days here.

MR. MANDELMAN:  Yeah, I know, so -- maybe they disclosed --

THE COURT:  The thing is, you know this, you're experienced, you want them to disclose everything and they do disclose everything.  If they hadn't disclosed it then you'd be telling me that they didn't disclose it.

MR. MANDELMAN:  Well, I think -- I'm not being

silly -- but it's tantamount to, when it's buried in that many discs, 39 discs, nested in hundreds of folders, it's tantamount to not --

THE COURT: Well, it may be the only way they know how to put it together.

MR. MANDELMAN: Well, they did organize stuff for this case, which, I mean, I've been able to sort of follow. This is a codefendant who's not on trial here.

THE COURT: Yeah. And he's -- well, do your best, gentlemen. Try to work this out. I know that this is a criminal case. I know the Government has the burden. I know the defense doesn't have the burden. Yeah, yeah. But you can still talk to each other and try to work together on these discreet problems. Right? Tim?

MR. HENRY: I try to do my best.

THE COURT: You always do.

MR. MANDELMAN: Well, the last issue I have is David Ochoa's testimony. He was announced as a witness. He is not a defendant in this case and I also don't know anything about Mr. Ochoa.

THE COURT: I don't either.

MR. SMITH: Mr. Ochoa has been debriefed. There are at least two written debriefings that have been provided. It was on supplemental disc either 12,

13 or 14 in a folder titled "post arrest proffered narratives".  There are two documents that contain the debriefing of David Ochoa.

THE COURT:  Did you give 'em an index of some kind?

MR. SMITH:  No, we did not; but I labeled each individual folder according to either whom it pertained to or the type of evidence it was or what counts it pertained to.

THE COURT:  How much trouble would it be for you, because you've got other cases coming along, okay, which I assume the discovery is very similar, to prepare an index of what's on each of these 39 or whatever it is discs?

MR. SMITH:  Would the index need to title every file that is contained on all the discs?

THE COURT:  I don't know what -- how you would do it but -- thankfully, I don't have to look at this stuff.  But it would be helpful, I think, to do it that way.

MR. MANDELMAN:  Yeah, I mean, I'm sympathetic --

THE COURT:  I don't know how much trouble it would be to do it in the middle of a trial.  I'm just saying that this is not the last of these cases.

MR. SMITH:  Your Honor, it would probably take dozens of hours to do so; but I will point out any piece of evidence they specifically have a question about and I will find it on the disc.

THE COURT:  All right.  You are a living -- then Mr. Smith is a living index and you can ask him and he knows where all the stuff is and he'll be happy to find it.  Okay?

MR. MANDELMAN:  Thanks, Judge.

MR. WACHTEL:  He is pretty good at it.

MR. MANDELMAN:  I mean, that's the issue, it is that big.  It would take 'em a long time because I -- we still don't know all the stuff that's on there.

THE COURT:  I don't either.

MR. MANDELMAN:  Thank you.  Have a good weekend.

(Recessed for the weekend at 3:05 p.m.)

(Beginning at 9:08 a.m. October 8, 2013, the following proceedings continued.)

THE COURT:  Mr. Wright, you're still under oath.  I'm sure you understand that.  All right.

MR. WACHTEL:  Thank you, Your Honor.

**CONTINUED CROSS EXAMINATION**

BY MR. WACHTEL:

Q   Mr. Wright, you look a bit cold.  Are you okay?

A   Yeah, I'm all right.

Q   When you testified here on Friday and kept using the name Peter, by your use of the name Peter, did you mean Pedro Garcia?

A   Yes.

Q   You have relatives that are DV gang members; right?

A   Yes.

Q   Russell Worthey is a member?

A   Yes.

Q   And Antonio Worthey is a member?

A   Yes.

Q   And Enrique Gobin?

A   Yes.

Q   And Lorenzo Gobin?

A   Yes.

Q   And those are your cousins; right?

A   Russell and Antonio are my blood cousins.

Q   And the other two?

A   Through marriage.

Q   You have any other relatives that are in the DV gang?

A   No.

Q   You're not related to Mr. Garcia?

A   No.

Q   And you're not related to Mr. Ramirez?

A   No.

Q   Is Mr. Garcia's nickname Peter?  Is that why you call him that?

A   Yes.

Q   Did you ever call him -- have you ever called him Pistol Pete?

A   No.  I've heard of him called that; but I've never called him that.

Q   And you've never said that to his face?

A   No.

Q   Do you remember in September of 2010 being interviewed in Woodward, Oklahoma, about this case?

A   Yes.

Q   Do you remember being interviewed by Detective Bice and Detective Webb?

A   Yes.

Q   I think you were interviewed at the Sheriff's Office.  Why were you at the Sheriff's Office in Woodward, Oklahoma?

A   I got arrested.  I had warrants.  I ran from Dodge and that's where I went.

Q   The warrant was for what?

A   For my possession of firearm and sales of methamphetamine.

Q   Was it for violating probation or was it for committing that crime?

A   Well, they let me out for this and then I took off.

Q   Let you out for this?

A   Well, for my testimony, they let me out.

Q   They let you out of jail or prison?

A   Out of jail.

Q   Who's they?

A   The DA in Dodge and the judge.

Q   Do you know whether or not the United States Attorney's Office knew that that was gonna happen?

A   No, I don't.

Q   Do you know if Detective Webb knew that that was going to happen?

A   Yeah, he was one of 'em that did it.

Q   I don't understand.  He's one of them that did it.
What --

A    Well, he's one of 'em that made a deal with me or whatever.

Q    He made a deal with you?

A    Yeah.

Q    And part of that deal was that you weren't going to spend any more time in prison for state crimes that you had committed?  Is that what part of the deal was?

A    Yes.

Q    How much time did you spend out of prison before you decided to run away?

A    How long was I out?

Q    Yes, sir.

A    Nine months.

Q    In any event -- and thank you very much for your testimony.  In any event, going back to Woodward County. I think that at that point in time you were asked about the shooting, weren't you?

A    Yes.

Q    And you said you didn't know anything about it, did you?

A    Yes.

Q    And you said that more than once?

A    Yes.

Q    And you told whoever was questioning you that you were telling them the truth; right?

A   Yes.

Q   Were you telling them the truth?

A   No.

Q   Now, you have an agreement with the Government to cooperate in this case; right?

A   Yes.

Q   Have you ever cooperated in any other case than this?  And by this I mean this whole -- this whole case in which you're a defendant.  Have you ever cooperated with the authorities and given testimony in any other case?

A   No.

Q   I'm sorry.

A   No.

Q   Not a case involving -- in Dodge City involving Scott Everett?

A   No.

Q   Well, let's talk a little bit, then, about the charges in this case.  All right?  Do you remember what you were originally charged with?

A   No.

Q   Well, let's see, do you remember being charged with racketeering conspiracy, Count 1?

A   Yes.

Q   Do you remember being charged with conspiracy to

commit murder, Count 2?

A   Yes.

Q   Do you remember being charged with the murder of Israel Peralta?

A   Yeah.

Q   That's Count 3; right?

A   Yes.

Q   Do you remember being charged with the attempted murders of Mr. Sorono and Mr. Faustino Peralta and Mr. Robert Arco?

A   No.

Q   Sir?

A   I don't --

Q   Roberto Arco.  I'm sorry.  You don't remember that?

A   I don't remember the names, no.

Q   But you were charged with attempted murder of three people; right?

A   Yes.

Q   Do you remember being charged in Count 5 with assault with a dangerous weapon?

A   Yes.

Q   And you remember being charged in Count 6 with possession and discharge of a weapon in furtherance of a crime of violence?

A   Yes.

Q   Now, you entered into a plea agreement with the Government; right?

A   Yes.

Q   And that Plea Agreement should be in front of you on this witness stand.  I believe it is Exhibit 155.  Am I right?

A   Yes.

Q   And that Plea Agreement contains what it is that you're going to do for the Government; right?

A   Yes.

Q   And what it is the Government is going to do for you in exchange for your testimony?

A   Yes.

Q   And as a part of that Plea Agreement, you plead guilty to Count 1 and Count 6; right?

A   Yes.

Q   Count 1 being racketeering conspiracy?

A   Yes.

Q   And Count 6 being use -- discharge of a weapon in furtherance of a crime of violence; right?

A   Yes.

Q   Do you remember what the maximum penalty was that you could have -- that you could receive for being convicted of Count 1?  Maximum penalty?

A   20 years I think.

Q   Not more than 20 years; right?

A   Yes.

Q   You remember what the maximum penalty is you could
be -- you could serve for being convicted of Count 2?

A   No.

Q   Was it not less than ten nor more than life?

A   Oh, yes.

Q   Now, the Plea Agreement contains some other things
also.  For example, if you look at Page -- if you go --
the second page, Page 2 at the top of that agreement.
And take a look at Paragraph 2.  Let me know when you're
there.

A   All right.

Q   Okay.  Paragraph 2 is titled "Factual Basis for the
Guilty Plea".  Right?

A   Yes.

Q   Now, you signed this guilty plea when you sat at
that table right there and plead guilty in this case;
correct?

A   Yes.

Q   But before you signed it, you talked with people
about it, talked with your lawyer about it?

A   Yes.

Q   You talked with the Government about it?

A   Yes.

Q   You understood -- in fact, before you plead guilty, Judge Belot had you stand up, raise your right hand and take an oath to tell the truth; right?

A   Yes.

Q   Now, with regard to the factual basis for the guilty plea, which covers pretty much two pages, did your lawyer write out the factual basis for your guilty plea?

A   I think so.

Q   You think so.  You didn't write it though; right?

A   No.

Q   Do you have any reason to believe that the Government wrote it?

A   I don't know who wrote it, honestly.

Q   But in any event, you knew that the factual basis for that guilty plea was gonna be used so that the Court could find you guilty of the crimes that you were pleading guilty to; right?

A   Yes.

Q   Did you read it?  The factual basis?

A   I went over it with my attorney, yes.

Q   Yeah, I know you did; but did you read it?

A   Yes.

Q   Well -- and you knew that Judge Belot was going to accept this because you swore that you were gonna tell the truth and that this was correct; right?

A    Yes.

Q    But it's not correct, is it?

A    Yeah.

Q    Well, for example, if you go on Page 2 to the one, two, third paragraph, and the sixth line of that paragraph, reads, "At some point thereafter Garcia or Ramirez suggested that the four Nortenos go look for some Sureno gang members."  Do you see that?

A    Yes.

Q    Did I read that correctly?

A    Yes.

Q    Well, in point of fact, you don't know who it was that said let's go look for some scraps, do you?

A    Yeah.

Q    You do?

A    Well, I'm, I'm pretty sure; but I'm not 100% sure, no.

Q    Have you ever told anyone -- let me rephrase that. Do you remember talking to the grand jury in this case?

A    Yes.

Q    Do you remember whether or not you told the grand jury that you didn't know who it was that said that?

A    No.

Q    Did you once know the answer to that question and have you now forgotten?

A    It's been a long time.

Q    So that's a yes; right?

        MR. WACHTEL:  Permission to approach, Your Honor.

        THE COURT:  Yes, sir.

        MR. WACHTEL:  Excuse me.  I just need to find my place.  I'm sorry for delaying things.

BY MR. WACHTEL:

Q    I'm going to hand you what's a copy of your testimony that you gave to the grand jury and ask you to take a look at Page 51 and read that page to yourself.

     Have you read it?

A    Yes.

Q    Is your recollection now refreshed about what you told that grand jury about who said let's go look for some scraps?

A    Yeah.

Q    What did you tell 'em?

A    I told 'em that it was Peter, I think it was Peter.

Q    Told 'em I think it was Peter; right?

A    Yes.

Q    Did you again talk to the grand jury about who it was that suggested that you go and look for some scraps? You remember talking about that again to the grand jury?

A    I don't remember.

Q   Remember telling the grand jury that -- you remember being asked the question:  And Russell said let's get some scraps?  You remember that?

A   No.

Q   So you don't remember that?  You don't remember your answer; right?

A   No.

MR. WACHTEL:  Permission, Your Honor.

THE COURT:  Yes.

BY MR. WACHTEL:

Q   I'm going to hand you again a copy of your grand jury testimony.  Direct your attention to Page 69 and ask you to read to yourself Lines 3 through 10.

Have you done that?

A   Yeah.

Q   Do you now remember being asked that question?

A   I still don't remember it, no, but --

Q   You don't.  So you don't remember being asked at the grand jury:  And Russell said let's go get some scraps; right?

A   No, I don't remember it.

Q   And you don't remember saying yes to that question?

A   No, I don't.

Q   Well, if you don't remember that now, how did you remember that well enough -- excuse me -- how did you

come at the time of your plea to tell this judge that it was either Garcia or Ramirez who suggested you go look for some scraps?

A   I said I don't remember being asked the question. But I remember that the statement was made.

Q   I'm sorry, sir.  You've lost me.  Which statement is that?

A   When Peter said let's go look for some scraps.

Q   Let's go back to your Plea Agreement if we can.  Do you remember -- as a part of your Plea Agreement, as a part of your plea, four counts of this -- of this case were dismissed as to you.  Right?

A   Yeah.

Q   And what you did was plead guilty to Count 1 and Count 6; right?

A   Yes.

Q   And then did that -- those other counts were dismissed against you in exchange for your cooperating in this case; right?

A   Yes.

Q   Do you know how much time you would have spent had you gone to trial and been convicted of all of those crimes?

A   The rest of my life.

Q   But you don't expect to spend the rest of your life

in prison now, do you?

A   I honestly don't know how long I'm going to spend.

Q   Well, let's see what the Plea Agreement says about that.  And it's in front of you so feel free to look at it if you wish.  Because you'll find the Government's agreements on Page 5 of 11 at Paragraph 5.  Let me know when you're there.

A   Yeah.

Q   So the Government agreed not to file any more charges against you no matter what you'd done; right?

A   Yes.

Q   They agreed to recommend a sentence at the low end of the applicable guideline range; right?  That was B?

A   Yes.

Q   Do you know what that even means?

A   No.

Q   Do you know that people are sentenced in federal court based on sentencing guidelines?

A   Yes.

Q   And those guidelines depend upon a person's criminal history and other things saying how much time is recommended that that person serve?

A   Yes.

Q   Yes?

A   Yes.

Q   And you discussed that with somebody before you signed this Plea Agreement; right?

A   My attorney.

Q   They also recommend -- Government also recommends to give you a two-level reduction under the guidelines for acceptance of responsibility.  And if your offense level was greater than 16, they would move at the time of sentencing to give you one more level reduction; right?

A   Yes.

Q   Now, do you know what getting these reductions does for you in terms of your sentence?

A   Gives me lesser time.

Q   Gives you less time.  And you knew that before you signed this agreement; right?

A   Yes.

Q   Government also agreed, though it's a little difficult to find, to dismiss all these other charges that they had against you; right?

A   Yes.

Q   The Government -- in exchange for that, there was some agreements that you made; right?

A   Yes.

Q   Agreed to provide truthful, complete and accurate information and testimony about this case; right?

A   Yes.

Q   You agreed to provide all the information concerning your knowledge about this case; right?

A   Yes.

Q   And now look at Paragraph 7 on Page 7 of 11.  Let me know when you've found it.

A   All right.

Q   Now, in the process of agreeing to enter a guilty plea, you talked with the Government -- because you did talk to agents of the Government about this, didn't you?

A   Yes.

Q   You talked to their lawyers?

A   Yes.

Q   You talked to the law enforcement agents; right?

A   Yes.

Q   And you talked about a thing called substantial assistance, didn't you?

A   Yes.

Q   Yeah.  And did you have an understanding of what substantial assistance was?

A   Yes.

Q   What did you understand it to be?

A   That they'll file a 5(k)(1) motion.

Q   Okay.  You understood -- let me see if I can -- you understood that the Government had the ability, if they were willing to, to file a motion to get your sentence

further reduced; right?

A   Yes.

Q   And you knew that only the Government can file that motion, didn't you?

A   Yes.

Q   You knew your lawyer couldn't do it; right?

A   Yes.

Q   You know Judge Belot couldn't do it on his own, didn't you?

A   Yes.

Q   In fact, in your Plea Agreement, Paragraph 7 acknowledges that you've already -- before you got here today, you've already provided substantial assistance. Remember that?

A   Yes.

Q   So by covering this Plea Agreement, just the Plea Agreement, have we covered every benefit that you have received in exchange for your testimony in this case?

A   Yes, I think so.

Q   You think so.  Okay.  Well, one of the benefits I think you told us about earlier today that you received was you got let out of either prison -- out of jail in Dodge City; right?

A   That was for the state, yes.

Q   But that was for cooperating in this case; right?

A    Yes.

Q    So you cooperated and they let you out of jail?

A    Yes.

Q    Did you get any other benefits that you can recall?

A    No.

Q    Do you remember not long before you testified to the grand jury being interviewed by Detective Webb and you were in the presence of several other people?  For example, your lawyer was there?

A    Yes.

Q    Uh-huh.  And there were two other people there; right?

A    Yes.

Q    Was one of them an Assistant County Attorney?  If you know.

A    There was the federal district attorneys.

Q    One of these gentlemen seated over here?

A    Are you talking about in the state?

Q    Yeah, I -- that's probably an unfair question.  In connection with this case and before you talked to the grand jury, you were interviewed by law enforcement and by several other people; right?

A    Yes.

Q    And on one occasion you were interviewed by, by Detective Webb when your lawyer was present, and you

were there, of course, and there were two other folks present.  Do you remember that?

A    I remember whenever there was one, a state DA and me and Webb and my lawyer.

Q    Well, do you remember talking with those people?

A    Yes.

Q    And expressing a concern as to whether or not the judge was going to do what the Government asked them to do with regard -- what the Government asked him to do with regard to your sentence.  You remember that?

A    Uhm, I don't remember.

           MR. WACHTEL:  Permission to approach, Your Honor.

BY MR. WACHTEL:

Q    I'm going to show you a transcript of that statement.  I'm sorry, it's not dated, and ask you to take a look at the first two pages.  Go ahead and take a look at those and let me know when you're done.

                (Off-the-record discussion
                 between Mr. Wachtel and
                 Mr. Smith.)

A    Yes.

Q    The Government reminded me, the date of this interview was September 14th of 2010.  Now, do you remember, after looking at that, do you remember talking

Q About whether or not the judge was going to do what everybody wanted them to do; right?

A Yes.

Q Do you remember someone -- you remember one of the people present telling you that if we both say -- I'm assuming that that means both prosecutors or -- both prosecutors say -- we go to the judge and we both say, you know, that it's our agreement and this is, is why, I don't see any reason why the judge wouldn't follow it. You remember that?

A Yes.

Q And you trusted that and you believed that that's what the judge would do; right?

A Yes.

Q And in exchange for your belief in that, you cooperated in this case; right?

A Yes.

Q Do you remember being concerned about your wife?

A What about her?

Q Well, was your wife facing any criminal charges in Dodge City?

A Uhm, possession of marijuana I think.

Q Have those charges yet been filed?

A    No.

Q    Did someone promise you in exchange for your testimony that if those charges were filed and if she was convicted, they could see that she would do no time?

A    Yes.

Q    Remember who made that promise to you?

A    I think it was the DA.

Q    What about the promise that if we both agree and ask the judge for a particular sentence that the judge would follow it.  Who made that promise to you?

A    I think it was the DA.

Q    The DA?

A    I think so.

Q    Isn't it in fact the case that on the day that this homicide in Dodge City occurred that you and Mr. Worthey drove through that part of the trailer complex that you don't live in because you were looking for scraps to get?

A    No.  We were just drivin' around.

Q    Why would you drive through the rest of the trailer court if you lived across the street from it?

A    People cruise all the time.

Q    You remember how Mr. Worthey's hair was cut on that day?

A    I think he had a Mongolian I think.

Q   Mongolian is a pretty noticeable haircut; right?

A   Yeah.

Q   What's it look like?

A   It's a tail from the top of your head.

Q   And you remember which part of the car he was sitting in when you drove through that trailer park?

A   In the passenger side.

Q   You drove right past those people that you eventually came back and helped kill; right?

A   Yes.

Q   You see any gang signs thrown up by them?

A   No.

Q   How about by Russell?

A   No.

Q   Were you watching Russell closely?

A   No.

Q   Now, you also told this Court that later on that evening a decision was made to go back to that trailer park.

A   Yes.

Q   And that was Russell's decision, wasn't it?

A   I can't say that.

        MR. WACHTEL:  Permission to approach again, Your Honor.

        THE COURT:  Yes.

BY MR. WACHTEL:

Q I'll show you again Page 69 of your grand jury testimony. You've looked at it before?

A Yes.

Q Does that refresh your recollection of whether or not you told the grand jury that it was Russell's idea to go to that trailer park?

MR. SMITH: Objection. Asked and answered.

THE COURT: Overruled.

A Yes.

BY MR. WACHTEL:

Q So when you tell this jury and these prosecutors that it was somebody's idea other than Russell, you're still trying to protect Russell, aren't you?

A No.

Q No. Oh, yeah, and I understand your testimony is that Russell on that day didn't have a gun; right?

A No, he didn't.

Q How is it that you know this?

A Because he had been with me.

Q Did he stay with you the night before?

A No.

Q Come over to your house?

A No. I went to his house.

Q Went to his house to pick him up?

A   Yes.

Q   Were you outside and he came out?

A   Yes.

MR. WACHTEL:  I don't think I have any other questions.  Thank you very much.

THE COURT:  Mr. Mandelman.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   I'm Joel Mandelman.  I'm the attorney who's representing, uhm, Gonzalo Ramirez with Tim Henry. You're five feet ten inches tall?

A   I think, approximately that.

Q   Uhm, the party that you referred to -- those two meetings, the one at Russell's and the one at TC's, Mr. Ramirez wasn't at either of those?

A   No.

Q   Uhm, the car that you drove the night of the homicide, it was your girlfriend's Mazda?

A   It was my wife's, yes.

Q   Were you married at the time?

A   Uhm, no.

Q   Okay.  At the time, it was your girlfriend now your wife?

A   Yes.

Q   And that car subsequently ended up in a scrapyard

before the police could examine it?

A   Yes.

Q   Uhm, I want to talk about your record.

A   About my what?

Q   About your record.  Uhm, let me just start with your adult felony record.  You've got five state court adult felonies; is that right?  Is that correct?

A   Yes.

Q   The first one is that 2005 case?  You made reference to it earlier.  Involved the pipe?

A   Yes.

Q   You remember that incident?

A   Yes.

Q   You were the driver of your girlfriend's car?

A   Yes.

Q   You got pulled over and the police saw white powdery substance on you?

A   No.

        MR. SMITH:  Objection to the relevance of the substance behind the convictions as it pertains to the convictions.

        MR. MANDELMAN:  Your Honor, Mr. Wright's role in this homicide and his candor or lack of candor with law enforcement are the central issues in this case.

        THE COURT:  I agree with that.  But I don't

understand what the relevance of the circumstances behind his prior conviction is.

MR. MANDELMAN:  When he was -- well, I can ask maybe one question and clear it up.  Otherwise, I'll just move on.

THE COURT:  Go ahead.  I think that's the way to do it.

BY MR. MANDELMAN:

Q   When you were -- when you were pulled over, the officer asked you -- they did a search of your vehicle. They found a pipe in the car.  And you told the officer that other people have access to that car?

A   Yes.

Q   And then you ended up pleading guilty to that pipe?

A   Yes.

Q   Okay.  That's all I wanted to know about that case. Uhm, at this time -- this is --

MR. MANDELMAN:  These are certified copies. Your Honor.  I'm going to move to introduce certified copies of the judgments from Mr. Wright's five adult felony convictions.  It's just a copy of the state court judgments from those cases.  There's nothing else in the record other than --

THE COURT:  Well, any objection?

MR. SMITH:  Your Honor, I object to the

admission of the last two, which appear to be crimes that have nothing to do with drug offenses or his -- they don't appear to have anything to do with this case, these two.

THE COURT:  I don't know what they are. You'll have to bring them up and let me look at them.

MR. SMITH:  Do you want to approach?

MR. MANDELMAN:  Yeah.

MR. SMITH:  I have no objection to those.  I object to these.

MR. MANDELMAN:  The 10 case and then this Oklahoma case.

MR. SMITH:  Yeah.

THE COURT:  I think what you need to do is first of all mark the ones that there are no objection to.

MR. MANDELMAN:  I'm going to go ahead and have Lorraine mark them.

THE COURT:  Well, have Lorraine do it then. And then have Lorraine mark these and then bring them back up and I'll make a ruling.  Otherwise, it's just referring to these and those and nobody knows what anybody is talking about.

MR. MANDELMAN:  Yeah.  That's not good.  Okay. I'll just call these 1 -- is that okay?  1, 2.  Is that

going to be confusing?

MR. SMITH:  How about A and B and C.

MR. MANDELMAN:  I don't know if I'm going to get up to 26 or not.

THE COURT:  Well, I think the Government's are numerical.  I think that --

MR. MANDELMAN:  We'll do AA.

THE COURT:  But you've got another defendant here so I think what these ought to -- Tim, or, rather, Val, I think to make the record clear, I think the way to do this is to mark Ramirez Exhibit, Garcia Exhibit, so that -- you can use letters if you want.

MR. WACHTEL:  I think it's easy enough to write Garcia exhibit, Garcia A, Garcia B, like that.  If the mark itself -- the sticker itself says defendant.

THE COURT:  I think so.  Any problem with that?

MR. HENRY:  Unless we're going to go over 26 exhibits.  Then it might be better to do Garcia is 1 or Ramirez 1.

MR. MANDELMAN:  I can be AA.

THE COURT:  Yes.  AA is fine.

MR. MANDELMAN:  This will be Ramirez A.

THE COURT:  I just want the record to be clear.

MR. WACHTEL:  Thank you, Judge.

MR. MANDELMAN:  Ramirez A, Ramirez B, Ramirez C, Ramirez D.

THE COURT:  And those -- there are no objections to A through D; correct?

MR. MANDELMAN:  These are the ones I marked.

MR. SMITH:  I do not object to Ramirez A.  I do not object to Ramirez B.  I do not object to Ramirez C and --

MR. MANDELMAN:  I think that was just the dismissal.

MR. SMITH:  I am unsure of what Ramirez D even pertains to.  So I object at this moment.

THE COURT:  Let me see D, Joel.

MR. MANDELMAN:  This was -- there's -- well, it may need to wait for that one until the rest of that case sort of --

THE COURT:  All right.  Well, A, B and C are received.  Now --

MR. MANDELMAN:  Yeah, and let's get to E and F.  And these are both crimes involving dishonesty.

THE COURT:  Let me see them.

MR. MANDELMAN:  Yeah.  Those are both crimes involving dishonesty.  One is tampering and he gave a bogus name.

THE COURT:  E and F are received.  Here they are.  I don't want them.

MR. MANDELMAN:  Okay.

MR. SMITH:  That's my copies.

THE COURT:  A through C and E and F are received.

MR. MANDELMAN:  How did we end up all mixed up like this.  I apologize.

(Thereupon, the following proceedings continued in the hearing of the jury.)

THE COURT:  I don't want these.

MR. MANDELMAN:  Where are we keeping the evidence then?  I'm just moving them into the record. Should I just set them up on the table.

THE COURT:  I don't care what you do with them.  I don't want them up here on the bench.  I thought you were going to show them to the witness.

MR. MANDELMAN:  I'm going to ask him questions about the actual incidents; but the judgments are just judgments.  They can go back with the jury.

THE COURT:  All right.

BY MR. MANDELMAN:

Q   Okay.  I want to go ahead and just move forward to 2009.

A    Okay.

Q    Can you go ahead and pull up the time line.  And actually -- wait, before you pull it up.  Let me give a copy to the prosecution.

MR. MANDELMAN:  I've prepared a demonstrative exhibit that I just wanted to show to the Government prior to showing it to the jury.

THE COURT:  Well, you just showed it to them. What does Mr. Smith say about it?

MR. SMITH:  Well, I object to some of the content, some of the verbiage that's used in some of the boxes.  And also some of the information on here has not been asked about nor admitted or brought before the court.

THE COURT:  All right.  Well, here's the way we're going to have to do this.  Otherwise, this case is going to last until Christmas.  You're going to have to show -- defense counsel are going to have to show proposed exhibits to the Government before they offer them, and particularly demonstrative exhibits which, by the way, Ladies and Gentlemen, aren't exhibits -- they're exactly what they say.  They're to demonstrate, kind of to summarize something.  But it's very unlikely that the exhibit itself will go back to the jury with you because it's something the lawyers have prepared to

help you.  It's not evidence.  But if they're accurate, then they're acceptable.  They help you.  But they're not evidence.  So, go over that at the recess or over the noon hour with Mr. Smith and clean it up and if there's problems, bring it up and I'll try to work it out.

MR. MANDELMAN:  Well, I think it would be helpful.  I can ask Mr. Wright enough questions to put in the foundation to clarify the dates and then display it once that foundation has been laid.

THE COURT:  Well, okay.  But -- doesn't sound to me like that's going to work but you can try it if you want.

BY MR. MANDELMAN:

Q   When did you get out of Lansing?

A   In January of 2009.

Q   And then in April you were accused of selling meth. Do you remember that?

A   Yes.

Q   That's 09 CR 414?

A   Yes.

Q   And then the homicide in this case occurred on June 8th, 2009?

A   Yes.

Q   And then three months later you're involved in an

incident at WalMart.  Do you remember that?

A    Yes.

Q    There was a warrant out for your arrest?

A    Yes.

Q    And you saw a police officer?

A    Yes.

Q    And you took off?

A    Yes.

Q    And you started pitching stuff from your pocket?

A    Yes.

Q    And then you ended up in the back of a cruiser?

A    Yes.

Q    And then in the back of the cruiser you dumped some drugs and a .25 caliber handgun?

       MR. SMITH:  Your Honor, I object to the substance.  He has admitted his criminal history, convictions and/or the fact that he has been arrested for certain crimes; but now we're getting into the background of each criminal act that the witness has been involved in.

       THE COURT:  I agree.  I don't think that getting into the details behind the convictions is relevant, with one exception.  If it goes to credibility, then that's different.  But just dropping drugs in the back of a police cruiser doesn't have

anything to do with what this case is about.

MR. MANDELMAN: Your Honor, he also was accused of dumping a handgun, which is what this case is about.

MR. SMITH: Your Honor, he admitted his conviction for possession of -- criminal possession of a firearm.

THE COURT: If that's the conviction, then that's what it is. The jury will know that he has been convicted of possessing a handgun. You don't need to go into the details about it.

MR. MANDELMAN: Well -- moving on.

BY MR. MANDELMAN:

Q October 17th -- pardon -- October 17, 2009, you were accused of discharging a firearm in the same trailer park where this homicide took place?

A Accused, yes.

Q There was a Sureno gang member who came over to your house?

A Yes.

Q And apparently threw some rocks at the house?

A Yes.

Q And then you were arrested for discharging a firearm?

A Yes.

Q   Later that night, Russell, Russell's wife, Juan and Antonio Worthey were all over at your house?

A   Yes.

MR. SMITH:  Objection to relevance.

THE COURT:  Is this going to lead to -- or whatever went on that night going to be the subject of a conviction?

MR. MANDELMAN:  Well, again, the incident goes to his participation; but he also entered, entered into a plea agreement which I'm going to discuss.

THE COURT:  Does the plea agreement deal with whatever went on over at the house that night?

MR. MANDELMAN:  Yes.

THE COURT:  Go ahead.

BY MR. MANDELMAN:

Q   I'm going to get back to that --

THE COURT:  Be brief about it.

MR. MANDELMAN:  Yeah.  I, I'm going to get back to it.  I just want to keep moving through this chronology.

BY MR. MANDELMAN:

Q   January 26, 2010, you enter into a plea agreement covering those three cases?  The case where you're accused of selling dope; the case with the firearm in the back of the police cruiser; and the case in which

you were accused of discharging a firearm.

A   No.  I don't think so.

Q   You don't remember the dates?

A   No, I, I didn't take a plea for discharging a firearm.

MR. MANDELMAN:  Permission to approach.

THE COURT:  Yes, sir.

BY MR. MANDELMAN:

Q   Do you recognize that document?  It's three pages long.  Just go ahead and take a look at it.

A   Yeah, I think so.

Q   Well, there's a signature on that document.

A   Yeah.

Q   Is there a different Anthony Wright that was charged in those three cases?

A   No.

Q   Okay.  That was the plea agreement you reached in that case with the State of Kansas?

A   Yes.

Q   Go ahead and take your time.

A   Nothing about discharging a firearm.

MR. MANDELMAN:  Uhm, Your Honor, I move to introduce Defendant's Exhibit R-G.  I just put Ramirez G.

MR. SMITH:  No objection.

THE COURT: All right. R-G is received. And it's a state plea agreement. Is that what it is?

MR. MANDELMAN: Yes, Your Honor.

THE COURT: All right. Go ahead.

BY MR. MANDELMAN:

Q Just at the very top, just -- the very top, there's four -- there's three charges listed under 09 CR 414? Sale of meth, conspiracy to sell and then no drug stamp. Under charge 09 CR 466, possession of meth, criminal possession of a firearm, felony obstruction of official duty. You following that?

A Yes.

Q Am I reading that correctly?

A Yes.

Q And then current charges, 09 CR 535, criminal possession of a firearm. And that was the case we were talking about at the trailer park?

A Yes.

Q Now I'm at the next paragraph here. Terms?

A Yes.

Q And it looks to me on 09 CR 414 the defendant will plead guilty or no contest to Count 1, and in exchange Counts 2 and 3 will be dismissed.

A Yes.

Q Okay. Am I reading that correctly?

A    Yeah.

Q    On 09 CR 466, the defendant will plead guilty or no contest to Count 2, criminal possession of a firearm. In exchange for said plea, Counts 1 and 3 will be dismissed. And this case will be recommended to run concurrently with any sentences issued in 09 CR 414. What does concurrently mean?

A    Back together.

Q    Okay. They're going to run them all in? You're not going to get any additional time on the gun?

        MR. SMITH: Your Honor, the text of the document contains the terms of it and I believe that the exhibit speaks for itself at this point. Typically, extrinsic evidence of --

        MR. MANDELMAN: I just want to ask him about the -- I'll keep moving through this.

        THE COURT: Well, wait a minute. The exhibit is in evidence. The jury can read it. I thought you were offering this exhibit to show that something with respect to the discharge of the firearm had been dismissed or whatever.

        MR. MANDELMAN: Okay.

        THE COURT: If that's the case, then you can point that out to him; but let's not go through these exhibits line by line. I think the jury is certainly,

not now, later, will be able to read these and determine what happened.  They're pretty clear.

MR. MANDELMAN:  Okay.  Then, I'm at that point right now, Your Honor.  I apologize.  09 CR 535.  The defendant will agree to truthfully testify to events leading up to those charges in a separate case proceeding against the man who attacked him that day, Jessie Guzman, a Ford County case.  In exchange for that, the state will dismiss the sole charge in this case, a felony weapons possession, without prejudice until the trial of Mr. Gusman.  It will end with prejudice after any such trial.

THE COURT:  I told you not to read this.  If you're -- the jury can read all of this.  If there's something in here that talks about discharging a firearm, let's get to it to refresh his recollection.

BY MR. MANDELMAN:

Q   When Mr. Wachtel asked you -- you testified that you had never previously offered to exchange your testimony in exchange for any sort of agreement.

A   I said I never testified.

Q   But you did enter such an agreement?

A   Well, I didn't remember it, no.

Q   You didn't remember that you had entered a -- entered an agreement to exchange your testimony with the

prosecutors in Ford County?

A    No.

Q    Did the two federal prosecutors handling this case ever ask you about that incident?

A    No.

Q    Did they ever ask you whether you had reached a deal to exchange your testimony in exchange for having a case involving the discharge of a firearm in that trailer park dismissed?

MR. SMITH:  Your Honor, I object now to any characterization of discharge of a firearm by Mr. Mandelman.  As we've seen by the documents which speak for themselves, he has never been charged with anything in relation to discharge of a firearm.  I move to strike his statement.

THE COURT:  If it's not in there, I said, several times, that if there's something in this document that relates to this incident where he discharged a firearm, please point it out.  If not, then let's move on to something else.

MR. MANDELMAN:  I think the witness testified that he -- he admitted that he was accused of discharging the firearm.

THE COURT:  No, I'm -- really -- you don't want to get on my wrong side here.

MR. MANDELMAN:  No, I don't, Your Honor.

THE COURT:  By trying my patience.  I've told you three times if there's something in this document that relates to discharging a firearm, point it out to the witness.  If not, the document is in evidence, the jury can read it later, we'll move on.

BY MR. MANDELMAN:

Q   I want to continue through the chronology.  The plea agreement has been admitted into evidence.  You didn't show up for your sentencing in this case; is that correct?

MR. SMITH:  Objection; relevance.  403, Rule 401 --

THE COURT:  Yes.  The objection is sustained.

MR. MANDELMAN:  Okay.

BY MR. MANDELMAN:

Q   On May 30th of 2010, you were arrested, you were arrested in Oklahoma?

A   Yes.

Q   And what -- go ahead and explain what happened there.

MR. SMITH:  Objection; asked and answered.

THE COURT:  Is this the Woodward, Oklahoma, incident?

MR. MANDELMAN:  It is.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1422

THE COURT: Well, that was covered briefly but you can cover it briefly again if there's something that needs to be brought out.

BY MR. MANDELMAN:

Q   You were coming on a traffic checkpoint and you bailed on your car and then you gave a bogus name?

A   Yes.

Q   And that happened after you were supposed to be sentenced in Ford County?

A   Yes.

Q   Okay.  And then you end up coming back on -- there's an outstanding fugitive warrant for you here in Kansas?

A   Yes.

Q   On July 12th, then you meet with the Dodge City Police Department?

A   I don't remember the date.

Q   You did provide them -- you provided them some information but nothing about the homicide?

A   Yes.

Q   And then 17 days later, you're released on bond?

A   Yes.

Q   And then on August 11th of 2010, you're arrested -- pardon me -- you're accused of tampering with electronic monitoring equipment?

A   Yes.

Case 6:12-cr-10089-MLB   Document 989   Filed 03/19/14   Page 43 of 125
Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 1424

502

Q   And go ahead and explain to me what happened there.

MR. SMITH:  Objection.  That document has been received into evidence.

MR. MANDELMAN:  It's a crime of dishonesty, Your Honor.

MR. SMITH:  And he's admitted to the conviction and the journal entry of conviction is in evidence.

THE COURT:  Yes.  Rule 403.  I think we need to move on here.  The document's in evidence.  The circumstances really aren't relevant.

MR. MANDELMAN:  Mr. Wright's flight from law enforcement during this time when he was under investigation for the homicide is why we're all here.

MR. SMITH:  I object to that characterization.

THE COURT:  What -- Ladies and Gentlemen, it's probably time for a morning recess.  I think I need to get things back on track here a little bit.  Remember and heed the admonition.  We'll come get you in 15 minutes or so.

(Jury excused for recess.)

THE COURT:  All right.  We're in recess.  I want to see Mr. Henry in chambers please.

(Recess.)

THE COURT:  All right, sir.

BY MR. MANDELMAN:

Q   Okay.  There's a couple more subjects I'd like to cover with you briefly here, Mr. Wright.  In your federal plea agreement, the Government's agreed to dismiss Count 3?

A   Yes.

Q   And Count 3 carried a mandatory life sentence?

A   Yes.

Q   The Government's also agreed to file a substantial assistance motion?

A   Yes.

Q   Now, that motion also includes a provision that allows the Court to impose a sentence below any mandatory minimum?

A   Yes.

Q   So even though there's a ten-year mandatory minimum on Count 6, if the judge grants that motion, your attorney can ask for any sentence that he wants as long as it's at least one day in prison?

A   Yes.

Q   And your state court plea agreement specified a particular sentence, 40 months?

A   Yes.

Q   There's no number at all in this document?

A   No, there's not.

Q   All it says is will be required to serve a sentence in federal prison, no length specified?

A   Yes.

Q   I want to go ahead and show you a letter.  I think this is Ramirez H, R-H.  Do you recognize this?

A   Yes.

Q   And what is it?

A   It's a letter to the judge.

Q   Do you remember when it was written?

A   No.

Q   There's kind of -- there's a file stamp on it.  Can you see that?

A   Yes.

Q   It looks to -- it looks to me like it's stamped July 12, 2010.  Is that what it looks like to you?

A   Yes.

Q   And you believe that date is correct?

A   Yes.

Q   I'm going to go ahead and ask you a couple questions about this letter.

THE COURT:  Well, you're either going to have to get it admitted into evidence or you can only use it to refresh his recollection if it's appropriate.

MR. MANDELMAN:  Okay.  I would ask -- there's -- I believe there's several prior inconsistent

statements here, inconsistent with his testimony on direct examination, and I would just move to have it admitted as Exhibit G -- pardon me -- as Exhibit H.

MR. SMITH:  Your Honor, a portion of this letter, the first portion of this letter, contains information for which you have sustained the Government's objection to admission.

THE COURT:  Well, here again, I haven't seen the letter so somebody bring me a copy of it and let me look at it.

(Off-the-record.)

THE COURT:  I don't think this letter is relevant.  So I don't think any of it's relevant under 403.

MR. MANDELMAN:  Can I just make a quick --

THE COURT:  Mr. Mandelman, I've said it isn't relevant.  That means it isn't relevant.

MR. MANDELMAN:  Just have it marked for the record.

THE COURT:  You can mark it for the record.

MR. MANDELMAN:  Can I question him about it?

THE COURT:  No.  I want to move this along.

MR. MANDELMAN:  I just have a couple questions about this letter.

THE COURT:  Mr. Mandelman, I'm telling you for

the last time, I have ruled, you can make your arguments to somebody else, but not me.  You can mark it and -- as a court exhibit or whatever; but Exhibit R-H is not received.

MR. MANDELMAN:  I would just ask to have it be part of the record subject to my objection so it can be reviewed.

THE COURT:  I'm sure the Court of Appeals will focus intently on this exhibit.  You can send it up there if you want, that's your purpose, but let's move on.

BY MR. MANDELMAN:

Q   There's still one subject I want to cover without addressing the letter specifically.  You testified, sir, that you had never heard of anybody getting beaten out of a gang?

A   I've heard of it.  I've never seen it.

Q   Now, you told Judge Hampton --

MR. SMITH:  Objection.

THE COURT:  That portion of the letter, you can ask him about.

BY MR. MANDELMAN:

Q   Okay.  Thank you.  You told Judge Hampton -- and do you -- you told Judge Hampton you had been beaten out of a gang.  Let me just -- there's just one sentence here.

I would like to let you know I took a brutal beating to end my gang life.

A   I never said I got beaten out of a gang.  I said I got beat up and decided to end my gang life.  Yeah, I didn't get jumped out.

Q   So you're making -- there's some sort of technical distinction here?

A   Yeah.  I'm not a member of DV.

Q   You told Judge Hampton that because you were looking to get a shorter sentence in that case?

MR. SMITH:  Objection.

THE COURT:  The objection is sustained.  Let's move on please.

BY MR. MANDELMAN:

Q   Your state court plea agreement called for a sentence of 40 months?

A   Yes.

Q   And you were afraid about doing that time, weren't you?

A   No.

MR. MANDELMAN:  Your Honor, now he's testified inconsistently with how he responded in this letter.

THE COURT:  Move on.

BY MR. MANDELMAN:

Q   In state court you were willing to exchange your

testimony for a shorter sentence; is that correct?

A    Yes.

Q    And you're willing to do that again here today; is that correct?

A    Yes.

Q    Is there anything you won't say for a shorter sentence in this case?

A    I won't lie.

MR. MANDELMAN:  I would just move to have Exhibit D introduced and then R-H subject to the Government's objection.

MR. SMITH:  Your Honor, may I just see which one D is again.  I don't have all of mine marked here.

THE COURT:  I don't know what D is either.

MR. SMITH:  D is now referenced in what has been marked as Ramirez G, so I do not object to D being admitted.

THE COURT:  D is received.  What is it?

MR. MANDELMAN:  This is the order as part of his plea agreement dismissing the shooting case.

THE COURT:  That's fine.

MR. MANDELMAN:  And then H is not to go back to the jury.

THE COURT:  Correct.

MR. MANDELMAN:  Just one second, Your Honor.

(Off-the-record discussion

between Mr. Mandelman and

Mr. Henry.)

MR. MANDELMAN:  Thank you, Mr. Wright.  I
don't have anything further for this witness.

THE COURT:  Redirect.

**REDIRECT EXAMINATION**

BY MR. SMITH:

Q   Good morning, sir.  How are you?

A   All right.

Q   Okay.  Do you still have that Plea Agreement in
front of you?

A   Yes.

Q   All right.  I want to reference the Plea Agreement.
Do you have it out where you can kind of go through it a
little bit?

A   Yeah.

Q   Okay.  Now, you recall being asked if you were
facing a mandatory or possible life sentence on Count 2;
is that correct?

A   Yes.

Q   And you plead guilty or -- did you plead guilty to
Counts 1 and Count 6?

A   Yes.

Q   Do you understand what the possible penalty is for

Count 6?

A    Yes.

Q    And what is the maximum penalty you can receive for
Count 6?

A    Life.

Q    And you plead guilty to that?

A    Yes.

Q    I want to refer you now to Paragraph 6, if that's
all right.   It should be on Page 6 in fact.

A    Yes.

Q    You were asked questions by Mr. Wachtel, in fact,
about Paragraph A and Paragraph B.   Do you recall being
asked those questions?

A    Yes.

Q    Are A and B the only subsections in Paragraph 6?

A    No.

Q    And is paragraph 6 entitled "The Defendant's
Agreements"?

A    Yes.

Q    And have you reviewed subparagraph C of Paragraph 6?

A    Yes.

Q    There are other promises that you made in this Plea
Agreement with the United States; is that correct?

A    Yes.

Q    Did you promise that you must give full and truthful

cooperation?

A    Yes.

Q    If you do not give full and truthful cooperation, can something happen to you or your plea agreement?

A    Yes.

Q    And what is that?

A    It will be no good.

Q    And is that promise contained in Subparagraph C of Paragraph 6?

A    Yes.

Q    If you lie or are untruthful, you may be charged with more crimes?

A    Yes.

Q    Is that promise that you made contained in Subparagraph C of Paragraph 6?

A    Yes.

Q    Thank you.  Now I want to go back to one subject that Mr. Wachtel asked you about.  Do you recall looking at Page 69 of a transcript and there was a question about what Russell may have said.  I don't think you have the transcript in front of you.  Do you remember the questions being asked of you?

A    Refresh my memory.

Q    Okay.  I'm going to -- may I approach?

        THE COURT:  Yes.

BY MR. SMITH:

A    Oh, yeah.

Q    You recall page 69 now?

A    Yes.

Q    And do you recall the questions about what Russell may have said; is that right?

A    Yes.

Q    And do you recall also being asked questions about whether Peter said let's go look for some scraps?

A    Yes.

Q    Now, were there two separate times that someone made a statement about looking for some scraps?

A    Yes.

Q    Do you recall there -- okay.  When was the first time that someone said let's go look for some scraps or something to that effect?

A    I think in Peter's house.

Q    And is that what you referenced in -- well, let's just go back to Page 51.  Do you remember page 51?

A    Yes.

Q    Is that what you reference in Page 51?

A    Yes.

Q    Someone saying that at Peter's house; is that correct?

A    Yes.

Q   Now, when was the time that Russell may have said something about looking for scraps?

A   That would have been in the car I think.  I'm not for sure though.

Q   Okay.  Will you turn back to Page 68, please. Preceding 69.  You can continue to 69 if that helps refresh your memory.

A   Yes.

Q   Are you done?

A   Yes.

Q   Is your memory refreshed?

A   Yes.

Q   Do you recall the circumstances in which Russell made the statement?

A   Yes.

Q   And what were the circumstances of Russell making the statement?

A   When we were going toward the south side.

Q   Were you in the vehicle?

A   Yes.

Q   Is Russell's statement separate and independent of the statement made at Peter's house?

A   Yes.

        MR. SMITH:  I have no further questions.

        THE COURT:  Yes, sir.

MR. WACHTEL:  Thank you, Your Honor.

**RECROSS EXAMINATION**

BY MR. WACHTEL:

Q   Mr. Worthey -- I'm sorry.  Mr. Wright.  I apologize. Russell said what he said to you in the car because he was telling you or giving directions about how to go back there and where he wanted to go.  Right?

A   Yes.

Q   Otherwise, there's no reason for that to have come up, is there?

A   Yes.

Q   Because he knows as well as you do that Surenos live in that trailer park, isn't that so?

A   Yes.

Q   You were asked a couple of questions about your Plea Agreement.  You still have that in front of you, don't you?

A   Yes.

Q   And in Paragraph 6-C, there is language that says that your agreement can be voided and you can be prosecuted for perjury if you commit that?

A   Yes.

Q   Or words to that effect; right?

A   Yes.

Q   So the real issue is whether or not you can keep the

Government believing that you've been telling the truth here; right?

A   Yes.

Q   Otherwise, you got nothing to worry about; right?

A   Yes.

Q   Just like you wrote a letter to Judge Hampton trying to convince him that you had been beaten out of a gang you weren't even a member of; right?

A   I never said I was beaten out of a gang.

Q   What was the purpose in sending the letter that talked about the terrible beating?

A   I said I was done with being in a gang.

MR. WACHTEL:  I don't have any other questions.  Thank you very much.

THE COURT:  Yes, sir.

MR. MANDELMAN:  If I could approach just real briefly.

THE COURT:  Yes, you may.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

MR. MANDELMAN:  There's one more thing in that letter.  He says he -- he said he had a problem with

drugs.  He testified on Friday that he was sober at the time this happened.  I believe he is willing to say whatever he needs to say in order to get a shorter sentence in this case.

THE COURT:  If that's where you're headed, you can't do it.  The only thing that can be covered is whatever was covered in redirect examination.

MR. MANDELMAN:  Well, the -- I didn't have --

THE COURT:  The only thing that can be covered is what is in redirect examination.  You cannot cover that subject.  If you have any questions, please go ahead and ask them.  If not, we'll get this witness off the stand and put another one on.

MR. MANDELMAN:  I didn't have an opportunity to ask him before --

THE COURT:  Mr. Mandelman --

MR. MANDELMAN:  I understand.

THE COURT:  -- if you continue to argue with me, things are not going to go well for you here.  Ask some of the other lawyers what has happened to people who do that.

(Thereupon, the following proceedings continued in the hearing of the jury.)

MR. MANDELMAN:  Your Honor, I have nothing

further for this witness.  Thank you.

THE COURT:  Thank you, sir.  You're excused.
Next witness.

MR. WELCH:  Your Honor, United States recalls
Shane Webb.

THE COURT:  Still under oath, Mr. Webb.

A    Yes, Your Honor.

**SHANE WEBB**

Having been previously duly sworn to tell the truth, the
whole truth and nothing but the truth, testified further
as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q    Mr. Webb, did you assist in the creation of a -- of
a roster of certain DV and LLC gang members with
photographs attached?

A    Yes, I did.

MR. WELCH:  May I approach the witness.

THE COURT:  Yes.

BY MR. WELCH:

Q    Handing you what's been marked for the record for
demonstrative purposes as Government Exhibit 1.  Do you
recognize that, sir?

A    Yes, I do.

Q    What is that?

A   This is a document that was made to assist the jury as well as the government and the defense in identifying persons by their street monikers to be able to associate that with their real name as well as their photograph of that person.

Q   And are there a number of photographs along with the names and street name or gang names attached to that document?

A   Yes.

Q   And are all of the photographs that are on the document photographs you've seen before?

A   Yes.

Q   And are all of those photographs, photographs of either Diablos Viejos gang members or Los Carnales Chingones gang members in Dodge City, Kansas?

A   Yes.

Q   Does the document contain every photograph of every DV or LCC gang member in Dodge City, Kansas?

A   No, it does not.

MR. WELCH:  Your Honor, we don't intend to offer this as an exhibit; but we do have copies for the jury, with the Court's permission.

THE COURT:  Any objection?

MR. WACHTEL:  Gosh, Your Honor, I don't object.  I'm sorry -- I don't object.

THE COURT:  Mr. Mandelman, any objection?

MR. MANDELMAN:  I object.  There's a lot of guys here who I don't think have come up at all.

MR. WELCH:  Your Honor, that is a true statement, Judge; but the point of this document is some of these people have come up already and we expect most if not all of them to come up in future testimony.

THE COURT:  Exhibit 1 is received.  And this is an exhibit, again, to help you and me keep track of who these people are, primarily because of their street names or other names that need to be associated for the evidence to make sense.  This won't go with you to the jury room.  It will only be used during the trial.

MR. WELCH:  May I distribute these?

THE COURT:  Yes, you may.

MR. WELCH:  Your Honor, I may have one for the Court.

THE COURT:  Thank you.

MR. WELCH:  I'll be brief in my questions to you, Mr. Webb.

BY MR. WELCH:

Q   Concerning the exhibit itself, some of the, as you testified earlier, some of these exhibits, the photographs have already been admitted into evidence; is that correct?

A   Yes, they have.

Q   All right.  For example, who is depicted on the screen now as Government Exhibit 22?

A   That is Juan Torres.

Q   And if we look at Juan Torres, is that Mr. Torres?  This is alphabetical; correct?

A   Yes, it is.

Q   All right.  So that is the same photograph that is on Exhibit 1 for Juan Torres; correct?

A   Yes, it is.

Q   And Mr. Torres' alias is listed as what?

A   As Bugzy.

Q   And then display Exhibit 26.  This is an example of testimony you've already provided.  Who is -- you can't see the face in Exhibit 26, but do you know who that is?

A   Yes, I do.

Q   Who is that?

        MR. WACHTEL:  Well, Your Honor, I object to this.  This is not discussion of a particular exhibit that we've admitted and this has all been asked and answered.

        THE COURT:  I agree.  Let's move on, please.

        MR. WELCH:  I will, Judge.  I have, Your Honor, three photographs that have not been admitted which are contained on the exhibit and I'd ask the

witness to identify those.

Q   Starting with Exhibit 413.  Do you recognize that photograph, sir?

A   Yes, I do.

Q   Who is that?

A   Eusebio Sierra-Medrano.

Q   Do you know if a different photograph -- well, first of all, Mr. Eusebio Sierra-Medrano's nickname is what?

A   TC.

Q   Is there another photograph of TC that's been admitted into evidence as Exhibit 41?

A   I believe there was, with a side profile.

Q   Would you display 41, please.  Is that one of the same person?

A   Yes.

Q   And then, finally, ask you to look at Exhibits 58 and 389.  Starting with 58.  Do you recognize what that is?

A   Yes, I do.

Q   What is that?

A   It's a picture of Gonzalo Ramirez.

Q   And then 389?

A   Picture of Pedro Garcia.

Q   Both these photographs are photographs in possession of the Dodge City Police Department; correct?

A   Yes, they are.

Q   Photographs you've seen prior to today?

A   Yes, sir.

MR. WELCH:  We would offer both 58 and 389, I believe, Your Honor.

THE COURT:  What about 413?

MR. WELCH:  I offer that as well, Judge.

MR. WACHTEL:  I don't have any objection to that, Your Honor.

THE COURT:  All right.

MR. MANDELMAN:  No objection.

THE COURT:  413, 58 and 389 are received.

MR. WELCH:  I have no further questions, Judge.

THE COURT:  All right.

MR. WACHTEL:  I don't have any questions, Your Honor.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Just briefly.  I notice the heights of these gentlemen aren't listed on this.  Would you be able to identify how tall these gentlemen are?

A   Right now?  Some of 'em I could probably give you an estimate on.  Without going back and actually pulling up their physical descriptors?  Is that what you're asking?

Q   Well, can you tell me how many of 'em were at least five feet ten inches tall?

A   I imagine if I set here and took time to go through, I could probably give you an estimate.

Q   At least several of these gentlemen?  Mr. Barnes?

A   I couldn't tell you without going through each one. Just from what I remember without having all their physical descriptors in front of me.

MR. MANDELMAN:  Thank you.

THE COURT:  Well, you're excused again, Agent Webb.  Next witness.

MR. SMITH:  United States calls Dr. Bamidele Adeagbo.

**BAMIDELE ADEAGBO**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Good morning, Doctor.  How are you?

A   I'm good.

Q   Okay.  Please tell us your name once again.

A   Bamidele Adeagbo.

Q   And what is it you do for a living?

A   I'm the physician that specialize in forensic

pathology; therefore, I investigate deaths, unexplained deaths.

Q   Unexplained deaths.  Is that what forensic pathology means or encompasses?

A   Yes.  Forensic pathology encompasses investigation of unexplained suspicious deaths.

Q   Okay.  Now, where are you employed currently?

A   Currently I practice in Calgary, Alberta, Canada.

Q   And what do you do in Calgary?

A   I investigate suspicious unexplained deaths.

Q   Okay.  Same thing?

A   Same thing.

Q   And who do you work for specifically?

A   I work for the government of Alberta.

Q   And prior to working for the government of Alberta, Canada, where did you work?

A   I work at Sedgwick County Regional Forensic Science Center, Sedgwick County, Wichita.

Q   So that's in Wichita, Kansas?

A   It's in Wichita, Kansas.

Q   When were you employed with the Sedgwick County Regional Forensic Science Center?

A   I work in Sedgwick County from 2008 to 2011.

Q   After leaving Sedgwick County, is that when you went to Calgary?

A    Yes.  I went to Calgary.

Q    And what was your job title or position when you were at the Sedgwick County Regional Forensic Science Center?

A    My title is Deputy Coroner, Forensic, Deputy Coroner Medical Examiner.

Q    What does a medical examiner do?

A    Medical examiner is a physician that uses the knowledge of pathology and extended knowledge of forensic pathology to investigate sudden and unexplained deaths and be able to make a determination in those deaths of the cause and manner of those deaths.

Q    I take it, then, the same duties that you have in Calgary now; is that correct?

A    Correct.

Q    You've mentioned being a physician who studies forensic pathology; is that correct?

A    Correct.

Q    Are you, in fact, a physician?

A    I'm a physician.

Q    Please go through your history and experience and training in becoming a physician?

A    I went to medical school in Indore and I became a physician.  And after I became a physician, I practice, I practice medicine for a while.  I came to the United

States and I recertify my medical credentials and I --

Q   When did you recertify those medical credentials?

A   That was between 1998 and 2000.  And I started my residency in 2000.  And I completed residency 2005.  And after the residency program, which is the program that made me to specialize in pathology, I train in anatomical and clinical pathology.  After that, I did one year fellowship training, which is an advanced training, to study forensic pathology, which is an application of pathology, timing and manner of death.  After I completed that, I also studied as a trainee in surgical pathology, which is under a different aspect of pathology that is for oncology, called tumor and everything, which is not going to be used in this particular job I'm doing right now, but I have additional training there.  After that, I started to work in Wichita in Regional Forensic Science Center.

Q   And when you were doing your forensic pathology fellowship, did you also work as a research assistant?

A   Yes, I did.

Q   And it was subsequent to that, then, you arrived at the Sedgwick County Regional Forensic Science Center; is that correct?

A   Correct.

Q   Are you still a licensed medical doctor in the

United States?

A   I am.

Q   In fact, are you licensed in Kansas?

A   I am.

Q   And I take it you are licensed in Canada as well?

A   I am.

Q   As part of being a medical examiner -- well, is there a difference between Medical Examiner and Coroner?

A   In term of the job.  In term of the authority, there's a difference.  A Medical Examiner will almost always be a forensic pathologist.  Who will investigate.  But a Coroner could be a forensic pathologist, but it is more of a, usually, it's some jurisdiction, could be more of a political office where you are elected to that position and that is why the difference between a Coroner and assistant.  In certain counties after -- we have a hybrid of a medical examiner and a coroner assistant, which makes it really very effective in performing duty because as a medical examiner, you forensic pathologist, so you have the knowledge to do it; and as a Coroner you are -- you have legislative power to make those determinations and that make it easy.

Q   So Sedgwick County was a hybrid system where you would have performed each role?

A    Correct.

Q    And you are a Medical Examiner; is that correct?

A    Correct.

Q    You were not elected to office?

A    No.

Q    You were simply hired by the Regional Forensic Science Center and subsequently by the government of Canada; is that right?

A    Correct.

Q    When you were at the Sedgwick County Regional Forensic Science Center in 2008, did you have an occasion to encounter a deceased person by the name of Israel Peralta?

A    I do.

Q    Now, what -- I'm sorry, 2009.  In June of 2009.  Did you do a report in relation to that examination?

A    I believe I did a report in that case on Israel Peralta.

Q    Would that report in fact contain the correct date of when you performed that examination?

A    It should.

Q    What sort of examination do you do as a medical examiner?

A    As a medical examiner, I perform lot of examinations and that could be as -- not as detailed as just an

external examination.  It could be far more to what I would call partial autopsy.  Or it could be more deep that would call full autopsy.  It depends on the case-by-case basis what is needed.

Q   And I guess you just have to describe to us briefly what is an autopsy?

A   In this case that we are talking about, I did a full autopsy.  And full autopsy, it encompasses everything, which include performing external examination.  And external examination entails examining all the apparel, clothing, the surface of the skin, to see for any injuries, to see for any signs, any marks, any distinguished features of this particular person you are examining.  And after this examination, you proceed to do the internal examination which requires to see any of injuries, any natural diseases, any developmental change, anything that is not supposed -- anything -- what -- whether it's wrong or whether it's not, you need to document it.  And that is what you need to do in that examination.

Q   That internal examination is part of what we term a full autopsy?

A   Correct.

            MR. SMITH:  Your Honor, may I approach?

            THE COURT:  Yes.

BY MR. SMITH:

Q   I'm handing you what's been marked as Government Exhibit 153.  You can remove the contents of Government Exhibit 153.  Do you recognize Government Exhibit 153?

A   Yes.

Q   What is Government Exhibit 153?

A   It is my autopsy report.  It's autopsy report I generated after completing every test that you do after the autopsy.

Q   Who was the subject of that autopsy report?

A   Israel Peralta.

Q   And on what date was your report completed?

A   My first report is completed on the 16th of July, 2009.

Q   And on what date was the autopsy itself performed?

A   10th of June, 2009.

        MR. SMITH:  Your Honor, I'd move to admit Government Exhibit 154.

        THE COURT:  You said 154 or 153?

        MR. SMITH:  153, Your Honor.

        MR. WACHTEL:  In any event, I object, Your Honor.  It is the testimony of this witness that is important in this case, not what he wrote in the report.

        THE COURT:  I didn't hear you.

        MR. WACHTEL:  I'm sorry, Judge.  I object to

the admission of his report.  His report would be duplicative of what he is about to say and it's his testimony that matters here, not what he wrote.

THE COURT:  What's the relevance of his report?

MR. SMITH:  That it contains his findings, Your Honor.

THE COURT:  The objection is sustained.  You can ask him what he concluded.

BY MR. SMITH:

Q   Doctor, in performing your autopsy, your examination of Israel Peralta, were you able to determine the manner and means of his death?

A   I was able to determine the manner and cause of his death.

Q   The cause and manner of his death.  And in your determination, what was the cause of death?

A   The cause of death of Israel Peralta is a single penetrating gunshot wound of the back.

Q   And the means -- I'm sorry, the manner?

A   The manner is determined to be homicide.

MR. SMITH:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. SMITH:

Q   I've placed in front of you what's been marked as

Government Exhibit 147 through 151.  Please review those.

A    I have reviewed them.

Q    Do you recognize Government Exhibit 147?

A    Yes, I do.

Q    What is Government Exhibit 147?

A    It's a picture of Mr. Israel Peralta showing his face while he was lying on the autopsy table.

Q    So you were present when this photograph was taken?

A    Yes, I was.

        MR. SMITH:  Your Honor, move to admit Government 147 through -- well, 147.

        MR. WACHTEL:  No objection to 147.

        MR. MANDELMAN:  No objection.

        THE COURT:  147 is received.

BY MR. SMITH:

Q    Let's display that, please.

     Is this the person that you performed the autopsy on in June of 2009?

A    Yes.

Q    Whom you've identified as Israel Peralta?

A    Correct.

Q    Is this prior to you conducting the internal examination of the autopsy?

A    Correct.

Q   And what is Government Exhibit 148, please, Doctor?

A   148 is an X-ray of the chest and abdomen.

Q   As part of your examination, do you conduct or perform X-rays?

A   Yes.

Q   What is the purpose of performing an X-ray?

A   The purpose of performing X-ray generally is to determine -- is to be able to determine if there is any objects in the body.

Q   Did you determine that in this autopsy?

A   Yes, I determined that.

Q   And, again, 148 is a photograph of that X-ray; is that correct?

A   Correct.

        MR. SMITH:  Move to admit 148, Your Honor.

        MR. WACHTEL:  No objection, Judge.

        MR. MANDELMAN:  No objection.

        THE COURT:  It's received.

        MR. SMITH:  Publish please.

Q   What is it that we see in Government Exhibit 148, Doctor?

A   There is a -- there's an object that is white on your screen right close to the -- right on the right chest close to the bone in the middle.  That object, I described it as opaque, which means that when you shine

X-ray on it, X-ray doesn't go through it and that makes me to see it.  And that object is suspicious object at that time.  It's not supposed to be there.

Q  And during your internal examination, were you able to locate that object?

A  Yes, I was able to locate the object.

Q  Do you recognize what is in Government Exhibit 148 -- I'm sorry, 149.

A  49, yes.

Q  What is Government Exhibit 149?

A  Exhibit 149 is a fragmented projectile.  And this picture is actually showing the base of the projectile with the fragment of the deform, of that projectile.

Q  Is 149 a photograph of the projectile that we saw in Government Exhibit 148?

A  That's correct.

Q  Did you recover that projectile?

A  Yes.  That projectile was recovered from that location where that X-ray showed that suspicious object.

MR. SMITH:  And I would move to admit Government 149.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

BY MR. SMITH:

Q  Let's display that.  This is Government Exhibit 149,

Doctor.  Again, that was what is depicted as 148; is that correct?

A    Correct.

Q    Where was it removed from Israel Peralta's body?

A    From the right chest.

Q    After that projectile was removed, what did you do with the projectile?

A    The projectile was -- picture was taken and it was packaged and sealed in an envelope and was transferred along with other materials that we recovered or examined to the chain of evidence to the police.

Q    And Government Exhibit 150 is in front of you; is that correct?

A    Correct.

Q    What is depicted in Government Exhibit 150?

A    Exhibit 150 is a picture of Mr. Israel Peralta lying on his face on the autopsy table.  And the picture is showing a round defect on the left chest and the defect I determined to be gunshot wound.

          MR. SMITH:  Move to admit Government Exhibit 150.

          MR. WACHTEL:  No objection.

          MR. MANDELMAN:  I don't object.

          THE COURT:  150 is received.

BY MR. SMITH:

Q   Would you please point out the defect?  And, Doctor, you can actually point on that screen and it will leave a mark.

                    (Witness complies with request.)

Q   You've described that as a gunshot wound; is that correct?

A   Correct.

Q   Is this Israel Peralta?

A   Yes, this is Israel Peralta.

Q   And did you do an internal examination to determine if this wound was a fatal wound?

A   Yes, I did internal examination.

Q   What did your internal examination reveal?

A   My internal examination shows that the projectile that went through that gunshot wound on the back went through the vertebra, fracture the vertebra, injured the spinal cord, goes further to injure the aorta and the inferior vena cava.  The aorta is the ventricle artery that take blood from the heart to the rest of the body. And the inferior vena cava is the major vein that take blood from the lower part of the body to the outer.  It injured them.  It also injured the heart; the wall around the heart.  It goes through the lungs.  Causes more blood, about one liter blood on the right and about a few mils of blood on the left.  Lungs on the right

were collapsed because of pressure of the blood and in that space surrounding the heart.  And that projectile is the projectile that I recovered from the right chest.

Q   And in your examination, did you determine if Israel Peralta sustained any other wounds?

A   Yes.  He did sustain another gunshot wound on the left, the left forearm.

Q   And do you recognize what is marked as Government Exhibit 151?

A   Yes, I do.

Q   What is Government Exhibit 151?

A   Exhibit 151 is a picture of Mr. Israel Peralta showing his left forearm being held in place by me because that was my hand and I remember, so that a picture could be taken of the wound, of the wound on that arm.

MR. SMITH:  Move to admit Government 151.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  It's received.

BY MR. SMITH:

Q   Please display 151.  Doctor, you've stated this is a wound on the left forearm; is that correct?

A   That's correct.

Q   And in your examination, can you determine if what

we see depicted here is an entrance or an exit wound?

A    Yes.  This is a picture of the exit wound.

Q    When you did your examination, what did it reveal as to where the bullet entered the arm and where the bullet exited the arm?

A    This picture is the, is showing the back of the left forearm.  On the opposite side, the front, is another wound that I determined to be the entrance.  So it goes in from the front to the back on that.

Q    Now, Doctor, in your examination, could you determine if those wounds, the one on the forearm, the one in the back, were the result of two projectiles or could they be the result of one?  If you can determine that?

A    It is difficult to make that determination based on the autopsy findings whether that wound was caused by single projectile or multiple projectile.  It is difficult to determine.

MR. SMITH:  Thank you, Doctor.  I have no further questions, Your Honor.

THE COURT:  Yes, sir.

MR. WACHTEL:  No questions, Judge.

MR. MANDELMAN:  Your Honor, we don't have any questions for this witness.

THE COURT:  Thank you, Doctor.  You're

excused, sir.  Next witness, please.

MR. WELCH:  United States would call Russell Worthey.

**RUSSELL WORTHEY**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you please tell us your name.

A   Russell Worthey.

Q   Mr. Worthey, you are currently incarcerated; is that correct?

A   That's correct.

Q   And you've been incarcerated for more than a year now; is that right?

A   That's right.

Q   Prior to your incarceration, where did you live?

A   In Dodge City.

Q   Dodge City, Kansas?

A   Kansas.

Q   How long -- prior to your incarceration, how long had you lived in Dodge City, Kansas?

A   All but one year of my life.

Q   And how old are you today?

A    25.

Q    Mr. Worthey, while you were living in Dodge City, Kansas, were you familiar with street gangs in that city?

A    Yes.

Q    And at some point in time in the past have you been affiliated with a gang in Dodge City, Kansas?

A    Yes.

Q    Which gang?

A    DV.

Q    And DV stands for what?

A    Diablos Viejos.

Q    When did you become a member of the Diablos Viejos gang?

A    When I was 17.

Q    And after you became a member of that gang, did you have a street name that you went by?

A    Yeah.

Q    Actually, before you became a member, did you have a street name?

A    Yeah.

Q    What was that?

A    Before I became a member, it was Yellow.  After I became a member, it was Blanco.

Q    Before you became a member it was what?

A    Yellow.

Q    Yellow.  What did that mean?

A    Just the color yellow.

Q    The color yellow.  And then Blanco means what?

A    White.

Q    That's Spanish for the word white; is that correct?

A    Correct.

Q    And how did you become a member of the Diablos Viejos?

A    Jumped in.

Q    What does it mean to be jumped in?

A    Jumped in is where four home boys jump you in.  You prove you know how to fight.

Q    You need to slow down just a little bit.  When you say four home boys.  What are home boys?

A    Already established in the gang.  They're already members.

Q    So these are -- where there female members of the Diablos Viejos?

A    Not that I remember.

Q    So those were four men that are already -- have already been initiated or jumped into the gang; is that right?

A    Correct.

Q    All right.  And you said -- was there always four as

part of a jump-in?

A    There was always four.

Q    And a jump-in is just -- what is it?  What do you do as part of a jump-in?

A    Just a fight.  You fight for home boys, show 'em you know how to fight.

Q    Now, when was it that you became a member and were jumped into DV?

A    When I was 17.

Q    You remember what year that would have been?

A    I don't remember.

Q    And do you recall the four members of the gang that jumped you in?

A    Yeah.

Q    Who was that?

A    Big Benji, Rokey and Bugzy.

Q    Big Benji.  Rokey.

A    Drak and Bugzy.

Q    And do you know Big Benji's real name?

A    No.

MR. WELCH:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. WELCH:

Q    Sir, I'm going to ask you to look at what's been

marked as Government Exhibit 400. Do you recognize who that is?

A Yeah.

Q Who is that?

A Yeah. That's Big Benji.

Q That is one of the men that jumped you into the gang; is that right?

A That's correct.

MR. WELCH: Your Honor, we would offer 400.

MR. WACHTEL: No objection, Your Honor.

MR. MANDELMAN: No objection.

THE COURT: 400 is received.

BY MR. WELCH:

Q We have a sheet that has been handed out to the jury, Mr. Worthey, which indicates that Big Benji's name was Benji Najera. Did you know his real name?

A I knew his last name was Najera.

Q Do you know, was Big Benji or Benji Najera related to Jason Najera?

A Yeah.

Q How were they related?

A Brothers.

Q You also said Bugzy was part of your being jumped in; correct?

A That's correct.

Q   Can we display 22 please.  Do you recognize -- can you see the screen right in front of you?  If you need to raise it, you can.  Do you recognize who that is?

A   Yeah.

Q   Who is that?

A   That's Bugzy.

Q   And did you know Bugzy's real name?

A   Juan Torres.

Q   You're telling us, sir, that he was another one of the people that jumped you into the gang; correct?

A   Correct.

Q   Can we display 31 please.  Do you recognize who that is, sir?

A   Yeah.

Q   Who is that?

A   Drac.

Q   Do you know Drac's real name?

A   Jesus Sanchez.

Q   Is this one of the other men who jumped you into the gang?

A   Yes.

Q   The last person you indicated you referred to him as Roke; is that right?

A   Rekay.

Q   Do you know Rekay's last name?

A    No.

Q    Was Rekay the first name of the person?

A    I think.  I'm not sure.

Q    All right.  Very good.  Where did the jumping in for you take place?  At what location?

A    At Junior and Beto's house.

Q    Okay.  Who's Junior?

A    He was another home boy.

Q    Do you know Junior's real name?

A    No.

Q    And then Beto, do you know his real name?

A    No.

Q    Both Junior and Beto were gang members; is that right?

A    They were associates.

Q    The four men who jumped you into the gang, they were already established as Diablos Viejos; is that correct?

A    Correct.

Q    Do you recall how long your jumping in and your beating took place?

A    It took 38 seconds.

Q    38 seconds.  All right.  Why 38 seconds?  Do you know?

A    It was originally 14 and they doubled it thinking it wasn't enough time, and then they raised it again.  I

don't know why.  Not enough time I guess.

Q   And let's help the jury understand.  When you were -- how was it decided that you were worthy now -- no pun intended -- but that you were deserving of being in DV?

A   I stood my ground.  I took my, my jump-in.

Q   All right.  But before you were physically beaten and jumped into the gang, do you know who decided that it was your turn to be -- to become a member of the gang?

A   It all depends on how the older home boys looked at you.

Q   All right.  You were 17 years old; is that right?

A   At the time, yeah.

Q   Prior to the -- you being initiated into the gang by being jumped in, had you been associated with the Diablos Viejos gang?

A   Yes.

Q   Prior to being jumped in, had you attempted to prove your -- that you wanted to join the gang?

A   Yes.

Q   What did you do to try and show the other gang members that you were willing and ready to be a member of the gang?

A   You represent the gang.  You wear the colors, the

numbers.  You do random criminal acts.

Q   Let's go one by one.  You say you represent the gang.  What do you mean by represent the gang?

A   You wear the colors.  You state the name.  You hit people up.

Q   Let's start -- you said by wearing the colors.  What colors did you wear as a DV gang member?

A   Red.

Q   And you also said you hit people up.  What does hit people up mean?

A   You flash 'em gang signs.  You, you let 'em know where you're from.

Q   All right.  Now, what type of people are you -- who are you trying to identify yourself to as a DV gang member?

A   As a Norteno.

Q   All right.  So DVs were considered Nortenos; is that right?

A   Correct.

Q   In addition to the DV, in Dodge City were DV and Norteno one and the same?

A   Well, it -- there's different branches of Norteno gang and DV was a branch.

Q   A branch of the Nortenos?

A   Yeah.

Q   In Dodge City?

A   In Dodge City.

Q   Were there other Nortenos in Dodge City that were not DV?

A   No.

Q   All right.  Now, there's also -- there's been testimony earlier about LCC or Los Carnales Chingones.  Are you familiar with that gang?

A   Yes.

Q   Was that also a gang that used the color red?

A   Yes.

Q   And what relationship, if you know, was there between DV and LCC in Dodge City?

A   Nothing but color.  Some family.

Q   All right.  And were there times where DV and LCC gang members would associate with one another?

A   Yes.

Q   All right.  When you got jumped in to the gang, you said it was at Beto's house; is that right?

A   Yeah.

Q   And Beto is actually an LCC gang member; is that correct?

A   No, that's the wrong Beto.

Q   Okay.  I beg your pardon.  But you have instances in the past where DV and LCC gang members associated with

one another; correct?

A    Correct.

Q    And are you aware of times when DV and LCC gang members committed criminal activity together?

A    I know of certain members who did.

Q    Now, going back, then, to prior to your being jumped in at 17.  You personally, what type of things did you do to try and show that you wanted to be DV and you were ready to be DV?

MR. WACHTEL:  Object to this as asked and answered, Your Honor.  We've talked about this.

MR. WELCH:  I'm talking about what he did himself, Your Honor.

THE COURT:  Well, he said that he had committed random criminal acts.  Is that what you're headed toward?

MR. WELCH:  Yes, sir.

THE COURT:  The objection is overruled.

BY MR. WELCH:

Q    What type of criminal activity had you performed prior to being jumped in at 17 as part of trying to join the DV to show you were ready to be a DV?

A    I mean, there was fights, taggings.

Q    Stop there.  Fights with who?

A    With rival gang members.

Q   Who would be who?

A   The Surenos.

Q   All right.  So in Dodge City, there's Nortenos you've told us about.  And the rivals were whom?

A   The Surenos.

Q   And you said you were engaged in fights with Surenos as part of even before you were DV, officially DV; is that right?

A   Correct.

Q   And why did you have fights with Sureno gang members when you weren't even a DV yet?

A   To work my way in.

Q   To what?

A   To work my way in.

Q   Meaning?  What does that mean to work my way in?

A   To earn the respect, to be able to become a full member.

Q   In addition to having fights with rival gang members -- are we talking fistfights?

A   It could be fistfights.  You could hit 'em with a bat.  I mean, it doesn't have to be fistfight.

Q   I'm talking about you personally.  What type of fights did you have with rival gang members?

A   Fistfights.

Q   And also I think you mentioned the word tagging; is

that right?

A    Yeah.

Q    What do you mean by tagging?

A    Tagging, you just find a blank wall or enemy tagging and tag up your set.

Q    All right.  And what is the purpose of tagging?

A    To -- well, it depends on if you're tagging on the south side or on the north side.

Q    All right.  Now let's -- let's explain that then. On the north side, you're talking about the north side of Dodge City, Kansas; correct?

A    Correct.

Q    All right.  Which gang considered the north side of Dodge City to belong to them or they controlled?

A    Well, I mean, the true north side, nobody controlled.  We were on the east side.

Q    So earlier, though, you said it depends whether you were on the north side or south side.  Let's start with the north side.  If you as a DV gang member are tagging in the north side, why are you doing that?

A    To mark our territory.  To show rivals are not welcome.  This is our area.

Q    Can we display Exhibit 9, please.  Mr. Worthey, we've already had testimony that this tagging was done by another gang member.  Do you know what this symbol

represents?

A   Yeah.

Q   What does that represent?

A   It's XIV is Roman numerals for 14.

Q   And why was 14 -- or, was 14 important as both a Norteno and a DV?

A   It's 14th letter of the alphabet.

Q   Is what?  What letter?

A   The letter N.

Q   And N stands for what?

A   For Norteno.

Q   All right.  So the use of the number 14 in various forms is a symbol adopted by DV in Dodge City, Kansas; correct?

A   Correct.

Q   All right.  So if this number is spray painted on a wall in Dodge City, Kansas, in the north part of town, what would the purpose be of displaying 14, especially the color red?

A   This is our territory.

Q   All right.  You also said there's a difference between tagging in the north side of town and tagging on the south side of town of Dodge City; correct?

A   Correct.

Q   What would be the difference between those two?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   Tagging on the south side is to show enemy that we were in their area.

Q   All right.  When you use the word enemy, who are you talking about?

A   Any gang who opposes us.  I mean, it doesn't have to be the Surenos.  Any gang that opposes us.

Q   All right.  Who were the rivals in Dodge City that you opposed most often?

A   Surenos.

Q   And in addition -- within the Surenos, were there subsets of rivals, subsets to you in Dodge City?

A   Yes.

Q   Who were those?

A   There's a bunch of 'em.

Q   But they're all -- what color do they all adopt?

A   Blue.

Q   Now, you said if you're tagging in the south part of town, that's to give notice to rivals that you were in their area; is that right?

A   Yeah.

Q   Is that a threat to the rivals?

A   It's basically a threat.

Q   All right.  Prior to you being jumped in at the age of 17, did you also engage in occasions where you tagged?

A    Yeah.

Q    You recall where -- I don't need the exact location -- but what parts of town do you recall tagging in?

A    I tagged in the east side and on the south side.

Q    East side and south side?  You need to answer out loud, sir.  Is that a yes?

A    Oh, yeah.

Q    Okay.  That's fine.  And you said east side of Dodge City was considered whose territory?

A    That's where we ran; but, I mean, LCC ran there, too.

Q    You say that's where we ran.  Who are you talking about?

A    DV.  That's where DV ran.

Q    By DV ran, that means that's where you operated?

A    Yeah.  That's where we live.  That's where we hung out.  That's -- that was where we lived.

Q    Okay.  And you said LCC also ran in that area of town as well; is that right?

A    Right.

Q    And, generally, did DV and LCC get along with one another?

A    Well, I mean, there were times we got along and there were times we fought.

Q   All right.  Now, you said you tagged the east side of Dodge City and south side of Dodge City; correct?

A   Correct.

Q   And you did that prior to being jumped in?

A   That's correct.

Q   Was there other activity in addition to fighting Sureno gang members and tagging in Dodge City, other criminal activity that you engaged in as part of showing that you were ready to be a DV?

A   I mean, just random things.  Anything criminal earns you a little bit of respect.  Everything earns a little bit more and a little bit more.

Q   All right.  You say anything criminal earns a little bit of respect and the more you do, the more respect you get?

A   Yeah.  I mean, it all adds up.

Q   All right.  Now, when you talk about respect, who are you trying to impress and who are you wanting the respect from?

A   The older homies.

Q   And who are the older homies?  I don't need names, but when you say older homies, who are you talking about?  What are you talking about?

A   I'm talking about the ones who have been in the gang longer.

Q   Older gang members; is that right?  Is that a yes?

A   Well, I mean, they don't have to be older age-wise.
They just, you know, they've been in the gang longer.
They know more than you.  They've done more than you.

Q   So they're more experienced?

A   Correct.

Q   All right.  Now, before you -- at some point in
time, someone decided that you were ready to be a DV;
correct?

A   Correct.

Q   And then you already told us you were jumped in by
those four DV gang members; correct?

A   Correct.

Q   And your jumping in was 38 seconds; is that right?

A   Correct.

Q   And you're not exactly sure why 38 seconds was --

        MR. WACHTEL:  I object, Your Honor.

        THE COURT:  This is so repetitious.  You know,
if this jury hasn't figured out by this time that the
Nortenos' enemy was the Surenos and vice versa, then
this case is hopeless already.  So let's move this along
please.

        MR. WELCH:  Yes, sir.

BY MR. WELCH:

Q   Mr. Worthey, in addition to being jumped in

yourself, did you also participate in jump in's of other DV gang members?

A    One other, yeah.

Q    All right.  And who did you help jump in?

A    Speedy.

Q    Speedy?

A    Yeah.

Q    Do you recall when that happened?

A    No.

Q    Do you recall who -- were there three other people who jumped Speedy in with you?

A    Yeah.

Q    Do you recall who joined you in jumping Speedy in?

A    Only other person I remember is C-Los, Carlos Lombrana.

Q    You were already a DV gang member when this happened; is that right?

A    Correct.

Q    What did you do physically?  What did you do to jump Speedy in?

            THE COURT:  Come on.  They beat him.  Let's move on.

            MR. WELCH:  Yes, sir.

            THE COURT:  They beat him up.  That's what you do when you jump in according to all the evidence in the

case.

BY MR. WELCH:

Q   Sir, are you familiar with the term jump out?

A   Yeah.

Q   What is a jump out?

A   It's the same thing, a beating.

Q   For what purpose?

A   For the disrespect.  For -- to take you out of the gang.  To show you're no longer one of us.

Q   And so you're being kicked out of the gang?

A   Yeah.

Q   Do you know whether or not -- did you ever participate in a jump out?

A   Yeah.

Q   All right.  Who did you help jump out?

A   My little brother.

Q   What's your brother's name?

A   Juan Worthey.

Q   Your little brother Juan Worthey, he is -- his nickname was Little Wicked; is that right?

A   Correct.

Q   And why was your brother jumped out of the gang?

A   Because he told.

Q   Because he what?

A   Because he snitched.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Because he snitched?  You need to answer out loud.

A   Yeah.

Q   Is that a yes?  Okay.  All right.  And who did he snitch on and what did he do?

A   He was shot by a rival gang member and he told on 'em.

Q   So your brother was shot by a Sureno?  Is that a yes?

A   Yeah.

Q   And he told who about being shot?

A   The police.

Q   And that was against the rules?

A   Yeah.

Q   All right.  And then you participated in jumping out your brother?

A   Yeah.

Q   So you helped beat your brother?

A   Yeah.

Q   After you did that, Mr. Worthey, did you earn greater respect within the gang?

        MR. WACHTEL:  Objection.  Calls for a conclusion.

BY MR. WELCH:

Q   If you know.

A   I mean, they looked at me different.

Q   What do you mean by that?

A   More people talked to me.  I mean, it felt like more respect.

THE COURT:  All right.  The answer will stand.

BY MR. WELCH:

Q   All right.  After you became a member of DV, did you continue to engage in criminal activity?

A   I did.

Q   What type of criminal activity did you engage in?

A   Same thing.  Fights; burglary.  I mean --

Q   All right.  Fights with who?

A   Surenos.

Q   And a burglary you said?

A   Well, I mean, really didn't have nothing to do with gang related but they put it down as gang related so --

Q   All right.  Let's -- were there other -- was there other criminal activity that you recall you participated in as part of the gang?

A   Other than fights and tagging, no.

Q   All right.  Sir, were you familiar with a man by the name of Pedro Garcia?

A   Yeah.

Q   How do you know Pedro Garcia?

A   I met him when I was young.

Q   And where?  In Dodge City?

A    In Dodge City.

Q    Do you know Pedro Garcia to be a member of a gang in Dodge City?

A    Yeah.

Q    Which gang?

A    DV.

Q    Do you see Mr. Garcia in the courtroom today?

A    Yeah.

Q    All right.  Would you please point to him and describe what he is wearing today?

A    Wearing white shirt and some tan pants.

Q    All right.  And could you point to him for us please.

(Witness indicating.)

Q    Is he the man seated next to Mr. Wachtel?

A    Yeah.  I don't know the attorney's name.

Q    The attorney with the white hair?

A    Yeah.

Q    Were you also familiar with a man by the name of Gonzalo Ramirez?

A    Yeah.

Q    How do you know Gonzalo Ramirez?

A    I met him when they picked me up from work.

Q    When he picked you up from what?

A    When he picked me up from work.

Q   Do you recall how long you had known Mr. Ramirez?

A   I have no idea.

Q   For several years?

A   Yeah.

Q   And did you know whether or not Gonzalo Ramirez was a member of a street gang in Dodge City?

A   Yeah.

Q   What gang was he a member of?

A   DV.

Q   Would you please do the same thing if you see Mr. Ramirez in the courtroom.  Point to him and describe what he is wearing.

A   Right here wearing a white shirt.

Q   Is he seated between the two attorneys, sir?

A   Yeah.

          MR. WELCH:  Your Honor, I'd ask the record reflect the witness has identified both Pedro Garcia and Gonzalo Ramirez.

          THE COURT:  It will.

BY MR. WELCH:

Q   Mr. Worthey, after you became a member of DV, did you become familiar with the structure of the gang?  How the gang operated?

A   Yeah.

Q   All right.  Did the gang have rules that you were

expected to follow?

A   Yeah.  I mean, all gangs have rules they expect you to follow.

Q   Let's just talk about DV, the rules of the gang you belonged to.  Okay?  Fair enough?

A   All right.

Q   All right.  Now, within DV, you talked earlier about wanting to gain respect.  What type of activities would you pursue to gain respect within the gang?

MR. WACHTEL:  I object.  This is repetitious also.

MR. WELCH:  Your Honor, we're now talking about the structure of the gang.  This is getting into a new area.

THE COURT:  I don't see what you're headed toward here.  The structure, that means who is who in the gang, not what they did.

MR. WELCH:  Well, actually, what you did, Your Honor, kind of helped define where you were within the gang.

THE COURT:  All right.  But let's move this along please.  This is the last witness I'm going to allow to go through the DV gang structure.  We've heard enough of it.  So you can -- whatever you can get out of him, that's fine.  But if there are going to be other DV

gang members here, we're not going through this again. And I don't care what it is that they have to say, we're not going to go through this with every single gang member, tagging, fighting with the Surenos.  This case is moving too slowly.  Let's move it along.  And I'm going to keep after all the lawyers in this case to move it along.  Go.

        MR. WELCH:  Yes, sir.

BY MR. WELCH:

Q   Mr. Worthey, did DV have -- hold meetings?

A   Yeah.

Q   When you were within -- in the DV gang, did you attend meetings as part of the gang?

A   Yeah.

Q   Where did meetings -- where were they usually held?

A   They were randomized.

Q   How often would meetings be held?

A   I mean, there was different times.  I mean, sometimes we try to do it the first Sunday of the month. Sometimes the second Sunday.  I mean, it changed. Different times.

Q   What was the purpose of conducting meetings?

A   Just to establish who was who and who's been doing what.

Q   Was there a time when you conducted meetings that

you were expected to pay money toward the gang?

A   Yeah.  After a while.

Q   And did you actually help keep track of monies that were paid during these meetings for the gang?

A   I did.

MR. WELCH:  May I approach, Judge?

THE COURT:  Yes.

BY MR. WELCH:

Q   Mr. Worthey, I'm going to hand you an envelope, manila folder, marked Exhibit 159.  Inside I'm going to remove the contents.  There's three different items which are marked 159-A, 159-B and 159-C.

Take just a minute, please, look at 159-A and open the notebook and look at it for a minute.  After you've had a chance to look at it, tell me when you're ready.

A   I already know what it is.

Q   That was my question.  Have you seen that before?

A   Yes.

Q   All right.  What is that?

A   It's a receipt book.

Q   All right.  And that receipt book you've seen before today; is that right?

A   That's correct.

Q   All right.  And was there a point in time when monies that were paid toward the gang, the gang kept

track somewhere who paid money?

A    I kept track.

Q    All right.  This exhibit, 159-A, do you recognize your handwriting on one or more of the ledger sheets?

A    Yeah.

Q    I've turned to what appears to be the second ledger sheet.  Do you see that, sir?

A    Yeah.

Q    And is there -- well, any question in your mind, Mr. Worthey, that this is a ledger sheet that you maintained as part of the gang to identify monies paid on behalf of -- by gang members toward the gang?

A    I did.

MR. WELCH:  Your Honor, we would offer 159-A I believe it is.  Yes, 159-A.

MR. WACHTEL:  No objection to 159-A.

MR. MANDELMAN:  Your Honor, I still object as to foundation as to when it was made.

THE COURT:  You can ask him that on cross-examination if you're really interested.  159-A is received.

BY MR. WELCH:

Q    Mr. Worthey, 159-A, in addition to that first white sheet I asked you to look at, do you recognize other sheets where amounts -- well, starting with the first

white sheet that I have open for you now, is there a month listed at the top of that statement?

A   There is.

Q   What month is that?

A   April.

Q   And below that date, month of April, do you see a list of names?

A   I do.

Q   And this is your handwriting; correct?

A   Correct.

Q   The names that are listed below, starting with this one, what is that name?

A   Blanco.

Q   Who is Blanco?

A   Me.

Q   Below that is the name what?

A   Caiyo.

Q   Caiyo is?

A   Fabian Neave.

Q   And Curly is who?

A   I never knew his name.

Q   All right.  Deuce-Deuce is who?

A   Alfredo Beltran.

Q   I won't go through each one of those; but if you look at each name listed below -- let me ask you this,

were each of those people -- these are all gang names; correct?

A   Correct.

Q   Were each of those people members of the Diablos Viejos street gang?

A   Yes.

Q   And to the right of the name, not on every line, but on most of the lines, there appears to be an amount of money.  Do you see that?

A   Yeah.

Q   Why did you write -- first of all, what amount of money did you write to the right of the people that have a name, what amount did you reflect?

A   20.

Q   $20?

A   $20.

Q   And then there are, one, two, three, four, five, six, seven, eight, nine, ten, where you reflect payments of $20; is that correct?

A   Correct.

Q   And up here at the upper right we have $20 unknown. Do you know why you wrote that?

A   I can't recall.

Q   And then at the top of that there's a number $290. Do you see that?

A   Yeah.

Q   Do you know why you wrote $290?

A   That's the total amount we had.

Q   That's the total amount that had been paid at that meeting; is that right?

A   I don't know if it had been paid at that meeting; but that's the amount we had.

Q   All right.  And the names that have dollar amounts written off to the side, was that an amount of money paid by that gang member at that meeting?

A   Yeah.  Well, it -- really, it's a monthly payment.

Q   It's what?

A   It was a monthly payment.  They didn't have to make it right at that meeting.  They could make it any time during the month of April.

Q   Okay.  So it was understood as part of the gang rules you had to make a monthly payment of $20?

A   That's correct.

Q   And this reflects that at least those gang members had paid that amount at that meeting?

A   Correct.

Q   All right.  Now, then going next, to the next sheet, which would be two more down.  Do you see the month listed there?

A   I do.

Q   What is that?

A   May.

Q   And, again, below that do you see a list of names, sir?

A   I do.

Q   And I'll just count -- 14.  Do you see 14 names?

A   Yes.

Q   Do you recognize each of those names as being members, street names of DV gang members in Dodge City, Kansas?

A   Yeah.

Q   And does this reflect some payment of money being made at a meeting in May?

A   Yeah.

Q   Do you recognize that as your handwriting as well, sir?

A   Yeah.

Q   Mr. Worthey, do you recall for what period of time you were responsible for collecting money on behalf of the gang?

A   I don't know if I kept it after May.  I mean --

Q   But there was a period of time that you did -- one of your jobs within the gang was to collect money?

        MR. WACHTEL:  I object.  This is --

        THE COURT:  I'm sorry.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

MR. WACHTEL:  I'm sorry, Your Honor.  That's a leading question.  One of your jobs was.

MR. WELCH:  I can rephrase it, Judge.

THE COURT:  Please.

BY MR. WELCH:

Q   Mr. Worthey, did you have a job within the gang in connection with the collection of money?

A   Well, I mean, it really wasn't a job; but I -- I'm the one who collected the money.

Q   Where did you -- after money was collected, where did you keep it?

A   In a lockbox.

Q   What was the purpose of collecting money?

A   To help with the homies.  To help with the gang, help with the homies.

Q   You say help with the homies.  Fellow gang members?

A   The ones that were incarcerated.

Q   How would this money help incarcerated Diablos Viejos, DV gang members?

A   It's a hard life in jail, you know, if you don't got commissary, I mean, you gonna --

Q   You say DV -- there were some DV gang members in jail or in prison during this time?

A   Yes.

Q   Money was collected to help provide money to

incarcerated DV gang members?

A    That's correct.

Q    So they could purchase items in prison?

A    That's correct.

Q    Was there other reasons why money was collected in addition to helping other DV gang members in prison?

A    Yeah.  That was to help the home boys on the outside.

Q    To help home boys on the outside?

A    Yeah, on the outside of jail.

Q    What do you mean by that?

A    Well, I mean, we could use it to buy guns.  We could use it to buy drugs.  If a home boy didn't have money to pay one of his bills, we would help him with his bills. That was the whole basis for it.

Q    That's why money was collected --

A    That's why money was collected.

Q    -- for gang members in prison and gang members outside of prison?

A    That's correct.

Q    All right.  Now, in addition to that Exhibit 159-A which we removed or I removed from the folder, I also asked you -- or identified two other documents, 159-B and 159-C.  Do you recognize those documents, sir?

A    I don't recognize them.

Q   All right.  Well, let me just ask you about 159-B.
Do you recognize the names that are on that document?

A   Yeah.  It's not my handwriting, but I recognize the names.

Q   And you actually see your street name as one of the names listed on the sheet?

MR. WACHTEL:  Objection.  Unless the document is admitted, we should not ask about it.

MR. WELCH:  I'll withdraw that question, Judge.  At this time, Judge, I will offer -- 159-A has already been admitted, correct, Judge?

THE COURT:  Correct.

MR. WELCH:  159-B and 159-C, we'll hold off on those two.

BY MR. WELCH:

Q   Mr. Worthey, in addition to the time period that you were collecting money on behalf of the gang, was there other times where money was collected while you were a DV gang member for the gang?

A   No, this was the beginning of it.

Q   Okay.  Were you expected to attend meetings when they were held?

A   Yeah.

Q   What would happen if you didn't?

A   Well, I mean, that depends on if -- there was a time

whenever the young home boys from my generation tried to take over.  Before that, you could, you could be excused out of a meeting.  I mean, unless it was a mandatory meeting.  After that, if you didn't attend the meeting, you got a violation.

Q   And what is a violation?

A   Violation is a beating, a correction, disciplinary action.

Q   Were you aware of occasions where gang members were violated for not attending meetings?

A   I was.

Q   Did that ever happen to you?

A   No.

Q   Was there other conduct or transgressions that were considered violations within the gang?

A   I mean, you could -- there was a lot of things you could do to get a violation.

Q   For example, what?

A   I mean, talkin' to police get a violation.  I mean, failure to comply with an order is a violation.  You know --

Q   Talking with the police is considered snitching; correct?

A   Well, I mean, no, snitching is done, you're jumped out.  I mean, just talkin' with police.

Q   All right.  So it's possible to -- if you cooperated with police, you would be violated but not necessarily kicked out of the gang?

A   If you don't snitch.

Q   What's the difference between cooperating with the police and snitching?

A   Snitching, you give somebody up.  Talkin' to the police is just you said too much, you should have kept your mouth closed.

Q   All right.  What other conduct or activities could get you violated?

A   Like I say, failure to follow an order.

Q   What do you mean by that?

A   An older home boy tells you to do something, usually you do it.  If you don't, chances are you'll get a violation.

Q   All right.  Were there occasions, Mr. Worthey, where you were violated for not following an order?

A   No.

Q   Now, you talked about older home boys, and were those generally the people who were able to give orders?

A   Yeah.

Q   All right.  And how was it -- how did you become, other than being older than other gang members age-wise, how did you become -- how did you get established in a

position where you could give orders?

A   I mean, depends on how crazy you were, how down you were.

Q   When you say how crazy you were, what do you mean by that?

A   Like, your willingness to do things.

Q   What kind of things?

A   Anything.  I mean, if, if you would fight somebody in the middle of WalMart, you're going to get more respect than to fight somebody in the middle of a park.

Q   By fighting somebody, who are you talking about?

A   Rival.

Q   So, if you -- you said if you're willing to show you're crazy, did that earn respect?

A   Correct.

Q   What other things would earn greater respect than fighting a rival gang member, physically fighting a rival gang member?

A   I mean, using a weapon, shooting.

Q   Would that earn even more respect?

A   Anything that escalates a crime is going to earn you just that much more respect.

Q   Were there gang members who had established within the gang because they were known as people who shot -- who had weapons and used them?

A    Correct.

Q    Known as shooters?

A    I knew a couple.

Q    All right.  And did you -- were there people within the gang who -- well, if you shot at rival gang members, did that earn a great deal of respect?

A    Yeah.

Q    And if you killed a rival gang member, would that earn you even greater respect?

A    Yeah.

Q    Did you know -- you said you know people within the gang who had respect based on their reputation of being a shooter; is that right?

A    That's correct.

Q    Did you know whether or not Pedro Garcia had status within the gang, was known as someone who would shoot?

A    Uh-huh.

Q    He was known to shoot?  You need to answer out loud, sir.

A    Yes.

Q    Okay.  And did you know whether or not Gonzalo Ramirez had status within the gang based on his reputation for being willing to shoot?

A    He was known to shoot.

Q    He was what?

A    He was known to shoot.

Q    Were there gang members, DV gang members, who were known to frequently possess firearms?

A    Yes.

Q    Who?

A    You want a list?

Q    The ones that you know of.

A    Peter, Gonzo, Rabbit, Jason --

MR. WACHTEL:  I object to the absence of foundation, Judge.  No foundation, Your Honor.

THE COURT:  I think -- go ahead and lay some foundation.  I assume you can.

BY MR. WELCH:

Q    Mr. Worthey, were there times that you saw gang members with firearms?

A    Yeah.

Q    More than one firearm?  What I mean by that is what type of guns did you see gang members in possession of?

A    Pistols, revolvers, shotguns, rifles.  No discrimination on firearms.

Q    Any firearm would do?

A    Any firearm will do.

Q    Were there times you saw Pedro Garcia with firearms?

A    Yeah.

Q    And where did you see him with firearms?

A    At his house.

Q    Had you been to his house before?

A    Yes.

Q    You recall where his house was located?

A    On Avenue D.

Q    Avenue D as in David?

A    Yeah.

Q    And were there -- do you recall what type of guns you had seen Pedro Garcia with at his house?

A    I only seen him with one pistol.

Q    A pistol?  All right.  You need to answer out loud, again, sir.

A    Yes.

Q    The lady can't take down a nod of the head.  All right?

A    Sorry.

Q    You're fine.  Now, have you seen Gonzalo Ramirez with firearms in the past?

A    I have.

Q    All right.  Where did you see him with firearms?

A    In his car.

Q    In a car?

A    In his car.

Q    In his car.  Okay.  What type of firearms did you see him in possession of?

A   Nothing but a revolver.

Q   And earlier you testified part of the reason you collected money for the gang was to obtain firearms if necessary?

A   Yeah.  If one came up for sale that a home boy knew about, we could -- we would deliberate and -- on purchasing it.

Q   All right.  And were there firearms that were available to you or other DV to use if they needed to use guns?

A   Yeah.

Q   Mr. Worthey, earlier you talked about part of the gang rules were you were expected to hit up rival gang members; correct?

A   Correct.

Q   Was it -- what would happen if you were with fellow DV gang members and you were hit up by Surenos and you failed to respond?

A   That would depend on if you were with the older home boy or not, depending on the situation.

Q   What do you mean by depend whether you were with an older home boy?  What do you mean by that?

A   I mean, you can't, like, if you have an older home boy just got out of prison, you can't get in a fight in Love's parking lot because then you're going to risk

that home boy going back to prison.

Q   Love's parking lot is a convenience store in Dodge City; correct?

A   Correct.

Q   All right.  But if you encounter this rival gang member in a different location and you're told to respond by the gang members that are with you and you don't, what could happen?

A   Violation.

Q   When you were a member of the Diablos Viejos gang, Mr. Worthey, was it important to you how you were viewed by other gang members?

A   Yeah.

Q   Was it important to you to have status within the gang?

A   I mean, up to a certain point.

Q   Mr. Worthey, in addition to the criminal activity that you've already told us you participated in, did you participate in distribution of drugs, narcotics?

A   No.

Q   Did you use drugs?

A   Yeah.

Q   Did you know DV gang members who did distribute drugs?

A   Yeah.

Q   Do you know whether or not Pedro Garcia distributed drugs?

A   I knew he did.

Q   You knew --

A   I knew he did.

Q   How do you know that?

A   I mean, it, it wasn't a hidden fact.

Q   All right.  Was there occasion where you obtained methamphetamine from Pedro Garcia?

A   Years before, yeah.

Q   And do you know whether or not Gonzalo Ramirez distributed drugs?

A   Yeah.

Q   And how do you know that?

A   Just the same thing.  It's a known fact.  I mean, you really didn't hide nothing from other gang members of your gang.

Q   Mr. Worthey, you recall being at one -- a gang meeting and there being a discussion or comment made by Gonzalo Ramirez regarding the distribution of drugs and what the role was in distributing drugs within the gang?

A   I remember -- I remember you asked me that.  I don't remember that comment.

Q   Okay.  We'll move on then.  Do you know a man by the name of Fabian Neave?

A    I do.

Q    He goes by what nickname?

A    Puppet.

Q    Do you know whether or not Fabian Neave distributed drugs while a DV gang member?

A    Yeah.

Q    Do you know a man by the name of David Ochoa?

A    Yeah.

Q    Was David Ochoa a DV gang member?

A    Yeah.

Q    And do you know whether David Ochoa -- do you know his nickname?

A    Little David.

Q    Do you know whether David Ochoa, known as Little David, did he distribute drugs as a DV gang member?

A    I mean, I never knew him personally so --

Q    If you don't know, that's fine.  So you're telling us you don't know whether David Ochoa distributed drugs?

A    Yeah, I don't know.

Q    That's fine.  All right.  Did you know a man by the name of Eusebio Sierra-Medrano, better known as TC?

A    Yeah.

Q    Was TC a member of DV?

A    No.

Q    Was he a Norteno?

A   Yeah.

Q   Do you know what set Mr. Sierra-Medrano belonged to?

A   The exact set, no.

THE COURT:   I think it's time to take our noon recess.   Approximately one hour, Ladies and Gentlemen. Please remember and heed the admonition.   Have a nice lunch.

(Noon recess at 12:10 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 1:17 p.m. October 8, 2013, the following proceedings continued.)

THE COURT: You may continue.

MR. WELCH: Thank you, Judge.

BY MR. WELCH:

Q Mr. Worthey, I want to focus a few questions on the date -- about the events that took place on June 8, 2009. Do you recall that date, sir?

A Yes.

Q Were you living in Dodge City on June 8, 2009?

A Yes.

Q And were you still a member of the Diablos Viejos on that day?

A Yes.

Q Do you know a man by the name of Anthony Wright?

A Yeah.

Q How do you know Anthony Wright?

A He's my cousin.

Q Did you see Anthony Wright on June 8, 2009?

A Yes.

Q Do you recall approximately when you first saw him that day?

A The time -- I can't put a time on it.

Q Where did you see him?

A    At my house.

Q    And what caused you to see Anthony Wright at your house that day?

A    He came picked me up, take me for a cruise.

MR. WACHTEL:  I'm sorry, Your Honor.  I could not understand the last couple words.

THE COURT:  I couldn't understand the answer either.

A    He picked me up to take me for a cruise.

BY MR. WELCH:

Q    And how did he pick you up?  What type of car?

A    Gold Mazda.

Q    And was it daylight when he came by your house?

A    It was almost dark.

Q    And you said he came by to pick you up for a cruise. Did you know he was coming to your house to see you?

A    No.

Q    And you said you were cousins with Mr. Wright; correct?

A    Correct.

Q    Did Mr. Wright live in Dodge City?

A    Yes.

Q    And would you see Mr. Wright on a regular basis?

A    Not on a regular basis.

Q    All right.  But on June 8, 2009, he came by in a

car. And did you decide to go with him to ride around or drive around?

A    I did.

Q    Where did you go?

A    We drove around just in a random pattern for a while. Then we --

Q    Go ahead.

A    Then we went to Peter's house.

Q    Now, prior to getting to -- you say Peter, you're talking about the Defendant Pedro Garcia?

A    Yes.

Q    Prior to getting to Pedro Garcia's house, do you recall being in the area of the trailer park in south Dodge City, Kansas?

A    I don't recall driving by it.

Q    Do you recall, would you be with Mr. Wright on any other day in the area of the trailer park in south Dodge City?

A    Yes.

Q    When do you recall being with Mr. Wright and the two of you being -- driving through this trailer park?

A    The day before.

Q    I want to hand you, sir, what's been admitted as Government Exhibit 100. Do you recognize what that is, sir?

A    A trailer park.

Q    Have you been to that trailer park either prior to June 8, 2009, or on June 8, 2009?

A    Yeah.

Q    Do you recall when you had been there -- had you been there on June 7, 2009?

A    Are you asking me what time?

Q    No.  On the date of June 7, 2009, are you saying you and Anthony Wright drove to that trailer park?

A    Yeah.

Q    What was the purpose of driving to that trailer park?

A    Just for a cruise.

Q    Do you recall seeing anyone or taking note of anyone, people, at the trailer park while you and Anthony Wright were driving around?

A    Yeah.

Q    Who do you recall seeing and why does that stick out in your mind?

A    Their names, I don't know.  Just two people were settin' up on the porch.

Q    And why did you -- why do you recall seeing these two people?

A    It sticks out in my mind because Anthony hit 'em up.

Q    What -- by hitting them up, what do you mean by

that?

A    He, he threw four fingers up at 'em.  He threw a gang sign at 'em.

Q    Do you recall whether those two people responded to that in any way?

A    They didn't respond.

Q    Prior to June 7, 2009, Mr. Worthey, had you been to this trailer park?

A    Yeah.  Not this specific area; but this park, yeah.

Q    Did you believe rival gang members lived in that area?

A    I didn't know any rival gang members lived there.

Q    Do you recall where Anthony Wright lived in June of 2009?

A    Yeah.

Q    Where did he live?

A    He lived on the other side of McArtor in the same trailer park.

Q    And where did you live?

A    I lived on Woodland, Woodlawn, something like that.

Q    And how far away from this trailer park was Woodland or Woodlawn, the house that you lived in?

A    On the other side of the bridges.

Q    Okay.  And those of us who haven't been to Dodge City --

A   I mean, I can't put a distance on it.  I mean, maybe half a mile, maybe a quarter mile, I mean --

Q   All right.  Had you been to Anthony Wright's home before?

A   In this trailer park?  Yeah.

Q   You said Anthony Wright lived in the same trailer park but across McArtor; is that right?

A   Yeah.

Q   To the north; is that right?

A   Yeah.

Q   And you recall Mr. Wright, you said, throwing gang signs at two people.  What location within the trailer park?  If you remember.

A   Are you asking me the square numbers?

Q   No.  In the approximate area -- you drove through the trailer park you say on June 7, 2009; correct?

A   Uh-huh.

Q   Where in the trailer park did you drive?

A   I mean, on this first road right here.

Q   I think it should be on your screen also.  You can actually touch the screen and it will indicate or it will leave a mark as to where you are indicating --

A   You want me to show the road that I drove or the house --

MR. WACHTEL:  I'm sorry, Judge.  I've caused a

commotion.  Our screen was blank and suddenly it came back.  And I apologize to you, Lanny.  Thank you.

MR. WELCH:  Sure.

Q   All right.  Mr. Worthey, I think I asked you on June 7, 2009, where within the trailer park did you and Anthony Wright drive?

A   Well, that's, I mean, that's what I asked you.  If you wanted to know the road we drove on or the house where the victims were at.

Q   If you can identify the house where you saw these two men on June 7, 2009, indicate that.

(Witness complies with request.)

Q   All right.  After these gang signs -- you said the four was shown; is that right?

A   Yeah.

Q   And four indicates what?

A   The four for one four.

Q   Meaning Norteno; is that right?

A   Yes.

Q   And you already told us you don't recall if these two men responded to that in any way; correct?

A   They didn't respond.

Q   Okay.  Later, after you and Mr. Wright drove through the trailer park, did you have any more interaction with anyone in the tailer park on that day?

A    Me personally?  No.

Q    Do you know if Mr. Wright did?

A    I know he had previous altercations.  I don't know about after that day -- well, up until --

Q    Let's stick with that day if you can.  June 7, 2009, after you and Mr. Wright were in the trailer park, you saw him flash gang signs.  Do you know if you -- you're telling us you didn't have any further interaction with anybody at the trailer park that day; correct?

A    Correct.

Q    And do you know that day whether Mr. Wright did?

A    No.

Q    After that happened, what did you do on June 7, 2009?

A    I got dropped off at home.

Q    Let's focus in on June 8, 2009, the next day.  You already told us you and Mr. Wright saw each other again on June 8, 2009; correct?

A    Correct.

Q    And do you remember approximately what time you first saw Mr. Wright on June 8, 2009?

A    I, I mean, approximate time, the sun was going down. It wasn't dark but it wasn't light.

Q    So in the evening.  Is that a fair statement?

A    I mean, it would be later than evening but --

Q   All right.  And what was the purpose of Mr. Wright coming -- how did you and Mr. Wright get together on June 8, 2009?

A   He pulled up in front of my house, was honkin' his horn.

Q   And what did you do?

A   I went outside to talk to him.

Q   And what was the conversation about?

A   He had been trying to purchase an old car that I had.

Q   A car you had for sale?

A   It wasn't for sale, but --

Q   So you talked about the possible sale of a car?

A   Well, he talked about that.

Q   Okay.  What else did you talk about?

A   Nothing really.  I mean, he told me let's go cruisin'.  I told him I didn't want to, I was stayin' home with my wife, we had movie.

Q   At some point did you finally agree to ride along with Mr. Wright?

A   I finally got in the car.

Q   And where did you go?

A   Cruisin' around for a little bit.  No particular pattern, just random cruising.  Then we went to Peter's house.

Q   You had been to Peter's house prior to June 8, 2009?

A   Yeah, I'd been there.

Q   Let me ask you to look at -- can we display 156.  Do you recognize what's depicted in 156?

A   Yeah.

Q   What is that?

A   That's the back of Peter's house.

Q   It's the back of Peter's house, did you say?

A   Yeah.

Q   It would help if you speak just a little louder, Mr. Worthey.

A   Yeah.

Q   All right.  And earlier you testified that his house was on Avenue D is your memory; is that correct?

A   Correct.

Q   Now, when you and Mr. Wright went to Mr. Garcia's house, why did you go there?

A   I, I have no idea why we went there.

Q   Was that a location that you had been to on a fairly regular basis in the past?

A   I mean, not regularly.

Q   Had you been there before?

A   I had been there before.

Q   All right.  So whose decision was it to go to Mr. Garcia's house on June 8, 2009?

A    It would have to be the driver.  Had to be Anthony.

Q    So Mr. Wright's driving the car; correct?

A    Correct.

Q    And where were you located?

A    Passenger seat.

Q    Was there anyone else in your car before you arrived at Mr. Garcia's house?

A    No.

Q    When you arrived at this house, what did you do?

A    We went to the back door and we knocked.

Q    Now, when you say you went to the back door.  Can you see the approximate location on this photograph where the back door was that you went to?

A    You want me to touch the screen?

Q    Please.

                    (Witness complies with request.)

Q    And when you were knocking on the back door, did anybody answer the door?

A    No.

Q    And, again, it's you and who else knocking on the back door?

A    Anthony.

Q    Anthony Wright?

A    Wright.

Q    All right.  So when no one responds to the knock,

what do you do?

A    We start to leave.

Q    And was there something that caused you to change your mind and stay?

A    Yeah.

Q    What was that?

A    We heard footsteps running up behind us.

Q    And did you identify who it was that you heard running behind you?

A    It was Tito, Gonzo, Peter and Big Knox.

Q    Now, you said Peter is Mr. Garcia; correct?

A    Correct.

Q    Gonzo is Defendant Gonzalo Ramirez; correct?

A    Correct.

Q    You referred to another man by the name of Tito.  Do you know his real name?

A    No.

         MR. WELCH:  May I approach, Your Honor?

         THE COURT:  Yes, sir.

BY MR. WELCH:

Q    I'm handing you, sir, what's been marked as Government Exhibit 385.  Do you recognize 385?

A    Yeah.

Q    What is that?

A    That's Tito.

Q   And let me also ask you to look at what's been marked as 387.  Do you recognize who that is?

A   Yeah.

Q   Who is that?

A   That's Big Knox.

Q   Do you know Big Knox' real name?

A   Josh Flores.

Q   And do both these photographs -- are they accurate depictions of the man you know as Tito and the man you know as Big Knox or Josh Flores?

A   Yes.

        MR. WELCH:  We would offer 385 and 387.

      Can we display 385 please.  And 387.

BY MR. WELCH:

Q   Mr. Worthey, you testified that as you were getting ready to leave Mr. Garcia's backyard, four men approached.  Where did they come from?  Could you tell?

A   They came from the alley.

Q   And is there an alley behind Mr. Garcia's house?

A   Yeah.

Q   Did you have any conversation with these men as they came through the alley?

A   Inside the house, no.

Q   When the four men arrived coming down the alley, where did they go?

A    Inside.

Q    Inside where?

A    Inside Peter's house.

Q    What happened when they went inside the house?

A    They all went in and sat down.

Q    And did you go inside the house also?

A    Yeah.

Q    Can you describe what they were wearing when they arrived running through the alley in the backyard?

A    No.

Q    And do you recall there being any conversation between these four men either in the backyard of the house or once you got inside the house about anything?

A    No.

Q    And where were you -- when these four men went inside the house, where were you located?

A    In the room right before the room where they were sitting.  It's like a big -- there's two rooms with a wall knocked down.

Q    Were you able to see the four men -- once you went inside the house into the basement of the house, were you able to see these four men?

A    Yeah.

Q    What were they doing?

A    They were sitting down.

Q    And where was Anthony Wright?

A    He was standing at the wallway (sic).

Q    How many people were in the basement of the house, then, at this point in time?

A    Six.

Q    You; correct?

A    Correct.

Q    Anthony Wright?

A    Correct.

Q    And then the four men you just saw running back to the house; correct?

A    Correct.

Q    Now, while you were in the house, you recall seeing any firearms?

A    Only one.

Q    All right.  What type of gun did you see?

A    A pistol.

Q    And where did you see it?

A    Josh Flores.

Q    Did you see any money or cash in the basement of the house?

A    No.

Q    Did you hear any discussion about any criminal activity that had just occurred?

A    Not in the house.

Q   Was there a point in time when you did hear a conversation about criminal activity that had taken place?

A   When we were cruising around.

Q   We'll get to that here in just a second.  But while you were at Mr. Garcia's house and the six of you are in the basement, did you have any conversation with either Pedro Garcia or Gonzalo Ramirez?

A   Not that I remember.

Q   Do you recall having any conversation with Anthony Wright?

A   No.

Q   At some point, do you leave the house?

A   Yeah.

Q   All right.  Who did you leave with?

A   Anthony, Peter and Gonzo.

Q   And how do you leave the house?  What are you riding in?  Or driving in?

A   The gold Mazda.

Q   Is that the same Mazda that you and Anthony Wright drove to the house?

A   Yep.

Q   Now, when the four men came back to the house through the alley, were they driving or were they on foot?

A    They were on foot.

Q    Now, once you got in the car, who was driving?

A    Anthony.

Q    And who was in the front seat passenger side?

A    Me.

Q    And who was sitting behind you?

A    Gonzo.

Q    Mr. Ramirez?

A    Yeah.

Q    And who was sitting behind Mr. Wright?

A    Peter.

Q    Defendant Pedro Garcia; correct?

A    Correct.

Q    Now, you told us earlier that once you got in the car, there was some conversation about criminal activity that had just taken place.  What did you hear in the car?

A    They were talkin' about they had just done a home invasion.

Q    And who is they that were talking about this?

A    Peter and Gonzo.

Q    When you heard them talking about a home invasion, did you know what that meant?

A    Yeah.

Q    When you hear home invasion, what did that mean to

you?

A    It's, I mean, self-explanatory.  You invade somebody's home.

Q    Is home invasion a type of crime or criminal activity you had heard the Diablos Viejos engaged in prior to June 8, 2009?

A    Well, I mean, not all DV gang members did it.

Q    That wasn't my question.  Had you heard other DV gang members that had participated in those type of robberies?

A    Yeah.

Q    Had you participated in those type of robberies?

A    No.

Q    So in the vehicle you heard Mr. Garcia and Mr. Ramirez talking about a home invasion robbery.  Did you understand when this robbery had taken place?

A    I mean, they never stated a time; but the way they were talking about it, it just happened.

Q    And do you know where it had taken place?

A    No.

Q    Did you -- do you recall hearing any other discussion about the robbery between Pedro Garcia and Gonzalo Ramirez while you were in the car?

A    No.

Q    While you were in the car, did you see either

Mr. Garcia or Gonzalo Ramirez at this point in the car with a gun?

A   No.

Q   And prior to leaving Mr. Garcia's house, did you have any discussion about the four of you, Mr. Wright, yourself, Mr. Garcia and Mr. Ramirez, doing something or doing anything?

A   No.

Q   So why are the four of you in the car together?

A   Going for a cruise.

Q   All right.  And did you go for a drive or a cruise?

A   Yeah.

Q   And where did you go?

A   I mean, we drove around a little bit.  Then we went to the trailer park.

Q   On the way to the trailer park, again, Mr. Wright is driving; correct?

A   Correct.

Q   Do you recall there being a discussion about any particular location that you wanted to go to?

A   No.

Q   All right.  Can you display 100 again, please.  Just to make sure we're clear, Mr. Worthey.  When you say at some point then the four of you arrived at the trailer park, is the trailer park depicted in Exhibit 100 the

same trailer park you're talking about?

A   Yeah.

Q   All right.  So when you arrived at this location, what happened?

A   Well, we drove down the first street and about two trailers back from the victim's house, Anthony states that there's some southsiders that live right up here. And as we come around, as they come into view, there's a group of men standing right there drinking beer.

Q   All right.  Now, you say you drove in through -- I think you said the first street of the trailer park. Again, would you place your finger on the display -- sorry -- and show us, when you say first street, which street are you talking about?

                    (Witness indicating.)

Q   And where did you come -- what street did you use to come into the trailer park from?  The street to the north?

A   Uhm, what is --

Q   The street to the north you testified earlier is McArtor; is that right?

A   Yeah.

Q   Did you drive on McArtor to get to that what you refer to as the first street?

A   Yeah.

Q   All right.  So once you drive off McArtor, that first street, what direction are you traveling?

A   South.

Q   Then you said when you got to about two trailers away from the victim's location you heard Mr. Wright make a comment; correct?

A   Correct.

Q   All right.  Can you just place a dot in the approximate location of where you hear this conversation about Surenos.

                    (Witness indicating.)

Q   And what exactly do you remember hearing?  Said?

A   They said there's some Surenos live right up here.

Q   That was who that said that?

A   Anthony.

Q   All right.  So after that comment is made, what happens?

A   As we continue driving, the house comes into view. There's four individuals -- well, theirs a group of individuals standing outside drinking.

Q   And why did you make note of the fact that there's men outside or a group of people outside drinking?

A   Because of what happened.  I mean --

Q   Well, let me -- just prior to that, you said Mr. Wright had made a comment about there being

southsiders or Surenos that live in this area; correct?

A   Correct.

Q   So when you arrived at the area where these people are gathered, was there any comment about these men or seeing these men?

A   No.  Just as we drove by, Peter said we're going to get these mother fuckers.

Q   All right.  Now, the location where this group -- I keep saying men.  Do you remember how many people were gathered in this area that you're talking about?

A   No.  I can't remember a number.

Q   Could you tell if there were men or women or both?

A   You could tell they were men.

Q   And Mr. Wright first said there's southsiders that live up here; correct?

A   Correct.

Q   As you drive by this group of people, another comment is made you said; correct?

A   Correct.

Q   And that comment was made by who?

A   Peter.

Q   And what was the comment?

A   Said, yeah, we're going to get these mother fuckers.

Q   What did you understand that to mean?

A   I mean, it could mean a number of different things.

Q   After the comment is made, what direction -- what happens?  Where did you go?

A   We continue south until we get to the -- to Hangden (ph) Street.  And we turn right to the next street and go north.

Q   If you would, from the approximate location of where you saw these group of men, would you just go ahead and drag your finger along the road and show us the direction of travel that the four of you took?

(Witness indicating.)

A   You want a complete drive path from start to finish?

Q   Start from where the group of men were located and then proceed the direction you traveled.

(Witness complies with request.)

Q   All right.  You've indicated a right turn going back north on what appears to be the middle road of the trailer park; is that right?

A   That's correct.

Q   All right.  And where did you go?  What do you do when you get to the middle road of the trailer park?

A   We drive down about halfway through and pull over and park.

Q   Can you show us the approximate location of where the vehicle came to park?

(Witness indicates.)

Q   When the vehicle stopped in this location, you just indicated approximately in the middle of the trailer park -- for the record, what happens?

A   Well, they all start getting out.  And Gonzo and Peter are putting bandanas around their face and asked if we're going to cover our face.  I knew something was wrong, so I hesitated.

Q   All right.  Now, had you seen bandanas in their possession prior to the vehicle stopping in the middle of this trailer park?

A   I seen a couple of people wearing 'em when they ran up to Peter's house; but I don't know exactly who was wearing 'em and who wasn't.

Q   All right.  So when you saw the four men running through the alley in the back of Peter's, the backyard, I guess, you said you saw at least two people wearing bandanas at that time; correct?

A   Correct.

Q   But you don't know which two were wearing bandanas.  Is that what you're saying?

A   Correct.

Q   All right.  So then the next time you see bandanas is when you're at the trailer park; correct?

A   Correct.

Q   Now, when you -- you're at the trailer park, is it

dark outside?

A    Yeah.

Q    And when you drove by this group of men -- and you've already told us you don't know how many men were there.  Did you notice if those men took note of you?  Did they look at you?  Did they say anything to you?  Did they do anything towards you?

A    Not nothing that I seen.

Q    All right.  So when you got to the area where you parked, you said you saw Peter, Pedro Garcia, and Gonzalo Ramirez put on bandanas; correct?

A    Correct.

Q    What did they say to you?

A    Gonzo told me:  Let's go home boy.

Q    And what did that mean?

A    That means let's go.

Q    You're still in the front seat of the car?

A    Yeah.  I got the door open.  I'm in the passenger seat.

Q    At this point, what did you think was happening?

A    I mean, a number of different things could have been happening.  Anywhere from a fist fight to a jumping to a shooting.

Q    All right.  Did you think you were going to be confronting rival gang members?

A    Yeah.

Q    Did you have a gun?

A    I didn't -- I didn't know they were rival gang members; but I knew we were going to confront the group of individuals.

Q    And was there comments -- prior to parking the car, were there comments made about there being Surenos in this area?

A    Yes.

Q    When the car is parked and you're getting out of the car, did you have a gun?

A    No.

Q    Do you know if Anthony Wright had a gun?

A    No.

Q    When you're getting out of the car, do you know if Pedro Garcia has a gun?

A    No.

Q    Do you know if Gonzalo Ramirez has a gun?

A    No.

Q    Now, when Mr. Ramirez told you let's go home boy, did you believe you could tell him no and you could stay in the car?

A    I mean, I could have, but I would have consequences to pay.

Q    You could have but -- I didn't hear what you said.

A   I would have consequences to pay.

Q   All right.  When you say you'd have consequences to pay, what do you mean by that?

A   I could take a violation for it.

Q   All right.  Now, on that day, June 8, 2009, was Gonzalo Ramirez a member of DV that you believed had a great deal of status?

A   Yeah.

Q   Did you believe that you could refuse direction or orders that he gave you?

A   No.

Q   And if you did, you're saying you would be violated?

A   Correct.

Q   Now, Pedro Garcia, let me ask you about him, did you believe him to be a person who had a great deal of status within DV?

A   Yeah.

Q   Did he give you any direct orders as you're getting out of the car about what he wanted you to do?

A   No.

Q   All right.  So the only one who told you what he wanted you to do was Mr. Ramirez, is that what you're saying?

A   Well, he didn't tell me what he wanted to do.  He just said come on.

Q   All right.   Did you feel like you could say no?

A   No.

Q   Why not?

A   I mean, I'm already, you know, trying to just maintain status in the gang.  I, I ain't trying to gangbang no more.  I'm not trying to take any violations.  I'm not trying to leave.  I'm not trying to be active.

Q   So if you had said no and not gone, did you believe your status could have been reduced in the gang?

MR. WACHTEL:  You know, I object, Your Honor.  This is really repetitious of what was gone through before.

THE COURT:  Incredibly repetitious.  Let's move on, please.

BY MR. WELCH:

Q   What did you do in response to the comment made to you by Mr. Ramirez?

A   I got out.

Q   And what happened?

A   I followed him.

Q   Where?

A   Through the trailers.  We weaved through the trailers and came out on the trailer right behind the individuals.

Q   All right.  Now, can you, starting from the spot that you have where the vehicle was parked, can you draw a line the direction of travel that you took.

A   You want me to draw the route?

Q   Yes.

(Witness complies with request.)

Q   Ask we display 105 please.  Mr. Worthey, do you recognize what's depicted in photograph 105?

A   It's the trailer we came out of the back of.  Behind it.

Q   Okay.  Now, can you do the same thing with this photograph and show us where you emerged from as you came around, as you said, came around the trailer.

A   We emerged from here.

(Witness complies with request.)

Q   And who is we?

A   All four of us.

Q   Where, as you're coming around this light blue trailer, where is Pedro Garcia?

A   He's in the front.

Q   Where is Gonzalo Ramirez?

A   Behind Peter.

Q   And where are you?

A   Behind Gonzo.

Q   Behind who?

A    Gonzo.

Q    And where's Anthony Wright?

A    Behind me.

Q    At this point in time, do you have your face covered, sir?

A    I have my shirt collar pulled up.

Q    Why?

A    To hide my tattoo.

Q    What did you think was going to happen when you got to this location?  Why were you trying to cover yourself up?

A    Like I said, any number of things could have happened, anything from a fight to a shooting.

Q    Do you know or do you recall if Anthony Wright had his face covered?

A    No.

Q    You don't recall or he did not?

A    I don't recall him having his face covered.

Q    All right.  And did Pedro Garcia have his face covered?

A    Yeah.

Q    And did Gonzalo Ramirez have his face covered?

A    Yeah.

Q    All right.  As you get to the corner, as you're turning the corner, what happens?

A   I see Gonzo pull a gun.

Q   Do you hear anyone say anything?

A   I hear Peter yell puro Norte.

Q   Okay.  Now, when you say you hear Mr. Garcia yell puro Norte --

A   Yeah.

Q   -- what does that mean?

A   It means pure northerner.

Q   And what, as a DV gang member, what does that mean to you, sir?

A   That's establishing that he's a northsider.

Q   And do you know who he was saying that to?

A   Have to be the victims.

Q   All right.  Now, after you hear Mr. Garcia say puro Norte, what happens?

A   They start firing.

Q   All right.  Now, you said at this point you saw Mr. Ramirez with a gun; correct?

A   Correct.

Q   Do you recall what type of gun you saw him with?

A   It was a revolver.

Q   Did you see Pedro Garcia with a gun?

A   No.

Q   Did you have a gun?

A   No.

Q And did Mr. Wright have a gun?

A No.

Q Now, you said they started shooting. Who do you mean by they?

A What I mean by they is I mean there was -- there were too many shots for just a revolver.

Q Did you see shooting?

A No.

Q When you heard the shooting begin, what did you do?

A I ran.

Q Can we display 103. Sir, I'm going to ask you to look at Exhibit 103. There's been testimony this is a diagram of the area where the shooting took place. Mr. Worthey, the light blue trailer that you identified as the one that you and the other three men came around, do you see that in the diagram, sir?

A Yeah.

Q Where is that trailer?

A Do you want me to touch on the screen?

Q Please.

(Witness indicates.)

Q All right. You've already told us you did not see anyone shooting; correct?

A Correct.

Q All right. But you heard gunshots fired; correct?

A    Correct.

Q    Did you see the victims, what they did after the gunshots began?

A    I don't know what they did.

Q    All right. Where was Pedro Garcia when you heard gunshots for the first time?

A    I didn't see where he was.

Q    Did you see where Gonzalo Ramirez was when you first heard gunshots fired?

A    No.

Q    Do you recall how many gunshots you heard?

A    Well, there were two bursts.

Q    Let's start with the first burst. Do you remember the approximate number of gunshots you heard?

A    Like five or six shots.

Q    All right. And then I take it -- you said there was another burst?

A    Then as I was running, there was another burst.

Q    And how many shots do you recall hearing in the second burst?

A    Probably another five or six.

Q    All right. So when you first hear gunshots, where are you located?

A    When I first hear it? I'm already running away. I mean, I ran at the sight of the gun.

Q   Let's move back to 100, please.  Mr. Worthey, we've placed back on the screen Exhibit 100.  Earlier, sir, you identified the location of where the what you refer to as victims were when you got there.  Can you indicate again the approximate location of the group of men that were the victims that evening?

A   Of the location where they were standing?

Q   Yes.

                    (Witness indicates.)

Q   All right.  Now, once you heard gunshots, you told us you didn't see the gun shot, the guns being fired; correct?

A   Correct.

Q   Where did you go?

A   You want me to draw the path I ran?

Q   Please.

                    (Witness indicates.)

Q   All right.  At some point in time, then, did you see -- well, I should ask you this.  While you're -- you're hearing gunshots and you take off running to the north and then a little bit to the northwest; correct?

A   Correct.

Q   Do you know where Anthony Wright is?

A   No.

Q   Do you see Anthony Wright again that evening?

A   Yes.

Q   Where do you first see him again?

A   He picked me up right there.

Q   In the location where you -- the last yellow mark is?

A   Correct.

Q   And he is now driving what vehicle?

A   The gold Mazda.

Q   The same car you arrived in?

A   Correct.

Q   When Mr. Wright picked you up, where did you get inside the car?

A   I got inside the car right there.

Q   Right.  But were you in the front seat or back seat?

A   Passenger, front passenger.

Q   All right.  Did you see Pedro Garcia again that evening?

A   Yeah.

Q   Where did you see him?

A   Right behind Anthony.

Q   So was Mr. Garcia in the car by the time you got into the car?

A   Yeah.

Q   And where was Gonzalo Ramirez?

A   Behind me.

Q    In the back seat?

A    Correct.

Q    All right.  So was Mr. Wright driving -- was the car moving when you saw it?

A    Yeah.

Q    And how -- do you know how they saw you?  Did you flag them down or how did you see them?

A    I mean, I came out, they told me jump in.

Q    And so when the car came to you just south of McArtor street, Mr. Wright is driving; correct?

A    Correct.

Q    And Pedro Garcia, Gonzalo Ramirez are in the back seat of the car?

A    Correct.

Q    You get back in the front passenger seat, which is the seat you rode into that location; correct?

A    Correct.

Q    What do you do?  Where do you go?

A    I mean --

Q    What happens after you get in the car?

A    We go out on McArtor and we turn right and we go to this street over here and we take that to, to -- we take that like a block to the first turn right and we take that street out all the way out to, like, the highway bypass.  We come out by the Flying J.

Q   What's the Flying J?

A   It's a truck stop.

Q   Okay.

A   And there's a dirt -- there's a dirt road right behind it.  We take the dirt road down and now we're back on the east side of Dodge on the avenues.  And we just weave our way in, drop Peter and Gonzo off, and Anthony drives me to a parking lot right by the police station and let's me out.  And I run across Wyatt Earp and right there to my house.

Q   All right.  Now, from McArtor street, as you're driving north to McArtor, you said you take a right, which is east, to the road which is on the farthest of this diagram.  You go around the bypass to Dodge City; correct?

A   Correct.

Q   While you're in the car -- you got back in the car just south of McArtor Street and then this travel back until you're dropped off at Wyatt Earp street, is there any conversation in the car?

A   Just -- I mean, when we're driving, Peter says, I got that one, I got him.  And Gonzalo says, yeah, you got him.

Q   So you hear Mr. Garcia say I got that one?

A   Yeah.

Q   And what did you understand that to mean?

A   He shot him.

Q   And what response did you say Mr. Ramirez made to that statement?

A   He said, yeah, you got him.

Q   And what did you understand that to mean?

A   That he shot him.

Q   Did you -- was there any other conversation or statements made while you were inside the car by anyone?

A   Yeah.  Just he -- he said he -- he said he know we got him just because of how dude fell over a fence.

Q   And who said that?

A   Peter.

Q   All right.  Do you recall any other discussion or conversation?

A   Then he told us to keep our mouths shut because we all got kids.

Q   And who said that?

A   Peter.

Q   Where did you go then after you were dropped off? You said you went to your house; correct?

A   Yeah, I went home.

Q   After that evening and the events that you took part in, Mr. Worthey, did your views of Pedro Garcia and Gonzalo Ramirez change in any way?

A    Did my what?

Q    Your views, how you looked at them, did it change in any way?

A    Yeah.

Q    How so?

A    They're killers.

Q    Did it effect the way you viewed their role and status in the gang, the DV gang?

A    Yeah.

Q    How so?

A    I mean, like the ultimate respect, you know what I'm saying.  They -- not everybody can kill somebody.

Q    All right.  Say that again.  I didn't hear you.  Not everyone --

A    I mean, it, it takes a lot of courage to kill somebody.  I mean, not everybody can do it.

Q    And as you arrive back to your house that night, did you believe that rival gang members were the target of this crime?

A    Only -- only one person said that they were rival gang members.  I didn't believe they were rival gang members.

Q    Did you hear the word -- the discussion about there being rivals or Surenos in that area?

A    Yes.

Q   And when -- the comment puro Norte, what did that mean to you in relation to the gang?

A   It's just stating what gang he is.

Q   Sir, I'm going to ask you to look at Exhibits 143, 144 and 145.  Can you explain 143, please.

Have you had a chance to look at all three of those, sir?

A   Yeah.

Q   And 145.  Thank you.  Mr. Worthey, if you saw someone in Dodge City wearing this clothing, what would you think?

A   He's a southsider.

Q   Would you believe him to be a rival gang member?

A   Yeah.

Q   Sir, would you please look at Exhibits 140 and 146. Starting with 140.  Can we display 140, please.  Sir, do you know who that is?

A   No.

Q   Had you seen that person on or before June 8, 2009?

A   Not that I recall.

Q   And then 146.  Do you recognize that person?

A   No.

Q   Do you recall having any trouble with the man depicted in the prior photograph or the man depicted in this photograph?

A    No.

Q    Let me ask you to look at Exhibit 101.  Do you know who that man is, sir?

A    No.

Q    Mr. Worthey, after June 8, 2009, you were contacted by a detective from the Dodge City Police Department. Do you recall that, sir?

A    Yes.

Q    And that contact also occurred in June, 2009; is that right?

A    Yeah.

Q    And that detective asked you various questions about events that took place on June 8, 2009, didn't he?

A    Yeah.

Q    And did he ask you about whether you had traveled to the trailer park on June 8, 2009?

A    Yeah.

Q    Did he ask you if you had any information about a homicide that had taken place at the trailer park on that date?

A    Yeah.

Q    And you didn't tell the detective everything you knew about that crime, did you?

A    No.

Q    In fact, you denied knowing anything about the

crime, didn't you?

A    Correct.

Q    Mr. Worthey, let me ask you to look at Government Exhibit 158.  Do you recognize that, sir?

A    Yeah.

Q    What is that?

A    That's my plea bargain.

Q    You have previously been charged for your participation and your aiding and abetting the crimes that occurred on June 8, 2009; correct?

A    Correct.

Q    And in this document that you have in front of you, sir, you plead guilty to two crimes; is that right?

A    Correct.

Q    What did you plead guilty to?

A    I plead guilty to conspiracy to RICO and discharge of firearm in furtherance of a crime of violence.

Q    And the RICO conspiracy that you plead guilty to related to the events that took place on -- at least in part related to the events that took place on June 8, 2009; correct?

A    Correct.

Q    And the second count that you plead guilty to you said was discharging a firearm?

A    In furtherance of a crime of violence.

Q   Okay.  And you admitted your role in that offense as well; correct?

A   Correct.

Q   You plead guilty to that offense?

A   Correct.

Q   Now, you understand, sir -- or do you understand the maximum penalty for the first count that you plead guilty to, the conspiracy count?  What's your maximum penalty that you face for that?

A   20 years.

Q   All right.  And then the maximum penalty for the firearm charge, what is that, sir?

A   Natural life.

Q   And you understand that that is the penalty -- the possible penalty you face as you sit here today; correct?

A   Correct.

Q   You have met with members of the Government trial team, haven't you, sir?

A   What was that?

Q   You met with prosecutors in this case and detectives and investigators in this case; correct?

A   Correct.

Q   Has anyone that you met with, as part of your plea in this case or your testimony in this case, has anyone

on the Government -- prosecutors, investigators or detectives promised you a sentence that you were going to receive?

A    Promised?  No.

Q    Has anyone told you that you will receive a reduced sentence?

A    No.

Q    Do you hope that you'll receive a reduced sentence?

A    I hope.

Q    And ultimately, who will decide what your sentence is, Mr. Worthey?

A    The judge.

Q    And Mr. Worthey, as part of the plea agreement, do you understand that the Government has instructed you that no matter what happens here, you will be sentenced to a term in federal prison?

A    Yeah.  My plea says I have to go to prison.

MR. WELCH:  Your Honor, I have no further questions of Mr. Worthey.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q    Mr. Worthey, my name is Val Wachtel.  I represent Pedro Garcia.

MR. WELCH:  Your Honor, I apologize to

interrupt.  I neglected to offer the plea agreement, which is Government Exhibit 158 and I would do so at this time.

MR. WACHTEL:  And I don't object.

THE COURT:  158 is received.

BY MR. WACHTEL:

Q   I'll start over, Mr. Worthey.  I'm Val Wachtel.  I'm Pedro Garcia's lawyer.  Can you hear me?

A   Yeah.

Q   If I ask you a question you don't understand, will you tell me you don't understand it?

A   Yeah.

Q   If you can't hear me, will you let me know that you can't hear me?

A   Yeah.

Q   Now, when you first began testifying here today, you said -- almost the first thing out of your mouth was that you were affiliated with the DV.  Do you remember saying that?

A   Correct.

Q   What does that mean?

A   Affiliated?

Q   Yes.

A   Means you wear the colors.  You're -- you're not a member, but you're representing.

Q   Yet as your testimony went on, you said you were a member.  Why did you change your testimony?

A   Because I got jumped in.

Q   Okay.  So you are a member now?

A   Yeah.

Q   You said -- you also said that at times DV and LCCs associated with one another.  Do you remember that?

A   At times.

Q   Sometimes they did that because they were family members; right?

A   Correct.

Q   Sometimes because they were friends?

A   Correct.

Q   But not because they were members of the same gang?

A   Correct.

Q   Because DV is a separate gang from LCC?

A   Correct.

Q   You talked about things that you would do to any gang that opposed you, things that you might do to their territory?

A   Correct.

Q   Remember?  Do you have any idea how many gangs there are in Dodge City?

A   There's -- I mean, sometimes there's new ones that just spring up and die out.

Q   Are all of these gangs Hispanic gangs?

A   Yep.

Q   Do they all do -- do many of them claim red?

A   About half and half.

Q   About half and half.  Older homies to you means people who have been in the DV, your gang, longer?

A   Correct.

Q   You talked about crimes that were committed.  You mentioned fights and burglaries.  You remember that?

A   Correct.

Q   You said you were involved in a burglary; right?

A   Correct.

Q   What burglary was that?

A   I have a juvenile burglary.

Q   Sir?

A   I have a juvenile burglary to a car and I have a -- another burglary with my brother-in-law.

Q   Your brother-in-law's name is?

A   Enrique Gobin.

Q   You said also that your burglaries at least were not gang-related.  Is that so?

A   Correct.

Q   Which means what?  That they were your idea?

A   No.

Q   Whose idea were they?

A   They were -- the juvenile burglary was my idea.  The adult burglary was just a -- it was an abandoned house, unoccupied dwelling.

Q   But, in any event, nobody from the DVs told you to do this; right?

A   No.

Q   And these two crimes were not committed for the benefit of the DVs; right?

A   Correct.

Q   And then, for that matter, not for the LCCs either?

A   Correct.

Q   You were shown Exhibit 159-A.  You may still have that in front of you.

A   I only have 158.

Q   I'm sorry.  I'll find it.

    I'm going to hand you back what's been admitted as Exhibit -- I guess it's 159.  I'm sorry.  In any event, that's yours; right?

A   Correct.

Q   And that is what?  A receipt book?

A   Correct.

Q   Open it up to the very first page, please.  And what's the very first entry on that page?  Very first up at the top?

A   The second page is the one with writing.

Q   I'm sorry.  Second page?

A   At the very top it says -- there's some math done.

MR. WACHTEL:  Permission to approach, Judge, so I can see this.

THE COURT:  Yes, you may.

BY MR. WACHTEL:

Q   Yes, there is.  And then below that it says April; right?

A   Correct.

Q   What year?

A   I don't recall the year.

Q   You don't?

THE COURT:  I think, for the record, this is 159-A.

MR. WACHTEL:  Yes, Your Honor.  I'm sorry. 159-A.

Q   So you don't remember the year?

A   No.

Q   Do you remember where you were when you wrote that down?

A   Correct.

Q   Where?

A   4th avenue.

Q   Any particular place on 4th avenue?

A   I don't know the address.

Q   Do you know whose place it was?

A   It was Caiyo's.

Q   You better spell that for the court reporter because I can't.

A   C-A-I-Y-O.

Q   Do you remember who all was present when you were writing that down?

A   There was a -- there was a bunch of us present.  We were having a meeting.

Q   Is Pedro Garcia's name on that page?

A   No.

Q   There's another page in there, too; right?

A   Correct.

Q   There's several pages but there's another one with writing on it?

A   Correct.

Q   The first entry on that page is May; right?

A   Correct.

Q   But don't remember what year?

A   No.

Q   Do you remember where you were when you wrote that down?

A   Yep.

Q   Where?

A   Same address.

Q    Same place?

A    Same place.

Q    Mr. Garcia's name appear there?

A    No.

Q    Was Mr. Garcia there --

A    No.

Q    -- when you made that?  Was he there when you wrote down what was on the first page?

A    No.

Q    If I understood your testimony correctly, nobody told you that you had to do it; right?

A    I was told to do it.  It wasn't a job.

Q    Who told you?

A    Couple different home boys that were there, that were present at that meeting.

Q    Who?

A    Caiyo, Puppet.

Q    Puppet, who is who?

A    Fabian Neave.

Q    And Caiyo, who is who?

A    Jose Neave.

Q    So you didn't volunteer to do this; right?

A    No.

Q    Were you ordered to do it or were you asked to do it?

A   Asked.  It was more of a, a group decision.

Q   So they vote on it?

A   Pretty much.

Q   Pretty much.  Did you just lose?

A   No.

Q   Did you win?

A   I won it.

Q   So you wanted to do it; right?

A   I didn't object.

Q   But there are only, as far as I can tell, two entries in that exhibit?

A   Correct.

Q   Why are there not more?

A   There was a raid and it was confiscated.

Q   What place got raided?

A   The same address on 4th.

Q   While you were there?

A   No, I wasn't present.

Q   So that -- the receipt book, 159, was left there in that place; right?

A   Correct.

Q   Now, did orders go out to all the DVs at the time that they had to pony up money to be put into this kitty?

A   All the younger home boys, yeah.

Q   By the way, where was the money kept?

A   In the same box.

Q   In the same house?

A   It was in a lockbox inside of the house.

Q   Now, you were asked also who could give orders.  You remember being asked about that?

A   Yeah.

Q   And I think you said that depended upon how crazy or how down you were.  Is that what you said?

A   Correct.

Q   I do not understand what that means.  Can you explain it to me?

A   Basically means your willingness to do something. The more willing you are to fight, the more -- the more you're going to be able to tell somebody else to do something.

Q   Then actually what you're really telling us is the more willing you are to do something, the crazier you are, the more down you are, the more you're likely to be listened to?

A   Correct.

Q   The more the younger people are likely to come to you for advice?

A   Correct.

Q   And that's at least in part because the DV -- the

DVs in Dodge City never had an official leader, did they?

A   Correct.

Q   In fact, you were questioned on June 17th, 2009, by law enforcement officers, in particular, Detective George, and you told him that, didn't you?

A   Correct.

Q   And so the best of your knowledge and belief, the DVs have never had a leader in Dodge City; right?

A   Correct.

Q   When you talk about -- among your friends, when you talk about Mr. Garcia, what do you call him?

A   I call him Peter.

Q   Peter.  Have you ever called him Pistol Pete?

A   No.

Q   Never said that to his face; right?

A   No.

Q   As far as you know, the only nickname that Mr. Garcia has is Peter; right?

A   Correct.

Q   Do you know his given name?

A   Pedro.

Q   Now, you told us that you -- well, on how many occasions have you been to Mr. Garcia's house?

A   I couldn't put a number on it.  More than a few.

Q   More than a few.  And all the time that you've been to his house, you've seen a firearm at his house one time?

A   I've seen it at his house more than one time.  I've only seen him in possession of one.

Q   In possession of one.  And where was that?

A   Inside of his house.

Q   Inside of his house.

A   I correct that.  I seen him with two.

Q   Two?

A   Two.

Q   With regard to the first gun you saw, what was it?

A   Caliber, I have no idea.

Q   Revolver or semi auto?

A   It was not a revolver.  It was a pistol.  It was not a revolver.

Q   And the second one?

A   Was a .40 caliber Glock.

Q   A .40 caliber?

A   .40 caliber Glock.

Q   How do you know that it was a .40 caliber Glock?

A   Because I, I seen it.  I held it.  I looked at it.

Q   You also said that years before -- and I'm not sure years before when -- but that you had purchased methamphetamine from Mr. Garcia.  You remember saying

that?

A   Correct.

Q   Do you remember when that was?

A   First time I ever met him.

Q   You remember when that was?

A   No.

Q   Remember how old you were?

A   About 14, 15.

Q   You remember what you paid for it?

A   I traded.

Q   Traded what?

A   Some speakers and amplifier.

Q   I'm sorry, I'm not sure I asked -- do you know where that took place?

A   Where the transaction took place?

Q   Yes, sir.

A   In his basement.

Q   The same basement of the same house that we've seen in some of these exhibits here today?

A   Correct.

Q   Were you -- at the time you made that purchase, right, were you an associate of the DVs?

A   Yeah.

Q   Do you know whether or not Mr. Garcia kicked any of that stuff you traded for back up to the DVs?

MR. WELCH:  I'll object.  It's irrelevant, Your Honor.

THE COURT:  Overruled.

BY MR. WACHTEL:

Q   Do you know?

A   No.

Q   Now, I think immediately after the noon recess you told us that on June 7 of 2009 you and Anthony Wright went cruising?

A   Correct.

Q   You know it was getting dark when you went but you don't remember what time it was?

A   That was on June 8.

Q   I'm sorry.  If I said June 9th, I apologize.  That was on June 8th?

A   On June 7th, we went cruising.  On June 7 is when I went to the trailer park.

Q   You're right.  I got myself confused.  Thanks for correcting me.  So on June 7th, Anthony Wright came over to your house and picked you up; right?

A   On June 7th --

Q   And -- well, I'm talking with you --

A   -- and 8th.

Q   -- just about June 7.  If I may.

A   Okay.

Q   He came over to your house and picked you up?

A   Correct.

Q   Did you know he was coming?

A   On June 7, yeah.

Q   How did you know he was coming?

A   He had called me.

Q   What was it that you talked about during that phone call?

A   Just -- nothing, a bunch of nothing.  How he missed me.  He, he had been in prison.  He had just got out a couple months before.

Q   'Cause you all were related; right?

A   Correct.

Q   I've got -- I'm related to a lot of people but I'm not close to very many.  Were you close to him?

A   I was close to him.

Q   I've gotten a bit ahead of myself.  You've been either associated with the DVs or a DV member for how many years?

A   I've been associated -- I was associated from the age of 14 to 17.  I got jumped in at age 17.

Q   Not unusual for DVs to carry guns, is it?

A   No.

Q   It wasn't unusual for you to carry a gun as a DV, was it?

A    I never carried a gun.

Q    Never?

A    Not to a crime.

Q    Sir?

A    Not to a crime.

Q    All right. Not to a crime. Did you have a gun that night -- I'm sorry -- the next night?

A    No.

Q    You weren't going to a crime the next night, were you?

A    No.

Q    So if you didn't carry -- I'm sorry -- if you carried guns not to crimes, is there a reason why you weren't carrying one then?

A    I don't like guns.

Q    In any event, on that cruise on the 7th, you all went through that trailer park; right?

A    Correct.

Q    Whose idea was that?

A    Had to be the driver.

Q    Because it wasn't yours?

A    It's random. It's a cruise.

Q    You remember what time of day that was?

A    The sun was still out on that one.

Q    After you drove past -- you drove through that

trailer park and you saw some folks in the park; right?

A   I seen two individuals on the porch.

Q   Right.  And according to you, it was Mr. Wright who threw down gang signs on 'em?

A   Correct.

Q   Right?

A   Correct.

Q   And it was not you?

A   Correct.

Q   Speaking of that day, did you have a Mongolian --

A   Yeah.

Q   -- that day?

A   Yeah.

Q   Did you have it the next day?

A   Yep.

Q   Is it a hairstyle that you had had for sometime?

A   Yep.

Q   What did you and your cousin do with the remainder of that day after those gang signs got thrown down?

A   Cruised around more.  Cruised around Ryan park, Cinderella park, Wright park.

Q   Looking for anything in particular?

A   No.

Q   Did you have -- did you talk about Surenos that day?

A   I mean, we always talked about that.

Q   Say --

A   It was always talked about.

Q   Well, after -- after -- after Mr. Wright threw down those gang signs on these poor innocent people, did you talk about Surenos then?

A   Yeah.

Q   What did you say?  What did he say?

A   He said that they were Surenos live at that house.

Q   Surenos that lit up the house?

A   Lived at the house.

Q   Lived at that house.  I'm sorry.  Did you say how do you know that?

A   I told him they weren't.

Q   So -- and what time that day did you get home?  If you can recall.

A   The sun was still up.  I can't recall a specific time.

Q   Now, that particular trailer park that you were in --

A   Uh-huh.

Q   -- would that be considered -- if I were a DV, would that be considered the south part of town?

A   Yeah.

Q   Okay.  So it would be, what, unusual for a DV to live in that part of Dodge?

A   I mean, it's not unusual for any of us to live anywhere. It's actually a small city.

Q   Yeah. That's Sureno territory though?

A   But it is Sureno territory.

Q   So it would be unusual for Nortenos to live in Sureno territory?

A   Like I said, it's not unusual because it's a small city; but it would be unusual to kick it there.

Q   Kick it there?

A   Hang out.

Q   Help me?

A   Hang out. Associate there.

Q   Do you mean it would be unusual for Nortenos to go to that part of town to hang out one with another?

A   Correct.

Q   Because that would be dangerous?

A   Correct.

Q   So the next day is June 8?

A   Correct.

Q   And on that day Mr. Wright came to pick you up again?

A   Correct.

Q   Did he call you?

A   He had been calling all day.

Q   Oh, about your car that he wanted to buy?

A    No.  He had just been trying to call all day.  I had called in to work that day.  I took my wife out to eat.  He was just blowing my phone up.  I only answered it once.

Q    But, anyway, eventually he comes to pick you up; right?

A    Correct.

Q    And you go to -- you all drive to Mr. Garcia's house?

A    Correct.

Q    In the process of driving to Mr. Garcia's house, did you drive back through that trailer park?

A    Not that I recall.

Q    Do you remember what you were wearing that day?

A    I was wearing a red, white and black striped shirt, polo shirt.

Q    And for slacks or pants?

A    Some black shorts.

Q    Shoes please?

A    Cortez.

Q    Sir?

A    Nike Cortez.

Q    Do you remember what Mr. Wright was wearing?

A    No.

Q    And you've already told us that you don't remember

what Mr. Garcia was wearing; right?

A   Correct.

Q   While you were at Mr. Garcia's house, you could not recall any particular conversation that took place?

A   Correct.

Q   But you do recall Josh Flores had a gun?

A   He possessed a gun.

Q   Sir?

A   He possessed a gun.

Q   And you did, too?

A   No.

Q   Do you remember -- after you left Mr. Garcia's house, you said you had cruised around.  How long did you cruise around?

A   About 30 minutes to an hour.

Q   And then you all went, what, to the trailer park?

A   Yep.

Q   And that was your idea; right?  To go to that trailer park?

A   No.

Q   No.  So if somebody in this case has testified that it was your idea, that was wrong?

A   Correct.

Q   It was your idea to go and, and, and get some Surenos, too, wasn't it?

A   Wrong.

Q   If somebody testified about that, that person is either wrong or not telling the truth?

A   Correct.

Q   When you were in that car, did anybody -- when you were on your way either -- when you were cruising around or on your way to that trailer park, did anybody use the word scraps?

A   Not until -- not until all the way -- until the crime scene.

Q   Who used that term?

A   Anthony.

Q   Mr. Wright?

A   Mr. Wright.

Q   That's a derogatory term for people who are from what, southern Mexico?

A   From south side, any south side gang.

Q   In fact, it was during that -- during that trip you tell us that it was Mr. Wright who said there were southsiders who lived in that trailer park?

A   Correct.

Q   And if somebody testified here today that you said that, that is either -- they are either mistaken or not telling the truth?

A   Correct.

Q   In any event, you told us you didn't believe that you could ignore Mr. Ramirez; right?

A   Correct.

Q   And since Mr. Garcia didn't tell you to do anything, it didn't matter to you; right?

A   Correct.

Q   Now, point in time that you could not ignore Mr. Ramirez, did you have any idea what was gonna happen?

A   I knew something was gonna happen.  I didn't know what was gonna happen.

Q   If there was -- if a fight had happened, were you ready to take part?

A   Correct.

Q   If a shooting happened, were you ready to take part?

A   No.

Q   In fact, you tell us that when the shooting happened, you ran away?

A   Correct.

Q   Now, in talking to -- in being questioned by counsel for the Government, you pointed out that you entered into a plea agreement with the United States; right?

A   Correct.

Q   And you agreed to plead guilty to this Indictment, Count 1 and Count 2; right?

A   Correct.

Q   And you told Mr. Welch that for Count 2 you could do up to natural life; right?

A   Correct.

Q   But you don't expect to do that, do you?

A   My guidelines state otherwise.

Q   Sir?

A   My sentencing guidelines state otherwise.

Q   All right.  Before we talk in any detail about your plea agreement, I want to talk to you about an interview that you had with police in Dodge City on June 17 of 2009.  Do you remember that?

A   Yep.

Q   Do you remember in that particular interview -- that particular interview was conducted by Detective George?

A   Well, I don't know his name.  I just know he's a big chubby guy.

Q   Heavy-set guy?

A   Yeah.

Q   Anybody else there at the time?  Any other law enforcement officer?

A   Another detective came in and tried talking with me also.

Q   Did you have anybody with you?

A   No.

Q   Well, now, I read a report of this interview and --

were you arrested on an outstanding warrant on or about June 17 of 2009?

A   Yeah, I had been arrested on a warrant.

Q   For what?

A   Aggravated assault; aggravated battery.

Q   Crime of violence; right?

A   Correct.

Q   Did they tell you that your name had come up with -- as being possibly involved in the trailer park shooting? Did they tell you that?

A   No.

Q   They did not?

A   They told me they had a witness that placed me there the day before.

THE COURT:  I didn't hear that answer.

MR. WACHTEL:  Say it again.

A   They had a witness that placed me there the day before.

BY MR. WACHTEL:

Q   There, your understanding, was in the trailer park?

A   Yeah.

Q   At the crime scene?

A   Where the crime scene was the next day.

Q   Right.  They had a witness who had placed you in the trailer park?

A   The day before.

Q   The day before.  They also told you they understood there had been a flash of gang signs between the individual at the trailer where the shooting took place; right?

A   Correct, the date before.

Q   Right.  You said to them, yes, my cousin Anthony Wright did that; right?

A   No.

Q   You said you didn't know anything about that?

A   Correct.

Q   Also told you they knew you were a passenger in the car that drove through there either on the 9th -- the 7th or the 8th; right?

A   Correct.

Q   But you said I don't remember whether I did that or not; right?

A   Correct.

Q   In an attempt to mislead the authorities; right?

A   Correct.

Q   Because you knew you'd been there?

A   Correct.

Q   And you knew that if you told 'em you didn't remember, that would not be the truth, would it?

A   Correct.

Q   So you hid behind things like they gave you the wrong color of the car; right?  They told you it was silver?

A   Correct.

Q   And you told the truth when you said you hadn't been in a silver car; right?

A   Correct.

Q   Didn't know anything about a silver car?

A   Correct.

Q   So you used the silver car to hide the fact that you had been in a different colored car in that same place?

A   Correct.

Q   So telling that you hadn't been in the silver car was truthful?

A   Correct.

Q   Which you used to mask something that was not truthful?

A   Correct.

Q   In fact, they even read you your Miranda warnings at the station that day; right?

A   Correct.

Q   Where they tell you you have the right to an attorney; any questions that they ask you, if you answer them, they could use it against you and that sort of stuff.  And you said, I'm waiving my Miranda rights, I

don't want an attorney.  Right?

A   Correct.

Q   Was that another attempt on your part to mislead the authorities?

A   Yes.

Q   Because if you told 'em you didn't want an attorney, they'd more likely -- they'd be more likely to believe you; right?

A   Correct.

Q   You told 'em that you'd been cruising around on the 7th and it was possible you thought that you went through the trailer park but you weren't sure what trailer park they were talking about.

A   Correct.

Q   Another lie; right?

A   Correct.

Q   You did admit that you were a Norteno gang member; right?

A   Right.

Q   Which is true?  It is true you're a Norteno?

A   No.

Q   I'm sorry.  You're not a Norteno, are you?

A   No longer.

Q   You weren't at the time either?

A   Yeah, I was at the time.

Q   You were a DV at the time?

A   That's correct.

Q   Okay.  In fact, the questions I've been asking you about what the police talked to you about, they asked you these questions more than one time; right?

A   Correct.

Q   And they encouraged you to be truthful with them; right?

A   Correct.

Q   And you told 'em you were being truthful; right?

A   Correct.

Q   So if the report says that you told them several times that you weren't in that -- that you weren't in that trailer park, that report would be accurate?

I'll rephrase it.  In fact, I'll withdraw it.  It's a bad question.

THE COURT:  Would you like to take a recess?

MR. WACHTEL:  Your Honor, I was just about to switch to another topic, so if that's okay with you.

THE COURT:  It's okay with me.

MR. WACHTEL:  It's okay with me, Judge.

THE COURT:  We'll take about 15 minutes, Ladies and Gentlemen.  Remember and heed the admonition.

(Recess.)

THE COURT:  Yes, sir.

MR. WACHTEL:  Thank you, Your Honor.

Q   Mr. Wright, you were indicted in this case and charged with six felony crimes; right?

A   Worthey.

Q   I'm sorry.  Mr. Worthey.  I apologize to you.

A   Yeah.

Q   I do remember your street name but I'm confusing your last name.  But in any event, you were charged with six felony crimes?

A   Correct.

Q   And you reached a plea agreement with the United States; right?

A   Correct.

Q   And four of those got dismissed?

A   Well, they got moved down to predicates.

Q   You plead guilty to two counts; right?

A   Correct.

Q   And those other counts for which you could have done time were dismissed by the Government, or at least they're gonna be dismissed at sentencing; right?

A   To my understanding.

Q   Because that's part of the agreement that you worked out?

A   Correct.

Q   Now, when you were working out that agreement, you

were represented by an attorney?

A   Correct.

Q   In fact, he's in the back of the room.  That's Mr. Pratt; right?

A   Correct.

Q   The plea agreement that you worked out, it's Exhibit 158 I believe.  I believe you still have it in front of you?

A   Correct.

Q   Found it?

A   Yeah.

Q   I'd like to talk with you about it.  What you ended up pleading guilty to, right, was Count 1, which is conspiracy to commit act of racketeering?

A   Correct.

Q   And Count 2, possession and discharge of a firearm in furtherance of a crime of violence?

A   Correct.

Q   What firearm was that?

A   I wasn't in possession of none.  They put me under section 2, aiding and abet.

Q   Aiding and abetting.  Then if you'll turn to the second numbered page of that agreement, you'll find in Paragraph 2 a factual basis for the guilty plea.  Do you see that?

A   Correct.

Q   And that is probably two pages and change long; right?  It goes all the way to Page 4?

A   Correct.

Q   Now, did your attorney write out these facts for you?

A   He wrote what I said.

Q   So whatever is written here:  Beginning June 8, 2009, in Dodge City, Kansas, Russell Worthey, Defendant, all the way through Page -- top two-thirds of page 4 -- let me know when you get there?

A   I'm on there.

Q   Where the last thing is trafficked in narcotics including methamphetamine, cocaine and marijuana. Right?

A   Correct.

Q   He wrote everything that's in that; the Government wrote none of it?

A   I don't know about that.

Q   But in any event, before you were able to plead guilty, you had to read this plea agreement; right?

A   Correct.

Q   And you did that?

A   Correct.

Q   You read it?

A    Yeah.

Q    And you signed it?

A    Correct.

Q    And then you went before Judge Belot to plead guilty?

A    Correct.

Q    And when you did that, you sat at this table; right?

A    Correct.

Q    And you took an oath to tell the truth?

A    Yeah.

Q    And as part of being -- accepting your guilty plea, the judge asked you whether or not everything that was in Paragraph 2 of your plea agreement was true.  Right?

A    Correct.

Q    And you said that it was?

A    Yeah.

Q    Now, in the process of negotiating this plea agreement, the Government agreed that if you'd plead guilty to what they wrote down that you did, the crimes they charged you with, they were gonna do certain things for you; right?

A    They only told me one.

Q    Sir?

A    They only told me they would do one.

Q    They only told you they were going to do one thing?

A   Correct.

Q   What did they tell you they were going to do?

A   They would file a motion.

Q   And I think we'll come to that; but why don't you take a look at Page 5 of this agreement.  Look at Section 5 where it says Government's agreements.

A   I got it.

Q   Do you see that?

A   Yeah.

Q   Because there are at least -- there's several things listed there.  Sub paragraph A says they agree not to file any additional charges against you arising out of the facts forming the basis of the present Indictment. Right?

A   Correct.

Q   And you remember that they promised to do that?  Or do you not remember?

A   Well, it wasn't a promise.

Q   It wasn't?

A   No.

Q   It says in your plea agreement that's the Government's agreement.  Did they not agree?

A   It was an agreement; not a promise.

Q   Okay. All right. Let's continue with these agreements.  All right?

A   Right.

Q   The next one said they would agree to file a 5(k)(1) motion on your behalf reflecting substantial assistance. Now, did anybody ever tell you what a 5(k)(1) motion was?

A   No, not -- they briefly explained it.

Q   Did you talk to your lawyer about it?  I don't want to know what he said --

A   Yeah.

Q   And so you understand that would be that they could -- if they're satisfied with what you do here today, they could file a motion to reduce your -- to ask the judge to reduce your sentence.  You understand that?

A   Correct.

Q   And you also understand that if you're looking at something that has a mandatory minimum sentence, they can ask the judge to reduce that sentence to below the mandatory minimum; right?

A   Well, the only one that said that was the judge.

Q   Is your --

A   The only person who said that was the judge.

Q   The only person who can grant that motion is the judge.  But they can agree to file it and they did so right here in sub Paragraph B; right?

A   Well, I didn't know that the 5(k) lowered the

mandatory maximum -- or the mandatory minimum.

Q   Nobody told you that -- you're looking at all of this time and nobody told you that?

A   They never told me it would lower the mandatory minimum.

Q   Well, subsection C says they're going agree to recommend that you receive a two level reduction of the applicable offense level for acceptance of responsibility and another one level reduction for timely notifying the Government that you were going to plead guilty.  So you understand that that reduces your sentence also; right?

A   Well, that reduces the points on my severity.

Q   Yes, it reduces the offense level; and that reduces the amount of time you're going to spend in jail.  Right?

A   Correct.

Q   And they also agreed that they were not going to request an upward departure from the applicable sentencing guidelines, meaning they weren't going to ask to give you more time than the applicable sentencing guideline if you didn't file -- if you didn't request a downward departure; right?

A   Correct.

Q   And those things they agreed to do?

A  Correct.

Q  And in exchange for that, you made some agreements; right?  If you'll turn the page.  At Page 6, you're going to find them at Section 6.

A  I got it.

Q  You agreed to provide -- this is 6-A.  You agreed to provide truthful, complete and accurate information and testimony in the trial of this matter before any grand jury or in any related hearing.  Did you ever testify before a grand jury?

A  No.

Q  Well, that's okay.  You testified here.  So -- so you've agreed to do that; right?

A  Correct.

Q  And is there a penalty that you face if you don't do that?

A  They said that I would face a penalty but I -- I don't know what it would be.

Q  Well, you reckon if you -- you reckon if they thought you were not telling the truth that they might not file the 5(k)(1) motion for you?

A  Well, I -- I would think that if I didn't tell the truth, they would take my entire plea away.

Q  They could do that, too.  And they could charge you with a crime; right?

A    Correct.

Q    So it's important to you that they not think that; right?

A    Correct.

Q    And you're going to cooperate with them and do whatever you must to get the benefit of this agreement; right?

A    No.

Q    You're not?

A    No.

Q    Well, what is it -- since you've already lied to authorities in this case, what is it that you won't do to get a benefit?

A    I'm not gonna lie for somebody's life.

Q    In any event, we know that this -- that Judge Belot is going to determine ultimately what your sentence is?

A    Correct.

Q    And you also know, don't you, that although the Government has agreed in your plea agreement to file a 5(k)(1) motion, a motion to reduce your sentence; right? For you.  You also know as a result of talking with these gentlemen here that nobody can make them do that?

A    Correct.

Q    Even if you -- even if you do fully cooperate.  Even if you do tell God's truth.  If they don't like what you

say or, frankly, for some other reason, they don't have to file anything?

A   From my understanding.

Q   Right.  The last thing, last thing.  One of the last questions that was put to you by Mr. Welch was, paraphrasing, did anybody from the Government promise you a sentence.  Remember that question?

A   Promise me a sentence?

Q   A sentence.

A   No.

Q   I'm sorry.  I just asked you if you remembered Mr. Welch asking you that when you testified?

A   No.

Q   Well, those are my notes.  And if I'm wrong, I'm wrong.  But I'll tell you what you said.  You said promise, question mark.  No.  You remember saying that?

A   What's the question again?

Q   Yeah, I'll -- I'm not doing a good job so let me try again.  You remember -- obviously, you remember testifying here today for the Government; right?

A   Correct.

Q   You remember that testimony ended before you got involved with me; right?

A   Correct.

Q   And one of the last questions that you were asked by

Mr. Welch, this gentleman here, was did anyone from the Government promise you a sentence in this case?

A   Yeah.   Nobody promised me nothing.

Q   But you said promise?  And then you said no.

A   Correct.

Q   But you said promise sort of with a question mark. Remember that?

A   Yeah.

Q   What were you thinking when you said promise?

A   Well, I mean, they, they told me that they would file a 5(k) motion.  They didn't promise that they would.  They told me they would.

Q   They didn't promise you they would but they told you they would; right?

A   Correct.

Q   They've signed a written agreement with you saying they would do that.  But that's not a promise as you think about it; right?

A   Correct.

        MR. WACHTEL:  Thank you for your time.  I don't have any more questions.

        THE COURT:  Yes, Mr. Mandelman.

### CROSS EXAMINATION

BY MR. MANDELMAN:

Q   I'm Joel Mandelman.  I represent Gonzalo Ramirez.

A    Okay.

Q    Have you ever fought with Mr. Ramirez?

A    Have I fought with him?

Q    Yeah.

A    Yeah.

Q    When was that?

A    I can't put a date on it.

Q    Christmas, 2007?

A    It was around Christmastime.

Q    What happened?

A    We got in a fist fight.

Q    And how would you describe your relationship with him?

A    Up 'til now, it was all right.

Q    Even despite the fact that you guys have fought in the past?

A    Correct.

Q    Now, he's not on that ledger that you prepared?

A    No.

Q    And he wasn't at that meeting?

A    No.  I think he was incarcerated at the time.

Q    Okay.  So he really wasn't available?

A    Correct.

Q    I want to talk about your statements in this case. The gentleman who saw you throw gang signs at the

trailer park the day before, is he telling -- is he lying?

A   I didn't throw gang signs.

Q   So that gentleman is not telling the truth?

MR. WELCH:  Object, Your Honor, as beyond the scope of direct; and it's also -- there's no foundation for that question.  And it's hearsay, Your Honor.

THE COURT:  The way you phrased it, I'm going to sustain it; but you can rephrase it if you want.

BY MR. MANDELMAN:

Q   Okay.  When Detective George spoke with you about the reason for your interview on the 17th --

A   Yeah.

Q   -- and he asked -- he informed you that they had information that someone had seen you throw gang signs the day before -- pardon -- on June 7th?

A   Well, he didn't say me specifically throwing gang signs.

Q   What did he say?

A   He said --

MR. WELCH:  Again, I'll object.  This is hearsay, Your Honor.  Actually, double hearsay.

THE COURT:  No, I'm going to let him answer; but I want you to identify this person who supposedly said that he had thrown gang signs.

BY MR. MANDELMAN:

Q   Okay.  A gentleman by the name of Mavito Majea (ph).  He picked you out of a line up.  That's why you were there.

A   Correct.  But it was my understanding that he had picked me out of a line up as the passenger, not the one who threw the gang sign up.

Q   Okay.  That's your understanding.  I'm not going to go through that whole interview with you.  I think it's already been discussed at several points.  It lasted for about 40 minutes; is that correct?

A   I have no idea how long it lasted.  I, I think it went on longer than 40 minutes.

Q   It was a while?

A   It was a while.

Q   Okay.  And you repeatedly just manufactured some sort of story?

A   Well I, I, I told 'em what happened earlier in the day and I manufactured lies about where I had been later in the day.

Q   And then a month later on July 17 of 2009, you were interviewed again?

A   Yeah.  That was my first interview.

Q   The first interview was with Detective George and Detective Bice?

A   I don't know the detectives names.  Heavy set lawyer -- or the heavy set detective was the first one.

Q   That was Detective George?

A   Uh-huh.  And when Webb interviewed me, it was --

Q   Way later?

A   Way later.

Q   Okay.  But in the intervening period, this gentleman here, here, Detective Bice, he's here in the courtroom, he spoke with you on July, on July 17.  Do you not remember that?

A   No.

Q   Now, Detective Bice came into the room and he said -- he talked to you and he said -- he said you weren't being forthcoming with him.  Is this -- well -- I'm sorry.  I don't want to -- is this misdated?  May be -- I apologize.  I think --

A   That was the same day as the heavy set detective.

MR. MANDELMAN:  Okay.  I apologize.  The police report is -- I think it's -- it may be misdated.

THE COURT:  Hey, this isn't something that you clear up in this manner.  I'm not the witness.  Just question the witness, please.

MR. MANDELMAN:  Sure.

BY MR. MANDELMAN:

Q   You met again on November 10 with Detective -- with

Detective Webb?

A   Correct.

Q   So that was about -- it would have been about a year and a half later?

A   Yeah, it was -- it was way later.

Q   And you again denied participation in any of these events?

A   At that meeting, I denied everything.  I requested a lawyer.

Q   Okay.  Now, again, on May 9th of 2012, so about three years later?

A   Correct.

Q   You again decided not to speak about this?

A   No, I asked for my attorney to be present.

Q   You asked for your attorney to be present.  And that was after -- after you'd been charged in this case?

A   Correct.

Q   So -- and then a few weeks later, for the very first time after you have now been charged in federal court with murder, you tell a different story?

A   No, I tell the truth.

Q   This is the very first time that you make any statements at all implicating yourself in this?

A   Correct.

Q   Now, you've got -- well, how many prior felonies do

you have?

A    Two.

Q    And what are those for?

A    Car burglary as a juvenile and burglary of an unoccupied dwelling as an adult.

Q    That case was with Enrique Gobin?

A    Correct.

Q    And Mr. Gobin was in the house and then during that arrest you, you said --

MR. WELCH:  Your Honor, I'll object.  The conviction is proper.  The background is not.

THE COURT:  I agree.

BY MR. MANDELMAN:

Q    You were also involved in an assault with Mr. Gobin?

A    Correct.

Q    And that was the case involved in throwing a tire iron?

A    They claimed that but I think they dropped the charges on that case.

Q    You ended up pleading guilty in that case?

A    I plead it.

Q    Okay.  And then you were charged in a third assault; is that correct?

MR. WELCH:  I'm going to object to what he's been charged with, Your Honor.  If there's a conviction,

that's proper.

THE COURT:  Yes.  Let's just stick with convictions.  I think it will --

MR. MANDELMAN:  Well, this last case was dismissed as result of the federal government adopting this case.  It was part of -- I'm trying to be as specific as I -- when the Government decided to take this case, he was relieved of any charges in that case.  That's all I --

Q   Is that correct?

THE COURT:  I think that if it's related to this case, then I'll allow it.  Otherwise, if it's just stuff that went on out in Dodge City, that doesn't have any relationship to this case.  I don't think it will be helpful, beyond convictions, for the jury to hear it.

MR. MANDELMAN:  Okay.

Q   Well, go ahead.

A   Yeah.  I -- I was -- I had pending charges of aggravated assault.

Q   And those were dismissed when the feds adopted this case?

A   Well, the feds picked that case up, too.

Q   That case wasn't a homicide?

A   No.

Q   Okay.  And it's not referenced -- is it referenced

in your plea agreement?

A   It is.

Q   Okay.  That was an assault.  Okay.  That case was an assault?

A   Yeah.

Q   Okay.  I'm going to go ahead and just -- I would like to just mark and introduce the prior convictions.

THE COURT:  What's the exhibit number?

(Off-the-record.)

MR. MANDELMAN:  I have these.  These are the three exhibits.

THE COURT:  Show them to the Government.

MR. WELCH:  I have copies, Judge.  I just need a minute to look at them.

THE COURT:  All right.  So we have R-I, R-J, R-K.  Any objection?

MR. WELCH:  Your Honor, I'm sorry, I haven't had a chance to look at it.

(Off-the-record discussion

between Mr. Welch and

Mr. Mandelman.)

MR. WELCH:  Your Honor, no objection to J and K.  We do object to I because it's my understanding that is a misdemeanor and should not be admissible.

THE COURT:  All right.

MR. MANDELMAN:  I can make -- I don't want to do it -- do you want me to do it at the bench or --

THE COURT:  All right.  J and K are received. I is not.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

MR. MANDELMAN:  Again, we believe this is proper because at issue is Mr. Worthey's participation. And this is an assault case involving a gang member.

MR. WELCH:  It's a battery assault that was -- on the second page, Judge, is where it says battery and assault.  It's handwritten in.  Maybe on the third page.

THE COURT:  J and K are received.  I is not.

MR. MANDELMAN:  But it's not to impeach his credibility.  It's to go to a fact at issue in the case.

THE COURT:  Let me suggest something to you, again.  After I have ruled, I have ruled.  That is the end of it.

MR. MANDELMAN:  Okay.

THE COURT:  No argument.  No further discussion.  No nothing, Joel.  And no smirking looks either.  I know you're disappointed; but there's no

point in displaying it.  That's not appropriate.

(Thereupon, the following

proceedings continued in the

hearing of the jury.)

BY MR. MANDELMAN:

Q    At one point did you know your cooperation in this case was going to help your wife's case?

A    No.

Q    Did you discuss your cooperation with her?

A    I told her that I was cooperating, but that's it.

Q    You explained to her -- and is she cooperating with the authorities in a case --

MR. WELCH:  Irrelevant, Your Honor.

THE COURT:  His wife's cooperation is irrelevant and the jury will disregard that.  Whether -- the first question, however, is relevant.  But he's answered it.

MR. MANDELMAN:  I just need one more minute.

(Off-the-record.)

BY MR. MANDELMAN:

Q    After your arrest in this case, how many times did you meet with the Government?

A    Three times.

Q    Do you remember when those occasions were?

A    No.

Q   You met with them on May 22nd of 2012; is that correct?  A few weeks after you were first arrested?

A   Correct.

Q   And then again on June 14th, 2012?

A   I don't know about that one.  I met once in August and once in December.

Q   Okay.  You remember meeting on August 8th of 2012?

A   Correct.

Q   And then again on December 17 of 2012?

A   Correct.

Q   And then since that time, have you met with the Government at all?

A   Only on just to let me know that I was coming to testify.

Q   And when was that?

A   Like three weeks ago.

Q   And who'd you meet with?

A   The prosecutor.

Q   Mr. Welch?

A   Yeah.

Q   And who was present at the meetings with the Government?

A   A detective, Detective Bice.  Sometimes Detective Webb.  The prosecutors and my attorney.

MR. MANDELMAN:  Just one second.

(Off-the-record.)

BY MR. MANDELMAN:

Q   Now, the day before, on June 7th, the day that you were accused of flashing these gang signs, you're saying it was Mr. Wright?

A   Correct.

Q   You remember what direction the car was traveling?

A   South.

Q   And it was Mr. Wright who flashed those gang signs?

A   Correct.

Q   And did you see him flash the gang signs?

A   Yes.

Q   Okay.

        MR. MANDELMAN:  That's all I have.  Thanks.

        THE COURT:  Redirect.

        MR. WELCH:  Thank you, Judge.

        MR. MANDELMAN:  I just have these two exhibits.

                    **REDIRECT EXAMINATION**

BY MR. WELCH:

Q   Mr. Worthey, following your indictment in this case and meeting with the Government, those meetings took place in the ATF office here in Wichita.  Do you recall that?

A   I don't know what office it was; but it was an

office.

Q   Do you recall ATF Agent Steve Gravatt being present for those as well?

A   Correct.

Q   And earlier Mr. Wachtel asked you about the ledger. The ledger which has been admitted as Exhibit 159-A. You told us that those meetings took place where again?

A   Fourth street.

Q   At a residence; correct?

A   Correct.

Q   Let me ask you to look at Exhibit 402 and tell us, if you can, do you know who that is?

A   Yeah.  That's Caiyo.

Q   Earlier you told us these meetings, the two that you made notes of in the ledger, took place at Caiyo's house; correct?

A   Correct.

Q   Is that the same man who's depicted in Exhibit 402?

A   Yes.

            MR. WELCH:  We would offer 402, Judge.

            MR. WACHTEL:  I don't have any objection, Your Honor.

            MR. MANDELMAN:  No objection.

            MR. WELCH:  Can we display that please.  402.

            THE COURT:  What is his name?

LAW CLERK MS. SILVA:  Caiyo.

THE COURT:  How do you spell that?

A    C-A-Y-I-O.

BY MR. WELCH:

Q    Do you know his real name?

A    Jose Neave.

Q    And then, Mr. Worthey, Mr. Wachtel also asked you some questions about DV and DV not being Nortenos.  Do you recall those questions?

A    I don't remember the specific one.

Q    All right.  Earlier when Mr. Wachtel was cross-examining you he talked about DV in Dodge City and asked you -- suggested that DV and Norteno are different gangs.  Do you recall those questions?

A    Well, they are different gangs.  I do recall the question.

Q    Is DV connected with Nortenos?

A    They're connected.

Q    Would you please show the jury the tattoos that are on your right and left arm?

A    You want me to stand and show them?

Q    Please.

(Witness stands and indicates.)

MR. WACHTEL:  Your Honor, I do think I object to this.  I did ask him about DV and Nortenos but I

didn't ask him one thing about tattoos.

MR. WELCH:  Well, Your Honor, the point of 14 and N is it means Norteno.  That's the whole point of these questions.

THE COURT:  Well, you all have testified now as to what this is, so -- and he's stood up and showed the tattoos.  So we may as well go ahead even though it wasn't covered in cross-examination.  Show 'em your tattoos, sir, and then we'll move on.

(Witness stands and indicates.)

BY MR. WELCH:

Q   14 stands for what?

A   The 14th letter of the alphabet.

Q   And what do you have tattooed on the back of your neck, sir?

A   The letter N.

Q   And that stands for what?

A   Norteno.

Q   Does that identify you as a Norteno?

A   Yes.

MR. WELCH:  No further questions, Your Honor.

MR. WACHTEL:  Your Honor, I don't have any questions.  Thank you.

MR. MANDELMAN:  Me neither.  Thank you, Judge.

THE COURT:  All right.  Thank you, sir.

You're excused.  Next witness, please.

MR. SMITH:  Your Honor, the United States calls Joe Galindo.

**<u>JOE GALINDO</u>**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**<u>DIRECT EXAMINATION</u>**

BY MR. SMITH:

Q   Would you tell the jury your name, please.

A   Joe Galindo.

Q   And are you familiar with Dodge City, Kansas?

A   Yes, sir.

Q   Did you used to reside there?

A   Yes, sir.

Q   When was that?

A   Well, I grew up there.  I grew up there and I moved when I was 14.  And then I came back when I was 18.

Q   Okay. When you were 14.  You remember about what year that was?

A   2004.

Q   Okay.  And you stated you moved back when you were 18; is that right?

A   Yes, sir.

Q   Around -- would that be around 2007?  2008?

A   Yeah.

Q   Okay.  Were you born in Dodge City or --

A   No.

Q   What age was it that you started living there?

A    I was brought there when I was a kid, about two-years-old, three-years-old.

Q   Okay.  Did you go to school in Dodge City?

A   Yes, sir.

Q   Grade school?

A   Yes.

Q   Middle school?

A   Yes.

Q   Maybe junior high -- that's middle school?

A    Junior high, I left.  Then I came back for high school.

Q   Okay.  And are you familiar with gangs in Dodge City, Kansas?

A   Yes, sir.

Q   Are there gangs in Dodge City, Kansas?

A   Yes, sir.

Q   What gangs are in Dodge City, Kansas?

A   There's Nortenos, Surenos, 18th Street, LCC.

Q   Are you a member of a gang?

A   Yes, I was.

Q   And what gang were you a member of?

A   Nortenos -- Diablos Viejos.

Q   When did you join that gang?

A   It was about 2004.

Q   How old were you?

A   14.

Q   Were you familiar with the gang before you were 14 years old?

A   Yeah.

Q   Do you recall about what age you became aware of them?

A   12, 13.

Q   How was it that you joined the gang?

A   I had friends that I grew up with in school in the sixth grade and they had brothers and then they ended up learning about being -- about the gangs.  So then I ended up learning about it, too, then.

Q   What happened to gain you entrance into the gang?

A   Just the color red.  I liked the color red and I didn't like the color blue.

Q   Okay.  Did you -- how did it -- was there an initiation?

A   Yeah.  I, I got jumped in.

Q   Okay.  You were jumped in?

A   Yes, sir.

Q   Do you remember who you were jumped in by?

A    Yes.

Q    Who were you jumped in by?

A    It was Jeremy Carmona; B.J. Rancones; David Ochoa; and Little Benji, Benji Martinez.

Q    And, again, that was in -- when you were 15 years old; is that correct?

A    2004.  I was 14.

Q    You were 14.  And after being jumped in, were you essentially a full member of the Diablos Viejos?

A    Yes.

Q    You stated then you moved away from Dodge City; is that correct?

A    Yes, sir.

Q    Why did you move away?

A    I caught a case.

Q    What does that mean?

A    It means I, I got in trouble.  Then I ended up moving away 'cause that was part of my getting out that I had to move away to where I had to go.

Q    What sort of case was it that you caught?

A    It was aggravated assault, aggravated robbery, aggravated battery with a deadly weapon and aggravated kidnap.

Q    Were you 14 or 15 at the time?

A    I was 14 -- 15.  I don't remember.  15 I think.

Q    Was anyone else charged with you?

A    Yes.

Q    And who was charged with you?

A    Antonio Perez.

Q    Okay.  What is it about this case that made you move away?

A    I, I ended up doing a lie detector and the -- I, I was there and the police ended up -- I did a lie detector and they believed me that I really didn't have nothing to do with it, just being there.

Q    So was the case dismissed or did you have charges --

A    The charges were dropped.

Q    Did your involvement in that case change anyone's -- change your status in the DV gang?

A    Later on when I came back in 2008, it was, it was an issue.

Q    What sort of issue was it?

A    They -- the Nortenos started looking at me like why did you leave, did you tell, or what happened?  They would question me about it.

Q    And that was when you returned in 2008?  Why did you return?

A    I just didn't -- I didn't like it where I was at any more.

Q    In between 2005 and 2008?

A   Yes.

Q   Okay.   Now, once you returned in 2008, were you still considered a Diablos Viejos member?

A   Yes.

Q   And did you begin to associate with new Diablos Viejos gang members?

A   Yes.

Q   Were the gang members that you associated with before different or a different group that you associated with in 2008?

A   There was some still -- some of 'em I still knew; and some of 'em, they were new.

Q   Now, did you know someone by the name of Pedro Garcia?

A   Yes.

Q   Is that person in the courtroom today?

A   Yes.

Q   Please point him out and tell us what he is wearing?

A   Right there.   White shirt.

Q   Okay.   And you pointed essentially towards the end of the table next to the attorney seated on the end; is that correct?

A   Yes.

Q   Do you know somebody by the name of Gonzalo Ramirez?

A   Yes.

Q   And is that person in the courtroom today?

A   Yes, sir.

Q   Please point him out tell us what he is wearing.

A   Right there.  Wearing a white shirt.

Q   And you pointed over your shoulder towards the wall of the courthouse or the courtroom; is that correct?

A   Yes.

        MR. SMITH:  Your Honor, the record should reflect the witness has identified the Defendants in this case.

        THE COURT:  It will.

BY MR. SMITH:

Q   When did you first come to know Pedro Garcia?

A   I knew him when I was younger.  I just -- I would see him around.  I really didn't know him too well.

Q   And do you know Pedro Garcia by any other names?

A   I knew him by Pistol Pete.

Q   How did you come to know him by Pistol Pete?

A   Well, just by hearing from the gang that, you know, he always had guns.

Q   Okay.  And when did you know Gonzalo Ramirez?

A   I met him later on.

Q   What does later on --

A   Whenever I came back in 2008.

Q   And so when you had known of Peter, was that before

you left?

A   Yeah, I had knew him.  I knew of him.

Q   And do you know Gonzalo Ramirez by any other name?

A   Gonzo.

Q   As to the Diablos Viejos -- and when you're testifying, I'd like for you to tell me if you're referring to the first time before you left Dodge City or after 2008 when you returned.  Were there persons that were considered leaders or in leadership positions of DV or Nortenos?

A   Well, in the beginning, in 2004, I took it as we had Jeremy Carmona, he was -- I looked at him like he had more, more say-so.  He was pretty much calling the shots.  But the gang had -- members from the gang would always say that our leader had died, the Nortenos, we didn't have a leader.

Q   Were you present when Jeremy Carmona would call shots or give instruction?

A   Yes, sir.

Q   Did Jeremy Carmona have a street name?

A   C Money.

Q   And after 2008, was it your understanding that the Diablos Viejos or Nortenos had any leaders?

A   I came to understand that we had gang meetings and we ended up trying to put -- we ended up putting Gonzalo

as a shot caller; but we needed to hide him, keep him where nobody would know anything about him.

Q   Okay.  So you've mentioned gang meeting.  What's a gang meeting?

A   A gang meeting is where we would all gather up and discuss issues, see if we needed to take care of anything like tagging up the walls or, or if somebody's no good or trying to do -- or trying to make money.

Q   What does it mean somebody's no good?

A   That they -- they either PC'd up, went to protective custody, or they dropped out.

Q   When you refer to PC, that refers to protective custody?

A   Yes, sir.

Q   Is that incarcerated in jail or in prison?

A   Yes, sir.

Q   Did you attend gang meetings in 2004 or earlier?

A   Yes, sir.

Q   Did you attend gang meetings in 2008 or later?

A   Yes, sir.

Q   And where were the gang meetings held in 2008 or later?

A   They were held at gang members' houses.

Q   Can you tell me some of them?

A   Yeah.  We had one at -- we had some at Peter

Garcia's house; C Money's house.  C Money was 2004.  We had George Quezada.  We had Savage. Savage is Erik Sanchez.  Little Benji.  That was Benji Martinez.  That was about 2004.  Those are some.

Q   Were there meetings at locations other than people's houses?

A   We had meetings at a shop which belonged to a guy named Tino.

Q   Do you know the thought process behind having the meeting at a shop?

A   Just -- it was just a location that we could just do it at.

Q   Was Tino a gang member?

A   He hung out with 'em; but he wasn't jumped in.

Q   Did you have gang meetings at any person's houses that were not Diablos Viejos or Norteno gang members?

A   I don't remember.

Q   Joe, I would like to refer your attention to Government Exhibit -- well, this one may not be an exhibit.  413.  Government Exhibit 413.  Do you see that?  You have a screen in front of you, actually.  You can tilt that up if you need to do that.  Just pull the top of the screen towards you.  There you go.

A   The screen is blank.

        MR. SMITH:  May I approach?

THE COURT:  Yes.  And this is in.

(Off-the-record.)

Q   Do you recognize who's in Government Exhibit 413?

A   Yes, sir.

Q   Who is that person?

A   That's Eusebio Sierra, known as TC.

Q   Do you know why he's known as TC?

A   He's from Cali.

COURT REPORTER MS. SCHWEMMER:  He's from where?

A   California.

Q   What does TC have to do with being from California?

A   The name Tulare County.  And he's also presented hisself by saying he is from California.

Q   And is Tulare County in California?

A   Yes.

Q   Is TC a gang member?

A   Yes.

Q   And he is a member of what gang?

A   ESP, East Side Poros.

Q   Ease Side Poros?

A   Yes.

Q   Is that P-O-R-O-S?

A   Yes.

Q   Are East Side Poros associated with Nortenos?

A   Yes.

MR. WACHTEL:  Foundation, Your Honor. Objection.

THE COURT:  Would you please state your objection.

MR. WACHTEL:  Absence of foundation, Your Honor.

THE COURT:  The objection is sustained.

BY MR. SMITH:

Q   Do you know if the East Side Poros are associated with any other gangs?

MR. WACHTEL:  Objection yet again, Your Honor. Foundation.

THE COURT:  The objection is sustained -- well, he can answer yes or no.

BY MR. SMITH:

Q   Do you know if the East Side Poros are associated with any other gangs?

A   Yes.

Q   Have you discussed with Eusebio Sierra-Medrano his association with the East Side Poros?

MR. MANDELMAN:  Objection as to hearsay.

THE COURT:  He may answer yes or no.

A   I don't remember.

BY MR. SMITH:

Q Have you observed tattoos on Eusebio Sierra-Medrano?

A Yes.

Q After observing those tattoos, do any of the tattoos represent association with any gangs?

A Yes.

MR. WACHTEL: Objection. Foundation, Your Honor.

THE COURT: The objection is sustained.

BY MR. SMITH:

Q Mr. Galindo, are you familiar with tattoos that Diablos Viejos gang members would have?

A Yes.

Q Do you have tattoos that represent your association with Diablos Viejos?

A Yes.

Q Mr. Galindo, are you familiar with tattoos that Norteno gang members would have?

A Yes.

Q Do you have tattoos that would associate yourself with the Nortenos?

A Yes.

Q Mr. Galindo, have you seen tattoos of other Diablos Viejos gang members?

A Can you repeat the question.

Q   On persons other than yourself, have you seen tattoos of other Diablos Viejos gang members?

A   Yes.

Q   Have you seen tattoos on those gang members that associate them with membership of the Diablos Viejos gang?

A   Yes.

Q   Have you seen tattoos of those Diablos Viejos gang members that would represent their association with the Norteno gang?

A   Yes.

Q   Have you seen tattoos of Eusebio Sierra-Medrano that would associate himself with the Norteno gang?

A   Yes.

Q   And have you seen tattoos of Eusebio Sierra-Medrano that would associate him with another set associated with the Norteno gang?

        MR. WACHTEL:  To which we object for want of foundation, Your Honor.

        THE COURT:  Objection is sustained.

BY MR. SMITH:

Q   And what was Eusebio Sierra-Medrano's status in the Diablos Viejos gang when you were in Dodge City after 2008?

A   We looked at him with respect.

Q   Why did you look at him with respects?

A   Because he was from northern California.

Q   Why is that worthy of respect?

A   Because that is where the gang -- that's where a lot of the gang -- where we found out a lot about Nortenos stuff.

Q   And that is the basis of your respect?

A   Yes.

Q   Did you know TC, Eusebio Sierra-Medrano, to deal in narcotics?

A   Yes.

Q   What sort of narcotics did Eusebio Sierra-Medrano deal in?

A   Methamphetamines.

Q   And why do you know that?

A   Because I, I used with him.

Q   And did you aid Eusebio Sierra-Medrano in the trafficking of methamphetamine?

A   Yes.

Q   What did you do to aid Eusebio Sierra-Medrano in the trafficking of methamphetamine?

A   I helped him send some money to Porterville.

MR. WACHTEL:  I'm sorry, sir.  To where?

A   To Porterville, California.

BY MR. SMITH:

Q   How is it that you helped TC send the money to Porterville, California?

A   He told me to help him send some money through the WalMart and --

MR. MANDELMAN:   Objection as to hearsay.

THE COURT:   I'll allow it just for purposes of what he was told to do.

BY MR. SMITH:

Q   And what was that?  You were told to do what?

A   To send some money to, to, over there in California to Porterville, California, because he -- it was a big quantity.

MR. MANDELMAN:   Objection.

THE COURT:   Beyond California, the objection is sustained and the jury will disregard it.

BY MR. SMITH:

Q   Did you go to WalMart?

A   Yes.

Q   Did you go to WalMart with anyone in particular?

A   With TC.  With Eusebio.

Q   Did you send money to California?

A   Yes.

Q   Were you present when Eusebio sent money to California?

A    Yes.

Q    What was the money for?

A    For drugs.

Q    Did you also aid anyone else in distributing illegal narcotics?

A    No.

Q    Do you -- and I want to know what you know specifically, what you personally know -- do you know other gang members, DV or Norteno gang members, in Dodge City that distributed illegal narcotics?

A    Yes.

Q    Who is it that you know that distributed illegal narcotics?

A    Pedro Garcia and --

         MR. WACHTEL:  Object, Your Honor.  I object unless he says a name -- I'm sorry -- I object that --

         THE COURT:  He was just about ready to say your client's name --

         MR. WACHTEL:  Yes, I know he was, Your Honor, and I still object to that because there's no foundation for this.

         THE COURT:  The objection as to foundation is sustained.

         MR. WACHTEL:  Thank you, Judge.

BY MR. SMITH:

Q   Did you see other persons that were members of Diablos Viejos or Nortenos distribute illegal narcotics?

A   Yes.

Q   Who did you see distribute illegal narcotics?

A   Gonzalo Ramirez and --

Q   Okay.  And where was that when you saw Gonzalo Ramirez distribute the illegal narcotics?

A   Distribute means have it?  Or sell it?

Q   Okay.

A   What are you --

Q   Have you seen Diablos Viejos or Nortenos gang members in Dodge City, Kansas, possess illegal narcotics?

A   Yes.

Q   Have you seen them sell it or give it to another person?

A   I don't remember.

Q   Okay.  Who have you seen possess illegal narcotics?

A   Pedro and Gonzalo, Gonzo.

Q   Where did you see -- I'm sorry.  I'm talking over the end of your sentences.  I'll slow down a little bit.

     Where did you see Pedro possess the illegal narcotics?

A   At his house.

Q   And do you recall where his house was?

701

A   On Avenue D.

Q   And that's in Dodge City, Kansas?

A   Yeah, in Dodge City, Kansas.

Q   You mentioned Gonzalo Ramirez; is that right?

A   Yes, sir.

Q   And where did you see Gonzalo Ramirez possess the illegal narcotics?

A   There at Avenue D.  Pedro's house.

Q   Are those the only persons that you knew -- that you personally knew possessing or selling illegal narcotics?

        MR. WACHTEL:  Object to the use of the word sell.  The questions have all been have you seen my client in possession of narcotics.

        THE COURT:  It is compound.  Either ask it possess or you ask it use.

BY MR. SMITH:

Q   Are those the only persons, Norteno or DV gang members, that you saw possess illegal narcotics?

A   No.

Q   Whom else did you see possess illegal narcotics?

A   I seen Shrek; Jesus Sanchez.  I seen him with marijuana.

Q   And did you see anyone else sell or distribute illegal narcotics?

A   Yes.

Q   And who did you see sell or distribute illegal narcotics?

A   Jason Najera and Rudy, Rudy Hernandez.

Q   And is Jason Najera a gang member?

A   Yes.

Q   And what gang is he a member of?

A   Norteno, Diablos Viejos.

Q   And Rudy Hernandez, is he a gang member?

A   Yes.

Q   And what gang is he a member of?

A   From ESP.

Q   Now, what drugs was it that Jason Najera -- that you saw Jason Najera with?

A   Cocaine.

Q   And what drugs did you see Rudy Hernandez with?

A   Cocaine.

Q   And what drugs did you see Pedro Garcia with?

A   Methamphetamine.

Q   And what drugs did you see Gonzalo Ramirez with?

A   Methamphetamine.

Q   Are you aware of where the cocaine that Jason Najera and Rudy Hernandez had came from?

A   No, I don't.

Q   Are you aware of where the methamphetamine that Pedro Garcia had came from?

MR. WACHTEL:  Objection; foundation.

THE COURT:  He can answer yes or no.

A    Yes.

BY MR. SMITH:

Q    How is it that you know where it came from?

A    Because I hung out with TC, with Eusebio Sierra.

Q    Explain that a little bit more.

A    I used to hang out with him and I knew that TC was doing -- had methamphetamine, too, and I had seen TC go to their house several times.

Q    And TC is whom?

A    Eusebio Sierra.

Q    And TC is whom you transmitted the money to California for?

A    Yes, sir.

Q    Now, yes or no, are you aware of where the methamphetamine that Gonzalo Ramirez had?  The origin of that methamphetamine?

A    No.  I, I think that it's from the same place, from TC.

MR. MANDELMAN:  Objection; speculation.

THE COURT:  He either knows or he doesn't know.  You can't speculate, sir.

A    No, I don't.

BY MR. SMITH:

Q   Now, as a part of your membership in the Diablos Viejos Norteno gang, were you involved in committing crimes yourself?

A   Yes.

Q   And are you aware of incident that involved Gonzalo Ramirez, Rudy Hernandez and then a Sureno?

A   Yes.

Q   What happened during that incident?

A   We, we went to Gonzalo Ramirez' house and we seen a Sureno right next to Gonzalo's house and he -- we ended up rushing that guy, the Sureno, and then that Sureno ended up shooting at us and hit Gonzalo in the face and Rudy Hernandez in the chest.

Q   So was that a firearm, then, that hit -- it was bullets from a firearm that hit Gonzalo Ramirez and Rudy Hernandez?

A   Yes.  From a shotgun.

Q   You witnessed that?

A   Yes.

Q   Why was it that you rushed the Sureno?

A   From him being a Sureno.

Q   Do you have any idea what year that was?

A   I don't remember.

Q   And were you involved with an incident that involved

a Sureno named Toro?

A   Yes.

Q   What happened with the incident with the Sureno named Toro?

A   We did a drive-by, me and, me and Jesus Sanchez.  We shot -- we shot at -- well, Jesus Sanchez shot at his house and then we left.

Q   How do you know that Toro was a Sureno?

A   Because Jesus Sanchez said it was Toro.

Q   Before that, did you know Toro to be a Sureno?

A   Yes.

Q   And how did you know that the house was Toro's house?

A   Because Jesus Sanchez told me to drive there.

Q   Who was armed during that drive-by?

A   Jesus Sanchez.

Q   Do you know what sort of gun Jesus Sanchez had?

A   It was a Glock 40.

Q   Did you see the Glock 40?

A   No.

Q   Had you seen the Glock 40 before that?

A   Yes.

Q   And had you seen the Glock 40 after that?

A   No.

Q   Let's look at Government Exhibit 31.  Is this Jesus

Sanchez?

A    Yes.

Q    Did you witness Jesus Sanchez fire the Glock 40 at Toro's house?

A    Yes.

Q    After that, were you involved with any incidents that would target Guatemalan immigrants?

A    Yes.

Q    And what sort of incidents were you involved with that targeted Guatemalan immigrants?

A    We tried to get money from them because we knew that they couldn't hold accounts because they were illegal.

Q    Is there any other reason that you know of that Guatemalan immigrants were targeted?

A    Just, just for them being a Guatemalan and not being -- having money, or them having money with them.

Q    And do you recall when it was that you were involved with an incident robbing the Guatemalan immigrants?

A    About 20 -- between 2009 and 2010.

Q    Were you with any other gang members?

A    Yes.

Q    And who were you with?

A    With Trey Edwards and Isaac --

Q    Does Trey Edwards have a street name?

A    Trey.

Q   Is Trey a member of a gang?

A   Now he is.

Q   And what gang was he a member of?

A   Diablos Viejos.

Q   May I approach?

THE COURT:  Yes.

BY MR. SMITH:

Q   I've shown you what's been marked as Government Exhibit 384.  Do you recognize that?

A   Yes.

Q   Who is that person?

A   Trey Edwards.

Q   And is that the person that you were involved in the robbery with?

A   Yes.

MR. SMITH:  Move to admit Government Exhibit 384.

MR. WACHTEL:  I don't have any objection, Your Honor.

MR. MANDELMAN:  I don't object.

THE COURT:  384 is received.

BY MR. SMITH:

Q   And is Isaac who you mentioned a member of a gang?

A   Now he is.

Q   And what gang is he a member of?

A    Norteno DV.

Q    Tell us what happened with the targeting of those Guatemalans?

A    We rushed Guatemalans and we tried to take some money from them; but they resisted, so Isaac hit 'em with a -- hit 'em with a gun, a BB gun.  Then I, I hit one of the Guatemalans, too, because they started to fight back.

Q    And did you get any proceeds from that robbery?

A    Yes.  I got about $200.

Q    Do you know if Trey or Isaac got any proceeds from that robbery?

A    I don't remember.

Q    Were you ever charged in that case?

A    No.

Q    Was anyone charged in that case --

A    I don't know.

Q    -- that you know of?  Now, are you aware of a Sureno that is named Spooky?

A    Yes.

Q    And how do you know that Spooky is a Sureno?

A    Just by his colors.  Just by the way he acts and he has three dots on his eyes.

Q    And what sort of incident were you involved with with a Sureno named Spooky?

A   He -- he -- he was at east side Love's in Dodge City, Kansas, and he -- him and his friend ended up -- we -- I started talkin' smack to them and they -- one of 'em pulled a gun out and then he -- we ended up going to their house and shootin' it up.

Q   Okay.  Let's explain that a little bit more.  Who were you with when you went to Spooky's house?

A   I was with some, some Nortenos that are from Texas. They were from here but they moved to Texas.

Q   Do you recall the names of any of those people?

A   Oscar Lopez and Tacho (ph).  Tacho, I don't know his last name.  And Tino.  Tino, he's from Texas.  And Big Loc, Eddie Ontiberos.

Q   Which one of those persons were with you when you were at east Love's?

A   It was Alfonso Hernandez and Ivan Munos.

Q   Is Alfonso Hernandez a member of a gang?

A   Yes.

Q   And what gang is Alfonso Hernandez a member of?

A   LCC.

Q   And was Ivan Munos a member of a gang?

A   Yes.

Q   What gang was Ivan Munos a member of?

A   LCC.

Q   Were the individuals that you've identified from

Texas there with you at Love's when you first encountered Spooky?

A   No.

Q   Where do you go after you leave Love's?

A   To -- we went to Eddie Ontiberos' house where Oscar Lopez was staying at; and Eddie, Eddie Rey Ontiberos, he's the one that gave us the -- a .22 rifle.

Q   Who was at Eddie Rey -- I'm sorry -- Eddie Ontiberos' house when you got that .22?

A   Eddie Rey.  Just --

Q   What about Alfonso and Ivan Munos?

A   No, they weren't there.  They were in the car.

Q   So is it you alone that goes to Eddie Rey's house?

A   Me and Oscar Lopez.

Q   Who was the individual from Texas; is that right?

A   Yes.

Q   And is Eddie Rey a member of a gang?

A   Yes.

Q   And what gang is Eddie Rey a member of?

A   DV.

Q   Was he a member of DV back when this incident with Spooky occurred?

A   Yes.

Q   After getting that .22, where do you go?

A   We go to Spooky -- we go looking for Spooky.

Q   Where do you go?

A   To the west side.  I don't remember the address; but we go to the west side and then we see them outside.

Q   You see whom outside?

A   Spooky and all the other guys that were with him.

Q   Who's with you at this point?

A   Me -- it was me, Ivan Munos, Alfonso and Tacho.

Q   And Tacho is from Texas?

A   Yes.

Q   What happens next?

A   We -- Tacho started -- Tacho lines out the window and was about to shoot but the gun jammed up.  So then I told him to let me see it, and I couldn't get it to work, so we ended up just getting shot at by, by Salizar.  I don't remember his first name.

Q   Was the person you identified as Salizar a Sureno gang member?

A   Yes.

Q   How did you know that?

A   Just by knowing of his family and him being -- the colors that he wore.

Q   So what -- was this the .22 that jams?

A   Yes.

Q   What happened after that .22 jams?

A   Then we -- we take off and that's when I jumped

in -- we went -- we went behind the house and we switched cars.  We switched people in the car.  And then it's me; Big Locs, Eddie Ontiberos, which is Big Locs; Tacho; Tino; and Oscar Lopez.  We end up going to, to -- we end up calling Eusebio Sierra for some guns.  Then he sends us -- he says that the guns are over there at Grim's house, and we go to pick up -- I think it was a 357, from over there at Grim's house.  And then from Grim's house, we went to Fonso's to pick up some bullets.  We also got a shotgun there.  We went to Fonso's house.  And then from Fonso's house we went to back to where he was at, where Spooky was staying at.  Then me and Tino, we ran up and shot up the house.

Q   Okay.

A   Spooky's house.

        MR. SMITH:  May I approach?

        THE COURT:  Yes, sir.

BY MR. SMITH:

Q   I've shown you what's been marked as Government Exhibit had 404; is that correct?

A   Yes.

Q   Do you recognize what's in Government Exhibit 404?

A   Yes.

Q   And what is Government Exhibit 404?

A   That's Eddie Rey.

Q   Eddy Rey Ontiberos?

A   Yes.

Q   Is that the person you've referred to as Big Locs?

A   Yes.

Q   The person that was driving you to Spooky's house?

A   Yes.

Q   And Government Exhibit 381, is that in front of you?

A   Yes.

Q   And what is Government Exhibit 381?

A   I'm sorry.  Can you repeat that again.

Q   Is Government Exhibit 381 a photograph of a person?

A   Yes.

Q   Do you recognize whom is in photograph 381?

A   Yes.

Q   And who is that?

A   Alfonso Hernandez.

Q   And is Alfonso Hernandez the person that you retrieved bullets for the 357 from?

A   Yes.

        MR. SMITH:  Move to admit Government 404.

        MR. WACHTEL:  No objection to 404.

        MR. MANDELMAN:  Yeah, no objection.

        MR. SMITH:  And 381.

        MR. WACHTEL:  No objection to 381, Your Honor.

        MR. MANDELMAN:  No objection.

THE COURT: Both 404 and 381 are received.

MR. SMITH: Publish 404, please.

BY MR. SMITH:

Q This is the person you've identified as Big Locs; is that correct?

A Yes.

Q A DV gang member?

A Yes.

Q And Government Exhibit 381 you've identified as Alfonso Hernandez; is that correct?

A Yes.

Q Alfonso Hernandez had bullets for the gun; is that right?

A Yes.

Q And does he have a street name?

A Savio (ph).

Q What's that?

A Savio, Salio -- I don't know. They call him Savio.

Q Okay. You've previously mentioned that he's a member of LCC; is that right?

A Yes.

Q You mentioned that you and one of the individuals from Texas went to Spooky's house and shot at the house. What do you mean --

A We, we went and retaliated for them shooting at us.

Q   So what gun did you have?

A   I had the 357.

Q   Did you fire it at the house?

A   Yes.

Q   The individuals from Texas, do you know if they were members of a gang?

A   I know Oscar Lopez was a Diablos Viejos and his brother, which is Tacho, claimed to be -- he thought he was a Norteno.

Q   What?

A   He -- well, pretty much he took it as because his older brother was a DV, he was DV; but he ended up being jumped in that night.

Q   Okay.  So that night the person you referred to as Tacho was jumped in?

A   Yes.

Q   Was that after the shooting?

A   Yes.

Q   Was that related to the shooting in some way?

A   No.  That was, that was -- he just needed to get jumped in because he, he had been saying that he was a DV gang member so -- Tino was the one, he got jumped in regarding towards the crime that was done.

Q   Okay.  So did Tino and Tacho get jumped in that night?

A   Yes.

Q   As DV gang members?

A   Yes.

Q   Were Tino, Tacho and Oscar Lopez all from Texas?

A   Yes.

Q   After this incident, do you know if they stayed in Dodge City or did they return to Texas?

A   They returned to Texas.

Q   And when they returned to Texas, do you know, did they retain their status as DV gang members?

A   Yes.

Q   Now, Joe, were you also involved in a fight that involved a Sureno named Frosty?

A   Yes.

Q   And how do you know that Frosty is a Sureno gang member?

A   I've, I've known him to be a Sureno. Just his -- the colors that he wore and the gang signs that he'd throw.

Q   Where was that fight?

A   That was at east Love's.

Q   And who were you with?

A   I was with, with Christian Sanchez, TC, Eusebio Sierra, Miguel Maestas, and me.

Q   And Eusebio Sierra you've already identified; is

that correct?

A    Yes.

MR. SMITH:  May I approach?

THE COURT:  Yes, sir.

Q    Showing you what's been marked as Government Exhibit 411.  Do you recognize the person in Government Exhibit 411?

A    Yes.

Q    Who is that person?

A    Christian Sanchez.

Q    Is Christian Sanchez related to anyone that you know of?

A    Yes.  Jesus Sanchez' his brother.

Q    The person you've identified as Drac?

A    Yes.

MR. SMITH:  Move to admit Government Exhibit 411.

MR. WACHTEL:  No objection, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  411 is received.  It's 411, isn't it?

MR. SMITH:  Yes, Your Honor.

THE COURT:  411 is received.

BY MR. SMITH:

Q    What happened during the fight at east Love's with

Frosty?

A   We went to east Love's to go get some cigarettes and whenever I got out of the car, Eusebio Sierra sent me to go get some cigarettes.  Well, when I went to go get 'em, I seen that Frosty was settin' outside of the car, he was sittin' in his car where the gas was.  Well, ended up, Eusebio's -- I went to get cigarettes and when I came back, all three of 'em, Christian Sanchez and Eusebio and Miguel, they were, they were on the back of the trunk.  And as I walked up, Eusebio Sierra told me to go hit 'em up, which means to go, go fight 'em.  So then I went and started -- and started fighting with them.

Q   Now, did you take that as an order from Eusebio Sierra?

A   Yes.

Q   And in your opinion, what would have happened if you had not followed that order?

A   They would have looked at me like if I was weak, like I was scared.

Q   And by following the order and hitting up Frosty, did that change your status in the Norteno gang?

A   Probably looked at me like he's down.

Q   Your involvement in these other crimes that you've mentioned with Spooky and Toro, did that change your

status in the Norteno gang?

A   I never found out what they thought about it, the Nortenos.

Q   And what was the end result of that fight with Frosty?

A   Eusebio, Eusebio ended up -- they ended up fighting, going out towards the highway, and he started trying to stab him with a knife.

Q   Who tried to stab who?

A   Eusebio tried to stab, stab Frosty with a knife.

Q   Were you ever charged in that case?

A   No.

Q   Do you know if anyone was charged in that case?

A   Eusebio.

Q   Were you ever questioned by law enforcement in that case?

A   No.

Q   Now, we've talked about --

THE COURT:  Sir.

JUROR # 100562025 01-0046:  Can we have a short break, Judge?

THE COURT:  We may.  Thank you very much. Remember and heed the admonition, Ladies and Gentlemen.

(Jury excused for recess.)

THE COURT:  How much more of this are we going

to have to endure?

MR. SMITH:  Your Honor, I'm moving to the homicide.

THE COURT:  Yeah.

MR. SMITH:  Yes.

THE COURT:  I mean, nobody was objecting, but I was wondering what in the world was relevant about all these other people who are not defendants, most of 'em, if any, and these other incidents.  What's the relevance of it?  Other than they just fight each other all the time out there.

MR. SMITH:  Your Honor, if I would not bring out the criminal incidents that the witness was involved in, then surely on cross-examination he would have been confronted with all of them.

THE COURT:  Well, he wasn't convicted of any of these things, was he?

MR. SMITH:  That's correct.  But I'm making sure that he has admitted his involvement in every criminal incident that he's been involved with.  And TC was charged in Count 1, Your Honor, and has been put up as having a position within the gang.  He was named as being a leader in Count 1 in the Indictment.  And Drak, Jesus Sanchez, was also charged in Count 1 with the RICO conspiracy.

MR. MANDELMAN: Your Honor, the Government agreed not to prosecute Mr. Galindo for this stuff.

THE COURT: Oh, well, Mr. Galindo is not named in the Indictment?

MR. SMITH: He is not.

MR. WELCH: But we have to prove a pattern of racketeering activity, obviously, Judge, and Eusebio Sierra-Medrano, TC, is charged as a conspirator in Count 1, as was Jesus Sanchez.

THE COURT: How much more pattern evidence are we going to endure here?

MR. SMITH: I would be happy to stipulate that there was an enterprise and a pattern of racketeering activity with counsel.

THE COURT: They're not going to stipulate to it; but that's not the question that I asked. How much more of this so-called pattern evidence are we going to have?

MR. SMITH: Well, with this witness I'm now moving to fact evidence of the homicide.

THE COURT: That's relevant. That's clearly relevant. That's what everybody's interested in. How many more pattern witnesses do you intend to try to put on?

MR. SMITH: There are at least three other

cooperating -- well, maybe not necessarily defendants. Three other cooperators that are fact witnesses and some of them can also provide enterprise or pattern of racketeering activity or interstate commerce evidence, which is the crux of the Defendants' defense that they have presented.  They argue --

THE COURT:  Well, I don't know, but I think it would have been a lot clearer to the jury to start out by saying, Mr. Galindo, has the Government agreed not to prosecute you in this case.

MR. SMITH:  Well, actually, Your Honor, he was never charged in this case and he wasn't a proposed defendant in this case.  It will come out that he had been charged in another case that wasn't related to this racketeering indictment.

THE COURT:  All right.  Well, you guys know what's going on.  I don't.  And I don't think the jury does either.

(Recess.)

THE COURT:  You may continue.

BY MR. SMITH:

Q   Joe, I was beginning to ask you specifically about Pedro Garcia.  You mentioned that you knew Pedro Garcia; is that correct?

A   Yes, sir.

Q   And Gonzalo Ramirez; is that correct?

A   Yes, sir.

Q   And did you know them to be members of a gang?

A   Yes, sir.

Q   And what gang?

A   Norteno DV.

Q   Let's talk about the period of 2008 and 2009.  How often did you hang out with, can you recall, with Pedro and Gonzo?

A   I hung out with them a lot.

Q   Give me an estimate.

A   For a while it was every day.

Q   You were where every day?

A   At Pedro's house.

Q   And was Gonzo present often or not so often?

A   Yes, he was there.  Often.

Q   Is this 2008 or 2009?  Or what time period?

A   2009.

Q   And do you recall what street Pedro Garcia's home was on?

A   On Avenue D.

Q   Now, do you know -- you've mentioned Pedro Garcia is a member of Diablos Viejos.  Do you know if Pedro Garcia had any tattoos identifying himself as a Diablos Viejos Norteno gang member?

A   Yes.

Q   And I want you to tell me about tattoos that you specifically yourself have seen.  What tattoos do you know that Pedro Garcia has?

A   He has X IV on his forehead.

Q   Any other tattoos?

A   That's the only ones I've seen.

Q   And specifically tattoos that you've seen, do you know if Gonzalo Ramirez has tattoos identifying himself as a Diablos Viejos or Norteno gang member?

A   Yes.

Q   And specifically tattoos that you've seen, what tattoos does Gonzalo Ramirez have?

A   He has Nuestra Familia on his chest and he has a devil on his, on his arm, with a Huelga bird on it, I think.  I don't remember too well.

Q   And the Huelga bird is associated with DV or Nortenos?

A   Nortenos and DV.

Q   Now let's talk specifically about June of 2009.  Specifically, June 8 of 2009.  Do you recall that date?

A   Yes.

Q   And did you have contact with Pedro Garcia and Gonzalo Ramirez on that date?

A   Yes.

Q   What happened to cause you to have contact with them?

A   Gonzalo called me on my phone and I was at one of my ex girlfriend's house and called me and told me to go pick him up.

Q   Did he tell you anything else?

A   Well, he would always call me and he would joke around like something was wrong; but this time I knew that something was wrong because he put it on Norte to go pick him up.

Q   Can you say that a little slower.  He put what?

A   He put it on Norte.

Q   Put it on Norte.  What does that mean?

A   Meaning like he's putting it on the set, on the gang, that this is for real.

Q   Did that change your impression of what you needed to do?

A   Yes.

Q   And how did it change your impression?

A   That I needed to act.

Q   So what did you do?

A   So I went and picked him up.

Q   Do you recall what vehicle you were driving?

A   My dad's purple car.

Q   Do you have any idea what time of night it was?

A    It was about -- it was late.  I don't remember.  I don't know exactly what time it was but it was late.

Q    Do you know where it was that you went to pick him up?

A    Yeah, right there on D.

Q    Avenue D?

A    Avenue D.

Q    Did you go to any particular home?

A    No.  They were walking on the side of the street -- well, kind of runnin'.

Q    Was anyone with you in the car?

A    No.

Q    And when you said they were walking on the side of the street, who are you referring to?

A    Gonzo and Peter.

Q    And you don't recall what time of day this was?

A    No.  It was at night.

Q    It was at night.  It was dark?

A    Yeah.

Q    You stated walking or running on Avenue D?

A    Yeah.

Q    Did you pick them up?

A    Yes.

Q    And after you picked them up, was there any conversation?

A    Well we, just --

Q    In the car after you picked them up?

A    Well, there was -- there was some police -- there was some police in the alley with flashlights and I don't know, there was something said -- I don't remember what we talked about, but I knew that there was police over there because they were looking back that way.

Q    Okay.  There were police in the alley.  Is that when you first picked up Gonzalo Ramirez and Pedro Garcia?

A    Both of 'em, yes, at first.

Q    Is that around Avenue D?

A    Yes.

Q    And you don't recall there being a conversation in the car at that point?

A    I recall there being a conversation; but I just don't remember right now what it was.

Q    And after picking up Gonzalo Ramirez and Pedro Garcia, did you go anywhere?

A    Yes.  We went to Gonzalo's house.

        MR. SMITH:  May I approach?

        THE COURT:  Yes.

BY MR. SMITH:

Q    Do you recognize what's depicted in Government Exhibits 98 and 99?

A    Yes.

Q    And what do you recognize to be Government Exhibit 98?

A    Gonzalo's house.

Q    Had you been to Gonzalo's house before June 8, 2009?

A    Yes.

Q    Is that the house that you were referring to that you took Pedro Garcia and Gonzalo Ramirez to on that date?

A    Yes.

Q    And what is Government Exhibit 99?

A    That's the backyard of Gonzalo's house.

Q    Do you recognize that backyard?

A    Yes.

        MR. SMITH:  Move to admit Government 98 and 99.

        MR. WACHTEL:  I have no objection, Your Honor.

        MR. MANDELMAN:  No objection.

        THE COURT:  They're both received.

BY MR. SMITH:

Q    After arriving at Gonzalo Ramirez' home, what did you do next?

A    We went to his backyard.

Q    Who is we?

A    Me, Peter and Gonzo.

Q    And is that the backyard that's depicted in

Government Exhibit 99?

A   Yes.

Q   Let's publish that please.  Let's look at 98 first.
Is Government Exhibit 98 Gonzalo Ramirez' home?

A   Yes.

Q   And Government Exhibit 99 is the backyard?

A   Yes.

Q   You stated that when you arrived you went to the
backyard; is that correct?

A   Yes.

Q   Who went to the backyard?

A   Me, Peter and Gonzo.

Q   Can we see on this photograph where exactly you went
in the backyard?  And you can actually touch the screen.

                    (Witness indicates.)

Q   You made a mark over by a dark-colored vehicle.  Is
that correct?

A   Yes.

Q   Do you recall, on that evening, was that dark-
colored vehicle there?

A   Yeah, it was there.

Q   Okay.  And -- thank you.  Go ahead and push that
screen down a little bit.  We don't need the screen any
more.  Push the top down.  Thank you.

     As you're in the area of that vehicle on June 8,

2009, was there any conversation being had?

A   Yes.

Q   Okay.  Who said what?

A   Peter -- I could tell that something was wrong because Gonzo's prancin' around.  He was just walkin' around like showin' something was wrong.  Peter --

MR. MANDELMAN:  Your Honor, I just object to the statements from Peter under the Sixth Amendment.

MR. SMITH:  Your Honor has made a ruling on this.

THE COURT:  Who made the statement?

MR. SMITH:  Your Honor, this was subject to the notice that --

THE COURT:  I can't -- the witness doesn't speak clearly as far as I can -- who made the statement that you're trying to get into evidence?

MR. SMITH:  This first statement was made by Pedro Garcia.

THE COURT:  Well, nobody objected to that. And there wouldn't be any reason to.  What's the second statement?

MR. SMITH:  I believe the witness will testify that Gonzalo Ramirez and Pedro Garcia made subsequent statements.

THE COURT:  All right.  Both of those

statements are admissible if you have the witness identify which one of them made the statement.

MR. SMITH:  Okay.

Q   Before we get to the statement, Mr. Galindo, you mentioned that Gonzalo Ramirez was acting a certain way. How was he acting?

A   He was movin' around, back and forth, pacin' back and forth.

Q   Did you find that unusual?

A   Yes.

Q   How was Pedro Garcia acting?

A   He was -- he was just shakin' his head.

Q   And after they were acting that way, did you ask them any questions?

A   Yes.

Q   What did you ask?

A   I asked 'em what was wrong.

Q   And did someone make a statement in response to that question?

A   Yes.

Q   Who made a statement?

A   Peter.

Q   And what did Peter say?

A   He said that a scrap died tonight.

Q   And when you say Peter, are you referring to Pedro

Garcia?

A    Yes.

Q    And after Pedro Garcia made that statement, did Gonzalo Ramirez make any statements?

A    He was just like, fuck -- just -- excuse my language -- but he was just -- he was trippin' pretty much.

Q    Okay.  And after Pedro Garcia made the statement about a scrap died tonight, did Pedro Garcia make any other statements?

A    Yes.  He, he said that a scrap died tonight.  That there was a scrap, a Sureno, trying to jump over the fence and that he shot him in the back -- or just shot him, and that the last words that Sureno heard was Norte puro.

Q    After Pedro Garcia made those statements, did Gonzalo Ramirez make any statements in response to that?

A    He laughed.

Q    Did Pedro Garcia make any statements in relation to a firearm?

A    Yes.  That, uhm, he kind of joked around that Gonzalo's gun jammed up.

Q    And did Gonzalo Ramirez make a statement about a firearm?

A    Yes.

Q    And what did Gonzalo Ramirez say?

A    That the gun had jammed up.

Q    Were there any other statements made by Pedro Garcia or Gonzalo Ramirez while you were in Gonzalo Ramirez' backyard that night?

A    To not tell nobody.

Q    And any statements, anything else after that?

A    I don't remember.

Q    Now, did you stay at Gonzalo Ramirez' home?

A    I'm sorry.  Can you repeat that.

Q    Did you stay at Gonzalo Ramirez' home after that conversation?

A    No.  We left.

Q    And who is we?

A    Me, Peter and Gonzo.

Q    Where did you go?

A    We went to Tito's house.

Q    Do you know who Tito is?

A    Yes.  He's Gonzo's cousin.

Q    Let's publish Government Exhibit 381.  381 -- 385, I'm sorry.  Do you recognize the person in Government Exhibit 385?

A    Yes.

Q    Who is that person?

A    That's Tito Flores.

Q   Have you known Tito before June 8, 2009.

A   Yes.

Q   And who was at Tito Flores' apartment?

A   His baby mama and Joshua Flores.

Q   And is Tito Flores -- I'm sorry -- is Joshua Flores a member of a gang?

A   Yes.

Q   And let's look at Government Exhibit 387.  Do you recognize the person in Government Exhibit 387?

A   Yes.

Q   And who is that person?

A   Joshua Flores.

Q   What gang is Joshua Flores a member of?

A   LCC.

Q   Does he have a street name?

A   Big Knox.

Q   Thank you.  Was anyone else with you and Tito and Knox and the woman at Tito's apartment?

A   Can you repeat that again.

Q   Tell me everybody that was in the apartment?

A   Me, Peter, Gonzo, Big Knox, and Tito and his wife, girlfriend.

Q   Now, during that conversation -- I'm sorry, during that period of time when you were at Tito's house, was there any conversation about any other criminal activity

that evening?

A    Yes.  About a home invasion.

Q    And who was having that conversation?

A    Tito.

Q    Who was Tito having the conversation with?

A    Just to everybody.

Q    Did Pedro Garcia participate in that conversation?

A    I don't remember.

Q    Did Gonzalo Ramirez participate in that conversation?

A    I don't remember.

Q    Did you learn when that home invasion took place?

        MR. WACHTEL:  I'm sorry, Your Honor -- I don't object to that question did you learn.

BY MR. SMITH:

Q    Did you learn when that home invasion took place?

A    Yes.

Q    And where or when did that home invasion take place?

        MR. WACHTEL:  Foundation, Your Honor. Objection.

        THE COURT:  Sustained.

BY MR. SMITH:

Q    Now, Mr. Galindo, you have been charged with a case in the Federal District Court of Kansas; is that correct?

A   Yes.

Q   When was it that you were charged in that case?

A   2010.

Q   Do you recall what the charges were?

A   Tampering with a witness.

Q   And what were the circumstances behind the tampering with a witness charge?

A   For messing with a witness.

Q   Okay.  Do you know -- first of all, who was the person that you messed with?  Do you know that?

A   I was supposed to tell -- I was supposed to pass a message.

Q   Okay.  Did you pass a message to someone?

A   Yes.

Q   Was that person a witness?

A   The -- yes.

Q   Okay.  And is that why you were charged with tampering with a witness?

A   Yes.

Q   After being charged with tampering with a witness in United States District Court for the District of Kansas, did you meet with law enforcement officers?  After you were charged with that, did you meet with law enforcement officers?

A   Yes.

Q   And when you met with law enforcement officers, did you discuss the homicide?

A   Yes.

Q   When you first discussed the homicide, were you still under indictment for the tampering with a witness charge?

A   Yes.

Q   At some point, were you let out of custody?

A   Yes.

Q   And why was it that you were let out of custody?

A   Because I agreed to work with the, with the police.

Q   And what do you mean you agreed to work with the police?

A   To stop crimes -- to -- to -- I don't know -- I don't know how to answer that.

Q   Okay.  Where was it you were working with police?

A   In Dodge City, Kansas.

Q   So did you return to Dodge City, Kansas?

A   Yes.

Q   Were you still charged with or under indictment for tampering with a witness?

A   Yes.

Q   And when you returned to Dodge City, Kansas, did you work for the police?

A   Yes.

Q   And what sorts of things did you do for the police?

A   I -- drug deals.

Q   What do you mean drug deals?

A   Just going and getting drugs, buying drugs.

Q   And was part of your cooperation in going and doing drug deals, your release on bond from the federal case?

A   Yes.

Q   Now, as you were working for the police and doing drug deals, did you receive any compensation, any payments from any agency?  Did you get any money from anybody?

A   Yes.

Q   Okay.  Do you recall how much money you would have gotten from anybody?

A   I don't remember.

Q   Was that while you were working for the police and doing the drug deals?

A   Say that again.  I'm sorry.

Q   The money that you received, was that while you were working for the Dodge City Police Department and participating in the drug deals?

A   Yes.

Q   And at that point, are you still under indictment in the federal case?

A   Yes.

Q   Was there something that happened that caused you to have to stop working for the police department?

A   Yes.

Q   What happened?

A   I had -- I had made a butt dial -- I had placed a call while the phone was in my pocket to a gang member, Lupe Amaro, and I was being -- I was talkin' to the police at the time and it went to -- it got recorded. So I -- so I had to leave.

Q   Okay.  So did you have a cellular telephone?  Did you have a cell phone with you?

A   Yes.

Q   And you say butt dial.  Was the cell phone in your pocket?

A   Yes.

Q   Tell me if I'm characterizing this correctly.  You accidentally dialed someone known as Lupe Amaro; is that correct?

A   Yes.

Q   You mentioned that this got recorded.  What do you mean it got recorded?

A   Voice mail.

Q   Okay.  May I approach?

        THE COURT:  Yes.

Q   Do you recognize what has been marked as Government

Exhibit 380?

A    Yes.

Q    Who is in Government Exhibit 380?

A    Lupe Amaro.

        MR. SMITH:  Move to admit Government Exhibit 380.

        MR. MANDELMAN:  No objection, Your Honor.

        MR. WACHTEL:  No objection.

        MR. SMITH:  May we publish.

BY MR. SMITH:

Q    Is this the person that you butt-dialed with your phone?

A    Yes.

Q    It was Lupe Amaro's cell phone that recorded the voice mail conversation?

A    Yes.

Q    What were you discussing when you accidentally called Lupe Amaro?

A    I don't remember.

Q    Okay.  Who were you having a conversation with when you accidentally called Lupe Amaro?

A    Shane Webb.

Q    And after you accidentally called Lupe Amaro, did anything happen to make you leave Dodge City, Kansas?

A    Yes.

Q   What happened?

A   I was going to do more work for the police department so I called Alonzo, known as Bo Bo, I called him to try to -- to try to do -- to do something else; and he ended up telling me that I was a -- that I was an informant.

MR. WACHTEL:  Objection; hearsay, Your Honor.

MR. SMITH:  Your Honor, this isn't offered for the proof of the matter asserted but as to why he left Dodge City.

MR. WACHTEL:  Makes me suspect that it's not relevant, Your Honor, if it's not offered for the truth.

THE COURT:  I'm reading something here and I am not listening to you because I can't listen and read at the same time.

All right.  Now, what --

MR. WACHTEL:  My objection, Your Honor, was that the statement was hearsay.  The response was that it's not offered for the truth.  And I then complained if it's not offered for the truth, it's not relevant here.

MR. SMITH:  Your Honor, it's relevant because --

THE COURT:  He left Dodge City after his cover was blown.  Is that what we're talking about?

MR. SMITH:  And he received assistance in leaving Dodge City.

THE COURT:  And he received assistance.

MR. SMITH:  Yes.

THE COURT:  From whom?

MR. SMITH:  From the Government.

THE COURT:  I think that's probably relevant.

MR. WACHTEL:  I don't object to that, Judge.

THE COURT:  I think that's probably relevant for purposes of credibility, isn't it?

MR. WACHTEL:  Yes, Your Honor.

THE COURT:  Isn't that something you're interested in?

MR. WACHTEL:  Your Honor, I don't object to that.  That's not what he was asked about.  Getting assistance in leaving.  I don't object to them asking him that question.

THE COURT:  Cindy, read the question.

(Question read back as follows:

Question:  And after you accidentally called Lupe Amaro, did anything happen to make you leave Dodge City, Kansas?

Answer:  Yes.  Question:  What happened?  Answer:  I was going

to do more work for the police department so I called Alonzo, known as Bo Bo, I called him to try to -- to try to do -- to do something else; and he ended up telling me that I was a -- that I was an informant.)

MR. WACHTEL:  That's where I made my objection that what Amaro said was hearsay.

THE COURT:  No, I don't think it is.  This -- you know, it's very hard, Ladies and Gentlemen, sometimes to figure out when someone else's statement is being offered for the truth of the statement or is just being offered for some other reason.  The way to handle something like this is not to get involved in the statement; but rather to say, without regard to what the statement was, what did you do.  Then we don't have to be concerned about the statement, only what he did in response to the statement.  But, I'll let it stand.  It's late in the day.  Let's move on.

BY MR. SMITH:

Q   Mr. Galindo, it's been characterized your cover was blown; is that right?

A   Yes.

Q   And did you then relocate?

A   Yes.

Q   Did you relocate with the assistance of the Government, of a governmental agency?

A   Yes.

Q   Did you receive compensation to aid you in relocating?

A   Yes.

Q   And, again, this is after you made this call to Lupe Amaro; is that correct?

A   Yes.

Q   And was Lupe Amaro a member of a gang in Dodge City, Kansas?

A   Yes.

Q   What gang?

A   DV.

Q   You also had contact with someone you named as Alondo Amaro; is that correct?

A   Alonzo.

Q   Was that person a member of a gang in Dodge City, Kansas?

A   Yes.

Q   And what gang was Alonzo Amaro a member of?

A   DV.

        MR. SMITH:   Thank you, Your Honor.  I have no further questions.

THE COURT: Yes, sir. You can start and we'll go until 5:00.

MR. WACHTEL: I'll do my best, Your Honor. Thank you.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q   Mr. Galindo, my name is Val Wachtel. I am Pedro Garcia's attorney. If I ask you a question that you don't understand, would you please tell me that you didn't understand it?

A   Yes, sir.

Q   If I speak so softly that you can't hear me, would you tell me that you can't hear me?

A   Yes.

Q   Thank you. You are -- I don't know whether you are or whether you were a DV gang member. What do you consider yourself to be?

A   I was.

Q   You were. And you left the DVs only because your cover got blown; right?

A   Yes.

Q   Otherwise, you'd have worked for the Government and done -- caught all those people for doing drugs and you would still be a DV; right?

A   Yes.

Q   Assuming you didn't have to testify?

A   I'm sorry.  Say that again.

Q   Assuming you didn't have to testify against those people that you set up; right?

A   I knew I would have to testify.

Q   In any event, you told us early on in your testimony that there were any number of aggravated crimes that were pending against you in Dodge City that were dropped.  You remember talking about that?

A   Yes.

Q   Aggravated battery?

A   Yes.

Q   Aggravated kidnapping?

A   Yes, sir.

Q   Any other aggravated crimes that were dropped at that time?

A   Besides the ones that I said?

Q   Besides the ones you said.

A   The aggravated robbery on that case.

Q   But in any event, those were dropped?

A   Yes.

Q   Why?

A   Because I testified -- or I -- I'm sorry -- I, I worked with -- I did a lie detector test.

Q   Oh, that's right, you passed the lie detector test?

A   Yes.

Q   Were you involved in those crimes?

A   Was I involved in them?

Q   Yeah.

A   Yes.

Q   What did you do?

A   I, I brought the guy out and I was there and I kicked the guy.

Q   You committed all those crimes, took a lie detector test, you passed the lie detector test?

A   Yes.

Q   The Government asked you about the organization of the DV.  You remember that?

A   Yes.

Q   And you told them that the DVs were not organized; right?

A   They are organized.

Q   They are?  Did you testify before a grand jury on October 14th, 2010?  Do you remember?

A   I don't remember what day it was, sir.

Q   You remember testifying before a grand jury, though; right?

A   Yes.

Q   Okay.  You remember being asked during that testimony whether or not Jason Najera was a leader of

one of the -- one of the sets? Remember being asked that? If you don't remember, tell me.

A Can you repeat the question.

Q Sure. Do you remember during that grand jury testimony being asked whether or not Jason Najera was the leader of one of the DV or Norteno sets? Do you remember being asked that question?

A Yes.

Q Do you remember how you answered it? Let me rephrase that. Do you also remember being asked who's the leader of the set you were associated with? Do you remember that?

A Yeah.

Q And you were associated with the DVs; right?

A Yes.

Q Do you remember how you answered that question?

A I don't remember how I answered it.

MR. WACHTEL: Permission, Your Honor, to approach.

THE COURT: Yes, sir.

BY MR. WACHTEL:

Q I'm going to show you a copy of your grand jury testimony from that point in time. I'm going to show you -- it should be on Page 27. Ask you to read to yourself Lines 2 through 5. Just read those to

yourself.  And take all the time you need.

(Witness complies with request.)

A    Okay.

Q    Now is your recollection refreshed?

A    Yes.

Q    Do you remember how you answered that question about the leader of your set?

A    Yes.

Q    How did you answer that?

A    That there was no leader, that we -- everybody just had their own, like, everybody just had their own deal about the gang.

Q    You told 'em that we just made -- everybody just made their own deal, everybody just agreed.  Right?

A    Everybody was in agreement.

Q    Yeah.  Doesn't sound to me like there's much ordering going on in that, was there?

A    At the time, it wasn't like that.

Q    Sounds to me pretty democratic; is that right?  Sound that way to you?

A    I don't know what that means, sir.

Q    Like we all agree to do something or not do something, then we do it or don't do it?

A    Yeah.

Q    Yeah.  So if there was no leader -- I'm sorry.  Are

you familiar with the term shot caller?

A    Yes.

Q    What does shot caller mean to you?

A    Somebody that calls the shots.

Q    Yeah.  What does that mean, calling the shots?

A    Somebody saying, saying what goes and what don't go.

Q    Well, there couldn't have been a shot caller at that point in time because you didn't have any leaders; right?

A    There was -- there was -- there was somebody that tried to call the shots; but everybody tried to say that it -- that everybody's equal.

Q    Right.  So that person was not, by your definition, a shot caller; right?

A    Right.

Q    You told us in direct examination that you had seen my client, Mr. Garcia, in possession of drugs.  Remember testifying to that?

A    Yes.

Q    Illegal drugs.  Yes?

A    Yes.

Q    When was that?

A    I don't remember the exact date.

Q    Do you remember a year?

A    2009.

Q   2009.  Do you remember a season?  Spring, winter, summer, fall?

A   I don't remember.

Q   Okay.  Do you remember where you were when you saw those drugs?

A   Yes.

Q   Where were you?

A   At Peter's house.

Q   Who was with you besides Mr. Garcia?

A   I don't remember who was with me.

Q   Do you remember if anybody was with you?

A   There was people already there.  There was gang members already there.

Q   But you don't remember who any of those were?

A   Huh-uh.

Q   I'm sorry.  Did you want to say something else?

A   I remember Jesus Sanchez showing up later.  I don't remember anybody else.

Q   Well, do you know -- do you know, not do you suspect, but do you know what Mr. Garcia did with those drugs?

A   He sold 'em.

Q   How do you know that?

A   Because there was one time I went with him to a house on -- around 7th street and they ended up -- I

stayed in the car and Peter and -- I don't remember if it was Peter or Gonzo, but --

Q   I'm sorry.  Say that again, because I couldn't hear you.

A   I don't remember if it was Peter or Gonzo; but one of 'em went to this house on 7th and then Peter, later we were at his house and the -- he went into -- he said -- he had mentioned about that his mom's porch, some guy was gonna -- some guy was gonna rebuild his porch and it was for something that he owed 'em.

Q   When did all that happen?

A   That was about -- I don't remember the exact date.

Q   When did that happen with regard to the drugs that you tell us all that you saw in Peter's house -- Pedro's house?  Forgive me.

A   It was around that time.

Q   What do you mean by around?

A   It was -- I don't remember.

Q   Same day?

A   No.

Q   A week later?  Two weeks later?  Two months?

A   About two weeks.  I don't remember exact dates, sir.

Q   Do you, yes or no, do you know what -- do you know how much Mr. Garcia was paid for that?

A   No.

Q   If you don't know what he was paid for that, you don't know what he did with what he was paid; right?

A   Right.

Q   Are you a native Spanish-speaker?

A   A what?

Q   Is Spanish a first language or a second language for you?

A   Spanish?  Second.

Q   Second.  You know what puro means?  P-U-R-O?

A   Puro?

Q   Yeah.

A   Pure.

Q   Do you know what -- forgive me.  Let me find it. Yeah.  You know what puta means?

A   Puta?

Q   Yeah.

A   Yeah, like -- can I say the word?

Q   Yes, sir, you may.

A   Bitch.

Q   Right.  That's not a very -- that's an insulting term, isn't it, to call somebody a bitch?

A   Yes.

Q   Why -- you told us that you heard Mr. -- Mr. Garcia had told you that the last words that the scrap had heard was Norte puta.  You remember telling us that?

A    Yes.

Q    Why would anybody who was a Norteno yell Norte puta at a scrap?  Why would they insult their own gang?

A    They wouldn't use it towards -- to insult the gang. They would use it to insult the Sureno.

Q    Okay.  So Norte puta means northern whore or northern bitch --

A    It's not --

Q    -- that's not what that means?

A    It may --

        MR. SMITH:  Your Honor, he needs to answer the question.

        THE COURT:  Let him answer.

BY MR. WACHTEL:

Q    Go ahead.  I'm sorry, sir.

A    Can you repeat the question.

Q    Yeah, I will.  What does Norte puta mean?

A    It means -- how do I put it out there?  That -- Norte is like Norte, like --

Q    Like north?

A    Yes.

Q    Okay.

A    Like Norte puto like -- that's it -- it's Norte -- it's all about Norte.

Q    Okay.  Thank you.  Thank you for explaining that to

me.  Now, also in direct examination you were asked about a lot of crimes that you were involved with. Remember?

A   Yes.

Q   While you were a Norteno, how many crimes did you commit?

A   A lot, sir.

Q   Now, were they -- were they felony crimes?

A   Yes.

Q   You remember what kind of crimes they were?

A   Yes.

Q   What kind of crimes were they?

A   Shooting, shooting guns, shooting at houses.

Q   Shooting at people and houses?

A   Yes.

Q   Anything else?

A   Drug dealing.

Q   Felony drug dealing, selling drugs?

A   Yes.

Q   What kind of drugs?

A   Cocaine.

Q   Crack or powder?

A   Powder.

Q   Any particular other crimes?

A   Uhm, robberies.

Q   Home robberies?

A   Yes.

Q   Any other kind of robberies?

A   That's all -- I don't remember.

Q   Okay.  If you committed a robbery -- well, you did commit robberies, home robberies, and you got money; right?

A   Yeah.

Q   And you did; correct?

A   Uh-huh.

Q   What did you do with that money?

A   I --

MR. SMITH:  Objection; relevance.

MR. WACHTEL:  It goes to --

THE COURT:  I know what it goes to.  The objection is overruled.

MR. WACHTEL:  It means you can answer.

A   Just on clothes for me.

BY MR. WACHTEL:

Q   In other words, not one dime of that money that you made robbing went to the DVs; right?

MR. SMITH:  Objection; relevance.

THE COURT:  Overruled.

Q   (By Mr. Wachtel) Right?

A   It went to clothes and having beer money.

Q   You spent it on you; right?

A   Well, the beer money for the homies so we could hang out and party.

Q   Beer for people and clothes for you; right?

A   Right.

Q   Now, I know you don't remember how many crimes you committed but -- they were so numerous that you just don't remember; right.  So many that you don't remember what they all were.  Right?

A   Yeah.

Q   Now, at some point in time you decided that you would cooperate with the United States government in this case; right?

A   Yes.

Q   What prompted you to do that?

A   I was tired of the life that I was living and I, I wanted to be out.

Q   Anything else prompt you to do that?

A   Say that again.

Q   Yes.  Anything else prompt you to do that, sir?  Cooperate with the government?

A   I wanted to be free.

Q   Sure you did.  You also -- yeah, you did.  And you didn't want to be prosecuted for all those crimes that you committed that you can't remember how many there

were; right?

A   Yes.

Q   Now, did you have a lawyer when you began to cooperate with the Government?

A   Yes.

Q   Do you remember -- I'm sorry -- do you remember who the lawyer was?

A   I don't remember his name.

Q   Do you remember a meeting, an interview, with Detective Bice that was conducted on November 16th, 2010?

A   No.

Q   I'm assuming in Wichita, Kansas.  Does that help you out.  Detective Bice would have been there.  You know Shane Webb; right?

A   Yes.

Q   Shane Webb was there.  Mr. Smith sitting right here, he was there.  Chad Sublett, who I think was at that time or is now the Ford County Attorney.  Remember having a meeting with all of those guys?

A   Yes.

Q   And you remember talking about at the beginning of that meeting about a Kastigar letter?  Do you remember that phrase?

A   What does that mean?

Q   Yeah. A Kastigar letter, a letter from the United States Attorney that says you talk to us and we're not going to use anything that you talk to us about to prosecute you.

A   Yes.

Q   You remember getting that; right?

A   Yes.

Q   Those letters are pretty standard.  You remember that that letter said that, that your proffer, your proffer, what you were gonna say, was gonna be off-the-record just to be used in resolving, in resolving how they were going to treat this matter?  Did you think you were talking to them off-the-record?

A   I don't understand the question.

Q   Yeah, I'm sorry, it's bad.  The general language in those proffer letters is that the government is going to consider the proffer off-the-record and the discussion -- excuse me -- I've done that -- let me move on.  I'll come back and get that.  Okay?

THE COURT:  I think probably it would be helpful if we quit for the day.  It's 5:00.  And we'll start again tomorrow and get things straightened out then.  Ladies and Gentlemen, please remember and heed the admonition.  I'll see you all at 9:00 tomorrow morning.

(Jury excused for the evening at 5:05 p.m.)

THE COURT:  Well, if there was ever any doubt about the reliability of polygraphs, we've heard it today.

MR. MANDELMAN:  He beat it.

THE COURT:  That's --

MR. WELCH:  Your Honor, there's a couple of scheduling things that we might discuss right now if you have just a minute.

THE COURT:  Yes.

MR. WELCH:  First of all, we're moving quicker than we expected.

THE COURT:  Good.

MR. WELCH:  And how much quicker, we don't know for sure, obviously, but I'm guessing Friday or Tuesday we'll probably be done with our evidence.

THE COURT:  Good.

MR. WELCH:  Two of our witnesses, Your Honor, wanted just to make it clear now just to make sure there's reason to bring them in.  One is a man by the name of Mark Thomas who is with BOP now.  He would be brought in to say that he did the intake screening of Pedro Garcia who admitted he was a Norteno.  It will be very quick.  And then the second is a former KDOC

employee, man by the name of Rick Honeycutt, who essentially would do the same thing for Gonzalo Ramirez, that he did intake in the state prison system where Mr. Ramirez admitted he was a gang member, Norteno, DV -- I think remember exactly what he said.

THE COURT:  All right.

MR. WELCH:  And it was part of the enterprise of -- as we discussed earlier, Your Honor.  I just want to make sure -- Mr. Thomas is coming from Illinois. Mr. Honeycutt is in Kansas, so his travel is not a big deal but --

THE COURT:  I think that's admissible evidence.

MR. WELCH:  Thank you.  I just wanted to clear that up.  Thank you, Judge.

MR. MANDELMAN:  My only concern about those guys was, with respect to my client, was that in this particular one he wasn't Mirandized, he was in custody.

THE COURT:  I don't understand why you think that that would require a Miranda warning.

MR. MANDELMAN:  If you're going to inquire about gang involvement and then the United States is going to introduce that in a prosecution --

THE COURT:  You should have filed a motion to suppress it.

MR. MANDELMAN:  I did.

THE COURT:  Then if I -- have I ruled on it? I don't remember.

MR. MANDELMAN:  I don't -- I filed, like, two. It's, it's been the subject of litigation in this, I don't know, two or three times.

LAW CLERK MS. SILVA:  The predicate acts and the --

MR. MANDELMAN:  I don't know if the Court has ruled.

MR. SMITH:  Your Honor ruled it admissible in the enterprise and predicate act and 404(b) ruling.

THE COURT:  I think so.  I don't remember ever hearing testimony from some guy at the prison and you wanting to suppress it.

MR. MANDELMAN:  Well, I, I don't know.  I did file two motions.  I don't know if the Court specifically on the -- in the Court's most recent ruling it said that I could challenge voluntariness but didn't specifically address the Miranda issue with respect to this one witness.  I don't think it's been ruled on.

THE COURT:  I don't think it's been raised.

MR. MANDELMAN:  Well, it's -- I mean, I'm not trying to raise anything new.  Whatever is out there. I'm not trying to raise anything new.

MR. WELCH:  It's my belief Your Honor did address that in the order.  I know it was mentioned in the enterprise disclosure and we had a hearing where we discussed that.  We discussed --

THE COURT:  We'll look it up.  But if I've already ruled on it, I've already ruled on it and I've already said it's admissible.

MR. WELCH:  Thank you, Judge.  That's all we have for tonight.

MR. WACHTEL:  Your Honor, with regard to -- not to that discussion, but to the scheduling.  I have a witness that I will be bringing in from New York City, or the New York City area, and I'm -- based on what Mr. Welch has said, I plan to have that person here I guess on Tuesday so we can keep the ball rolling.  It's going require her probably to stay here more time than we had expected but that's --

THE COURT:  Is this a gang expert?

MR. WACHTEL:  Yes, sir.

THE COURT:  Okay.

MR. WACHTEL:  Thank you.

THE COURT:  You know, I'm glad that we're moving along.  But I'll have to leave it up to you all to decide when to have your witnesses here because there's no way for me to say how long any particular

witness is going to take.

MR. WACHTEL:  I know, Your Honor.  I'm just trying to -- if it will help Mr. Welch --

THE COURT:  Now, I want the Government to update the witness list; and, Lorraine, I want you to prepare a witness list for the defense because, obviously, we're going to have some defense exhibits.  I mean exhibit list, not witness list.  So that will help me and it will help Cindy.  All right.  Anything further?

MR. WACHTEL:  No, sir.

MR. MANDELMAN:  Thank you, Judge.

MR. WELCH:  No, Your Honor.

THE COURT:  We're going to quit tomorrow at 4:30, for your information.

(Adjourned at 5:10 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 8:55 a.m. October 9, 2013, the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT:  Now, before we bring the jury out today, I want to do a couple things.  Right before we broke, Mr. Welch was talking about two witnesses, which I assume -- or, who I assume are people at a jail or a prison and asked the Defendants questions about their gang membership so they won't put them in with the Surenos or something like that.  But make a quick proffer with respect to what those two people will say.

MR. WELCH:  Your Honor, the first is Mark Thomas, who is a BOP employee.  He had some responsibility for intake on Defendant Pedro Garcia on his federal conviction.  There's forms they fill out, one of which is a question that asks do you have a gang affiliation.  Mr. Garcia said he did.  I don't remember exactly the way it's written.  I think it says Norteno 14 I think.  That would be the testimony from Mr. Thomas.  Again, the reason was to keep him separated from rival gang members.  And then be very similar. Rick Honeycutt is the other witness.  He is a retired KDOC employee.  He works for Kansas State University today, but formerly worked at KDOC, and he did

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

essentially the same thing with Mr. Ramirez when Mr. Ramirez was in state prison, did intake. Mr. Ramirez identified that he was in a Hispanic group, Norteno 14. So -- I may be wrong about Mark Thomas, but Norteno 14 is what's on the form that Mr. Honeycutt filled out with Mr. Ramirez and we would have him testify that he did that process.

THE COURT: Val, is that something you want to challenge?

MR. WACHTEL: I do want to cross-examine him about that, Your Honor.

THE COURT: Oh, sure.

MR. WACHTEL: But I'm not sure that that kind of statement is admissible because it's my understanding when the statement was made, Mr. Garcia was alone, and I think those are taken by the prison to aid in future prosecution of cases. They may also help separate folks.

THE COURT: And, Joel, your position is that there should have been a Miranda warning?

MR. MANDELMAN: Yes. And also, I guess I'll just add that it seems like it's cumulative and it's prejudicial to have a guy from corrections come again to talk about --

THE COURT: Everything in the Government's

case is prejudicial.  We all know that.  We wouldn't be here if it --

MR. MANDELMAN:  But particularly someone who's a prison official.  But, right, I think -- I understand they're using it, right, so there's not fights or whatever; but now it's being used for a different purpose and we think that he ought to have been Mirandized.

THE COURT:  All right.  Here's what I'm going to do.  Val and Joel have until 8:00 tomorrow morning to write me a brief on that discrete issue as to whether or not a Miranda warning is required in a prison setting when a prisoner, which they both were at that time --

MR. WACHTEL:  Yes, sir.

THE COURT:  -- is queried on an admission form about gang membership.  I don't recall ever seeing that or ever having that come up before.  But I don't want to make a major mistake.  So -- then I'll read it.  And if I want a response from the Government, I'll get one.

Now, there's another matter that I'm concerned about here.  And I'm listening to the evidence.  You all may not think I am, but I am.  And I've heard an awful lot of evidence here about gang activity and that sort of thing in Dodge City, but I sure haven't heard what I think is much evidence about interstate commerce.  Now,

I may be hearing that pretty soon, but I want the Government to write me a brief with respect to its view as to interstate commerce and how interstate commerce is impacted by what it knows now to be the evidence in this case. And that I -- Lanny, when do you think you're going to finish your evidence?

MR. WELCH: I would say, Judge, safely, next Tuesday.

THE COURT: All right. By 5:00 on Friday. That will give us a chance, even with the holiday, to look that over, give the defense counsel a chance to get your view on that. I can't think of anything else. Rachael, can you think of anything? I've been looking at the instructions. They're probably pretty well formulated at this point in time, and I think that's going to be an issue, and Rachael reminded me, I didn't pay much attention to that case upstairs, but you were in that case, weren't you, Val?

MR. WACHTEL: Yes, Your Honor. I never went to trial in that case. My client was severed out. But, yes, sir, I'm familiar with the Crips case. There were two of them.

THE COURT: The jury hung in that case, didn't they, on RICO?

MR. WACHTEL: They hung as to one or two

people is my recollection.

THE COURT:  Yeah.  Well, the jury -- this is going to be the longest set of instructions, with the possible exception, Lanny, of a death penalty case, and I want to be sure I'm right on the instructions, number one.  And, number two, I assume that there will be motions for judgment of acquittal at least on some of the counts and I want to make sure I understand what everybody's position on that is.

All right.  Let's bring out the jury.

(Jury enters the courtroom at 9:05 a.m.)

THE COURT:  Good morning, everyone.  Please be seated.  Mr. Wachtel, you may continue.

MR. WACHTEL:  Thank you, Your Honor.

BY MR. WACHTEL:

Q   Mr. Galindo, you remember yesterday we were beginning to talk about a Kastigar letter that you had received from the United States government.  You remember that?

A   Yes, sir.

Q   I asked you if you remembered that Kastigar letter.  Do you remember it?

A   Yes.

Q   The Government made you some promises in that

Kastigar letter; right?

A    Yes.

Q    What's your recollection of what they promised you?

A    That I couldn't be charged for the crimes that I had admitted to.

Q    Any crime that you had admitted to; right?

A    Well, to the ones that I confessed about.

Q    Right.  If there was something you didn't tell them, you could be prosecuted for that?

A    Yes.

Q    So you told 'em every crime that you had committed that you could remember; right?

A    Yes.

Q    And evidently -- well, sorry, that was bad.  And your memory of the crimes you committed was better on November 16 of 2010 than it is now; right?

A    Yes.

Q    In any event, the, the Kastigar letter, the proffer letter, was if you tell the truth, we're not going to prosecute you; right?

A    Yes.

Q    If you lie to us and we find out you did, we'll prosecute you for false statement; right?

A    Yes.

Q    And we won't use any of this information that you're

going to tell us against you; right?

A   Yes.

Q   And here we are quite sometime later and nothing that you told the Government has been used against you; right?

A   Yes.

Q   Despite your activity as a Diablos Viejos in Dodge City, you've not been charged with one thing; right?

A   Yes, sir.

Q   Now, you also -- at that meeting on November 16th, 2010, there were also present a state prosecutor. Remember?

A   Yes.

Q   And the state prosecutor brought with him a letter that you signed at that meeting that is called an immunity agreement.  Do you remember that?

A   Yes.

Q   By the way, since yesterday, have you seen that immunity agreement?

A   No.

Q   Since yesterday.  No?  I'm sorry.

A   No.

Q   Thank you.  In any event, the -- you were told by the Ford County prosecutor that they thought resolving the federal government's concerns was more important

than prosecuting you for crimes in Ford County, Kansas. You remember them telling you that?

A   Can you repeat that again.

Q   Yeah. I'll try. Someone, a county attorney, told you that the county believed that resolving these federal crimes, those concerns, was more important to them, State of Kansas, than prosecuting you for all the crimes you talked about by the state. Right?

A   Yes.

Q   Yeah. In other words, they said to you, and they put it in a letter which you recall receiving -- right? That if you told everything you know about Norteno crimes -- right? That the State of Kansas was not gonna prosecute you no matter what crimes you committed in Dodge City. Right?

A   Yes.

Q   Including homicide?

A   No.

Q   No. I'm sorry. I misspoke. I apologize. But you hadn't committed any homicides; right?

A   No.

Q   And from the time you signed that agreement to this day, you've not been prosecuted for anything by the State of Kansas, have you? From the -- from the 16th of November of 2010 to this very day, you've not been

prosecuted by the State of Kansas?

A   No.

Q   Right?  Right.  No.  In fact, and every crime --
it's not coming out well, Judge.  I'm sorry.

You've not been prosecuted for any crime that you
told about in that Kastigar letter?  In that meeting
with the prosecution.  Right?

A   Repeat that.

Q   Yeah.  I absolutely will.  You have committed lots
of crimes in Dodge City; right?

A   Right.

Q   But you've not been prosecuted for one of them after
you received this immunity agreement?

A   Right.

Q   You're one of the few former DV witnesses that the
Government has presented to us in civilian clothes.  Are
you not incarcerated anywhere?

A   No, sir.

Q   I have the debriefing from you, which I'd be happy
to show you, which -- the one I have is the November
16th, 2010, debriefing.  Was that the very first contact
you had with law enforcement agents about wanting to
cooperate in this case?

A   I don't remember.

Q   Okay.  You do remember having an attorney by the

name of Doug Adams; right?

A    Yes.

Q    I notice that Mr. Adams received a letter from the Government on June 9th, 2010.  Now, had you had contact with the Government about these cases prior to June 9th, 2010?

A    Regarding the case that I was charged with?  That I --

Q    Regarding any DV/Norteno/LCC crimes committed in Dodge City, Kansas.

A    Yes.

Q    What's the earliest contact that you can remember?

A    Prior to me getting arrested by the police department, I was -- the -- Officer Nau, the day he got ahold of me and told me to meet him there at the police department.

Q    Was that the day that you learned that your cover had been broken and you needed to get out of Dodge?

A    No.

Q    Who'd you meet with on that day?

A    Repeat the question.

Q    Yeah.  You told me that you met with an officer in Dodge City.  It wasn't the day they told you to get out of Dodge.  Who did you meet with?

A    With Officer Nau.

Q   Oh, Nau?

A   Yes.

Q   N-A-U?

A   I'm sorry.

Q   I spelled his name.

A   Okay.

Q   What did you talk about?

A   That's his name, Officer Nau.

Q   Yes, I know.  What did you talk about?

A   We talked -- he had asked me if I had threatened the witness and I told him I didn't wanna talk.

Q   And I'm not concerned with that case.  I'm concerned with when you -- when the first time was you talked with federal authorities about this, the things that are wrapped up in this case.  Do you remember when that was?

A   That was after I got out.

Q   After you got out of?

A   Out of jail here in Newton.

Q   When was that?

A   I don't remember the exact date, sir.

Q   I'll try to be brief.  You are a free man today; right?

A   Yes, sir.

Q   Is that freedom important to you?

A   Yes, sir.

Q   Is it valuable to you?

A   Yes, sir.

Q   And to keep that freedom, you need to cooperate with the Government; right?

A   Yes.

Q   And you're gonna do that no matter what it takes; right?

A   Yes, sir.

MR. WACHTEL:  I don't have any further questions.  Thank you, sir.  Thank you, Judge.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   I'm going to try and -- my name is Joel Mandelman. I'm the attorney who's representing Gonzalo Ramirez. And I'm going to try not to repeat questions that you've already been asked.  I do want to pick up where Mr. Wachtel left off.  Uhm, the first time you talked about the homicide, it was more than a year after the homicide?

A   Yes.

Q   And before you agreed to present -- to testify in front of the grand jury, you had already entered into this immunity agreement with both the State of Kansas and the federal government?

MR. SMITH:  Objection, Your Honor.  The federal government did not provide an immunity agreement.  The State of Kansas provided an immunity agreement.

THE COURT:  I don't know whether that's the case or not, but --

MR. SMITH:  Misstatement of the evidence.

THE COURT:  I don't know whether that's a misstatement.

BY MR. MANDELMAN:

Q   I'll go ahead and just present you with the Kastigar letter that we've talked about and you can see if you can identify it.  Permission to approach.

THE COURT:  What's the exhibit number on that?

MR. MANDELMAN:  That's gonna be R-N-2.

BY MR. MANDELMAN:

Q   That actually contains three different letters; is that correct?

A   Yes.

Q   There's two letters from the United States Attorney's office and one letter from the Ford County Attorney?

A   Yes.

Q   And those letters outline the terms under which you provided information to the Government?

A   Can you --

Q   Those letters provide the protection for you to speak with the Government?

A   Yes.

Q   And those are -- you recognize your signature at the bottom of those letters?

A   Yes.

MR. MANDELMAN:  I move to introduce Defendant's Exhibit R-N-2.

MR. SMITH:  I object.  He's testified to the contents and he's been cross-examined by Mr. Wachtel and can be by Mr. Mandelman.

THE COURT:  Can I see R-N-2 please.

MR. MANDELMAN:  Sure.

THE COURT:  Well, R-N-2 contains the three letters?

MR. MANDELMAN:  Yes.

THE COURT:  R-N-2 is received.

BY MR. MANDELMAN:

Q   Again, I'm not going to restate the crimes that you've already talked about that you weren't prosecuted for.  Mr. Ramirez did not participate in any of those crimes?

A   No.

Q   And you also talked about some drug dealing you did

with TC?

A    Yes.

Q    Mr. Ramirez didn't participate in that?

A    No.

Q    You did mention one incident with my client where I believe you guys ran upon a Sureno and then you said you actually got shot at?

A    We all got shot at.

Q    That happened back at least -- that was your first stint in Dodge City?  That was back in, like, '04?

A    No.

Q    It's your recollection that was sooner?

A    Later.

Q    Later?

A    Yes.

Q    But you don't remember the date?

A    No, I don't remember the date.

Q    And then after you began cooperating, you started doing some drug buys for the state.  What was the nature of your relationship?  Cooperating as a drug informant?

A    I don't know what that means.

Q    What did you do when you were working with the KBI?

A    I bought drugs.

Q    Did you set up other Norteno, other members of the DV?

A    Yes.

Q    And they knew you so you worked with a confidential informant to set them up?

A    Say that again.

Q    They knew you, a lot of those guys.  Is that correct?

A    DV?

Q    Yeah.

A    Yes.

Q    So you would work with someone else and arrange -- make the introduction and then they would purchase the drugs?

A    If they -- if -- who would purchase drugs?

Q    You would -- I'm asking.  You tell me.

A    Can you repeat your question before that.

Q    Just how did the arrangement work?

A    I purchased the drugs to work as an informant.

Q    You purchased directly from your own gang members?

A    Yes.

Q    During what period of time was this?

A    This was when I was working for the police department as an informant after I agreed to work with the PD.

Q    Okay.  And for that cooperation, you received several payments?

A   Yes.

THE COURT:  Received what?

MR. MANDELMAN:  Several payments.

THE COURT:  Payments.

MR. MANDELMAN:  Permission to approach.

THE COURT:  Yes, sir.

BY MR. MANDELMAN:

Q   I'm going to show you what's been marked as Defendants Exhibit R-N-1.  Do you recognize those documents?

A   Yes.

Q   And can you -- is that your signature on the bottom?

A   Yes.

Q   And those are receipts that you received from the state for working on these drug buys?

A   Yes.

MR. MANDELMAN:  I move to introduce R-N-1.

MR. SMITH:  No objection.

THE COURT:  R-N-1 is received.

BY MR. MANDELMAN:

Q   Now, when your cover was blown, you mentioned that you received some assistance in relocating?

A   Yes.

Q   What sort of assistance did you receive?

A   Money to move.

Q   How much money?

A   About $1,000.

Q   And you relocated out of state?

A   Yes.

Q   In 2009, you were also -- you were convicted in state court of a felony?

A   Yes.

Q   And you remember what that case was for?

A   Obstruction.

Q   And Jesus Sanchez was accused of attempted second degree murder?

A   Yes.

Q   And you helped conceal him?

A   I gave him a ride.

Q   And then you misled the police about his whereabouts?

A   I don't remember what I said.

          MR. MANDELMAN:  I move to introduce -- well, I'll let the Government take a look.  This is R-L-1 -- pardon.  This is just R-L.

          THE COURT:  What is it?

          MR. MANDELMAN:  This is Mr. Galindo's state court conviction for obstruction.

          THE COURT:  The J and C.

          MR. MANDELMAN:  Yes.

MR. SMITH:  No objection.

THE COURT:  It's received.

BY MR. MANDELMAN:

Q   During your testimony you've mentioned that a lot of the alleged DV gang members didn't speak with you because they thought you were a snitch?

A   Correct.

Q   And it's your claim here that Mr. Garcia confided in you about this homicide?

A   Yes.

Q   Was anybody else present besides Mr. Garcia and my client?

A   No.

Q   You mentioned a phone call that you received from my client?

A   Yes.

Q   Were you ever able to provide law enforcement with any sort of cell phone records to verify that call?

A   No.

Q   And it's your claim that confession took place outdoors in Mr. Ramirez' backyard?

A   Yes.

Q   And Mr. Ramirez has a large doberman in his backyard.  Do you remember that?

A   I remember a dog being back there; but I don't

remember what kind of dog it was.

Q   Can I go ahead and -- I'm just going to show you Government Exhibit 99.  This exhibit has already been received into evidence.  You see that big cage?

A   Yes.

Q   That's where the doberman was?

A   Yes.

Q   And you remember how the doberman reacted to having all these guys back there late at night?

A   I don't remember.

MR. MANDELMAN:  I don't have any more questions for you, sir.

THE COURT:  Redirect, please.

**REDIRECT EXAMINATION**

BY MR. SMITH:

Q   Mr. Galindo, you were just asked if there was anybody else present during these confessions of those murders.  Do you remember that question?  Do you remember if you were asked if anyone else was present?

A   Yes.

Q   Subsequent -- well, you know who Huesos is?

A   Yes.

Q   Do you know who Blanco is?

A   Yes.

Q   Had you ever had any conversations with Huesos or

Blanco about the homicide?

A    No.

Q    Have you ever had any conversations with Huesos or Blanco about the homicide?

A    No.

Q    You were asked a question, Mr. Galindo, about a telephone call being made; is that correct?

A    Yes.

Q    Now, it's my understanding -- I believe you testified you did not talk about this homicide until a year after the homicide had occurred; is that correct?

A    Yes.

Q    Do you know if you even have the same telephone?

A    No.

Q    Now, you were asked if you remember the dates that you would have been purchasing narcotics for the state. Do you recall that question?

A    Yes.

Q    Do you remember when it was you were charged with obstruction in federal court?

A    In federal court?

Q    Yes.  With tampering with a witness -- I'm sorry -- in federal court?

A    It was about 2009, 2010.

Q    And you have the Kastigar letters in front of you

which were marked, I believe, R-N-1 -- I could be wrong about that.

THE COURT:  R-N-2.

BY MR. SMITH:

Q   R-N-2.  You have those letters in front of you; is that correct?

A   No.

MR. SMITH:  May I approach?

THE COURT:  Yes.

BY MR. SMITH:

Q   Look at that first letter for me, if you would.  The first page of the first letter.  Is that the letter that you were given when you had Doug Adams as an attorney?

A   Yes.

Q   Is that letter signed and dated?

A   Yes.

Q   Did you sign and date that letter?

A   Yes.

Q   And what date did you sign that letter?

A   6-23-10.

Q   Is that while you were still under indictment in federal court?

A   Yes.

Q   Did you do your work for the state after 6-23 of 2010?

A   Yes.

Q   I'd also like for you to take a look at the third letter dated November 16th, 2010.  Do you see that?

A   Yes.

Q   And during that letter you were present and signed and dated that letter; is that correct?

A   Yes.

Q   Did you initial specific paragraphs in that letter?

A   Yes, I did.

Q   And it appears there are one, two, three and four paragraphs in that letter; is that correct?

A   Yes.

Q   Now, in that letter, was it stated that the information that you gave during your proffers would not be used against you as long as you told the truth?

A   Yes.

Q   And in that letter does it make a statement that if you provide false or if you conceal information in the proffer, you may be prosecuted?

A   Yes.

Q   And you could be prosecuted federally; is that correct?

A   Yes.

Q   And if you were to make false statements or conceal information, all of the information you gave during the

proffer could be used against you in prosecution?

A   Yes.

MR. SMITH:  Just a moment, Your Honor.

THE COURT:  Yes, sir.

(Off-the-record.)

BY MR. SMITH:

Q   Now, this happened yesterday, Mr. Galindo, but do you recall being asked a question if there were two different sets of Diablos Viejos by Mr. Wachtel?

A   If there's two different sets of Diablos Viejos?

Q   Let me focus your attention more.  Do you recall being asked the question about whether you were with a group that didn't necessarily have a leader and then there was another group that did have a leader?

A   Yes.

Q   And you were shown part of a grand jury transcript, in fact, to refresh your memory?

A   Yes.

Q   Do you recall that?

A   Yes.

Q   Was there a point in time around 2010, when Diablos Viejos had a power struggle, a rift?

A   Yes.

Q   What was the cause of that rift to your knowledge?

MR. WACHTEL:  I object, Your Honor.  That's

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

not proper for cross-examination.  I did not touch on that -- excuse me -- for redirect.  I did not touch on that in cross-examination.

THE COURT:  You didn't touch on it directly but you opened the door to it.  Objection is overruled.

BY MR. SMITH:

Q   What was the cause of the rift?

A   Because I had a bunch of friends that were gang members that they -- they were backin' me up because they said that even though they called me a snitch that they know that I'm still a rider and that I'm still -- still gonna -- that I'm still a Norte.

Q   Okay.  And so was there a group on the other side that was opposed to you?

A   Yes.

Q   Where was Jason Najera?

A   On the other group.

Q   Was Jason Najera in a leadership position of the other group?

A   Yes.

Q   After this rift, was it your group that you said didn't have a leader but kind of voted on things democratically?

A   Yes.

Q   Do you have any idea how long that rift lasted?

A   Well, it lasted as, as far as I know, it was -- I stopped banging after all this happened so -- they kept going, so I don't know where they stand now.  But it was, like, we all came to an agreement.

Q   Now, you were arrested in 2010?

A   Yes.

Q   For the tampering with a witness case; is that correct?

A   Yes.

Q   You went into custody; is that right?

A   Yes.

Q   And we've already mentioned you were released on bond and began working for the police department; is that correct?

A   Yes.

Q   So as you're working for the police department, are you banging?

A   No.

Q   Are you with either one of these groups?

A   No.

Q   Do you know if there's two groups or one group at that point?

A   No.

        MR. SMITH:  I have nothing further.

        THE COURT:  Yes, sir.

**RECROSS EXAMINATION**

BY MR. WACHTEL:

Q    Mr. Galindo, you were talking with the Assistant
United States Attorney about a rift in the Diablos
Viejos.  You just did that.  Do you remember that?

A    Yes.

Q    And you said to him that some of the older Diablos
Viejos didn't support you?

A    Yes.

Q    And some of the younger ones did; right?  Isn't that
what you said?

A    No, I didn't say what age group or anything.

Q    All right.  Let me ask it then.  The older Diablos
Viejos did not support you; right?

A    There were some of the older Diablos Viejos that
supported me.

Q    Well, let's make it simple, what Diablos Viejos
didn't support you?

A    Which ones didn't?

Q    Yes, sir.

A    Do you want to know the names?

Q    Yes, sir.

A    Okay.  You got, you got Jason Najera.  Caiyo.

Q    You should spell that for the reporter, please.

A    His name is Jose, Jose, Caiyo, C-A-I-Y-O.  You got

Chucky.  I don't know -- I don't remember his name right now.  You got Russell.  You have Lorenzo Gobin -- no, not Lorenzo Gobin, Ricky Gobin.

Q   When you say Russell, did you mean Russell Worthey?

A   Yes.

Q   Thank you.  Go ahead.

A   Big Locs.

Q   And that is who?

A   Eddie Rey, Ontiberos.  Those are the ones that were at the gang meeting.

Q   Did Mr. Garcia support you?

A   Yes.

Q   He did?

A   Yes.

Q   But he wasn't at that meeting?

A   Right.

Q   Did Mr. Ramirez support you?

A   I never knew about him, if he supported me.  I, I didn't have -- I hadn't talked to him any more.

Q   In any event, was it part of that rift that convinced you to begin cooperating with the Government in terms of being -- buying drugs for them from Diablos Viejos?

A   Can you explain it?

Q   I can try to.  That rift that happened, did that

make you mad that you were not successful in that rift?

A    It didn't make me mad.

Q    Would it upset you with the people who opposed you?

A    Yes.

Q    Is that what lead, at least in part, to you cooperating with the Government and buying drugs for -- not the government, but the State of Kansas, and buying drugs in Dodge City for them?

A    Not as much.

Q    But somewhat; right?

A    Yes.  I don't know.

Q    So doing that was a way to get even with the Diablos Viejos that didn't support you, isn't it?

A    No, because when I worked for the PD, I -- it was somebody -- I worked -- I did work for somebody that was supporting me.

        MR. WACHTEL:  Thank you very much.  I don't have any questions, Judge, any more.

        MR. MANDELMAN:  No, Your Honor.  Thank you.  I have no more questions for this witness.

        THE COURT:  All right, sir.  Your excused. Next witness, please.

        MR. WELCH:  United States calls Frank Herrera.

                        **FRANK HERRERA**

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you please state your name?

A   Francisco Herrera.

Q   Mr. Herrera, how are you employed?

A   I am employed with the Dodge City Police Department.

Q   How long have you been with the Dodge City Police Department?

A   Since 2005.

Q   What do you do for the Dodge City Police Department?

A   I'm a patrolman.

Q   What are your general duties as a patrolman in Dodge City, Kansas?

A   As a patrolman, I take calls for service, traffic, and other small things that help around the community.

Q   I would like to focus your attention on the day of June 8, 2009, if I could.  Were you working that day?

A   Yes, I was.

Q   Do you recall late that evening receiving a -- being dispatched to a crime which occurred on Avenue E in Dodge City, Kansas?

A   Yes.

Q   What time did you receive the information that a

crime had occurred at that location?

A    It was soon after 11:00 p.m. when Ford County communications dispatched officers to that residence.

Q    Were you one of the officers that was dispatched to that location?

A    Not initially.  That day, I was on light duty status so I was pretty much contained to the police department unless I was needed for language skills.

Q    All right.  And at some point were you informed that you were needed for language skills?

A    Yes.

Q    And where were you needed?

A    I was needed at 1005 Avenue E.

Q    And did you go there?

A    Yes.

Q    Can you tell the members of the jury what type of residence is located at 1005 Avenue E in Dodge City, Kansas?

A    1005 Avenue E is a single, I guess, it looks like a single home residence, basement, with two, I guess two levels, basement and main level upstairs.  The community -- the neighborhood is much more of a poorer neighborhood, lower income.

Q    All right.  Had you -- do you recall whether you had been at that address prior to June 8, 2009?

A    Had I been to that address?  No, I had not.

          MR. WELCH:  Your Honor, may I approach?

          THE COURT:  Yes, sir.

BY MR. WELCH:

Q    Sir, I'm going to hand you what's been marked Government Exhibit 200 and 201.  Starting with 200, can you tell us what those photographs are?

A    Yes.  This photograph is the address marker, 1005, for that residence.

Q    On Avenue E?

A    Yes.

Q    And the 201?

A    201 is a larger photograph of the same entrance to that residence, the porch area.

Q    And do both photographs accurately depict the portions of the residence as the residence appeared that night?

A    Yes.

          MR. WELCH:  I would offer 200 and 201, Your Honor.

          MR. WACHTEL:  I have no objection, Your Honor.

          MR. MANDELMAN:  No objection.

          THE COURT:  They're received.

BY MR. WELCH:

Q    Earlier, Mr. Herrera, you testified that 200, the

purpose of taking this photograph is to document the
address of the residence; is that right?

A    That is correct.

Q    So we see -- it's not terribly legible -- but the
address 1005 on a post; is that correct?

A    That is correct.

Q    And 201.  And what is 201?

A    201 is the photograph of the front, or, I guess
the -- yeah, the main front of the residence, the porch.

Q    All right.  You said you got dispatched -- you
initially hear the call around 11:00 p.m. is that
correct?

A    That is correct.

Q    What time do you recall arriving at that house?

A    Would have been maybe 10, 15 minutes afterwards.

Q    And can you tell the members of the jury when you
arrived at the house, what was the scene like?  What did
you find?

A    When I arrived, I remember seeing Ford County EMS
was already on-scene as well with other officers
responding.  The main victim had received some injuries.
When I arrived, there was what appeared some residents
outside on the front of the porch just as that picture
shows.  And officers were trying to take photographs of
the area already and trying to put together what had

occurred.

Q   Did you -- you speak Spanish, sir?

A   Yes, I do.

Q   Are you a fluent Spanish speaker?

A   Yes.

Q   Do you frequently use your language skills as part of your job in Dodge City, Kansas?

A   Yes.

Q   Was that why you were dispatched to this address that night?

A   That is correct.

Q   Why were you needed -- why was a Spanish speaker needed at that location?

A   I was needed there, one, because I'm fluent in Spanish and at that time I was the only officer on duty to speak Spanish available.  And the, the victims were of, I guess, Guatemalan descent.

Q   And what language do Guatemalan immigrants in Dodge City generally speak?

A   They generally speak a broken dialect of Spanish and also other dialects of K'iche'.

Q   K'iche' is a language native to Guatemala; is that correct?

A   That is correct.

Q   Do you speak K'iche'?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   No, I do not.

Q   But are you able to normally converse with Guatemalans in Dodge City by using Spanish?

A   Yes.

Q   And that night, did you use your Spanish skills to communicate with one or more persons at the house?

A   Yes.

Q   How many people lived at that house?

A   I cannot recall exactly how many.  I know that there was at least three tenants of the upstairs and a second family that lived in the basement.

Q   So multiple people lived there?

A   Yes.

Q   And were these people all related to one another or do you know?

MR. WACHTEL:  Object to --

A   I do not.

MR. WACHTEL:  Too late.  Never mind.

BY MR. WELCH:

Q   You said you don't know?

A   No, I don't know.

Q   Do you recall how many people at the house you spoke with?

A   I remember speaking to at least three people that resided at the house.

Q   Let me ask you to look at Exhibit 207.  Do you recognize that as one of the people you spoke with that night?

A   Yes, it is.  I do.

Q   Do you know that person's name?

A   Yes.  That is Isidro Raleas-Velasquez.

Q   Does that photograph accurately depict what Mr. Raleas-Velasquez looked like when you spoke to him that night or when you saw him?

A   Yes.

MR. WELCH:  Your Honor, we would offer 207.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  I don't object.

THE COURT:  207 is received.

Q   Earlier you testified, Officer Herrera, that there was injuries to persons at that location; correct?

A   That is correct.

Q   Do you recall whether Mr. Raleas-Velasquez was injured?

A   Yes.

Q   How was he injured?

A   He had several lacerations to the top of his head.

Q   And did you learn how those injuries had occurred?

A   Yes.  When I spoke to him, he explained to me that he had been pistol-whipped.

MR. WACHTEL:  Objection; hearsay, Your Honor.

THE COURT:  Did you show 207 --

MR. WELCH:  To the witness.

THE COURT:  Yes, but did --

MR. WELCH:  We don't have it in the system, Judge.

THE COURT:  You don't have it?

MR. WELCH:  It's not in our computer system, so, no, I did not show it --

THE COURT:  There it is.  Now, make it clear --

LAW CLERK MS. SILVA:  Can the jury see it?

THE COURT:  Can you all see it, Ladies and Gentlemen?

LAW CLERK MS. SILVA:  I have to turn it on.

THE COURT:  All right.

BY MR. WELCH:

Q   Officer Herrera, can you see the photograph --

THE COURT:  Now --

MR. WELCH:  I'm sorry.

THE COURT:  The objection is hearsay.  If you can lay a foundation for its admission under Rule 803(2), I'll consider admitting it.

MR. WELCH:  Judge, I'll withdraw the question and move on.  Save some time.

BY MR. WELCH:

Q   And I'll return to Exhibit 207.  Do you see that now displayed on the screen, sir?

A   Yes, I do.

Q   All right.  And was this one of the people that you saw when you arrived at the location that night?

A   Yes.

Q   And this is one of the people that you spoke to in Spanish; correct?

A   That is correct.

Q   And you said you spoke to two other people?

A   Yes.

Q   Did you see injuries on those two other people?

A   No, I did not.

Q   Do you recall, Officer Herrera, did you enter the home as part of your assisting in that investigation?

A   Yes, I did.

Q   And what did you see when you went inside the home, if you -- anything stand out in your mind?

A   I remember -- well, some of the residents were still semi inside and some of them were outside on the porch. I remember, I recall, going in through the living room. And I'm not certain if I remember seeing anything in particular there like blood or something like that.

Q   Did you see any damage inside the home?

A   As I recall, yes.  There was a damaged door to a, I believe, a room, a bedroom.

Q   Can I ask you, Officer, to look at Exhibit 205.  Do you recognize that?

A   Yes, I do.

Q   What is that?

A   That is the door that was damaged and this is the door to that bedroom.

Q   All right.  And this bedroom is located upstairs or downstairs?

A   Upstairs.

Q   Does that photograph accurately depict the door to that bedroom as it appeared when you arrived at the location?

A   Yes.

MR. WELCH:  Your Honor, we would offer 205.

MR. WACHTEL:  I don't have any objection, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  205 is received.

MR. WELCH:  I think we do have this in the system.  If we can switch from the elmo.  Thank you.

BY MR. WELCH:

Q   All right.  Do you see on the screen, Officer Herrera, a picture?

A    Yes.

Q    What is that?

A    That is that same door, damaged, just a different angle.

Q    And, sir, you testified earlier about the general nature of the neighborhood that this home was located in.  Do you recall that?

A    Yes.

Q    Are you familiar with that area?

A    Yes.

Q    Let me ask you to look at Exhibit 210.  Do you recognize what's depicted in Exhibit 210?

A    Yes.  It is an aerial view of that neighborhood.

Q    And is the house located at 1005 Avenue E, is it depicted in this aerial photograph?

A    Yes, it is.

Q    And are you familiar with the residence of Pedro Garcia?

A    Yes.

Q    Do you know where his address is or was in 2009?

A    Yes.

Q    Where did he live?

A    1302 Avenue D.

Q    And is 1302 Avenue D also depicted in this aerial photograph?

A    Yes, it is.

Q    And does the photograph, the aerial photograph,

accurately depict the locations of Pedro Garcia's house

at 1302 Avenue D and the victim's residence at 1005

Avenue E in Dodge City, Kansas?

A    Yes.

MR. WELCH:  We would offer 210, Your Honor.

MR. WACHTEL:  No objection, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  210 is received.

BY MR. WELCH:

Q    Officer, if you touch the screen, you can actually

leave a mark indicating where certain locations are.  So

let's start with, if we can, the address of 1005 Avenue

E, the house that you dispatched to on June 8, 2009.

Can you place a mark in the location where that house

is?

A    Yes. (Witness indicates.) Just above that line.

Q    And then your line is partly in the street; right?

Of Avenue E?

A    That is correct.

Q    And then you testified the residence of Pedro Garcia

at 1302 Avenue D is also located in this area; correct?

A    That is correct.

Q    Would you likewise make a mark where that house is

located?

(Witness complies with request.)

Q    What direction from 1005 Avenue E is 1302 Avenue D?

A    It is north.

Q    And one block to the what direction?

A    To the west.

Q    Do you know, Officer Herrera, if there is an alley that runs behind 1302 Avenue D?

A    Yes.

MR. WELCH:  Your Honor, I have no further questions of this witness.

MR. WACHTEL:  I don't have any questions. Thank you.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q    Were the men you talked to able to identify the number of assailants?

A    Yes.

Q    And how many people?

A    He said there was approximately six individuals that came into the residence.

Q    And what kind of -- what color clothing were they wearing?

A    He could not give me clothing description besides they were wearing -- one -- at least one gentleman or

person was wearing a mask.

Q   And what color mask was that?

A   I believe it was black.

Q   And you also assisted in the -- in a homicide investigation involving a trailer park -- at the trailer park on McArtor Road?

A   On that same day?

Q   Yes.

A   Yes.

Q   And I just have one, just one question about that investigation.  You're the officer who showed Primavito Majia (ph) the photo line up?

        MR. WELCH:  I'll object.  Beyond the scope of direct.

        MR. MANDELMAN:  This is just one question so I don't have to call this guy back.

        THE COURT:  He can answer yes or no.

A   Yes, I believe so.

        THE COURT:  All right.  That's your question. That's your answer.  Thank you.  You're excused, sir.

        MR. MANDELMAN:  Appreciate your testimony.

A   Thank you.

        THE COURT:  Next witness, please.

        MR. SMITH:  Your Honor, the United States calls Isidro Raleas-Velasquez.

(NOTE:  Answers are spoken by

Interpreter Ms LuAnn Rivera,

unless otherwise noted.)

### ISIDRO RALEAS-VELASQUEZ

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as

follows on:

### DIRECT EXAMINATION

BY MR. SMITH:

Q   Sir, will you tell us your name.

INTERPRETER:  Isidro Raleas-Velasquez.

Q   And in 2009, did you live in Dodge City, Kansas?

A   Yes.

Q   How long had you been in Dodge City at that point?

A   Since 2008.

Q   Are you originally from Kansas?

A   No, I'm from Guatemala.

Q   When did you leave Guatemala?

A   Like in April of 2008.

Q   Do you have family in Guatemala?

A   Yes.  I have four.

Q   And were you working when you were in Dodge City,

Kansas?

A   Yes, we're working on the farms, in the farms.

Q   Was that what you were doing in 2009?

A   Yes.  That's what I've been working at, that's what I did.

Q   Let's display government Exhibit 200.  Do you recognize the photograph in Government Exhibit 200?

A   Yes, that's the house that we live at.

Q   Do you live there now?

A   We were there then.  Now we live in another house.

Q   So that was your home in 2009?

A   Yes, that was the house.

Q   Who else lived at that house?

A   Just Diego, Alonzo.

Q   Were there any -- was there anyone else living in a different part of the house?

A   Just -- no.  Just two, two of us there.

Q   Was there a basement in the home?

A   Yes.  There is a basement and he and I had the room upstairs.

Q   You and Diego had the room upstairs?

A   Yes.  Right next to the living room.

Q   And did other people live in the basement room?

A   Just family of Diego Alonzo in the basement.

Q   In the summer of 2009, was there an evening when people broke into your home?

A   Yes.  When I came out of the bathroom -- I didn't see them come in.  When I came out of the bathroom, they

were there.

Q   Who was there?

A   They were all covered up.  I don't know.

Q   What part of them was covered?

A   It was black.  They were covered up in black.

Q   Was their face covered?

A   Everything was covered, yes.

Q   Do you know how they got into the home?

A   I don't know.

Q   Do you know how many people you saw?

A   There were six.

Q   Was Diego Alonzo in the home?

A   Yes.  Diego and me came out of the bathroom.  We were in the living room.

Q   Both you and Diego were in the living room?

A   Yes.  There were the two of us and then those six people.

Q   Did any of the six people speak to you?

A   No.  Just of the six of them, three of them went into another room.

Q   What room?

A   That other entrance.  That other room that is around the corner.  They -- we didn't answer so they knocked down the door.

Q   Is this while you were in the living room?

A    Yes.  And then the three of them were telling us to give them money.

And then we gave 'em the money and they left.

Q    Were all three people telling you to give them money?

A    The three of them, three of them.  And then the others went in the bedrooms looking for money.

Q    Did you give them money?

A    No.  I just showed them where the table was and he took it.

Q    What room was the table in?

A    In the bedroom where my bed is, there's the table.

Q    Let's display Government Exhibit 203, please.  Do you recognize that?

A    Yes, there it is.  My bed and there's the table.

Q    Please place your finger on the screen and touch the screen and point out what table you're referring to.

(Witness complies with request.)

MR. SMITH:  I'm sorry, Your Honor.  Let's not display that.

Q    Did you recognize 203?

A    Yes.  That's where we slept.

MR. SMITH:  Your Honor, I'd move to admit 203.  We hadn't made that motion yet.

MR. WACHTEL:  Too late to object, Your Honor.

I don't object.

MR. MANDELMAN:  No objection.

THE COURT:  203 is received.

MR. SMITH:  May I approach?

THE COURT:  Yes.

BY MR. SMITH:

Q   Do you recognize the photograph I've placed in front
of you?

A   Yes.  This is the room where we sleep.

Q   Does that photograph show the table that you were
referring to?

A   Yes.  That's the table where, like, when I come
home, I put my papers and things.

MR. SMITH:  Move to admit Government 204,
which is what I've placed in front of the witness.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  It's also received.

BY MR. SMITH:

Q   Let's display Government 203 again.  And place that
mark on the table, please, that you've indicated the
money was at.

(Witness complies with request.)

Q   When the people asked you for your money, were you
in the living room or in that bedroom?

A   I was in the living room and then they come in the door and they push and they say where's the money and I take 'em to the bedroom.

Q   Were you injured that evening?

A   Everywhere, everywhere.

Q   Okay.  What part of your body was injured?

A   My head here and here.  My hand.  Because I tried to cover my head when he was hitting me.

Q   So were you hit in the head more than one time?

A   Yes.  Three.  And then here.  With the, with the gun.

Q   So were you hit with an object?

A   Yes.  But they were hitting me and a lot of blood was coming out.

Q   Okay.  What object were you hit with?

A   With the end of the gun.

Q   How would you describe the gun?

A   It was a white gun.

Q   Was one person hitting you or more than one person?

A   Just one.  Just one.

Q   Did you see any other guns that evening?

A   Yes.  All six of them had guns.

        MR. SMITH:  May I approach?

        THE COURT:  Yes.

BY MR. SMITH:

Q   I'm showing you what's been marked as Government 206 and 208.  We'll talk about the first photograph, 206.  Do you recognize what is in that picture?

A   That's my shirt.

Q   Was it the shirt you were wearing that evening?

A   Yes.  That's the shirt I had on that night.

Q   And Government 208.  Do you recognize what's in that picture?

A   That's my head.

Q   Does it show the injuries that you sustained that evening?

A   Yes.  Back here and here.

MR. SMITH:  Your Honor, I move to admit Government 206 and 208.

MR. WACHTEL:  No objection, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  They're received.

MR. SMITH:  Let's display Government 206 please.

A   Yes, that's my shirt.

Q   The shirt that you were wearing that evening?

A   Yes.  But after I got hit, I took it off because of the blood.

Q   Is that blood from being hit that night?

A   Yes.  From my head.

Q   And Government 208, please.  Is that the injury --
one of the injuries you had that evening?

A   Yes.  From the point of the gun.

Q   I'm going to show you another picture on the screen
here.  Do you recognize what's in that photograph?

A   That's me.

Q   Does that show the injuries and the blood from that
night?

A   Yes.  The blood was just coming down.

Q   And how much money was taken from you that evening?

A   $800 what he took.

Q   Did you keep all of your money at your home?

A   Yes.  It's on the table underneath the papers and
things.

Q   Did you save your money to send back to Guatemala?

A   Yes.  I hadn't sent it that week.  I was saving it.

Q   How often would you try to send money to Guatemala?

        MR. WACHTEL:  Object as to relevance, Your
Honor.

        MR. SMITH:  Your Honor, we have to show a
portion of an interstate commerce connection.

        THE COURT:  The objection is overruled.

A   I try to send $500 every two weeks.

Q   How did you send it back?

A   There's stores there where you pay them $10 and they send it.

Q   Some of the money that was stolen from you that evening, did you mean to send that to Guatemala?

MR. MANDELMAN:  Object.  Calls for speculation.

THE COURT:  Overruled.

A   Yes.  The money was still there.  I was waiting to send it.

MR. SMITH:  No further questions.

THE COURT:  Yes, sir.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q   Mr. Velasquez, I represent Mr. Garcia seated over here at this table.

A   Okay.

Q   If I ask you a question that you don't understand, will you please tell me that you don't.

A   Okay.  Yes.

Q   You have told us that there were six people who came into your house that particular night.

A   Yes, six people.

Q   And there is no question in your mind as you sit here today that there were six people?

A   I have no doubt.

Q   No doubt?

A   No.

Q   Three of those people stayed with you; right?

A   Yes.  And three went in the other room.

Q   Thank you.  Do you remember how the three people that stayed with you were dressed?

A   No.  They were all covered.

Q   Well, their faces were covered; right?

A   Yes.  All covered.

Q   But their clothing was not?

A   The colors, I don't know after they hit me, I don't know.

Q   Do you remember whether the three people that were with you were wearing long pants or short pants?

A   It's just that after they hit me, I didn't -- I don't know.

Q   I understand.  It is your recollection today that all six people had guns?

A   All six of them had a gun.

Q   Did any one of those six people, any one, stand beside the door and keep watch?

A   Yes.  Well, they were -- one was at the door but then three went with me and three in the other room.

Q   That would be seven people, would it not?

A   No.  Six.

MR. WACHTEL:  Well, thank you very much.  I don't have any further questions.

THE COURT:  Yes, sir.

A    Thank you.

### CROSS EXAMINATION

BY MR. MANDELMAN:

Q    How do you know Alonzo Diego?

A    We were neighbors in Guatemala.

Q    And was Mr. Diego hurt?

A    No.  Not him.

MR. MANDELMAN:  I have nothing further.  Thank you for coming.

THE COURT:  Anything further of this witness?

MR. SMITH:  No, Your Honor.

THE COURT:  Thank you.  He's excused.  Who's your next witness?

MR. WELCH:  Diego Alonzo, Your Honor.

THE COURT:  How long is he going to take?

MR. WELCH:  I think about as long as Mr. Valesquez.

THE COURT:  You all want to take a recess now or do you want to wait until after this next witness?  Wait.  Call Diego Alonzo.

MR. WELCH:  We would call Diego Alonzo.

MR. SMITH:  The marshals are getting him, Your

Honor.

(NOTE:  Answers are spoken by

Interpreter Ms. LuAnn Rivera,

unless otherwise noted.)

**ALONZO DIEGO**

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as

follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you tell us your name.

A   My name?

Q   Yes.

INTERPRETER:  Alonzo Diego Hemon (ph).

Q   Sir, you said your name is Alonzo Diego; correct?

A   Alonzo Diego Hemon.

Q   Mr. Diego, where are you from originally, sir?

A   From Guatemala.

Q   And is there a period of time that you have lived in

Dodge City, Kansas?

A   About four years.

Q   And do you recall, was there a period of time, sir,

that you lived at a house located at 1005 Avenue E in

Dodge City, Kansas?

A   Uh-huh.  Yes.

Q   And do you recall being the victim of a robbery while you lived at that house?

A   Yes.  They, they robbed -- there was two of us that were living there.

Q   All right.  Who was living at that house at the time of the robbery?

A   There were two of us.  Isidro Velasquez.

Q   Let me ask you, Mr. Diego, to look at Exhibit 201. Do you recognize that, sir?

A   That's where we lived on Avenue E, uh-huh.

Q   Is that where you lived when the robbery occurred?

A   Yes, that's where we lived.

Q   You told us that you and Isidro lived upstairs in that house; correct?

A   Yes.  The room upstairs.

Q   Was there a basement in that house?

A   I lived in the basement downstairs.

Q   All right.  So the people lived upstairs in the house and downstairs in the house; is that correct?

A   I'm the only one down.

Q   Did anyone live with Isidro upstairs?

A   Yes, someone did, but they're not there any more.

Q   Do you recall that person's name?

A   I didn't know him.  I don't know.

Q   Now, when this robbery occurred, Mr. Diego, were you

home?

A   I'm sorry.  Can you say that again please.

Q   Were you present -- were you home when the robbery occurred?

A   Yes, I'm there in the living room.

Q   And was Isidro home?

A   We were there together watching TV.

Q   And what happened?

A   Well, they just came in.

Q   And who's they?

A   I just saw some people that had their faces covered.

Q   Do you know how they came into your house?

A   I was just sitting on the couch and all of a sudden I saw the door just swing open.

Q   Mr. Diego, do you see in the photograph 201, the door that you said swung open when these people came into your home?

A   Here's the entrance here, I think, where they came in.

Q   Okay.  Mr. Diego, you can touch this screen and it will leave a mark as to where you're indicating.

            (Witness indicates.)

Q   And you've placed a dot on a door in this photograph; is that right, Mr. Diego?

            INTERPRETER:  I'm sorry.  It's hard for him to

see.

A    (Witness.)  Uh-huh.

Q    That's yes?

A    Yes.

Q    All right.  And when these people came to your house, you were in the living room; correct?

A    Yes, I'm in the living room.

Q    How many people came into your house?

A    I'm not sure how many came in.  I saw two.

Q    Of the two people you saw, did you see either one of them with guns?

A    They were -- they had their faces covered up in black.  And then the one of 'em showed me his gun.

Q    Did these people say anything to you or to Isidro?

A    Yes.  One said to me raise up your hands.

Q    And are they speaking to you in Spanish?

A    Yes, they spoke in Spanish.

Q    You said one of these people told you to raise your hands?

A    Yes.  One said raise your hands.  So I lifted up my hands.

Q    And the person who told you to raise your hands, was that the person that you saw in possession of a gun?

A    Yes, he had a gun.

Q    Did that person say anything to Isidro?

A    He was talking to me and he said raise your hands. And then he told me to give him the money and I told him I didn't have any money.

Q    After you told this person with the gun you didn't have any money, what did that person do, the person with the gun?

A    And then he said get down.  And so I laid down on the ground.

Q    In what room did you lay down, sir?

A    Right there in the living room.

Q    All right.  The one robber that had a gun is the one that told you to raise your hand and then later get on the floor; is that correct?

A    And he said and close your eyes and don't move.

Q    The second robber, could you tell whether he had a gun?

A    I didn't see it.  I don't know.

Q    Did that second robber, the man that you couldn't tell whether he had a gun, did he say anything to you or to Isidro?

A    No.  I just closed my eyes and I stayed still.  I don't know.

Q    So you know there's at least two people that came to your house and robbed you; is that correct?

A    Yes.

Q   Is it possible that there were other people, other robbers that night in your home?

A   I had my eyes closed so I don't know.

Q   Now, did you see Isidro receive injuries that night?

A   Yes.  When I got up, he was very beaten up, bloody everywhere.

Q   Do you know how that happened?

A   I don't know.

Q   Mr. Diego, when you were ordered to the floor, you told us you complied with that order; correct?

A   I'm sorry.

Q   You told us you were ordered down to the floor and you got on the floor; correct?

A   He said get down on the ground and close your eyes and do not move.

Q   And by the time you heard that statement, had you already seen a gun in the hand of the robber?

A   Yes.  And after I laid down, I saw nothing else.

Q   Mr. Diego, were you afraid that you would be harmed if you did not comply with those demands?

A   Yeah.  I just laid down on the ground in the hopes that they wouldn't hit me or anything.

Q   I understand.  But were you afraid that if you did not get on the floor, you could be hurt?

A   Yes, I was very scared.  My mind was just going.

Q   Were you afraid that you could be shot?

A   Yes, that's what I thought.

Q   Were you afraid that Isidro may be shot if you did not do everything the robbers told you to do?

A   That's what I thought.

Q   Now, Mr. Diego, you told us you were laying on the floor in the living room.  Did Isidro stay with you in the living room during the robbery?

A   No, he went into his room.

Q   Do you know why he went into the room?

A   I was just kind of laying there hiding and then he left.  When he came back out, he was all beaten up.

Q   Do you know, Mr. Diego, whether one of the robbers went with Isidro into the bedroom?

A   I don't know.  My eyes were closed.

Q   Let me ask you, Mr. Diego, to look at Exhibit 202 and 203.  Starting with 202 --

A   That's the bedroom.  That's his bedroom.

Q   And whose bedroom is depicted in 202 and 203?

A   That's where Isidro sleeps.

Q   202 and 203, are they accurate depictions of the bedroom, the upstairs -- one of the upstairs bedrooms in the home that you lived in?

A   Yes.  I know that's Isidro's bed.

MR. WELCH:  We offer 202.  I think 203 may

already be entered.  If not, we offer it as well.

MR. WACHTEL:  I don't have any objection, Your Honor.

THE COURT:  I show 202 and 203 both admitted.

BY MR. WELCH:

Q   Can we display 202 then.  Mr. Diego, this was not your bedroom; correct?

A   No.  I lived in the basement.

Q   Do you know, sir, if the robbers ever went into the basement during the robbery?

A   Nobody went down there.  They stayed upstairs.

Q   Do you know where in the upstairs portion of the house the robbers went?

A   Well, all I know is they took $800 away from Isidro.

Q   Do you know where the $800 was when it was taken by the robbers?

A   He said by the radio.

Q   In his bedroom?

A   Yes.  In Isidro's bedroom.

Q   And, sir, let me ask you to look at Exhibit 205.  Do you recognize what that is, sir?

A   I don't remember.  It's been a long time ago.

Q   Do you recall, Mr. Diego, whether there was any damage sustained to the house during the robbery?

A   Oh, yeah.  This is the door they broke to get in.

I'm sorry.

Q All right. Now, what door is this, is depicted in this photograph?

A If you're in Isidro's room and you go into the living room, then that door is there.

Q Do you know -- if you don't, tell us; but do you know, Mr. Diego, whether the damage that we see on this door happened during the robbery at your house?

A Yes, it did.

Q Mr. Diego, when you told the robbers that you didn't have any money, that was the truth, you didn't have any money with you that day, did you?

A No. I didn't have any money that day. I hadn't worked that day.

Q So you told us that Isidro had $800 stolen during the robbery; but did you have any money stolen?

A No, not a penny from me.

Q Mr. Diego, you're not legally in the United States. Is that true, sir?

MR. WACHTEL: I object as to relevance, Your Honor.

MR. WELCH: The man was brought in in chains, Your Honor. I just want to explain to the jury why he's in custody.

THE COURT: I don't think it's relevant.

MR. WELCH:  All right.  No further questions, Judge.

THE COURT:  Yes, sir.

MR. WACHTEL:  I just wondered if we were going to press on, Your Honor.  I'm certainly ready.  Thank you.

THE COURT:  Press on regardless.  Here we go.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q  Sir, is your name, your last name, Diego-Hemon (ph)?

A  Diego-Hemon Alonzo.

Q  And Alonzo is your first name?

A  Yes.  Second one is Hemon.

Q  Thank you.  Do you remember being interviewed by a police officer after this robbery occurred?

A  Yes.  Came to my house.

Q  Did that police officer speak Spanish?

A  Yes.  Speak Spanish.

Q  Do you remember the police officer's name?

A  I don't know his name.  I don't.

Q  Well, do you remember -- and I know it's been a while -- do you remember the officer asking you about how many people came into your house?

A  Yes.  They asked me.

Q  Do you remember telling him that six people came

into your house?

A   I know that's what it said; but I only saw two come in.

Q   Do you remember telling him that you saw six people leave your house?

A   I didn't see anybody go out.  Because I'm on the ground with my eyes closed.

Q   And you only saw one person with a gun; is that correct?

A   Just that one.  Just one.

MR. WACHTEL:  Thank you very much, Mr. Diego-Hemon.  I don't have any further questions.

### CROSS EXAMINATION

BY MR. MANDELMAN:

Q   May I proceed?  Okay.  Do you remember telling the officers that the gentlemen were wearing black or dark blue?

A   No, I didn't say anything like that.  Just that their faces were covered dark.

MR. MANDELMAN:  I thank you for your testimony.

THE COURT:  Anything further?

MR. WELCH:  No, sir.

THE COURT:  Thank you.  He's excused.  We'll take our recess, Ladies and Gentlemen.  Remember and

heed the admonition.

(Recess.)

THE COURT:  I thought I excused this witness.

MR. SMITH:  You did.  I ask to recall the witness Isidro Raleas-Velasquez.

THE COURT:  All right, sir.  You're still under oath.

A   Yes.

(NOTE:  Answers are spoken by Interpreter, Ms. LuAnn Rivera, unless otherwise noted.)

**ISIDRO RALEAS-VELASQUEZ**

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Sir, the questions I'm asking you are about the night of the robbery that you've already testified about.  You understand?

A   Yes.  About that night?

Q   Yes.  When the persons came into your home, were you afraid that you would be harmed?

A   Yes.  I was afraid they would hit me.

Q   Were you afraid you could be injured with the

firearm?

A   Yes.   When they come inside like that and they have a gun.

Q   Were you afraid you could be shot?

MR. MANDELMAN:  I object, Your Honor.  It's leading and this is beyond the scope of any recall.

THE COURT:  I'm not aware of any rule regarding scope of recall.  You didn't object to it. But the objection is sustained on grounds that the question is leading.

BY MR. SMITH:

Q   What were you afraid could happen to you?

A   Well, when they come inside, I mean, they were all in the house.  What can you think?

Q   Tell me what you thought.

A   Well, just the way they came in and then when they hit me.

MR. SMITH:  Nothing further.

MR. WACHTEL:  No questions, Your Honor.

MR. MANDELMAN:  No questions, Judge.

THE COURT:  Now may he be excused?

MR. SMITH:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Next witness, please.

MR. WELCH:  Your Honor, United States calls Jesus Flores.

**JESUS FLORES**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you tell us your name.

A   Jesus Hector Flores.

Q   Sir, can you get closer to that microphone for us and state your name again for us.

A   Jesus Hector Flores.

Q   Mr. Flores, you're currently incarcerated; is that correct?

A   Yes, sir.

Q   And are you incarcerated for your participation in a robbery which occurred June 8, 2009?

A   Yes.

Q   In Dodge City, Kansas?

A   Yes, sir.

Q   Mr. Flores, was there a point in time that you actually lived in Dodge City, Kansas?

A   Yes, there was.  I'd say about October, 2008, to July, 2009.

Q   All right.  Prior to living in Dodge City, you lived in Hawaii; is that right?

A   Yes, sir.

Q   And there's a period of time you've been incarcerated; is that correct?

A   Yes.

Q   You say from October, 2008, until about July, 2009, you lived in Dodge City?

A   Yes, sir.

Q   All right.  Let's focus on that time period then. When you were in Dodge City during that time period, did you know a man by the name of Gonzalo Ramirez?

A   Yes.

Q   And are you related to Gonzalo Ramirez?

A   Yes, sir.

Q   How are you related to him?

A   Cousins.

Q   Do you see him in the courtroom today?

A   Yes, sir.

Q   All right.  Would you please point to him and describe what he is wearing?

A   He's over here.  (Witness indicating.)

Q   And what does he have on?

A   Blue shirt and glasses.

        MR. WELCH:  Your Honor, I'd ask the record reflect the witness has identified Gonzalo Ramirez.

        THE COURT:  It will.

BY MR. WELCH:

Q    Mr. Flores, during that period of time, 2008 until
July, 2009, when you were living in Dodge City, did you
see and associate with Gonzalo Ramirez?

A    Yes.

Q    Do you also know a man by the name of Pedro Garcia?

A    Yes, sir.

Q    How do you know Pedro Garcia?

A    Acquaintance.

Q    Are you related to Pedro Garcia?

A    No, sir.

Q    And do you see him in the courtroom today?

A    Yes, sir.

Q    Please point to him and describe what he is wearing?

A    Over here.   (Witness indicating.)

Q    What is he wearing?

A    White shirt.

        MR. WELCH:   Your Honor, I'd ask the record
reflect the witness has identified Pedro Garcia as well.

        THE COURT:   It will.

BY MR. WELCH:

Q    Mr. Flores, while you were in Dodge City from,
again, '08 to July, 2009, did you associate with Pedro
Garcia?

A    Yes, sir.

Q   How often would you see Gonzalo Ramirez and Pedro Garcia during that time period?

A   I'd have to say two, three-month period, every other day.

Q   And did you know -- starting with Gonzalo Ramirez, did you know Gonzalo Ramirez to be associated or a member of a street gang in Dodge City?

A   Yes.

Q   What street gang?

A   Nortenos.

Q   And did you know Pedro Garcia to be a member of a street gang in Dodge City?

A   Yes, sir.

Q   What street gang?

A   Nortenos.

Q   Were you a member of a street gang?

A   No, sir.

Q   Despite not being a member of a street gang, did you associate with people who -- in addition to Gonzalo Ramirez and Pedro Garcia, did you associate with people who were members of a street gang?

A   Yes, sir.

Q   Are you familiar also with the term Diablos Viejos?

A   Yes.

Q   Or DV?

A   Yes.

Q   Did you consider Gonzalo Ramirez to be a DV gang member?

A   Yes.

Q   All right.  And did Pedro Garcia consider himself and did you consider him to be a DV gang member?

A   Yes.

Q   Do you know if Gonzalo Ramirez, did he have tattoos or does he have tattoos which identify him as a member of a street gang?

A   Yes.

Q   Have you seen those yourself?

A   Yes.

Q   Can you describe, tell us, the tattoos you recall Gonzalo Ramirez has that identify his membership in a street gang?

A   He has a Nuestra Familia on his chest, meaning NF.

Q   Do you know -- go ahead.

A   And he has -- I've seen four dots on his eyes, one of his eyes.

Q   And what do the four dots represent?  If you know.

A   The four meaning the N, the fourteenth letter of the alphabet, Norte.

Q   All right.  So the letter N stood for Norte as you understood it?

A    Yes.

Q    Let me ask you, sir, to look at Exhibit 59.  Ask you, do you recognize what that is and who that is?

A    Yes.

Q    Who is that?

A    That's Gonzalo.

Q    Gonzalo Ramirez?

A    Yes.

Q    Have you seen the item that's depicted in that photograph, have you seen that yourself?

A    Yes.

Q    And is that a fair and accurate representation of a tattoo that Gonzalo Ramirez has?

A    Yes.

         MR. WELCH:  Your Honor, we would offer 59.

         MR. MANDELMAN:  Your Honor, I just renew my previous objections.

         MR. WACHTEL:  No objection, Your Honor.

         THE COURT:  Well, I don't remember your previous objection; but I'll show that it's renewed, whatever it was.  And it's overruled.

         MR. MANDELMAN:  Thank you.

         MR. WELCH:  Could we display 59, Your Honor.

         THE COURT:  Yes.

         Cindy L. Schwemmer, Certified Shorthand Reporter
          United States District Court, Wichita, Kansas

BY MR. WELCH:

Q   Earlier, Mr. Flores, you said that Nuestra Familia stands for NF; is that right?

MR. WACHTEL:  Your Honor, I object.  Repeating his answers to him and then followed by a question is repetitious and leading.

THE COURT:  Yes.  It's both.  And it's unnecessary and it's time consuming.  Let's see if we can just move through this without repeating every answer as part of the next question.

BY MR. WELCH:

Q   What is NF?

MR. MANDELMAN:  Objection; foundation.

MR. WELCH:  Trying to get there, Judge.

THE COURT:  I'll let him answer.

BY MR. WELCH:

Q   What is NF?

A   The initials for Nuestra Familia.

Q   How do you know that?

A   I asked Gonzalo before and he stated it to me, or he gave me the definition.

Q   All right.  And why did you ask him what Nuestra Familia stands for?

A   I was just interested, I guess, just a question.

Q   What did he tell you?

A   Because I associated and I wanted to know what it was.

Q   I'm sorry.  What did he tell you as to what Nuestra Familia meant and why he had that tattoo?

A   It's -- I guess it's the, the headquarters of the gang.

MR. MANDELMAN:  Judge, I'm going to object. I've never seen any of these statements before in any form.

THE COURT:  Never seen a what?

MR. MANDELMAN:  These statements from my client.

THE COURT:  What?

MR. MANDELMAN:  He's testifying -- approach real briefly?

THE COURT:  No.  Why don't you object on the proper basis and I'll sustain it.

MR. MANDELMAN:  Objection as to speculation.

THE COURT:  Correct.  Sustained.

BY MR. WELCH:

Q   Did Gonzalo Ramirez tell you what it meant?

A   Yes.

Q   What did he tell you it meant?

A   Our family.

Q   And did he tell you why he had the tattoo on his

chest?

A   Well, he was a member of the gang.

Q   Now, did you -- can you say that you have seen Pedro Garcia with tattoos that identified his membership in a gang?

A   Have to say the only tattoo that I've seen was a little thing, X and 4 on his forehead.

Q   I'm sorry.  Go ahead.

A   On his forehead.

Q   That was on Pedro Garcia's forehead?

A   Yes, sir.

Q   What does X4 mean?  If you know.

A   The 14.

Q   And 14 standing for what?

A   The N.  The 14th letter of the alphabet, which is the N.

Q   Now, while you associated with both Gonzalo Ramirez and Pedro Garcia in Dodge City did you see them or were they active within DV?

            MR. WACHTEL:  I object, Your Honor.  I'm sorry.  I'll withdraw that and wait.

BY MR. WELCH:

Q   As you associated with both Gonzalo Ramirez and Pedro Garcia, did you see them or did they tell you they were active in DV, the Diablos Viejos?

MR. WACHTEL: Multiple part question, Your Honor.

THE COURT: Sustained.

BY MR. WELCH::

Q Did you observe Pedro Garcia active within the DV gang?

A Yes.

Q Did he tell you that he was active within the DV gang?

A Yes.

Q Did he tell you about activities he participated in as a DV gang member?

A Uhm --

Q Let me withdraw that question and ask you this. Mr. Flores, you recall Mr. Garcia speaking about rival gang members, rival to the DV?

A Yes.

Q How did he make reference to rivals to the DV in Dodge City?

What did he call them?

A He would call 'em scraps, like a derogatory term of disrespect towards them.

Q And when you heard him use the term scraps, what did you -- did you understand who he was talking about?

A Yes, sir.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Who was he talking about?

A   Sureno, Sur Trece, it's a rival gang of the NF, DV.

Q   You said Sureno, then you said sur --

A   Surenos.

Q   Sur -- but you said Sur Trece?

A   Yeah, Sur Trece.

Q   What does that mean?

A   Sur 13, meaning -- it's S -- it's S-U-R 13.  The S stands for southern.  The U stands for united and the R stands for raza, meaning southern California.  Raza means race.

Q   Is this a gang, as you understand it?

A   Yes.

Q   Now, when you associated with Gonzalo Ramirez, did you observe him being active within the DV gang?

A   Yes.

Q   How so?  What was he doing?  What did he -- well, let me stop there.  What did he do that you observed?

A   They would, you know, talk about their gang.

Q   Who's they?

A   Gonzalo and Pedro and their fellow gang members.

Q   And did you hear those conversations yourself?

A   Yes, sir.

Q   And did you hear Gonzalo Ramirez also speak about rival gang members in Dodge City?

A    Yes, sir.

Q    And what terms did he use for rivals in Dodge City?

A    Scraps or rats, sewer rats.

Q    Were there occasions, Mr. Flores, that you went to Pedro Garcia's house?

A    Yes.

Q    Do you recall where his house was located?

A    Avenue D.

Q    During that time period, 2008 through July of 2009, would you frequently go to Pedro Garcia's residence?

A    Yes.

Q    When you were at his residence, did you see Pedro Garcia there?

A    Yes.

Q    Did you see Gonzalo Ramirez there?

A    Yes.

Q    Did you see other gang members at that house?

A    Yes.

Q    Do you recall the names of any of those people you would have seen, other gang members you would have seen at the house?

A    Uhm, occasionally I'd see Joe Galindo, Little Locs. Jason Najera.

Q    Do you know what his nickname was?  Jason Najera?

A    Norte.

Q    Anyone else you recall?

A    I'd say, uhm, Jesus Sanchez.  They call him Dracula.

Q    All right.  Anyone else?

A    George.

Q    Do you know George's --

A    I don't know his last name.  I don't think he has a nickname.

Q    And Joe Galindo, did you understand him to be a DV gang member?

A    Yes, sir.

Q    And Jason Najera, did you understand him to be a DV gang member?

A    Yes, sir.

Q    And Jesus Sanchez you referred to as Dracula, did you understand him to be a DV gang member?

A    Yes, sir.

Q    And George whose last name you can't recall --

A    Yeah, I'm not for sure.

Q    All right.  Do you know -- did you understand him to be a gang member?

A    Yes, sir.

Q    What street gang?

A    Norteno, DV.

Q    When you say Norteno, do you know if Norteno DV are related to one another or the same?

A    Yeah.  It's, it's a branch off from the NF.

Q    And what is a branch?

A    Well, they all fall under the N, the Norte, and some people in a different state or a different city would have a branch; and their branch was DV.

Q    When you say their branch, are you talking about Pedro Garcia?

A    Yeah, Peter and Gonzalo.

Q    Gonzalo Ramirez?

A    Yes, sir.

Q    All right.  Mr. Flores, while you were living in Dodge City during that time period, were you trafficking in narcotics?

A    Yes, sir.

Q    What type of drugs were you dealing?

A    Methamphetamine.

Q    Do you know whether during that time period Pedro Garcia was trafficking in drugs?

A    Yes, sir.

Q    How do you know that?

A    Sometimes he would get it from me.

Q    All right.  He would get what from you?

A    Meth.

Q    And that was during this time period 2008 through July, 2009; is that correct?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   Yeah, between then.  I'd say it was more along March, 2009.

Q   And how many occasions did you recall supplying methamphetamine to Pedro Garcia?

A   Once or twice, three times.

Q   Do you know what he did with the methamphetamine that you supplied to him?

A   I'm not for sure.  He sold it, more than likely, or --

Q   I'm just asking what you know.

A   I'm not for sure.  He might have done it.

MR. MANDELMAN:  Objection.  Speculation.

MR. WELCH:  I'll withdraw it.

THE COURT:  I'm not sure what the answer was but it is speculation and the jury will disregard it.

BY MR. WELCH:

Q   If you know, Mr. Flores, do you know whether or not Gonzalo Ramirez was distributing narcotics during that time period that you lived in Dodge City?

A   Yes.

Q   How do you know that?

A   I would also give him the meth, too.

Q   And by him, you're talking about Gonzalo Ramirez?

A   Yes.

Q   You supplied methamphetamine to Gonzalo Ramirez

during that time period that you lived in Dodge City?

A  Yes, sir.

Q  Do you recall how many times you did that?

A  Three times.

Q  Earlier you said it would have been approximately in March of 2009 that you supplied methamphetamine to Pedro Garcia.  Do you recall the approximate time period you would have supplied methamphetamine to Gonzalo Ramirez?

A  I'd say around that same time, March.

Q  Now, only if you know, do you know whether Gonzalo Ramirez distributed the methamphetamine that you supplied to him?

A  No.

Q  Did you ever see, while you were at Mr. Garcia's home or anywhere else, did you ever see Pedro Garcia in possession of firearms?

A  Yes.

Q  What type of firearms did you see?

A  MAC 11.

Q  What is a MAC 11?

A  Handgun, automatic handgun.

Q  Do you know what type of ammunition is fired in a MAC 11?

A  9 millimeter.

Q  Did you ever see 9 millimeter ammunition at Mr.

Garcia's house or in his possession?

A    Yes.

Q    All right.  Where?  At his house?

A    Yes.  It was in his basement, in his room.

Q    And the MAC 11 that you saw, where did you see that?

A    On his person.

Q    Where was he when you saw that?

A    In his hand.

Q    But were you at his house or --

A    Yeah, at his house.

Q    All right.  Now, where was his room in the house?

A    It was downstairs, the basement.

Q    Let me ask you, sir, to look at what I think has been admitted as Exhibit 156.  Do you recognize that?

A    Yes.

Q    What is that?

A    It's the back of Pedro Garcia's house.

Q    I'm sorry.  Earlier you said that Pedro Garcia's room was in the basement of the house.  Was there a door on the outside that you could access the basement and Pedro Garcia's room?

A    Yes.  It's right between the tree and the stairs.

Q    Let me --

A    It's real dark.

Q    Let me put this up for you.  If you touch the

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

screen, you can leave a mark in the area where you're

indicating.  Can you touch the screen and show us where

that door would be that would lead to the house.

A    It would be right there.  (Witness indicating.)

Q    And had you gone through that door on multiple

occasions?

A    Yes, sir.

Q    All right.  Now, let's go back to this MAC 11.  When

you saw Pedro Garcia in possession of the MAC 11, he was

in the basement of this residence?

A    Yes, sir.

Q    And the 9 millimeter ammunition that you saw, was it

also in the basement of this residence?

A    Yes, sir.

Q    And you said there's a -- the basement and there's

his bedroom in the basement; correct?

A    Yes.

Q    All right.  Let's be clear.  The 9 millimeter

ammunition was in his bedroom or was it elsewhere in the

basement?

A    In his bedroom.

Q    And the MAC 11 semiautomatic handgun, was that in

his bedroom, on his person or elsewhere in the basement?

A    All three on different occasions.

Q    All right.  That was my question.  Had you seen this

weapon on multiple occasions?

A    Yes.

Q    Every time you saw the weapon, was it -- were you at this house?

A    Yes.

Q    And whose weapon was the MAC 11?  If you know.

A    Their's, meaning the gang's.

Q    All right.  Now, when you say the gang's, which gang are you talking about?

A    DV.

Q    And how do you know that that was a gang firearm?

A    Uhm, I had asked 'em where they got it and they mentioned to me that they bought it.

Q    Who's they that you're talking about?

A    Gonzalo and Pedro.

Q    All right.  And you asked 'em where the MAC 11 came from.  And what did they tell you?

A    I remember them saying they got it from a neighbor, one of their fellow gang members, Joe Rodriguez.

Q    And did you know Joe Rodriguez?

A    Yes.  I, I've met him before.

Q    Did you know Joe Rodriguez to in fact be a Diablos Viejos gang member?

A    Yes.

Q    In addition to the MAC 11 which you described as a

gang gun, did you see other firearms with Pedro Garcia, at his house or anywhere that were tied to him?

A   Yes.

Q   What other weapons did you see Pedro Garcia with? Firearms?

A   An SK.

Q   What is an SK?

A   It's an assault rifle.

Q   Where did you see that?

A   In the basement, in his room.

Q   And when did you see that?

A   Around the same time, maybe March, April.

Q   Of what year?

A   2009.

Q   And the MAC 11, you said you saw that on multiple occasions, but what year did you see the MAC 11?

A   2009.

Q   Did you see other firearms in that house or in Mr. Garcia's possession?

A   No, that was -- that was it.

Q   All right.  Now, let's turn then to Gonzalo Ramirez. You've already testified that the MAC 11 was considered a gang gun and you talked about Gonzalo Ramirez and Pedro Garcia about that weapon; is that correct?

A   Yes, sir.

MR. WACHTEL:  You know, Your Honor, I object to the constant repetition that's going on.

THE COURT:  I do, too.  Let's see if we can -- it's not necessary -- I think the jury gets it the first time, Mr. Welch.  It's not necessary to restate the witness's answer to every question that you ask.

MR. WELCH:  I'll try to do better, Judge.

THE COURT:  Please.  You're very experienced.  Let's see if you can do it the right way.

MR. WELCH:  Thank you, Judge.

BY MR. WELCH:

Q   Mr. Flores, did you see Gonzalo Ramirez in possession of other guns other than the MAC 11?

A   Yes, sir.

Q   What type of guns did you see him in possession of?

A   It was a .38 revolver, chrome.

Q   And where did you see that gun?

A   On his person.

Q   When did you see that gun?

A   2009.

Q   And where was he when you saw that gun that -- you said a .38 chrome revolver?

A   Yes.

Q   Where was he when you saw that gun in his possession?

A    Pedro's house.

Q    Have you ever seen Gonzalo Ramirez with any other type of firearm?

A    No.

Q    Other than the MAC 11, do you know where -- the SKS, do you know where Pedro Garcia got that gun?

A    No, I don't.

Q    The .38 revolver that Gonzalo Ramirez possessed, do you know where he got that gun?

A    No, I don't.

Q    While you were living in Dodge City during that time period, Mr. Flores, were you familiar with a term kick door?

A    Yes, sir.

Q    What did kick door mean?

A    Home invasion.

Q    Did you participate in a home invasion robbery?

A    Yes, sir.

Q    And the kick door that you heard of -- prior to your participation in a home invasion robbery, had you heard of the practice of home invasion robberies?

A    Yes.

Q    And who had you heard that term, the kick in, who'd you heard that term from?

A    Various people of the gang, DV gang; but I'd have to

say Pedro and Gonzalo.

Q   And then you actually participated in one yourself, didn't you?

A   Yes, sir.

Q   Let's focus on the date of June 8, 2009 if we can. Do you recall, did you participate in a home invasion robbery that day?  Actually, that night?

A   Yes, sir.

Q   And on that date, June 8, 2009, were you living in Dodge City?

A   Yes, sir.

Q   And did you see -- let's start with Pedro Garcia. Do you recall seeing him on June 8, 2009?

A   Yes, sir.

Q   Where did you first see him that day?

A   At his house.

Q   The same house you were talking about earlier?

A   Yes, sir, Avenue D.

Q   And about what time did you recall seeing him?

A   I'd have to say before evening, before 6, 5.

Q   So it was still light outside?

A   Yes, sir.

Q   And did you go to his house?

A   Yes, sir.

Q   Why did you go to his house?

A    Just to stop by.  I guess hang out --

Q    Is that something --

A    -- like I said.  Yeah.

Q    Is that something you did on a regular basis?

A    Yes, sir.

Q    All right.  When you got to his house, was Pedro Garcia home?

A    Yes, sir.

Q    All right.  Where did you go in the house?

A    Basement.

Q    And when you went to his room -- you said around dusk -- was there anyone else there?

A    Gonzalo.

Q    Gonzalo Ramirez?

A    Yes, sir.

Q    Was anyone else present?

A    Josh Flores.

Q    Is Josh Flores someone that you knew prior to June 8, 2009?

A    Yes, sir.

Q    Let me ask you to look at Exhibit 387.  Who is that?

A    Josh Flores.

Q    Can you display 387, please.  When you got to the house of -- Pedro Garcia's house, Josh Flores was present as well?

A   Yes, sir.

Q   Are you related to Josh Flores?

A   Yes, sir.

Q   How are you related to Josh Flores?

A   Cousin.

Q   I'm not sure if I asked you.  I know I asked you about Gonzalo Ramirez.  But are you related to Pedro Garcia?

A   No.

Q   But Josh Flores is your cousin; is that correct?

A   Yes, sir.

Q   Now, when you -- was there anyone else at the house other than Pedro Garcia, Gonzalo Ramirez and Josh Flores?

A   I think a couple females might have been there previously; but I'm not for sure of their names.

Q   At some point, then, while you were at the house, is there a discussion about committing a crime?

A   No.

Q   All right.  At some point, do the four of you decide to leave the house?

A   Yes.

Q   When you left the house, approximately what time was that?

A   Approximately 7, 8, 8:00.

Q   In the evening?

A   Yeah.  It was gettin' dark.  It was dark already.

Q   Now, when you left -- prior to leaving the house, was there any discussion about what you were gonna do?

A   Just take a walk and go look for some rival -- scraps, gang members.

Q   Now, who said that?  The point was to look for some rival gang members.

A   Gonzo, Gonzalo Ramirez.

Q   Do you recall anyone else making that comment other than Gonzalo Ramirez?

A   Pedro.

Q   Pedro Garcia?

A   Garcia.

Q   You've never been jumped in a gang; is that right?

A   No.

Q   You're not a member of DV?

A   No, sir.

Q   So why would they be talking about rival gang members, going to look for rival gang members, in front of you?

        MR. WACHTEL:  Calls for speculation or conclusion, Your Honor.  I object.

        THE COURT:  Sustained.

BY MR. WELCH:

Q Do you know why they would talk about those things in front of you?

A Because I associated with them.

MR. WACHTEL: Object to that as being not responsive to the question and no foundation.

THE COURT: Sustained.

BY MR. WELCH:

Q Are you related to two of them?

A Yes.

Q Do you know whether they trusted you?

A Yes, sir.

Q Did they talk about those type of things frequently in front of you?

A Yes, sir.

Q So were you surprised that evening when they were talking about Surenos, going to look for rival gang members in your presence?

A No, sir.

Q Had he done that before?

A Yes.

Q Talked about those kind of things in front of you?

A Yes, sir.

Q So the four of you leave the house; is that right?

A Yes, sir.

Q   And what do you do?  What do you think you're doing?

A   Taking a walk down the alley.

Q   Let me ask you to look at -- I don't believe this has been admitted yet.  Please take a moment and look at that and tell me if you recognize what that is?

A   This is the -- coming out of Pedro Garcia's house from the back side.

Q   And do you recognize that as a portion of the alley behind his house?

A   Yes, sir.

Q   And does that photograph accurately depict at least that portion looking to the south of the alley?

A   Yes, sir.

        MR. WELCH:  We would offer 157, Judge.

        MR. WACHTEL:  I don't object, Your Honor.

        MR. MANDELMAN:  No objection.

        THE COURT:  It's received.

BY MR. WELCH:

Q   Can we display 157, Your Honor.

    Now, Mr. Flores, you earlier testified that Exhibit 156 is the back of the house and a portion of the backyard of that residence; correct?

A   Yes, sir.

Q   All right.  157, is that the area of the alley right behind the house?

A   Yes, sir.

Q   When you left, the four of you left together, what direction did you travel?

A   South, right, as we're leaving the back side of his house.

Q   And, again -- well, as you're going down this alley to the south, how far did you travel before you stopped?

A   Couple blocks.

Q   And why did you stop?

A   We decided to do a kick-door, kick-in.

Q   How was that decided?

A   Amongst us.  Gonzalo stated it and he went up to the house and looked in the side window and said let's go and we all went in.

Q   Let's back up just a second.  When you left Pedro Garcia's house, did you have a gun?

A   Yes, sir.

Q   What type of gun did you have?

A   I believe it was a 22.

Q   And where had -- was that your gun?

A   Yes, sir.

Q   How long had you had that gun?

A   I'd say a couple months.

Q   Do you know when Pedro Garcia left the house and you were walking in the alley, whether he had a gun?

A    I'm not for sure.

Q    All right.  And do you know whether or not Gonzalo Ramirez, as you were walking down the alley, had a gun?

A    Yes, sir.

Q    How do you know he had a gun?

A    I've seen it.

Q    What type of gun did he have as you were leaving the house that night?

A    Chrome .38 revolver.

Q    Was Josh Flores, your cousin, with you also?

A    Yes, sir.

Q    Do you know whether or not Josh Flores had a gun?

A    I'm not for sure.

Q    Was there anyone else with you as you left Mr. Garcia's house that night?

A    No, sir.

Q    Just the four you've already described?

A    Yes, sir.

Q    So let me ask you to look at Exhibit 200 and 201. Could we display 201, please.  Do you recognize what's depicted in Exhibit 201, Mr. Flores?

A    Yes, sir.

Q    What is that?

A    It's the entrance of the house that we robbed.

Q    Prior to entering the house, you said someone did

some surveillance or looked inside the house; is that right?

A   Yes, sir.

Q   Who did that?

A   Gonzalo.

Q   And where inside -- where on the outside of the house did he look into to decide this was a good place to rob?

A   It would be on the side, the south side.

Q   Can you place a mark on the screen and show us what side of the house?

A   It would be on this side.  (Witness indicating.)

Q   Now, when this is happening, where are you located?

A   In the alley.

Q   And where is Pedro Garcia?

A   In the alley.

Q   Where's Josh Flores?

A   In the alley.

Q   And could you see Gonzalo Ramirez approaching the house?

A   Yes.

Q   Did you know what he was going to the house to do?

A   To, I guess, uhm, check it to see who was all in the house.

Q   Well, by the time you arrived at this house -- what

direction did you come to the house from?

A   From, from behind the house.

Q   Let me ask you, were you on foot or were you in a vehicle?

A   We were on foot.

Q   And you said before I interrupted you, you came up to the back of this house?

A   Yeah.  Coming from behind.

Q   So as you're standing in the alley with Pedro Garcia and Joshua Flores, had you already made up your mind that you were going to participate in a robbery at that house?

A   Yes, sir.

Q   And did you do that?

A   Yes, sir.

Q   What did you do?

A   I went in with 'em and went through that the house and helped clear it and we left after that.

Q   All right.  Now, when you were inside -- how did you get into the house?

A   Through the front door.

Q   Do you see the front door in this picture?

A   Yes, sir.

Q   Did all four of you enter through that door?

A   Yes, sir.

Q Once you got inside, who did you see inside the house?

A A man.

Q Did you know that man?

A No, I didn't.

Q Had you ever seen that man before?

A No, sir.

Q Did you speak to the man you saw inside the house?

A No, sir.

Q Did you hear anyone else that came with you speak to the man inside the house?

A Gonzalo.

Q Gonzalo Ramirez?

A Yes, sir.

Q And how did Mr. Ramirez speak to him? In English or Spanish?

A Spanish.

Q Do you remember as you sit here today, were -- well, let me ask you: Do you speak Spanish?

A No, sir.

Q So could you tell what Gonzalo Ramirez was saying to the man inside the house?

A No, sir.

Q Did you see what Gonzalo Ramirez did with the man inside the house?

A    He grabbed him and hit him in the head.

Q    Hit him in the head with what?

A    The pistol.

Q    And what type of pistol did you see him hit this man with?

A    .38 special.

Q    The same gun that you told us you had seen earlier?

A    Yes, sir.

Q    Where was Pedro Garcia while this is happening? While Gonzalo Ramirez is taking charge of this man and hitting him with a gun, what is Pedro Garcia doing?

A    He was in the house also.

Q    And what was he doing?  Was he doing anything?

A    I guess securing, securing it, too, as look out.

Q    I'm sorry.  Did you see Pedro Garcia in possession of a gun once you were inside the house?

A    No.

Q    What was Joshua Flores doing once you guys went into the house?

A    Look out, securing the premises, seeing if anybody else was in the house.

Q    Did Pedro Garcia speak to any of the -- how many victims do you recall seeing inside the house?

A    The first man that Gonzalo grabbed and there was another one.

Q   You said Gonzalo grabbed the first one.  What did Gonzalo do with the first man?  After he hit him, what did he do.

A   He took him in the other room.

Q   Did you see where he went with the first victim?

A   The other room.  There was a room that they entered.

Q   Did you see that other room?

A   I wasn't in that room.  I just seen him walk into the room.

Q   From where you were standing, could you see this bedroom?

A   Yes.

Q   Did you see Gonzalo Ramirez and this first man enter the room together?

A   Yes, sir.

Q   Do you know what Gonzalo Ramirez did with this man inside that bedroom?

A   I think he had --

Q   Not what you think.  Did you see what -- did you see what was happening with this man in the bedroom?

A   No.

Q   All right.  Now, while this is happening, was Pedro Garcia still standing next to you?

A   Yes.

Q   What was he doing?  If you recall.

A    Looking, looking out.

Q    At any point while you were inside the house, did you -- do you recall seeing Pedro Garcia in possession of a gun?

A    No, sir.

MR. WACHTEL:  Objection.  Asked and answered, Your Honor.

A    No, sir.

THE COURT:  He's answered it.

BY MR. WELCH:

Q    At any point in time do you recall seeing Joshua Flores -- inside the house now, do you recall seeing Joshua Flores in possession of a gun?

A    No, sir.

Q    Did you have -- the gun that you had in your possession, did you have it out and was it displayed?

A    No, sir.

Q    What was Joshua Flores doing inside the house while Gonzalo Ramirez had the first victim in the bedroom?

A    Just securing the premises, looking for goods.

Q    All right.  And what were you -- what was your role? What were you doing?

A    Same, looking for goods and look out.

Q    All right.  When you say looking for goods, you were looking for things to steal; right?

A   Yes.

Q   Did you personally, did you steal anything?

A   No.

Q   Do you know if Joshua Flores found anything that he took with him?  If you know.

A   No.

Q   Do you know if Pedro Garcia took anything that he took with him?

A   No.

Q   Do you know if Gonzalo Ramirez stole anything during the robbery?

A   Yes.

Q   What did he steal?

A   Cash.

Q   Did you have any interaction with the second man, the second victim -- what did the second man do once you guys got into the house and the robbery began?

A   He was on the floor.

Q   Did you talk to him at all?

A   No.

Q   Do you remember if Joshua Flores or Pedro Garcia talked to that second man at all?

A   No.

Q   At some point then did Gonzalo Ramirez emerge from the bedroom and come back into the living room where you

were located?

A    Yes.

Q    What happened?

A    Well, at that time, we all left the house.

Q    And where did you go?

A    Back to the alley and back to Pedro Garcia's house.

Q    The same house that had you been in earlier?

A    Yes, sir.

Q    And when you got back to Pedro Garcia's house, what did you do?  What happened?

A    We went downstairs, went to the basement.  Split up some of the money and we parted ways, me and Josh.

Q    Did you get some of the money from the robbery that night?

A    Yes, sir.

Q    Do you recall how much money you got?

A    About $50.

Q    Do you know if Joshua Flores received money from the robbery?

A    Yes, sir.

Q    Do you know how much?

A    About 100.

Q    Do you know if Pedro Garcia received money from the robbery?

A    Yes.

Q   Did you see that happen?

A   Yes.

Q   All right.  And do you know how much money he would have received?

A   No.

Q   And do you know whether Gonzalo Ramirez kept any of the money that he stole from the house?

A   Yes.

Q   And you saw that yourself; is that right?

A   Yes.

Q   Now, you said you and Joshua Flores then left Pedro Garcia's house; is that right?

A   Yes.

Q   Prior to leaving the house, was there anyone else at the house when you came back from the robbery that wasn't there when you had left?

A   Yes.

Q   Who did you see at the house that wasn't there previously?

A   I'm not sure.

Q   How many people did you see at the house that weren't there earlier when you left?

A   There was one, one person.

Q   Did you know that person?

A   No.

Q   Had you seen that person prior to that day?

A   No.

Q   Did you have any interaction with that person -- is it a man or woman?

A   A man.

Q   Did you know whether that man was a gang member?

MR. WACHTEL:  Objection, Your Honor.  That would call for speculation in light of his future answers -- his prior answers.

MR. WELCH:  Just asking if he knows, Your Honor.

THE COURT:  What man?

MR. WELCH:  I'm sorry.

THE COURT:  What man?

MR. WELCH:  The man who was at the house when he got there after the robbery that wasn't there before.

THE COURT:  Does he know who it is?

MR. WELCH:  He said he didn't know the person. Let me ask this.  I'll withdraw the question, Judge.

BY MR. WELCH:

Q   The man who was at the house that wasn't there before, did you see any gang tattoos on that person?

A   No, sir.

Q   And did you have any conversation or any interaction with that man?

A    No, sir.

Q    Do you know a man by the name of Anthony Wright?

A    Yes, sir.

Q    And are you related to Anthony Wright?

A    No, sir.

Q    Do you know a man by the name of Russell Worthey?

A    Yes, sir.

Q    Are you related to Russell Worthey?

A    No, sir.

Q    Do you recall seeing Anthony Wright or Russell Worthey at the house when you came back to Pedro Garcia's house?

A    No, sir.

Q    How long did you stay at Pedro Garcia's house when you came back?

A    I stayed about five minutes, ten at the most.  It was real brief.

Q    And then did you have any discussion with Pedro Garcia or Gonzalo Ramirez before you left the house?

A    Besides splitting up the money, no.

Q    Do you know -- after you got back to the house, do you know what Pedro Garcia and Gonzalo Ramirez did later in the evening?

A    No, sir.

Q    Were you with them later in the evening?

A    No, sir.

Q    Mr. Flores, have you entered a plea of guilty in connection with your participation in this robbery?

A    Yes, sir.

Q    I'm handing you, sir, what's marked Exhibit 212.  Do you recognize Exhibit 212?

A    Yes, sir.

Q    What is that?

A    It's my plea agreement.

Q    And what did you plead guilty to, Mr. Flores?

A    Count 7 and Count 8 of this Indictment.

Q    And what was Count 7?

A    Conspiracy to commit assault with a dangerous weapon.

Q    And what was Count 8?

A    Assault with a dangerous weapon.

Q    Now, prior to entering the plea agreement that you have in front of you now, Mr. Flores, do you recall being interviewed by law enforcement?

A    Yes, sir.

Q    And during one or more of those interviews, do you recall being asked about the events that took place on June 8, 2009?

A    Yes, sir.

Q    And do you recall being asked specifically about

your -- whether or not you participated in a robbery at 1005 Avenue D on June 8, 2009?

A    Yes, sir.

Q    Now, were there times in the past that you lied to law enforcement and denied being involved?

A    Yes.

Q    And in the past, have you lied about being in possession of a firearm during the robbery?

A    Yes, sir.

Q    In the plea agreement, did you admit your participation in the robbery and the two crimes that you plead guilty to?

A    Yes, sir.

Q    Mr. Flores, either in the plea agreement or in any discussions you've had with the prosecution or investigators, have you been promised that you will not go to prison in this case?

A    No, sir.

Q    Does the plea agreement specifically state that you will be sentenced to a term in federal prison?

A    Yes, sir.

Q    And you know that's going to happen to you, don't you?

A    Yes.

Q    Ultimately, Mr. Flores, who will decide how much

time you spend in federal prison?

A   Mr. Belot.  The judge.

MR. WELCH:  If I can have just a second, Judge.

(Off-the-record.)

MR. WELCH:  Your Honor, I have no further questions of Mr. Flores.

THE COURT:  We'll take our noon recess, Ladies and Gentlemen.  Approximately one hour.  Please remember and heed the admonition.

(Noon recess.)

(Beginning at 1:05 p.m. October 9, 2013, the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT:  Does somebody want to raise something in the absence of the jury?

MR. WACHTEL:  Yes, sir, I did.  I was told by Mr. Welch a few minutes ago that Mr. Welch wanted me to postpone my cross-examination of this witness so that he could ask him some more questions.  He did not tell me what he wants to ask.  I object to not having my opportunity to cross-examine this witness now and I have no idea what more he could tell us.

THE COURT:  Well, why don't I do this, why don't I let you conclude his cross-examination, and then if he gets into something in redirect that you want to ask him about, you can object.  But I don't know what it is and I may or may not sustain an objection that it's beyond the scope of cross-examination.

MR. WACHTEL:  Whatever Your Honor rules is fine by me.

THE COURT:  How about that?

MR. WELCH:  Judge, that's fine.  I didn't offer 212.  I wanted to do that as part of getting back up.  That's my mistake.

THE COURT:  Is that all you wanted to do was offer --

MR. WELCH:  No.  I also have about four questions in addition to offering 412.

THE COURT:  Well, I don't think it's appropriate to interrupt Val's cross-examination at this point because -- and then Joel may want to cross-examine him, too.

MR. WELCH:  I only did that, Judge, because he hadn't started his cross-examination yet.

MR. WACHTEL:  He is correct, Your Honor.  I have not yet begun.

THE COURT:  Then what's the problem about having him ask these other questions?

MR. WELCH:  I don't know.

MR. WACHTEL:  If I knew what he was going to ask, I might not have a problem; but if he is just going to plow over old ground, yes, I have a problem with that.

MR. MANDELMAN:  Well, I guess my only concern is if he's going to change his testimony from this morning or if he had any sort of meetings with the Government during lunch.

MR. WELCH:  I haven't met with him, Judge.  I wouldn't do that.

THE COURT: These are the kind of things that can be covered on cross-examination. If he changes his testimony, it isn't going to help the Government's case any, probably. Bring him in. Lanny, go ahead and ask your questions. I didn't -- I should have remembered that Val hadn't started yet.

(Jury enters the courtroom.)

THE COURT: All right, sir. You may continue your direct examination.

MR. WELCH: Your Honor, thank you.

BY MR. WELCH:

Q   Mr. Flores, earlier I asked you a question concerning when you returned to Pedro Garcia's house after the robbery did you see anybody there. Do you recall that question?

A   Yes.

Q   Who did you see?

A   I'm --

MR. MANDELMAN: Question has been asked and answered. Objection.

MR. WELCH: It has, Judge; but I promise I won't ask another question -- I need to lay that foundation to ask the next question, Judge.

THE COURT: All right.

BY MR. WELCH:

Q   Do you recall -- do you remember seeing a person at the house?

A   Yes.

Q   All right.  Now, Mr. Flores, do you recall being interviewed in the past by law enforcement officers about the robbery?

A   Yes.

Q   And do you recall during one of those interviews indicating that Russell Worthey was at Pedro Garcia's house when you returned following the robbery?

A   Yes.

Q   And do you recall telling the investigators that Russell Worthey left with Pedro Garcia and Gonzalez Ramirez after you left -- after you got back from the house -- got back to the house?

A   Yes.

Q   Earlier when you testified that you saw a person at the house, do you know whether or not that person was Russell Worthey?

A   It looked like him.  I believe it was him.

        MR. MANDELMAN:  Objection; speculation.

A   I, I can't say that it actually was because it was dark.  But it was --

        MR. WELCH:  Let me withdraw that question --

THE COURT:  Just a minute.  That objection is sustained.

BY MR. WELCH:

Q   Do you know, Mr. Flores, whether or not Pedro Garcia and Gonzalez Ramirez -- or did you see -- let me ask that -- Pedro Garcia and Gonzalo Ramirez leave with Russell Worthey?

MR. MANDELMAN:  Again, objection.  Asked and answered.

A   Yes.

THE COURT:  Just a minute.  Are you asking him whether this is something that he told the officers during the interview or is --

MR. WELCH:  Yes, sir. I'm attempting to refresh his recollection about what he had said earlier.

THE COURT:  All right.  Go ahead.

BY MR. WELCH:

Q   My question, Mr. Flores, is do you recall in an earlier interview with law enforcement telling them that you saw Russell Worthey, Pedro Garcia and Gonzalo Ramirez leave Pedro Garcia's house?

A   Yes.

MR. WELCH:  No further questions, Your Honor. If I didn't, I offer 212, Judge.

THE COURT:  212 is in.  That's his plea

agreement.

MR. WACHTEL:  No objection.

THE COURT:  It's in.

MR. MANDELMAN:  No objection.

THE COURT:  Now, Mr. Wachtel, you can proceed, sir.

MR. WACHTEL:  Thank you, Your Honor.

## CROSS EXAMINATION

BY MR. WACHTEL:

Q   Mr. Flores, I'm Val Wachtel.  I'm Mr. Garcia's attorney.  I'm going to ask some questions.  If you don't understand me, will you tell me that you did not understand?

A   Yes, sir.

Q   Okay.  So is this the first time you've ever changed your testimony?

A   Yeah, first time I've ever given a testimony.

Q   Well, what was it that happened between the time you left this stand and a few moments ago that made you remember that Russell Worthey was at Pedro's house when you left?

A   Well, I, I've seen him a couple times before.  Like I said, it was kind of dark outside; but I believe it was Russell Worthey.

Q   You believe it was Russell Worthey but don't know,

do you?

A   Uhm, I guess that's why I kind of -- I said I didn't know who was there.  But it was a white complexion, man of a white complexion.

Q   You've seen Russell Worthey a number of times; right?

A   Since I've been incarcerated, yeah.

Q   And before?

A   But before, I'd have to say three times.

Q   Well, you are either sure you saw Mr. Worthey or you're not.  It sounded to me when you testified before you got questioned again that you did not see Mr. Worthey at Pedro's house.  Is that true?

A   Yeah.

Q   Thank you very much.  I'm going to go back now and talk to you about some of the other things that you testified to here today.  Are you related to Josh Flores?

A   Yes.

Q   What is your relationship to him?

A   Cousin.

Q   You are not a DV; right?

A   No, sir.

Q   You are not a Norteno?

A   No, sir.

Q   You are not a member of Nuestra Familia; right?

A   No, sir.

Q   Do you know whether or not your cousin Josh Flores is a DV?

A   No, he's not.

Q   Is he a member of a gang?

A   He's a member of a gang.

Q   What gang is that?

A   LCC.

Q   You testified on direct that you saw Mr. Garcia active in the DV gang.  I'd like to talk with you about that.  Can you tell me what it was you saw that leads you to that belief?

A   Uhm, well, first of all, they would have meetings in the basement of the house.

Q   In the basement of what house?

A   Pedro Garcia's house.

Q   How do you know that?

A   Because I was present.

Q   When were you present?

A   I don't know the exact date but it was around that time frame when I was hanging out with him.  I'd say --

Q   What time -- excuse me.  Go ahead.

A   March to July maybe, April, July, four-month period in 2009.

Q   And you were not a DV yet you got admitted to these gang meetings?

A   Yeah.

Q   So you saw him in the company of people that you took to be DV gang members; right?

A   Yes.

Q   How long -- were you at more than one meeting or only one?

A   I recall a meeting.  One.

Q   Do you recall who was present besides Mr. Garcia and you?

A   I'd have to say Gonzalo Ramirez.

Q   You actually don't have to say that unless it's accurate.  Was Mr. Ramirez there?

A   I apologize.  It was Gonzalo --

Q   Thank you.

A   -- he was there.  Jason Najera was there.  Joe Galindo was there.  I'm gonna say, uhm, George, I don't know his last name.  I've known him.  I think George's little brother.  His name is Hernan.  There was more people.  I'm not --

Q   You've told us to the best of your recollection, have you?

A   Yeah.  Uhm, well, there was more people there but, you know, it was like five years ago.

Q   It was a while, wasn't it?

A   Yeah, it's been a while.

Q   Without telling me, do you remember what was said at that meeting?

A   No.  I wasn't actually in the meeting, no.  I was there at the house while they had the meeting; but not being a part of the Norteno gang, I can't be in the -- in his council, circle.

Q   So you don't know whether that was just a meeting among friends that you weren't invited to because you don't know what went on there?

A   Oh, it was a meeting, a gang meeting.  They usually call it a junta in Spanish, meaning a meeting, a gang meeting.

Q   A who what?

A   A junta.

Q   Can you spell that word for --

A   No, I can't.

Q   Well, unfortunately, neither can I.  I'll try to look it up.

    In any event, let's move forward.  Now, you testified, I believe -- correct me if I'm wrong -- that Mr. Garcia dealt in methamphetamine.  Did you testify to that?

A   Yes.

Q   Did Mr. Garcia buy methamphetamine from you?

A   Yes.

Q   On how many occasions?

A   I'd have to say two to three times.  About three.

Q   Let's talk --

A   I'd say three.

Q   Let's talk about the first time.  When was that?

A   There's not an actual date.  I've given him methamphetamines over the time frame, the time frame that I have hung out with him --

Q   So --

A   -- in 2009.

Q   Excuse me.  Go ahead.

A   In 2009.

Q   If I understand your answer correctly, you don't know exactly when this was in 2009 that he bought methamphetamine from you; right?

A   Yes.

Q   The first time.  How about the second time, got a memory of that?

A   It was, obviously, sometime after the first time.

Q   But you don't remember?

A   No.

Q   And you don't remember when the third time was either?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    Like I said, that time frame that we hung out.

Q    Well, perhaps you remember where you were the first time you sold him methamphetamine.  Do you?

A    I might have delivered it to him, I'm guessing, is what I'm actually thinking.  I took it to his house. Might have been an ounce or half ounce of methamphetamines.

Q    What about the second time, do you remember where that transaction took place?

A    I'm going to have to say at one of his girlfriend's house.

Q    Are you guessing?

A    No.

Q    You're not?

A    No.

Q    What girlfriend's house?

A    Paula Torres.  He was datin' her at one time.

Q    And the third time?

A    I couldn't tell you.

Q    Talk about the first time.  How much were you paid for that meth -- for that -- how much were you paid for that methamphetamine?

A    How much was he paying?

Q    How much were you paid?

A    How much would I pay?

Q   How -- I'm sorry.  I'm not being -- I understood you to say that you sold methamphetamine to Mr. Garcia; right?

A   Yes.

Q   How much did he pay you for it the first time you did it?

A   Okay.  A thousand.

Q   A thousand dollars?

A   Yeah.

Q   What about the second time, do you remember how much he paid?

A   Probably about another thousand.

Q   Are you guessing?

A   A thousand.  Because that's what I usually sold was ounces.

Q   So on the third time -- excuse me -- I'm sorry.

A   It would be 500 or $1000.  Depends what they picked up.

Q   And the third time, you estimate that was a thousand dollars also?

A   Yes, sir.

Q   Okay.  But you didn't front that to him, did you?

A   Yeah.

Q   You fronted it?

A   Yes, sir.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Okay.  Did you ever get paid back?

A   Yes, sir.

Q   In full?

A   Yes.

Q   What did you do with your share of the booty?  What did you do with the money you got back?

        MR. WELCH:  Objection; irrelevant, Your Honor.

        THE COURT:  It may not be.  I'll hear his answer and then decide.

BY MR. WACHTEL:

Q   Did you remember the question?

A   Yeah.

Q   What did you do --

A   What I did with the money.

Q   Yes, sir.

A   Used it for bills or miscellaneous.

Q   You spent it on yourself; right?

A   Yeah.

Q   And you didn't kick any of that money to the LCC?

A   No, sir.

        MR. WELCH:  To which I'll object, Your Honor.  It's irrelevant.  He said he is not a member of DV or LCC.

        MR. WACHTEL:  He is an associate, Your Honor.

        THE COURT:  I'm not sure what that is.

MR. WACHTEL:  Nor am I, Judge.  I'm sorry.

THE COURT:  In any event, the objection is overruled as to spending it on himself.  Now, your next question was what?

MR. WACHTEL:  Next question was whether or not he kicked any of that money to the LCC.

THE COURT:  He may answer.

A   No, sir.

BY MR. WACHTEL:

Q   And my next question is:  Did you kick any of it to the DVs?

A   No, sir.

Q   Thank you.  Would I be right if -- let me rephrase it.  You never saw what Mr. Garcia did with the money that -- I'm sorry.  I withdraw that question.

You said you had seen Mr. Garcia with a semiautomatic pistol.  You remember saying that?

A   Yes, sir.

Q   Can you tell us when you saw him with a semiautomatic pistol?

A   The time frame that I hung out with him, probably March -- between March and June.

Q   But you also told us that on June 8th, 2009, you did not see Mr. Garcia with a weapon; right?

A   Uhm --

Q   The night that you got -- that you knocked over that house?

A   I don't recall saying that.

Q   Did you see him with a weapon that night?

A   That night, yes.  Not in the house.  It wasn't exposed.

Q   Where was he when you saw him with it?

A   At the house.  At his house.

Q   Inside or outside?

A   I'd say inside.

Q   What time of the evening?

A   About 5ish.

Q   Before or after you committed the home invasion?

A   Before the robbery.

Q   I just have one more question for you about this before we move on to something else.  Is it your testimony that the gun that you saw Mr. Garcia with that day was a gang gun?

A   Yes, sir.

Q   What's a gang gun?

A   Say if you ever had any problems with a rival gang, meaning not Garcia or Ramirez, but one of their fellow gang members, they could come to the house and ask them to use it to go retaliate if they've been offended.  So it's, I guess, all of theirs, meaning the DV gang.

Q    Do you know where Mr. Garcia got this gang gun from or who he got it from?

A    They -- Joe, Rodriguez.

Q    How do you know that?

A    Because they told me.

Q    Who's they?

A    Garcia, Pedro Garcia.

Q    When did he tell you that?

A    What?  Sorry, sir.

Q    When did he tell you that?

A    When they got it.

Q    Well, when?

A    When they bought it.

Q    When was that, sir?

A    That same time frame that I was hangin' out with 'em.  I'd say around March to -- between March and June, 2009.

Q    Is your recollection of that time very good?

A    Yeah.

Q    Yeah.  Was it -- was it -- is it better today than it was then?

A    No.  But, like I said, it was five years ago.

Q    Yeah, it was five years ago.

A    It was a lifetime.

Q    Okay.  Well, do you remember being interviewed --

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1814

I'm sorry. You got arrested in the case that's before this court right now; right? You got arrested, remember, you plead guilty to the case involving Mr. Garcia. You remember getting arrested in this case?

A   Yes, sir.

Q   And where were you when you got arrested?

A   Garden City.

Q   And did you talk to law enforcement officers after you were arrested?

A   You mean --

Q   Sometime in 2012.

A   Meaning --

Q   Meaning were you interviewed by --

A   -- at the time I got arrested that same day or the following day? Or year?

Q   Near or about the day you were arrested, were you interviewed by law enforcement?

A   Yes.

Q   Do you remember who interviewed you?

A   Detective Webb.

Q   Was it Detective Bice perhaps?

A   Detective Webb and that gentleman over there.

Q   Webb. Now, they told you you were under federal arrest warrant; right?

A   Yes, sir.

Q   And there were other people present at that interview?  For example, Special Agent Larry Stoddard was there.  Do you remember that?

A   Is he an ATF agent?

Q   Yes, sir.

A   Yes, sir.

Q   Do you remember telling whoever was interrogating you that you did not hang out with, quote, those guys, because you're not a gangbanger?

A   Yes.

Q   Was that a true statement?

A   I believe so.

Q   What part of it was -- well, you did hang out with Pedro Garcia; right?

A   Yes.

Q   And you did hang out with Josh Flores; right?

A   Occasionally, yes.

Q   Yes.  And you did hang out with Mr. Ramirez; right?

A   Yes, sir.

Q   So in point of fact, you did hang out with those guys and what you told the investigator was not true; right?

A   Well, they were family, you know.

Q   Mr. Garcia is not your family --

A   No, sir.

Q   -- is he?

A   No, sir.

Q   But you hung out with him?

A   Yes.

Q   And you told the investigators that you did not; right?

A   I, I don't really recall; but I believe so.

Q   Now, when you told 'em that you -- well, I'm sorry. The term gangbanger, what does that term mean to you?

A   Somebody being in a gang.

Q   In a gang?

A   Yes.

Q   Not somebody who commits crimes with gang members?

A   No.

Q   That's not gangbanging; right?

A   No.

Q   Okay.  You told the officers that -- excuse me -- they asked you if you recalled being at Mr. Garcia's house on the night of the home invasion.  Right?

A   Yes.

Q   And you told 'em that you weren't there?

A   I believe I told 'em I was there.

Q   Okay.  Did they ask you if you were aware of any robberies that had been committed?  Do you remember?

A   Yes.

Q    And did you tell them that you had never done any robberies?  Remember?

A    Uhm, I believe I told 'em I'd done robberies -- well, that robbery, home invasion that night on June 8th, 2009.

Q    You think you did?

A    Yeah.

Q    Is that something you recall or are you guessing?

A    I'm guessing.  I'm pretty sure I told 'em that.

Q    Permission to approach, Your Honor.  I want to show you a copy of your report of your interview by law enforcement that we've been talking about.  It is -- it consists of two unnumbered pages; right?

A    Okay.

Q    I want to direct your attention to the first page, about one, two, three, fourth paragraph up from the bottom.  All right.  Where it says:  I asked Flores whether he was aware of any robberies.  Ask you to just read that to yourself.  This paragraph right here.

                    (Witness complies with request.)

A    Yes.

Q    Did you read that?

A    Yes, I did.

Q    Do you now recall having been asked that question, sir?

A    Yeah.

Q    Do you remember what you said?

A    What I said there, previous robberies.

Q    That you'd never been involved in any robberies?

A    No.

Q    But you had, hadn't you?

A    Well, that robbery that I committed on June 8th, yes, sir.

Q    But you didn't tell 'em that you did that, did you?

A    No.

Q    Did they ask you also if you knew anything about any robberies or home invasions?  Remember them asking you that?  If you don't, let me know.

A    I think, yeah, they did ask me.

Q    Approach, Your Honor?

        THE COURT:  Yes.

Q    This is the second page of the document that we just talked about.  Take a look at the first paragraph.

A    Uh-huh.

Q    Read all of it to yourself if you wish.

        (Witness complies with request.)

A    Yeah.

Q    Yeah.  Your recollection is refreshed; right?

A    Yeah.

Q    So they did ask you about other home invasions and

you said you didn't know anything about those?

A    Yeah.

Q    Right?

A    I said I heard.

Q    Yeah.  But you didn't tell them you heard about the one that you were involved in, did you?

A    No.

Q    Also during the course of that -- you were sort of angry about being there in the first place, weren't you? You were upset because you were arrested?

A    Yeah.

Q    And you asked people things like what did I do, what did I do; right?

A    Yeah.

Q    Then you asked whoever was interviewing you to tell you what it was he wanted to know.  Do you remember doing that?

A    Uh-huh.

Q    Well, why did you ask that question?

A    Uhm, I wanted to know what actually -- what I was being arrested for.  I didn't know what they said that I was being arrested for at that time.

Q    He didn't tell you before that?  He didn't tell you why you were arrested?

A    Well, he said something about a robbery and

racketeering.

Q   Uh-huh.

A   And my recollection, I didn't know what racketeering was.

Q   Well, that's quite possible.  But why would you?

A   He said RICO.  That's all they told me in the beginning.  And I didn't --

Q   -- excuse me.  Go ahead.

A   -- know -- they said about RICO, racketeering, and, like I said, I didn't know what he was talking about.

Q   Uh-huh.  Well, I'm still confused.

A   Then he asked --

Q   When you asked him what he wanted to know, that's not asking him what are you talking about, that's asking him what do you want me to say to you; right?

A   Yeah.

Q   Right?

A   Yeah.

Q   Because, because at that point in time, you knew you were in trouble, didn't you?

A   Well, when they came and got me in the first place, how they came and got me, I pretty much knew I was in trouble.

Q   You were prepared to do anything that you needed to do to get out of being in trouble, weren't you?

A   No.

Q   No?

A   No.  I was just trying to figure out what was going on.

Q   Do you remember being interviewed again about this matter on September 13th by law enforcement?  September 13th of 2012.  I'm sorry.  Do you remember that?

A   Yes.

Q   And that was, what, after -- did you have a lawyer at that time in this case?

A   Yes, sir.

Q   But you talked -- you talked with law enforcement again.  You remember how that came about to happen?

A   Yes, sir.

Q   How did that happen?

A   We had a meeting.

Q   Did you ask for the meeting?

A   What do you mean did I ask for the meeting?

Q   Well, you -- you were interviewed by law enforcement on September 13th, 2012; right?

A   Yeah.

Q   Did you have a lawyer at that time?

A   Yes, sir.

Q   How did you happen to have this meeting?

A   Through my lawyer.

Q   Okay.  Did you ask for -- did you want this meeting to take place?

A   Yes.

Q   What was the purpose that you hoped to accomplish by having this meeting?

A   To confess what I did.

Q   Sir?

A   To confess what I did for these charges.

Q   And to stand up and face the music; right?

A   That's right.

Q   And tell 'em the truth; right?

A   Yes, sir.

Q   Just like you're doing here; right?

A   Yes, sir.

Q   Remember them asking you -- you remember speaking about the home invasion that you were indicted on?

A   Yes, sir.

Q   Do you remember telling the officer that you didn't remember the home invasion and you only heard about the murder?  Remember telling them that?

A   Yes, sir.

Q   That's an example of what you considered truthful; right?

A   Yes.

Q   Because that's a lie, isn't it?

A   Yeah.  At the time, I was lying.

Q   Sir?

A   I said at that time, I was lying, said I didn't know nothing about it.

Q   Now, there did come a time during that interview when you changed that story; right?  And you did tell law enforcement that you were involved in the home invasion?

A   Yes.

Q   You remember?

A   Yes.

Q   Well, did you do that because you knew you'd been caught?  Caught out?

A   No.

Q   No?

A   Just wanted to confess.

Q   Well, you did that confessing after you talked to your lawyer; right?

A   Yes.

Q   You became aware that -- I'm sorry, just a moment.

THE COURT:  Are you talking about a third interview now?

MR. WACHTEL:  This is a second interview I'm talking about, Your Honor.

THE COURT:  Still on the second interview.

MR. WACHTEL: Yes, sir.

BY MR. WACHTEL:

Q   Do you remember yet a third interview on September 30th, 2013?

A   Yes, sir.

Q   Do you remember -- and that happened in Wichita, Kansas; right?

A   Yes, sir.

Q   You talked about your general knowledge of gangs with law enforcement, did you?

A   Yes.

Q   How much general knowledge of DVs do you have?  Do you know a lot?

A   Well, I've hung out with 'em for a period of time, you know, and asked questions here and there and they answered them questions.  And I've done time in prison and, you know, I, I know about gangs.

Q   From being in prison?

A   Yeah.  Surrounded by gangs in prison.

Q   I'm through talking with you about meetings that you had with law enforcement.  But I do want to talk to you about the plea agreement that you entered into.  It is Exhibit 212.  Do you have that before you?

A   Yes, sir.

Q   You might want to take a look at that while I talk

to you in case you need to refer to it.  Okay?

A    Yes, sir.

Q    Now, originally in this case you were charged with three crimes?

A    I believe so.

Q    And those crimes were, were assault upon Isidro Raleas-Valesquez; right?

A    Yes.

Q    And with conspiracy to commit assault with a dangerous weapon; right?

A    Yes, sir.

Q    And brandishing or possessing a firearm in furtherance of a crime of violence?

A    Yes, sir.

Q    Of those three counts, you plead guilty to two?

A    Yes, sir.

Q    One of them was Count 7, which was what?

A    Conspiracy, I believe.

Q    Actually -- I'm sorry -- it was the assault with a dangerous weapon.  You remember that now?

A    7, or vice versa.  Conspiracy to commit assault with a dangerous weapon and assault with a dangerous --

Q    But at the time you did this guilty plea, you knew what kind of a sentence you were facing if you went to trial and got convicted; right?

A    Yes, sir.

Q    What was the -- what was the mandatory minimum sentence that you were facing?  If you can recall.

A    20, I believe.  Not more than 20 is one of the charges, the highest.

Q    Not more than 20 is a cap; right?

A    Yes, sir.

Q    Count 8, I think, according to your plea agreement, if you look on Page 2 of the plea agreement, Count 8, the plea on that, the penalty on that is not more than three years of imprisonment.  Right?

A    Yes, sir.

Q    And then you understood when you entered into this plea agreement that at sentencing, right, the Government was going to dismiss the other count that was pending against you?

A    Yes.

Q    Right.  Okay.  Now, to do a plea in federal court, there has to be a factual basis for your guilty plea. You remember that?

A    Yes.

Q    And you sat here at this table where Mr. Garcia sits now and you took an oath at the plea hearing to tell the truth; right?

A    Yes, sir.

Q   And you had to sign the plea agreement, didn't you?

A   Yes, sir.

Q   Did you sign it on the day that you plead?  If you can remember.

A   Yes.

Q   Had you read the plea agreement before you signed it?

A   Yes, sir.

Q   The factual basis for the guilty plea is set out on Pages 2, 3, and -- just 2 and 3 in your case.  You read that before you admitted to having committed crimes; right?

A   Yes, sir.

Q   Do you know who wrote that factual basis?

A   I believe the Government.

Q   Well, so do I.  But in any event, you got some agreements out of the Government for doing this plea; right.  Remember?  You remember?

A   Yeah.

Q   The Government agreed to some stuff; right?

A   And dropped one charge.

Q   Well, let's take a look at Page 5 of the agreement. It's actually a continuation of Section 5, which is two lines on the previous page.  You got that?

A   You mean the Government's agreement?

Q   Government's agreement.

A   Paragraph 5.

Q   Yeah, Paragraph 5 or Section 5.  And look at Page 5.

A   Okay.

Q   The Government agreed not to file any more charges against you as a result of facts that form the basis for the present Indictment.  Remember?

A   Yes.

Q   That's what they said they'd do.  And that means for anything that happened -- anything that they were aware of in that Indictment that you were not already charged with; right?

A   Yes, sir.

Q   They agreed they would recommend a sentence for you at the low end of the guideline range.  That's B?

A   Yes, sir.

Q   What's the guideline range mean to you?

A   Uhm, whatever the United States guideline sentencing --

Q   Let me make it easier.  There's a sentencing guideline system adopted by --

A   Yes.

Q   -- United States; right?

A   Yes.

Q   You talked about that with your lawyer; right?

A    Uh-huh.

Q    And your lawyer told you what low end of the applicable guideline range means?

A    Yes.

Q    Do you have a recollection of what the low end of the guideline range is in regard to your crimes?

A    Well, with -- I believe it was 80 months to 120 months.  I believe that's where I fall in with my criminal history.

Q    That's what you think?

A    Yeah, 80 to 110 months is where I fall.

Q    Now, the Government also agreed to recommend to Judge Belot that you receive a two-level reduction in the applicable offense level for accepting responsibility.  That's in Subparagraph C.  Do you see that?

A    Yes.

Q    Now, you did understand that federal offenses and guidelines have levels; right?

A    Yes.

Q    Just like your criminal history has a level; right?

A    Yes.

Q    So a two-level reduction operates to what?  Reduce the sentence you're going to get?

A    Yes, sir.

Q   And in that same paragraph they say that they're going to -- if your offense level is greater than 16, is 16 or greater, then they're going to recommend you get one more level reduction for acceptance of responsibility for timely notifying the government of your intent to plead; right?

A   Yes, sir.

Q   And that would further reduce your sentence, wouldn't it?

A   Yes.  But as I -- where I told you where I fall at, with the one and the two level reduction, the three level reduction, I fall at between 80 and 120 months.

Q   Well, that's substantially less than 20 years, isn't it?

A   Yes.

Q   Okay.  They also agreed in Subparagraph D they weren't going to request what's called an upward departure, ask the judge to sentence you more harshly; right?

A   Yes.

Q   If you didn't request to be sentenced more leniently?

A   Yes, sir.

Q   And, and they were gonna recommend to the judge -- they are gonna recommend to the judge that Counts 7 and

8 run concurrently?

A   Yes, sir.

Q   And concurrently means at the same time?

A   Yes, sir.

Q   As opposed to consecutively which means back-to-back?

A   Yes, sir.

Q   Now, you agreed -- if you go to Page 6, Paragraph 6. You agreed to provide truthful, complete and accurate information.  If you're there.  At 6A.

A   Yes, sir.

Q   You agreed to provide information about your participation in the offenses charged in the Indictment; right?

A   Yes, sir.

Q   That's B.  And you agreed in C, which is a lengthy paragraph, that if you weren't truthful, the government could walk away from this agreement; right?

A   Yes, sir.

Q   And in D you agreed to fully assist the United States in identifying and recovering forfeitable assets?

A   Yes, sir.

Q   Do you know what forfeitable assets are?

A   Not for sure.

Q   Now, there's another paragraph called substantial

assistance.  That is Paragraph 7 on Page 7.

A   Yes, sir.

Q   And in that paragraph you and the Government agree that you have not yet provided substantial assistance?

A   Yes, sir.

Q   And the paragraph also says that you understand that the question of whether or not you provided substantial assistance lies solely in the opinion of the United States government; right?

A   Yes, sir.

Q   And that even if you think you did, you cannot ask Judge Belot to reduce your sentence based on that?

A   Yes.

Q   So seems to me that -- oh, but there's no side agreement; right?  That says the -- for you to get credit for substantial assistance, this jury needs to convict my client; right?  You don't have an agreement that says that?

A   No.

Q   No.  So the only people that you have to convince in this courtroom that you've been truthful with what you say here is the Government?  The same people who made a deal with you.  Right?

A   Yeah.

Q   Yeah.  How long you been in jail now?

A   I'd say about 17 months, 17, 18 months.

Q   More or less?

A   More or less.  Give or take.  June -- May 9th, 2012, when I was picked up.  So about 17 months.

Q   How valuable is freedom to you?

THE COURT:  I didn't hear your question.

Q   I'm sorry, Judge.  How valuable is freedom to you, sir?

A   Well, it's pretty valuable.  Everybody wants to be free, you know.

Q   More valuable than money perhaps?

A   Uhm, I'd -- you know, I could say I'd like to be free, you know; but I did what I did and accept my punishment.

Q   And you're willing to say that Mr. Garcia did what you say he did?

A   I'm sorry.  Can you say that again?

Q   Yeah, I sure will.  And to get that freedom, you're gonna say whatever pleases the Government in order to try to convict Mr. Garcia?

A   No, sir.  I'm going to speak the truth.  I'm sworn in.

Q   Like you did the second time you were interviewed by law enforcement regarding your involvement in the home invasion?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

MR. WELCH: Objection. Asked and answered multiple times, Judge.

THE COURT: He's admitted he lied. I think that we covered that and need to move on here. We're moving awfully slowly.

MR. WACHTEL: No further questions, Your Honor.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q I'm Joel Mandelman. I represent Gonzalo Ramirez. You got arrested January 13th of 2009 for selling meth?

A Yes, sir.

Q And then you have a pretty good recollection of those dates? You keep referring to March of 2009. That's when you got out on bond in that case?

A I believe so.

Q End of February?

A Maybe. Around that time. Sometime after January.

Q And you start cooperating with law enforcement setting up some drug buys?

A No.

Q So you're out there on bond selling drugs while you're out on bond in that drug case?

A Yes, sir.

Q Okay. And you're still carrying a firearm?

A    Yes, sir.  I mean, not on a daily basis, but I had -- I had one.

Q    You had access to it?

A    Yes, sir.

Q    Okay.  Was it in your home?

A    Yes.

Q    Okay.  That sounds like access.

A    Yes.  I said that.

Q    And you end up getting -- how many prior felony convictions do you have?

A    Two.

Q    The drug case and then the second case is for what?

A    Aggravated criminal threat.

Q    Was it not an aggravated assault case?

A    Yes.  Criminal threat, aggravated assault.  Both level 9s, I believe.

        MR. MANDELMAN:  I'm going to go ahead and just introduce those felony convictions.  These are marked R-W and X.

        THE COURT:  Any objection?

        MR. WELCH:  I don't think so, Judge.  I'm just confirming that's what this is.

            (Off-the-record.)

        MR. WELCH:  No objection, Judge.

        THE COURT:  They're received.

BY MR. MANDELMAN:

Q   Those happened about this time period?  One was in January, 2009; the other was in May?

A   Yes, sir.

Q   Now, I'm not going to rehash that first interview again if I don't have to; but on May 9, 2012, you lied to law enforcement?

A   May 9th?

Q   May 9, 2012, the date you were arrested in this case.

A   Yes.  Well, I, I really didn't state nothing to 'em, no truthful facts.

Q   And do you remember how you described my client?

A   Not that I remember.

Q   Did you say nice things about him?

A   I don't think so.

Q   You remember calling him a faggot?

A   No.

Q   You remember calling Mr. Garcia and Mr. Ramirez fuckin' faggots?

A   No, I don't.

        MR. MANDELMAN:  Your Honor, I'd request permission to play the interview.

        THE COURT:  Play it?

        MR. MANDELMAN:  It's about 25 minutes.  I

think it goes to bias.

THE COURT: Because of two words, you want to play the whole interview?

MR. MANDELMAN: Well, it's got -- the whole thing has got prior inconsistent statements about what he's made here.

THE COURT: No, I'm not going allow that. You can play the portions of it or read the portions of it to refresh his recollection; but I'm not going to play an entire 25 minute interview for two words.

BY MR. MANDELMAN:

Q   During the interview you indicate -- they ask you if you're related to Mr. Ramirez?

A   Yes.

Q   And you indicate you're related through your dad's side?

A   Yes, sir.

Q   And on the interview you state you're not close to your dad's side, you hang out with your mom's side of the family?

A   Yes, more often.

Q   You remember saying that?

A   Yeah.  I was raised with my mom's side of my family.

Q   Okay.

A   Yeah.

Q   And basically the interview is -- I don't want to mischaracterize it.  It's basically about 25 minutes worth of profanity.  Is that accurate?

A   I don't recall; but I assume it could have been. I'd just been -- they just kicked in my house and hogtied -- I was pretty enraged.  You know, ATF and U.S. Marshals came in and kicked in the door and throwin' my kids around.  You know, I was kind of enraged.  I assume I was probably using a lot of profanity.  I don't recall but --

Q   And some of that was directed towards my client?

A   It could have been.

Q   Mr. Bice, on the interview -- let me go ahead and -- let me go ahead and show you.

        MR. WELCH:  Your Honor, I don't think there's been a question that needs to be refreshed yet.

        THE COURT:  I agree.

BY MR. MANDELMAN:

Q   You refer to the gang members as fuckin' retarded and fuckin' dumb.  Do you remember that?

A   I don't.  But I'm not going to say I did say it or I'm not going to say I didn't say it.

Q   Let me go ahead and refresh your recollection.

A   Yes, sir.

Q   And do you mind just reading just that -- there's a

quote in there, Flores stated --

A    Flores stated they're all f'ing retarded and f'ing dumb. Flores stated that stuff is stupid.

Q    Okay. You're not disputing Detective Bice's summary of that interview?

A    Uhm, I don't recall, I mean, actually saying all that but --

MR. MANDELMAN: I'd ask again for an opportunity to play it. There's substantial portions of the interview here that he doesn't recall. It's not that long of an interview in the context of this trial. It's only about, like I said, it's about 25 minutes.

A    Yeah, but I -- like I said, I might have said it out of anger and rage. I just got raided, you know, and had my family -- I was pretty angry so --

THE COURT: If the purpose of playing the interview is to shock the jury with swear words, something tells me that that wouldn't happen. If the purpose of playing the interview is to impeach him on specific points, then it won't take 25 minutes. You can do it just like we're doing the rest of this, by asking him if he said something, and if he denies it, then you can refresh his recollection with the written document. Which surely will take less than 25 minutes.

MR. MANDELMAN: Yeah, I'll, I'll just try to

keep on moving on, Your Honor.  I do not have a transcript of that interview.

THE COURT:  You should have.  If you were going to use it, you should have had a transcript made. Let's move on.

MR. MANDELMAN:  Well, we have a video of it; but I will, Your Honor.

THE COURT:  Don't ever assume that you're going to get to play a video --

MR. MANDELMAN:  I understand.

THE COURT:  -- to impeach somebody.

BY MR. MANDELMAN:

Q   You also indicate that despite the California gang affiliation, most of these guys have never been to California?

A   A lot of 'em.

Q   Have not been to California?

A   I mean, who -- you mean --

Q   I don't know.  You refer -- you say a lot of these DV guys had never even been to California?

A   Well, mean a lot of these California gangs, gang members, meaning that they -- they're kind of fightin' a war that has nothing to do with them because -- especially the ones that live in Kansas.  I'm saying, Surenos and Nortenos, that's a California gang.

Q   Right.  And you're from Hawaii?

A   Yeah.

Q   So you know --

A   I was born in Dodge, but I lived in Hawaii part of my life.

Q   For a long time?

A   Yes.

Q   So you know about being from out of state or at least having lived other places?

A   Yeah.

Q   And a lot of these folks like Mr. Ramirez have only lived in Kansas?

A   Is that what you're asking?

Q   I'm asking you, you're not aware he's ever lived outside of Dodge?

A   I don't think so.  He could have.  I'm not --

Q   Not to your knowledge?

A   Yeah.

Q   I just have a few more things I want to talk about with you.  The plea agreement here, the Government agreed to dismiss Count 9?

A   Yes, sir.

Q   And Count 9 was the count that carried a mandatory minimum of seven years?

A   Yes, sir.

Q   It was -- it was use of a firearm in furtherance of a crime of violence?

A   I believe brandishing a firearm, yes.

Q   Right.  Go ahead.  Yeah.

A   Yeah.  Yes.

Q   And that crime carried a mandatory minimum sentence?

A   I'm not for sure.  It's not on this paper right here; but I, I assume what you're saying is right.

Q   You discussed the plea agreement with your attorney?

A   Yes.

Q   And you knew in exchange for pleading guilty, they were going to dismiss one of the charges?

A   Yes, sir.

Q   And that was the one charge that carried a mandatory minimum?

A   Yes.

Q   And there's no minimum in this plea agreement that requires you to serve at least one day -- you've already got that in, it sounds like --

A   No -- what do you mean?

Q   Well, the terms of the plea agreement --

MR. WELCH:  Your Honor, I'd ask that he be allowed to finish.

THE COURT:  I think you need to -- if you're asking him questions, I think you need to let him answer

before you try to argue with him some more.  The rules are you ask the question, then you let him answer, and then when he's through answering, you ask another question.  Please don't interrupt one another.  And the same goes for you, sir, don't interrupt --

A    Sorry, Your Honor.

THE COURT:  -- counsel when he's trying to ask you a question.

BY MR. MANDELMAN:

Q    I was just wondering if this plea agreement required you to serve anything more than at least one day of jail time?

A    This plea agreement says whatever the sentencing guideline, the PSI, whatever they sentence me to is what I'm gonna get; but they're going to recommend low end of the box.  And, say, if I fall into category 5 or 6 at a level 28, maybe that's 100 months to 120 months, the Government is going to recommend the low end, meaning 100 months.  That's the only --

Q    You understand that the plea agreement includes the possibility of a motion for substantial assistance?

A    Possibility, yes.

Q    And what does that mean to you?

A    Where it says substantial assistance, if I provide truthful and substantial assistance, then they'll file

it; but there's no promise whatsoever.

Q   And that would allow you to argue for a sentence outside of those guidelines that you're discussing?

A   If I was provided with -- if they granted it to me?

Q   Yes.

A   I guess if it's up to the judge -- I'm not sure how the process goes.

Q   You did read this document?

A   Yes.

Q   And I noticed it's dated October 7th?

A   Yes.

Q   This is your second time in this courtroom this week?

A   Yes, sir.

Q   Okay.  You entered this agreement on Monday?

A   Yes.

Q   Okay.  When's the -- did you have an opportunity to speak with any law enforcement over the lunch hour?

A   No.

Q   When's the last time you've spoken with law enforcement?

A   Can you restate that?  What do you mean by --

Q   Sure.  When is the last time that you spoke with an agent of the Government in this case?

MR. WELCH:  Your Honor, I'm going to object.

The marshals that transport Mr. Flores are law enforcement --

MR. MANDELMAN:  Okay.  Somebody associated --

Q   I'm not asking about the marshals, sir.  I'm just asking about the agents that are working on the case or the prosecutor, the --

A   I'm going to have to say September.

Q   September 30th?

A   Yes.  I believe.

Q   That was last week.  And do you have a nickname?

A   Yes.

Q   Go ahead.

A   Tito.

MR. MANDELMAN:  That's all I have.

THE COURT:  Redirect.

### REDIRECT EXAMINATION

BY MR. WELCH:

Q   Could you display 201, please.  Mr. Flores, on June 8, 2009, did you assist Pedro Garcia and Gonzalo Ramirez in robbing people in this house?

A   Yes, I did.

MR. WELCH:  No further questions.

THE COURT:  Anything further?

MR. WACHTEL:  Absolutely not, Your Honor.

MR. MANDELMAN:  No, Your Honor.

THE COURT:  Thank you, sir.  You're excused.
Next witness, please.

MR. SMITH:  United States calls Jeff Moordian
from the Dodge City Police Department.

THE COURT:  Who?

MR. SMITH:  Your Honor, for the benefit of the
court and the jury, the following approximately ten
witnesses, at least that we have scheduled at this
point, are witnesses that would be offering testimony on
crimes for which Gonzalo Ramirez is only charged.  Pedro
Garcia is not charged in the crimes for which the next
several groups of witnesses will be presenting evidence.

THE COURT:  Thank you.  I think that will help
all of us.

**JEFF MOORADIAN**

Having been first duly sworn to tell the truth, the
whole truth and nothing but the truth, testified as
follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Officer, please tell us your name.

A   Jeff Mooradian.

Q   What is it you do for a living?

A   I'm a detective sergeant with the Dodge City Police
Department.

Q   How long have you been with the Dodge City Police Department?

A   Approximately 11 years.

Q   Do you recall, were you working with the Dodge City Police Department in October of 2008?

A   Yes, I was.

Q   What was your job back then?

A   I was patrol corporal.

Q   What does that mean?

A   I helped supervise the patrol officers on the shift that evening.

Q   And what do you do to supervise the patrol officers?

A   We handle all the calls that come in from dispatch during that shift, work traffic, different things like that.

Q   Did you have a particular time of day that you worked?

A   That shift I worked 6 p.m. to 6 a.m.

Q   6 p.m. to 6 a.m.?

A   Yes.

Q   Now, were you working specifically on October 4th, 2008?

A   Yes, I was.

Q   And, I'm sorry, I'm not good with math, so 2008, how long had you been with the force?

A    I'd been with the force approximately six years.

Q    And what is the progression in the Dodge City Police Department as far as the positions that you would hold?

A    I began as a recruit, then officer.  Then you can promote to corporal or detective.  From there you go to sergeant, lieutenant.

Q    All right.  So October 4th, 2008, were you working?

A    Yes, I was.

Q    And in the late evening hours, or I suppose the early morning of another day, were you at a traffic stop?

A    Yes, I was.

Q    Where were you at the traffic stop?

A    I was on the corner of Comanche Street and north 14th, the Dillons supermarket parking lot.

Q    While you were at the traffic stop, did anything unusual happen?

A    Yes.  When I walked back up to the driver of the vehicle to hand back the driver's license, I heard what sounded to me like gunshots.

Q    Have you heard gunshots before?

A    Yes, I have.

Q    Why did you think these were gunshots?

A    They sounded like gunshots that I had heard before.

Q    How many gunshots did you hear?

A    Approximately 15 to 20.

Q    Any estimation as to how far away those gunshots were?

A    I would say approximately a quarter mile if it was on a straight line.

Q    And what did you do in reaction to hearing those gunshots?

A    I radioed to our dispatch to let them know that I heard what appeared to be gunshots in a certain area of town.

Q    And then what did you do?

A    Then I got into my vehicle and began driving towards that area.

Q    What area were you driving toward?

A    I was driving south towards the area of approximately the 13 to 1200 block of 4th or 5th street.

Q    Now, did you arrive at a location that you learned was involved in the shooting?

A    I did.

Q    What was that location?

A    It was 1110 4th Avenue.

        MR. SMITH:  May I approach, Your Honor?

        THE COURT:  Sir.

Q    I've placed in front of you what's been marked as Government Exhibits 300 through 303.  Do you see those

exhibits?

A   Yes.

Q   Do you recognize what is in Government Exhibit 300?

A   Yes, I do.

Q   What is that?

A   That is the residence of 1110 4th Avenue, Dodge City, Kansas.

Q   Where you responded that evening?

A   Yes, sir.

Q   What is Government Exhibit 301?

A   The north side of that same residence.

Q   And Government Exhibit 302?

A   Again, another photo just a little further east of the same residence.

Q   And Government Exhibit 303?

A   Be the rear of that residence.

Q   Do each of those photographs accurately depict the residence as you saw it on the evening of October 4, 2008?

A   Yes, they do.

          MR. SMITH:  Your Honor, move to admit those exhibits, 300 through 303.

          MR. HENRY:  No objection.

          THE COURT:  They're received.

BY MR. SMITH:

Q    Let's display Government Exhibit 300 please.

THE COURT:  What's this officer's last name?

A    Mooradian.

THE COURT:  Spell it.

A    M-O-O-R-A-D-I-A-N.

THE COURT:  Thank you.

A    You're welcome.

BY MR. SMITH:

Q    Now, Detective, we've displayed Government Exhibit number 300; is that correct?

A    Yes.

Q    Is this the front of the residence?

A    Yes, it is.

Q    And when you arrived, did you arrive at the front or the rear of this residence?

A    I arrived at the front.

Q    When you arrived at the front of this residence, did you notice anything that caught your attention?

A    I noticed the front door was open and there were several individuals on the north side of the residence.

Q    The north side being where?  You can actually pull that screen up that's right next to you on your right hand, grab the top, pull it toward you.  And what is the north side of the residence?

A    North side would be over here.  (Witness

indicating.)

Q   And you say you saw several people over in that area?

A   Yes, I did.

Q   Outside of the house?

A   Yes.

Q   And let's look at Government Exhibit 301.  Does this better show that area?

A   Yes.

Q   Is that the side of the house that you saw?

A   Yes.

Q   How many people?

A   I don't know for sure.  I would approximate three or four, maybe more.

Q   Did you see anything else unusual on the side of the house?

A   I noticed there was what appeared to be some trash litter, some beer cans and things like that laying outside.

Q   Let's look at Government 302.  Does that show the same residence?

A   Yes, it does.

Q   And, again, is this photograph taken the evening and as you arrive at the location?

A   Yes.

Q   You mentioned some trash and litter and beer cans; is that correct?

A   Yes.

Q   Are those visible in this photograph?

A   Yes, they are.

Q   And is this the rear of the residence?

A   Yes, it is.

Q   So what side -- or, I'm sorry -- what direction, then, would we be looking at?

A   We would be looking straight to the -- would be the southeast.

Q   And Government's 303.  Is that a different perspective looking at the rear of the residence?

A   Yes.

Q   You mentioned trash and debris.  Do we see that in the photograph?

A   Yes.

Q   What is that trash and debris?

A   I believe it's empty Corona beer cases.

Q   And are there beer bottles visible?

A   Yes.

Q   And you don't remember how many people were outside at this point?

A   No, I don't.

Q   At some point, did you enter the home?

A    I did.

Q    And why was it that you entered the home?

A    I heard the individuals from the north side of the house yelling that somebody had been shot inside.

Q    Whether true or not, did that cause you to then enter the home?

A    Yes.

Q    And when you entered the home, what was it that you observed?

A    When I first entered, I saw the front door open and I saw an older Hispanic female laying on a couch directly in front of the front door.

Q    And after seeing that Hispanic female laying on the couch, did you notice if she was injured?

A    Yes, I did.

Q    What injury did you see?

A    I noticed what appeared to be a bullet wound to her right forearm.

Q    Did you see anyone else in the home?

A    After I went up to render first aid to her, a younger Hispanic male had walked out from the back side of inside of the residence towards the back of the living room and it appeared he also had a gunshot wound to his left calf area to the front of his leg.

Q    You saw that injury?

A   I did.

MR. SMITH:  May I approach?

THE COURT:  Yes, sir.

BY MR. SMITH:

Q   I've placed in front of you Government Exhibit 364. Do you have that document?

A   Yes.

Q   Do you recognize it?

A   Yes, I do.

Q   What is in Government Exhibit 364?

A   This is the Hispanic male that had come walking out from the back of the living room that had what appeared to be a gunshot wound to his leg.

Q   Is that how you saw him on that evening?

A   Actually, I put put the bandage on his leg.  He had come limping out.  He hadn't had the bandage on his leg yet.

MR. SMITH:  Move to admit Government 364.

MR. HENRY:  No objection.

THE COURT:  It's received.

BY MR. SMITH:

Q   If we can publish that.  This is the individual you saw in the home?

A   Yes.

Q   You mentioned the bandage.  Please point that out

for us.

A    This white bandage here I put on his leg to try to stop the bleeding.  (Witness indicating.)

Q    What about the Hispanic female you saw in the home, did you do any bandaging of the Hispanic female?

A    I started to.  When I began that, other officers walked into the residence so I asked the other officers to assist with the female while I tended to the male.

        MR. SMITH:  May I approach?

        THE COURT:  Yes, sir.

BY MR. SMITH:

Q    Do you recognize Government Exhibit 368?

A    Yes, I do.

Q    What is Government Exhibit 368?

A    This is the Hispanic female that was injured on the couch inside the residence.

        MR. SMITH:  Move to admit Government 368.

        MR. HENRY:  No objection.

        THE COURT:  It's received.

Q    The Hispanic female you saw on the couch?

A    Yes.

Q    Is her wound visible in this photograph?

A    No, it's not.

Q    This photograph is not at the residence; is that correct?

A    No, I believe it's at the hospital.

Q    After observing these individuals -- at some point while you were out on the scene, did you investigate the area around the house to search for evidence?

A    Yes, I did.

Q    And what area did you investigate?

A    I walked around the house and saw the trash in the back. I then walked up the street to the west and approximately a half a block to the west.

        MR. SMITH: May I approach?

        THE COURT: Yes.

Q    Showing you Government Exhibit 374; is that correct?

A    Yes.

Q    You recognize what is depicted in Government Exhibit 374?

A    Yes.

Q    What is Government Exhibit 374?

A    It's an aerial photo of 3rd and 4th street in Dodge City.

Q    Does that aerial photograph contain the residence at 1110 4th Avenue?

A    Yes, it does.

Q    The residence that you responded to that evening?

A    Yes.

Q    Does it accurately depict the area around that

Case 6:12-cr-10089-MLB   Document 992   Filed 03/19/14   Page 62 of 148

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 1859

937

residence?

A   Yes.

MR. SMITH:  Move to admit Government 374.

MR. HENRY:  No objection.

THE COURT:  It's received.

BY MR. SMITH:

Q   Now, you can actually -- well, you touched the screen.  Can you mark on this exhibit where 1110 4th Avenue is?

A   I believe it's right here.  (Witness indicating.)

Q   Okay.  Do we have this oriented north to south correctly as we're viewing it?

A   No.  I'm sorry.

Q   Sorry.  So you've taken the Exhibit 374 and turned it upside down now?

A   I did, yes.

Q   And mark for us again --

A   Just give me a second here to get my bearings straight here.

    This house right here.  (Witness indicating.)

Q   You've placed another mark, a circle essentially, on Government 374; is that correct?

A   Yes.

Q   Is that 1110 4th Avenue that you responded to?

A   Yes.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1859

Q Do you recall where you parked?

A Yes.

Q Where was it you parked?

A Right in front of the residence on the side of -- be on the east side of the street, directly in front of the sidewalk.

Q And is that 4th Avenue?

A Yes, it is.

Q Where were the individuals gathered outside?

A It would have been in this area here. (Witness indicating.)

Q And where was the debris, the beer cases and beer bottles?

A In this area right here. (Witness indicating.)

Q Towards the rear of the --

A Towards the, yes, towards the rear of the residence.

Q You mentioned you exited the house and looked for evidence of the shooting; is that correct?

A Yes.

Q And did you find evidence of a shooting?

A Yes, I did.

Q And in what area did you find that evidence?

A It would have been right here in this area here. (Witness indicating.)

Q And what was it that you saw in that area?

A    It appeared to be shell casings from bullets.

Q    Now, did you have any responsibility in collecting those shell casings?

A    No, I didn't.

Q    Photographing?

A    No.

Q    Or marking those shell casings?

A    No, I did not.

Q    Were those duties taken over by other law enforcement officers that responded?

A    Yes, they were.

Q    And that evening, you were a patrol corporal; is that correct?

A    Yes.

Q    Was it your responsibility to assign other law enforcement officers to perform other duties?

A    Yes.

Q    Whether true or not, did you receive information from the home that caused you to dispatch officers to another location?

A    I wasn't aware of the location; but I did get word that a brown Cadillac vehicle had left the scene and gone south on 4th.

Q    South on 4th.  Let's bring 374 up again.  Now, I understand maybe I have this upside down, but what

direction would be south on 4th?

A   Going this way.   (Witness indicating.)

Q   And as a result of receiving that information, did you dispatch officers?

A   I did.   Two of my officers had pulled up to the residence.   I gave them the information and told them to head that direction to look.

Q   Do you recall which officers they were?

A   Yes, sir.   I believe it was Officer Stein and Officer Nau.

Q   And did those officers leave the location?

A   Yes, they did.

Q   Were the victims then transported off-scene to the hospital?

A   Eventually, yes.   I was not there when they were transported; but they were transported to the hospital.

Q   Did you respond to another location after you left 1110 East 4th Street?

A   Yes, sir.

Q   And what was that in response to?

A   That was in response to Officer Nau and Officer Stein letting other officers know that they had found the possible location of the vehicle that had left the scene at 1110 4th.

Q   Then when you left, did you meet again with Officer

Stein and Officer Nau?

A   Yes, I did.

Q   And were they at the location of a vehicle that was found?

A   Yes.

MR. SMITH:  I have no further questions, Your Honor.

THE COURT:  Mr. Henry.

MR. HENRY:  Thank you, Your Honor.

### CROSS EXAMINATION

BY MR. HENRY:

Q   When you first come to a crime scene, you're trying to get as much information out as possible; is that correct?

A   Yes, sir.

Q   And there was information that you obtained as well as maybe some of the other officers that was being given regarding how many suspects that you were looking for; is that correct?

A   I'm not sure about the amount of suspects.

Q   Could you look at your report please.

A   Yes, sir.

Q   Do you have it with you?

A   Yes, sir.

Q   On Page 2.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   Okay.

Q   Toward the middle of the page.  Do you see that?
The fourth paragraph down?

A   Yes.

Q   How many subjects or suspects were you looking for?

A   I'm sorry.  Which paragraph down, sir?

Q   Fourth paragraph down on Page 2.

A   Says approximately five.

Q   And the, the initial description of the vehicle, do
you remember it being the color brown?

A   Yes.  I remember someone saying that it appeared to
be a brown Cadillac.

Q   You remember also somebody possibly saying that the
suspect vehicle might be a Cougar and not a Cadillac?

A   I don't recall.

Q   Okay.  At least that's not in your report.  It must
have been -- there were a number of officers at this
1110 4th Avenue; is that correct?

A   Yes.

Q   Now, was any suspect or weapon found that evening?

A   I don't believe suspects were found.  I don't recall
what was found at the location.  I didn't search for
anything that evening.

Q   Did you actually collect the evidence at the scene
regarding the shell casings out in the road?

A    No, I did not.

Q    And if I remember correctly, 1110 4th Avenue, it is a -- it's a house that's on a corner; right?

A    Yes, sir.

Q    And these pictures that have been shown, show that the -- they're looking towards the front of the house, that would be towards the east; is that correct?

A    Yes.

Q    And the shell casings were slightly up the hill in the block to the west of the house; is that correct?

A    Yes, sir.

Q    The -- and, again, there was, you said approximately -- well, there was a number of cases of beer that was out back; is that correct?

A    Yes, sir.

Q    The -- I notice there was a blue car in the back there where all the empty beer cases were.  Do you remember that?

A    I see it in the picture.  I don't recall.

Q    I believe it was Exhibit 302 and 303.  Request we pull those up again.  There's 302.  Looking towards the back of the house; is that correct?

A    Yes.

Q    And then could we go to 303.  The front of the blue car is there as well; is that correct?

A   Yes, it is.

Q   Now, when you went inside, one of the wounds by the male that was injured had a blue bandana trying to be used as a tourniquet; is that correct?

A   Yes.

Q   For some type of pressure on the wound; is that right?

A   Yes.

Q   Now, with respect to blue bandanas, in your line of work in Dodge City, is that indicative of a certain type of gang?

A   Yes.  There's certain gang members that do carry blue bandanas.

Q   Would those be the Surenos?

A   Yes.

MR. HENRY:  I have nothing further.  Thank you.

THE COURT:  Anything further?

MR. SMITH:  Nothing further.

THE COURT:  Thank you, sir.  You're excused. And we will take a recess, Ladies and Gentlemen. Approximately 15 minutes.  We're going to quit at 4:30 today, so when you come back, we'll finish things up.

(Recess.)

THE COURT:  Yes, sir.

MR. WELCH: Your Honor, the United States recalls Shane Webb.

**SHANE WEBB** (Recalled)

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, are you the same Shane Webb who's testified earlier in this case?

A   Yes, sir.

Q   Mr. Webb, prior to your employment with the KBI, you've testified earlier that you were a police officer with the Dodge City Police Department; is that correct?

A   That is correct.

Q   On October 4, 2008, were you employed with the Dodge City Police Department?

A   Yes, I was.  I was a detective at that time.

Q   As a detective, did you receive an assignment to assist in an investigation of a shooting which took place at 1110 4th Avenue, Dodge City?

A   Yes, I did.

Q   Do you recall what time you received that notification?

A   Yeah.  It was approximately 045 hours, right after

midnight.

Q   And after you received that direction, what did you do?

A   At that time I then placed a phone call to, at the time, Corporal Jeff Mooradian.

Q   Did you have a discussion with Mr. Mooradian?

A   Yes, I did.

Q   Did Mr. Mooradian ask for your assistance?

A   Yes, he did.

Q   So what did you do?

A   I then responded to the Dodge City Police Department to obtain photographing equipment, things of that nature.

Q   And after you -- after retrieving equipment you thought you might need, where did you go?

A   I went to the address of 1110 4th Avenue.

Q   Can you display 300, please.  Do you recognize what's depicted in that photograph, sir?

A   Yes, I do.

Q   What is that?

A   This is the residence at 1110 4th Avenue, Dodge City.  This is a photograph that I took.

Q   And the actual date when you arrived at this house in relation to this investigation would have been when?

A   It would have been on the October the 4th of 2008.

Q   And when you arrived at the location, did the house look pretty much like it does in this photograph?

A   That is correct.

Q   Can we then display 301.  Did you look at the outside of the residence when you first arrived, sir?

A   Yes, I did.

Q   Do you recognize what's depicted in 301?

A   Yes.

Q   What is that?

A   This would be the north side of the residence, so looking toward the south of the residence.

Q   And 302.  Do you recall this portion of the residence, sir?

A   Yes, I do.

Q   Did you see it that night?

A   Yes, I did.

Q   Or that morning?  And then 303.  Do you recognize that, sir?

A   Yes, I do.

Q   What is that?

A   This is the east side of the residence, so this is looking at the back side of the residence.

Q   All right.  What did you do as part of this investigation once you got on the scene?

A   When I got on the scene, first thing I did was

assess the scene to see if the area that the officers had marked off, our crime scene, if our crime scene area needed to be expanded. I noticed that on the street, on Oak Street, which runs just to the -- on the north side of the residence, to the west of the residence, there was 20 placards which are small yellow numbering systems, there was 20 of those placed out. These were over shell casings.

Q  Agent, let me stop you just for a second. Can we display 374, please. Do you recognize what's depicted in 374?

A  Yes, I do.

Q  What is that?

A  This would be an aerial map of the neighborhood between 5th Avenue and 3rd Avenue and Oak Street on the north.

Q  And is the address 1110 4th Avenue depicted in this photograph?

A  Yes, it is.

Q  Could you please touch the screen and indicate where that house is located?

A  Yes, it would be right here. (Witness indicating.)

Q  Now, I asked you to stop. You started to talk about evidence that you observed in the location of the crime scene; is that right?

A    That is correct.

Q    What evidence do you recall seeing outside of the house?

A    Are you talking -- on Oak Street, I noticed the 20 shell casings that were marked out by officers.

Q    When you arrived at the crime scene, some evidence had already been located and marked?

A    That is correct.

Q    Let me ask you to look at -- the one above these may already be admitted -- but 304 and 305.  Starting with 304.  Do you recognize what this is?

A    Yes, I do.

Q    What is that?

A    This is a photograph that I took --

THE COURT:  These are not admitted so --

MR. WELCH:  Thank you, Judge.

Q    Does 304 accurately depict a portion of the crime scene as it looked to you that morning?

A    Yes, it does.

Q    And then 305, what is that?

A    From the same location.  They're both looking east on Oak Street.

Q    Do 304 and 305 accurately depict evidence that was observed and marked at the scene by the Dodge City police officers?

A   Yes, it does.

MR. WELCH:  Your Honor, we offer 304 and 305.

MR. HENRY:  Your Honor, no objection.  And with respect to all the other ones regarding the shell casings that are coming up, I don't have any objection to those.

THE COURT:  Thank you.

MR. WELCH:  Can we display 304 please.

BY MR. WELCH:

Q   In this photograph -- did you say you took this photograph?

A   Yes, I did.

Q   In this photograph there are yellow markers in the foreground of the picture; correct?

A   That is correct.

Q   And those are indicating locations of what?

A   These would be seven point six two by three nine shell casings for ammunition.

Q   And did you collect those shell casings as evidence?

A   The police department did.  I did not personally.

Q   Do you know which officer actually physically collected the shell casings?

A   It was Officer Leslie Lima.

Q   In the background of this photograph do you see the residence that you previously identified depicted in

Exhibit 301, 300 and 304?

A   Yes.

Q   Where is it in this photograph?

A   It would be right here behind the signs.  Did that show --  (Witness indicating.)

Q   All right.  Can we display 305.  And then what is depicted in that photograph, sir?

A   305 is the same photograph -- the photographs were actually taken using a flash on and with a flash off. So this would be one where the flash would presumably be on in this photograph.

Q   And then each of the yellow markers appear to be a number; is that correct?

A   That is correct.

Q   What is the purpose of putting sequential numbers in this location at this crime scene?

A   So that evidence could be tracked back to where the evidence was in the photographs and so that it could be numbered when those items were placed into evidence.

Q   Each of the markers indicates the location of a shell casing.  Is that your testimony?

A   Yes, sir.

Q   And did you also, in addition to taking an overall picture of all the shell casings, did you take individual photographs of each shell casing?

A   Yes, I did.

Q   And did you do that yourself?

A   Yes, sir.

Q   Agent Webb, I'd ask you to look at exhibits 306 through 325.  Take a minute and tell me if you recognize what those are.

A   Yes, sir.

Q   All right.  What are 306 through the last one, 327; is that correct?

A   That is correct.  Excuse me, 325.

Q   Thank you.

A   These are photographs depicting each one of the shell casings that I photographed individually.

Q   And do each of those photographs accurately reflect or depict a separate shell casing found that morning?

A   Yes, sir.

        MR. WELCH:  Your Honor, we would offer 306 through 325.

        MR. HENRY:  No objection.

        THE COURT:  I note there's also a 326 that says shell casing.  Is that also being offered?  Maybe that's the shell casings themselves.

        MR. WELCH:  Yes, sir.

        THE COURT:  Are you going to object to that, Mr. Henry?

MR. HENRY:  I won't object; but, yeah, there's no 326 in my evidence book so I guess --

THE COURT:  When they offer it then --

MR. WELCH:  That would be a different witness, Judge.

THE COURT:  All right.  Go ahead.

BY MR. WELCH:

Q   All right.  We won't go through each of these; but starting with 306.  Would you display it.  Thank you.  306, Agent Webb, is what?

A   This is one of the spent shell casings that was laying on Oak Street.

Q   And then Exhibit 308 is what?

A   This is another shell casing laying on Oak Street.

Q   Did you sequentially mark and photograph each of the shell casings?

A   Yes.  Did we skip number 2?

Q   I did because I didn't intend to go through each one.

A   Yes, sir.

Q   Let me show another one.  324.  Would you display this please.  What is 324?

A   Another spent shell casing laying on Oak Street.

Q   All right.  What was the number, total number of shell casings that were recovered at that crime scene

outside?

A    There was 20 shell casings.

Q    All right.  So if we were to go through each one of these, there is a separate photograph of a shell casing totaling 20 photographs of shell casings; is that correct?

A    That is correct.

Q    Agent Webb, when you arrived at the location, do you recall seeing any victims, shooting victims?

A    No, sir.

Q    And in addition to the shell casings that you've testified about that you photographed and we just introduced those photographs, was there anything else you did as part of your investigation on the outside of the residence?

A    Yes.

Q    What did you do?

A    I went to the residence and began identifying places where the projectile would be entering into the residence.  I started on the north side of the house and I started by using basically yellow sticky notes and started labeling numbers on the outside of the residence to account for the impact places of the projectiles.

Q    Would you display 374 please.  Agent Webb, I've asked Ms. Hesston to enlarge the portion of the diagram

where the residence is located.  Do you agree that the residence that was the subject of the crime scene is on the screen currently?

A    Yes.

Q    Now, you told us you started at the north end of the house and started looking for what again?

A    For the places where the bullets would have impacted the residence.

Q    Where on this diagram did you begin your examination for bullet strikes on the outside of the house?

A    I started right here at the northeast corner and I moved down this way headed to the west on the residence on the north side, working my way around.

Q    And did you in fact find locations where bullets had struck the residence?

A    Yes.

Q    In what locations on, generally speaking, what side of the house did you find bullet strikes?

A    I found locations on the north side that appeared to be traveling to the east by the way the siding was broke off.  It wasn't a straight, a straight-in puncture into the residence.  It was more of a coming in at an angle. I then, once starting on the north side, I then moved to the west side of the residence to the front of the residence.  And there were several more impacts on the

front of the residence.

Q   Let me start by asking you, sir, to look at Exhibits 327, 328 and 329.  Do you recognize those, sir?

A   Yes, I do.

Q   What are those?

A   These are photographs that -- these are all photographs that I took, would have been of the impact points on the north side of the residence.

Q   And do 327, 328 and 329 accurately depict those portions of the house where you found bullet strikes?

A   Yes.

MR. WELCH:  Your Honor, we would offer 327 through 329.

MR. HENRY:  Your Honor, I don't object; and I don't object through 336 because those are other similar pictures.

THE COURT:  Thank you.

BY MR. WELCH:

Q   We now have depicted on the screen, Agent Webb, 327. What is that?

A   This would be a photograph.  This would be more towards the east end of the residence.  More, I guess, further to the east than the middle anyway.  And these were impact points.  And I basically started from the east side on the north side of the residence from the

east side of that property on the north side and began working towards the west.  And so these would be the sticky notes that I explained.  I started with number 1 and I started placing these so that I could photograph them so that they could later be diagrammed.

Q   The total number of bullet strikes that we can see in this photograph is what?

A   Three.

Q   And would you mark -- touch the screen and show where the three bullet strikes are?

A   There's one here.  Number two is right there. Number three is right there.  (Witness indicating.)

Q   And then can we display 328.  What is depicted in Exhibit 328?

A   This would be down at the foundation of the residence.  This would be where I marked number 4, and there was a bullet impact right here.

Q   And 328.  What is depicted in 329?

A   329, I marked impact site number 5 up top and number 6 down towards the corner.  This is getting ready to come around to the front of the residence.

Q   Agent Webb, I'm now going to hand you photographs that are marked in sequence 330 through 336.  If you would take a minute and look at those and tell me if you recognize what those are.

A    Yes, I do.

Q    What are those?

A    These are photographs of the west side of the residence, which would be the front of the residence facing towards 4th Avenue; and these are where impact points would have been on the west side of the residence.  There is also some photographs where we've taken dowel rods and placed through the holes that would go either through walls or wherever they may be so we can see trajectory going into the residence.

Q    All right.  And do the photographs marked 330 through 336 accurately depict various locations of the house where you identified bullet strikes?

A    Yes.

        MR. WELCH:  We would offer 330 through 336, Judge.

        MR. HENRY:  No objection.

        THE COURT:  They're received.

BY MR. WELCH:

Q    Could we display 330.  Agent Webb, what is depicted in Government Exhibit 330?

A    This would be coming around the side to the west side or the front side of the residence.  This kept going in order, so I labeled this as impact site number 7.  This would be number 8, number 9, number 10, and

number 11.

Q   All right.  What is depicted in Exhibit 331?

A   This would be the front porch area on the west side of the residence.  And where the number 12 is marked, that would be another impact point.

Q   332.  What is depicted in 332, sir?

A   This was another -- well, besides what's off on the left, what I've already spoken about that has dowel rods already sticking out of it for trajectory.  Number 13 is now marked in this photo where a round went through the porch column.

Q   Next one is 333.  What do you see depicted in Exhibit 333?

A   This was a small sidewalk area after you come off the front porch that goes towards the north; and one of the impact points would be right here at number 14.  And it actually broke up the concrete right there.

Q   Number 334, what is depicted in 334?

A   This is the front door to the residence looking out towards -- the photograph is looking towards the east but the front door actually faces out towards the west.  And this would be impact point number 15, number 16, and number 18.

Q   And in this photograph, Agent Webb, we see rods that have been placed physically into the house.  You

mentioned earlier the purpose of that, but why was that done?

A   For trajectory.  So you could try to find the bullet slugs inside the residence or know where those bullets may have traveled inside the residence.

Q   All right.  335, please.  What is depicted in 335?

A   Again, the holes that we spoke about; and also number 17 is now in the photograph and it's up towards the --

Q   I'm sorry.  Go ahead.

A   Just up towards the top of the photograph.

Q   336, what is depicted in 336?

A   This would be if you're looking at the front door of the residence, this would be to the right of the front door.  You would refer to those as picture windows or looking out the front of the residence.  And this would be impact point number 19.

Q   After -- did you find any other bullet points or strikes on the outside of the house other than the ones we've already shown?

A   There was possibly one that would have been up near the roof gable; however, we could not get up there to it to identify if it was or not.

Q   After identifying and photographing the bullet strikes on the outside of the house, what did you do?

A    First of all, not all these photographs towards the end were ones that I have taken but I was there and present when they were being taken.  Once that was completed on the outside of the residence, we then moved on to the inside of the residence to start seeing if we could identify where any of those bullet fragments or bullet slugs had went inside the residence.

Q    Were you able to do that?

A    Yes, we were.

Q    Where do you recall finding bullets or bullet fragments inside the house?

A    When you walk in the front door, you walked into a living room that extended into a dining room area.  In both the living room/dining room area we could see impact points where they went through the front living room of the residence.  And we were able to also find fragments and bullet slugs in both the -- what I call the living room and dining room area.  And then on the northwest corner of the residence was a bedroom; and inside that bedroom, we also found bullet slugs.

Q    Agent Webb, I'm now going to hand you what's been marked in sequence Exhibits 337 through 344.  Could you look at those, and when you're ready, tell me if you recognize what those are.

A    Okay.

Q   What are those photographs -- what do they depict?

A   These are photographs that were taken by Detective Thompson; and these photographs depict the living room area and the dining room area of the residence.

Q   Do they accurately depict the living room and dining room area of the house as it appeared when you were there on October 4, 2008?

A   Yes, they do.

MR. WELCH:   Your Honor, we offer 337 through 344.

MR. HENRY:   No objection, Your Honor.

THE COURT:   They're received.

Q   Starting with 337, what is depicted in Exhibit 337, Agent Webb?

A   This would be looking from the dining room area towards the living room area, then out the front door of the residence.

Q   And then 338.   What was the purpose of taking this photograph?   Do you know?

A   This was to show the trajectory of one of the bullets that struck the residence coming in; and this is the what I would consider the entertainment center that had a TV and other knick-knacks on it.

Q   And was a rod placed through this bullet hole showing trajectory?

A   Yes.  This is the -- you can see the rod right there in the middle of what I just circled.

Q   And 339.  What is depicted in this photograph?

A   This is also the same entertainment center where bullets had struck the entertainment center coming into the living room.

Q   And 340.  What is depicted in Exhibit 340?

A   This is behind the entertainment center, one of the holes coming through the wall.

Q   341.  What is this?

A   This is taken from about the proximity of the front door looking across the living room into the dining room area, back into the kitchen area of the residence.

Q   And 342, what is that?

A   Again, same photograph, just looking a little bit more to the left at the love seat.

Q   And 343.  What is that?

A   A picture of the love seat and the red substance on the floor.

Q   And 344, what is that?

A   This would be the -- a cushion on the back of the couch where an impact point has went into the couch.

Q   All right.  Now, there were -- appeared to be more than one couch in that living room; is that right?

A   That is correct.  There was two.

Q   And before we leave this photograph, there's a number that's been placed on the couch.  Do you know who did this?

A   Yes, I did.

Q   All right.  And why did you do that?

A   This is so I could collect this item of evidence.

Q   What is the number of that?  What number did you place on that?

A   Item number 21.

Q   Can you display 342.  The couch that you have placed the number 21 on which we saw in photograph 344, do you see it in this photograph?

A   Yes.  Item number -- it would have went right here. You can kind of see a small dot.

Q   Sir, you also testified about the dining room area of the residence.  Do you see the dining room area in this photograph?

A   Yes.  It's where the kitchen table would be.

Q   Ask you to look at exhibits 345, 46 and 47.  Do you recognize those?

A   Yes, I do.

Q   What are those?

A   One of these photographs is actually from standing in the kitchen area looking out towards the front door. And the next one is of the kitchen table.  And the 347

is of the kitchen table and then looking a little bit into the kitchen area.

Q   Do all three of these photographs depict the dining room area of the house?

A   Yes.

Q   And do they accurately depict the dining room area of the house as it appeared on October 4, 2008?

A   Yes.

MR. WELCH:  We offer 345 through 47, Judge.

MR. HENRY:  No objection.

THE COURT:  Received.

BY MR. WELCH:

Q   345 has been displayed, Agent Webb.  What is the vantage point of this photograph?  Where are we standing and looking?

A   This photograph would have been taken probably just inside the kitchen looking out towards the front door.

Q   And is the front door open in this photograph?

A   Yes, it is.

Q   All right.  And 346.  What is depicted in 346?

A   This would have been one of the legs to the table where a -- right here is a bullet impact point and then right here is partial part of a bullet slug.

Q   And then 347.  What is depicted in 347?

A   Again, this is the table from the previous picture

and it was taking a picture of this leg of the table.

Q   Agent Webb, I'm now handing you what's been marked Government Exhibit 348, 349, 350, 351 and 352.  Starting with 348 will you tell us what those photographs -- this series of photographs are?

A   Yes.  These are more photographs that were taken inside the residence.

Q   And do each of them accurately depict various portions of the residence as it appeared October 4, 2008?

A   Yes, it does.

MR. WELCH:  Your Honor, we would offer 348 through 52.

MR. HENRY:  No objection.

THE COURT:  Received.

BY MR. WELCH:

Q   348 is what, sir, that's now displayed?

A   This is the northwest bedroom in the residence and this would be right around the -- when I was on the outside coming up to the northwest corner of the residence, this would be the room right inside there.

Q   Did you locate items of evidence in this bedroom?

A   Yes, we did.

Q   Then 349.  What is depicted in 349?

A   This was back out in the living room.  This would be

967

the couch that divided the living room area from the dining room area.  Down at the bottom there was an impact point on the couch.

Q   Did you mark that impact point with a note, a sticky note?

A   Yes, I did.

Q   And how did you identify that impact point?  By what number?

A   18-A.

Q   And 350 is what?

A   Again, the impact point.  And then what appeared was is that possibly one of the rounds had fragmented or came apart whenever it would have hit a piece of metal, possibly from the door jam, the bottom of the door jam, and would have split apart and hit two different parts of the couch.

Q   And so you marked -- you see again 18-A that you marked and there's the number 20 as well; is that right?

A   That is correct.

Q   And you placed both the 18-A and the 20 on the couch?

A   Yes.

Q   What is 351?

A   This is what appeared to be from the number 18 that had went through the couch and then came out the back

side of the couch and went through a boot that was placed there on the floor.

Q   All right.  So the couch that had the 18-A and the 20 in the previous photograph, is this the same couch?

A   Yes, it is.

Q   But the back side of that couch?

A   Yes, sir.

Q   And then 352.  And what is that?

A   This is the boot that was setting behind the couch.

Q   All right.  And there are two sticky notes with numbers.  Did you place those numbers there?

A   Yes, I did.

Q   Why?

A   Because they coincided with where number 18 would have went into the couch -- or, excuse me -- 18-A would have went into the couch.  18-B was coming out the back side of the couch to reference the hole coming out right there.  And then 1-C would have been, of course, it went through the front and back of the boot.  Just keep those in relation to each other.

Q   Agent Webb, I'm going to ask you to look at 353, 358 and 359.  Can you tell us what those are?

A   Yes, I can.

Q   What are 353, 358 and 359?

A   353 was the table leg on the bottom of the kitchen

table that we previously discussed.  358 and 359 are in the northwest bedroom.  There was a piece of furniture where you keep clothing in.  I believe it also had a place where you could hang clothes.  It wasn't actually a built-in closet, but it was -- there was a place to hang clothes and there was also a small table underneath it.  And these were photographs from the bedroom, 358 and 359 were.

Q   And what was the purpose of taking 358 and 359 and the closet or the clothing area?

A   To show where the rounds had impacted the front of the residence that came into that bedroom.

Q   And do 353, 358, 359 accurately depict various portions or locations within the house?

A   Yes, they do.

        MR. WELCH:  We offer 353, 358 and 359, Judge.

        MR. HENRY:  No objection.

        THE COURT:  They're received.

BY MR. WELCH:

Q   What is displayed as 353, Agent Webb?

A   This would be where it was in line with where the round had went through the couch, through the boot and then struck this table leg.

Q   And a sticky note with a number has been placed on this table leg; is that correct?

A   That is correct.

Q   And who did that?

A   I did.

Q   And what number did you place there?

A   18-D.

Q   All right.  And 358, what is 358?

A   This would be in the northwest bedroom.  This would be one of the places that appeared to be struck by a round.

Q   And can you touch the screen and show us where you believe this furniture was struck by a round?

(Witness complies with request.)

Q   Okay.  And then 359, what is --

A   This was looking in that same table.  These are the dowel rods that we placed from the outside of the residence to the inside of the residence so they're coming through the hole.

Q   Agent Webb, I'm now asking you to look at what have been marked Government Exhibit 354, 355, 357.  And then 360 through 363.  Starting with 354, can you tell the Court -- can you tell us what those are?

A   Yes.  I then began marking numbers with actual item numbers to coincide, to go back into order.  I knew I had 20 markers outside, so when I was going to start collecting evidence inside, I was going to start with

number 21. These are the items of evidence that were collected or -- appears there's also another bullet impact point as well as an item that would have been collected out of the bed.

Q   Are these photographs 354, 355, 357 and then 360 through 363 accurate depictions of either evidence that was located by yourself or locations in the house that you documented as part of this investigation?

A   Yes.

MR. WELCH:  Your Honor, we would offer 354, 55, 57 and 360 through 63.

MR. HENRY:  No objection.

THE COURT:  Received.

BY MR. WELCH:

Q   Agent Webb, what is depicted in this photograph 354?

A   This is what I consider a bullet fragment.  It was collected at site number 21.

Q   And 355.  What is that?

A   This is a bullet slug.  This would be in the living room by the entertainment center.

Q   And 357 is what?

A   Another bullet slug.

Q   And just to make sure we're all on the same page, would you actually circle the bullet slug that you're identifying with item 26?

A    Yes, sir.  (Witness indicating.)

Q    And then 360 is what?

A    This would have been found in the northwest bedroom and this was actually, like, the bed was pushed up into the northeast corner of the room up against the walls. This would be located at the southwest corner of the bed and it was another slug.

Q    And you identified that bullet slug with a number; correct?

A    Yes, I did.

Q    What number did you use?

A    This was item number 27.

Q    All right.  And 361.  First of all, what is 361?

A    This is a photograph with a unit of measurement in it to show the height of the bed and you could see where an impact point was between the box springs and the mattress.

Q    Would you please circle the impact point.

                    (Witness complies with request.)

Q    362, what is 362?

A    This would have been lifting the mattress from that impact point to see where this round would have went and came to rest right there.

Q    And 363, what is 363?

A    This would be the bullet slug in between the

mattress and the box springs. This is actually looking at the box springs. And this would be item number 28 that I collected.

Q Sir, I'm now handing you a bag which is marked 375, Government Exhibit 375. Can you examine the contents of the bag and tell us if you've seen those items.

A Yes, I have.

Q What are those?

A These would be items number 21, 22, 26, 27 and 28, which would be the slugs that were depicted in the photographs that I collected on 10-4-2008.

Q And are you certain those are the same bullet fragments or bullet slugs that you collected as part of your role in the investigation on October 4, 2008?

A Yes, I am. I entered these into evidence. I sealed them with Dodge City Police Department tape and I then initialed over the tape. And these have not been opened since I sealed them.

Q I should have further identified the exhibit. I told you the bag is marked Government Exhibit 375; correct?

A That is correct.

Q Now, each of -- how many envelopes, smaller brown envelopes, were contained inside the larger brown bag?

A There was five.

Q   If you flip those over and tell me if there are exhibit stickers on the back side of each of those envelopes?

A   Yes, there are.

Q   Starting from left and working to right, what are the exhibit numbers for each of those five?

A   375-A, 375-B, 375-C, 375-D, and 375-E.

MR. WELCH:  Your Honor, at this time we offer 375 and the contents 375-A through E.

MR. HENRY:  No objection.

THE COURT:  They're received.

BY MR. WELCH:

Q   Now, 375-A you marked with -- the number that you placed on the exhibit at the time that you recovered it, the sticky note that we saw in the photographs, did you mark those on the envelope as well?

A   The number that coincided with the sticky notes? Yes.

Q   You're holding in your left hand, item what?

A   Item number 21.

Q   On the back side, that's exhibit what?

A   Exhibit number 375-A.

Q   Can we display 354, please.  Are you now holding in your left hand the item that you marked as item 21 which you earlier identified as a bullet fragment?

A   Yes, I am.

Q   And turning to 375-B.  What number did you give that?

A   Item number 22.

Q   Can we display 355, please.  And 355, is that the photograph of the item that you now hold in your hand when you marked as exhibit -- or item number 22 and now Government Exhibit 375-B as in boy?

A   Yes.

Q   And turning then to the next one, 375-C.  What was the item number that you gave that item?

A   Item number 26.

Q   Could you display 357, please.  And is the photograph 357 which we can now see, does it depict the item you now hold in your left hand?

A   Yes.

Q   So item 26 is exhibit number what?

A   It's Exhibit 375-C.

Q   Then the next 375-D, what item number is that?

A   This would be item number 27.

Q   Can we display 360.  And depicted in the photograph is an item you earlier identified as item number 27.  Do you now hold that in your, the actual bullet in your -- bullet fragment in your left hand?

A   Yes, I do.

Q   And it is Exhibit 375-D as in David; correct?

A   That is correct.

Q   Then, finally, could you display 363 please.  And 363 is a photograph of the item you're holding in your hand now; correct?

A   Yes.

Q   And that is Government exhibit number what?

A   The Government exhibit --

Q   Yes.

A   I'm sorry.  375-E.

Q   And it's item number what?

A   It would be item number 28.

Q   Thank you.

        MR. WELCH:  Your Honor, I have no further questions of Agent Webb.

        THE COURT:  Mr. Henry.

        MR. HENRY:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. HENRY:

Q   Agent Webb, you did not open up those individual fragments, did you?

A   Up here on the stand?

Q   Yes.

A   No, sir.

Q   They're still in there?

A    Yes, sir.

Q    And maybe this is something that you could educate me on; but I wanted to ask you, there appear to be the fragments from number 354 and 357.  If we could pull those up.  Do you see that?

A    Yes, I do.

Q    And then the next one -- no, not -- 357.  The fragments.  And it could be just their condition; but they seem to be a different color than the fragments that are 355, 360 and 363.  Could you pull those three pictures up.  355, 360 and 363.

     Now, those seem to be more of a copper color rather than more of the metallic or silver type color from the previous pictures.  Is that just the level of damage done to the fragment or are we talking about different type of bullets that were found in the residence there?

A    It appeared to all be the same; however, on some of the previous pictures, you can see more of the lead, which once the bullet impacted, the brass or the jacket, I guess you could say, to the actual slug itself had peeled back and you could see lead inside.

Q    Okay.  So the -- and I'm asking that because I remember you said that there were 20 shells outside and there were what you found to be 19 impact points on the outside and maybe another one up in the gable.  You

weren't sure on that.  But what I'm trying to figure out is is that when these fragments -- did the fragments go to the lab for analysis?

A   It does not appear they've went anywhere because they haven't been opened.

Q   So they're still in the same condition as when you picked them up that night?

A   Yes, sir.

Q   And I guess what I'm wondering is, is there -- there's testing that can be done to determine whether or not a certain fragment comes from a certain bullet; is that correct?

A   I'm not for sure exactly what the lab can do.

Q   Okay.  But, I mean, if, if there was a .45 caliber bullet in the wall in that house versus what you've testified to as being a 7.62 by 39 bullet, they'd be able to make a differentiation between something like that; is that correct?

A   It's possible.

Q   Okay.  And, again, I mean, you know, from military rounds to just a simple small .22 slug, we're talking about some, you know, from small to large as far as the type of bullets; right?

A   I would agree with that.

Q   Okay.  Now, I guess what I'm trying to figure out is

were you able to determine specifically that the fragments that you were able to collect that day came from the shooting that occurred that night?

A    Yes.

Q    Okay.  Because let me ask you this, is it possible that that house had had a drive-by shooting done at a previous time?

A    Not with the level of damage and where debris would have fallen into areas where persons would walk, the debris from the impact points by the door that were breaking off wood pieces and placing them right in the walkway, it wouldn't be consistent with that.

Q    Are you saying that the damage that you saw and the impact points appeared to be fresh?

A    That is correct.

Q    Okay.  Were some of those damage points, though, not fresh?

A    Didn't appear to be.

Q    What about inside the house?

A    It didn't appear to be either.

Q    Let me ask you about something -- with respect to -- could we pull up number 358.  Now, you circled that big huge fragment in the side of that wooden dresser, I guess I'd call it.  And then the following picture, I believe, shows a couple different smaller holes.  Can we

pull up the next picture.  Do you see that?

A   Yes.

Q   I guess what I'm trying to figure out is if there's a fragment that is making that large of a hole on impact going in, why are the holes on the back side of this dresser so small?

A   Because of the angle that they would hit at.  This would actually then have had two rounds that went through that same area.  And it wasn't a straight-on impact.  It would be more at an angle or side so that round would take a while to get through that piece of material.

Q   Okay.  So you're saying, though, that two bullets went through that big hole?

A   It appeared so.

Q   Okay.  Now, did you retrieve these two bullets?

A   I couldn't tell you if we retrieved those two or not.

Q   How many fragments did you actually retrieve?

A   There was five.

Q   Five.  So out of 20 shells on the outside on the street on Oak Street, there's still 15 fragments somewhere?

A   Yes, sir.

Q   Okay.  And then not every drive-by shooting is

reported to the police, is it?

A   Is it possible they're not?  I mean, I couldn't answer that.

Q   Well, for example, somebody maybe not be home on a certain day and still get -- have bullets directed at that house.  Isn't that possible?

A   If they're not home?

Q   Yes.

A   It's possible their house could get shot and they wouldn't be home.

Q   So I guess what I'm trying to figure out is that the -- if you haven't retrieved 15 other fragments, I guess you're assuming or concluding that everything came from that night; is that correct?

A   Yes.

Q   But it's possible that fragments that you picked up may have come from earlier firings?

A   I don't agree with that, no.

Q   Okay.  Now, with respect to the boot, the picture of the boot -- remember the hole in the boot?

A   Yes.

Q   Right out of the back side of the couch.  Abel Hernandez wasn't wearing a boot that day, was he?

A   I didn't see Abel Hernandez on that day, sir.

Q   Did you happen to see the -- I want to say -- let me

look and see which number it is -- it's not been admitted yet. Do you know whether or not Mr. Hernandez was wearing a Nike Cortez shoe?

A I do not know if he was wearing a shoe or not. I know that it wouldn't be consistent with where I know that Abel Hernandez was shot, that it would be consistent with him being shot in the foot. But I believe he was shot in the leg.

Q And, in fact, the boot that you pictured with the hole in it didn't have any blood in it, did it?

A No.

Q So that was not being worn when the bullet went through it?

A No, sir. We were just showing trajectory through the house.

Q Okay. Again, to go back to all the shell casings on the street that you've identified, I think, in 306 to 325, exhibits, those were all similar shell casings; is that correct?

A Yes. Seven sixty-two by three nines.

Q And, again, the fragments that you were able to obtain, they have not been analyzed to determine whether or not they were 7.62 by 39s?

A By a laboratory?

Q Yes.

A    No.

Q    Thank you.

          MR. HENRY:  I have nothing further.

          THE COURT:  Yes, sir.

                    **REDIRECT EXAMINATION**

BY MR. WELCH:

Q    Agent Webb, did you ever find the gun that was used in this shooting?

A    No.

Q    You have to have the gun so you can compare the gun to the shell casings, don't you?

A    To the best of my knowledge, yes.

          MR. WELCH:  Nothing further, Your Honor.

          THE COURT:  Anything?

                    **RECROSS EXAMINATION**

BY MR. HENRY:

Q    A lab would be able to determine whether or not the slugs that you were able to retrieve were even from a 7.62 caliber weapon or a, say, .45 or a .40; isn't that true?  Or a 9 millimeter even?

A    I think a lab is able to put it in different what they call families, so, like a 9 millimeter, I believe, is of a .380 family and it will have numerous rounds of ammunition underneath it.

Q    Okay.  And the fragments, you just picked up

fragments because they appeared to be evidence of the shooting that night; but they have not had any further analysis, have they?

A    Not to my knowledge.

MR. HENRY:  Thank you.  Nothing further.

THE COURT:  Well, may Agent Webb be excused now or --

MR. WELCH:  I expect we'll have him back, Judge.

THE COURT:  Okay.  Permanent witness.  All right.  Next witness, please.

MR. SMITH:  United States calls Officer Leslie Lima.

### LESLIE LIMA

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

### DIRECT EXAMINATION

BY MR. SMITH:

Q    Please tell us your name.

A    Leslie Lima.

Q    What is it you do for a living?

A    I am a police officer.

Q    For whom?

A    Dodge City Police Department.

Q   And how long have you been with the Dodge City Police Department?

A   Seven years.

Q   Were you working on October 4th, 2008?

A   Yes.

Q   What were your job duties that evening?

A   Patrol; respond to calls as I was dispatched; traffic stops.

Q   Do you recall what shift you had?

A   I worked the weekend night shift.

Q   And on October 4, 2008, were you dispatched to 1110 4th Avenue in Dodge City, Kansas?

A   I responded to that address, yes.

Q   Okay.  Why did you respond?

A   There was a call for shots fired.

Q   And what happened when you responded?

A   I arrived on-scene, there were several officers already there.  I assisted with a little bit of translation.  After the victims were transported, I assisted with putting the police tape line around the residence and also helping with picking up evidence.

Q   And let's display Government Exhibit 300.  Do you recognize what Government Exhibit 300 is?

A   Yes.

Q   Look on the screen right in front of you.

A   Yeah.

Q   And what is in Government Exhibit 300?

A   That is a photograph of 1110 4th Avenue.

Q   Is that an accurate depiction of the residence as you arrived that evening?

A   Yes.

Q   So we see some police tape up there on the tree and the porch.  Is that some of the police tape that you put up?

A   Yes.

Q   Okay.  Now, you mentioned that you did some brief translation; is that correct?

A   Yes.

Q   Was that for residents of that home?

A   Yes.

Q   And you stated those persons were transported?

A   Yes.  Transported by ambulance to the hospital.

Q   Where was it that you collected evidence?

A   I collected evidence across the street from that residence at the -- I believe it was Oak intersection.

Q   If we could look at Government Exhibit 304.  And Government Exhibit 304, can we see the location of where you located evidence?

A   Yes.

Q   Just describe for the jury what we're looking at

here?

A    Okay.  This is a view of the street at the corner of 4th and Oak.  You can see the residence in the back.

Q    Go ahead and touch the screen and show us where the residence is.

A    Okay.  The residence is located right back there. (Witness indicating.) Then down here in this area you see the yellow placards which we labeled bullets -- I'm sorry -- shell casings that were located in that area.

Q    What's the purpose of having the placards there?

A    To label them and for the collection of evidence and photographing.

Q    And if we look at Government Exhibit 305, do we see another scene of the evidence that was marked?

A    Yes.

Q    Are these the shell casings?

A    Yes.

Q    And have you seen individual photographs of each one of these shell casings and placards marking their locations?

A    Yes.

Q    If we look at Government Exhibit 306, is that one of the markings and shell casings that you collected?

A    Yes.

Q    And Government Exhibit 325, is that a photograph

depicting one of the shell casings that you collected?

A    Yes.

Q    Marked as placard number what?

A    20.

Q    Did you collect these shell casings?

A    Yes, I did.

Q    And how many shell casings did you collect?

A    There were 20 shell casings collected.

Q    What process do you go through to collect those shell casings?

A    After they're labeled and photographed, use gloves to pick up the evidence.  Just standard procedure to pick up evidence with the gloves on.  After they've been photographed, and place them in bags.  Later, seal them and mark them so that way they can be placed into evidence.

MR. SMITH:  May I approach, Your Honor?

Q    I've shown you what's been marked Government 326. Do you see that marking?

A    Yes.

Q    That bag has just been opened.  Do you see the -- can you open that bag and see what the contents of that bag is?

A    Yes.  They were --

Q    Go ahead and pull out the contents of the bag.

A    All of them?

Q    Please.

                    (Witness complies with request.)

A    Okay.

Q    Just pick one up and take a look at it.

A    Very well.

Q    Do you recognize what that is?

A    Yes.

Q    And how do you recognize it?

A    I labeled these and placed the evidence tape around them after they were sealed.  These are the shell casings that were collected from 1110 4th Avenue.

Q    When you say you labeled, did you put markings on that package?

A    Yes, I did.

Q    And are there marks that identify it as being yours and that you collected that item?

A    Yes.

Q    Do you know what the content of those packages are?

A    It is the shell casings that I put in here.

Q    And did you make markings on the package to identify what number it would coincide to in the photographs?

A    Yes.

Q    Other than your markings, are there other marks placed on that package by different agencies?

A    There is.

Q    And do those markings have different numbers associated with them?

A    Yes.

Q    Please describe what that marking is so we know that -- we don't get it confused with what you marked the package?

A    Very well.  At the front of the package is sharpie marks from the date that it was collected, the victim from the offense, the case number, the number associated with the item that was picked up.  And my number as well as the description of the item.

Q    And what color is that sharpie mark?

A    Black.

Q    And would that date that you mentioned be the October 4, 2008?

A    Yes.

Q    What was the victim you associated with your markings?

A    Rumalda Hipolito.

Q    Okay.  And there are other markings on the package that have different numbers associated with them?

A    Yes.

Q    And what would that marking be?

A    There is different colored evidence tape.  The

lighter faded blue one says Dodge City Police Department.  That is the evidence tape that we use. After we collect them and label them, we seal them and put our initials over that marking.  The red tape above is, I believe, the KBI's evidence tape.  And then the yellow marking, that also comes from KBI.

Q   Now, do the KBI labels contain numbers that do not coincide with the numbers as you collected the evidence?

A   Yes.

Q   Well, please just look at the 20 items that you have in front of you and make sure that you identify each of those 20 items.

(Witness complies with request.)

A   Okay.

Q   Do you recognize each of the 20 items that were the contents of what's been marked Government Exhibit 326?

A   Yes.

Q   Do each of them contain the marking that you've described for the jury?

A   Yes.

MR. SMITH:  Your Honor, I would move to admit Government Exhibit 326.  I have not labeled them individually because there's nowhere on the package to mark them without covering up distinctive markings on those packages.

MR. HENRY: Your Honor, I won't normally object; but these have now KBI stickers on them as well. I didn't know whether or not there was going to be some supplementary evidentiary testimony regarding these packages.

MR. SMITH: There may not be; but I would submit that goes to the weight and not the admissibility of the evidence.

MR. HENRY: I'm fine with them, Your Honor.

THE COURT: I thought you would be. They're received.

MR. SMITH: Your Honor, is it acceptable to leave it as marked as collectively Government Exhibit 326?

THE COURT: Yes.

MR. SMITH: Without individually identifying them?

THE COURT: I don't think it's necessary to ID each one of them separately.

BY MR. SMITH:

Q   Thank you. After collecting those shell casings, what did you do with the shell casings?

A   After we collected them and placed them inside the bags, we took them back -- or I took them back to the police department, put the blue tape over them and put

the evidence in the evidence locker.

Q   In relation to collection or marking of evidence, did you do anything further at 1110 4th Avenue?

A   Just spoke to residents, assisted with picking up of the tape and that's it.

MR. SMITH:   Nothing further.

THE COURT:   Mr. Henry.

**CROSS EXAMINATION**

BY MR. HENRY:

Q   You used gloves that night; is that correct?

A   Yes, sir.

Q   That's so you don't contaminate any evidence that you're collecting?

A   That's correct.

Q   It appears from these exhibits in number 326, these individual packages, they were sent off to the KBI lab for analysis; is that correct?

A   Yes, sir.

Q   Are you aware of the results from the KBI?

A   No, I am not.

Q   But from the condition that those individual packages have, it does appear that the KBI did analyze them and then returned them to you?

A   Yes.  It appears that each one was opened.

Q   Okay.

MR. HENRY:  Thank you.  I have nothing

further.

MR. SMITH:  Nothing further.

THE COURT:  Thank you, ma'am.  You're excused.

Next witness, please.

MR. WELCH:  Your Honor, United States calls

Alberto Hernandez.

I beg your pardon.  Our next witness would be Brady

Schulte.

THE COURT:  Brady?

MR. WELCH:  Brady Schulte.

**BRADY SCHULTE**

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as

follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Good afternoon, sir.  How are you?

A   Not to bad.  How are you?

Q   Tell us your name please.

A   Brady Schulte.

Q   Are you familiar with Dodge City, Kansas?

A   Yes.

Q   Have you lived in or around Dodge City, Kansas -- or

did you in the year 2008?

A    I lived outside of Dodge.

Q    Outside of Dodge?

A    Yes.

Q    And that was in 2008?

A    Yes.

Q    Was there an occasion in October of 2008 where you were listening to a police scanner?

A    Yes.

Q    And what is a police scanner?

A    Just where I could hear what was going on around with the calls that went into the -- from PD to the -- I guess their dispatch.

Q    Were you friends or acquaintances with officers from the Dodge City Police Department --

A    Yes.

Q    -- prior to the date that you were listening to the scanner?

A    Yes.

Q    And on or around October 4, 2008, do you recall having your attention drawn to what would be described as a gold Cadillac?

A    From what I heard, I thought they said silver but --

Q    Okay.  Tell us what you heard?

A    It came back -- I heard that there was a -- it was on Fourth and Division.  There was a drive-by shooting.

They were looking for a silver Cadillac low-rider with I think they said five occupants, but I'm not for sure on the occupants for sure.

Q   And after hearing that information on the scanner -- well, tell us what area of Dodge City you were at?

A   I was actually at my house. I was heading in -- I was heading -- just leaving my house heading into town and I was going to pass Matt Down Lane right on the very west side of Dodge.

Q   Slow down just a little bit. You were going past what?

A   Matt Down Lane.

Q   Matt Down Lane. That's the name of a road?

A   A street, yes.

Q   Going into Dodge City?

A   Yes.

Q   And as you were driving down Matt Down Lane, do you notice anything unusual?

A   I just seen -- when I heard the Cadillac, I seen looked like a Cadillac go across the road in front of me. I was actually on Highway 50 and I was driving Highway 50 past Matt Down Lane coming to that intersection when I seen it, when I seen the Cadillac going across the road.

Q   Okay. You're driving down Highway 50. Was the

Cadillac driving -- what road was the Cadillac driving?

A   The Cadillac was on Matt Down Lane.

Q   After you saw the Cadillac -- did it go through the intersection?

A   It was already through the intersection.  It was across --

Q   Did you observe the Cadillac go anywhere else?

A   I just turned and I was following it.  And followed it down the street until it got to, I think, Park Street; and I followed it down Park Street.  And I don't know if it changes on Park Street to a different name. I think it might change to Kettle Way I think is the name of it.

Q   Okay.  So how far do you think that you followed that vehicle?

A   Probably close to a mile and a half, two miles probably.

Q   And you stated -- I'm sorry -- is Park Street a different street than Matt Down Lane?

A   Yes.  Matt Down Lane comes up to the intersection of Matt Down and Park Street.  It changes to a dirt road. Matt Down Road changes into -- you can turn left or right onto Park Street.

Q   Did you follow the vehicle onto Park Street?

A   Yes.

Q   And you believe that Park Street then turns into or changes names to Kettle Way?

A   I think the road curves around and I think it -- I think the road that it curves around to changes to Kettle Way, yes, sir.

Q   And that's kettle, K-E-T-T-L-E, as a cooking kettle?

A   Yes.  I think that's the name of the street anyway.

Q   After the vehicle turned onto Kettle Way, did you observe where the vehicle went?

A   Yes.

Q   And where did it go?

A   It went down to a house on the righthand side of the road, pulled into looked like a red barn.

Q   And is that the righthand side of Kettle Way?

A   Yes.  It would be on the north side of the street.

Q   North side.  And pulled into a red barn?

A   Yes.  Into or around a red barn.

Q   Did you observe anything else in relation to that vehicle?

A   Nope.

Q   Did you observe any occupants of that vehicle?

A   I could just tell there was people in there; but I couldn't see who anybody was or see any faces.  I was behind it the whole time.

Q   Were you able to determine how many people were in

the vehicle?

A   No, sir.

Q   After you made the observations of that vehicle, did you inform anybody of that information?

A   I called Officer Nau.

Q   Is that Officer Nau?

A   Yes.

Q   And that's spelled N-A-U; is that correct?

A   N-A-U.

Q   And after calling Officer Nau, did you relay that information to Officer Nau?

A   Yes.

Q   Did you have any further involvement in this case?

A   No, sir.

Q   Did you see that vehicle at any subsequent time?

A   Like after?

Q   After that, did you see the vehicle at any time?

A   No.  Nope.

Q   Were you ever able to determine the number of people that were in the vehicle?

A   No, sir.

Q   Did you see people exiting the vehicle when they were in or around the red barn?

A   I never did see anybody get out, no.  After it pulled in there, I just, I just drove on by.

Q   Do you recall if you ever stated to Officer Nau that you saw five people inside of the gold Cadillac?

A   Not that I can remember.  Not that I recall.

MR. SMITH:  Nothing further.

THE COURT:  Mr. Henry.

**CROSS EXAMINATION**

BY MR. HENRY:

Q   Mr. Schulte, this happened, well, about almost exactly five years ago; is that correct?

A   Yes.

Q   And would you agree that maybe your memory or the memory of Officer Nau who wrote a report that night might be a little bit better than yours is today?

A   Yes.

Q   Okay.  The -- when you -- so you listen to the scanner -- and you were going into town anyway; is that right?

A   Yes.

Q   But you decided to follow what you thought may have been the vehicle that was listed on the scanner; is that correct?

A   Yes, sir.

Q   And, in fact, you followed it all the way down what you think is Kettle Way to a point where it pulls in and you say you see it go into a barn; is that correct?

A   I don't know for sure if they pulled into the barn. I thought from what I remember they went around the back of the barn. So I was assuming they were pulling in I guess.

Q   So you lost sight of it somewhere back around where the barn was at?

A   Yes.

Q   Did you actually pull into that driveway?

A   No, sir.

Q   Okay. And the -- and so did you just go down the road, turn around and come back in because you were planning on going into town?

A   Yeah. We went down to the end of the road and turned around and went back on into town.

Q   Now, I know the Government asked you this, but I'm going to hand you the first page of officer Nau's report. I'm marking it as Defendant Exhibit R-FF. And I believe the part of Officer Nau's report that appeared from that morning has just that last paragraph deals with, I think, your call to him. Would you just review that please.

(Witness complies with request.)

Q   Having reviewed that, does that in any way refresh your memory if you told Officer Nau how many subjects were in the vehicle?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   No, not for sure.  I just don't remember ever seeing anybody in -- I knew there was people in it, but I don't remember seeing how many or how many people got out.

Q   Well, in fact, you lost sight of the vehicle when it went behind the barn; is that correct?

A   Yes.

Q   Did you see the vehicle come back out from around the barn?

A   I don't remember if -- it never came back out towards the -- to the street.  I know that.  I don't remember if it -- I don't remember seeing it after it went around there.  But, like I said, I don't remember for sure, it's been long enough ago.

Q   Okay.  Now, with respect to the time when you first actually came into contact with it out on the street, you talked about it was on Matt Down Lane and you were on Highway 50.  Is that right?

A   Yes.

Q   And did it actually turn in front of you?  In front of your lights?

A   No.  It was already past the railroad tracks.  It was a little ways down.  By looking at the taillights, I could tell it looked like a Cadillac.

Q   Okay.  But as far as the -- you then followed it for at least a mile and a half, two miles, and you had your

lights on, then, on the back end of the Cadillac; is that correct?

A   Yes.

Q   And were you able to count heads when you were following it?

A   No.

Q   Do you know where Officer Nau would have gotten the five --

A   It came -- I know when it came across the scanner, they thought there was five male occupants, so I guess I could have told him there might be five in there; but I don't remember saying that for sure, so I can't be positive I said that.

Q   Okay.  And you'd agree because of the five years that have passed, maybe what was recorded back then by Officer Nau would be more reliable than your testimony here today on the number?

A   Yes, probably.

        MR. HENRY:  Thank you.  I have nothing further.

        THE COURT:  Yes, sir.  Anything further?

        MR. SMITH:  Nothing further.

        THE COURT:  Thank you, Mr. Schulte.  You're excused.  Next witness.

        MR. WELCH:  Your Honor, United States calls

James Nau.

## JAMES NAU

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

## DIRECT EXAMINATION

BY MR. WELCH:

Q   Sir, will you tell us your name.

A   James Nau.

Q   Mr. Nau, are you employed?

A   Yes.

Q   How are you employed?

A   I work for the Kansas Department of Revenue, the Alcohol Beverage Control Division.

Q   How long have you worked for the State of Kansas?

A   A little over a year.

Q   Prior to your employment -- well, before I go there -- what do you do for the State of Kansas?

A   I'm an alcohol agent, so enforce alcohol laws.

Q   You're a law enforcement officer?

A   Yes.

Q   Prior to your employment with the State of Kansas, how were you employed?

A   I was employed by the Dodge City Police Department.

Q   And how long were you with the Dodge City Police

Department?

A    For about six and a half years.

Q    Where you employed with the Dodge City Police Department in October of 2008?

A    Yes, I was.

Q    Specifically, the date of October 4, 2008, were you working that day or that night?

A    Yes.

Q    Did you become involved in an investigation of a shooting that took place on 4th Avenue in Dodge City, Kansas?

A    Yes, I did.

Q    What caused you to become involved in that investigation?

A    When we heard the initial call come out, I believe it was Corporal Mooradian at the time who was our street supervisor, asked us to come to that area.  They thought at that point it was a gang-related shooting.  And me and my partner were on the gang unit at that time so we responded to that area.

Q    And in response to Corporal Mooradian's direction, you went to that address; is that right?

A    Yes.

Q    What address did you go to?

A    We went to the area of 1110 4th.  We were in that

general area, as the car had -- the suspect car had just left that area.  So we went towards that area kind of looking around for it.

Q   And at some point that evening were you actually physically at the location of 1110 4th Avenue?

A   I was not, no.

Q   What time did you get a call from Corporal Mooradian to help in the investigation?

A   If I can look at my notes --

Q   Please do.

A   -- I could give you a better --

It's going to be a little bit after 12:30 a.m.

Q   On the 4th of October?

A   Yes.

Q   All right.  And what was your assignment -- if you didn't go to the house, what did you do as part of the investigation?

A   We were notified of the vehicle description which first came out as a possibly silver car.  Then we were later notified exactly what kind of car it was, that being a gold Cadillac with shiny rims.  Me and my partner both had a pretty good idea whose car that was, so we started looking at different locations for that vehicle.

Q   Let me stop you there.  Who was your partner?

A    Bob Stein.

Q    And you and Officer Stein were assigned to gang investigations; is that correct?

A    Yes.

Q    What exactly did you do as a gang investigator in Dodge City in 2008?

A    We would basically be proactive, interact with our gang members, do surveillance on 'em.  Any time there was a gang-related call or a traffic stop involving a gang member, we responded to that to get descriptions of vehicles, people they were with.

Q    Now, on this morning of October 4, 2008, when you received a call from Corporal Mooradian -- you said you know there's a shooting; correct?

A    Correct.

Q    And there's a vehicle initially identified as being a suspect vehicle is what you referred to it as; is that right?

A    That is correct.

Q    The initial call, you received this over the radio?

A    Yes.

Q    What was the initial description of the vehicle that you were supposed to be looking for?

A    The first description was possibly, what we were told, a silver Cadillac.

Q   And later was the description of the vehicle that you were supposed to be looking for changed in any way?

A   Yes.  Just a few -- not even maybe a minute later, another officer who was speaking to a witness had stated it was a gold Cadillac with shiny rims lower to the ground.

Q   And had you seen a car that matched that description prior to October 4, 2008?

A   Yes.

Q   All right.  Had you seen a person in Dodge City that drove a car that matched that description?

A   Yes.

Q   Who was that person?

A   Gonzalo Ramirez.

Q   Do you see Gonzalo Ramirez in the courtroom today?

A   Yes, I do.

Q   Would you please point to him and describe what he is wearing?

A   Sitting back over at the corner table in a blue button-up with glasses.

            MR. WELCH:  Your Honor, I'd ask the record reflect Agent Nau has identified the Defendant Gonzalo Ramirez.

            THE COURT:  It will.

BY MR. WELCH:

Q   You said in response to the second description of the vehicle you went and looked at different locations to see if you could find that car; correct?

A   That's correct.

Q   Where did you go look for that car?

A   We basically went to any known Norteno gang member's residence where we knew Ramirez may frequent.

Q   Did you go to the residence of Gonzalo Ramirez?

A   We went past it, yes.

Q   Did you see the vehicle at the residence at that time when you drove by?

A   No, we did not.

Q   Can you tell us approximately what time it was that you would have driven by the residence of Gonzalo Ramirez and did not see the car?

A   I don't have a time.

Q   Can you give us an estimate of how long after you were assigned to assist in this investigation that you would have done that?

A   Maybe within five to ten minutes.

Q   After you drove by the residence of Gonzalo Ramirez, you said you looked at other locations of Norteno gang members?

A   We started to drive into areas of other Norteno gang

members; and while doing that, me and my partner were trying to think of places that the car may go.

Q   Did you receive information that lead you in a different direction?

A   Later on.  Me and my partner did remember this car -- I don't remember exactly without looking -- about two weeks before this incident, we had followed that same car out to an address out on Kettle Way.

Q   And the address on Kettle Way, was that an address familiar to you?

A   Yes.

Q   And why?

A   It was a known DV or Norteno hang out.

Q   And was there a person, one or more DV gang members, that lived at that residence?

A   Yes.

Q   Who lived at that residence that had been identified as a Diablos Viejos gang member?

A   Erik Sanchez and Angel Cerda; and then later on, their younger brother.

Q   And are Angel Cerda and Erik Sanchez related?

A   Yes.

Q   And are they both documented as DV gang members?

A   Yes.

Q   You said approximately two weeks prior to October 4,

2008 you had been at the location of Angel Cerda, Erik Sanchez' house on Kettle Way near Dodge City; correct?

A    We followed this -- we followed Gonzalo Ramirez' Cadillac out to that residence, yes.

Q    Two weeks before this happened, what was the purpose of following Gonzalo Ramirez' vehicle to the address on Kettle Way?

A    We were working a gang task force undercover.  So, basically, on our gang task force, we went out and tried to find out where gang members were at, what they were doing, kind of more surveillance; but it was more undercover in this capacity.

Q    All right.  Did you see the brown Cadillac that you associated with Gonzalo Ramirez two weeks prior to October 4 in or around the Kettle Way residence?

A    Yeah.  We followed it all the way as it pulled into the driveway.

Q    Could you tell who was driving the car two weeks earlier?

A    We couldn't tell.  I mean, with the people in the car and the red clothing, we knew we had Norteno gang members.  We just didn't know exactly who.

Q    And two weeks prior, could you tell how many people were inside the brown Cadillac?

A    I don't recall if I have anything.  I don't

remember.

Q   Let's turn then to the date of October 4, 2008, when you were now looking for a gold or brown Cadillac.  At some point do you and your partner -- is your partner riding in the same vehicle with you?

A   Yes.

Q   At some point did you and your partner go to this residence on Kettle Way?

A   We initially were getting other units.  We had an idea it may have headed out there, so we were trying to get more people gathered up to go with us.  As we were doing that, on our way to meet with other officers and Sheriff's deputy is when I received the phone call.

Q   Received a phone call from who?

A   From Brady Schulte.

Q   Who is Brady Schulte?

A   He's a kid I grew up with.  I went to school with his brother, so I've known him about all my life.

Q   Did Mr. Schulte provide information to you?

A   Yes, he did.

Q   What information did Mr. Schulte provide to you?

A   I believe at the time he lived out in that area of Kettle Way and was -- had a police scanner with him and heard the description of the vehicle and saw this same gold Cadillac pull into 10770 Kettle Way.

Q   10770 Kettle Way.  Is that the same house that you had been at two weeks earlier?

A   Yes.

Q   The same house you described as being the residence of both Angel Cerda and Erik Sanchez?

A   Yes.

Q   All right.  How far approximately is 10770 Kettle Way from 1110 4th Avenue in Dodge City?

A   Several miles.

Q   When Mr. Schulte -- what additional information did Mr. Schulte give you with the phone call or during phone call?

A   He stated -- he didn't know the exact address, but he gave a good description of where the vehicle pulled in, what was in the driveway that they pulled into, around the red barn.  Appeared that they pulled into the barn from -- be the north side of the barn.  And stated there was approximately five people in the car.

Q   In response to that phone call, what did you do?

A   I had told my partner Officer Stein what I was getting as I was getting the information and that's when we were meeting at a predetermined location with other officers already, so the hunch we had where that car might be was pretty accurate with what we were getting.

Q   At some point did you meet with other law

enforcement officers?

A    Yes.

Q    Did you go to the house located 10770 Kettle Way, Dodge City, Kansas?

A    Yes.

Q    When you arrived at that location, were you still with your partner Officer Stein?

A    Yes.

Q    Were other Dodge City police officers with you when you arrived at that location?

A    Yes.

Q    Were Ford County Sheriff's deputies with you as well?

A    Yes.

Q    Were there any other law enforcement officers?

A    I believe we had Kansas Highway Patrol as well, a couple of them.

Q    Do you remember -- if you need to look at your report, Officer Nau, please do so -- the approximate time that you arrived at 10770 Kettle Way?

A    It would have been about 1:00 in the morning.

Q    And when you arrived at that residence, did you find the gold Cadillac you were looking for?

A    Yes, we did.

            MR. WELCH:  Your Honor, may I approach?

THE COURT: Yes.

BY MR. WELCH:

Q   Sir, please, if you would, take a minute and look at what have been marked Government Exhibit 370 through 373. And after you've looked at all four of those photographs, tell me whether or not you recognize those photographs.

A   Yes.

Q   Starting with 370, what is that?

A   That is a picture of the front end of the gold Cadillac inside the barn facing south.

Q   And 371?

A   371 is a closer up shot with the North Town tag on the front of the gold Cadillac.

Q   All right. Exhibits 370 and 371 accurately depict the location of the gold Cadillac where it was found by law enforcement on October 4, 2008?

A   Yes.

MR. WELCH: Your Honor, we would offer 370 and 371.

MR. HENRY: No objection, Your Honor.

THE COURT: They're received.

BY MR. WELCH:

Q   372 and 373 are what?

A   These are pictures of the gold Cadillac as -- after

it was secured and taken back to the Dodge City Police Department in our sally port.

Q   And did you see the gold Cadillac back at the Dodge City Police Department after it was located on Kettle Way?

A   Yes.

Q   And do exhibits 372 and 373 accurately depict that vehicle as it appeared after being seized by the Dodge City Police Department?

A   Yes.

MR. WELCH:  Your Honor, we offer 372 and 373.

MR. HENRY:  No objection.

THE COURT:  They're received.

BY MR. WELCH:

Q   Could we display 370 please.  Officer Nau, we have displayed on the screen Government Exhibit 370.  Can you tell us the location of this vehicle in this photograph?

A   This is inside the red barn at 10770 Kettle Way.

Q   All right.  Is there a barn located at the residence that you've described earlier as being the residence of Angel Cerda and Erik Sanchez?

A   Yes.

Q   And this vehicle is parked inside the barn on that property?

A   Yes.

Q   And then 371, what is that?

A   That's a close-up shot of the Cadillac in the barn with the North Town tag on the front.

Q   The North Town license plate on the front of that car, does that have any significance to you as a gang officer in Dodge City?

A   Yes.

Q   What?

A   To me, it would resemble either a north side or a Norteno gang member.

Q   And then 372, 372 is what?

A   This is the Cadillac secured in our sally port at the Dodge City Police Department.

Q   And then 373, what is that?

A   That's the rear end of the vehicle tag displayed on it as it's parked in our sally port.

Q   Now, Officer Nau, when you arrived at the residence on Kettle Way and found the gold or brown Cadillac in the barn, did you find Gonzalo Ramirez?

A   No.

Q   Did you find a man by the name of Juan Torres?

A   No.

Q   Did you find anyone who admitted to you that they had been in that Cadillac that evening or that morning?

A   No, I did not.

MR. WELCH:  Have no further questions of Agent Nau.

THE COURT:  Mr. Henry.

MR. HENRY:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. HENRY:

Q   You had mentioned in your -- you looked at your report to try to determine when you actually got out to the Kettle Way address; is that right?

A   That is correct.

Q   And you actually were dispatched at 12:29.  That's shown in your report; is that right?

A   Yes.

Q   I didn't see the time when you actually got out to Kettle Way.  Was it in there?

A   It's on the CAD sheet.

Q   It's on a different sheet?

A   It's not in my report.  It's on the CAD from the whole night from that call.

Q   Okay.  If we could pull up numbers 370 and 371.  I notice there's a time down in the -- stamped on that picture in the lower righthand corner.  That actually is an incorrect time; is that correct?

A   Yes.

Q   Did you say yes?

A    Yeah.  I'm sorry.

Q    I didn't know if the jury heard.  The, in fact, I think that there had been some other pictures that were taken that night that reflected even that the camera -- the date was even a year off.  Do you happen to remember any of that?

A    I haven't seen any other photos; but I know that's been pretty common with some of our equipment.

Q    If the camera is not reset, it's just gonna go off of whenever the batteries get changed or something to that effect?

A    Correct.

Q    Okay.  So the 12:41, just wanted to make sure everybody knew that was not when you actually took that photograph.

A    That's correct.

Q    In fact, you got there at 1:00; but you're not taking the photograph until much later?

A    That is correct.

Q    Because you're looking for suspects; right?

A    Correct.

Q    And the -- and you remember -- I mean, you did your report that same -- later that morning, didn't you?

A    I could give you --

Q    Maybe not.  Maybe a day later or so?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    It was done before I left.

Q    What date would that have been?

A    It was on the 4th still.

Q    Okay.  So it would have been that same shift?

A    Yes.

Q    And the -- and so what you said in that last paragraph on Page 1 of your report regarding your discussions with Brady Schulte, that's what you remembered that morning, later that day, that he had told you that he had seen five people in that vehicle; is that right?  Last paragraph, Page 1.

A    Yeah.  He stated five people inside the gold Cadillac.

Q    In fact, that was consistent with the information that was coming out of the scene at 1110 4th Avenue; is that right?

A    As far as how many people were in the car?

Q    Yes.

A    I don't recall ever getting how many people were in the car.  Just a description of the car.

Q    Okay.  You don't remember Corporal Mooradian giving you the number?

A    No, I don't have anything in my report.  Just the description of the car.

Q    Okay.  Your partner, Officer Stein, probably also

made a report that evening?

A   Yes, he should have, yes.

Q   Okay.   The -- with respect to the -- remembering
seeing the car out at that address two weeks earlier; is
that correct?

A   That is correct.

Q   Okay.   Now, there had been a -- you had testified
Angel Cerda and Erik Sanchez live out at that address;
is that correct?

A   Correct.

Q   And even the -- and Angel Cerda is the older brother
to Erik Sanchez; is that correct?

A   Correct.

Q   Erik Sanchez is known as Savage; is that right?

A   That's correct.

Q   And Angel Cerda is known as Shrek?

A   Correct.

Q   And then there's even a younger son or brother that
is Alex; is that right?

A   That's correct.

Q   Alex Sanchez.   Erik's little brother?

A   Yes.

Q   And did you actually speak to him that night?

A   I don't remember if I spoke with him.   I remember --
let me look real quick.   I don't believe I spoke with

him.  I think maybe my partner might have.

Q   Okay.  Do you remember him giving any information regarding Savage or Erik Sanchez?

A   Remember who?

Q   Alex.  There was a, a, I think juvenile Hispanic male that talked to the police early that morning.

A   I don't recall.  I can't tell you who talked to him.

Q   I'll move on.  Now, with respect to the seeing the vehicle out at Angel Cerda's place or Savage's place two weeks earlier, Angel Cerda had been involved in a police chase recently, hadn't he?

A   At that same time or --

Q   Well, within the week or two before?

A   I know he was involved in a police chase.  I don't know the exact date.

Q   Okay.  But it was -- you did not mention it in your report.  I'm not seeing it in there.

A   If it's the same police chase I recall, I was on vacation out-of-state during that police chase so --

Q   I'm thinking of a different person's report.  Sorry about that.  But I guess what I wanted to make sure is that your witnessing two weeks earlier that vehicle at Angel Cerda and Savage's house, that was not the police chase with Angel Cerda?

A   That is correct.

Q   So we're talking two different incidents there.  And in fact, the time that you were out there earlier was even in an undercover role you said?

A   Yes.

Q   Now, Gonzalo Ramirez, my client, doesn't live out on Kettle Way, does he?

A   No, he does not.

Q   He lives at I think 140 --

A   1409.

Q   1409 Avenue H?

A   Yes.

Q   The -- did you interview any witnesses out at the scene that night?

A   No, I did not.

MR. HENRY:  I have nothing further, Your Honor.  Thank you.

THE COURT:  Anything further of Mr. Nau?

MR. WELCH:  No, Your Honor.

THE COURT:  Thank you.  You're excused.  We'll take our evening recess, Ladies and Gentlemen.  I'll see you tomorrow at 9:00.  Please remember and heed the admonition.

(Recessed for the day at 4:30 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 9:05 a.m. October 10, 2013, the following proceedings continued.)

THE COURT:  Rachael said that some of you were inquiring about the shut down, or whatever they're calling it, and whether that will effect this trial. And the answer is no, it won't.  We get something about every hour, you know, from Washington, we're here from Washington, we're here to help, you know, that kind of thing.  But this says in all caps, I can now report that our fee balances are sufficient to maintain judiciary operations through October 17, which is a week.  And I don't know whether the case will be over in a week, but that's not a matter of concern.  But the real question, of course, is if this continues, whether we'll have to curtail other trials.  But -- because you all are entitled to be paid.  But you don't need to worry about it.  But I wanted to answer your question in case anybody was really concerned.

All right.  Next witness, please.

MR. WELCH:  Your Honor, United States calls Alberto Hernandez.

**ALBERTO HERNANDEZ**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as

follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, please tell us your name.

A   Alberto Hernandez.

Q   Make sure you stay close to that microphone if you could.  Mr. Hernandez, where do you live?

A   Dodge City.

Q   How long have you lived in Dodge City?

A   About 18, 19 years.

Q   I'm having trouble hearing you.

A   18 to 19 years.

Q   Thank you.  Please stay close to the microphone if you would.  And how old are you, sir?

A   25.

Q   In June -- excuse me, October of 2008, where in Dodge City did you live?

A   On 4th Avenue.

Q   Let me show you what has been admitted as Government Exhibit 300.  Do you recognize that, sir?

A   Yeah.  That's --

Q   Go ahead.

A   That's the house I used to live in.

Q   That is what?

A   The house that I used to live in.

Q   On October 4, 2008, were you living in that house?

A   Yes.

Q   All right.  Who lived at that house with you, sir?

A   Me, my brother, my other brother and my mother.

Q   Okay.  Let's go through -- yourself.  First brother, what's his name?

A   Myself, my brother Abel, and my brother Santiago.

Q   And your mother's name is what?

A   Roberta.

Q   And you have a brother named Santiago and a brother named Abel; correct?

A   Yes.

Q   Abel Hernandez and Santiago Hernandez?

A   Yes.

Q   Just the four of you that lived in this house on October 4, 2008?

A   Yeah.

Q   Do you recall events that took place in the late October 7 and/or early morning hours of October 4, 2008? (sic)

A   Yes.

Q   Tell the jury what you recall.  Did you have a confrontation that late evening or early morning?

A   Me and couple of cousins of mine, friends, we were there socializing in the back of the house.

Q   You were doing what in the back of the house?

A   Socializing.

Q   Okay.  What happened?

A   We were there, then from the left side of the house we heard a white car, I remember it was a white car, came in and asked us if we claimed anything or road claimed.

THE COURT:  I'm having real trouble understanding what he's saying.  I don't know about the jurors but --

Q   Let me ask you to slow down and we'll cover the facts.

A   Okay.

Q   Let me ask you to look at Government Exhibit 302 and 303.  Do you recognize 302 and 303?

A   Yes.

Q   Then start with Exhibit 302.  What is 302?

A   It's the left side of the house.

Q   And do you see the approximate location of where you and your friends were gathered?

A   Yes.

Q   All right.  Did we display 302.  Now, Mr. Hernandez, you can actually touch the screen in front of you, and if you see the approximate location of where you were gathered with your cousins and your friends, just tap it

if you will.

A    We were beyond this block thing right here.

(Witness indicates.)

Q    And do you recall, Mr. Hernandez, how many people were with you -- well, let me ask you this.  About what time was it that this confrontation began?

A    I would say it was after 10.

Q    10:00 in the evening?

A    After 10.

Q    All right.  And why don't you back up from the microphone just a little.  Perfect.  Thank you.  All right.  And how many of you, you and your friends, were gathered in this area?

A    About seven or eight.

Q    And you said you were socializing.  What do you mean by socializing?

A    We were havin' some beers.

Q    Okay.  Then look at 303.  And can we display 303 please.  Do you recognize the area which is depicted in Government Exhibit 303?

A    Yes, I do.

Q    What is that?

A    This is where we were at.

Q    Where you were located?

A    I was -- actually, I was down in this area down

here.

Q    And all of the people who were with you, were they all men?

A    Yes.

Q    All the men gathered in approximately the same location as you were?

A    Yes.

Q    All right.  Now, you said you had a confrontation with someone or people in a car; is that right?

A    That's right.

Q    All right.  Let me show you what has been admitted as Government Exhibit 374, which is an aerial diagram. Do you see your house on this diagram?

A    Yes.

Q    Okay.  Can you, again, touch the screen and show us where your house was located?

A    Right here.  (Witness indicating.)

Q    And then the vehicle that you were talking about, where did the vehicle approach your house?  What direction did it come from?

A    It came that way.  (Witness indicating.)

Q    Then at what point did the confrontation begin? What started the confrontation?

A    We were just there minding our own business and as the car comes up -- and I don't remember exactly how

many, but they asked us if we claimed anything.

Q   All right.  Let me stop you there.  Now, you said this car came up.  All right.  When you said this car came up, you're talking about the vehicle that you made the line on the left side, that vehicle?

A   Yes.

Q   At some point did the vehicle come to a stop?

A   Yes.

Q   And can you see on the diagram the approximate location where the car came to a stop?

A   Just exactly where we were at.  (Witness indicates.)

Q   And where were you located on the diagram, sir?

A   We were right here.

Q   All right.  And so the car came to a stop on the street?

A   Yes.

Q   Approximately parallel to you?

A   Yes.

Q   All right.  And do you recall how many people were in the car?

A   Two or three.

Q   And do you remember whether or not they were men or women or could you tell?

A   From what I saw, they were men.

Q   And what did -- when did you first notice this car?

A   Well, we noticed right away because they, they told us what we claimed loud.

Q   I didn't understand what you just said.

A   They told us what we claim, if we claimed anything.

Q   The people -- were the people in the car, they were men?

A   Yes.

Q   The men in the car, they said -- they asked you what you claimed?

A   Yes.

Q   What did that mean to you?

A   If we were part of a gang or -- basically, if we were part of a gang.

Q   All right.  And how did you know what that meant when they said what do you claim?  Why did you understand that?

A   It's been going on in Dodge City so I knew.

Q   And were you, you yourself, were you a member of a gang?

A   No.

Q   To your knowledge, were any of your cousins or any of the people gathered with you outside the house, were they members of a gang?

A   No.

Q   As far as you know?

A   No.

Q   And so when the person who asked you what do you claim, could you tell, was that the driver of the car or was he somewhere else in the car?

A   I don't know exactly who that was.

Q   All right.  Did anyone get out of the car?

A   No.

Q   All right.  And so did you see -- the person who is asking what do you claim, where in the car was that person located?

A   I really don't -- I don't know if it was the driver or the passenger.

Q   Okay.  Someone inside the car but you're not sure who --

A   Someone inside the car.

Q   Let me finish the question before you answer.  Okay? So are you certain that someone inside the car asked you and the others gathered what do you claim?

A   Yes.

Q   But you don't know who?

A   No.

Q   Did you recognize the people in the car?

A   No.

Q   Was there anything about the people in the car that told you or indicated to you that they might be gang

members?

A   I saw they were wearing red.  Exactly, I don't know; but I saw they were wearing red.

Q   You saw how many people in the car wearing red?

A   I saw at least one.

Q   And in addition to wearing red, their comment or question to you what do you claim, does that indicate to you that they themselves may be affiliated with a gang?

A   Yes.

Q   And what type of red clothing did you see them -- or, was there red clothing that you saw?

A   It was red.

Q   Did you see both of the people wearing red?

A   No, I only saw one.

Q   Which one?  Do you recall?

A   No.

Q   After these comments were made, did you respond to those questions what do you claim?

A   No.

Q   Do you recall any of your friends responding to that question?

A   I do remember, we were talking among us, you know --

Q   Hang on a second.  You were talking what?

A   Among us.

Q   Yourselves?

A   The people that were there, you know, what's their problem.  We're just here minding our own business and they pulled up, you know.  We had no idea why they came or anything so --

Q   All right.  Prior to October 4, 2008, do you recall seeing this car before?

A   No.

Q   And prior to that date, did you, as far as you could tell, the men inside the car that you could see, did you even know who they were?

A   No.

Q   Had you personally had any trouble with -- did you know what the red gang in Dodge City was?

A   Yes.

Q   What was the red gang in Dodge City?

A   Well, it was a gang -- it was Surenos and Nortenos. I saw most of this in middle school so that's how I know.

Q   So you had encountered gang activity while attending school in Dodge City?

A   Yes.

Q   All right.  Now, the red that you saw with one or more of these guys inside the car, did that associate in your mind these people with one of the gangs in Dodge City?

A    Yes.

Q    Which one?

A    The Nortenos.

Q    In addition then to seeing the red clothing and the comment made by one or more of the people inside the car about what do you claim, did the people in the car say anything else to you that was in your opinion gang-related?

A    No.  That's all I can remember.

Q    Do you recall the word Norte being used at any point in time?

A    Yes.

Q    All right.  And who used the word Norte?

A    The people in the car.

Q    And in what context?  What did they say?  How was that word used to you?

A    Puro norte.

Q    I need you to slow down on that one again.

A    Okay.

Q    Say both those words together.

A    Puro Norte.

Q    What does that mean?

A    Pure north.

Q    Do you speak Spanish?

A    Yes.

Q   And in addition to -- puro Norte you said means pure north; is that right?

A   Yes.

Q   In addition to the meaning in Spanish, does the phrase puro Norte have any other gang-related meaning that you know of?

A   No.  That's just what I've heard them saying whenever they claim that.

Q   I need your help here.  You said that's what they say when they claim that.  Who is they?

A   Whenever their own teams, that's what they say to the other people, that's what they're claiming.

Q   Puro Norte is a phrase that you associate with Nortenos in Dodge City, Kansas?

A   Yes.

Q   And you've heard that phrase -- had you heard that phrase prior to October 4, 2008?

A   Yes, I had heard it before.

Q   All right.  So when you heard that phrase from someone inside the car, did that confirm your suspicions that these were people who were at least claiming to be members of a gang?

A   Yes.

Q   After you heard puro Norte, what happened, sir?

A   I don't remember who, but one of my friends or

cousins threw a beer because, my belief, they got mad, you know.  I mean, what's their problem.

Q   Okay.  So were you wanting to have a confrontation or physical altercation with the people in this car?

A   No.

Q   Had you invited any trouble with the people in this car?

A   No.

Q   Did you have any idea why this car stopped in the first place?

A   No.

Q   Initially were you confused as to what they were saying or what this was all about?

A   I was confused why they pulled up.

Q   Earlier you told us you had been drinking beer; correct?

A   Yes.

Q   Do you recall, I mean, were you intoxicated to such a degree you don't have a memory of that evening?

A   I have a perfect memory of what happened that night.

Q   All right.  You said that at some point somebody in your crowd gathered outside threw a beer bottle at this car; is that correct?

A   Yes.

Q   Could you see where the beer bottle landed?

A    No.  I just heard it break.

Q    Did you throw anything at the car?

A    No.

Q    How many beer bottles do you recall being thrown at the car?

A    I just remember one.

Q    And do you know whether the beer bottle actually hit the car or not?

A    I don't.

Q    You didn't actually see the bottle being thrown?

A    No.  I just heard it break.

Q    All right.  So was there any other response from your group -- I should ask you this.  When the people in the car are saying what do you claim, puro Norte, are there any -- is there any verbal response from any of the members of your group back to the car?  Are they answering the people in the car?

A    No.

Q    But at some point they answer by throwing a beer bottle at the car?

A    Yes.

Q    Now, after the beer bottle was thrown, what happened with the car?

A    They left.

Q    Let me see 304, I think it is.  No, 374.  All right.

Now, Mr. Hernandez, you've told us already that the car initially stopped approximately in that location; is that correct?

A   Yes.

Q   All right.  After the beer bottle was thrown, where did the car go?  What direction?

A   It kept on going down this street.  (Witness indicates.)

Q   And did you see it turn at any point?

A   No.

Q   Did you, as far as you knew, did you expect to see that car again that night?

A   Uhm, no.

Q   Did you think you were done, you had no further altercation with the people in that car?

A   Yes.

Q   All right.  After the car left the scene, was there another incident that took place at your house?

A   Yes.

Q   All right.  What was that?

A   After a while, after that happened, we were just there talkin' about, you know, why they came up and -- amongst us.  Then all the sudden, we heard gunshots.

Q   How long after the car -- I should have asked you this.  How long did the car stop and how long was this

back and forth with them saying things to you in your group and then the beer bottle being thrown? How long did that initial encounter last?

A Uhm, no more than five minutes.

Q And then from the point that the car left, how long was it then before you heard gunshots?

A About 20 minutes after.

Q About 20 minutes?

A Yes.

Q And how did you -- what did you think when you first heard what turned out to be gunshots? Did you realize what they were?

A At first we didn't. We thought -- some of us thought they were fireworks, we had heard fireworks; but then someone yelled those are way too loud to be fireworks and --

Q Go ahead.

A We heard the shots hitting the house. That's when we realized they were gunshots.

Q All right. When you heard what you finally realized to be gunshots, where were you located?

A On the back of the house.

Q Could you display 303 please. Earlier you told us, Mr. Hernandez, this is where you and your friends were located when the car came to a stop parallel to you; is

that right?

A    Yes.

Q    When you heard what turned out to be gunshots, were you still located in this same area?

A    Yes.

Q    Were all of your friends who had been there 20 minutes or so before when the car stopped by, were all your same friends still gathered in that location?

A    Yes.

Q    Your brother Abel Hernandez, do you know where he was when this encounter took place?

A    He was inside in his room.

Q    Had he been outside with you during the encounter with the car?

A    No.  He was inside the whole time.

Q    And your mother, Rumalda, her last name is Hipolito; is that right?

A    Yes.

Q    Do you know where she was when this encounter with the car took place?

A    She was in the living room.

Q    And your brother Santiago Hernandez, do you know, was he outside with you when the car was there and this altercation was taking place?

A    He was not there yet.

Q   Okay.  Do you know where he was?

A   He was working.

Q   At some point, did your brother Santiago Hernandez come home to the house?

A   Yes.

Q   Did he come home while the car was still there and while this altercation was taking place?

A   No, he didn't see any of that.

Q   Was he home when the gunshots occurred?

A   He was there, yes.

Q   All right.  So when you heard what you learned later to be gunshots, what did you do?

A   We -- me and -- I don't remember if anybody else did, but me and my brother ran to the front of the house.

Q   By your brother, which brother are you talking about?

A   Santiago.

Q   Santiago, your brother, was now home from work?

A   Yes.

Q   And you ran to the front of the house.  What did you see?

A   Lot of smoke.

Q   All right.  Now, where did you see the smoke?

A   At the front of the house.

Q   Let me ask to display 374 again.  And Mr. Hernandez, you've told us earlier that this is your house; correct?

A   Yes.

Q   When you ran to the front of the house, you're running to 4th Avenue; is that right?

A   Yes.

Q   And could you tell at the time that the what you thought first were fireworks then later learned to be gunshots, could you tell what direction they were coming from?

A   They were coming from either somewhere from up here. Exactly I don't know where.  I just know they were coming from this direction towards that direction. (Witness indicates.)

Q   And do you know for certain that bullets struck your house?

A   Yes.

Q   Did you hear them striking your house?

A   Yes.

Q   Did you later see the damage caused by the bullets that struck your house?

A   Yes.

Q   And then you also told us when you went to the front of the house you saw smoke; is that right?

A   Yes.

Q   Where did you see the smoke?

A   Right on the front porch.

Q   Right where?

A   On the front porch.

Q   And could you tell what the smoke was from, what had caused the smoke?

A   It was from gunshots from where they had entered the house through the walls.

Q   Where the bullets had entered the house?

A   Yes.

Q   All right.  After you see the smoke, sir, what did you do and what did you see?

A   We heard -- I heard my mom scream, both me and my brother Santiago, we heard my mom scream that they got hit.  And as --

Q   Hang on for a second.  When you heard your mother screaming, where were you located?  Were you outside the house or inside the house?

A   Outside.

Q   All right.  So you heard your mom screaming.  What did you do?

A   I was getting ready to go inside, running, I saw a car --

Q   All right.  Where did you see --

A   -- come --

Q   Hang on one second.  Okay.  Where did you see a car?

A   I saw it in this alley.  (Witness indicating.)

Q   And which direction did it go?  Did it drive on 4th Avenue?

A   No -- yes, it went that way.

Q   And what caused you to take notice of that car?

A   Well, I saw the car because we were looking, me and my brother, we were looking everywhere, basically, and we saw a car and the people that were in the car, all of them were looking our direction.

Q   This car that you saw after the shooting, was it -- do you know if it's the same car you saw earlier during the altercation?

A   I don't know.  It was too dark.

Q   It could be or it couldn't be?  You don't know?

A   Yeah, it could be, could not.

Q   All right.  Now, you saw this car turning to the right in this photograph.  And you said the people inside the car were looking back at you and the house?

A   Yes.  They were looking my direction.

Q   Could you tell how many people were in the car -- in that car as it was driving pulling off of 4th Avenue?

A   I saw at least two.

Q   At least two?

A   Uh-huh.

Q   You need to answer out loud.

A   I saw at least two.

Q   And could you tell if they were men or women?

A   It was too dark.  It was too dark.

Q   The fact that they were looking back at you, why did you notice that?  Why did that stand out to you?

A   Because there was -- there wasn't any other car in the area at that moment.  And the fact that they were all staring this way.

Q   And do you recall the approximate time when the gunshots took place that hit your house?

A   I don't know.

Q   But it was roughly 20 minutes after the confrontation with the car on what would be Oak Street which runs to the, on this diagram, to the left of your house; correct?

A   Yes.

Q   Now, you said you heard your mother scream, you started to go inside and you saw this car.  After you see the car, did you watch the car -- how far did you train your eyes and look at the car as it drove away?

A   I just saw it looking this way and then it just took out and then I just ran inside to see how my mom was doing.

Q   Did you find your mom inside?

A    Yes.

Q    And where was she?

A    She was -- she had gotten up.  She was on the couch in the living room.  And she had gotten up because my brother who was -- my brother Abel who was in his room, he came out wondering what's all this.  He hadn't even noticed he had gotten shot.

Q    So you went into the living room of your house; is that right?  You need to answer out loud.  Is that a yes?

A    Yes.

Q    And let me ask you to look at what has been admitted as Exhibit 368.  Do you know who that is?

A    That is my mother.

Q    Did you -- could you tell whether your mother had been shot?

A    Yes.

Q    Do you know where she had been shot?

A    She was shot in the arm.

Q    Did you see the wound yourself?

A    Yes.

Q    And while you were looking at your mother, your brother Abel Hernandez came into the living room?

A    Yes.

Q    Ask you to look at 364.  Can we display 364.  Sir,

do you recognize who that is?

A   That's my brother Abel.

Q   All right.  And do you recognize where your brother is located in this photograph?  I mean where in the house.

A   That is the living room.  The living room on the couch.

Q   And did you see the wound sustained by your brother Abel Hernandez?

A   Yes.

Q   Where was he shot?

A   In the leg.

Q   Do you know where he was located inside the house when he was shot?

A   He was in his room.

Q   In the bedroom?

A   In his -- yes.

Q   Sir, do you recognize what's been marked and admitted at Exhibit 348?

A   Yes.  That's where he was.  That's the room he was in.

Q   Was that your brother Abel Hernandez' bedroom?

A   Yes.

Q   And you know that's where he was located when he was struck by a bullet?

A   Yes.

Q   Do you know where your mother was located when she was struck by a bullet?

A   She was sleeping on the couch in the living room.

Q   My memory, there was three couches in the living room in the house.  Do you know which one she was on?

A   There's a small one, middle and a big one.

Q   This photograph has two of the couches in it.  342. If you know, Mr. Hernandez, do you know where your mother was located when she got shot?

A   She was sleeping on this couch.  (Witness indicates.)

Q   Do you know, Mr. Hernandez, at some point, were both your mother and your brother Abel Hernandez transported to the hospital?

A   Yes.

Q   Did you see both of them at the hospital?

A   Yes.

Q   And did you see your brother's wound while he was being treated at the hospital?

A   Yes, I did.

Q   I'd ask you to look at Government Exhibits 365, 366 and 367.  Starting with 365, do you recognize who's in that photograph, sir?

A   Yes.  This is my brother Abel.

Q   And then 366?

A   The leg he was shot.

Q   And 367?

A   That's the leg he was shot.

Q   And do the three photographs accurately -- the first one show your brother's face and upper torso and then do the next two photographs accurately show two sides of the wound that your brother sustained?

A   Yes.

Q   That's a yes?

A   Yes.

MR. WELCH:  Your Honor, we would offer 365, 366 and 367.

MR. HENRY:  Your Honor, I'd object on foundation.

THE COURT:  He said he saw the wounds in the hospital.

MR. HENRY:  He didn't take the pictures though, Your Honor.

THE COURT:  They're received.

BY MR. WELCH:

Q   Could you display 365.  This is your brother Abel Hernandez, sir?

A   Yes.

Q   366.  This is your brother's left leg; is that

correct?

A   Yes, that's his left leg.

Q   Was he struck by a bullet in any other portion of his body?  Do you know?

A   No, it was just the leg.

Q   And 367.  Does that appear to be the same wound we saw the other side of in the photograph?

A   Yes.  It went through.

Q   Mr. Hernandez, do you know if your brother Abel Hernandez was a member of or associated with a gang in Dodge City?

A   I was not aware if he was or he wasn't.  But he had some friends that were in a gang, but I'm not -- I don't know for sure if he was part of a gang.

Q   All right.  The friends that your brother had that were in a gang, which gang were they a member of?

A   The Surenos.

Q   How long -- I know I asked this, but I don't remember what you said.  How long had you and your family lived in this house?

A   About seven years, six or seven years.

Q   Prior to October 4, 2008, had you or your family or this house been the victim of a drive-by shooting?

A   No.

Q   This was the one and only time; is that right?

A   One and only time.

Q   And after the shooting took place, your brother Abel Hernandez was deported to Mexico; is that right?

A   Yes.

MR. WELCH:  Your Honor, I have no further questions of Mr. Hernandez.

THE COURT:  Mr. Henry.

**CROSS EXAMINATION**

BY MR. HENRY:

Q   You had said earlier in your direct examination by the Government that you were not in a gang and no one there was.  Do you remember that?

A   Yes.

Q   Okay.  And can you give us the names of everyone that was out there?  If you remember.

A   I don't remember.

Q   I thought some of these people were your cousins?

A   Yes.  Not all of them.  Some of them.

Q   You don't even know your cousins' names?

A   Excuse me.

Q   You don't know your cousins' names?

A   One of 'em was Manuel Hipolito.

Q   So Manuel Hipolito was there that night?

A   Yes.

Q   Give us another name of another cousin that was out

there?

A    Also Alvarez.

Q    Okay.  So when you just answered my question and told the jury you don't know anybody else that was out there, couldn't remember their names, you were not telling the truth, were you?

MR. WELCH:  Objection; argumentative, Your Honor.

THE COURT:  Sustained.

BY MR. HENRY:

Q    Now, I didn't understand you right off the bat.  You said it was a white car that had pulled up by the house?

A    That's what I remember, yes.

Q    And do you remember being interviewed by Officer Gordon shortly after the -- or even that night, I think, on October 4th of 2008?

A    I don't know who the officer was; but, yes, I remember being interviewed.

Q    Do you remember telling that officer that you saw there were approximately five occupants in the vehicle?

A    I don't remember exactly what I told him.

Q    Let me hand you what's been marked as -- I believe this is Defendant's, would be R-GG.  Unless that's already been entered and I'll change the number.  But I'm handing you the first page of Officer Gordon's

report.  And if you could just refresh your memory here with respect to -- the interview is with Alberto H. Hernandez, is that you?

A    Yes.

Q    And is this your correct date of birth?

A    Yes.

Q    So you were giving this information to the officer that evening?

A    Yes.

Q    Okay.  Now, if you could look down on the fifth paragraph here, and if you could just review that to see if that would refresh your memory.

A    Yes.

Q    Does that refresh your memory?

A    Yes.

Q    And how many did you tell Officer Gordon were in the vehicle?

A    In that statement says I saw around five.  It doesn't say exactly I saw five.

Q    It did mention five, though, correct?  That's the number that you thought was the accurate number?

A    Yes.

Q    You weren't trying to mislead Officer Gordon, were you?

A    No.

Q   Now, when did you start socializing that night?

A   Exactly, I don't remember, but it was after sunset.

Q   Okay.  Now, were you in school at the time or were you working?

A   I was -- I was in school I believe.

Q   Okay.  And the -- when does Santiago get off work?

A   He, he was on overtime.  He stayed over time, so it just depends on how much work they have.

Q   But he works first shift?

A   He did.

Q   Okay.  So you're saying he got back sometime after the initial encounter, sometime in that 20 minutes that you said?

A   Somewhere around there, yes.

Q   Now, can we pull up number 303, please.  There seems to be quite a few boxes of beer out there; is that correct?

A   Yes.

Q   And you were down by the back door.  Is that what you're saying?  Could you put another mark where you were at that evening.

(Witness complies with request.)

A   Somewhere around this area.

Q   So you're down in a recessed area by the back door.  And then above that walled area of the walkway there's

another retaining wall; is that correct?

A   Yes.  This.  (Witness indicates.)

Q   And on the other side of that is actually a blue car; is that right?

A   Yes.

Q   And that blue car was there that night when the car pulled up?

A   Yes.

Q   You said that you knew that your mom was sleeping on a couch.  Does that mean that you actually had been inside for part of the night?

A   Well, I went inside at some point, yes.

Q   Were you inside when the car came by?

A   No, I was outside.

Q   So the -- so the statements that were given that night by your brother Abel or by your brother Santiago where two people got out of the vehicle on the initial encounter, are you saying that they're lying to the police?

A   No.  I'm saying I don't -- it's been five years, I don't remember exactly what I said that night.

Q   I'm going to show you a -- first page of Detective Bice's report.  Now, you said Jose Louis Alvarez Lopez was one of your cousins; is that correct?

A   Yes.

Q   Okay.  Now --

MR. WELCH:  I'm going to object to this line of questioning, Your Honor.  As I understand it, this is another person's statement.  There's no foundation that this man knows anything about what the other person would have said.

THE COURT:  I don't know.  I'm going to let Mr. Henry lay a foundation if he can.  If all he's doing is refreshing his recollection with it, that's another matter.  If he's trying to introduce it then, that's something else again.

MR. WELCH:  I may be mistaken.  I didn't understand this to be this witness's statement.  That's my objection.

THE COURT:  I thought it was Bice's report.

MR. HENRY:  Detective Bice's report of the interview with his cousin Jose Louis Alvarez Lopez.

MR. WELCH:  Another person, Judge.

THE COURT:  Well, you can use anything to refresh recollection if that's -- if that's your point. You can certainly show it to him and ask him if it refreshes his recollection.

BY MR. HENRY:

Q   I'm handing you the first page of Detective Bice's interview with Jose Louis Alvarez Lopez.  And you had

said that that was your cousin there that night?

A    Yes.

Q    Okay.  I'm going to direct your attention to this paragraph here.  Have you read that?

A    Yes.

Q    Does that refresh your memory from five years ago about what happened out there with that vehicle that stopped on the street?

A    Well, like I said, I was down by the step so he had a better view than I did.  He was close to the other little wall --

Q    So what you're saying is -- if we can pull up number 303 again -- that -- and, again, you said there were six or seven people out there socializing; is that right?

A    Yes.

Q    And you had been drinking for at least, what, a couple hours?

A    Yes.

Q    And there's the initial wall where the sidewalk is at.  There's the retaining wall.  Then there's a car. And you remained down by that back door; is that right?

A    Yes.

Q    Was Jose Louis Alvarez Lopez up towards the street?

A    Yes.

Q    And if he had a better view of what happened there

with that vehicle, would you agree with his memory that evening when he -- or that time period when he met with Detective Bice?

MR. WELCH:  I'll object to foundation, Judge.

THE COURT:  I don't think he can agree about somebody else's memory, Mr. Henry.

BY MR. HENRY:

Q   Okay.  With respect to whether or not two people got out of that vehicle that evening in that first encounter that you said there were people -- one person that you say you saw wear red, is it possible that you didn't see the people but that two people did get out of that vehicle?

A   I saw someone in the car wearing red.

Q   But that's all you saw?

A   Yes.

Q   Okay.  Now, and, again, you said Jose Louis Alvarez Lopez was in a better position to see what was going on with that vehicle?

A   Yes.

Q   And, in fact, your view would have been blocked by the blue vehicle that was there; isn't that correct?

A   Could have been.

Q   Now, you said you were out there with your brother Santiago; is that correct?

A   At some point.

Q   Okay.  You remember someone -- and you said Manuel Hipolito was there; is that correct?

A   Yes.

Q   He's your cousin; is that right?

A   That's right.

Q   Is that Manuel Hipolito Alvarez?

A   I don't know if he has the second last name; but I just know him as Manuel Hipolito.

Q   And do you recall the discussions being made after that initial encounter had passed from Santiago that the person that they recognized was Gonzalo Ramirez' younger brother Erik?

A   I don't remember any of that discussion.

Q   Now, you said that Santiago was not there; is that correct?

          THE COURT:  There when?

Q   I'm sorry.  The evening of October 3rd into the morning hours of October 4th.  Do you recall saying that he was not there at the initial encounter?

A   Yes.

Q   Now, Abel gave a statement shortly after that evening to the Dodge City authorities; isn't that correct?

A   I don't know.

Q   Okay.  Do you remember telling your brother Abel that two individuals had gotten out of the car and that you began -- or they began throwing beer bottles at these two individuals because they were cussing at them?  Do you remember that?

A   I don't remember.

MR. WELCH:  Object to foundation and hearsay, Judge.

THE COURT:  No.  The question is appropriate as to whether this witness told his brother that, not anything about what his brother may have said.  And he says he doesn't remember.  Right, Mr. Henry?  Is that the answer you heard?

MR. HENRY:  Yes.

THE COURT:  All right.

BY MR. HENRY:

Q   I'm going to hand you what's been marked as Defendant Exhibit R-II.  It is a report from Detective Webb, and it's dated at the top October 7, 2008.  This is an interview that he had with your brother Abel Hernandez.  Do you see that?  I'm going to direct your attention -- you need to answer yes or no.

A   What are you -- what are you asking?

Q   I'm handing you what's been marked as Defendant's Exhibit R-II.  It is a narrative report from a detective

at the top of the page.  What detective is that?

A    Webb.

Q    And it is a -- appears to be a narrative taken from an interview that he did with Abel Hernandez; is that your brother?

A    Yes.

Q    There's a date of birth here.  Is that your brother's date of birth?

A    Uhm, August, he's from August.

Q    Is that the correct date of birth, then, of your brother?

A    August 4, 1990.

Q    Okay.  So the person that Detective Webb was talking to appears to be the brother that is identified by his date of birth?

A    Well, my brother Abel, he was born on August 4th.

Q    I'm going to direct your attention to the last paragraph on Page 1.  I want you to review that please.

A    Last paragraph?

Q    Last paragraph.

A    Okay.

Q    Okay.  Now, you had said to this jury that Santiago Hernandez, your brother, was not there at that first encounter?

A    Yes.

Q    And you're sure of that?

A    Very sure.

Q    Even though you had been drinking for a number of hours?

MR. WELCH:  Your Honor, I'm going to object. This is argumentive.  No foundation.  Hearsay.  And now there's no relevance to this line of questioning about an interview done of Abel Hernandez, Your Honor.

THE COURT:  Well, so far, I don't see anything objectionable.  Again, he can use that report to refresh this witness's recollection, but that's all.

BY MR. HENRY:

Q    Did you tell your brother Abel that two individuals got out of the car and were cussing and looking for a fight?

A    I don't remember exactly.

Q    Okay.  But one of the brothers, you or Santiago, did make that statement to Abel?

MR. WELCH:  Objection, Your Honor.

THE COURT:  Well, that's a different story. You can use this as to this witness, but not as to what his brother may have said.

BY MR. HENRY:

Q    If Santiago wasn't there during the first encounter, you were the only brother there of Abel's that would

have told him regarding what happened at the first incident; isn't that correct?

MR. WELCH:  Objection.  Asked and answered. Argumentative.

THE COURT:  No.  Overruled.

BY MR. HENRY:

Q   Isn't it true that between --

THE COURT:  Wait a minute.  You need to let the witness answer your question.

Q   I'm sorry.  Could you please answer the question.

A   Could you repeat the question.

Q   Since Santiago, according to your testimony, wasn't there at the first encounter that evening, if Abel had been told by one of his brothers about that first encounter, it would have had to have been you?

A   Like I said, I don't remember exactly everything I said that night, so I don't remember.

Q   So are you saying you didn't tell your brother Abel that?

A   I'm saying I don't remember.  I'm not saying I didn't.

Q   Now, you also had talked about on direct examination that initially that you're not in a gang and that no one out there was.  And then Mr. Welch asked you toward the end of direct examination that you were not aware of

whether or not your brother Abel was or wasn't in a gang. Is that correct?

A   Yes.

Q   Do you know whether or not Santiago was in a gang?

A   I do not know.

Q   There was a blue bandana around Abel's wound that evening. Do you know where that came from?

A   No.

Q   Could we pull up that, number 367. Do you see that? You need to answer.

A   Yes.

Q   Number 367. That's the picture from the hospital bed; is that correct?

A   Yes.

Q   And there is a blue bandana next to -- I think you've testified your brother Abel's left leg; is that right?

A   That's correct.

Q   And he's wearing blue shorts; is that correct?

A   Uhm, yeah.

Q   Number 365. Is that a dark blue or a black T-shirt? Can you tell?

A   That is black.

Q   What was being said when you were being asked by your -- by the people that were in that vehicle what do

you claim, what were your people out there -- what were your acquaintances that you were socializing with saying back to them?

A   Saying back?

Q   Yes.

A   I don't know exactly what they were saying.

Q   But you were there.  You don't remember anything that was being said?

A   After five years ago, I don't remember everything that was said.

Q   Well, you remembered that the car said do you claim anything?

A   Yes.

Q   And you don't remember the response that was made by these six or seven individuals that had been drinking with you?

A   Well, I mean, what response -- I mean, it's nothing, I mean, what's your problem.

Q   Well, did you claim that you were Surenos?

A   Surenos?

Q   Surenos.

A   Oh, Surenos.

Q   Yes.  Wearing blue --

A   I don't remember anyone saying that.

Q   Do you know what you were wearing that night?

A   No.

MR. HENRY:   I have nothing further, Your Honor.

THE COURT:   Redirect please.

**REDIRECT EXAMINATION**

BY MR. WELCH:

Q   Mr. Hernandez, on October 4, 2008, when this car came and stopped next to you and your friends, at that time did you have any idea why these people chose to stop next to your house?

A   No.

Q   Did you have any idea why they chose to ask you if you were in a gang?

A   Well, I mean, you know, they saw a group of people, you know.

Q   Had you had any trouble with the people in this car before?

A   Did not even know them.

Q   As you sit here today, do you know why your house was shot up?  Had you done anything to the people in that car that would cause your house to be shot up that night?

A   No.

MR. WELCH:   No further questions.

THE COURT:   Mr. Henry.

MR. HENRY:  Nothing further.

THE COURT:  Thank you.  You're excused, sir.  Next witness.

MR. SMITH:  United States calls Santiago Hernandez.

Your Honor, Ms. Lou Ann Rivera is here at the request of Santiago Hernandez in case he feels that he needs her services.  But he is going, I believe, to attempt to testify without her help.

THE COURT:  Always a pleasure to see Lou Ann.

INTERPRETER:  Thank you, Your Honor.

### SANTIAGO HERNANDEZ

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

### DIRECT EXAMINATION

BY MR. SMITH:

Q    Will you tell us your name please.

A    Santiago Hernandez.

Q    And do you have a brother named Abel Hernandez?

A    Yes.

Q    And do you have a brother named Alberto Hernandez?

A    Yes.

Q    And what is your mother's name?

A    Rumalda Hipolito.

Q   Do you live in Dodge City, Kansas?

A   Yeah.

Q   How long have you lived in Dodge City, Kansas?

A   For like 18 years now.

Q   18 years?

A   Yeah.

Q   And so were you living there in 2008?

A   Yeah.  Yes.

Q   In October of 2008?

A   Yes.

Q   Do you recall the home or the address of the home that you were living at at that time?

                    (Ms. Rivera interprets question

                        to witness.)

A   1110 4th Avenue.

Q   I'm going to show you a few photographs here I'd like for you to take a look at.  If I may approach, Your Honor?

          THE COURT:  You may, sir.

Q   Do you recognize that first photograph that's in front of you that's been marked as Government Exhibit 300?

A   Yeah.

Q   What is Government Exhibit 300?

                    (Ms. Rivera interprets question

to witness.)

A    The house where we used to live.

Q    And do you recognize Government Exhibit 302?

A    Yeah.

Q    And what is that?

A    The back -- the side of the house.

Q    And was that the home that you were living in on October 4, 2008?

A    Yeah.

Q    Do you recall being at the house on October 4, 2008, when something unusual happened?

                    (Ms. Rivera interprets question

                         to witness.)

A    Yes.

Q    Where were you before going to the home?

A    I had worked.

Q    What sort of work were you doing?

A    I work at the plant.

Q    And how long were you working that day?

A    Eight hours.

Q    When did you get off of work on October 4th or October 3rd?

                    (Ms. Rivera interprets question

                         to witness.)

A    Like around 11:30.

Q   11:30 in the evening?

                    (Ms. Rivera interprets question

                    to witness.)

A   In the night.

Q   11:30 at night.  After getting off work at 11:30,
did you go to the house that's in Government Exhibit
300?

A   Yes.

Q   Do you know what time it was that you got to the
house?

A   Like around 12, or 11:50.

Q   Still in the evening.  So that would be midnight; is
that correct?

A   Yeah.

Q   Was anyone at the house?

A   Yes.  There were some people there.  My brother.

Q   Which brother?

A   Alberto Hernandez.

Q   Do you remember anyone else that was there?

A   Yeah.  Yes.

Q   Who else?

A   Well, there was a lot of people.

Q   Tell me their names?

A   Manuel Hipolito.  Jose Hernandez.

Q   How do you know Manuel Hipolito?

A    Well, he is a cousin from us.

Q    And you mentioned Jose Hernandez?

A    Yeah.

Q    How do you know Jose Hernandez?

A    He's a friend.

Q    Do you remember the names of anyone else at the house?

A    No, not right now.

Q    Did you have any other relatives at the house?

A    Well, there were all our friends that were there, they -- I know them for several time.

Q    You had known those friends for a long time?

A    Yeah.

Q    Now, what about your brother Abel?

A    When I got home, he was inside sleeping.

Q    And your mother Rumalda?

A    Her, too.  She was inside.

Q    Did you see them inside?

A    Well, after that, that happened, yeah.

Q    After something happened, you saw them inside.  Is that a yes?

A    Yes.

Q    Thank you.  You just have to say it out loud.

A    Yes.

Q    When you arrived at the house around 11:50 or

midnight, what did you do?

(Ms. Rivera interprets question to witness.)

A    I go out in the back of the house with the guys that were there.

Q    Let's look at Government Exhibit 303.  In this photograph do we see where you went to at the house?

A    Right next to the --

Q    And you can point on the screen and touch the screen so we can see.

A    Yeah, right next to the door.  We were standing there.  (Witness indicates.)

Q    Do you remember how many people were outside at that time?

A    Not exactly.

Q    And do we see some beer bottles here in this photograph?

A    Yeah.  Yes.

Q    When you arrived, did you begin drinking beer with the other persons at the house?

A    I opened one beer.

Q    Were you able to drink it?

A    Uhm, I think so.  Not all of it.

Q    Okay.  Whether true or not, were the people at the house having a conversation about something that had

just occurred?

A   When I got home they were, they were talking about something that had happened.

Q   Do you remember what that conversation was?  What were they talking about?

A   Well, they were saying about -- because when I got home, I see a lot of broken bottles in the street.

Q   You saw broken bottles in the street?

A   Yeah.

MR. SMITH:  May I approach?

THE COURT:  Yes, sir.

Q   I'm showing you Government Exhibit 374.  If we can display that.  This is a photograph from above.  Is this photograph a photograph of the area of your home.

(Ms. Rivers interprets question
to witness.)

A   Yes.

Q   And there's been testimony that your home is the home that I've just placed the yellow mark upon.  Is that your home?

A   Yes.

Q   And would you please place a mark where it was that you saw broken bottles in the street?

(Witness complies with request.)

Q   After you saw the broken bottles in the street, was

there a conversation with the other people at the house about what occurred?

A   I asked 'em what had happened and they said some people passed by and they throw bottles at them.

Q   Okay.  And do you remember who they is specifically or is it the group?

A   No.  I don't remember who specifically.

Q   You don't remember who specifically said that?

A   No.

Q   Did something else occur that evening?

A   Yes.  After that, we hear some shots.

Q   Who is -- okay.  Did you hear shots?

A   Yes.

Q   Could you tell where the shots were coming from?

A   Well, whenever, whenever I hear them, I wasn't sure if it was shots or fireworks.  I wasn't sure what was going on.

Q   Then what did you do?

A   Well, we -- I -- we -- I, I standing there until they stop, the sound of that shooting or --

Q   Okay.  Hold on.  Let's look at 374 again.  You stood where?

A   Around right here.  (Witness indicates.)

Q   Did you stay there until after the shots --

A   Yes.

Q    -- had stopped?

A    Yes.

Q    Do you recall the number of shots that you heard?

A    Like, like around 15, 16.

Q    After those shots stopped, what did you do?

A    I run to the front of the house.

Q    Point to the front of the house for us please.

                    (Witness complies with request.)

Q    Did you run with anyone else?

A    My brother, Alberto.

Q    And after arriving at the front of the house, what did you see?

A    When I arrive at the front of the house, I remember seeing a car going over here, coming down over here. (Witness indicates.)

Q    Okay.  You've made a mark on the screen; is that correct?

A    Yes.

Q    You've made an L-shaped mark with a vehicle driving down a street and then turning onto 4th Avenue; is that right?

A    Yes.

Q    Do you remember the name of that street before the turn onto 4th Avenue?

                    (Ms. Rivera interprets question

                         to witness.)

A   Division.

Q   Why is it that the car turning there caught your attention.

A   Because it was so late and there was no car passing back.  That was the only car I saw when the shooting happened.

Q   How long after you heard the shots fired did you see that vehicle?

A   Like around a minute, two minutes.

Q   Did you hear anything at the house?

A   Well, after that, I went and unlocked the door because it was locked and my mother was trying to open it.

Q   Your mother was trying to open the door?

A   Yeah.

Q   Did you go inside the house?

A   Yes.

Q   Did you see your mother?

A   Yes.

Q   And when you saw your mother, did you see anything unusual?

A   Yes.

Q   What did you see?

A   Well, when she opened the door, she told me that she

          Cindy L. Schwemmer, Certified Shorthand Reporter
           United States District Court, Wichita, Kansas

got shot and that my brother, too.

Q   Did you see an injury on your mother?

A   Yes.

Q   And what had happened?

A   Well, she had -- she had blood on her arm and my brother was sitting on the sofa, on the couch, and he was bleeding from his leg.

MR. SMITH:  May I approach?

THE COURT:  Yes, sir.

BY MR. SMITH:

Q   Do you recognize what's in Government 364.  Do you recognize that picture.

(Ms. Rivera interprets question to witness.)

A   Yes.

Q   Who is that?

A   That's my brother.

Q   Do we see the injury?

A   Yes.

Q   Did you see the injury before it was bandaged?

A   Yes.

Q   Is that as he was seated the evening when you walked into the house other than the bandage?

A   No.  Because when I walk in the house, he didn't have no bandage.

Q   When you were outside with the folks that were gathered before the gunshots, do you recall if any of those people were members or associated with any gang?

A   No.

Q   Are you a member or associated with any gang?

A   No.

Q   Do you know if your brother Abel Hernandez is a member of or associated with any gang?

A   I don't know if he was; but he was hanging out with people.

Q   And what sort of people was he hanging out with?

A   Because when we -- when we live in the house, sometimes he had friends that go and knock and ask for him.

Q   Friends would come to the house and ask for him?

A   Yeah.  But I don't know if they were gang members or something like that.  I don't know.

Q   You don't know if they were gang members or what? Was there a reason why you paid attention to his friends?

A   No.  But, but I don't know if they were, you know.

Q   You don't know if they were gang members?

A   Yeah, I don't know.

Q   And you don't know if Abel was a gang member?

A   No.

Q   When you saw the vehicle turning onto 4th Avenue, did you see what sort of vehicle it was?

A   It was dark and I was so far from it; but, yeah, I think it was like --

Q   How would you describe the vehicle?

A   I remember seeing, like, a brown car.

Q   And do you know or how would you describe the make of the vehicle, what type of vehicle it was?

A   Yeah, I can remember seeing like a brown car like a Cadillac kind of make, model.

Q   Was that when the car turned from Division onto 4th Avenue?

A   Yes.

MR. SMITH:  Nothing further.

THE COURT:  Mr. Henry.

**CROSS EXAMINATION**

BY MR. HENRY:

Q   I'm handing you what's been marked as Defendant Exhibit R-JJ.  It is a report by Officer Simmons who spoke with you that night.  Do you remember speaking with an officer that night?

(Ms. Rivera interprets question
to witness.)

A   Yes.

Q   I'm going to direct your attention to the sixth

paragraph down.  Do you remember being asked whether or not your brother associated with any gang?

(Ms. Rivera interprets question

to witness.)

A    I don't really remember that.

Q    You don't remember that?

A    No.

Q    You don't remember telling Officer Simmons that Abel Hernandez associates with the blue gang which I know is Surenos?

A    I don't remember that.

Q    What were you wearing that night?

A    I don't remember.  I was coming off of work.

Q    Were you wearing blue like your brother Abel was?

A    I don't know.  I don't remember what was I wearing when I was coming out from work.

Q    Now, you're saying now five years later that you don't know if he was with a gang but you were suspicious of some of his friends that would come by; is that correct?

A    Yes.

Q    Those friends wore blue; isn't that correct?

A    Yes.

Q    And that, coming from Dodge City, you know that means Surenos?

A    Yes.

Q    Okay.  So this statement that you say you don't remember giving Officer Simmons is consistent with your understanding that Abel ran with Surenos?

                    (Ms. Rivera interprets question

                         to witness.)

A    Yes.

Q    Now, you weren't working overtime that night, were you?

A    No.

Q    So you were working second shift, not first?

A    Second shift, yes.

Q    And the -- there were a lot of people there when you arrived; is that correct?

A    Yes.

Q    Started drinking a beer.  Now, when we talk about a lot of people, how many people were out there?

A    I remember seeing like seven, ten people.

Q    Seven to ten.  And there was a lot of glass out in the road; is that right?

A    Yes.

Q    That's Oak Street on the north side of the house?

A    Yes.

Q    The -- and -- and you were asked on direct examination what had happened -- or you had asked what

had happened and a bunch of people were talking about what had just happened; is that right?

A   Yes.

Q   And you said that you didn't remember them saying anyone specifically regarding who was involved in this; is that right?

A   Not really.

Q   Okay.  So you do remember specifically someone being mentioned as being involved in this incident that night?

MR. SMITH:  Actually, Your Honor, my question was if he remembered who at the party had told him what had happened.

THE COURT:  Well, I don't know.  But this is cross-examination.  Mr. Henry can question him about this.

BY MR. HENRY:

Q   Do you remember telling Officer Simmons that night that you had heard from Manuel Hipolito that Gonzalo Ramirez' younger brother Erik had been the one that was involved in that initial incident?  Do you remember that?

A   Yeah.

MR. SMITH:  Objection; hearsay.

A   Yes.

THE COURT:  The answer will stand.

BY MR. HENRY:

Q   Now, is Manuel Hipolito in a gang?

A   No.

Q   Was he in a gang back then?

A   No.

Q   Now, you have another cousin that was there by the name of Alvarez Lopez; is that correct?

A   No.

Q   Or is it -- Juan Louis Alvarez Lopez?

A   No.

Q   Okay.  Are you and -- excuse me -- are you and Alberto full brothers?

A   Yes.

Q   So Jose Louis Alvarez Lopez is not your cousin?

A   No.

Q   Is Manuel Hipolito your cousin?

A   Yes.

Q   Were you able to tell how many people were in the vehicle you saw on Division Street?

A   No.

Q   Your brother Abel is -- has been deported; is that correct?

A   Yes.

Q   He hung out with the 18th Streeters or the Master Criminal Boys, didn't he?

A    I don't know.

            MR. HENRY:  I have nothing further, Your Honor.

            THE COURT:  Redirect, please.

            MR. SMITH:  No, Your Honor.

            THE COURT:  Thank you, sir.  We'll take our morning recess, Ladies and Gentlemen.  For approximately 15 minutes.  Remember and heed the admonition.

                      (Recess.)

            THE COURT:  Next witness.

            MR. WELCH:  Your Honor, United States calls Rumalda Hipolito.

                      (NOTE:  Answers are spoken by
                       Interpreter, Ms. LuAnn Rivera,
                       unless otherwise noted.)

                  **RUMALDA HIPOLITO**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

                  **DIRECT EXAMINATION**

BY MR. WELCH:

Q    Ma'am, would you tell us your name.

A    Rumalda Hipolito.

Q    Ma'am, where do you live?

A    (Witness.)  Dodge City.

INTERPRETER:  Dodge City.

Q   How long have you lived in Dodge City, Kansas?

A   (Interpreter.)  It's been about 16 years.

Q   And who do you currently live in Dodge City with?

A   I live with one of my children.

Q   And what -- is that a son or daughter?

A   Yes.

Q   A son?

A   Santiago Hernandez.  And Alberto Hernandez.

Q   I would like to ask you some questions about the date of October 4, 2008.  Is that okay?

A   Yes.

Q   Ma'am, do you recall that date?

A   Yes.

Q   And on October 4, 2008, were you living in Dodge City, Kansas?

A   Yes.

Q   Let me ask you to look at what's been admitted as Exhibit 300.  Do you recognize what that is, ma'am?

A   Yes.

Q   And, ma'am, it might be easier for you to look at the screen.  What is depicted in Exhibit 300?  What is that?

A   Well, that's where I used to live.

Q   And on October 4 of 2008, did you live at this

house?

A   Yes.

Q   Who lived in this house with you?

A   With my children.

Q   How many children lived with you in the house in October of 2008?

A   My three sons.

Q   Earlier you told us you currently live with your son Santiago Hernandez?

A   And Alberto also lives with me.

Q   Who is the third son that lived with you in this house?

A   Abel Hernandez.

Q   And do you recall how long you had lived in the house as of October 2008?

A   No, I don't remember.

Q   Was it more than a year?

A   I don't remember.

Q   Very good.  Okay.  Now, ma'am, on October 4, 2008, do you recall your house being struck by gunfire?

A   Yes.

Q   Where were you when that happened?

A   I was laying down on the sofa.  I was sleeping on the sofa when I heard gunshots.

Q   Do you recall about what time you first heard the

gunshots?

A    It wasn't during the day.  It was at night.  Or early morning.

Q    Ma'am, let me ask you to look at Exhibit 341.  Can you tell us if you recognize what's in that photograph?

A    Yes.

Q    What is that?

A    It's the sofa that I was laying on.

Q    And you were laying on this sofa when what happened?

A    I was laying down sleeping when I heard that there were gunshots.

When I heard the gunshots going off, I let myself fall to the floor.

And when the gunshots finished, I stood up and I turned on the lights.

And when I turned on the lights, I saw that there was a lot of smoke inside.

And right when I turned on the light, my son came in.

My son also came in to see what was happening.

Q    Ma'am.  Slow you down a little bit.  First of all, let's make sure we're all on the same page.  On Exhibit 341, you told us that this is -- in this photograph is the couch that you were sleeping on.  Is that right?

A    Yes.

Q   You can actually touch the screen in front of you and show us where the couch -- there's three couches in this picture -- where the couch is that you were sleeping on.

(Witness complies with request.)

A   That one.

Q   And at the time that the gunshots began, you were asleep; is that correct?

A   Yes.

Q   Now, your son Abel Hernandez, at the time that the gunshots occurred, did you know where he was?

A   Yes.  He was laying down asleep in the other bedroom.

Q   Let me ask you to look at Exhibit 348.  Do you recognize that, ma'am?

A   Yes.  He was sleeping in there.  On the bed.

Q   Your son Abel Hernandez was sleeping in that bedroom; is that correct?

A   Yes.

Q   Did you know whether or not your son Santiago Hernandez was home at the time the gunshots occurred?

A   He was working.  He had just gotten off work.

     He hadn't come home when I was sleeping.

     He still hadn't arrived.  But then when this happened, when I heard the gunshots -- I opened the door

and he was already home from work.

Q   Let me stop you there for a second.  Your son Santiago Hernandez had been at work that night; is that right?

A   Yes.

Q   And do you know -- did you know -- when is the first time you realized that your son Santiago was home?

A   When I opened the door.

Q   The front door of the house?

A   When I saw him.

Q   The front door of your house?

A   Yes.

Q   When you opened the front door of your house and you saw your son Santiago, did you see anyone else?

A   Just him.  And there were some other guys that were there.  They had been outside drinking.  The ones that live in the basement.

Q   All right.  Did your -- was your son Alberto Hernandez home at the time of the shooting?

A   He also was outside.  He was with the people that lived downstairs.

    When we got home, he went outside to be with them.  And just me and my son Abel went inside and went to sleep.

    And Alberto had gone outside to be with them.

Q   All right.  Now, you said earlier that when you got home.  Had you and some of your family been somewhere else that day?

A   Yes.  We had gone to Kansas City.

Q   Who had gone to Kansas City?

A   Me and Alberto and Abel.

Q   And had Santiago gone with you to Kansas City?

A   No.  He had gone to work.

Q   Do you remember what time you, your son Abel and your son Alberto had gotten back home?

A   I don't really remember, but it was late.

I don't remember what time it was, but it was late.

Q   So when you returned home from Kansas City, you went down and went to sleep on the couch in the living room?

A   Yes.

Q   And your son Abel went to sleep in the bedroom; is that correct?

A   Yes.

Q   And your son Alberto went outside with some people?

A   Yes.

Q   Now, the four of you, you and your three sons, did you all live in the upper level of the house?

A   Yes.

Q   You've testified about some people who lived downstairs; is that right?

A    Yes.

Q    Who lived downstairs?

A    Another person, a cousin of mine.

Q    And do you know whether your son Alberto when he went outside to be with these other people, was he with some of the people -- you said he was with some of the people who lived in the basement?

A    Yes.  He was with them.

Q    Do you know what they were doing outside?

A    They were out there drinking.

Q    Now, were you -- did you see -- there's been testimony, ma'am, about a confrontation involving a car next to your house.

A    That's what they say.  I didn't see anything.  I didn't know anything about that.

Q    Were you asleep when that happened?

A    Yes.

Q    And your son Abel Hernandez, was he asleep when that happened?

A    Yes.

Q    If you don't know, just tell us, but do you know whether your son Santiago saw anything related to what happened with the car?  Was he present?

A    I know he didn't because he was working.

Q    And do you know whether your son Alberto was present

when the car -- the confrontation took place?

A   I don't know.  I don't know if that car had passed by earlier or after we had already gotten there.  I don't know.

Q   Now, ma'am, when did you realize that bullets had been fired into your house?

A   It was sometime around 12 or 1 in the morning.

Q   How was it that you realized that bullets had been fired into your house?

A   When I heard the gunshots, I saw, like, these streaks coming through my house.

Q   Were you struck by a bullet that night or that morning?

A   Yes.

Q   And were you laying on the couch -- and you showed us earlier -- when you were struck by a bullet?

A   Well, I was laying on the couch.  But I didn't realize I'd been hit until I turned on the light.

Q   When did you first realize that you had been hit by a bullet?

A   When I turned on the light.  And then when I opened up the door, that's when I saw that I had been hit.

Q   And where had you been hit by the bullet --

    Ma'am, you don't have to show us.  I appreciate that.  You can just tell us.  Thank you.

A    It was right here.  (Witness indicates.)

Q    And you are holding up, for the record, your right arm?

A    It was this one right here.

Q    Okay.  Thank you.

A    Right here.

Q    Ma'am, I'm going to hand you what have been marked Exhibits 368 and 369.  Let me ask you to look at 368. Do you recognize who that is?

A    Yes.

Q    Who is that?

A    Me.

Q    Can you tell us what's depicted in Exhibit 369?

A    That's where I got hit.

Q    Ma'am, does this photograph accurately reflect or depict the wound as it appeared the night that it happened?

A    Yes.

        MR. WELCH:  We offer 369, Judge.

        MR. HENRY:  No objection.

        THE COURT:  It's received.

BY MR. WELCH:

Q    Ma'am, were you struck by bullets in any other part of your body that morning?

A    No.

Q   Now, earlier you told us about your son Abel Hernandez and then he came into the room after the gunshots?

A   Yes.

Q   What did you and Mr -- your son Abel, what did you talk about?  Or what happened?

A   He just asked me what had happened.  He said, mom, what happened.  And I said, well, son, they fired gunshots.

And I said who would shoot --

MR. HENRY:  Your Honor, I'm going to object as hearsay since Mr. Hernandez is out of the country.

THE COURT:  I think that this would be an excited utterance if you can lay a foundation for it.

BY MR. WELCH:

Q   Ma'am, when the gunshots took place, were you scared?

A   Yes.

Q   And was your son Abel Hernandez confused and scared about what was taking place?

A   Yes.

Q   And were you concerned for your safety when you had this conversation in the living room of your house?

A   Yes.

Q   Could you tell whether your son Abel Hernandez was,

in addition to being confused, was he excited and concerned?

A   He was, he was scared because he kept asking what had happened.  Who was shooting, mom.  I said I don't know, son.  I don't know.

Q   Ma'am, did you answer your son's questions as to what happened and who would do this?

A   Yes.  I told him I didn't know.  I don't even know who shot.

And then when I saw him, he was dripping blood from his leg.  And I said:  Look, son, you've been hit, too.

He said:  No, I don't think I've been hit.

Q   Ma'am, let me ask you to look at 364.  Government Exhibit 364.  Do you recognize that?

A   Yes.

Q   Who is that?

A   My son.

Q   That's your son Abel Hernandez?

A   Yes.

Q   And could you -- did you see that morning where your son was struck by the bullet?

A   I just saw that blood was dripping down because he had long pants on.

He went and put the shorts on and then that's when I saw where he had been hit.

Q    And where had he been hit?

A    On his leg.

Q    All right.  Did you see the wound at the house that night?

A    Yes.

Q    Did you see the wound later at the hospital?

A    Yes.

Q    I'd ask you, ma'am, to look at Exhibit 366.  Do you recognize that as a photograph of your son's wound at the hospital?

A    Yes.

Q    Ma'am, when you and your son Abel Hernandez were having this conversation in the living room and you indicated to your son you didn't know who would do this, did your son Abel Hernandez say that he had an idea or he knew who would do this?

A    No, he didn't tell me anything.

Q    Either on the date of October 4, 2008, or before, to your knowledge, had you had any trouble with anybody in Dodge City who would do something like this to you?

A    No.  I didn't have problems with anyone.

Q    Do you know if any of your three sons had problems with anyone that would cause this type of action to be done to your house?

            MR. HENRY:  Foundation.

THE COURT:  The objection is sustained.  Well, she can answer yes or no.

A    No.

BY MR. WELCH:

Q    Do you know, ma'am, whether your son Abel Hernandez was associated with a gang in Dodge City, Kansas?

A    I don't know about that.

Q    Do you know whether your son Alberto was associated with a gang in Dodge City, Kansas?

A    Neither.  I don't know.

Q    And do you know whether your son Santiago was associated with a gang in Dodge City, Kansas?

A    No.

Q    While you lived in this house, had your house been shot at before?

A    No.

MR. WELCH:  Your Honor, I have no further questions of Ms. Hipolito.

THE COURT:  Mr. Henry.

MR. HENRY:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. HENRY:

Q    I believe you said that you didn't remember how long you had lived at that house; is that correct?

A    No.  Correct.  I don't remember how long.

Q   Was it just a few months?  Was it over a year?

A   I don't remember.  It's been a long time.

Q   You said that you got home late from Kansas City that day.  Do you remember the time?

A   No.

Q   Was it light or dark?

A   Not dark dark.

Q   Okay.  So around sunset?

A   Around there.

Q   And did you go to bed right away?

A   Yes.  I laid down.  I was watching TV and I fell asleep.

Q   Okay.  And Abel had already fallen asleep as well?

A   Yeah.  When we got home, he went into his room and didn't come back out.

Q   But your son Alberto was out drinking with the rest of the group?

A   When we got home, he did -- he went out back with the rest of them.

Q   Now, you said that you don't remember any earlier incident out on the street.  Is that because you were already asleep?

A   Yes.

Q   And so you don't know when Santiago came home that night, do you?

A   No.  I don't know what time he came home from work.

Q   You said that you had a cousin of yours that sleeps in the basement or lives in the basement?

A   Yes.  He lives downstairs in the basement.

Q   Okay.  And is he similar age to you?

A   No, he's younger.

Q   Okay.  And what is his name?

A   His name is Herasmo.

Q   Do you remember also someone -- do you remember telling a police officer that a Manuel Gonzalez lives in the basement?

A   Manuel?

Q   Yes.  Gonzalez.

A   No.

Q   How many people lived in the basement apartment?

A   The only people that lived in the basement were him and his wife because he was married.

Q   Does your -- do your sons have cousins by the name of Jose Louis Alvarez Lopez?

A   He's not a cousin; but he's from our same home town.

Q   And a Manuel Hipolito, is he a cousin?

A   Yes, he's their cousin.

Q   Did you see them there that night?

A   I didn't see them.

Q   When you got --

A    I didn't see them because they were out back.

Q    Okay.  So when you returned home that night from Kansas City, there were already people out back?

A    You could hear that there were people back there. But I didn't see who was there.

Q    But that's where Alberto went?

A    Yes.

Q    And you don't know when Santiago got home?

A    I don't know what time he came home from work.

MR. HENRY:  Thank you.  I have no further questions.

MR. WELCH:  Nothing further, Your Honor.

THE COURT:  Thank you, ma'am.  You're excused. Next witness, please.

MR. SMITH:  United States calls Marriet Gonzalez.

**MARRIET GONZALEZ**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q    Please tell us your name.

A    Marriet Gonzalez.

Q    And make sure and speak up.  You can actually move

the microphone down if you need that.

A    Okay.

Q    Is that better?

A    Yeah.

Q    Okay.  Now, do you live in or have you lived in Dodge City, Kansas?

A    Yes.

Q    How long have you lived in Dodge City, Kansas?

A    Probably ten years already.

Q    That would be ten years now?

A    Yeah.

Q    So were you living there in 2008?

A    Yes.

Q    And how old are you?

A    I'm 23.

Q    So in 2008, you would have been 18 years old?

A    Yes.

Q    Is that right?

A    Yes.

Q    And you were still living in Dodge City at the time?

A    Yes.

Q    I want to draw your attention to a shooting that would have occurred on October 4 of 2008.  Are you familiar with that?

A    Yes.

Q   Have you been interviewed by law enforcement about that shooting in the past?

A   Just one time.

Q   Were those detectives with the Dodge City Police Department?

A   Yes.

Q   Where was that interview conducted?

A   At the police station.

Q   And were you asked questions about what occurred that evening?

A   Yes.

Q   Was that from one detective or more than one person?

A   It was from one detective.

Q   And after -- well, when you were questioned about what occurred on October 4, 2008, did you tell your story about what you remembered?

A   Yes.

Q   Did you tell the truth or all of the details that you knew about what occurred on October 4, 2008?

A   Just all the details I remembered.

Q   Did you leave out details?

A   Yes.  Some.

Q   Did you tell the law enforcement officers all of the participants that were there on October 4, 2008?

A   Just some that I remembered.

Q   And were you interviewed after that by law enforcement officers another time?

A   Yes.

Q   Do you recall if that was a detective -- was it a man or a woman?

A   It was a man.

Q   And when you were interviewed the next time by law enforcement officers, did you tell them different information than you told them the first time?

A   Yes.

Q   Do you recall what information it was that was different when you spoke to them the second time?

A   Uhm, yes.

Q   And what -- well, I guess I'll get into the details later.  Did you, in fact, testify in front of a grand jury after you were interviewed by law enforcement officers?

A   Yes.

Q   And during the testimony at the grand jury, you took an oath to tell the truth; is that correct?

A   Yes.

Q   When you testified in the grand jury, did you tell the grand jury what you remembered or the details of what occurred on October 4, 2008?

A   Yes.  The details I remembered.

Q   Did you tell the grand jury who participated in this event that occurred on October 4, 2008?

A   Yes.

Q   When you told the grand jury who participated on October 4, 2008, did you accurately tell them who was there?

MR. HENRY:  I'm going to object to the leading nature.

THE COURT:  Objection is sustained.

BY MR. SMITH:

Q   Did you tell the grand jury who was there with you on October 4, 2008, during the shooting?

A   Yes.

Q   Did you tell them the truth?

A   Yes.  Well, I had said someone's name that wasn't there.

Q   So that was inaccurate?

A   Yeah, inaccurate, yeah.

Q   Okay.  Who did you say that was at the shooting that was not there?

A   Savage.

Q   And you know who Savage is?

A   Yes.

Q   Do you know Savage's name?

A   Not his real name.

MR. SMITH:  May I approach?

THE COURT:  Yes.

Q   I've placed in front of you, it has a sticker on there, says Government Exhibit 412; is that correct?

A   Yes.

Q   Do you recognize the person in that exhibit?

A   Yes.

Q   Who is the person in that exhibit?

A   Savage.

MR. SMITH:  Your Honor, I'd move to admit Government Exhibit 412.

MR. HENRY:  No objection.

THE COURT:  It's received.

MR. SMITH:  Let's publish that, please.

BY MR. SMITH:

Q   This is the person you've identified as Savage?

A   Yes.

Q   This is the person during grand jury testimony you said was present; is that right?

A   Yes.

Q   Was he present?

A   No.

Q   Let's take that down.  You understand, ma'am, that you have taken an oath today prior to giving your testimony; is that correct?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   Yes.

Q   And you understand that part of that oath is an oath to tell the truth; is that right?

A   Yes.

Q   Let's talk about October 4, 2008.  Were you affiliated with a gang on October 4, 2008?

A   I wasn't affiliated; but I was hanging out with, with them.

Q   Okay.  Who's them?

A   With just people I knew from school.

Q   Were they members of a gang?

A   Yeah.

Q   What gang?

A   Norte.

Q   Norte?

A   Uh-huh.

Q   Were they identified by any other name?

A   No.

Q   Norte.  Who was it that you were hanging out with?

A   Mostly everybody from school.  I mean --

Q   I don't know who that is, ma'am.  Who were you hanging out with?

A   I mean, I mean, I just recall hanging out with everybody at school; and when we would just go in there, a lot of people, I mean --

Q   Let's start with October 4, 2008.  Were you hanging out with people that were members of the Norte gang?

A   Yes.

Q   When did you begin hanging out with those people on that date?

A   That was my first time --

Q   Okay.

A   -- to hang out --

Q   That day?

A   -- with them.

Q   That day, when were you hanging out with people?

A   That day I was -- we started hanging out, we went to the football game.

Q   Where was the football game?

A   At the Dodge City football stadium.

Q   Do you recall what time the football game was?

A   Like around 7.

Q   How long were you at the football game?

A   Probably like an hour or two.

Q   Who were you with at the football game?

A   Uhm, I was with my friend.  I know my friend Theresa Tinoco picked me up.

Q   How long had you known Theresa Tinoco?

A   For probably quite a while already.

Q   What does quite a while mean?

A   Like three years.

Q   Who else was at the football game?

A   Me and her other friend, her friend.

Q   Do you know who they were?

A   Some of them I do; and some of them I don't.

Q   Were they men or women?

A   Women.  Yeah.

Q   Were you hanging out with any men at the football game?

A   No.

Q   And after you were at the football game for a couple of hours, where did you go?

A   We went to kick back.

Q   When you left the football game, did you walk or drive?

A   We drive.

Q   Who drove?

A   I don't recall at that time who drove.

Q   Do you know whose vehicle you were in?

A   I can't -- honestly, I don't remember whose car we were in.

Q   Who's with you?

A   Theresa Tinoco and her friend.

Q   How many friends?

A   Like three, four.

Q   This is a couple of hours after 7:00?

A   Yeah.

Q   You stated you went to a kick back?

A   Uh-huh.

Q   Is that a yes?

A   Yes.

Q   Sorry.  We just have to type it down --

A   Okay.

Q   -- and it's easier to type yes or no.

A   Okay.

Q   Do you recall where the kick-back was?

A   Yes.

Q   What is a kick-back?

A   Just where you -- wherever you're hanging out with people, they would just drink and -- that's what we were doing.

Q   Is it a party?

A   Yeah, kind of; but it wasn't, like, really packed, like, it wasn't a big, big party.  It was just something --

Q   It was a small party?

A   Yeah.

Q   Where was this kick-back?

A   Shrek's house.

Q   Shrek's house?

A    Yes.

Q    Had you met Shrek before that evening?

A    No.

MR. SMITH:  May I approach?

THE COURT:  Yes, sir.

BY MR. SMITH:

Q    I've placed in front of you what's marked as Government Exhibit 418.  You can't see that.  I've covered the bottom half of that photograph.  Do you recognize Government Exhibit 418?

A    Yes.

Q    Is there a person in that government exhibit?

A    Yes.

Q    Is that a photo of a person?

A    Yes.

Q    Who is that?

A    Shrek.

MR. SMITH:  Move to admit Government 418.

MR. HENRY:  No objection.

THE COURT:  It's received.

BY MR. SMITH:

Q    Who was at Shrek's house?

A    I mean, I know it was older people that I didn't know at that time.

Q    How many people were at Shrek's house?

A    Probably like ten, 15 people.

Q    Does that include Theresa Tinoco?

A    Yes.

Q    Does that include her friends?

A    Yes.

Q    Does that include Shrek?

A    Yes.

Q    Who else was there that you know their name?

A    At that time, I hadn't -- I didn't know nobody. That's when I had barely -- they had introduced me to the people.

Q    Who were you introduced to?

A    I know I had borrowed a sweater from Gonzo.

Q    Had you met Gonzo before that evening?

A    No.

Q    Do you see Gonzo in the courtroom today?

A    Yes.

Q    Please point to him and let us know what he is wearing.

A    He is wearing glasses.

Q    Will you point in that direction please?

A    Yeah.  (Witness indicates.)

          MR. SMITH:  Your Honor, the record should reflect the witness has identified the Defendant Gonzalo Ramirez.

THE COURT: It will.

BY MR. SMITH:

Q   On that evening, did you know the name of the person you referred to as Gonzo?

A   No.

Q   When did you learn the name of the person that you referred to as Gonzo?

A   When I asked Theresa to let me borrow a sweater, that's when I heard her say his name.

Q   What name did she say?

A   Well, that's what she had named -- I heard it -- it would always be Gonzo and nothing else.

Q   All right.  Whom else were you introduced to that evening?

A   I heard Shrek's name.

Q   Anyone else?

A   I knew -- I don't know if it was Rabbit or -- I think it was Rabbit.  I mean, I don't know if it's Rabbit or the other name that you call him, but I went to school with him.

Q   So he would have been about the same age as you?

A   Yeah.

Q   Let's look at Government Exhibit 22.  Do you recognize who that person is?

A   Yes.

Q   Who is that?

A   That's -- I don't know.  I know him by Juan Torres.

Q   Juan Torres?

A   Yes.

Q   Thank you.  You saw Juan Torres at the kick-back?

A   Yeah.

Q   Were you drinking that evening?

A   I had only drank one beer, but that's all.  I really didn't drink.

Q   Were you doing any drugs that evening?

A   No.

Q   How long were you at the kick-back?

A   Probably the whole night.

Q   What is the whole night?

A   Probably like 'til 11, 12.

Q   And did you leave?

A   Yes.

Q   Were you with anyone when you left?

A   Yes.

Q   Who did you leave with?

A   As I remember, it was Gonzo, Shrek, Rabbit, me and Theresa.

Q   Let's look at Government Exhibit 22 again.  You've mentioned this person is Juan Torres; is that correct?

A   Yes.

Q   Is this the person that you were referring to as Rabbit?  Yes or no.

A   Yes.

Q   So when you left, it was you, Gonzo, Shrek, Juan Torres, or Rabbit, and Theresa?

A   Yes.

Q   Did you walk or drive?

A   We drove.

Q   And what vehicle did you drive?

A   Gonzo's car, I think it was.

Q   Why do you think it was Gonzo's car?

A   Because I remember -- I don't know if it was white or red; and that's the car that we had got in and I recall someone saying it was his car.

Q   You didn't know?

A   No, I didn't know.

Q   Do you recall who was driving?

A   I don't honestly recall.  I don't remember who was really driving.

Q   Do you remember where you were seated?

A   Where I was seated?  In the back.

Q   Was there anyone else in the back with you?

A   Yes.

Q   Who was in the back with you?

A   Theresa Tinoco and Rabbit -- and Juan Torres.

Q   Who was in the front?

A   I don't know who was driving; but I know it would have been probably Shrek and Gonzo.

Q   And where did you go?

A   We were just heading -- we were gonna go home and, uhm, on our way home we went through avenue -- I think it was 4th and -- I don't know if it's 4th and Elm.

Q   You stated 4th and what?

A   We were passing -- we were going -- we were getting dropped off already and we just -- we were passing through, I don't know if it was -- I know it was down the street -- I don't know if it was Elm.

Q   You were going to be dropped off where?

A   To my house; but we had just -- I forgot where we were gonna go first so we had stopped.  I think it was we were going to 5th and Elm.  I don't know the, really, the street.

Q   Do you recall during your interview with law enforcement officers stating that you were going eastbound towards Oak Street and 4th?

A   Yeah.

        MR. HENRY:  Objection; leading.

        THE COURT:  The objection is sustained.

BY MR. SMITH:

Q   Did you tell law enforcement officers during your

first interview --

A   Yes.

Q   -- what location you went to?

A   Yes.

Q   Do you remember what you told law enforcement officers during your first interview?

A   Yes.

Q   What did you tell law enforcement officers during your first interview?

A   We had went through 4th, I don't know if it was Elm or Oak.

Q   Were you familiar with that area?

A   Yeah, because my grandma lived on 3rd.

Q   Did you know anyone that lived in the area?

A   The person that lived in that house?  Yes.

Q   The person that lived at what house?

A   At the one that got shot at.

Q   And who was it that you knew that lived in the house?

A   Abel Hernandez.

Q   How did you know Abel Hernandez?

A   We went to school together.

Q   Was he about your same age?

A   Huh?

Q   Was he about the same age as you?

A    Yeah.

Q    And let's look at Government 365, please.  Do you recognize the person in Government Exhibit 365?

A    Yes.

Q    Who is that?

A    Abel.

Q    Do you know if Abel Hernandez was associated with or a member of any gang?

A    Yes.

Q    And what gang do you know Abel Hernandez to be associated with?

A    South Side.

Q    Did you know that back on October 4th, 2008?

A    Yes.

Q    Did you tell anyone that on October 4, 2008?

A    No.

Q    Did you hear any conversation about Abel Hernandez or South Side on October 4, 2008?

A    No.

Q    When you first arrived, are you stating you arrived at Abel Hernandez' home?

A    Yeah, we were passing through there.

Q    And when you passed through there near Abel Hernandez' home, what did you do?

A    We were passing through there and they started

whistling and doing all kinds of, you know, things when we were passing by there so they -- so they stopped the car.

Q   When you say we were passing through, is that the vehicle that you're in?

A   Yeah.

Q   Who's doing -- whistle and what else did you describe?

A   Whistling and just, you know, sayin' stuff.

Q   Who was doing that?

A   The people that were, that were outside Abel Hernandez' house.

Q   If you saw a photograph of Abel Hernandez' house, would you recognize it?

A   Yes.

Q   Had you been to his house before?

A   No.

Q   How would you recognize his house?

A   Because my grandma used to live close, like right in front of him.

MR. SMITH:  May I approach?

THE COURT:  Yes.

BY MR. SMITH:

Q   Do you recognize Government Exhibit 300?

A   Yes.

Q    What is Government Exhibit 300?

A    Abel's house.

Q    When you stated that first people were whistling or saying things, do you know where those people were in relation to the house?

A    No, I don't, know who.

Q    Did you see the people that were whistling and saying things?

A    There was -- I mean -- there was a lot of -- I don't know how they were -- but there was a lot of them drinking outside.

Q    Let's look at Government Exhibit 300 again.  Do you know where they were around the house when they were doing that?

A    Yes.

Q    Go ahead you can touch the screen.  Pull that screen up if you need to.  Grab on to the top.  There you go. And touch the screen.  Where were the people that were whistling --

A    Right there -- (witness indicates.)

Q    -- and yelling?

A    -- in that area.

Q    Okay.  Thank you.

     You stated there were people outside drinking?

A    Yes.

Q   About how many people?

A   Probably like 20, 20 guys.  I mean, there was a lot of 'em.

Q   And what did you do?

A   Nothing.  We were passing through there and they started whistling and everything so -- I don't know who was driving, if it was Gonzo or Shrek, they stopped.

Q   The vehicle stopped?

A   Yes.

Q   Do you recall what street you were on?

A   4th and Oak.

Q   Okay.  Where did the vehicle stop?

A   In the middle, right in front of his house, like, on the side where they were at.

Q   Let's look at Government 303.  Let's look at Government 302.  Can you see the approximate location that the vehicle would have stopped?

A   Yes.

Q   Go ahead and point to it on the screen please.

A   On the street.  (Witness indicates.)

Q   After stopping, what did you observe?  Or what did you see?

A   Nothing.  They were just arguing and complaining --

Q   Who's they?

A   The people, the guys that were at the kick-back.

They were kickin' it at Abel Hernandez' and Gonzo.

Q   Okay.  So the people that were outside of Abel Hernandez' house --

A   Uh-huh.

Q   -- you state they were arguing?

A   Yeah.  They started telling us stuff and I don't know what they were really specifically saying, you know, but they were saying some stuff to Gonzo and Shrek.

Q   And did you hear anyone from your vehicle say anything back to them?

A   Yes.  They were arguing; but I don't know what they were saying.

Q   Did you hear Gonzo arguing?

A   I mean, I don't remember, you know, who was, you know, fighting, who was arguing, you know.  I just remember them, you know, someone arguing and complaining; but I don't really honestly remember who doing what.

Q   Are you still in the back seat of the vehicle?

A   Yes.

Q   Is Juan Torres in the back seat of the vehicle?

A   Yes.

Q   And Theresa Tinoco?

A   Yes.

Q   Has anyone left the vehicle?

A   No.

Q   What happened after -- how long does the arguing and complaining take place?

A   I don't know how long.  Probably like five minutes. And before we left, that's when they threw a beer can at Gonzo's car.

Q   Who is they?

A   The people at the party.

Q   You stated a beer can?

A   Yeah.  'Cause I remember that day -- or, that night they were drinking 'cause you could see all kinds of beer cans.

Q   Do you know if it was one person or more than one person who -- or was it one can, I guess, or more than one can?

A   I just remember, recall, hearing one can hit the car.

Q   And it struck the vehicle you were in?

A   Yes.

Q   What happened after that?

A   They got -- Gonzo and them, got mad.

Q   What do you mean by get mad?

A   Because they had thrown a beer can at the car.

Q   When you say Gonzo got mad, what did Gonzo do or say

that made you think he was mad?

A   The way he got -- the way he drove to this house --

Q   Okay.

A   -- you could tell he was mad, the way he was -- the speed he was going.

Q   So at this point do you know who's driving?

A   Yes.

Q   Who's driving?

A   Gonzo.

Q   Where is Shrek?

A   Passenger seat.

Q   Are you still in the back?

A   Yes.

Q   With Theresa and Juan Torres?

A   Yes.

Q   How long did it -- Gonzo drove away from the house?

A   Yes.

Q   You stated went to his house?

A   Yes.

Q   Who's his?  Who are you referring to as his?

A   His mom's.

Q   Are you referring to Gonzo?

A   Yes.

Q   Had you been to Gonzo's house before?

A   No.

Q   How long did it take you to get to Gonzo's house?

A   I don't remember.  Like probably five minutes.  It didn't take us that long.

Q   What did you do when you got to Gonzo's house?

A   I remember me and Theresa had to use the restroom so we got out to use the restroom.

Q   You got out of the vehicle?

A   Yes.

Q   Where did you use the restroom?

A   In his house.

Q   That is what you're referring to as Gonzo's house?

A   Gonzo's.

Q   Or Gonzo's mother's house?

A   Yeah.

Q   Same house?

A   Yeah.

Q   You'd never been there before?

A   No.

Q   Do you know what Gonzo, Shrek or Juan Torres did while you were using the restroom?

A   No.  Because me and Theresa were in the restroom.

Q   Did they remain in the car?

A   No.  We all had gotten out.

Q   All five people got out of the vehicle?

A   Yes.

Q   Did you return to the vehicle?

A   Yes.  After we were done using the restroom.

Q   Who got in the vehicle?

A   All the same people.

Q   Where did you get into the vehicle?

A   In the back.

Q   Who got in the back with you?

A   The same people that went in the back with me that were there before earlier.

Q   Juan Torres?

A   Yes.

Q   And Theresa?

A   Yes.

Q   Who got in the front?

A   Gonzo and Shrek.

Q   Who was driving?

A   At this time, I don't remember who was driving.

Q   Was anybody carrying anything back to the vehicle?

A   I know something was carried; but I don't know what it was.

Q   Who carried whatever it was?

A   I know Gonzo and Shrek had something in their hands; but, I mean, it was, you know, covered so I don't know what it is.

Q   Covered with what?

A    I think it was a sweater.

Q    Was it large or small?

A    Probably --

Q    Would you say it was large or small?

A    I would have to say small.  I mean, or large -- I don't really remember.  Just -- I just remember seeing them carrying something.

Q    Did you see anyone else carrying anything?

A    No.

Q    You say Gonzo and Shrek.  So were they both carrying the item?

A    I don't know if it was one or two things that they were carrying.  I don't recall.  I just remember getting in the car and them telling us to get in the car.

Q    After you -- who told you to get in the car?

A    Theresa.

Q    And after you got in the car, what happened?

A    We drove back down -- down -- it wasn't on 4th, but it was the next street from Oak and 4th.

Q    The next street what direction?

A    Probably right.  So it was a block down from 4th and Oak.

Q    Let's look at -- let me show you -- that's Government Exhibit 374; is that correct?

A    Yes.

Q    If you look at Government Exhibit 374, do you recognize the area?

A    Yes.

Q    And do you recognize the intersection of Oak and 4th Street?

A    Yes.

Q    When you mentioned one street over, or one road over from Oak and 4th, is that road that you're referring to on this diagram?

A    Yes.

Q    And please touch the screen and note what road you're referring to.

                    (Witness complies with request.)

Q    Thank you.  Is it still the same five people in the car?

A    Yes.

Q    And after you're on that road, where do you go?

A    To the alley behind 4th and 5th.

Q    Do you see that alley?

A    Yes.

Q    Will you please point that alley out.

                    (Witness complies with request.)

Q    And after going to the alley, did you drive somewhere?

A    No, we stopped there.

Q   Where did you stop in the alley?  If you recall.

A   In the middle of the alley.

Q   Go ahead and place a small mark where you recall stopping.

(Witness complies with request.)

Q   Is it still the same five people in the car?

A   Yes.

Q   What happens after you stop in the alley?

A   I remember all the three guys got off and they told me and Theresa to stay in the car.

Q   Are you still seated in the back?

A   Yes.

Q   Is Theresa seated in the back?

A   Yes.

Q   The three people that you're referring to get off is who?

A   Gonzo, Shrek and, uhm, Juan.

Q   And do you mean exit the vehicle?

A   Yes.

Q   And when they got out of the vehicle, where did they go?

A   I remember them just walking down the block, walking down the block.

Q   In what direction?

A   This way.  (Witness indicates.)

Q   Is that towards Oak Street?

A   Yes.

Q   Did you see anyone carrying anything?

A   I just remember seeing the sweater just get dropped off in the car and them just leaving.  I don't remember, recall, you know, seeing anything or any gun.

Q   After the people walked toward Oak Street, did something happen?

A   Yes.

Q   What happened?

A   All I heard was some shooting.

Q   Gunshots?

A   Yes.

Q   How many gunshots did you hear?

A   I mean, I can't be specific because, I mean, at that time I was just, you know, scared and I didn't know what to think.

Q   Can you estimate?

A   Like five, five, six.

Q   What happened next?

A   They got in the car and we took off.

Q   Who is they?

A   Gonzo, Shrek, Rabbit, me and Theresa.

Q   Did you see after those three people went down the alley toward Oak Street, did you see them the entire

way?

A    No.

Q    Were you able to see them when the gunshots were fired?

A    No.

Q    Where did they come from to come back to the vehicle?

A    The same way they left to -- from 4th and Oak.

Q    Walking or running?

A    Running.  After that, they came running.

Q    Did they get in the vehicle?

A    Yes.

Q    Where did Juan Torres get in the vehicle?

A    In the back.

Q    Where did Shrek get in the vehicle?

A    In the front.

Q    Where did Gonzo get in the vehicle?

A    In the front.

Q    Did you see anyone carrying anything?

A    No.

Q    At any point that evening did you see a firearm?

A    No.

Q    In your past statements to law enforcement or testimony to the grand jury, have you said that you saw people carrying a firearm that night?

A    Yeah, I did, but that was -- I had -- I was confusing it with another thing that had happened on 4th.

Q    Okay. What would that other thing have been that happened on 4th street?

A    Uhm, I had got in trouble. It was probably a couple months after the shooting happened that I had got in trouble again.

Q    And were there firearms involved in that trouble?

A    Uhm, I guess they found some, you know, I mean, I saw one that day -- that night I had seen one, you know, 'cause this guy from Nebraska had tooken one.

Q    Had taken a firearm?

A    Yeah.

Q    So is your testimony that on the evening of October 4th, 2008, you did not see anyone carrying a firearm?

A    Yeah, I didn't see nobody.

Q    You have stated in the past to law enforcement officers or in testimony that you did see a firearm?

A    Yes.

Q    And you're now stating that you've confused that with a different incident --

A    Yes.

Q    -- that occurred on 4th Avenue?

A    Yeah.

Q    There was a -- well, did you see the firearm during the second incident on 4th Avenue?

A    Yes.

Q    After the individual ran back to the car, what did you do?

A    We took off, went down -- went up on, I think it was, it was 4th, and then we hit Wyatt Earp.  It was right -- we left the alley of 4th and 5th and then we went all the way through.

Q    Okay.  On this diagram we have the alley of 4th and 5th; is that right?

A    Yes.

Q    Which direction did you drive in the alley?

A    Straight.

Q    Straight.  Why don't you go ahead and draw a line on there for us.

A    More like that.  (Witness indicates.)

Q    Let's erase that since you put two marks on there.

A    Okay.

Q    Which direction did you drive in the alley?  After driving down that alley, did you -- you stated you went on 4th.  Do you recall when you went onto 4th street?

A    No.  I mean, we were, we were going up from 4th and 5th leaving the alley, so it would have been leaving -- we would have been going -- leaving like that up there.

Going that way.

Q   Toward 4th Avenue or away from 4th Avenue?

A   Away from 4th Avenue.

Q   And you went to where?

A   We hit Wyatt Earp.

Q   And after you hit Wyatt Earp, did you go somewhere?

A   Yes.  We went back to Shrek's house.

Q   The same house that the kick-back was at?

A   Yes.

Q   How many people were at Shrek's house?

A   At that time, nobody, no one.

Q   Other than the five of you?

A   Yes.

Q   Did you drop anyone else off --

A   No.

Q   -- while you were driving towards Shrek's house?

A   No.

Q   When you got to Shrek's house, what happened?

A   Shrek took off one direction and me, Theresa, Gonzo and Rabbit took off another direction.

Q   What do you mean one direction?  What direction did Shrek take off to?

A   I don't remember him, where he went.  We just -- I just remember us running through the fields.

Q   What fields were those?

A   Right behind Gonzo -- I mean Shrek's house.

Q   So was Shrek with you?

A   No, he wasn't.

Q   Who was with you?

A   It was me, Theresa, Gonzo and Rabbit.

Q   Where did you go?

A   We were -- we ran through probably like five, six fields.

Q   How long did that take?

A   I don't remember how long it took.  It probably took like 30 minutes.  I mean --

Q   And in your testimony when you refer to Rabbit, are you referring to Juan Torres?

A   Yeah, Juan Torres.

Q   Where did you go as you were running through the fields?

A   We hit -- we went through -- we were going through the fields until we hit a field that had -- was -- you know, where nobody could see us.

Q   And then what happened?

A   Uhm, we -- they told us to just stay there, to just lay on the ground and --

Q   Who is they?

A   Uhm, Theresa told me and then Gonzo and Juan Torres did the same.

Q   To lay down?

A   Yeah.

Q   And what did you do?

A   Uhm, after that, we stayed there until everything was cleared.

Q   Well, did you lay down in the field?

A   Yes.

Q   Were the other three people with you?

A   Yes.

Q   Is that Theresa, Gonzo and Juan Torres?

A   Yes.

Q   Were you hiding behind anything?

A   Not that I recall.  I just remember there was a tree right next to us.

Q   As you were running through the fields, was anyone carrying anything?

A   No.

Q   Have you told law enforcement in the past that someone was carrying something when you were running through the field?

A   Yes, because I remember when we were running, someone stopped at an old vehicle and dropped something and I, I knew it was a gun -- I don't know if it was a gun, you know, but they dropped something in an old car.

Q   You knew or you did not know that it was a gun?

A   I, I knew it was a gun or, I mean, I really didn't know, you know, what it was; but I knew it was something 'cause when it hit, it just dropped, and that's when we were still --

Q   Is this an old vehicle in one of the fields?

A   Yes.

Q   Were there any other old vehicles around it?

A   No.

Q   How far away from that old vehicle was it when you stopped and hid in the field?

A   Like, must have been, like, three miles.  I mean, we were pretty far already.

Q   Okay.  And you stated you waited until it was all clear?

A   Yeah.

Q   What happened when it was all clear?

A   I had called -- we needed a ride, so I had called my mom.

Q   And then what happened after you called your mom?

A   My mom, my brother and my dad picked us up.

Q   How long after -- or how long had you been hiding?

A   Probably two, three hours.

Q   Who did your mother, brother and father pick up?

A   Me, Theresa, Gonzo and Rabbit.

Q   After you were picked up, where did you go?

A   They took -- I remember Theresa -- Theresa, Gonzo and Juan got dropped off at their house, his house.

Q   Who's his house?

A   Juan Torres' house.

Q   The three of them were dropped off at Juan Torres'?

A   Yeah.

Q   Where did you go?

A   I went home.

Q   In previous interviews with law enforcement, did you tell law enforcement that you were dropped off somewhere other than Shrek's house?

A   Yes.

Q   What did you tell them?

A   That I had just got dropped off at home.

Q   And you've stated in previous interviews that the person you've identified as Savage was in the vehicle?

A   Yes.

Q   When you stated that Savage was in the vehicle, did you leave someone out of the vehicle?

A   I mean, that's all I remembered.  I -- that I know, remember, just us five were in the car.

Q   Well, who was you five in the car?

A   Me, Gon -- me, Theresa, Juan, Shrek and Gonzo.

Q   Why did you say Savage was in the vehicle?

A   Because that's -- because I had gotten in a

previous -- the time I got -- I went to jail the last time, it was at Savage's house.

Q    When was it that you went to jail that time?

A    I don't remember the date but --

Q    Was it before or after October 4, 2008?

A    Probably after.

Q    And why was it that you told law enforcement you were dropped off somewhere other Shrek's house?

A    Because I didn't want to get my parents involved in it.

Q    After the confrontation in the street where the beer cans were thrown, did you hear Gonzo say anything?

A    I mean, I don't remember who kept, you know, who kept saying what, you know.  I mean, I just remember when the beer can got thrown at the car.

Q    After October 4th, 2008, did you speak to Gonzo about this shooting?

A    No.  I just remember when Theresa told me not to tell, not to the say anything.

Q    Well, did you speak to Gonzo?

A    At that time not no more.  I hadn't seen him or anything no more.

Q    After October 4, 2008?

A    Yeah.  I don't recall.  I don't remember seeing him again.

MR. SMITH: One moment, Your Honor.

(Off-the-record.)

Q   Do you recall telling a detective with the Dodge City Police Department that after October 4, 2008, Gonzo and Juan Torres came to your house?

A   Yes.  But the one that had told me everything was Theresa.  She had told me not to say nothing because they didn't want --

MR. HENRY: Objection; hearsay.

THE COURT: The objection is -- I don't really understand her answer; but as to what Theresa told her, the objection is sustained.

BY MR. SMITH:

Q   Okay.  Did you tell law enforcement officers that Gonzo and Juan Torres came to your house?

A   Yes.

Q   Did you tell law enforcement officers that Gonzo and Juan Torres said something to you?

A   Yes.

Q   What did you tell law enforcement officers that Gonzo and Juan Torres said to you?

A   Not to say nothing.

Q   Did that happen?

A   No.

MR. SMITH: Nothing further.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. HENRY:

Q   You started off your testimony saying that you were interviewed just one time by law enforcement; is that right?

A   Yes.

Q   Is that true?

A   Yes, as I recall.  I mean, it was two, three years ago, I mean, I really don't remember how many people I talked to.

Q   And that the interview you had was with just one police officer; is that right?

A   Yes, that I recall.

Q   So you didn't meet with Detective Bice and a Sgt. Brooks-Francis?

A   I remember Detective Bice.

Q   So you don't remember an interview where there were two law enforcement officers?

A   I mean, I remember there was a lady there; but, I mean, I would always talk to Detective Bice.

Q   So is this the one time that you were interviewed?

A   Yes.

Q   Now, do you remember a time when it was -- well, who else was in the room with you and this lady?

A    My -- I remember my dad being in the room with me.

Q    Okay.

A    He took me to the station.

Q    Anyone else?

A    No.  Not that I --

Q    The -- do you remember an interview where you had your dad in the room and it was just Detective Bice and your child, your baby?

A    Yes.

Q    Is that the one you're talking about?

A    Yes.

Q    You don't remember an interview the month later with Detective Bice and Sgt. Francis?

A    Just when they went to my house to tell me that I had court in Wichita and they talked to my parents.

Q    Okay.  So that was just to tell you when you had court?

A    No.  And to tell my parents what was going on, the problem.

Q    How long did that interview last?

A    Probably like an hour or so.  They just told my parents what was going on.  They didn't specifically tell them, you know, what was going on; but just some, like, a little detail of what was going on.

                    (Off-the-record discussion

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

                    between Mr. Henry and

                    Mr. Smith.)

          MR. HENRY:  While they're looking for that,

could we have 374 pulled up.

BY MR. HENRY:

Q   Now, if you could, again, tell us the direction that
you came back after the beer bottle incident?

A   It was this one.  (Witness indicates.)

Q   On that road.  Okay.  And which direction were you
going?

A   We were going up, so it would have been this way.

Q   You were going to -- is that to the west?

A   Yes.

Q   Okay.  And then you would have turned into the
alley.  Is that what you had testified to?

A   Yes.

Q   Okay.  And then did you proceed out of that alley
forward?

A   Yes.

Q   So you would have gone up to Oak Street?

A   No.

Q   Did you tell any of the officers that you had backed
up?

A   No.

Q   Did you go up to Oak Street?

A   No, we didn't.

Q   Handing you what's been marked as 414.  Do you recognize that individual?

A   Yes.

Q   Do you know who it is?

A   I don't remember his real name.

Q   Do you know what he goes by?

A   Either Rabbit or Cornejo, I mean, I don't know.

Q   What does Cornejo mean?

A   The same.

Q   Rabbit?

A   Yeah.

Q   Okay.

       MR. HENRY:  I'd move for the admission of Government number 414.

       MR. SMITH:  No objection.

       THE COURT:  414 is received.

BY MR. HENRY:

Q   So this is Rabbit?

A   Yes.

Q   So this was the individual that you were in the back seat with?

A   No.

Q   So there are two Rabbits?

A   Yes.  I mean, I don't know which one goes by which.

Q   Now, you know who Savage is; right?

A   Yes.

Q   And, in fact, you go to school with him; isn't that right?

A   I did.

Q   You did?

A   Yeah.  But --

Q   You're out of high school now?

A   Yeah.

Q   And back five years ago, though, you would have been in high school with him?

A   Yes.

Q   Was he in the same grade with you?

A   No.

Q   But you know that Savage, his name also is Erik Sanchez; is that right?

A   I don't know what his name is.  I mean, I just know him by Savage.

Q   Okay.  You know he's good friends, though, with Gonzalo's little brother Erik Ramirez; isn't that right?

A   I mean, I know Erik Ramirez knew my brother.

Q   Your brother is Angel --

A   No.

Q   I'm sorry.  Who's your brother?

A   Manuel Gonzalez.

Q   Okay.  And the -- with respect to the interview that you had --

A   Yes.

Q   -- with Detective Bice.  You first told him that it was Erik Sanchez, a/k/a Savage -- could we pull up that picture.

Now, he was -- was he younger than you?

A   Yes.

Q   Okay.  Now, he was the one that you had said was in the car with you in the back seat?

A   Yes.

Q   And that was -- how many times did you tell the police that?

A   I went to the police station and here in court when I had court two years ago here.

Q   Okay.  You actually had an interview with Detective Bice in January of 2011?

A   Yes.

Q   And you also had an interview with Detective Bice and Sgt. Francis-Brooks, I believe, a month later in February of 2011; isn't that correct?

A   Yes.  I mean, I don't remember.

Q   And then you had your grand jury testimony in late March of 2011?

A   Yes.

Q   So there were three times that you met or you actually gave statements regarding who was in the back seat with you; is that right?

A   Yes.

Q   And you had maintained that position -- you said Erik Savage -- excuse me -- Erik Sanchez, also known as Savage, was in the back seat with you throughout all those times; is that right?

A   Yes.

Q   Did you have an attorney for you when you testified in front of the grand jury?

A   No.

Q   Okay.  But you stood up in front of that grand jury and you took an oath to tell the truth; isn't that right?

A   Yes.

Q   Okay.  And, of course, back in 2011 when you're discussing this month after month, and then to the grand jury under oath, this stuff is fresh in your mind? Fresher certainly than it is today?

A   Yes.

Q   And you told them each and every time that it was Erik Sanchez that was by you?

A   Yes.

Q   Okay.  Now, Theresa Tinoco was with you that whole

time; right?

A    Yes.

Q    And Theresa Tinoco is a close friend of yours; is that right?

A    Yes.

Q    The -- Theresa is a -- was she in your class?

A    I mean, I met her in school.

Q    You had said, I believe, that you were -- let me just find -- that night October 8, I believe, of 200 -- no, excuse me -- October 4 of 2008, you had said that you were unaffiliated?

A    Yes.

Q    Okay.  So you weren't associated with any gang?

A    I mean, I was hanging out with them; but I was never -- never got involved in a big --

Q    Do you remember telling Detective Bice that you were blessed into the Diablos Viejos?

A    Not that I recall.

Q    Do you recall telling him that you were blessed in because you were -- let me just see here.  Who was your boyfriend back then?

A    Joseph Marquez.

Q    And he was in the DV?

A    Yes.

Q    Okay.  He was fairly a big-wig in the DV; isn't that

true?

A   Yes.

Q   Now, do you recall telling Detective Bice in January of 2011, that you had been blessed in because of your relationship with Mr. Marquez?

A   Not that I recall; but I may have said that.

Q   Do you remember at that first interview with Detective Bice that you told 'em you didn't know any of the guys that were in the car?

A   Yes.

Q   That's a lie?

A   I mean, the only person I knew was Theresa and Juan Torres.

Q   Okay.  You didn't even know Gonzo when he was at the kick-back?

A   At the kick-back, I mean, I hadn't -- I've never met him, like, in person, you know.  I would hear about him; but never met him in person.

Q   Okay.  Now, you told also Detective Bice at that first interview that you weren't in Gonzalo's car that night; isn't that true?

A   Yes.

Q   And that it was -- in fact, the -- now, at the kick-back, you said that Gonzalo was there?

A   Yes.

Q    Okay.  But you didn't remember anybody else that was there?

A    I mean, I remember people being there; but, I mean, I really didn't know the older people.

Q    Okay.  But you said that Angel Cerda was there?

A    Yes.

Q    And you know him by another name; correct?

A    Shrek.

Q    Now, did you say that Shrek was the one who actually drove from his place?

A    Yes.

Q    Okay.  And that's true, isn't it?

A    Yes, I think -- I mean, it's been so long that, you know, I really don't remember, you know, what had happened.

Q    And isn't it true that Erik Sanchez, also known as Savage --

A    Yes.

Q    -- was there at that kick back?

A    Yes, as I recall, he was.

Q    Okay.  And, again, both Eric and Angel live right there?  That's their house?

A    I remember it was Shrek's house but not Savage's house.

Q    Okay.  But Eric Sanchez is Angel Cerda's younger

brother?

A   I didn't know that.

Q   But they were both there.  You remember telling Detective Bice that Gonzalo wasn't in the car?

A   Yes.

Q   Now, you had said you're unaffiliated?

A   Yes.

Q   Yet, Joseph Marquez is fairly high up in the DVs there in Dodge City; is that right?

A   I mean, he was.  I'm not with him no more, so I wouldn't know.

Q   Okay.  But back then he was?

A   Yes.

Q   And the -- you had said you were unaffiliated; is that right?

A   Yes.

Q   And in 2011 when you talked to Detective Bice, you said that you weren't banging; isn't that correct?

A   Yes.

Q   But that wasn't true, was it?

A   I mean, I was -- I was dating him; but, I mean, I never did anything to --

Q   Now, you were dating Joseph Marquez when?  On October 4 of 2008?

A   No, we had -- I wasn't with him at that time no

more.

Q   Okay.  But you were with your father and your newborn?

A   Yes.

Q   In this first interview with Detective Bice; is that right?

A   Yes.

Q   Now, you left Joseph Marquez; but you ended up going and getting with Tony Martinez; isn't that right?  I'm sorry, may be wrong on the first name.  Who's the father of your child?

A   Jose Martinez.

Q   Jose Martinez.  Okay.  And you actually boasted to Detective Bice that he was the leader of a a new gang that was forming on the west side of Dodge City; isn't that right?

A   Yes.

Q   Okay.  And, again, this was in 2011.  You had a newborn that was born in late 2010?

A   Yes.

Q   Okay.  So you would have been with Mr -- again, his name is --

A   Jose Martinez.

Q   Jose Martinez.  Who's the leader of the West Siders -- is that the name?

A   Yes.

Q   Okay.  This is, again, another home-grown group out of Dodge City?

MR. SMITH:  I object to the relevance of this line of questioning.

THE COURT:  The objection is overruled.

BY MR. HENRY:

Q   The West Siders was a fairly new group that was organized there in Dodge City; is that right?

A   Yes.

Q   And so -- were you with Mr. Martinez at the time when -- October 4th, of 2008?

A   No.

Q   But during this time, you were banging from one group to another with different boyfriends; is that right?

A   I mean, I wasn't dating Joseph no more.  I mean, that was like, what, four or five years, probably like seven years ago.

Q   Now, prior to your testimony here today, you would have met with the Government's prosecution team here; is that correct?

A   Yes.

Q   And when was the last time you met with them?

A   Uhm, I have to say three, four months ago.

Q    Three or four months ago?

A    Yeah.  Before I had -- just to talk.

Q    And did you meet with them prior to today's testimony?

A    Yes.

Q    And when did you meet with them?

A    I don't remember the date.

Q    Did you meet with them this week or last week?

A    No.

Q    Just three or four months ago?

A    Like two, three months ago.  I don't remember the month.

Q    When was the first time that you told the prosecution team that it wasn't Savage that was in the back seat with you?

A    That day that they told me that I had to talk to them.

Q    What day was that?

A    I don't remember the date; but it was a meeting. They told me to go to a meeting.

Q    How long ago was that?

A    Two, three months ago.

Q    So this, so we're talking about, oh, four, almost five years go by and the first time you mention to them that it wasn't Erik Sanchez with you at that time,

sometime this summer?

A   Yes.

Q   They told you that you had to be at that meeting; isn't that right?

A   Yes.

Q   And this is getting closer to trial?

A   Yes.

Q   And did they tell you that your testimony regarding Erik Sanchez being in the back seat with you was inconsistent with Juan Torres' testimony?

A   They just told me that I had to tell the truth because they knew more information and that's when they started telling me --

Q   You aren't being prosecuted in this case; isn't that correct?

A   Yes.

Q   And, in fact, Detective Bice told you that as long as you told 'em the truth back in 2010, in January of 2010, 2011, that as long as you told 'em the truth, nothing would happen.  Isn't that right?

A   Yes.

Q   Okay.  And so you told 'em the truth in January of 2011 that it was Erik Sanchez in the car with you?

A   Yes.

Q   And you told that to Detective Bice and Sgt. Brooks

the following month; correct?

A   Yes.

Q   And you told that in front of a grand jury where you actually had to take an oath to tell the truth?

A   Yes.

Q   Just like had you to take an oath today to tell the truth?

A   Yes.

Q   And you did tell the truth back then, didn't you?

A   I mean, I just don't remember, I mean, who was in the -- I mean, I just remember the people, people that I remember that were in the car.

Q   Whether or not it was directly told to you, were you given the impression or message that you had to change your version of who was in the car this past summer when you met with the Government or with any law enforcement officers?

A   No.

Q   Okay.  You know that if your story doesn't line up the way the Government is trying to present it, that they may actually prosecute you, don't you?

A   Yes.

Q   Now, you and Theresa Tinoco are good friends?

A   Yes.

Q   And, in fact, Theresa Tinoco called you in that

first interview when Detective Bice was out of the room.
Do you remember that?

A    Yes.

Q    And, in fact, at that time you had said -- you told
her, at least from that first interview, that I'm still
here, I guess Shrek snitched on us that we were there.
Do you remember telling her that?

A    Yes.

Q    Okay.  And you were -- I mean, did anybody tell you
that Shrek had snitched on you?

A    Like, people would just tell me, you know, hey, you
know you're in trouble right now and I think Shrek
talked or said something about you.

Q    Okay.  And that was -- at least that was the word on
the street and that's what you and Theresa understood?

A    Yes.

Q    Okay.  And then later in that interview, Detective
Bice tells you that you're not going to be -- as long as
you tell us the truth, the prosecutors aren't going to
want to charge you.  Do you remember that?

A    Yes.

Q    Okay.  So that's when all the sudden you started
changing your story and saying that it was Shrek in
the -- excuse me -- Savage in the back seat with you?

A    Yes.

Q   Okay.  And you thought it was the truth back then?

A   Yes.

Q   And you're saying that it's not the truth now?

A   Yes.

Q   You admit, though, when you were talking to Detective Bice that you said Gonzalo Ramirez wasn't there?

A   Yes.

Q   And you're saying that Juan Torres, not Jesus Torres who I just showed you, but a different Rabbit --

A   Uh-huh.

Q   Is that a yes?

A   Yes.

Q   Is it consistent to have people with the same -- in the same organization or group to be named the same?

A   I mean --

        MR. SMITH:  Objection; speculation.

        THE COURT:  What was your answer, ma'am?

A   I mean, I just don't remember which one was called Rabbit.  I mean, I just knew him as Juan Torres but I knew he had a nickname.

        THE COURT:  The answer will stand.  She's already said that once anyway.

BY MR. HENRY:

Q   Now, you told also Detective Bice that -- well,

first, you told Detective Bice before he kind of told you that, well, they don't want to charge you, just come clean, and then you did; but before that you told him that you actually weren't there at the shooting. Do you remember that?

A   Yes.

Q   In fact, you said that after the beer incident that they took you home?

A   Yes.

Q   And then later on, you said you were there but you didn't see anything?

A   Yes.

Q   Now, the beer incident, you're saying that it was the group that was alongside Abel Hernandez' house that actually started talking, whistling, throwing signs or whatever; isn't that right?

A   Yes.

Q   Okay. Now, the -- and you said it was 15 to 20 people; right?

A   Yes.

Q   Okay. So it was a big gathering. They were all drinking?

A   Yes, they were all drinking.

Q   Were they all Surenos?

A   I just remember Abel Hernandez being a Sureno. I

don't remember if the -- I don't know who the other people were.

Q   Okay.  But did you see Abel that night on the side of the house?

A   I mean, I don't remember if he was there; but I knew he lived there.

Q   In fact, you're the one that directed Shrek to drive up 4th -- down 4th Avenue to drive by Abel Hernandez' house; isn't that true?

A   No.

Q   If Juan Torres, the other Rabbit, says that, is he lying?

A   Yes, because I never told him to go down that street.

Q   You never said that when you were traveling supposedly home that, oh, I know where a Sureno lives just down this street?

A   No.

Q   Now, you remember telling Detective Bice that you stayed in the car when you got to Gonzo's mother's house?

A   Yes.

Q   And you're saying now that wasn't true?

A   Yes.  Because I remember that I had got off because I had -- me and Theresa had to pee.

Q    Okay.  So everyone got out of the car?

A    Yes.

Q    Do you remember first saying that it was just three people that got out?

A    Yes.

Q    But that's not true?

A    Yeah.

Q    And do you remember saying that it was three people who got out in the alleyway with whatever was in the sweater?

A    Yes.

Q    Okay.  Now, is that what you're saying today or are you saying everybody got out?

A    We all got out.

Q    Okay.  So you're actually -- you and Theresa got out of the vehicle as well?

A    Yes.

Q    Do you remember first telling Detective Bice that you and Savage got into the front seat?

A    Yes.

Q    Okay.  And, again, at that time you were saying that Savage was kept in the car to kind of watch over you; is that right?

A    Yes.

Q    And you're saying that's not true now?

A   No, that's not true.  We all got off.

Q   So when you ended up telling Detective Bice that you and Savage got in the front seat when everyone else came back, that's not true?

A   That's not true.

Q   You remember telling Detective Bice that you went down the alley, past Division, all the way down to I think Spruce; is that right?

A   I don't know what the alleys are called.  I mean --

Q   Do you remember telling him that you got let off at a place in Dodge City in alphabet city, that area of town east of Wyatt Earp -- excuse me -- north of Wyatt Earp, by some place that had a statue?

A   Yes.

Q   Okay.  Was that the place over by Applebee's?

A   I think so, yeah.

Q   You remember telling Detective Bice that?

A   Yes.

Q   And you're saying that's not true either?

A   No.

Q   Okay.  So at first you weren't down at Cerda's after the shooting; and now you're saying you're down at Cerda's after the shooting?

A   I mean, I just remember us going -- getting off at Gonzo's and going to an alley and that's when everything

happened.

Q   Okay.  And they let you off -- you -- actually,
didn't up tell Detective Bice that the car went through
a number of alleys?

A   Yes.

Q   Okay.  Before hitting a street?

A   Before hitting Wyatt Earp.

Q   Okay.  So if we could pull up 374 again.  Tell us
the direction in which the car went.

A   Like that.  (Witness indicates.)

Q   Okay.  And then which way?

A   We went up 5th.  So it would be up 5th.  (Witness
indicates.)

Q   So you would have -- okay.  Now you said that you've
gone down 5th?

A   Up 5th.

Q   That's right, because there's a hill there.  You're
actually going up a little hill --

A   Yes.

Q   -- and it's going down hill toward --

A   Towards Wyatt Earp.

Q   To the east?

A   Yeah.

Q   Okay.  The alley -- now, again, you said to
Detective Bice one time that you had gone through a

number of alleys; is that right?

A    Yes.

Q    Okay.  But now you're saying that you just somehow backtrack?  Do you remember backing up?

A    No.

Q    Okay.  But you went in forward to the north in that alley, didn't you?

A    Yes.

Q    But now you're saying that somehow you came out and you were going west on 5th Avenue?

A    Yes.  We were going up 5th and going to Wyatt Earp.

Q    Okay.  So you're not saying that you went east on 5th to 4th Avenue and then took a right?

A    No.

Q    Okay.  Thank you.  You can take that down.

Do you know Mariella Cerda?

A    Yes.

Q    Did you know her from school or how'd you know her?

A    School.

Q    Okay.  So Erik Sanchez is younger than you; is that right?

A    Yes.

Q    Angel Cerda, his older brother, is he older than you?

A    I think so.

Q   And then Mariella is in the middle?

A   Yes.

Q   So you were familiar with that place out there on Kettle Way; is that right?

A   I mean, I didn't know she lived there.  I mean, I didn't know who lived there.  I just knew Mariella from school.

Q   This is where the kick-back was occurring; right?

A   Yes.

Q   Okay.  Now, do you remember telling Detective Bice that you didn't do any drinking that night?

A   Yes.

Q   Now you're telling the jury that you had been drinking?

A   I just drank -- opened one beer and probably took one or two sips and after that I just left the beer there.

MR. HENRY:  Your Honor, I don't know if this is a good time -- I'm going to try to clean up things -- maybe if the Court wanted to take a break -- and try to close up my cross.

THE COURT:  We'll take our noon recess, Ladies and Gentlemen, until about 1:30.  Remember and heed the admonition.

(Noon recess.)

(Beginning at 1:45 p.m. October 10, 2013, the following proceedings continued.)

THE COURT:  Yes, sir.

MR. HENRY:  Thank you, Your Honor.

BY MR. HENRY:

Q   I want to touch on two things before I end, Ms. Gonzalez.  You had said that, on your direct examination, that you didn't know who drove the car that night; is that correct?

A   Yes.

Q   And you made a statement in February of 2011 to Detective Bice and to Sgt. Brooks-Francis.  Do you remember that?

A   Yes.

Q   I've put in front of you that report.  It's I think marked Defendant's Exhibit R-CC.  It's the report from February 16th of 2011.  Do you see that in front of you?

A   Yes.

Q   Now, I want to refresh your memory with respect to who was driving.  And on that front page, there are four references that are made.  One is in the middle of the -- well, about two-thirds of the way down in the first paragraph, about who was driving.

A   Uh-huh.

Q   Do you see that?

A   Yes.

Q   And then down at the bottom of the third paragraph. Do you see that?

A   Yes.

Q   And in the fourth paragraph, the driver is referenced twice.  Do you see that?

A   Yes.

Q   Each of those times -- well, let me ask you this. Does that refresh your memory as far as who was driving the vehicle that night?

A   Yes.

Q   And it was somebody that you knew by the name of Shrek; is that correct?

A   Yes.

Q   And that person is Angel Cerda; is that correct?

A   Yes.

Q   And his younger brother is the one that you had said all along until just this summer was also in the car with you?

A   Yes.

Q   Now, there's another document in front of you.  It's the grand jury testimony from your testimony on March 30th of 2011 and it's marked Defendant's Exhibit R-DD. Do you see that?

A   Yes.

Q   Could you please turn to Page 9.  If you could just review that page.

    Have you reviewed that?

A   Yes.

Q   And does that refresh your memory with respect to who was driving the vehicle on October 4th of 2008?

A   Yes.

Q   And who was the person that was driving?

A   As I remember, since we were in Gonzo's car, I think it was -- I think it was Gonzo.  I mean, I don't --

Q   Did you actually say that on March 30th of 2011?

A   No.

Q   Okay.  And on Page 9 you actually say that it's Shrek that was driving Gonzo's car; is that correct?

A   Yes.

Q   Can you please turn to Page 2.  Up at the top of that page, before you were asked any questions by the Government's attorney at that time, you actually had to take an oath; is that correct?

A   Yes.

Q   And you swore to state the truth and nothing but the truth; is that correct?

A   Yes.

Q   Now, isn't it possible that the reason why Gonzo

wasn't driving his car that night is because Gonzo wasn't in the car that night?

A   Huh?

Q   Isn't it possible that Gonzalo Ramirez wasn't driving his car that night because he wasn't in the car that night?

A   As I recall, he was.

Q   As you recall?

A   Yeah.

Q   And you've had a lot of memory lapses over the last five years.  Would that be a fair statement?

A   Just here and there.  I mean, I don't remember everything clearly.

Q   Now, you've had -- do you have a tattoo, four dots tattoo on your hand?

A   Yes.

Q   And do you still have those?

A   Yes.

Q   Could you show them to the jury.

                    (Witness complies with request.)

Q   I'm sorry.  Okay.  And what does that symbolize?

A   Four dots?  Norte.

Q   Okay.  Is that something that you had back in 2008?

A   No, at that time I didn't have it.

Q   When did you get your tattoo?

A    When I went to foster.

Q    Okay.  When was that?

A    I don't remember when I went to foster.

Q    Okay.  The -- since the time that you had your boyfriend Mr. Marquez who was a member of the Diablos Viejos, as was mentioned earlier, you actually started dating somebody from a new gang that was the West Siders; is that correct?

MR. SMITH:  Objection; asked and answered. Cumulative.

THE COURT:  Overruled.

BY MR. HENRY:

Q    Is the -- is that tattoo something that is now outdated since you're no longer --

A    Yes.

Q    -- affiliated?

A    Yes.  I'm just waiting to after I have my daughter to take it off.

Q    Okay.  So you -- how long has it been that you're not affiliating with the DVs?

A    Ever since after that, I don't talk to nobody.

Q    So would it be fair to say that if you're going to have that tattoo removed, you haven't been talking with anybody, that you have no regard for the DVs?

A    No.

Q   And your testimony here today, is it being changed from this summer because you're not wanting to be charged by the Government?

A   No.

Q   You understand that you have to be truthful with them --

A   Yes.

Q   -- in their opinion --

A   Yes.

Q   -- not my opinion --

A   Yes.

Q   -- not the jury's opinion.  But you have to be sympatico with their testimony?

A   Yes.

Q   Or they wouldn't have put you on?

A   Yes.

Q   And that happened to change when you had a meeting with them this summer?

A   Yes.

MR. HENRY:  I have nothing further.

MR. SMITH:  Nothing further.

THE COURT:  Thank you.  You're excused.  Next witness, please.

MR. WELCH:  Your Honor, United States calls Juan Torres.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Your Honor, we expect that this witness and going forward will offer evidence -- that this witness will offer evidence against both Pedro Garcia and Gonzalo Ramirez; and I think that will be true for the witnesses going forward.

THE COURT:  So we're now back, throughout the remainder of the Government's case, back to both Defendants?

MR. WELCH:  Yes, sir.

THE COURT:  All right.

**JUAN TORRES**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you please state your name.

A   Juan Torres.

Q   Make sure you get closer to that microphone so we can hear you, sir.

A   Juan Torres.

Q   Mr. Torres, where do you live?

A   Dodge City, Kansas.

Q   Are you currently employed, sir?

A   Yes.

Q   How long have you lived in Dodge City, Kansas?

A   My whole life.

Q   How old are you?

A   22.

Q   Since your living in Dodge City, have you become familiar with a gang by the name of Diablos Viejos or DV?

A   Yes.

Q   Were you a member or are you a member of DV?

A   Yes.

Q   When did you become a member of DV?

A   When I was 15 years old.

Q   And how did you become a member of the Diablos Viejos?

A   I got jumped in.  To the gang.

Q   Prior to your joining the gang, did you have a brother who was a member of Diablos Viejos?

A   Yes.

Q   What is his name?

A   Jesus Torres.

Q   And you said you got jumped in to join the gang. What actually happened to you to get jumped into the gang?

A   I was beat by four other members who were already gang members.

Q   And you were how old when this happened?

A   15.

Q   Where did that happen?

A   At another gang member's house.

Q   And do you recall the four gang members who jumped you in?

A   Jose Neave, Barnaby Racone, Alfredo Beltran and my brother Jesus Torres.

Q   Is Jose Neave known as Caiyo?

A   Yes.

Q   And your brother Jesus Torres, what's his nickname?

A   Rabbit.

Q   Make sure you're close to that microphone so we can hear you, Mr. Torres.  Thank you.

Sir, when you became a Diablos Viejos gang member, did you have a nickname?

A   Yes.

Q   What was your nickname?

A   Bugzy.

Q   Prior to officially becoming a member and being jumped in to the gang, did you associate with DV gang members?

A   Yes.

Q   And how long were you in a period of associating or hanging around with the DV before you became a member?

A    About six months.

Q    Did you participate in jumping in other members into the gang?

A    Yes.

Q    Who do you recall helping jump into the gang, or jumping into the gang?

A    Only one.  Donte Barnes.

Q    Do you recall what Donte Barnes' nickname was?

A    Snipes.

Q    I want to ask you just a little bit about what made you a Diablos Viejos gang member.  First of all, what color would you typically wear, sir?

A    Red.

Q    And did you personally wear red to signify your membership in Norteno or Diablos Viejos?

A    Yes.

Q    Can we display 22 please.  Who is that, sir?

A    That's me.

Q    And in this photograph, can you tell us whether or not you are identifying yourself as a DV gang member?

A    Yes.

Q    How so?

A    Wearing a red hat, black and red, and red hoody, jacket.

Q    And in addition, then, to the colors, were there

other symbols that you as a DV gang member or other DV gang members used to identify your membership?

A    Yeah.  Gang signs, flashing gang signs.

Q    Go ahead.  What type of gang sign would you use?

A    Throwing up a one and a four, DV, an N.

MR. WACHTEL:  Your Honor, I object.  This is repetitious.  We have heard this kind of testimony from I don't know how many witnesses in this case.

THE COURT:  Sustained.  Let's not hear any more about red and gang signs unless there's some specific reason.

MR. WELCH:  All right.

BY MR. WELCH:

Q    Can we display 82, please.  Sir, do you recognize yourself in this photograph?

A    Yes.

Q    Where are you located in this photograph?

A    In the middle with the white jersey.

Q    And the white jersey has what number?

A    14.

Q    And do you see Donte Barnes in this photograph?

A    Yes.

Q    Where is he located?

A    On the front right.

Q    Let me -- you can actually touch the screen and it

will leave a mark where you're indicating.  Let's start with place a mark on where you're located in the photograph, sir.

(Witness complies with request.)

Q   And then can you make a mark where Donte Barnes is located.

(Witness complies with request.)

Q   And is this the same Donte Barnes that you helped jump into the gang?

A   Yes.

Q   In addition to yourself and Donte Barnes, do you see two other men in this photograph that were members of a gang in Dodge City?

A   Yes.

Q   Who are they?  Starting from the far left, who is that?

A   Joshua Flores.

Q   And what gang was Mr. Flores -- Josh Flores a member of?

A   LCC.

Q   And then the person to his -- it would be to his left and our right.  There's a female next to him, then a male next to her.  Do you see him?

A   Yes.

Q   Who is that?

A   Jayson Vargas.

Q   Was Jayson Vargas a member of a gang?

A   Yes.

Q   What gang was he a member of?

A   LCC.

Q   Now, in addition then to -- in this picture you're wearing the number 14 to signify your association with Norteno; is that right?

A   Yes.

Q   All right.  In addition to that, did you also personally tag -- engage in the practice of tagging in Dodge City?

A   Yes.

Q   What is tagging?

THE COURT:  I think we know what tagging is. Ladies and Gentlemen, do any of you have any questions at this point about what tagging is?  They all know what it is.

MR. WELCH:  Your Honor, I'm attempting to establish foundation --

THE COURT:  You asked him what it was.  He knows what it is.  Let's move on here.  These are all gang members.  They know.

MR. WELCH:  All right.

THE COURT:  Come on.  I have put up with this

much longer than I have intended to do so and I'm just admonishing you to get to the point with these witnesses.

BY MR. WELCH:

Q   Mr. Torres, are you familiar with the term Nortenos?

A   Yes.

Q   And what is the relationship in Dodge City between Nortenos and Diablos Viejos?

A   Diablos Viejos is a faction of Nortenos, smaller faction.

Q   So if you are a Diablos Viejos, does that make you automatically a Norteno?

A   Yes.

Q   But are all Nortenos anywhere in the country, are they all Diablos Viejos gang members?

A   No.

MR. WACHTEL:   Foundation, Your Honor. Objection.

THE COURT:   Sustained.

BY MR. WELCH:

Q   Do you know of Nortenos -- people who claim to be Nortenos that are not DV gang members?

A   Yes.

Q   Do you know a man by the name of Pedro Garcia?

A   Yes.

Q   And how do you know Pedro Garcia?

A   He's also a gang member.

Q   I didn't hear what you said.

A   He's also a gang member.

Q   Okay.  Let's back up just a second.  When did you first meet Pedro Garcia?

A   When he got out of prison.

Q   I'm having trouble hearing you so I'm guessing some of the jurors may be having trouble hearing you, sir.

A   When he got out of prison.

Q   Do you recall when Pedro Garcia got out of prison and when you would have met him?

A   I don't remember exactly.

Q   As you sit here today, can you give us an estimate of how long you have known Pedro Garcia?

A   About four years maybe.

Q   And do you see him in the courtroom today?

A   Yes.

Q   Would you please point to him, describe what he is wearing.

A   Blue shirt.

Q   Seated -- are you indicating the man seated next to this person here?

A   Yes.

MR. WELCH:  Your Honor, I'd ask the record

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

reflect the witness has identified Pedro Garcia.

THE COURT:  It will.

BY MR. WELCH:

Q   You told us earlier that Pedro Garcia is a gang member in Dodge City; is that right?

A   Yes.

Q   What gang was Pedro Garcia affiliated with?

A   DV.

Q   How do you know that Pedro Garcia was a DV gang member?

A   Because he was just part of the gang.  I don't know.

Q   Did you attend meetings that he was present at?

A   I don't remember.

Q   Do you know whether or not -- did you ever see Pedro Garcia wearing red?

A   Yes.

Q   Do you know if he has tattoos that identify him as a Norteno or DV gang member?

A   I think he has an X IV on his forehead.

Q   And the X IV stands for what?

A   14.

Q   Did he -- did you associate with him on occasion?

A   Yes.

Q   And did he participate in gang activities?

A   Yes.

Q   All right.  Do you know a man by the name of Gonzalo Ramirez?

A   Yes.

Q   All right.  And how long have you known Gonzalo Ramirez?

A   Probably about the same time.

Q   When did you first meet Gonzalo Ramirez?

A   When he got out of prison.

Q   And how long ago was that -- or how long have you known him?  If you're able to give us an estimate.

A   Four or five years.

Q   And do you see Gonzalo Ramirez in the courtroom today?

A   Yes.

Q   Would you please point to him and describe what he is wearing.

A   He is wearing a gray shirt.

Q   All right.  Is he the person seated between the man with the red and blue tie and the man with the blue tie?

A   Yes.

        MR. WELCH:  Your Honor, I'd ask the record reflect the witness has identified the Defendant Gonzalo Ramirez.

        THE COURT:  It will.

BY MR. WELCH:

Q   Mr. Torres, while you were a member of the DV gang, did you personally have interaction with or confrontations with rival gang members?

A   Yes.

Q   And who were the rivals to Nortenos or DV in Dodge City?

A   Surenos.

Q   And what type of confrontations did you personally have with rival gang members in Dodge City?

A   Fights.

Q   And was that something that was conducted or that occurred on a regular basis between Nortenos and Surenos in Dodge City?

A   Yes.

Q   And how many fights do you recall having, you personally, having with rival gang members?

A   Ten to 15.

Q   And when you say fights, can you tell us, are we talking fist fights?  Were weapons used?

A   Fist fights.

Q   In addition, then, to the fighting that you would engage in, you personally, had you been involved in other confrontations with rival gang members that involved firearms?

A    No.

Q    Was your house ever shot at by rival gang members?

A    Yes.

Q    Do you remember when that happened?

A    It happened on two occasions, maybe around 2008, 2009.

Q    Within the gang itself -- when I say gang, I'm referring to DV. Okay, Mr. Torres?

A    Yes.

Q    Were there certain gang members that had greater respect than other gang members?

A    Yes.

Q    All right. What type of behavior or what type of conduct earned or garnered more respect within the gang?

A    People who were more willing to get in confrontations. People who were more willing to be there for other gang members when they needed to be.

Q    If I heard you correctly, you said people who were willing to be involved with what?

        MR. WACHTEL: You know, I object, Your Honor. This is another one of those leading questions where we restate the first question.

        MR. WELCH: I didn't hear what the witness said, Your Honor.

        THE COURT: Well, I'm having a little trouble

hearing him, too.  Speak up.

A    Can you repeat the question.

BY MR. WELCH:

Q    Certainly.  I asked you first if there was -- if there were certain gang members within the gang who had greater respect than others.  You said yes.  And I asked you what type of activity or what type of conduct, what earn greater respect by your fellow gang members.

A    When a gang member would be more willing to participate in confrontations with rivals or when they would be willing to be there when another gang member called for assistance or anything like that.

Q    Would gang members who participated in crimes of violence earn greater respect?

A    Yes.

MR. HENRY:  Leading.

THE COURT:  Sustained.

BY MR. WELCH:

Q    What type of crimes would earn greater respect within the gang?

A    If someone was willing to -- to shoot or to use weapons against rivals.

Q    And were there gang members in DV who had that type of respect -- who had gained respect because they were willing to use weapons against rival gang members?

A   Yes.

Q   What other type of criminal activity or what other criminal activity earned respect from fellow gang members?

A   I guess just any crime, if they would end up going to prison probably have more respect than someone who hadn't been there.

Q   Mr. Torres, when you met Pedro Garcia, from the point you met him going forward, do you know whether or not he had a level of respect amongst fellow gang members?

A   Yes.

Q   How was he viewed or what was his reputation within the gang?

A   Uhm, people had more respect for him than others.

            MR. WACHTEL:  I'm sorry, sir.  I honest to God couldn't hear you.  Can you repeat your answer.

A   People had more respect for him than, than other gang members.

            MR. WACHTEL:  Thank you.

BY MR. WELCH:

Q   Do you have -- why was Pedro Garcia given greater respect than other gang members?

            MR. WACHTEL:  Foundation.  Objection, Your Honor.

MR. WELCH: That's what I'm trying to get at, Judge.

BY MR. WELCH:

Q   Do you know why he was given greater respect than some other gang members within DV?

A   I think because he was a little bit older and he had just gotten out of prison so that gained him more respect in some people's eyes.

Q   Now let me ask about Gonzalo Ramirez. Did you -- do you know whether he had a reputation within the gang?

A   Yes.

Q   What was that reputation?

A   Probably the same as Pedro's.

Q   Now, how did you view Gonzalo Ramirez?

A   I had respect for him.

Q   Did you know Gonzalo Ramirez to have tattoos that identified him as a member of a gang?

A   Yes.

Q   What type of tattoos did he have?

A   He had a 14 on his hand.

Q   Mr. Torres, I'm going to ask you to look at what's been marked as Government Exhibit 53. Ask you if you can identify that?

A   I think that's the tattoos on his hand.

Q   Whose hand?

A    Gonzalo.

Q    And any question in your mind, sir, that is a photograph of the hand of Gonzalo Ramirez?

A    What's that?

Q    Are you certain that's a picture of his hand?

A    Yeah, I'm pretty sure.

Q    Have you seen that before?

A    Yeah.

MR. WELCH:  Your Honor, we would offer 53.

MR. HENRY:  Your Honor, I still believe his testimony is speculative and I don't believe a proper foundation has been laid to make that identification. Anybody can get a tattoo.

THE COURT:  Do you want to voir dire him on this limited point, Mr. Henry?  Or do you want to wait and cross-examine him?

MR. HENRY:  I'll wait during cross-examination.  But it's just a picture of a hand. It doesn't show who it's attached to.

THE COURT:  I think you're right.  You can lay some more foundation as to how he would know that Exhibit 53 is Ramirez' tattoo.

BY MR. WELCH:

Q    Mr. Torres, the tattoo that you described on the hand of Mr. Ramirez, would you once again tell us what

that tattoo is?

A    It's the number 14 with Ene on the top of it.

Q    Have you seen that tattoo on Mr. Ramirez prior to today?

A    Yes.

Q    Did you know anyone else within DV that had the exact same tattoo, the letters E-N-E above the number 14, on their left hand?

A    Not this exact one.

Q    All right.  So the photograph that you have in front of you, can you identify that as the tattoo that you've identified previously seeing on Gonzalo Ramirez' left hand?

A    Yes.

MR. WELCH:  Your Honor, we again offer 53.

MR. HENRY:  Your Honor, he's just testified that others had Ene as well on the tattoo.  I would still object.

MR. WELCH:  Your Honor, can the jury see Gonzalo Ramirez' left hand?

THE COURT:  Yes, they can.

MR. WELCH:  Would you please stand up, Mr. Ramirez, and show the jury your left hand.

(Defendant Mr. Ramirez stands.)

BY MR. WELCH:

Q   Mr. Torres, would you please look at Gonzalo Ramirez' left hand.

A   Yes.

Q   Is that the same tattoo that is in photograph 53?

A   Yes.

MR. WELCH:  Your Honor, we would offer 53.  Is there any objection?

MR. HENRY:  Similar, certainly.  Again, we don't know who took this picture.

THE COURT:  I don't think it's necessary to know who took the picture.  53 is received.  Unless you want to question him about it, Mr. Henry.  I'm giving you the opportunity.

MR. HENRY:  Okay.  I'll question him.

THE COURT:  If you don't want to and wait until cross, that's okay, too.

MR. HENRY:  I'll question.

You said that other people had the tattoo of Ene; is that correct?

A   Yes.

MR. HENRY:  That's an E-N-E; is that right?

A   Yes.

MR. HENRY:  And that is the spelled out word for the letter N in Spanish?

A   Yes.

MR. HENRY: And, in fact, Jayson Najera was known as Ene or Norte; is that correct?

A   Yes.

MR. HENRY: Did he have a tattoo of Ene?

A   I'm not sure.

MR. HENRY: But that was his nickname; correct?

A   Yes.

MR. HENRY: What other people within the DVs had Ene tattooed on their hands?

A   I'm not sure of exactly on the hand but --

MR. HENRY: Others had it on their bodies?

A   Yes.

MR. HENRY: Who else had it?

A   I don't know exactly who.

MR. HENRY: I have nothing further.

THE COURT: 53 is received.

BY MR. WELCH:

Q   Mr. Torres, as a Diablos Viejos gang member, were there certain rules that you were expected to follow?

A   Yes.

Q   What type of rules did the gang have in place that you were expected to follow?

A   Whenever you saw a rival, you had to attack 'em one way or another whenever you saw 'em, on sight.

Q   If you didn't respond to a rival that you saw on sight, what could happen to you?

A   You could get a violation or beat on by your fellow gang members.

Q   Were there occasions that you personally observed violations being meted out or violations being carried out?

A   Yes.

Q   In addition to the expectation to confront rivals, were there other rules that you were expected to follow that if you didn't could result in a violation?

A   Yes.

Q   What were they?

A   I remember for a while there was a -- we weren't allowed to do methamphetamine.

Q   You weren't allowed to what?

A   To use methamphetamine.

Q   Were there -- let me ask you this.  Were there gang members that sold or distributed methamphetamine?

A   Yes.

Q   And you were one of them, weren't you?

A   Yes.

Q   But you weren't allowed to use methamphetamine, is that what you're saying?

A   No.

Q   Why not?

A   Because a gang member overdosed on methamphetamine so they put that into place.

Q   Who was the gang member who died from using methamphetamine?

A   Benji Najera.

Q   All right. And did Benji Najera, the man who died, did he have a relative who was in the DV gang?

A   Yes.

Q   Who was that?

A   Jason Najera.

Q   If you could display 40 please.

        MR. WELCH: Your Honor, I apologize. May I approach?

        THE COURT: Yes. Because I don't think 401 is in evidence.

        MR. WELCH: That's why I'm apologizing, Judge. I thought it had been.

BY MR. WELCH:

Q   Let me show you what's marked as Government Exhibit 401, sir. Do you recognize that?

A   Yes.

Q   Who is that?

A   Jason Najera.

Q   And this is the same Jason Najera that was a DV gang

member in Dodge City; is that right?

A    Yes.

MR. WELCH:  We offer 401, Your Honor.

MR. HENRY:  No objection.

MR. WACHTEL:  No objection, Your Honor.

THE COURT:  401 is received.

BY MR. WELCH:

Q    The rule about not using methamphetamine, who imposed that rule?

A    I don't remember exactly.

Q    Do you know -- if you don't have any memory of it, that's fine -- but do you recall whether Jason Najera had any role in the decision that methamphetamine could not be used?

MR. HENRY:  Objection.  He just said he didn't know.

THE COURT:  The objection is sustained.

BY MR. WELCH:

Q    In addition, Mr. Torres, to the rules you told us about confronting rivals and other rules, were there other things that could get you violated if you violated those rules?

A    Yes.

Q    Like what?

A    Messing around with another gang member's girlfriend

or wife or something like that.

Q   Was there a time that the gang actually conducted meetings?

A   Yes.

Q   How often would you conduct meetings?

A   For a while, it was monthly.

Q   What would happen if you failed to attend a meeting?

A   That could also lead to a violation.

Q   Were there times, Mr. Torres, that you know -- earlier you said there were times violations did happen; correct?

A   Yes.

Q   Were you present for violations?

A   Yes.

Q   Do you remember who you saw get violated?

A   George.  His nickname was Oso.  I don't remember his last name.

Q   His first name was George, you don't know his last name, but his nickname was what?

A   Oso.

Q   What did Oso or George get violated for?

A   For being a snitch.

Q   And who had he cooperated with?  If you know.

A   I don't know.

Q   Was there other violations that you personally saw

get carried out?

A   Yes.

Q   What were they?

A   Another one for a member who was using methamphetamine when it was a no-no.

Q   All right.  Who was that member who got violated for using meth?

A   Manuel Marquez.

Q   Did you participate in either one of those violations?

A   No.

Q   Do you recall seeing any other violations?

A   No.

Q   You touched on just a second ago, Mr. Torres, the use of methamphetamine.  I think I asked you were there gang members who distributed methamphetamine.  Do you know whether or not there were?

A   Yes.

Q   Did you distribute methamphetamine?

A   Yes.

Q   When?  What time period?

A   Like from the middle of 2010 to 2011.

Q   And do you know of other DV gang members that distributed narcotics?

A   Yes.

Q   Who?

A   Fabian Neave.

Q   Who else?

A   Armando Maestas.

Q   Anybody else?

A   David Ochoa.

Q   How about your brother Jesus Torres?

A   Not that I know of.

Q   And Fabian Neave, David Ochoa and Armando Maestas, what type of drugs do you know that they distributed?

A   Methamphetamine.

Q   Are there any other DV gang members that you know of that distributed methamphetamine?

A   No.

Q   Who did you receive -- the methamphetamine that you distributed, who did you receive it from?

A   David Ochoa.

Q   And did David Ochoa have a nickname?

A   Yes.  Little D.

Q   Do you recognize who's in this photograph, sir?

A   Yes.

Q   Who is that?

A   David Ochoa.

Q   And is that the man who was your source of methamphetamine that you distributed?

A   Yes.

MR. HENRY:  Your Honor, I'm going to object as far as the testimony regarding methamphetamine sales as being irrelevant to this case.

MR. WELCH:  Your Honor, it's a racketeering act.

MR. HENRY:  Hasn't said anything regarding my client or Mr. Garcia.

MR. WELCH:  We don't have to, Judge.  We can approach if we need to.

THE COURT:  No.  No.  I'm just wondering why we're now objecting to testimony from this witness which we've heard from four or five other witnesses similar testimony.  Has something changed?  The objection is overruled.  But, let's move through it, please, as rapidly as possible.

MR. WELCH:  I will, Your Honor, but I also have to prove a racketeering --

THE COURT:  Oh, I know what you have to prove. Don't tell me what you have to prove.

BY MR. WELCH:

Q   Mr. Torres, did you distribute methamphetamine to other Diablos Viejos gang members in Dodge City?

A   Yes.

Q   Now, Mr. Torres, earlier you told us that there was

a period of time that meetings were being conducted by the gang.  Do you remember the time period those gang meetings occurred?  What years?

A   2008, 2009 maybe.

Q   2008, 2009.  There was coughing, Judge.  I really didn't hear the answer.

A   Yes.

Q   Okay.

Do you know, Mr. Torres, whether records were maintained of who attended those meetings?

A   Yes.

Q   And when you -- at the meetings, what business, gang business, was conducted?  What was the purpose of getting together?

A   Just to see how things were going within the gang; see if anybody needed a violation or things like that.

Q   And was there a time period where money was collected from gang members?

A   Yes.

Q   What was the purpose of collecting money from gang members on a monthly basis?

A   For different things, for buying guns, sending money to other gang members who were in prison.

Q   And did you attend meetings where money was collected for the gang?

A    Yes.

Q    Did you pay money, you yourself pay money either at the meetings or on a monthly basis that you knew was going to be used to benefit the gang?

A    Yes.

Q    Sir, I'm going to hand you what's been admitted as Exhibit 159-A.  Turning to the third page of that document.  Let me first ask you if you have seen this document before today.  Can we display 159.  And page -- all right.  We have enlarged a portion of this exhibit, Mr. Torres.  Let me first ask you, just make sure we're all together, up at the top of this page, we see a month under the date?

A    Yeah.

Q    What month is this?

A    April.

Q    Now, do you know what year, April of what year this ledger is recording?

A    No.  2008 or 2009 maybe; but I'm not sure.

Q    All right.  And do you see your nickname on the list of attendees?

A    Yes.

Q    Where is it?

A    The fourth one up from the bottom.

Q    And is the name Juan Torres listed?

A   No.

Q   What name is listed that identifies you as being present?

A   Bugzy.

Q   Do you see the other names in that list that appear both above your name Bugzy and below your name?

A   Yes.

Q   Do you recognize those names as members of a Diablos Viejos gang?

A   Yes.

Q   Let's start with -- we won't go through all of these, Judge -- but let's start with the top one, Blanco.  Did you know who Blanco was?

A   Yes.

Q   Who was that?

A   Russell Worthey.

Q   And then right below Blanco is Caiyo; is that right?

A   Yes.

Q   Who is Caiyo?

A   Jose Neave.

Q   And four down -- there's Blanco, Caiyo, Curly and Deuce-Deuce.  Do you know who Deuce-Deuce is?

A   Yes.

Q   Who was Deuce-Deuce?

A   Alfredo Beltran.

Q   Off to the right, not on every line, but on some of the lines, there appears to be an amount of money listed.  Do you see that?

A   Yes.

Q   How much money is listed on the ones that have money listed?  How much is reflected?

A   $20.

Q   Now, next to your name, if you look to the right, there is $20 indicated and an X.  Do you know what that indicates, sir?

A   That I paid for the month, $20.

Q   You paid $20?

A   Uh-huh.

Q   Do you know when this time period -- when this ledger was being maintained, do you know who was doing the ledger?

A   No.

Q   And do you recall where the meetings occurred where this ledger would have been used?  What location?

A   At Caiyo' house.

Q   Caiyo' house?

A   Uh-huh.

Q   And Caiyo, his real name is what again?

A   Jose Neave.

Q   Could you display 402, please.

Do you recognize the person that's on the screen?

A    Yes.

Q    Who is that?

A    Jose Neave.

Q    All right.  Let's go to the next month.  Would be two pages.  And, once again, at the top of this document, do you see a month reflected?

A    Yes.  May.

Q    And would that be the next month after April?

A    Yes.

Q    As far as you know, the same -- I know you don't know the year exactly, but the same year that the ledger was kept in April?

A    Yes.

Q    Again, do you see your name on this list of attendees?

A    Yes.

Q    Where are you on this list?

A    Second to last one.

Q    Now, on this month when you look off to the right there's no money reflected for you this time.  Do you see that?

A    Yes.

Q    Were you required to pay your dues or pay your money at the meeting itself?

A   I think it could have been any time during the month, just the deadline was at the meeting.

Q   Now, you said the purpose of collecting money was -- one thing was to collect money for gang members in prison?

A   Yes.

MR. WACHTEL:  I object, Your Honor.  That is asked and answered and it's leading.

THE COURT:  Yes, it is.

BY MR. WELCH:

Q   Well, why would you collect money for gang members in prison?

A   Just to send to them so they would have money on their books.

Q   And what could the gang member use the money for in prison?

A   To buy things they needed in there from the commissary list.

Q   All right.  In addition to providing money for fellow gang members in prison, the money was also intended to be used for what?

MR. HENRY:  Objection.  It's leading.

THE COURT:  No, not that question.

BY MR. WELCH:

Q   You can answer my question, sir.

A   To buy guns.

Q   Do you know, Mr. Torres, whether or not in fact a gun was purchased by the gang for the gang?

A   Yes.

Q   What type of gun was purchased for the gang?

A   A hand gun.

Q   All right.  You remember what type, what make of gun it was?

A   A Glock.

Q   Did you see the Glock hand gun that was purchased for the gang by the gang?

A   Yes.

Q   Do you know, Mr. Torres, where the gun was purchased?

A   No.

Q   Do you know, Mr. Torres, in addition -- the money that was collected, do you know where it was kept?

A   In a safe lock box.

Q   At what location?

A   I think Jose Neave's house.  I'm not sure.

Q   Do you know whether or not the gang lost that money that had been collected?

A   Yes.

Q   How did the gang lose that money?

A   The police raided the house and found it.

Q   Sir, let me ask you it look at what's been marked as Government Exhibit 68.  Do you recognize what that is, sir?

A   Yes.

Q   What is that?

A   It's a picture of me, Fabian Neave and Gonzalo Ramirez.

MR. WELCH:  Your Honor, we would offer 68.

MR. HENRY:  No objection.

MR. WACHTEL:  No objection, Your Honor.

THE COURT:  Received.

BY MR. WELCH:

Q   Can we display 68.  Mr. Torres, we don't need to go through each one of them; but are there gang signs being thrown by all three of you in this photograph?

A   Yes.

Q   Let's just talk about you.  What gang sign are you throwing?  Are you on the far left?

A   Yes.

Q   What gang sign are you throwing?

A   DV.

Q   And Mr. Neave is where?

A   In the middle.

Q   And Mr. Ramirez is where?

A   On the right.

Q   Mr. Torres, let me ask you, on October 4 of 2008, were you a member of the Diablos Viejos gang?

A   Yes.

Q   And do you recall being with other DV gang members on that day?

A   Yes.

Q   Where did you first see other Diablos Viejos gang members on October 4, 2008?

A   At Angel Cerda's house.

Q   Where was Angel Cerda's house?

A   A little bit outside of Dodge City.

Q   Can we display 418, please.  Do you recognize who's on the screen now, sir?

A   Yes.

Q   Who is that?

A   Angel Cerda.

Q   And you said Mr. Cerda's house was outside of town?

A   Yes.

Q   What direction?

A   West.  West.

Q   Do you recall the address of Mr. Cerda's house?

A   No.

Q   Do you recall the road that it was on?

A   Kettle Way.

Q   And why were you at Angel Cerda's house on October

4, 2008?

A   We were just hangin' out.

Q   And who's we?

A   Me, him and Gonzalo.  Me, Angel and Gonzalo.

Q   When you say Angel, you're talking about Angel Cerda?

A   Cerda.

Q   And Gonzalo Ramirez?

A   Ramirez.

Q   The three of you were hanging out to do what?  What was the purpose of being at Mr. Cerda's house?

A   Just drinkin', drinkin' beer.

Q   Do you remember what time approximately that you would have gotten to Mr. Cerda's house?

A   No.

Q   Was it daytime?

A   No.  Night time.

Q   And was there a point in time when other people came out to that location and joined you?

A   I don't remember.

Q   All right.  Do you recall seeing women out at the location at some point?

A   Yes.

Q   Do you know who they were?

A   Not all of them.

Q   Did you know some of them?

A   Yes.

Q   Just tell us the ones that you did know?

A   Marriet, I don't know her last name.  And Theresa Tinoco.

Q   How many people -- you said you were there drinking beer; is that right?

A   Yes.

Q   How many people joined you that evening at the address on Kettle Way to have beer or socialize?

A   I don't remember who else besides us five exactly.

Q   At some point did you leave that location?

A   Yes.

Q   How did you leave that location?

A   Gonzalo's car.

Q   When you say Gonzalo, you're talking about Gonzalo Ramirez?

A   Yes.

Q   What type of car did Gonzalo Ramirez have?

A   A tan Cadillac.

Q   Had you seen that car before?

A   Yes.

Q   Had you been in that car before?

A   Yes.

Q   If we could display 372.  Sir, we have placed on the

screen Government Exhibit 372.  Do you recognize that vehicle?

A    Yes.

Q    Whose vehicle is that?

A    Gonzalo Ramirez' car.

Q    And is that the same vehicle that you were in at some point the evening of October 4, 2008?

A    Yes.

Q    How had you gotten to Angel Cerda's house on Kettle Way?

A    In that same vehicle.

Q    So did someone come pick you up?

A    Pick me up from where?

Q    That's my question.  Did someone pick you up somewhere in Dodge City before you went out to Angel Cerda's house?

A    Yes.

Q    Who picked you up?

A    I'm pretty sure it was Gonzalo.

        MR. HENRY:  Objection; speculation.

        THE COURT:  Sustained.

BY MR. WELCH:

Q    How did you get to Angel Cerda's house?

A    I don't remember exactly how I got there.

Q    In what vehicle?

A    I don't remember if it was exactly in this car but --

Q    Very good.  We'll move on.  At some point do you recall being in this vehicle that night?

A    Yes.

Q    When do you recall for certain being in the car that night?

A    When we left Angel Cerda's house.

Q    Do you remember approximately what time you left Angel Cerda's house?

A    No.  I just remember it was dark.

Q    It was?

A    Dark.

Q    And who was with you when you left Angel Cerda's house?

A    Gonzalo Ramirez, Angel Cerda, Marriet, and Theresa Tinoco.

Q    And yourself?

A    Yes.

Q    And what were you gonna do?  What was your purpose in leaving?

A    I don't remember exactly.

Q    When you left Angel Cerda's house in this car, who was driving?

A    Gonzalo.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   It helps if you say the full name.

A   Gonzalo Ramirez.

Q   All right.  And who was in the front passenger seat?

A   Angel Cerda.

Q   Where were you located?

A   In the back seat.

Q   Where in the back seat?

A   By a window.  I don't remember which side though.

Q   And then Theresa Tinoco was located where?

A   In the back seat.

Q   And Marriet who you don't recall her last name;
right?

A   No.

Q   All right.  Where was Marriet located?

A   In the back seat.

Q   Did you know Theresa Tinoco before that day?

A   Yeah.

Q   How did you know her?

A   I just knew her from around.

Q   Did you go to school with her?

A   No.  She was older than me.

Q   Did you know Marriet prior to that day?

A   Yeah.

Q   How did you know her?

A   I went to school with her.

Q   Angel Cerda, I'm not sure I've asked you how you knew Angel Cerda.  How did you know him?

A   Because he was a gang member.

Q   What gang?

A   DV.

Q   Was he someone you associated with prior to October 4, 2008?

A   Yes.

Q   And you told us by this time -- by October of 2008, can you tell us how long had you known Gonzalo Ramirez?

A   Not very long.

Q   All right.  So when you leave Angel Cerda's house, where are you going?  What's your destination?

A   I don't think anywhere in particular.

Q   Why did you leave the house then?

A   I think we were just going for, for a cruise, for a ride.

Q   All right.  At some point in time did you and the other occupants of this car engage in confrontation with people in the city of Dodge City?

A   Yes.

Q   Do you recall where that took place, the approximate location?

A   On 4th Avenue.

Q   Sir, I'm going to hand you what has been admitted as

Government Exhibit 300. Sir, do you recognize that house?

A Yes.

Q What is that house?

A The house where Abel Hernandez lives.

Q All right. Did you know Abel Hernandez?

A Yes.

Q How did you know Abel Hernandez?

A I went to school with him.

Q Prior to October 4, 2008, did you believe Abel Hernandez was a gang member?

A No, I thought he was just an associate.

Q An associate of a gang?

A Yes.

Q An associate of what gang?

A Surenos.

Q And what lead you to believe that Abel Hernandez was an associate of the Surenos gang?

A He would hang out with them in school.

Q Did you go to school with Abel Hernandez?

A Yes.

Q Is this Dodge City junior high and high school?

A High school.

Q All right. Did you intend to drive to this house on 4th Avenue?

A No.

Q But did you in fact drive to this house on 4th Avenue?

A Yes.

Q What happened when you got there?

A There was a confrontation with a group of men that were outside the house.

Q Mr. Torres, I'm going to hand you what has been admitted as both 301 and 302. Starting with 301 -- or 302 if it's better. Which one of those photographs can you identify the location of where you saw these men that night?

A 302.

Q Can we display 302. Now, I think -- I can't remember if I asked you to do this yet or not -- but on this screen, Mr. Torres, you can indicate by touching the screen -- you can leave a mark -- can you please touch the screen and leave a mark in the location where you saw these men at the house on 4th Avenue?

A Right there. (Witness indicates.)

Q And what drew your attention or the people in your car's attention to this group of men?

A Someone said that a Sureno lived there at that house.

Q All right. And in response to -- do you remember

who said there may be a Sureno that lives at this house?

A   I think it was Marriet.

Q   Well, you believed a Sureno associate lived at the house?

MR. WACHTEL:  Objection; leading.

MR. WELCH:  I can rephrase the question, Your Honor.

THE COURT:  Please.

BY MR. WELCH:

Q   Did you believe there was a Sureno associate that lived at that house?

MR. WACHTEL:  That's still leading, Your Honor.  The answer is --

THE COURT:  He can answer yes or no.

MR. WELCH:  Did you say he can answer yes or no?

THE COURT:  Yes.

BY MR. WELCH:

Q   Mr. Torres, did you believe a Sureno associate lived at that house?

A   Yes, after she said that.

Q   How did you know that that was Abel Hernandez' house?

A   I didn't know that it was his house until she said.

Q   All right.  Now, when you got to the house and there

was discussion about a Sureno living there, what happened?

A    We drove by -- we drove by and started yelling gang -- shouting gang slurs at them.

Q    Now, who was shouting gang slurs at who?

A    Us in the car.

Q    So people in the car are shouting out to this group of men?

A    Yes.

Q    What is being shouted by people in the car towards the group of men outside the car?

A    Just gang things.  I don't remember exactly what.

Q    Do you recall anything specifically that was said that would identify you as gang members?

A    I think someone might have yelled Norte.

Q    What does that mean?

A    It means north in Spanish, north side.

Q    And how does that identify you as being gang members in Dodge City?

A    Because the gang, they're Nortenos.

Q    All right.  And prior to you -- do you remember who said Norteno, used the gang slurs?

A    I don't remember exactly who.  I think it might have been all of us.

Q    And, again, who's driving the car?

A    Gonzalo Ramirez.

Q    And who's in the front passenger seat?

A    Angel Cerda.

Q    And you're in the back seat; correct?

A    Yes.

Q    Do you recall you personally yelling out or using any type of gang slurs during this confrontation?

A    I believe I was; but I don't remember exactly what I said.

Q    But it's possible that you did?

A    Yes.

Q    Do you know whether or not Gonzalo Ramirez did so?

A    He might have also.

Q    And Angel Cerda, do you know whether or not he did?

A    Probably, yes.

Q    Well, you said there's a possibility that you did?

A    Uh-huh.

Q    Do you know that there were other people in addition to you that used gang slurs at this group of men?

A    I think it was just us three.  I don't think the girls said anything.

Q    So you remember that three men all said something?

A    Yes.

Q    Had the men in the yard where the arrow is indicating, had they done anything to you first?

A    No.

Q    Did you even know any of the men in the yard, you yourself?

A    I didn't recognize them.

Q    Were there any of the men standing in the yard that you believed to be Sureno gang members?

A    No.

Q    Did the car come to a stop at any point?

A    Yes.

Q    Let me ask you, sir, to look at 374.  Can we display 374, please.  Mr. Torres, there's been testimony yesterday and today that the house on 4th Street that we just showed you a picture of in 300 is located where I just placed a yellow arrow.  Would you agree with that?

A    Yes.

Q    Now, can you show us the direction of travel of the brown Cadillac when you came to a stop -- where did you come to a stop next to the house?  Go ahead and place a dot, if you would, in that location.

A    Probably right around here.  (Witness indicates.)

Q    And what happened when the car came to a stop?

A    The group of men started throwing beer bottles at the car.

Q    The slurs that had been uttered earlier, had they already -- did they continue once the car stopped?

A   Yes.

Q   Do you recall the men in the yard indicating that they were Sureno gang members?

A   I don't remember.  I don't think so.

Q   Are there terms, derogatory terms, that Nortenos use towards Surenos?

A   Yes.

Q   What terms are most commonly used?

A   Scraps.

Q   Do you recall that word being used by one or more of the men in your car towards this group of people in the yard that night?

A   Yeah, probably.

MR. HENRY:  Objection; speculation.

THE COURT:  Sustained.

BY MR. WELCH:

Q   Do you recall slurs, derogatory terms toward -- used by Nortenos towards Surenos being used that night?

MR. HENRY:  Asked and answered, Your Honor.

THE COURT:  He can answer yes or no.

BY MR. WELCH:

Q   Do you recall slurs being used?  Insulting terms towards this group of men?

A   Yes.

Q   Are there slurs that Surenos use towards Nortenos?

A    Yes.

Q    Did you hear any of those slurs thrown back at you by any of these men in the yard?

A    No.

Q    What happened, sir, after the car came to a stop and beer bottles were thrown at the car?

A    We left.

Q    Where did you go?

A    To Gonzalo Ramirez' house.

Q    Can you describe Gonzalo Ramirez' appearance and his behavior after the beer bottles were thrown at his car?

A    He got -- he got really mad.

Q    How do you know that?

A    Because we left -- when we left, we took off pretty fast.

Q    Where did you go?

A    To his house.

Q    Had you been to his house before?

A    Yes.

Q    Do you know why you were going to his house?

A    No.

Q    Do you know now why you went to his house?

A    Yes.

Q    What happened when you got to his house?

A    He went inside and came right back out.

Q   Did he have something with him when he came back out?

A   Yes.

Q   What did he have?

A   A gun.

Q   A what?

A   A gun.  A rifle.

Q   Do you know what type of gun?

A   An SKS.

Q   Had you seen that SKS rifle prior to June, 2008?

A   No.

Q   Did you know he had one?

A   No.

Q   Did you know why he retrieved the gun on June 4, 2008?

A   Yes.

Q   From the point that the car stopped until you got to Gonzalo Ramirez' house, did you recall Gonzalo Ramirez saying anything?

A   No.

Q   There was testimony earlier, Mr. Torres, that people got -- people in addition to Gonzalo Ramirez got out of his car at that house.  Did you get out of his car?

          MR. HENRY:  Your Honor, I'm going to object to the form of the question.  He's essentially giving him

the answer before he --

MR. WELCH:  I think you're going to like the answer, Mr. Henry.

THE COURT:  I don't care whether he likes it or not.  The question is improper.  And the objection is sustained.

BY MR. WELCH:

Q   Did you get out of the car, Mr. Torres?

A   No.

Q   Do you recall anyone other than Gonzalo Ramirez getting out of the car?

A   No.

Q   How long was Gonzalo Ramirez out of the car?

A   About two minutes tops.

Q   And when he got back in the car, where did he get inside the car?

A   Back in the driver's seat.

Q   And where was Mr. Cerda?

A   In the same place in the passenger seat.

Q   In the front?

A   In the front.

Q   Front seat.  And where were you?

A   In the same place in the back seat.

Q   And where were the two females?

A   In the same place in the back seat.

Q    Where did you go?

A    Back to that house.

Q    To what house?

A    Actually, to the alley way by the house on 4th.

Q    Can we display 374 again, please.  Now, Mr. Torres, you've testified you drove back to an alley.  Can you show us on this diagram where the alley is located?

A    Right there.  (Witness indicates.)

Q    How did you get to that location?  After driving from Gonzalo Ramirez' house, what road did you drive that's on this diagram?  What road did you use to get there?

A    Oak Street.  I think that's what it says.  The one on the left.

Q    Okay.  And what direction, then, did you enter into the alley from?

A    From the -- like if you were coming in from the bottom, so --

Q    All right.  Just indicate, if you would, by using a line, where you came from and how you turned into the alley.

A    That way.  (Witness indicates.)

Q    And what direction is Gonzalo Ramirez' house from that location?

A    The same direction, east.

Q   All right.  How far is it from that location approximately?  How many blocks?

A   Blocks?  About 10, 15.

Q   All right.  So when you got to the alley, what happened?

A   Parked the car in the middle of the alley.  And he got out and ran towards Oak Street, back towards the street.

Q   Who got out?

A   Gonzalo.

Q   Gonzalo Ramirez?

A   Yes.

Q   You said he ran towards Oak Street?

A   Yes.

Q   Do you know what he was doing?  Why did he get out of the car?

A   To shoot at the house.

Q   When Gonzalo Ramirez got out of the car, did you get out of the car?

A   No.

Q   Did Angel Cerda get out of the car?

A   No.

Q   Did the two girls get out of the car?

A   No.

Q   And how do you know that Gonzalo Ramirez ran toward

Oak Street?

A    Because he ran the opposite direction that the car was facing.

Q    All right.  And did you see him running that direction?

A    Yes.

Q    Could you see him -- how far did you follow him -- how far did you watch where he went?

A    Until he turned where the house is on the corner.

Q    All right.  Once again -- I'm sorry.  I just removed the yellow dot.  Place a dot where the car was parked in the alley.

                    (Witness complies with request.)

Q    And show us by drawing a line what direction Mr. Ramirez ran from the car.

                    (Witness complies with request.)

Q    And where did you lose sight of him?

A    Where that house is on the corner.

Q    After you lost sight of him, did you hear anything?

A    Yes.

Q    What did you hear?

A    Gunshots.

Q    Do you recall how many gunshots you heard?

A    A lot, like 20, 15 or 20.

Q    Did you see Mr. Ramirez again after you heard

gunshots?

A   Yes.

Q   Where did you see him again?

A   In the car.

Q   And what happened after you saw him again?

A   We left.

Q   Where did you go?

A   Back to Angel Cerda's house.

Q   Did you receive any -- well, in addition to the firearm, do you know whether Mr. Ramirez gathered anything else from the house when you stopped earlier?

A   No.

Q   At some point did you hear the police had been called about -- in regard to the shooting?

A   Yes.

Q   How did you know that?

A   There was a scanner in the car.

Q   When did you first notice that there was a scanner in the car?

A   A little after we were already leaving, after it happened.

Q   After the shooting had taken place?

A   Yes.

Q   And how did you learn there was a scanner in the car?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   I heard the dispatcher -- I don't know how you call it -- I heard it on --

Q   You heard what?

A   The scanner.

Q   Right.  You heard the scanner.  And what information did you and the other people in the car get from listening to the scanner?

A   That there was a shooting on 4th Avenue.

Q   Do you recall Mr. Ramirez making any statements in the car while you're driving away from the scene?

A   I think he had said I thought I --

        MR. HENRY:  Objection; speculation.

        THE COURT:  What did he say, Cindy?  He thinks he said?  The objection is sustained.

BY MR. WELCH:

Q   Mr. Torres, did you believe that people had been shot inside the house?

A   Yes.

Q   Why did you believe that?

A   Because when we were leaving, Gonzalo said I think I hit somebody.

Q   And how did he gather the information that perhaps he had hit somebody in the house?

A   I think the scanner might have said something.

Q   All right.  So as you're driving away from this

location, you went back to Kettle Way?

A    Yes.

Q    What did you do when you got to Kettle Way?

A    Parked the car in the barn.

Q    All right.  Now, when you -- when Gonzalo Ramirez got back in the car, where did he get in the car when he left from the alley to go back to Kettle Way?

A    I think in the back seat.

Q    All right.  Who was driving at this point?

A    Theresa Tinoco.

Q    And where were you?

A    In the back seat still.

Q    And where was Angel Cerda?

A    In the front seat still.

Q    And where was Marriet?

A    In the back seat still.

Q    So Theresa Tinoco and Gonzalo Ramirez traded places?

A    Yes.

Q    Once the five of you then got back to Kettle Way, what did you do?

A    Parked the car in the barn.

Q    Can we display 370, please.  Sir, do you recognize this photograph?

A    Yes.

Q    What is that?

A    That's Gonzalo Ramirez' car inside of the barn on Kettle Way.

Q    Do you know how the car got into the barn in that location?

A    We drove it there.

Q    After the car was parked -- is this a barn on Angel Cerda's property?

A    Yes.

Q    After you got to that location, what did you do?

A    We left running.

Q    You left what?

A    Running.

Q    All right.  Did all five of you run together?

A    Yes, for a little bit; and then Angel Cerda went inside his house.

Q    And what did the four of you -- Angel Cerda went to his house.  What did the other four of you do?

A    Kept running through a field in the back of the house.

Q    Why did you go into a field behind the house?

A    Because on the scanner they had said the address to the house.  They knew where we were, so we left.

Q    On this scanner you heard the address for what house?

A    To Angel Cerda's house.

Q   Did you believe police officers would be coming to the scene?

A   Yes.

Q   So what direction from Angel Cerda's house did you run?  Where was the field that you ran to?

A   West.

Q   And approximately how far away from the house did you go?

A   Not that far.  Not very far.

Q   What did you do when you got out to the field?

A   We hid in the tall grass, laid down.

Q   And who is the we that are hiding in the tall grass?

A   The four of us, besides Angel Cerda.

Q   And what did you do?

A   We just stayed there for a couple -- few hours.

Q   Did police officers find you in that location?

A   No.

Q   At some point did you leave the field?

A   Yes.

Q   How did you leave the field?

A   Marriet called her parents and they picked us up.

Q   And did that happen?

A   Excuse me.

Q   Did that happen?

A   Yes.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Were you able, sir, to -- strike that.  After the shooting took place, Mr. Torres, did you view Gonzalo Ramirez differently?

A   Yes.

Q   How did you view him differently?

A   Just thought he was, he was crazy.

Q   In your eyes as a DV gang member, did it effect the way you viewed him, his position or status within the gang?

A   Yes.

Q   How so?

A   Gained more respect for him.

Q   Why?

A   Because he was willing to -- to do what he did.

Q   Which is what?

A   Attack rival gang members.

Q   Did you view Gonzalo Ramirez as someone that you could refuse orders from?

A   No.

Q   Were you afraid of him?

A   Yes.

Q   Mr. Torres, the gun that was used in the shooting that night, did you see what happened to the gun?

A   No.

Q   Do you recall -- when is the last time you remember

seeing the SKS, semiautomatic assault rifle?

A   The same night?

Q   Yes.

A   That same night is the last time I remember seeing it.

Q   When Mr. Ramirez got out of the car -- when you were parked in the alley and Mr. Ramirez got out of the car, did you see the gun in his possession?

A   Yes.

Q   Did you see it in his possession when he came back to the car?

A   Yes.

Q   Did you see it in his possession when you got to Angel Cerda's house?

A   Yes.

Q   Did you see it in his possession when you got to the location in the field where you hid?

A   No.

Q   All right.  In between the barn on Angel Cerda's property and the field that the four of you hid in, do you know what happened to the gun?

A   No.

Q   And are you certain when you left the field hours later, did you see Mr. Ramirez with the gun at that point?

A    No.

Q    Do you know whether or not he had the gun with him any more?

A    He didn't.

Q    Now, Mr. Torres, you have plead guilty to your participation in this crime, haven't you?

A    Yes.

Q    Sir, I'm going to hand you what's been marked as Government Exhibit 376.  Do you recognize what 376 is?

A    My plea agreement.

Q    In your plea agreement, sir, what crime did you plead guilty to?

A    Aiding and abetting attempted murder.

Q    Mr. Torres, in that agreement or at any time you've ever spoken with anyone from the government, has anyone promised you that you would not go to prison?

A    No.

Q    And in the agreement does it specifically state that you will in fact go to federal prison?

A    I'm not sure.

Q    Do you understand that you will likely serve a term in federal prison?

A    Yes.

Q    Ultimately, who decides how much time you spend in federal prison?

A   The judge.

MR. WELCH:  Your Honor, I have no further questions of Mr. Torres.

THE COURT:  Did you intend to offer 376?

MR. WELCH:  I did, Judge.  Thank you.

MR. WACHTEL:  No objection, Your Honor.

MR. HENRY:  No objection.

THE COURT:  376 is received.  And we will take a recess, Ladies and Gentlemen.  Approximately 15 minutes.  Remember and heed the admonition.

(Jury excused for recess; whereupon, the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

MR. WELCH:  Your Honor, can we just have one minute of your time?

THE COURT:  Yes, sir.

MR. WELCH:  We just wanted to talk scheduling real quick, Judge.  Our plan after Mr. Torres was to call Fabian Neave.  His attorney Mr. Bell is here. Mr. Bell cannot be here tomorrow.  His son is getting married.  And I haven't asked Mr. Bell -- I'm sorry, Judge.  Just one second.

(Off-the-record.)

MR. WELCH:  Your Honor, we may not have an

issue. I apologize for wasting your time. Our plan will be to start with Fabian Neave today and get as far as we can. Again, Mr. Bell won't be here tomorrow. If we carry over to tomorrow, he won't be here for Mr. Neave; but he told me that's not a problem.

THE COURT: I don't know why the lawyers are here anyway but --

MR. HENRY: Your Honor, I do have a matter. We were handed a copy of the Exhibit 159-A that's been admitted into evidence and there is a page here that I did not see, nor I think Mr. Mandelman. It is a page that is beyond the testimony of Mr. Worthey who laid the foundation for taking the dues on April and May, and that's what I thought was the only thing that was in there. There is a notation on the top of a page later on that says June 23rd, July 23rd, balanceas, (ph) June 23, 4:45 -- or balance, balance, I'm sorry, I thought it was Spanish. Anyway -- anyway, but that clearly --

THE COURT: We need to get Lu Ann here?

MR. HENRY: I'll interpret for you, Judge.

THE COURT: Thank you.

MR. HENRY: No -- but the witness was only able to identify April and May when he was taking the dues. And I thought the rest of the book was empty and therefore didn't matter coming in; but, obviously, there

was some other notation there that the witness didn't testify to.  I would ask that that not be --

THE COURT:  Just the fact that there's a balance.

MR. HENRY:  Well, later on in the summer, beyond where the witness was testifying to the two pages which we have no objection to.  Those came in.  But this other page, I was not aware of.  And there's a yellow page that is the back --

THE COURT:  Only if the Government doesn't want to offer it.

MR. WELCH:  Well, I do want to leave it in there, Judge.  We just got lucky that we have the person who is the author of the document.  If we didn't have Mr. Worthey, this is still a relevant item of evidence because it was found at a gang house with other gang items.  I believe we would have been able to offer it whether or not we knew who wrote it or not.  The fact that Mr. Worthey didn't identify a single small portion of the page --

THE COURT:  To me -- here's the rule, you know.  You had an opportunity to look through it.  You didn't see it; but it was in there --

MR. HENRY:  Well, it appears not to be Mr. Worthey's writing and I think that's why --

MR. WELCH:  I don't think it matters.

THE COURT:  I don't see how it matters.  $476.  Boy, what -- what a wealthy gang we're talking about here.  Your objection is overruled.

(Recess; whereupon the following proceedings continued IN THE PRESENCE OF THE JURY.)

MR. WACHTEL:  Your Honor, if you don't mind, Mr. Henry and I would like to change our order with this witness.  I talked to the Government.  They don't mind.

THE COURT:  Go ahead.

MR. HENRY:  Thank you, Your Honor.

**CROSS EXAMINATION**

BY MR. HENRY:

Q   Do you remember a short interview with the police, lasted only two or three minutes, where you said you were sleeping during the night in question and you knew nothing about this incident?

A   No.

Q   Do you remember on August 30 of 2011 having that conversation with a police officer or detective?

A   August 30th, 2011?

Q   Yes.

A   No, I don't remember.

MR. HENRY:  Your Honor, we don't need

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

necessarily to have the whole thing played; but it's only 2 minutes and 49 seconds.  It's just audio.  No video.  I was wondering if we were able to pull that up --

THE COURT:  2 minutes and 49 seconds, I think we can manage it.

MR. HENRY:  Again, we don't need to have everything --

THE COURT:  How are you going to do it if you don't have everything?

MR. HENRY:  Well, it's just the first part where he is denying any involvement in the -- in this and said he was sleeping at the time.

THE COURT:  Go ahead.

MR. HENRY:  By the way, the audio didn't identify who the officer was so --

(Portion of audio tape played

for the jury.)

BY MR. HENRY:

Q    Do you recall that conversation?

A    No.

Q    Not at all?

A    Not at all.

THE COURT:  I'm sure nobody -- was anybody able to understand what was on there?  Was that one of

those Thomas Edison wax things that they recorded it on?

MR. HENRY:  It was a prior statement --

THE COURT:  I know.  But, Tim, it's fine, you played it; but I don't think anybody could hear what was on it.  So it's been played --

MR. HENRY:  Could I ask the Government to identify who the officer was since he's denied ever having made the statement --

THE COURT:  I let you play it.  But the point is that nobody could understand what they were saying on it.

MR. HENRY:  And I want to be able to follow up because it was so hard to hear.  He says he didn't make the statement.  We've been given a statement that says it's Juan Torres' statement.  We don't have an identification of an officer.  I need --

MR. WELCH:  Your Honor, we can take this up later.  I don't think we need to testify about it now.

THE COURT:  I agree.  All I wanted you to know, and I think I've made it clear, asked the jurors, could they understand what was said.  They couldn't. I'm not telling you you couldn't play it because you did.

MR. HENRY:  And it's because of that I think I'm going to have to follow up on it.  I thought it

would come out better on the audio.

BY MR. HENRY:

Q   Mr. Torres, your brother Jesus is known as Rabbit; is that correct?

A   Yes.

Q   And you're known as Bugzy, is that what you're telling us?

A   Yes.

Q   The -- you had been drinking that night, hadn't you?

A   Yes.

Q   In fact, you'd been drinking a lot?

A   I don't remember exactly how much.

Q   Okay.  When did you start drinking that day?

A   I don't remember.  It was over five years ago.  I don't remember.

Q   Now, you said that you and Cerda, Angel Cerda -- that's Shrek; is that correct?

A   Yes.

Q   And my client were there at Cerda's place prior to everyone else coming out there later that evening.  Is that right?

A   Yes.

Q   So before it got to be about -- how many people were there at the high point?

A   I don't remember.

Q   Okay.  And, but, clearly, the three of you were drinking early in the evening; is that right?

A   Yes.

Q   Was it even in the afternoon that you started drinking?

A   It could have been.

Q   Okay.  And we're talking about something that goes on around 11:00 to 12:30 that next morning; isn't that right?

A   I think so, yes.

Q   So by the time you're remembering these things, you've been drinking for at least five or six hours?

A   Yes.

Q   How much do you weigh?

A   About 150.

Q   Now, you're saying that it's Marriet who said she knew where a bunch of Surenos would be at; is that correct?

A   Yes.

Q   And, in fact, you drive up there and there are a lot of Surenos out there at the side of that house, aren't there?

A   I didn't know who they were.  I didn't recognize them.

Q   Did you recognize the blue car that was out there?

A    No.

Q    How about the blue bandanas that they were wearing?

A    No.

Q    Blue shorts?  Blue pants?

A    No.

          MR. WELCH:  Your Honor, I'm going to object. This misstates the evidence.  There's no evidence that those men had blue bandanas or blue clothing on.

          THE COURT:  Sustained.

BY MR. HENRY:

Q    Do you remember making a statement to Detective Villasenor on July 1st of 2013?

A    What statement?

Q    Do you remember making a statement to a detective from the, I believe, Dodge City Police Department this summer?

A    What was the date?

Q    July 1st.

A    Yes.

Q    Handing you what's been marked as R-Z, Defendant's Exhibit R-Z.  If you could just keep it there for a while, I'll have you refer to it.

      There's been testimony that it was Angel Cerda who was actually driving the gold Cadillac that night.  Do you actually remember everything about what went on that

night?

A   Not everything.

Q   In fact, I think you say on the top of the second page of that report that --

MR. WELCH:  Your Honor, I'm going to object to refreshing the witness's memory when he hasn't had a question put to him that needed to be refreshed yet.

THE COURT:  I agree.  Sustained.

BY MR. HENRY:

Q   Do you remember telling Detective Villasenor that you could not remember every detail from that night?

MR. WELCH:  Asked and answered, Your Honor. He just said he didn't remember everything.

THE COURT:  He didn't say what he said to the detective; but the witness may answer the question.

A   I didn't remember everything from that night, no. Like I said earlier, it was more than five years ago now so -- I remember the major parts.

BY MR. HENRY:

Q   Now, you said that Theresa Tinoco is the one who supposedly drove the vehicle back after the shooting; is that correct?

A   Yes.

Q   But yet on Page 1 of that -- excuse me -- didn't you also say that it was Angel Cerda who drove the car into

the garage or barn that night?

A   Where does it say that?

Q   Do you remember saying that it was Angel Cerda --

MR. WELCH:  Your Honor, I'm going to object --

Q   -- who drove into the barn?

MR. WELCH:  -- to this method of refreshing recollection.  He first has to ask if he remembers who drove the car.

THE COURT:  I agree.  It's not proper to refresh recollection in this manner.

BY MR. HENRY:

Q   Did you say that Angel Cerda drove the car into the barn that night?

MR. WELCH:  I'll object.  He needs to ask first did Angel Cerda drive the car into the barn that night.

THE COURT:  I agree.

BY MR. HENRY:

Q   Did Angel Cerda drive the car into the barn?

A   No.

Q   Okay.  Please look at R-Z in front of you.  It's on the first page, third paragraph from the bottom -- I'm sorry.  I lost where it was at.  First sentence.  Does that refresh your recollection of what you told Detective Villasenor this summer?

A   I remember reading this whole thing.  It was poorly written.  There's a lot of little things that were mixed around.

Q   Okay.  So you're saying that this detective -- you think he was drinking when he wrote this?

MR. WELCH:  Your Honor, I'm going to object.

THE COURT:  No, let's -- let's keep on track here if we can.

BY MR. HENRY:

Q   Do you see where it says in that report -- does that refresh your memory regarding whether or not Angel parked the car in the garage?

A   Yes, I see it.

Q   Are you saying you didn't say that?

A   No, because that's not the way I remember it happening.

Q   Now, I think you said on direct examination that the only time you saw that SKS that Gonzalo Ramirez supposedly had that night was that night when he went in, you saw it that day, or that night when he came out with it, when he went down the alley and when he came back to the car and that was the only time you had seen it.  Is that right?

A   Yes.

Q   Okay.  Could you go to the bottom of Page 2, last

paragraph, first sentence.  Does that refresh your memory about what you told the detective this summer?

A    I might have seen it before.

Q    Do you remember telling him that?

A    Yeah.

Q    Okay.  So you had seen that gun before.  Had you possessed that gun?

A    No.

Q    Now, you said in your testimony that there was -- there were meetings that took place; is that right?

A    Yes.

Q    I think you referred to a document 159-A.  Is that up there?

A    Is that the notebook?

Q    It is the -- I'm sorry.  It's up here then.  I apologize.  Do you remember being asked questions by Mr. Welch this afternoon about that?

A    Yes.

Q    And if we could pull up the two pages that have all the names on them.  Thank you.

     Now, Blanco, that's -- is that Anthony Wright?

A    No.  That's --

Q    That's Russell Worthey?

A    Yes.

Q    Okay.  And all the names that are on the April page,

does it show that either Mr. Garcia or my client

Mr. Rodriguez (sic) attended that meeting?

A    No.

Q    And on the next page, May, does it show either

Mr. Ramirez or Mr. Garcia on that page?

A    No.

Q    Now, I think you had said in this interview that

there had -- there could be a violation if you didn't

pay your dues; is that right?

A    Yes.

Q    And, in fact, a violation might actually get you

beat up; is that right?

A    That's right.

Q    So if you don't have your money, you don't want to

show for the meetings, do you?

A    No.

Q    And, in fact, didn't you tell the detective this

summer that the meetings didn't last very long, did

they?

A    No.

Q    You didn't tell him that?

A    No, they didn't last very long.

Q    Okay.  So it was just a couple months?

A    Yeah.

Q    And, in fact, the money that supposedly was being

collected, it ended up getting taken by the police; is that right?

A   Yes.

Q   So it couldn't be used in paying for -- I think -- what did you say the purpose of the meetings?  I think you said just to see how things were going?

A   Yes.

Q   Okay.  Now, you also said, I think, that there were four people that sold meth.  I think you named them; is that right?

A   I think so.  I don't remember.

Q   Now, do you consider yourself still a DV?

A   No.

Q   There were a large number of DVs; is that right?

A   Yes.

Q   Okay.  And you're only able to say that four were selling dope?

A   That I knew of.

Q   Okay.  Now, the pictures that you talked about this morning -- could we pull up 83.  Now, you're the one in the red cap; is that correct?

A   No.

Q   I'm sorry.  You're not in this picture?

A   No.

Q   Okay.  But Donte Barnes is?

A   Yes.

Q   And I think it's the previous picture.  It's the one that had the girls in it.  It's 82.  There it is.  Okay. Now, you're in this picture there in the middle with the black hat; is that correct?

A   Yes.

Q   Okay.  Donte Barnes is the one with the sunglasses on and the red flannel?

A   Yes.

Q   Now, Donte Barnes, you're the one who helped get him into the DVs; is that right?

A   Yes.

Q   And is he -- is he Hispanic or is he light-skinned African American?

MR. WELCH:  Objection.  It's irrelevant, Your Honor.

THE COURT:  I don't know.  I'll let him answer.

A   He's African American.

BY MR. HENRY:

Q   African American.  Okay.  How tall is he?

A   I don't know.

Q   He's taller than you, though, isn't he?

A   Yes.

Q   How tall are you?

A    About five-nine.

Q    Five-nine.  Now, could we go to number 68.  This was also another picture that was shown.  And in the middle there, is that Fabian Neave?

A    Yes.

Q    He's also known as Caiyo?

A    Puppet.

Q    Puppet.  That's right.  I'm sorry.  And he is in the middle.  And you're over on the left; is that correct?

A    Yes.

Q    You're five-nine so, obviously, Puppet is taller than you?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    And Gonzalo Ramirez is shorter than you; is that correct?

A    Yes.

Q    There was a -- with respect to Donte Barnes, he was friends with Anthony Wright and Russell Worthey; isn't that correct?

A    I don't know.

Q    Didn't he live down south where Anthony Wright lived?

A    Who?  Donte Barnes?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Donte.

A   No.  He lived on the east side of town.

Q   Okay.  The -- there was a split that was occurring within the Diablos Viejos; isn't that correct?

A   Yes.

Q   And was the split over whether or not certain people should -- should be allowed to use drugs?

A   No, I don't think so.

Q   Okay.  Well, do you know what the split was over?

A   Yes.

Q   What was it over?

A   Certain people didn't like one gang member and that's kind of what -- half the people were with him and the other half were against him.

Q   Okay.  Now, we're talking about Joe Galindo; is that right?

A   Yes.

Q   Now, Joe Galindo got out from underneath the case, left town for a period of time during the time that you were in the DVs; is that right?

A   Yes.

Q   And he, he aligned himself with Sierra-Medrano, also known as TC; isn't that correct?

A   Yes.

        MR. WELCH:  I'm going to object to foundation

and relevance, Your Honor.

THE COURT:  Sustained.

MR. HENRY:  Your Honor, it goes to bias respecting this witness and what side he was on in the split that occurred within the DVs.

MR. WELCH:  Still no foundation for any of that, Judge.

MR. HENRY:  We've had a number of witnesses talk about --

MR. WELCH:  Not this one.  No foundation, Judge.

THE COURT:  Let me check my notes here.

(Off-the-record.)

THE COURT:  Exceeds the scope of direct examination.  The objection is sustained.

MR. HENRY:  Your Honor, may I attempt to establish foundation?

THE COURT:  No.  It exceeds the scope.  He didn't say anything about the split.  I think the prior witness did, but he didn't.

BY MR. HENRY:

Q    That evening, were you also using drugs?

MR. WELCH:  What evening are we talking about, Your Honor?

MR. HENRY:  October 4th, 2008.

A   I don't remember.

BY MR. HENRY:

Q   I think you admitted on direct examination that you were one of the four that sold methamphetamine; is that right?

MR. WELCH:   Asked and answered, Your Honor.

THE COURT:   Sustained.

BY MR. HENRY:

Q   Did you sell to support your habit?

A   No.

Q   You talked about getting respect in the gang if someone confronts somebody or shoots somebody.  Did you ever shoot anybody while you were in the gang?

A   No.

Q   Now, you knew that Angel Cerda, Shrek, had a younger brother that was also in the gang named Savage or Alex Sanchez; is that right?

A   Yes.  Erik Sanchez.

Q   I'm sorry, Erik.  I think Alex was the younger brother; is that right?

A   Yes.

Q   Okay.  So Erik Sanchez.  Was he at the kick-back that night?

A   I don't remember.  He might have been.  It was his mom's house.

Q   And you know that he and Erik Ramirez, Gonzalo's younger brother, are good friends and hang out together?

A   I don't know that.

Q   You don't know that.  You never saw 'em together?

A   No.

Q   This gun that you talked about, this Glock gun that you said you had seen it, you'd possessed it as well; isn't that right?

A   No.

Q   You never had it?

A   No.

Q   Now, you've talked about a lot of things that went on from about 11:00 to 12:30 that night out at the house at 1110 4th Avenue.  Yet you don't know how you got to the kick-back or to Cerda's place that night or in which car.  Isn't that right?

A   That's right.

Q   When did you normally start drinking back in 2008?

A   On the weekends.

Q   Well, this was a Friday night; isn't that right?

A   I think so, yeah.

Q   You didn't go to the football game that night, did you?

A   No.

Q   Okay.  So in your mind, the weekend begins on

Friday; right?

A   Yes.

Q   Now, there's been testimony that -- previous statements had placed Savage in the vehicle that night when you went by 1110 4th Avenue.  It's your position that Savage wasn't in there?

A   Yes.

Q   That you can remember?

A   No, he wasn't there.

Q   How about Erik Ramirez?

A   Who's that?

Q   Savage's friend and younger brother of Gonzalo?

A   No.

Q   You said no one got out of the car but Gonzalo at his house, or his mother's house?

A   Yes.

Q   Are you sure the girls didn't get out to go to the restroom?

A   Nobody got out.

Q   That you remember?

A   That I remember.

Q   Now, if we could pull up the -- I think it's 374. Okay.  Now, you had said even though you'd been drinking a good part of the day that you came back to that area of the house from the east; is that correct?

A    The first time?

Q    After -- no, the -- after you had been to Gonzalo's mother's house?

A    Yes.

Q    Okay.  And you showed us where that was at.  Could you please show us again?

                    (Witness complies with request.)

Q    Okay.  That's where the vehicle was stopped?

A    Yes.

Q    Now, you're saying that's coming from Gonzalo's house; is that right?

A    No, because his house is on the east side and we're coming eastbound.

Q    Okay.  I guess what I'm trying to figure out is Gonzalo's house is above this picture; is that correct?

A    Yes.

Q    A number of blocks?

A    Yes.

Q    So I thought you said on direct examination that you were coming from the east?

A    Yes, but not directly to this street.  The map is not big enough.  Came from one of the other streets and turned around and then came --

Q    Do you remember what directions you went from his house?

A    I don't remember the exact route.

Q    But what you've drawn, shown here with the yellow markings, is coming from the west, not the east; isn't that right?

A    Yes, coming from the west driving eastbound.

Q    Okay.  And on your direct examination you said you were coming from the east; is that right?

A    I meant we came from the east side of town and then somehow ended up coming from the west when we turned this way.  The map's not big enough.

Q    And you're saying at that alleyway only one person got out of the vehicle, not three?

A    Yes.

         MR. WELCH:  Objection.  Asked and answered.  Again.

         THE COURT:  The objection is sustained.

BY MR. HENRY:

Q    Now, you had said that you believed or you think that the person you've identified as Gonzalo made a comment in the car about thinking about hitting somebody; is that right?

A    Yes.

Q    Isn't it possible that that may have been something that you would have heard over the scanner that night?

A    Pretty sure it wasn't.

Q   But, again, you don't remember everything that evening, do you?

A   No.

Q   The -- after you arrived back at Cerda's place, you and these three individuals took off, two women and the person that you said is Gonzalo. And the gun, I think -- did you say that Gonzalo had the gun?

A   Yes.

Q   I'm going to refer you to the front page of Defendant's Exhibit R-Z again. Third from the last paragraph from the bottom. Just below the part where -- about Angel parking the car. Does it say who hid the gun? Do you remember telling Detective Villasenor that you hid the gun while you were under a car?

A   No. I don't remember telling her that at all.

Q   Did you hide behind a car out in the field?

A   No.

Q   Were there cars out there that you had passed when you were escaping?

A   Yes.

Q   Okay. You don't remember saying that you threw the gun under one of those cars?

A   No.

Q   Now, you have in front of you what's been marked as Government Exhibit 376; is that correct?

A    Which one is that?

Q    I'm sorry.  It's the plea agreement in your case.

A    Yes.

Q    Now, in this case you were charged in Counts 9,
10 -- excuse me, 10, 11, 12 and 13.  Is that correct?

A    Yes.

Q    And you were able to plead to Count 10 which carried
just a ten-year maximum; is that correct?

A    Yes.

Q    And that's shown in Paragraph 1; is that right?

A    Yes.

Q    And at the time of sentencing -- and you haven't
been sentenced yet, have you?

A    No.

Q    And at the time of sentencing, that Paragraph 1 also
says that the Government is going to agree to dismiss
the remaining counts of the Indictment.  Is that right?

A    Yes.

Q    So you're getting 11, 10 -- excuse me -- yes.  11,
12 and 13 dropped?

A    Yes.

Q    Now, your attorney is here in the courtroom today,
isn't he?

A    Yes.

Q    Mr. Shultz.  And he talked to you about that 13th

count, didn't he?

A    Which one is that?

Q    Count 13 is the discharging of a firearm in furtherance of a crime of violence.  Do you remember that?

A    Yes.

Q    And that count has a mandatory minimum of ten years and a possible maximum sentence of up to life.  You remember him talking to you about that?

A    Yes.

Q    In fact, above all the other counts, that was the one that you wanted to make sure got dropped out of here; isn't that right?

A    Yes.

Q    Because on a mandatory minimum, you'll do at least the ten years?  Correct?

A    Yep.  Yes.

Q    Now, number 12, Count 12, had a 20-year maximum.  Do you remember that?

A    Yes.

Q    And Count 10 and 11 had just the ten-year maximum; is that correct?

A    Yes.

Q    Could you turn to Page 5, Paragraph 5.  This part of it talks about what the Government is agreeing to give

to you.  Not just dismissing those other three counts; but they agree not to file any further charges against you arising out of the facts forming the basis for the present Indictment.  Do you see that?

A   Yes.

Q   Okay.  Now, the present Indictment, you were only charged in four counts, but it was a 38-count Indictment.  You remember that?

A   Yes.

Q   Now, this deal that you've entered into essentially says that if other information comes up, that they're not going to -- that's related to this Indictment, you're not going to get charged any more than what you already are.  Isn't that true?

A   Yes.

Q   They also got the State of Kansas, even though they're not a party to this agreement, they got them to agree to not file any additional charges against you nor prosecute crimes arising out of the facts forming the Indictment and agree to dismiss any case underlying the Indictment.  Do you see that?  Paragraph 5-B?

A   Yes.

Q   Okay.  So you get to plead to just the one count here and you're getting everything in the state court dropped off; isn't that right?

A   Yes.

Q   Now let's go to Paragraph -- Page 8, Paragraph 9. Do you see where it says:  Information provided by the defendant?

A   Yes.

Q   You were allowed to give a -- well, you interviewed with the -- with the -- with your attorney and with the prosecution team to tell what you knew about this -- the DVs and this Indictment.  Isn't that right?

A   Yes.

Q   And in turn for that, do you remember signing off on a Kastigar letter?

A   I don't know what that is.

Q   Okay.  Well, it's similar to what's contained in this paragraph.  It says that the Government has agreed not to use any new information you would give to them in that proffer of your own criminal conduct against you. So you could reveal anything in your past and it couldn't be used against you.  Isn't that true?

A   I think so.

Q   Okay.  So you're getting the state cases all wiped off; you're getting a possible life sentence wiped out; you get to plead to one count -- oh, by the way, let's look at number 7, substantial assistance.  Says here that you understand that if you are giving substantial

assistance by your testimony here today that the Government would file a motion under a statute and a guideline number that would allow you to get a lower sentence than what your guidelines would be.  Do you see that in Paragraph 7?

A   Yes.

Q   Says:  The United States shall request the Court to consider reducing your sentence below what would be otherwise received from the applicable statutes and guidelines.  Isn't that correct?

A   Yes.

Q   And you're out on bond right now; isn't that right?

A   Yes.

Q   Okay.  And you haven't been sentenced yet.  So you're hoping that you might be able to, to stay out?

A   Yes.

Q   Because it's up to the judge to determine what happens with you; isn't that right?

A   That's right.

Q   But because of the deal that you've struck with your attorney, you could get all the way down to probation in this case?

A   I don't know if I can or can't.

Q   You don't know if you can?

A   No.

Q   But it's up to the judge.  Government is going to agree to do this motion if they believe you're being truthful?

A   Yes.

Q   So if you testify the way they want you to testify, they'll file that motion.  Isn't that true?

A   Yes.

Q   You would hang out with Joe Galindo, Russell Worthey and Anthony Wright, wouldn't you?  Back then?

A   All of 'em except Anthony Wright.  I didn't know him.

Q   Now, let me ask you this.  I think -- are you married to Roselda Ochoa?

A   I'm not married.

Q   Is she your fiancee?

A   Yes.

Q   Now, she is the sister of David Ochoa; is that correct?

A   Yes.

Q   So you and David Ochoa will be brothers-in-law fairly soon?

A   Yes.

        MR. HENRY:  Your Honor, I would ask that Mr. Torres be kept under the subpoena to discuss matters that were beyond the scope of direct examination.

THE COURT:  All right.

MR. HENRY:  I have nothing further.

THE COURT:  Mr. Wachtel.

MR. WACHTEL:  Thank you, Your Honor.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q   Mr. Torres, my name is Val Wachtel.  I'm Mr. Garcia's lawyer.  If I ask you a question that you do not understand, would you please tell me that you do not understand it?

A   Okay.

Q   I have a tendency to speak softly.  If I'm speaking too softly for you and you can't hear me, would you tell me that you can't hear?

A   Yes.

Q   How many crimes between 2008 and April 16th, 2012, have you committed?

A   I don't know.

Q   So many that you've lost track?

A   No, I just -- I don't know.

Q   More crimes than are in this Indictment, though, huh?

A   No.

Q   No?

A   No.  I never killed anybody.

Q   Oh, I didn't mean to insinuate that you had.  But you committed more crimes than are charged against you in this Indictment; right?

A   Oh, just the ones that are charged?  On me?

Q   I'm doing a bad job.  This Indictment charges you with I think four crimes; right?

A   Yes.

Q   10, 11, 12, 13.  And you committed those crimes; right?

A   Yes.

Q   But you committed more crimes than that in the past 10, 15 years; right?  I'm sorry -- between 2008 and 2012.  You've committed more crimes than that; right?

A   Yes.

Q   Because you sold drugs; right?

A   Yes.

Q   Sold methamphetamine; right?

A   Yes.

Q   How many times did you sell methamphetamine?

A   I don't remember exactly.

Q   How much weight were you selling?

A   I don't remember exactly.

Q   But in any event, it doesn't matter because they can't ever prosecute you for that, can they?

A   I don't know if they can or can't.

Q   Plea agreement says they can't if you testify in a satisfactory manner to the Government; right?

A   That's what it says.

Q   Well, you read it and that's what it says; isn't it? Isn't it?

A   Yes, I guess.

Q   You guess?

A   Yes.

Q   Okay.  Well, I won't trouble you with that agreement any more; but I do have some other questions for you. You sold methamphetamine; right?

A   Yes.

Q   Sir?

A   Yes.

Q   And for which you were paid?

A   Yes.

Q   And out of that money, you had to pay off whoever your supplier was; right?

A   No.

Q   No?  Were you your own supplier?

A   No.

Q   How'd you get the meth that you sold?

A   I just held onto it for a few days and someone would come pick it up.

Q   Did you get paid for that?

A    Yes.

Q    I expect you cannot remember how much you got paid; but what did you do with that money?

A    Used it.

Q    For yourself; right?

A    Yes.

Q    Because you didn't kick any of that money -- you didn't kick any of that money into the DVs, did you?

MR. WELCH:  To which I'll object as not being relevant, Your Honor.

THE COURT:  The objection is overruled.

BY MR. WACHTEL:

Q    You may answer, sir.

A    Can you repeat the question.

Q    Yes, I can.  You didn't give any of that money to the DVs, did you?

A    No.

Q    You didn't give any of that money to any Norteno gang that wasn't in Dodge City, Kansas?

MR. WELCH:  Again, I will object as not being relevant.  That's not the law, Your Honor.

THE COURT:  Overruled.  He may answer.

A    No.

BY MR. WACHTEL:

Q    And you didn't give any of it to the, to Nuestra

Familia; right?

A   No.

Q   So those drug crimes were committed for your benefit; right?

A   Yes.

Q   You told us in direct examination that your house was shot at on at least two occasions in 2008 or 2009. Remember telling us about that?

A   Yes.

Q   Were you there?

A   Yes.

Q   Did you see who did it?

A   On one occasion, yes.

Q   Were you able to identify that person or those persons?  Whichever?

A   Yes.

Q   Were you able to tell -- to identify each individual?

A   Yes.

Q   Were those people gang members?

A   Yes.

Q   Perhaps Surenos?

A   Yes.

Q   You told us in direct examination that people who were willing to get into confrontations with rivals got

more respect; right?

A   Yes.

Q   Well, what difference did that make in the overall Norteno scheme, the overall DV scheme of things?  They couldn't give you orders; right?  Just because you respected them, could they?

A   No.

Q   So respect, I guess in terms of Norteno -- of DV hierarchy, didn't mean much, did it?

MR. WELCH:  I'm going to object as not being relevant, Your Honor.

THE COURT:  I was thinking -- I was writing a note to my law clerk and I wasn't paying attention --

MR. WACHTEL:  I'm sorry.

THE COURT:  -- to that question.  Please read the question to me.

(Previous question read back as follows:  Well, what difference did that make in the overall Norteno scheme, the overall DV scheme of things?  They couldn't give you orders; right?  Just because you respected them, could they?)

THE COURT:  He can answer that.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

COURT REPORTER MS. SCHWEMMER:  Oh, wait. There's another one.  I'm sorry.

THE COURT:  Another one?

MR. WACHTEL:  The one objected to.

COURT REPORTER MS. SCHWEMMER:  I read you the wrong one.  I apologize.

(Question read back as follows:

So respect, I guess in terms of

Norteno -- of DV hierarchy,

didn't mean much, did it?)

A    Can you repeat it?

BY MR. WACHTEL:

Q    Yeah.  So respect in terms of DV hierarchy, if they had it, didn't mean much of anything, did it?

A    Yeah, it meant something.

Q    What did it mean to you?

A    To me?

Q    Yeah.  To you.

A    It just meant that some people were more respected than others.

Q    Well, let's just take Mr. Garcia who you said had respect.  Did that mean you would go to Mr. Garcia for advice on how to be a criminal?

A    No.

Q    And you never did that, did you?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    No.

Q    Would you go to Mr. Garcia for advice on how to live a better -- a better Diablos Viejos life?

A    No.

Q    Thank you for those answers.  And because of the criminal life that you lived, you got -- earned some respect also; right?  Sir?

A    I don't know.

Q    You don't know.  So just because a person committed crimes didn't necessarily mean that anybody who was a DV was going to respect them.  Is that a fair statement?

A    I guess there's no way to measure if someone respects.  It's just the way someone looks at 'em.

Q    You talked about how the Diablos Viejos were run.  For example, you talked about rules.  Remember talking about that?

A    Yes.

Q    The rule of attacking rivals --

A    Yes.

Q    -- in some manner.  The rule of don't use methamphetamine.  Right?

A    Yes.

Q    The rule not to mess with another member's girlfriend or wife; right?  Are the Diablos Viejos' rules written down anywhere that you know of?

MR. WELCH: Objection; irrelevant, Your Honor.

THE COURT: Overruled.

A   Not that I know of.

BY MR. WACHTEL:

Q   Have you ever read them?

A   No.

Q   Now, you told us that you attended at least two meetings that were held by the Diablos Viejos?

A   Yes.

Q   Right. And then I think you told us that at those meetings you, you didn't do much; but they checked on how things were going. Right?

A   Yes.

Q   You remember telling us that?

A   Yes.

Q   Well, what legitimate businesses did the Diablos Viejos gang have?

MR. WELCH: I'll object to the form of the question. And under the law, it's not relevant.

THE COURT: Well, I'll tell the jury the law at the appropriate time; but there's nothing wrong with the question. Then the jury can consider the witness's answer in light of the instructions that I give. I don't think it's not relevant.

BY MR. WACHTEL:

Q   The judge told you you can answer that question, sir.  Can you answer it?

A   No, there's no businesses.

Q   No legitimate business?

A   That I know of.

Q   Excuse me?

A   No.

Q   No legitimate businesses whatsoever?

A   No.

Q   Oh, you talked about Exhibit 159-A.  Do you have it still in front of you, sir?  It's the ledger.

A   Yes.

Q   You told us, I think, you were there when that ledger was created?

A   Yes.

Q   At a meeting at some point in time; right?

A   Yes.

Q   I notice when I read it that every place -- just take Blanco, for an example, second page.  Blanco has $20 to the side of his name and an X; right?

A   Yes.

Q   And near as I can tell, everybody who's got a $20 number in their column and an X, that's everybody that contributed, contributed 20 bucks; right?

A    Yes.

Q    And how did that number come into existence?  If you know.

A    What do you mean?  The $20?

Q    How come it's $20 and not $40?  How come it's $20 and not 10?

A    I don't know.

Q    So you weren't there when, when anybody agreed that's the number that they would contribute; right?

A    No.

Q    And is there -- did you ever see a record of what of the money collected went back to help the guys in prison with commissary?

A    No.

Q    You don't need to look at that exhibit any more. I'm finished with that.  I am finished with it; but I do have another question.  Is that the only ledger that you have ever seen in your time span as being a member of the Diablos Viejos?

A    I'm not sure.  There could have been more.

Q    But you don't know?

A    No.

Q    Now, you talked about -- you were asked about the purchase of a gun by the gang.  You remember talking about that?

A   Yes.

Q   And you talked about, I think, a Glock; right?

A   Yes.

Q   Were you there when that Glock was acquired?

A   No.

Q   Do you know who it was acquired from?

A   No.

Q   Do you know who acquired it?

A   No.

Q   Have you ever seen it?

A   Yes.

Q   Where?

A   I don't remember.  At one of the meetings.

Q   How do you know that the Glock that you told us was acquired by the gang, but you don't know from whom or for how much or when, how do you know that's the same Glock that you saw?

A   I remember them talking about it.

Q   Who is them?

A   Gang members.  I don't remember exactly who.

Q   You do not remember what gang members talked about it; right?  So your memory is cloudy with regard to that issue, that question?

A   Yes.

Q   Yes?

A   Yes.

Q   Can you name the, the, the four Nortenos that you believe dealt in drugs?  I'm sorry, I say Nortenos and it's my fault.  I'm talking about DVs.

A   The ones that I know?

Q   Yes, sir.  The ones that you know.

A   Me; David Ochoa; Fabian Neave and Armando Maestas.

Q   I'm sorry?

A   Armando Maestas.

Q   And you know those other three people did that because you saw them do that; right?

A   Yes.

Q   And methamphetamine was what they sold?

A   Yes.

Q   Do you know what they did with their profits?

A   No.

Q   Now, you had a lawyer in this case.  He's sitting in the room with us; right?

A   Yes.

Q   And the Government shared with your lawyer some discovery materials, information about this case; right?

A   Yes.

Q   And did your lawyer share that stuff with you?

A   Some of it.

Q   Some of it.  And, and did he share that with you

before you made up your mind to, to cooperate with the Government?

A   Yeah.  Yes.

Q   And after you made up your mind to cooperate with the Government, did he continue to share the discovery information with you?

A   No.

Q   He did not?

A   I don't think so.

Q   Do you remember when it was that you made up your mind -- excuse me -- I'll withdraw that.  But you didn't make up your mind to cooperate with the Government until after you had been charged with these four serious felonies; right?

A   Yes.

        MR. WACHTEL:  Your Honor, I am almost finished.

Q   Oh, do you know if any of the money that was collected for the, for the gang members for the jail ever found its way to Mr. Garcia?

A   I don't know.

Q   You don't know.

        MR. WACHTEL:  Your Honor, I don't have any further questions for this witness.  Thank you.

        THE COURT:  Redirect.

## REDIRECT EXAMINATION

BY MR. WELCH:

Q   Mr. Torres, in addition to the two meetings that you told us you attended which are reflected in Government Exhibit 159-A, did you attend other DV gang meetings?

A   Yes.

Q   And whether or not at those other gang meetings a ledger was kept, you don't know; is that right?

A   What's that?

Q   Do you know whether or not a ledger was kept at these other DV gang meetings?

A   No.

Q   Were gang meetings held at various locations throughout time?

MR. WACHTEL:   That is asked and answered and not something I inquired about, Your Honor.

MR. WELCH:   He talked about 159 a lot, Your Honor, with Mr. Wachtel, which goes to the gang meetings.

THE COURT:   Overruled.

BY MR. WELCH:

Q   Mr. Torres, my question was where did these meetings take place while you were a DV gang member?

A   Different places.

Q   Give me examples.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    At Caiyo' house.  At Junior's house.  At --

Q    Let me stop you there.  Junior, do you know his real name?

A    Jose Romaro.

Q    And who else?  Where else I should say?

A    I don't remember.  Just wherever.  Other gang members' house.

MR. WACHTEL:  Objection; speculation.  He says he does not remember.

MR. WELCH:  He is trying to answer the question, Judge.

THE COURT:  Well, I'm beginning to wonder what the relevance of any of this is.  That he went to other meetings?  I'm kind of beginning to see Mr. Wachtel's point here.

MR. WELCH:  The point I'm trying to make, Your Honor, is other meetings were in fact conducted by the gang, which shows structure.

THE COURT:  Oh, gosh, haven't we heard that already from other witnesses?

MR. WELCH:  Well, the fact that he can corroborate that, Your Honor, is important.  It corroborates the other witnesses who have said it as well, Judge.

THE COURT:  Well, that's what you believe

anyway.  Let's move on.  Come on.  It's late.  We need to move.

BY MR. WELCH:

Q   Mr. Torres, has anyone from the United States, Mr. Smith, myself, or any detective or agent that spoke to you, told you to say anything other than the truth during your testimony, sir?

A   No.

MR. WELCH:  Nothing further, Your Honor.

THE COURT:  Mr. Henry, do you have any questions?

MR. HENRY:  Not with respect to redirect, Your Honor.

MR. WACHTEL:  I don't have any more questions, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Torres. Mr. Henry, if he wants you to come back, he'll let the Government know and then you'll have to come back when he needs you.

Who's the next witness?

MR. SMITH:  Your Honor, we had hoped to call Fabian Neave; but at this late time we would ask to delay that.  We know that we are going to have one witness to put on on Tuesday.  We will finish Tuesday. And I know that Mr. Bell would prefer to be present.

Obviously, he's not available tomorrow.  So we can finish approximately 10 witnesses tomorrow, we hope, and then we would just have a couple witnesses that includes Mr. Neave on Tuesday and we would be done.

THE COURT:  It's been a long day, Ladies and Gentlemen.  You mind going home half an hour early? I'll see all at 9:00 tomorrow morning.  Remember and heed the admonition.

(Recessed for the day at 4:30

p.m.)

(Beginning at 9:05 a.m. October 11, 2013, the following proceedings continued.)

THE COURT:  Good morning.  It's Friday.  Next witness, please.

MR. SMITH:  United States calls Special Agent Neal Tierney.

**NEAL TIERNEY**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Good morning, sir.  How are you?

A   Very well.  How are you doing, sir?

Q   Very good.  Please tell us your name.

A   Neal Tierney.

Q   And, briefly, generally what is it you do for a living?

A   I'm employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives here in Wichita, Kansas.

Q   Now let's get into it in a little more detail. Before being employed as a special agent now, your position with the ATF in Wichita, Kansas, what was your

involvement in law enforcement?

A    Before coming to Wichita?

Q    Let's start with your first involvement with law enforcement.

A    First involvement was in August of 1992.  I became hired by the Bureau of Alcohol, Tobacco, Firearms in Washington D.C.  I went to Washington D.C. and became a member of the National Firearms Act Branch.  The National Firearms Act Branch is the branch within ATF that is required -- or maintains the registry of all registered firearms.  Most people think firearms are registered, like pistols, long guns, handguns; but what I'm talking about are machine guns, silencers, destructive devices like grenades and so forth.  I worked there for seven months.  And then I was selected to become an inspector in Kansas City, Missouri.  Became an ATF inspector where I was charged with investigating licenses and permits for people that were issued licenses and permits to acquire and dispose of firearms and explosive materials.  I did that until 2000 when I became an ATF Special Agent.  Then I was transferred to a different group in Kansas City where then I was required to investigate crime and allegations of crime involving alcohol, tobacco, firearms, explosives and arson.  Then in 2001 I transferred down to Wichita where

I've been employed since, doing the same.

Q   So each time you refer to ATF, that's the Bureau of Alcohol, Tobacco, Firearms and Explosives; is that correct?

A   Yes, sir.

Q   It's not really referred to as ATF any more, by those of us who have been around for a while; is that right?

A   No.

Q   Is the ATF a federal agency?

A   Yes.

Q   So since your first employment in August of 1992, have you been employed by the federal government?

A   Yes.  21 years and six weeks.

Q   Including as a special agent for the ATF now; is that correct?

A   That is correct.

Q   Do you have a specialty in the ATF?

A   I have several.

Q   And -- well, let's talk about explosives.  Do you know anything about that?

A   Yes, I do.

Q   Tell us about that?

A   I am an ATF Special Agent Certified Explosives Specialist.  Been through all the training and now I

teach as well as training.  I'm authorized to handle,
destroy, teach and destroy explosive materials.  I also
teach in our academy; as well as do state and local
training and also teach internationally with ILEA, which
is International Law Enforcement Association.

Q   How often do you do the training, teach training?

A   It's, it's not a set schedule.  It's as requested.
There was a whole bunch and after 9/11, it kind of
tapered off.  I'll get requests to teach internationally
two or three times a year.  Depending what kind of
training we're having locally, get together with state
fire marshals or specific bomb squads and do post-flash
training.  Then also teach at our academy as well as the
special agent recertification program.

Q   And being a Certified Explosives Specialist, are you
required to recertify with the ATF to keep that
designation?

A   Yes, sir.

Q   Have you done so since being a Certified Explosives
Specialist?

A   Yes.  I believe six times.

Q   And you are currently certified?

A   Yes.

Q   I take it you have to continue on with your own
education to be a Certified Explosives Specialist as

well, other than the recertifications?

A   Yes.  You have to be active in the investigation,

prosecution and disposal of explosive materials.

Q   With your other duties, when you worked for the ATF

starting in August 1992, were there trainings, courses,

classes and certifications that you needed to maintain

to perform each of those other duties?

A   Absolutely.

Q   Did you do so?

A   Yes.

Q   Beginning in 1992 when you worked with the National

Firearms Branch; is that correct?

A   Yes.

Q   And did you do so when you worked as an ATF

inspector until the year 2000?

A   Yes.

Q   And do you continue to do so after becoming a

special agent in the year -- I'm sorry -- well, 2000 as

well; is that correct?

A   Yes.

Q   Up until today?

A   Yes.

Q   Let's talk about your other specialties in relation

to your employment with the ATF.

A   In addition to being a Special Agent and Certified

Explosives Specialist, I am also recognized as an interstate nexus expert relative to firearms and ammunition.

Q   Tell us what interstate nexus is?

A   Interstate nexus.  There's basically two terms. You've got interstate and intrastate.  Intra, I-N-T-R-A, means within the state boundary, so if this is Kansas, anything within the state would be intrastate. Interstate, I-N-T-E-R, means outside those state boundaries.  So crossing the state line.  And then that also could apply to crossing the country line as well.

So for interstate nexus, in a very general explanation, part of the elements of proving felon in possession and some of the other federal statutes is that the Government is required to show that the firearm or ammunition traveled in or effected interstate or foreign commerce.  Crossing the state line, for interstate.  And in foreign commerce, for example, Berettas typically are made in Italy, so it's manufactured in Italy.  If it's recovered in Kansas, then it crossed the state line as well as the country border.

Q   That's the interstate.  Is there anything to add to the nexus portion of that phrase?

A   Well, to be recognized as an interstate nexus

expert, you have to conduct research to determine the place of manufacture or origin of a firearm or ammunition.  And -- would you like for me to explain that training process?

Q   Please.

A   The process begins with a special agent -- typically, person has got to be on the job at least three to five years.  There has to be a specific interest in that particular person for knowledge regarding firearms and ammunition.  Someone is not interested in firearms, obviously, wouldn't be a very good pick for being an interstate nexus expert.  There's got to be a need for that particular person in a field office or within a division.

So shortly after I got to Wichita, that need, obviously, existed here in Wichita.  My name was forwarded up through my RAC, Recident Agent in Charge, which was my direct supervisor.  That then goes from him to his supervisor, which is the Assistant Special Agent in Charge, ASAC.  And then that goes up to the SAC, Special Agent in Charge.  And then the SAC, which is in Kansas City, that's our field division here for Wichita, makes a recommendation to bureau headquarters in Washington D.C.  There's, obviously, other divisions looking for the same type of expertise.  They get with

the training and professional development branch.  They start amassing a list of names.  And then once there's 20 or more folks picked, they put a class on.  And then I went through that process.

For the beginning of the training, you are sent to Washington D.C.  You arrive and all of us are sat down in a room and we're given a pretest.  If you don't score 80% or more on that test, then you're sent back.  You, obviously, don't know enough already to start to be in the program and you're taken out of the program.  So that's how it began.  And I scored well on the first test.  There's a week-long training from there to include mock trial, all kinds of research.  The ATF firearms library consists of over 5,000 firearms.  You tour that.  And then there's a whole bunch of firearms and ammunition that are presented to you and you have to conduct research, a minimum of three different levels of research.  That is to say, three different sources.  So that you look at this particular firearm and it says it's made in Smyrna, Georgia.  Then a second source and a third source.  At least three.  And then it goes to a mock trial on a Thursday.  Where it's videotaped.  And it shows an agent introducing this, and they tend to tap the desk or do something, try to help you be a better witness.  Then there's a final test on that last day,

Friday, which is a comprehensive test for everything that's been taught to you.  And you have to receive a passing score on that.

And then there's several schools after that if you would like for me to discuss those.

Q   Let's stop there for a moment.  So after -- did you successfully pass that training?

A   Yes, sir.

Q   Which is why you are a firearms and ammunition interstate nexus expert; is that correct?

A   That and other classes.

Q   During your duties, have you conducted examinations of firearms and ammunition for the purpose of determining whether they were in or effecting interstate or foreign commerce?

A   Yes.

Q   And you mentioned that you then go on to other trainings.  Do you also -- you mentioned that ATF has a firearm library; is that correct?

A   Yes, sir.

Q   What exactly is the purpose of going to the ATF firearm library?

A   Well, it's -- as far as ATF is concerned, it is a very, very diverse collection of firearms.  Every -- hopefully, with the intention of everything that we may

encounter.  It's there for research.  We have a branch called FTB, which is Firearms Technology Branch, for them to make determinations on whether a firearm is a machine gun or not.  To see if a silencer has baffles or rings, which makes it reduce the decibels to be considered a silencer.  The simplest answer I can provide is a reference library of firearms.

Q   In your duties as an interstate nexus expert, do you have access to the expertise of the Firearms Technology Branch?

A   Yes, sir.  Myself and other interstate nexus experts, we have a shared drive and it contains all that information.

Q   And have you referenced the firearms and technology branch in your job duties?

A   Very often, yes.

Q   So there were subsequent trainings to the training that you just mentioned.  What are the subsequent trainings that you have participated in?

A   The next class I went to after the initial training cycle was -- it's a -- it's a week-long training process where you travel in on Sunday and travel home on a Saturday.  They get Monday through Friday.  And we tour the firearms manufacturing facilities up and down the east coast.  Primarily in the New England states.  So

Colt, Smith and Wesson, Mossberg, New England Firearms, Marlin and so on.  I think there was eleven, eleven or twelve companies that we toured.  So that you can see what the firearms manufacturing process is.  How firearms become serialized.  At what point they stamp the model, city and state, or city and country on the firearm.  How the lock, stock and barrel come together to make a functional firearm.  Understand the difference between a pistol and a revolver.  All of that.  By touring these plants.  And that was the next training cycle that I did after the initial first week.

Q   Did you successfully complete that training?

A   Yes, sir.

Q   Did you visit each of those firearm manufacturers?

A   Yes.

Q   Did it aid you in your expertise as an interstate nexus expert?

A   Yes.  I mean, I thought I was aware of how firearms were made; but when you actually see it first hand, it is definitely an educational experience.

Q   And you were moving on to further training?

A   Yes.  Next training cycle was similar to the first one in that it was ammunition manufacturing plants.  Quite a different process.  Then when you start adding in the gun powder and explosive materials, quite --

quite enlightening as well.  It was particularly interesting to me, too, the relationship to the explosives specialist title.  And we did that in the midwest.  So, Missouri, Oklahoma, Illinois, Arkansas. Went around and toured various ammunition manufacturing facilities to see how ammunition was made.

Q   Is there a further training cycle?

A   They're always updating the data base.  As far as I'm aware of, the process has not changed.  I know that there is also a training cycle where interstate nexus experts can be put through an international environment overseas, Germany, Europe, to tour those plants; but I don't believe the government has had money to send people over there for quite sometime.

Q   Now, are you a member of any professional organizations?

A   Yes.

Q   And what are those?

A   ISME for explosive materials.  I'm also a member of IABTI -- I'm sorry -- International Association of Bomb Techs and Investigators, in relation to the Special Agent, Certified Explosive Specialist.

Q   After you have received a firearm or piece of ammunition to conduct your examination, what's the process that you go through?

A   Process is essentially the same.  There's a slight difference, obviously, between firearms and ammunition. When I receive a firearm, I examine the firearm, obviously, to first make sure it's not loaded.  And then at that point determine is it a rifle, shotgun, pistol or revolver, handgun or long gun.  Then I will look at and record whatever specific markings exist on the gun. Firearms domestically made are required to have a serial number, caliber, city and state of manufacture. Obviously, guns not made in the U.S. then are required to have city and country; and if it is not an alpha or numeric, it's not the alphabet A through Z or the numbers zero through nine, like Cyrillic, for example, may be Russian numbers or letters, or maybe Chinese.  If it is not alpha numeric, a number or letter, then the import company is required to stamp their own serial number on it so that we can trace guns in this country.

Q   And can you estimate the number of such examinations that you've done during your career?

A   Several thousand, several tens of thousands.

Q   When you do an examination of a firearm, I suppose, are some of those more complex?

A   Yeah.  Some of them are very easy and some of them are very difficult.

Q   And why is that?

A    I did a firearm for an agent a couple of weeks ago. It had four markings on the frame or receiver.  If I'm holding a handgun, okay, and so it's, it's capable of being fired by the action of one hand, a handgun. Obviously, what I'm looking for are the markings on the firearm.  Maybe even include proof marks.  Proof marks are not required in the United States.  They're required in Europe.  Of course, the history in this country is not nearly as lengthy as overseas.  Proof marks overseas or European countries are designed so that a person can pick up that weapon, recognize someone has fired it, they put their proof mark on it, they fired it at either one and a half or two times the amount of powder in the casing.  You can pick it up, look at it, see the proof mark, know you can fire that weapon, it's not going to explode in your hand.  The firearms manufacturing specifications in the U.S. probably exceed that and we just don't have the requirement.  But the point I'm trying to make is I look at all those markings.  All that's going to help me determine where it's made.  I examine that firearm.  I write the markings down. Typically will start going to the Blue Book of Gun Values and then -- I get an updated version every year, or sometimes every other year, depending when it comes out, the new version.  Then I will look that up.  And it

will tell me what that firearm is and where it was made. Then I'll go to a second source.  I will do the same thing.  And I go to a third source and do the same thing.  If I'm getting conflicting information or one of those sources I'm not finding it because it was maybe a firearm that was manufactured and didn't sell well or had some kind of problem, then I will always fall back on Firearms and Technology Data Base to confirm the information that I found in the initial research.  And that's how it's done for firearms.

Q   What sort of -- you mentioned these sources that you use.  Give us an example of some of the sources other than --

A   Gun Trader's Guide. Gun Digest.  Sometimes I'll go with Guns and Ammo.  Get referred to as a gun stroke in the office and that's not true.  But I do subscribe to Guns and Ammo because I get the magazine and I see what the new firearms are every year.

Q   And is the process similar for ammunition?

A   Very similar.

Q   When you receive ammunition, do you make an attempt to examine each individual piece of ammunition?

A   Absolutely.

Q   Why?

A   So that, with respect, when I come into this

courtroom and present myself as an expert witness, if I have 50 cartridges in a box, I'm not telling you that all 50 are made by one company.  I will look at all 50 rounds and tell you 29 of them are made by this, and 21 of them are made by this company.  Because a lot of times, especially in criminal investigations, you're going to find an assortment or mixture of ammunition. So it's absolutely critical that I look at each one, provide determination for each one.  And then when that happens, typically, whether it's one of the agents in my office or a detective from the state or local police department or Sheriff's deputy, when the ammunition is collected, it is generally collected as one item.  So, a bag of ammunition, but it may be actually 13 different kinds of ammunition inside that one bag.  So ammunition, with respect, creates a lot of work for me because I have to look at each specific round.

Q   Now, relative to the subject of interstate nexus for firearms and ammunition, have you worked with other law enforcement agencies or other organizations to lend your knowledge?

A   Yes, sir.

Q   And who's that?

A   United States Secret Service.  Customs, or ICE. Judge Advocate General.  State and local law enforcement

in Kansas and Missouri.  United States Marshal Service.
Just about -- well, any federal agency or state agency
that asks for my help, then I do that.  That's just -- I
can get out my C.V. and read a list if you'd like.

Q    What about organizations other than law enforcement?

A    Other than law enforcement?

Q    Schools, museums, anything like that?

A    Well, I have taught at various universities.  There
was a program that the United States Attorney put on,
U.S. Citizen Academy would get members from the industry
together and they would try to get one of the senior
agents from the various federal agencies to come out and
explain what we do.  I don't know, four or five
universities I've taught at.  If requested, we'll put
training on and go teach.

Q    I understand.  Relative to the trial at hand and
investigation of the Norteno gang in Dodge City, Kansas.
Have you become involved in determining whether any
firearms or ammunition have effected or are subject to
interstate nexus?

A    Yes.

Q    If I'm using the wrong phraseology, tell me what
phraseology you would prefer.

A    No, that's good.

Q    And in those examinations, have you essentially

prepared reports?

A    Yes.

Q    Why do you prepare reports?

A    Well, the report is the official presentation of the research that I conduct.  So I will take all of my notes, generate a report.  The report then is looked at by my supervisor, the Resident Agent in Charge here, that is my boss.  He looks at that for grammatical errors or other issues.  Typically, it gets by on the first pass, sometimes it doesn't.  But it has a peer-review process where it's at least looked at before I submit it.

In addition to that, the program the ATF has is called NFORCE.  It's what all of our case management system, all the reports, all the property, all the participants and so on is in that.  And the nexus branch looks at our reports as well in the peer-review process because it's entitled interstate nexus.  Then I have to make a window, whether it's contact interview, search warrant, what have you.  So there's a peer-review process to that as well.

Q    Besides -- I'm sorry.  Go ahead.  I don't want to cut you off.

A    Well, I get long-winded -- but, I prepare that report then so that I can provide it to the various

parties.  And then as an expert witness, there's an opinion and conclusion at the bottom of my report.  And then that's where I say where a specific firearm or ammunition was manufactured.

Q   Other than the nexus determination, is there anything else that you do or anywhere you send the information after doing those examinations?

A   No.

Q   Is there ever an attempt to trace ammunition or firearms or is there a national tracing data base?

A   There is.  That's not part of the nexus program.

Q   Yes.  What is the purpose of that?

A   Well, the purpose of the trace is not to provide interstate nexus.  The purpose of the trace -- and when I say trace, it is, if a firearm is recovered and then it is requested that the trace be done on the firearm. The trace is initiated through the National Tracing Center where -- it's another branch of ATF and it's located in Falling Waters, West Virginia.  They will take all the descriptors for the firearm, manufacturer, model, serial number, type, typing like break-open derringer, pistol, revolver, shotgun, pump action.  And take that information and then they'll go back to either the manufacturer and/or the importer.  As I spoke earlier, if it doesn't -- if it's imported from outside

the United States, then they have to put an importer mark on it. Obviously, if it's manufactured in Germany or Italy, we can't trace that in the U.S. We would have to go to the company that manufactured it. Which is why those markings are required to be on the firearm. Tracing Center takes that information and then they contact the manufacturer. So for the point at which the firearm is made, wherever that is, whether it's U.S. or outside the U.S., then they contact them and say where did it go. And they say: I manufactured the firearm, I shipped it to this wholesaler or this importer; then the trace goes forward until it ends with a specific person and that's where the trace ends. So it's an investigative tool to the agent, to the detective, to the deputy, whoever is initiating the trace, to come up or try to determine the last known individual person with the firearm.

MR. SMITH: Your Honor, I'd move to have Special Agent Neal Tierney declared an expert on the subject of examination of firearms and ammunition and interstate nexus.

MR. WACHTEL: I was wondering when that was coming. I don't have any objection, Your Honor.

MR. MANDELMAN: Your Honor, my only objection to Mr. Tierney's testimony is the report that he

prepared in this case wasn't disclosed until after the beginning of the trial in this case.  I believe he's an expert --

THE COURT:  We all know he's an expert.  But that's not the point.  In federal court, it's not necessary to ask that a witness be declared an expert.  The objection as to the production of his report is overruled.  You have listened to Agent Tierney, you'll hear the rest of his testimony and then it will be up to you, under the instruction that I give you, to determine whether he's an expert; and if so, to weigh his opinion.  It's the jury's determination, not mine.

MR. SMITH:  May I approach?

THE COURT:  Yes.

MR. SMITH:  Thank you.

BY MR. SMITH:

Q   Agent Tierney, I've placed in front of you what's been marked for identification as Government Exhibit 119.  Do you see that?

A   Yes, sir.

Q   Do you recognize Government Exhibit 119?

A   I do.

Q   What do you recognize Government Exhibit 119 to be?

A   Government Exhibit 119 bears an ATF evidence label that I have affixed to it with my signature and my

initials.  Government Exhibit 119 contains a variety of envelopes that are all similar to this one.  Each one of these as well bears an evidence seal from my entry into the envelope, withdrawing the cartridge casing inside the envelope and then placing it back in the envelope with my evidence label.  And they all contain previously fired ammunition cartridge casings.

Q   Now, do the packages themselves -- you've mentioned they have your markings; is that correct?

A   Yes, sir.

Q   Why?

A   There's a variety of reasons why.  If I'm provided evidence in a case and it is in a sealed package, then when I am done, or at the conclusion of my examination, I return that evidence back into its original packaging and then I put an evidence tape or label onto it to show the day that I looked at it and then the day that I resealed it and put that evidence back into its original package.

Q   Have you examined the contents of each of those original packages?

A   If I take it out -- as of about the last three years, forced to wear glasses.  I also have magnifying glasses.  I also have a jewelers loop.  Sometimes the marks can get specific.  Sometimes, firearms, there's an

attempt to obliterate serial numbers. Depending how good or bad that obliteration process was, I may or may not be able to determine what the serial number is. But I conduct a physical examination of each item.

Q Do you have exhibit numbers that you've attributed to these individual packages?

A Yes, I do.

Q Is that beginning with Exhibit 112-A?

A Yes.

Q Through Exhibit 112-J; is that correct?

A Yes.

Q Those are your exhibit numbers; is that right?

A Yes. What I did -- Government Exhibit Number 119, as displayed by the yellow sticker, is the exhibit that is shown to the Court. When ATF -- specifically, when Agent Steve Gravatt from my office received this package, he put it into evidence as Exhibit 112. So they're the same item. The prosecution has labeled this 119. When we got it, it was presumably the 112th piece of evidence we got in that case. So when I write my report, I write my report in regards to the ATF exhibit number. So instead of saying 119, I refer to it as 112. First one I look at is A; second one is B, C, so on and so forth.

Q Let's talk about 112-A then specifically. Did you

personally conduct an examination of item 112-A?

A   Yes, I did.

Q   Will you hold that up for the jury?

A   Would you like me to open the package?

Q   I don't think that's necessary.  You tell me if you feel like it's necessary to open the package.

A   I can if you'd like; but I'm certain of my findings.

Q   Have you conducted a physical examination of the contents of 112-A?

A   Yes, I have.

Q   And does 112-A have your markings on it to identify it with a specific examination and report that you have completed?

A   Yes, it does.

Q   What were your findings -- I'm sorry -- how did you identify Exhibit 112-A?

A   Well, I identified Exhibit 112-A as just that, 112-A.  And then I'm going to go ahead and take it out so I can display this to the jury.

    That's a previously fired 9 mm cartridge casing. Ammunition is one of four component parts.  All four component parts individually are ammunition.  Put together, it's a complete ammunition cartridge casing. So if you would allow me to expand that, to a live cartridge.  You're going to have the cartridge casing.

You're going to have a primer inserted into the back end of the cartridge casing. It has a small amount of explosive powder inside of it. Inside the cartridge casing, then, is a variety of different types of smokeless powder. Smokeless powder for a shotgun shell is going to be different from a smokeless powder for a rifle casing. Which is going to be different from the smokeless powder from an ammunition cartridge casing. So you've got the primer. You've got the shell casing. You've got the propellent powder in there. Then you have the projectile or bullet in the end. It is impressed within the cartridge casing. And then all four component parts are put together and you have an ammunition cartridge that is ready to fire. When the primer -- and there's two types of primers. There's a rim fire primer, which has a dusting of a high explosive material around the rim, like .22 calibers typically. There are many more than that, but typically .22 is what you see. Or you can have a center fire cartridge primer, which is typically your shotgun, your handgun and your long gun primers. So when the firing pin impinges or impresses sufficiently into the primer, it causes a spark. That spark then -- there's either one hole or a series of holes on the inside of the primer inside that cartridge case. That spark of fire then

goes inside the cartridge case and comes into contact with the powder that's inside there, smokeless powder. There is a process -- it's a very, very fast process. It's called deflagration. Which when that smokeless powder starts to burn, it's burning extremely rapidly, off-gassing, it's creating gas. Once the pressure from that off-gassing or deflagration, burning of the smokeless powder, occurs, it's created enough gas that something's got to happen. The bullet or projectile that is in the end of that cartridge casing is holding that rapid expansion of gasses back. It then goes to a detonation. It's a small detonation and it actually explodes, which then causes that bullet or projectile to get sent forward. Now, inside the chamber of a firearm, whatever type of firearm it is, the chamber where all that action is happening is designed to retain that overpressure, hold that explosion. Then the only thing that the bullet can do or the projectile is to leave in this direction and that's where it goes out the end of the barrel. And then firearms are further manufactured with rifling so it spins, so it gets to its target much better than an antique musket or other type of firearm. So, kind of explaining the ammunition.

This cartridge casing out of Government Exhibit 19, reference numeric as 112-A, bears markings on the end.

That is how interstate nexus is done from the cartridge casing. This is a tool that the ammunition manufacturers use and it's called a bunter. And it's very simple. The hole where the primer is going to go afterwards is protruding on the end of that. And then it's proprietary to each company, the stamp. So you may see REM, 45 auto, Remington 45 auto. You might see Sig 357, Sig Sauer. Or Smith and Wesson. Whoever has manufactured that proprietary cartridge, they stamp it in there; and that is the only thing, really, you can tell within something that small as a 9 mm cartridge as to who made it and where it was made.

The stamping on the head stamp of this previously fired cartridge casing reads FC, capital F-C, 9 mm, millimeter, and Luger. So when I examined that, I know, and I go through my research, FC is Federal Cartridge Company. 9 mm is the caliber. Luger means it's a 9 by 17, or 9 by 18, which was initially manufactured by the German Army and it became adopted as their cartridge and so that appears on there because it's proprietary to the person that originally made it. And that is an ammunition cartridge made by Federal Cartridge Company in Anoka, Minnesota.

Q   With the stamping -- I'm sorry -- the 9 mm, which is the caliber; is that correct?

A   Yes, sir.

Q   In your training and experience, is that in fact a 9 cartridge casing?

A   Yes, it is.  All of them are.

Q   And a luger cartridge casing.

A   Yes.

Q   Did you do a similar examination for what you have marked as 112-B through 112-J?

A   Yes, sir, I did.

Q   How are 112-B and 112-J marked on the cartridge casing?

A   Exactly the same as this one.  All of them bear the same marking.

Q   FC 9 mm luger?

A   That's correct.

Q   In your training and experience, were the stampings accurate or an accurate description of the casings that you examined?

A   Yes.

Q   You've mentioned rim fire, center fire.  Are those rim fire or center fire cartridge casings?

A   These are center fire.

Q   Did you do an examination of what you have marked as exhibit number 113, which is in Government Exhibit number 119?

A   Yes, I did.

Q   Go ahead and remove the contents of that please.

(Witness complies with request.)

A   Is there another exhibit?

Q   There may be.  Government Exhibit number 120.  Do you recognize Government Exhibit 120?

A   Yes, I do.

Q   And how do you recognize Government Exhibit 120?

A   It also bears an evidence label with my initials and the date that I looked at it.

Q   So did you do an examination of Government Exhibit 120?

A   Yes, I did.

Q   You've removed a manila envelope from that exhibit; is that correct?

A   Yes, sir, I have.

Q   Do you recognize that manila envelope?

A   Yes, I do.

Q   Did you do an examination of the contents of that manila envelope that is identified as Government Exhibit 120?

A   Yes, sir.  It also bears my initials and a date. And I put that on there.

Q   Is that what has been identified as ATF Exhibit number 113?

A    Yes, it is.

Q    And what is Government Exhibit number 113?

A    Government Exhibit 113, which is -- I'm sorry -- ATF Exhibit 113, Government Exhibit 120.

Q    Thank you for correcting me.

A    Is the ammunition cartridge casing absolutely similar to this except it has the projectile, it has the propellent powder and it has a live primer, not a previously fired or expended primer.  So now I have all four here as all four component parts, where I only have two on this one.

Q    And, well, what are the stampings that identify ATF Exhibit 113?

A    ATF Exhibit 113, which, again, and I apologize, is Government Exhibit 120, is stamped FC 9 mm -- excuse me -- 9 M-M, and then luger, L-U-G-E-R.  Again, Federal Cartridge Company, caliber 9 mm.  And it's the 9 mm luger cartridge, which, again, is designed by and therefore proprietary to Germany.

Q    Now, in your examination of Government Exhibit -- the contents of Government Exhibits 119 and 120, were you able to determine where that ammunition was manufactured?

A    Yes, sir.

Q    And do you have an opinion as to where that

ammunition was manufactured?

A    Yes, sir.

Q    And what is your opinion?

A    That ammunition was manufactured in Anoka, Minnesota.

Q    And do you have an opinion as to whether the contents of Government Exhibit 119 through 120 are in fact ammunition?

A    Yes, they are.

Q    And what is your expert opinion?

A    Government Exhibit 119, which comprises ten very similar -- they're the same -- are cartridge casings with a spent primer previously fired, manufactured by Federal Cartridge Company in the state of Minnesota. And then Government Exhibit 120 is ATF Exhibit 113 is a live ammunition cartridge manufactured by Federal Cartridge Company in Minnesota.

Q    So in relation to this case in Dodge City, Kansas, what is your opinion as an interstate nexus expert as to this cartridge or these casings and this live rounds effect on interstate nexus?

        MR. MANDELMAN:  Objection, Your Honor.  This is a question for the jury.

        THE COURT:  I think he's right.  The objection is sustained.  He can testify with respect to the

interstate aspect of the exhibits, whether they crossed state lines, but interstate -- the word nexus is not something that -- I think the jury is going to have to consider that.

BY MR. SMITH:

Q   Agent, in your experience, for these cartridges or rounds to have been found in Dodge City, Kansas, did they travel in interstate or foreign commerce?

A   Yes, they have to.  They can't -- they're not made in Kansas.  It has to cross the state line to be found in the state of Kansas.

Q   Thank you.  Let's go ahead and package that up again.

                    (Witness complies with request.)

Q   I've placed in front of you what's been marked for identification as Government Exhibit 326; is that correct?

A   Yes.  This package bears the Government Exhibit 326 sticker.

Q   Have you examined the contents of that package before?

A   Yes, I have.  This package also bears evidence tape with my signature and title and date.

Q   Please remove the contents of that package.  Keep an eye out for A.

(Witness complies with request.)

A   This one.

Q   Do you have what has been marked as ATF Exhibit 12-A?

A   112-A, yes.

Q   Have you examined the contents of that package?

A   I have.

Q   Please open it.

(Witness complies with request.)

Q   What is contained in that package?

A   Government Exhibit 326 contains 20 previously fired rifle ammunition cartridge casings.  I identified this one in my research and report as Exhibit 112-A.  Again, this was processed by Agent Gravatt as item 112.  And then I have to take them out individually, A, B, C, D and so forth.  This is the first one I did, which is 112-A.

Q   What is that?

A   This is a previously fired cartridge casing.  It is a steel ammunition cartridge casing.  The previous one we looked at was brass.  This one -- I'm sorry -- 12-A, it bears the markings 7.62 with an X, times, 39, and then the numbers 97.

Q   What's the significance of 7.62?

A   Seven six two by three nine is -- when you're

dealing with a European cartridge casing as opposed to a United States type cartridge casing, the U.S. cartridge casing like .45, .45 is a decimal system adopted by the United States.  And it shows it's just under half an inch.  Point five would be half an inch.  European cartridge casings will typically have two numbers.  762, which is your diameter; and 39, which is the length of the cartridge casing itself in millimeters.  So it's actually showing the cartridge case length and the diameter length for the proper insertion of that bullet.

Q   And did you examine that cartridge casing to determine its place of manufacture?

A   Yes, I did.

Q   Did you examine the entire contents of Government Exhibit Number 326 to determine the place of manufacture for each of those individual cartridge casings?

A   Yes.  I examined every one of them.

Q   And that was 20 separate cartridge casings; is that correct?

A   Yes, sir.

Q   In your examination of each of those 20 separate cartridge casings, did you form an opinion as to the place of manufacture of those cartridge casings?

A   Yes, sir, I did.

Q   And what is your opinion?

A   Government Exhibit 326, which then appears in my report for the specific examination of each one of them, all of these are manufactured in the country of Russia. And the company that made it -- and I will spell it -- is K-L-I-M-O-V-S-K, Klimovsk, stamping plant located in Russia.

Q   Now, Agent Tierney, have you formed an opinion as to -- well, if these cartridge casings were found in the state of Kansas, do you have an opinion as to whether they traveled in interstate or foreign commerce?

A   Yes, sir.

Q   And what is your opinion?

A   They traveled both interstate and foreign commerce. They're manufactured in Russia.  To be recovered in Kansas, they traveled in interstate and foreign commerce.

Q   Agent, let's repackage those please.

(Witness complies with request.)

Q   You mentioned before, and this is specific to firearms, that firearms are required to contain certain stampings or have certain stampings on them; is that correct?

A   Yes, sir.

Q   What is the purpose of those stampings?

A   Well, the purpose is to identify the firearm.  Prior

to 1968, when the Gun Control Act was created by Congress, serial numbers were not required to be stamped onto a firearm. It was more an inventory control issue for the manufacturer. With the Gun Control Act in 1968, there was very, very many rules and regulations imposed at that point; but one of those relative to your question is the firearms were required to be stamped with city and state or city and country of manufacture, serial number, model, and caliber.

Q   And if the firearm is manufactured outside of the United States, are there additional stampings?

A   Yes. If it is manufactured outside the United States, the same rules apply; but so that firearms trace can be conducted, there is an additional requirement of the city and country of manufacture to be placed on it. Again, as I explained earlier, if it doesn't have an alpha and numeric serial number, then a unique individual serial number by the importer would have to be placed on it for the same reason, for tracing purposes.

Q   Now, Agent, during the course of this trial has it been made known to you that two Glock manufactured handguns have been in the possession of persons mentioned in this trial?

A   Yes, sir.

MR. WACHTEL:  Objection; hearsay.

THE COURT:  Overruled.

BY MR. SMITH:

Q    And have you conducted examinations on Glock manufactured handguns during your training and experience?

A    Yes, sir, many times.

Q    Well, what's many?

A    You know, I apologize for having to guess to the jury, but several hundred times.  I don't know a number.

Q    And have you also conducted additional research to determine the place of manufacture of Glock handguns?

A    Yes.

Q    Have you personally observed Glock handguns, then, each of those several hundred times?

A    Yes.

Q    Now, in your -- have you been able to form an expert opinion as to the place of manufacture of Glock handguns?

A    Absolutely.

Q    What is your opinion?

A    The fact is that Glocks are made either in the country of Austria, and now they have a manufacturing plant in Smyrna, Georgia.  Up until recently, all Glock firearms were manufactured in the country of Austria.

And then with the popularity of Glocks, it is the primary firearm of choice for law enforcement inside the U.S., Glock Manufacturing has done very well, and they are actually making firearms in the United States in the state of Georgia.  So it's either manufactured in Austria or in the state of Georgia.

Q   And in your examination of Glock firearms, what sort of markings do Glock firearms generally have on them to identify them?

A   Well, again, with the previous explanation as to the proof mark, they proof marked it because, obviously, they manufactured firearms for the international market. And they have much greater sales internationally than they do inside the U.S.  They put their proof mark on it.  Glock also is very good about stamping on the firearm it's either made in Austria or it's made in Georgia.

Q   Now, Agent, during the course of this trial, have you had made known to you that persons involved in this trial would have possessed a firearm generally described as a MAC 11?

A   Yes, I am aware.

Q   Have you done research in relation to identifying a MAC -- what a MAC 11 is?

A   Yes, I have.

Q   And in your research, have you been able to determine a type of firearm or class of firearm that fits the description of MAC 11?

A   Yes, sir.

Q   Is MAC 11 the term that you would use to refer to that firearm?

A   It is a term commonly used to refer to that firearm. It's kind of like Kleenex, you know, everyone refers to a kleenex as a kleenex, when in fact it's a tissue. There are six or seven companies that make firearms similar to the original design of the MAC.  MAC is Military Armament Corporation, which is a company that started making firearms in 1978 in Georgia, the state of Georgia.  I believe it was sometime in the later '80s that it went out of business.  And then that design was popular and many other companies started making it.  But it is -- it is the original company.  And those firearms are typically referred to as MAC 10s or MAC 11s.

Q   Is there another short phrase that they would be referred to as?

A   M9, M11, depend on the caliber.

Q   In your research, in this class of firearms identified as MAC 11, have you been able to form an opinion as to where the place of manufacture of those firearms is?

A    Absolutely.

Q    And what is your opinion?

A    They're all made in Georgia.

Q    If a MAC 11 had been found in the state of Kansas during the course of this trial, would it have crossed interstate lines?

A    To be found in Kansas and to be made in Georgia, it crossed interstate lines.

Q    During the course of your research, have you been able to determine the type of cartridges that a MAC 11 is capable of firing?

A    Yes.

Q    Can a MAC 11 fire 9 mm ammunition?

A    Yes.  And one more time -- not to, to over qualify it -- but it depends on the caliber.  If the MAC 9, the MAC 11, or the M9, 11, whichever model you're talking about, is calibrated for 9 mm, it would fire a 9 mm. They make it in several calibers, 45, 9, 380.  But, yes, it could.  It can.

Q    Thank you.

        MR. SMITH:  One moment, Your Honor.

                    (Off-the-record.)

        MR. SMITH:  I have no further questions at this time.

        THE COURT:  Yes, sir.

MR. WACHTEL: We've switched turns again, Your Honor.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q   Agent Tierney, I have a few questions for you.  And I'd like to talk with you about the reason that information is stamped on the bottom of cartridges.  If I understand your testimony, all ammunition manufactured, at least that finds its way to this country, all has something stamped on the bottom?

A   Yes.

Q   It has the caliber?

A   Doesn't always have the caliber; but if there's room for it.  For example, a .22 may have a symbol that's recognized by a specific company; but if there's room, they will try to put the caliber.

Q   Tell us again, then, what must be stamped on it, on the bottom of the cartridges?

A   What must be stamped is some unique identifier to be able to show who manufactured that cartridge casing. There is, for example, again, when it gets smaller like a .22, there's just not room.  Then, again, understand that within the rim fire or the center fire primer is a high explosive charge, it's very, very, very small.  But to try to get something in there and put that on as it

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

gets smaller is more difficult.  So very often on the smaller calibers like .22 you may have an H, stands for Hornady.  May have a C, which stands for Cascade Cartridge Company Incorporated.  You may have a symbol like a hummingbird, which is relative to a Winchester.  So some type of marking such that it can be related back to the manufacture of that casing.

Q   Didn't you tell us, though, in your direct examination that the -- that a purpose of the stamping is to assist in tracing?  Do you remember telling us that?  Yes?  No?

A   Yes.

Q   Who in America, other than law enforcement, does tracing of ammunition?  If you know.

A   I can't think of anyone outside of law enforcement.

Q   And can you think of a purpose served by tracing -- I'm sorry -- let me rephrase it.  Can you think of a purpose outside of the prosecution of criminal conduct that tracing is conducted by law enforcement?  Does that make sense to you?

A   Yeah.  And I, I believe I would have to answer -- and we can qualify this -- outside of prosecution, it might be to attempt to return stolen property to the victim of a crime of theft.

Q   Have you ever done it for that reason?

A   I haven't traced it for that reason; but I have been involved in investigations for making those determinations for the purpose of stolen property.

Q   The tracing -- did you do the tracing in this case? You did; right?

A   No, sir, I did not.

Q   Who did?

A   I'm not aware.  I don't know.

Q   Do you know the purpose for which the tracing was done in this -- do you know the purpose for which the tracing was done in this case?

A   I don't believe any of the ammunition was traced. Firearms by serial number, manufacture, model, caliber are typically traced.  I have not seen those traces.  I assume that they've been done.  I don't know.

Q   Did -- in reaching your conclusions that you've shared with us here today, did you rely on any of the information stamped on the bottom of the shell casings and live rounds that you -- that you've shown to -- that were exhibits in this case?

A   Yes, sir, I have.

MR. WACHTEL:  I don't have any further questions.  Thank you, Judge.  Thank you, Agent Tierney.

THE COURT:  Yes, sir.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Did you analyze any firearms in this case?

A   Yes.

Q   And what firearms did you analyze?

A   Well, any firearm that I was asked to do, I've done.

Q   None that have been introduced into evidence?

A   With respect, sir, I don't know what's been introduced into evidence.

        MR. SMITH:  Objection.  He hasn't been allowed to answer the first question.  And, again, facts not in evidence.  He doesn't know what has or has not been introduced into evidence because there hasn't been a specific question posed.

        THE COURT:  Sustained.

BY MR. MANDELMAN:

Q   Your testimony here didn't cover a specific firearm, did it?

A   So far we've discussed a MAC 10.  That's the only firearm I've discussed.

Q   When did you first analyze the ammunition that you testified about?

A   I believe it was several weeks ago.

Q   Do you have -- do you have your report in front of you?

A   Yes, I do.

Q   And when is that report dated?

A   The 9 mm cartridges I examined on October 3rd; and then the 762 by 39 rifle cartridges, I also examined on October 3rd.

Q   Okay.  So that's one week ago?

A   Yes.  One week and a day.

Q   And who contacted you about the report?

A   Agent Gravatt.

MR. MANDELMAN:  Thank you.

### REDIRECT EXAMINATION

BY MR. SMITH:

Q   Agent, the conversational interchange you had about tracing of ammunition, does that aid you in your expert opinion as to whether the ammunition traveled in interstate or foreign commerce?

A   No, sir.

Q   Now, you also had a question posed to you as to examination or testimony about any specific firearms and you mentioned a MAC 10; is that correct?

A   Yes, I did.

Q   And in direct examination you mentioned -- or did you mention MAC 10 or MAC 11?

A   I discussed the series of MAC 10, MAC 11.

Q   Was there also discussions about a Glock?

A    I'm sorry, there was discussion about a Glock.

Q    And have you done research into Glock firearms?

A    Yes, I have.

Q    You were posed a question as to whether you did examinations of any other firearms in this case; is that correct?

A    Yes, I was asked that question.

Q    Do you recall that question?

A    I do.

Q    Have you conducted examinations of other firearms related to this case?

A    Yes, I have.

Q    Agent Tierney, have you conducted an examination of a Browning Buckmark .22 caliber pistol?

A    Yes, I did.

Q    Was that in relation to your involvement in this case?

        MR. MANDELMAN:  Judge, I object as to now beyond the scope.

        THE COURT:  It certainly is not.  Defense counsel opened the door to this.

    He examined a .22 caliber what?

BY MR. SMITH:

Q    Agent, take a moment to find your report.

A    Okay.

Q   Have you found the relevant report?

A   Yes, sir.

Q   How would you identify that firearm for the jury?

A   It is ATF Exhibit Number 324, which is identified as a Browning Arms, model Buckmark, capital B-U-C-K-M-A-R-K .22 caliber pistol.  And then identified by a serial number and this particular firearm has an obliterated serial number.  It's been scratched out such that it's not readable.

Q   If a firearm has an obliterated serial number, are you able to determine or make an interstate nexus examination?

A   Yes.

Q   How does that process work?

A   It's the same.  Serial number is one of the five things that I look at.  Manufacture, model, caliber, serial number, type.  Serial number will assist me in determining the year of manufacture of a firearm. Because I've got access to the proprietary records from the manufacturer to show started making this model on this date.  They either continue making it or they ended making it this date.  Then I can zero it into a specific year.  That's relevant because firearms companies move and get sold; and then for me to make an accurate determination on when it was made, I can reference the

serial number.

And in the case of this firearm, the firearm that is identified as Exhibit 324 was actually made for Browning by another company.  That company is Arms Technology Limited Partnership.  And they manufactured it in the state of Utah for Browning.

Q   Did you also examine ammunition in relation to your examination of that firearm?

A   Yes.  This firearm was submitted to me with five live cartridges of ammunition identified as ATF Exhibit 325.  Those five cartridges were identified with the marking, as I was explaining to defense counsel Wachtel, is a .22 rim fire, a very small surface to put a marking on that head stamp.  It is identified by a capital F, that stamped for Federal Cartridge Company; and those five live cartridges were manufactured by Federal Cartridge Company in Minnesota.

Q   Do you have an expert opinion as to whether that Browning Arms Company firearm and the ammunition submitted with it traveled in interstate or foreign commerce to be found in the state of Kansas?

A   Yes, sir, I do.

Q   What is your expert opinion?

A   The Browning Buckmark was manufactured in the state of Utah.  For it to be recovered in Kansas, it traveled

in interstate commerce to be in Kansas.  Ammunition recovered with that firearm bearing the capital mark F on the head stamp, Federal Cartridge Company, and they make ammunition in the state of Minnesota.  For it to be recovered in Kansas, it traveled interstate lines, crossing state lines, to be recovered in Kansas.

Q   And, Agent, did you -- did you do an examination of what would be identified as ATF Exhibits 581 and 582?

A   Yes, sir, I did.

Q   What is ATF Exhibit 581?

A   ATF Exhibit 581 is identified as a Jimenez Arms, H -- I'm sorry, J-I-M-E-N-E-Z, Model J, period, A, period, 380.  Bearing 380 auto caliber with a serial number of 030856.

Q   And what is Exhibit 582?

A   Exhibit 582 are six live ammunition cartridges.  The head stamp on these six live cartridges bear the writings, alpha numeric, W-I-N, in capitals, 380, and then capital letters auto, WIN 380 auto.

Q   In your examination of ATF Exhibit 581, the Jimenez Arms .380 auto caliber pistol, were you able to determine the place of manufacture?

A   Yes, I did.

Q   What was the place of manufacture?

A   Jimenez Arms manufactures firearms that they make in

the state of California.

Q   And in your examination of ATF Exhibit 582, were you able to determine the place of manufacture?

A   Yes, sir, I did.

Q   And what is the place of manufacture of ATF Exhibit 582?

A   ATF Exhibit 582 is manufactured by Winchester. Winchester makes ammunition in the state of Illinois.

Q   Do you have an expert opinion as to whether ATF Exhibit 581 and 582 traveled in interstate or foreign commerce if it were found in the state of Kansas?

A   Yes, sir, I do.

Q   And what is your opinion?

A   It has to travel interstate commerce to be manufactured in California and/or Illinois to therefore then be recovered in the state of Kansas.

Q   Agent, have you examined what's been marked as ATF Exhibit 542?

A   Yes, sir, I did.

Q   What is ATF Exhibit 542?

A   ATF Exhibit 542 is a Hi-Points firearm, model C, Charlie, F, Frank, .380 caliber, semiautomatic pistol. Bearing the serial number of P as in Paul 856482.

Q   In your examination of ATF Exhibit 542, were you able to determine the place of manufacture?

A   Yes, I was.

Q   What is the place of manufacture for ATF Exhibit 542?

A   ATF Exhibit 542, Hi-Points Firearm .380 caliber pistol is manufactured in the state of Ohio.

Q   Do you have an expert opinion as to whether ATF Exhibit 542 traveled in interstate or foreign commerce to be found in the state of Kansas?

MR. WACHTEL:  542?

MR. SMITH:  ATF Exhibit 542.

A   Yes, sir.

Q   What is that opinion?

A   The research that I conducted on ATF Exhibit 542 is that it was manufactured in Ohio.  To be recovered in Kansas, it had to cross the state lines from Ohio to be in Kansas.

Q   Now, Agent, in addition to those firearms that I've referenced and you've attributed ATF exhibit numbers, have you examined firearms in relation to this case that you have not yet had a chance to complete reports on?

A   Yes, sir.

MR. SMITH:  Your Honor, may I approach?

THE COURT:  Well, I think what we need to do at this point is to take a recess.  Please remember and heed the admonition.  Probably 15 minutes, maybe a

little longer.

(Jury excused from the

courtroom.)

THE COURT:  You all can be seated.  I'm a little concerned about getting into incomplete examinations.  What's the point here?

MR. SMITH:  Your Honor, we have several firearms that have been seized from co-conspirators or seized from persons already testified about this case or locations in this case that we have in our possession. We actually have people that have mentioned them in testimony before or will mention them in testimony.  We have them in our possession.  Agent Tierney has examined those firearms --

THE COURT:  You don't need to tell me all this.  I figured that out myself.

MR. SMITH:  I'm sorry.

THE COURT:  My concern is that he hasn't completed his examination and therefore hasn't submitted reports that are in the hands of defense counsel.

MR. SMITH:  Your Honor, if it please the Court, we would be happy to stop with our examination of Agent Tierney at this point.  We thought that he would be subject to recall.  He can complete the examinations, complete the reports.  We will turn them over and recall

him --

THE COURT:  If the Government intends to get into more firearms in this case, the defense counsel are entitled to full reports from Agent Tierney about those firearms.

MR. SMITH:  We will do that.

THE COURT:  All right.  How many are we talking about here?  Is this an arsenal?  I mean, I saw 'em carrying a long gun in here.  We've had testimony about an SKS.

MR. SMITH:  Your Honor, we have an SKS, I believe, in our possession; two .45s; this 9 mm that I have with me now.  The Mossberg shotgun that is on the floor.  We have a couple of guns actually that I don't think that we want to touch upon.  So let's say five more, two to five.

THE COURT:  All right.  If you're going to get into that -- I take it these three he has fully examined.

MR. SMITH:  He has.

THE COURT:  All right.  If you're going to get into more, Neal is going to have to finish up his examination of those firearms, provide reports to defense counsel and then you can recall him if that's what you want to do.

MR. SMITH:  We will do so.  Thank you.

THE COURT:  All right.  So are we finished now with his redirect?

MR. SMITH:  Yes.

THE COURT:  All right.  And when the jury comes back, if you all have any recross-examination, you may do that.

MR. WACHTEL:  Thank you.

THE COURT:  And then he can be recalled at the appropriate time.  Now, while the jury is out, I've made a decision about these two people who would come in, prison guards or whatever they are, and testify with respect to statements made by the Defendants.  I've read the cases.  And here's my conclusion in a nutshell. These statements, obviously, were made while these Defendants were in custody.  They are, obviously, declarations that the Government is trying to elicit with respect to gang membership.  The question is whether they are incriminating.  Now, I have heard no testimony in this case that gang -- being in a gang, per se, by itself, is incriminating.  So, the real question then is the purpose for which they were asked.  And I heard the proffer that they use this in classification. What I haven't heard is whether or not the fact that any inmate is asked about gang membership has some effect on

the inmate in a penitentiary, which would be, in my opinion, potentially incriminating.  So, if the Government wants to put this testimony on, they will have to bring these witnesses here, I will hear their testimony outside the presence of the jury so that defense counsel can cross-examine them; and then, depending on what they say, I'll decide whether or not to receive their testimony.

MR. WELCH:  Your Honor, thank you for that. And I'm sorry.  You said your concern -- at the end, your concern regarding that testimony would be whether within the prison setting that information can be used to incriminate --

THE COURT:  Well, or that it could have -- not necessarily incriminating, because, obviously -- I mean, that's the terminology that's used in the cases that I've read which are the ones that the -- I've read *U.S. v Washington*, which is a 9th Circuit 2006 case, 462, which concerns gang monikers but not gang membership. And in that case, that was a routine -- viewed as a routine booking question.  I've read the Supreme Court's decision in *Pennsylvania vs. Muniz*, M-U-N-I-Z.  And here in that case, it's a little different because this guy somehow -- it's a case involving a drunk driver -- made it to the United States Supreme Court.  But the

questions that were asked could have been used in the prosecution. So they theoretically at least some of them were incriminating. So if -- unless the Government can provide me with some case, which it hasn't yet, but I know I may have gotten a little ahead of things, but we want to get these guys on the plane for next week if they're going to be used, it seems to me that you extended the idea of incriminating, if it could have some sort of -- if it's beyond a mere booking question like name, date of birth, et cetera, et cetera, and it could have some negative effect on them in the prison. Other than putting them -- keeping them away from the other gang members. But if it could make a higher classification, something like that, then I would view that as incriminating and I would sustain the objection because there was no Miranda warning. Now, have I made that clear?

MR. WELCH: You have. I just want to make sure I ask the right questions of the witnesses when I call them.

THE COURT: Right. And I think if you read these cases, Lanny, we can't find any cases directly on point, and you all know that if Rachael Silva can't find a case directly on point, there aren't any cases directly on point. But you might take a look also at

*United States against Lara-Garcia*, 478 Fed. 3rd, 1231, which is a Tenth Circuit case.  And here again, that involved questioning about immigration status; but the ultimate end of that would be that he could be prosecuted for being in the United States illegally. Here, there isn't any negative effect on a defendant who's already incarcerated, then I think that I can safely protect the record by saying that the question was a legitimate booking question and -- okay.

MR. WELCH:  I understand, Judge.  Thank you.

THE COURT:  Okay.

MR. SMITH:  Your Honor, while the jury is gone -- did you want to discuss that conflict issue?

MR. MANDELMAN:  We do have one witness, Your Honor --

THE COURT:  Yes, sir.

MR. MANDELMAN:  The Government indicated they might call David Ochoa.  Our office, Ron Wertz in Topeka, represented Mr. Ochoa.  I mean, we weren't aware of it.  Mr. Ochoa is not a codefendant in this case.

THE COURT:  Right.

MR. MANDELMAN:  He's a drug dealer from Dodge City who's gonna say he knew some of these guys. Although I'm not even -- I don't know exactly his relationship to Mr. Ramirez.  But I'm going to be in a

position where I need to cross-examine him after having our office having represented him.  We won't have -- obviously, we didn't know this because he's not a codefendant in the case.

THE COURT:  I don't see -- Joel, why do you think that presents a problem?

MR. MANDELMAN:  Well, I just want to -- I think I might have to ask -- I'm not in a position to ask my client now for, you know, a waiver of conflict. My allegiance here is to Mr. Ramirez; but our office previously represented Mr. Ochoa --

MR. HENRY:  We essentially will be cross-examining him based upon a 2006 conviction in which we represented him.  We have to use one of our own cases against our own witness -- or our own former client.

MR. SMITH:  But, Your Honor, the fact of his conviction comes in, but the background or the facts behind the conviction I don't believe are to be inquired into.

THE COURT:  Well --

MR. SMITH:  I think that protects their conflict.

THE COURT:  Well, I don't know.

MR. MANDELMAN:  I just need to make a record.

This is a serious case.  You know, Mr. Ramirez has concerns down the road that we represented a guy who's a witness.  There was no way for us to know he was going to be a witness.  He's not charged in the case.

THE COURT:  He wasn't listed as a witness.

MR. WELCH:  Yes --

MR. HENRY:  At the beginning of -- in the voir dire, he was mentioned.

MR. MANDELMAN:  At the beginning of the trial --

MR. SMITH:  Actually, discovery in relation to David Ochoa was turned over at the appropriate time.

MR. MANDELMAN:  There was a --

THE COURT:  Well, I guess the point is that if you were going to inquire beyond the conviction as to -- and I can't imagine that you would be doing this -- as to conversations that he had had with Ron Wertz who's now retired, then there might be some sort of conflict.  But Wertz was in Topeka.  Wertz was never, to my knowledge, involved in this case.

MR. MANDELMAN:  No, no.

THE COURT:  I just don't see a problem for the limited purpose that you're concerned about.

MR. MANDELMAN:  Okay.  I just wanted to make a record.

THE COURT:  I know.  And I appreciate you doing that.  Here again, I don't want to make any mistakes in this case if I can avoid it; but if this is something that would present, you know, a problem, in the event of convictions, would raise itself on appeal or collateral --

MR. MANDELMAN:  Right.

THE COURT:  -- which is more my concern --

MR. MANDELMAN:  With that issue --

THE COURT:  -- with this issue, Joel.  If you can present me not only with a little bit of authority as to -- but mainly how I can deal with it.

MR. MANDELMAN:  Well, I think Mr. Ochoa's testimony is going to be real peripheral to the case. It's not gonna -- I'm not going -- I think his testimony could safely be excluded from the trial.  He's, he's not charged in the Indictment.  He's not one of the -- he's not one of the conspirators who's named in the Indictment.  We were told, you know, that if there was other -- in order to conspire, we were told there were no unknown conspirators in Count 1.  So in order to conspire, we would have to know his identity.  He's not charged in this case.  He's gonna be bringing in some background drug dealing information that's gonna confuse the jury.  We think it's -- we think it's not relevant

and it's inadmissible under both 401 and 404(b) because of the nature of his testimony. He's a drug dealer. He's been convicted twice --

THE COURT: Well, he must be a drug dealer that's going to connect either your client or Mr. Garcia.

MR. WELCH: He is going to connect the enterprise, Judge. He's a DV. He has been a DV from Dodge City since way back.

THE COURT: Well, you all think about it; but I can't, standing right here right now, I can't really think of what to do about it, if anything. I don't know that the fact that -- I understand -- I don't think 404(b) has anything to do with it. But 403 conceivably could, although I've never before encountered a 403 question where a witness was represented by the public defender who is now representing one of the defendants. Anyway, guess who's going to take a look at that.

MR. WACHTEL: But she finds all the cases in the world, Judge, so we don't need to worry.

(Recess.)

THE COURT: Redirect, please. Or recross.

MR. WACHTEL: I don't have any questions, Your Honor.

MR. MANDELMAN: Nothing more at this time,

Your Honor.

THE COURT:  All right.  Next witness, please.

MR. SMITH:  Your Honor, the United States calls Fabian Neave.

**FABIAN NEAVE**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Good morning, sir.  How are you?

A   All right.

Q   Pull yourself forward a little bit here.  And you can move that microphone down if you need to do that. Okay?  You've got to answer out loud yes or no or whatever your answer is.  Do you understand?

A   Yes.

Q   There's also a screen in front of you.  Do you see that computer screen?

A   Yes, sir.

Q   On that computer screen there may be a piece of evidence that will be shown to you.  If you need to look at that screen, you reach up, grab the top of it and you can pull it forward.  Do you understand?

A   Yes, sir.

Q   And you can also physically touch the screen and make marks on that screen if there is a mark that needs to be made on one of the exhibits.  You got it?

A   Yes, sir.

Q   Thank you.  Now, please tell us your name again.

A   Fabian Neave.

Q   And are you currently incarcerated?

A   Yes, sir.

Q   And do you know what you were incarcerated for?

A   Yes, sir.

Q   What is that?  Have you been involved in an Indictment of Norteno or DV gang members in Dodge City, Kansas?

A   Yes, sir.

Q   Have you been indicted in that case?

A   Yes, sir.

Q   Have you plead guilty to your role in that case?

A   Yes, sir.

Q   Do you recall what it is that you plead guilty to?

A   Yes, sir.

Q   And what was that?

A   Conspiracy to commit racketeering.

Q   And in your plea to conspiracy to commit racketeering, did you admit all of the individual involvements that you had in the racketeering acts?

A    Yes, sir.

Q    Fabian, have you lived in Dodge City, Kansas?

A    Yes, sir.

Q    How long -- when did you go to Dodge City, Kansas, originally.  Were you born there?

A    I was born there.

Q    How old are you now?

A    26.

Q    So from the time you were born until what age was the first period of time that you lived in Dodge City, Kansas?

A    All my life except for when I was in prison.

Q    Okay.  So there were periods of times that you were in prison; is that correct?

A    Yes, sir.

Q    When is the first time that you went to prison?

A    2004.

Q    And what was that for?

A    Aggravated battery.

Q    How long were you in prison?

A    51 months.

Q    Do you recall when you were released?

A    2008.

Q    And do you know what month you were released?

A    I believe April.

Q   So you were out starting in April of 2008.  And how long were you out?

A   About three and a half months.

Q   And during that three and a half months, did you return to Dodge City, Kansas?

A   Yes, sir.

Q   So after three and a half months elapsed, did you go back into custody?

A   Yes, sir.

Q   And what was that for?

A   Well, I was --

MR. WACHTEL:  I'm sorry.  I cannot understand, Your Honor.  I couldn't understand the witness.

THE COURT:  I don't think he finished his answer.  And you need to speak up, sir.

A   Well, I got arrested originally for giving a fake name in Salina, Kansas.  I mean --

BY MR. SMITH:

Q   What is it that you went and did your time for in 2008?

A   Well, I did six months county jail time for misdemeanor theft and misdemeanor assault.  Then I went back for a probation violation.

Q   Was that a probation violation on your 2004 case?

A   Yes.

Q   Was that in, essentially, three and a half months
after April of 2008?

A   Yes, sir.

Q   How long did you go into custody then?

A   36 more months.

Q   Three years?

A   Yes, sir.

Q   You got out in 2011?

A   Yes, sir.

Q   And where did you go after you got out?

A   Dodge City.

Q   And do you recall when it was you were released in
2011?

A   August 15th.

Q   In 2011, were you again arrested?

A   Yes, sir.

Q   And incarcerated?

A   Yes, sir.

Q   We'll talk about that a little bit later.  Prior to
2004, were you involved in a gang in Dodge City, Kansas?

A   Yes, sir.

Q   What gang?

A   DV.

Q   What is DV?

A   Diablos Viejos.

Q   When did you become involved in DV?

A   Since I was about 10, 11, 12, somewhere around there.

Q   Did you get jumped in?

A   Yes, sir.

Q   What year were you jumped in?

A   2002, I believe.

Q   Do you recall how old you were?

A   I was like 14, 15.

Q   Do you remember who jumped you in?

A   Yes, sir.

Q   Who jumped you in?

A   Uhm, can I say their nicknames?

Q   Yes.  If that's the names you know, you can tell us your nicknames -- their nicknames.

A   Huevos, C-Mac, Fidel, and Little Benji.

Q   And do you have gang-related tattoos?

A   Yes, sir.

Q   What gang-related tattoos do you have?

A   I have 14s and --

Q   Well, let's go individually.  Let's start with one tattoo and tell us about it.

A   I got a huelga bird on my back.

Q   A huelga bird on your back?

A   Yes, sir.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Okay.

A   I got another huelga bird on my right arm.  I got a one-four on my hand.  Another 14 on my arm.

Q   Does the number 14 represent something?

A   Yes, sir.

Q   What does that represent?

A   Well, it's the 14th letter of the alphabet.

Q   Which is?

A   N.

Q   And does N represent something?

A   Yes, sir.

Q   What does that represent?

A   It represents Nortenos.

Q   In 2004 when you were incarcerated, what facility did you go to?

A   I went to Ellsworth.  Well, I went to ElDorado first and then Ellsworth and then Lansing.

Q   When you were incarcerated from 2004 to 2008, were you a member of a gang?

A   Yes, sir.

Q   What gang?

A   Nortenos, DV.

Q   And in 2011, you were again arrested; is that correct?

A   Yes, sir.

Q   When you went into custody in 2011, were you a member of a gang?

A   Yes, sir.

Q   And what gang were you a member of?

A   DV.

Q   Do you know a person by the name of Pedro Garcia?

A   Yes, sir.

Q   Is Pedro Garcia in the courtroom today?

A   Yes, sir, he is.

Q   Please point to him and tell us what he is wearing.

A   He's right here in the blue shirt.   (Witness indicates.)

        MR. SMITH:   Your Honor, the record should reflect the witness has identified Pedro Garcia.

        THE COURT:   It will.

BY MR. SMITH:

Q   And do you know a person by the name of Gonzalo Ramirez?

A   Yes, sir, I do.

Q   Is Gonzalo Ramirez in the courtroom today?

A   Yes, sir.

Q   Please point him out and tell us what he is wearing.

A   Right here in the white shirt.   (Witness indicates.)

        MR. SMITH:   Your Honor, the record should reflect the witness has identified the Defendant Gonzalo

Ramirez.

THE COURT:  It will.

BY MR. SMITH:

Q   Do you know if Pedro Garcia is a member of a gang?

A   Yes, sir.

Q   And what gang is Pedro Garcia a member of?

A   Same gang as me.

Q   Which is?

A   DV.

Q   Do you know if Gonzalo Ramirez is a member of a gang?

A   Yes, sir.

Q   And what gang is he a member of?

A   DV also.

Q   When did you first come to know Pedro Garcia?

A   Probably when I was like 9 or 10, around there.

Q   Do you know when Pedro Garcia joined the gang relative to when you joined the gang?

A   No, I don't know exactly when.

Q   And how long have you known Gonzalo Ramirez?

A   Probably since I was about 12 or 13, around there.

Q   And do you know when Gonzalo Ramirez joined the gang relative to when you joined the gang?

A   Around the same time.  I don't know exactly the date.

Q   Were you involved in jumping either Pedro Garcia or Gonzalo Ramirez in?

A   No, sir.

Q   And are you familiar with jumping someone in means?

A   Yes, sir.

Q   Have you witnessed jump-in's before?

A   Yes, sir.

Q   Now, Mr. Neave, we've mentioned that you went into custody in 2011; is that correct?

A   Yes, sir.

Q   What were you arrested for in 2011 that caused you to be incarcerated again?

A   Distribution of methamphetamines; possession of firearm; possession of other drugs.

Q   Did you distribute methamphetamine or have methamphetamine for distribution?

A   Yes, sir, I did.

Q   Did you possess a firearm at that time?

A   Yes, sir, I did.

Q   Where were you arrested?

A   In front of Latino's night club in a car.

Q   And were you with anyone?

A   Yes, sir.

Q   Who were you with?

A   I was with my little brother Adam Jabarra; his

girlfriend Joanna Niero (ph); and a friend, Armando Maestas.

Q   How long have you known Armando Maestas?

A   I met him in prison the second time.  Probably known him about three years maybe.

Q   Would that have been when you were incarcerated in 2008?

A   I met him probably around 2010 in ElDorado, when I was incarcerated in ElDorado.

Q   Do you know if Armando Maestas is a member of a gang?

A   Yes, sir.

Q   What gang is Armando Maestas a member of?

A   DV.

Q   You mentioned that you were arrested for distributing or possession with intent to distribute methamphetamine; is that correct?

A   Yes, sir.

Q   How long had you been distributing methamphetamine?

A   About three or four months.

Q   This is in 2011?

A   Yes, sir.

Q   Did you distribute methamphetamine or any other drugs prior to 2011?

A   Yes, sir.

Q   When did you first begin to distribute drugs?

A   Before I went to prison the first time.

Q   In 2004?

A   Yes, sir.

MR. WACHTEL:  I object, Your Honor, that this is not relevant.  The Government alleges that this conspiracy took place between 2008 and April 16, 2012. 2004 is not within that period.

MR. SMITH:  Your Honor, we must prove a pattern of racketeering activity --

MR. MANDELMAN:  I just join, within the time period of the conspiracy.

MR. SMITH:  And predicate acts, as long as one predicate act is admissible within the ten-year time period preceding, other predicate acts can be precedent to that time period.

MR. MANDELMAN:  These gentlemen still have to have knowledge of what's going on.  To conspire.

THE COURT:  How much more testimony are you going to have from this witness about what happened prior to 2008?

MR. SMITH:  That was probably my only question.

THE COURT:  All right.  Then I'll allow the witness -- that answer.  But I really think that for the

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

purposes of this case, the purposes of Rule 403, the

evidence should be confined to 2008 forward.

BY MR. SMITH:

Q   Did you distribute drugs in your past prior to 20 --

when you went to prison in 2004?

A   Yes, sir.

Q   What type of drugs?

A   Methamphetamine.

Q   Any other drugs?

A   No.

Q   And you were out of custody for a period of time in

2008; is that correct?

A   Yes, sir.

Q   Did you distribute drugs in 2008?

A   Yes, sir.

Q   What type of drugs?

A   Methamphetamine.

Q   Did you distribute any other drugs in 2008?

A   No, sir.

Q   And when you were out of custody in 2011, did you

distribute illegal drugs?

A   Repeat that again.

Q   Did you distribute illegal drugs in 2011?

A   Yes, sir.

Q   What type of drugs?

A    Methamphetamine.

Q    Any other types of drugs?

A    Marijuana.

Q    And did you consume illegal drugs, let's say, from 2008 through now?  Did you take the drugs?

A    Yes, sir.

Q    What types of drugs?

A    Methamphetamine.

Q    How often would you use methamphetamine?

A    Just depends.

Q    Well, let's use an example of December, 2011.  How often would you use methamphetamine?

A    Every day.

Q    And in 2008, summer of 2008, how often would you use methamphetamine?

A    Couple times the whole time I was out.

Q    Not long -- or not very often during that three and a half month period.  Is that what you're saying?

A    Yes, sir.

Q    Now, Mr. Neave, I'm going to ask you questions specifically in relation to Pedro Garcia and Gonzalo Ramirez.  And when I ask you questions, I want you to answer only what you specifically personally know.  Do you understand that?

A    Yes, sir.

Q   Do you know if Pedro Garcia distributed illegal drugs?

A   Yes, sir.

Q   How do you know that?

A   He told me.

Q   And what did Pedro Garcia tell you about his distribution of illegal drugs?

A   He would tell me where he got it from.

Q   And where did he say he got the drugs from?

A   From Sierra in California.

COURT REPORTER MS. SCHWEMMER:  From where? I'm sorry.

A   From a person named Sierra in California.

Q   Is that S-I-E-R-R-A?

A   Yes, sir.

Q   In California?

A   Yes, sir.

Q   Do you know if Sierra is related to anyone in Dodge City, Kansas?

A   Yes, sir.

Q   Who is Sierra related to in Dodge City, Kansas?

A   TC.

Q   Let's display Government Exhibit 413.  Do you recognize Government Exhibit 413?  You can pull that screen up.

A   Yes, sir.

Q   Who is the person in Government Exhibit 413?

A   That's TC.

Q   The person related to Sierra in California?

A   Yes, sir.

Q   Thank you.  Did Pedro Garcia tell you how he got the drugs from Sierra in California?

A   Yes, sir.

Q   And what did he tell you?

A   They would mail 'em through the -- get them in the mail.

Q   Get the drugs in the mail?

A   Through the mail, yeah.

Q   Did Pedro Garcia tell you what sort of drugs it was that he got in the mail?

A   Yes, sir.

Q   And what drugs were those?

A   Methamphetamine.

Q   Were you with Pedro Garcia at any point when he sold methamphetamine?

A   Ever?

Q   Yes -- well, from 2008 through 2011?

A   No, sir.

Q   And did Pedro Garcia tell you who he -- what he did with the drugs?

A   Yes, sir.

Q   And what did he tell you that he did with the drugs?

A   He sold 'em.

Q   Did he tell you anyone specifically that he sold the drugs to?

A   Yes, sir.

Q   And what did he tell you?

A   Lazy and Huesos helped him sell 'em.

Q   Lazy and Huesos?

A   Yes, sir.

Q   And do you know Huesos' name?

A   Anthonyy Wright.

Q   Let's display Government Exhibit 417, please.  I'm sorry.  Let's instead display -- I'm sorry -- you mentioned Lazy; is that correct?

A   Yes, sir.

Q   And do you know what Lazy's name is?

A   Adam Flores.

Q   Adam Flores?

A   Yes, sir.

        MR. SMITH:  May I approach, Your Honor?

        THE COURT:  Yes.

Q   Do you recognize the person in Government Exhibit number 417?

A   Yes, sir.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Who is the person in Government Exhibit 417?

A   Anthony Wright.

Q   What is Anthony Wright's name, nickname?

A   Huesos.

        MR. SMITH:  Move to admit Government 417.

        MR. WACHTEL:  I don't object.

        MR. MANDELMAN:  No objection.

        THE COURT:  It's received.

BY MR. SMITH:

Q   Let's display Government Exhibit 417, please.
That's Anthony Wright?

A   Yes, sir.

Q   That is one of the people that Pedro Garcia
mentioned distributing meth -- well, drugs to; is that
correct?

A   Yes, sir.

Q   When I'm using the word drugs in relation to Pedro
Garcia, what drug am I referring to?

A   Methamphetamine.

Q   You also mentioned someone by the name of Lazy; is
that correct?

A   Yes, sir.

Q   I'm going to bring two photographs to you for you to
view.  The first is Government Exhibit 21.  Do you
recognize the person in Government Exhibit 21?

A   Yes, sir.

Q   Who is that?

A   Lazy.  Little Lazy.

Q   I'm sorry.  You said Little Lazy?

A   Yeah, that's Little Lazy.

Q   Okay.  So are there two different people with the nickname of Lazy?

A   Yes, sir.

Q   And is this one of those people?

A   Yes, sir.

Q   This is Little Lazy you referred to?

A   Yes, sir.

Q   Do you know this person's name in Government Exhibit 21?

A   Adam Flores.

Q   Is that the person that it was your understanding that Pedro Garcia was distributing methamphetamine to?

A   No, sir.

Q   So were you referring to the other person with the nickname of Lazy?

A   Yes, sir.

Q   I've placed in front of you what's been marked as Government Exhibit 386.  Do you recognize that?

A   Yes, sir.

Q   What is Government Exhibit 386?

A    That's Lazy.

Q    That's the person you referred to as Lazy?

A    Yes, sir.

MR. SMITH:  Move to admit Government 386.

MR. WACHTEL:  I don't object, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  386 is received.

MR. SMITH:  Can we display that.

BY MR. SMITH:

Q    Fabian, do you know if the person in Exhibit 386, Lazy, is a member of a gang?

A    Yes, sir.

Q    What gang is the person in Government 386 a member of?

A    LCC.

Q    And the person that you've identified as Huesos, which was in Government Exhibit 417, do you know if that person is a member of a gang?

A    Yes, sir.

Q    And what gang is Huesos a member of?

A    DV.

Q    Did Pedro Garcia give you any other details about how he received the methamphetamine from California?

A    Yes, sir.

Q    And what details were those?

A    Came bubble wrapped.

Q    What do you mean?  Explain that for us.

A    There's wrapping that you, like, wrap stuff in.  Got little pop bubbles.

Q    So the -- you mean the methamphetamine came bubble-wrapped?

A    Yeah.

Q    And was that when it was in the mail?

A    Say again.

Q    When the methamphetamine was mailed, it was --

A    Yes, sir.

Q    Okay.  Thank you.  Now, Fabian, do you know if Gonzalo Ramirez distributed illegal drugs?

A    Yes, sir.

Q    How do you know that Gonzalo Ramirez distributed illegal drugs?

A    We used to sell drugs together.

Q    What did you do when you sold drugs together?  Go ahead and tip that screen down.  What did you do when you sold drugs together?

A    What do you mean?

Q    Whom did you sell to?

A    Various people.

Q    What time period was this?

A    2008.

Q   And what drugs were you selling?

A   Methamphetamines.

Q   Where were you getting the drugs from?

A   I was getting them from Gonzo.

Q   So you received the methamphetamine directly from Gonzalo Ramirez?

A   Yes, sir.

Q   Were you with Gonzalo Ramirez when he got the methamphetamine?

A   No, sir.

Q   Did Gonzalo Ramirez tell you where he received the methamphetamine from?

A   Yes, sir.

Q   And what did Gonzalo Ramirez tell you about where he received the methamphetamine from?

A   From Pepe.

Q   Who is Pepe?

A   I don't know.  That's all I know.

Q   Have you met Pepe before?

A   No, sir.

Q   Have you ever met Pepe?

A   No, sir.

Q   Do you know where Pepe was located?

A   No, sir.

Q   In 2011, did you again become involved in the

distribution of drugs?

A   Yes, sir.

Q   That was methamphetamine?

A   Yes, sir.

Q   What was the source of your drugs in 2011?

A   Where I was getting them from?

Q   Where did you get them from?

A   Little D.

Q   And who is Little D?

A   David Ochoa.

Q   How long did you deal with David Ochoa?

A   Since about three weeks after I got out.

Q   Three weeks after you got out in what year?

A   2011.

Q   And may we display Government Exhibit 44.  Do you recognize who is in Government Exhibit 44?

A   Yes, sir.

Q   Who is that?

A   David Ochoa.

Q   How much methamphetamine were you getting from David Ochoa?

A   Uhm --

        MR. WACHTEL:  I'm sorry.  I couldn't hear you, sir.

        MR. SMITH:  He hasn't said anything.

THE COURT:  He hasn't answered.

BY MR. SMITH:

Q   How much methamphetamine were you getting from David Ochoa?

A   That depends on what I wanted.

Q   Well, what's the small size of methamphetamine that you received from him?

A   An ounce.

Q   And what is the larger size of methamphetamine that you received from him?

A   Four ounces.

Q   How often would you receive the one to four ounces of methamphetamine?

A   Every few days.

Q   Did you -- where was David Ochoa when you were receiving the drugs from him?

A   Depends.  Sometimes he would be in town; sometimes he would be in Wichita.

Q   When you say in town, are you referring to Dodge City, Kansas?

A   Yes, sir.

Q   So would you travel to Wichita to pick up the drugs?

A   Yes, sir.

Q   And sometimes David Ochoa would be in Dodge City?

A   Yes, sir.

Q   Did you use anyone else to transfer the drugs
between you and David Ochoa?

A   Yes, sir.

Q   Who did you use to help transfer the methamphetamine
between you and David Ochoa?

A   Bugzy and Rabbit.

Q   And do you know the names of Bugzy and Rabbit?

A   Juan Torres and Jesus Torres.

Q   Government Exhibit 22, please.  Who is that?

A   Bugzy.

Q   And Government Exhibit 414, please.  Who is that?

A   Rabbit.

Q   Do you know if Bugzy was a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   Was Rabbit a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   Was David Ochoa a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   How long were you receiving the methamphetamine from

David Ochoa?

A   Since I got out.  About three weeks after I got out.

Q   Was there anyone else that you received illegal drugs from during that time period?

A   Yes, sir.

Q   Who was that?

A   Lupe Morrow.

Q   And do you recognize Government Exhibit 380?

A   Yes, sir.

Q   Who is that?

A   Lupe Amaro.

Q   Is Lupe Amaro a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   Was that methamphetamine that you were receiving from Lupe Amaro?

A   Yes, sir.

Q   What time period was that?

A   2011, when I got out.

Q   Who did you distribute the methamphetamine from that you were receiving from David Ochoa?

A   Various people.

Q   Were you distributing to other gang members in Dodge City, Kansas?

A    Yes, sir.

Q    What gang members were you distributing methamphetamine to in Dodge City, Kansas?

A    Beto.

Q    Who is Beto?

A    Humberto Ortiz.

Q    Do you know if Humberto Ortiz is a member of gang?

A    Yes, sir.

Q    And what gang is Humberto Ortiz a member of?

A    LCC.

Q    Other than Beto, who else?

A    Cutty.  (ph)

Q    And do you know Cutty's name?

A    Enrique Hernandez.

Q    What gang -- or, is he a member of a gang?

A    No.

Q    Is he associated with a gang?

A    Yes.

Q    What gang is he associated with?

A    Both gangs, LCC and DV.

Q    Did you distribute methamphetamine to any other gang members?

A    Yes.

Q    And who?

A    Armando Maestas.

Q    And does Armando Maestas have a nickname?

A    Mando.

Q    And is he a member of a gang?

A    Yes, sir.

Q    What gang?

A    DV.

Q    Each of those people you mentioned -- you've now mentioned Humberto Ortiz, Beto, Armando Maestas and Enrique Hernandez; is that correct?  What drugs were you distributing to those people?

A    Methamphetamine.

Q    Now, at some point did you mention that you also distributed marijuana?

A    Yes, sir.

Q    Did you distribute marijuana to any gang members?

A    Yes, sir.

Q    And who did you distribute marijuana to?

A    Same ones.

Q    The same people?

A    Yes, sir.

Q    Any of the people that you are distributing methamphetamine or marijuana to, are they then reselling or distributing those drugs?

A    Yes.

          MR. WACHTEL:  Foundation, Your Honor.

Objection.

THE COURT:   Let me hear the question again.

Q   The people that you're distributing the drugs to, methamphetamine or marijuana, are they then redistributing the drugs?

THE COURT:   The objection is sustained on the basis of foundation.

BY MR. SMITH:

Q   Do you know if any of the people that you sold the drugs to were reselling the drugs?

A   Yes, sir.

Q   How do you know that?

A   Sometimes I would send them.  Sometimes they had their own customers.

Q   So tell me if I'm interpreting this correctly.  You would -- would you send the people that you sold to, to essentially service some of your own customers?

A   Yes, sir.

Q   And did they do that?

A   Yes, sir.

Q   Who was it that did that?

A   What?

Q   Who was it that you would send to deliver your drugs to the customers?

A   All of 'em.

Q   Okay.  So you mentioned Humberto Ortiz, Enrique Hernandez, Armando Maestas; is that right?

A   Yes, sir.

Q   Any other gang member?

A   Alfonso.

Q   Who is Alfonso?

A   Alfonso Fernandez.

Q   Do you know if Alfonso Fernandez is a member of a gang?

A   Yes, sir.

Q   And what gang is he a member of?

A   LCC.

Q   Do you know a person by the name of Narison?

A   Yes, sir.

Q   Did you distribute any drugs to Narison?

A   Yes, sir.

Q   Government Exhibit 89, please.  Do you recognize Government Exhibit 89?

A   Yes, sir.

Q   Who is Government Exhibit 89?

A   Narison.

Q   Do you know his name?

A   Jose Luna.

Q   Is Jose Luna a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   Thank you.  Other than David Ochoa and Lupe Amaro, did you have an occasion to purchase methamphetamine from anyone else in the 2011 time period?

A   Yes, sir.

Q   And who was that person?

A   Pelon.

Q   Pelon.  P-E-L-O-N?

A   Yes, sir.

Q   How is it you came to know Pelon?

A   Through Little Lazy.

Q   Little Lazy being Adam Flores?

A   Yes, sir.

Q   Was Pelon a member of a gang?

A   No, sir.

Q   About how old was Pelon?

A   Mid 30s.

Q   Where was Pelon in relation to Dodge City?

A   On the outskirts of town.

Q   Did he live in the area -- he lived in that area on the outskirts of Dodge City?

A   Yes, sir.

Q   Did you go to his home or his residence?

A   Yes, sir.

Q   How often did you go to his residence?

A   Went maybe half a dozen times.

Q   And what was the nature of your arrangement with Pelon?

A   I bought around ten ounces of methamphetamines from him.

Q   Do you recall when it was that you purchased that ten ounces?

A   It was probably in maybe early November.

Q   Of 2011?

A   Yes, sir.

Q   How did you -- or, what was the payment arrangement for the drugs from Pelon?

A   Gave him 500 bucks and three guns.

Q   And three what?

A   Three guns.

Q   Three guns.  Where did you get those guns from?

A   Various people.

Q   Did you purchase them from people?

A   Yes, sir.

Q   Is purchasing guns the only way that you came in possession of the guns?

A   Well, I would trade for methamphetamine.

Q   And on that occasion, you traded three guns and an amount of cash; is that correct?

A   Yes, sir.

Q   For ten ounces of methamphetamine?

A   Give or take, yeah.

Q   Did that seem like a fair price for that amount of methamphetamine?

A   Yes.  It's a really good price actually.

Q   A really good price.  Was there a reason why you got a good price on that methamphetamine?

A   Yes.

Q   And what was that reason?

A   It wasn't that good.

Q   In what way?

A   Purity.

Q   Now, did you have any other business dealings with Pelon?

A   Yes, sir.

Q   What sort of business dealings did you have with Pelon?

A   I sold him a lot of guns.

Q   Talking about your history as a user of methamphetamine, how long have you been using methamphetamine?

A   When did I start?

Q   When did you start using methamphetamine?

A   Since I was about 13, 14, around there.

Q   And in 2008, the time period that you were out in 2008, how often were you selling methamphetamine?

A   I didn't sell a whole lot back then.  Maybe an ounce a week.

Q   An ounce a week.  And in 2011, how often would you sell methamphetamine?

A   Maybe ounce or two a day.

Q   And I think that you testified you were using methamphetamine more heavily in the 2011 time period; is that correct?

A   Yes, sir.

Q   I'm going to move on here for a moment.  Have you had an occasion to speak to Pedro Garcia about his participation in a homicide?

A   Yes, sir.

MR. MANDELMAN:  Your Honor, I'm going to object to this testimony on confrontation clause grounds.  Bruten, Sixth Amendment issue here, I believe.

THE COURT:  You don't represent Pedro Garcia. You don't represent Pedro Garcia.

MR. MANDELMAN:  Well --

THE COURT:  Do you?

MR. MANDELMAN:  No, Your Honor.  But if there's a statement that implicates my client from Mr. Garcia --

THE COURT:  All he asked him was whether he spoke to Pedro Garcia.

MR. MANDELMAN:  Well, I'm anticipating testimony before it comes out.

THE COURT:  I can't tell what testimony is going to come out and what isn't.  Please make an objection at the appropriate time.

BY MR. SMITH:

Q   Have you spoken to Pedro Garcia about his participation in a homicide?

A   Yes, sir.

Q   And what did Pedro Garcia tell you about his participation in a homicide?

A   What exactly did he tell me?

Q   Well, let's start with this.  You were indicted in this RICO case; is that correct?

A   Yes, sir.

Q   After indictment, were you taken into custody for this RICO case?

A   Yes, sir.

Q   While in custody, were you in the presence of Pedro Garcia?

A   Yes, sir.

Q   Was Pedro Garcia under the same Indictment?

A   Yes, sir.

Q Did you -- did you know or do you know if he was indicted for participation in a homicide in relation to this RICO case?

A Yes, sir.

Q And I'm using RICO just generally. You understand that?

A Yes, sir.

Q Did you have a conversation with Pedro Garcia about the homicide he is indicted for in this RICO case?

A Yes, sir.

Q Do you recall when you had that conversation?

A It was around the middle of my year with him over there.

Q Okay. Your year with who?

A With Pedro.

Q Over where?

A In Butler.

Q Is that Butler County?

A Yeah. Butler County jail.

Q Butler County jail. What did Pedro Garcia tell you about his participation in that homicide?

A He told me who he was, the shooter.

Q Okay. Told you that who was the shooter?

A He told me he shot.

Q What did he tell you about the details of he shot?

A   Well, he told me what happened and how they -- him had went over there and got out the car and shot and he told me what kind of gun he had.

Q   Okay.  What did he tell you about the type of gun he had?

A   It was a TEC 9.

Q   Did he tell you who he shot at?

A   Yes, sir.

Q   And who did he say?

A   Surenos.

Q   And did he tell you how he found -- or how they found the Surenos?

A   Yes, sir.

Q   And what did he tell you?

A   Anthony and Russell told him.

Q   Told him what?

A   Where they was at.

Q   And where they, is that referring to the Surenos?

A   Yes, sir.

Q   Did you ask Pedro Garcia how he felt about the homicide?

A   Yes, sir.

Q   And what did Pedro Garcia say?

A   He never did say nothing.

Q   Did you ask Pedro Garcia about the gun that was

used?

A    Ask him what?

Q    Did you ask him anything about the gun that was used?

A    Well, I asked him what happened to it and he told me his girlfriend got rid of it for him.

Q    And did he tell you who his girlfriend was?

A    Angelica.

Q    Do you know Angelica's last name?

A    Flores.

Q    Did he describe to you what got rid of it was?

A    He told me she sold it.

Q    Sold it?

A    Yeah, sold it.

Q    Now I'm going to move on from this subject.  Fabian, you were indicted with more than one crime in this indictment; is that correct?

A    Yes, sir.

Q    Were you indicted for your participation in a robbery with a Jesus Sanchez?

A    Yes, sir.

Q    Do you recall what year that robbery occurred?

A    2008.

Q    Who participated in that robbery with you?

A    Me, Drak and Taz. (ph)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

2304

Q   And is Drak Jesus Sanchez?

A   Yes, sir.

Q   I've placed in front of you Government Exhibit 403. Do you recognize Government Exhibit 403?

A   Yes, sir.

Q   Who is Government Exhibit 403?

A   Taz.

Q   Do you know if the person in Government Exhibit 403 goes by any other nicknames?  If you don't know, you can say no.

A   No, I don't.

Q   You refer to him as Taz?

A   Well, I --

Q   I'm sorry --

A   Well, I just used to call him Gordo, too, but I don't know if that's a nickname.

Q   Gordo.

        MR. SMITH:  Move to admit Government 403.

        MR. WACHTEL:  I'm sorry.  No objection.

        MR. MANDELMAN:  No objection.

        THE COURT:  403 is displayed.

BY MR. SMITHE:

Q   Let's display that.  Is this the person you've referred to as Taz?

A   Yes, sir.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   But you called him Gordo?

A   Yes, sir.

Q   Meaning?

A   Fast boy.

Q   Okay.  In 2008, was Taz a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   And in 2008, was Jesus Sanchez, Drak, a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   Were you arrested for that robbery back in 2008?

A   Yes, sir.

Q   And did you get convictions based upon that robbery in 2008?

A   Yes, sir.

Q   At -- do you know if Taz got any convictions from that robbery in 2008?

A   No, I don't.

Q   In relation to Taz, did you make an attempt to contact him or have him contacted about his testimony in your robbery in 2008?

A   Yes, sir.

Q   What did you try to accomplish in relation to Taz' testimony?

A   I tried to get him out of the country so he wouldn't testify against me.

Q   Were you in custody when you were doing this?

A   Yes, sir.

Q   What steps did you take to attempt to get Taz out of the country?

A   I talked to Gonzo about it and I talked to his cousin David.

Q   And we're not going to talk about what Gonzo or David would have said because you were in custody.  Is that correct?

A   What do you mean?

Q   Well, whether you know what Gonzo or David said, what was the purpose of you contacting those people?

A   So they could talk to Taz.

Q   And when you say get him out of the country, what, specifically were you trying to accomplish?

A   Trying to get him to go to Mexico.

Q   Do you know, if you know, did Taz leave the country?

A   Yes, he did.

Q   Did Taz ever testify against you in that case?

A   No, he did not.

Q   Now, Mr. Neave, in this Indictment, are you aware if

there was a crime involving a George Gonzalez?

A   Yes, sir.

Q   Who is George Gonzalez?

A   Ponzon.

Q   Who is Ponzon?  Is Ponzon a member of a gang?

A   Yes, sir.

Q   And what gang is Ponzon a member of?

A   MCB.

Q   And is that a Sureno gang?

A   Yes, sir.

Q   Do you know Ponzon?

A   Yes, sir.

Q   How do you know Ponzon?

A   He's my -- my little cousin's baby's daddy.

Q   In relation -- well, was there anything -- a crime
charged that related to Ponzon being a victim?

A   Yes, sir.

Q   Do you know who was involved in that crime?

A   Yes, sir.

Q   Who was involved in that crime?

A   Drak, Rickey, Fonzo, and a girl.

Q   Those people that you named, do you know if those
people were members of a gang?

A   Yes, sir.

Q   What gang?

A    Fonzo is LCC.  Drak is DV and Rickey is DV.

Q    Did you speak to Ponzon in relation to that crime?
Did you talk to Ponzon?

A    No.  I talked to my little cousin.

Q    And who is your little cousin?

A    Mariselle Torres.

Q    What was the purpose of you talking to Mariselle
Torres?

A    To get George to not testify against Drak.

Q    Now, Fabian, after you got out of prison -- and I'm
referring now to 2008 -- you returned to Dodge City; is
that correct?

A    Yes, sir.

Q    Were you then -- were you active in the DV gang?

A    Yes, sir.

Q    Were there meetings going on in 2008?

A    Yes, sir.

Q    How did the meetings come about?

A    They were already going on before I got out.

Q    Did you go to any meetings?

A    Yes, sir.

Q    Why were you going to meetings?

A    To structure the gang a little more.

Q    Did you personally attempt to structure the gang
more?

A    We all did.

Q    Well, explain the process to me.  In 2008, what were you trying to accomplish?

A    More unity; more drug selling; more profits.

Q    And did you discuss that at the gang meetings?

A    Yes, sir.

Q    How many gang meetings do you think you were able to attend in 2008?

A    Maybe four or five.

Q    At each of those gang meetings, did you discuss the structure of the unity, the drug dealing and the money-making?

A    Yes, sir.

Q    Did you take any particular role -- did you yourself take any role during those meetings?

A    Yes, sir.

Q    And what role did you take?

A    I would make sure people attended.  I would go find people.  I would take roll call and I would take money.

Q    And why were you taking money?

A    To save up for whatever purpose we needed it for.

Q    What are those purposes?

A    Drugs; guns.

Q    Did you take any of the money to purchase drugs with?

A   No.  We were still building it.

Q   Did you direct that any of the money be used to buy drugs?

A   No.

Q   You were building it as in you were saving the money?

A   Yes, sir.

Q   And where were these meetings taking place?

A   4th and Elm.

Q   4th and Elm.  Was that a house?

A   Yes, sir.

Q   Who lived at that house?

A   Well, my home boys lived in the bottom.

Q   Who are your home boys?

A   Jose Neave and his brother Adam.

Q   And does Jose Neave have a nickname?

A   Yes, sir.

Q   What is that?

A   Caiyo.

Q   Is he a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   You mentioned they lived -- did you say bottom or the basement?  Is that what you said?

A   Yes, sir.

Q   Did anyone else live in the house?

A   Yes, sir.

Q   Who?

A   Uhm, Mugsy, George, Marta.

Q   Let's start with Mugsy.  Who's that?

A   Hernan Quezada.

Q   Is Mugsy, Hernan Quezada, a member of a gang?

A   Yes, sir.

Q   What gang?

A   DV.

Q   And you mentioned George.  Who's that?

A   George.

Q   George.  Is George a member of a gang?

A   Yes, sir.

Q   And what gang is George a member of?

A   DV.

MR. SMITH:  We're missing an exhibit, Your Honor.  I'm sorry.  Or I'm missing an exhibit.

THE COURT:  Well, let's go on without it.

MR. SMITH:  All right.

THE COURT:  I suppose -- I'm just speculating -- that it's a picture of someone.

MR. SMITH:  It is not.  I'm sorry.

THE COURT:  Oh, my goodness.  That's what

happens when you speculate.

BY MR. SMITH:

Q   Now, let's move forward then a little bit.  I want to use a phrase, bonds.  Are you familiar with that phrase?

A   Yes, sir.

Q   What do I refer to when I say bonds?

A   The 14 bonds are like rules and regulations of our gang.

Q   What do you mean when you say our gang?

A   DV, Nortenos.

Q   And how do you know about the bonds?

A   Got taught.

Q   Who were you taught by?

A   Peter.

Q   Where were you taught about the bonds by Peter?

A   In Butler.

Q   Butler County jail?

A   Yes, sir.

Q   Was that during this year?

A   Yes, sir.

Q   Did you have conversations about the bonds with anyone else?

        MR. MANDELMAN:  Judge, I'd object.  This is outside the time period of the conspiracy.

THE COURT:  I'll have to think about that.

MR. SMITH:  I would submit that it, that it evidences rules and structure of the gang and that knowledge of the rules and structure of the gang must have preceded the time period that he was in custody in Butler County jail, which came just after this Indictment.

THE COURT:  That's speculation on your part. I'm going to sustain the objection unless you can lay a better foundation.

(Off-the-record.)

THE COURT:  How would you all like to take an early lunch today?  Let's do that.  Let's take a lunch break until about 1:00.  Please remember and heed the admonition.

(Jury excused from the courtroom.)

THE COURT:  The conspiracy, if there is one proven, ended when these Defendants were arrested.  But I'm trying to think of -- that doesn't necessarily bar the evidence if things happened -- I'm trying to remember case law and I can't remember it specifically -- that would further the conspiracy.  For example, by trying to bribe someone not to testify even though the conspiracy was over.  But that's not what

we're dealing with here.  You want him to testify about what Mr. Garcia told him the rules were while they were in jail.

MR. SMITH:  And, Your Honor, there's been cross-examination of a couple of witnesses about whether the DV gang was aware of the bonds or the constitution related to the Nortenos and that is the purpose of my question.

THE COURT:  Well, that's relevant.  His objection, though, is that this conversation occurred after the conspiracy was over.

MR. SMITH:  That's when the conversation occurred.

THE COURT:  I think I'm going to sustain the objection.  Unless you can come up with something over the noon hour to tell me that I ought to let it in.

Now, speaking of that, I've got a couple cases here for you with respect to this Mr. Ochoa business and Wertz' representation of Ochoa.  I'm a little -- is it David Ochoa, Jr?

MR. SMITH:  Correct.

THE COURT:  I'm looking at at plea agreement here that Marten had where Ochoa plead guilty represented by Charlie O'Hara.

MR. SMITH:  That's correct.

MR. WELCH:  That's his attorney now, Judge.

MR. MANDELMAN:  This is his second federal case.

THE COURT:  Well, anyway, take a look at *U.S. vs. McCullah*.  76 Fed. 3rd 1087.  That's Tenth Circuit.  And it references *U.S. vs. Travino* which is a Western District of Texas case.  992 Fed. 2nd -- no, it started in the Western -- 992 Fed. 2nd 64.  Fifth Circuit.  You can take a look at those cases.  It doesn't seem to me that it's a problem.  But you can take it up before Mr. Ochoa testifies.  I'll see you all at 1:00.

MR. SMITH:  Thank you.

THE COURT:  If he testifies.

(Noon recess.)

(Beginning at 1:05 p.m. October 11, 2013, the following proceedings continued.)

THE COURT:  Before we continue.  Let me give you a little heads-up about scheduling.  I'm pretty sure that the evidence in this case will be over probably either on Tuesday or Wednesday.  Then we'll probably take a half a day recess because I need to go over the instructions for you with the lawyers.  And in this case, unlike most of the cases that I've had, the instructions are very long.  They're 80 pages, maybe more than 80 pages long.  I know you're happy to hear that.  But, the law requires me to go over the instructions, let the lawyers have their opportunity to have an input.  And there's no point in you coming in, sitting in the jury room while we do that.  So when that's done, we'll come back, I'll read the instructions to you, which will probably take quite a while with 80 pages.  The law says I have to read the instructions to you.  I know that you all can read, but I still have to read them to you.  So you'll have to endure that.  Then the lawyers have an opportunity to make their closing argument and then you all get the case.  So that's kind of where we're at.  Anybody have any concerns about that schedule?  You will each have a copy of the instructions

to read along and use in the jury room.

You know, it used to be, a long, long time ago when I was a law clerk with one of the federal judges, he didn't give the jury any written instructions.  He didn't even have written instructions.  He just sat up on the bench and told the jury what the law was.  And sometimes I think maybe that would work better.  But here, it would not work in this case.

I think if it's all right with you, we'll quit about 4:30 today.  Any objection to that?  All right. Let's keep going here, wherever we were.

BY MR. SMITH:

Q   Good afternoon, sir.  Go ahead and tilt that microphone down for us again.  I just have a few last questions for you here.

MR. SMITH:  May I approach, Your Honor?

THE COURT:  Yes, sir.

Q   Go ahead and take that out.  I'm showing you what's been marked for identification as Government Exhibit 91. Remove Government Exhibit 91 from the sleeve and then tell me, after you have an opportunity to look at it, if you recognize that.

A   Yes, I recognize it.

Q   What do you recognize it to be?

A   A letter I wrote.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Do you recall what the subject of that letter was?

A   I don't -- I mean, I remember writing it and I think I have a general idea of what it was about; but it's been years.

Q   If it would be helpful to you to refresh your recollection about what the letter is about, go ahead and flip through a couple of pages there.

(Off-the-record.)

Q   Are you reading Page 1?

A   I'm on Page 2 now.

Q   Have you been able to refresh your recollection about the subject of that letter?

A   Yeah.

Q   And, generally, what was the subject of that letter?

A   To get him to flee.  To get --

Q   To get whom to flee?

A   Gordo.

Q   To get Gordo to flee.  And is that the person you referred to as Taz?

A   Yeah.

Q   Is that in relation to the robbery that you've already testified about?

A   Yes, sir.

Q   Do you recall when it was that you wrote that letter?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    That was when I was in jail in '09, '10, something like that.

Q    When you were in jail recently after that robbery?

A    Yeah.

Q    Do you recall whom you wrote that letter to?

A    To Gonzo.

MR. SMITH:  Your Honor, I would move to admit Government Exhibit 91.

MR. MANDELMAN:  It's -- I'd object.  It's hearsay.

MR. SMITH:  Your Honor, I would submit that it's admissible under 801(D)1(b), which is a statement that is not hearsay if the declarant is a trial witness subject to cross-examination if such statement is consistent with trial testimony or offered to rebut a charge of recent fabrication, improper influence or improper motive.

THE COURT:  Doggone it.  You read that absolutely correctly.  But, all he has said is, so far, about this incident with George, Taz, whoever it is, that he tried to influence Taz not to testify against him about the robbery.

MR. SMITH:  Yes.

THE COURT:  Is there anything else in the letter that doesn't relate to that?  Because if there's

something else in the letter --

MR. SMITH:  Your Honor, we could redact the letter if counsel thinks there's something that doesn't pertain to Taz or Gordo in that letter.

MR. WACHTEL:  Your Honor, I do.  If one turns their attention to the PS on the last page.  It's a statement of quotes from somebody who is not even identified who is not Gordo and who is not Gonzo.  And that's most surely hearsay.

THE COURT:  I agree.  What about that, Mr. Mandelman?

MR. MANDELMAN:  No, I -- he's testified as to the contents so it's -- it's an out-of-court statement.  It's not admissible.  We haven't -- we haven't questioned him so there's nothing to rebut.

THE COURT:  Have you looked at Rule 801?

MR. MANDELMAN:  Yes, Judge.  I mean, the provision that, uhm, that Mr. Smith referred to, but, again, I mean, I guess there's some conceivable scenario based on questioning that it might come in as rebuttal; but not during his direct examination.

THE COURT:  If you can redact it --

MR. SMITH:  It can be redacted.

THE COURT:  -- I'll receive it.  But, frankly, I don't know why you want to admit it given that you've

elicited the testimony already from the witness with respect to the contents of the letter.

MR. SMITH:  Then we would ask that it provisionally be received in a redacted form and may withdraw.  If that's acceptable to the Court.

MR. WACHTEL:  I was just thinking about what I heard, Judge.  I had nothing to say.

THE COURT:  What are you thinking?  You want to tell me what you're thinking?

MR. WACHTEL:  I do on rare occasions, Your Honor, yes.

THE COURT:  Is that acceptable?

MR. WACHTEL:  It is acceptable to me, Your Honor.

THE COURT:  All right.  What about you, Mr. Mandelman?

MR. MANDELMAN:  Your Honor, I maintain my objection that this is -- this is just plain hearsay.

THE COURT:  It's not hearsay under the rule.  It may be hearsay over in the public defender's office; but it's not hearsay under the rule.  Let's do that.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  I think it would be cumulative as well, wouldn't it?

MR. SMITH:  I'm ready to move on, Your Honor.

THE COURT:  Let's move on.

BY MR. SMITH:

Q   Now, Mr. Neave, turning to the Indictment, what you've been indicted for.  You recall that you've testified you plead guilty to a conspiracy to commit RICO; is that correct?

A   Yes, sir.

Q   In this Indictment, you were originally charged with several other counts; is that right?

A   Yes, sir.

Q   Were you charged with the robbery that involved Jesus Sanchez and Taz or Gordo?

A   Yes, sir.

Q   In an individual count or individual counts; is that correct?

A   Yes, sir.

Q   Were you also charged with four other co-conspirators in a stabbing that would have occurred in 2011, I believe?

A   Yes, sir.

Q   I'm going to double check that date, though, because I don't want to make a mistake.

     Were you also charged with -- you mentioned the possession with intent to traffic methamphetamine and the possession of a firearm?

A   Yes, sir.

Q   Generally, in the stabbing that I've mentioned, which I believe I said was 2011, August, if my memory serves but will double check, were you charged in those counts with other people?

A   Yes, sir.

Q   And who do you remember being your codefendants in those counts?

A   Jason Najera, Humberto Ortiz, Jose Neave, Jesus Torres and me.

Q   Now, you've mentioned Humberto Ortiz and Jose Neave and Jesus Torres in your prior testimony; is that correct?

A   Yes, sir.

Q   And do you know who Jason Najera is?

A   Yes, sir.

Q   Does he have a nickname?

A   Norte.

Q   Is he a member of a gang?

A   Yes, sir.

Q   And what gang is he a member of?

A   DV.

Q   Generally, those charges involved a stabbing of two individuals; is that correct?

A   Yes, sir.

Q   As part of your plea, did you admit your role and your involvement in those counts?

A   Yes, sir.

Q   And just generally for the jury, what behavior is it that you admit to committing for those counts?

A   What did I plead to or --

Q   Not what you plead to; but what you were charged with doing in those counts.

A   I was charged with -- in state or federal?

Q   Federal.

A   Aggravated assault with a deadly weapon.

Q   And did you admit your behavior or what you did during those counts?

A   Yes, sir.

Q   And in pleading to Count 1, did you admit what you did in the robbery in 2008?

A   Yes, sir.

Q   And did you admit what you did in 2011 when you had methamphetamine for distribution and a firearm for distribution?

A   Yes, sir.

        MR. SMITH:  May I approach, Your Honor?

        THE COURT:  Yes, sir.

BY MR. SMITH:

Q   I'm showing you what's been marked as Government

Exhibit 162.  Do you see that?

A    Yes.

Q    Do you recognize the item that is marked for identification as Government Exhibit 162?

A    Yes, sir.

Q    How do you recognize that item?

A    It's the gun I got caught with.

Q    This is the gun you got caught with when?

A    In 2011.  December 27th.

Q    Thank you.

        MR. SMITH:  Move to admit Government 162.

        MR. WACHTEL:  No objection, Your Honor.

        MR. MANDELMAN:  I'd object on relevance.

        THE COURT:  Exhibit 162 --

        MR. SMITH:  It's newly marked, Your Honor.

        THE COURT:  It's received.

BY MR. SMITH:

Q    You mentioned December 27, 2011; is that correct?

A    Yes, sir.

Q    Is that the same date that you refer to being arrested when you were also in possession of methamphetamine?

A    Yes, sir.

Q    That you were also indicted for in this case?

A    Yes, sir.

Q   I'm showing you what's been marked as Government Exhibit 49.  Do you recognize that?

A   Yes, sir.

Q   What is Government Exhibit 49?

A   It's my Plea Agreement.

Q   Is that your Plea Agreement in this current case?

A   Yes, sir.

Q   The RICO Indictment?

A   Yes, sir.

Q   Is that the Plea Agreement that essentially states that you plead guilty to the RICO conspiracy charge?

A   Yes, sir.

Q   And in entering that Plea Agreement, once again, did you admit your entire involvement in the balance of the counts of this case?

A   I did.

Q   In this case and in conjunction with your Plea Agreement, has the United States government or any agent of the United States government asked you to do anything other than tell the truth?

A   No, sir.

Q   In that Plea Agreement, does it contain provisions of what would happen if you were not to tell the truth?

A   Yes, sir.

Q   And what is your understanding of what would happen

if you did not tell the truth?

A    Take my plea away.

Q    Which would result in what?

A    Prosecution on all counts maybe.

Q    And do you understand what penalty that you possibly face in pleading guilty to Count 1 -- or in pleading guilty to the RICO conspiracy of this Indictment?

A    Yes, sir.

Q    And what is your understanding of the penalty that you could face?

A    No less than 20 but my PSI came back to 92 months.

Q    All right.  In that Plea Agreement is there also a provision where you would attempt to provide substantial assistance to the United States government?

A    Yes, sir.

Q    Do you know who is responsible for determining what your sentence is?

A    Yes, sir.

Q    Who is responsible for determining your sentence?

A    Judge.

        MR. SMITH:  Thank you.  I have no further questions.

        THE COURT:  Yes, sir, Mr. Wachtel.

        MR. WACHTEL:  Thank you, Judge.

        THE COURT:  Did you want to offer this Plea

Agreement?

MR. SMITH:  I do move to admit 49, Your Honor.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  It's received.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   Mr. Neave, I'm Val Wachtel.  I represent Pedro Garcia sitting right over there.  If I ask you a question you don't understand, will you tell me that you do not?

A   Yes, sir.

Q   And if I speak too softly, as I often do, and you can't hear me, will you tell me that you didn't hear me?

A   Yes, sir.

Q   I'd like to talk with you first about the Indictment in this case.  I don't know if they gave you a copy of it, so I have a copy if you need to refresh your recollection, tell me.

A   All right.

Q   But my first question about this case really, I guess, is when did you get arrested?

A   December 27, 2011.

Q   Where were you?

A   Dodge City, Kansas.

Q   Now, let's talk about this Indictment.  You were indicted in Count 1 with conspiracy to violate RICO statutes; right?

A   Yes, sir.

Q   But you were indicted in other counts, in fact, several other counts, with -- first one of which was Count 27, violent crimes in aid of racketeering, assault with a dangerous weapon on Gabriel Rivera and Carlos Ramirez; right?

A   Yes, sir.

Q   And you were charged with Jason Najera, Jesus Torres, Jose Neave and Humberto Ortiz?

A   Correct.

Q   Who are Gabriel Rivera and Carlos Ramirez?

A   I don't know them.

Q   Why did -- why did you guys assault them with dangerous weapons?

A   It was just a big fight.

Q   Did you start it?

A   No, sir.

Q   What kind of gun did you have?  What kind of dangerous weapon did you have to commit this assault?  Or did anybody have?  Do you remember?

A   I had a knife.

Q   Count 28 charges you with another violent crime in

aid of racketeering.  It's a conspiracy to commit assault with a dangerous weapon.  And in that count you're charged along with Jesus Sanchez.  You remember that?

A   Correct.

Q   Who did you conspire to commit the assault upon?  Do you remember?

A   Do I remember his name?

Q   Yes, sir.

A   Yes, sir.

Q   What's his name?

A   Bryant Lincon.  Bryant Lincon.

Q   Can you spell his last name for the reporter please.

A   L-I-C-O-N.

Q   L-I-C-O-N.  It's not Lincoln, it's L-I-C-O-N.  Did that assault ever take place the one that you were conspiring to do?

A   I mean, what's your definition of assaulting him?

Q   Well, I'm -- okay.  Assault, generally speaking, as the Judge defines the law, is when you threaten or attack somebody but you don't hit 'em.  Okay?  Did that assault ever take place?

A   Yes, it did.

Q   And that happened about July 2nd, 2008?

A   Correct.

Q   The Count 30 charges you with being a felon in possession of a firearm?

A   Correct.

Q   The firearm that got introduced as evidence in this case, is that the one you had?

A   Yes, sir.

Q   Why did you have that firearm?  Why did you have it?

A   No particular reason.

Q   None at all?  You have to say yes or no.

A   No, sir.

Q   Is that just because it was like carrying -- carrying a pistol was, like, natural to you?

A   At the time I really didn't carry a pistol; but at that time I did have one.

Q   And then Count 32 is possession of a firearm in furtherance of a drug trafficking crime.  You remember that?

A   Yes, sir.

Q   What did that -- how did possessing that firearm further a drug trafficking crime?  If you know.

A   Well, because I had a gun and drugs at the same time.

Q   Yeah, well, did you have a gun to protect yourself from being robbed?

A   Could be but I didn't think I was gonna get robbed.

Q   Well, in any event, after all of that happened, you got arrested and charged and a lawyer was appointed to represent you; right?

A   Correct.

Q   Is that -- who was the lawyer?  Do you remember?

A   Mark Howell, I believe.

Q   Is he here?

A   No, sir.

Q   Do you know if somebody from his office is here?

A   I don't believe so.

Q   The Government started giving your lawyer discovery in this case, paper, stuff with facts in it; right?

A   When?

Q   Well, sometime after you got arrested and your lawyer got appointed for you.  Right?

A   Yes.  Correct.

Q   Your lawyer showed you the discovery that he had been provided; right?

A   Correct.

Q   And that discovery didn't have to do just with your crimes.  It had to do with crimes allegedly committed by other people involved in this case.  Right?

A   In what case?

Q   I'm sorry.  The case that you are here testifying about now and in which you plead guilty.

MR. SMITH:  Your Honor, I believe there's some confusion.  When Mr. Neave was arrested on December 27, this is -- that was a state case.  He had a state attorney appointed to him.  He was not taken into custody on this case until much later when everyone else was taken into custody.

MR. WACHTEL:  Thank you, sir.  I apologize.

BY MR. WACHTEL:

Q   I want to talk with you about this case.  Now. Okay?

A   Okay.

Q   When were you arrested on this case?  If you can remember.

A   May 9th, I believe.

Q   Of two thousand --

A   12.

Q   What?

A   12.

Q   2012.  Arrested in Dodge City?

A   I was in county jail in Dodge City.

Q   Lawyer got appointed to represent you; right?

A   Yes, sir.

Q   Same lawyer that you mentioned earlier today?

A   No, sir.

Q   Who was it?

A   Gregory D. Bell.

Q   In this case you received discovery also; right?

A   No, I did not.

Q   None at all?

A   No, I did not.

Q   Do you know if your lawyer received any?

A   I'm sure he did.

Q   Okay.  So you didn't receive anything in discovery that had anything to do with my client Pedro Garcia?

A   No, sir.

Q   In any event, you ended up pleading guilty to one count of conspiracy to commit acts of racketeering; right?  Violating RICO?

A   Yes, sir.

Q   And it's my understanding that when you looked at your presentence investigation which was done, you think that if the Court followed that, you could get 90 months?

A   92 months.

Q   92.  I'm sorry.  But as part of this -- oh, by the way, and when you plead guilty, in your Plea Agreement on Page 2 there's a factual basis for the guilty plea set out if you want to look.

A   I know what it says.

Q   Do you?

A    Yes, sir.

Q    Did you read it?

A    I read it a lot of times.

Q    When is the last time you read it?

A    I don't know.  Probably a month or two ago.

Q    Okay.  Do you know who wrote it?  Did the Government write these facts?

A    Yes, sir.

Q    That you admitted to?

A    Yes, sir.

Q    And then the Paragraph 3 talks about the application of the sentencing guidelines to you?

A    Correct.

Q    And the sentencing guidelines, it's your understanding that those are federal rules that control or at least make recommendations as to how people should be sentenced?

A    Correct.

Q    Part of what is -- your understanding of them, part of what's considered is your criminal history?

A    Correct.

Q    Where you are assigned points for all the -- not necessarily all the bad stuff that you have done, but for many if not all of the crimes that you've committed?

A    Correct.

Q   And then there's a severity level of the crime that you're convicted of; right?

A   Correct.

Q   And those guidelines where they intersect is roughly what you could, depending upon whether there's a mandatory minimum, is roughly what you could expect to get as your sentence?

A   Correct.

Q   But the Government also agreed to do certain things for you.  And those are found in Paragraph 5 on Page 5. The Government agreed not to file any more charges against you arising out of the facts that form the basis of the present Indictment.  Remember that?

A   Yeah, I do.

Q   You do?  Okay.  So what that means is that, but for that with which you have been charged, and unless you violate the agreement, you're not going to get charged by the federal government with anything that you did from 2008 to 2012; right?

A   Correct.

Q   And, in fact, the Government also promised to dismiss all of those other counts that you and I have talked about on the day you get sentenced; right?

A   Correct.

Q   Now, interestingly enough, if you look at Paragraph

B, 5-B, the state of Kansas was not a party to this case at all, made some agreements with you also, didn't it?

A   Correct.

Q   And that agreement was that they're not going to file any charges against you, nor prosecute you, nor prosecute crimes arising out of the facts forming the basis of this Indictment, and they further agree to dismiss any case underlying this Indictment.  In other words, any state case presently pending against you.  Is that your understanding of that?

A   Correct.

Q   Is there a state case presently pending against you?

A   Not no more.

Q   Not no more.  Was there one pending against you when you signed this Plea Agreement?

A   Yes, sir.

Q   What was it?

A   Attempted murder, I believe.

Q   Attempted murder out in Dodge?

A   Yes, sir.

Q   Did the -- is it your understanding the state of Kansas dismissed that case after you plead guilty?

A   I don't know if it was after I plead guilty or not.

Q   So it could have been after, it could have been before; right?

A   Could be.

Q   But it was certainly after you and the Government, your lawyer and the Government began discussing a plea agreement; right?

A   Correct.

Q   So that's a benefit that you sort of already received, isn't it?

A   Correct.

Q   They agreed to recommend a sentence for you at the low end of the guideline range.  And we've discussed the guidelines?

A   Correct.

Q   They're going to recommend to this court a two-level reduction from the offense level for acceptance of responsibility.  And a one-level reduction because you sort of did that in a timely manner.  Right?

A   Correct.

Q   And they're not going to request an upward departure if you don't request a downward departure?

A   Correct.

Q   Now, at what point in time during the prosecution of this case did negotiations between your lawyer and the Government begin to work out this agreement?

A   There was none.

Q   Never were any negotiations?

A    No, sir.

Q    Well, how did this agreement come about if there were never any negotiations?

A    I wrote my lawyer and told him I was gonna cooperate.

Q    Okay.

A    And he came to see me and he said you're going to debrief on Monday, or whatever day it was, the next week.  I debriefed; and then they offered me a plea bargain of conspiracy to commit racketeering.

Q    Do you remember what day you wrote your lawyer and said I want to cooperate?  Do you remember?

A    I don't remember exactly the date.

Q    But you tell us that you debriefed the very next day?

A    No, within a week after or so.

Q    Could it have been on or around March 20th of -- I'm sorry -- forgive me.  Could it have been on or around May 14th of 2013?

A    It was around there, yes.

Q    In any event, so this -- these government agreements are not bargained for, it's just a flat-out we're gonna do this.  Right?  You didn't bargain for this.  This is what they offered you; right?  Their promises; their agreements.  Is that right?

A    I don't understand.

Q    Yeah.  You told us that you didn't bargain for the -- for the -- for dismissal of all these charges?

A    No, I did not.

Q    You didn't bargain for the get rid of the pending Kansas cases?

A    No, I did not.

Q    In other words, everything that is contained within the, the Government's agreements are just stuff that they gave you, not stuff that you asked for?

A    Correct.

Q    There are also provisions at Page 7, Paragraph 7, about substantial assistance?

A    Correct.

Q    You read those and you understand those; right?

A    I do.

Q    Do you understand that if the Government is convinced that you have told the truth to these good jurors here that they're going to ask this judge to further reduce your sentence; right?

A    Correct.

Q    And it's only the Government that can make that motion; right?

A    Correct.

Q    If the judge thinks you gave substantial

assistance -- he can't make that motion on his own, can he?

A   Correct.

Q   And your lawyer can't make it, can he?

A   I don't know if that's --

Q   He didn't tell you that he could not make that?

A   I don't remember.

Q   Well, without regard to what he said then, the Government told you in the Plea Agreement that the decision whether or not to file that motion for you is entirely and conclusively -- entirely and exclusively within their discretion.  You understand that?

A   I do.

Q   That means, doesn't it, that the only person you gotta satisfy here that you're telling the truth is the United States of America; right?

A   Correct.

Q   And as long as they're satisfied, they're gonna move -- they're gonna file that motion on your behalf; right?

A   I hope.

Q   I hope so, too.  Even though -- and you're -- your plea agreement is not conditioned on Mr. Garcia getting convicted?

A   It is not.

Q   Because it doesn't say in here you have to convince the jury that he is guilty; right?

A   Correct.

Q   And it doesn't say you have to convince the judge that he is guilty?

A   Correct.

Q   Let's talk a little bit about liberty.

A   About what?

Q   Freedom, not being in jail, not being in prison.

A   All right.

Q   Is that important to you?

A   Of course it is.

Q   You don't like being in prison; right?  You do not like being in jail?

A   I don't like being in jail, no.

Q   And you've been in prison and you don't like that?

A   No, I do not.

Q   So what is it that you wouldn't do to get out of jail, prison?

A   I don't understand the question.

Q   Yeah.  What would you -- what would you not do to get out of prison?  I mean -- what would you do to get out of prison?  Maybe that's a better question.  Anything the Government asked you to do?

A   No, sir.

Q   What would you not do?

A   I don't know what you mean.

Q   Well, I'm sorry, sir.  I'll withdraw the question because I can't make it any more clear and that is my fault and I apologize.  One last question about this, what happened in this court.  There was a thing in this trial called a James hearing and that's where the defendants asked that the prosecution be made to prove that a conspiracy existed.  It was an evidentiary hearing that happened here.  Did you attend that?

A   Yes, I did.

Q   It took place, I think, over two days.  Did you attend the first day or --

A   Second day.

Q   And you listened to all the testimony that came from that witness stand; right?

A   I did.

Q   You remember the policemen that testified; right?

A   I do.

Q   And what they said?

A   I do.

Q   You recall them talking about the homicide that happened in Dodge City at the trailer park?

A   No, sir.

Q   You don't?

A    That was the first day, I believe.

Q    Did your lawyer send you a copy of the transcript?

A    No, sir.

Q    Have you read the transcript?

A    I read some of 'em, yeah.

Q    Have you read the transcript that Mr. Garcia had?

A    Yes, sir.

Q    Have you read it end to end?

A    No, sir.

Q    Have you read about the murder?

A    I don't remember if I did or not.

Q    You don't remember reading about that?

A    It's -- it was like this thick.  It was thick.  I, I flipped through it.

Q    You flipped through it.  So you know there was information about the murder in there; right?

A    I don't know what kind of information.

Q    Okay.  Where'd you get it?  Did Mr. Garcia -- did you take Mr. Garcia's?

A    He gave it to me.

Q    He gave it to you.

A    Yeah.

Q    Did you give it back?  Did you give it back?

A    I don't know if I still have it or not.

Q    Well, let's talk about Mr. Garcia's alleged

distribution of drugs.  On how many occasions were you with Mr. Garcia on which he distributed drugs?

A    Couple.

Q    Couple to me means two.  Is that what you mean?

A    Yes, sir.

Q    Okay.  When was the first one?

A    It was when we were young.

Q    Was it -- was it before 2008?

A    Yes, it was.

Q    Is that one of the occasions that you've told us about here today?

A    No, sir.

Q    When was the next one?

A    I was never with him out there.

Q    So you weren't with him when he distributed drugs?

A    No, sir.

Q    At least not since 2008?

A    No, sir.

Q    When did he tell you that -- and I'm now talking about the, anything that happened in 2008, when did he tell you that he had distributed illegal drugs?

A    When I was in Butler County with him the last year and a half.

Q    He told you about it then.  Well, yeah, but when in -- when you were in Butler County.  What month?  What

year?  If you know.

A    Probably about a year ago.

Q    Did he tell you how he went about doing it?

A    Yes, he did.

Q    Did he tell you who he was involved with?

A    Yes, he did.

Q    Who was he involved with?

A    Where'd he get the drugs from?

Q    Who was he involved with in his distribution?  Was it -- let me make it -- did he tell you who he got the drugs from?

A    Yes.

Q    Who was it?

A    From Big Puppet.

Q    Big Puppet?

A    Yeah.

Q    Anybody else?

A    No.

Q    Did he tell you who he sold the drugs to?

A    Yes, sir.

Q    To whom did he sell the drugs?

A    Told me mostly Huesos and Lazy.

Q    Did he tell you -- did he mention anybody who wasn't either a DV or a LCC?

A    No, sir.

Q   Okay.  Did he tell you what he did with the money?

A   No, sir.

Q   Now, I think you also said that he told you that he got his drugs through the mail?

A   Yes, sir.

Q   And then in that one occasion that he told you about was in 2008; right?  That's what we're talking about?  Or are we?  I'll withdraw that and ask you a different question.

    Did you ever see that occur?

A   No, sir.

Q   Did he tell you where the drugs were mailed to?

A   No, sir.

Q   Did you sell drugs?

A   Yes, sir.

Q   Starting in 2008, tell me about the first drug sale that you made?

A   I don't understand.

Q   Yeah.  Did you make a drug sale in 2008?

A   Yes, sir.

Q   Did you make many?

A   Quite a few, yeah.

Q   And tell me about the first one?

A   I don't remember the first one.

Q   Do you remember what you sold?

A   I sold methamphetamine.

Q   Do you remember who you got it from?

A   Yes, sir.

Q   Who'd you get it from?

A   Gonzo.

Q   Do you remember what -- I'm sorry -- did you sell it?

A   Yes, sir, I sold it.

Q   Did you pay for the drugs?

A   No.

Q   So those drugs you got for free?

A   No, they're not for free.

Q   Did you pay Mr. Ramirez then for those drugs?

A   Well, we would sell them together and I would give him the money.

Q   And did you keep a little scrape as a profit for yourself?

A   Yes, sir.

Q   What did you do with it?

A   Whatever I wanted to.

Q   Right.  You spent it on yourself probably; right?

A   Most likely.

Q   And you were a DV?

A   Correct.

Q   You didn't give -- you didn't kick any of it back to

the DV; right?

MR. SMITH:  Objection; relevance.

THE COURT:  Overruled.

BY MR. WACHTEL:

Q   You didn't kick any of that back to the gang itself; right?

A   I don't think that's true.

Q   How much did you give to the gang?

MR. SMITH:  Objection; relevance.

THE COURT:  Overruled.

BY MR. WACHTEL:

Q   I think you can answer, sir.

THE COURT:  Yes.  Go ahead.

A   I mean, I don't know no specific dollar amount; but at the time, they're my friends and I spent my money on my friends and me.

Q   I understand.  You used that money to help entertain your friends; right?

A   In a way.  Or friends that were in jail.

Q   Or to send some money to a guy who was in jail.  But how much money did the DVs demand that you give back to the gang?  Nothing; right?

MR. SMITH:  Objection; relevance.

A   No.

THE COURT:  Overruled.

MR. SMITH:  And asked and answered.

THE COURT:  Overruled.

BY MR. WACHTEL:

Q   That means that you can answer that question, sir.
If you can.

A   Didn't nobody demand nothing, no.

Q   I was a little confused about one part of your
testimony and I'm going to talk about 2011 if I may.  I
couldn't tell whether you sold drugs on your own during
that period or whether you sold drugs in conjunction --
in connection with other members of the gang.  Can you
help me understand that please?

A   When?

Q   2011.

A   2011?

Q   Yes, sir.

A   Well, we was like a team.  I don't know exactly what
you trying to get me to tell you.

Q   Well, I think I understand. Let me try to ask a
better question.  You said we were like a team.  You and
who were like a team?

A   Me, Caiyo, Fonso, Beto, David, everyone.

Q   So you -- everyone that you just named?

A   Yes, sir.

Q   How did those drug sales work that happened in 2011?

A    Well, I would get 'em from one person, sell some on my own, maybe give some to another person and they would sell it on their own.

Q    Uh-huh.

A    All the money would come back to me and then I would give the money to someone else.

Q    To pay for the drugs?

A    Correct.

Q    So the people you named were distributing your drugs; right?

A    Correct.

Q    You talked a little bit with us about what you told the Government about the -- let me rephrase that.

When you were testifying here today, you told us that when this homicide occurred that Mr. Garcia had a TEC-9. You remember saying that?

A    Yes, sir.

Q    What's a TEC-9?

A    A 9 mm semi automatic.

Q    Do you recall the color of the TEC-9 that Mr. Garcia had?

A    He didn't tell me what color it was.

Q    Oh -- oh -- I'm sorry. You've never seen this TEC-9?

A    No, sir.

Q   Not so much as a picture of it?

A   No, sir.

Q   But when you're telling us that Pedro told you he had a TEC-9, you were telling us the truth; right?

A   Yes, sir.

Q   So do you remember being interviewed on May 14th of 2013, by Detective Bice here in Wichita?

A   Yes, sir.

Q   Do you recall telling Detective Bice that Mr. Garcia told you that he had a MAC-9?

A   I got confused.

Q   Oh, okay.  You were confused then or are you confused now?

A   In my first interview I said it was a TEC.  I think I confused the second one.

Q   Well, in discovery I received two debriefings with you.  One was on May 14th of 2013.  That's the one in which you identified this weapon as a MAC-9.  The other one was in -- on June 4th of 2014.  So did you identify it as a TEC-9 in the June 4th interview?

A   No, I believe it was the first one.

        MR. WACHTEL:  Permission to approach, Your Honor.

Q   I have a copy of the May 14th, 2013, interview that you conducted.  Let me put it in front of you.  Ask you

to take a look at it.  Paragraph 1, 2 and 3.  Read those and let me know -- don't read them aloud.  Read those and let me know when you've read them.

(Witness complies with request.)

A    All right.

Q    Have you read it?

A    Yes, sir.

Q    In this interview, the document says that -- your first interview, you said a MAC-9.  Is this wrong?

A    Could be.

Q    Could be.  How big of a break do you hope to get from the United States for -- as a result of all your cooperating?

A    I don't know.  I haven't got promised nothing.

Q    Sir?

A    I don't know.  I haven't got promised nothing.

Q    I understand they haven't promised you -- they've not even promised you that which is in here.  But how big a break are you hoping for?

A    I don't know.

Q    You don't know how big a break you're hoping to get?

MR. SMITH:  Objection; asked and answered.

THE COURT:  I'm having trouble hearing you.

MR. WACHTEL:  Hearing me, sir?

THE COURT:  Yes.  What did you ask him?

MR. WACHTEL:  I asked him how big a break is he hoping that the Government will ask for on his behalf on the basis of his cooperation.

THE COURT:  Well, he can answer that; but then I think we've covered this pretty thoroughly.

BY MR. WACHTEL:

Q   You can answer that question.  If you have an answer.

A   I mean, I would like a year or two off.  I mean, that's what I think.  I don't know.

MR. WACHTEL:  I don't have any further questions for you.  Thank you very much.

THE COURT:  Mr. Mandelman.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Hi.  I'm Joel Mandelman.  I'm representing Gonzalo Ramirez.  Since 2004 how many months have you been out of custody?

A   About eight.

Q   Eight months?

A   Yes, sir.

Q   So your testimony today was primarily about those eight months?

A   Mostly, yes.

Q   And how much of that time was in 2008?

A    Three and a half months.

Q    Three and a half months.  Okay.  And how much -- how much drugs were you using in '08?

A    I got high on methamphetamines a few times.

Q    And what about alcohol?

A    I drank alcohol probably on a regular every day.

Q    And how much did you drink?

A    I don't know.  Might be with friends, we would buy a couple 30-packs or something.

Q    Do you remember an interview in February of 2012 with Colleen Brooks-Francis?

A    Yes, sir.

Q    And do you remember discussing your alcohol use in that interview?

A    Yes, sir.

Q    I'm going to go ahead and show you a transcript of that interview.

        MR. SMITH:  Your Honor, so far he doesn't have a memory that hasn't been refreshed, nor has he posed any inconsistent statement.

        THE COURT:  I agree.  There's nothing to -- no reason to be using that now.

        MR. MANDELMAN:  The testimony about the 30-packs is inconsistent with his testimony prior.

        MR. SMITH:  He needs to be asked.

THE COURT: I agree. Let's do it the way the rules say, please.

BY MR. MANDELMAN:

Q How much did you actually drink during that time?

A Well, at the time I had the interview, I was in jail.

Q The time you were describing in the interview?

A When I talked to Colleen Francis, Lt. Francis, I was talking to her about 2011, not about 2008.

Q Okay. Fair enough. Do you remember telling her you were drinking a bottle a day?

A I do.

Q Okay. And do you remember saying I was going through a jug of Crown Royal a day, two days?

A I do.

Q So that was describing your drinking during what period of time?

A The last month of 2011.

Q Okay. And how much alcohol were you consuming in '08?

A I was drinking beer.

Q Okay. Not -- it's your testimony not as much?

A Yeah.

Q And how was your memory of that time period in general?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    It's fair.  I mean, I ain't got the best memory, but --

Q    Do you remember telling her:  I can't remember what I did last week, I was so -- I was drinking so much. But I have a drinking problem so bad, you know what I mean.

A    Yeah, I do.

Q    Okay.  Well, what did you mean by that?

A    I mean little every day things.

Q    Uh-huh.  Go ahead.

A    Like eating breakfast or something.  I mean, do you remember what you ate for breakfast two weeks ago?

Q    That statement sounds a lot broader to me; but am I mischaracterizing it?

        MR. SMITH:  Objection.  That's not a question. It's testimony.

        THE COURT:  Let's, question answer, question answer, please.

BY MR. MANDELMAN:

Q    How many prior convictions do you have?

A    Since when?

Q    You tell me.

A    Since a juvenile?  A lot.

Q    Well, and then you have an adult felony conviction, that 2004 case.  What was that for?

A    Aggravated battery.

Q    And then, as I understand, it's your testimony that in 2008, that agg robbery case got plead down to a theft?

A    Misdemeanor theft; misdemeanor assault.

Q    Okay.

        MR. MANDELMAN:  At this time, I'd move to introduce Mr. Neave's two prior convictions.

        THE COURT:  Well, what are the exhibit numbers?

        MR. MANDELMAN:  These are marked R-O and R-P.

        THE COURT:  Any objection?

        MR. SMITH:  Your Honor, my objection would be that he's testified now extensively about what he's been convicted of and having the physical exhibits is not helpful to the jury.

        THE COURT:  That's up to the jury to decide. Is that your only objection?

        MR. SMITH:  It is.

        THE COURT:  Then they're received.

BY MR. MANDELMAN:

Q    A couple questions about you testified on direct examination that there were four or five meetings?

A    Correct.

Q    Do you remember telling Ms. Brooks-Francis that the

group only met two or three times?

A    I remember.

Q    So your testimony today here is different than the testimony you gave prior?

MR. SMITH:  Your Honor, it was not testimony prior.  It was an interview.

MR. MANDELMAN:  Okay.

BY MR. MANDELMAN:

Q    Different than the statement you made previously?

A    Correct.

Q    During that time you described -- well, do you remember how formal the meetings were?

A    Not very formal at all.

Q    So would it be accurate when you said:  It wasn't no meeting, like, oh, well, we did this and that, it was a whole bunch of bullshit, too.

A    Well, when we were having meetings, we were drinking, too, and sometimes we -- sometimes they're not very organized.  Sometimes we'd postpone 'em, sometimes -- you know what I mean.

Q    And you remember you told her:  We didn't ever get it really established, like, we only had a few meetings, I mean, I was out, I was only out for three months.

A    Correct.

Q    And then you remember telling her the money got

stolen before it could get spent?

A   It didn't get stolen.

Q   It got -- the police, the police raided the place?

A   Correct.

Q   Okay.  And then she asked you what the money was for?

A   Correct.

Q   And you said:  Shit, I could keep it if I wanted to, too.

A   I don't believe that.

MR. MANDELMAN:  Permission to approach.

THE COURT:  For what purpose?

MR. MANDELMAN:  Just to show him his prior statement.

THE COURT:  For what purpose?

MR. MANDELMAN:  He says he doesn't recall saying that he could spend the money on his own, for himself.

THE COURT:  Ask him if he recalls saying that.

BY MR. MANDELMAN:

Q   Do you recall saying that?

A   If I did say that, it would be because I was buying stuff for the gang, not for my own -- my own -- I don't know -- like clothes or something like that.

Q   The question she asked is:  Because it's supposed to

be everybody's, you get to keep it.  And then you answered:  It would be me who decided, yeah, pretty much, or you who decides.  Shit, I could keep it if I wanted to, too.

MR. SMITH:  Objection.  I object to the mode of the presentation of that statement.

THE COURT:  Yes.  That's just not the way to do it, Mr. Mandelman.

BY MR. MANDELMAN:

Q   Do you recall discussing this with the detective?

A   I do.

Q   Okay.  And she asked you about who it was for; is that correct?

A   Yes.

Q   And you indicated that you could spend it on yourself?

A   I could.

Q   Okay.  Have you ever previously offered to cooperate with the Government?

A   I don't understand.

Q   Have you ever previously offered your services to law enforcement to assist in the prosecution of other defendants?

A   No.

MR. MANDELMAN:  Request permission to approach

the witness.

THE COURT:  You may.

Q   Just go ahead and take a look at that.  Do you recognize that document?

A   Yes, sir.

Q   Is that written in your hand?

A   Yes, sir.

Q   And --

THE COURT:  Is it marked?

MR. MANDELMAN:  Yes.  I apologize, Your Honor.  It's marked R-R.

THE COURT:  All right.

BY MR. MANDELMAN:

Q   And what is it?

A   I wrote Lt. Francis and told her I would talk to her if maybe she could help me out.

Q   Okay.  And that does result in a meeting?

A   It did.

Q   And in that letter you described yourself as a hustler?

A   Correct.

Q   What did you mean by that term?

A   Selling drugs, just --

Q   That you could potentially obtain information from other people to cooperate in criminal cases?

A    Obtain or have?

Q    Well, you tell me.

A    I was talking about maybe I could, yeah.

Q    Uhm, what were you -- what were you trying to get?

A    I was trying to get my bond lowered.

Q    You told her:  If you help me get out soon, just think of the possibilities?

A    I don't remember.

Q    Uhm, let me just direct your attention to the -- I guess it's the fourth paragraph on the first page.

A    Fourth paragraph on the first page?

Q    Yeah.

A    All right.

Q    What did you mean by that?

A    Everybody knew me.

Q    Go ahead.

A    Go ahead what?

Q    What was the significance of the fact that everybody knew you?

A    Well, if I wanted to help her, I could.

Q    In what way?

A    In cooperating.

Q    And were you concerned she wouldn't take you up on the offer?

A    Of course I was.

Q   And why were you concerned about that?

A   Because I grew up and I never trusted no police before.

THE COURT:  What did you say, sir?  I can't hear you.

A   Because of growing up, I never trusted no police before.

Q   And you --

MR. MANDELMAN:  Your Honor, I'd move to admit this exhibit.

THE COURT:  Why?

MR. SMITH:  He's admitted the statement itself.  He's been confronted with it.  The exhibit itself does not need to be admitted.  He's been confronted with the --

THE COURT:  You objected, Mr. Mandelman, to the Government's attempt to admit a statement on the -- they wanted to admit theirs and I wouldn't let 'em do it.  Now you want to admit yours.  And it's just as much, from your analysis of the rule, hearsay as it was when you were objecting.

MR. MANDELMAN:  Well, no, I --

THE COURT:  I'm not going to receive it.  You can ask him -- you can ask him all the questions you want about the circumstances of the -- here's what the

rule says.  You can question him about the contents of the statement.  If he says he can't remember, you can show him the statement to refresh his recollection.  It would not be admissible under the rules unless he said his recollection was completely exhausted and he could not remember anything in the statement.  That's the rule.  Unless it's been changed.

MR. MANDELMAN:  I was just introducing it for motive or bias.

THE COURT:  Please.  It's not admissible for that either.

BY MR. MANDELMAN:

Q   There's something I do want to just touch briefly in your plea agreement.  You mentioned that -- you understand that the maximum sentence to be 20 years; is that correct?

A   Correct.

Q   And the minimum sentence in your case is zero?

A   I guess so.

Q   There's no mandatory minimum, is there?

A   I don't know.

Q   The Plea Agreement says you must serve some time but you have already served some time?

A   Correct.

MR. MANDELMAN:  Just one second.

THE COURT:  Yes, sir.

(Off-the-record.)

BY MR. MANDELMAN:

Q   Just a couple more questions.  When did you write that letter to Ms. Brooks-Francis?

A   It says right here, 2-11-12.

Q   You think that's correct?

A   Yeah.

Q   So that would have been -- you were arrested, I think you testified, on -- was it December 28th of 2011?

A   27th.

Q   Okay.  Of 2011.  So about -- this is about six weeks later?

A   Well, that would be about eight weeks later, nine.

Q   That's when you first offered your services to the Government?

A   Correct.

Q   And the earlier letter you sent to my client was also an effort to manipulate the criminal justice system on your behalf?

A   Correct.

MR. MANDELMAN:  I don't have anything further.

THE COURT:  Any redirect?

**REDIRECT EXAMINATION**

BY MR. SMITH:

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Fabian, do you recall being asked a question about a state charge you had pending for attempted murder?  Do you remember that question?

A   Yes, sir.

Q   Was that state attempted murder charge one of the same counts that you were indicted for in this case?

A   Yes, sir.

Q   Which event was that?

A   The aggravated assault with a deadly weapon.

Q   And was that the 2011?

A   Yes, sir.

Q   Okay.  And there were some questions about meetings and how organized or unorganized they were.  Do you recall that?

A   Correct.

Q   You mentioned that -- did you mention there was some sort of roll call or something else that was taken?

THE COURT:  He didn't say anything about that.

MR. SMITH:  Your Honor --

THE COURT:  He didn't say anything about that.

MR. SMITH:  I'll rephrase.

BY MR. SMITH:

Q   Was there any record taken?

MR. MANDELMAN:  I'd object as beyond the scope.

THE COURT:  I agree.  Well, he said -- you got him to say that they were unorganized.

MR. MANDELMAN:  Okay.

THE COURT:  So, I mean, it's in there; but, it's not.

MR. SMITH:  I have nothing further.

MR. WACHTEL:  I don't have anything, Your Honor.  Thank you.

MR. MANDELMAN:  I would just like to introduce the judgment from that dismissal.

MR. SMITH:  I don't know what that is.

THE COURT:  The state murder charge dismissal?

MR. MANDELMAN:  Yeah.

THE COURT:  What's the exhibit number?

MR. MANDELMAN:  This is R-Q.

THE COURT:  R-Q.  Okay.  Any objection?

MR. SMITH:  No objection.

THE COURT:  Okay.  R-Q is the dismissal and it is received.  And we'll take a short recess, Ladies and Gentlemen.  Please remember and heed the admonition. And I need to see Mr. Henry up here for a moment.

(Recess.)

THE COURT:  Yes, sir.

MR. WELCH:  United States calls James Thompson.

**JAMES THOMPSON**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, could you please tell us your name.

A   James Thompson.

Q   Mr. Thompson, are you employed?

A   I am, sir.

Q   How are you employed?

A   I'm currently employed by the Dodge City Police Department.

Q   How long have you been employed with the Dodge City Police Department?

A   I worked for Dodge City from 2002 until the end of 2009.  Then went to work for another agency.  And I recently came back, approximately a year ago.

Q   In the interim from 2009 until about a year ago, who did you work for?

A   Andover Police Department.

Q   I'd like to ask you currently, as you sit here today, what is your title with the Dodge City Police Department?

A   Currently today?

Q   Yes, sir.

A   I am currently a patrol officer.

Q   In 2008, specifically, June 29th, 2008, were you working with the Dodge City Police Department?

A   Yes, I was.

Q   Were you assigned, as part of your duties with the Dodge City Police Department, were you assigned to a special unit at that time?

A   I was.  I was a detective with the police department but I was assigned to the Kansas KBI Southwest Kansas Drug Task Force as an agent.

Q   All right.  Did you work primarily in Dodge City, Kansas, with the KBI task force?

A   In the southwest Kansas area, yes.

Q   All right.  Now, on that day, June 29, 2008, do you recall assisting the Dodge City Police Department in a search of a residence?

A   I did.

Q   What's the address of that residence?

A   It was at 910 1/2 4th Avenue.

Q   You recall what time you arrived at that location?

A   If I could refer to my report.

Q   Please do.

A   I don't have the exact time that I was contacted.  I was actually at the station working on an unrelated case

when I was requested to go to that residence.  When I arrived, most of the situation had already been taken care of and they were just searching for the search -- due to the search warrant.

Q   You just mentioned a search warrant.  Did you assist in searching the house pursuant to a search warrant?

A   Yes, I did.

Q   What portion of the house do you recall searching?

A   Throughout the basement of the house.

Q   What type of residence is this?

A   I believe it was a split, split dwelling.  There was a separate part on the upstairs and then there was the different occupants that lived in the basement.

Q   All right.  And why did you focus your attention on the basement of this house?

A   That's just where I was assigned to search at.

Q   And did you find items of evidence that were seized by the police department?

A   Yes, I did.

Q   Sir, I'm going to ask you to look at what has been admitted as Government Exhibit 159-A.  Let's start there.  Do you recognize what that is, sir?

A   Yes, I do.

Q   What is that?

A   This is a ledger that I found inside of a fire safe

in one of the bedrooms.

Q   And let me also ask you to look at Government Exhibit 94.  Do you recognize what that is?

A   Yes, sir.  That is a safe that I had to break open that I found the ledger and other items inside.

Q   Was that a safe that was located in the house at 910 1/2 4th Avenue, Dodge City, Kansas?

A   Yes.  It was originally found in the closet by the entry team and then when I got there it was sitting on I believe it was the bed.

Q   You were the one that actually gained entry into the lock box?

A   Yes, sir.

MR. WELCH:  Your Honor, we would offer 94.

MR. WACHTEL:  I don't have any objection, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  94 is received.

BY MR. WELCH:

Q   Let's display 94, please.  Thank you.  After you opened the lock box, did you find contents inside?

A   I did, sir.

Q   What did you find inside?

A   There was the ledger that had different names on it. There was dollar amounts.  There was a phone list with

different phone numbers.  And there was $440 in U.S. currency.

Q   The ledger that you found inside the lock box, is it the same ledger that's been admitted as 159-A?

A   Yes, sir.

Q   In addition to that ledger, let me also ask you to look at 159-B as in boy and 159-C.  Do you recognize those items?

A   Yes, sir.  These were pieces of paper that were with the ledger and the currency inside the fire safe.

MR. WELCH:  Your Honor, we would offer 159-B and C.

MR. MANDELMAN:  I'd object.  They haven't been authenticated.

MR. WELCH:  Offered as items that were found inside the lock box pursuant to the search warrant, Your Honor.

MR. WACHTEL:  I don't object, Your Honor.

THE COURT:  How would he authenticate something that was found in a lock box other than to say that he found it in a lock box.  I don't understand your objection.

MR. MANDELMAN:  I mean, we don't know what it is.  It's a piece of paper that was found in the lock box.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

THE COURT: All right. What kind of paper is 159-B?

BY MR. WELCH:

Q   Mr. Thompson, would you focus your attention on 159-B. Is it a single piece of paper?

A   There's actually two pieces of paper. First one that's marked 159-B is a sheet of notebook paper that has a date on it with different names that I recognize to be gang monikers.

THE COURT: And what's C?

A   C, Your Honor, is an 8 by 11 piece of printer paper that has other names that I recognize to be gang monikers and a list of phone numbers with gang monikers.

MR. WELCH: We offer, once again, Your Honor, 159-B and C.

THE COURT: Any objection?

MR. MANDELMAN: I do have -- I have the same objection, Your Honor. We don't know what the significance of this document is. He didn't prepare it. If the Government is going to use it to argue something --

THE COURT: Okay. 159-B and C are received.

BY MR. WELCH:

Q   Can we display 159-B please. Earlier, sir, you testified that -- let's stick with 159-B. There's a

list of names that appear on that sheet of paper; is that right?

A   Yes, sir.

Q   And you told us you recognized these as gang monikers?

A   Yes, sir.

Q   Do you recognize those names based on your --because of or from your employment as a detective, now patrolman, with the Dodge City Police Department?

A   Yes, sir.  And also it would have been sometime in 2003, I started the first Street Crime Unit or gang unit for the Dodge City Police Department, and for most of my patrol career before I promoted to detective, my main, my main mission with the Dodge City Police Department was to investigate gang crimes and document known gang members in Dodge City.

Q   And then let's look at 159-C.  What is that?

A   This is the 8 by 11 piece of paper that has other names on it that I recognize as gang monikers.  And on the back page is phone numbers of known gang monikers in Dodge City.

Q   All right.  In addition, then, to 159-A, B and C, let me ask you if you recognize Government Exhibit 93.

A   This is the U.S. currency that I found inside the fire safe.

Q   In the same lock box as marked and admitted -- in the photograph marked and admitted as 94?

A   Yes, that is correct, sir.

Q   Are you certain that this is a fair and accurate depiction of the currency that you found inside that same lock box?

A   Yes.

MR. WELCH:  Your Honor, we would offer 95.

THE COURT:  You said 93.

MR. WACHTEL:  I don't have an objection, Your Honor.

MR. MANDELMAN:  I don't object to 93.

THE COURT:  93 is received.

BY MR. WELCH:

Q   Can we display 93.  Now, sir, I --

In addition to the currency that is laid out, do you see the same ledger that's already admitted as 159-A?

A   Yes, sir.

Q   And did you collect or did someone with the police department collect the money that's in the photograph?

A   I believe they did, yes, sir.

Q   Did you personally count the money that was recovered from that safe?

A   Yes.

Q   How much money was in the safe?

A   $440 in U.S. currency.

Q   Did you compare the amount of money that you found in the safe to the amounts of money that were reflected in the ledger?

A   Yes.  I believe it was on the second or third page of the ledger that -- when I added up the dollar amounts listed there, I came up with $445, and so I recounted the money that was actually in the safe and came up with $440.

Q   Sir, in addition to the lock box and the contents of the lock box, do you recall you personally locating other items of evidence in the basement of this residence?

A   I did, sir.

Q   What was that?

A   I located a 12-gauge Mossberg shotgun in the ceiling area of the basement utility room.

Q   Sir, I'm now handing you what's been marked as Government Exhibit 95.  Please look at that and tell us if you recognize what that is?

A   Yes, sir.  This is the shotgun that I found inside the rafters of the utility room.

Q   Any doubt in your mind that this is the same gun that was found in the same location as the ledger in the

lock box and the money?

A    No.  I remember it because it had a partially obliterated serial number.

MR. WELCH:  We would offer 95.

MR. WACHTEL:  Object, Your Honor.  Relevance. Just because it was found in a house that he searched does not mean it has any relevance to this case.

THE COURT:  I agree.  Not -- he hasn't laid a foundation for it yet.

MR. WELCH:  Your Honor, this is the -- we've had -- can I approach and not argue in front --

THE COURT:  You don't need to approach.  Whose house is this?

MR. WELCH:  We will cover that, Your Honor.

BY MR. WELCH:

Q    Sir, the residence located at 910 1/2 4th Avenue, do you know whether there were people who are documented gang members found at the house that day?

A    Yes, there were.

Q    All right.  How many gang members were found at that house?

A    I don't know exactly how many; but I know that several of the people that were found inside that house -- there was twelve suspects listed on Officer Stringer's report that were located at the house.

Several of those were known gang members.

Q   Do you know a man by the name of Gonzalo Ramirez?

A   I'm sorry.

Q   Do you know a man by the name of Gonzalo Ramirez?

A   I do, sir.

Q   Do you know whether or not Gonzalo Ramirez was found at the house on that same date the search warrant was executed?

A   Yes, he was.

Q   And in addition to Gonzalo Ramirez, do you recall other documented gang members being found at the house?

A   Yes, sir.

Q   Can you tell us who those people were?

A   If I can refer to Officer Stringer's report.

Q   You can use that to refresh your memory, sir.

A   Jason Najera.

MR. WACHTEL:  Objection, Your Honor.  He can use it to refresh his memory but he cannot read from it.

THE COURT:  Correct.

MR. WACHTEL:  Which is what he's doing.

BY MR. WELCH:

Q   Just read the report and tell us if you know any additional people.

(Witness complies with request.)

A   Jason Najera is a known gang member.  Humberto Ortiz

was a known gang member. Alondo Amaro was a known gang member at the time. And I believe there was a couple more.

Q All right. And do you recall a man by the name of Jose Neave being located at the house?

A I do not recall that, sir.

Q Let me ask you to look at Exhibit 401. Do you know who that is?

A This is Jason Najera.

Q Can we display 401, please. And do you know Mr. Najera's nickname?

A It's been a while since I've dealt with Mr. Najera. I do not recall at this time.

Q But do you recall he is a documented gang member in Dodge City; correct?

A That is correct.

Q What gang do you know him to be a member of?

A Again, it's been several years. Mr. Najera was either a member of the Diablos Viejos gang or the Los Carnales Chingones gang.

Q Sir, if you know -- you said earlier when I asked you to look at 159-B you recognized some names on that sheet as known gang members in Dodge City; is that correct?

A Yes, sir.

Q   All right.  Do you also -- looking at the ledger you have open now to the month of April.  Do you see that?

A   I do.

Q   Do you recognize names or nicknames that are listed on that document as gang members in Dodge City?

A   Yes.

Q   All right.  Starting with the first one, do you know -- do you recognize that name, that nickname?

A   I do not recognize that one, no.

Q   Very good.  Let me --

MR. WELCH:  Your Honor, I will -- we'll call another witness to introduce the shotgun, Judge.

THE COURT:  I don't know -- you may do that; but I'm satisfied that you've laid a foundation for its admission unless, unless defense counsel can convince me otherwise.

MR. WELCH:  I'm sorry, Judge.  I would offer the shotgun.

MR. WACHTEL:  I could try.  If I could voir dire the witness about it, Your Honor.

THE COURT:  You may.

MR. WACHTEL:  Thank you.  Detective, did you find -- did you find that shotgun?

A   Yes, sir.

MR. WACHTEL:  Okay.  Where did you find it?

A   It was in, like -- if you picture an unfinished basement where the walls -- you can see the two by six studs running along the floor and up toward the ceiling. What would create the floor on the other room, there was openings all along in this utility room.  There was no sheet rock on there.  There was a tile that was covering up a hole and that was the only tile that was in that place.  When I removed that tile down, the shotgun was wrapped up inside of, I believe it was a black T-shirt or a piece of cloth, and that's where I pulled it out of.

MR. WACHTEL:  So if I understand you correctly, without regard to all of those names that appear on the exhibit that you were last shown -- the ledger; right?

A   Yes, sir.

MR. WACHTEL:  You didn't find that in the possession of any of those people?

A   No, sir.

MR. WACHTEL:  As you sit here today, do you know who the -- do you know whether that was a rental house or whether it was owned?  Do you know.

A   I do not know, sir.

MR. WACHTEL:  If it was a rental house, do you know who the renters were?

A   I do not know, sir.

MR. WACHTEL:  If the house was subject to mortgage and owned, you do not know who the owners were; is that right?

A   Yes, sir.  I do not know who owned that house.

MR. WACHTEL:  Your Honor, I just don't think there's sufficient foundation to put that gun into this case.

THE COURT:  You have any questions, Mr. Mandelman?

MR. MANDELMAN:  It's -- this gun, just so I'm clear, it was found somewhere in the basement?

A   It was found in the ceiling of the basement, yes.

MR. MANDELMAN:  Was anybody near it at the time you found it?

A   No, sir.  At the time that I was searching for the gun, the SWAT team had already removed all the occupants from the house.

MR. MANDELMAN:  You don't know who owns this place?

A   I do not know who owns this place, sir.

MR. MANDELMAN:  Okay.

THE COURT:  Exhibit 95 is received.

BY MR. WELCH:

Q   At the time you found Exhibit 95, sir, did you check

to see if the weapon was loaded?

A    I did, sir.

Q    And was it loaded?

A    Yes, sir.  There was five rounds in the magazine. There was one round in the chamber.

Q    Sir, I'm now handing you what's been marked Government Exhibit 96.  Can you tell us what that -- what those items are?

A    These are the six shotgun shells that I removed from the shotgun.

Q    Were those placed into evidence at the Dodge City Police Department along with the shotgun?

A    Yes, sir.

          MR. WELCH:  Your Honor, we would offer 96.

          MR. WACHTEL:  I simply would renew my objection as the same applied to the shotgun, Your Honor.

          MR. MANDELMAN:  I join those two objections. 95 and this one.  Has no relevance.

          THE COURT:  96 is received.

BY MR. WELCH:

Q    Finally, Detective -- or, excuse me, Patrolman Thompson, do you recall recovering a set of scales in the basement area of this residence?

A    Yes.  I remember seeing a set of scales.  I didn't

actually collect them.

Q   Why would you make note of a set of scales pursuant to the execution of a search warrant?  Why would that be important?

A   Based on my training and experience, people that have digital scales are involved in illegal distribution of narcotics.

MR. WELCH:  Your Honor, I have no further questions of Mr. Thompson.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   Detective, I think I only have one or two.  Sir, if you can remember, what did the warrant authorize you to search for?

A   The initial warrant, sir, was for the body of the person that had allegedly been kidnapped and being held hostage inside the house.  And weapons, I believe.  And then the warrant was amended after we started searching because we found green leafy vegetation that appeared to be marijuana.  So the warrant was amended for drugs and drug paraphernalia and things of that matter.

Q   And the scale -- you're an experienced law enforcement officer; right?

A   Yes, sir.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Scales are generally associated, at least by law enforcement officers, with, with illicit drugs, illegal drugs; right?

A   Yes, sir.

Q   How come you didn't seize it?

A   I believe the scale was seized, sir.

Q   I'm sorry.  I perhaps misunderstood you.  You do believe it was seized?

A   Yes, sir.

MR. WACHTEL:  Thank you very much.  Have a safe trip back to Dodge City.

A   Thank you.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Just real briefly.  If I could approach.  I just want to take a look at that report that he was looking at.

A   Which report would that be, sir?

Q   The report that Stringer prepared.  Did you not -- did you not prepare a report in this case?

A   I did, sir.  I have two reports in this case.

Q   But it just -- it was -- it was less complete than the report prepared by Officer Stringer?

A   I don't understand the question, sir.

Q   I don't know.  You were referring to this report.

A   Yes, sir.  She did the primary narrative, which would have all the people, all the suspects.  I came in after the fact and my primary mission in this search warrant or in this case was searching for evidence at the crime.  So my report documents what I did at the case or what I did while I was there.

Q   And this -- this residence doesn't belong to my client?

A   Not that I'm aware of, no.

MR. MANDELMAN:  I don't have anything more.

THE COURT:  Yes, sir.

**REDIRECT EXAMINATION**

BY MR. WELCH:

Q   Mr. Thompson, in conversion with Mr. Wachtel, you and he had a discussion about criminal activity that happened prior to your arrival at that location.  You recall that?

A   Yes.

Q   What was it that happened that drew the police department's attention to the house in the first place that day?

A   It was reported to the police department that a man was being held inside the house against his will and had been harmed.

Q   And do you know if -- were people extracted from the house prior to you going to execute the search warrant that day?

A   Yes, sir.  Everybody was extracted from the house prior to my arrival.

Q   Do you know how they were extracted from the house that day?

A   Some of the people walked out on their own and then the SORT team from the Dodge City Police Department executed the warrant and removed the rest of the people from inside the house.

Q   Do you know, sir, whether there was reports of someone being beaten inside the house which lead to --

MR. MANDELMAN:  Objection to --

MR. WACHTEL:  Objection, Your Honor.  I didn't ask about --

MR. WELCH:  He opened the door, Your Honor.

THE COURT:  I agree.

MR. WELCH:  No further questions, Your Honor.

MR. WACHTEL:  Nothing.  Thank you.

THE COURT:  Thank you, Officer Thompson.  Next witness, please.

MR. WELCH:  United States calls Dallas Hornback.

**DALLAS HORNBACK**

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as

follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you please tell us your name.

A   Dallas Hornback.

Q   Mr. Hornback, how are you employed, sir?

A   I'm a farmer now.

Q   How long have you been a farmer?

A   About the last five years.

Q   Prior to farming, how were you employed, sir?

A   Police officer at the Dodge City Police Department.

Q   How long were you with the Dodge City Police

Department?

A   About five years there, too.

Q   Were you employed with the Dodge City Police

Department in January of 2008?

A   Yes.

Q   And what was your title and what were your duties at

that time?

A   At that time, I was a detective.  Investigating

various crimes.

Q   I'd like to direct your attention, if I can, to the

date of January 20th of 2008.  Do you recall that day,
sir?

A    Yes.

Q    Were you working that day?

A    Yes.

Q    Do you recall responding to a report of a fight in
Dodge City that occurred that day?

A    Yes.

Q    What time do you recall, if you recall, what time
did you report to that scene?

A    Mid afternoon, I believe.

Q    And what did you find when you arrived -- where did
you go?

A    I can't remember the exact address.  It was in south
Dodge.  It was a residence of a person I dealt with
before.

Q    Whose residence was it?

A    I believe the individual's name was Felix Delreal
(ph).

Q    You said you had dealt with Mr. Delreal in the past?

A    Yes.

Q    Was Mr. Delreal known to you as a gang member in
Dodge City?

A    Yes.

Q    Do you know what gang Mr. Delreal belonged to or

with?

A    I believe -- I believe it was 18th Street.  He was -- it was a Sureno gang.

Q    And then what caused you to go to Mr. Delreal's residence that day?

A    I believe the call came in that day it was for -- it was -- there was a large group of people or something arguing in the front yard.

Q    When you arrived, what did you find?

A    When I was headed down there, I met a car leaving that area that matched the description of I think a car that was called in that I also knew from dealing with people in that car in the past.

Q    All right.  Now, whose car was that?

A    It was a white Oldsmobile, belonged to Jason Najera's girlfriend.

Q    And was Jason Najera someone that you knew?

A    Yes.

Q    Sir, let me ask you to look at Exhibit 401.  Do you recognize who that is?

A    Yes.

Q    Who is that?

A    Jason Najera.

Q    Was Jason Najera someone that you dealt with while a police officer in Dodge City, Kansas?

A    Yes.

Q    Did you know Mr. Najera to be a gang member?

A    Yes.

Q    What gang was Mr. Najera affiliated with?

A    DV.

Q    Do you know Mr. Najera's nickname?

A    I don't remember what it is.

Q    In addition to Mr. Najera -- did you encounter Mr. Najera that day?

A    Yes.

Q    Where?

A    He was driving the vehicle.

Q    And did you stop the vehicle?

A    I didn't personally.

Q    Was the vehicle stopped at some point?

A    At some point, it was.

Q    Do you know where?

A    It was several blocks away where it was finally stopped.  I don't remember -- on Sunnyside somewhere, I think.

Q    Was it -- was Mr. Najera arrested?

A    Yes.

Q    All right.  Was anyone else located with Mr. Najera?

A    Yes.

Q    Who was that?

A   Gonzalo Ramirez.

Q   And was Gonzalo Ramirez someone known to you prior to January of 2008?

A   Yes.

Q   And did you know Gonzalo Ramirez to be a gang member?

A   Yes.

Q   What gang did you believe Mr. Ramirez belonged to?

A   DV also.

Q   All right.  Do you see Mr. Ramirez in the courtroom today?

A   Yes.

Q   Please point to him.

A   Yes.  He is sitting there.  (Witness indicates.)

Q   What color is his shirt?

A   White shirt.

        MR. WELCH:  Your Honor, I'd ask the record to reflect Mr. Hornback has identified Mr. Ramirez.

A   Yes.

Q   Now, Mr. Hornback, did you have any personal contact with Mr. Ramirez that day?

A   I don't recall if I did.  I did later -- not -- I don't think at the time of the, of the stop, though.

Q   Did you detail any gang information related to Mr. Ramirez on that day?

A    When I went to the jail after the fact to serve him some paperwork.

Q    And as part of your duties with Dodge City Police Department were you responsible for detailing and making notes of gang information that you gathered at various stops and arrests?

A    Yes.

Q    Did you do that that day with relation to Gonzalo Ramirez?

A    Yes, I did.

Q    Did you detail the tattoos that Mr. Ramirez had as of January 20, 2008?

A    Yes.

Q    Do you recall, sir, which tattoos you made note of that Mr. Ramirez had in January of 2008?

A    I know there was a tattoo on the right arm.  I believe it was -- it was what I knew at that time to be a huelga bird and had Norteno above it.  He had X-I -- an X on one wrist and a IV on the other.  And a tattoo on the back of his neck.  I can't remember what exactly it said.

Q    Let me ask you to look at your report to see if it might help refresh your memory as to other tattoos you may have seen on Mr. Ramirez that day.

A    The X-IV on the back of his neck --

MR. WACHTEL:  Objection, Your Honor.  He can refresh his recollection; but he can't read from it.

BY MR. WELCH:

Q   Just read it and tell me after you're done reading it.

A   The X-IV on the back of his neck.

Q   Let me ask you to look at Government Exhibit 53.  Do you recall seeing that tattoo when you encountered Mr. Ramirez in January of 2008?

A   I don't remember that tattoo being on there.

Q   And can we display 53, please.  In the report that you generated, sir, you did not make a note of this tattoo on the left hand of Mr. Ramirez.  Is that your testimony?

A   No, I did not.

Q   Do you believe you would have seen that tattoo if it had been there that day?

A   I believe so.

Q   Do you recall making note of a tattoo on the upper left arm of Mr. Ramirez?

A   I don't.

Q   You don't remember?

A   I don't remember.

MR. WELCH:  Your Honor, I have no further questions of Mr. Hornback.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   I haven't had a chance to cross-examine a farmer in a long time.  Is the drought broken in Dodge City?

A   We're gaining.

Q   That's good.  Thank you very much.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Just real briefly.  Do you know if he had a cast on that day?

A   There was -- there was reports of the cast.  I didn't put it in my report but I -- I do know other officers saying he had a cast on his arm.

Q   That's why you couldn't see the tattoo that was here?

A   That's possible.

Q   Okay.  And you don't know -- you don't know when he got those tattoos?

A   No, I don't.

Q   You're not aware he got them while he was a teenager?

A   I do not know that.

MR. MANDELMAN:  That's all I have.  Thank you.

MR. WELCH:  Nothing further, Judge.

THE COURT:  Thank you, sir.  You're excused.

MR. WELCH:  Your Honor, United States calls Kendra Owens.

**KENDRA OWENS**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Ma'am, would you tell us your name.

A   Kendra Owens.

Q   Ms. Owens, have you lived in Dodge City, Kansas, in the past?

A   Yes, sir.

Q   I need you to get closer to the microphone so we can hear you.

A   Yes, sir.

Q   And do you currently live in Dodge City, Kansas?

A   No, I don't.

Q   How long have you not lived in Dodge City, Kansas?

A   About two years.

Q   Were you born in Dodge City?

A   No, ma'am -- no, sir.

Q   How many years total did you live there?

A   I lived there from the time I was about four years

old to -- on and off, and then I moved away completely whenever I was about 20 years old.

Q   How old are you now?

A   22.

Q   While you lived in Dodge City, did you associate with gang members?

A   Yes, I did.

Q   Which gang or gangs did you associate with in Dodge City?

A   The Nortenos and LCC.

Q   Did you consider yourself an associate, formal associate, of either DV or LCC?

A   At the time, yes.

Q   Both DV and LCC or one or the other?

A   Just DV.

Q   And then what did that mean?  Being associated with DV?

A   I talked to and hung around the gang members.

Q   You hung out with them?

A   Yes.

Q   Did you date some?

A   Yes, I did.

Q   Did you know people in Dodge City who were DV gang members?

A   Yes, sir.

Q   Did you know a man by the name of Pedro Garcia?

A   Yes, sir.

Q   How did you know Pedro Garcia?

A   We dated for about a month, maybe a little bit over, that's all.

Q   When would that have taken place?

A   After my birthday, which was March 6, and before my prom, which was about April 16.

Q   Of what year?

A   2009.

Q   And that would be a period of approximately five weeks?

A   Yes, somewhere around that.

Q   All right.  And you said you dated Mr. Garcia for that period of time?

A   Yes.

Q   How did you first meet him?

A   They were all hanging out at my house I had in Dodge City and I was getting ready to go out on a date and he talked me into going to a party with him and some other gang members instead of going out.

Q   Now, you told us they came to your house.  Who's they?

A   Just some other gang members that were with him.

Q   All right.  You have a sister who is also affiliated

with DV gang; correct?

A   Yes, sir.

Q   Was your sister one of the people that was there that night?

A   Yes.

Q   Along with Mr. Garcia?

A   Yes.

Q   The man that you knew as Pedro Garcia, do you see him in the courtroom today?

A   Yes.  I do.

Q   All right.  Would you please point to him and describe what he is wearing.

A   Wearing the blue shirt.  (Witness indicates.)

MR. WELCH:  Your Honor, I'd ask the record reflect the witness has identified Pedro Garcia.

THE COURT:  It will.

BY MR. WELCH:

Q   Ms. Owens, during the time period that you dated Pedro Garcia, how often would you see him?

A   Every day.

Q   And did you have occasion to go to his home?

A   I stayed at his home the majority of the period.

Q   I'm having a little trouble hearing you.

A   I stayed at his home the majority of the period that I was with him.

Q   So you didn't actually live -- you lived where?

A   I lived at a house on 4th Street but I stayed at his house most of the time, staying overnight and bringing clothes every night.

Q   Do you recall where his house was located?

A   On Avenue D.  I don't know the address, though.

Q   And do you recall ever seeing Mr. Garcia -- do you know whether or not Pedro Garcia trafficked in narcotics?

A   Yes, I do.

Q   And how do you know that?

A   Because at one point in time he tried to show me how to weigh out methamphetamine for distribution.

Q   All right.  Let me stop you there and back up just a little bit.  Were there occasions that you saw Mr. Garcia in possession of drugs?

A   Yes, sir.

Q   All right.  What drugs did you see him in possession of?

A   Methamphetamine.

Q   And where did you see him in possession of methamphetamine?

A   In his room in the basement.

Q   All right.  In the room at the house on Avenue D?

A   Yes.

Q   Did you know him to have any other residence during that time period?

A   No.

Q   And tell us what quantities of methamphetamine do you recall seeing?

A   I only saw small quantities, which would be 20s or 30s, like -- which would be 0.3 or 0.2, just small, small amounts ready to be sold off.

Q   So how could you tell that these amounts of methamphetamine were intended for sale?

A   Because whenever he would have it and he would get it ready to weigh, or he would weigh it out, he would go out of the room and I could hear -- I could hear him having conversations with people that he was selling it to.

Q   Did you actually see packages that were packaged for sale?

A   He was packaging them at the time, yes.

Q   Did you see him do that?

A   Yes.

Q   And earlier you said that he had discussions with you about methamphetamine distribution; is that right?

A   Yes.

Q   Tell us what those conversations were?

A   He just was trying to show me how to weigh it out

and package it just in case somebody had ever came to his house and he was gone and wanted something.  And it never ended up happening but -- and that's why he was showing me how to weigh out methamphetamine.

Q   And so how many times do you recall seeing packages of methamphetamine at his house intended for sale?

A   Two or three times.

Q   Was Mr. Garcia employed while you knew him?

A   No.

Q   And do you recall -- do you know whether there's other DV gang members in this time period in 2009 that were selling methamphetamine?

A   At 2009, no.

Q   Do you know other time periods where DV gang members were selling methamphetamines?

A   Yes, sir.

Q   Who do you know was selling methamphetamine?

A   In 2011, I know Carlos Maestas, Maestas, to sell methamphetamine.  David Ochoa.  And Gloria Sanchez.

Q   Carlos Maestas, is he a gang member?

A   Yes.

Q   What gang does he belong to?

A   The Nortenos.

Q   And David Ochoa, is he a gang member?

A   Yes, sir.

Case 6:12-cr-10089-MLB   Document 996   Filed 03/19/14   Page 89 of 125

1483

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 2405

Q   What gang does he belong to?

A   The Nortenos.

Q   And you said the name of a woman?

A   Gloria Sanchez.  She's, she's an affiliate, or I guess an associate I guess you would say.

Q   And I'm having a little trouble hearing you again.

A   Gloria Sanchez, she would be an associate of the Nortenos.

Q   Do you know David Ochoa, whether or not he had a street name?

A   Little D.

Q   And Carlos Maestas, did he have a street name?

A   C-Mac.

Q   Let's go back to 2009 for just a second.  During the time period that you were living -- or I shouldn't say that.  During the time period that you dated Pedro Garcia, did you go to his house every day?

A   Pretty much, yes, sir.

Q   Did you see him every day?

A   Yes, sir.

Q   During that time period, do you remember seeing him in possession of a firearm?

A   Yes, sir.

Q   What firearm did you see him in possession of?

A   I don't know the make and model; but it was a black

United States District Court, Wichita, Kansas

2405

handgun.

Q   All right.   Where did you see that gun?

A   In his room mostly.

Q   And did you have any discussion with Mr. Garcia about this gun?

A   One day he was leaving outside of the room and he left the gun in the room under my pillow and he told me that if anybody was to come in that didn't need to be in there to just shoot them.

Q   Ma'am, did you or do you know a man by the name of Gonzalo Ramirez?

A   I know of him.   I don't know him personally.

Q   During the time period that you were dating Pedro Garcia, did you see Gonzalo Ramirez?

A   Yes, he came over with his wife a couple times; but I never had any discussions with him.

Q   Do you know if Gonzalo Ramirez distributed any type of drugs?

        MR. MANDELMAN:   Objection.   Lack of firsthand knowledge.

        THE COURT:   Sustained.

BY MR. WELCH:

Q   Ma'am, in addition to Pedro Garcia, in the time period of 2009, you're telling us you didn't know any other gang members that were dealing methamphetamine; is

that your testimony?

A    Not at that time.  Not that I can recall.

Q    All right.  And -- one second.

                    (Off-the-record.)

BY MR. WELCH:

Q    May we display Exhibit 40, please.  Let me raise this so you can see that.  I've asked to display what's been admitted as Government Exhibit 40.  Do you recognize what that is?

A    Yes.  This was a picture taken at a -- at a concert here in Wichita, Kansas, in 2008.

Q    And do you see yourself in that photograph?

A    Yes, sir, I do.

Q    You can actually touch the screen in front of you and it will leave a mark.  Can you do that and indicate where you are.

A    Right here, sir.  (Witness indicates.)

Q    And you said this is a concert that took place in Wichita, Kansas; correct?

A    Yes.

Q    What type of concert was it?

A    It was a Nortenos concert.

Q    What does that mean, a Norteno concert?

A    Norteno gang members that were rappers came up from California and had a concert here at a local skating

rink.

Q   The people in this photograph, do you know some of them?

A   Some of them, yes.

Q   And the persons that you know, where are they from?

A   Dodge City, Kansas.

Q   And the people that you know, do you know them to be DV or LCC gang members?

A   Yes.

Q   Which gang?  Are there people in this photograph that were DV gang members?

A   Yes, sir.

Q   Can you tell us which ones you see in this photograph and their names if you know them.

A   Most of them are.  I mean, I'm not -- I'm not very good with names, sir.

Q   All right.  Are there -- let me ask you this.  Are there any LCC gang members in this photograph?

A   No, sir.

Q   And you are, in this photograph, again, you're in the lower right corner, you are holding up your fingers; is that right?

A   Yes.

Q   What are you doing in that picture?

A   Signifying 14.

Q   And you're also wearing red; is that right?

A   Yes, sir.

Q   And do you see others in this photograph that are also showing gang signs?

A   Yes, sir.

Q   Did you -- was this -- you said that was rap concert; is that right?

A   Yes, sir.

Q   The rap artist that was at the concert, do you remember his name?

A   There was several different ones.

Q   Do you recall the name?

A   Yeah.  It was Big Oso Loco, D'mena (ph) Kicka (ph) and I think Little Goner (ph).  I can't really remember. It was back in 2009.

Q   Do you know where the singers were from?

A   Excuse me.

Q   Do you know where the artists, do you know where they were from?

A   California.

Q   And were they claiming a gang also?

A   The same gang, the Nortenos gang.

        MR. WELCH:  I have no further questions of Ms. Owens, Your Honor.

        THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   Thank you.  Ms. Owens, my name is Val Wachtel.  I represent Pedro Garcia.  Just working backwards.  Can we -- can we put 40 back up, please.  Thanks.  Can you tell us where in Exhibit 40 Mr. Garcia is?

A   I believe he's not in this picture, sir.

Q   Take a close look and make sure that you are right.

A   I don't see Pedro in this picture.

Q   Do you remember testifying before a grand jury?

A   Yes, I do.  Two years ago.

Q   Ma'am?

A   Two years ago, yes, I do.

Q   Do you remember -- you've told us about Mr. Garcia, Pedro, selling drugs when you were with him; right?

A   Yes.

Q   Did you tell that to the grand jury?

A   I don't recall what happened two years ago, sir.

MR. WACHTEL:  Permission, Your Honor.

Q   I'm going to show you a transcript of your testimony before the grand jury which was -- testimony was given on the 10th day of January, 2012.  I've looked to the part in it in which you testified about Mr. Garcia.  It begins on Page 31 at Line 2.  Would you read to yourself that page, Page 32 and about halfway on 33.  Just read

those to yourself.  Tell me when you're done.

(Off-the-record.)

Q    Have you had a chance to look at this?

A    This is the first time I've ever looked at it.

Q    But did you have a chance to read what I asked you to read to yourself?

A    Yes.  I read it a little bit.  I'm not the best at reading; but I did read through it.

Q    Does that -- having worked your way through that, does that refresh your recollection of whether or not you were asked about Mr. Garcia's alleged drug dealing during your testimony before the grand jury?

A    The little bit that I read, I don't recall them asking me in court, but --

Q    And you don't recall testifying about it; right?

A    No, sir.

Q    Thank you.  When did you first tell anybody in law enforcement, anybody, or any attorneys, about your knowledge of Mr. Garcia's alleged drug dealing?  Do you remember when you first talked about that?

A    No, I don't remember.

Q    Was it before, if you can recall, was it before you spoke to the grand jury?

A    I don't recall when it came up, sir.

Q    Do you recall who you told it to?

A    If I told it to anybody, I would have told it to the attorneys.

Q    To one of the prosecuting attorneys?

A    Yes, sir.

Q    Have you ever seen -- this is Mr. Smith right here. Have you ever seen him before today?

A    I'm not sure.  I have a very bad memory, sir.

Q    You know, so do I, and I'm a heck of a lot older than you are.  So let me ask you one last question --

A    Yes.

Q    Okay.  The rappers from California, were they any good?

A    Yeah, they are.

Q    Were they?

MR. WACHTEL:  Thank you very much.  I don't have any further questions.

THE COURT:  Yes, sir.  Any questions?

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q    Just real briefly.  Are you aware of a gentleman by the name of Juan Torres?

A    Juan Torres?  Yes, I am.

Q    Are you aware of an incident in which Mr. Torres had a gun?

MR. WELCH:  I'll object as being beyond the

scope of direct, Your Honor.

THE COURT:  Sustained.

MR. MANDELMAN:  That's all I have.  Thanks.

THE COURT:  Thank you, Ms. Owens.  You're excused.  Next witness, please.

MR. SMITH:  Your Honor, do you want to take an afternoon recess?  Or we can start with the next witness.  It would be Mr. Tierney.

THE COURT:  It's 3:30.  Would you all like to take a recess?  We'll take a short recess.  About 10 minutes this time.  We're going to go until 4:30.

(Recess.)

MR. SMITH:  United States calls Special Agent Neal Tierney.

THE COURT:  You're still under oath, of course.

**NEAL TIERNEY**

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Good afternoon, sir.

A   Good afternoon.

Q   How are you?

A   Very well.

Q   Excellent.  So after your testimony this morning, did you conclude writing some reports on interstate nexus?

A   Yes, sir, I did.

Q   And conduct some investigations on further firearms?

A   Yes, sir.

Q   And were those firearms -- or were those examinations in relation to conducting interstate nexus examinations?

A   Yes, they were.

Q   Agent, I'm handing you -- or I have handed you what was marked as Government Exhibit 162.  Is that correct?

A   Yes, sir.

Q   Did you conduct an examination of Government Exhibit 162?

A   Yes, sir, I did.

Q   What is Government Exhibit 162?

A   Government Exhibit 162 has been previously identified as ATF Exhibit 583.  The Government's exhibit 162 is a semiautomatic pistol.  It is a pistol manufactured by Jiminez Arms, Model JA9.  It's a 9 mm caliber semiautomatic pistol.  And it bears an obliterated serial number.  Serial number on this firearm is located right here and it's been scratched

and rubbed out.

Q   Despite the obliteration of the serial number on that Jiminez Arms 9 mm handgun, were you able to conduct an examination to determine what nexus it had to interstate commerce?

A   Yes, sir.

Q   And have you sufficient information to form an opinion as to whether that firearm was manufactured or where that firearm was manufactured?

A   Yes, sir.

Q   And what is your opinion?

A   Jiminez Arms manufactured this firearm in the state of Nevada.

Q   Now, for that firearm to have been found in Kansas, Special Agent Tierney, have you been able to form an opinion as to whether that firearm traveled in interstate commerce?

A   The firearm, having been made in the state of Nevada, and then recovered in the state of Kansas, has caused that it traveled in interstate commerce to be recovered in Kansas.

Q   Thank you.  Agent, I've handed you what's been marked as Government Exhibit 95; is that correct?

A   Yes, sir.

Q   Do you recognize what Government Exhibit 95 is?

A   Yes, I do.

Q   And what is that?

A   Government Exhibit 95 has been previously identified as ATF Exhibit 584.  I examined this firearm.  This firearm is identified as a Mossberg Model 500A, 12-gauge pump shotgun, bearing serial number F 268456.

Q   In your examination, did you have sufficient information to form an opinion as to where that shotgun was manufactured?

A   Yes, sir.

Q   And what is your opinion?

A   Mossberg OF & Sons Incorporated manufactured this firearm in the state of Connecticut.

Q   Have you formed an opinion as to whether that shotgun traveled in interstate or foreign commerce if it were to have been found in Dodge City, Kansas?

A   Yes, sir.

Q   And your opinion is what?

A   For the firearm to be manufactured in the state of Connecticut and recovered in Kansas, firearm traveled in interstate commerce.

Q   Thank you.

    I've handed you what's been marked as Government Exhibit 96; is that correct?

A   Yes, sir.

Q   And you've removed the contents of Government Exhibit 96; is that right?

A   Yes, sir, I have.

Q   What are Government Exhibit 96?

A   Government Exhibit 96 has been previously marked as ATF Exhibit 585.  I conducted ammunition and interstate nexus on these six cartridges.  The four that are red are all the same.  The two that are green are both the same, both the same cartridge.

Q   What are the red cartridges?

A   The red cartridges are marked on the head stamp of the actual cartridge case itself with Western Super X, number 12, made in USA.  That's a lot of writing on there; but, again, it's the larger cartridge.  Western Super X is a brand name for Winchester.  And these cartridges were manufactured by Winchester in the state of Illinois.

Q   And is that your opinion?

A   Yes.

Q   After doing the examination?

A   Yes.

Q   And what about what was identified as ATF Exhibit 585-B?

A   585-B are the two green cartridges.  They have the markings on the head stamp, says Remington Express 12ga,

which is short for gauge. Center fire primers. Green plastic hull. It further has the markings on the outside of the husk, has Remington Express Mag, four and a quarter, one five-eighths, two, and then three-inch. So the manufacturer is telling the user of this particular cartridge that it is only to be placed in a three-inch or larger chamber for a 12 gauge.

Q And were you able to form an opinion as to what the place of manufacture of those two shells?

A Yes. The company Remington made those cartridges in either the state of Connecticut or the state of Arkansas. Their production began in Connecticut and it now rests in Arkansas.

Q Do you have an opinion if those six cartridges were found in the state of Kansas as to whether they traveled in interstate or foreign commerce?

A Yes, sir.

Q And what is that opinion?

A For those cartridges to be recovered in the state of Kansas, having been made in either Arkansas or Connecticut, they traveled in interstate commerce.

Q Can we repackage those please.

(Witness complies with request.)

Q Agent Tierney, did you further do interstate nexus examinations on what would be identified as a Norinco

model SKS?

A    Yes, sir.

Q    And what ATF exhibit number would that be?

A    ATF Exhibit number 11.

Q    Please identify the Norinco model SKS that you did the examination on?

A    This firearm was examined.  I wrote down all of the information that was produced on the firearm.  It states and is written on there, Norinco, N-O-R-I-N-C-O.  It says model SKS.  The caliber is 7.62 by 39.  And then I identified it as the firearm is a semiautomatic rifle, which means single trigger pull, cycles another round, is ready to fire again with another trigger pull.  That firearm bears the serial number 24004675 K.  And then it further bears import markings on the weapon as well and it says made in China, Poly, USA, G-A for Georgia.

Q    And during your examination, did you -- do you have sufficient information to determine the place of manufacture of that firearm?

A    Yes, sir, I do.

Q    And what is your opinion?

A    My opinion is it is made by Norinco.  Norinco is a series of approximately 100 plants in the country of China that make the firearms for China.  It is made in China.  This firearm was then imported into the United

States by a company called Poly USA, and that is located in the state of Georgia.

MR. WACHTEL:  Your Honor, I, I object.  The firearm that he's talking about having examined and moved through interstate commerce is not even an exhibit in this case; therefore, his opinion on that firearm is not relevant to the proceedings in this case.

THE COURT:  Well, you can cross-examine him about it.  But there's been testimony in the case about an SKS firearm.  And I don't know that -- unless you can provide me with some pretty good authority, he's, I think we all agree, but it's up to the jury, qualified as an expert.  Experts can testify about matters that are not in evidence.  We all know that.  So if it's not in evidence, that's a matter for the jury to consider the weight of his testimony.  The objection is overruled.

MR. MANDELMAN:  I'll just want to join in the objection for the record.

THE COURT:  Your objection is overruled, too, for the same reason.

BY MR. SMITH:

Q   Agent Tierney, if that firearm were found in Kansas, Dodge City, Kansas, do you have an opinion as to whether that firearm traveled in or effected interstate or

foreign commerce?

A   Yes, sir, I do.

Q   And what is that opinion?

A   That it in fact effected both.  It's manufactured in China --

MR. HENRY:  Your Honor, whether an effect on interstate commerce --

THE COURT:  Is this going to be your witness that you cross-examine, Mr. Henry?  Or is it going to be Mr. Mandelman's?  We're not double-teaming people here.

MR. HENRY:  I understand; but -- but the question this time was regarding an effect on commerce --

THE COURT:  I said we're not double-teaming people here.

MR. SMITH:  I'll rephrase the question if I inartfully asked the question.

BY MR. SMITH:

Q   Agent Tierney, if that firearm were found in Kansas, Dodge City, Kansas, do you have an opinion as to whether that firearm traveled in interstate or foreign commerce?

A   Yes.

Q   And what is your opinion?

A   If the firearm were recovered in the state of Kansas, it effected interstate commerce and it was

imported to the United States through Georgia; and then it also would have -- it would have effected foreign commerce by being manufactured in the --

Q   You mean traveled in?

A   Traveled in.  Excuse me.

MR. MANDELMAN:  Again, Your Honor, I'd object. His testimony is limited to whether or not the weapon traveled in interstate commerce, not as to its effect on interstate commerce.

THE COURT:  It will be up to the jury to decide that I think.  But his testimony about it moving in interstate commerce and foreign commerce, in the case of the SKS, the jury may consider that.

BY MR. SMITH:

Q   Agent Tierney, did you also during the course of this investigation examine a Smith & Wesson .40 caliber semiautomatic pistol?

A   Yes, sir, I did.

Q   Is that pistol -- does it happen to be identified by ATF Exhibit number 13?

A   Yes.

Q   Please identify for the jury what that firearm was?

A   I examined this firearm.  This firearm was identified by the markings Smith & Wesson.  It states model SW 40 VE.  It states that it is a .40 caliber

Smith & Wesson semiautomatic pistol.  And then the firearm -- serial number on this weapon is also obliterated.

Q   During your examination, do you have information to determine the place of manufacture of that Smith & Wesson?

A   Yes, sir, I do.

Q   Do you have an opinion as to the place of manufacture of that firearm?

A   Yes, I do.

Q   And what is the place of manufacture of that firearm?

A   This is a firearm that Smith & Wesson actually farms out the manufacture of the frame or receiver.  The company that manufactured the frame of this firearm is Phillips Plastics.  They made the frame of this firearm in the state of Wisconsin.  Then under contract for Smith & Wesson, that frame is shipped to them in the state of Massachusetts where they assemble it into a functional firearm.

Q   And, Agent, if this firearm were found in the state of Kansas, do you have an opinion as to whether it traveled in interstate commerce?

A   Yes, sir.

Q   And what is your opinion?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

2423

A   If the firearm is recovered in the state of Kansas, having been initially assembled in Massachusetts and made into a firearm frame in Wisconsin, that effects interstate commerce.

MR. WACHTEL:  Objection about the effect.  I don't mind travel.

MR. MANDELMAN:  I -- again --

THE COURT:  Yes.  Same ruling.

BY MR. SMITH:

Q   And finally, Agent Tierney, did you have an opportunity during the course of this case to examine a Springfield Armory Model 1911-A 145 caliber semiautomatic pistol?

A   Yes, sir.

Q   Please identify that for the jury.

A   The Springfield Armory pistol is identified by ATF Exhibit 301.  It states Springfield Armory, Model 1911-A1.  It is .45 caliber semiautomatic pistol.  It bears serial number NM 47727.

Q   During your examination, were you able to form an opinion as to the place of manufacture of that Springfield Armory firearm?

A   Yes, sir, I did.

Q   What is your opinion?

A   Springfield Armory manufactured ATF Exhibit 301 in

the state of Illinois.

Q For that firearm to have been found in Kansas, do you have an opinion as to whether it traveled in interstate commerce?

A Yes, sir.

Q And what is your opinion?

A For the firearm to be recovered in Kansas, having been made in Illinois, the firearm traveled in interstate commerce.

MR. SMITH: Nothing further.

THE COURT: Yes.

MR. WACHTEL: Oh, Your Honor, I -- I don't have any questions.

MR. MANDELMAN: Thank you, Judge. I have nothing.

THE COURT: Thank you very much, again, Agent Tierney. You're excused. Can he be excused now?

MR. SMITH: Yes, Your Honor.

THE COURT: You're through with him?

MR. SMITH: We must be. I think he's going on vacation.

THE COURT: Next witness, please.

MR. WELCH: Your Honor, United States recalls Craig Mellecker.

THE COURT: Chief, you're still under oath.

A    Yes, sir.

## CRAIG MELLECKER

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

## DIRECT EXAMINATION

BY MR. WELCH:

Q    Sir, for the record, you're the same Craig Mellecker who testified earlier in this trial; is that right?

A    Yes, I am.

Q    Now, you told us that you're currently the chief in Dodge City; is that right?

A    That is correct.

Q    In 2004, were you employed with the Dodge City Police Department?

A    Yes, I was.

Q    What was your rank with the police department in 2004?

A    I was a lieutenant assigned to the detective bureau.

Q    On the date of March 11, 2004, did you participate in an investigation that took place at 1302 Avenue D in Dodge City?

A    Yes, sir, I did.

Q    What caused you to go to that location on that day?

A    We were serving a search warrant for narcotics

activity at that address.

Q   And on that date, March 11, 2004, did you know a man by the name of Pedro Garcia?

A   Yes, I did.

Q   And did you know 1302 Avenue D to be the residence of Pedro Garcia on March 11, 2004?

A   Yes, I did.

Q   As a result of the investigation that you participated in at that location on March 11, 2004, do you know if Pedro Garcia was charged with any criminal activity?

MR. WACHTEL:  Actually, Your Honor, I object. This case -- the relevant time period in this case is 2008 to 2012 I think.  And this is -- we're talking 2004.  It's the same objection I made about other testimony in this case.  It is remote and not relevant.

MR. WELCH:  Your Honor, you've already -- this is the subject of a previous ruling.  You admitted this -- you've told us that you would admit this evidence.  Also, this is a racketeering predicate.

THE COURT:  Well, why don't you come up and remind me of what I ruled.  I've made a lot of rulings in this case over a long period of time.

(Thereupon, the following

proceedings were had at the

bench by Court and Counsel

outside the hearing of the

jury.)

MR. WELCH:  Your Honor, it's the enterprise notice that we talked about.

MR. SMITH:  Within the 404(b) enterprise and RICO predicate notice that we gave and you made rulings on each of the specific acts.  This was one of the RICO predicates where Pedro Garcia --

THE COURT:  Have I made that --

MR. WACHTEL:  Your Honor, I think that --

THE COURT:  I don't have my notebook up here.

MR. WACHTEL:  I may know, Your Honor.  I believe that you did; but I, in retrospect, I'm simply renewing that motion because I think this is that remote.

THE COURT:  All right.  You've made your record.  Your objection is overruled.

MR. MANDELMAN:  Let me just join on 401, 404(b) and 403.  We have some similar -- this kind of stuff coming in for Mr. Ramirez.

THE COURT:  Have I already covered it in a previous ruling?

MR. MANDELMAN:  I believe so, Your Honor.

THE COURT:  Well, then your objection is noted

and overruled for the reasons previously stated.

MR. MANDELMAN:  Thanks.

(Thereupon, the following

proceedings continued in the

hearing of the jury.)

BY MR. WELCH:

Q   Mr. Mellecker, my question to you was:  As a result of the investigation that was conducted on March 11, 2004, at the address of 1302 Avenue D in Dodge City, Kansas, was Pedro Garcia charged with criminal activity?

A   Yes, he was.

Q   And do you know whether or not he was convicted of criminal activity stemming from the investigation that occurred on March 11, 2004?

A   Yes.  He was convicted of possession with intent to sell methamphetamine.

Q   Let me ask you to look at Government Exhibit 5, sir. Do you recognize what Exhibit 5 is?

A   It's a Kansas Sentencing Guideline Journal Entry of Judgment.

Q   And is it the judgment from this case reflecting the conviction of Pedro Garcia for possession of -- with intent to distribute methamphetamine?

A   Yes, it is.

MR. WELCH:  Your Honor, we would offer Exhibit

5.

MR. WACHTEL:  To which I object, Your Honor.
I do not believe that Exhibit 5 is a -- at least the
copy I have, does not appear to be certified
according -- it's not offered by anybody from that court
system and it's hearsay.

(Off-the-record record

discussion between Mr. Welch and

Mr. Wachtel.)

MR. WACHTEL:  If I'm mistaken, Your Honor, I
apologize.

(Off-the-record.)

MR. WACHTEL:  I apologize, Your Honor.
Withdraw my objection.

THE COURT:  5 is received.

MR. WELCH:  Nothing further, Your Honor.

MR. WACHTEL:  No questions, Your Honor.

THE COURT:  Thank you, Chief.  You're excused.
Next witness, please.

MR. SMITH:  Your Honor, the United States
calls Lt. Colleen Brooks-Francis.

**COLLEEN BROOKS-FRANCIS**

Having been first duly sworn to tell the truth, the
whole truth and nothing but the truth, testified as
follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Please tell us your name.

A   Colleen Brooks-Francis.

Q   What is it you do for a living?

A   I'm a lieutenant at the Dodge City Police Department.

Q   And prior to be being a lieutenant with the Dodge City Police Department, how long had you worked with the Dodge City Police Department?

A   I've been there 11 years.

Q   Now, were you working for the Dodge City Police Department in the year 2009?

A   Yes, I was.

Q   And did you have the same job duties?

A   No, not that I have now.

Q   And what were your job duties in 2009?

A   I was a sergeant assigned to the patrol division.

Q   During 2009, were you familiar with a person identified as Pedro Garcia?

A   Yes.

Q   And did you become familiar with a case in which he was charged with a codefendant Antonio Flores?

A   Yes.

Q   What was -- just briefly, what was the nature of

that case?

A   It was November 6, 2009.  And during that case, what happened is that Pedro Garcia and Antonio Flores went to East Love's, which is a gas station in Dodge City, and Pedro ended up pointing a gun at a witness in another case which I was also involved in.

Q   So then, just briefly, what was the other case that you were involved in?

A   That was from September 13th, 2009, and in that case Lorenzo Morales, III, who is an LCC gang member, ended up shooting at Hugo Fernandez, Sr, in the face.

Q   Hugo Fernandez, Sr?

A   Right.  And he was the father of the victim in the case at East Love's.

Q   Again, the case at East Love's involved Pedro Garcia; is that correct?

A   Yes.  And Antonio Flores.

Q   Let's look at Government Exhibit 386.  You can look down at that screen.  Do you recognize the person in Government Exhibit 386?

A   Yes.  That's Antonio Flores.

Q   And do you know if Antonio Flores is a gang member?

A   Yes, he is.

Q   And what gang is Antonio Flores a member of?

A   LCC.

Q   And you can go ahead and push the screen back down. Thank you.  And do you know if Pedro Garcia is a gang member?

A   Yes, he is.

Q   And what gang is he a member of?

A   DV.

Q   Subsequent to this occurring in -- did you say November of 2009?

A   The incident at East Love's, yes, was November 6, '09.

Q   And Pedro Garcia had possession of what type of firearm?

A   It was a 12 gauge shotgun, a Mossberg.

Q   Was that case referred for prosecution anywhere?

A   Yes.  It was referred to the federal system.

Q   And was that case charged in the federal system?

A   Yes, it was.

Q   Do you know if that case resulted in a conviction?

A   Yes.

Q   And resulted in a conviction for whom?

A   For Pedro Garcia and Antonio Flores for felon in possession of a firearm.

Q   Is there a third case that's related to this series of events?

A   Yes, there is.

Q   What did that third case involve?

A   In -- it was May 1st, 2010, another member of the Fernandez family, the victim family, Hugo Fernandez, Jr, was at a party and he ran into Joe Galindo, who is a DV gang member, and Joe ended up telling Hugo that --

MR. MANDELMAN:  Judge, I'm going to object on hearsay.

THE COURT:  Sustained.

BY MR. SMITH:

Q   Do you know that -- was there a prosecution that stemmed from any contact with Joe Galindo and Hugo Fernandez, Jr?

A   Yes.

Q   And where was that prosecution referred to?

A   To the federal system.

Q   Do you know what happened to that prosecution?

A   No.  I know what Joe was originally charged with.

Q   And what was Joe originally charged with?

A   Tampering with a witness.

MR. SMITH:  Nothing further.

THE COURT:  Yes.

MR. WACHTEL:  Thank you.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q   The Mossberg shotgun that you have told us that

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Mr. Garcia -- I'm sorry. I'm Val Wachtel. The Mossberg shotgun that you told us that Mr. Garcia had --

A   Yes.

Q   -- did you bring that with you to the courthouse today?

A   No. It's in the possession of the ATF.

Q   It is?

A   Yes.

Q   If I -- let me just show you something if I may. Permission, Your Honor?

THE COURT:  Yes.

MR. WACHTEL:  Thank you.

Q   This is Exhibit 95. I don't know if you're familiar with the shotgun that Mr. Garcia had on that day or not. Is this it?

A   No.

MR. WACHTEL:  Thank you very much.

MR. WACHTEL:  That's all, Your Honor. That's all, ma'am. No further questions.

THE COURT:  Yes, sir.

MR. MANDELMAN:  Your Honor, I don't have any questions for this witness.

THE COURT:  Thank you, Lieutenant. You're excused. Next witness.

MR. WELCH:  Your Honor, may we approach?

THE COURT:  Oh, yeah.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

MR. WELCH:  I apologize, but our next witness I expect to be David Ochoa, and I told the marshals that they could take Mr. Ochoa back because I didn't think we would get to him.

THE COURT:  Not a problem.  I want to talk to you about David Ochoa anyway, but out of the presence of the jury.

(Thereupon, the following proceedings continued in the hearing of the jury.)

THE COURT:  Well, I promised you 4:30, but I'm going to let you go at 4.  I don't see any tears.  As you know, Monday is a holiday.  So I'll see you all at 9:00 on Tuesday morning.  And I think we're pretty much on schedule as to what I told you earlier today.  So have a good weekend.  Remember and heed the admonition.

(Jury excused for the weekend at 4:05 p.m.)

THE COURT:  Please be seated.  Tim or Joel,

what, if anything, have you concluded about your position on what's his name, Ochoa?

MR. MANDELMAN:  I did -- I just had -- I don't want to -- I just looked at those cases briefly, Your Honor, during lunch.  It looked to me like the court did not find a Sixth Amendment problem with the representation.  I guess we would still have a concern as far as just legal ethics as far as our duty to -- whether there's a constitutional issue or not, there still may be a professional issue with cross-examining someone as far as loyalty and confidentiality.  Obviously, I don't -- two things.  I don't think the fact that Mr. Wertz is in a different office has any real material effect.  He worked in our -- the same agency so the fact that --

THE COURT:  Well, that's not what that one case says.

MR. MANDELMAN:  Well, I -- the Texas case where they said different public defender, but I don't think that's the Kansas ethics rules about as to whether or not somebody is in a different, different office.

THE COURT:  Probably not.  But I don't know.

MR. MANDELMAN:  Yeah, so, I mean, we, we still have that concern.  And then, I guess, I have the broader concern about Mr. Ochoa's testimony.  He hasn't

had any contact with Mr. Ramirez since 2004.  We're going to get some deep background about drug dealing in Dodge City that doesn't have anything to do with Mr. Ramirez.  But it's gonna be -- I don't -- its relevance to the case --

THE COURT:  Ochoa plead guilty before Marten, didn't he?

MR. WELCH:  He has, Judge, yes.

THE COURT:  And what was the charge?

MR. WELCH:  Methamphetamine.  Possession with intent to distribute methamphetamine.

THE COURT:  But it certainly didn't have -- didn't have anything to do with this case.

MR. WELCH:  Well, he's, he's a DV gang member, Judge, and has been for many, many years.

THE COURT:  Well, I'm beginning to wonder if there's anybody in Dodge City who isn't a DV gang member.  But here's my point.  Was there another case that he had --

MR. WELCH:  Yes.  2006, I believe it is, Judge, he was convicted in Topeka for methamphetamine.

THE COURT:  Federal court?

MR. WELCH:  Yes, sir.

THE COURT:  Now, I assume that neither you or Tim have talked with Ron Wertz about his representation

of Ochoa.

MR. MANDELMAN:  That's correct, Your Honor, I have not.

THE COURT:  Well, let's do this.  I hate to keep delaying these things.  But I don't want to inject error into this case.  I'm just sitting here trying to think how Joel cross-examining Ochoa about matters not involved, at least directly involved in this case, other than the fact that he's a DV gang member and probably knows Mr. Ramirez, could somehow compromise -- it certainly wouldn't compromise Ochoa in any way.  He's -- the only issue in this case would be if it somehow compromised Mr. Ramirez.  I don't know about -- you can -- if you want the weekend -- it's hard to -- for me to see it without hearing the testimony.  But I don't want to have a proffer type of thing.  If you want to look at the Kansas ethics rules over the weekend and see if you can identify something in there that might or might not --

MR. MANDELMAN:  I appreciate it.  We'll kind of mull this over.  It is a little tangled I think.

THE COURT:  Yeah.  Is Ochoa going to testify about Mr. Garcia in any way?

MR. WELCH:  Your Honor, I think he will touch on both Pedro Garcia and Gonzalo Ramirez.

THE COURT: Well, this issue would not involve Mr. Garcia.

MR. WELCH: I don't believe so, Judge.

MR. WACHTEL: I don't think it does either, Your Honor.

THE COURT: Why don't you take a look, Joel, and see if you can find something. I mean, I think basically we've had a pretty clean trial so far and I don't want to stick something in it that in some -- well, I don't know of any law clerk smarter than Rachael, but -- on the Tenth Circuit, that might see it as a problem.

All right. 9:00. Now, we have my instructions but I want you to know that I haven't gone over these. Obviously, Rachael has put them together. But I wanted you to have them over the weekend so that you could look at them. But I haven't had an opportunity to look at them yet so they're pretty rough but --

MR. SMITH: Your Honor, Cindy has informed me, she's probably informed Mr. Henry, that she already had that transcript.

THE COURT: Yeah. She's already given it to him, I think. I don't know what he is going to do with it --

MR. SMITH: That's something that maybe we

need to take up early Tuesday.

THE COURT:  Well --

MR. SMITH:  Or at some point outside the presence of the jury.

THE COURT:  Well, yeah, if he is going to call you as a witness, I suppose maybe we should.

MR. SMITH:  I hope so.

(Recessed for the weekend at 4:10 p.m.)

(Beginning at 9:05 a.m. October 15, 2013, the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT:  Well, before we bring out the jury, I'll hear anything, briefly, that anybody wants to say about this Ochoa situation.

MR. MANDELMAN:  Your Honor, thanks.  I filed just a short motion kind of summarizing my --

THE COURT:  It was very helpful.

MR. MANDELMAN:  -- my concerns and, you know, relevance, this being sort of the primary issue here; but also 403.  We're going to be hearing about drug dealing that I believe wasn't -- is not the subject, not the subject of this case and that involved a conspiracy here that wasn't charged.  And then to the extent that it does involve my client, I'm concerned it's going back in a period of time when our office did in fact represent him.

THE COURT:  What is this guy going to say?

MR. WELCH:  Your Honor, David Ochoa will say that he was a member of the Diablos Viejos and that he sold methamphetamine during the period of time charged in the Indictment.  Fabian Neave has already testified, Judge, on Friday.  Fabian Neave testified that one of

his sources was David Ochoa.  As the Court knows, the first element of Count 1 that we have to prove is that there was an enterprise that effected interstate commerce through a pattern of racketeering activity.  We believe David Ochoa will help establish further that there was a pattern of racketeering activity, in this case, distribution of narcotics --

THE COURT:  Don't you have enough evidence at this point to establish a pattern of racketeering?

MR. WELCH:  Judge, that's up to the jury to decide if we have enough.  I don't know if we have enough so I don't feel comfortable saying we do.

THE COURT:  And those sales occurred in 2004?

MR. WELCH:  Some did, Judge; but others occurred during the period of 2010 and 2011, which is --

THE COURT:  And they occurred in Kansas?

MR. WELCH:  Yes, sir.

THE COURT:  Not in California to Kansas or -- whatever.

MR. WELCH:  Well, his distribution would be to DV and LCC gang members in Dodge City, Kansas.

THE COURT:  Is he going to say he got the drugs in California?

MR. WELCH:  No, he's not; but he'll say the drugs he sold were not produced in Kansas.

THE COURT: I think this is cumulative and I won't allow him to testify.

MR. WELCH: Your Honor, if I may. We also -- we gave notice to Mr. Ochoa as an unindicted co-conspirator in this case. We gave discovery as to Mr. Ochoa. I think what's really happening here, this is a ploy by the defense by using this possible conflict, which can be waived by Mr. Ramirez --

THE COURT: I don't think that even Mr. Mandelman is very convinced in his own mind that there's a conflict. You know, I don't remember when Wertz represented Ochoa; but Mr. Mandelman has not suggested that he has gained information about Ochoa through Ron Wertz, who's now retired. And Mr. Mandelman wasn't even in the Public Defender's Office when all of that occurred. Tim Henry is over there and he hasn't said he's gotten any information. I don't really think there's a conflict. I think it's cumulative.

MR. WELCH: Well, Your Honor, obviously, one of our principal racketeering acts in this case is distribution of narcotics. We believe another Diablos Viejos gang member who will testify that he was trafficking in narcotics to other DV and LCC gang members is highly relevant.

THE COURT: It's cumulative. He won't be

allowed to testify.  When we bring out the jury, bring on your next witness.

MR. SMITH:  Your Honor, I think there was a couple of other motions pending.  Mr. Henry had a motion about a transcript.

THE COURT:  He's already got it.  Right?

MR. SMITH:  Is he pursuing that?

MR. HENRY:  Yes, Your Honor.  We are asking that we be allowed to use the Government's admission as party opponent in any of the -- all but the last one of the 801(d)2.  I think 1, 2, 3 and 4 are possible grounds for the admission of the testimony of Mr. Smith regarding Erik Sanchez being involved in the drive-by shooting.

THE COURT:  I've never seen -- I saw it that you got the transcript.  I've never read the transcript. I don't know what you're talking about.

MR. HENRY:  Your Honor, the Page 9 of the transcript, Mr. Smith is testifying, he says:  Now, the police department also gained information -- this is a question from Mr. Welch.  Did the police department gain information in the events that occurred on October 4, 2008, there was a juvenile in addition to the defendant that had some involvement in that crime?  Yes.  Their investigation revealed that there would have been

another juvenile involved in the October 4, 2008, shooting.  What is his name?  His name is Erik Sanchez.  And Erik Sanchez is not charged in the Indictment, was he?  He was not charged.

So it is my position that that is an admission by a party opponent that can be admitted in this case for the purposes of the jury.  We can just carve out that on a separate document and ask that the Court have that admitted and marked as an exhibit.

THE COURT:  What's the purpose of that, Tim?

MR. HENRY:  Your Honor, the purpose is is that there has been a change in testimony from one of the Government's key witnesses regarding the drive-by shooting.  That is, Marriet Gonzalez testified back in 2011 that Erik Sanchez was in the car when the drive-by shooting occurred.  She has since changed her testimony based upon some comment that was made in preparation for her testimony this past summer.  She said it happened approximately three months ago.  We were not made aware of this change in testimony, this exculpatory evidence, until such time as right before she went on the witness stand.  And so we did not, I think, anticipate that she would be changing her testimony until that morning.  And so the bottom line is is that this is contrary to the Government's case based upon the evidence they presented

in trial here.  It is an admission by them.  It is unusual for the Government to actually take the witness stand and testify in a matter; but they did so in this case.  And they can go ahead and try to explain it away to the jury; but I think it is an admission that is allowed under the rules of evidence and is not hearsay.

MR. SMITH:  Your Honor, the statements that were made -- the information that was gathered from the Dodge City Police Department of which I testified parroting the information that the Dodge City Police Department --

THE COURT:  Where did you testify?

MR. SMITH:  I testified here in Juan Torres' Motion to Dismiss for Pre-Indictment Delay.  Your Honor had a hearing, and that information --

THE COURT:  I'm supposed to remember any of this?  When did that happen?

MR. HENRY:  February 13th, I believe, Your Honor.

THE COURT:  Oh, my goodness.

MR. SMITH:  And that information about the involvement of another juvenile, Erik Sanchez, was information garnered directly from law enforcement or from Marriet Gonzalez.  Now, did Marriet Gonzalez give an inconsistent statement?  Yes.  But she's been

confronted on the stand with extrinsic evidence of her prior inconsistent statement.  Any testimony by me parroting the information that came from her is irrelevant and prejudicial under Rule 403.  I would argue further, placing me on the stand or taking a statement from me then creates another one of these ethical issues that I believe would disqualify me from further participation in this trial.  We would ask for a one week continuance to try to get another attorney up --

THE COURT:  I wouldn't give you a one minute continuance.  This case is gonna be over within the next couple of days.

MR. SMITH:  It should.  I agree.

MR. HENRY:  Your Honor, there's also a document that the Government filed.  It appears to be filed on February 19th.  February 4th of 2013 was the hearing.  February 19th of 2013 is filing by the Government, United States' Disclosure of Known Unindicted Co-conspirators and -- with regard to Counts 10 through 13.  They named Erik Sanchez as an unindicted co-conspirator.

THE COURT:  Well, let me put it this way.  If I were to allow Mr. Smith to be called as a witness, that wouldn't be right now, obviously.  That wouldn't be

until the defense case.  The defense case is quite a ways away at this point, maybe a day.  I've got to say that if anybody on the jury believes much, if anything, about what Marriet has to say, I want to talk to them about some beach front property I have up in Wyoming. If they're that stupid to believe what that witness said.  But, be that as it may, I'm not going to make a decision about this now because I've read cases before about the dangers of calling attorneys in a trial.  And I think that just, under the circumstances, probably I'm not going to allow it to happen because I think it's a very minor point.

MR. HENRY:  Your Honor, I don't know --

THE COURT:  Rule 403 situation --

MR. HENRY:  I'm not for sure if just -- this document that the Government filed that Erik Sanchez was an unindicted co-conspirator on Counts 10 through 13, it says enough to the jury if this document was simply admitted as the admission; but I would certainly want to be able to use this to be able to argue it if in fact we didn't actually carve out the testimony of Mr. Smith.

THE COURT:  Well, I don't know about that either.  Here again, I don't think any of that's going to make any difference.  I don't see how that would destroy Marriet's credibility any more than she's

already self-destructed her own credibility.  Anyway, what else?  Come on, it's 9:15.  What else have we got?

MR. SMITH:  I believe that's the last motion that's pending.

THE COURT:  Okay.  Who's the next witness?

MR. WELCH:  Joe Rodriguez, Your Honor.

THE COURT:  Who's he?

MR. WELCH:  Person that sold the gun to Gonzalo Ramirez.

THE COURT:  Good enough.  That's fair enough. Let's get the jury out here.

(Jury enters the courtroom.)

THE COURT:  Good morning, everyone.  You all sound very chipper.  All right.  Please be seated.  Call your next witness, please.

MR. WELCH:  Your Honor, United States calls Joe Rodriguez.

**JOE RODRIGUEZ**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Sir, would you please tell us your name.

A   Joe Rodriguez.

Q    Make sure you get close to the microphone.
Mr. Rodriguez, have you formerly lived in Dodge City, Kansas?

A    Yes.

Q    You no longer live in Dodge City, Kansas; is that right?

A    No.

Q    When did you live in Dodge City, Kansas?

A    Back in 2012.

Q    2012?

A    Yes.

Q    Did you live in Dodge City prior to 2012?

A    Yeah.

Q    Are you from Dodge City?

A    No.

Q    Sir, what period of time prior to 2012, sir, did you live in Dodge City, Kansas?

A    From '08 to 2012.

Q    Now, while you lived in Dodge City, Kansas, were you familiar with a street gang by the name of the Nortenos or Diablos Viejos?

A    Yes.

Q    Were you a member of the Nortenos Diablos Viejos?

A    Yes.

Q    Did you become -- were you jumped into that gang?

A    Yes.

Q    And you have tattoos that identify you as a Nortenos DV?

A    I've just got dots.

Q    You have what?

A    The dots.

Q    You also have dots on your eyes?

A    Yes.

Q    Sir, while you were in Dodge City, Kansas, did you know a man by the name of Pedro Garcia?

A    Yes.

Q    Did you know Pedro Garcia -- do you know whether or not Pedro Garcia belonged to a street gang?

A    No.

Q    You don't know if Pedro Garcia belonged to a street gang?

        MR. WACHTEL:  Objection.  Asked and answered, Your Honor.

        THE COURT:  I'll let him answer.

BY MR. WELCH:

Q    You said you knew Pedro Garcia; correct?

A    Well, as a Nortenos, yeah.

Q    Let me ask that again.  Make sure I understand. Let's start with you knew Pedro Garcia while you lived in Dodge City, Kansas?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

2452

A    Yes.

Q    Did you know Pedro Garcia to be affiliated with a street gang?

A    Yes.

Q    Which street gang?

A    Diablos Viejos.

Q    Earlier did you say Nortenos?

A    Yeah, Nortenos.

Q    You consider Norteno and Diablos Viejos to be one and the same --

A    Yes.

Q    -- in Dodge City?

A    Yes.

Q    All right.  Thank you, sir.  Were you also familiar with a man by the name of Gonzalo Ramirez?

A    Yes.

Q    All right.  And did you know Gonzalo Ramirez to be associated or a member of a street gang?

A    Yes.

Q    Which street gang?

A    Diablos Viejos.

Q    Sir, while you were living in Dodge City, did you own a firearm known as a MAC 11?

A    Yes.

Q    When did you first obtain the MAC 11?

A    Like in the fall of '08.

Q    And where did you get that gun?

A    Here in Wichita, Kansas.

Q    Do you remember who you got that gun from?

A    No.  Some random guy.

Q    And did you buy that gun?

A    Yes.

Q    How long did you own that gun?

A    Five to six months.

Q    And you said you purchased it in the fall of 2008?

A    Yes.

Q    And you owned it for five or six months?

A    Yes.

Q    What happened to it after a period of five or six months?

A    I sold it.

Q    Who did you sell it to?

A    Gonzalo Ramirez.

Q    All right.  The man that you sold the MAC 11 to that you've identified as Gonzalo Ramirez, do you see him in the courtroom today?

A    Yes.

Q    Would you please point to him, describe what he is wearing.

            (Witness complies with request.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

2454

A    The purple shirt.

Q    Purple shirt?

A    Yeah.

Q    Seated between the two men in suits in the corner?

A    Yes.

          MR. WELCH:  Your Honor, I'd ask the record reflect the witness has identified the Defendant Gonzalo Ramirez.

          THE COURT:  It will.

BY MR. WELCH:

Q    And the man that you knew as Pedro Garcia, do you see him in the courtroom also?

A    Yes.

Q    Again, would you please point to him, describe what he is wearing.

                    (Witness complies with request.)

A    He's right there.

Q    What color is his shirt?

A    Blue, pale blue.

Q    Seated next to the gentleman with the white hair?

A    Yes.

          MR. WELCH:  Your Honor, ask the record to reflect the witness has identified Pedro Garcia.

          THE COURT:  It will.

BY MR. WELCH:

Q   Sir, after you sold this gun five or six months after purchasing the gun, did you ever see it again after you sold it to Gonzalo Ramirez?

A   No.

Q   Do you know where that gun is today?

A   No.

Q   Sir, while you still owned the gun, did you identify any problem with the weapon?

A   Yes.

Q   What was the problem?

A   It would lock up when you pull it back.   (Witness indicating.)

Q   For the record, you made a sliding motion with your right hand; is that right?

A   Like that.   (Witness indicating.)

Q   You said occasionally the gun would lock up?

A   Yeah.   That's why I sold it.

Q   That's why you sold it?

A   I didn't think it worked.

        MR. WELCH:  No further questions, Your Honor.

        MR. WACHTEL:  Thank you, Your Honor.

        THE COURT:  Yes, sir.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q   Sir, I'm Mr. Garcia's attorney.  Just have a few questions for you.  If you don't understand a question, tell me you don't understand --

A   All right.

Q   -- and I'll reask it.  You tell us you're a member of the DV.  What was your position in the DV?

MR. WELCH:  Objection; irrelevant.

THE COURT:  Overruled.

BY MR. WACHTEL:

Q   If had you a position in the DVs, what was it?

A   Nothing.

Q   Sir?

A   Nothing, sir.

Q   I couldn't --

A   Nothing.

Q   Nothing?

A   Yeah.

Q   Okay.  In that capacity, did you keep any financial records for the DVs?

A   No.

Q   Did you make -- I'm sorry -- I don't have any further questions for you.  Thank you very much.

THE COURT:  Yes, sir.

MR. MANDELMAN:  No questions on cross, Your Honor.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

THE COURT:  All right.

MR. WELCH:  Nothing further, Your Honor.

THE COURT:  Thank you, Mr. Rodriguez.  Next witness, please.

MR. SMITH:  Your Honor, the United States calls Timothy Quint.

**TIMOTHY QUINT**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Tell us your name, please.

A   T.J. Quint.

Q   And do you go by T.J.?  Is that what you said?

A   Timothy Quint.  I go by T.J.

Q   Scoot forward a little bit for us here.  Get a little bit closer to that microphone.  Okay.  Are you all right?

A   Yeah.

Q   T.J. Quint.  Now, what city do you live in, sir?

A   Pratt, Kansas.

Q   How long have you lived in Pratt, Kansas?

A   Pretty much my whole life.

Q   Were you living in Pratt, Kansas, then, from let's

say, 2009 through 2013?

A   Not the whole time.  I just moved back from Oklahoma.

Q   When did you move back from Oklahoma?

A   About four months ago.

Q   Okay.  Four months ago in 2013?

A   Yes.

Q   So until those past four months, you lived in Pratt, Kansas?

A   Prior to that four months, I lived in Oklahoma for a year and a half.

Q   Okay.  Why don't you tell me, from 2009 on, when is the period of time that you lived in Pratt?

A   Probably until 2011.  Then I moved to Oklahoma.  And now I've been back in Pratt for four months.

           MR. SMITH:  May I approach, Your Honor?

           THE COURT:  Yes.

BY MR. SMITH:

Q   I'm showing you what's been marked as Government Exhibit 166.  Do you see that sticker on there that says Government 166?

A   Yes.

Q   Do you recognize what Government 166 is?

A   No, I don't.

Q   Do you recognize the photograph?

A    Yes, I do.

Q    Okay.  And what is it a photograph of?  Do you recognize what the photograph is?

A    Angelica Flores.

Q    And have you known Angelica Flores prior to today?

A    Yes.

MR. SMITH:  Move to admit Government 166.

MR. WACHTEL:  I don't object, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  Received.

BY MR. SMITH:

Q    When did you meet Angelica Flores?

A    Probably been about four years.

Q    You met her four years ago?

A    Yes.

Q    Was that in Pratt, Kansas?

A    Yes.

Q    What was your relationship with Angelica Flores?

A    She was friends with my girlfriend.

Q    Friends of your girlfriend.  And was that beginning four years ago?

A    Yes.

Q    At some point in time, did Angelica Flores contact you about a firearm?

A    Yes.

Q   When was that?

A   It's been about three years.  2010.

Q   When she contacted you in 2010 about a firearm, what did she do?

A   She asked if I could --

MR. WACHTEL:  Objection.  Hearsay on what she may have said or asked.

THE COURT:  Is this -- I'm having trouble hearing this witness.  But is he -- are you asking him questions about what Angelica Flores told him about a firearm?

MR. SMITH:  I asked what she did.

THE COURT:  What she did?

MR. SMITH:  When she contacted him.

THE COURT:  Well, you can't testify, Mr. Quint, about what Angelica Flores may have said to you.  You may testify about what she did.

BY MR. SMITH:

Q   What did Angelica Flores do in 2010 when you were contacted about a firearm?

A   Asked if I could hold onto it.

MR. WACHTEL:  Objection, Your Honor.

BY MR. SMITH:

Q   Don't tell us what she said.  Tell us what she did.

THE COURT:  The objection is sustained.

A    Dropped the gun by my house.

Q    I'm sorry?

A    She brought a gun by my house.

Q    After bringing the gun by your house, did you take possession of the gun?

A    Yes.

Q    What did you do with the gun?

A    I had it for about a month and I told 'em I didn't want it in my house no more, that they needed to come pick it up.

Q    Did anyone come pick it up?

A    No.

Q    Then what did you do with the firearm?

A    I got rid of it to a friend named Ricky.

COURT REPORTER MS. SCHWEMMER:  Named who?

A    Ricky Melina (ph)

MR. SMITH:  Nothing further, Your Honor -- I'm sorry.  One more question.

Q    Now, Mr. Quint, are you able to identify what type of firearm it was?

A    It was a MAC 11.

MR. SMITH:  Nothing further.

MR. WACHTEL:  Your Honor, before I cross-examine this witness, may we approach, please.

THE COURT:  I guess.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

MR. WACHTEL: Your Honor, I am familiar with Angelica Flores. It is Mr. Garcia's former girlfriend. I know where Angelica is. She is in the county jail. And in this particular case, her actions are also hearsay because I don't think she's going to be available to come to this court and testify. So her actions are hearsay as well and I ask that that be stricken.

THE COURT: Her actions are hearsay?

MR. SMITH: They were personally observed by --

THE COURT: I've never heard of actions being hearsay.

MR. WACHTEL: I didn't bring a case with me in that regard, Your Honor, because I was not expecting this witness --

THE COURT: Well, if that's your objection, it's overruled.

(Thereupon, the following proceedings continued in the

hearing of the jury.)

THE COURT: All right. You may cross-examine, Mr. Wachtel.

MR. WACHTEL: I don't have any questions, Judge.

MR. MANDELMAN: No questions on cross, Your Honor.

THE COURT: Thank you, Mr. Quint. You're excused. Next witness, please.

MR. SMITH: United States calls Michael Huffines.

## MICHAEL HUFFINES

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

## DIRECT EXAMINATION

BY MR. SMITH:

Q   Please tell us your name, sir.

A   Michael Huffines.

Q   What is it you do for a living?

A   I work for Immigration and Customs Enforcement.

Q   How long have you been doing that?

A   About seven years.

Q   Now, Immigrations and Customs Enforcement, what sort of duties or what sort of activity is that agency

responsible for?

A    Mainly identifying foreign nationals and their removability.

Q    And what does it mean, their removability?

A    Whether they're allowed to be in the country or not.

Q    Now, other than identifying foreign nationals and removing them, does ICE or Immigrations and Customs Enforcement, gather any records as to international travel?

A    We do.

Q    And how is that conducted?

A    Through a system called Automatic Tracking System Persons, which basically records border crossings for everyone.

Q    Automatic Tracking Systems Persons -- well, is it known as ATSP?

A    That's correct.

Q    And does it contain records of entries and exits of people from the United States?

A    That's correct.  Using a United States land border.

Q    Land border?

A    Well, land and air.

Q    Land and air.  And do you have access to ATSP?

A    I do.

Q    And what do you use that access to ATSP for?

A   To run record checks and see when individuals have crossed our international border.

Q   And why are those records collected?

A   They're collected on everyone, whether it be USCs or -- United States citizens or foreign nationals.

Q   What is the purpose of collecting the records?

A   Just to document when you left and entered the country, certain timeframes people can stay and what have you.

Q   Does ATSP always have both an exit and an entrance into the country for any given individual?

A   No.

Q   And why would it lack one or both of those records?

A   It would lack an exit if you were to leave the United States because you entered -- you entered through a, for example, a Canadian or Mexican land border and you would re-enter through the American border.

Q   So which part would be lacking?

A   It would be lacking an exit from America.

Q   And why is that record lacking?

A   It's not tracked who leaves the land border.

Q   Okay.  It's not tracked by the United States?

A   Correct.

Q   Or ATSP?

A   Correct.

Q   Have you had an opportunity to search ATSP to identify if a Jose Enrique Ochoa, Jr. had crossed the land border of the United States?

A   I did.

Q   And by what date of birth did you identify Jose Enrique Ochoa?

A   November 4 of 1990.

Q   And in searching ATSP for any land border crossing of Jose Enrique Ochoa, did you find a land border crossing?

A   I did.

Q   And what land border crossing did you find for Jose Enrique Ochoa?

A   I found an in-bound crossing dated 10-27-2009, Bridge of the Americas in ElPaso, Texas.

Q   Did you locate any out-bound crossings prior to that?

A   No.

Q   There is no -- is there a way for you to know when that out-bound crossing would have occurred?

A   Not with the systems I have access to.

        MR. SMITH:  Nothing further.

        MR. WACHTEL:  I don't think I have any questions for this witness, Judge.

**CROSS EXAMINATION**

BY MR. MANDELMAN:

Q   Have you ever spoken with Jose Enrique Ochoa?

A   No.

Q   Have you ever spoken with Gonzalo Ramirez?

A   No.

MR. MANDELMAN:  I don't have anything further. Thank you.

MR. SMITH:  Nothing further, Your Honor.

THE COURT:  Thank you, sir.  You're excused. Come up again, counsel.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

THE COURT:  Just to make clear here my ruling with respect to a previous witness.  Rule 801 defines a statement as an oral or written assertion, which clearly his testimony did not, the result of sustaining the objection, did not come in.  Or nonverbal conduct if it is intended by the person as an assertion.  And there was certainly nothing in his testimony that would indicate that whoever that was, that woman, intended, by giving him the gun, intended -- it was intended as an

assertion.  So I'm -- and there are cases about that.

For example, *United States vs. Bahae*, B-A-H-A-E, at 128

Fed. 3rd 1440, a Tenth Circuit case, says:  Intimate

touching of the wife by the husband signaling the need

for sex would be nonverbal conduct intended as an

assertion.  This clearly doesn't fit that definition.

MR. SMITH:  Clearly.  Thank you.

MR. WACHTEL:  With that as the standard, Your

Honor, I agree.

THE COURT:  All right.

(Thereupon, the following

proceedings continued in the

hearing of the jury.)

THE COURT:  Next witness, please.

MR. SMITH:  Your Honor, the United States

calls Special Agent Steve Gravatt.

**STEVEN GRAVATT**

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as

follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Sir, tell us your name please.

A   Steven Gravatt.

Q   What is it you do for a living?

A    I am a Special Agent for Alcohol, Tobacco and Firearms, ATF.

Q    Is that a federal agency?

A    Yes, it is.

Q    How long have you been with the ATF?

A    Since 2007.

Q    And what did you do before that?

A    I worked for Immigration and Customs Enforcement from 2003 to 2007.

Q    And is that a federal agency?

A    Yes, it is.

Q    Did you have any law enforcement experience before that?

A    Yes.  I was a Kansas City, Missouri, police officer from '98 to 2003.

Q    From when?

A    '98 to 2003.

Q    And are you familiar with the investigation for which we're in trial here today?

A    Yes, I am.

Q    How did you become involved in this investigation?

A    Started in 2008 when we had the meeting and then -- with multiple agencies.  At which time or soon thereafter we started getting cases from Dodge City related to gun crimes.

Q   I see.  Prior to 2008, were there any other agents from ATF working on, essentially, this Dodge City Nortenos --

MR. MANDELMAN:  Objection as to relevance.

THE COURT:  Overruled.

BY MR. SMITH:

Q   Were there any agents working on this Dodge City Nortenos case prior to 2008?

A   Yes.  Special Agent Neal Tierney.

Q   What case specifically was Special Agent Neal Tierney working on?

A   Jason Najera, Alonzo Cruz case.

Q   And did Special Agent Neal Tierney -- well, have you reviewed the file as to that case?

A   Yes.

Q   And in that case, was an investigation done by the ATF?

A   Yes.

Q   Was a grand jury investigation done subsequent to ATF's investigation of that case?

A   Yes, it was.

Q   And did that involve presentation of witnesses to the grand jury?

A   Yes, it did.

Q   Can you approximate the number of witnesses that

were presented?

A    Approximately ten.

Q    And subsequent to 2008, what became your involvement in relation to Special Agent Tierney's involvement?

A    I, I was assigned the case with Pedro Garcia and Antonio Flores.

Q    The case with Pedro Garcia and Antonio Flores, was that charged in the United States Federal District Court?

A    Yes, it was.

Q    Were you responsible for presenting that case for charging?

A    I did.

Q    And did you see that case through to conviction?

A    Yes.

Q    And after being assigned that case with Pedro Garcia and -- I'm sorry -- who was it?  Antonio?

A    Antonio Flores.

Q    Did you perform other duties in relation to the Dodge City Norteno investigation?

A    Yes.  Over the past three years I participated in many interviews, sat in interviews, evidence collection in this case, a lot of meetings involved in it.

Q    As to evidence collection, is ATF in possession of the evidence in this case?

A    Yes.

Q    And when I say this case, I'm referring to the Indictment that has been presented in this case, not simply the charges against Pedro Garcia and Gonzalo Ramirez.

A    Yes, I have all the evidence in the Indictment.

Q    And from where did you collect the evidence?

A    From Dodge City.

Q    And have you collected evidence from other agencies?

A    Yes.

Q    And what other agencies have you collected evidence from?

A    Ford County Sheriff's Office and Kansas Bureau of Investigation.

Q    Were you responsible for moving that evidence to other locations for various things like testing?

A    Yes.

Q    Again, the larger investigation, not simply the charges in trial today?

A    Yes.

Q    You mentioned that you were responsible for going to numerous meetings; is that correct?

A    Correct.

Q    Can you approximate the number of meetings?

A    Well over 20, I'm sure.

Q   Did you travel to Dodge City, Kansas?

A   Numerous times.  Yes, numerous occasions.

Q   What would numerous be?

MR. MANDELMAN:  Again, Your Honor, I'm going to object as to relevance here.

THE COURT:  Well, Agent Gravatt is the case agent; but where are we headed here?

MR. SMITH:  Well, Your Honor, during opening statement and some of the questions presented by defense counsel in this case were characterizing this case as a state case or state charges; and I am presenting for the jury the involvement of federal agencies in this case from the moment of the investigation.

THE COURT:  I think that's legitimate; but let's move it along, please.

BY MR. SMITH:

Q   You traveled to Dodge City, Kansas?

A   Yes.

Q   Did you participate in law enforcement operations in Dodge City, Kansas?

A   Yes.

Q   What sort of operations?

A   After the Indictment when everybody was arrested, participated in that; few of the search warrants and interviews.

Q   And are you referring to after the Indictment at that point?

A   Yes.

Q   Did you participate in search warrants and interviews prior to Indictment?

A   Yes.

Q   Was that during the time period stemming from 2008 through 2012?

A   Yes, it was.

Q   Subsequent to the Indictment, have you been responsible for meeting with or debriefing witnesses?

A   Yes.

Q   And have you met with or debriefed co-defendants or co-conspirators in this case?

A   I have.

Q   Other than the Indictment in this case, did your investigation yield prosecutions related to this case?

A   Yes.

Q   Did you present those prosecutions or did you present those cases for prosecution?

A   Yes.

Q   And were they prosecuted?

A   Yes.

Q   Do you know the number of cases that you presented independent of this investigation but related to this

investigation?

A    I believe it was three or four.

Q    Did your participation in this investigation result in the use of a confidential informant?

A    Yes.

Q    Who was that confidential informant?

A    Joe Galindo.

Q    And when did Joe Galindo become a confidential informant?

A    Early spring, summer of 2010.

Q    Was there -- was there a reason why Joe Galindo came to your attention?

A    Yes.

Q    And why was that?

A    He -- basically, he was arrested for intimidation of a witness.

Q    And was that a prosecution that was brought by you as the case agent?

A    Yes.

Q    And that case, is that independent of the three or four other cases that you've mentioned that were separate from this Indictment?

A    Yes.

Q    After -- did -- after you used Joe Galindo -- or, did you use Joe Galindo as a confidential informant?

A    For a short time, yes.

Q    For what sort of operations did you use Joe Galindo?

A    Undercover and confidential informant of narcotics purchases.

Q    You mentioned a short period of time; is that correct?

A    Yes.

Q    Why was it such a short period of time, briefly?

A    Basically, his phone recorded -- he, he was calling an individual to set up another deal and didn't shut off his phone, it was in his pocket, and the individual that he was calling didn't answer the phone and it went to his voicemail and it recorded a conversation between the agents and officers as we were trying to set up the next deal.

Q    After that happened, did that change Joe Galindo's status with your agency?

A    Yes.

Q    And how did it change it?

A    We had to remove him from Dodge City to out of state for his safety.

Q    Do you know what happened to the prosecution after -- Joe Galindo's prosecution after he was removed from the jurisdiction?

A    The case was dismissed.

Q   In removing Joe Galindo from the jurisdiction, were benefits paid to him?

A   Yes.

Q   And what benefits were paid to Joe Galindo?

A   He received a little bit of subsistence.  I don't have the exact figures.  It was under $1,000.  And it was $1040 to help him move out of state.

Q   So that's two different amounts of money; is that correct?

A   Yes.

Q   Under a thousand dollars for subsistence; is that correct?

A   Yes.

Q   And $1040 to aid in the relocation?

A   Yes.

Q   Okay.  The cases for which Joe Galindo worked as a confidential informant, were you involved in those operations?

A   Yes.

Q   Where were those operations?

A   In Dodge City.

Q   Did you travel to Dodge City for your involvement in those operations?

A   Yes.

Q   Have you traveled outside of the state of Kansas in

conducting your duties as a case agent in this case?

A   Yes.

Q   To where did you travel?

A   Recently went to Atlanta.

Q   Special Agent, there were three people named in Counts 2 through 7, I believe, or 2 through 6, as being possible victims of an attempted murder; is that correct?

A   Correct.

Q   A Roberto Arco; is that right?

A   Yes.

Q   I've forgotten the other names.  You tell me the names.

A   Faustino Peralta.  Ricardo Arco Cruz.  Marianno Sorono.

Q   And Marianno Sorono.  In your duties as the case agent in this case, did you attempt to contact or locate Faustino Peralta?

A   Yes.

Q   Were you able to contact or locate Faustino Peralta?

A   I was not able to locate him.

Q   Do you know where Faustino Peralta is?

A   Yes.  In Mexico.

Q   And -- well, do you know why he is in Mexico?

A   Yes.

Q   And why is he in Mexico?

MR. MANDELMAN:  Objection as to hearsay.

THE COURT:  I think so.  Sustained.

BY MR. SMITH:

Q   Did you do an investigation as to why Faustino Peralta is in Mexico?

A   Yes.

Q   Did you reference law enforcement data bases or information to determine why Faustino Peralta is in Mexico?

A   Yes.

Q   In referencing your law enforcement resources, were you able to determine why Faustino Peralta went to Mexico?

MR. MANDELMAN:  Objection again.  This is relying on hearsay.

THE COURT:  Sustained.

BY MR. SMITH:

Q   You've mentioned before that you were familiar with the investigation of Pedro Garcia and Antonio Flores; is that correct?

A   Correct.

Q   That was a prosecution from a case that you investigated; is that right?

A   Yes.

Q   Did Pedro Garcia sustain a conviction in that case?

A   He did.

        MR. SMITH:  May I approach?

        THE COURT:  You may.

Q   I'm showing you what's been marked as Government Exhibit 4; is that correct?

A   Yes.

Q   Are you familiar with what Government Exhibit 4 is?

A   I am.

Q   Without referencing Government Exhibit 4 right now, are you familiar with what Pedro Garcia was convicted of?

A   Yes.

Q   And what was Pedro Garcia convicted of?

A   Felon in possession of a firearm.

Q   And --

        MR. WACHTEL:  Your Honor, I object.  This is not part of the charged conduct in this case; and if and to the extent this is somehow conceived by the Government as being a predicate act, Government has promised not to use information gained in the prosecution of the case the agent is talking about against Mr. Garcia.

        MR. SMITH:  Your Honor has already made a ruling on this in the enterprise and 404(b) notice that

this conduct was admissible.  And my next question will --

THE COURT:  Well, I have, as Exhibit 5, a Judgment and Commitment for Garcia in 2004.  What is this one?

MR. SMITH:  Your Honor, this was --

THE COURT:  It's already in evidence.

MR. SMITH:  This is not.  This is 2009, 2010. This is a separate event.  And I think my next question will clarify the information that I'm asking.

THE COURT:  All right.  Go ahead and I'll listen to it and decide.

BY MR. SMITH:

Q   Special Agent, you mentioned that Pedro Garcia was convicted of felon in possession of a firearm; is that correct?

A   Correct.

Q   In a conviction for felon in possession of a firearm, is there a specific finding made as to the characteristics of the firearm?

A   Yes.

Q   And what are those characteristics?

A   It's the interstate commerce.

Q   Well, what do you mean by that?

A   It effected -- it crossed state lines and effected

interstate commerce.

Q   To be convicted of felon in possession of a firearm in that case, did Pedro Garcia admit that he possessed a firearm that traveled in interstate commerce?

MR. MANDELMAN:  Again, I'm going to object as to relevance.

MR. WACHTEL:  To which I'll join, Judge.

THE COURT:  Are you representing Mr. Garcia now?

MR. WACHTEL:  No.  But I'll make the same objection, Your Honor.

THE COURT:  Let me see the J and C we're talking about.

MR. SMITH:  Your Honor, I actually presented him with the Plea Agreement.  I'll approach.

(Thereupon, the following proceedings were had at the bench by Court and Counsel outside the hearing of the jury.)

THE COURT:  All right.  I see it.

MR. WACHTEL:  I just brought -- I think that the felon in possession is not a racketeering act; and I know that Your Honor has ruled on these things.  I have to preserve these objections and I --

THE COURT:  I know you do; but it's also 404(b) as far as I'm concerned.  It would qualify as 404(b).

MR. SMITH:  And that is enterprise -- this is the interstate commerce element that I've presented this information for.

THE COURT:  Okay.

MR. MANDELMAN:  I just want to join in any objection.

THE COURT:  You offered -- Exhibit 4 will be received.

MR. SMITH:  I want to --

THE COURT:  All right.

MR. MANDELMAN:  Just join in the objection.

THE COURT:  You don't have any standing to join in the objection --

MR. MANDELMAN:  Well, we're --

THE COURT:  -- Mr. Mandelman.

(Thereupon, the following proceedings continued in the hearing of the jury.)

MR. SMITH:  Your Honor, I move to admit Government Exhibit 4.

MR. WACHTEL:  We object, Your Honor.

MR. MANDELMAN:  I join to the extent that I am

able to.

THE COURT:  4 is received.

BY MR. SMITH:

Q   Now, Agent, in your duties as a case agent, did you make known to you the locations that each of the Defendants charged in this case were being housed?

A   Yes.

Q   This is post-Indictment; is that correct?

A   Correct.

Q   Were all of the persons indicted in this case housed in the same jail, the same facility?

A   No.

Q   Do you know when Fabian Neave -- or do you know if Fabian Neave was housed in Butler County jail?

A   Yes.

Q   And do you know if Pedro Garcia was housed in Butler County jail?

A   Yes, he was.

Q   Were Fabian Neave and Pedro Garcia housed in Butler County jail at the same time?

A   They were.

Q   Was there a period of time when they then were not housed together?

A   Fabian was transferred to another jail in May of this year.

Q   That would be May of 2013?

A   Correct.

Q   Prior to that, do you know how long they were housed together in Butler County jail?

A   Approximately 11 months together.

MR. SMITH:  One moment, Your Honor.

(Off-the-record.)

MR. SMITH:  Nothing further.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. WACHTEL:

Q   You told us about Fabian Neave being housed in Butler County jail?

A   Yes.

Q   Mr. Garcia was housed in Butler County jail?

A   Correct.

Q   For 11 months at the same time?

A   Approximately.

Q   Do you know if they were in the same pod?

A   I can't answer that.

Q   Did you look to see when you were checking on these records?

A   No.

Q   You are aware that such a record would exist at Butler County?

A   Yes.

Q   Why didn't you look?

A   Didn't have any reason to at the time.

Q   Oh, yeah, and you also mentioned in your testimony that as a result of cooperating with the Government that the state case against Joe Galindo was dismissed. Was that a state case that got dismissed?

A   It was a federal case.

Q   How much time was he looking at in that case? Do you know?

A   No.

Q   What was the case?

A   Intimidation of a witness.

Q   Any other charges along with that?

A   No.

Q   My understanding is that post-Indictment you arrested some folks involved in this case; right?

A   Yes.

Q   Kind of arrest could be made by anybody, any officer, didn't have to be federal to do that; right?

A   They were all federal arrest warrants.

Q   Okay. They were federal arrest warrants. There were meetings held by whatever group you were working with in Dodge City; right?

A   Yes.

Q   Several?

A   Yes.

Q   You helped participate in some search warrants?

A   Yes.

Q   Were those federal search warrants or state?

A   Those were state.

MR. WACHTEL:  I don't have -- thank you for your testimony.  I don't have any further questions.

THE COURT:  Yes, sir.

#### CROSS EXAMINATION

BY MR. MANDELMAN:

Q   Ricky Molino was prosecuted as part of this investigation?

A   No.

Q   Well, as part of one of the investigations that you undertook as a result of this case?

A   What's your question?

Q   Was Ricky Molino prosecuted for possessing a firearm?

A   No.

Q   Not at all?

A   No.

Q   As part of the investigation, you mentioned some debriefings?

A   Yes.

Q   Following the Indictment in this case, uhm, you or some officer with the ATF participated with maybe Detective Bice in meeting with -- you've been here all this -- many of the witnesses we've seen?

A   Yes.

Q   Were any of those meetings recorded?

A   No.

Q   Why not?

A   I can't answer that.

Q   The Government has resources for, for recording equipment or a tape recorder?

A   Yes.

Q   And you understand if those meetings are recorded, you're required to turn them over to defense counsel?

A   Yes.

Q   And those meetings were not recorded in this case?

A   No.

            MR. MANDELMAN:  Thank you.

            THE COURT:  Anything further?

                    **REDIRECT EXAMINATION**

BY MR. SMITH:

Q   Agent, after all of these debriefings, were reports generated that were turned over to the defense in this case?

A   Every single one, yes.

MR. SMITH:  Nothing further.

THE COURT:  You may resume your seat unless somebody else --

MR. WACHTEL:  I don't have anything.

MR. MANDELMAN:  No thanks, Judge.

THE COURT:  Next witness, please.

MR. SMITH:  United States calls Agent James Nau.

THE COURT:  You're still under oath, Mr. Nau.

**JAMES NAU**

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

**DIRECT EXAMINATION**

BY MR. SMITH:

Q   Tell us your name, sir.

A   James Nau.

Q   What is it you do for a living now?

A   I'm an agent for the State of Kansas, Kansas Department of Revenue, Alcohol Beverage Control Division.

Q   How long have you been with the Kansas Department of Revenue?

A   It was a year in September.

Q   Prior to being with the Kansas Department of

Revenue, did you work for a law enforcement agency?

A   Yes, sir, I did.

Q   What agency was that?

A   I worked for the Dodge City Police Department.

Q   And how long were you with the Dodge City Police Department?

A   About six and a half years.

Q   While working for the Dodge City Police Department, did you have any duties specifically related to gang enforcement?

A   Yes, I did.

Q   What were those duties?

A   I was assigned onto the gang unit in 2007 and was still on that as I left in 2012.

Q   What does that mean?  What is that unit for?

A   Primarily it was to focus on our gang problem in Dodge City.  Basically, anything with -- any crime related with gang members or traffic stop with gang members, we were -- either responded to or assigned to.

Q   Is that -- did you respond to those even if other officers were initially involved?

A   Yes.

Q   What was the purpose of that?

A   For information gathering, intelligence gathering.

Q   And during those six and a half years, did you

become familiar with gangs in Dodge City, Kansas?

A   Yes, I did.

Q   Did you become familiar with the Norteno gangs?

A   Yes.

Q   And are there other names by which that gang identifies itself?

A   Yes.

Q   And what name is that?

A   One was Diablos Viejos or DV; and LCC, Los Carnales Chingones.

Q   During your employment with Dodge City Police Department working as a gang officer, gang intelligence officer, did you have contact with DV gang members?

A   Yes, I did.

Q   Did you have contact with LCC gang members?

A   Yes, I did.

Q   And during those contacts did you have opportunities to speak to some of them under voluntary circumstances?

A   Yes.

Q   And during those contacts, did you have opportunities to make observations of each of those gang members?

A   Yes.

Q   Did you make observations of the clothing that they wore?

A   Yes.

Q   Did you make personal observations of the tattoos that they had?

A   Yes.

Q   And for what purpose?

A   For information gathering for -- on certain crimes, depending on what crimes were committed, some people may see a tattoo that stuck out to them.  It was something for intelligence gathering for our department for the gang officers in particular.

Q   During your employment with the Dodge City Police Department, did you become familiar with a person known as Pedro Garcia?

A   Yes.

Q   Is Pedro Garcia present in the courtroom today?

A   Yes, he is.

Q   Please point him out and tell us what he is wearing.

A   He's sitting right here by the computer monitor in the light blue button-up shirt.  (Witness indicates.)

           MR. SMITH:  Your Honor, let the record reflect the witness has identified the Defendant Pedro Garcia.

           THE COURT:  It will.

BY MR. SMITH:

Q   During your employment with Dodge City Police Department as a gang officer, did you become familiar

with a Gonzalo Ramirez?

A   Yes, I did.

Q   Is Gonzalo Ramirez present in the courtroom?

A   Yes, he is.

Q   Please point him out and tell us what he is wearing.

A   He sitting right over here to my left in the purple button-up.  (Witness indicates.)

Q   To your left.  Is he sitting in between two attorneys?

A   Yes.

Q   Farthest to your left; is that correct?

A   I'm sorry.

Q   Is that farthest -- the person farthest to your left --

A   Yes.

Q   -- the two attorneys farthest to your left?

A   Yes.

        MR. SMITH:  Your Honor, the record should reflect the witness has identified the Defendant Gonzalo Ramirez.

        THE COURT:  It will.

BY MR. SMITH:

Q   Now, Agent, specifically, did you have a contact with a Pedro Garcia on a June 19th, 2009?

A   Yes.

Q   Who did you contact on June 19, 2009?

A   Pedro Garcia was part of it.  And Gonzalo Ramirez.

Q   Was anyone else present?

A   I believe it was a traffic stop with Joe Galindo.

Q   And are you familiar with Joe Galindo?

A   Yes.

Q   Is Joe Galindo a member of any gang?

A   Yes.

Q   And what gang is Joe Galindo a member of?

A   DV.

Q   And that's Diablos Viejos?

A   Yes.

Q   On June 19, 2009, did Pedro Garcia make any statements in relation to gang membership?

A   He stated that he was down with DV.

Q   And in your training and experience, what does down with DV mean?

A   That he -- when they say they're down with the gang, they're a part of or that's who they are.

Q   Did Gonzalo Ramirez make any statements regarding gang membership on June 19, 2009?

A   He also stated he was with DV.

Q   He stated he was with DV?

A   If I look at my notes, I can give you exactly what he said.

Q   If that would refresh your recollection.

A   He stated that he is a DV gang member.

Q   And, again, that's on what date?

A   That is on June 19th.

Q   And you mentioned Joe Galindo was present?

A   Yes.

Q   Was anyone else present?

A   Without looking -- Josh Flores.

Q   Is that Joshua Flores?

A   Yes.

Q   Do you know if Joshua Flores is a member of a gang?

A   Yes, he is.

Q   And what gang is Joshua Flores a member of?

A   He is a member of LCC.

Q   Did you also have contact with Gonzalo Ramirez on May 18th of 2009?

A   Yes, I did.

Q   During that contact, did you make any observations of Gonzalo Ramirez?

A   Contact -- or, the observations were his clothing.

Q   And what did you note about his clothing?

A   His shoes and his belt and --

Q   What was notable about the shoes and the belt?

A   They were both red.

Q   Did you make any other observations regarding his

clothing?

A    His pants were red.

Q    Did Gonzalo make any statements in relation to gang membership on May 18, 2009?

A    He stated that he is DV and would always be DV.

Q    Did you have a contact with Gonzalo Ramirez on April 9th of 2009?

A    Yes.

Q    And during the contact on April 9th of 2009, did Gonzalo Ramirez make any statements to you?

A    Yes.  He stated that he was DV.

Q    On April 9th of 2009, was Gonzalo Ramirez with anyone?

A    He was with Joe Galindo.

Q    Is that the same Joe Galindo that you mentioned being present on June 19th, 2009?

A    Yes.

        MR. SMITH:  May I approach, Your Honor?

        THE COURT:  Yes.

BY MR. SMITH:

Q    Agent, I've placed in front of you what's been marked for identification as Government Exhibit 50; is that correct?

A    Yes, sir.

Q    Are you familiar with what Government Exhibit 50 is?

A   Yes.

Q   What is Government Exhibit 50?

A   It is -- the top photograph is a picture of Pedro Garcia; and the bottom photograph is another picture of him with his hand in the air with -- showing his tattoos.

Q   So in that -- does that photograph accurately depict your observations of Pedro Garcia?

A   Yes.

MR. SMITH:  Move to admit Government Exhibit 50.

MR. WACHTEL:  I don't object.

THE COURT:  It's received.

BY MR. SMITH:

Q   Can we publish that please.  What tattoos are visible in Government Exhibit 50?

A   The ones that I was familiar with are the four dots on his right hand.

Q   Go ahead and pull this screen up and circle that for us.

(Witness complies with request.)

A   I just covered right over it.

Q   Go ahead and circle that for us.

(Witness complies with request.)

Q   You mentioned four dots on the left hand?

A    Yes.

Q    Do the four dots, in your training and experience, have any significance?

A    Yes.

Q    And what is that significance?

A    That's most commonly seen as the Norteno represent the number 14.  We usually see a one dot and a four dot.  On occasion you just see the four dots itself.  So -- representing the number 14.

Q    Thank you.  Are you familiar with any other tattoos of note on Pedro Garcia?

A    At the time, no; not until seeing these photos.

Q    And after observing the photos, have you identified any other tattoos of significance on Pedro Garcia?

A    There was the X-IV.

Q    And where is the X-IV located?

A    Towards the top of his head.

Q    Go ahead and use your head and point it out for the jury, please.  Not on the picture.  Use your head.

A    Oh, up here.  (Witness indicates.)

Q    Does X-IV have any significance?

A    Yes.

Q    What does it represent?

A    The X is the Roman numeral 10; and the IV.  10 and 4 is 14.

MR. SMITH:  Thank you.  May I approach?

THE COURT:  Yes.

BY MR. SMITH:

Q   I've placed in front of you what's been marked for identification as Government Exhibits 51 through 57, I believe; is that correct?

A   Yes.

Q   Are you familiar with the contents or what is depicted in Government Exhibits 51 through 57?

A   Yes.

Q   Are those accurate depictions of what you would have observed personally?

A   Yes.

Q   And who is depicted in Government Exhibits 51 through 57?

A   Gonzalo Ramirez.

MR. SMITH:  Your Honor, move to admit Government Exhibits 51 through 57.

MR. MANDELMAN:  Your Honor, I just renew my prior objections.

THE COURT:  51 through 57 are received.

BY MR. SMITH:

Q   Please describe for us what is it that we observe in Government Exhibit 51?

A   51 is the four dots near the left eye.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   And it appears on this photograph there's quite a bit of flash, wash-out.  Can you circle those four dots?

A   Yes.  (Witness indicates.)

Q   That is near the left eye of Gonzalo Ramirez; is that correct?

A   That is correct.

Q   Do those four dots have the same identifying significance as you identified with Pedro Garcia?

A   Yes.

Q   What is it we observe in Government Exhibit 52 of significance?

A   It would be X on the right wrist and IV on the left wrist.

Q   Does that, once again, represent X-IV as in 14?

A   Yes, it does.

Q   Does it have the same significance to which you've testified in relation to Pedro Garcia?

A   Yes.

Q   Government Exhibit 53, what is of significance in Government Exhibit 53?

A   The ENE, which is the E-N-E, and the 14.

Q   And ENE means what?

A   Spanish for the letter N.

Q   Representing the letter N?

A   Yes.

Q   And 14, does that represent the letter N?

A   Yes, it does.

Q   Do each represent Norteno?

A   Yes.

Q   Government Exhibit 54.  And what is of significance that we observe in Government Exhibit 54?

A   At the top of the -- be the left shoulder, is the word Diablos.  Also inside the -- can I circle it on here?

Q   Please.

A   (Witness indicates.)  Right in here -- I just crossed over it -- is an X-IV inside the eyes.

Q   X inside what eyes?

A   There's -- if you look real good on this --

Q   We can zoom in on that.

A   I'm going to circle the whole face there.  (Witness indicates.)  Yeah.  You've got an X right here and a IV right here.

Q   Okay.  Now we'll zoom out again.  Is there any other symbology contained in this tattoo that is of significance to you?

A   Yes.  The Viejos right underneath the barrel of the revolver.

Q   The word Viejos?

A   Right there.  (Witness indicates.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   And are there any other pictures depicted in this photograph that are of significance to you?

A   Not that I can tell.

Q   And let's observe Government Exhibit 54.

A   That was 54.

Q   That was 54.  Government Exhibit 55.  Is that a photograph of the same shoulder that we just observed?

A   Yes.

Q   With a clear depiction of the Viejos word; is that correct?

A   That is correct.

Q   Government Exhibit 56, what do we see on Government Exhibit 56 that is of significance?

A   The huelga bird that's inside the, kind of, the beard.

Q   And what does the huelga bird represent?

A   It was --

MR. WACHTEL:  Your Honor, I object.  I don't think this witness was going to be -- I do not believe this witness -- I did not believe this witness was going to be presented as an expert.  And if he is, then perhaps the Government ought to qualify him.

MR. SMITH:  Your Honor has made a pretrial ruling on this witness.

THE COURT:  I thought we had a James hearing

that lasted three days with respect to this witness and another one.

MR. WACHTEL:  I was here for a day of it, Judge.

THE COURT:  Well, do you want to voir dire him at this point regarding his knowledge of --

MR. WACHTEL:  Actually, Your Honor, I will wait.  Thank you.

THE COURT:  All right.  Go ahead.  Your objection is overruled.

BY MR. SMITH:

Q   What is the significance of the huelga bird?

A   The huelga bird was a symbol that was adopted by the Norteno gang.

Q   Is it representative of the Norteno gang?

A   Yes.

Q   And Government Exhibit 57.  Are you familiar with what is depicted in Government Exhibit 57?

A   Yes.

Q   What is in Government Exhibit 57?

A   That is a Roman numeral X-IV which is for 14.

Q   For the number 14?

A   Yes.

Q   And you've already testified as to what that represents; is that correct?

A   Yes.

Q   Thank you.  Let's look at Government Exhibit -- moving on to a completely different subject.  Let's look at Government Exhibit 22, please.  Are you familiar with a person that is depicted in Government Exhibit 22?

A   Yes.

Q   Who is the person depicted in Government Exhibit 22?

A   That is Juan Torres.

Q   Did you become involved in an investigation and an interview of Juan Torres about a gang related incident?

A   Yes.

Q   Specifically, were you involved in an interview of him in August of 2011?

A   Yes.

Q   What was the nature of your contact with Juan Torres in August of 2011?

A   I had met with Juan Torres at his probation -- city probation officer's office in regards to a stabbing where shots were fired that a person matching his description was seen at.

Q   Okay.  So that was a stabbing where shots were fired?

A   Yes.

Q   Did that stabbing and shots fired occur in August of 2011?

A    Yes.

Q    And to your knowledge, has that crime been included in this Indictment, though not part of this trial?

A    Yes.

Q    And do you know the participants that were indicted for that crime?

A    Yes.

Q    And who were those people?

A    There was a Fabian Neave and Jason Najera and several others.

Q    And others?  Was Juan Torres indicted as part of that crime?

A    I don't believe -- I don't know if he was or not.

Q    And in your interview with Juan Torres, did you have questions for him about whether he was present or what his participation was in that crime?

A    Yes.

Q    And was there a tape recording or some sort of audio recording made of that?

A    Yes.

Q    Have you been made aware that portions of that audio recording were played in this trial prior?

A    Yes, I was.

Q    So was that interview and that audio recording that you made of Juan Torres, did it have anything to do with

the shooting on 4th Avenue on October 4th of 2008?

A   No, it did not.

Q   It was solely -- or, was it solely related to the stabbing in August of 2011?

A   That is correct.

Q   Moving then forward to another completely unrelated subject.  Agent Nau, are you familiar with the type of ammunition that was recovered at the 4th Avenue shooting on October 4th, 2008?

A   Yes.

Q   And what type of ammunition was recovered?

A   It was ammunition from an SKS assault -- from a rifle.

Q   From a rifle?

A   Yes.

Q   And are you familiar with that it was caliber 7.62 by 39?

A   Yes.

Q   Are you familiar with SKS type rifles?

A   Yes.

Q   And from where or how do you have that familiarity?

A   I used to own three of them.

Q   You owned three of them?

A   Yes.

Q   What sort of ammunition does an SKS rifle fire?

A    7.62 by 39.

Q    Agent, in your employment with the Dodge City Police Department and the Kansas Department of Revenue, do you carry a firearm?

A    Yes, I do.

Q    Are you trained and certified to carry that firearm in law enforcement -- in a law enforcement capacity?

A    Yes.

Q    Do you own firearms?

A    Yes, I do.

Q    Do you own semiautomatic firearms?

A    Yes, I do.

Q    What sort of training do you receive in order to remain certified with a firearm?

A    We shoot a qualification course that's approved by the state for us to qualify on our weapon.

Q    How often do you do that?

A    Every year.

Q    Have you successfully passed each of those qualification courses?

A    Yes.

Q    Other than your service weapon, have you fired many other type of semiautomatic weapons?

         MR. WACHTEL:  Your Honor, I object that this is not relevant to the issues in this case how many guns

and what kind he has shot.

THE COURT:  Sustained.  As to this witness.

MR. SMITH:  I will move forward.  May I approach?

THE COURT:  Yes, if you have to.

BY MR. SMITH:

Q   I'm showing you what's been marked as Government Exhibit 130.  Have you seen that before?

A   Yes, I have.

Q   And were you involved in the homicide investigation on June 8 of 2009?

A   Just briefly, yes.

Q   You understand what this diagram represents in relation to that homicide investigation?

A   Yes.

Q   And let's zoom in a little bit there.  Are you familiar that shell casings were recovered at the scene of the homicide on June 8, 2009?

A   Yes.

Q   And do you see where those shell casings are represented on Government Exhibit 103?

MR. WACHTEL:  Object, Your Honor.  This is repetitive.  We have heard this testimony before; not from him, but from other witnesses.

THE COURT:  Well, we've had a lot of testimony

about this.  Where are you headed here?

MR. SMITH:  I have two more questions.

THE COURT:  All right.

MR. SMITH:  Maybe one and a half.

BY MR. SMITH:

Q   Agent, are you familiar with where the shell casings are represented on Government 103?

A   Yes.

Q   And there's been testimony that persons were standing in approximately this area when firearms were discharged in a -- well, down and to the left, if I'm describing this photograph -- do you understand what I'm describing?  Toward the blue car?

A   I think.  I see where you're at.

Q   Okay.  Toward the blue car --

A   Uh-huh.

Q   -- there's been testimony that firearms were discharged in that direction.

A   Okay.

Q   In your training and experience, is the pattern of where the shell casings ejected consistent with the placement of where I placed the dot as to someone firing a firearm?

MR. WACHTEL:  I object, Your Honor.  This calls for a conclusion that there's no -- there's been

no testimony that he is qualified to make.  Some weapons discharge spent casings in different directions.  He has apparently no training in tool mark examination or ballistics and I object to this conclusion.

MR. MANDELMAN:  I join in the objection.

THE COURT:  Do you want to voir dire him at this point?

MR. WACHTEL:  I'll do it all at the same time.  Thank you, Judge.

THE COURT:  All right.  Go ahead.

BY MR. SMITH:

Q   Is the placement of the shell casings depicted on Government Exhibit 103 consistent with the placement of the mark that I've placed, or the area I've placed for someone -- well, that's an ugly mark right there -- for someone discharging the firearm?

A   Yes.

Q   Is that -- is there a particular -- is there a difference in revolvers and semiautomatic weapons?

A   Yes, there is.

Q   And is there a difference in how or whether casings are ejected?

A   Yes.

Q   What is the difference?

A   In revolvers, they have their own cylinder so when

the spent shell casing is shot, it stays in there until it is emptied.  So on a revolver, the cylinder has to come out, you have to push the shells out into your hand or to wherever, so they don't -- they don't kick out. In a semiautomatic pistol or semiautomatic rifle, as you shoot, they eject out toward the side of the power.

(Witness indicates.)

Q   And toward the side, you're making a motion with your hand toward your right with your right hand toward the right; is that correct?

A   That is correct.

        MR. SMITH:  We can take that down.  Thank you. I have no further questions.

## CROSS EXAMINATION

BY MR. WACHTEL:

Q   SKS fires a 7.62 by what did you say?  39?

A   By 39.

Q   You know that because you owned three?

A   Yes.

Q   What other weapon fires a 7.63 --

        THE COURT:  2.

A   7.62.

Q   2.  I'm sorry.  2.

A   Some AK 47s will fire a 7.62 by 39.

Q   Does the M-14 fire that round?

A    I couldn't tell you.

Q    So your experience with 7.62 comes entirely from your having handled SKSs and AKs?

A    Correct.

Q    Did you own any AKs that you're familiar with?

A    I have not owned one, no.  I have shot one before; but I have not owned one.

Q    You were involved in the -- you were involved in an investigation of a trailer park shooting; right? Correct?  You were just shown an exhibit --

A    Right.

Q    -- about that.  You were involved in that investigation; right?

A    I was involved in it, yes.

Q    What did you do?

A    I wasn't there very long.  I responded to help for assistance; but, basically, when I got there, they sounded like they had enough so --

Q    So you didn't pay any attention to -- you didn't examine the scene itself; right?

A    On that day?  No.

Q    Sir?

A    On that night, no.

Q    You didn't look to see whether there was any indication, physical indication, of where the person who

shot that weapon might have been standing?

A   No.

Q   You didn't look at anything to find out where the,

the projectiles went; right?

A   Correct.

Q   Do you mind putting up Exhibit 50, please.

We've put up Exhibit 50 on the screen.  Do you also

have a hard copy of that?

A   I have what they just gave me.

Q   Well, yeah, do you have that still?

A   Yes.

Q   May I approach, Your Honor?  Just to take a quick

look at that.  You talked about -- have you ever

examined Mr. Garcia to see what kind of tattoos, if any,

that he has?

A   Only time I have were the ones on his wrist, the

four dots.

Q   The four dots?

A   Yes, sir.

Q   On his wrist?

A   Well, on his left hand between his --

Q   Has four dots?

A   Yes.

Q   And no fifth dot that you're aware of?

A   Correct.

Q   So seems to me that what we're talking about is the fourth letter in the alphabet, don't you?  Which would be, even in Spanish, A, B, C, D?

A   It's possible.

Q   It's probable, isn't it?  Without that, without that fifth dot which symbolizes, my understanding from everybody's testimony, is that symbolizes the ten and the four dots symbolize four and you get 14.  Right?

A   You get one dot as one and four dots as four which makes the 14.

Q   Yes.  I'm sorry.  You said that much better than I could.  But the one dot's not there; right?

A   Correct.

Q   Now, with regard to the, the tattoos that appear on Mr. Garcia's forehead.  When I look at Exhibit 50, I see one dot on the left side of his forehead.  Is that what you see?

A   I'm not sure exactly what it is; but I see -- I see what you're talking about.

Q   Yeah.  I don't see -- you cannot see the right side of his forehead; right?

A   Correct.

Q   But you told us there were tattoos on both sides; right?

A   Correct.

Q   And you told us the tattoos on the left side were, what, four dots?

A   I didn't say exactly what they were.

Q   Oh.  Oh.  I'm sorry.  I misunderstood you.  You don't know what those tattoos were?

A   I didn't tell you what was on where.  I just -- I didn't know he had tattoos on his forehead until later on.

Q   When is later on?

A   When we were dealing with this case up here in Wichita.

Q   What tattoo, if any, does he have on the left side of his forehead?

A   Well, from what I can see, what you have pointed out is it looks like a dot.  I can't see exactly what it is.

Q   And you can't see the other side of his head; right?

A   That is correct.

Q   So based on your observations, are whatever is on his forehead gang tattoos?

A   Without being able to see them, I can't tell you.  But with the one dot on the left side and the four dots on his left wrist, you could -- you could say that they are.

Q   You could in fact say that.  But you know as well as I do that when the -- when you're using four dots on

your hand, there's usually -- there is, for a Norteno, a fifth dot on that hand; right?

A   Not usually on that hand, no.

Q   Would that fifth dot be as far away as your head from your hand?

A   It could be wherever they want to put it.  I've seen it on -- a dot on one hand and four dots on the other.

Q   An X on one hand; a four on the other?

A   Correct.

Q   But in any event, truth be told, you have no idea what's on this young man's head?

A   Correct.

Q   Well, let's talk about your training and experience. Briefly tell us what your training has been?

A   I received training through the local police department, as instructors come in, I've attended conferences on gangs.

Q   Well, when was the last one you attended?

A   The very last conference I attended?

Q   Yes.

A   Was in July of this year in Topeka.

Q   Who put that on?

A   Topeka PD did, police department.

Q   I'm sorry.

A   Topeka police department.

Q   For the sake of brevity, how many of those training -- it's a training seminar; right?

A   Correct.

Q   How many of those have you attended over your career before you got this new job?

A   This was -- this was even with this new job.  I've been through, oh, probably about six to eight of 'em, conferences.

Q   Conferences.  Lasting what?  Approximately a day or approximately half a day?

A   No.  The conferences usually last anywhere from three to five.

Q   Days?

A   Days, yes.

Q   Have you ever attended a conference that addressed itself to the Diablos Viejos, that specific street gang in Dodge City?

A   I've been at conferences where Agent Webb has spoke about 'em; but not any direct training from anywhere else solely on them.

Q   Okay.  So what you know about the Diablos Viejos is what you have learned yourself?

A   Correct.

Q   And what you learned from Agent Webb who has talked to us?

A   Correct.

Q   Okay.  Well, keeping in mind the Diablos Viejos, do you know what Nuestra Familia is?

A   I'm familiar with it.

Q   Do you know what it means?

A   It's -- it's -- the way I understand it, it's the -- it's kind of like the Mexican mafia with the Surenos, they have an allegiance that they -- Surenos pay their allegiance or respect towards the Mexican mafia.  Which is a prison-based gang.  Nuestra Familia is the same thing, which your Nortenos, DV and LCC --

Q   Let's just stick with Nuestra Familia for a moment.  Would you agree with me --

THE COURT:  Stop interrupting your witnesses.

MR. WACHTEL:  I'm sorry, Judge.

THE COURT:  Cross-examination, Mr. Wachtel, as you well know, does not include the right to interrupt.  Let him finish his answers.

MR. WACHTEL:  I apologize, Your Honor.  I'm sorry, sir.  Go ahead.

A   The Nuestra Familia is another prison-based gang and that's where the separation kind of sets with how your Nortenos pay their allegiance versus how your Surenos pay their allegiance to the Mexican mafia.

Q   Are you familiar with, with an entity called Nuestra

Raza?  Nuestra Raza?

A    I am not, no.

Q    You have no idea what connection, if any, Nuestra Raza has to either Nuestra Familia or the -- excuse me -- or Nortenos; right?

A    Correct.

Q    Do you know whether or not Nuestra Familia has a written constitution?

A    I've heard they do.  I don't know.

Q    Have you ever seen it?

A    No, I have not.

Q    Are you aware of whether or not Nuestra Raza has, I don't know, for want of a better word, a written constitution?

A    I don't know.

Q    Do you know with regard to DVs whether or not the DVs honor the Nuestra Familia constitution?  Do you know whether or not the DV -- I'm sorry -- I misspoke and I apologize.

     Do you know whether or not the Nortenos honor the Nuestra Familia constitution?

A    Without knowing their constitution, I can't say that they do or they don't because I don't know what their constitution is.

Q    Based on your training and experience, do you know

whether or not Nortenos have a written constitution?

A   I have not seen one.  It's the same thing.  I've heard that there is one; but I have not -- I've not personally seen it.

Q   Based on your training and experience, do the DVs have a written constitution?

A   It's gonna be the same thing.  This is -- I've heard that there is; I've never seen one.

Q   How long in Dodge City have you all been investigating the DVs?

A   As far as what do you mean?

Q   As far as criminal activity.

A   Whenever they're involved.

Q   How -- for how many years have you been involved in investigating them?

A   I can't say them specifically.  I've worked from -- on the gang unit from 2007 to 2012.  I started in 2006.  So even before I was assigned to the gang unit, I was still on gang-related calls.

Q   Right.  Because Dodge City Police Department is only so big; right?

A   Correct.

Q   Well, but you did eventually become a part of what I would call the gang task force out of Dodge; right?

A   Correct.

Q   And that investigates gangs, gangs, plural; right?

A   Correct.

Q   Do you now -- using that as its starting place, do you know how many years you've been investigating the DVs?

A   Well, I can't tell you, I mean, from the time I was on from 2007 to 2012 where my primary focus was gangs only.  So that entire period.  I mean, it was DV, it was the other gangs we deal with as well.

Q   Whatever the subsets of the Surenos are; correct?

A   Uh-huh.

Q   You would investigate them?  But in the length of -- in your entire investigative career, you never have run across -- I'm sorry -- let me withdraw that.  You participated in executing search warrants on DV, on homes belonging to DVs; right?

A   Correct.

Q   More than once?

A   Correct.

Q   You ever find a written constitution there?

A   I never have, no.

Q   And just to make sure that I understand what you're saying.  You have told us that on that -- on the occasion that you had to talk to Mr. Garcia, he described himself to you as a DV?  That's what you told

us; right?

A    Correct.

Q    And for that matter, so did Mr. Ramirez describe himself?

A    Correct.

Q    In your investigation -- and then I'll be done -- in your investigation of the DVs, have you ever found -- have you ever found any recording of how much money came in, from whom it came in and how it was spent?

MR. SMITH:  Objection; relevance and beyond the scope.

THE COURT:  Overruled.

BY MR. WACHTEL:

Q    Did you understand my question, sir?

A    No.  I'm sorry.

Q    In all of your investigation into the DVs, okay, have you ever found anything other than -- I know that you're familiar with a ledger which has been admitted into this case; right?

A    Correct.

Q    You know what that is?

A    Correct.

Q    And I'm not talking about that.

A    Okay.

Q    Have you ever found records that indicate how much

money came in from individual gang members and how it was spent?  I'm talking about written records.

A   I have not, no.

MR. WACHTEL:  Thank you so much for your time. I don't have any further questions.

THE COURT:  We'll take our morning recess, Ladies and Gentlemen.  Approximately 15 minutes. Remember and heed the admonition.

(Recess.)

(Whereupon, the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT:  All right.  Before we call the jury back.  With respect to the matter of Mr. Smith testifying.  I can't find any Tenth Circuit cases; however, there's an Eighth Circuit case. *United States V Watson*.  952 Fed. 2nd 982.  Whether defending or prosecuting, whether an attorney may testify in a case he is trying is within the discretion of the district court.  The party seeking such testimony must demonstrate that evidence is vital to his case and that his inability to present the same or similar facts from another source creates a compelling need for the testimony.

A Fifth Circuit case, *Riddle vs. Cockrell*, 288 F.

3rd 713. It is generally improper for the prosecutor to testify at the trial of a case he is prosecuting, whether for or against the defendant. Such practice should be permitted only in extraordinary circumstances or for compelling reasons. And it is preferrable for the prosecutor to step down after his testimony.

I find, based on what Mr. Henry said, that there's no demonstration of any extraordinary circumstance or compelling need. So Mr. Smith will not be testifying. Let's bring the jury back.

(Jury returns to the courtroom.)

THE COURT: Please be seated. Mr. Mandelman, you may cross-examine.

MR. HENRY: Actually, Your Honor, I'm going to take the cross-examination.

THE COURT: Go ahead, Mr. Henry.

MR. HENRY: Thank you, Your Honor.

### CROSS EXAMINATION

BY MR. HENRY:

Q   Now, my client, Gonzalo Ramirez -- he goes by, also, I think, the name Gonzo; is that correct?

A   That is correct.

Q   That is not a gang moniker, is it?

A   That's what he is known as. That's his -- for our validation purposes on our gang sheet, that's what his

gang name is.

Q   Do you remember testifying at the Daubert hearing in this case?

A   Yes.

Q   Do you remember Mr. Mandelman cross-examining you and asking you whether or not Gonzo was a gang moniker?

A   It depends on how you -- how you're asking the question.  It's his gang name.  If you're asking towards the resemblance of the gang itself, no, it doesn't.

Q   First question by Mandelman in his cross-examination, do you remember him saying:  Gonzo is not -- that's not a gang nickname?  And you recall answering:  That's not at gang nickname; that's his nickname.

A   Correct.

Q   Okay.  Now, do you know when he obtained all of his tattoos that you've testified to?

A   No.  I don't know exactly when he had them all, no.

Q   Okay.  The -- now, there was a time earlier in the trial where a very tough to understand tape recording, very short tape recording, of Juan Torres was played.  And I don't believe anyone was able to hear it.  That recording, that's the interview that you've testified just now this morning about and it was about a stabbing and a shooting.  Is that correct?

A    It was about a stabbing and shots being fired, yes.

Q    Okay.  So it wasn't about the October 4th, 2008, drive-by shooting; is that correct?

A    That is correct.

Q    That tape didn't identify you on there, did it?

A    I haven't heard it.  I don't remember it.  I remember the interview.  I don't remember --

Q    Okay.  And it was a very short interview; isn't that right?

A    Yes, it was.

Q    In fact, he was essentially saying he was sleeping and denied any involvement; is that right?

A    That is correct.

Q    Is that, is that your understanding of that incident?  Why were you interviewing Juan Torres that day?

A    Because somebody had mentioned somebody in his age range, his stature, that was possibly there or that was there.  So he was interviewed in reference to that.

Q    Okay.  Do you believe he was telling you the truth when he said he was sleeping?

A    I don't believe he was, but --

Q    Now, you also mentioned in that interview that he was known to be carrying a 9 mm; is that right?

A    Not specifically him; but whoever that person was.

Q   But that's what you had essentially accused him of in that interview?

A   I didn't accuse him of anything.  I asked him about it.

Q   Okay.  The word on the street is is that he's carrying a 9 mm?

A   I don't remember exactly everything that was talked about, if it was 9 mm or what it was.  But there was shots fired at this incident.  He was -- somebody like him was described, so that's why he was interviewed.

Q   Okay.

MR. HENRY:  I have nothing further.

THE COURT:  Anything further?

MR. SMITH:  No.  Nothing further.

THE COURT:  Thank you, Mr. Nau.  Next witness, please.

MR. WELCH:  Your Honor, United States recalls Shane Webb.

THE COURT:  Still under oath, Mr. Webb.

A   Yes, Your Honor.

**SHANE WEBB**

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

**DIRECT EXAMINATION**

BY MR. WELCH:

Q   Agent Webb, for the record, you are the same Shane Webb who's testified previously in this case?

A   Yes, sir.

Q   All right.  Can we display Exhibit 40, please.  Sir, do you know when this concert took place?  When it occurred?

A   Not the exact date, but it occurred in 2008.

Q   And it occurred here in Wichita, Kansas; is that right?

A   Yes, sir.

Q   And before I get any further into this photograph, is Dodge City, Kansas, located in Ford County, Kansas?

A   Yes, it is.

Q   Now, from 2008 when this concert occurred until a period of 2012 -- well, let me ask you first.  2008, do you know the approximate number of DV gang members that the Dodge City Police Department had documented as of 2008?

A   I believe it was in June or July of 2012, there was 217 active members.

Q   Let me ask you as of 2008.  Do you recall?

A   I don't recall in 2008.

Q   Let me ask you this.  The numbers of DV gang members, did it remain fairly constant during that

four-year period of 2008 to 2012?

A    Yes, it did.

Q    And when you left your employment with the Dodge City Police Department to join the KBI were the number of DV gang members roughly similar to the same number you experienced while you worked at the Dodge City Police Department?

A    Yes.

Q    Are you familiar, sir, with investigations conducted by the Dodge City Police Department of DV and LLC gang members who were targeting Surenos or persons they suspected to be Surenos?

A    Yes.

Q    In addition to the testimony that has already been presented concerning the shooting on 4th Avenue on October 4th, 2008, and the murder which occurred on June 8, 2009, are you aware of other investigations in addition to those two where the police department investigated DV or LCC gang members targeting Surenos or people they suspected to be Surenos?

A    Yes.

Q    Let me ask you to focus your attention on the date of March 29, 2010.  Are you familiar with an investigation the police department conducted that meets that description?

A   Yes.

Q   All right.  What occurred on March 29, 2010?

MR. MANDELMAN:  Judge, I'd object as to relevance.  This doesn't have anything to do with these two gentlemen.

MR. WELCH:  Your Honor, we have to establish a pattern of racketeering, which is what we're establishing, there's a pattern of racketeering.

MR. MANDELMAN:  They have to establish those guys are -- had some knowledge.  We're here on a specific --

MR. WELCH:  No, we don't.

THE COURT:  Well, I want to talk to the lawyers about this, Ladies and Gentlemen.  I hate to do it, but please return to the jury room.

(Jury excused to the jury room.)

THE COURT:  Be seated.  You've said that so many times, Mr. Welch, we have to establish a pattern of racketeering activity.  We have been here -- we're starting our third week of trial; and it seems to me that most of that trial has been to, one way or another involved, in a pattern of racketeering activity.  Why do we have to beat that horse to death?

MR. WELCH:  Your Honor, first of all, we're gonna be in trial not as long as we expected.  And we

moved quicker than we thought we were.

THE COURT: That's fine. I applaud everyone for that. But my question is, you know, have we not had enough evidence of pattern of racketeering activity from the maybe 30 people who have testified here one way or another.

MR. WELCH: Your Honor, the Indictment charges that one of the purposes of the gang was to intimidate rival gang members. And what I intend to do is discuss other crimes which the jury has not heard about where both members of the conspiracy that are indicted, for example, Eusebio Sierra-Medrano, Jesus Sanchez, Fabian Neave and others, engaged in activity, criminal activity, directed at Surenos, which is what we charged in the Indictment and goes to the proof that we have to establish both the enterprise and the pattern of racketeering activity.

THE COURT: I know that. I've spent most of yesterday going over the instructions and I think I'm relatively familiar with what the law says you have to establish. My question is: Why is it necessary to go on with additional evidence about this? What is it about your evidence that we've spent two weeks going over now, in your mind, is insufficient that requires more testimony about the DVs and the LCC against the

Surenos?

MR. WELCH:  Your Honor, I think we should be entitled to present the evidence we have about those crimes where DV and LCC gang members engaged in criminal activity toward their rivals.  I don't know how much the jury is going to determine is enough, Judge.  And I think we should be entitled to present our case.  We're not presenting every crime that occurred in Dodge City along those lines.  Just the ones that involve the members of the Indictment that were -- the Defendants in the --

THE COURT:  Well, you're entitled to as long as it isn't cumulative.

MR. WELCH:  I understand, Judge.  I will -- again, we've cut out some that we were going to get into, were going to attempt to get into.  I've limited it to one, two, three, four additional crimes; and, Your Honor, it also goes to the interstate commerce nexus that we have to prove because some of these crimes involve firearms, which Neal Tierney testified about the firearms.  We're trying to link up Mr. Tierney's testimony to the actual crime itself.

THE COURT:  What do you think, Val?

MR. WACHTEL:  I don't know, Your Honor.  It seems to me if there isn't enough here, there's never

gonna be.

MR. WELCH:  Well, that's not what he is going to say in his closing argument, Your Honor, so -- if he'll say that in his closing, then, hey, I'll sit down; but I'm guessing he ain't gonna say that.

THE COURT:  My guess is that you're correct. This is like the testimony about those two Defendants being members of the DVs, the Nortenos.  I don't expect the Defendants to stipulate that they are; but I don't think there's going to be much doubt in the jury's mind that they are based on the evidence I've heard so far.

MR. WACHTEL:  I don't think there's going to be much doubt in the jury's mind, Your Honor, that my client is a DV.  I do not -- I don't think there will be any -- nobody over there is going to think he's not.

THE COURT:  What do you think?  I know what you think; but you can't put it on the record.

MR. MANDELMAN:  Yeah.  Thank you, Judge.  Just for the record, I want to object for 401, 403, 404(b); and also I think the potential --

THE COURT:  Well, it's not 404(b) unless it involves these two Defendants probably.

MR. MANDELMAN:  Well, some of the -- I mean, the Government's basically trying to lump all these guys together; and I think there's the potential here -- I

understand there's a conspiracy charged in Count 1; but we're going to hear evidence of some separate conspiracies that weren't involving these Defendants and creating that possibility that we're going to be asking for a multiple conspiracy instruction if --

THE COURT:  Please, those things are terrible.

MR. MANDELMAN:  Well --

THE COURT:  Let me ask you this, Lanny.  Is Agent Webb going to testify about other incidents that involve either of these two Defendants?

MR. WELCH:  Your Honor, in this portion of his testimony, no; but he will testify about other conspirators that are charged with these two Defendants in the same Count 1 conspiracy.

THE COURT:  And these are four incidents during what period of time?

MR. WELCH:  The period charged in the Indictment, Judge, 2010, 2011.

MR. MANDELMAN:  Mr. Ramirez was locked up --

MR. WELCH:  Judge, it doesn't matter.  Again, the law doesn't -- we don't have to establish those two Defendants participated in the crime.  We have to establish these are members of the enterprise that participated in this --

THE COURT:  And is this the last evidence that

you intend to put on that demonstrating enterprise and what-not?

MR. WELCH:  Yes.  Yeah.  We expect Agent Webb to be our last witness, Judge.

THE COURT:  Oh, you're not going to call these two people who supposedly at the prison interviewed these two Defendants and got them --

MR. WELCH:  No, sir.

THE COURT:  All right.  You pick the two best DV versus Sureno incidents and I will permit Agent Webb to testify about those.

But then I think you will have covered your bases. And if it isn't enough at this point in time, I agree with Mr. Wachtel, it will never be enough.

MR. WELCH:  Your Honor, just to anticipate one other issue.  As the Court is aware, we indicted -- we alleged robberies as part of the racketeering activity engaged in by this enterprise --

THE COURT:  Well, we've got evidence of a robbery.

MR. WELCH:  I'm sorry.

THE COURT:  We have evidence of a robbery at the Guatemalans' house.

MR. WELCH:  That's right, Judge; but I think we should be allowed -- I'd ask that we be allowed to

establish other robberies committed by the enterprise which shows, as we alleged in the Indictment, that this gang was responsible for robberies --

THE COURT:  You put on evidence of two robberies.  If that goes into -- or comprises the two incidents I'm going to let you put on.  Or one robbery. But it's only two.  So pick your best two and let's go with it.

MR. WELCH:  Can I have a second, Judge.

(Off-the-record.)

THE COURT:  Val, is your witness here?

MR. WACHTEL:  She is in my office, Your Honor. At least she should have been in about 10 minutes ago. In my office, not in the courthouse.

THE COURT:  How long do you think her testimony will take?

MR. WACHTEL:  I would think, Your Honor, that I would probably use an hour and 15 minutes to an hour and 30.  And I don't know --

THE COURT:  You think that's the only witness you'll call?

MR. WACHTEL:  That is the only witness I will call.

MR. MANDELMAN:  Yeah, Judge, we, we have two real short witnesses.  We had kind of coordinated

suggesting they might come here on Wednesday morning. They're going to be real short. I got probably five minutes for mine and I think Tim has got one, he's kind of cleaning up just a few facts from the actual incidents that we're on trial for --

MR. HENRY: Actually, I have three. One is driving from out-of-state and would be, I think, through here late this afternoon. The other two, because we thought the Government and Val would go the whole day, we pretty much told 'em on Friday that we would be wanting them Wednesday morning. They are short witnesses.

THE COURT: It's okay. I'm trying to think, I think what we'll do is we'll finish up with Agent Webb. The Government presumably will rest. We'll take up any motions. Then after lunch, Val, you can put your witness on. By that time, maybe I'll have a final set of instructions for you. And we'll take the rest of the day to deal with instructions, try to wrap those up. There are a lot of them. And I know you want to have an opportunity to look at the final set. And then we'll bring them back tomorrow morning and have your people on.

MR. HENRY: Your Honor, the Government may know -- Officer Stein, Robert Stein, was somebody that I

subpoenaed and I don't know if he's going to be in late today or tomorrow morning.

MR. WELCH:  We don't know, Judge.  I'm sorry.

MR. HENRY:  I'll talk to Orlando and try to find out where he's at.

THE COURT:  Anyway, you can put your people on tomorrow morning.  And we'll see where we get with the instructions today.  And it may be that I'll have them come in later tomorrow so that we cannot have them sitting in the jury room while we're finalizing instructions.

MR. MANDELMAN:  I think, Your Honor, I think, because I started kind of wrestling with them, too, I appreciate the Court's work.  I have a few things that I'm probably going to suggest.

THE COURT:  Well, there are going to be some significant revisions in these to try to make them more understandable to the jury.  And, so -- anyway.  Okay. You want me to bring them back or have you decided, Lanny?

MR. WELCH:  I have, Judge.  Thank you.

THE COURT:  All right.  Let's bring them back.

(Jury returns to the courtroom.)

THE COURT:  All right.  Go ahead, Mr. Welch.

MR. WELCH:  Thank you, Judge.

BY MR. WELCH:

Q   Agent, let me focus your attention on the date of March 30th of 2011. Are you familiar, sir, with an investigation the Dodge City Police Department conducted on a gang crime directed at -- gang crime committed by DV gang members directed at Sureno gang members?

A   Yes.

Q   All right. What occurred on March 30, 2011? Briefly.

A   What happened was there was a Sureno gang member by the name of George Gonzalez. He was at East Love's in Dodge City, when he was confronted by three members of DV and one member of LCC.

Q   Let me stop you there for a second. Can you display 31, please. Do you recognize who that is, sir?

A   Yes.

Q   Who is that?

A   That is Jesus Sanchez. His street name is Drakula.

Q   And what gang does he belong to?

A   Diablos Viejos.

Q   Was Jesus Sanchez one of the DV gang members present at east Love's that day involved in this crime?

A   Yes.

Q   Let me ask you to display 28, please. Do you recognize who that is?

A    Yes, I do.

Q    Who is that?

A    This is Enrique Gobin.  His street name is Sonny Boy.

Q    And is Mr. Gobin a documented gang member?

A    Yes, he is.

Q    What gang is he documented to belong to?

A    Diablos Viejos.

Q    And was Mr. Gobin involved in the incident that you're about to describe?

A    Yes.

Q    And then could we display Exhibit 381.  Do you recognize who that is?

A    Yes.

Q    Who is that?

A    This is Alfonso Banda-Hernandez.

Q    And does he have a street name?

A    He goes by Fonso.

Q    And was Alfonso Banda-Hernandez -- was he a documented gang member?

A    Yes.

Q    What gang is he documented?

A    LCC.

Q    Was he present and did he participate in the crime you're about to describe?

A   Yes.

Q   All right.  These three men that you've just identified, what did they do that day?

A   What initially --

MR. MANDELMAN:  Judge, I'm going to object.  It calls for a narrative response.  He can't just come here and narrate what happened.

THE COURT:  Let's keep it question, answer, question, answer and not long narratives.

BY MR. WELCH:

Q   You testified earlier, Agent Webb, that an incident began at east Love's in Dodge City, Kansas; correct?

A   That is correct.

Q   What is east Love's?

A   East Love's is a convenience store.

Q   Who was present at east Love's?

A   George Gonzalez; Alfonso Banda-Hernandez; Jesus Sanchez; Enrique Gobin; Arsenio Rios (ph); Andrew Gusman.  I believe that's it.

Q   And is Andrew Gusman also a documented gang member?

A   Yes.

Q   What gang is he documented to belong to?

A   DV.

Q   Was there a confrontation that took place at east Love's between DV gang members and a Sureno gang member?

A    Yes.

Q    What happened?

A    Initially, they were yelling at each other and throwing gang signs --

MR. MANDELMAN:  Again, Judge, I'm going to object.  I think this is all hearsay.

THE COURT:  That would be hearsay --

BY MR. WELCH:

Q    All right.  As a result --

THE COURT:  Well, it isn't hearsay that they were yelling.  If he's going to get into what they were saying as opposed to just yelling at each other, then that would be hearsay.

MR. MANDELMAN:  His knowledge of the incident is all what he's been told from other people.

THE COURT:  Well, that, too --

MR. WELCH:  Your Honor, he participated in the investigation of this crime.

THE COURT:  Let's keep it away from the hearsay, please.

MR. WELCH:  Yes, Your Honor.

BY MR. WELCH:

Q    Was there a shooting that took place in relation to this investigation?

A    Yes, there was.

Q   Where did the shooting take place?

A   It was at, I believe, 1504 6th Avenue, in the alleyway behind it.

Q   And did you personally investigate the aftermath of the shooting?

A   Yes, I did.

Q   All right.  And what was your role in that investigation?

A   I worked the crime scene; collected evidence from the crime scene.  I also spoke to the victim.

Q   And who was the victim of the shooting?

A   George Gonzalez.

Q   Same George Gonzalez that's a documented Sureno?

A   Yes.

Q   All right.  As a result of the investigation, were DV gang members arrested for the shooting?

A   Yes.

Q   Who was arrested?

A   Jesus Sanchez; Alfonso Banda-Hernandez; Enrique Gobin, and -- I'm sorry -- it just --

Q   And --

A   -- Andrew Gusman.

Q   Was a firearm recovered as part of that investigation?

    Yes.

Q   What type of firearm was recovered?

A   It was a Smith and Wesson .40 caliber semiautomatic pistol.

Q   Where was that firearm recovered?

A   From Laura Rodriguez' house.  Enrique Gobin's residence.

Q   Sir, I'm going to ask you to examine Exhibit 163. Tell us if you recognize what that is.

A   Yes, I do.

Q   What is that?

A   This is the firearm that was recovered in the basement area of that residence.  The serial numbers were obliterated.  That's how I know this is the weapon.

Q   All right.  And was it determined that this firearm was involved in the shooting at George Gonzalez?

A   Yes.

Q   And the firearm was found in the basement of whose residence?

A   Laura Rodriguez is Enrique Gobin's mother.  It was Enrique Gobin's residence.

Q   Exhibit 28, please.  Is this the person who the firearm was found at his residence?

A   Yes.

Q   Sir, let me ask you whether or not there was an investigation conducted by the Dodge City Police

Department of an incident, a gang incident which occurred on August 27, 2011?

A    If I could refer to my notes.

Q    Please do.

A    August 27, 2011?

Q    Yes, sir.

A    Yes.

Q    What investigation was conducted by the police department, gang-related investigation that day?

A    This was a stabbing of two individuals that occurred in the 700 block of 9th Avenue in Dodge City, Ford County, Kansas.

Q    And were members of the DV gang arrested as participants or charged with committing the stabbings that occurred on August 27, 2011?

A    Yes.

Q    Which DV or LCC gang members were arrested for the stabbing that occurred on August 27, 2011?

A    Jason Najera; Humberto Ortiz; Fabian Neave; Jose Neave; and Christian Sanchez.

Q    Can we display 401, please.  Who is that?

A    This is Jason Najera.

Q    And is he is a documented gang member?

A    Yes, he is.

Q    What gang?

A    Diablos Viejos.

Q    And 414, please.  Who is that?

A    This is Jesus Torres.

Q    And does he have a gang name?

A    Yes.  He goes by Rabbit.

Q    And is he a documented gang member?

A    Yes, he is.

Q    What gang is he documented belonging to?

A    Diablos Viejos.

Q    Then can we display 402, please.  Do you know who that is?

A    Yes.

Q    Who is that?

A    This is Jose Neave.

Q    And is he a documented gang member?

A    Yes, he is.

Q    What gang is he documented belonging to?

A    Diablos Viejos.

Q    And 405, please.  Do you know who that is?

A    Yes.

Q    Who is that?

A    Humberto Ortiz.

Q    Is he a documented gang member?

A    Yes, he is.

Q    What gang?

A     LCC.

Q     As a result of actions taken by these men that day -- in addition to those four photographs, you also testified Fabian Neave was involved in this incident; is that right?

A     Yes.

Q     The same Fabian Neave who testified last Friday in this courtroom?

A     I don't know when he testified but --

Q     All right.  Very good.  All right.  As a result of the actions of those five DV or LCC gang members, were people treated for wounds suffered as a result of this altercation?

A     Yes.

Q     What wounds -- first of all, who was wounded?

A     Gabriel and Carlos Rivera.

Q     Where did Mr. Rivera -- and possibly Carlos Ramirez?

A     Yes.

Q     Where were they when they were injured?

A     The address is 80 -- 803 or 805 -- excuse me -- 703 or 705 9th Avenue.  I'm not exactly sure.

Q     And what wounds did they sustain?

          MR. WACHTEL:  Objection; foundation.

          THE COURT:  Sustained.

BY MR. WELCH:

Q   Did you participate in that investigation, sir?

A   Only in the interviews after the crime scene was worked.

Q   All right.  As part of the investigation, did you look at photographs that were taken of the injuries at any point?

A   Yes, I have seen them.

Q   All right.  After looking at the photographs and just participating in that investigation, did you observe wounds that were suffered by these two men?

MR. WACHTEL:  I'm going to -- same objection, Your Honor.  It's also hearsay.  It's -- this is un -- unsubstantiated photographs, un-- that have not been admitted in this case and he is going to base his testimony on.

THE COURT:  Sustained.

BY MR. WELCH:

Q   Do you know, sir, whether those two men received medical treatment that day?

A   Yes.

Q   All right.  Do you know where they received medical treatment?

A   One of them in Dodge City.  One of them was transported here to Wichita.

Q   Do you know why one of the victims was transported to Wichita?

A   Because of the extent of his injuries.

MR. WACHTEL:  Objection, Your Honor.  That's a yes or no question.  What may follow it could be hearsay and we can't object.

THE COURT:  Well, go ahead.

MR. MANDELMAN:  I just join in the objection.

BY MR. WELCH:

Q   Agent Webb, my question was do you know why one of the victims was transported to Wichita and not -- did not receive treatment in Dodge City, Kansas?

A   Once again, because of the extent of his injuries, the hospital in Dodge was not able to provide care to him that he needed.

THE COURT:  Pretty obvious.  That's the usual situation, I think, that we're all familiar with.  Whether it's a car wreck or whatever.

MR. WELCH:  May I have just one second, Judge.

(Off-the-record.)

Q   Agent Webb --

MR. WELCH:  Your Honor, we move to admit Exhibit 163.

THE COURT:  163.  Any objection?  That's the Smith & Wesson .40 caliber.  Any objection?

MR. WACHTEL: I don't object, Judge.

MR. MANDELMAN: I object on relevancy and 403.

THE COURT: Exhibit 163 is received.

BY MR. WELCH:

Q   Moving to a new subject. Do you recognize who that is, sir?

A   Yes, I do.

Q   What is that?

A   Eusebio Sierra-Medrano.

Q   Have you, sir, in the past, seized firearms that were found to be in the possession of Mr. Sierra-Medrano?

A   Yes.

Q   Let me first ask you, sir, to look at Exhibit 164. Do you recognize what 164 is?

A   Yes, I do.

Q   What is 164?

A   This is a Springfield Armory .45 caliber 1911 model frame firearm, semiautomatic pistol.

Q   Have you seen that gun prior to today?

A   Yes, sir.

Q   Do you recall where you first saw that firearm?

A   Yes.

Q   Where?

A   It was at a residence on Kansas Avenue in Dodge

City.  There's only, I believe, one residence on that street.  It's Greg Martinez' residence.  I've seen this firearm in the backyard where Eusebio Sierra-Medrano began running from.

Q   The address that you've testified to, who resided -- well, when did you first see that weapon?

A   July 30th of 2011, I believe.

Q   And the residence that you described where you located this firearm, who was living at that residence on that date?

A   Greg Martinez, Eusebio Sierra-Medrano and Eusebio's girlfriend.  I believe her name was Heidi Anderson or Heidi Medrano.

Q   In addition to that firearm, did you seize another firearm at the residence that day?

A   Yes, we did.

Q   Ask you to look at Exhibit 165.  Do you recognize what that is?

A   Yes, I do.

Q   What is that?

A   This is a Norinco brand SKS.  Shoots 7.62 by 39 ammunition.  This was found in Eusebio Sierra-Medrano's bedroom.

Q   Is Eusebio Sierra-Medrano a documented gang member?

A   Yes.

Q   What gang is he documented belonging to?

A   Diablos Viejos.

Q   What is his street name?

A   TC.

MR. WELCH:  Your Honor, we would offer 165.

MR. WACHTEL:  I object to 165, Your Honor, in that if it is not tied to some sort of predicate act, criminal activity, it is irrelevant to this case.  As is, unfortunately, the .45, the number I do not remember.

MR. MANDELMAN:  Your Honor, I make a similar objection under 401 and 403.

MR. WELCH:  Your Honor, Agent Tierney testified to both of these weapons last week, that he had performed interstate commerce examination on both firearms.

THE COURT:  164 and 165 are received.  They were both seized pursuant to this warrant search.

BY MR. WELCH:

Q   How did you seize both those firearms, sir?

A   Yes, it was -- a search warrant had been signed for the residence.

Q   Can we display Exhibit 50, please.  Sir, prior to today, have you observed tattoos on the forehead of Pedro Garcia?

A   Yes, I have.

Q   Do you know what the tattoos are?

MR. WACHTEL:  Your Honor, I object.  This is going outside of the -- of what was understood that this testimony would be about based on conferences which we had on the record with counsel.

MR. WELCH:  Your Honor, he's our gang expert, one of our gang experts; and he's had personal contact with Mr. Garcia.

THE COURT:  The objection is sustained but for a different reason.  It's cumulative.  Agent Nau was also your expert, designated expert.

BY MR. WELCH:

Q   Sir, in the past have you had contact with Gonzalo Ramirez that caused you to complete what we've referred to as a gang sheet?

A   Yes.

Q   Let me ask you first, the date of April 17, 2007, did you have a contact with Gonzalo Ramirez and did you generate a gang sheet from that contact?

A   Yes, I did.

Q   What occurred on April 17, 2007, that caused you to generate a gang sheet?

A   A search warrant was executed at a residence at 2700 Avenue A.  It's an apartment complex.  I believe the

apartment was 1-D.  This was an Angelica Gonzalez.

Officers were looking for her brother, and a search

warrant was signed for that residence to find his body.

Within that residence, I made contact with Gonzalo

Ramirez and had a conversation with him.

Q   And did the conversation you had with Mr. Ramirez

include whether or not he was affiliated with a gang in

Dodge City, Kansas?

A   Yes.

Q   What did you ask him and what did he say?

A   I asked him basically -- if I could refer to my

notes on this one --

Q   Please do.

A   Okay.  I refreshed my memory.

Q   What did you ask him and what did he say?

A   I asked him if he was still with DV.  He told me he

still kicks it with them.  He stated he was trying not

to hang out around with them that much, is basically our

conversation as far as him hanging out with DV.

Q   What did it mean to you when he said he still kicks

it with DV?

A   That he was still a DV gang member.

Q   And then let me ask you if you generated a gang

sheet based on a contact you had with Gonzalo Ramirez on

January 30 of 2009?

A    Yes, I did.

Q    All right.  What occurred on January 30, 2009?

A    Gonzalo Ramirez and Rudy Hernandez were shot with a shotgun at 1104 Johnson Avenue in Dodge City.  Those two individuals were at the hospital whenever I had a conversation with them.

Q    All right.  And Rudy Hernandez, is he or was he a documented gang member?

A    Yes.

Q    What gang was he documented belonging to?

A    Diablos Viejos.

Q    In response to the shooting, did you participate in the investigation of the shooting?

A    Yes, I did.

Q    And did you have contact with Gonzalo Ramirez?

A    Yes, I did.

Q    What was the nature of that contact?

A    I was trying to talk to him at the hospital regarding gathering information from him in reference to who possibly did this to him.

Q    All right.  Did he assist you in that investigation?

A    No, sir.

Q    All right.  Did you have any discussions about whether or not he was a member of a gang in January of 2009?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    No, I did not.

Q    Let me focus your attention, sir, on the date of October 19, 2010.  Do you recall executing a search warrant on a residence in Dodge City that day?

A    Yes.

Q    What residence did you search that day?

A    I believe there would have been two search warrants executed that day.  One of the residences was 1302 Avenue D, which was Pedro Garcia's residence.  The other one was 1409 Avenue H, which was Gonzalo Ramirez' residence.

Q    All right.  As a result of the execution of those search warrants, did you recover items that were turned in as evidence?

A    Yes.  I didn't seize them but I was -- Detective Bice seized those items.

Q    Let me first ask you to look at Exhibit 61.  Sir, do you recognize what is marked as Government Exhibit 61?

A    Yes, I do.

Q    What is that?

A    This was a license tag, says North Towne.  This was seized out of Pedro Garcia's bedroom.  And this tag is the tag that used to be the front plate that was on Gonzalo Ramirez' car.

Q    All right.  Now let me ask you to look at Exhibit

371. Do you recognize what that is, sir?

A    Yes, I do.

Q    What is that?

A    Are you talking about the front plate?

Q    What is the vehicle, first of all?

A    This is Gonzalo Ramirez' Cadillac that he used to own.

Q    All right. Now, the license plate which is displayed on the vehicle in this photograph, is it the same license plate that is now in your hand marked Government Exhibit 61?

A    Yes.

Q    All right. How do you know it's the same one?

A    We had a -- Gonzalo Ramirez' vehicle was in a traffic accident and this was on the front of the vehicle when that accident occurred.

Q    All right. But when you recovered the exhibit, where did you take it or where did you recover it from?

A    From Pedro Garcia's bedroom, the 1302 Avenue D.

Q    All right. Come we display 156, please. All right. Is this the residence that you conducted the search that resulted in you seizing the license plate marked as 61?

A    Yes. This is a photograph from behind the residence.

            MR. WELCH: Your Honor we would offer 61

please.

MR. WACHTEL:  Object as it's not relevant, Your Honor.

MR. MANDELMAN:  Join in the objection.

THE COURT:  61 is received.

BY MR. WELCH:

Q   Sir, I'm handing you what's been marked as Exhibit 63.  Do you know what that is?

A   Yes, I do.

Q   What is that?

A   This is a clipboard that was taken out of Pedro Garcia's bedroom on that date at 1302 Avenue D.

Q   Why was that item of evidence seized during the search warrant, sir?

A   Because it has gang graffiti on the back of it.

Q   What specifically -- what graffiti do you find or did you find on the clipboard?

MR. WACHTEL:  Object, unless the clipboard is admitted, Your Honor.

MR. WELCH:  I beg your pardon.  Thank you.

BY MR. WELCH:

Q   Are you certain this is the same clipboard that was discovered and seized as part of the search warrant, sir?

A   Yes.

MR. WELCH:  Your Honor, we would offer 63.

MR. WACHTEL:  I would still object that it's not relevant, Your Honor.

MR. MANDELMAN:  Join in the objection.

THE COURT:  63 is received.  It's going to be up to the jury, frankly, Ladies and Gentlemen, to evaluate the weight of this evidence.  Just because it's received in evidence, you are still ultimately going to have to determine the weight of it.

BY MR. WELCH:

Q   Now returning to the clipboard, sir.  What gang graffiti did you find on the clipboard which caused you to seize the clipboard?

A   It has Norteno on it with a one and a four on the sides of the word Norteno.  It's also got DV with one dot to the left of where it says DV, four dots to the right of where it says it.  And it also has the word Ene on it.

Q   The word or the letter N-A?

A   As the word, E-N-E, which is for the letter N.

Q   All right.  Did you also seize letters that you found in the bedroom of Pedro Garcia during that search warrant?

A   Yes.

Q   I'm going to hand you, sir, what's been marked as

Government Exhibit 169 and 170.  Please look at 169, and after you've had a chance to look at that, tell me if you recognize what it is.

A   Yes, I do.

Q   What is 169?

A   169 is a letter from a Griselda Ramirez to Pedro Garcia at the Winfield Correctional Facility; and this letter is from Gonzalo Ramirez to Pedro Garcia.

Q   Why did you seize that letter?

A   Because there's -- the talk inside it.  There's different talk using gang slangs --

MR. WACHTEL:  Object to that, Your Honor, unless the exhibit --

THE COURT:  This is a letter from whom --

A   This is from Gonzalo Ramirez to Pedro Garcia.  It was in an envelope that was marked with Griselda Ramirez as a return address.

BY MR. WELCH:

Q   Let me ask you this --

THE COURT:  Wait a second.  How do you know it's from Gonzalo Ramirez?

A   He has signed the back of the letter.

THE COURT:  And it's to Mr. Garcia.

A   Gonzalo Ramirez is the one that is the author of this letter, sir.

THE COURT:  All right.  Go ahead.

MR. WELCH:  Your Honor, thank you.

BY MR. WELCH:

Q   Now, you said on the return envelope there is the name Griselda Ramirez; is that right?

A   That is correct.

Q   Do you know who Griselda Ramirez is?

A   Sister to Pedro Garcia.

Q   Griselda Ramirez?

A   Yes.

Q   All right.  Now, the letter itself you seized for what purpose?  Why?

A   Because there's different writings inside it that contain the word Diablo, referring to Pedro as Diablo, which is a term that would be used from one Diablos Viejos gang member to another.  Just -- and also the conversation with these two persons interacting with each other.

Q   And the letter you said was addressed to Pedro Garcia, not at an address in Dodge City; is that right?

A   That is correct.

Q   All right.  Where was the letter sent to Pedro Garcia at?

A   To 1806 Pinecrest Circle in Winfield, Kansas.

Q   Before I ask any more about the letter, let me offer

Exhibit 169 -- are you certain that the letter you have in your hand is the same letter that was seized as part of the search warrant that was conducted at 1302 Avenue D?

A    Yes.  And Griselda Ramirez -- I'm just thinking about that -- that possibly is not his sister.

MR. WELCH:  Now we offer 169, Judge.

MR. WACHTEL:  Object to 169, Your Honor. Insufficient foundation.  There's been no authentication.  There's been no testimony that this witness is familiar with Mr. Ramirez' handwriting. There's been no testimony of a handwriting analysis on this letter.  And it's simply more prejudicial than it is probative in admitting it in this case.

THE COURT:  Sustained.

BY MR. WELCH:

Q    Sir, I'm handing you a bag which has contents marked Government Exhibit 77 and 78.  Do you know what those are?

A    Yes, I do.

Q    What are those?

A    Exhibit Number 78 is gun cleaner that we found in Pedro Garcia's bedroom.  And Exhibit 77 would be gun oil that was found in that bedroom.

Q    And why were those seized?

A    In relationship to using them on firearms.

Q    And are you certain that those two cans now marked as 77 and 78 are items of evidence that were seized during that search warrant, sir?

A    Yes, I am.

        MR. WELCH:  We offer 77 and 78, Your Honor.

        MR. WACHTEL:  I don't object.

        THE COURT:  They're received.  Unless you object.

        MR. MANDELMAN:  I just object on relevance.

        THE COURT:  Well, they're received.

BY MR. WELCH:

Q    Sir, I'm handing you what has been marked Government Exhibit 159 and admitted as such.  Turn your attention to 159-A, 159-B and 159-C.  Starting with 159-A.  Sir, have you seen that prior to today?

A    Yes, I have.

Q    And what is that?

A    This is a ledger that was seized on June 29th, 2008, out of 910 1/2 4th Avenue pursuant to a search warrant.

Q    Sir, I'm handing you two photographs marked Government Exhibit 167 and 168.  Starting with 167, do you recognize what that photograph is?

A    Yes, I do.

Q    What is that?

A    167, the photograph is of the front of the residence at 910 4th Avenue.

Q    And what is 168?

A    168 is a photograph of the east side of the residence, which would be taken from the alleyway.

Q    And do 167 and 168 accurately depict the residence located on 4th Avenue where this ledger was seized?

A    Yes.

MR. WELCH:  Your Honor, we would offer 167 and 168.

MR. WACHTEL:  I don't object.

MR. MANDELMAN:  No objection.

THE COURT:  They're received.

BY MR. WELCH:

Q    Could we display 167, please.  Sir, this is looking toward the front side of the residence; is that correct?

A    That is correct.  This would be taken from the northwest looking back to the southeast.

Q    168 please.  What is that, sir?

A    This is from behind the residence, so this would be a picture kind of taken looking southwest at the residence but this is the back of the residence.

Q    Now, there's been testimony, sir, that this item or these items were seized from this residence on June 29th, 2008.  Are you aware of that, sir?

A    Yes.

Q    Were you present at the house on June 29, 2008?

A    Yes, I was.

Q    And did you assist in that investigation, sir?

A    Yes, I did.

Q    Do you know whether DV gang members were found in the house as part of the investigation that was conducted?

A    Yes, they were.

Q    Which DV gang members do you recall being located at this house on that day?

A    Gonzalo Ramirez; Jason Najera; Junior Romero; Alondo Amaro; Hernan Quezada; and I believe Jose Neave.

Q    Are all of those men you've just told us about documented as gang members in Dodge City?

A    Yes, they're Diablos Viejos.

Q    Then, if you would, open Exhibit 159-A and look at -- I believe the first month is April and then May which is behind that one.  Let's start with April.  Do you recognize the names, street names, that are listed on 159-A?

A    Yes, I do.

Q    Are all of the names listed on this sheet marked April documented DV gang members?

MR. MANDELMAN:  Your Honor, I object.  We've

already heard testimony about this and this is all
hearsay now.

THE COURT:  It's cumulative.  The objection is
sustained on that basis.

BY MR. WELCH:

Q   Exhibit -- can we turn to May, if you would, sir.
Are all the names that appear on the May ledger
documented DV gang members?

MR. MANDELMAN:  Your Honor, same objection.

THE COURT:  Same ruling.

BY MR. WELCH:

Q   Look at 159-B.  Well -- before we do that.  Exhibits
159-A, exhibits that are identified as the month of
April and the month of May, sir, do you know, would it
have been possible for Gonzalo Ramirez to attend a gang
meeting in April or May of 2008?

MR. MANDELMAN:  Your Honor, objection.  Lack
of firsthand knowledge.

MR. WELCH:  Your Honor, I can lay more
foundation.

THE COURT:  Lay a foundation if you can.

BY MR. WELCH:

Q   Agent Webb, have you investigated the location of
Gonzalo Ramirez in April and May of 2008?

A   Yes.

Q   Do you know where he was both those months?

A   Yes.

Q   Where was he?

A   He was in KDOC's custody.  He was actually --

MR. MANDELMAN:  Your Honor, I'd object.  This is irrelevant.  It's prejudicial.  Inadmissible character evidence.

THE COURT:  The objection is sustained unless you can somehow tie all of this up.

MR. WELCH:  Your Honor --

BY MR. WELCH:

Q   If you look at Exhibit 159-A, sir.  Look at the month of April.  Do you see Gonzalo Ramirez' name or his street name on that sheet?

A   No.

Q   And would you also look at May, sir, that you have in front of you.  Do you see Gonzalo Ramirez' name or street name on that sheet, sir?

A   Yes.

MR. MANDELMAN:  Your Honor, there's no year on this thing.

MR. WELCH:  There's been testimony about the year already, Your Honor.

MR. MANDELMAN:  He wasn't sure when it was prepared.

MR. WELCH:  Other witnesses have testified to the year, Your Honor.

THE COURT:  The jury will disregard this testimony with respect to Ramirez in custody and whether his name's on these exhibits.  This is very cumulative.  And not relevant.

BY MR. WELCH:

Q   Would you look at Exhibit 159-B, please, sir?

A   Yes.

Q   Can we display 159 -- on 159-B, sir, what is -- do you recognize the names on 159-B?

A   Yes.  All but a couple of them.

Q   Do you see the name of Gonzalo Ramirez or a reference to Gonzalo Ramirez on 159-B?

A   Yes.

Q   And the column under which Gonzalo -- well, first of all, how is he referenced on that roster?

A   It's under the wording of "penta" and it says out of town.  Penta is a Spanish word for a ship, but the slang for it would be referencing somebody in jail or in prison.

Q   And on the --

MR. MANDELMAN:  Again, Your Honor, I'm gonna object to this.  He is not the preparer of this document.  There's no foundation here.  It's irrelevant,

and inadmissible character evidence.  It's more prejudicial than probative.

THE COURT:  Can you think of anything else?

MR. WACHTEL:  Yes, Your Honor.  Best evidence rule.  The document speaks for itself.

THE COURT:  The document is already in evidence.  Nobody objected on those bases when the document was received.

MR. WACHTEL:  I'm not objecting to the document.  I'm objecting to his telling us what it means.

THE COURT:  Then the objection is sustained on that basis.

MR. WACHTEL:  Thank you.

BY MR. WELCH:

Q   Agent Webb, did you participate in an investigation of Gonzalo Ramirez and distribution of methamphetamine?

A   Yes, I did.

Q   When did that investigation occur?

A   In the summer of 2009.

Q   And did you join other law enforcement agencies -- you were with the Dodge City Police Department at that time; is that right?

A   Yes, sir.

Q   Did you join with other law enforcement agencies in

conducting that investigation?

A    Yes, we did.

Q    Did you or did -- were you able to purchase quantities of methamphetamine from Gonzalo Ramirez?

MR. MANDELMAN:  Your Honor, again, I'm going to object to this under 401, 403, 404(b) and *Roviaro*. There's no connection -- there's no indication that this is at all tied to this case.

THE COURT:  Well, I disagree with that.  But the problem, which you haven't raised, is whether this witness, Agent Webb, purchased methamphetamine from your client.

MR. MANDELMAN:  Foundation, Your Honor; lack of firsthand knowledge.

THE COURT:  The objection is sustained on that basis.

BY MR. WELCH:

Q    Agent Webb, were you active in the investigation that resulted in purchasing methamphetamine from Gonzalo Ramirez?

A    Yes, I was.

Q    Were you present -- when methamphetamine was purchased from law enforcement officers from Gonzalo Ramirez, were you present each day as part of the investigation?

A    I was on the first two buys.  The last buy, I was not present.

Q    What date was the first buy in the investigation?

A    If I could refer to my notes.

Q    Please do.

A    It was on May 28 of 2009.

Q    And where did that take place?

A    At East Love's convenience store.

Q    The same East Love's you testified about earlier?

A    Yes, sir.

Q    You said you were present at the second buy that took place; is that right?

A    Yes.

Q    What date was the second buy?

A    It was on June the 16th, 2009.

Q    And where did that purchase take place?

A    At 1302 Avenue D, Pedro Garcia's residence.

Q    All right.  Now, the purchase took place at 1302 Avenue D; but who did the agents or who did -- who sold the methamphetamine on June 16, 2009?

A    Gonzalo Ramirez.

Q    From Pedro Garcia's residence?

A    Yes, sir.

Q    All right.  Now, the third buy, do you know what date that occurred?

A    Yes.

Q    What date did that occur?

A    It would have been on July the 30th of 2009.

Q    And do you know the location of that third buy?

A    Yes.

Q    Where was that?

A    At 1409 Avenue H in Dodge City.

Q    Is that a residence?

A    Yes.

Q    Whose residence is that?

A    That's Gonzalo Ramirez' residence.

Q    As a result of the purchase of methamphetamine on these three days -- were all of those in Dodge City, Kansas?

A    Yes.

Q    In Ford County, Kansas?

A    Yes, sir.

Q    As a result of those three purchases of methamphetamine, was Gonzalo Ramirez charged with a crime?

A    Yes, he was.

Q    Was he convicted for crime or crimes?

        MR. MANDELMAN:  Again, Your Honor, I'm going to object on the same grounds:  401, 403, 404(b) and *Roviaro*.

MR. WELCH:  These aren't racketeering acts, Your Honor.

THE COURT:  I'll receive the testimony because of the -- if you can lay a foundation for the convictions.

BY MR. WELCH

Q   Let me ask you, sir, to look at Exhibit 3.  Do you know what Exhibit 3 is?

A   Yes, I do.

Q   What is Exhibit 3?

A   This is the journal entry of the charges on Gonzalo Ramirez from the Ford County district courthouse.

Q   Does the document you have reflect a conviction for those charges?

A   Yes, it does.

Q   Let me see it for just a second.

(Off-the-record.)

MR. WELCH:  Your Honor, we would offer Exhibit 3, which is a certified copy of the journal entry of conviction from Ford County, Kansas.

MR. MANDELMAN:  Same objections:  401, 403, 404(b) and *Roviaro*.

THE COURT:  3 is received.

MR. WELCH:  If I can have just a moment, Judge.

(Off-the-record.)

MR. WELCH:  Your Honor, if I might, I believe I might be done with this witness; but can we take our lunch recess and I'll know after lunch.

THE COURT:  Yes.  We'll take a recess until approximately 1:15 today.  Remember and heed the admonition.

(Noon recess.)

(Beginning at 1:20 p.m. October 15, 2013, the following proceedings continued.)

THE COURT:  Yes, sir.

MR. WELCH:  Your Honor, I have no further questions of Agent Webb.

THE COURT:  Yes, sir.

MR. WACHTEL:  Thank you, Your Honor.

### CROSS EXAMINATION

BY MR. WACHTEL:

Q   Agent Webb, we meet again.  How are you?

A   Just fine, sir.

Q   I've got just a few questions for you.  I know that you told us that you had a warrant to search Pedro's -- Pedro Garcia's house; right?

A   On which occasion, sir?

Q   Well, the one in which you found Exhibit 61, the North Towne license tag that used to belong to Mr. Ramirez.  That case.

A   Yes, sir.

Q   Were you there?  Did you go on that search?

A   Yes, I did.

Q   Did you accompany the people that searched the house?

A   I searched the house, sir.

Q   Were there people in that house when you went over to serve your warrant?

A   Yes.

Q   Were they allowed to stay while you searched?

A   I don't recall.

Q   Do you know who was there?

A   I believe Peter's -- one of Pedro's sister's; and I can't remember if his mother was there, but I think she was.

Q   You know, do you not, that Mr. Garcia has a brother named Roque, R-O-Q-U-E, don't you?  Roque Garcia?

A   Yes.

Q   Was Roque there?

A   No.

Q   Do you know that Roque lived there during that time that you made that search?

A   That he -- excuse me?

Q   Roque -- during the period of time that you made that search, are you aware that Roque lived in that house?

A   No, he was not living there.

Q   Okay.  Do you know where he was living if he wasn't living there?

A   I can't remember if he was in prison or if he was in Hutchinson.

Q   But in any event, Mr. Garcia surely was not there --

A   That is correct.

Q   -- when that search was conducted?

A   That is correct.

Q   Now, you found Exhibit 61, which is this, this sort of bummed up North Towne vanity -- for want of a better word -- vanity license plate; right?

A   This is correct.

Q   Do you know where this was located, Exhibit 61? Where it was found?

A   It was found in the northwest bedroom of the residence, which was Peter Garcia's, his bedroom.

Q   You've also confirmed for us that that is the plate off the front of Mr. Ramirez' car?

A   That is correct.

Q   Do you know how that plate got into Mr. Garcia's house?

A   No, I do not.

Q   Is there a place in Dodge City known as North Towne?

A   No, sir.

Q   Just like there are places in my home town called, like, East Ninth, but there's no such place in Dodge right?

A   North Towne, no, sir.

Q   Okay. What else did you find? Oh, the clipboard,

Exhibit 63.  If I may, Judge.  This is Exhibit 63, the clipboard, if you want to take that.  And you've told us, I think, that there's writing on the back of that clipboard.  Right?

A   That is correct.

Q   Is there writing on the front part?

A   Yes, there is; but it's, it's extremely faded.

Q   Well, do you know -- let's just talk about the back part if we can.  Feel free to look at it.

A   Sure.

Q   Do you know who wrote whatever it is that's written there?

A   No, I do not.

Q   Do you know whether or not that clipboard was even the property of Pedro Garcia?

A   No, I do not.

Q   And you have not -- you tell me, have you had any, any handwriting experts look at that and compare that handwriting with known exemplars of Mr. Garcia?  Have you done that as part of your investigation?

A   Not to my knowledge.

Q   You reckon you'd know that, though?

A   As far as I know, I don't know of any handwriting samples have been done of Mr. Garcia compared to anything.

MR. WACHTEL: If I could have just a moment, Your Honor.

THE COURT: Yes, sir.

(Off-the-record.)

BY MR. WACHTEL

Q   I think I'm almost finished. Oh, yeah, you also testified about -- roughly at the end of your testimony -- that in the summer of 2009 you did an investigation of Mr -- of Mr. Ramirez regarding meth dealing. Remember testifying about that?

A   Yes, I was involved in that investigation.

Q   Summer of 2009 is at least three months or more long. Do you remember when it was that this investigation actually took place from A to B?

A   Yes. If I can refer to my notes, I'll tell you exactly.

Q   Please do.

A   There was three purchases. The first one was on May 28 of 2009. The last one was on July 30th of 2009.

Q   Three purchases. Excuse me -- go ahead.

A   There was also subsequent search warrants.

Q   That arose out of that?

A   Yes, sir.

Q   Do you know whether Mr. Garcia was even in Dodge City during that period of time?

A   Yes, he was.

Q   He was.  Do you know whether Mr. Garcia was even in Dodge City when you searched his house and discovered Exhibit 169?

A   Okay.  Now you're not talking no longer about directly after those buys happened with Gonzalo Ramirez but --

Q   No, no.  I just moved back to -- if I said Ramirez, I apologize.  I moved back to Mr. Garcia.  You searched his house; right?

A   Yes, sir.

Q   And you found Exhibit 169?

A   Yes, sir.

Q   The license -- I'm sorry -- you found the license tag and the clipboard?

A   I'm totally getting confused.  Are you talking about Mr. Ramirez and finding the clipboard in his house?  Because that was in Mr. Garcia --

Q   No, in Mr. Garcia house.

A   I think you just said Ramirez.

Q   Well, I apologize.  I am not trying to fool you --

A   I'm getting confused himself.

Q   -- because I don't think I could do it.  But let's talk about Mr. Garcia.

A   Yes, sir.

Q   Was Mr. Garcia in Dodge City when you searched his house and found Exhibit 63 -- or the authorities found Exhibit 63?

A   No, he was not.

Q   Then I apologize if I confused you.  But I'll make your day brighter.  I don't have any more questions.

A   Okay.  Thank you.

THE COURT:  Yes, sir.

### CROSS EXAMINATION

BY MR. MANDELMAN:

Q   I just have a few topics to cover real quickly.  As far as the two sort of issues related to ballistics in this case, we've heard testimony that there were ten shell casings and one live round collected in connection with the homicide of Israel Peralta.  Are you aware of that?

A   Yes, I am.

Q   And are you aware of whether those shell casings and the live round were sent off for testing?

A   Yes, they were.

Q   And do you know where they were sent?

A   To the Kansas Bureau of Investigation.

Q   And do you know whether or not any fingerprints were recovered from any of those objects?

A   There was, to my knowledge, no fingerprints

recovered due to the lack of ridge detail.

Q   Second sort of ballistics issue here.  We've also heard testimony that -- and I believe you testified that you collected those 20 shell casings outside of that residence or near that residence on 4th Avenue?

A   No, I did not.

Q   Were you not the one who marked those shell casings?

A   No, I was not.

Q   Okay.  You're familiar with the incident that I'm talking about, though?

A   Yes, sir.

Q   And those twenty 7.62 by 39 shell casings were collected by the Dodge City Police Department?

A   By Officer Lima, yes, sir.

Q   And you testified earlier this morning that an SKS rifle was recovered from the bedroom of Eusebio Sierra-Medrano's house?

A   That is correct.

Q   Was that the rifle that fired those shells?

A   At the 4th Avenue shooting?  No, they were not.  We sent that gun off to be compared to those shell casings. They did not match.  That was sent to the Sedgwick County forensic crime lab, I believe is what it's called.

Q   Okay.  Thank you.  Now, the -- you testified also a

little bit about a drug investigation that involved my client?

A    That is correct.

Q    Did that case involve a confidential informant?

A    Yes, it did.

Q    And do you know the identity of that confidential informant?

        MR. WELCH:  To which I'll object, Your Honor, based on the Court's previous ruling.

        THE COURT:  The objection is sustained unless it was Mr. Galindo who's already been identified as a confidential informant.

        MR. MANDELMAN:  I don't believe it --

Q    Well, was it Mr. Galindo?

A    No, sir.

        THE COURT:  Then the objection is sustained.

        MR. MANDELMAN:  Well, I just asked him if he knew.

        THE COURT:  If he knew what?

        MR. MANDELMAN:  The identity.

        THE COURT:  Well, maybe he doesn't know the identity.  I'm sorry.  Do you know the identity?

A    Yes, I do, sir.

        THE COURT:  Then the objection beyond that is sustained.

MR. MANDELMAN:  Okay.  Well, I'll just make my objection again on the previous grounds and the Sixth Amendment.  That's all I have.  Thank you.

THE COURT:  Redirect, please.

MR. WELCH:  Thank you, Judge.

**REDIRECT EXAMINATION**

BY MR. WELCH:

Q   Agent Webb, I just want to clear up a little confusion that was left, perhaps, after Mr. Wachtel asked you a few questions.  Exhibit 63 and Exhibit 61, both of these items were seized during the same -- execution of the same search warrant; correct?

A   That is correct.

Q   What date did you execute that search warrant at Pedro Garcia's residence?

A   That would have been in October of 2010 on that search warrant.

Q   And on the date of that search warrant, was it your testimony that Pedro Garcia was not in Dodge City?

A   That is correct.

Q   All right.  Now, as to the investigation, drug investigation, which occurred the summer of 2009, was Pedro Garcia in Dodge City the summer of 2009?

A   Yes.

MR. WELCH:  No further questions, Your Honor.

MR. WACHTEL:  Thank you very much.  I don't have any more questions.

THE COURT:  Thank you, Mr. Webb.

MR. MANDELMAN:  Thanks, Judge.

THE COURT:  Next witness.

MR. WELCH:  Your Honor, at this time the United States rests.

THE COURT:  Well, when the Government rests, I need to take up a few things with the lawyers and then we'll come back.  Now, my understanding is that there will be a defense witness here this afternoon.

MR. WACHTEL:  Yes, Your Honor.  She's here.

THE COURT:  Then I'll let you go when that witness is finished.  Then tomorrow morning, I believe, Mr. Henry may or may not call two or three short witnesses.  Would that be correct?

MR. HENRY:  Mr. Mandelman and myself will each have at least one, Your Honor, possibly two.

THE COURT:  All right.  And then unless there's no rebuttal by the Government, the time will come to instruct you and for the lawyers to make their closing arguments.  I want to do my best to get that done tomorrow.  And I think I can.  Rachael and I have been working on the instructions, passing copies back and forth, you probably noticed.  And I think they're

about ready, but they're pretty extensive.  And the lawyers have an opportunity to go over them and make any objections that they want to make.  I think I told you this before.  So depending on where we're at this afternoon, I may be able to get a final set to the lawyers this afternoon and we may be able to start at 9 tomorrow with the remaining witnesses; but it may be that we won't start until 10 so that I'll have sufficient time to let the lawyers make a record about the objections to instructions and any changes that need to be made.  And I don't see any reason for you all to sit in the jury room while that's being done.  So, I'll have the final word to you about that after we finish this afternoon.  So please return to the jury room and it will only be a few minutes.

                    (Jury excused from the

                     courtroom.)

        THE COURT:  Be seated Mr. Wachtel, do you have a motion?

        MR. WACHTEL:  Your Honor, Mr. Mandelman has consented to go first if that's all right with you.

        THE COURT:  That's fine.

        MR. MANDELMAN:  Yeah, sure.  Thanks, Judge. And we're going to go ahead and make our Rule 29 motion for a judgment of acquittal on this case; and, Your

Honor, I just intend to make a general motion.  We believe the evidence has been insufficient as to all elements on all counts and I -- given the penalties here, I feel like I need to make a general motion in order to preserve the record.  I don't -- I'm prepared, if the Court has some questions about some specific details; but it's our intention to, uhm, make a general motion at this time.

THE COURT:  Tell me what you think about the interstate commerce aspect of this, will you?

MR. MANDELMAN:  Yeah, uhm, so the definition here of interstate commerce talks about an enterprise that is engaged in or whose conduct effects interstate commerce.  Now, it's our position that this group, whatever you want to call it, uhm, was not engaged in interstate commerce.  Now, that issue, I've looked at the appeals from Clinton Knight and from Tracey Harris.  I know those cases the Court's looked at, involved the Cryps case that Judge Marten tried and that was a drug dealing gang.  They had a house, they were in the drug dealing business.  That's not the evidence we've heard here.  This was a local street gang.  Was not engaged in interstate commerce.

So then we get to that second prong or conduct effects interstate commerce.  And, again, there's sort

of two issues here.  What effect does the Government have to prove?  Whether it's substantial or de minimis.

THE COURT:  I'm probably going to instruct that it -- I don't think the term is de minimis; but it doesn't have to be substantial.

MR. MANDELMAN:  Yes, and the Tenth Circuit didn't -- at least the issue came up on plain error in *Smith*, this 2005 case, as to what the proper standard was.  It's our position here -- and I don't think there's a definitive Tenth Circuit ruling on what effect.  There is a Sixth Circuit case which we've cited and then there's some cases from -- that the Government cited over the weekend in its brief that say that it doesn't need to be substantial.  I'm aware of the differing opinions out there.  It's our position that the effect does need to be substantial and it hasn't been proven as substantial here.  In the alternative, even if the effect doesn't need to be substantial, we don't believe the evidence here has shown any effect at all.  And I can address some of the points that the Government raised in its brief.  What we've got here is the use of some firearms in some crimes; and then there's a little bit of assorted testimony that some of the members sort of engaged in drug dealing on their own; and then there was two other sort of really

miscellaneous points that I don't think were really proven, but that one gang member was allegedly beat-in here and then moved to Texas and was still a gang member; and that somehow Mr. Neave tried to manipulate some witness and that guy ended up going to Mexico. I don't think either of those have been proven in this case. And we think simply the use of guns here doesn't satisfy the Supreme Court's decision in *Lopez*. That case also involved a firearm near a school and just the use of -- just the presence of a firearm wasn't sufficient. If this case is allowed to stand in federal court, basically, any crime involving a group of people and firearms is gonna end up in this courtroom.

THE COURT: I hope not.

MR. MANDELMAN: Well --

THE COURT: All right. Val.

MR. WACHTEL: Your Honor, I'm going to take exactly the same position that Mr. Mandelman did in terms of I rely on the record and I do not believe the record is sufficient to feed the bull dog here.

I also agree with Mr. Mandelman in terms of the kind of impact on interstate commerce that is required here. For the very reasons that Mr. Mandelman put out. I mean, I don't mean to minimize what happened in Dodge City. Terrible tragic things that happened to folks.

But if you look at it in the cold clear light of day, you have -- you have local street crime. And if the local street crime discussed in this case is not -- is allowed to be prosecuted under the commerce clause, then there's no kind of street crime in this country that can't be. And that is what troubles me and that's why I think the impact has to be substantial. And I will brief this whole thing later on, Your Honor, but that's my position with regard --

THE COURT: What if your client is found not guilty, you still going to brief it?

MR. WACHTEL: No, I'm gonna write a letter to the editor, Your Honor.

THE COURT: All right. You don't need to argue. I think we all know what the standard is that I have to follow at this point in time. We've had two weeks worth of evidence and you all know that I have some concern about the interstate aspect of this, or maybe the foreign commerce aspect of it as well; but the Government has briefed it and I think that the evidence is sufficient to go to the jury on all of the counts in the Indictment. We'll see what the jury does, number one. And number two, these are things that can be addressed later. This is the kind of case where we could spend all afternoon arguing about individual

counts and individual evidence.  And I think Joel has approached it, and Val's approached it, in the correct way here with the anticipation that we're going to have to let the jury resolve this in the initial stage.

Now I need to address Mr. Garcia and Mr. Ramirez. You don't need to stand.  You can if you want. Gentlemen, I know you know this, but you have the right to testify in this case.  Each of you understand that right?

DEFENDANT MR. GARCIA:  Yes, Your Honor.

DEFENDANT MR. RAMIREZ:  Yes, sir.

THE COURT:  And you don't have to testify. And I'm assuming based on what your lawyers have told me, that each of you has made the decision not to testify.  Is that correct, Mr. Garcia?

DEFENDANT MR. GARCIA:  Yes, Your Honor.

THE COURT:  And Mr. Ramirez?

DEFENDANT MR. RAMIREZ:  Yes, sir.

THE COURT:  All right.  You understand that's your decision that has to be made, not their decision for you?  You understand that, gentlemen?

DEFENDANT MR. GARCIA:  Yes, Your Honor.

DEFENDANT MR. RAMIREZ:  Yes, sir.

THE COURT:  All right.  Well, I'm going to assume, based on what I've heard so far, that neither of

you will testify and I will instruct the jury

accordingly that that can't be held against you.

Now, do either of you have any questions of me at

this point about your rights in connection with

testifying or calling witnesses or both?

DEFENDANT MR. GARCIA:  No.

DEFENDANT MR. RAMIREZ:  No, sir.

THE COURT:  All right.  Thank you.  You may be

seated.

All right.  You may call your lady and then when

we're through with her, I think we're pretty close to

having a final set of instructions.

MR. WACHTEL:  I'll go get her, Judge.

THE COURT:  We'll go get the jury while you're

getting your witness.

(Jury enters the courtroom.)

THE COURT:  Please be seated.  Mr. Wachtel,

you may call your first witness.

MR. WACHTEL:  Thank you, Your Honor.  We would

call Ms. Lisa Taylor-Austin.

**LISA TAYLOR-AUSTIN**

Having been first duly sworn to tell the truth, the

whole truth and nothing but the truth, testified as

follows on:

**DIRECT EXAMINATION**

BY MR. WACHTEL:

Q   Ms. Taylor-Austin, you are kind of soft-spoken, so you should get as close to that microphone as you can.

For the purposes of the record, would you state your name.

A   Yes.  Lisa Taylor-Austin.

Q   Without regard to your street address, Ms. Taylor-Austin, where do you live?

A   In Milford, Connecticut.

Q   What is your profession?  What do you do for a living?

A   I'm a psychotherapist and I'm also a school counselor.

Q   And you've practiced those two professions where?

A   In Connecticut.

Q   In order to, to practice your profession --

A   Yes.

Q   -- is there any kind of educational requirement or certification that is required?

A   Yes.  I have a Master's degree in Counseling, which I earned from the State University of New York at Rockport; and I have a Bachelor's degree, which I earned from the same university in developmental and behavioral disabilities, as well as a minor in African American studies.

Q   Are you, are you licensed by the state of Connecticut in any way?

A   Yes.

Q   What is that?

A   I'm licensed as a professional counselor in the state of Connecticut.  And I'm also licensed as a mental health counselor in the state of New York.

Q   In addition, do you hold any board certifications of any kind?

A   Yes.  I'm a Board Certified Forensic Mental Health Evaluator, which is a national title and designation. I'm also a nationally Certified Counselor, which is a national board certification.

Q   And for your -- for your work in the public schools, do you also have certifications?

A   Yes, sir.

Q   What might those be?

A   I am certified in the state of Connecticut as a school counselor; and also in the state of New York as a school counselor.  And I'm also certified in the state of California as a community college counselor.

Q   Do any of your certifications, are any of them what I would call, for want of a better phrase, gang specific?

A   My certifications are not; but my experience is.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

Q   Yes, and we will come to that.  Now, have you, all of your professional career, have you worked out of Connecticut?

A   No, I have not.  I started my professional career in the Los Angeles, California area, where I worked for approximately eight and a half, almost nine years.  And then I moved to New York and then I moved to Connecticut.

Q   And Los Angeles is southern California?

A   Yes, it is.

Q   What did you do there, Ms. Taylor-Austin?

A   I was a counselor in a school working with -- I was assigned to a population that was predominantly gang members and so I was counseling them.  And it was approximately, I would say, half African American and half Hispanic.

Q   I know this was sometime ago --

A   Yes, sir.

Q   -- but, do you remember any of the various gangs these children belonged to that you were counseling?

A   The Culver City Boys; the Santa Monicas; the then Shoreline Crips; Elm Street; Grape Street Watts.

Q   Did there come a time in your career that you counseled or treated Surenos or any clique thereof?

A   Yes.  I worked predominantly with Surenos in

southern California.  Surenos are localized -- condensed to the southern California area.  And many of the Hispanic gang members there are connected to La Eme or the Mexican Mafia and are Surenos.

Q   Are the Surenos a street gang or are they a prison gang?  If you know.

A   Well, they're a coalition of different cliques.  The cliques are gangs and they report to La Eme, which is the Mexican Mafia in prison.

Q   Now, Ms. Taylor-Austin, are you a published -- do you write?  Are you published?

A   Yes.  I was most recently published in the *Textbook of Forensic Psychology and Sociology*, where I wrote a chapter about the role of the gang expert in court, which was published by Springer Publishing.  And I also have been published in a book called *Gang Social Issues Firsthand*, which I wrote a chapter about counseling gang members.

Q   And do you recognize any particular learned treatises that are applicable to -- well, let us say Diablos Viejos?

A   Can you rephrase your question?

Q   I have confused you.  I will try to rephrase.  You know what a learned treatise is; right?

A   I believe I do.

Q   Are you aware of any learned treatises that address the Diablos Viejos gang?

A   No, I am not.

Q   Now, before we get on any further into this, let's talk with you about your court experience.  Have you testified in courts of the United States or the various several states?

A   Yes, I have.

Q   With regard to testifying before the United States District Courts for the State of Kansas -- United States District Courts, no matter where they are, have you been recognized as a gang expert by any of the United States District Courts?

A   Yes, I have.

Q   Do you remember which ones?

A   I could look if you would like me to.

Q   If you need -- if you need to look at your resume to be sure, please go ahead and look at it; and then when your recollection is refreshed, tell us.

A   Okay.  The most recent one was the *USA vs. Anthony Boykin* in New York.  Prior to that was the U.S. District Court in Montgomery, Alabama.  And prior to that was the Sedgwick County court here in Wichita, Kansas.

Q   United States District Court here in Wichita, Kansas?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   Yes.

Q   Do you remember the name of that case that you testified in here?

A   *USA vs. Jamal Campbell*.

Q   And that case, did it involve DVs or some other gang?

A   Some other gang.

Q   And in all the cases that you have named for us, right, you did testify in those cases?

A   Yes, sir.

Q   To -- let's go back and talk about counseling.  To counsel Surenos and Surenos related gangs, is it necessary to know about gangs other than the Surenos?  Using that as broadly as I can use it.

A   Yes, it is.

Q   Why is that important?

A   Oftentimes, gang members in counseling will talk about their own personal families; but they'll also talk about their gang involvement.  And in talking about that, they will discuss maybe different things that they do or they've been asked to do and then we'll talk about their enemies.  And so it's important to know who they are.

Q   By who they are, are you talking about who their enemies are?

A   Yes.

Q   Using Surenos, not technically but broadly, right, would the Surenos have any particular enemies?

A   Well, their largest enemy is the Nortenos.

Q   There was something else I meant to ask you.  Let me go find it.  Have you ever counseled with, professional counsel services that you provide, with any Nortenos?

A   Two that I recall.

Q   And did that -- where did that counseling take place?  In what state?

A   California.

Q   You have since left California?

A   Yes.

Q   Have you counseled with any Nortenos or Surenos in New York?

A   No.

Q   I contacted you to come and talk to the jury about gangs; right?

A   Yes.

Q   And I provided you -- we provided you, in fact, Mr. Mandelman did, too, with certain information about this case.  Do you recall?

A   Yes.

Q   And some of the stuff we provided you with documents --

A    Yes.

Q    -- to look at.  Can you share with the jury the documents and kind of documents you looked at?  And you may have to look at your opinion to do that.  I don't know.

A    I know that I reviewed grand jury testimony.  I reviewed *Daubert* hearing testimony of Agent Webb.  I reviewed *James* hearing testimony of Agent Webb.  I reviewed some photographs; some -- a probation department report.  I reviewed some documents from the Federal Bureau of Prisons.  And also -- I do need to refer to my report.

Q    Sure.

A    Plea agreements of several individuals.  And there was also some police documentation that I reviewed as well.

Q    Now, you talked about a *Daubert* hearing --

A    Yes.

Q    -- that you read the transcript of.  Did you attend that here?

A    I did on the first day, yes.

Q    That hearing was held right here in this courtroom?

A    I believe it was.

Q    After you attended that hearing, did you go to Dodge City and try to conduct any kind of investigation on

your own?

A   I did.

Q   Do you remember who you spoke to in Dodge City?

A   I remember I spoke to a Pastor Herman at a Hispanic church in Dodge City somewhere in the 4th Street area neighborhood.  I also talked to a Father Ted at the Our Lady of Guadalupe Catholic Church in Dodge City.  And I also talked to two social workers at the Catholic -- I believe it was Catholic Family Services or Catholic Counseling Services, something along those lines, in the same neighborhood.

Q   Did you talk with those people about gangs?

A   Yes.

Q   Any particular gangs?

A   Yes.  I asked them about --

        MR. SMITH:  Objection; hearsay.

        MR. WACHTEL:  I don't think what she asked them is hearsay.

        THE COURT:  I don't think it is either.

BY MR. WACHTEL:

Q   Let's just take Pastor Herman Valladares, V-A-L-L-A-D-A-R-E-S.

A   Yes.

Q   Did you talk to him about any gangs?

A   I did.

Q   Without telling us what he told you, did you find the information that he gave you helpful in arriving at whatever conclusion you have arrived at in this case?

A   I'm thinking.

Q   Sure.  You go right ahead.

A   Yes.

Q   What did he tell you?

MR. SMITH:  Objection; hearsay.

MR. WACHTEL:  Your Honor, it's my understanding that expert's report can be based on hearsay if it's not offered for the truth.

THE COURT:  Your understanding is partially correct.  It has to be information -- get the exact language so the jury can hear it.

The facts or data of a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inference upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Now --

MR. WACHTEL:  The information -- if I may --

BY MR. WACHTEL:

Q   The information you got from Pastor Herman, is that the kind of information that you normally rely upon in reaching opinions related to gangs?

A   It's considered, yes.

MR. SMITH:  I now object to foundation for the basis of those persons' opinions and the information that they can provide that would be helpful as to this particular subject.

THE COURT:  Well, I will allow you to voir dire the witness with respect to those issues if you wish or you can wait and question her about it in cross-examination.

MR. SMITH:  I will do so on cross-examination, Your Honor.

THE COURT:  Then you may proceed.

BY MR. WACHTEL:

Q   What did Pastor Herman tell you that was of assistance to you in reaching an opinion?

A   He stated that he had heard of Diablos Viejos in the neighborhood.  He was familiar with the Nortenos but did not believe that the Nortenos were in the neighborhood and stated some other places that he had heard of them being.  And he said that, you know, lately, he hasn't heard of, really, any gangs causing much problems in the neighborhood.

Q    With regard to Father Ted of Our Lady of Guadalupe,
did you talk to Father Ted?

A    Yes.

Q    Did Father Ted provide you with the kind of
information that is ordinarily relied upon by you in
reaching -- used in reaching conclusions about gangs?

A    It was considered, yes.

Q    What do you recall him telling you?

A    That he lived in the same neighborhood as the church
where Pastor Herman has his church and that he recalled
seeing gang graffiti there.  He said that the city
covers it up quickly.  And that was about all he knew.

Q    And then you have also talked to unnamed staff
members from Catholic Social Services?

A    Yes.

Q    Do you recall how many?

A    Two.

Q    Do you recall names?

A    I do not.

Q    Did those people share with you information that
people in -- that you relied on in reaching whatever
opinion you may have reached in this case?

A    It was considered, yes.

Q    What did they tell you?

A    They were two social workers and they said that,

uhm, they have not counseled anyone who's discussed Nortenos or Diablos Viejos specifically.  One of the women said that she went to a training about five years ago and she had heard of Diablos Viejos but that's all she remembered.

Q   Did you talk to Mr. Garcia?

A   I did not.

Q   In fact, have you talked to any of the gang members who are involved in this over-arching RICO case?

A   I have not.

Q   In the process that you've been engaged in, have you come to an opinion as to whether or not the Diablos Viejos in Dodge City, Kansas are Nortenos?

A   I have.

Q   What is your opinion?

A   My opinion is that they are not Nortenos in the sense that they are not connected to a national gang. They are what I believe to be called a hybrid gang.

Q   And can you tell the Ladies and Gentlemen of the Jury exactly what a hybrid gang is?

A   A hybrid gang is a street gang that pretty much steals the symbols, signs and even name of a national gang to kind of bolster their credibility in some instances.  In other instances, they do that for a different reason.  And so they are -- they are usually

young people who grew up together, they may or may not be committing crimes together; but then they take some of these things from over here and say, hey, we're going to use these signs, we're going to use these names, we're going to use these symbols and they begin doing so even though they have no authority, no blessing, no connection to the -- to the national gang that's over here.

Q   In the process of arriving at this opinion --

A   Yes.

Q   -- have you researched, studied, looked at the organization of the Nortenos?

A   Yes.

Q   And is that -- is that a bottom-up organization?  Is it a top-down organization?  What is it?

A   The Nortenos are a top-down organization in the sense that if we think of a triangle, so, at the top would be Nuestra Familia, or NF for short.  Nuestra Familia is a prison gang.  Their leader is in Pelican Bay.

Q   What's Pelican Bay?  Because we don't know.

A   Pelican Bay is a maximum security prison in California.  It might be a super max, but I'm not sure.

Q   You talked about a pyramid.  Where would Nuestra Familia be on that pyramid?

A   They're up at the top in the little pointed section of the pyramid up at the top.

Q   Does Nuestra Familia, its membership, does the membership have titles?

A   Yes.  Within the Nuestra Familia there's what's referred to as cars or pintas, and those are groups of Nuestra Familia that loop together in their particular group.  So you might have several different cars or many different cars or pintas within one prison.  The people who are in those cars or pintas work together as a group and they have ranks.

Q   Ranks.  Probably a better -- if you know, what's the highest rank in Nuestra Familia?

A   The Supreme Authority, which is David Cervantes.

Q   Are there ranks below the Supreme Authority in Nuestra Familia?

A   Yes.

Q   Do you know what those are based on your education and study?

A   I know that there are generals.  I also know that there is a group of -- a group of NF that functions as their legal counsel.  They have a name.  I don't recall it off the top of my head at this moment.  And I believe there are other ranks as well; but I don't know what they are.

Q   Does -- does Nuestra Familia make money?

A   Yes.

Q   Are you familiar -- given what you know about Nuestra Familia, are you familiar with the word bank?

A   Yes.

Q   Does -- how -- how do the word bank and Nuestra Familia work one with the other?

MR. SMITH:  Objection to the relevance of this.

THE COURT:  Overruled.  You can cross-examine her about it when the time comes.  Unless you want to question her about it now.

MR. SMITH:  No.

THE COURT:  All right.  Go ahead.

A   I'm sorry, Your Honor.

THE COURT:  No need to apologize.

A   Nuestra Familia has a bank in the prison system. Each car, each pinta has their own bank.  When I say bank, it's not a bank that we go to that we think of, you know, across the street.  It's money and funds that are held.  The funds can be hidden someplace.  They can be disguised in other places.  And basically what happens is that people below the Nuestra Familia funnel money up to them.  Nuestra Familia, I'd say main goal, is to control drugs inside and outside of the prison.

Q    Let me ask you to pause for a moment and return to the question of banks.  Do these banks keep -- do these Nuestra Familia banks, do they keep records?

A    Yes, they do.

Q    What kind of records do they keep?

A    Well, usually they're written down in handwriting. And they're something similar to what we might use in our checkbooks as a checkbook register.  So money is documented coming in, where it came from, the date it came, who it came from, where this money was derived from.  Then money is also documented going out.  So where did it go, who was it given to, what was the purpose it was used for and that type of thing.

Q    Now, in this, is there -- in this pyramid, is there an entity or gang that is directly below Nuestra Familia?

A    Yes.

Q    What is that gang?

A    Nuestra Raza.

Q    And what is that?

A    Nuestra Raza is the middle part of the pyramid and they were started by the Nuestra Familia.  They are Nortenos, and they were started to pretty much bolster the ranks of Nortenos out into the street.  There were different things that happened inside the prison that

cut off some of the Nuestra Familia's being able to get money; and so they decided if they started Nuestra Raza and Nuestra Raza's charge was to get more Nortenos, those people could then be working for them and money would funnel up to them.

Q   Is Nuestra Raza a prison gang?

A   Some of the members are in prison and some are out on the street.  They are individuals who don't have life sentences, usually.  They can get out or come back in and so it's kind of fluid.

Q   Does Nuestra Raza, does its membership have ranks?

A   Yes.

Q   Do you know what those ranks are?

A   Well, again, Nuestra Raza has the regiments.  Each regiment has a lieutenant and a captain who reports to a general.  The general then ultimately reports to David Cervantes and then Nuestra Familia.

Q   How much -- how much independence does the -- not -- does Nuestra Raza have with respect to Nuestra Familia? Does that question make sense to you?

A   It does.  They have little independence in the sense that they are taking orders from Nuestra Familia, so the NF is telling them what to do and giving them orders coming down from the top.  They might make smaller decisions on their own; but then those decisions are

reported and funneled back up through their chain of command to NF.

Q   Now -- oh, does Nuestra Raza, does it have banks?

A   Yes.

Q   Would those banks be similar to that which you have described Nuestra Familiar as having?

A   Yes.  It's a requirement of Nuestra Familia that all Nortenos have a bank.  They have a 15-page or so constitution; and in their constitution, it's required that each regiment or each car or each pinta has their own bank.

Q   And is there -- in this gangster food chain, is there a layer beneath Nuestra Raza?

A   Yes.

Q   And what, who or what is that layer?

A   Those are the people we know of as Nortenos.  They are the foot soldiers for Nuestra Raza and ultimately Nuestra Familia.

Q   Do they have ranks?

A   Yes.  They have lieutenants and captains and they report to a street regiment commander who I think is a street general.  That person then reports to a general and then ultimately it goes up.

Q   Do they operate independently of the chain that you have described?

A   No.

Q   How do they separate their -- and you've used two words.  The words cliques -- well, I'm sorry -- you used pintas and cars.  In this courtroom we've heard a lot about sets.  Does Nuestra Familia, Nuestra Raza and then the Nortenos, do they have sets or subsets?

A   No, sir, they do not.

Q   What do they have, if they have anything?

A   Well, in prison, their gangs are called cars or pintas.  In the Nuestra Raza, it's usually a regiment, a clique or a clika; and in the Norteno, it would be the same thing.

Q   Do the Nortenos operate solely within the prison system?  I'm talking about the bottom level.

A   No.  Nortenos -- most Nortenos operate in the street; but it depends on if they become incarcerated.  Once they become incarcerated, then they align with Nuestra Raza.

Q   And is it possible, if you know, to actually graduate up to become Nuestra Familia, a member of the Nuestra Familia?

A   Yes, it is possible.

Q   Are the -- if I call the, the Nortenos, clikas, is this a language you and I can talk in?

A   Yes.

Q   Are they independent of this system that you have described?

A   Absolutely not.  Orders come down from the top and funnel down to them.  So anyone above them, they must take orders from.

Q   Do the cliques have banks?

A   Yes, they do.

Q   And how far are those bank records -- if there are bank records that are kept, how are they kept and what do they contain?

A   Well, again, they're usually written.  They contain information going in and -- money coming in and money going out.  Where it went, what it was used for, who it went to, that type of thing.  And there's two reasons for that.  One is that if they are -- let's say I'm a Norteno and I want to sell drugs, and I buy drugs from someone for $1,000 and I sell them for $2000.  I can then see I made a profit.  But not only can I see I made a profit, the people above me can see I made a profit.  And then I am required to funnel money back up through the chain.

Q   So if I'm a Norteno clique, I must contribute money to La Raza or La Familia or whom?

A   The money goes up the chain and it's decided the percentage of what goes where.

Q   Do, based on your knowledge and experience and training, does -- do the Norteno individual members, all right, do they decide how much money they're going to send back up the food chain?

A   No.  The lieutenant is in charge of the bank; and the lieutenant has to take orders from the captain and so there's an agreement there about that.

Q   Is Nuestra Raza involved in any way in determining the amount of money, the percentage, if you will, that must be kicked up the food chain from all the little individual cliques?

A   I don't know.

Q   And if I asked you the same thing about Nuestra Familia, would you know the answer to that?

A   Well, they're the ultimate authority, so they would be the decision makers about the percentage or the number.

Q   Based upon what you looked at in this case involving the Dodge City Diablos Viejos, are they different -- they have called themselves Nortenos.  There's evidence in this case that they have.  Are they different from the Nortenos that you and I have been talking about?

A   Yes.

Q   How -- how so, based on what you looked at?

A   Well, the first thing that comes to mind is there is

a gang called Diablos Viejos in southern California in Escondido that are Surenos. So the fact that they are calling themselves Diablos Viejos and Nortenos, they're really naming themselves after their rivals. So that's the first thing. The second thing is that I have not seen evidence that anyone has a particular rank. And I also haven't seen evidence that any orders have come down from anyone above them to them. I also haven't seen any evidence that they follow the NF constitution, which specifically states that all Nortenos must follow it.

I have one other thing can I add --

Q    I've forgotten to ask you something -- that you think would enlighten us? Go ahead.

A    I also haven't seen evidence of a bank with the Diablos Viejos.

Q    Evidence of a bank like the banks you've been describing to us. Is that what you're talking about?

A    Yes, sir.

Q    The, the Nuestra Familia?

A    Yes.

Q    What does it do with its money?

MR. SMITH: Objection to relevance. This is not related to the Diablos Viejos or the Dodge City Nortenos.

MR. WACHTEL:  I think perhaps it is, Your Honor.  There has been testimony in this court about the $20 contributions that were required to be made and what those were used for.  And that may be vastly different from what Nuestra Raza and Nuestra Familia and the Nortenos do.

THE COURT:  You can cross-examine her about it.

BY MR. WACHTEL:

Q   That means you may answer, ma'am.

A   What do they do with their money?  Nuestra Familia does several things that come to mind with their money. One is they purchase more drugs that can be sold; and there's drugs changing hands inside the prison.  The other thing is that they might pay specific people to commit murder for them.  These are usually high level murders, not a murder in the street of a neighbor that we might know or something like that.  It's usually of a person who is a direct threat to Nuestra Familia.

Q   Do they use their money to provide lawyers --

A   Yes, they do.

Q   -- for their members?

A   Yes, they do.

Q   Would that service, that extend very far down the chain?

A   I believe the NF uses their bank for themselves.  We have to remember that the regiments of Nuestra Raza and also the Nortenos have their own banks which should be used for the purposes of retaining counsel if they commit a gang-related crime.

MR. WACHTEL:  If I could just have a moment, Your Honor, to consult with counsel.

(Off-the-record.)

BY MR. WACHTEL:

Q   So in the final analysis, Ms. Taylor-Austin, in your opinion, in your opinion, are the Diablos Viejos in Dodge City, Kansas, Nortenos?

MR. SMITH:  Objection.  Asked and answered.

THE COURT:  Let her answer.

A   No.

MR. WACHTEL:  I don't have any further questions.  I'm sure the young gentleman here will.

THE COURT:  I'm going to -- you go ahead, Mr. Mandelman, and then we'll take a recess and then we can have cross-examination.

MR. MANDELMAN:  Okay.  I just have a few question, too, so, I'm going to be short.

THE COURT:  You know, I've been doing this for a long time and every lawyer that ever gets up says I just have a few questions --

MR. WACHTEL:  We have a tendency to fall in love with the sound of our own voice.

MR. MANDELMAN:  I'm not going to disappoint everybody at this point.

### CROSS EXAMINATION

BY MR. MANDELMAN:

Q    Does a Norteno tattoo make you a Norteno?

A    No, not necessarily.

Q    And does a Nuestra Familia make you a Nuestra Familia member?

A    Not necessarily.

Q    And what else -- why do you say that?

A    Well, it could.  I mean, if someone has those tattoos on their body, they could be a member of those two groups.  However, on the other hand, anyone can go to a tattoo artist, bring a picture and say this is what I would like; and if you pay the person the right fee, they will give you that tattoo.  The other thing is that many times individuals give each other tattoos.  So if someone wants one, they could either go to a tattoo artist or ask another person.

Q    Does red clothing make you a Norteno?

A    No.

Q    And what's the significance of -- what significance do you attribute to clothing?

A    It's an identifier; but in and of itself, it is not a decision maker.  So it's something that we look at and take into the totality of the situation to decide if someone is or isn't a gang member or this is or is not a gang.  But in and of itself, it's not a decision maker because we can all wear whatever we would like.

MR. MANDELMAN:  Okay.  That's all I have. Thanks.

THE COURT:  We'll take a recess, Ladies and Gentlemen.  Approximately 15 minutes.  And then we'll have cross-examination.

(Recess.)

**CROSS EXAMINATION**

BY MR. SMITH:

Q    Good afternoon, ma'am.  How are you?  Let me know if you don't understand any of my questions.  Sometimes I tend to get a bit excitable and start to talk quickly. And at the end of my questions, I also sometimes have this pregnant pause, so don't let me talk over the beginning of your answer in case I just haven't finished my thought, for instance.

A    Okay.

Q    Now, ma'am, you testified you worked -- or you are a psychotherapist and a school counselor; is that correct?

A    Yes.

Q   In a sense, there are two aspects to your professional life; is that right?  The therapy side and your testimony or your forensic side; is that correct?

A   I think that in a way, yes; and in a way, no.

Q   Okay.  Well, let's just talk about your work as a psychotherapist or school counselor?

A   Yes, sir.

Q   You have a Master's degree in counseling or being a social worker; is that correct?

A   In counseling, yes.

Q   In counseling.  You work as a school counselor now; is that correct?

A   Yes.

Q   You have done so for many different schools or school districts or community colleges in the past?

A   Yes, sir.

Q   And continue to do so?

A   Yes, sir.

Q   You also -- now, when you're counseling gang members, you've mentioned that you counseled approximately, what, 2000 gang members?

A   Yes, sir.

Q   When you counsel those gang members, is that in conjunction with your work in schools or private practice of some sort?

A    More within the school system.  I have had a few gang members in my private practice; but the vast majority are in the school system.

Q    And is that true for your work in Connecticut, New York and also your past work in Los Angeles?

A    Yes.

Q    Or the Los Angeles area?

A    Yes, sir.

Q    Now then, you work as an expert in forensic issues; is that correct?  Explain to the jury what forensics is?

A    My understanding and my use of the word forensic is that it has to do with anything related to court and the law.  So it could be evidence.  It could be psychological.  It could be any type of information in connection to court or legal issues that bring us to court.

Q    So what we probably need to do is split your forensic work into two categories as well; right?  The therapy or psychotherapist forensic work that you do and then your work testifying as a gang expert.  Is that correct?

A    I am currently working as an expert on a case that is therapy related but it has not gone to court.  So I'm not sure how to answer your question because I haven't done that yet.

Q   But in your work with the court system, you have, for instance, contributed to sentencing memorandums?

A   I have contributed.

Q   To sentencing memoranduma?

A   Sentencing memorandums?

Q   Yes.

A   I have been asked to write reports.  I don't know --

Q   And have you done that?

A   Yes, sir.

Q   Based upon your therapeutic skills and not your expertise as a gang expert; is that correct?

A   No, that is not correct.

Q   Okay.  What was the information that you put in that forensic sentencing memorandum?

A   You're using the word sentencing report, and I'm sure that I've written one, but I don't remember my reports in that manner.  I remember my reports as reports that were written because I was asked by the attorney who hired me to do so.

Q   Okay.  Have you been asked to write any reports by an attorney in relation to a sentencing hearing?

A   I don't recall.

Q   Okay.  I'll move on, ma'am.  You have testified in prior federal cases; is that correct?

A   Yes.

Q   In fact, you've testified in a prior federal case in the District of Kansas; is that right?

A   Yes, sir.

Q   You've also mentioned Alabama and New York; is that right?

A   Yes, sir.

Q   You also consider yourself an expert in the identification or in certain types or sets of gangs; is that correct?  Do you have --

A   Yes.

Q   -- an expertise in Bloods and Crips?

A   Yes, sir.

Q   And I believe that you've also mentioned that you have an expertise in BGD, which is Black Gangster Disciples.  Is that correct?

A   It is correct, Uhm, yes.

Q   So Bloods, Crips and Black Gangster Disciples are the gangs for which you are most familiar; is that right?

A   Yes.

Q   You have researched them first on the west coast being when you were working in the Los Angeles area; is that correct?

A   Yes.

Q   And researched them also on the east coast being

when you did your work in New York; is that correct?

A   Yes.

Q   In fact, when you testified in the United States District Court for New York, you were testifying about a Blood gang; is that right?

A   Yes, it is.

Q   And you also have included in your C.V. a number of other court, trial testimony or consultations of cases that you've worked on and included the types of gangs that you worked on.  Is that right?

A   Uhm, yes.  I included the cases and I included the gangs mentioned.  The way that the gangs are mentioned in the actual, uhm, trial or in the indictment.

Q   Now, other than this Indictment, you have not worked on or been in a court involving a court case involving any Nortenos or Norteno gang groups or cliques, have you?

A   That is correct.

Q   This is the first time you've been involved in investigating a Norteno clique for the purposes of court testimony?

A   I don't investigate when I come to my opinion.  I review the investigation that's already taken place.

Q   This is the first time that you've done so in relation to a Norteno clique; is that correct?

A   That is correct.

Q   What about Surenos?

A   Can I look?

Q   Please.

A   Okay.  Your question had to do with testimony or work done?

Q   Yes.

A   Which one?

Q   Well, let's just do work done.

A   Okay.  I did work on a Nortenos case prior to this one.

Q   What case was that?

A   But I didn't testify.

Q   What case was that?

A   USA vs. Angel Cerda.

Q   Well, that's this Indictment, isn't it, ma'am?

A   Yes.  But it was a separate trial.

Q   Was it a trial?

A   I believe that it was going to be a trial and then they settled out of court, entered a plea.

Q   So Angel Cerda plead?

A   I believe so.

Q   He plead guilty?

A   I don't know.

Q   He was indicted in this case in the very same

Indictment that Pedro Garcia and Gonzalo Ramirez were indicted in?

A   I don't know.

Q   Have you reviewed the Indictment in this case?

A   Uhm, I believe I did.

Q   And when you reviewed the Indictment --

A   Uh-huh.

Q   -- did you note if Angel Cerda was indicted in the case with Pedro Garcia and Gonzalo Ramirez?

A   I wasn't focused on that.

Q   You weren't -- I believe you were consulting on Angel Cerda; is that correct?

A   Well, at that time, yes; but not in this trial.

Q   May I approach.  I'm showing you what's been marked as Government Exhibit 2.  Do you recognize that?

A   Yes.

Q   Have you read that in the past?

A   Yes.

Q   What is Government Exhibit 2?

A   It's the Indictment of all the numerous defendants.

Q   Does that Indictment include Angel Cerda?

A   Yes.

Q   Does that Indictment include Gonzalo Ramirez?

A   Yes.

Q   Does that Indictment include Pedro Garcia?

A   Yes.

Q   So you are familiar with that Indictment?

A   I have read it in the past, yes.

Q   So you have not read it recently to your testimony today?

A   Correct.

Q   Okay.  Thank you.  Now, you mentioned that you have traveled to Dodge City, Kansas; is that correct?

A   Yes.

Q   When did you do so?

A   April 16th, 2013.

Q   And that was after a court hearing here in Wichita, Kansas; is that correct?

A   Yes.

Q   The Daubert hearing?

A   Yes, sir.

Q   How long were you in Dodge City, Kansas?

A   Off the top of my head, approximately, I would say, 11 to 12 hours.  That included travel there and back.

Q   Okay.  And do you recall how long your travel took?

A   I don't recall because I wasn't driving, so I don't recall exactly.

Q   All right.  So you drove to Dodge City, Kansas, on April 16th.  Did I get that date right?

A   That's correct.

Q   And did you drive back the same day?

A   Yes.

Q   So minus travel time is the time that you spent in Dodge City, Kansas, doing these interviews; is that correct?

A   Yes.  We had the interviews and then I also drove around the city and wanted to get a look at other things in addition to talking to people.

Q   You mentioned that you spoke to four people; is that right?

A   Yes, sir.

Q   A pastor, a priest and two social workers; is that correct?

A   That is correct.

Q   And the primary purpose for you to speak to those four people was to determine if there was gang activity in Dodge City, Kansas?

A   I thought it would be helpful to talk to people who usually work in the community who work with gang members or could possibly work with gang members directly.

Q   Did you interview law enforcement officers?

A   No, I did not.

Q   Did you interview probation officers?

A   No, I did not.

Q   Did you interview anyone that worked in the court

system?

A   No, I did not.

Q   Did you interview any gang members?

A   I don't believe so.

Q   Did you interview the families of any gang members?

A   Yes.

Q   And who did you interview?

A   Angel Cerda's sister.

Q   And what was her name?

A   I don't recall.

Q   Do you have it in your notes?

A   Not with me; but in my notes at my office, I do.

Q   And you would agree -- you must agree that law enforcement officers in a particular community would have a great deal of valuable information as to identification of gang members?

A   That's a true statement.  I believe that there's other people as well.

Q   And probation officers would have a great deal of valuable information as to identification of gang members?

A   That's, in general, a true statement.

Q   As a matter of fact, you've mentioned that during your interview with one of the pastors, either the pastor or the priest, that they mentioned that they had

noticed that there really hadn't been a lot of current gang activity; is that correct?

A    That is correct.

Q    And law enforcement would be the group that would know the extent of the gang activity; is that right?

A    They are one entity that would know.  There's other entities as well.

Q    And you made this trip on April -- and I'm not going to remember the date now -- 16th of 2012; is that correct?  I'm sorry -- 2013.  Is that right?

A    Yes, sir.

Q    Which was after the Indictment was handed down in this case; correct?

A    Yes.

Q    In which 23 people -- 23 gang members were indicted; is that right?

A    Correct.

Q    And no longer in Dodge City, Kansas; is that right?

A    Correct.

Q    You have mentioned the phrase hybrid gang.  Correct me if I'm wrong.  You've said that a hybrid gang is a gang that takes signs, symbols, names of some other gang and adopted them as their own.  Is that correct?

A    Yes.  A hybrid gang can be that.  It can also be other things.

Q   In this case, that is what the hybrid gang is; isn't that right?

A   Yes, in my opinion.

Q   So the Diablos Viejos, in your opinion, is a hybrid gang in Dodge City, Kansas?

A   Yes, sir.

Q   And LCC is a gang in Dodge City, Kansas?

A   It's reported as a gang.  I haven't studied them or researched them or, uhm, given them my focus.

Q   In your provisional report that was provided in discovery, did you state: "It is this writer's preliminary opinion that Diablos Viejos and Los Carnales Chingones were street gangs in Dodge City, Kansas, during the dates involved in this case."?

A   Yes.

Q   So it is your opinion that they each were street gangs in Dodge City, Kansas?

A   Yes.

Q   And you would agree that the members of the Diablos Viejos have adopted the signs, symbols, colors and names and words of the Nortenos?

A   Yes, I would.

Q   So the Diablos Viejos in Dodge City, Kansas, have identified themselves with the word or phrase Norteno?

A   It seems as they have, yes.

Q   They have adopted the representation of the number 14; is that correct?

A   Yes, sir.

Q   They have adopted the representation of the letter N; is that correct?

A   Yes, sir.

Q   They have adopted the phraseology of using the word Norte; is that correct?

A   I believe so, yes.

Q   You have reviewed reports and interviews that have indicated that they have used the hand signs that identify themselves as Nortenos; is that correct?

A   Yes, sir.

Q   And you have reviewed reports that have indicated that phrases have been said during the course of commission of crimes such as puro Norte; is that correct?

A   That is correct.

Q   That phrase identifies one as being a Norteno gang member.  You would agree with that?

A   No, I would not.

Q   Okay.  You would agree that the Diablos Viejos and Los Carnales Chingones have adopted the color red; is that correct?

A   Yes, sir.

Q   And used the color red to represent their allegiance with the gang of which they are a member; is that correct?

A   Yes, sir.

Q   You would agree that the Diablos Viejos members in Dodge City, Kansas, have adopted tattoos that identify themselves as being Nortenos; is that right?

A   They have adopted tattoos that do say Norteno and are similar to Norteno tattoos, that is correct.

Q   The 14 tattoo would identify themselves as being a Norteno?

A   I don't believe it identifies them as being a Norteno.  They have adopted it.

Q   Does the 14 represent Norteno?

A   Yes, sir.

Q   Does an X-4 represent Norteno?

A   Yes, sir.

Q   Does XIV represent Norteno?

A   Yes, sir.

Q   Does one dot and four dots represent Norteno?

A   It can.

Q   Does the word Norteno represent Norteno?

A   It can.

Q   And the word Ene?

A   Yes, sir.

Q   You would agree that all of those tattoos, words, phrases and symbology identify with the Norteno gang?

A   It could.  The one dot and the four dot could represent something else.

Q   In the context of someone who's identified themselves as a gang member, wears the color red and uses phraseology from Norteno, what would it identify them as?

A   It could identify them as a Norteno.  It could also identify them as a person who's done time in prison.

Q   Okay.  Now, when you offered your opinion, you stated it was your opinion that the Diablos Viejos gang members in this case were not Nortenos in the sense that they aren't related to the national organization of Nortenos; is that correct?

A   That is correct.

Q   But you would agree that these individual gang members named in this Indictment identified themselves as Nortenos whether they are approved of by another Nortenos group or not?

A   Yes.

Q   And your testimony about the Nortenos comes, in essence, from your research -- the learned treatise was one of the phrases that came out.  Is that correct?

A   Yes.  And my experience working with Surenos and

just a couple of Nortenos.

Q   That's right.  You've interviewed two Nortenos; is that right?  You've counseled two Nortenos?

A   Yes, sir.

Q   And you counseled those two Nortenos when you were in the Los Angeles area?

A   Yes, sir.

Q   Which was at least nine years ago; is that right?

A   Yes.

Q   Do you recall if those two people that you counseled spoke about Norteno cliques in Kansas?

A   They did not.

Q   So, again, you've done some review of the discovery provided in this case; is that right?

A   Yes.

Q   And you have consulted the learned treatises from various different authors; is that right?

A   Yes.  And I have also had conversations with other people in my profession.

Q   I understand.  Thank you.  Did those conversations with other people in your profession give you insight into the Diablos Viejos in Dodge City, Kansas?

A   They did not.

Q   Had they ever been to Dodge City?

A   No.

Q   Have they interviewed any gang members in Dodge City?

A   No, they did not.

Q   Now, this next question may be more of an academic question.  You've identified the use of the word clique; is that correct?

A   Yes.

Q   A clique is a gang; is that right?

A   That is correct.

Q   So the word clique and gang are synonymous?

A   Yes.

Q   And in this case, you've identified DV, Diablos Viejos, as being a gang, this would be synonymous with being a clique; is that correct?

A   No.

Q   Well, clique and gang are synonymous; is that right?

A   Clique and gang are synonymous in the pyramid structure that we were talking about earlier.  But there are many gangs who are not cliques; so I might have misunderstood specifically what you were asking.

Q   Because those other gangs would be sets; is that right?

A   They could be sets.  They could be something else. I don't know what Asian gangs call their gangs because I don't work in that area.

Q   So let's just work, then, with African American gangs and Hispanic gangs.

A   Yes, sir.

Q   Kind of what your expertise is and what this case is about?

A   Yes.

Q   A set is synonymous with gang; is that right?

A   If you're African American, yes.

Q   Yes.  And you've testified to that many times before?

A   Yes.

Q   And a clique is synonymous with gangs; is that correct?

A   Yes, it can be.

Q   So while the word clique and set may be crossing racial boundaries, they each are synonymous with a gang?

A   In a general sense, yes.

Q   Thank you.  Now, the rules, the constitution from Nuestra Familia, is handed down from Nuestra Familia itself; is that right?

A   That is correct.

Q   Nuestra Familia created and the power center is in California, the California penal system; is that right?

A   Yes, sir.

Q   And you would agree that the rules, the

constitution, the by-laws, that the Nuestra Familia has is most important and most enforced in the prison setting?

A   I'm sorry.  Could you repeat that.

Q   Would you agree that the constitution, by-laws of Nuestra Familia, is more important and more enforced in the penal setting?

A   No, I would not agree with that statement.

Q   Okay.  Now, you've mentioned the bank.  You're aware in this case that a ledger has been seized that tracked the collection of money; is that right?

A   Yes.

Q   And you would agree that that ledger does in fact appear to be a written recordation that money was collected by the Diablos Viejos; is that right?

A   I don't know that in looking at the actual document.

Q   Have you looked at the actual document?

A   Yes.

Q   Have you looked at other Norteno bank ledgers?

A   Ever or in this case?

Q   Ever.

A   Yes, sir.

Q   And when you looked at those other Norteno bank ledgers in your experience, did you use your experience to interpret whether that recorded the collection of

funds for that gang, clique, car, pinta?

A    I think I'm a little bit confused by your question.

Q    Okay.  The bank ledger we have in this case --

A    Yes, sir.

Q    Government Exhibit 159-A.  Do you agree that Government Exhibit 159-A appears to record the collection of funds for Diablos Viejos?

A    There's no gang name on here so I can't agree with that or disagree with it.

Q    Because you're unfamiliar with the gang monikers in 159-A?

A    I recognize one.

Q    And which one is it that you recognize?

A    Drac.

Q    Okay.  Then you would agree that that document appears to record the collection of money for individuals of which you do not know?

A    Yes.

        MR. SMITH:  I have nothing further.

        THE COURT:  Yes, sir.

        MR. WACHTEL:  Yes.  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. WACHTEL:

Q    Ms. Taylor-Austin, take a look at Exhibit 159-A. And if you can, for the Court, can you compare the

information in that to Norteno or Nuestra Raza bank records that you have seen?  Can you do that?

A   Yes.  First and foremost, the thing that impresses upon me right away, Nortenos write in micro-writing, which is very, very, very small writing.  Even with my glasses, I'm not able to read it.  I have to use a very powerful magnifying glass to be able to read it.  This is written in regular handwriting.

The other thing is that this is showing people's names and $20.  The figures are then added up.  I don't know what the $20 was used for.  I don't know if it was money coming in or money going out.  Where a Nortenos bank account would specify that and what it was used for.  Usually the bank account of NF or Nuestra Raza or Norteno group would somehow identify what it is.  So it might say -- these are my words, might not say it in these words -- might say, for example, April's meeting or April's debts, that specifies what it is.  And it's written more -- similarly to a bank statement, but it's in micro-writing.

Q   And you can set that exhibit aside.  I don't have any more questions from that.

You remember Mr. Smith asked you about all the things Norteno that DVs have sort of adopted?  Remember that discussion?

A   Yes, sir.

Q   Adopting all of that stuff -- adopting all of that stuff, does that make, in your opinion, does that make the Dodge City DVs Nortenos?

A   No, it does not.

Q   What makes a Norteno a Norteno?

A   A Norteno is a Norteno because they follow the 14 bonds and the NF constitution.  They also have been brought into the gang by someone above them in this pyramid structure that we're talking about.  They also have a rank.  And I have not seen any evidence of rank in this case.

        MR. WACHTEL:  I don't have any further questions for you.  Thank you very much.

        MR. MANDELMAN:  No questions on redirect, Your Honor.

        THE COURT:  Anything further?

                    **RECROSS EXAMINATION**

BY MR. SMITH:

Q   Ma'am, Mr. Wachtel essentially asked you what makes a Norteno a Norteno.  And when he asked that question, it was your understanding that he was asking about what makes someone a Norteno in relation to your definition and your knowledge as to how Nortenos are formed under Nuestra Familia and Nuestra Raza in the California penal

system.  Is that right?

A    Yes.  Legitimate Nortenos.

Q    Legitimate Nortenos.  Now, legitimate or illegitimate, you agree that Diablos Viejos represent themselves to be Nortenos?

A    Yes.

MR. SMITH:  Nothing further.

MR. WACHTEL:  I have no further questions, Your Honor.

THE COURT:  You're excused, ma'am.  Thank you.

A    Thank you, sir.

THE COURT:  Next witness, please.

MR. WACHTEL:  I have no further witnesses, Your Honor.  Mr. Garcia rests.

THE COURT:  All right.  Ladies and Gentlemen, I'm going to excuse you to return at 10:00 tomorrow morning.  I'm hopeful -- going to make every effort to be ready to let Mr. Henry call any witnesses that the Defendant Ramirez wants to call and then I'll start reading the instructions to you.  They're pretty long; but they are what they are.  After the instructions, the lawyers will have the opportunity to make the closing arguments and then the case will be yours.  So remember and heed the admonition.  I'll see you at 10:00 tomorrow morning.

(Jury excused for the evening at

3:10 p.m.)

THE COURT:  All right.  If you all please wait around maybe half an hour or so, we'll get you a copy of these instructions.  I'll see you then at 9:00 tomorrow morning and we'll go over the instructions and -- now, how much time does the Government want for closing?

MR. SMITH:  In total, Your Honor -- first, we would ask permission to split the closing argument, the primary closing and rebuttal closing between myself and Mr. Welch.

THE COURT:  You may do that.

MR. SMITH:  Thank you.  With the volume of instructions and the amount of information we've gone over, it's really hard for me to predict, but three hours --

THE COURT:  You know I'm not going to give you whatever you want.

MR. SMITH:  I know.  I would say three hours in total would easily cover the information that we need.  Splitting it between myself and Mr. Welch.

THE COURT:  What about you, Val?

MR. WACHTEL:  Gosh, Your Honor, I'm long-winded, but I certainly cannot eat up three hours. And I'm thinking if they get three hours, the most I

would want would be an hour and a half and I doubt that I would use all of that.

THE COURT:  How are you going to handle -- are you going to split?

MR. MANDELMAN:  We would like to for this because there's a lot of issues.  If that's all right with the Court.  But I don't think we need anywhere near -- I don't need anywhere near that time.

MR. HENRY:  Your Honor, I would think that 45 minutes per Defendant and an hour and a half for the Government would be plenty.

THE COURT:  Well, I'm going to err on the side of caution.  The Government can have two hours.  And I'm -- frankly, I was thinking about giving you a little more than Val because you have to answer a few more charges.  So what I'm going to do is I'm going to give the Defendants collectively two hours and you can -- among the three of you lawyers, and you can figure out how to split that up.  How's that?

MR. WACHTEL:  That's fine, Your Honor.

THE COURT:  That way, hopefully, we can get the case to the jury tomorrow.  And that's enough.  Oh, my God, for the jury to listen to four hours, as much as four hours worth of argument, we'll have to get -- what do they call that stuff, that five-hour energy, go out

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 2646

and get some of that.  All right.  I'll see you at 9:00.

(Recessed for the day at 3:15 p.m.)

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 9:15 a.m. October 16, 2013, the following proceedings continued.)

THE COURT: All right. Now, in the presence of the Defendants and absence of the jury, I want to start going over the instructions. And the first thing I want to talk about are Joel's supplemental proposed instructions because I think some of those are okay and I want to add them, depending, of course, what the Government has to say. So -- but let's start on the first page.

Does the Government object to dividing the VICAR instruction? Enterprise and interstate commerce. Just having an extra element?

MR. WELCH: I guess we do, Judge, because the Tenth Circuit has not instructed that way. The cases -- at least the cases I know of, there's no pattern Tenth Circuit instructions; but we would ask --

THE COURT: Well, I'm looking at the Tenth Circuit cases.

MR. WELCH: Judge, I'm thinking of *Smith* and *Errington* and *Angilau* --

THE COURT: Right. I don't see any reason not to divide it. We'll divide the VICAR instructions.

Then the next, second: Defendant requests the

Court add as to each Defendant at the opening paragraph. I don't see why you want that. I've instructed four or five times in here that they have to give separate consideration.

MR. HENRY: Your Honor, I think your first set of instructions that I went through didn't have the multiple defendant, multiple counts instruction included and so I thought that it was important to make sure on the individual instructions that the Defendants were to be treated separately when they are, you know, deliberating. And so the last set of instructions we got last night included that one, so that minimizes, I think, what I thought was -- the first element of some of the elements instructions kind of said I think it was the Defendants either or both, or something like that, and that seemed to be somewhat, I thought, confusing maybe to the jury. And I wanted to make sure each elements instruction had that, that they are to be treated separately essentially. And you have added that other instruction. I do think that the either or both is -- yeah, it's in the third element, for example, in the VICAR, Count 5, the Defendants, either of them, had a position in the enterprise. The Defendants or either of them. And so it kind of starts out by lumping the two together and I thought that there should be some

separation in the individual elements instruction.

THE COURT:  Well, I don't think that I'm going to change that.  I've got an instruction that says a separate crime is charged, et cetera, and I don't think the jury is going to be confused about that.  I don't know, Tim or Joel, about the lesser included offense.  You know, we get that from the state instructions.  If you don't want a lesser included offense instruction, we won't give one.  I mean, that's to the benefit of the defendant if you ask me.

MR. SMITH:  Your Honor, my only comment is the federal law, which I believe is 1111, 18 U.S.C. 1111, includes first degree and second degree murder in 18 U.S.C. 1111, so it's all one.

THE COURT:  But they're not being charged under 1111.

MR. SMITH:  Well, that's correct.  But in 1959 and 1961 it references any act involving murder or threat of murder.  We've referenced the state law; but the federal law acknowledges that first degree and second degree murder are integral --

THE COURT:  Well, that may be.  You should have alleged federal law then --

MR. MANDELMAN:  Yeah.  And, again, I'm not actually -- 1111 separates, you know, first and second

degree murder.  And 1959 just says murder.  So I don't see why they would get a lesser included instruction.  This allows the 1959 instruction to include a mandatory life sentence if they found him guilty of second degree murder in state court.

THE COURT:  The two of you are totally confusing me here.  I really don't see why I should give a second degree murder instruction.

MR. MANDELMAN:  It would allow the jury to convict these guys of 1959 murder if they found 'em guilty of second degree murder in state court.

THE COURT:  Yeah.  And the way I read this -- this thing is so long, the Government has overcharged this case, in my opinion, but everything is so long in here -- but my recollection is that there's no allegation in this case that there's a federal violation of the murder statute, 1111.  It's all state.  Correct?

MR. WACHTEL:  That is correct, Your Honor.

MR. SMITH:  That is correct, Your Honor.

THE COURT:  All right.  Then I'm not going to instruct on federal murder.  That's -- you should have done that yourself if you thought you could do it.

MR. SMITH:  Agreed.  And 59 and 61 reference an act or threat involving murder, under state law, second degree murder is a lesser included offense of

first degree murder. It's actually included in that instruction.

THE COURT: That's why it's instructed this way. We got it out of PIK.

MR. SMITH: Yes, we agree with that.

MR. MANDELMAN: I guess I -- sorry. I didn't mean to confuse the Court either by referencing 1111. I just don't think they get a second degree state court murder instruction.

THE COURT: Why?

MR. MANDELMAN: Because the original -- the Indictment just charges the -- references the state court murder but it doesn't reference second degree.

THE COURT: It's been a long -- I have -- very confused usually about what is going on over in state court. In state court, if someone is charged with murder in a complaint in state court -- Val, you're the guy on this -- does the Complaint have to allege both murder and second degree murder?

MR. WACHTEL: No, Your Honor, it does not. Oftentimes they are alleged in the alternative. But in state court, the court must instruct on lesser included and we can't turn it down. And that is why, in this particular fight, my dog says, yes, instruct on lesser included offenses; and, frankly, I've been able to get

the courts in Sedgwick County in a first degree murder case to actually instruct on unintentional manslaughter. I just don't agree with that.  I'm satisfied with your instruction.

THE COURT:  Yeah, I thought it was error not to instruct on lesser included offenses.

MR. WACHTEL:  I think it is.

THE COURT:  Unless, of course, the defendant, you know, the parties don't want a lesser included offense; but, anyway, I'm going to leave it the way it is.

MR. MANDELMAN:  Okay.  Just note my objection.

THE COURT:  I will.

MR. MANDELMAN:  Thanks.

THE COURT:  Now, fourth, the Defendant asks -- well, I think the evidence is sufficient and so that's the end of that one.

Fifth, the Defendant requests that the Court include the following paragraph.  What's wrong with the two paragraphs that I have?  They basically say the same thing.

MR. MANDELMAN:  Well, I guess I just wasn't clear that the paragraphs that we had indicated that the enterprise had to be separate and apart from the alleged racketeering activity.

THE COURT: Well, now, I'm breaking it up like you want.

MR. MANDELMAN: Well, on the elements for the VICAR offenses; but on the actual definition of enterprise, that the enterprise has to exist separate and apart from the racketeering activity.

THE COURT: What's the Government's position on that?

MR. SMITH: We don't think that your instructions are unclear at all. I think that the language that is included in this proposed instruction has already been incorporated in the instructions you've given. Well, actually, throughout multiple of the instructions that you've given. Each one of those words or phrases have been addressed.

THE COURT: It seems to me, Joel, that if I do what -- and I am going to do what you suggest and that is separate the elements.

MR. MANDELMAN: That does help clarify the concern.

THE COURT: I've separated the elements -- well --

MR. MANDELMAN: There's just the sort of -- it's -- you know, it's a real fine legal point that the enterprise has to be something other than just -- it has

to have some independent existence even if it's slight.

THE COURT:  Tell you what I'll do.  I think this is a correct statement of the law and I'm going to put your requested paragraph between the last two paragraphs.

MR. MANDELMAN:  Okay.  Thank you.  I think that's a good idea.

THE COURT:  And I don't think that will change anything; but if there's a problem, that solves it. Now, does the Government have any objection to the proposed instructions on Pages 13 and 14 which limit the testimony, the evidence as to Garcia?

MR. WELCH:  No, Your Honor.

THE COURT:  I think those are appropriate. Now, you can make an argument about the rest of your proposed instructions; but I've either given them or I think they're way too argumentative.  I think you can argue them if you want; but I think that I've given all the instructions that are necessary to define expert witnesses and how the jury is to consider people like Worthey and the rest of those people.

MR. MANDELMAN:  Just real briefly.  Yeah, because we had two witnesses here with just, just the one on 15 with, uhm, Agent Webb and Officer Nau, just because they testified to sort of this -- well, in

multiple roles. I just wanted to make it clear that they don't have any sort of extra weight or authority based on those two roles. And it wasn't always clear in the trial. And I know some of it was just sort of convenience; but we sort of had Webb on the end, he was just sort of testifying about everything. And he can be a fact witness and he can be an expert witness, I understand, but it's not like -- he can't just come up there and narrate about what happened in the case. And that was sort of my concern.

THE COURT: Well, I don't think -- actually, I sustained somebody's objection to narrative testimony and he really didn't give any narrative testimony.

MR. MANDELMAN: Yeah. The number of times he testified and the number of different roles that he occupied in the case just made me concerned and that's why I asked for that instruction.

THE COURT: I know but I don't think the jury will be helped by that.

MR. MANDELMAN: And then the other instructions are sort of along a similar theme about the different roles that these sort of different cooperating witnesses played and, you know, it's -- we feel like their testimony was highly compromised and that the jury has a -- jury ought to be instructed about how to

consider it.

THE COURT:  I think I have; and particularly looking at the one about Fabian Neave.  That's just argument and that wouldn't be appropriate for me to essentially give an argumentative instruction.  But they're in there for the record and I'll show that you made them and that I'm declining to give them.  Now, I think I've covered all of your supplemental proposed instructions.

MR. MANDELMAN:  Thank you, Judge.

THE COURT:  Now, can we start on my instructions?  Is there any reason we can't start on those at this point?

MR. WELCH:  No, sir.

THE COURT:  All right.  This is quite a list but I think it's necessary.  Do you have any objection to the index?

MR. WELCH:  No, Your Honor.

MR. MANDELMAN:  No.  No, Your Honor.

MR. WACHTEL:  Your Honor, if I may, we were given a new index and so in the large package should I just exchange these things?

THE COURT:  Right.  I thought maybe --
Rachael, have you given them the ones that we've worked on?

LAW CLERK MS. SILVA:  Yes.  This morning,.

THE COURT:  We worked on those after you left yesterday.  And you should substitute those because I've added a couple of instructions, then the instruction numbers will probably change but not the index.  Okay?

MR. WACHTEL:  Yes, sir.

THE COURT:  Members of the jury.  Any objection?

MR. WELCH:  No, Your Honor.

THE COURT:  You all don't need to stand.

MR. MANDELMAN:  No, Your Honor.

MR. WACHTEL:  No, Your Honor.

THE COURT:  Any objection to the Indictment?

MR. WELCH:  No, Your Honor.

MR. MANDELMAN:  No, Your Honor.

MR. WACHTEL:  No, sir.

THE COURT:  All right.  Then an Indictment is but a formal method.

MR. WELCH:  No objection.

MR. WACHTEL:  Your Honor, I don't have an objection to that instruction either.  I would ask the Court to give that before the Court gives the instruction on -- before the Court reads the Indictment.

THE COURT:  Okay.

MR. MANDELMAN:  Yeah, we agree with that.

THE COURT:  That's all right.  I'll do that. We'll change the order.  Now, on or about.  You want me to give that at the beginning, too?

MR. MANDELMAN:  I think so.  That would make sense to read those two together.

THE COURT:  Okay.  Then the next one, I probably ought to give it, too, a separate crime is charged, et cetera.

MR. MANDELMAN:  I agree.

MR. WACHTEL:  I agree.

THE COURT:  All right.  Those three.  Then I'll read the Indictment.  Okay?

MR. WACHTEL:  Yes, sir.

THE COURT:  Okay.  Then the next instruction will be after the Indictment, the following instructions define terms.  Any objection?

MR. WACHTEL:  No problem.

MR. WELCH:  No, Your Honor.

MR. MANDELMAN:  No objection.

THE COURT:  Then there's the first instruction is the conspiracy instruction.  Any objection?

MR. WELCH:  No, Your Honor.

MR. WACHTEL:  No, sir.

MR. MANDELMAN:  No, Your Honor.

THE COURT:  Then the instruction on overt act.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Then the instruction on aiding and abetting.

MR. WELCH:  No objection.

THE COURT:  And the reason this is divided between Garcia and Ramirez is simply because it makes it clear to them for the umpteenth time that Ramirez is charged in more counts than Garcia is.

MR. WACHTEL:  I don't have any objection to this instruction.

MR. MANDELMAN:  I don't have an objection to it.

THE COURT:  Okay.  Next is the definition of enterprise which we're going to modify.

MR. MANDELMAN:  Okay.  Thank you, Judge.  I have no other objection.

MR. WELCH:  Judge, this was changed from the one we got yesterday.  Can I ask what the change is?

LAW CLERK MS. SILVA:  Deleted the section after it said the term enterprise includes.  There was a list of -- a list that was unnecessary, about seven words --

THE COURT:  It said something about, for

example, drug dealing or something like that.  And I thought that it would probably be better for me not to point out --

LAW CLERK MS. SILVA:  It used to say the term enterprise includes any individual partnership, corporation, association or other legal entity and any union.  You deleted from any individual until legal entity.

MR. WELCH:  No objection.

THE COURT:  All right.  I didn't think we -- we don't have a corporation here yet.

MR. WACHTEL:  Not yet, Your Honor.  We don't object.

THE COURT:  Joel?

MR. MANDELMAN:  No, that sounds fine, Your Honor.  Thank you.

THE COURT:  Then interstate commerce.  Or actually interstate, foreign commerce.

MR. WELCH:  Your Honor, we would request the language, or similar language to what we proposed in our instructions concerning, basically, the language from *Smith* or language like that which says that -- in *Smith*, the court structured that the purchase and sale of the controlled substances produced or cultivated outside Utah, or the use of firearms or ammunition manufactured

outside of Utah, may be sufficient to prove the interstate commerce element of 1962(c).  We would ask the final paragraph has some language like that.  It's my memory that the court, including Your Honor, generally gives that type of instruction in the Hobbs Act cases.  I realize this is not a Hobbs Act case, but it's similar insofar as the interstate commerce.

THE COURT:  That's on Page 27 of your proposed instructions?

MR. WELCH:  And in the brief that I filed over the weekend, Your Honor, I cited other courts have given similar language like that in the interstate commerce instruction.  I think I cited *Smith*, *Miller*, which is not a Tenth Circuit case, Judge, and then another -- I don't have -- well, yes, I do.

THE COURT:  What do you think?

MR. MANDELMAN:  It's our position that's an unwarranted broadening of the definition of interstate commerce.  We've objected to the definition of interstate commerce because we believe that this wasn't an enterprise that was engaged in interstate commerce and the Government needs to show a substantial effect on interstate commerce.  So we -- although we disagree with the definition and we further object to a further broadening of that definition.

MR. WACHTEL:  And we join in that, Your Honor. Most especially on the theory that substantial impact is required in this case because these people did, unlike the Crips, who have their own crack house, these young men in western Kansas did not have anything that was engaged directly in interstate commerce and they're not alleged to have.

MR. WELCH:  Just to be clear, Judge, I'm not asking for any additional language involving the de minimis standard.  I'm just asking that the Court provide additional -- what is the law of the Tenth Circuit based on *Smith* and the other cases I cited, that the Court can give that language to further educate the jury as to what they have to find and what they can find.  And I think it's appropriate based on the cases I've cited.

MR. HENRY:  Your Honor, I believe that it's invading, I think, the question that the jury has to reach in this case by giving them essentially what we objected to and the Court sustained is that Neal Tierney can testify that the guns traveled in interstate commerce, but the decision on whether that's an effect on interstate commerce is for the jury to decide.  And this instruction that the Government is asking for is not mandated by the Tenth Circuit.  It was allowed.

But, in, I think, one or two cases, but it doesn't mean that the Court has to give it.  And there's a difference here, for example, in the Crips case, Your Honor, where there is a drug house operating essentially in interstate commerce, or it's different from a Hobbs Act case where there is a business that's operating in interstate commerce that might put it in the second category of the three tiers of the commerce clause, the channels, the things in interstate commerce or intrastate that requires the substantial effect.  What we have in this case is clearly under the third standard which is why we're arguing for the substantial effect. But even if we take what the Court's already given, it is a reach for the Government to ask for this to all the sudden be applied in that second tier when we have evidence that this is essentially just localized street crime.

THE COURT:  Well, I agree with you.  Okay? You may sit down.

MR. WELCH:  Your Honor, for the record, may I just add one more thing?

THE COURT:  Yes, you may.

MR. WELCH:  To be clear, we're asking the Court to tell the jury that they may, not that they have to find that it effected interstate commerce; and in the

*Smith* decision, that court even instructed in the disjunctive and said that drugs, firearms or ammunition, either one of the three, could be enough.

THE COURT:  Well, I don't remember what the *Smith* -- I guess I could read it.  But here's my problem.  I kind of agree -- I agree that the Government's put on enough evidence of interstate commerce to let the jury decide; and I'll probably never change my mind about that, even if they convict these Defendants or either of them.  But, I'm a firm believer in erring on the side of not creating error.  Okay?  And I also believe -- and I've told many people this -- when I was a prosecutor, Judge O'Connor -- you don't any of you know him --

MR. WACHTEL:  I do.

THE COURT:  He was -- if there was ever a model of a federal judge, it's him.  And he told me one time that if I would argue his instructions, that it would appear to the jury that I -- that he, the judge, had gotten down off the bench and stood beside me during my closing argument.  And, boy, do I ever believe that.  And I think in this case if I gave that kind of requested language, even if it says may, that I might -- the jury might misconstrue that.  So I'll show that; but -- that the Government's requesting it; but I'm not

going to give it.  Any other objections to the interstate commerce definition?

MR. WELCH:  No, Your Honor.

THE COURT:  Racketeering, any objection to that?

MR. MANDELMAN:  No Your Honor.

MR. WACHTEL:  No, Your Honor.

MR. WELCH:  Your Honor, we have one question. The last line says:  Drug, robbery, aggravated assault. That it says aggravated assault is the part we're concerned about.

THE COURT:  The part of what, Lanny?

MR. WELCH:  The aggravated assault -- and I'm probably missing it because I miss lots of things -- but agg assault is not listed as a racketeering act in 1961. Not racketeering activity.  And, again, if I'm missing where that --

THE COURT:  Well, but assault is, isn't it?  I know that's a long definition.

MR. WELCH:  Well, if defense counsel doesn't object then --

THE COURT:  You're charging aggravated assault.  That's the only reason I added the word aggravated.  I assume assault is in there.  I can look at it but --

MR. SMITH: We're charging aggravated assault as it relates to the VICAR count assault with a deadly weapon because assault with a deadly weapon is a specific --

THE COURT: Is assault not part of racketeering activity?

MR. SMITH: -- VICAR act --

THE COURT: Every mafia movie I've ever seen involves some kind of aggravated assault and murder.

MR. WACHTEL: Well, the one thing we can agree on, Your Honor, as charged here, aggravated assault is exactly what we're talking about because it can't be a -- any crime committed in Kansas law with a gun -- I think it's there --

MR. SMITH: Actually, it is a threat, so it would be a threat involving murder or other -- the various things.

MR. WACHTEL: Coupled with the ability to carry the threat out.

MR. WELCH: I've wasted your time, Judge. I'm sorry.

THE COURT: No, you're not wasting my time.

MR. WELCH: So no objection, Judge.

THE COURT: What do you think, Joel?

MR. MANDELMAN: Well, now that Mr. Welch has

raised it, I mean, I guess I don't -- I'm not seeing aggravated assault.

MR. WELCH:  It would be threat, Your Honor, of murder, robbery, is what we have.

MR. MANDELMAN:  I guess I would just suggest, then, we take it out.

THE COURT:  Okay.  It stays in.  Pattern of racketeering activity.  Any objection to that?

MR. WELCH:  No, Judge.

MR. MANDELMAN:  I just have two things.  It says here persons known and unknown.  This is in the -- I guess the -- just in the very first sentence, I think the Government stated previously that there's no one unknown.  So I don't want the jury to go out and think that it could be conspiring with other people.

THE COURT:  Are you still back on conspiracy?

MR. MANDELMAN:  Well --

THE COURT:  I'm on pattern of racketeering activity.

MR. MANDELMAN:  Oh, I guess I'm -- I guess mine got out of order.  Sorry.  I apologize.  I'm fine with this definition.  Sorry.

MR. WACHTEL:  No objection on our behalf, Your Honor.

THE COURT:  All right.  The definition of

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

dangerous weapon.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Now, to the charges contained in the Indictment, Defendants has entered pleas of not guilty.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Okay.  The next, the following instructions discuss each of the counts, et cetera.

MR. WELCH:  No objection, Judge.

MR. WACHTEL:  I don't have any objection to that.

MR. MANDELMAN:  No objection.

THE COURT:  Now, Count 1 --

MR. WELCH:  Your Honor, the only -- I'm not even sure I'm making a formal request.  I'm just thinking out loud.  Russell Worthey was not indicted on Count 1 but he plead guilty to Count 1.  So I think we could add Russell Worthey to the list of people.  Russell Worthey admitted he engaged in conduct which resulted in the conspiracy.

THE COURT:  He plead to an Information?

MR. WELCH:  He did, Judge, to Count --

MR. MANDELMAN:  We're entitled to notice.  I mean, he's not in the Indictment.

MR. WELCH:  Well, he plead guilty months ago so they had notice of that.

THE COURT:  Here's the problem.  I can't believe this jury will nit-pick this; but if they go back and look at the Indictment, they won't see his name there.

MR. WELCH:  But he admitted on the stand, Judge, that's what he plead guilty to.  So they know he plead guilty to conspiracy.  I would just ask that we add his name.  Frankly, it's not a big deal, but --

THE COURT:  Well, I don't think it's -- it says together with persons known and unknown.  So he's a known person.  He'd just not named.

MR. MANDELMAN:  Right.  And I was just objecting to the unknown part because there's nobody -- there is nobody.

THE COURT:  Is there anybody?

MR. SMITH:  Well, there's no one unknown to counsel; but the jury didn't hear every name of every person.

THE COURT:  I thought we did.  I thought we heard every name of every person that lives in Dodge

City.

MR. WELCH: Judge, we didn't. There's some more.

MR. SMITH: I tried.

MR. WACHTEL: What's interesting about Count 1 is there's a preface to it that names everybody who got arrested in this case, including Mr. Worthey. It gets confusing. I'm kind of like you, Your Honor, I don't know whether they're going to even notice this or not. I did look at his Plea Agreement. There was a Superseding Indictment filed with regard to him. I remember that I read it; and I think they charged him with the conspiracy act, I think.

THE COURT: Well, why don't I do this. Why don't I just change it to say together with other persons.

MR. WELCH: That's fine, Judge.

MR. WACHTEL: That's okay.

THE COURT: Okay?

MR. WACHTEL: Yes, sir.

THE COURT: And leave out known and unknown. All right. Now, any objection, having made that change, any objection?

MR. WELCH: No, sir.

MR. MANDELMAN: Not to that change, Your

Honor.

MR. WACHTEL:  No, sir.

MR. MANDELMAN:  I still have just previously just objected to the drug stuff, it being included here because I don't believe that these were shown to be conducted under the affairs of the enterprise.

THE COURT:  Well, if I'd have believed you -- not believed you, but accepted your argument, then I guess I would have sustained at least part of your motion for judgment of acquittal.  And I didn't.  Next is the elements.

MR. WELCH:  No objection.

MR. MANDELMAN:  I've previously submitted a different 1969(d) instruction, which I stand by.  I understand this is the instruction from *Harris*, but I've submitted another one and there's at least disagreement in the circuits about what the elements of --

THE COURT:  I'll show that you did that; but I think I have to follow the Tenth Circuit, or I should anyway.

MR. WACHTEL:  And, Your Honor, we actually join in that request made by Mr. Mandelman.

THE COURT:  Well, it's certainly possible that these Defendants will be acquitted and you won't have to make that argument.  On the other hand, if they're

convicted, you've got an argument.  I don't think it's going to go very far.  You'd have to get to the Supreme Court, but who knows.  Tim has been trying to get to the Supreme Court for 20 years and I don't think he's made it yet, but I'm hopeful that he will.

MR. HENRY:  We've hired a much smarter attorney in the office now, Your Honor.

THE COURT:  On the *Almendarez-Torres* case if I recall correctly.

MR. HENRY:  My former colleague argued that in Forth Worth in front of the Supreme Court.

THE COURT:  He should have let you do it.

All right.  The next one starts out to establish the existence of the conspiracy, et cetera.

MR. WELCH:  No objection, Knocks.

MR. MANDELMAN:  Your Honor, at the end of the, the first -- the last sentence of the second paragraph.

THE COURT:  Yeah.

MR. MANDELMAN:  I just think there might be a word missing.  It is up to you?

THE COURT:  Yes, you're right.  It is up to -- up to.  Thank you.  All right.  Anything else?

MR. MANDELMAN:  Nothing else, Your Honor.

MR. WACHTEL:  No, Your Honor.

THE COURT:  Then, with respect to the third

element, your verdict must be unanimous, et cetera.

MR. WELCH:  No objection.

MR. WACHTEL:  Your Honor, is that not -- unless -- and I don't remember if that exact language appears with regard to every element; but if it appears only with regard to that one, do we run the risk of misleading the jury when every element must be proved, must be unanimous -- found it must be unanimous.  And I just don't remember if we said that about 1 and 2.

THE COURT:  No, if you're -- if your concern is that the jury might read this as despite my other instructions about unanimous verdict, I guess I could change it to you must all agree or something like that; but I assume we all want the two types listed.

MR. WACHTEL:  I want unanimity listed, Your, Honor, with regard to each element of each count; and I just wondered if by saying with respect to the third element your verdict must be unanimous, and I just don't remember as I sit here whether we made that same statement with regard to all the other elements that they have to prove.

THE COURT:  Oh, there's a general instruction about that.  What I'm trying to do is to tell them that they're going to have to list those and they're going to have to agree.

MR. MANDELMAN:  I don't object to this.  I think it's fine.

THE COURT:  I'm going to leave it.  I just don't see how this could be -- signal to the jury that all the other elements they could be ten to two or nine to three or something.

MR. MANDELMAN:  It's just a more specific instruction as to this particular -- yeah, I think it's fine.

THE COURT:  All right.  Any other comments about that instruction?

MR. WACHTEL:  No, sir.

MR. WELCH:  No, sir.

THE COURT:  Okay.  Then we start on the VICAR instructions.  And there's this little one that just says Counts 2, 5, 7, et cetera.  Any objection?

MR. WELCH:  No, sir.

MR. WACHTEL:  No.

MR. MANDELMAN:  No, Your Honor.

THE COURT:  Now, we're making that change and she's already made it in the VICAR instructions but -- we now have six elements.  Any -- and there's several instructions but all basically the same.  Any --

LAW CLERK MS. SILVA:  They don't have that, what you have.  I've only made one copy.

THE COURT:  Right.  But they all now -- all the VICAR charges have six elements.

MR. WELCH:  Judge, I might be premature on this one; but what I'm looking at is the one -- the instruction that starts Count 2 charges the Defendants committed.  And it lists what are in the old instruction five elements.  I understand there are now six elements.  My question is, what was the fifth element concerning position, we're asking that the -- instead of -- your instruction currently says for purposes of gaining entry to, maintaining and increasing.  That should be or.  The law is or.  We don't have to prove all three.  I think it's confusing the way it's written.  All of the VICAR elements say and, and should say or.

THE COURT:  I think that's right.

MR. WACHTEL:  I don't object to changing that word.

THE COURT:  Okay.  We'll change that.  Now, in the former instruction, the one that you're looking at, it said something about position.  And Rachael and I don't know where we got that word; but we've changed it to members.

MR. WELCH:  Which I was going to ask for.  I didn't mention it because Rachael had already told us you were changing that to members.

THE COURT: Okay.

MR. MANDELMAN: Your Honor, we think position -- we prefer position. We think that's proper.

THE COURT: Well, have you got a case that says it?

MR. MANDELMAN: I'm trying to think where I got that Fifth Circuit -- I was relying on some Fifth Circuit pattern instructions for when I broke out the elements. Let me see what they in fact use. Maybe they use --

THE COURT: Well, the Tenth Circuit doesn't even --

MR. MANDELMAN: Yeah.

THE COURT: -- require it. But it seems to me that it makes sense to require the Government to prove that the Defendants were members of the enterprise. If they weren't --

MR. WELCH: Judge, I was going on the *Errington* case, which you have used with other defendants who have plead guilty, which says member, and so that's why --

THE COURT: So, we don't know where we got the word position. All right.

MR. MANDELMAN: Yeah, I guess it just sort of -- it sort of mirrors the fifth element.

MR. WACHTEL:  I would think because we cannot cite a case does not prevent the Court from doing the right thing.  But that's just me.

THE COURT:  Rachael thinks probably it just mirrors the word position; but that is the language. But, anyway, I don't think the jury is going to hang up on that.  Then the next one says to establish the fifth element, conspiracy to murder.

MR. WELCH:  That's a new one, is that right, Judge?

LAW CLERK MS. SILVA:  No, we've just changed the word fifth.  It used to say fourth.  But because the elements have been shifted, it now says fifth.

THE COURT:  Yeah, we're just -- did you hear what Rachael said?

MR. WELCH:  No.

THE COURT:  She said it used to say fourth element, now it says fifth element because there are now six elements instead of five.

MR. WELCH:  Okay.  So the form instruction says to establish the fourth element of VICAR, conspiracy to murder, now says the fifth.

THE COURT:  But the elements are the same.

MR. WELCH:  Okay.

THE COURT:  Any objection?

MR. WELCH:  No, sir.

MR. MANDELMAN:  No, Your Honor.

MR. WACHTEL:  No, Your Honor.

THE COURT:  Okay.  Then the next one says to establish now the sixth element of every VICAR offense. And that just simply describes increasing his position, et cetera.  Any objection?

MR. WELCH:  No, sir.

MR. MANDELMAN:  No, Your Honor.

MR. WACHTEL:  No.

THE COURT:  Okay.  Maybe we can go through these a little more quickly now.  This is Count 3 with the changes that we have made.

MR. WELCH:  With "position" changed and the "and" being changed to "or", no objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  And again, I just note my interstate compact and the interstate commerce; but I don't have any other objections to the elements.

THE COURT:  All right.  Now, the next one I think we've already covered.

MR. MANDELMAN:  Right.  We've talked about this.

THE COURT:  This is the lesser included offense and I'm going to give it.  Okay.

MR. WELCH:  Judge, no objection; but Israel Peralta's name is misspelled.  It should be --

THE COURT:  P-E-R-A-L-T-A.

MR. WELCH:  Yes, sir.  Otherwise, no objection.

MR. MANDELMAN:  Just object as previously noted.

THE COURT:  All right.  We're changing that. Because down at the bottom it is spelled correctly, P-E-R-A-L-T-A.

MR. WELCH:  Yes, sir.

THE COURT:  Okay.  The next instruction is Count 4.

MR. WELCH:  With the changes we've already discussed, no objection, Judge.

THE COURT:  And his name is spelled correctly here.  Any objection?

MR. MANDELMAN:  Well, Your Honor, it lists Faustino Peralta, and he didn't testify here and I'm not sure we've had sufficient evidence about Mr. Faustino Peralta.

MR. WELCH:  Both Mr. Arco and Mr. Sorano testified that he was present, Judge.

MR. HENRY:  Your Honor, Mr. Wachtel may be able to testify to this; but I thought in state court

there had to be a requirement that the victim actually present themselves in court to establish that someone was a victim.  Other than a murder case, obviously.

MR. WACHTEL:  Other than a murder.  I've never argued that issue, Your Honor, but ordinarily that's what one does, that you cannot convict -- with regard to a living human being, you cannot convict on -- at least in the State of Kansas, without something, without something from that -- for example, if we were charged with having done an aggravated assault, one of the things that the Government would have to prove in Kansas law in an aggravated assault is that in fact scared the person who got assaulted.  So to the extent that Faustino Peralta --

THE COURT:  So you're saying because Mariano Sorano didn't testify --

MR. WELCH:  He did testify, Judge.

THE COURT:  I mean -- he did --

MR. WELCH:  Faustino --

THE COURT:  I don't know.  I don't know what the state law is.

MR. SMITH:  Judge, there isn't an awareness element to murder.  There isn't an awareness element of attempt to murder.  What if the victim were shot and were in a coma?  He would not present himself in court.

He would still be the victim of an attempted murder. There is no awareness element. There is no element of fear or immediate apprehension of bodily harm as there is in aggravated assault.

MR. WACHTEL: That's correct. I apologize. I was thinking about aggravated assault. Which does have an element.

THE COURT: Okay. Thank you. Spare me what goes on over across the street if at all possible.

MR. WACHTEL: This is a more polite place, Your Honor.

THE COURT: All right. Then the next one says to establish the fifth element. And that's attempted murder. Any objection to that?

MR. WELCH: No, sir.

MR. WACHTEL: No, sir.

MR. MANDELMAN: No, Your Honor.

THE COURT: All right. Now we turn to Count 5. The changes are going -- either have been or will be made about maintaining or increasing et cetera. Any objection?

MR. WELCH: Just one note, Your Honor. Previously the Court has -- when you listed the victims, you said "and/or" and this time we just said "and". I think it should be consistent and say "and/or".

THE COURT:  And/or.  Okay.

MR. WELCH:  Otherwise, no objection.

MR. WACHTEL:  Your Honor, now I would object with regard to a witness who didn't testify because we're talking about an assault, which is, under Kansas law, which is a threat, which has to put the person who was threatened in fear.  And there's no evidence that I'm aware of in this case that Faustino Peralta was in fear of anything.

MR. SMITH:  We don't object to removing his name in this instruction.

THE COURT:  All right.  Faustino is out.  Any other comments or objections to that instruction?

MR. WACHTEL:  No, sir.

MR. MANDELMAN:  No, Your Honor.

THE COURT:  Okay.  Then the next one says to establish the fifth element, and it just gives these three elements.

MR. WELCH:  No objection.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  No objection.

THE COURT:  Count 7.

MR. WELCH:  No objection with the changes already noted, Judge.

THE COURT:  Okay.

MR. MANDELMAN:  No further objections.

MR. WACHTEL:  No objections other than those already made.

THE COURT:  And then the same, fifth element.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Count 8.

MR. WELCH:  No objection with the changes already noted, Judge.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  And the one that says to establish the fifth element, conspiracy to commit assault.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Count 10.

MR. WELCH:  Your Honor, here we have the "and/or" issue again with --

THE COURT:  I know.  I'm making that change in every one.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Next one, conspiracy to murder.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Count 11.

MR. WELCH:  Again, we need to add "and/or".

THE COURT:  "And/or", Rachael is making that change as we speak.

MR. WELCH:  Okay.  No objection, Judge.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  I don't know that I have standing to object to a separate --

THE COURT:  Probably not; but I'm giving you the opportunity.

MR. WACHTEL:  But I don't object.

THE COURT:  Then the fifth element, attempted murder.

MR. WELCH:  No objection.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  No objection.

THE COURT:  Count 12.

MR. WELCH:  The "and/or" again, Your Honor.

THE COURT:  The "and/or".

MR. WELCH:  No objection.

THE COURT:  Okay.  Joel?

MR. MANDELMAN:  Yeah, I'm just --

THE COURT:  Oh, maybe we ought to say Hipolito and/or Abel Hernandez --

MR. WELCH:  Your Honor, this is the assault situation again and Abel Hernandez did not testify, so we don't object to removing him.  Abel Hernandez did not testify, Judge.  He was deported to Mexico.

THE COURT:  Okay.  So we'll take out assaulted Abel Hernandez with a dangerous weapon -- I mean Rumalda Hipolito.

MR. WELCH:  Just leave Rumalda Hipolito, Judge.

THE COURT:  Are you okay with that, Joel?

MR. MANDELMAN:  Yes, Your Honor.

MR. WACHTEL:  I don't have any objection to that, Judge.

THE COURT:  Next is the fifth element.

MR. SMITH:  Your Honor, we need to change deadly weapon to dangerous weapon in that instruction.

THE COURT:  I agree.  All right.  Any --

MR. MANDELMAN:  No, Judge.  Thank you.

THE COURT:  All right.  Now we go back to Count 6 and the elements of Count 6.  Any objection?

MR. WELCH:  Your Honor, on the next three instructions, we believe we probably need a special

verdict form because as to Count 6, discharge is alleged.  As to Count 9, brandish is alleged.  And as to Count 13, discharge is alleged and -- I'm sorry -- I can't cite the Supreme Court decision that says in order to enhance the punishment, the jury has to specifically find in this case discharge, brandish or --

THE COURT:  Let me look at the Indictment. They charge that --

MR. WELCH:  We did charge possessed and discharged or possess and brandish --

THE COURT:  Then I'll have to give the definitions of discharge and brandish.

MR. WELCH:  That's right, Judge.

THE COURT:  Joel, what do you think?

MR. MANDELMAN:  We would agree with Mr. Welch. We think the jury has to make the finding if they're going to get the different penalty.

MR. WACHTEL:  And we agree with that also, Your Honor.

THE COURT:  All right.  Let's go first to Count 6.  Second line.  This law makes it a crime to possess and discharge --

MR. WELCH:  Or discharge, Judge, I think. Either one is a violation, Judge.

THE COURT:  Or discharge a firearm.  Then in

the second element, possess or discharge.  Then Count 9 also charges --

MR. WELCH:  That's just brandish, Your Honor.

THE COURT:  Brandish.  Possess or brandish. And the last line, possess or brandish.  Now --

MR. SMITH:  Judge, before we leave that.  If we can go to Count 13 and add the "or discharge" language on Count 13; but there's something on Count 9 that I need to address.

THE COURT:  Well, is the best place for me to define discharge in the elements instruction itself or should I do a separate instruction?

MR. SMITH:  We would be happy with it being in the elements instruction.

MR. WACHTEL:  I would be happy with whatever makes it easiest on your staff, Your Honor.

THE COURT:  I think what I will do, since I am giving a separate instruction on actual and constructive possession, I will give a separate instruction on the terms which will appear right after the one about firearm and possession in furtherance of, I'll do a separate instruction that talks about discharge, defines discharge and brandish.  Okay?

MR. WELCH:  Yes, sir.  Thank you.

MR. MANDELMAN:  We think -- yeah.  Thank you,

Judge.  Those terms should be --

THE COURT:  You had something about 9, Aaron?

MR. SMITH:  Yes, Your Honor.  In Count 9 of the Indictment, the way Count 9 in the Indictment was plead is that the violent crime was plead as an aggravated robbery, a state aggravated robbery.  And you even mention that in your instruction that they committed the crime of aggravated robbery.  I just think we need the elements, then, for that.  And I have those elements.

THE COURT:  I wonder why I couldn't just instruct that aggravated robbery is a crime of violence.

MR. MANDELMAN:  Your Honor, I guess it needs to be a crime that's prosecutable in U.S. District Court and state aggravated robbery is not one of those crimes.  In order for this 924(c) count to end up here, it has to be the VICAR aggravated robbery.

MR. SMITH:  Then instruct on that.

MR. HENRY:  924(c) has the added element that it has to be something that's prosecutable in the U.S. District Courts and that's not included in here.  And so I think in conjunction with what Mr. Mandelman said, I think there needs to be a third element that brings that out for the jury to decide.

THE COURT:  Well, the Tenth Circuit

instruction, which is where we got this one from, Tim, which is 2.45.1, has just those two elements.  Now, there are other definitions which I suppose we can give.

MR. HENRY:  Your Honor, I think, in looking at this, this doesn't appear to be the scenario that we're dealing with here where we're bringing in state offenses through the VICAR statute.  These are just the in furtherance of, possession or carry or use during a drug trafficking or crime of violence.  These are generic. They are presupposing the underlying crime of violence is one that can be brought in Federal District Court. We don't have that here.  And so I think that -- and, again, I think it is an issue whether or not this is a state or federal crime and certainly the -- I think that that nexus, that connection, back to a state offense being charged under the federal offense is required -- is another hoop that they have to jump through in this Indictment.  Not necessarily in another case where we routinely have a 924(c) in a bank robbery or in a drug case.  But this does not contemplate the racketeering aspects of this case.

THE COURT:  This is not at VICAR charge. Count 6 is pure 924(c).  Count 9 is pure 924(c).  Count 13 is charged as 924(c).  Not VICAR.

MR. HENRY:  Well, but 924(c) requires -- it is

for which a person may be prosecuted in a court of the United States.  And if this isn't a VICAR case, then they're using the underlying robbery as the crime of violence and that is a state -- that's been charged as a state agg robbery and --

THE COURT:  Here's where we're at on this. The way I read the Indictment and -- they've charged 924(c) and I'm going to give 924(c) instructions and I'm not going to require proof of anything beyond what 924(c) says.  And if I make a mistake on that, I guess you can make an argument and -- but, I'm following the language in the Tenth Circuit proposed instruction, number one.  And, number two, I am going to define discharge and brandish.  And I think that will cover the territory on that.

MR. WACHTEL:  Your Honor, we join -- Mr. Garcia joins with Mr. Ramirez in this issue that was discussed by Mr Henry.

THE COURT:  That's fine.  All right.  That takes care of those three.  And it takes care of -- I think we talked about the definition of firearm and in furtherance of.  You know I'm going to give another instruction after that.  The next is actual and constructive possession.  Any objection?

MR. WELCH:  No, sir.

MR. WACHTEL:  Well, I kind of -- I don't know what the evidence in this case is of constructive possession by anybody.

MR. WELCH:  Your Honor, there's testimony about the firearm going to Angelica Flores and other people.

THE COURT:  I don't know -- but every time the word possession comes up in one of these cases, I give actual and constructive possession.  I don't see how it would be improper to give it and I'm going to give it.  I'll show your objection if you want me to.

MR. MANDELMAN:  I'll just join in Mr. Wachtel's objection.

THE COURT:  Next is presumption of innocence.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Next is the definition of proof beyond a reasonable doubt.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Next is burden of proof.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Next is intent.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Next is union or joint operation of act and intent.

MR. WELCH:  No objection.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  No objection.

THE COURT:  Next is direct and circumstantial evidence.

MR. WELCH:  No objection.

MR. WACHTEL:  I don't have any objection to that.

MR. MANDELMAN:  No objection.

THE COURT:  Next is the standard credibility -- general credibility instruction.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  No objection.

MR. WELCH:  No objection.

THE COURT:  Next, weight of the evidence.

MR. WELCH:  No objection.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  No objection.

THE COURT: Next is the expert witness instruction.

MR. WELCH: No objection.

MR. WACHTEL: No objection.

MR. MANDELMAN: No objection.

THE COURT: Next, defendant didn't testify.

MR. WELCH: No objection.

MR. WACHTEL: No objection.

MR. MANDELMAN: No objection.

THE COURT: Next, defendants are on trial only for the acts alleged in the Indictment.

MR. WELCH: No objection.

MR. MANDELMAN: No objection.

MR. WACHTEL: No objection. I do have a question about that, though, Judge, because we have -- we have discussed in front of this jury predicate act issues until we were blue in the face. I don't quite understand how that blends into this. I know they're not charged as crimes.

MR. SMITH: Your Honor, those will be included on a special verdict form so the jury should have -- will have to unanimously find the predicate acts, which they will do on a special verdict form so it's not -- the crime will be identified for them. They will identify the crime.

THE COURT: You know, every time I have a case where there's some evidence of other crimes by the defendant, I feel compelled to give this instruction; but I haven't had a predicate act case. Now, I don't know whether this confuses them or not.

MR. WACHTEL: I don't know either. And to be honest, Judge, I tried to find a predicate act instruction in the *Campbell* case and I think I failed.

MR. MANDELMAN: Yeah, Your Honor, we don't object to this.

THE COURT: Okay. Next is the codefendants instruction.

MR. WELCH: No objection.

MR. MANDELMAN: And I think I submitted for this one and the next one just one that had I guess a little bit more, a little longer instruction. So I just, insofar as I've submitted different instructions, I just have submitted those and ask that those be given.

THE COURT: All right.

MR. WACHTEL: I don't object.

THE COURT: Next, accomplice.

MR. MANDELMAN: Again, same objection.

MR. WACHTEL: I don't object.

MR. WELCH: No objection.

THE COURT: Next is contradictory evidence.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Next, immunity.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection except insofar as I've submitted something different.

THE COURT:  Conviction of a felony.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  My only concern about this is with regard to some of the folks who -- Mr. Wright and Mr. Worthey, where their participation in some other felonies we think is relevant to their participation in the murder.  I mean, maybe that's a subject we can just argue to the jury but we think -- is the Court following me?  For some of these guys where their participation is at issue, we think their prior conduct, although not the fact of the conviction, might go to the weight of their testimony.

THE COURT:  And I think I just instructed on that.  And even named them.

MR. MANDELMAN:  Okay.

THE COURT:  All right.  Next, drug abuser.

MR. MANDELMAN:  No objection.

MR. WELCH:  No objection.

MR. WACHTEL:  I don't object to the drug abuser instruction.

THE COURT:  All right.  Next, good sense.

MR. MANDELMAN:  No objection.

MR. WELCH:  No objection.

THE COURT:  Joel, let's see, your instructions -- your proposed instructions on -- just a second.  I'm going to pull them out here and we'll decide where to put them in.  All right?

MR. MANDELMAN:  Sure.  Thank you.

THE COURT:  I believe that I will put these in after the drug abuser.

MR. MANDELMAN:  Yeah, that sounds good.

MR. WELCH:  That's fine.

THE COURT:  All right.  Both of those then go in there.  Then we have the good sense instruction.  Any objection to that one?

MR. WACHTEL:  No.

MR. MANDELMAN:  No objection.

MR. WELCH:  No objection.

THE COURT:  Statements, arguments, questions of counsel.

MR. WELCH:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Next, during the trial I passed on objections.

MR. WELCH:  No objection.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  No objection.

THE COURT:  Next, punishment.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  Notes.

MR. WELCH:  No objection.

MR. MANDELMAN:  No objection.

MR. WACHTEL:  No objection.

THE COURT:  The final suggestion.

MR. MANDELMAN:  No objection.

MR. WELCH:  No objection.

MR. WACHTEL:  No objection.

THE COURT:  Then the unanimous verdict instruction.

MR. WELCH:  No objection.

MR. MANDELMAN:  Yeah, no objection.

MR. WACHTEL:  No objection.

THE COURT:  And then the final one that says upon retiring to the jury room.

MR. WELCH:  No objection.

MR. MANDELMAN:  No objection.

THE COURT:  And lastly, the verdict form.

MR. WELCH:  Your Honor, only with the addition of the 924(c) offenses, we have no objection to the verdict form.

THE COURT:  Run that by me again.

MR. WELCH:  I think they have to make a special finding as to possess, brandish or discharge on the appropriate 924(c) charges and I think we probably need a special verdict form to say what they found.

MR. WACHTEL:  I can't remember the name of the case that Mr. Welch is talking about; but that's exactly what that case says, they've got to --

THE COURT:  How did that case say we have to -- is that just a yes or no?

MR. SMITH:  It could just be a checkmark, they check the box, the defendant brandished the firearm.

MR. WACHTEL:  That's got to be -- yeah, it has to be found by the jury and I take that to mean specifically found.

MR. SMITH:  Yes.

THE COURT:  But how do we phrase it in the verdict form?  Is it just do you find that, et cetera, brandished, yes or no, or --

MR. SMITH:  Firearm was brandished.  The firearm was discharged.

MR. WELCH:  Do you find it was possessed or brandished.  I think they need both options to --

THE COURT:  I'm not going it read the verdict form to them so we'll work on that and give you the verdict form and we can talk about it.  All right.  Now, have we talked about everybody's proposed instructions?

MR. WACHTEL:  I missed one, Judge.  Somehow I was looking for other instructions when we got to the testimony of a witness who provides evidence against a defendant for immunity.

THE COURT:  Yeah.

MR. WACHTEL:  I submitted an instruction that comes from the *Singleton* case about the inherent untrustworthiness of such a witness.  It's on my --

THE COURT:  I know.

MR. WACHTEL:  I'm looking for my particular instruction.  It's on the instruction that is submitted and is Document 815, which is only one instruction.

THE COURT:  Well, I guess I don't have that.

MR. WACHTEL:  I'll be happy to bring it up, Your Honor.

THE COURT:  Okay.

MR. WACHTEL:  And if the Court gave it, I

would not expect the Court to give the legal citations that are in it.

THE COURT:  Is that exact quote of the -- without the instruction -- without the citations?

MR. WACHTEL:  Without the citations -- I have *Singleton* here someplace, Judge.  That is 144 Fed. 3rd --

THE COURT:  I tell them it has to be examined with great care.

MR. WACHTEL:  This is the language that that comes from in *Singleton*.  That is the, the panel decision.  That decision was reversed on other grounds by the -- en banc but they never changed that particular language.

THE COURT:  I'll show that you're requesting it; but that's not an instruction that we're talking about here.  This is, this is just language out of the decision and I think we all know generally that we don't do that.  We don't pull language out of the decisions to make instructions.  So I'll show that you requested it but I think I've given it --

MR. WACHTEL:  Thank you.

THE COURT:  All right.  The old *Singleton* case.  Okay.  Thank you very much.  Yes, Tim.

MR. HENRY:  Your Honor, before we --

Mr. Ramirez' case begins, I wanted to make a record.  I know the Court's already ruled on this; but the Court's statement at the time, I think, confused me.  The Court said that I was not going to be able to get into -- or to have Aaron Smith testify.  Actually, what we're trying to do is to get in a prior statement that was made in that transcript from when Mr. Smith was put on the stand in February of this year.  Or alternatively, document, I think, number 531, where the Government is giving notification in a formal filing that Erik Sanchez also known as Savage is an unindicted coconspirator with respect to Counts 10 through 13.  So I wasn't planning on putting on Mr. Smith or calling him as a witness.  And I think that at least one of the cases that was cited by the Court talked about trying to put a person on the stand and then that person has to step down from prosecution.  I don't want to infect the case like that, Your Honor.  But, so, I was, I was using -- I wanted to use the out-of-court statement --

THE COURT:  But it says out-of-court statement.

MR. HENRY:  Well, the filing, I guess, would be, or the prior testimony would be out of trial setting.  But I wanted to just kind of clarify that.

And then, Your Honor, I'm going to call an officer

to the stand regarding some statements that were made out at the scene and I would anticipate the Government may object out of hearsay; but I would just -- I would point out that, as a precursor, that the two statements are not being offered for the truth of the matter because both statements by these witnesses were false and so they're not being offered for the truth. One is Angel Cerda saying that he was there all night on the drive-by because he's later plead guilty to it and that's been brought out in cross-examination of Lisa Taylor-Austin by the Government.

And then secondly is the statement by -- I want to say sister or mother, Denise Jabarra, who said he was there all night, which is also a lie. I'm not offering it for the truth of the matter asserted so I don't believe that they qualify as hearsay, so -- and Officer Stein is here for that.

MR. SMITH: I don't know. It's hard for me then to speculate to what purpose or end it could possibly be helpful or relevant or overcome Rule 403, that two other completely random persons who are not here offered inconsistent statements. But we don't know they're inconsistent because they haven't been confronted with it, which they're supposed to be allowed to be confronted with an inconsistent statement in court

before extrinsic evidence of that inconsistent statement can be presented.  I may not be tracking --

THE COURT:  Well, he is not going to call them.  He is going to call the officer to say that they said that.

MR. SMITH:  If they're not offered for the truth of the matter asserted, I guess I'm just having -- maybe Mr. Henry can elaborate more as to the purpose of it.  What the purpose of people who hadn't been mentioned before at all talking about people who are not on trial and what the purpose of that is if it's not offered for the truth of the matter asserted.

MR. HENRY:  Well, it's our position that Gonzalo Ramirez was not the person that is being -- or that was involved in the drive-by regarding Counts 10 through 13 so this testimony is relevant to that.  I don't necessarily have to explain it until I would submit closing arguments; but the bottom line is is that I do believe that as far as the defense goes, we should be allowed to present what we believe is relevant and they have the right to cross-examine if they feel that it's irrelevant.

MR. SMITH:  Then it is offered for the truth of the matter asserted because they're attempting to prove that Angel Cerda or someone else was present or

not present. And Gonzalo Ramirez isn't even mentioned in that statement. So if it -- I would just submit it is offered for the truth of the matter.

THE COURT: I think it's, at this point in the case, I think it's way too tenuous to get into. If the -- these two people had told Officer Stein, or whatever his name is, that Gonzalo Ramirez was not present, that would be different. I think --

MR. SMITH: And I would agree with that because that would be direct evidence.

THE COURT: But -- wait a minute. You're saying that he wants to come in and say that these two witnesses told him, not that Gonzalon Ramirez was at home, but that somebody else was at home?

MR. HENRY: The officers descend upon the address at Kettle Way that night where the Cadillac -- Mr. Schulte sees the Cadillac go into the barn. The police descend on the home. There are interviews made and there are lies that are made by the individuals that were there. And I submit that I'm not offering it for the truth of what they said is true that they were there the whole night because we know that's not true. The Government knows that's not true because they put together a Plea Agreement in Angel Cerda's case that says he was in the car that night so -- but the, the

evidence in this case is is that five individuals were in the car. And we've had conflicting testimony of who those five were. And the fact that Angel Cerda and a family member are lying that night and that he actually was in the car that night is important because we've had testimony that Alex -- excuse me -- Erik Sanchez was in the car, Gonzalo Ramirez was in the car, Angel Cerda was in the car, Theresa Tinoco was in the car, Marriet Gonzalez was in the car --

THE COURT: How are you putting this on -- I didn't mean to interrupt you, Tim -- but how are you going to, other than argument, perhaps, but how are you going to show those witnesses are lying through this Officer Stein?

MR. SMITH: And, Your Honor, without interrupting, I would also submit that all of the witnesses testified that Angel Cerda was in the car. It was the other participants, the other passengers in the vehicle, that the stories were different. Angel Cerda was always placed in the car. So it doesn't accomplish --

MR. HENRY: It is a matter of record that Angel Cerda plead guilty in this court. It's not necessarily a piece of evidence for this jury yet. And --

THE COURT: Well, I adhere to my ruling. Under Rule 403, particularly at the end of a two and a half week case, putting on evidence that is not offered for the truth and that, assuming judges and lawyers understand that concept, jurors don't understand it and there's no way to make the jury understand that. And under Rule 403, I think this is -- this will confuse the jury. So I'm not going to allow that testimony. I'll show that you made a proffer; but I don't think it will help the jury at all reach a verdict about this case. As I said, if it was something about your client directly, then that would be different. But it isn't.

Okay. Anything else?

MR. HENRY: Well, I guess it's relevant, Your Honor, because we've had evidence so far that there are six people that are potentially inside a car that had five occupants.

THE COURT: Tim, you can make that argument; but I'm not going to allow it. I've made my ruling. I've made a lot of rulings in this case. Some of 'em may be erroneous, some of 'em may not; but I don't think this will be one, especially when the testimony is not offered to directly impeach a witness, but hearsay, and then try to figure out whether it's hearsay or not, whether it's offered for the truth. All right. Let's

go out -- Rachael has got -- we'll have a final set of the instructions.  We'll work on the verdict form and we'll get the jury in here and put on any evidence other than that and then we will take a break and I'll start reading -- as soon as we can make copies of all these for the jurors, I'll start reading the instructions. And my guess is that that will take us up to the noon hour.  And then we'll take a recess.  And then we'll start the closing arguments.  And that probably will consume more or less most of the afternoon with recesses and what-not.  So I don't think they're going to start deliberating today; or if they do, they won't deliberate very long.  So tomorrow probably will be the big deliberating day.  Okay?

MR. WELCH:  Thank you, Judge.

THE COURT:  Now, one other thing, we're going to quit today about 4:30.  Unless, of course, we're in the middle of a closing argument or something like that but we'll try not to have that happen.

(Recess.)

(Whereupon, the following proceedings continued IN THE PRESENCE OF THE JURY.)

THE COURT:  Well, I apologize for the delay but -- Mr. Henry, call your first witness please.

MR. HENRY: Defense calls Jose Louis Alvarez-Lopez, please. Your Honor, I have Ms. Dolittle on stand-by in case we need some interpretation.

THE COURT: Yes. This is Terri Dolittle, Ladies and Gentlemen, and she is another one of our interpreters.

## JOSE LOUIS ALVAREZ-LOPEZ

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

## DIRECT EXAMINATION

BY MR. HENRY:

Q   Please state your name for the jury.

A   Jose Louis Alvarez-Lopez.

Q   And Mr. Alvarez-Lopez, if there is something that you don't understand that I ask or the Government's attorneys ask, will you please use Ms. Dolittle to interpret for you?

A   Okay.

Q   If you could move up closer to the microphone so we could hear you.

Do you recall being at a residence in Dodge City on October 4th, 2008, where a shooting occurred later in the evening?

A   Yeah, I was there.

Q   Okay.  Could we pull up 300, 301 and I think 302.  I want you to look at the screen there.  If you could pull up that screen from the top.

Do you see what's been marked as Government Exhibit 300.  Do you see the house that's pictured on the screen?

A   Yeah.

Q   Are you familiar with that house?

A   Yeah.

Q   Okay.  Could we go to 301.  And 302 I believe it is.  Do you recognize those two pictures as well?

A   Yeah.

Q   Okay.  What are those pictures of?

A   That is the house in that city where we was at.

Q   Okay.  Is this the house that you were at on October 4 of 2008?

A   Yes, sir.

Q   Who do you know that lives at that house?

A   Who I know?

Q   Excuse me.

INTERPRETER:  Who do I know?  Someone I know?

Q   Yeah.  Who is it that you know that lives or -- why you were there at that house.

A   I was there with one of my cousins because he live in the basement and one of my friends, he lives in the

top side.

Q   Okay.  So you knew two people that actually lived at that house?

A   Yeah.

Q   You remember their names?

A   I know more people, the three brothers that live in the top, that's Santiago Hernandez and Alberto Hernandez; and the other one I think is Francisco, just know by the nickname.  And the other one is my cousin. He was living in the basement.  He was -- his last name is Hipolito.  I know what his nickname is Chuletta (ph) but Rasmo Hipolito.

Q   Okay.  Rasmo Hipolito?

A   Uh-huh.

Q   Now, that evening, how many people were there earlier in the evening?

A   Early?

Q   Yes.

A   It was like six people, seven people I think.

Q   Now, during the course of the evening, did there -- in looking at number 302 in front of us, there appear to be some bottles and what I think might be an empty box of beer.  Do you see that in front of you?

A   Yeah.

Q   Okay.  Had you and these individual been drinking

that night?

A   Yeah, I was drinking right there.

Q   Okay.  What do you recall that happened that evening with respect to a vehicle.  Could you please tell the jury what you witnessed?

(Interpreter interprets question to witness.)

A   You say early or after --

Q   Was there a time when a confrontation occurred that evening with somebody in a vehicle?

A   We saw the car, he passed like two, three times, around.  After that, they stopped, like, in front.  So, one guy, he come out.  And after that, the vehicle just keep going a little, a little down, and another guy come out.  So they started, like, talking to us.  You know, like, and one my friends, he throw a bottle of beer.  So they started, like, walking down the street and they get to the car, they left.  So after that, I think like two, three, hours later, they come back and just they shoot the front of the house because we was in the back of the house.

Q   You mentioned a beer bottle being thrown.  Do you know how many beer bottles were thrown at the vehicle?

A   Seemed like four or five.

Q   And are you able to tell on this diagram where that

vehicle would have stopped initially?

A   Initially almost to the back of the blue car.  They keep going down.

Q   Okay.  So this picture, number 302, looks towards the back alley of that house; is that correct?

A   Yeah, back side of the house.

Q   So is it your testimony that the vehicle had two different positions on the street when it, when it stopped?

A   No.  They stop like right there so they go just down.

Q   They went a little bit further?

A   Yeah.

Q   Were they past the alley, do you think?

A   Yeah, I think, like, past the alley.

Q   Okay.  Now, you said that at first one person got out and then another; is that right?

A   Yes, sir.

Q   Do you know which car doors that they got out?

A   I just remember was from the right side and the left side; but I don't remember it was in the front or the back.

Q   Okay.  I'm going to hand you what's been marked as Defendants Exhibit R-HH and I would ask that you review the third paragraph.  Do you remember speaking with

Detective Bice from the Dodge City Police Department who's seated here at the Government's table?

(Interpreter interprets question to witness.)

A   Yes.

Q   Now, you say you don't remember which car doors they came out of.  You did speak with Detective Bice a few days afterwards; is that correct?

A   Yeah.  I went to his office over there and talked to him.

Q   Okay.  In fact, did you -- did he have you look at some pictures?

A   Yeah, he showed me some pictures.

Q   Okay.  But as far as that interview with him, having looked at Defendant Exhibit R-HH, Paragraph 3, does that refresh your memory as to where the two individuals got out of the vehicle?

A   Yeah.

Q   And where did they get out of the vehicle?

A   For the back side.

Q   Now, the vehicle in question was a -- well, was it a four-door vehicle?

A   Yeah.

Q   Okay.  And the two individuals that got back -- that got out of the back seat of that vehicle, did they get

out of each side of the driver and the passenger side of the back seats? Or did they get out of one car door?

A   I think it was for each side.

Q   Each side?

A   Yeah.

Q   And the -- now -- and these were -- were these men or women?

A   There was two mens.

Q   Two men?

A   Uh-huh.

Q   Yes. You have to say yes or no.

A   Yes.

Q   And then -- and tell the jury again what happened when these two individuals got out of the vehicle?

A   So just one come up first. So the one was coming later. So they was walking to us, is one the -- one of the guys that was with me that throw the bottle. After that, all the guys was there would throw the bottles, so they left and get into the car. They left.

Q   Okay. Now, was the car -- and I think you mentioned that the car was initially about by where the alley would have been at?

A   Yeah. Before they stop, you know, one guy come out of the car, the car go just a little down and they were coming out. Then they try to go out, the car did not

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

2714

stop, it keep going, and the other guys, they run and get into the car, they left.

Q   And then later that evening, something else happened that evening; is that correct?

A   Yeah.  Yes, sir.  We went to the back to the house. We still there.  After that, they come back and start shooting.

Q   Okay.  You didn't actually see who was doing the shooting, did you?

A   No.  Just we hear the shots.

Q   So if we could pull up number 303.  Do you recognize this picture?

A   Yes, sir.

Q   Could you -- you can actually touch the screen and tell us where you were at at the time when you heard the shots.

(Witness complies with request.)

Q   Okay.  So -- and did you remain there during the course of hearing the shots or what did you do?

A   Just get into the, the little -- like the hill that's there.

Q   Okay.  Did you get closer to the house?

A   Yeah, just -- we just -- we stayed there.

Q   Okay.  You weren't -- there wasn't any gun fire that was hitting back in the backyard?  Or was there?

A    Yes.  We, we hear the -- like the, the bullets, you know, the bullets, we could, like, foom, foom, just like that. (Witness indicates by making a sound.)

Q    Did you see who was actually firing the weapon?

A    No.  We don't see nobody.  Just when we start hearing the, like, you know, sound was, like --

(Witness speaks to interpreter.)

INTERPRETER:  It wasn't too loud.

A    Yeah.  After that, we, we hear the other ones. That's when we stayed there.  And after those stopped, we run to the front of the house and is when we saw the car was leaving.

Q    And of all the pictures that you were shown that evening, were you able to pick anyone out as the individuals who got out of the back seat?

(Interpreter interprets question to witness.)

A    No.

Q    Okay.

MR. HENRY:  I have nothing further, Your Honor.

THE COURT:  Yes, sir.

**CROSS EXAMINATION**

BY MR. WELCH:

Q    Mr. Alvarez-Lopez, good morning.  I have a few

questions for you, sir.  The interview that you had with Detective Bice was actually three days after this incident took place; is that right?

A   Yes.

Q   So it wasn't the night of the shooting, was it, that you were interviewed by Detective Bice?

                    (Interpreter interprets question
                         to witness.)

A   No.

Q   And then the night that this happened, the shooting happened, you told us that a car came alongside the house where you and your friends were gathered drinking beer.  Is that right?

A   Yes, sir.

Q   Can we display 372, please.  Sir, Detective Bice actually showed you this car when you met with him and you identified this as the car that drove alongside the house that night.  Is that right?

A   Yes, sir.

Q   And you also told Detective Bice that you never got to see the driver of the car and you could not identify the driver of the car.  Isn't that what you said, sir?

A   Yes.  Yes, it was a lady driving.

Q   Do you still have that in front of you, sir.  Would you look at the very last paragraph on the first page

and then look at the top, the rest of the paragraph at the top of the second page.

(Interpreter interprets question to witness.)

Q   All right.  Mr. Alvarez-Lopez, do you recall Detective Bice asking you if you could see the driver of the car and you said that you could not?

A   Yeah.  After that I remember, you know, like, when I was talking to my friends, I started remembering that it was a lady that was driving.

Q   The people in the car, did you know any of those people?

A   No.

Q   And when the car came alongside the house, earlier you testified that there was -- the people in the car were saying things to you and your friends.  Is that right?

A   Yes, sir.

Q   And when you were interviewed by Detective Bice, you told him that the things these people said to you were -- included North Side, Norteno and 14.  Do you recall telling Detective Bice all three of those things?

A   Yeah, it was something like that.

Q   All right.  So you recall that the people in this car said things like that or those things to you, you

and your friends?

A   Yeah.  They was, all this, you know, they was talking that the whole --

Q   You knew that -- you understood that to mean that they were gang members; is that right?

A   Yeah.

Q   All right.  And in addition to the things that they said to you, north side, Norteno and 14, they were also wearing red, weren't they?

A   Yeah.

Q   And you knew that red means Norteno, Diablos Viejos in Dodge City, Kansas; correct?

A   Yes.

Q   Now, were you a member of a gang, sir?  That night or any time?

                    (Interpreter interprets question
                     to witness.)

A   Oh, no.

Q   Had you done anything to these people in the car before the car came to the house or at the time the car came to the house and came to a stop and they started saying these things to your friends, had you done anything to provoke these people?

A   No.

Q   To your memory, sir, did anyone in your party, the

guys, the friends drinking beer, had any of those people said anything or done anything to this carload of people who stopped and started this confrontation?

A    No, they didn't say nothing because just -- we was talking is when we saw the car passing, like, two or three times.

Q    All right.  So this entire incident began because the people in the car started what happened; is that right?

A    Yeah, I think, yeah.

Q    And they started it by identifying themselves as Norteno, 14, north side; is that right?

A    Yes, sir.

Q    And the car -- show 372 again, please.  The car that you identified for Detective Bice as the car that came alongside the house and began this confrontation with you and your friends, you told Detective Bice that this same car came back later and was seen at the time of the shooting.  Correct?

A    Yeah.  We see, like, you know, like, I seen the car, I could see it from the back.  But we saw the same, the same rims.

Q    And you told Detective Bice before he ever showed you the car that you believed it was a brown Cadillac; is that right?

A    Yes, sir.

Q    And the information that it was a brown Cadillac that was involved in the initial confrontation and a brown Cadillac that was involved in the shooting later on, you and your friends told Dodge City police officers that that night of the shooting and gave them that information; correct?

MR. HENRY:  Objection, Your Honor.  It assumes hearsay with regards to friends.

MR. WELCH:  I'm just asking if he knows that information was passed along to Dodge City police officers.

THE COURT:  The objection is overruled.

BY MR WELCH:

Q    Mr. Alvarez-Lopez, my question was the night of the shooting, are you aware that this information, the description of the vehicle, was given to Dodge City police officers the night of the shooting?

A    I give the information later because I think, like, his brother, from -- the guy that get shoot -- and they, they talked to the police, so I went to my house, so they call me later, so I had to go to the office, yes, I went to his office and talked to him.

Q    All right.  But the night of the shooting, you saw this car after the shooting -- well, you saw this car

after the shooting?

A    Yes.

MR. WELCH:  No further questions, Your Honor.

THE COURT:  Mr. Wachtel, did you have any questions?

MR. WACHTEL:  No, sir I do not.

THE COURT:  All right.

### REDIRECT EXAMINATION

BY MR. HENRY:

Q    Mr. Alvarez-Lopez, Defendant's Exhibit R-HH that I put in front of you just during your testimony, you had not seen that today, had you, until I put it forward to you?  I did not have you review that prior to your testimony?

MR. WELCH:  Beyond the scope of cross, Your Honor.

THE COURT:  I'll allow him to answer that question.

BY MR. HENRY:

Q    Is that correct?

(Interpreter interprets question to witness.)

INTERPRETER:  I have not seen it.

Q    So your testimony here today has been based upon what your memory is and not because of this report?

MR. WELCH:  Objection; leading.

THE COURT:  Sustained.

MR. HENRY:  I have nothing further.

MR. WELCH:  Nothing further, Your Honor.

THE COURT:  Thank you, sir.  You're excused. Call your next witness, please.

MR. HENRY:  Your Honor, I would call Detective Bice.

THE COURT:  You're still under oath, sir.

A   Yes, Your Honor.

### J.L. BICE

Having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, testified further as follows on:

### DIRECT EXAMINATION

BY MR. HENRY:

Q   Detective, with regard to Mr. Alvarez-Lopez' testimony, you were here in the courtroom when he just testified; is that correct?

A   Yes, sir.

Q   And you were the one who interviewed him a few days after the drive-by shooting at 1110 4th Avenue; is that correct?  In Dodge City?

A   Yes, sir.

Q   And you showed him a number of photographs; is that

correct?

A   That's correct.

Q   And was Gonzalo Ramirez in that number of photographs?

A   Yes, he was.

Q   That picture was shown to him that evening or when -- excuse me -- when you interviewed him on October 7?

A   That's correct.

Q   And did he pick out Gonzalo Ramirez?

A   No, sir, he did not.

MR. HENRY:   Thank you.   I have nothing further.

**CROSS EXAMINATION**

BY MR. WELCH:

Q   Detective Bice, how many photographs did you show Mr. Alvarez-Lopez?

A   It's usually an arrangement of six photographs total.

Q   And was Mr. Alvarez-Lopez able to pick out anyone in the photographs you showed him that night?

A   No, sir, no one.

MR. WELCH:   No further questions.

**REDIRECT EXAMINATION**

BY MR. HENRY:

Q   Was Erik Sanchez in that six-photo line-up?

MR. WELCH:  Objection.  Irrelevant and beyond the scope of cross.

THE COURT:  Sustained.

MR. HENRY:  I have nothing further, Your Honor.

MR. WELCH:  Nothing further, Judge.

THE COURT:  You may resume your seat.  Next witness, please.

MR. MANDELMAN:  Your Honor, I'm going to call Lt. Drew Francis.

**DREW FRANCIS**

Having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows on:

**DIRECT EXAMINATION**

BY MR. MANDELMAN:

Q   Please state your name.

A   Drew Francis.

Q   And how are you employed?

A   With the Dodge City Police Department.

Q   And how long have you worked in that capacity?

A   Twelve years.

Q   And were you working in that capacity in June and July of 2009?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A    I was.

Q    And did you participate in an investigation involving a homicide of Israel Peralta?

A    I did.

Q    And in the course of your investigation, did you speak with a witness named April Solis?

A    Yes.

Q    And when did you first meet Ms. Solis?

A    I believe the day she came in for the interview, which was June 11th.

Q    So that would have been just a couple days after the homicide?

A    Yes.

Q    And did you have occasion to speak with her a second time?

A    I did.

Q    And can you describe -- not what Ms. Solis said, she's already testified, but what you did following your first conversation that lead to that second meeting?

A    Say that again.

Q    Yes.  Where did you meet with Ms. Solis the second time?

A    At trailer at 56-B.

Q    And where is trailer 56-B?

A    That's in the same trailer park that the murder

occurred.

Q   And did you conduct any investigation following your conversation with Ms. Solis?

MR. WELCH:  Your Honor, I'm going to object at this point.  This calls for hearsay, that's what his investigation was based upon; and also this is cumulative.  Ms. Solis has already testified, Judge.

THE COURT:  No --

MR. MANDELMAN:  It's just a couple brief questions just to find out if the officer followed up.

THE COURT:  If you can wait just a minute, I'm going to see if I can find my notes about her testimony.

Is she also known as April Solis Archuleta (ph)?  Well, I'm not making any progress in that regard, so go ahead.

MR. MANDELMAN:  Okay.  And I'll be brief.  I believe that's -- I don't know.  That's -- we've only heard --

THE COURT:  Well, if that's the same one, trailer 56-B.  All right.  Go ahead.

BY MR. MANDELMAN:

Q   Did you examine the view from outside that -- from inside the trailer to outside?

A   Yes.

Q   And what were you able to see?

A   I positioned my car outside approximately where she had described --

MR. WELCH:  Objection; hearsay, Your Honor.

MR. MANDELMAN:  Just going to explain how he conducted his investigation.

THE COURT:  You don't need to respond.  The objection is overruled.  He can say what he did.

A   I positioned my car out in front of that trailer where she had described to me in our prior interview where she believed the car was.

MR. WELCH:  To which I object as being hearsay, Your Honor.  This whole investigation is based on what she told this officer.

THE COURT:  Overruled.  You may go ahead. Let's move this along and get this over with.

A   And then I viewed what I could see into that car from the same window that she described having looked out that night.

BY MR. MANDELMAN:

Q   And what were you able to see?

A   The driver's side and the center console.

Q   And have we ever discussed your testimony before?

A   No.

Q   We've never met before today?

A   No.

Q   Have I offered you anything in exchange for your testimony?

A   No.

MR. MANDELMAN:  I appreciate your time. Thanks.

### CROSS EXAMINATION

BY MR. WELCH:

Q   Sir, when you looked through the window of the trailer toward your car, you confirmed that you could not see any passengers -- if there were passengers in your car, you couldn't see any of them in the car, could you?

A   No.

Q   And the driver, you could see, to the extent that you could, see the lower jaw line and below but not the face of the driver?

A   Correct.

MR. WELCH:  All right.  No further questions.

MR. MANDELMAN:  Just one further question.

### REDIRECT EXAMINATION

BY MR. MANDELMAN:

Q   You could see the entire front seat, both the driver and the passenger side?

A   No, I could not see the passenger side.  I could see the driver's seat and then into the center console area.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

I would not have been able to see somebody sitting in the passenger side of my car.

Q   You were, in fact, able to see the console?

A   Yes.

Q   And you would have been able to see the area where somebody may have placed a gun in the console.

MR. WELCH:  Objection; calls for speculation, Your Honor.

THE COURT:  Sustained.

MR. MANDELMAN:  That's all I have.  Thanks.

MR. WELCH:  Nothing further, Judge.

THE COURT:  Thank you very much, sir.  You're excused.  Next witness, please.

MR. MANDELMAN:  Uhm, Your Honor, at this time I'm just moving to admit a copy of Mr. Ramirez' birth certificate.  We've marked it R-EE.

MR. WELCH:  I've been provided a copy.  I'll object.  I have no idea why that would be relevant, Judge.

MR. MANDELMAN:  Uhm, well, it's just our position there's been some inferences here about California connections to the gang and I just want to show that, uhm, Mr. Ramirez' place of birth.

MR. WELCH:  This doesn't show anything about that at all.

THE COURT:  I don't think so.  I don't see how that's relevant at all.

MR. MANDELMAN:  Well --

THE COURT:  Now days, you can be born in one state and visit another state.  So the objection is sustained.  You can mark it; but I'm not going to admit it.

MR. MANDELMAN:  Okay.  Just note it marked R-EE.

THE COURT:  Yes, sir.  Next witness, please.

MR. MANDELMAN:  Your Honor, thank you.  The defense rests.

THE COURT:  Mr. Wachtel, have you rested or do you want to rest?

MR. WACHTEL:  I am fully rested; but I did rest, Your Honor.

THE COURT:  Any rebuttal?

MR. WELCH:  No, Your Honor.

MR. SMITH:  Your Honor, the final matter the United States has is withdrawing Government Exhibit 91, which was marked provisionally admitted.  It was the letter that we discussed redacting.

THE COURT:  You're just withdrawing that Exhibit 91?

MR. SMITH:  We're withdrawing that.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

THE COURT: All right. Now, the evidence is over. And how are we coming on the instructions?

LAW CLERK MS. SILVA: I think there's about five more left running through.

THE COURT: We're copying them. And we'll take a short recess and then we'll come back and I will read these to you. There's about 100 pages so it will take a little while. And then I'll let you go to lunch. And then when you come back from lunch, we'll have the closing arguments. And I think that will probably conclude today, frankly, but we'll see. Each side, the Government and the two Defendants together, I've given them two hours. Two plus two. So four hours. They don't have to take all of that; but they probably will, knowing lawyers. So you probably won't get to start on your deliberations today; but maybe, I don't know. Let's take a short recess. Remember -- yes, sir. Did somebody have a question? Remember and heed the admonition. When you come back, your instructions are going to be sitting on your chair.

(Recess.)

THE COURT: I'm not going to read the index page to you. It's there to help you during your deliberations.

Now that you have heard all the evidence, it

becomes my duty to instruct you on the law applicable to this case.  In the interest of clarity, I'm going to read these to you; and each of you has a copy and you may read along; and, of course, use the instructions in the jury room.

(Judge Belot reads instructions to the jury.)

THE COURT:  Government have any additional requested instructions or any additional objections to the instructions given?

MR. WELCH:  No, Your Honor.

THE COURT:  Mr. Wachtel?

MR. WACHTEL:  None that have not been made, Your Honor.

THE COURT:  Mr. Mandelman?

MR. MANDELMAN:  Your Honor, I don't know if the Court wants to take judicial notice of the date the Indictment was returned.

THE COURT:  I will.

MR. MANDELMAN:  I believe it was April 16th of 2012.

THE COURT:  I'll do that right now.

Well, it's not on my copy.  What is the date?

MR. WACHTEL:  It is April 16, 2012, Your Honor.

MR. WELCH:  That is correct, Your Honor.

THE COURT:  All right.

MR. SMITH:  Your Honor, I did notice one, I believe, typographical error and it was in the instruction that had to do with --

THE COURT:  Give me the number.

MR. SMITH:  I'm looking for it.  I lost my place.  My apologies.  Instruction number 58.

THE COURT:  Yes.

MR. SMITH:  Jesus Torres did not testify in this case.

THE COURT:  All right.  I'll take out Jesus Torres.  We'll provide a new instruction number 58 for each of the jurors and for you.  All right.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  Thank you.  Let's see, what time is it?  1:00.  Would you all be able to take your lunches today in 45 minutes instead of an hour?  All right.  Let's do that.  45 minutes.  Be 1:45.  And when you come back, we'll have the lawyers' closing arguments.  Remember and heed the admonition.

(Jury excused for noon recess.)

THE COURT:  We're going to have to substitute reporters later in the afternoon.  But I intend to -- if we go past 5:00, we're going to keep the courthouse open

because I want to finish the closing argument.

MR. HENRY:  Thank you, Your Honor.  We need to renew the Rule 29 motion.

MR. MANDELMAN:  On the same, you know, on all grounds --

THE COURT:  Same ruling.  Last thing, do you want any kind of warnings?

MR. SMITH:  Your Honor, if you would let me know when I've spoken for an hour.

THE COURT:  And you all have divided up things?

MR. WACHTEL:  Yes we have.

MR. MANDELMAN:  Yes, Your Honor.

THE COURT:  If you want warnings, I'll give them to you.

MR. WACHTEL:  50 minutes, a 15-minute, Your Honor.

THE COURT:  That won't work.  You want me to --

MR. HENRY:  After 35 minutes --

MR. WACHTEL:  Yes.

THE COURT:  35.

MR. WACHTEL:  I'm going to speak for 50 maybe. I want a warning --

THE COURT:  At 35, I'm going to say 35.

MR. WACHTEL:  Thank you.

THE COURT:  What about you guys?

MR. HENRY:  Your Honor, I would ask that a warning be given at 40 minutes.

THE COURT:  35 and 40.

MR. HENRY:  Yes.

MR. MANDELMAN:  I'll be fine.

THE COURT:  Are you both going to speak?

MR. HENRY:  I'm going to start.

MR. MANDELMAN:  I'll just use the balance.

THE COURT:  Fair enough.

MR. WELCH:  Judge, I'm going to do the very end.  I would appreciate a 15-minute warning when I have 15 minutes left.

THE COURT:  All right.  Let me write this down.  Government, one hour.  Val, 35.  Defendant Ramirez -- the warning is at 35.

MR. HENRY:  40 minutes.

THE COURT:  And 40 for Ramirez.

MR. WELCH:  And then 15 minutes left on mine, Judge, because I don't know how much time Mr. Smith will take.  I know we have two hours total --

THE COURT:  I know; but if he talks for two hours --

MR. WELCH:  Then I won't have much to say.

(Noon Recess.)

THE COURT:  All right.  We will now have the opening portion of the Government's closing argument. Mr. Smith, you may proceed.

MR. SMITH:  Your Honor, may it please the Court.

Ladies and Gentlemen, I understand that you have been handed now a daunting set of instructions; that you are probably apprehensive about the prospect of four hours of closing arguments.  So before we get too far, and lest we forget what the case is truly about, it is murder.  Vicious and angry murder.  It is about terror and apprehension and fear.  It is about blood, red blood, inflicted upon the persons in Dodge City, Kansas. It is about anger.  It is about the lack of safety a person would feel in their own home.  It is about mothers and sons and immigrants; and the common people of Dodge City, Kansas, sustaining this terror, the fear, the murder, the blood red, that is inflicted upon them by the Nortenos, the Red Raggers, the persons that follow that sign, that signal, that color.  XIV, the 14. Norte, Norteno.  The huelga, the gang, the color red. The 14 that represents -- XIV which represents 14. Norte is what is important to them.  North Towne.  And representing the Diablos Viejos, these devils in Dodge

City, Kansas, these Norteno devils whose goal was to terrorize, to hunt and to inflict the red blood, pain and fear upon Dodge City. They did it in this case in three instances. At 201 East McArtor on June 8, 2009, where four innocent persons were out drinking beer in the evening after a long day. And the crime was that one of them was wearing a blue shirt, blue shorts and a 13 belt. They did it on Avenue E at the home of Isidro Raleas-Velasquez and Alonzo Diego, two Guatemalan immigrants, traveled to Dodge City to make money, to make a life for themselves, to provide for families back in Guatemala. Their crime was that they were individuals that were essentially created to be a victim class in the minds of these Nortenos. They did it at 1110 4th Avenue in Dodge City, Kansas, where a boy named Abel Hernandez associated with Surenos but lived there with two brothers and a mother who wanted nothing more than to be secure in their home, which was ripped away in quick succession by 20, 20 pulls of a high-powered assault rifle tearing through their home, throwing smoke and debris through the front and to the rear of their house, traveling through walls, furniture, cabinetry and striking each of those two individuals. That, Ladies and Gentlemen, is two parts of what your job is today to consider. That is the visceral, factual element that

you must take back into the jury room, remember and collectively decide what it is you truly heard and what story actually occurred.

Now, the second half of that is a more analytical, I would submit mathematical, duty that you have; and that is sitting through the jury instructions that you've been given, the 80 or 100 pages of instructions. I am going to move through a series of those instructions. Obviously, you know how long it was, you listened to all of them, and I'm not going to go over them word for word. It wouldn't be helpful to you. It would probably be more irritating to you than anything. But I am going to submit to you a formula, an analytical way to progress through this case when you begin your deliberations.

The judge has already instructed you that you must go back and choose a foreperson. I would suggest that you ponder that, give it great time, weight and credit. It shouldn't be the person that goes into the bathroom first or the person that goes into the bathroom last. Because the foreperson will guide your deliberations.

Your Honor instructed you the second thing you should do is go through and read the instructions. You can choose to read them word-for-word if you would like. What I would ask for you to do is to consider the

structure of the instructions. You were given an index. They are broken into certain groupings that are relevant to individual parts of the case. Consider the structure of the instructions. There are instructions that are definitional, we'll talk about some of them later. They're instructions that refer specifically to the VICAR counts and we will talk about that later. There is a great deal of instructions that deal with Count 1, which is referred to as the RICO conspiracy. Now, it is my suggestion, you needn't follow it, but as you're choosing a foreperson and as you're considering the structure of the instructions, I would suggest that you assign someone to consider a certain subject, for instance, conspiracy, and all the definitions that go with conspiracy; the definitions of aiding or abetting. So that each time you go through the instructions and the crimes, you know who to look to, who to reference so that you can collectively come to the conclusion that is proper under the instructions.

Now, remember key concepts. I've already mentioned a few. Conspiracy and what is conspiracy, the definitions of conspiracy. There are definitions for dangerous weapon, aiding or abetting, possession, so on and so forth. There are definitions for enterprise and there are many definitions for enterprise because there

are numerous different elements for enterprise.

Remember those key concepts.  Think of who you will look

to to remind you, any time that we see the word

enterprise, we need to consider these certain concepts.

And then after that, I would suggest that you move on to

the charges.  And I will go through my closing arguments

in a certain way that I believe would be helpful for you

to follow.  When you move on to the charges, I would

even suggest that you separate out the charges into

certain distinct events.  There is the 201 East McArtor

shooting that involved Israel Peralta.  There are

numerous crimes that are charged here, conspiracy to

murder, a murder, and an attempted murder; assault with

a deadly weapon, possession and discharge of a firearm

in furtherance of a crime of violence, et cetera.

Separate out those charges and then work through those

charges individually, and I'll suggest a method to do

that, until you feel you're comfortable with the

conclusions that you've reached.  Other than 201 E.

McArtor, there is the robbery that involved Isidro

Raleas-Velasquez.  There are a couple of VICAR counts

related to that, a conspiracy to assault with a deadly

weapon and assault with a deadly weapon and a possession

of a firearm in furtherance of that deadly weapon.  And

then there is the shooting at 1110 4th Avenue in Dodge

City, Kansas.  Rumaldo Hipolito; Abel Hernandez. Separate out those charges.  There are, I believe, three VICAR charges and the possession of a firearm in furtherance of.  Then you have your pods of information to work on so you're working on these pieces of information in a methodical, mathematical way.  I think that that will keep you from being overwhelmed by the amount of information you have.  Read the VICAR counts. I have mentioned that each of those events have VICAR counts, the murder has several, the robbery has two, the 4th Avenue shooting has three, I believe, but consult your instructions, please, and we've changed some instructions so some of the numbers I have in this powerpoint may be incorrect.  Always consult your instructions because it is the ultimate law.

When you consider the VICAR counts, each of them have six elements, the recipe that you must find each of those six elements to convict these two defendants of those elements.  The enterprise elements -- I will describe them generally as enterprise elements -- are in one, two, three, four and six.  I will not go into detail of all the enterprise elements at this time.  You have pages of enterprise elements.  Essentially, was it a gang?  Were they members?  Did the gang effect interstate commerce?  Did it effect gang maintained or

obtain their position in the gang.  It is the fifth element of each VICAR crime that I suggest that you begin with.  Number 5 of each VICAR crime is what we think of as the crime:  Murder, attempted murder, assault with a dangerous weapon or aggravated assault is another way to say it.  Conspiracy to do those things.  So I would suggest that as you work through this Indictment and work through the instructions, you move to the VICAR crimes and you move to the fifth element.

Now, once you have considered the fifth element, for instance, in Count 3, the murder, also 2, 4, 5 -- 2, 4 and 5 when it has to do with the shooting at 201 E. McArtor.  Then I would suggest that you move on.  And the reason why I suggest this, which is different than the instructions, is you keep each specific event the same.  Move on to, for instance, Count 6 for the murder, which is possession, and discharge -- or discharge a firearm in furtherance of a crime of violence, in this case, murdering Israel Peralta.  You'll have the instructions for that.  Once you have completed your analysis of the VICAR counts, 2, 3, 4, 5 and then 6, the possession and discharge, that event is done.  You then, for instance, move on to the robbery.

Possession and discharge or possession and brandish a firearm in furtherance of a crime of violence is in

Count 6, for the murder at 201 E. McArtor.  It's in Count 9 for the robbery of Isidro Releas-Velasquez.  And it's in Count 13 for the shooting at 1110 Avenue D, the shooting at Rumaldo Hipolito and Abel Hernandez.  Now, you have now considered each of the crimes from Counts 2 through 13.  So, finally, what's left?  Return then to Count number 1.

Count number 1 is the RICO conspiracy charge. Count 1 indicts Pedro Garcia and Gonzalo Ramirez in connection with other named people, it's in the instructions, and charges them with being members of a conspiracy.  And it has all the same racketeering elements that you will have gone through.  You're going to read those because you're going to consider those when you've gone through the VICAR.  So you will have considered it, thought about it, and made a learned decision on the enterprise elements.  You then must consider whether there was a conspiracy, whether they are members of the conspiracy, so on and so forth.  Read the instructions.  I cannot go over them again or even summarize them in the period of time that I have.  That is the RICO conspiracy.

Now, once you've considered the enterprise elements of Count 1, the RICO conspiracy, once you've considered, and found, in fact, that these two Defendants were

members of that conspiracy, they acted in furtherance of the conspiracy, so on and so forth, what you will be asked to do is find two predicate acts that each of these men committed.  What two things, what two crimes, what two racketeering acts did Pedro Garcia commit and Gonzalo Ramirez commit.  You will consider together and unanimously find two predicate acts in relation to each of those men in considering Count 1.

So, I'm going to move forward now.  I mentioned VICAR, the VICAR counts.  When you're considering the VICAR counts, 2 through 5, 7, 8 and 10, 11 and 12.  They have six elements.  Number one, there was an enterprise. The Nortenos were an enterprise.  The Diablos Viejos part of the Nortenos were an enterprise.  There was an enterprise, it was in Dodge City, Kansas, operated in Dodge City, Kansas.  So, you're considering that as part of your analysis of VICAR.  It engaged in racketeering activity.  And you have the definitions of racketeering activity.  Generally, the racketeering activity in this case is acts involving murder, involving robbery, involving distribution of narcotics.  There was acts involving murder, robbery, attempts of those, distribution of narcotics.  You will consider whether the enterprise effected interstate or foreign commerce. And there are lengthy definitions of what that means.

So please refer back to the definitions.  That the Defendants were part of the enterprise, which should seem self-evident in this case, that Gonzo, Gonzalo Ramirez; Pedro, Peter, Pistol Pete, Garcia, were members of this Norteno Diablos Viejos criminal enterprise.

The fifth element which we've already discussed is the individual crime itself.  The murder, the attempted murder, the conspiracy to murder, the aggravated assault, the conspiracy to commit the aggravated assault.  I've suggested that you look at that first.  If you choose to look at the enterprise elements first, you may do so.  It gets you to the same place.

And the sixth element that the Defendants or either of them, they did so when they committed these acts to gain or maintain or increase their position in the Diablos Viejos, in the Norteno enterprise, which I would submit, again, is self-evident, considering the acts and actions that you've heard testimony of and evidence of in this case.  That is the beginning of your analysis.  So let's walk through each event.

201 E. McArtor.  This trailer park in Dodge City, Kansas, Ford County, on June 8th, 2009.  The murder, the attempted murder, the conspiracy to kill.  Count number 2 is the conspiracy to murder four people:  Israel Peralta; Mariano Sorano; Faustino Peralta, Israel's

brother; and Roberto Arco.  So, element number 5, what is plugged into that VICAR count, is in red, generally summarized, that the defendants, Pedro Garcia, Gonzalo Ramirez, or either of them, conspired to murder one or more of those four named victims.  To find what conspired to murder or what conspiracy to murder is, there is a further instruction.  Israel Peralta, the dead boy found behind the trailer after jumping a fence with a bullet in his back.  Mariano Sorano, Bari, a kid from Atlanta who was wearing the wrong clothes, running for fear for his life toward another fence and shot in the leg, able to finally clear the fence and get away.  Faustino Peralta, Israel Peralta's brother who you did not hear from, was present and sitting by that blue Volkswagen Jetta with the four gentlemen drinking beer.  And Roberto Arco, Mateo, he was referred to at one point, another young man who then fled to Atlanta after this shooting with his cousin or nephew Bari.  This is the scene of that conspiracy to commit a murder.  You will read what the elements of conspiracy are; and I would suggest that when you break these instructions down and you consider each one of the VICAR counts, even feel free to separate the instructions if you wish, pull the count that refers to VICAR conspiracy to commit murder and then there's an instruction that goes along

with it which defines what conspiracy to commit murder is. Consider those instructions. Make a decision. Move to Count 3.

Who are the conspirators? Who participated in this conspiracy to commit the murder of the four people. Pedro Garcia, the Defendant, participated. Gonzalo Ramirez, the Defendant, participated. Russell Worthey, Blanco, participated in the conspiracy and testified. And Anthony Wright, Huesos, testified, but participated in the conspiracy. They had prior knowledge of where these people were. They passed on the prior knowledge of where they were, believing they were Surenos, rightfully or wrongfully. They suggested where to find the Surenos. Directed, Pedro Garcia and Gonzalo Ramirez, to the location. They got out of the vehicle with Pedro and Gonzo. They went to the location of the shooting.

The murder, Count Number 3. The Defendants or either of them, murdered Israel Peralta. Now, remember, in red, that's the fifth line, the fifth element of the VICAR count. You still have one, two, three, four and six, the enterprise elements that you must consider. The Defendants, or either of them, murdered Israel Peralta. We know he was murdered. His body was found, a bullet in his back that essentially tore his heart

apart.  He died on the scene.  Blood gushing from his mouth.  As Lt. Rankin testified.  What is murder?  Because, remember, there is an accompanying instruction with each of the VICAR counts.  So, the Defendants or either of them mmurdered Israel Peralta.  The fifth element in the VICAR count.  Then move to the definition, the elements for murder.

What must you find?  You find each of these three things beyond a reasonable doubt.  First, the Defendants, or either of them, intentionally killed Israel Peralta.  Well, I would submit that intent in this case is not a question for the jury's mind.  A man running and shot in the back as he climbed a fence, after shots were fired, essentially a trailer away, hot pursuit given to finally end this boy's life.  That the killing was done with premeditation.  And you'll receive a definition for premeditation.  I will not go into great detail with premeditation; but the intentional act must be thought of beforehand.  They traveled there.  They armed themselves.  They donned rags.  They came around the corner.  They fired the guns.  Cleared a jammed round and pursued a boy running away.  And that the act occurred on or about June 8th, 2009, in Dodge City, Kansas -- I'm sorry, Ford County, Kansas, which I would submit is not up for dispute.  Or murder.  In this

case you have two alternatives to making the finding of murder.  Now, my suggestion is, of course, consider that which comes first in the instruction and that was the murder instruction that included premeditation.  There is another instruction included in that self same page.  Another definition of murder which includes two elements rather than three, that the Defendants, or either of them, intentionally killed Israel Peralta.  And, second, that this act occurred on or about June 8, 2009.  Again, intent to kill is not, I would submit to you, truly a question that you should dwell on because what other intent could there reasonably be.  The distinction between first and second degree murder is the existence or lack of premeditation, which I discussed when I discussed the first murder instruction.  Here is the murder victim.  He did not arrive there accidentally.

The next count, the attempted murder of Mariano Sorano, Faustino Peralta and Roberto Arco.  The Defendants, Count 4, or either of them, attempted to murder those three individuals.  Well, we know that four people were sitting around that night.  We know those bullets flew by all four of them.  We know that each of them were targeted because we know that one of them, Mariano Sorano, was shot.  He was in fact struck and had a bullet go into his leg.  What must you find to find

that there was an attempted murder?  The Defendants or either of them performed an overt act towards the commission of the murder.  Driving there, taking the gun, hiding as they make their way through the trailers.  Surprising them.  Donning disguises and firing on this group of people.  They had so with the intent to commit the crime of murder.  They failed in committing the crime of murder.  Well, Roberto, Faustino and Roberto Arco survived, so they were not murdered.  There was a failure.  And, again, that it happened on that date in Ford County, Kansas.  And, once again, proof that there was an attempted murder beside the fact that one man is dead, is Mariano Sorano's wound that he sustained during that shooting in the presence of the other two individuals.

Next, the next count is another VICAR count.  It's Count 5, an assault with a dangerous weapon on three individuals, Israel Peralta, Mariano Sorano and Roberto Arco.  Faustino Peralta is not named in this count for, essentially, a factual or legal issue; but when you consider the VICAR count, you will see that element number 5 is the Defendants, or either of them, assaulted Israel Peralta, Mariano Sorano or Roberto Arco with a dangerous weapon.  You have those definitions.  Well, you will learn that assault is described as the

defendant's intentionally -- remember, we've already seen intent because there was an intent to murder, intentionally, placed any person, being those three individuals, in reasonable apprehension of immediate bodily harm. Well, Ladies and Gentlemen, I submit to you, holding a gun up, pointing it at you and firing at least 11 rounds in your direction, striking one of you, is reasonable apprehension of immediate bodily harm, which two men actually suffered. And that in inflicting this bodily harm, a dangerous weapon was used. Now, you will see that there is a phrase appended to this that no bodily contact was necessary; but you know in this case that at least there was bodily contact for Mariano Sorano, while there may not have been for Roberto Arco. Dangerous weapon is defined. But, dangerous weapon is obvious.

So, Count number 6, the possession of a firearm in furtherance of a crime of violence. And you'll actually be asked to find that a firearm was discharged in furtherance of this crime of violence. Well, the question of discharge, I would submit, is not truly one that you must dwell on since people were struck. Once again, what must you find to find the Defendants guilty of Count 6? First, that the Defendants, Garcia and Ramirez, or either of them, committed the crime of

murder, which we've gone over, and this is a crime of violence.  And second, that either of the Defendants possessed the firearm in furtherance of the crime. Firearm is defined here.  I won't dwell on that.  And possession in furtherance of is defined in your instructions as well.  Generally, for the purpose of assisting in or promoting the objective of the underlying offense.  Well, to murder, the use, discharge of a firearm, I would submit is clearly assisting in or promoting that crime.

I'm going to take break.  Instead of going through all these VICAR instructions, going through all of the individual criminal elements, and talk about a few definitions that we've already mentioned.  These definitions are going to apply to each of those individual events.  So, as I suggested, one of you may have your definitions sections out and be responsible for aiding the rest of the jury, pointing them to their definitions as you consider each one of these crimes. An overt act, this overt act definition, is relevant to you when you consider the attempted crimes, the attempted murder in the 4th Avenue shooting, the attempted murder in the east McArtor shooting.  I am not going to go through this entire definition.  You have it available to you.  But, remember, when you are

considering the attempt crimes, you must consider the definition of overt act.  What else must you consider is aiding and abetting.  This instruction is key.  This instruction applies to numerous crimes.  You actually have an instruction -- or, in the instruction it defines for you which crimes you should pay attention to when I'm talking about aiding and abetting.  Generally, aiding and abetting says whoever commits an offense against the United States or aids, abets, helps, counsels, commands, induces or procures, really, ask for help, the commission of that crime is punishable as a principal.  Meaning, you helped somebody, aid somebody, you procure their assistance.  You are responsible just as if the person who pulled the trigger were responsible.  Every time you consider murder, aggravated assault, attempted murder, remember the aiding and abetting because Pedro Garcia's charged with aiding and abetting and Gonzalo Ramirez is charged with aiding and abetting each one of those crimes.  Essentially, unless it's conspiracy because conspiracy has its own definitions, you should always remember aiding and abetting and whether they aided and abetted themselves, each other, really, or they aided and abetted another participant, Russell Worthey, Anthony Wright, Juan Torres, Angel Cerda, Joshua Flores, Tito, Jesus Flores.

Aiding and abetting.  It makes it a crime to intentionally help someone else commit a crime.  Read the instructions, please, Ladies and Gentlemen.  Remember, every time you consider one of those specific crimes.

Another definition is conspiracy.  This one I really am not going to read or get into.  You have the instructions, read them carefully, there are several conspiracy charges.  Count 1 is a conspiracy charge.  There is a conspiracy to murder at 201 E. McArtor.  There is a conspiracy to commit an aggravated assault on Avenue E.  And there is a conspiracy to commit an aggravated assault on 4th Avenue.  Each time you encounter one of those as you go through it, reference back to the conspiracy definition and what it means to be a member of a conspiracy, participate in the conspiracy and how you're responsible for that.  There is a definition of dangerous weapon.  I believe that you will find it is self-evident.  So, a brief break.  Now back to the instructions, the elements.

1005 Avenue E, Ford County, Dodge City, Kansas, June 8, 2009.  The self-same date that Israel Peralta was murdered.  What happened and what are the charges?  First, this is an assault with a dangerous weapon of Isidro Raleas-Velasquez.  The first Guatemalan immigrant

that testified in this case.

Count 7 is a VICAR count so, 1, 2, 3, 4, 5 -- no, 1, 2, 3, 4 and 6 are the enterprise definitions that you must consider. And 5 is an assault with a dangerous weapon. Count 5 of VICAR says the Defendants, or either of them, assaulted Isidro Raleas-Velasquez with a dangerous weapon. What is it to assault with a dangerous weapon? Again, the other jury instruction, when you're pulling them out, when you're organizing them, when you find the VICAR assault with a dangerous weapon, pull this instruction out and read it as well. First, the Defendants, or either of them, intentionally placed Isidro Raleas-Velasquez in apprehension of immediate bodily harm. Okay. You've heard this before. The instruction is the same as it was for the murder count. Either of them, the Defendants, used a dangerous weapon. Aid or abet. Let's remember aid or abet. Aid or abet always applies unless we're talking about a conspiracy. When I was talking about the murder at 201 E. McArtor. Aid or abet. Somebody's got to have that instruction out. Keep that in the back of your mind. And it occurred on that date in Ford County, Kansas. Again, no bodily contact is necessary; but, what do we have in this case? This poor man had his home invaded by a bunch of gang members who wanted his money, grabbed

him, yanked him out of the room, took a pistol and beat him over the head, and he testified, I believe, struck him at least three times in the head and once in the hand.  No bodily contact is necessary; but, once again, the blood flows freely when it comes to the Nortenos. There is an accompanying conspiracy to commit assault with a dangerous weapon.  Read the conspiracy instruction.  Obviously, this is in Count 8.  Was there a conspiracy with the defendants, or did they participate in a conspiracy, to commit assault with a dangerous weapon?  So the assault with a dangerous weapon instruction is the same.  Going to have to find the same thing.  And what is it to have a conspiracy first that those defendants, these Defendants, agreed with another person or others to commit this assault with a dangerous weapon.  And then read through the rest of the instructions.  Because it is assault with a dangerous weapon.  Well, conspiracy, so they agreed with another person or others to commit this conspiracy, to commit an assault with a dangerous weapon.  Joshua Flores, Big Knox, Knox, LCC gang member, and Jesus, Tito, Flores.  A person who has identified himself as not being a gang member but truly is an associate of the Norteno gang.  And admitted that.  Also, a cousin of Joshua, Big Knox, Flores, and Gonzalo, Gonzo, Ramirez.

Tito Flores testified about what he did, admitted he had a gun, knew they were going in to rob somebody. Obviously, acting as a look-out or searching the house or holding things down. I don't remember his exact phraseology. While others robs the residence of Alonzo Diego and Isidro Velasquez. That, Ladies and Gentlemen, I would submit, is a conspiracy between these two people and these two Defendants. They went there for a reason, with guns, to intimidate, to put in fear, to rob.

Once again, a possession of a firearm in furtherance of a crime of violence. In this case you will be asked to find that the firearm was brandished. You have a definition of brandish. But we know that the firearm was used, held out, shown and then smashed against the head of Isidro Raleas-Velasquez. So I would submit that brandish in this case is not something that you should spend a lot of time on. I would submit that the evidence is clear that the firearm in this case was brandished and that there was a violent crime being committed in this case, aggravated robbery.

1110 4th Avenue. Rumaldo Hipolito living there with her three sons, a relative in the basement. It's October 4th, 2008. Dodge City, Kansas. There's a party, some guys have gathered, some after work, some maybe not after work. Beer is flowing. But you have a

bunch of individuals in their backyard minding their own business; and low and behold, what happens?  Well, the Diablos Viejos, the Nortenos, happen.  And a conspiracy to murder two people, Rumaldo Hipolito or Abel Hernandez is hatched.  What is the reason for the conspiracy to murder?  Maybe a beer bottle was thrown.  Maybe five beer bottles were thrown.  Maybe somebody just looked at the car funny.  Maybe a bunch of Diablos Viejos Nortenos who have no compunction about shooting firearms at anyone who looks askance, decided that they were just going to hunt down somebody who they thought was a Sureno.

In Count 10, Gonzalo Ramirez and only Gonzalo Ramirez is charged, as conspired with others, other people, to commit murder.  And in this case, Rumaldo Hipolito or Abel Hernandez are the named victims.  Well, we know that the Defendant knew and the occupants of the car knew that was Abel Hernandez' house.  Marriet Gonzalez lived at the house.  There was testimony that there was a conversation about who lived at the house, how to get to the house and whether there were scraps or Surenos at the house.  That was the VICAR count.  That was element number 5.  You have an accompanying instruction.  You're going to get tired of me harping and saying the same thing.  Pull that instruction out,

find that it defines conspiracy to commit murder. Ramirez agreed with another person to commit or assist the commission of the crime of murder. And you can reference back to the definition of murder as well to remind yourself, if you feel necessary. He agreed with the intent that the crime would be committed. It happened on or about October 4, 2008, and acted in furtherance of the agreement. So, was there a conspiracy? Well, there were coconspirators. Juan Torres who testified in this case, a Diablos Viejos gang member who road in the car with Gonzalo Ramirez, Marriet Gonzalez, Theresa Tinoco and with Shrek, Angel Cerda, a Diablos Viejos Norteno gang member, as was Juan Torres, Bugzy or Little Rabbit. What was the conspiracy? What was the act in furtherance of? There was a fight or there were bottles thrown. People got pissed off. They left. They went to another house. They got an assault rifle. They returned. They drove down an alley. They parked. They walked around the corner. Aimed the assault rifle at 1110 4th Avenue in Dodge City, Kansas, and discharged 20, 20, 7.62 mm rounds into that house.

Then in Count 11, the attempted murder is charged. Remember aid or abet. Remember aid or abet. The VICAR count in number 5 says that Gonzalo Ramirez committed the attempted murder of Rumaldo Hipolito or Abel

Hernandez.  Pull the attempted murder instruction.  Read the attempted murder overt act.  Driving, leaving, getting a gun, parking the car, hiding, walking around a corner, leveling the firearm at the house, shooting.  Failed to complete the commission of the murder.  Neither Rumaldo Hipolito, thankfully, nor her son Abel Hernandez, died during the commission of this shooting.  When you're considering the attempted murder, you consider the intent as well.  Was it intentional?  What did they mean to happen in this case?  When you take an SKS type assault rifle, which you've heard testimony is similar to an AK 47, you take that weapon, you point it at a house that you know is occupied.  You know there's a bunch of people standing around the house.  You know that one of the residents or think one of the residents of the house is a sworn rival, a Sureno gang member.  You walk into the middle of the street and you shoot 20 rounds dead into the body of that home.  What do you intend to do?  There was no warning shot.  This wasn't shooting at a can on a fence.  These bullets went through walls, went through cabinets.  They went through furniture, came out of the furniture, went through shoes.  They flew through the kitchen.  They took out chunks of a kitchen table leg.  And it was 20 of those rounds.  They went through furniture.  They hit a woman

sleeping on a couch after going through walls, furniture and possibly the couch.  They hit a boy sleeping in his bed after going through walls, furniture, halfway through his mattress, and through his leg.  What did they intend?  Look at the pattern.  This isn't the only picture.  That's one, two, three bullets tightly spaced going straight into the front of that house.  And we know what happened when they went in.  There's a series, a strafe of bullets on the side of the house.  There's more than just those three rounds that went into the front of the house.  That's no accident.  You know what they meant when they did that.

After that, in Count 12 there's an assault.  This is VICAR, with a deadly weapon, of Rumaldo Hipolito.  Ignore the part that says and Abel Hernandez.  Your instruction says an assault with a deadly weapon of Rumaldo Hipolito.  The fifth part of the VICAR count says Gonzalo Ramirez assaulted Rumaldo Hipolito with a dangerous weapon.  Ladies and Gentlemen, look at the instruction for dangerous weapon.  There is another instruction that tells you what assault with a dangerous weapon is.  Well, did the Defendant intentionally aid or abet?  Place a person in reasonable apprehension of immediate bodily harm?  Well, reasonable apprehension.  They were shot up.  Immediate bodily harm?  They were

all struck.  And a dangerous weapon was used on October 4, 2008, in Ford County, Kansas.  That is a dangerous weapon.  That is a reasonable apprehension.

There is a possession and in this case a discharge of a firearm during the commission of a crime of violence.  I will not go over this again.  I think that you have it down.  So, I'm returning again to VICAR because that's what we're talking about.  I've talked about element number 5 of all of these individual counts.  The substantive crime, the murder.  The attempted murder.  When you consider VICAR, you must consider the other five elements.  Element number 1, that there was an enterprise.  Now, I am suggesting that you consider the substantive crimes first, murder, attempted murder, assault with a deadly weapon.  If you so choose, it would make sense as well to consider these enterprise elements.  Enterprise is the crux, in essence, of this case because that is how these men associated themselves with this criminal activity as the enterprise.  If you choose to consider the enterprise elements of the VICAR counts first, please do so.  So, separate out the instructions.  Think about it analytically and decide if there is evidence of an enterprise.  Well, Ladies and Gentlemen, the defense expert herself acknowledged that it was a gang, whether

you call it a hybrid gang or not.  You'll get the definition of enterprise more fully; but, an enterprise in this case existed.  It was a gang.  It was for a purpose.  It lasted for a period is time.  Conducted affairs.  It existed independent of the crimes themselves.  Did that enterprise engage in racketeering activity?  There is a definition of racketeering activity.  You will find, I am confident, after you consider the evidence, that the enterprise did engage in racketeering activity, and that the racketeering activity, or the enterprise, actually, the enterprise, effected interstate or foreign commerce as is in your instruction.  Consider all of the ways that enterprise or foreign commerce was effected.  Firearms, drugs, stealing money that was to be sent to somewhere else. Getting people out of town.  Putting people in fear to flee, so on and so forth.  But you will find, Ladies and Gentlemen, that the enterprise effected interstate or foreign commerce.  The Defendants were part of the enterprise.  Do you have a doubt at all that Gonzalo Ramirez and Pedro Garcia were Nortenos, DVs, members of this criminal enterprise?  I would submit that there is sufficient evidence, beyond sufficient, for you to make a finding that the Defendants were part of that enterprise.

Number 5, as I've gone through extensively now, is the substantive count that you will have already considered or you may choose to consider now. And number 6, the Defendants, or either of them, committed these acts in order to gain, maintain or increase their position in the enterprise. This was a violent gang. They meant to intimidate and injure their rivals. They meant to shoot at or kill their rivals. They meant to make money. They meant to make themselves look like bad asses in front of their fellow gang members. And they did whatever was necessary to do that. And, Ladies and Gentlemen, you will find after considering the evidence that these two Defendants committed these acts to do so as well.

You have the definition of enterprise. I will not go through the definition, the pages of definition of enterprise. But I am highlighting these because if you do choose to consider the enterprise elements of VICAR first, draw your attention to the definitions first. In this case, though, generally, the enterprise is just a group of individuals associated in fact. These guys, in fact, associated with each other. And they had a common purpose. The enterprise generally has, in this section of the definition, there is three things that help you make that determination. Was there a common purpose?

Intimidation, drug dealing, shooting, partying, collecting money. Number two: Was it an ongoing organization? Whether it was informal or formal. The conspiracy alleged in this case is from 2008 through 2012. That is ongoing. You heard about events that occurred before that. Jump-in's. Who started the gang. Who was in charge way back when. When dealt drugs at this time. Who shot at this person, so on and so forth. Was it an ongoing organization? And did the members, essentially, of the enterprise work together? That was number 3. Again, enterprise, this enterprise doesn't have to have a formal structure. That's the law. It does not have to have a formal structure. There just must be some sort of sufficiency in the organization.

Number 2 and number 3 I've kind of lumped together. That there is a pattern of racketeering. You'll get the definition. And that it effected interstate commerce. I started with interstate commerce. I'm sorry -- this is one of the instances where things got renumbered and my fingers just didn't type fast enough, so I included it all together. Interstate commerce. I'm going to go down to the red highlighted portion. Movement of money, like wiring money to California for the payment of drugs for TC, Eusebio Sierra-Medrano, as Joe Galindo did. Taking money that was to move in interstate commerce

like the Guatemalans' money that they were sending home to support their family.  Goods.  Ammunition.  Firearms. Services.  Persons, Jose Ochoa, Jr, Taz, Gordo, who was threatened to the point by Fabian Neave, who testified, and admitted that he left the country, he left Mexico -- to Mexico, so in fact he wouldn't have to testify.

MR. MANDELMAN:  Your Honor, I object.  That's hearsay.

THE COURT:  This is closing argument.

MR. SMITH:  Well, Michael Huffines from ICE testified, Ladies and Gentlemen, that Jose Ochoa, Jr left the country and came back in.  He gave you the date.  Mariano Sorano and Roberto Arco fled the state after one of them was shot.  They were too afraid to stay.  There are other instances or think about.  The instances, all the different ways, that interstate commerce was effected.

Okay.  Along with that, the law is you don't have to have proof that any particular defendant, so Pedro Garcia or Gonzalo Ramirez, that they themselves effected interstate commerce.  That's not the law.  You don't have to know if Pedro effected interstate commerce or Gonzalo effected interstate commerce.  It's just the acts of the enterprise itself.  Further, you just consider -- and this kind of goes along with the first

definition, the acts of the enterprise as a whole, whether everything you heard about, whether this table, whether the testimony that you heard, in its entirety shows that effect on interstate commerce.

The Government is not required to prove a significant or substantial effect.  What the Government must prove is a minimal effect.  Minimal effect on interstate commerce.  You're gonna hear argument -- you will hear argument in closing after I sit down, the argument will go something like, Ladies and Gentlemen, ignore the law that says minimal --

MR. WACHTEL:  Your Honor, I absolutely object to the inference that at least I will ask this jury to ignore the law.  I object to that.

MR. SMITH:  I will rephrase that.

THE COURT:  Yes, I think you should.  That's not proper argument.

MR. SMITH:  I will rephrase that.  You will have the suggestion made to you, you'll have the argument made to you, Ladies and Gentlemen, what you've been shown is not a minimal, not even a minimal effect. It's something subminimal.  It's something not in the instruction.  That the number of bullets, shell casings, guns, drugs, movements of persons, doesn't even rise to this level but it just kind of fits something underneath

that we don't really know even how to define it or describe it. We are not required that the defendants even knew that they were effecting interstate commerce. And keep that in mind.

Racketeering activity, the second part to this, which is either the second or third element now, I can't remember because we changed the numbers. So, what is racketeering activity? Generally, offenses that include drug trafficking. You've heard about that. Murder. It happened. And robbery. Isidro. There's more definitions of pattern of racketeering activity. I'll go back, I'll let you take a glance at it. Because the pattern of racketeering must relate to the enterprise. Well, Ladies and Gentlemen, in the first instance in the shooting, we know it was four Norteno gang members who committed it. In the second instance, it was four individuals who committed it, two Norteno gang members and LCC gang member, a Norteno. Two DV gang members, a LCC gang member and somebody who associated with those gangs and was related to at least two of the participants. So is that related to the enterprise. And then the third instance, three Norteno gang members, Gonzo, Bugzy and Shrek. I'm actually getting tired at this point. My voice is getting hoarse. I apologize. So, what can you look at to infer that the pattern --

that it was a pattern of racketeering activity? Did the crimes have similar purposes? Intimidation. Did the crimes have similar results? Shooting up houses, shooting up people, shooting people, killing people, scaring people, wounding people. Did the crimes have similar participants? Well, in this case, Pedro and Gonzo participated in the first two acts. Gonzo participated in the second one. Each act contained multiple enterprise gang Norteno, DV, LCC members. Did they have similar victims? You heard about the targeting of Guatemalan victims or the targeting of people that are Surenos or are suspected of being Surenos. Or are the methods of commission the same? Like shooting.

THE COURT: You've used 60 minutes.

MR. SMITH: Thank you. Were Gonzalo Ramirez and Pedro Garcia part of this enterprise? That's number four. When you consider VICAR. Tattoos. Their associations with other people. Their relationships with other people. The crimes themselves that they committed. They have been identified as Norteno DV gang members and they both admit and have admitted that they are DV gang members and will be for life. We're down with DV, something similar to that effect.

We talked about number 5 and VICAR number 6, that

they committed the act to gain, maintain or increase their position in the enterprise. And, Ladies and Gentlemen, you have sufficient evidence of how that would occur.

Then I've said move on to Count 1, the RICO conspiracy. So, read the conspiracy definitions again. Okay. You've made your decision. And I'm confident you have said guilty to all of the VICAR counts. You're moving to Count 1, the RICO conspiracy. Read the conspiracy definitions. That will lead you to find that the first element has been found, that there was a conspiracy. The second element has been found, that these two men joined the conspiracy. And then you move to the third element, that the Defendants, Pedro Garcia, Gonzalo Ramirez, agreed someone, someone, not necessarily them, would commit two racketeering acts as detailed in the Indictment. Murder. Acts involving murder, robbery, drug dealing, et cetera. There's the list. Aggravated assault. Distribution or possession with the intent to distribute controlled substances, murder and robbery. Did these two agree with someone that they or someone would commit at least two racketeering acts? You will have to make a finding of what those racketeering acts are.

You've also been given a list of who the

conspirators are in Count 1, just in Count 1. Jason Najera, Ene, Norte. Anthony Wright, Huesos. Eusebio Sierra-Medrano, TC. Jayson Vargas, Wee Wee. Fabian Neave, Puppet, he testified. Anthony Wright testified. Russell Worthey is not charged in Count 1. That is actually an error. Or they did it together with other persons associated with the Norteno street gang. So, the conspirators. You have that definition.

So, the third element, the agreement to commit the two racketeering acts. Let's go through that. For Pedro Garcia, here's the formula for Count 1. You consider number 1, the conspiracy instructions, the definition; number 2, the conspiracy definitions. Then you find what are the two acts. And you must find the acts unanimously. You'll have a place on the verdict form to write it down. The murder of Israel Peralta. That's one act there. The conspiracy or attempted murder of the Peraltas, Sorano or Arco, that's another act. It's an act involving murder. The robbery, which is part of the pattern of racketeering activity, the robbery of Isidro Raleas-Velasquez. I would submit, Ladies and Gentlemen, at this point, you have found Pedro Garcia guilty of Count 1. There's two acts -- there's three right there that you can make a decision on. If he committed those acts, he is guilty of Count

1. Once you've found those conspiracy definitions.

But what else? Well, we know it can be acts involving the distribution of drugs. Anthony Wright testified he was selling for, selling methamphetamine for Pedro Garcia. Fabian Neave testified that Pedro told him, Pedro told him that Pedro was receiving methamphetamine in the mail from Sierra, a guy who's a brother to TC, Eusebio Sierra-Medrano, receiving it in the mail. So, interstate, commerce, Ladies and Gentlemen.

We move to Gonzalo Ramirez. The analysis is similar. Look at the conspiracy definitions. Once you've found number one and number two, you move to number three and find two predicate acts, the murder, the conspiracy to commit or the attempted murder of the Peraltas, Sorano and Arco. The robbery, again, of Isidro Raleas-Velasquez. Gonzo, Gonzalo Ramirez, is the one that struck him across the head. The attempted murder of Rumaldo Hipolito and Abel Hernandez. You have four choices there. You'll find two. You'll -- you will find four. But you will find two. At this point I submit that Gonzalo Ramirez is guilty of Count 1. But what else? We know in 2008 he sold methamphetamine with Fabian Neave. That he sold meth at east Love's on May 28th, 2009. He sold meth at Peter's house. He sold

meth at his house.  And Anthony Wright saw him sell meth.  I've lost count.  Nine choices.  Or, evidence that you all collectively remember.  Other racketeering acts that I haven't mentioned.  What have we learned about this murder, Ladies and Gentlemen?  Mariano Sorrano and Roberto Arco -- we have a close-up of this area.  Mariano Sorrano and Roberto Arco were standing by this car.  The assailants come around the side of the trailer.  Mariano Sorrano flees.  It's hard to see that line, I think.  Mariano Sorrano flees towards the fence.  He's shot.  Both Mariano Sorrano and Roberto Arco say this.  Again, the assailants come around.  Roberto Arco flees in the same direction.  So does Isreal Peralta. We know where Israel Peralta's body is found.  What else do we know about the murder?  Ricardo Sanchez says the yellow X is where the victims are, that a vehicle parks right in that location.  Why is that important?  Well, we know that that's important because then he sees the assailants run through the trailers in that location, which the victims have said as well.  April Solis says, there's the victims again, that a car, later after the shots, picks up individuals in about that location.  Why is that important?  Anthony Wright and Russell Worthey testify as well.  There's the victims.  They drove around following that red line.  Anthony Wright says he

parked right about there.  Ladies and Gentlemen, in fact look at Government Exhibit 154, the diagram that Anthony Wright created.  Why is this important?  Well, that comports with what Ricardo Sanchez said.  Then Anthony Wright says they get in the car and drive north, have to stop, slow down to pick up Russell Worthey.  That comports with what April Solis says.  Russell Worthey says that he flees separate from the other individuals, runs through the trailers, meets up with him later. That comports with what April Solis says.  You have four individuals telling substantially similar stories.  So, what do we know?  Ricardo, Anthony and Russell agree where the car is parked.  Mariano and those individuals agree on the paths of the vehicle.  Ricardo, Mariano, Roberto, Anthony Russell agree how the shooters approach the victims.  Ricardo, Anthony Russell agree on the number of assailants.  April Solis confirms there is at least one or two assailants because she hears more than two people running towards the car and one person driving.  Then another individual getting in.  April Solis confirms the path of the vehicle slowing down to pick up Russell, which Anthony Wright and Russell Worthey each testify to and Ricardo and April describe the same pattern of shots.  A series of shots, a pause, Israel Peralta runs, is chased down, and two more shots

as he is shot in the back climbing a fence.  Everyone agrees there was firearms.  Assailants thought that they were targeting Surenos.  Joe Galindo had accurate details.  He wasn't there, but the details told him by Pedro Garcia were very close to accurate and what Anthony Wright and Russell Worthey said.  He heard the Norte comment.  He said norte puto.  Somebody else said puro norte.  How close is that?  He knew the gun jammed.  You have an ejected shell casing.  Pedro gave accurate details to Fabian Neave, including the searching for scraps.  Pedro told Fabian Neave the gun went to his girlfriend Angelica Flores in Pratt.  Angelica Flores did take the gun to TJ Quint late in 2010 in Pratt.  And before the homicide, Joe Rodriguez sold the MAC 11 to Gonzalo Ramirez.  The MAC 11, as Joe Rodriguez testified, just happened to malfunction or jam.  And Pedro Garcia had Break Free gun oil in his home in 2010.  Dr. Adeagbo's autopsy confirms Israel Peralta was shot in the back.

What have we learned about the robbery?  Tito Flores, Anthony Russell, agree how everyone arrived at Pedro's house.  Tito and the victim, Isidro, agree with how he was attacked in the house.  Tito and Alonzo Diego agree with what happened in the house as far as Alonzo cowering during the robbery.  Joe Galindo reunites Pedro

and Gonzalo with Tito and Josh Flores.  Just coincidence that the four guys then meet up later.  Joe Galindo sees police searching the area of the alley around Avenue D.

What have we learned about the 4th Avenue shooting? Everyone agrees that Surenos, or who they thought were Surenos, were targets.  Juan Torres and Marriet agree that there are five occupants.  Santiago Hernandez, Juan and Marriet agree it's Gonzalo's vehicle.  In fact, the gentleman that testified this morning agrees as well. Everyone agrees that there was a prior confrontation. The number of beer bottles is immaterial, I would submit.  Everyone agrees where the shots came from. Juan and Marriet agree they flee to Shrek's, that they flee through the field.  Brady Schulte confirms the flight of the Cadillac; and Marriet was consistent with Juan Torres and Gonzalo being present.  She never indicated that anyone other than those two were present, though she did indicate that at some point someone named Savage was present.

THE COURT:  Let me stop you for a minute.

MR. SMITH:  Your Honor.

THE COURT:  All right.  Cindy has to leave and we're going to substitute Ms. Wilkinson as the court reporter.  So let's take about ten minutes so we can accomplish that.

(Recess.)

(NOTE:  Johanna Wilkinson, CSR, takes the record for the remainder of the day.)

(Transcript of remainder of closing arguments contained in a separate volume filed by Ms. Wilkinson.)

(Beginning at 12:00 p.m. October 17, 2013, the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT:  All right.  In the presence of the Defendants, I have a question from the jury which reads as follows:  "Count 1, listing racketeering act.  Do they have to be specific acts testified to or can -- " and I think he is saying it "-- be generic such as robbery, murder, et cetera?"

What's the Government's position?

MR. WELCH:  Your Honor, we believe the answer is that they don't have to be testified to; but we also believe the Court's Instructions 17 and 18 address that question.  If we could direct the Court -- or, the jurors' attention to those two instructions to answer

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

the question.

MR. SMITH:  Your Honor, I apologize.  I think that I'm only trying to interpret that their question has more to do with specificity; and I don't think that there has to be a certain degree of specificity as long as they understand that it must be unanimous so that when the jurors decide which act it is, if their decision is unanimous, then, you know, a certain extent of specificity.  I don't think they have to name a date, a participant, an act, so on and so forth, as long as it's unanimous.  And it, obviously, complies with one of these things delineated in instruction 17.

THE COURT:  What's the Defendant's position?

MR. MANDELMAN:  I guess we would ask, certainly, that they specify the act.

THE COURT:  In what way?

MR. MANDELMAN:  By, you know, by date or what instance they're referring to.  Otherwise, I think it gets blurry if they just -- if they're unanimous, if they just list robbery, robbery, or something, that doesn't -- I think that might --

THE COURT:  All right.  We'll recess until 1:00.  You all come back with authority for your positions.  I don't know the answer; and so you can go out and research it and come back.

MR. HENRY:  Your Honor, I think that it is kind of a compound question; and the concern I have is that when they say is it a specific act testified to, I would think that they just can't pull something out and say that it wasn't brought out in the last two and a half weeks of testimony.  It has to be evidence that came out in court.

THE COURT:  Go out and do your research and come back with an answer.

MR. HENRY:  Thank you.

THE COURT:  The jury is having lunch.  I'll have Rachael tell the jurors that we'll get them an answer to their question as soon as we can.  It's obvious that there's a lot more than Count 1 for them to be working on here.

MR. WACHTEL:  Thank you, Judge.

THE COURT:  E-mail your authority over to Rachael so we can have a look at it before you come back.

(Recess.)

(Beginning at 1:05 p.m. October 17, 2013, the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT:  Well, as to the first question, I put my answer on your desks.  Anyone have any objection to that answer?

MR. SMITH:  The United States does not object to the first question.

MR. MANDELMAN:  Your Honor, I just want to acknowledge *Randle*.  I saw that paragraph in there.  I think this is the right state of the Tenth Circuit law.  Just for purposes of the record, we would just like to preserve the issue for appeal as to specificity as to the predicate acts.  But I understand the Court's instruction.

MR. WACHTEL:  I would join in that, Your Honor, too.  I've read *Randle*.  What I didn't have time to do is read the facts in *Randle*.  I don't disagree with what Rachael found; and I don't disagree with what they found; but I need to preserve this.

THE COURT:  Well, I don't ever have any problem with preserving things; but, you have to convince somebody above the Tenth Circuit I suspect.

Now, the second question I don't think requires any significant legal research.  The question is:  "Number 6.  Do you find that the Defendant discharged the firearm?  We are not unanimous.  Do we mark no or do we use the highest vote?"

MR. SMITH:  My suggestion would just be to say that your decision must be unanimous.

THE COURT:  I believe what I'll do is say -- and I think I'll just write on this, unless you all have some objection.

MR. SMITH:  I do not.

MR. WACHTEL:  I don't.

THE COURT:  "Please refer to Instruction 72. Your verdicts must be unanimous as to each count and each Defendant."

MR. SMITH:  And I might suggest and each finding.  Since that is a finding under a verdict.  But maybe I'm parsing words too much.

THE COURT:  All right.  I'll provide you with the written answer on the question.  Of course, we'll file all these so that there's a record made.  All right.  Thank you very much.

(Recess.)

(Beginning at 1:37 p.m. the following proceedings continued OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT:  Okay.  Now we have a third question.  On Count 6.  So let's take a look here.

The verdict form on Count 6 -- I think this is

their concern -- has these two questions.  Do you find the Defendant discharged the firearm?  Possessed the firearm?  "Question:  We are trying to answer the yes and no questions.  If we are not unanimous, how do we mark the question?  Do we leave it blank or do we mark it no?"

What's the Government say?

MR. SMITH:  Well, unfortunately, I think it's self-evident, although it's not self-evident to them.  I would suggest the answer is:  A unanimous decision has to be yes.  You mark yes.  Anything less than unanimous, you mark no.

I mean, I know that it's giving them very detailed instructions, which is going beyond the Court's instructions; but, obviously, they're not getting to the proper conclusion.

THE COURT:  What do you think, Joel?

MR. MANDELMAN:  We agree.

THE COURT:  Well, I've got a question in my own mind.  If they answer question 6 guilty but they don't -- they can't unanimously -- they have to answer the question, one of the other questions, one or both of the questions, in order to answer guilty I think.

MR. SMITH:  Well, I don't.  And the reason why I think not, of course, we're invading the province of

the jury at this point and speculating; but a person could be found guilty of Count 6 under the aiding or abetting theory, yet these specific findings are so distinctly specific as to saying that defendant that there is a possibility that no could be marked yet guilty as an aider or abettor could be found under Count 6.

MR. WACHTEL:  Judge, isn't the answer you don't mark either one of them because it would say yes or no on either one.  I would think that requires unanimity.

THE COURT:  The only way I know how to answer this type of question is to say that whatever your answers are, they must be unanimous.

MR. SMITH:  I agree with that.

MR. MANDELMAN:  We don't -- I mean -- that's fine with us, too.

MR. WACHTEL:  I agree; but I fear they want -- they're looking for what do -- where do we write that. I think they can't write it in no and they can't write it in yes.  I think they can't write it at all.

MR. SMITH:  They can leave it blank, which is what their specific question was.

THE COURT:  What does that -- that was what I was trying to think through.  If they mark guilty and

then leave them blank, what are we left with?

MR. SMITH:  I would submit it's still a finding of guilt because there's still alternative principles of culpability that are specific in the jury instructions.

THE COURT:  I don't want to tell them they don't have to answer the questions.  I've already told them they have to.

MR. WACHTEL:  And their question is if we are not in agreement, what do we write.

THE COURT:  I think your point is well taken.

MR. WACHTEL:  Thank you, Judge.

THE COURT:  Whatever your answers are, they have to be unanimous.

MR. HENRY:  Well, Your Honor, they don't have to be unanimous on the no.  They have to be unanimous on the yes.  If they cannot reach a decision on yes, then they can mark no if they are not unanimous.  And I think what could happen in the Court's statement just now is that we could be here for days and weeks because you can't get a certain person off the number that they're at because they're not unanimous right now.  And so I think they have to be unanimous to get the higher penalty.  If they're not unanimous, then they mark no.  But if they have to be unanimous on no, and it's 11 to

1, it may be a week from now before we even get --

MR. SMITH:  I fear the follow-up question is we're not unanimous, period, then what do we do?  I fear that being the next question.

THE COURT:  Well, all right.  Then the answer to their question is:  With respect to a guilty or not guilty determination as to Count 6, if you vote guilty, your verdict has to be unanimous.  If you do not -- if you are not unanimous, then your answer is not guilty and you don't have to answer the questions.

But then if they circle guilty, they still have to answer the other two questions and they have to be unanimous.

MR. SMITH:  And, Your Honor, they've only inquired about the yes and no questions.  They specifically said we're trying to answer the yes and no questions.

THE COURT:  That's getting back to what I said.  Your answers to every question have to be unanimous, whatever they are.

MR. SMITH:  We accept that answer.

THE COURT:  I don't see how we can answer it any other way.

MR. WACHTEL:  My problem, Your Honor, my problem with not giving the option to not answer is that

we may be driving them to a decision and that I don't think is our job at this point in time.

THE COURT: I don't either. But I don't think telling them that whatever their answers are to any question on the verdict form, the answers must be unanimous. Well, that doesn't tell them to do anything except their answers, whatever they are, have to be unanimous.

MR. WACHTEL: Well, to me, it is clear that what they want to know is what the hell do we do if we're not -- what do we put down on this if we are not unanimous? Do we write something down --

THE COURT: I don't think we want to get involved in that. These Defendants are entitled to unanimous verdicts, whatever they are; and if the jury says -- circles yes, they're guilty of Count 6, or one or the other of 'em is guilty, then the jury, to answer the other two questions, will have to be unanimous as to whether they possessed it or brandished it or whatever, discharged. I'm looking at you Joel.

MR. MANDELMAN: Yeah, I mean I'm just thinking about, about this, too. I know Mr. Wachtel suggested they could leave it blank and I do think if they can't -- no, I think that's -- they could, uhm --

THE COURT: Well, I'm very reluctant to tell

them they don't have to answer questions.  If they found -- if they find them not guilty, obviously, they don't have to answer them; but if -- we've told them in the verdict form if they find them guilty, either of them, they have to answer those.  And their answer has to be unanimous.

MR. MANDELMAN:  Yeah.

MR. SMITH:  Well, I mean, arguably, if they found them guilty -- let's say that this was a situation where we didn't submit the special findings.  I understand that we have; but, arguably, if the finding is guilty, they wouldn't have to make a decision on the special findings and it would just revert to the statutory minimum scheme under 924(c).

THE COURT:  Well, I know that; but we can't tell them that.

MR. WACHTEL:  Just for purposes of the record, Your Honor, it's my opinion that you are absolutely right.  My client is entitled to a unanimous yes or unanimous no.  But, due process says he's also entitled to no verdict at all.  That doesn't mean we have to come back.  And even if it does -- but -- so, just to sort of try to make my position on this as clear as I can for somebody who will look at this later.

MR. SMITH:  I guess what I'm --

THE COURT:  I'm not sure what your position is.

MR. WACHTEL:  My position is, Your Honor, they don't have to find yes; they don't have to find no. They can not reach a finding.

MR. SMITH:  I think that's true.  They could make the decision to not make a special finding.

THE COURT:  They could make a decision not to answer any of these questions.

MR. WACHTEL:  They certainly could if they're hung, Your Honor.

THE COURT:  That gets back to my point.  Any question they answer, has to be unanimous.

MR. WELCH:  And, Judge, I guess our position is they don't have to answer those questions.  It just goes to sentencing.  If they don't answer those questions, as Aaron says --

THE COURT:  We can't tell 'em that.  That's not what the verdict form says.

MR. WELCH:  Well, you say please answer the following questions; but, again, they're not required to answer those questions if they can't come to a --

THE COURT:  That's not what the verdict form says.

MR. WELCH:  I'm reading it.  If you find the

Defendant guilty as charged in Count 6, please answer the following questions.  It doesn't say -- you've asked them to.  It's not required under the law, Judge, that they answer the question.

THE COURT:  Then we, you know, we should have -- I should have been smart enough to think about this and to have a crystal ball up here --

MR. SMITH:  I guess --

THE COURT:  -- you know, to have a crystal ball that the jury might ask a question like this and then we wouldn't put these on here with the understanding that if either Defendant was found guilty, they couldn't have their sentence enhanced.

MR. WACHTEL:  We could have done that.

THE COURT:  But we can't do it now.

MR. SMITH:  So, I was listening to your suggestion -- or what I interpreted as your suggestion, and I understand this is very subtle and possibly cleverly worded; but if Your Honor answered by saying any question that you do answer must have a unanimous decision, or must be unanimous.  It's a very subtly worded artful phrase, but --

THE COURT:  Nobody's ever accused me of being subtle or artful --

MR. WACHTEL:  There's a first time for

everything, Your Honor.

MR. SMITH:  October 17, 2013, Your Honor.

THE COURT:  I don't know -- but I think that we just have to tell 'em that whatever question they answer -- we don't tell 'em you must answer or you don't have to answer; but if you do answer, it has to be unanimous.

MR. WACHTEL:  I like that.

MR. MANDELMAN:  Just to give 'em a little bit -- if you answer, your decision must be unanimous.

MR. SMITH:  That is artful.

THE COURT:  All right.  I'll write something out here.

I don't want to sound insulting; but you don't suppose they don't understand what unanimous means, do you?

MR. SMITH:  I don't think that's the issue.

MR. WACHTEL:  Sometimes we think that our instructions are clear but we are writing them mostly for ourselves.  And I'm convinced the pattern instructions are written for us.

THE COURT:  Well, how does this sound?  Your answers to questions on the verdict forms, whatever they are, must reflect unanimous agreement of all jurors.

That doesn't tell them what to do other than be

unanimous.

MR. WELCH:  We would ask that you incorporate your initial language:  If you answer the question, it must be unanimous.  But what else you added, Judge, we have no objection to.

THE COURT:  Lanny, then they're going to go back there and they're going to say, oh, well, gosh, we don't have to answer this, we don't have to answer this.

MR. SMITH:  That's true.  We have no objection to your proposed answer.

THE COURT:  Val?

MR. WACHTEL:  I would not object if it had the word "if" in it where counsel has suggested that it be if you answer, your answer must be -- your answer, whatever it is, must be unanimous.

THE COURT:  Joel?

MR. MANDELMAN:  Yeah, I agree with Val.  Just say if you answer a question, it must be unanimous.

THE COURT:  Well, he said I ought to put "if" in there.

MR. WACHTEL:  If you answer.

MR. MANDELMAN:  If you answer a question, your decision must be unanimous.  I don't --

MR. SMITH:  Or any other finding you answer must be a unanimous decision.  Since we're really

referring to a special finding.

LAW CLERK MS. SILVA:  The problem is I don't think they know that the questions are special findings versus the other questions.  We haven't separated it out to special findings.

MR. HENRY:  They could read that the opposite way and --

LAW CLERK MS. SILVA:  Everything is special, right?

THE COURT:  Let's do this, because they haven't reached it yet, but it's going to come up on 9 which has the same thing.  So let's just say:  Your answers to questions 6 and 9 -- questions 6 and 9 on the verdict forms, whatever they are, must reflect unanimous agreement of all jurors.

MR. SMITH:  And 13 for Defendant Gonzalo Ramirez.

Your answers to the yes and no questions must be unanimous, what you've proposed.

LAW CLERK MS. SILVA:  You could say that your answers to the yes and no questions on the verdict form because there's a question on 3.

THE COURT:  Your answers to the yes or no questions on the verdict forms, whatever they are, must reflect the unanimous agreement of all jurors.  How

about that?

MR. SMITH:  No objection.

MR. WACHTEL:  I preferred my suggestion, Your Honor, and would stand by it; but I don't mind including the different counts.

THE COURT:  Okay.  She'll make copies of it for the record and for you all.

(Recess.)

(Beginning at 4:10 p.m. October 17, 2013, the following proceedings continued.)

(NOTE:  Pursuant to the Rules, Juror names have been replaced by their respective Juror Number.)

THE COURT:  Juror # 100574000 01-0045, I understand the jury has reached verdicts.

A    That's correct.

THE COURT:  All right.  Would you please hand the verdict forms to Mrs. Silva.

(Complies with request.)

THE COURT:  Defendants will rise to hear the reading of the verdicts.

LAW CLERK MS. SILVA:  We the jury, duly impaneled and sworn, upon our oaths, find Defendant

Pedro Garcia, guilty as charged in Count 1 of the Indictment.

If you find Defendant guilty as charged in Count 1, please list the two racketeering acts that Defendant agreed at least one person would commit.  Drug trafficking.  Aggravated assault.

Guilty as charged in Count 2 of the Indictment.

Guilty as charged in Count 3 of the Indictment.

If you find Defendant guilty as charged in Count 3, please state whether you determine the murder was first or second degree.  First degree.

Guilty as charged in Count 4 of the Indictment.

Guilty as charged in Count 5 of the Indictment.

Guilty as charged in Count 6 of the Indictment.

Do you find that Defendant discharged the firearm? Yes.

Do you find that Defendant possessed the firearm? Yes.

Guilty as charged in Count 7 of the Indictment.

Guilty as charged in Count 8 of the Indictment.

Guilty as charged in Count 9 of the Indictment.

Do you find that Defendant brandished the firearm? Yes.

Do you find that Defendant possessed the firearm? Yes.

Dated today's date and signed by the foreperson.

THE COURT:  Poll the jury.

LAW CLERK MS. SILVA:  Juror # 100574503 01-2029, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100576252 01-0138, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100574000 01-0045, was this and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100569417 01-0051, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100584020 01-0123, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100567963 01-0078, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100555287 01-0027, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100578682 01-0124, was that and is that your verdict?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

A   Yes.

LAW CLERK MS. SILVA:  Juror # 100576584 01-0213, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100569040 01-0095, was that and is that your verdict?

A   Yes.

LAW CLERK MS. SILVA:  Juror # 100590490 01-0200, was that and is that your verdict?

A   Yes.

LAW CLERK MS. SILVA:  Juror # 100555433 01-0197, was that and is that your verdict?

A   Yes.

LAW CLERK MS. SILVA:  We the jury, duly impaneled and sworn, upon our oaths, find Defendant Gonzalo Ramirez, guilty as charged in Count 1 of the Indictment.

Please list the two racketeering acts that Defendant agreed at least one person would commit.  Drug trafficking.  Aggravated assault.

Guilty as charged in Count 2 of the Indictment.

Guilty as charged in Count 3 of the Indictment.

Please state whether you determine the murder was first or second degree.  First degree.

Guilty as charged in Count 4 of the Indictment.

Guilty as charged in Count 5 of the Indictment.

Guilty as charged in Count 6 of the Indictment.

Do you find that Defendant discharged the firearm?

Yes.

Do you find that Defendant possessed the firearm?

Yes.

Guilty as charged in Count 7 of the Indictment.

Guilty as charged in Count 8 of the Indictment.

Guilty as charged in Count 9 of the Indictment.

Do you find that Defendant brandished the firearm?

Yes.

Do you find that Defendant possessed the firearm?

Yes.

Guilty as charged in Count 10 of the Indictment.

Guilty as charged in Count 11 of the Indictment.

Guilty as charged in Count 12 of the Indictment.

And guilty as charged in Count 13 of the Indictment.

Do you find that Defendant discharged the firearm?

Yes.

Do you find that Defendant possessed the firearm?

Yes.

Dated today's date and signed by the foreperson.

Juror # 100574503 01-0209, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:   Juror # 100576252 01-0138, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:   Juror # 100574000 01-0045, was that and is that your verdict?

A   Yes.

LAW CLERK MS. SILVA:   Juror # 100569417 01-0051, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:   Juror # 100584020 01-0123, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:   Juror # 100567963 01-0078, was that and is that your verdict?

A   Yes.

LAW CLERK MS. SILVA:   Juror # 100555287 01-0027, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:   Juror # 100578682 01-0124, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:   Juror # 100576584 01-0213, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100569040 01-0095, was that and is that your verdict?

A   Yes, ma'am.

LAW CLERK MS. SILVA:  Juror # 100590490 01-0200, was that and is that your verdict?

A   Yes.

LAW CLERK MS. SILVA:  Juror # 100555433 01-0197, was that and is that your verdict?

A   Yes, ma'am.

THE COURT:  Counsel satisfied with the poll of the jury?

MR. WACHTEL:  Yes, Your Honor.

MR. MANDELMAN:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  You may be seated.  Ladies and Gentlemen, thank you.  You may return to the jury room.

(Jury excused from the courtroom at 4:15 p.m.)

THE COURT:  All right.  We'll return the exhibits to the Government unless there's an objection.

MR. WACHTEL:  No, Your Honor.

MR. MANDELMAN:  Yeah, no, Your Honor.

THE COURT:  All right.  Of course, presentence reports will have to be prepared.  The Defendants will be sentenced on January 6.  Garcia at 10. Ramirez at

10:15.

MR. WACHTEL:  January 6, Your Honor.

THE COURT:  Yes.

MR. WACHTEL:  Thank you.

THE COURT:  If there's nothing further, we're in recess.

(Adjourned at 4:17 p.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 19th day of March, 2014.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS


UNITED STATES OF AMERICA,              )
                                       )
                             Plaintiff,) District Court
                                       ) Case No. 12-10089-02
vs.                                    ) Circuit Court
                                       ) Case No. 14-3006
PEDRO GARCIA,                          )
                             Defendant,)
                                       )
_____


**TRANSCRIPT OF SENTENCING**


     On the 6th day of January, 2014, came on to be heard **Sentencing** in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, Sitting in Wichita.


**APPEARANCES**

     The **Plaintiff** appeared by and through Mr. Lanny Welch and Mr. Aaron Smith;
     Defendant **Pedro Garcia** appeared in person and by and through Mr. Val Wachtel;

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 2804

(Beginning at 10:15 a.m. January 6, 2014, the following proceedings were held.)

THE COURT:  Next case is the Pedro Garcia case.  This is United States against Pedro Garcia.  Case number 12-10089-02.  Aaron Smith and Lanny Welch appear for the Government.  The Defendant is here with Val Wachtel.

There's one objection to the presentence report. I'll hear whatever you might want to say about that, Mr. Wachtel.

MR. WACHTEL:  I'd just stand on that objection, Your Honor.

THE COURT:  The Court's ruling on the Defendant's objection is that, to the extent the Defendant disputes evidence, that was resolved by the jury.  But the bottom line here is that the objections, the objection, doesn't have any impact on the sentence. So that's the Court's ruling on that objection.

Now, Mr. Garcia, have you had an opportunity to review the presentence report and discuss it with Mr. Wachtel?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Is there anything in the report that you want to change or correct?

DEFENDANT:  No.  No, Your Honor.

THE COURT:  And are you still satisfied with the way Mr. Wachtel has handled your case?

DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Well, I've read the Defendant's Sentencing Memorandum; and if you wish to make any comments about that --

MR. WACHTEL:  No, Your Honor.  I cannot make it any more clear than it is there.

THE COURT:  All right.  We've clarified the sentence.  The Defendant's total offense level is 43.  He has a criminal history category of 6.  Here's the Court's intended sentence, which I've clarified with Mr. Brewer, the probation officer.

Count 3 is life.  Counts 2 and 4, are 120 months each.  Counts 1, 5 and 7 are 240 months each.  Count 8 is 36 months.  My intention is to run Counts 2, 4 -- excuse me -- Counts 1, 2, 4, 5, 7 and 8 concurrent with Count 3.  Count 9 is seven years and it is to run consecutive to Counts 3 -- 1, 2, 4, 5, 7 and 8.  And then Count 6 is 25 and it runs consecutive to the other counts.  Now, did I correctly state that counsel?

MR. SMITH:  You did, Your Honor.

THE COURT:  Mr. Wachtel?

MR. WACHTEL:  Yes, Your Honor, you have.

THE COURT:  Now, that's the intended sentence of the Court.  Government have any comment with respect to that sentence?

MR. SMITH:  Your Honor, I think that that is the appropriate sentence in this case.  Your Honor, obviously, heard the trial and evidence which I believe supports the sentence that Your Honor has announced.  And the sentence that you've announced comports and complies with all relevant statutory and case law; and we would argue even based upon the arguments in the Sentencing Memorandum that that is the appropriate sentence.

THE COURT:  Mr. Wachtel?

MR. WACHTEL:  We don't have any comments about the sentence, Your Honor.  Other than to say, Your Honor has correctly stated the various sentences for the various counts.

THE COURT:  Right.  But do you have anything else you want to say with respect to that?

MR. WACHTEL:  No, sir.

THE COURT:  Mr. Garcia, do you have anything you wish to say?

DEFENDANT:  No, Your Honor.

THE COURT:  All right.  Now, the Court then finds that the presentence report is accurate and orders

its contents to be incorporated in the following sentence.  Count 3 is life.  Counts 2 and 4 are 120 months, each count, to run concurrently.  Counts 1, 5, and 7 are 240 months to run concurrently.  Count 8 is 36 months.  And Counts 1, 2, 4, 5, 7 and 8 run concurrent with Count 1.

MR. SMITH:  Count 3, Your Honor.

THE COURT:  Count 3.  Count 9 is 7, and it runs consecutive to all other counts.  Count 6 is 25 years and it runs consecutive to all other counts.  So what we're looking at, a controlling sentence of life plus 32 years.

MR. SMITH:  Yes, Your Honor.

THE COURT:  Correct?

MR. WACHTEL:  That is correctly calculated, Your Honor.

THE COURT:  All right.  Now, supervised release, Counts 1 through 7 and 9, three years, each count, to run concurrently; and Count 8, one year, to run concurrent with Counts 1 through 7 and 9.

No fine will be imposed.  Restitution is not applicable.  There's a special assessment of $900.  That's $100 per count.

Now let me turn to the conditions of supervision.  The mandatory condition of supervision is that he shall

refrain from any unlawful use of a controlled substance; submit to drug tests within 15 days of commencing supervision and at least two periodic drug tests thereafter, all as directed by the probation office. He's to cooperate in the collection of DNA as directed. Special conditions:  He's to successfully participate in and successfully complete an approved program for substance abuse as directed by the probation office.  He shall not use alcohol.  He shall not be a member of any street gang or participate in any gang related activities or associate with gang members.

There's also a condition, Mr. Garcia, that relates to monitoring and basically I don't think that -- let's assume that that won't apply in your case; but if it does for some reason, rather than read this into the record, unless Mr. Wachtel wants me to, you'll have to comply with whatever monitoring requirements would be placed on you by the probation office at that time because by that time, if you're ever on supervision, the monitoring probably will be different.  So, as fast as electronic monitoring changes.

You shall submit your person, house, residence, vehicles, papers, business or place of employment or any property under your control to a search by the probation office.  You're prohibited from possessing or purchasing

a firearm, ammunition, destructive device or other dangerous weapon.

Of course, voluntary surrender is denied.

And this case, the sentence in this case, runs consecutive to the sentence in case number 10-CR 10021, which is a case in this court.

I'm not going to advise you of your right to appeal beyond telling you that there was a trial in this case. My guess would be that you want to appeal.

DEFENDANT:  Yes, Your Honor.

THE COURT:  And you have every right to appeal.  Mr. Wachtel knows what to do about that and he'll file a notice of appeal for you.  Do you have any questions?

DEFENDANT:  No, Your Honor.

THE COURT:  All right.  Thank you.  You're excused.

(Adjourned at 10:25 a.m.)

(Beginning at 2:30 p.m. January 6, 2014, the following proceedings continued.)

THE COURT:  We're back on the record now in the Garcia and Ramirez cases.  Everyone who was here before is here with the exception of Mr. Welch.

What happened was that after I completed the sentencing hearings today, I was concerned that I had not explained the reasons for my sentences.  And I caught Mr. Henry and mentioned it to him.  It's my view -- and I'm going to cite some cases momentarily -- that Count 3 carries a life sentence, that it's not a matter of discretion for me to impose less than a life sentence.  I know what Mr. Mandleman asked; but as a practical matter, I don't think the law supports that.  But, if -- and I wanted to look at some case law on it before I made up my mind -- but if it was discretionary, if I could sentence up to life but didn't have to sentence life on Count 3, that I should state my reasons, because I didn't state any reasons.  Nobody argued anything really that would require me to state my reasons.  So I wanted to give counsel an opportunity to take a look at the law and if the law says that I can sentence less than life on Count 3 as to either Defendant, I'll consider that.

What's the Government's position?

MR. SMITH:  Your Honor, we believe that the sentence is a mandatory minimum of life; and, essentially, we went to the cases that counsel has cited.  The Second Circuit case is the *James* case, and I believe it reads:  1959(a)(1) carries a mandatory

minimum sentence of life in prison.  This is the *James* case that is cited in the Defendant's Sentencing Memorandum.  And the Ninth Circuit case is *Rollness*, which is also cited in the Defendant's Sentencing Memorandum, that reads:  Accordingly, we join the Second and DC Circuits in holding that 1959(a)(1) imposes a minimum sentence of life imprisonment for VICAR murder. That is the crime for which these two Defendants were adjudged guilty.  Your Honor, I'm not mentioning the DC Circuit case.  It was 45 pages long and I didn't want to print it out since I have these other two cases, and I would say that --

THE COURT:  Well, I've got it up here and I've got another case so --

MR. SMITH:  I would say there's not a Supreme Court case or a Tenth Circuit case that is in contradiction to these Ninth Circuit and Second Circuit cases; and so, therefore, I believe the law is it is a mandatory sentence of life.  Your Honor doesn't have the discretion or need to give reasons for that life sentence.

THE COURT:  Mr. Wachtel.

MR. WACHTEL:  I think Joel is volunteering to go next, Your Honor.  I'm sorry.

MR. MANDELMAN:  I did cite those cases and

that's the authority that I found out there.  The Tenth Circuit hasn't had the opportunity, I think, to address this issue.  And it's peculiar, but the statute is in fact quite -- it's not ambiguous in our opinion.  It is clear.  It does use the word "or" and we think Congress, when they draft a statute like this, they know what or means.  And I defer to Congress in this instance.  And I think that the Court has discretion to impose a sentence of up to life based on the plain language of the statute.

MR. WACHTEL:  That's exactly our position, Your Honor.  It seems to me that or means or.  It doesn't mean and.  And even Congress that doesn't do anything, surely knows the difference between the meaning of "and" and "or".  So I'll join Mr. Mandleman.

THE COURT:  I'm sure they do.  I'm sure that Congress knows it.  I'm just being facetious and this is not the time to be facetious.

MR. WACHTEL:  Yes, Your Honor.

THE COURT:  The point here is, though, that no case has been cited; and I know that if there was a case, you all would have found it, that says what Joel wants me to do.  In addition -- well, let's start here. United States V Flores, 572 F. 3rd 1254, at 1268, an Eleventh Circuit case in 2009.  Life sentences are

expressly permitted for RICO conspiracy and are required for VICAR murder.  That's at Page 1268.  The long case that was mentioned, *U.S. vs. Mahdi*, which is at 598 F. 3rd 883, at 897.  That's the DC Circuit case.  VICAR requires a minimum sentence of life for the murder of Curtis Hattley, see 18 U.S.C. Section 1959(a)(1).  And then the two cases that you're already aware of, *United States V Rollness*, 561 Fed. 3rd 996, a Ninth Circuit case; and *United States against James* and others, 239 Fed. 3rd 120, which is a Second Circuit case.

I believe that a life sentence is required in this case and I think it's an appropriate sentence as well; but I didn't see any reason to beat these two men over the head with a long recitation of what they did and why I'm giving them a sentence which I believe to be a sentence I'm required to give them.  And I know there's going to be an appeal.  I certainly anticipate that. And if I'm wrong and the Tenth Circuit says, gentlemen, that I should have sat here and told you how reprehensible your conduct was and why a life sentence is appropriate, then they'll have no hesitation to send it back and I'll take it up at the time.  Do we have any questions here?

MR. MANDELMAN:  No, Your Honor.

MR. WACHTEL:  No, Your Honor.  Thank you.

Appellate Case: 14-3006   Document: 23-2   Date Filed: 04/01/2014   Page: 2814

THE COURT:  All right.  Thank you for coming back.

MR. MANDELMAN:  Thank you, Judge.

(Adjourned at 2:40 p.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 19th day of March, 2014.


s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter